**DENTONS US LLP**

Tania M. Moyron (*pro hac vice* pending)
Van C. Durrer, II (*pro hac vice* pending)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:  tania.moyron@dentons.com
        van.durrer@dentons.com

John D. Beck (*pro hac vice* pending)
Sarah M. Schrag (*pro hac vice* pending)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:  john.beck@dentons.com
        sarah.schrag@dentons.com

*Proposed Counsel for Debtors and
Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Amanda C. Glaubach (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  altogut@teamtogut.com
        aglaubach@teamtogut.com
        eblander@teamtogut.com

*Proposed Counsel for Debtors and
Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re:<br>Powin, LLC, *et al.*,[1]<br><br>　　　　　Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered)<br><br>**Hearing Date: June 24, 2025 at 10:00 a.m. E.T.** |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504], (iii) PEOS Holdings, LLC [5476], (iv) Powin China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [15241], (vii) Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [2495], and (ix) Powin Energy Operating, LLC [6487]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

**NOTICE OF AMENDED MOTION OF THE DEBTORS FOR
ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING THE DEBTORS TO
OBTAIN POSTPETITION OPERATIONAL CASH FLOW FINANCING; (II) GRANTING
LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS;
(III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING A FINAL DIP HEARING;
AND (V) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that on June 9, 2025 and June 10, 2025 (collectively, the "Petition Date"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").

**PLEASE TAKE FURTHER NOTICE** that on June 21, 2025, the Debtors filed a *Motion of the Debtors for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; (IV) Scheduling a Final DIP Hearing; and (V) Granting Related Relief* [Docket No. 120] (the "Motion").[2]  A hearing via Zoom only to consider approval of the Motion on an interim basis has been scheduled for June 24, 2025 at 10:00 a.m. E.T. (the "Hearing"), or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have negotiated for better terms than those identified in the Motion, and are hereby amending the relief sought in the Motion (the "Amended Terms") as follows:

(a) the Debtors are substituting in FlexGen Power Systems, LLC as the new "DIP Lender";

(b) the newly negotiated applicable interest rate shall be equal to Term SOFR plus 4.00%, which is better than the applicable interest rate previously identified in the Motion;

(c) the newly negotiated DIP Facility Fees shall be

(i) An upfront fee equal to 2.00% of the DIP Facility Commitment, which shall be fully earned upon entry of the Interim DIP Financing Order (the "Commitment Fee"), but shall only become payable on the applicable Funding Milestone, in each case, in an amount equal to 2.00% of the DIP Facility Loans made available to the Borrowers on the date of such Funding Milestone (whether or not DIP Facility Loans are actually advanced to the Borrowers on such date), and which fees shall be payable in kind; *provided that any* unpaid portion of the Commitment Fee shall become automatically payable on the Termination Date (as defined below); and

(ii) A fee equal to 2.00% of the DIP Facility Commitment, which shall be fully earned upon entry of the Interim DIP Financing Order (the "DIP Exit Fee", and together with the Commitment Fee, the "DIP Facility Fees"), but shall only become payable on the date DIP Facility Loans are actually advanced to the Borrowers, in each case, in an amount equal to 2.00% of the DIP Facility Loans actually advanced to the Borrowers on such date, and which fees shall be payable in kind,

which are better than the DIP Facility Fees previously identified in the Motion; and

(d) an additional $5 million of scheduled borrowings will be available to the Debtors sooner as part of the Initial Advance.

---

[2] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

Except for the foregoing improved Amended Terms, the relief in the Motion is substantially the same as is on file with the Court. A clean, executed version of the Amended Terms is attached hereto as **Exhibit A**, with a redline version of the Amended Terms attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that parties wishing to appear at the Hearing must register with the Court by submitting an e-mail to Chambers (chambers_of_mbk@njb.uscourts.gov) indicating the name of the person appearing, their e-mail address, their affiliation, and whom they represent/interest in this case. If the request is approved, the participant will receive appropriate credentials and further instruction. Telephonic information for observational purposes can be found on the page on the Court's website devoted to the *Powin, LLC, et al.*, bankruptcy case: https://www.njb.uscourts.gov/powin.

**PLEASE TAKE FURTHER NOTICE** that written objections, if any, to the relief requested in the Motion on an interim basis shall: (a) be in writing; (b) state with particularity the basis of the objection; and (c) be filed with the Clerk of the Bankruptcy Court electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002 (the "General Order") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and shall be served on such parties in accordance with the General Order and the Supplemental Commentary, so as to be actually received no later than the Hearing. Oral objections may be presented at the Hearing.

**PLEASE TAKE FURTHER NOTICE THAT YOUR RIGHTS MAY BE AFFECTED. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. If you do not have an attorney, you may wish to consult one.**

**PLEASE TAKE FURTHER NOTICE** that a copy of the Motion, and any related filings, can be viewed and/or obtained by: (i) accessing the Bankruptcy Court's Website for a fee, (ii) visiting the website for the Debtors' chapter 11 cases at: https://www.veritaglobal.net/powin or (iii) by contacting the Office of the Clerk of the United States Bankruptcy Court, District of New Jersey. Please note that a PACER password is required to access documents on the Bankruptcy Court's Website.

*[Signature Page Follows]*

Dated: June 23, 2025

**TOGUT, SEGAL & SEGAL LLP**

*/s/ Frank A. Oswald*
Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Amanda C. Glaubach (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  altogut@teamtogut.com
        aglaubach@teamtogut.com
        eblander@teamtogut.com

- and -

**DENTONS US LLP**

Tania M. Moyron (*pro hac vice* pending)
Van C. Durrer, II (*pro hac vice* pending)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:  tania.moyron@dentons.com
        van.durrer@dentons.com

John D. Beck (*pro hac vice* pending)
Sarah M. Schrag (*pro hac vice* pending)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:  john.beck@dentons.com
        sarah.schrag@dentons.com

*Proposed Counsel for Debtors and
Debtors in Possession*

## Exhibit A

**(Executed Amended Terms)**

**POWIN, LLC**

**Term Sheet**
**Secured Superpriority Debtor in Possession Financing**

**June {●}, 2025**

This term sheet (together with the exhibits hereto, the "***Term Sheet***") describes the principal terms and conditions on which FlexGen Power Systems, LLC (the "***DIP Lender***") will make a secured term loan facility (the "***DIP Facility***"), junior only to certain existing liens as agreed to by the DIP Lender, available to the Borrowers, in their capacity as debtors-in-possession in the chapter 11 cases being jointly administered under the case caption *In re Powin, LLC, et al.*, Case No. 25-16137 (MBK) (the "***Chapter 11 Cases***"), which cases are currently pending in the United States Bankruptcy Court for the District of New Jersey (the "***Bankruptcy Court***").[1]

This Term Sheet shall be a binding agreement from and after, and subject to, the entry of the Interim DIP Financing Order with respect to the DIP Facility Loans but does not purport to summarize all of the terms, conditions, representations, and other provisions with respect to the DIP Facility, which will be set forth in the DIP Documents. The effectiveness of this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein. In the event of any conflict between this Term Sheet and the terms of the Interim DIP Financing Order or the Final DIP Financing Order, the terms of the Interim DIP Financing Order or the Final DIP Financing Order (as applicable) shall govern.

| | |
|---|---|
| **Borrowers:** | (i) Powin Project LLC; (ii) Powin, LLC; (iii) PEOS Holdings, LLC; (iv) Powin China Holdings 1, LLC; (v) Powin China Holdings 2, LLC; (vi) Charger Holdings, LLC; (vii) Powin Energy Ontario Storage, LLC; (viii) Powin Energy Operating Holdings, LLC; and (ix) Powin Energy Operating, LLC (collectively, the "***Borrowers***"). |
| **DIP Lender:** | FlexGen Power Systems, LLC |
| **DIP Facility:** | The DIP Lender will provide to the Borrowers a secured superpriority debtor-in-possession credit facility (the "***DIP Facility***") consisting of a delayed draw term loan facility in the aggregate principal amount of up to $27.5 million (the "***DIP Facility Commitment***," and the portion thereof drawn by the Borrowers, the "***DIP Facility Loans***").<br><br>Advances under the DIP Facility shall be made available to the Borrowers, subject to the additional terms and conditions set forth in this Term Sheet, as follows (each, a "***Funding Milestone***"):<br><br>(i)  $10 million upon entry of the Interim DIP Financing Order (the "***Initial Advance***");<br><br>(ii)  $5 million upon entry of the Final DIP Financing Order; |

---

[1] Capitalized terms used but not defined in these introductory paragraphs have the meanings ascribed to such terms in the summary of terms and conditions set forth in the grid below.

|  | |
|---|---|
|  | (iii)  $7.5 million on August 4, 2025 (and subject to entry of the Final DIP Financing Order); and |
|  | (iv)  $5.0 million on August 4, 2025 (and subject to entry of the Final DIP Financing Order); *provided, however,* that the available amount of such advance shall be reduced by (i) $4 million to the extent the stalking horse bidder in connection with a Sale (as defined below) of the Borrowers' assets agrees to assume the employment agreements of substantially all of Borrowers' employees as part of the Sale, and (ii) $1 million to the extent the stalking horse bidder in connection with a Sale of the Borrowers' assets agrees to purchase substantially all of the Borrowers' inventory as part of the Sale. |
|  | Pending the entry of the Final DIP Financing Order, the DIP Lender shall be afforded all of the protections contained in the Interim DIP Financing Order. |
| **Use of Proceeds:** | The proceeds of the DIP Facility may only be used in accordance with the Approved Budget and the applicable DIP Financing Order. |
| **DIP Facility Interest Rate** | The DIP Facility Loans shall accrue interest at a rate per annum based on a 360-day year equal to Term SOFR plus 4.00%. All accrued interest on the DIP Facility Loans shall be paid in kind monthly on the first day of the month following the Initial Advance. "***Term SOFR***" shall mean, with respect to any interest period, the forward-looking term rate based on the secured overnight financing rate published by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) on the day that is two business days prior to the first day of such interest period. If such rate is not available for any reason, Term SOFR shall be determined by the DIP Lender in its reasonable discretion, acting in good faith and in a manner consistent with market practice. During the continuance of an Event of Default (as defined below), any amounts outstanding under the DIP Facility will bear interest at an additional 2.00% per annum based on a 360-day year, and any such additional interest accruing upon the continuance of an Event of Default shall be payable in kind on the earlier of demand by the DIP Lender and the next interest payment date. |
| **Fees** | As a material inducement to the DIP Lender to make the DIP Facility Loans, the Borrowers shall pay the DIP Lender the following fees: |
|  | (i)  An upfront fee equal to 2.00% of the DIP Facility Commitment, which shall be fully earned upon entry of the Interim DIP Financing Order (the "***Commitment Fee***"), but shall only become payable on the applicable Funding Milestone, in each case, in an amount equal to 2.00% of the DIP Facility Loans made available to the Borrowers on the date of such Funding Milestone (whether or not DIP Facility Loans are actually advanced to the Borrowers on such date), and which fees shall be payable in kind; *provided that* any unpaid portion of the Commitment Fee shall become automatically payable on the Termination Date (as defined below); and |

2

| | |
|---|---|
| | (ii) A fee equal to 2.00% of the DIP Facility Commitment, which shall be fully earned upon entry of the Interim DIP Financing Order (the "***DIP Exit Fee***", and together with the Commitment Fee, the "***DIP Facility Fees***"), but shall only become payable on the date DIP Facility Loans are actually advanced to the Borrowers, in each case, in an amount equal to 2.00% of the DIP Facility Loans actually advanced to the Borrowers on such date, and which fees shall be payable in kind.<br><br>Once earned, the DIP Facility Fees shall be added to the principal amount of the DIP Loans and shall thereafter be treated as principal for all purposes under the DIP Facility, including the accrual of interest thereon at the non- default and default rates set forth above. |
| **Prepetition Secured Obligations** | (i) *Prepetition Credit Agreement.* Pursuant to that certain Loan Agreement, dated as of October 1, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "***Prepetition Credit Agreement***," and together with all other agreements, documents, instruments and certificates executed or delivered in connection therewith, including, without limitation, the Loan Documents (as defined in the Prepetition Credit Agreement), collectively, the "***Prepetition Loan Documents***"), by and among Powin Energy Intermediate LLC, as the Parent Pledgor (the "***Parent Pledgor***"), Powin, LLC, as the Borrower (the "***Prepetition Borrower***"), the subsidiary guarantors party thereto (the "***Subsidiary Guarantors***" and, together with the Parent Pledgor and Prepetition Borrower, the "***Prepetition Loan Parties***"), GLAS USA LLC, as the administrative agent and collateral agent (in such capacity, the "***Prepetition Agent***"), and the lenders party thereto (collectively, the "***Prepetition Lenders***" and, together with the Prepetition Agent, the "***Prepetition Secured Parties***"), the Prepetition Lenders provided Loans (as defined in the Prepetition Credit Agreement) to the Prepetition Borrower.<br><br>(ii) *Prepetition Guaranty.* Pursuant to Section 10 of the Prepetition Credit Agreement, the Parent Pledgor and the Subsidiary Guarantors guaranteed, on a joint and several basis, all of the Prepetition Secured Obligations (as defined below).<br><br>(iii) *Prepetition Loan Obligations.* As of June 9, 2025 (the "***Petition Date***"), the Prepetition Loan Parties were indebted and liable to the Prepetition Secured Parties in the outstanding principal amount of not less than $25,612,281.51 plus certain reimbursement obligations, fees, costs, expenses (including, without limitation, certain attorneys' fees and related fees, charges and disbursements), indemnification obligations, and any other amounts, contingent or otherwise, whenever arising or accruing, that may be due, owing or chargeable in respect thereof, in each case, to the extent provided in the Prepetition Loan Documents (as reduced by any payments received by the Prepetition Secured Parties during the Chapter 11 Cases to reduce such obligations, collectively, the "***Prepetition Secured Obligations***"). |

3

| | |
|---|---|
| | (iv) *Prepetition Liens*. Pursuant to the Security Documents (as defined in the Prepetition Credit Agreement), each of the Prepetition Loan Parties granted to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders liens on and security interests in (the "***Prepetition Liens***") all Collateral (as defined in the Prepetition Credit Agreement) (collectively, the "***Prepetition Collateral***"). |
| **Superpriority Administrative Expense Claims** | All amounts owing by the Borrowers under the DIP Facility (the "***DIP Obligations***") at all times will constitute allowed superpriority administrative expense claims in the Chapter 11 Cases, having priority over all claims and administrative expense claims against the Borrowers, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 361, 364(c)(1), 365, 503(a), 503(b), 506(c) (subject to entry of the Final DIP Order granting such relief), 507(a), 507(b), 546(c), 1113, 1114, or any other provisions of the Bankruptcy Code and any other claims against the Borrowers (the "***DIP Superpriority Claims***"); *provided, however*, that the DIP Superpriority Claims shall be subject to the Carve-Out and junior and subordinate in all respects to any administrative expense claims granted as Adequate Protection Obligations (as defined below) to the Prepetition Secured Parties. |
| **Collateral** | All of the DIP Obligations shall be secured by the following (collectively, the "***DIP Liens***"): |
| | (i) pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, first priority, fully perfected security interests in and liens on all of the Borrowers' rights in property of the Borrowers' estates as of the Petition Date that, as of the Petition Date, were unencumbered (and do not become perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), including, subject to and upon entry of the Final DIP Financing Order, the proceeds of any claims and Causes of Action under chapter 5 of the Bankruptcy Code of the Borrowers or their estates (all of the foregoing property, collectively, the "***Unencumbered Property***"), in all cases subject and subordinate only to the Carve-Out and any security interests and liens granted as Adequate Protection Obligations; and |
| | (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, fully perfected security interests in and liens on all of the Borrowers' rights in property of the Borrowers' estates that are subject to valid, perfected, and non-avoidable liens that (x) were in existence immediately prior to the Petition Date, including the Prepetition Liens granted to the Prepetition Secured Parties, or (y) were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and including (z) any security interests and liens granted as Adequate Protection Obligations (as defined below) (collectively, the "***Permitted Prior Liens***"), which security interests and liens shall be junior and subordinate only to such Permitted Prior Liens (for so long as the obligations secured by such liens remain |

4

|  | outstanding) and the Carve-Out (such collateral, collectively with the Unencumbered Property, the "***DIP Collateral***").<br><br>All liens authorized and granted pursuant to the DIP Financing Orders entered by the Bankruptcy Court approving the DIP Facility shall be deemed effective and perfected, and no further filing, notice or act will be required to effect such perfection.<br><br>The DIP Lender shall be permitted, but not required, to make any filings, deliver any notices, make recordations, perform any searches or take any other acts as may be desirable under state law in order to reflect the security, perfection or priority of the DIP Lender's claims described herein.<br><br>For purposes of this Term Sheet: "***Causes of Action***" means any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, and license of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Closing Date, in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction law, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or similar local, state, or federal U.S. or non U.S. law; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of title 11 of the United States Code; (e) any state or foreign law pertaining to actual or constructive fraudulent transfer, fraudulent conveyance, and (f) any "lender liability" or equitable subordination claims or defenses. |
|---|---|
| **Adequate Protection:** | Pursuant to and in accordance with the interim order authorizing Borrowers use of the cash collateral of the Prepetition Secured Parties [Docket No. 68] (the "***Interim Cash Collateral Order***"), and subject to the final order with respect to the use of such collateral (such order, together with the Interim Cash Collateral Order, the "***Cash Collateral Orders***"), the Prepetition Secured Parties have been granted certain adequate protection liens, claims and other entitlements with respect to the potential diminution in value of their interests in the Prepetition Collateral (such liens, claims and entitlements, as provided and set forth in the Cash Collateral Orders, the "***Adequate Protection Obligations***"). |
| **Carve-Out** | The DIP Liens and the DIP Superpriority Claims shall, in all instances, be subject and subordinate to prior payment of the Carve-Out. The "***Carve-Out***" |

US-DOCS\160919079.5

means proceeds of any DIP Collateral used to pay only: (i) unpaid fees and expenses required to be paid by the Borrowers to the Clerk of the Court or to the Office of the United States Trustee under 28 U.S.C. § 1930(a)(6); (ii) reasonable fees and expenses incurred by a trustee in any Successor Case under section 726(b) of the Bankruptcy Code in an aggregate cumulative amount not to exceed $25,000; (iii) to the extent allowed by the Court at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by persons or firms retained by the Borrowers pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "*Debtor Professionals*") and permitted by the Approved Budget (the "*Allowed Professional Fees*") at any time before the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined below) (the "*Pre-Carve-Out Professional Fees*"); and (iv) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $250,000 in the aggregate incurred on or after the first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice (the amounts set forth in this clause (iv) being the "*Post-Carve-Out Trigger Notice Cap*").

For purposes of the foregoing, "*Carve-Out Trigger Notice*" shall mean a written notice delivered by email (or other electronic means) or in writing by the DIP Lender to the Borrowers, their lead restructuring counsel, and the U.S. Trustee (collectively, the "*Carve-Out Notice Parties*"), which notice may be delivered following the Maturity Date or the occurrence and during the continuation of an Event of Default and acceleration of the obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

Prior to the Maturity Date, and so long as a Carve-Out Trigger Notice has not been delivered, the Borrowers shall be authorized to direct funds to a segregated designated professional fee trust account (the "*Professional Fee Account*") in the amount equal to, but not to exceed, previously incurred fees for the Debtor Professionals permitted by the Approved Budget (the "*Budgeted Estate Professional Expenses*"). Except for permitting funding the Carve-Out from the DIP Collateral, the DIP Lender shall have no responsibility, liability, or obligation whatsoever to fund, direct payment or reimbursement of any fees or disbursements, or otherwise ensure that the Borrowers fund the Professional Fee Account or that the Professional Fee Account has funds equal to the aggregate amount of Budgeted Estate Professional Expenses for any applicable period. The Borrowers may fund the Professional Fee Account on a weekly basis in an amount up to, but not to exceed, the Budgeted Estate Professional Expenses for that week. Such funds shall be held in an identifiable segregated account for the benefit of the Debtor Professionals to be applied to the Allowed Professional Fees of the Debtor Professionals. Any Allowed Professional Fees shall be paid first out of the Professional Fee Account. Any excess amounts in the Professional Fee Account after payment of the Allowed Professional Fees shall be subject in all respects to the DIP Liens.

For the avoidance of doubt, the delivery and effectiveness of a Carve-Out Trigger Notice shall not limit or impair the Borrowers' right to use funds in the Professional Fee Account to pay Allowed Professional Fees. Once all payments

6

| | |
|---|---|
| | are made from the Professional Fee Account after the Court rules on final fee applications, any remaining amounts shall be returned to the DIP Lender. |
| **Closing Date:** | The first business date on which the Conditions to Closing (as defined below) shall have been satisfied and the making of the Initial Advance shall have occurred (the "***Closing Date***"). |
| **Conditions to Closing:** | The closing of the DIP Facility will be subject to the satisfaction of all conditions precedent to be set forth in this Term Sheet deemed necessary or appropriate by the DIP Lender (collectively, the "***Conditions to Closing***"), including but not limited to: |
| | (i)  no later than two days prior to the filing of the motion seeking authorization for the Borrowers to enter into the DIP Facility (the "***DIP Motion***"), the DIP Lender shall have received a cash forecast for the period from the filing of the DIP Motion through the following 8-weeks setting forth projected cash flows and disbursements that is acceptable to the DIP Lender (the "***Initial Approved Budget***"); |
| | (ii)  other than as set forth herein, the Borrowers shall not have executed, entered into or otherwise committed to any plan or restructuring support agreement or any other agreement or understanding concerning the terms of a sale of assets, chapter 11 plan, or other exit strategy without the consent of the DIP Lender; |
| | (iii)  an interim debtor-in-possession financing order, substantially on the terms contemplated in this Term Sheet and acceptable to the DIP Lender in its sole and exclusive discretion (the "***Interim DIP Financing Order***"), shall have been entered by the Bankruptcy Court on or before June 24, 2025, and shall not have been vacated, reversed, or stayed, appealed, or modified or amended without the prior written consent of the DIP Lender; |
| | (iv)  reimbursement in full in cash of the DIP Lender's reasonable and documented out-of-pocket costs and expenses; and |
| | (v)  such other deliverables as the DIP Lender may reasonably require. |
| | Modification of the DIP Financing Orders shall require the consent of the DIP Lender, in its sole and exclusive discretion. DIP Lender may, in its sole discretion, waive any of the above conditions precedent other than the conditions precedent regarding entry of the Initial DIP Financing Order. |
| **Conditions Precedent to DIP Facility Loans:** | The obligations of the DIP Lender to make any DIP Facility Loan will be subject to conditions precedent customarily found in loan documents for similar debtor-in-possession financings, including, but not limited to: |
| | (i)  the Conditions to Closing shall have been satisfied; |
| | (ii)  with regard to all DIP Facility Loans other than the Initial Advance, (y) a definitive credit agreement (the "***DIP Credit Agreement***") and |

7

|  | related security agreement(s), security documents, and other agreements, instruments and documents required by the DIP Lender (collectively, and together with the DIP Credit Agreement, the "***DIP Documents***") shall have been executed and delivered by the Borrowers to the DIP Lender, in form and substance acceptable to the DIP Lender in its sole and exclusive discretion, and (z) entry of a final debtor-in-possession financing order, substantially on the terms contemplated by this Term Sheet and in form and substance acceptable to the DIP Lender in its sole and exclusive discretion (the "***Final DIP Financing Order***," together with the Interim Order, collectively, the "***DIP Financing Orders***"), which shall not have been vacated, reversed or stayed, appealed (and for which the appeal period has expired or has been waived), or modified or amended without the prior written consent of the DIP Lender; |
|---|---|
|  | (iii)   the Borrowers shall be in compliance with the terms of the Interim DIP Financing Order or the Final DIP Financing Order, as applicable; |
|  | (iv)   the Approved Budget shall demonstrate a need for the funds to be advanced under the DIP Facility and the Borrowers shall have delivered at least three business days prior to the applicable draw date (or such shorter period as the DIP Lender may agree in its sole and exclusive discretion) a borrowing notice to the DIP Lender; |
|  | (v)   the Debtor shall have provided a certificate confirming that all of the representations and warranties of the Borrowers in this Term Sheet or the DIP Documents, as applicable, remain true and correct, unless otherwise agreed by the DIP Lender; |
|  | (vi)   there shall be no defaults or Events of Default under the terms of this Term Sheet or the DIP Documents, as applicable, or any defaults or Events of Default shall have been waived by the DIP Lender; and |
|  | (vii)   the Borrowers shall be in compliance with the Milestones (as set forth below). |
|  | With the exception of the conditions related to entry of the Interim DIP Financing Order and Final DIP Financing Order, DIP Lender may, in its sole and exclusive discretion, waive any of the above conditions precedent. |
| **Milestones:** | Each of the Borrowers will agree to comply with the following deadlines (each of which may be extended or waived with the prior written consent of the DIP Lender, which may be by e-mail, without further order of the Bankruptcy Court) (collectively, the "***Milestones***"): |
|  | (i)   The Bankruptcy Court shall have entered the Interim DIP Financing Order by no later than June 24, 2025. |
|  | (ii)   The Bankruptcy Court shall have entered the Final DIP Financing Order by no later than July 15, 2025. |

US-DOCS\160919079.5

|  | (iii) | The Borrowers shall file, by June 27, 2025, a motion to sell all or substantially all of the Debtors' assets through a sale pursuant to section 363 of the Bankruptcy Code (the "**Sale**"), which motion shall be in form and substance acceptable to the DIP Lender (the "**Sale Motion**"). |
|  | (iv) | The Bankruptcy Court shall have entered an order approving the bidding procedures contemplated by the Sale Motion by July 15, 2025. |
|  | (v) | The Bankruptcy Court shall have entered an order approving the Sale by no later than August 8, 2025, and such order shall be in form and substance acceptable to the DIP Lender in its sole and exclusive discretion. |
|  | (vi) | The Sale shall be consummated, and the Prepetition Secured Obligations shall be paid off in full, by no later than August 11, 2025. |
|  | | The extension of any Milestone is subject to the consent of the DIP Lender at its sole discretion. For the avoidance of doubt, the DIP Lender reserves the right to amend the dates set forth for each of the Milestones in a proposed Final DIP Financing Order to be filed with the Court before any such hearing to consider entry of the Final DIP Financing Order (the "**Final DIP Hearing**"). |
| **Representations and Warranties:** | | The DIP Documents will contain representations and warranties customary for debtor-in-possession facilities of this size, type, and purpose. |
| **Mandatory Prepayments:** | | Until the DIP Facility has been repaid in full, and subject to the Carve-Out, the following mandatory prepayments will be required to be made (unless waived in the sole and exclusive discretion of the DIP Lender) toward the DIP Facility within three (3) business days of receipt by any Borrower: (i) 100% of any net cash proceeds from any asset disposition; (ii) 100% of any proceeds received (x) under any insurance policy on account of the damage or destruction of any assets or property of any Borrower and (y) due to any taking or condemnation of any assets or property; (iii) 100% of the net cash proceeds of the incurrence or issuance of any indebtedness or equity by any Borrower; *provided that* no Borrower shall incur or issue any additional postpetition superpriority indebtedness or liens unless such amount shall be sufficient to prepay the DIP Facility in cash in full; (iv) 100% of any proceeds received or any cash received by or paid to or for the account of any Borrower not in the ordinary course of business, including but not limited to tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments (other than casualty and condemnation event proceeds) and (v) the consummation of the Sale. |
| **Reporting and Information:** | | Reporting requirements usual and customary for financings of this type, including, without limitation, the requirement that the Borrowers provide the DIP Lender, with reasonable promptness, such information regarding the operations, business affairs, and financial condition of the Borrowers as the DIP Lender may reasonably request in writing from time to time. |
| **Budget; Variance Covenant; Other** | | The Borrowers shall prepare for the DIP Lender's review and approval an 8-week detailed rolling cash projection similar in form to the 8-week cash |

9

| | |
|---|---|
| **Financing Covenants:** | projection attached hereto as __Exhibit A__ (the "***Initial Approved Budget***"), which shall be thereafter updated, as necessary (each, a "***Proposed Budget***," together with the Initial Approval Budget, the "***Budget***").

Upon the Borrowers' receipt of the DIP Lender's approval (in its sole and exclusive discretion, and in writing, with e-mail notice being sufficient) of a Proposed Budget, such budget shall become an "***Approved Budget***" and shall replace the then-operative Approved Budget for all purposes.

The Initial Approved Budget shall be the Approved Budget until such time as a new Proposed Budget is approved, following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved. The Borrowers shall operate in accordance with the Approved Budget and all disbursements shall be consistent with the provisions of the Approved Budget (subject to the Permitted Disbursement Variance (as defined below)). The Borrowers may submit additional Proposed Budgets to the DIP Lender, but until the DIP Lender approves such Proposed Budget in writing, it shall not become an Approved Budget and the Borrowers shall continue to comply with the then-operative Approved Budget.

Subject to the schedule below, and beginning on June 30, 2025, (the "***Initial Reporting Date***, and with each subsequent Monday, collectively and individually, each a "***Reporting Date***"), the Borrowers shall deliver to the DIP Lender, in a form consistent with the form of the Approved Budget, a variance report describing in reasonable detail, by line item (including capital expenditures and professional fees, excluding the fees of Lender's professionals), (i) the actual disbursements of the Borrowers and actual receipts during the applicable Testing Period (as defined below); (ii) any variance (whether positive or negative, expressed as a percentage) between the actual disbursements during such Testing Period against the estimated disbursements for the applicable Testing Period, as set forth in the applicable Approved Budget (each a "***Variance Report***"); and (iii) comments relating to any variances between budgeted and actual disbursements (the "***FA Reports***").

As used herein, "***Testing Period***" shall mean the cumulative period from the beginning date of the Approved Budget through the Sunday that is eight calendar days prior to the applicable Reporting Date. The last day of each Testing Period shall be a "***Testing Date***".

As of any applicable Testing Date, actual cumulative disbursements (excluding DIP Lender professional fees) on an aggregate basis (the "***Actual Disbursement Variance***") shall not exceed budgeted cumulative disbursements (excluding DIP Lender professional fees) on an aggregate basis as reflected in the Approved Budget for such period, by more than 15% (the "***Permitted Disbursement Variance***"). Any overperformance of the Approved Budget may be used to increase the amount held in the reserve line item for the Borrowers' wind down expenses.

If the Actual Disbursement Variance for such period is less than or equal to the Permitted Disbursement Variances, the amount by which each Actual Disbursement Variance is less than the Permitted Disbursement Variance shall |

10

| | |
|---|---|
| | be carried forward to the next Testing Date and added to the Permitted Disbursement Variance for such next Testing Date.<br><br>The Borrowers shall be deemed to be in compliance with the Approved Budget for all purposes under this Term Sheet and the DIP Financing Orders unless, as of any Testing Date, the Borrowers' actual disbursements vary from the Approved Budget by more than the applicable Permitted Disbursement Variance as measured on any Testing Date (the "***Variance Covenant***").<br><br>The DIP Lender and the financial advisor for the Borrowers shall hold weekly calls to discuss the Budget and relevant portions of the Chapter 11 Cases, including actual performance against the Approved Budget, status of the Sale process, and receive a business update.<br><br>DIP Lender may, in its sole and exclusive discretion, waive or extend any of the foregoing Approved Budget or Variance reporting or approval procedures, provided such procedure change is not more onerous or otherwise adverse to the Borrower. |
| **Affirmative Covenants:** | The DIP Documents will contain affirmative covenants customary for debtor-in-possession facilities of this size, type and purpose including, but not limited, to the following as reasonably determined by the DIP Lender:<br><br>(i)    Compliance with the Milestones.<br><br>(ii)    The Borrowers shall at all times, (a) comply with the DIP Financing Orders and each other order entered by the Bankruptcy Court in the Chapter 11 Cases and all applicable laws, rules and regulations, and (b) comply with the Approved Budget, subject to the Permitted Disbursement Variance.<br><br>(iii)    Compliance with the Approved Budget, including delivery of each Proposed Budget and Variance Report.<br><br>(iv)    Borrowers agree to provide the DIP Lender and its counsel with draft copies of all material motions, applications, supporting papers and notices prepared by any Borrower (including forms of orders and notices to interested parties) relating to the assumption and assignment of any executory contract or unexpired lease, or otherwise relating to the transactions contemplated by the Sale not later than two business days prior to filing.<br><br>(v)    Borrowers shall during normal business hours and without interruption of operations: (a) afford DIP Lender and its Representatives (as defined below) full and free access to and the right to inspect and appraise all of the properties, assets, premises, bank accounts, books and records, contracts and other documents and data related to the assets of the Borrowers; and (b) furnish the DIP Lender and its Representatives with such financial, operating and other data and information related to such assets as the DIP Lender or any of its Representatives may reasonably request. DIP Lender and its Representatives shall be entitled to meet |

| | |
|---|---|
| | with key personnel as requested. For purposes hereof, "***Representatives***" shall mean any person or persons designated from time to time by the DIP Lender.<br><br>(vi) Except as consented to in writing by DIP Lenders, Borrowers shall conduct, and/or shall instruct its management to conduct, operations in the ordinary course of business consistent with past practice, *provided, however*, that Borrowers (i) may continue to implement the LTSA Program as defined in the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Enter Into New Customer Program with Existing Customers and (II) Granting Related Relief* [Docket No. 15]; and (ii) shall not grant "IP access" to any customers unless contractually obligated to do so.<br><br>DIP Lender may, in its sole and exclusive discretion, waive any of the above affirmative covenants. |
| **Negative Covenants:** | The DIP Documents will contain negative covenants customary for debtor-in-possession facilities of this size, type and purpose including, but not limited to, the following as reasonably determined by the DIP Lender:<br><br>(i) The Borrowers will not seek any other debtor-in-possession financing with liens senior or *pari passu* to the DIP Lender's liens during the pendency of its bankruptcy proceedings.<br><br>(ii) The Borrowers shall not use any funds or the proceeds of the DIP Facility in a manner or for a purpose other than in accordance the Approved Budget, or on such other terms as the DIP Lender may agree.<br><br>(iii) Without the prior written consent of the DIP Lender, the Borrowers will not sell, lease or otherwise transfer or dispose of any material assets of the Borrowers, other than in the ordinary course of business, or otherwise in accordance with the Approved Budget.<br><br>(iv) The Borrowers shall not open any new deposit or securities accounts; *provided however*, the Borrowers may open deposit or securities accounts if such account is pledged to the DIP Lender and the DIP Lender has received an account control agreement in form and substance reasonably acceptable to the DIP Lender.<br><br>(v) No Borrower shall do, cause to be done, and agree to do or cause to be done any of the following: (a) create, incur, assume or permit to exist any indebtedness or liens, other than in respect of the DIP Facility, Prepetition Loan Documents, or Adequate Protection Obligations; (b) purchase, hold, or acquire (including pursuant to any merger, consolidation or amalgamation with a person that is not a wholly owned subsidiary immediately prior to such merger, consolidation or amalgamation) any equity interests, evidences of indebtedness or other securities of, make or permit to exist any loans or advances to or guarantees of the obligations of, or make or permit to exist any investment or any other interest in any other person other than the |

US-DOCS\160919079.5

|  | subsidiaries of the Borrowers as of the petition date; (c) merge into, or consolidate or amalgamate with, any other person, or permit any other person to merge into or consolidate with it, or sell, transfer, license, lease or otherwise dispose of (in one transaction or in a series of transactions) all or any part of its assets, or issue, sell, transfer or otherwise dispose of any equity interests of any Borrower or any subsidiary of any Borrower, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other person or any division, unit or business of any other person, other than (i) asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the DIP Lender in its reasonable discretion or is otherwise in accordance with the Approved Budget, (ii) asset sales in the ordinary course of business and consistent with past practice and (iii) dispositions of obsolete, worn out, used or surplus property in the ordinary course of business and consistent with past practice; (d) incur or make any dividend or distribution (whether in cash, property, securities or otherwise), investment, loan or other payment without the prior written consent of the DIP Lender, other than as expressly contemplated under the Approved Budget; (e) modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) its organizational documents, except as required by the Bankruptcy Code or a plan of reorganization and otherwise acceptable to the DIP Lender; (f) subject to the DIP Lender's discretion, not to be unreasonably withheld, assume or reject any executory contract or unexpired lease; (g) engage in any activities that would result in any Borrower becoming an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940; or (h) transfer any cash or cash equivalents that constitute DIP Collateral to a subsidiary of any Borrower without the prior written approval of the DIP Lender (other than as expressly contemplated under the Approved Budget). |
|---|---|
|  | (vi)  Such additional covenants as the DIP Lender and the Borrowers may agree. |
|  | DIP Lender may, in its sole and exclusive discretion, waive any of the above negative covenants. |
| **Events of Default:** | "***Events of Default***" under the DIP Facility shall contain events of default usual and customary for debtor-in-possession facilities of this size, type and purpose including, but not limited to, the following as determined by the DIP Lender: |
|  | (i)  the Interim DIP Financing Order at any time ceases to be in full force and effect, or shall be vacated, reversed, or stayed, or modified or amended, or shall not have been entered on or before June 24, 2025; |
|  | (ii)  the Final DIP Financing Order at any time ceases to be in full force and effect, or shall be vacated, reversed, or stayed, modified or amended, or shall not have been entered on or before July 17, 2025; |

13

|  | (iii) | failure of the Borrowers to comply in any material respect with the terms of the applicable DIP Financing Order and such failure shall remain unremedied for more than five (5) business days after receipt by the Debtors, any Committees appointed in these cases, and the U.S. Trustee of written notice thereof; |
|  | (iv) | the failure of any Borrower to (a) comply with the Variance Covenant, (b) have an Approved Budget; (c) comply with any negative covenant or certain other customary affirmative covenants in the Term Sheet or with any other covenant or agreement contained in the DIP Financing Orders or DIP Documents in any respect or (d) comply with any other covenant or agreement contained in this Term Sheet subject, in the case of the foregoing clause (d), to a grace period of two business days; |
|  | (v) | other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget to the extent authorized by one or more "first day" orders or other orders reasonably satisfactory to the DIP Lender, any Borrower shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables; |
|  | (vi) | (a) any of the Chapter 11 Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; (b) a Chapter 11 trustee or an examiner (other than a fee examiner) with enlarged powers relating to the operation of the business of any Borrower (powers beyond those expressly set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed; (c) any other superpriority claim or grant of any other lien (including any adequate protection lien) other than as provided for herein which is *pari passu* with or senior to the claims and liens of the DIP Lender shall be granted in any of the Chapter 11 Cases; or (d) the filing of any pleading by any Borrower seeking or otherwise consenting to or supporting any of the matters set forth in clause (a) through clause (c) of this subsection (vi); |
|  | (vii) | except for an order granting the currently pending Expedited Motion of Applied Surety Underwriters, Siriuspoint America Insurance Company and Pennsylvania Insurance Company for Relief from the Automatic Stay with Respect to Customs Bond [Docket No. 85], the Bankruptcy Court shall enter one or more orders during the pendency of the Chapter 11 Cases granting relief from the automatic stay to the holder or holders of any lien evidencing indebtedness in excess of $150,000 to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on assets of any Borrower; |
|  | (viii) | the Borrowers petition the Bankruptcy Court to obtain additional financing *pari passu* or senior to the DIP Facility; |
|  | (ix) | the Borrowers' "exclusive period" under section 1121 of the Bankruptcy Code for the filing of a plan of reorganization terminates; |

14

|  | (x) | the consummation of a sale of any material portion of the DIP Collateral without the DIP Lender's prior written consent (other than through the contemplated Sale or a sale in the ordinary course of business that is contemplated by the Approved Budget); |
|  | (xi) | any Borrower (A) engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the liens on or security interest in the assets of the Borrowers securing the DIP Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing such indebtedness or (B) engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the DIP Lender; |
|  | (xii) | the entry of an order by the Bankruptcy Court in favor of any statutory committee appointed in these Cases by the U.S. Trustee (each, a "***Committee***"), any ad hoc committee, or any other party in interest, (i) sustaining an objection to claims of the DIP Lender, or (ii) avoiding any liens held by the DIP Lender; |
|  | (xiii) | the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against any of the DIP Collateral; |
|  | (xiv) | the inaccuracy in any material respect of any representation of any Borrower when made or deemed made; |
|  | (xv) | the failure to meet any Milestone; |
|  | (xvi) | entry of an order by the Bankruptcy Court in favor of any Committee, any ad hoc committee, or any other party in interest, (i) granting such party standing to pursue any claims against the DIP Lender, (ii) sustaining an objection to claims of the DIP Lender, or (iii) avoiding any liens held by the DIP Lender; and |
|  | (xvii) | the Termination Date (as defined below) shall have occurred. |
| **Remedies:** | Upon the occurrence and during the continuance of any Event of Default, and without further application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time: | |
|  | (i) | issue a written notice (the "***Remedies Notice***") (which may be by e-mail) to the Borrowers and their counsel, counsel for any Committee, and the U.S. Trustee (the "***Remedies Notice Parties***") declaring the occurrence of the Termination Date (as defined below); |
|  | (ii) | issue a Carve-Out Trigger Notice (as defined below); |

15

| | |
|---|---|
| | (iii)  declare all DIP Obligations to be immediately due and payable without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Borrowers; |
| | (iv)  declare the suspension or termination of the DIP Facility as to any further liability or obligation of the DIP Lender thereunder, but without affecting the DIP Liens or DIP Obligations (the "***Termination Notice***"); and |
| | (v)  charge the default rate of interest under the DIP Facility. |
| | During the five business days immediately following the date the DIP Lender delivers a Remedies Notice to the Remedies Notice Parties (the "***Remedies Notice Period***"), the DIP Lender and/or Borrowers may seek an emergency hearing (a "***Stay Relief Hearing***") to determine whether an Event of Default has occurred, and the filing of any such motion shall toll the Remedies Notice Period. In the event the Bankruptcy Court determines during a Stay Relief Hearing that an Event of Default has occurred, the Court may fashion an appropriate remedy, which may include the exercise of any and all rights available to the DIP Lender under this Term Sheet, the DIP Credit Agreement, the Interim DIP Financing Order, and/or the Final DIP Financing Order, as applicable. |
| | Upon expiration of the Remedies Notice Period, if a motion seeking emergency relief has not been filed or unless ordered otherwise by the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified without further order of the Bankruptcy Court to the extent necessary to permit the DIP Lender to exercise any and all remedies against the DIP Collateral permitted under state law. |
| **Maturity/Termination Date:** | The DIP Facility shall automatically terminate without further notice or court proceedings on the earliest to occur of: |
| | (i)  August 8, 2025 (the "***Scheduled Maturity Date***"); |
| | (ii)  the date of termination of the commitments under the DIP Facility and/or acceleration of any outstanding borrowings under the DIP Facility, in each case, by the DIP Lender following the occurrence of an Event of Default and upon the delivery of a Termination Notice to the Remedies Notice Parties; |
| | (iii)  the first business day on which the Interim DIP Financing Order expires by its terms or is terminated, unless the Final DIP Financing Order has been entered and become effective prior thereto; |
| | (iv)  the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; |

16

|  | (v) the dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; or <br><br> (vi) the repayment in full in cash of all obligations and termination of all commitments under the DIP Facility <br><br> (each, a "***Termination Date***"), unless extended with the prior written consent (which may be by e-mail) of the DIP Lender. |
|---|---|
| **Credit Bidding:** | The Initial DIP Financing Order shall provide that the DIP Lender shall have the right to serve as the stalking horse bidder in connection with any sale or disposition of assets by the Borrowers in the Chapter 11 Cases and to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the DIP Obligations, in whole or in part, in connection with any sale or disposition of assets by the Borrowers in the Chapter 11 Cases and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code. |
| **Right of First Refusal** | The DIP Lender shall have a right of first refusal to act as the stalking horse bidder in connection with the Sale of the Borrowers' assets. |
| **Stalking Horse Requirements** | To the extent the DIP Lender elects not to serve as the stalking horse bidder in connection with the Sale, Borrowers shall have the right to select an alternative stalking horse bidder (an "***Alternative Stalking Horse***") and the DIP Lender shall have the continued right to credit bid the DIP Obligations in any auction. To be acceptable, any bid by an Alternative Stalking Horse must provide a reasonable offer representing the highest and best bid received by the Borrowers at the time the bid was made by the Alternative Stalking Horse, which bid shall be subject to the approval of the Bankruptcy Court and shall include funding for repayment of the DIP Obligations in full and allowed closing costs. |
| **DIP Facility Amendments:** | In order to amend, waive, or modify provisions related to this Term Sheet or any of the DIP Documents, the express written consent of the DIP Lender shall be required. |
| **Section 506(c) Waiver:** | The Final DIP Financing Order shall include a ruling that, except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender; and the Borrowers shall irrevocably waive and shall be prohibited from asserting any claim described in this paragraph, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral. |

| No Marshaling: | The Final DIP Financing Order shall provide that the DIP Lender may exercise all remedies available under this Term Sheet and the DIP Documents, as applicable, without any requirement first to look to exercise any of its or their rights against any particular collateral or party or to exhaust any remedies available to it or them against any particular collateral or party or to resort to any other source or means of obtaining payment of any of such obligations or to elect any other remedy. Subject to entry of the Final DIP Financing Order, in no event shall any of the DIP Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the collateral securing the DIP Facility Loans. |
|---|---|
| **Section 552(b):** | The Final DIP Financing Order shall provide that the DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, the "equities of the case" exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, rents, issues or profits of any of their collateral, and no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under section 552(b) of the Bankruptcy Code. <br><br> Furthermore, subject to entry of the Final DIP Financing Order, the Borrowers and their estates shall be deemed to have irrevocably waived and have agreed not to assert any claim or right under sections 552 or 726 of the Bankruptcy Code to avoid the imposition of the liens of the DIP Lender on any property acquired by any of the Borrowers or any of their estates or to seek to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Lender upon the DIP Collateral. |
| **Restrictions on Use of DIP Facility Loans:** | None of the Carve-Out, the DIP Facility Loans, or the DIP Collateral may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to, the DIP Facility, this Term Sheet, or the DIP Documents, or the security interests and liens securing any of the DIP Obligations, or to fund prosecution or assertion of any claims, or to otherwise litigate against the DIP Lender. |
| **Payment of Expenses:** | The reasonable and documented fees and out-of-pocket expenses incurred or accrued by the DIP Lender and its counsel, Latham & Watkins LLP, and any financial advisor retained by the DIP Lender in connection with the Chapter 11 Cases (the foregoing to include all unpaid reasonable and documented prepetition fees, out-of-pocket costs and expenses incurred by the DIP Lender in connection with the DIP Facility) in connection with any and all aspects of the Chapter 11 Cases shall be timely paid upon receipt of an invoice or other request for payment in accordance with the DIP Financing Orders. |
| **Indemnification:** | The Borrowers shall agree to indemnify and hold harmless the DIP Lender (solely in its capacity as DIP Lender) and its affiliates and each of their officers, directors, employees, agents, advisors, attorneys and representatives (each, an "***Indemnified Party***") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable and |

18

|  | documented fees and out-of-pocket expenses of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the DIP Facility, or any of transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Borrowers, any of their respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. |
|---|---|
| **Assignments** | The DIP Lender shall have the right, without the need for consent from any party, to assign all or a portion of its rights and obligations under this Term Sheet or the DIP Documents, as applicable, including all or a portion of its DIP Facility Commitments and the DIP Facility Loans at the time owing to it, to any person. |
| **Miscellaneous:** | This summary of terms and conditions does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions that would be contained in definitive credit documentation for the DIP Facility contemplated hereby, all of which shall be acceptable to the DIP Lender. |
| **Governing Law:** | The laws of the State of New York (excluding the laws applicable to conflicts or choice of law), except as governed by the Bankruptcy Code. |

US-DOCS\160919079.5

IN WITNESS WHEREOF, this Term Sheet is duly executed as of the date first set forth above.

**DIP LENDER**

FlexGen Power Systems, LLC

By: _____
Name: Kelcy Pegler
Title: CEO

**BORROWERS**

POWIN PROJECT LLC POWIN, LLC
PEOS HOLDINGS, LLC
POWIN CHINA HOLDINGS 1, LLC POWIN CHINA
HOLDINGS 2, LLC CHARGER HOLDINGS, LLC
POWIN ENERGY ONTARIO STORAGE, LLC
POWIN ENERGY OPERATING HOLDINGS, LLC
POWIN ENERGY OPERATING, LLC

By: _____
Name: Gerard Uzzi
Title: Authorized
Signatory

**<u>Exhibit B</u>**

**(Redline of Amended Terms)**

**POWIN, LLC**

**Term Sheet**
**Secured Superpriority Debtor in Possession Financing**

**June {●}, 2025**

This term sheet (together with the exhibits hereto, the "***Term Sheet***") describes the principal terms and conditions on which ~~private investment funds managed by Keyframe Capital Partners, L.P.~~**FlexGen Power Systems, LLC** (the "***DIP Lender***") will make a secured term loan facility (the "***DIP Facility***"), junior only to certain existing liens as agreed to by the DIP Lender, available to the Borrowers, in their capacity as debtors-in-possession in the chapter 11 cases being jointly administered under the case caption *In re Powin, LLC, et al.*, Case No. 25-16137 (MBK) (the "***Chapter 11 Cases***"), which cases are currently pending in the United States Bankruptcy Court for the District of New Jersey (the "***Bankruptcy Court***").[1]

This Term Sheet shall be a binding agreement from and after, and subject to, the entry of the Interim DIP Financing Order with respect to the DIP Facility Loans but does not purport to summarize all of the terms, conditions, representations, and other provisions with respect to the DIP Facility, which will be set forth in the DIP Documents. The effectiveness of this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein. In the event of any conflict between this Term Sheet and the terms of the Interim DIP Financing Order or the Final DIP Financing Order, the terms of the Interim DIP Financing Order or the Final DIP Financing Order (as applicable) shall govern.

| | |
|---|---|
| **Borrowers:** | (i) Powin Project LLC; (ii) Powin, LLC; (iii) PEOS Holdings, LLC; (iv) Powin China Holdings 1, LLC; (v) Powin China Holdings 2, LLC; (vi) Charger Holdings, LLC; (vii) Powin Energy Ontario Storage, LLC; (viii) Powin Energy Operating Holdings, LLC; and (ix) Powin Energy Operating, LLC (collectively, the "***Borrowers***"). |
| **DIP Lender:** | ~~Private investment funds managed by Keyframe Capital Partners, L.P.~~**FlexGen Power Systems, LLC** |
| **DIP Facility:** | The DIP Lender will provide to the Borrowers a secured superpriority debtor-in-possession credit facility (the "***DIP Facility***") consisting of a delayed draw term loan facility in the aggregate principal amount of up to $27.5 million (the "***DIP Facility Commitment***," and the portion thereof drawn by the Borrowers, the "***DIP Facility Loans***").<br><br>Advances under the DIP Facility shall be made available to the Borrowers, subject to the additional terms and conditions set forth in this Term Sheet, as follows (each, a "***Funding Milestone***"):<br><br>(i)    $~~5~~**10** million upon entry of the Interim DIP Financing Order (the "***Initial Advance***"); |

---

[1] Capitalized terms used but not defined in these introductory paragraphs have the meanings ascribed to such terms in the summary of terms and conditions set forth in the grid below.

| | |
|---|---|
| | (ii)    $~~10~~5 million upon entry of the Final DIP Financing Order; |
| | (iii)   $7.5 million on August 4, 2025 (and subject to entry of the Final DIP Financing Order); and |
| | (iv)   $5.0 million on August 4, 2025 (and subject to entry of the Final DIP Financing Order); *provided, however*, that the available amount of such advance shall be reduced by (i) $4 million to the extent the stalking horse bidder in connection with a Sale (as defined below) of the Borrowers' assets agrees to assume the employment agreements of substantially all of Borrowers' employees as part of the Sale, and (ii) $1 million to the extent the stalking horse bidder in connection with a Sale of the Borrowers' assets agrees to purchase substantially all of the Borrowers' inventory as part of the Sale. <br><br> Pending the entry of the Final DIP Financing Order, the DIP Lender shall be afforded all of the protections contained in the Interim DIP Financing Order. |
| **Use of Proceeds:** | The proceeds of the DIP Facility may only be used in accordance with the Approved Budget and the applicable DIP Financing Order. |
| **DIP Facility Interest Rate** | The DIP Facility Loans shall accrue interest at a rate per annum based on a 360-day year equal to Term SOFR plus ~~10.00~~4.00%. All accrued interest on the DIP Facility Loans shall be paid in kind monthly on the first day of the month following the Initial Advance. "***Term SOFR***" shall mean, with respect to any interest period, the forward-looking term rate based on the secured overnight financing rate published by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) on the day that is two business days prior to the first day of such interest period. If such rate is not available for any reason, Term SOFR shall be determined by the DIP Lender in its reasonable discretion, acting in good faith and in a manner consistent with market practice. <br><br> During the continuance of an Event of Default (as defined below), any amounts outstanding under the DIP Facility will bear interest at an additional 2.00% per annum based on a 360-day year, and any such additional interest accruing upon the continuance of an Event of Default shall be payable in kind on the earlier of demand by the DIP Lender and the next interest payment date. |
| **Fees** | As a material inducement to the DIP Lender to make the DIP Facility Loans, the Borrowers shall pay the DIP Lender the following fees: <br><br> (i)    An upfront fee equal to ~~4.00~~2.00% of the DIP Facility Commitment, which shall be fully earned upon entry of the Interim DIP Financing Order (the "***Commitment Fee***"), but shall only become payable on the applicable Funding Milestone, in each case, in an amount equal to ~~4.00~~2.00% of the DIP Facility Loans made available to the Borrowers on the date of such Funding Milestone (whether or not DIP Facility Loans are actually advanced to the Borrowers on such date), and which fees shall be payable in kind; *provided that* any |

2

|  | | unpaid portion of the Commitment Fee shall become automatically payable on the Termination Date (as defined below); and |
|  | (ii) | A fee equal to ~~4.00~~**2.00**% of the DIP Facility Commitment, which shall be fully earned upon entry of the Interim DIP Financing Order (the "***DIP Exit Fee***", and together with the Commitment Fee, the "***DIP Facility Fees***"), but shall only become payable on the date DIP Facility Loans are actually advanced to the Borrowers, in each case, in an amount equal to ~~4.00~~**2.00**% of the DIP Facility Loans actually advanced to the Borrowers on such date, and which fees shall be payable in kind. |
|  | | Once earned, the DIP Facility Fees shall be added to the principal amount of the DIP Loans and shall thereafter be treated as principal for all purposes under the DIP Facility, including the accrual of interest thereon at the non-default and default rates set forth above. |
| **Prepetition Secured Obligations** | (i) | *Prepetition Credit Agreement*. Pursuant to that certain Loan Agreement, dated as of October 1, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "***Prepetition Credit Agreement***," and together with all other agreements, documents, instruments and certificates executed or delivered in connection therewith, including, without limitation, the Loan Documents (as defined in the Prepetition Credit Agreement), collectively, the "***Prepetition Loan Documents***"), by and among Powin Energy Intermediate LLC, as the Parent Pledgor (the "***Parent Pledgor***"), Powin, LLC, as the Borrower (the "***Prepetition Borrower***"), the subsidiary guarantors party thereto (the "***Subsidiary Guarantors***" and, together with the Parent Pledgor and Prepetition Borrower, the "***Prepetition Loan Parties***"), GLAS USA LLC, as the administrative agent and collateral agent (in such capacity, the "***Prepetition Agent***"), and the lenders party thereto (collectively, the "***Prepetition Lenders***" and, together with the Prepetition Agent, the "***Prepetition Secured Parties***"), the Prepetition Lenders provided Loans (as defined in the Prepetition Credit Agreement) to the Prepetition Borrower. |
|  | (ii) | *Prepetition Guaranty.* Pursuant to Section 10 of the Prepetition Credit Agreement, the Parent Pledgor and the Subsidiary Guarantors guaranteed, on a joint and several basis, all of the Prepetition Secured Obligations (as defined below). |
|  | (iii) | *Prepetition Loan Obligations*. As of June 9, 2025 (the "***Petition Date***"), the Prepetition Loan Parties were indebted and liable to the Prepetition Secured Parties in the outstanding principal amount of not less than $25,612,281.51 plus certain reimbursement obligations, fees, costs, expenses (including, without limitation, certain attorneys' fees and related fees, charges and disbursements), indemnification obligations, and any other amounts, contingent or otherwise, whenever arising or accruing, that may be due, owing or chargeable in respect thereof, in each case, to the extent provided in the |

|  | Prepetition Loan Documents (as reduced by any payments received by the Prepetition Secured Parties during the Chapter 11 Cases to reduce such obligations, collectively, the "***Prepetition Secured Obligations***"). |
|---|---|
|  | (iv) *Prepetition Liens*. Pursuant to the Security Documents (as defined in the Prepetition Credit Agreement), each of the Prepetition Loan Parties granted to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders liens on and security interests in (the "***Prepetition Liens***") all Collateral (as defined in the Prepetition Credit Agreement) (collectively, the "***Prepetition Collateral***"). |
| **Superpriority Administrative Expense Claims** | All amounts owing by the Borrowers under the DIP Facility (the "***DIP Obligations***") at all times will constitute allowed superpriority administrative expense claims in the Chapter 11 Cases, having priority over all claims and administrative expense claims against the Borrowers, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 361, 364(c)(1), 365, 503(a), 503(b), 506(c) (subject to entry of the Final DIP Order granting such relief), 507(a), 507(b), 546(c), 1113, 1114, or any other provisions of the Bankruptcy Code and any other claims against the Borrowers (the "***DIP Superpriority Claims***"); *provided, however*, that the DIP Superpriority Claims shall be subject to the Carve-Out and junior and subordinate in all respects to any administrative expense claims granted as Adequate Protection Obligations (as defined below) to the Prepetition Secured Parties. |
| **Collateral** | All of the DIP Obligations shall be secured by the following (collectively, the "***DIP Liens***"): |
|  | (i) pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, first priority, fully perfected security interests in and liens on all of the Borrowers' rights in property of the Borrowers' estates as of the Petition Date that, as of the Petition Date, were unencumbered (and do not become perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), including, subject to and upon entry of the Final DIP Financing Order, the proceeds of any claims and Causes of Action under chapter 5 of the Bankruptcy Code of the Borrowers or their estates (all of the foregoing property, collectively, the "***Unencumbered Property***"), in all cases subject and subordinate only to the Carve-Out and any security interests and liens granted as Adequate Protection Obligations; and |
|  | (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, fully perfected security interests in and liens on all of the Borrowers' rights in property of the Borrowers' estates that are subject to valid, perfected, and non-avoidable liens that (x) were in existence immediately prior to the Petition Date, including the Prepetition Liens granted to the Prepetition Secured Parties, or (y) were perfected subsequent to the Petition Date as permitted by |

4

section 546(b) of the Bankruptcy Code, and including (z) any security interests and liens granted as Adequate Protection Obligations (as defined below) (collectively, the "***Permitted Prior Liens***"), which security interests and liens shall be junior and subordinate only to such Permitted Prior Liens (for so long as the obligations secured by such liens remain outstanding) and the Carve-Out (such collateral, collectively with the Unencumbered Property, the "***DIP Collateral***").

All liens authorized and granted pursuant to the DIP Financing Orders entered by the Bankruptcy Court approving the DIP Facility shall be deemed effective and perfected, and no further filing, notice or act will be required to effect such perfection.

The DIP Lender shall be permitted, but not required, to make any filings, deliver any notices, make recordations, perform any searches or take any other acts as may be desirable under state law in order to reflect the security, perfection or priority of the DIP Lender's claims described herein.

For purposes of this Term Sheet: "***Causes of Action***" means any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, and license of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Closing Date, in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction law, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or similar local, state, or federal U.S. or non U.S. law; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of title 11 of the United States Code; (e) any state or foreign law pertaining to actual or constructive fraudulent transfer, fraudulent conveyance, and (f) any "lender liability" or equitable subordination claims or defenses.

| | |
|---|---|
| **Adequate Protection:** | Pursuant to and in accordance with the interim order authorizing Borrowers use of the cash collateral of the Prepetition Secured Parties [Docket No. 68] (the "***Interim Cash Collateral Order***"), and subject to the final order with respect to the use of such collateral (such order, together with the Interim Cash Collateral Order, the "***Cash Collateral Orders***"), the Prepetition Secured Parties have been granted certain adequate protection liens, claims |

| | |
|---|---|
| | and other entitlements with respect to the potential diminution in value of their interests in the Prepetition Collateral (such liens, claims and entitlements, as provided and set forth in the Cash Collateral Orders, the "***Adequate Protection Obligations***"). |
| **Carve-Out** | The DIP Liens and the DIP Superpriority Claims shall, in all instances, be subject and subordinate to prior payment of the Carve-Out. The "***Carve-Out***" means proceeds of any DIP Collateral used to pay only: (i) unpaid fees and expenses required to be paid by the Borrowers to the Clerk of the Court or to the Office of the United States Trustee under 28 U.S.C. § 1930(a)(6); (ii) reasonable fees and expenses incurred by a trustee in any Successor Case under section 726(b) of the Bankruptcy Code in an aggregate cumulative amount not to exceed $25,000; (iii) to the extent allowed by the Court at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by persons or firms retained by the Borrowers pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") and permitted by the Approved Budget (the "***Allowed Professional Fees***") at any time before the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined below) (the "***Pre-Carve-Out Professional Fees***"); and (iv) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $250,000 in the aggregate incurred on or after the first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice (the amounts set forth in this clause (iv) being the "***Post-Carve-Out Trigger Notice Cap***").

For purposes of the foregoing, "***Carve-Out Trigger Notice***" shall mean a written notice delivered by email (or other electronic means) or in writing by the DIP Lender to the Borrowers, their lead restructuring counsel, and the U.S. Trustee (collectively, the "***Carve-Out Notice Parties***"), which notice may be delivered following the Maturity Date or the occurrence and during the continuation of an Event of Default and acceleration of the obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

Prior to the Maturity Date, and so long as a Carve-Out Trigger Notice has not been delivered, the Borrowers shall be authorized to direct funds to a segregated designated professional fee trust account (the "***Professional Fee Account***") in the amount equal to, but not to exceed, previously incurred fees for the Debtor Professionals permitted by the Approved Budget (the "***Budgeted Estate Professional Expenses***"). Except for permitting funding the Carve-Out from the DIP Collateral, the DIP Lender shall have no responsibility, liability, or obligation whatsoever to fund, direct payment or reimbursement of any fees or disbursements, or otherwise ensure that the Borrowers fund the Professional Fee Account or that the Professional Fee Account has funds equal to the aggregate amount of Budgeted Estate Professional Expenses for any applicable period. The Borrowers may fund the Professional Fee Account on a weekly basis in an amount up to, but not to exceed, the Budgeted Estate Professional Expenses for that week. Such funds shall be held in an identifiable segregated account for the benefit of the Debtor Professionals to be applied to the Allowed Professional Fees of the Debtor Professionals. Any Allowed Professional Fees shall be paid first out |

6

| | |
|---|---|
| | of the Professional Fee Account. Any excess amounts in the Professional Fee Account after payment of the Allowed Professional Fees shall be subject in all respects to the DIP Liens.<br><br>For the avoidance of doubt, the delivery and effectiveness of a Carve-Out Trigger Notice shall not limit or impair the Borrowers' right to use funds in the Professional Fee Account to pay Allowed Professional Fees. Once all payments are made from the Professional Fee Account after the Court rules on final fee applications, any remaining amounts shall be returned to the DIP Lender. |
| **Closing Date:** | The first business date on which the Conditions to Closing (as defined below) shall have been satisfied and the making of the Initial Advance shall have occurred (the "***Closing Date***"). |
| **Conditions to Closing:** | The closing of the DIP Facility will be subject to the satisfaction of all conditions precedent to be set forth in this Term Sheet deemed necessary or appropriate by the DIP Lender (collectively, the "***Conditions to Closing***"), including but not limited to:<br><br>(i) no later than two days prior to the filing of the motion seeking authorization for the Borrowers to enter into the DIP Facility (the "***DIP Motion***"), the DIP Lender shall have received a cash forecast for the period from the filing of the DIP Motion through the following 8-weeks setting forth projected cash flows and disbursements that is acceptable to the DIP Lender (the "***Initial Approved Budget***");<br><br>(ii) other than as set forth herein, the Borrowers shall not have executed, entered into or otherwise committed to any plan or restructuring support agreement or any other agreement or understanding concerning the terms of a sale of assets, chapter 11 plan, or other exit strategy without the consent of the DIP Lender;<br><br>(iii) an interim debtor-in-possession financing order, substantially on the terms contemplated in this Term Sheet and acceptable to the DIP Lender in its sole and exclusive discretion (the "***Interim DIP Financing Order***"), shall have been entered by the Bankruptcy Court on or before June 24, 2025, and shall not have been vacated, reversed, or stayed, appealed, or modified or amended without the prior written consent of the DIP Lender;<br><br>(iv) reimbursement in full in cash of the DIP Lender's reasonable and documented out-of-pocket costs and expenses; and<br><br>(v) such other deliverables as the DIP Lender may reasonably require.<br><br>Modification of the DIP Financing Orders shall require the consent of the DIP Lender, in its sole and exclusive discretion. DIP Lender may, in its sole discretion, waive any of the above conditions precedent other than the |

US-DOCS\160919079.1160919079.5

| | |
|---|---|
| | conditions precedent regarding entry of the Initial DIP Financing Order. |
| **Conditions Precedent to DIP Facility Loans:** | The obligations of the DIP Lender to make any DIP Facility Loan will be subject to conditions precedent customarily found in loan documents for similar debtor-in-possession financings, including, but not limited to:<br><br>(i)   the Conditions to Closing shall have been satisfied;<br><br>(ii)   with regard to all DIP Facility Loans other than the Initial Advance, (y) a definitive credit agreement (the "***DIP Credit Agreement***") and related security agreement(s), security documents, and other agreements, instruments and documents required by the DIP Lender (collectively, and together with the DIP Credit Agreement, the "***DIP Documents***") shall have been executed and delivered by the Borrowers to the DIP Lender, in form and substance acceptable to the DIP Lender in its sole and exclusive discretion, and (z) entry of a final debtor-in-possession financing order, substantially on the terms contemplated by this Term Sheet and in form and substance acceptable to the DIP Lender in its sole and exclusive discretion (the "***Final DIP Financing Order***," together with the Interim Order, collectively, the "***DIP Financing Orders***"), which shall not have been vacated, reversed or stayed, appealed (and for which the appeal period has expired or has been waived), or modified or amended without the prior written consent of the DIP Lender;<br><br>(iii)   the Borrowers shall be in compliance with the terms of the Interim DIP Financing Order or the Final DIP Financing Order, as applicable;<br><br>(iv)   the Approved Budget shall demonstrate a need for the funds to be advanced under the DIP Facility and the Borrowers shall have delivered at least three business days prior to the applicable draw date (or such shorter period as the DIP Lender may agree in its sole and exclusive discretion) a borrowing notice to the DIP Lender;<br><br>(v)   the Debtor shall have provided a certificate confirming that all of the representations and warranties of the Borrowers in this Term Sheet or the DIP Documents, as applicable, remain true and correct, unless otherwise agreed by the DIP Lender;<br><br>(vi)   there shall be no defaults or Events of Default under the terms of this Term Sheet or the DIP Documents, as applicable, or any defaults or Events of Default shall have been waived by the DIP Lender; and<br><br>(vii)   the Borrowers shall be in compliance with the Milestones (as set forth below).<br><br>With the exception of the conditions related to entry of the Interim DIP Financing Order and Final DIP Financing Order, DIP Lender may, in its sole and exclusive discretion, waive any of the above conditions precedent. |

| | |
|---|---|
| **Milestones:** | Each of the Borrowers will agree to comply with the following deadlines (each of which may be extended or waived with the prior written consent of the DIP Lender, which may be by e-mail, without further order of the Bankruptcy Court) (collectively, the "***Milestones***"):

(i)    The Bankruptcy Court shall have entered the Interim DIP Financing Order by no later than June 24, 2025.

(ii)    The Bankruptcy Court shall have entered the Final DIP Financing Order by no later than July 15, 2025.

(iii)    The Borrowers shall file, by June 27, 2025, a motion to sell all or substantially all of the Debtors' assets through a sale pursuant to section 363 of the Bankruptcy Code (the "***Sale***"), which motion shall be in form and substance acceptable to the DIP Lender (the "***Sale Motion***").

(iv)    The Bankruptcy Court shall have entered an order approving the bidding procedures contemplated by the Sale Motion by July 15, 2025.

(v)    The Bankruptcy Court shall have entered an order approving the Sale by no later than August 8, 2025, and such order shall be in form and substance acceptable to the DIP Lender in its sole and exclusive discretion.

(vi)    The Sale shall be consummated, and the Prepetition Secured Obligations shall be paid off in full, by no later than August 11, 2025.

The extension of any Milestone is subject to the consent of the DIP Lender at its sole discretion. For the avoidance of doubt, the DIP Lender reserves the right to amend the dates set forth for each of the Milestones in a proposed Final DIP Financing Order to be filed with the Court before any such hearing to consider entry of the Final DIP Financing Order (the "***Final DIP Hearing***"). |
| **Representations and Warranties:** | The DIP Documents will contain representations and warranties customary for debtor-in-possession facilities of this size, type, and purpose. |
| **Mandatory Prepayments:** | Until the DIP Facility has been repaid in full, and subject to the Carve-Out, the following mandatory prepayments will be required to be made (unless waived in the sole and exclusive discretion of the DIP Lender) toward the DIP Facility within three (3) business days of receipt by any Borrower: (i) 100% of any net cash proceeds from any asset disposition; (ii) 100% of any proceeds received (x) under any insurance policy on account of the damage or destruction of any assets or property of any Borrower and (y) due to any taking or condemnation of any assets or property; (iii) 100% of the net cash proceeds of the incurrence or issuance of any indebtedness or equity by any Borrower; *provided that* no Borrower shall incur or issue any additional postpetition superpriority indebtedness or liens unless such amount shall be sufficient to prepay the DIP Facility in cash in full; (iv) 100% of any |

| | |
|---|---|
| | proceeds received or any cash received by or paid to or for the account of any Borrower not in the ordinary course of business, including but not limited to tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments (other than casualty and condemnation event proceeds) and (v) the consummation of the Sale. |
| **Reporting and Information:** | Reporting requirements usual and customary for financings of this type, including, without limitation, the requirement that the Borrowers provide the DIP Lender, with reasonable promptness, such information regarding the operations, business affairs, and financial condition of the Borrowers as the DIP Lender may reasonably request in writing from time to time. |
| **Budget; Variance Covenant; Other Financing Covenants:** | The Borrowers shall prepare for the DIP Lender's review and approval an 8-week detailed rolling cash projection similar in form to the 8-week cash projection attached hereto as **Exhibit A** (the "***Initial Approved Budget***"), which shall be thereafter updated, as necessary~~, not later than June 20, 2025~~ (each, a "***Proposed Budget***," together with the Initial Approval Budget, the "***Budget***").

Upon the Borrowers' receipt of the DIP Lender's approval (in its sole and exclusive discretion, and in writing, with e-mail notice being sufficient) of a Proposed Budget, such budget shall become an "***Approved Budget***" and shall replace the then-operative Approved Budget for all purposes.

The Initial Approved Budget shall be the Approved Budget until such time as a new Proposed Budget is approved, following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved. The Borrowers shall operate in accordance with the Approved Budget and all disbursements shall be consistent with the provisions of the Approved Budget (subject to the Permitted Disbursement Variance (as defined below)). The Borrowers may submit additional Proposed Budgets to the DIP Lender, but until the DIP Lender approves such Proposed Budget in writing, it shall not become an Approved Budget and the Borrowers shall continue to comply with the then-operative Approved Budget.

Subject to the schedule below, and beginning on ~~July~~**June** 30, 2025, (the "***Initial Reporting Date***, and with each subsequent Monday, collectively and individually, each a "***Reporting Date***"), the Borrowers shall deliver to the DIP Lender, in a form consistent with the form of the Approved Budget, a variance report describing in reasonable detail, by line item (including capital expenditures and professional fees, excluding the fees of Lender's professionals), (i) the actual disbursements of the Borrowers and actual receipts during the applicable Testing Period (as defined below); (ii) any variance (whether positive or negative, expressed as a percentage) between the actual disbursements during such Testing Period against the estimated disbursements for the applicable Testing Period, as set forth in the applicable Approved Budget (each a "***Variance Report***"); and (iii) comments relating to any variances between budgeted and actual disbursements (the "***FA Reports***").

As used herein, "***Testing Period***" shall mean the cumulative period from the |

10

|  | beginning date of the Approved Budget through the Sunday that is eight calendar days prior to the applicable Reporting Date. The last day of each Testing Period shall be a "***Testing Date***". |
|---|---|
|  | As of any applicable Testing Date, actual cumulative disbursements (excluding DIP Lender professional fees) on an aggregate basis (the "***Actual Disbursement Variance***") shall not exceed budgeted cumulative disbursements (excluding DIP Lender professional fees) on an aggregate basis as reflected in the Approved Budget for such period, by more than 15% (the "***Permitted Disbursement Variance***"). Any overperformance of the Approved Budget may be used to increase the amount held in the reserve line item for the Borrowers' wind down expenses. |
|  | If the Actual Disbursement Variance for such period is less than or equal to the Permitted Disbursement Variances, the amount by which each Actual Disbursement Variance is less than the Permitted Disbursement Variance shall be carried forward to the next Testing Date and added to the Permitted Disbursement Variance for such next Testing Date. |
|  | The Borrowers shall be deemed to be in compliance with the Approved Budget for all purposes under this Term Sheet and the DIP Financing Orders unless, as of any Testing Date, the Borrowers' actual disbursements vary from the Approved Budget by more than the applicable Permitted Disbursement Variance as measured on any Testing Date (the "***Variance Covenant***"). |
|  | The DIP Lender and the financial advisor for the Borrowers shall hold weekly calls to discuss the Budget and relevant portions of the Chapter 11 Cases, including actual performance against the Approved Budget, status of the Sale process, and receive a business update. |
|  | DIP Lender may, in its sole and exclusive discretion, waive or extend any of the foregoing Approved Budget or Variance reporting or approval procedures, provided such procedure change is not more onerous or otherwise adverse to the Borrower. |
| **Affirmative Covenants:** | The DIP Documents will contain affirmative covenants customary for debtor-in-possession facilities of this size, type and purpose including, but not limited, to the following as reasonably determined by the DIP Lender:<br><br>(i)    Compliance with the Milestones.<br><br>(ii)    The Borrowers shall at all times, (a) comply with the DIP Financing Orders and each other order entered by the Bankruptcy Court in the Chapter 11 Cases and all applicable laws, rules and regulations, and (b) comply with the Approved Budget, subject to the Permitted Disbursement Variance.<br><br>(iii)    Compliance with the Approved Budget, including delivery of each Proposed Budget and Variance Report. |

11

|  | |
|---|---|
|  | (iv)  Borrowers agree to provide the DIP Lender and its counsel with draft copies of all material motions, applications, supporting papers and notices prepared by any Borrower (including forms of orders and notices to interested parties) relating to the assumption and assignment of any executory contract or unexpired lease, or otherwise relating to the transactions contemplated by the Sale not later than two business days prior to filing. |
|  | (v)  Borrowers shall during normal business hours and without interruption of operations: (a) afford DIP Lender and its Representatives (as defined below) full and free access to and the right to inspect and appraise all of the properties, assets, premises, bank accounts, books and records, contracts and other documents and data related to the assets of the Borrowers; and (b) furnish the DIP Lender and its Representatives with such financial, operating and other data and information related to such assets as the DIP Lender or any of its Representatives may reasonably request. DIP Lender and its Representatives shall be entitled to meet with key personnel as requested. For purposes hereof, "***Representatives***" shall mean any person or persons designated from time to time by the DIP Lender. |
|  | (vi)  Except as consented to in writing by DIP Lenders, Borrowers shall conduct, and/or shall instruct its management to conduct, operations in the ordinary course of business consistent with past practice, *provided, however,* that Borrowers (i) may continue to implement the LTSA Program as defined in the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Enter Into New Customer Program with Existing Customers and (II) Granting Related Relief* [Docket No. 15]; and (ii) shall not grant "IP access" to any customers unless contractually obligated to do so. |
|  | DIP Lender may, in its sole and exclusive discretion, waive any of the above affirmative covenants. |
| **Negative Covenants:** | The DIP Documents will contain negative covenants customary for debtor-in-possession facilities of this size, type and purpose including, but not limited to, the following as reasonably determined by the DIP Lender: |
|  | (i)  The Borrowers will not seek any other debtor-in-possession financing with liens senior or *pari passu* to the DIP Lender's liens during the pendency of its bankruptcy proceedings. |
|  | (ii)  The Borrowers shall not use any funds or the proceeds of the DIP Facility in a manner or for a purpose other than in accordance the Approved Budget, or on such other terms as the DIP Lender may agree. |
|  | (iii)  Without the prior written consent of the DIP Lender, the Borrowers will not sell, lease or otherwise transfer or dispose of any material assets of the Borrowers, other than in the ordinary course of business, |

or otherwise in accordance with the Approved Budget.

(iv)    The Borrowers shall not open any new deposit or securities accounts; *provided however*, the Borrowers may open deposit or securities accounts if such account is pledged to the DIP Lender and the DIP Lender has received an account control agreement in form and substance reasonably acceptable to the DIP Lender.

(v)    No Borrower shall do, cause to be done, and agree to do or cause to be done any of the following: (a) create, incur, assume or permit to exist any indebtedness or liens, other than in respect of the DIP Facility, Prepetition Loan Documents, or Adequate Protection Obligations; (b) purchase, hold, or acquire (including pursuant to any merger, consolidation or amalgamation with a person that is not a wholly owned subsidiary immediately prior to such merger, consolidation or amalgamation) any equity interests, evidences of indebtedness or other securities of, make or permit to exist any loans or advances to or guarantees of the obligations of, or make or permit to exist any investment or any other interest in any other person other than the subsidiaries of the Borrowers as of the petition date; (c) merge into, or consolidate or amalgamate with, any other person, or permit any other person to merge into or consolidate with it, or sell, transfer, license, lease or otherwise dispose of (in one transaction or in a series of transactions) all or any part of its assets, or issue, sell, transfer or otherwise dispose of any equity interests of any Borrower or any subsidiary of any Borrower, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other person or any division, unit or business of any other person, other than (i) asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the DIP Lender in its reasonable discretion or is otherwise in accordance with the Approved Budget, (ii) asset sales in the ordinary course of business and consistent with past practice and (iii) dispositions of obsolete, worn out, used or surplus property in the ordinary course of business and consistent with past practice; (d) incur or make any dividend or distribution (whether in cash, property, securities or otherwise), investment, loan or other payment without the prior written consent of the DIP Lender, other than as expressly contemplated under the Approved Budget; (e) modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) its organizational documents, except as required by the Bankruptcy Code or a plan of reorganization and otherwise acceptable to the DIP Lender; (f) subject to the DIP Lender's discretion, not to be unreasonably withheld, assume or reject any executory contract or unexpired lease; (g) engage in any activities that would result in any Borrower becoming an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940; or (h) transfer any cash or cash equivalents that constitute DIP Collateral to a subsidiary of any Borrower without the prior written approval of the DIP Lender (other than as expressly contemplated under the

13

| | |
|---|---|
| | Approved Budget). |
| | (vi)   Such additional covenants as the DIP Lender and the Borrowers may agree. |
| |     DIP Lender may, in its sole and exclusive discretion, waive any of the above negative covenants. |
| **Events of Default:** | "***Events of Default***" under the DIP Facility shall contain events of default usual and customary for debtor-in-possession facilities of this size, type and purpose including, but not limited to, the following as determined by the DIP Lender: |
| | (i)   the Interim DIP Financing Order at any time ceases to be in full force and effect, or shall be vacated, reversed, or stayed, or modified or amended, or shall not have been entered on or before ~~July~~June 24, 2025; |
| | (ii)   the Final DIP Financing Order at any time ceases to be in full force and effect, or shall be vacated, reversed, or stayed, modified or amended, or shall not have been entered on or before July 17, 2025; |
| | (iii)   failure of the Borrowers to comply in any material respect with the terms of the applicable DIP Financing Order and such failure shall remain unremedied for more than five (5) business days after receipt by the Debtors, any Committees appointed in these cases, and the U.S. Trustee of written notice thereof; |
| | (iv)   the failure of any Borrower to (a) comply with the Variance Covenant, (b) have an Approved Budget; (c) comply with any negative covenant or certain other customary affirmative covenants in the Term Sheet or with any other covenant or agreement contained in the DIP Financing Orders or DIP Documents in any respect or (d) comply with any other covenant or agreement contained in this Term Sheet subject, in the case of the foregoing clause (d), to a grace period of two business days; |
| | (v)   other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget to the extent authorized by one or more "first day" orders or other orders reasonably satisfactory to the DIP Lender, any Borrower shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables; |
| | (vi)   **(a)** any of the Chapter 11 Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; **(b)** a Chapter 11 trustee or an examiner (other than a fee examiner) with enlarged powers relating to the operation of the business of any Borrower (powers beyond those expressly set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed**;** (~~b~~**c**) any other superpriority claim or grant of any other lien (including any adequate |

protection lien) other than as provided for herein which is *pari passu* with or senior to the claims and liens of the DIP Lender shall be granted in any of the Chapter 11 Cases~~,~~; or (~~e~~d) the filing of any pleading by any Borrower seeking or otherwise consenting to or supporting any of the matters set forth in clause (a) ~~or~~through clause (~~b~~c) of this subsection (vi);

(vii)    except for an order granting the currently pending Expedited Motion of Applied Surety Underwriters, Siriuspoint America Insurance Company and Pennsylvania Insurance Company for Relief from the Automatic Stay with Respect to Customs Bond [Docket No. 85], the Bankruptcy Court shall enter one or more orders during the pendency of the Chapter 11 Cases granting relief from the automatic stay to the holder or holders of any lien evidencing indebtedness in excess of $150,000 to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on assets of any Borrower;

(viii)    the Borrowers petition the Bankruptcy Court to obtain additional financing *pari passu* or senior to the DIP Facility;

(ix)    the Borrowers' "exclusive period" under section 1121 of the Bankruptcy Code for the filing of a plan of reorganization terminates;

(x)    the consummation of a sale of any material portion of the DIP Collateral without the DIP Lender's prior written consent (other than through the contemplated Sale or a sale in the ordinary course of business that is contemplated by the Approved Budget);

(xi)    any Borrower (A) engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the liens on or security interest in the assets of the Borrowers securing the DIP Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing such indebtedness or (B) engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the DIP Lender;

(xii)    the entry of an order by the Bankruptcy Court in favor of any statutory committee appointed in these Cases by the U.S. Trustee (each, a "***Committee***"), any ad hoc committee, or any other party in interest, (i) sustaining an objection to claims of the DIP Lender, or (ii) avoiding any liens held by the DIP Lender;

(xiii)    the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against any of the DIP Collateral;

(xiv)    the inaccuracy in any material respect of any representation of any Borrower when made or deemed made;

(xv)    the failure to meet any Milestone;

|  | |
|---|---|
|  | (xvi)  entry of an order by the Bankruptcy Court in favor of any Committee, any ad hoc committee, or any other party in interest, (i) granting such party standing to pursue any claims against the DIP Lender, (ii) sustaining an objection to claims of the DIP Lender, or (iii) avoiding any liens held by the DIP Lender; and<br><br>(xvii)  the Termination Date (as defined below) shall have occurred. |
| **Remedies:** | Upon the occurrence and during the continuance of any Event of Default, and without further application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time:<br><br>(i)  issue a written notice (the "***Remedies Notice***") (which may be by e-mail) to the Borrowers and their counsel, counsel for any Committee, and the U.S. Trustee (the "***Remedies Notice Parties***") declaring the occurrence of the Termination Date (as defined below);<br><br>(ii)  issue a Carve-Out Trigger Notice (as defined below);<br><br>(iii)  declare all DIP Obligations to be immediately due and payable without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Borrowers;<br><br>(iv)  declare the suspension or termination of the DIP Facility as to any further liability or obligation of the DIP Lender thereunder, but without affecting the DIP Liens or DIP Obligations (the "***Termination Notice***"); and<br><br>(v)  charge the default rate of interest under the DIP Facility.<br><br>During the five business days immediately following the date the DIP Lender delivers a Remedies Notice to the Remedies Notice Parties (the "***Remedies Notice Period***"), the DIP Lender and/or Borrowers may seek an emergency hearing (a "***Stay Relief Hearing***") to determine whether an Event of Default has occurred, and the filing of any such motion shall toll the Remedies Notice Period. In the event the Bankruptcy Court determines during a Stay Relief Hearing that an Event of Default has occurred, the Court may fashion an appropriate remedy, which may include the exercise of any and all rights available to the DIP Lender under this Term Sheet, the DIP Credit Agreement, the Interim DIP Financing Order, and/or the Final DIP Financing Order, as applicable.<br><br>Upon expiration of the Remedies Notice Period, if a motion seeking emergency relief has not been filed or unless ordered otherwise by the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified without further order of the Bankruptcy Court to the extent necessary to permit the DIP Lender to exercise any and all remedies against the DIP Collateral permitted under state law. |

US-DOCS\160919079.1160919079.5

| | |
|---|---|
| **Maturity/Termination Date:** | The DIP Facility shall automatically terminate without further notice or court proceedings on the earliest to occur of:<br><br>(i)   August 8, 2025 (the "***Scheduled Maturity Date***");<br><br>(ii)  the date of termination of the commitments under the DIP Facility and/or acceleration of any outstanding borrowings under the DIP Facility, in each case, by the DIP Lender following the occurrence of an Event of Default and upon the delivery of a Termination Notice to the Remedies Notice Parties;<br><br>(iii) the first business day on which the Interim DIP Financing Order expires by its terms or is terminated, unless the Final DIP Financing Order has been entered and become effective prior thereto;<br><br>(iv) the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing (which may be e-mail) by the DIP Lender;<br><br>(v)  the dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; or<br><br>(vi) the repayment in full in cash of all obligations and termination of all commitments under the DIP Facility<br><br>(each, a "***Termination Date***"), unless extended with the prior written consent (which may be by e-mail) of the DIP Lender. |
| **Credit Bidding:** | The Initial DIP Financing Order shall provide that the DIP Lender shall have the right to serve as the stalking horse bidder in connection with any sale or disposition of assets by the Borrowers in the Chapter 11 Cases and to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the DIP Obligations, in whole or in part, in connection with any sale or disposition of assets by the Borrowers in the Chapter 11 Cases and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code. |
| **Right of First Refusal** | The DIP Lender shall have a right of first refusal to act as the stalking horse bidder in connection with the Sale of the Borrowers' assets. |
| **Stalking Horse Requirements** | To the extent the DIP Lender elects not to serve as the stalking horse bidder in connection with the Sale, Borrowers shall have the right to select an alternative stalking horse bidder (an "***Alternative Stalking Horse***") and the DIP Lender shall have the continued right to credit bid the DIP Obligations in any auction. To be acceptable, any bid by an Alternative Stalking Horse must provide a reasonable offer representing the highest and best bid received by the Borrowers at the time the bid was made by the Alternative Stalking Horse, which bid shall be subject to the approval of the Bankruptcy Court and shall include funding for repayment of the DIP Obligations in full and allowed closing costs. |

17

| | |
|---|---|
| **DIP Facility Amendments:** | In order to amend, waive, or modify provisions related to this Term Sheet or any of the DIP Documents, the express written consent of the DIP Lender shall be required. |
| **Section 506(c) Waiver:** | The Final DIP Financing Order shall include a ruling that, except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender; and the Borrowers shall irrevocably waive and shall be prohibited from asserting any claim described in this paragraph, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral. |
| **No Marshaling:** | The Final DIP Financing Order shall provide that the DIP Lender may exercise all remedies available under this Term Sheet and the DIP Documents, as applicable, without any requirement first to look to exercise any of its or their rights against any particular collateral or party or to exhaust any remedies available to it or them against any particular collateral or party or to resort to any other source or means of obtaining payment of any of such obligations or to elect any other remedy. Subject to entry of the Final DIP Financing Order, in no event shall any of the DIP Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the collateral securing the DIP Facility Loans. |
| **Section 552(b):** | The Final DIP Financing Order shall provide that the DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, the "equities of the case" exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, rents, issues or profits of any of their collateral, and no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under section 552(b) of the Bankruptcy Code.<br><br>Furthermore, subject to entry of the Final DIP Financing Order, the Borrowers and their estates shall be deemed to have irrevocably waived and have agreed not to assert any claim or right under sections 552 or 726 of the Bankruptcy Code to avoid the imposition of the liens of the DIP Lender on any property acquired by any of the Borrowers or any of their estates or to seek to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Lender upon the DIP Collateral. |
| **Restrictions on Use of DIP Facility** | None of the Carve-Out, the DIP Facility Loans, or the DIP Collateral may be used to challenge the amount, validity, perfection, priority or enforceability |

| | |
|---|---|
| **Loans:** | of, or assert any defense, counterclaim or offset to, the DIP Facility, this Term Sheet, or the DIP Documents, or the security interests and liens securing any of the DIP Obligations, or to fund prosecution or assertion of any claims, or to otherwise litigate against the DIP Lender. |
| **Payment of Expenses:** | The reasonable and documented fees and out-of-pocket expenses incurred or accrued by the DIP Lender and its counsel, ~~Faegre Drinker Biddle & Reath~~ Latham & Watkins LLP ~~and Porter Hedges LLP,~~ and any financial advisor retained by the DIP Lender in connection with the Chapter 11 Cases (the foregoing to include all unpaid reasonable and documented prepetition fees, out-of-pocket costs and expenses incurred by the DIP Lender in connection with the DIP Facility) in connection with any and all aspects of the Chapter 11 Cases shall be timely paid upon receipt of an invoice or other request for payment in accordance with the DIP Financing Orders. |
| **Indemnification:** | The Borrowers shall agree to indemnify and hold harmless the DIP Lender (solely in its capacity as DIP Lender) and its affiliates and each of their officers, directors, employees, agents, advisors, attorneys and representatives (each, an "***Indemnified Party***") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable and documented fees and out-of-pocket expenses of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the DIP Facility, or any of transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Borrowers, any of their respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. |
| **Assignments** | The DIP Lender shall have the right, without the need for consent from any party, to assign all or a portion of its rights and obligations under this Term Sheet or the DIP Documents, as applicable, including all or a portion of its DIP Facility Commitments and the DIP Facility Loans at the time owing to it, to any person~~, including CES Clean Services, LLC or its affiliates~~. |
| **Miscellaneous:** | This summary of terms and conditions does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions that would be contained in definitive credit documentation for the DIP Facility contemplated hereby, all of which shall be acceptable to the DIP Lender. |
| **Governing Law:** | The laws of the State of New York (excluding the laws applicable to conflicts or choice of law), except as governed by the Bankruptcy Code. |

19

US-DOCS\~~160919079.1~~160919079.5

IN WITNESS WHEREOF, this Term Sheet is duly executed as of the date first set forth above.

**DIP LENDER**

~~**[KEYFRAME FUND]**~~FlexGen Power Systems, LLC

By: _____

    Name:

    Title:

**BORROWERS**

POWIN PROJECT LLC POWIN, LLC

PEOS HOLDINGS, LLC

POWIN CHINA HOLDINGS 1, LLC POWIN CHINA

HOLDINGS 2, LLC CHARGER HOLDINGS, LLC

POWIN ENERGY ONTARIO STORAGE, LLC

POWIN ENERGY OPERATING HOLDINGS, LLC

POWIN ENERGY OPERATING, LLC

By: _____

    Name:

    Title:

| Summary report: Litera Compare for Word 11.10.1.2 Document comparison done on 6/23/2025 11:49:03 AM | |
|---|---|
| **Style name:** L&W with Moves | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://usdocs.lw.com/US-DOCS/160919079/1 | |
| **Modified DMS:** iw://usdocs.lw.com/US-DOCS/160919079/5 | |
| **Changes:** | |
| **Add** | 24 |
| **Delete** | 24 |
| *Move From* | 0 |
| *Move To* | 0 |
| **Table Insert** | 0 |
| **Table Delete** | 0 |
| *Table moves to* | 0 |
| *Table moves from* | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 48 |