**DENTONS US LLP**

Lauren Macksound (admitted)
101 JFK Parkway
Short Hills, NJ 07078
Telephone:  (973) 912-7100
Facsimile:  (973) 912-7199
Email:  lauren.macksoud@dentons.com

Tania M. Moyron (*admitted pro hac vice*)
Van C. Durrer (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:  tania.moyron@dentons.com
        van.durrer@dentons.com

John D. Beck (admitted *pro hac vice*)
Sarah M. Schrag (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:  john.beck@dentons.com
        sarah.schrag@dentons.com

*Proposed Counsel for Debtors and*
*Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Amanda C. Glaubach (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  altogut@teamtogut.com
        aglaubach@teamtogut.com
        eblander@teamtogut.com

*Proposed Counsel for Debtors and*
*Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>Powin, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504]; (iii) PEOS Holdings, LLC [5476]; (iv) Powin China Holdings 1, LLC [1422]; (v) Powin China Holdings 2, LLC [9713]; (vi) Charger Holdings, LLC [5241]; (vii) Powin Energy Ontario Storage, LLC [8348]; (viii) Powin Energy Operating Holdings, LLC [2495]; (ix) Powin Energy Operating, LLC [6487]; (x) Powin Energy Storage 2, Inc., [9926]; (xi) Powin Energy Ontario Storage II LP, [5787]; and (xii) Powin Canada B.C. Ltd. [2239]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

**DEBTORS' SUPPLEMENT TO EXPEDITED MOTION OF THE DEBTORS FOR ENTRY OF
AN ORDER (I) AUTHORIZING AND APPROVING SETTLEMENT AND RELEASE
AGREEMENT; AND (II) GRANTING RELATED RELIEF [DOCKET NO. 191]**

**PLEASE TAKE NOTICE** that on June 9, 2025 (the "Petition Date"),[2] the
above-captioned debtors and debtors-in-possession (collectively, the "Debtors") each filed a
voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United
States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").

**PLEASE TAKE FURTHER NOTICE** that on June 28, 2025, the Debtors filed
(i) the *Expedited Motion of the Debtors for Entry of an Order (I) Authorizing and Approving
Settlement and Release Agreement; and (II) Granting Related Relief* [Docket No. 191] (the
"Settlement Motion"),[3] and the (ii) *Debtors' Application for Entry of an Order Authorizing the
Debtors to Redact and File Under Seal Confidential Information Contained in Settlement and
Release Agreement* [Docket No. 192] (the "Sealing Motion").  The Settlement Motion seeks
approval of a certain settlement and release agreement (the "Settlement Agreement") and
contemplates attaching the Settlement Agreement in redacted form (the "Redacted Settlement
Agreement") as an exhibit to the order approving the Settlement Motion.

**PLEASE TAKE FURTHER NOTICE** that the Debtors are filing this
supplement (the "Supplement") to the Settlement Motion to provide parties in interest with the
Redacted Settlement Agreement, a copy of which is attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that the Bankruptcy Court has scheduled
a hearing to consider the Settlement Motion and the Sealing Motion for July 8, 2025, at 11:30
a.m. (the "Hearing") via Zoom.  *See* Docket No. 221.

**PLEASE TAKE FURTHER NOTICE** that parties wishing to appear at the
Hearing must register with the Court by submitting an e-mail to Chambers
(chambers_of_mbk@njb.uscourts.gov) indicating the name of the person appearing, their e-mail
address, their affiliation, and whom they represent in this case.  If the request is approved, the
participant will receive appropriate credentials and further instruction.  Telephonic information
for observational purposes can be found on the page on the Bankruptcy Court's website devoted
to the *Powin, LLC, et al.,* bankruptcy case:  https://www.njb.uscourts.gov/powin.

**PLEASE TAKE FURTHER NOTICE** that copies of the Settlement Motion, the
Supplement, the Sealing Motion, and any related filings, can be viewed and/or obtained by:
(i) accessing the Bankruptcy Court's Website for a fee, (ii) visiting the website for the Debtors'
chapter 11 cases at: https://www.veritaglobal.net/powin or (iii) by contacting the Office of the
Clerk of the United States Bankruptcy Court, District of New Jersey.  Please note that a PACER
password is required to access documents on the Bankruptcy Court's Website.

---

[2]    Lead Debtor Case No. 25-16137 (MBK) for Debtor Powin Project LLC was filed on June 9, 2025, and the
majority of Debtors were filed shortly thereafter on June 10, 2025, except that, three additional Debtor-affiliates
(Powin Energy Storage 2, Inc., Powin Energy Ontario Storage II LP, and Powin Canada B.C. Ltd.) filed for
petitions on June 22, 2025.

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
Settlement Motion.

Dated: July 1, 2025                          **TOGUT, SEGAL & SEGAL LLP**

                                             */s/ Frank A. Oswald*
                                             Frank A. Oswald (admitted)
                                             550 Broad Street
                                             Suite 1508
                                             Newark, NJ 07102
                                             Telephone:  (212) 594-5000
                                             Facsimile:  (212) 967-4258
                                             Email:  frankoswald@teamtogut.com

                                             Albert Togut (admitted *pro hac vice*)
                                             Amanda C. Glaubach (admitted *pro hac vice*)
                                             Eitan Blander (admitted *pro hac vice*)
                                             One Penn Plaza, Suite 3335
                                             New York, New York 10119
                                             Telephone:  (212) 594-5000
                                             Facsimile:  (212) 967-4258
                                             Email:  altogut@teamtogut.com
                                                     aglaubach@teamtogut.com
                                                     eblander@teamtogut.com

                                             - and -

                                             **DENTONS US LLP**

                                             Lauren Macksoud (admitted)
                                             101 JFK Parkway
                                             Short Hills, NJ 07078
                                             Telephone:  (213) 623-9300
                                             Facsimile:  (213) 623-9924
                                             Email:  lauren.macksoud@dentons.com

                                             Tania M. Moyron (admitted *pro hac vice*)
                                             Van C. Durrer, II (admitted *pro hac vice*)
                                             601 S. Figueroa Street #2500
                                             Los Angeles, CA 90017
                                             Telephone:  (213) 623-9300
                                             Facsimile:  (213) 623-9924
                                             Email:  tania.moyron@dentons.com
                                                     van.durrer@dentons.com

                                             John D. Beck (admitted *pro hac vice*)
                                             Sarah M. Schrag (admitted *pro hac vice*)
                                             1221 Avenue of the Americas
                                             New York, NY 10020-1089
                                             Telephone:  (212) 768-6700
                                             Facsimile:  (212) 768-6800
                                             Email:  john.beck@dentons.com
                                                     sarah.schrag@dentons.com
                                             *Proposed Counsel for Debtors and
                                             Debtors in Possession*

## Exhibit A

**Redacted Settlement Agreement**

*Execution Version*

# SETTLEMENT AND RELEASE AGREEMENT

This SETTLEMENT AND RELEASE AGREEMENT (this "Agreement") is entered into and is effective as of June 25, 2025 (the "Execution Date"), by and among Powin, LLC, a Delaware limited liability company (on behalf of itself and its direct and indirect subsidiaries, "Powin"), Munmorah Battery ProjectCo Pty Ltd, ACN 662 894 699, an Australian corporation ("Munmorah"), Ulinda Park ProjectCo Pty Ltd, ACN 659 144 484, an Australian corporation ("Ulinda", and together with Munmorah, and each of their designees, successors, and assigns, the "Project Group"), FS KKR Capital Corp., a Maryland corporation, KKR FS Income Trust, a Delaware statutory trust, KKR FS Income Trust Select, a Delaware statutory trust, Forethought Life Insurance Company, an Indiana domestic insurance corporation, Commonwealth Annuity and Life Insurance Company, a Massachusetts insurance corporation, and First Allmerica Financial Life Insurance Company, a Massachusetts insurance corporation (together with FS KKR Capital Corp., KKR FS Income Trust, KKR FS Income Trust Select, Forethought Life Insurance Company and Commonwealth Annuity and Life Insurance Company, each a "KKR Party" and collectively, "KKR"). Each of Powin, the Project Group and KKR are sometimes referred to herein individual as a "Party", and, collectively as the "Parties".

# RECITALS

WHEREAS, Munmorah is engaged in the development of a battery storage project located in Munmorah, New South Wales, Australia, known as the Waratah Super Battery (the "Munmorah Project");

WHEREAS, Ulinda is engaged in the development of a battery storage project located in Queensland, Australia, known as the Ulinda Park BESS (the "Ulinda Project", and together with the Munmorah Project, the "Projects");

WHEREAS, in furtherance of the Munmorah Project, Munmorah and Powin entered into (i) that certain Energy Supply Agreement, dated November 7, 2022 (as amended, supplemented, or amended and restated, from time to time, the "Munmorah ESA"), (ii) that certain Long Term Supply Agreement, dated December 16, 2022 (as amended, supplemented, or amended and restated, from time to time, the "Munmorah LTSA") and (iii) that certain ▇▇▇▇▇ US Three Party Master Escrow Agreement, dated February 22, 2024, by and among Munmorah, Powin and ▇▇▇▇▇▇▇▇▇, a Georgia corporation ("▇▇▇▇▇" and such agreement, as amended, supplemented, or amended and restated, from time to time, the "Munmorah IP Escrow Agreement" and, such agreement, together with the Munmorah ESA and the Munmorah LTSA, collectively referred to as the "Munmorah Agreements");

WHEREAS, in furtherance of the Ulinda Project, Ulinda and Powin entered into (i) that certain Energy Supply Agreement, dated June 26, 2023 (as amended, supplemented, or amended and restated, from time to time, the "Ulinda ESA" and, together with the Munmorah ESA, the "ESAs"), (ii) that certain Long Term Supply Agreement, dated June 28, 2023 (as amended, supplemented, or amended and restated, from time to time, the

"Ulinda LTSA" and, together with the Munmorah LTSA, the "LTSAs") and (iii) that certain ███████ US Three Party Master Escrow Agreement, dated September 10, 2024, by and among Ulinda, Powin and ███████ (as amended, supplemented, or amended and restated, from time to time, the "Ulinda IP Escrow Agreement", and such agreement together with the Ulinda ESA and the Ulinda LTSA, collectively referred to as the "Ulinda Agreements"). The Munmorah IP Escrow Agreement and the Ulinda IP Escrow Agreement shall collectively be referred to herein as the "IP Escrow Agreements", and the Munmorah Agreements and the Ulinda Agreements shall collectively be referred to herein as the "Project Documents";

WHEREAS, prior to the Petition Date (as defined below), (i) Munmorah and Powin and certain key subcontractors and suppliers set forth on Exhibit A-1 have entered into direct agreements (the "Munmorah Key Supplier Agreements" and the suppliers party to such agreements, the "Munmorah Key Suppliers") and (ii) Ulinda and Powin and certain key subcontractors and suppliers set forth on Exhibit A-2 have entered into a direct agreements (the "Ulinda Key Supplier Agreement" and together with the Munmorah Key Supplier Agreements, the "Key Supplier Agreements" and the suppliers party to the Ulinda Key Supplier Agreement, the "Ulinda Key Suppliers", and together with the Munmorah Key Suppliers, the "Key Suppliers");

WHEREAS, as of the Execution Date, (i) Munmorah or its affiliates have made payments to Powin in the amount of USD ███████ under the Project Documents, to Key Suppliers in the amount of USD $███████ under the Munmorah ESA, and to certain other subcontractors, vendors, or suppliers of Powin in the amount of AUD ███████ as set forth on Exhibit A-3, and (ii) Ulinda or its affiliates have made payments to Powin in the amount of USD $███████ under the Project Documents, and to certain other subcontractors, vendors, or suppliers of Powin in the amount of AUD ███████ as set forth on Exhibit A-3, and, in the case of Exhibit A-3 with respect to both Projects, such payments (a) should have been made by Powin, (b) were the sole responsibility of Powin, (c) Powin failed to make and (d) the Project Group intend, but have no obligation, to pay;

WHEREAS, the Project Group alleges that Powin has materially breached certain of its obligations under the Project Documents (as described in the Termination Notices (as defined below)) and on May 29, 2025, each of Munmorah and Ulinda issued termination notices to Powin with respect to the Munmorah ESA and Munmorah LTSA and the Ulinda ESA and Ulinda LTSA, respectively (collectively, the "Termination Notices"), and further alleges the Project Group is owed damages, including liquidated damages, pursuant to the Munmorah ESA;

WHEREAS, (a) time was of the essence under the ESAs based on the Project Group's commitment to third parties to complete the Projects by a date certain and therefore the Project Group and Powin agreed for Powin to complete the Work (as defined in the ESAs) by certain guaranteed dates in the ESAs; (b) as provided under the terms of the ESAs (certain of which survive termination thereof), following termination of the ESAs for Powin's breach or default, the Project Group can complete the Work by any method

deemed expedient where the Project Group uses reasonable means necessary to mitigate damage or cost; and (c) the Project Group expects to incur significant delays, costs and expenses in order to complete the Work for each Project;

WHEREAS, (a) the Project Group believes that all conditions necessary to release to the Project Group the Supplier's Intellectual Property (as defined in the ESAs) and all Deposit Materials (as defined in the IP Escrow Agreements) have been satisfied under the IP Escrow Agreements, (b) on May 27, 2025, and June 5, 2025, in the case of Munmorah, and May 30, 2025, in the case of Ulinda, the Project Group delivered escrow release demands to ████████ and copied Powin with respect to the Munmorah IP Escrow Agreement and the Ulinda IP Escrow Agreement, respectively, and (c) Powin has disputed such release of the Deposit Materials;

WHEREAS, on June 5, 2025, each of Munmorah and Ulinda delivered notices to Powin and ████████ in each case, alleging that the materials deposited by Powin as Deposit Materials under the Munmorah Agreements and Ulinda Agreements, respectively, did not, as of June 5, 2025, contain all materials required to be deposited in escrow in accordance with the Munmorah Agreements and Ulinda Agreements, respectively, and annexed thereto a list of the materials required to be deposited by Powin as Deposit Materials in accordance with the Munmorah Agreements and Ulinda Agreements (all such materials collectively, the "Missing IP");

WHEREAS, as a condition precedent to the execution of this Agreement, the Project Group and Powin entered into that certain Letter Agreement, dated June 6, 2025, attached hereto as Exhibit C (the "Letter Agreement"), which remains in full force and effect, pursuant to which Munmorah and Ulinda made a payment to Powin in the aggregate amount of USD $████████ (the "Initial Payment"; USD $████████ of the Initial Payment is deemed paid by Munmorah and USD $████████ of the Initial Payment is deemed paid by Ulinda), receipt of which is hereby acknowledged by Powin, in exchange for, among other things, Powin providing the Project Group and its affiliates with access to certain information the Project Group alleges it was entitled to under the Project Documents, obtaining certain acknowledgements by the parties thereto, and an agreement in principle to settling any and all claims and causes of action among the Parties relating to the Project Documents pursuant to this Agreement (collectively, the "Project Disputes"), which Letter Agreement was acknowledged and consented to by KKR in accordance with the terms thereof;

WHEREAS, on June 10, 2025 (the "Petition Date"), Powin and certain of its affiliates (collectively, the "Debtors") commenced voluntary cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court");

WHEREAS, on June 17, 2025, Powin filed that certain *Motion of the Debtors for Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief* D.I. 88, seeking to reject the ESAs and the LTSAs under

section 365 of the Bankruptcy Code (the "Rejection Motion" and the order related thereto the "Rejection Order"), which rejection, the Project Group asserts, would entitle the Project Group to damages in connection therewith (the "Rejection Damages" and, together with the Project Disputes, the "Disputes"); and

WHEREAS, the Parties desire to enter into this Agreement in order to set forth the terms and conditions pursuant to which they will resolve the Project Disputes.

NOW, THEREFORE, in consideration of the covenants, obligations, conditions and promises contained in this Agreement, all prior and future payments made and to be made by the Project Group or its affiliates to third parties in connection with the Projects, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound, the Parties to this Agreement agree as follows:

## AGREEMENT

1. <u>Covenants and Conditions Precedent to Final Payment</u>. From the Execution Date until the Settlement Time (as defined below) (unless an earlier deadline is expressly provided for below) as conditions precedent to Munmorah's and Ulinda's requirement to make the Final Payment under this Agreement, Powin (and KKR, to the extent expressly required in the final paragraph of Section 1(c), Section 1(l), Section 1(o), Section 1(p) and Section 1(q); it being acknowledged and agreed, for the avoidance of doubt, that KKR is not bound by any other provisions of this Section 1 and KKR expressly agrees and acknowledges that Powin and/or its affiliates is undertaking the actions set forth in all of the provisions of this Section 1) shall, and shall cause its affiliates to:

    a. use their best efforts to confirm (or cause its employees, representatives or affiliates to confirm) whether any software or code base required to be provided as part of the Suppliers Intellectual Property or Deposit Materials (including Missing IP) that the Project Group is entitled to receive under the Project Documents includes any encryption libraries or other items that could be subject to the U.S. exports controls or U.S. export licenses requirements;

    b. deposit into the escrow established under the IP Escrow Agreements all relevant, necessary or helpful passwords, encryption keys and access for all software, source code, intellectual property and other materials relevant, necessary or helpful to the Project Group to access, read or otherwise enjoy the rights in the license (subject to, and without expanding, the scope herein and in the Project Documents) the rights in the license granted with respect to all Deposit Materials (as defined in the IP Escrow Agreements), Supplier's Intellectual Property or Deposit Materials (including Missing IP) in accordance with (and subject to the terms and conditions of) the Project Documents;

c.  within three (3) days of the Execution Date (the "Disclosure Deadline"), which deadline may be extended by the Project Group in its sole discretion, in order to update Schedule 4(a)(i)(B) and Exhibits E-1 and E-2 and satisfy Sections 4(a), 4(b) and 4(c), with respect to each Project, provide:

   i.  (1) a list of all subcontractors, vendors and suppliers (including those listed (or to be listed) on Exhibits E-1 and E-2, the "Subcontractors") contracted in writing by Powin or its affiliates for the Projects and (2) true correct and substantially complete copies of substantially all (i) contracts and agreements, (ii) all current, outstanding, paid, or completed purchase orders and (iii) warranties, in each case with the Subcontractors for the Projects on an unredacted basis (subject to confidentiality obligations set forth in Section 12 hereof) together with Powin's reasonable estimate of the Cure Costs required to be paid pursuant to section 365 of the Bankruptcy Code to effectuate the assumption by Powin and the assignment to the Project Group of the applicable agreements and purchase orders listed on Exhibits E-4;

   ii. a substantially complete inventory for each of the Ulinda Project and the Munmorah Project (including location and the status of the relevant Subcontractor's title and whether ordered or acquired for the purpose of commissioning or operation of the applicable Project) of any and all commissioning and operation spare parts and any other spare parts as well as consumables and other materials located in all ████████████████████ (together with its affiliates, "███████████") facilities or storage locations in Australia (together with evidence of orders or ownership of such spare parts, equipment and assets); and

   iii. use commercially reasonable efforts (which shall not require Powin to incur any expense, unless the Project Group agrees to pay for such expense) to cause ████████ to provide the Project Group, its affiliates or representatives physical access to the ████████ facilities and storage locations in Australia during normal business hours that hold any spare parts, consumables, materials and equipment for the Projects for the purpose of inspection and confirmatory inventory thereof (the "████████ Inspection").

Following delivery by Powin of the documentation and information required under this Section 1(c), the Project Group will review such documentation and information and Powin shall reasonably cooperate with and respond to the Project Group's diligence questions with respect thereto. Upon completion of such review, the Project Group shall deliver to Powin and KKR (1) updated version of Schedule 4(a)(i)(B) (based on the ████████ Inspection and any additional diligence of the Project Group) and (2) a list of all desired subcontracts and purchase orders for Munmorah

Project as an updated Exhibit E-1 ("Desired Munmorah Contracts") and (3) a list of all desired subcontracts and purchase orders for Ulinda Project as an updated Exhibit E-2 ("Desired Ulinda Contracts") based on the documentation and information provided by Powin under this Section 1(c), which updated versions shall be deemed automatically incorporated into this Agreement (A) in the case of Exhibits E-1 and E-2 immediately upon delivery by the Project Group to Powin and KKR to the extent such updated versions of Exhibits E-1 and E-2 only include agreements and/or purchase orders listed on Exhibit E-4 ("Data Room Index"), and to the extent the Project Group desires to add any contract and/or purchase order to Exhibit E-1 and/or Exhibit E-2 that is not listed on Exhibit E-4, the addition of such contract and/or purchaser order shall be subject to consent by Powin and KKR which consent shall not be unreasonably withheld, conditioned or delayed and (B) upon written consent from Powin and KKR, not to be unreasonably withheld, conditioned or delayed with respect to updates to Schedule 4(a)(i)(B); provided that the Project Group can waive, in its sole discretion, updates to Schedule 4(a)(i)(B) and Exhibits E-1 and E-2;

d.  with respect to the Ulinda Project, execute and deliver the direct agreements (including the direct deeds), the descriptions of which are set forth on Exhibit F in the form agreed by Powin and the Project Group via an email exchange on June 23, 2025;

e.  (i) provide to the Project Group the export control classification for all of Supplier's Intellectual Property or Deposit Materials that the Project Group is entitled to under the Project Documents (including Missing IP provided or required to be provided pursuant to the IP Escrow Agreements) and provide all Export Control Classification Numbers therefor and (ii) provide all necessary or helpful assistance in connection with any export control restrictions on the software and other intellectual property that is or should have been subject to the IP Escrow Agreements;

f.  notwithstanding Section 5, with respect to employees and personnel with necessary, relevant, appropriate or helpful technical information, know-how or operational knowledge relating to either or both of the Projects (such employees and personnel, the "Knowledge Employees"), use best efforts to (i) make available to the Project Group or their affiliates, on an ongoing basis prior to the Settlement Time, the Knowledge Employees to the extent such Knowledge Employees remain employed by Powin or if such persons are employed or contracted by the Project Group or their affiliate ensure such persons continue to have access to all Powin systems, logins, hardware and other authorizations reasonably necessary to access, read or otherwise enjoy the rights in the license (subject to, and without expanding, the scope herein and in the Project Documents) granted with respect to the material described in the foregoing provisions of this Section 1 (but only to extent necessary to comply with, and subject to the limitations set forth in, this Section 1) as though they continued to be employed by Powin, and (ii) to

6

the extent they remain employed at Powin, direct such Knowledge
Employees to fully cooperate with the Project Group and their affiliates
(A) for the purpose of identifying and verifying the Missing IP, (B) for the
purpose of transferring and delivering to the Project Group or their affiliates
(at the Project Group's direction), or otherwise assisting the Project Group
to understand, read and use any of the Deposit Materials (including the
Missing IP) that the Project Group is entitled to receive under the Project
Documents and this Agreement, (C) for the purpose of identifying relevant
account managers with respect to third-party software licensors and service
providers and other vendors included in the Deposit Materials (including
the Missing IP), (D) to provide, or otherwise deliver in a medium acceptable
to the Project Group, the Deposit Materials (including any Missing IP) that
the Project Group is entitled to receive under the Project Documents and
this Agreement, and (E) for the purpose of achieving the work plan and
deliverables set forth in Exhibit D;

g.  in the case of any Deposit Materials (including any Missing IP or other
items or materials deposited into such escrow in connection with
Section 1(b)) in escrow with ███████ pursuant to the IP Escrow
Agreements (whether as of the Effective Date or Settlement Time), to the
extent not already released or otherwise provided to the Project Group,
direct ██████ to release such Deposit Materials to the Project Group as of
the Settlement Time;

h.  in the case of any Missing IP, use best efforts to provide or otherwise deliver
in a medium acceptable to the Project Group, the Missing IP and Deposit
Materials to the Project Group, as applicable in accordance with (and
subject to the terms and conditions of) the Project Documents;

i.  participate in, and cause the Meeting Parties (as defined below) to
participate in periodic meetings requested by the Project Group (provided
such requests are made with 24 hours' notice prior to the proposed meeting
time) to (i) provide a verbal update on the status of the conditions precedent
in Section 1 hereof and (ii) respond to inquiries and reasonable information
requests of the Project Group related to the Parties' obligations under this
Agreement. The "Meeting Parties" means collectively, (i) one of Powin's
senior attorneys from the Dentons law firm, (ii) one of Powin's senior
financial advisors at Huron Consulting, (iii) Gerard Uzzi or Chris Ucko
from the Uzzi & Lall firm, and (iv) representatives from the Project Group
or its affiliates, and their attorneys and financial advisors (as required by the
Project Group);

j.  until the Settlement Time, provide the Project Group with a copy of the cash
flow reporting provided to (i) KKR (or any of its successors and assigns,
including other lenders from time to time under the Credit Facility (as

defined below)) under the Cash Collateral Orders[1] concurrently with Powin's delivery of the same to KKR and to (ii) the lenders from time to time under any DIP Orders (as defined below) concurrently with Powin's delivery of the same to such lenders;

k.  comply with the terms of the Letter Agreement and this Agreement and take and complete all of the actions required to be completed by Powin and its affiliates hereunder (including under the Letter Agreement) prior to the initiation of the Final Payment by the Project Group;

l.  in the case of KKR, deliver, or cause its affiliates to deliver, any required lien releases from the Collateral Agent in escrow, to be released as of the Settlement Time in accordance with Section 4(d);

m.  promptly following the Execution Date and on or prior to the applicable Milestones, Powin shall file a motion to approve this Agreement under sections 105, 362, 363 and 365 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Approval Motion");

n.  The Approval Motion and Bankruptcy Court order approving the same (the "Approval Order") shall be in form acceptable to the Project Group and KKR;

o.  Powin and KKR will use best efforts to pursue entry of the Approval Order by the Bankruptcy Court;

p.  Powin and KKR acknowledge and agree that they will promptly take all actions reasonably requested by the Project Group to assist in obtaining entry of the Approval Order, including furnishing declarations or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that the Project Group is a "good faith" purchaser under section 363(m) of the Bankruptcy Code;

q.  Powin and KKR shall not (i) reject or file any pleadings seeking to reject any agreements or purchase orders on the Data Room Index on or prior to the Expiration Date or (ii) object to or take any other action that is inconsistent with or that reasonably would be expected to prevent, interfere with, delay, or impede the Parties' ability to consummate and perform under this Agreement, including Powin's and KKR's ability to satisfy their obligations under Section 1 and Section 4 of this Agreement;

r.  in the event the entry of the Approval Order is appealed, Powin will use commercially reasonable efforts to defend such appeal;

---

[1] "Cash Collateral Orders" means the interim and final orders entered in Powin's Chapter 11 Cases approving Powin's use of "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code.

8

s.     deliver the test reports regarding compliance of Powin's hardware with safety standards with respect to the Projects from the Test Houses identified on <u>Exhibit E-3;</u>

t.     deliver to the Project Group (a) a written consent in form and substance acceptable to the Project Group in its sole discretion from FlexGen Power Systems (or any other entity that will be providing debtor-in-possession (DIP) financing to Powin pursuant to a DIP Order, the "<u>DIP Lender</u>") (1) approving and consenting to this Agreement and all of the transactions and releases contemplated hereunder, (2) agreeing to comply with the covenant set forth in <u>Section 1(q)</u> as if such DIP Lender were a party to this Agreement and (3) including a release of each Project Group Released Party as of the Settlement Time in form and substance substantively similar to the KKR release set forth in <u>Section 4(e)(iii)</u>, and (b) lien releases, in form and substance acceptable to the Project Group, from the DIP Lender and its collateral agent, if applicable, releasing any and all liens of such DIP Lender and its collateral agent, if appliable, on all assets, subcontracts and warranties transferred pursuant to <u>Sections 4(a)</u>, <u>4(b)</u> or, <u>4(c)</u> of this Agreement as of the Settlement Time substantially similar to the lien release in <u>Section 4(d)</u>; and

u.     in the case of Ulinda Project, receive written confirmation from Ulinda prior to Settlement Time that it has obtained consent or waiver to enter into this Agreement under any loan or financing agreement for the Ulinda Project.

The obligations of the Project Group under this Agreement, including making the Final Payment and the mutual releases, are subject to (i) the satisfaction, or waiver by the Project Group in its reasonable discretion, of the covenants and conditions precedent set forth in <u>Sections 1(c)</u>, <u>1(d)</u>, <u>1(l)</u> and <u>1(s)</u> and, in the Project Group's sole and absolute discretion, <u>Section 1(t)</u> (the conditions found in such Sections <u>1(c)</u>, <u>1(d)</u>, <u>1(l)</u>, <u>1(s)</u>, and <u>1(t)</u> collectively, the "<u>Effective Date CPs</u>"), (ii) the entry by the Bankruptcy Court of the Approval Order and (iii) the Approval Order becoming final and non-appealable (the date on which clauses (i) and (iii) occur, shall be the "<u>Effective Date</u>", or if the condition in clause (iii) is waived by the Project Group, the "<u>Effective Date</u>" shall be the date on which clauses (i) and (ii) occur and the Project Group expressly waives condition (iii), above). The covenants and conditions precedent in this <u>Section 1</u> are for the sole benefit of the Project Group and may only be waived by the Project Group in writing, and which waiver may include any conditions required by the Project Group.

2.   <u>Final Payment</u>. Upon the occurrence of the Effective Date, Munmorah shall pay to Powin an amount equal to USD $████ and Ulinda shall pay to Powin an amount equal to <u>USD $</u>████ payable by the Project Groups in an aggregate amount equal to USD $████ (the "<u>Final Payment</u>"), by one-time wire transfer of immediately available funds to a bank account designated by Powin in writing in advance of payment, or if no such designation is made, to the account which the Initial Payment was made.

3. <u>Settlement Time</u>. The "<u>Settlement Time</u>" contemplated by this Agreement shall be 12:01 a.m. on the date in which the Project Group makes the Final Payment.

4. <u>Assignment; Release and Other Transactions</u>. Effective as of the Settlement Time (except as indicated otherwise in <u>Section 4(b)</u>):

    a. <u>Assignment of Assets</u>.

        i. With respect to Munmorah Project:

          (A) Powin hereby acknowledges and confirms that Munmorah has title to and ownership of all spare parts, equipment, materials, consumables and supplies acquired by Munmorah under the Munmorah ESA and Munmorah Key Supplier Agreements prior to Settlement Time and delivered or caused to be delivered by Powin to the Munmorah Project site (the "<u>Munmorah Equipment</u>"), free and clear of any and all liens attributable to any act or omission of Powin to the fullest extent permissible under section 363(f) of the Bankruptcy Code.

          (B) Powin hereby irrevocably and unconditionally assigns, conveys and transfers title to and ownership of all parts, equipment, materials, consumables and supplies that are listed on <u>Schedule (4)(a)(i)(B)</u> (as updated from time to time in accordance with <u>Section 1(c)</u>, collectively, the "<u>Additional Munmorah Equipment</u>"[2]), which schedule includes spare parts, equipment, materials, consumables and supplies for the Munmorah Project and Ulinda Project, free and clear of all liens to the fullest extent permissible under section 363(f) of the Bankruptcy Code (other than the ███████ liens identified in the written notice by ███████ attached as <u>Exhibit G</u> hereto, the "███████ Liens").

        ii. With respect to the Ulinda Project, Powin hereby acknowledges and confirms that Ulinda has title to and ownership of all parts, equipment, materials, consumables and supplies acquired by Ulinda under the Ulinda ESA and the Ulinda Key Supplier Agreement prior to the Settlement Time and delivered or caused to be delivered by Powin to the Ulinda Project site (the "<u>Ulinda Equipment</u>"), free and clear of any and all liens attributable to any act or omission of Powin to the fullest extent permissible under section 363(f) of the Bankruptcy Code.

        iii. For each Project, with respect to any spare parts, equipment, materials, consumables and supplies ordered or acquired for such

---

[2] As this may be updated in accordance with Section 1(c) with KKR's consent.

Project by Powin or its affiliates, to which neither Powin nor its affiliates nor the Project Group nor its affiliates have title to as of the Settlement Time and for which title remains with a subcontractor, supplier or vendor under an applicable Project Subcontract, limited in each case solely to the extent listed on <u>Schedule 4(a)(i)(B)</u>, Powin hereby relinquishes any right to title or ownership that it may have (whether present, future or contingent) in such parts, equipment, materials, consumables and supplies and agrees that no such parts, equipment, materials, consumables and supplies constitute property of its estate under section 541 of the Bankruptcy Code and further agrees that the Project Group and its affiliates is permitted to directly negotiate with the applicable subcontractor, supplier or vendor for title, in accordance with <u>Section 11</u>.

b.  <u>Transfer of Designation Rights in Respect of Project Subcontracts and Purchase Orders</u>.

 i.  Effective as of the Execution Date, subject to the Approval Order, Powin hereby irrevocably and unconditionally assigns, conveys, and transfers to Munmorah, free and clear of all liens, claims, and encumbrances to the fullest extent permitted by section 363(f) of the Bankruptcy Code, the exclusive right to irrevocably, subject to the express provisions herein, select, identify, and designate (on one or more occasions) (such rights, the "<u>Designation Rights</u>") the Munmorah subcontracts (including the purchase orders related to the Munmorah Project) listed on <u>Exhibit E-1</u>[3] between Powin or its affiliates and a person or entity that furnishes labor, services, material or equipment to Powin for the purposes of the Munmorah Project (collectively, the "<u>Munmorah Subcontracts</u>") in respect of which Munmorah, or its assignee, will acquire all of Powin's right, title and interest in and to the applicable Munmorah Subcontracts.

 ii.  Effective as of the Execution Date, subject to the Approval Order, Powin hereby irrevocably and unconditionally assigns, conveys, and transfers to Ulinda, free and clear of all liens, claims, and encumbrances to the fullest extent permitted by section 363(f) of the Bankruptcy Code, the Designation Rights in respect of the Ulinda subcontracts (including the purchase orders related to the Ulinda Project) listed on <u>Exhibit E-2</u>[4] between Powin or its affiliates and a person or entity that furnishes labor, services, material or equipment to Powin for the purposes of the Ulinda Project (collectively, the

---

[3] As of the Execution Date, Exhibit E-1 includes a list of Subcontractors and will be updated prior to Settlement Time in accordance with Section 1(c).

[4] As of the Execution Date, Exhibit E-2 includes a list of Subcontractors and will be updated prior to Settlement Time in accordance with Section 1(c).

"Ulinda Subcontracts", and together with the Munmorah Subcontracts, the "Project Subcontracts").

iii. Effective as of the Execution Date, subject to the terms and conditions of this Agreement, the Approval Order, and the requirements of section 365(b) of the Bankruptcy Code, by no later than 5:00 p.m. on the date that is 60 days after the date the Bankruptcy Court enters the Approval Order (the "Expiration Date" and such hearing the "Approval Hearing", and the period between the Execution Date and the Expiration Date, the "Designation Rights Period"), the Project Group may, by written notice to Powin (such notice a "Project Group Assumption Notice"), designate one or more of the Project Subcontracts for assumption and assignment, in the Project Group's sole and absolute discretion, which can be exercised with respect to any number, or none, of the Project Subcontracts prior to the Expiration Date. Such notice shall provide the following information: (i) the Project Subcontract proposed to be assumed and assigned, (ii) the identity of the assignee, if any, (iii) the identity of the subcontractor with respect to the applicable Project Subcontract, and (iv) the Cure Costs[5] associated with the applicable Project Subcontract. The Project Group (or its assignee(s)), at the Project Group's sole cost and expense, shall have the exclusive right to take an assignment of any Project Subcontract and to negotiate with the subcontractor with respect thereto (it being understood that upon written notification by the Project Group to Powin that the Project Group will not elect to have a Project Subcontract assigned to it or its assignee, in which case Powin shall have the right to then reject or assign such Project Subcontract to another party in Powin's sole and absolute discretion). The Designation Rights set forth herein shall terminate on the Expiration Date. Within one (1) Business Day following the date of Powin's receipt of a Project Group Assumption Notice, Powin shall file with the Bankruptcy Court and serve by overnight mail and email (in each case, where available) on the applicable subcontractor(s) and other appropriate notice parties an appropriate notice (the "Proposed Assumption Notice") in respect of the designated Project Subcontracts (the "Designated Project Subcontracts") subject to such Project Group Assumption Notice. The Proposed Assumption Notice shall contain (i) the Project Subcontract proposed to be assumed and assigned, (ii) the identity of the assignee, if any, (iii) the identity of the subcontractor with respect to the applicable Project Subcontract, and (iv) the Cure Costs associated with the

---

[5] With respect to each Designated Project Subcontract, on the Contract Assignment Closing Date (as defined below) relating to such Designated Project Subcontract, the Project Group shall pay to Powin for further payment to the applicable subcontractor for such Designated Project Subcontract an amount equal to the cure costs approved by the Bankruptcy Court for such Designated Project Subcontract (the "Cure Costs").

applicable Project Subcontract. Unless otherwise agreed by the Parties, the Proposed Assumption Notice shall provide the applicable subcontractor(s) no more than seven (7) days following service of such notice (the "Response Deadline") to object to the proposed Cure Costs and/or assumption of the applicable Project Subcontract, and such objection shall be heard at the later of (i) the Approval Hearing and (ii) a hearing before the Bankruptcy Court no later than fourteen (14) days after service of the Proposed Assumption Notice. The Parties agree to close the assumption and assignment of any designated Project Subcontracts, as applicable, on the later of (i) the first (1st) Business Day after the Approval Order is entered by the Bankruptcy Court, (ii) the Response Deadline, if no objection is lodged by a contract counterparty or prior to such Response Deadline, such objection is resolved, and (iii) the first (1st) Business Day after the Bankruptcy Court enters an order overruling or resolving any objection lodged by the contract counterparty (each, as applicable, a "Contract Assignment Closing Date"). Notwithstanding the foregoing, effective as of the applicable Contract Assignment Closing Date, Powin assigns to the Project Group all of Powin's rights, titles, and interests in any and all Avoidance Actions (as defined below) relating to or arising from the Project Subcontracts assumed and assigned to the Project Group pursuant to Section 4 of this Agreement; provided, for the avoidance of doubt, Powin shall retain all Avoidance Actions relating to or arising from Project Subcontracts not assumed and assigned under this Agreement. For purposes of this Agreement, "Avoidance Actions" means any and all actual or potential avoidance, recovery, subordination, or other claims, causes of action, or remedies that may be brought by or on behalf of Powin, its affiliates, or their successors or assigns or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including claims, causes of action, or remedies arising under chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common law, including fraudulent transfer laws.

iv. With respect to any Designated Project Subcontract:

1. The Project Group and Powin shall each use commercially reasonable efforts to accomplish, and shall fully cooperate with each other in, the resolution of any objections to the proposed assumption and assignment of such Project Subcontract, provided that Powin shall have no requirement to contribute to any Cure Costs.

2. Unless otherwise agreed upon by the Project Group and Powin, the Project Group shall have no liability or

13

obligations, other than for the payment of Cure Costs, with respect to any liabilities, claims, damages or other obligations of Powin under such Project Subcontract to the extent arising through and including the Contract Assignment Closing Date.

v.  Nothing in this Agreement, including this <u>Section 4(b)</u>, nor any correspondence or action taken in connection with this Agreement, the Letter Agreement or the Project Documents, shall be construed as an assumption by the Project Group or any of its affiliates of any obligation, claim, liability, loss, damage or other cost arising under any of the Projects or Project Subcontracts, with respect to the period prior to the assumption thereof in accordance with this <u>Section 4(b)</u> other than the Cure Costs (collectively, the "<u>Retained Liabilities</u>"), and the Parties acknowledge and agree that all such Retained Liabilities under the Project Subcontracts remain liabilities of Powin.

vi.  The Retained Liabilities shall remain the sole responsibility of, and shall be retained, paid, performed and discharged by Powin, in due course, unless otherwise expressly agreed by the Parties in writing (no email shall suffice).

c.  <u>Assignment of Warranties</u>.

i.  Powin hereby irrevocably and unconditionally assigns, conveys and transfers to Munmorah, to the extent transferable without incurring any additional cost to Powin (unless Munmorah or its affiliate agree in writing to cover such additional out-of-pocket costs), all the rights and benefit of all warranties (1) under the Project Subcontracts assumed and assigned to the Project Group and (2) with respect to all spare parts and equipment scheduled on <u>Schedule 4(a)(i)(B)</u>, in each case, benefiting Powin, and Munmorah hereby accepts such assignments; and

ii.  Powin hereby irrevocably and unconditionally assigns, conveys and transfers to Ulinda, to the extent transferable without incurring any additional cost to Powin (unless Ulinda or its affiliate agree in writing to cover such additional out-of-pocket costs), all the rights and benefit of all warranties benefiting Powin (1) under the Ulinda Subcontracts, and Ulinda hereby accepts such assignments and (2) with respect to all spare parts and equipment scheduled on <u>Schedule 4(a)(i)(B)</u>.

d.  <u>KKR Release of Liens</u>. Each KKR Party hereby automatically releases any liens, pledges, encumbrances and/or security interests granted in connection with the Credit Facility (as defined below) or any other contract,

14

arrangement, indebtedness or collateral agreement of any fashion by and between Powin and any of its affiliates, on the one hand, and any or all of KKR and/or any of its affiliates (including by the relevant collateral agent on KKR's behalf), on the other hand, on any assets, subcontracts or warranties transferred pursuant to Sections 4(a), 4(b) or, 4(c) of this Agreement; *provided* that, for the avoidance of doubt, KKR shall only release liens, pledges, encumbrances and/or security interests on the assets specified on Schedule 4(a)(i)(B) and Exhibits E-1 and E-2. KKR shall direct the Collateral Agent to execute and deliver at the Settlement Time any lien releases and/or filings requested by the Project Group to evidence such release. "Credit Facility" shall mean the credit facility pursuant to that certain Loan Agreement, dated as of October 1, 2024 (as amended, restated, supplemented or otherwise modified from time to time), by and among Powin Energy Intermediate, LLC, as parent pledgor, Powin, as borrower, the other subsidiary guarantors party thereto, GLAS USA LLC, as administrative agent and collateral agent (the "Collateral Agent") and the other parties thereto.

e.   Mutual Release**.**

i.   Release by Powin of the Project Group. Effective for all purposes as of the Settlement Time, Powin acknowledges and agrees on behalf of itself and its affiliates and each of their respective employees, agents, directors and officers, affiliates, stockholders, successors and assigns (each in their capacity as such and solely to the extent such persons can be bound by Powin, each, a "Powin Releasing Party") that each such person or entity, to the fullest extent permitted by appliable law, hereby unconditionally, irrevocably and forever releases, acquits and discharges the Project Group, its affiliates, and each of their respective current, former and future directors, officers, managers, employees, representatives, agents, members (including direct or indirect equity holders), stockholders, successors, parents, affiliated investment funds, affiliated investment vehicles, managed accounts, managed funds, managed entities, agents, representatives, owners, partners, financial advisors, legal advisors, investment advisors, fund advisors, fund, principals, consultants, accountants, predecessors and assigns (each, a "Project Group Released Party" and collectively, the "Released Project Group Parties") from any and all rights, actions, charges, claims, demands, liabilities, obligations, allegations, assertions, complaints, controversies, duties, grievances, causes of action, suits, debts, promises, commitments, agreements, costs, losses, debts, expenses, judgments and damages ("Claims"), that arise out of or are related directly or indirectly in whole or in part to (x) the Projects, the Project Documents or the Letter Agreement or the negotiation, formulation, or preparation of the foregoing, (y) any transactions, negotiations, discussions,

proposals, or interactions arising from or relating to clause (x) or clause (y), or (z) Powin or any of its assets, liabilities, finances, properties, businesses, operations, or affairs, at law or in equity, known or unknown, matured or unmatured, contingent or vested, of any kind or nature or description whatsoever, from the beginning of time to the Settlement Time, that any Powin Releasing Party had, presently has or may hereafter have or claim or assert to have against any Project Group Released Party, except for Powin's right to receive the Final Payment pursuant to the terms and subject to the conditions of this Agreement.

ii.  <u>Release by the Project Group of Powin</u>. Effective for all purposes as of the Settlement Time, each of Munmorah and Ulinda acknowledges and agrees on behalf of itself and its affiliates and their respective employees, agents, directors and officers, stockholders, successors and assigns (each in their capacity as such and solely to the extent such persons can be bound by the Project Group, each, a "<u>Project Group Releasing Party</u>") that each such person or entity, to the fullest extent permitted by applicable law, hereby unconditionally, irrevocably and forever releases, acquits and discharges Powin and its subsidiaries and each of their respective current, former and future directors, officers, managers, employees, representatives, agents, members (including direct or indirect equity holders), stockholders, successors, parents, affiliated investment funds, affiliated investment vehicles, managed accounts, managed funds, managed entities, agents, representatives, owners, partners, financial advisors, legal advisors, investment advisors, fund advisors, fund, principals, consultants, accountants, predecessors and assigns (each, a "<u>Powin Released Party</u>" and collectively, the "<u>Released Powin Parties</u>") from any and all Claims, that arise out of or are related directly or indirectly in whole or in part to (x) the Projects, the Project Documents or the Letter Agreement or the negotiation, formulation, or preparation of the foregoing, (y) any transactions, negotiations, discussions, proposals, or interactions arising from or relating to clause (x) or clause (y), or (z) Powin or any of its assets, liabilities, finances, properties, businesses, operations, or affairs, at law or in equity, known or unknown, matured or unmatured, contingent or vested, of any kind or nature or description whatsoever, from the beginning of time to the Settlement Time, that any Project Group Releasing Party had, presently has or may hereafter have or claim or assert to have against any Powin Released Party.

iii.  <u>Release by KKR of the Project Group</u>. Effective for all purposes as of the Settlement Time, each KKR Party acknowledges and agrees on behalf of itself and its affiliates and each of their respective employees, agents, directors and officers, affiliates, stockholders,

successors and assigns (each in their capacity as such and solely to the extent such persons can be bound by such KKR Party, each, a "KKR Releasing Party", and together with Powin Releasing Parties and Project Group Releasing Parties, the "Releasing Parties", and each, a "Releasing Party") that each, to the fullest extent permitted by appliable law, hereby unconditionally, irrevocably and forever releases, acquits and discharges each Project Group Released Party from any and all Claims, that arise out of or are related directly or indirectly in whole or in part to (x) the Projects, the Project Documents or the Letter Agreement, the Credit Facility or any other contract, arrangement, indebtedness or collateral agreement of any fashion by and between Powin and any of its affiliates, on the one hand, and any or all of KKR and any of its affiliates (including by the relevant collateral agent on KKR's behalf), on the other hand, or the negotiation, formulation, or preparation of the foregoing or (y) any transactions, negotiations, discussions, proposals, or interactions arising from or relating to clause (x) or clause (y).

iv.  Release by the Project Group of KKR. Effective for all purposes as of the Settlement Time, each Project Group Releasing Party acknowledges and agrees that each such person or entity, to the fullest extent permitted by applicable law, hereby unconditionally, irrevocably and forever releases, acquits and discharges KKR and its subsidiaries and each of their respective current, former and future directors, officers, managers, employees, representatives, agents, members (including direct or indirect equity holders), stockholders, successors, parents, affiliated investment funds, affiliated investment vehicles, managed accounts, managed funds, managed entities, agents, representatives, owners, partners, financial advisors, legal advisors, investment advisors, fund advisors, fund, principals, consultants, accountants, predecessors and assigns (each, a "KKR Released Party" and collectively, the "Released KKR Parties" and together with the Project Group Released Parties and the Powin Released Parties, each a "Released Party" and collectively, the "Released Parties") from any and all Claims, that arise out of or are related directly or indirectly in whole or in part to (x) the Projects, the Project Documents or the Letter Agreement or the negotiation, formulation, or preparation of the foregoing or (y) any transactions, negotiations, discussions, proposals, or interactions arising from or relating to clause (x) or clause (y).

v.  Notwithstanding anything to the contrary in this Agreement, this Section 4(e) shall not release, alter, waive, or amend, and Claims shall not include, any of the rights, terms, obligations or covenants granted to or imposed upon any Released Parties, or any claims for

breach or violation of any such rights, terms, obligations, or covenants under this Agreement.

vi.    Nothing herein shall or shall be deemed to (or is intended to) limit any Released Parties' rights to assert or prosecute any affirmative defense, or otherwise raise any defense or take any action to defend itself or themselves, in connection with any Claim (whether direct or indirect) brought by any person relating to any of the above-referenced Claims.

vii.    Each of the Releasing Parties understands, acknowledges and agrees that the releases provided herein are full and final general releases of all Claims, released hereunder, including those that could have been asserted in any action, suit or proceeding of any kind against a Project Group Released Party or Powin Released Party, as the case may be. Each of the Releasing Parties hereby irrevocably covenants to refrain from, directly or indirectly, asserting any Claim, or commencing, instituting, or causing to be commenced or instituted any action, suit or proceeding of any kind released hereunder, against any Released Party, as the case may be. Each of the Releasing Parties agrees that in the event such party should bring a Claim released hereunder against any Released Party, this Section 4(e) shall serve as a complete defense to such Claim.

viii.    Section 1542 Release. The Parties acknowledge that they are familiar with section 1542 of the Civil Code of the State of California ("Section 1542"), which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Effective for all purposes as of the Settlement Time, the Parties waive and relinquish on behalf of each Releasing Party any rights and benefits which such Releasing Party may have under Section 1542 or any similar statute or common law principle of any jurisdiction to the full extent that it may lawfully waive all such rights and benefits pertaining to the subject matter hereof. The Parties acknowledge and covenant that (a) the Releasing Parties have not heretofore made or filed and will not make or file any allegations or any claim, action, suit or proceeding against any of the Released Parties in connection with, based upon or arising out of any Claims released and discharged as described above and (b)

18

the Releasing Parties have not and will not assign to any entity or person any Claims or rights including any Claims (or any part thereof) released or discharged above, and KKR and Powin covenant that they will cause any acquirer of their relevant business or assets to agree in a written agreement provided to the other Party to be bound by the terms of <u>Section 17</u> and to allow the Project Group Released Parties to be an intended third party beneficiary of such agreement without joinder of any Project Group Released Party.

5.   <u>Employees and Non-Solicitation.</u>

    a.   As of the Execution Date, the Parties terminate the non-solicitation provision in section I(7) of the Letter Agreement, which, from and after the Effective Date, has no further force or effect. The Project Group hereby agrees, on behalf of itself and its controlled affiliates, to not solicit any persons that are employees of Powin as of the Execution Date until the date that is the earlier of (i) the Effective Date and (ii) twenty-one (21) days from the Execution Date, except with respect to (a) any solicitations or offers of employment made by the Project Group or an affiliate thereof prior to the execution of the Letter Agreement by all parties thereto, (b) any employee that responds to general solicitations through a public medium by the Project Group or any of its affiliates, and (c) Powin's Australian employees listed on <u>Exhibit H</u>.

    b.   The Parties further agree that Munmorah and Ulinda will reimburse Powin for amounts paid by Powin as severance pay in accordance with the Fair Work Act 2009 (Cth), for amounts due and payable to any Australian employees of Powin (the "<u>Subject Australian Employees</u>") provided that such severance payments shall not exceed in the aggregate the amount of USD $ ▇▇▇▇  Such amounts will be paid in a proportion of ▇% by Munmorah and ▇% by Ulinda Park on the Settlement Time. For the avoidance of doubt, once the severance payment is paid by Munmorah and Ulinda to Powin, no Project Group entity shall have any further obligation in relation to severance payments and Powin remains solely liable for payment of severance payments to the Subject Australian Employees.

6.   <u>License.</u>

    a.   In furtherance of section I-5 of the Letter Agreement, Powin, on behalf of itself and its affiliates, successors, and assigns, hereby acknowledges and agrees that (i) certain release conditions under the Project Documents necessary or sufficient to trigger the release of the Deposit Materials have occurred and (ii) the rights and licenses to the Supplier's Intellectual Property and Tech Escrow Documents (as defined in the ESAs) and the Deposit Materials (as defined in the IP Escrow Agreements), expressly set forth in the Project Documents, including pursuant to sections 36 and 45(i)

of the Munmorah ESA, sections 37 and 49(i) of the Ulinda ESA and sections 3.E and 23 of the IP Escrow Agreements are in full force and effect and shall continue to apply in full force and effect (notwithstanding, and fully surviving, any termination of the Project Documents, but subject to all terms and conditions set forth therein, including any limitation on the permitted purpose to which Munmorah and Ulinda are permitted to use the Supplier's Intellectual Property, Tech Escrow Documents and Deposit Materials as provided, without limitation, in section 36 of the Munmorah ESA and section 37 of the Ulinda ESA) irrevocably and in perpetuity.

b.  For purposes of clarity and in restatement (without expansion or amendment) of such rights referenced in <u>Section 6(a)</u> above, Powin, on behalf of itself and its affiliates, successors, and assigns, hereby grants the Project Group a worldwide, non-exclusive, perpetual, irrevocable, transferable, right and license, with the right to sublicense (including through multiple tiers) to use, modify, reproduce, create derivative works of the Deposit Materials (as defined in each of the IP Escrow Agreements) for purposes of improving, manufacturing, having manufactured, installing, configuring, commissioning, operating, repairing, and maintaining the Equipment (as defined in the Project Documents) or any technology incorporated into the Equipment, and to support any sublicensees under the Project Documents, solely in connection with the Project and the businesses and activities of the Project Group, and its affiliates, and its and their customers related thereto. For avoidance of doubt, the foregoing shall in no event be interpreted to expand the scope of the licenses granted to the Project Group under the Project Documents, or permit the Project Group to use any Supplier Intellectual Property or Deposit Materials for a purpose unrelated to the Projects, Equipment or any technology incorporated into the Equipment, and is intended solely to emphasize, restate, and confirm the rights under the Project Documents for purposes of this Agreement.

c.  Powin, on behalf of itself and its affiliates, successors and assigns, agrees that it shall not, and shall not directly or indirectly cause others to, take any action, or fail to take any action, that would reasonably be expected to directly or indirectly to frustrate, hinder, alter, impede, encumber, impair, diminish, undermine, seek to terminate or limit, or otherwise interfere with the Project Group's use and enjoyment of any rights and licenses set forth in this <u>Section 6</u>, or the Project Group's rights in the Supplier's Intellectual Property or Deposit Materials (including Missing IP) under the IP Escrow Agreements or this Agreement, without the express written consent of the Project Group. Powin shall (and shall cause its affiliates, successors, and assigns to) use reasonable efforts to ensure that any subsequent transfers, assignments, or licenses of the Supplier's Intellectual Property or Deposit Materials are expressly subject to the Project Group's rights therein, which the Parties hereby acknowledge and agree shall survive in perpetuity and without modification in the event of any such transfer, assignment, or license.

d. Section 6(a)(ii) shall survive any termination of the Project Documents, Letter Agreement and/or this Agreement. For the avoidance of doubt, Section 6(b) above shall terminate and cease to apply if this Agreement is terminated by the Project Group pursuant to Section 19.

7. Further Assurances. On and after the Execution Date (including after the Settlement Time), Powin and, with respect to Section 4(d), KKR, respectively, shall take such actions and execute and deliver such consents, waivers, certificates, documents and instruments, and shall cause its affiliates or other applicable parties over which it has control to take such actions and to execute and deliver such consents, waivers, certificates, documents and instruments, as may be reasonably requested by the Project Group as necessary, appropriate or desirable to fully effectuate the covenants, conditions precedent, agreements and transactions set forth in the Letter Agreement and this Agreement (as applicable), or as required under any conditional waiver given by the Project Group under this Agreement, including (as applicable) to (i) ensure the Project Group's continued access and ability to use the Missing IP and Deposit Materials (including support with respect to any export restrictions on the Deposit Materials and Missing IP) and (ii) perfect and/or evidence the transfers, assignments, releases of liens and other transactions and actions under Section 4 of this Agreement; *provided* that on and from the Settlement Time, neither Powin nor KKR shall be required to incur any out of pocket costs in connection with the foregoing unless the Project Group or their affiliate agrees in writing to cover or reimburse such documented out of pocket expenses.

8. Taxes.

   a. In this Section 8:

      i. "GST" has the meaning given in the GST Act;

      ii. "GST Act" means A New Tax System (Goods and Services Tax) Act 1999 (Cth);

      iii. "GST Law" has the meaning given in the GST Act;

      iv. "Tax Authority" means a Governmental Agency, including any delegate, that collects, imposes or otherwise administers a Tax whether in Australia or any other jurisdiction;

      v. "Taxes" means all forms of taxation imposed by a Tax Authority, whether direct or indirect, and whether levied or charged at present or at a date in the future, and without limitation includes income tax, capital gains tax, GST, any stamp, transaction or registration duties, customs and excise duties, withholding taxes other levies and rates;

      vi. words or expressions used in this Section 8(a) which have a particular meaning in the GST Law, any applicable legislative determinations and Australian Taxation Office public rulings, have

the same meaning, unless the context otherwise requires;

vii. any reference to GST payable by a Party includes any corresponding GST payable by the representative member of any GST group of which that Party is a member; and

viii. any reference to an input tax credit entitlement by a Party includes any corresponding input tax credit entitlement by the representative member of any GST group of which that Party is a member.

b. Payment of Tax.

i. Except as expressly provided in this Agreement, all Taxes payable in connection with this Agreement will be borne by the Project Group.

ii. If the Project Group is liable to pay an amount under this Agreement and that payment is subject to a withholding or deduction for or on account of Tax, then the payment must not be grossed up.

iii. For the avoidance of doubt, any such amount referred to in Section 8(b)(ii) will not be increased to ensure that the net amount retained by the recipient after any such withholding or deduction or payment of Tax equals the amount the recipient would have retained had there been no withholding or deduction or Tax payable.

c. GST.

i. All amounts payable under or in connection with this Agreement are inclusive of GST.

ii. A Party's right to payment under or in connection with this Agreement is subject to a valid Tax Invoice being delivered by the supplier to the recipient of the taxable supply.

iii. To the extent that a Party is required to reimburse or indemnify another Party for a loss, cost or expense incurred by that other Party, that loss, cost or expense shall be inclusive of GST but excludes any GST component for that loss, cost or expense for which that other Party is entitled to claim an input tax credit.

iv. To the extent that any consideration payable to a Party under this Agreement is determined by reference to a cost incurred by a Party, or to a price, value, sales, revenue or similar amount, the GST exclusive amount of that cost, price, value, sales, revenue or similar amount must be used.

v.  If, at any time, an adjustment event arises in respect of any taxable supply made by a supplier under this Agreement, then a corresponding adjustment must be made between the Parties in respect of any amount paid in accordance with Section 8(b). Payments to give effect to the adjustment must be made between the Parties and the supplier must issue a valid adjustment note in relation to the adjustment event.

9.  Representations and Warranties. Each Party hereby represents and warrants as of the date hereof (and as of the Settlement Time where so indicated) to each other Party:

a.  subject to entry of the Approval Order with respect to Powin, that it has all requisite corporate or limited liability company power and authority to execute and deliver this Agreement and any and all instruments necessary or appropriate in order to effectuate fully the terms and conditions of this Agreement and to perform and consummate the transactions and obligations contemplated by this Agreement. This Agreement has been duly and validly authorized by all requisite action on the part of such Party, and has been duly and validly executed and delivered by such Party and constitutes a valid and legally binding obligation of such Party enforceable against such Party in accordance with its terms and conditions;

b.  that the execution and delivery of this Agreement and the performance by such Party of its obligations contemplated hereunder do not and will not conflict with, or result in any violation or termination of, or cause any default under, its constitutional documents, or any agreement, contract, obligation, promise, commitment, governmental order, undertaking or understanding (whether oral, written, express or implied), or any applicable law to which it is a party or by which it or any of its assets or properties may be bound or affected;

c.  other than entry of the Approval Order with respect to Powin, that no consent, approval, order or authorization of, or registration, declaration or filing with, or notice to any (i) governmental authority or (ii) any other person or entity is necessary or required to be made or obtained by such Party to enable such Party to lawfully execute and deliver, enter into, and perform its obligations under this Agreement;

d.  solely with respect to KKR, each KKR Party is a lender under the Credit Facility and other than KKR, there are no other lenders to the Credit Facility as of the Execution Date and as of the Settlement Time subject to the assignment rights under Section 17; and

e.  solely with respect to Powin, as of the Execution Date and as of the Settlement Time, other than the ██████ Liens, there are no other liens, pledges, voting agreements, voting trusts, proxy agreements, security interests, restrictions, mortgages and other possessory interests, conditional

sale or other title retention agreements, assessments, easements, rights-of-way, covenants, restrictions, rights of first refusal, defects in title, encroachments and other burdens, options or encumbrances of any kind on any of the assets (including spare parts, contracts, purchaser orders, and warranties) to be transferred, assigned or delivered pursuant to Section 4.

10. Good Faith and Cooperation. The Parties agree to cooperate fully and in good faith to carry out the terms of this Agreement and to effectuate the purpose of this Agreement. Each Party agrees that it shall not, and it shall not directly or indirectly cause others to, take any action, or fail to take any action, that would reasonably be expected to directly or indirectly frustrate, hinder, or delay the implementation or enforcement of this Agreement or the benefits intended to be conferred by it.

11. Discussions and Agreements with Transferred Suppliers.

   a. Notwithstanding any existing or go-forward contract, purchase order or other agreement, business relationship or engagement Powin or its affiliates have or may have with the Subcontractors listed on Exhibits E-1 and E-2 hereto, or any other subcontractor subsequently mutually designated by Powin and the Project Group, (each a "Transferred Supplier"), as of the Execution Date, Powin hereby consents to and agrees and acknowledges that on and after the Execution Date, the Project Group and its affiliates shall have the right to enter into discussions with the Transferred Suppliers (including ███████ in connection with its liens), including in the contemplation or negotiation of any agreement or arrangement with respect to the Projects, provided that, the Project Group or their affiliates do not enter into any binding arrangements with such Transferred Suppliers with respect to the Projects until the earlier of (i) Settlement Time and (ii) the day that is twelve (12) days following the Execution Date. Notwithstanding anything in this Section 11, prior to, on and after the Execution Date, the Project Group and its affiliates have the right to directly engage and contract with (i) ██████████ and ████████████ for the supply of battery pack controllers ("BPCs") and string controllers and ████████ for the supply of BPC box assemblies and associated equipment to BPCs, and any supplier, vendor or subcontractor of Powin for any other critical parts for the Projects as agreed between Powin and the Project Group in writing (email shall suffice) for the Projects, (ii) ██████ or any of its affiliates and ████████████████████ in connection with the Projects, (iii) authorized service providers who are working on either Project site in Australia and (iv) any direct or indirect subcontractor, supplier or vendor of Powin who is party to a direct or substitution agreement with Munmorah and/or Ulinda on or prior to the Petition Date but in each case (i) through (iv) solely with respect to the applicable Project.

b.  On and after the date that is the earlier of (a) the Settlement Time and (b) the day that is twelve (12) days following the Execution Date, Powin hereby consents to and agrees and acknowledges that the Project Group and its affiliates may negotiate and enter into any agreements, contracts, purchase orders or other arrangements or engagements either directly or indirectly with any direct or indirect subcontractors, suppliers and vendors of Powin and its affiliates with respect to the Projects and make any payments as agreed with such direct or indirect subcontractors, suppliers and vendors; provided that, until August 8, 2025, the Project Group agrees to not enter into any agreements, contracts or purchase orders with the Transferred Suppliers as an agent of any customer of Powin as of the Petition Date solely for the purpose of supplying equipment or spare parts to such customer of Powin in connection with projects not owned or under development by the Project Group or its affiliates (for the avoidance of doubt, this proviso shall not limit the ability and rights of the Project Group and its affiliates to freely engage, negotiate and contract with any entity or person in connection with projects under development or acquired by the Project Group or its affiliates whether before, on or after the Execution Date).

c.  In furtherance of the above consents and acknowledgements by Powin pre and post Settlement Time, with respect to any contract, purchase order or other agreement, business relationship or other engagement it has with any subcontractor, supplier or vendor ("Transferred Supplier Agreements"), which requires consent or waiver by Powin for such subcontractor, supplier or vendor to enter a direct agreement with the Project Group or its affiliates (or in connection with which the subcontractor, supplier or vendor desires to have an express consent or waiver from Powin before proceeding to do business with the Project Group or its affiliates) with respect to the Projects, as of the Settlement Time (or the date which is twelve (12) days following the Execution Date, whichever is earlier), Powin hereby (i) grants such consent and automatically waives any breach or default, or other right or cause of action they may have against such subcontractor, supplier and vendor of such Transferred Supplier Agreement and a copy of this Agreement may be adduced as evidence of such consent or waiver and (ii) waives any breach or default, or other right or cause of action it may have against the Project Group or any of its affiliates for the direct engagement of or payment to such subcontractor, supplier or vendor in connection with the foregoing.

d.  KKR hereby acknowledges and agrees to the rights granted to the Project Group and its affiliates in this Section 11 with respect to Transferred Suppliers and any other direct or indirect suppliers, vendors or subcontractors of Powin with respect to the Projects.

12. Confidentiality.

a.  Each Party (each, a "Receiving Party") must:

25

i.   keep confidential the terms of this Agreement, the Letter Agreement, information regarding the each other Party or any of its affiliates and any information disclosed by a Party or any of its affiliates or representatives ("Disclosing Party") pursuant to this Agreement or the Letter Agreement which the Receiving Party knows or ought to have known is confidential (whether or not that information is expressly designated confidential) ("Confidential Information"); and

ii.  notify the Disclosing Party as soon as reasonably practicable after it suspects or becomes aware of any breach of this Agreement and promptly take all reasonable steps, at its own expense, to prevent or stop, any suspected or actual breach of this Agreement.

b.   Nothing in this Section 12 prohibits the disclosure of Confidential Information:

i.   which is in the public domain otherwise than as a result of a breach of this Section 12;

ii.  with the prior written consent of the Disclosing Party;

iii. which is received from a third party provided that it was not acquired directly or indirectly by that third party as a result of a breach of this Section 12;

iv.  which is required to be disclosed by law or any government authority of any jurisdiction (whether inside or external to the United States of America) or stock exchange having authority over a Party or any of its affiliates or by the rules of a stock exchange which has jurisdiction over a Party or any of its affiliates;

v.   which is required to be disclosed in connection with a dispute or legal proceedings relating to this Agreement or the Letter Agreement;

vi.  to a Receiving Party's current and future directors, officers, managers, employees, representatives, agents, members (including direct or indirect equity holders), stockholders, successors, parents, affiliated investment funds, affiliated investment vehicles, managed accounts, managed funds, managed entities, agents, representatives, owners, partners, financial advisors, legal advisors, investment advisors, fund advisors, fund, principals, consultants, accountants, predecessors and assigns;

vii. as required under the Approval Motion, subject to any redactions the Project Group determines in its sole discretion are necessary to

26

protect commercially sensitive information entitled to be protected under section 107 of the Bankruptcy Code;

viii.  to financiers, insurers, purchasers, equity investors, professional advisors or bona fide prospective financiers, insurers, purchasers or equity investors of the Project Group, its affiliates or the Munmorah Project or Ulinda Project (and their professional advisers); and

ix.  as required by the Project Group to any third party as evidence of the Project Group's title after the Settlement Time to the assets referred to in <u>Section 4</u>, or otherwise as evidence of the assignments under <u>Section 4</u>.

13. <u>Termination of Project Documents and Letter Agreement</u>.

a.  Effective for all purposes as of the Settlement Time, the Parties hereby acknowledge and agree that the Project Documents (other than the IP Escrow Agreements) have been terminated as of May 29, 2025 and shall be of no further force and effect except with respect to (i) sections 9(d), 9(e), 12(c), 12(f), 12(g), 34, 36, 37, 45(i), 54(a), 54(b) and 54(c) and any other section of the Munmorah ESA necessary to give effect to section 54(a) of the Munmorah ESA, in the case of the Munmorah ESA, and (ii) sections 8(a), 8(f), 12(d), 12(e), 35, 37, 38, 49(i), 59(a), 59(b) and 59(c) and any other section of the Ulinda ESA necessary to give effect to section 59(a) of the Ulinda ESA, in the case of the Ulinda ESA.

b.  The Parties agree that the sections of the Munmorah ESA and Ulinda ESA referenced in <u>Section 13(a)(i)</u> and <u>13(a)(ii)</u>, respectively, shall be incorporated herein by reference in their entirety and deemed to apply, *mutatis mutandis*, to this Agreement.

c.  Effective for any and all purposes as of the Effective Date, the Parties hereby acknowledge and agree that the Letter Agreement shall terminate in its entirety and be of no further force and effect and shall be superseded by this Agreement.

14. <u>Equitable Relief</u>. The Parties acknowledge and agree that, in addition to all other remedies available (at law or otherwise) to the Parties, each Party shall be entitled to equitable relief (including injunction and specific performance), and the Parties acknowledge that the payment of damages for a breach of <u>Sections 1(b)</u> and <u>1(f)</u> will not be an adequate remedy, as a remedy for any breach or threatened breach of any provision of this Agreement, including with respect to Powin's obligations to provide passwords, encryption keys and access for all software, source code, intellectual property and other materials relevant, necessary or helpful to the Projects which Powin is obligated to provide in accordance with <u>Section 1</u>. The Parties further acknowledge and agree that the Parties shall not be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred

to in this <u>Section 14</u>, and each of the Parties waive any right it may have to require that the other Parties obtain, furnish or post any such bond or similar instrument.

15. <u>No Waiver</u>. No Party's failure or delay in exercising any of its rights will constitute a waiver of such rights unless expressly waived in writing.

16. <u>Severability</u>. If any term or other provision in this Agreement or the Letter Agreement is determined by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced by any rule of law or public policy, all other terms, provisions and conditions in this Agreement and the Letter Agreement shall nevertheless remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby are not affected in any manner adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible to the fullest extent permitted by applicable law in an acceptable manner in order that the transactions contemplated hereby are fulfilled to the extent possible.

17. <u>Assignment</u>.

    a.   Prior to the Settlement Time:

        i.   Powin and KKR may not assign this Agreement by any means, including by operation of law, merger, acquisition, other business combination or change of control, without the prior written consent of the other Parties hereto, *provided* that KKR may assign this Agreement to any person succeeding to its position as lender under the Credit Facility (1) provided KKR takes reasonable efforts to provide written notice to the Project Group within two (2) Business Days of such assignment and (2) so long as the assignee expressly assumes all of the assignor's obligations and liabilities and all other terms and conditions hereunder and under the Credit Facility.

        ii.   The Project Group may assign this Agreement by any means and for any reason, including by operation of law, merger, acquisition, other business combination or change of control and in any event without the consent of Powin or any KKR Party, provided that (i) the assignee is an affiliate or a purchaser of substantially all assets related to a Project or the Projects and (ii) the Project Group remains liable for the Final Payment under this Agreement in the event the Settlement Time occurs.

    b.   After the Settlement Time:

        i.   Powin and any KKR Party may assume and/or assign this Agreement without the written consent of the Project Group (A) in the case of KKR, to any person succeeding to its position as lender

under the Credit Facility and (B) in both cases, so long as the assignee (I) provides directly to the Project Group adequate assurance of future performance (as that term is used in section 365 of the Bankruptcy Code) in connection with the assumption and/or assignment of this Agreement and (II) expressly assumes all of the assignor's obligations and liabilities and all other terms and conditions hereunder and thereunder.

    ii.  The Project Group may assign this Agreement by any means and for any reason, including by operation of law, merger, acquisition, other business combination or change of control and in any event without the consent of Powin or any KKR Party.

18. <u>Milestones</u>. Powin shall satisfy the following milestones (the "<u>Milestones</u>") and any extension of such milestones shall require the prior written consent of the Project Group (which may be by email, including from counsel) (which consent shall not to be unreasonably withheld, conditioned or delayed; it being understood that it shall not be unreasonable for the Project Group to withhold, condition or delay such consent in the event that Powin has not used their respective reasonable best efforts to avoid any such extension):

    a.  Powin shall have in good faith substantially completed its obligations to provide the documents and access contemplated in <u>Section 1(c)</u> no later than the day that is three (3) days following the Execution Date.

    b.  Powin shall have filed the Approval Motion no later than the day that is three (3) days following the Execution Date.

    c.  Powin shall have served the Proposed Assumption Notices no later than the day that is two (2) Business Days after receipt by Powin of the Project Group Assumption Notices from the Project Group.

    d.  The Bankruptcy Court shall have entered the Approval Order no later than the day that is twelve (12) days following the Execution Date.

    e.  Without the duplication of <u>Section 18(a)</u>, the Effective Date CPs shall have been satisfied in the Project Group's reasonable discretion (other than the condition that the Approval Order be final and nonappealable) within one (1) Business Day after the date the Bankruptcy Court enters the Approval Order.

19. <u>Termination</u>.

    a.  If any of the Milestones set forth in this Agreement are not satisfied or waived in writing by the Project Group by the applicable deadline(s) set forth in <u>Section 18</u>, the Project Group may, upon two (2) Business Day's prior written notice to Powin and KKR, terminate this Agreement. Upon such termination, this Agreement shall have no further force and effect and

neither Party shall have any further rights, liabilities or obligations hereunder, except for Section 6(a)(ii) and any other rights and obligations that expressly survive termination of this Agreement. For the avoidance of doubt, any termination of this Agreement prior to the Settlement Time shall have no effect on the Letter Agreement, which shall continue in full force and effect following such termination of this Agreement. Powin and KKR and their successors and assigns agree that they shall not dispute the giving of notice of termination of this Agreement by the Project Group or their successors or assigns as a violation of the automatic stay under section 362 of the Bankruptcy Code and Powin and KKR and their successors and assigns waive to the fullest extent permitting by law the applicability of the automatic stay to the giving of such notice and their right to assert a contrary position in Powin's Chapter 11 Cases.

20. Defined Terms; Interpretation.

    a.  Any terms used but not defined herein shall have the definition given to such terms in the Letter Agreement or the Project Documents, as applicable.

    b.  Unless expressly provided for elsewhere in this Agreement, this Agreement shall be interpreted in accordance with the following provisions: (i) the words "this Agreement," "herein," "hereby," "hereunder," "hereof," and other equivalent words shall refer to this Agreement as an entirety and not solely to the particular portion, article, section, subsection or other subdivision of this Agreement in which any such word is used; (ii) the word "including" and its derivatives mean "including, without limitation" and are terms of illustration and not of limitation; (iii) all definitions set forth herein shall be deemed applicable whether the words defined are used herein in the singular or in the plural and correlative forms of defined terms shall have corresponding meanings; (iv) the word "or" is not exclusive and has the inclusive meaning represented by the phrase "and/or"; (v) a defined term has its defined meaning throughout this Agreement and each exhibit and schedule to this Agreement, regardless of whether it appears before or after the place where it is defined; (vi) all references to prices, values or monetary amounts refer to United States dollars; (vii) wherever used herein, any pronoun or pronouns shall be deemed to include both the singular and plural and to cover all genders; (viii) this Agreement has been jointly prepared by the Parties hereto, and this Agreement shall not be construed against any person or entity as the principal draftsperson thereof, and no consideration may be given to any fact or presumption that any applicable Party hereto had a greater or lesser hand in drafting this Agreement; (ix) the captions of the articles, sections or subsections appearing in this Agreement are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or extent of such section, or in any way affect this Agreement; (x) any references herein to a particular Section, Article, Exhibit or Schedule means a Section or Article of, or an Exhibit or Schedule to, this Agreement unless otherwise expressly stated herein; (xi) the

Exhibits and Schedules attached hereto are incorporated herein by reference and shall be considered part of this Agreement; (xii) all references to days shall mean calendar days unless otherwise provided; (xiii) all references to "Business Days" shall mean New York City Business Days; (xiv) all references to time shall mean prevailing Eastern Time in the United States unless otherwise stated; (xv) references to any person or entity shall include such person or entity's successors and permitted assigns; (xvi) if the last day of any period is a non-Business Day, the period in question shall end on the next succeeding Business Day; and (xvii) for all purposes under this Agreement and the Letter Agreement, with respect to the Project Group, the term "affiliate" shall include Akaysha Energy Pty Ltd, ACN 649 223 987, an Australian corporation.

c.   Notwithstanding anything herein to the contrary, the words "successor" or "successors" shall include any estate representative or trustee appointed in any of the Chapter 11 Cases or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing and/or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "Successor Cases").

21. Entire Agreement; Amendments. As of the Effective Date, this Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior or contemporaneous oral or written agreements concerning such subject matter, including the Letter Agreement. This Agreement may not be amended except by written agreement signed by authorized representatives of the Parties.

22. Governing Law; Venue; Jurisdiction.

a.   This Agreement shall be construed and governed in accordance with the internal laws of the State of New York without regard to rules concerning conflicts of laws.

b.   Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to hear and decide any and all claims, demands, causes of action, disputes, controversies and other matters in question arising out of, relating to, or in connection with this Agreement or the transactions, including any question regarding its existence, breach, validity or termination (each, a "Transaction Dispute") and (ii) any and all proceedings related to the foregoing shall be filed and maintained exclusively in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for deciding any Transaction Dispute and shall receive notices at such locations as indicated in Section 23 (as may be updated from time to time in accordance with Section 23); provided, however, upon the closing of the Chapter 11 Cases (or any corresponding chapter 7 case, in the event of conversion), the

Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the courts in New York County, New York and irrevocably waive any objection to such courts on the grounds that they are an inconvenient or inappropriate forum or that such courts lack personal jurisdiction over the Party.

23. <u>Notices</u>. All notices and other communications and deliveries to and between the Parties pursuant to this Agreement ("<u>Notice</u>") must be in writing and will be deemed to have been duly given when (i) delivered in person, (ii) five (5) days after posting in the United States mail having been sent by registered or certified mail return receipt requested, or (iii) delivered by e-mail, addressed as follows:

     a.   if to Powin:

Powin, LLC
20550 SW 115th Ave
Tualatin, Oregon 97062
Email: notice@powin.com

*With a copy to*

Gerard Uzzi
Uzzi & Lall
One Liberty Plaza
165 Broadway 23rd Floor
New York, NY 10006
Phone: (732) 675-9503
Email: guzzi@uzzilall.com

*And a copy to:*

Van C. Durrer, II
Dentons US, LLP
601 S. Figueroa Street
Suite 2500
Los Angeles, CA 90017-5704
Email: van.durrer@dentons.com

     b.   if to the Project Group:

C/o Akaysha Energy Pty Ltd
Attn: General Counsel
Level 5, 388 George Street
Sydney, NSW 2000
Email: legal@akayshaenergy.com with copy to:
Brooke.Miechel@akayshaenergy.com

*With a copy to:*

Weil, Gotshal & Manges LLP
Attn:   Andriana Georgallas
            Kevin Bostel
            Irina Tsveklova
767 Fifth Avenue
New York, NY 10153
Email:  andriana.georgallas@weil.com
            kevin.bostel@weil.com
            irina.tsveklova@weil.com

   c.   if to KKR:

Kohlberg Kravis Roberts
Attn: Kevin O'Neill and Samuel Mencoff
30 Hudson Yards
New York, NY 10001
Email: kevin.oneill@kkr.com
            samuel.mencoff@kkr.com

*With a copy to:*

White & Case LLP
Attn:   Andrew Zatz
            Nadav Klugman
1221 Avenue of the Americas
New York, NY 10020
Email: azatz@whitecase.com
            nadav.klugman@whitecase.com

24. <u>No Third-Party Beneficiaries</u>. This Agreement (including any schedules or exhibits hereto) shall be binding upon and inure to the benefit of the Parties hereto, the Released Parties and their respective successors and permitted assigns, as well as, with respect to <u>Section 11</u>, the Transferred Suppliers. Any Released Party, or any Transferred Supplier with respect to <u>Section 11</u>, who is not named as a Party hereto shall have the rights of an intended third-party beneficiary with respect to the provisions of this Agreement to the extent applicable thereto (in each case, together with any related definitions and other provisions). Except as set forth in this <u>Section 24</u>, no other entity or person not a Party hereto shall be deemed a third-party beneficiary of any provision of this Agreement or shall otherwise be entitled to enforce any provision hereof.

25. <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. The exchange of a

fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the Parties to the terms and conditions of this Agreement.

26. <u>Bankruptcy</u>.

    a.   The Parties acknowledge and agree that the Supplier's Intellectual Property and Tech Escrow Documents (as defined in the ESAs) and the Deposit Materials (as defined in the IP Escrow Agreements) that are subject to the license in <u>Section 6</u> is "intellectual property" as defined in section 101(35A) of the Bankruptcy Code, as the same may be amended from time to time, that have been licensed hereunder in a contemporaneous exchange for value. Each Party, on behalf of itself and its affiliates, acknowledges that even if this Agreement (or any Project Document) is rejected (including by a chapter 7 trustee), the provisions of section 365(n) of the Bankruptcy Code apply, and the Project Group and their affiliates and each of their successors and assigns (collectively, the "<u>Project Group Entities</u>") will retain and may fully exercise all of their rights and elections under the Bankruptcy Code, including that Powin and its affiliates and each of their successors and assigns including any chapter 7 trustee (collectively, the "<u>Powin Entities</u>") shall provide to the Project Group Entities as licensee party, any intellectual property (including such embodiment) held by the Powin Entities upon written request by the Project Group Entities (whether prior to or after rejection of this Agreement). The Powin Entities hereby irrevocably and unconditionally grant, convey, and hypothecate (with no action required by the Powin Entities or the Project Group Entities) to the Project Group Entities the licenses, covenants, and releases that are provided in this Agreement.

    b.   Powin and KKR acknowledge and agree, and they and their successors and assigns will use best efforts to ensure, that the Rejection Order, any other order of the Bankruptcy Court seeking to reject any other Project Documents, the Cash Collateral Orders, and the DIP Orders (as defined below)[6] shall expressly provide that (i) any liens granted thereunder shall not attach to any assets that are not or do not become property of the Debtors' estates under section 541 of the Bankruptcy Code, (ii) nothing therein shall alter the rights of any party under section 365(n) of the Bankruptcy Code and (iii) solely with respect to any DIP Orders, no collateral shall be granted and no liens shall attach to the Debtors' right, title, ownership, benefit, and interest in, to, and under all assets and property of the Debtors of any kind or nature whatsoever, whether real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, or existing prior to or arising after the Petition Date, whether proposed to be or hereafter is conveyed, transferred, delivered, and/or assigned to the

---

[6] "<u>DIP Orders</u>" means any interim and final orders entered in the Chapter 11 Cases or any Successor Cases approving debtor-in-possession financing.

Project Group under (i) this Agreement, (ii) any order(s) of the Bankruptcy Court approving this Agreement including the Approval Order (collectively, the "Settlement Order"), (iii) any order(s) of the Bankruptcy Court authorizing the Debtors' assumption and assignment of executory contracts or unexpired leases to the Project Group in connection with this Agreement (collectively, the "Assignment Orders"), and (iv) any and all additional documents, instruments, certificates and agreements as may be necessary to implement the terms or effectuate the purposes of this Agreement, the Settlement Order, or the Assignment Orders.

27. Wrong Pockets. Without duplication of Section 7, if at any time after the Settlement Time, it is established that any asset, property, right, contract, purchase order or claim (each, an "Asset") which was not delivered, assigned, conveyed or transferred at Settlement Time to the Project Group but should have been delivered, assigned, conveyed, or transferred to the Project Group at the Settlement Time if held by Powin or any of its affiliates, then Powin shall (and shall cause its affiliates to) (a) execute all instruments, agreements, certificates, releases or documents as may be reasonably necessary for the purpose of delivering, conveying, transferring or assigning each such Asset or relevant interests in the Asset (or part thereof) held by Powin or its affiliates to the Project Group, (b) do all such further acts or things as may be reasonably necessary to validly effect the delivery, conveyance, transfer and assignment and vest the relevant interest in such Asset (or part thereof) in the Project Group, (c) ensure that Powin or its affiliates shall, where permitted by the terms on which Powin or such affiliates have the right to such Asset, hold the Asset (or part thereof), and any monies, goods or other benefits arising after the Settlement Time with respect to such Asset, as agent of and trustee for the Project Group and allow the Project Group to have full enjoyment and use of such Asset, and (d) ensure that Powin or its affiliates shall promptly on receipt pay or deliver such monies, goods or other benefits to the Project Group.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, each of the Parties has executed this Agreement as of the date first set forth above.

**POWIN, LLC**

By: _____

*Signed by:*

*Gerard Uzzi*

C933082321E44B5...

Name:  Gerard Uzzi

Title:   Authorized Signatory

[*Signature Page to Settlement and Release Agreement*]

**IN WITNESS WHEREOF**, each of the Parties has executed this Agreement as of the date first set forth above.

**PROJECT GROUP**

**EXECUTED** by **MUNMORAH BATTERY PROJECTCO PTY LTD (ACN 662 894 699):**

| | |
|---|---|
| Signed by: | Signed by: |
| *[signature]* | *Mick Carter* |
| 25C6867A8EC840B... | 1FF74BAEC3224FE... |
| Signature of director | Signature of director/secretary |
| | |
| Andrew Wegman | Nicholas Carter |
| Name | Name |

**EXECUTED** by **ULINDA PARK PROJECTCO PTY LTD (ACN 659 144 484):**

| | |
|---|---|
| Signed by: | Signed by: |
| *[signature]* | *Mick Carter* |
| 25C6867A8EC840B... | 1FF74BAEC3224FE... |
| Signature of director | Signature of director/secretary |
| | |
| Andrew Wegman | Nicholas Carter |
| Name | Name |

[*Signature Page to Settlement and Release Agreement*]

**IN WITNESS WHEREOF**, each of the Parties has executed this Agreement as of the date first set forth above.

**FS KKR CAPITAL CORP.**

By: *Samuel Mencoff*
Name: Samuel Mencoff
Title:   Authorized Signatory

**KKR FS INCOME TRUST**

By: *Samuel Mencoff*
Name: Samuel Mencoff
Title:   Authorized Signatory

**KKR FS INCOME TRUST SELECT**

By: *Samuel Mencoff*
Name: Samuel Mencoff
Title:   Authorized Signatory

**FORETHOUGHT LIFE INSURANCE COMPANY**

By: *Samuel Mencoff*
Name: Samuel Mencoff
Title:   Authorized Signatory

**COMMONWEALTH ANNUITY AND LIFE INSURANCE COMPANY**

By: *Samuel Mencoff*
Name: Samuel Mencoff
Title:   Authorized Signatory

**FIRST ALLMERICA FINANCIAL LIFE INSURANCE COMPANY**

By: *Samuel Mencoff*
Name: Samuel Mencoff
Title:   Authorized Signatory

*[Signature Page to Settlement and Release Agreement]*

<u>Schedule 4(a)(i)(B)</u>

Additional Munmorah Equipment[7]

<u>Part I</u>

(<u>*See attached list*</u>)

<u>Part II</u>

Low Voltage Benches and Devops testing:
1. Firmware testbenches 1-3
2. 42u Racks for embedded control testing (Centipede)
3. 3x - 42u Racks for testbed/devops
4. 1x - Grey Manual QA Cabinet
5. Raw battery pack controller PCB and String PCB12

---

[7] To be updated in accordance with Section 1(c) (unless waived by the Project Group).

**<u>OMITTED</u>**

<u>Exhibit A-1</u>

Munmorah Key Suppliers



<u>Exhibit A-2</u>

Ulinda Key Suppliers



<u>Exhibit A-3</u>

Amounts Paid by the Project Group or its Affiliates on Behalf of Powin

Munmorah Project: payments:



- ███████████████ (AUD ████ )
- ███████ (AUD ███ )
- ████████████ (AUD █████ )
- ██████████ (AUD ██ )
- █████████ (AUD ██ )
- ███████ (AUD ███ )
- ████████████ (AUD ████ )

Ulinda Project payments:



- ███████ (AUD ██████

<u>Exhibit B</u>

[Reserved]

<u>Exhibit C</u>

Letter Agreement

(See attached)

Exhibit C – 1

*Execution Version*
Subject to FRE 408 - Confidential

**LETTER AGREEMENT**

This letter agreement ("**Letter Agreement**"), dated and effective as of June 6, 2025, is by and among Munmorah Battery ProjectCo Pty Ltd and Ulinda Park ProjectCo Pty Ltd (collectively, "**Akaysha**") and Powin, LLC ("**Powin**"). Powin and Akaysha are referred to herein individually as a "**Party**" and collectively as the "**Parties**."

WHEREAS, the Parties desire to enter into this Letter Agreement in order to facilitate Akaysha's access to certain information, obtain certain acknowledgements, and provide the basis for settling any and all any claims and causes of action between the Parties under the Project Documents (as defined below) pursuant to a settlement agreement to be entered into by the Parties in form and substance mutually acceptable to the Parties (the "**Settlement Agreement**").

NOW, THEREFORE, in consideration for the mutual covenants and promises contained in this Agreement and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound (except with respect to Article II hereof), the Parties to this Agreement agree as follows:

I.    <u>**Binding Terms**</u>

| | | |
|---|---|---|
| 1. | **Background** | Munmorah Battery ProjectCo Pty Ltd and Ulinda Park ProjectCo Pty Ltd, respectively, are parties to (a) Energy Supply Agreements ("**ESAs**") and Long Term Services Agreements ("**LTSAs**", and together with ESAs, "**Project Documents**") with Powin in connection with (i) the Waratah battery storage project, located in Munmorah, New South Wales, Australia (the "**Waratah Project**") and (ii) Ulinda Park battery storage project, located in Queensland, Australia (the "**UL Project**" and, together with the Waratah Project, the "**Projects**") and (b) three party master escrow agreements with Powin and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ to provide Akaysha with access to intellectual property materials in connection with the Projects ("**IP Escrow Agreements**"). |
| 2. | **Purpose and Conditions Precedent to this Letter Agreement** | The parties (i)  are hereby executing this Letter Agreement to facilitate the immediate cooperation by Powin and direction by Powin to its employees, and instructions to others (including, without limitation, ▇▇▇▇▇ as necessary, to provide all passwords, encryption keys and access for all software, source code, IP and other materials relevant to the Projects and (ii) following the execution of this Letter Agreement, shall use best efforts to enter into the Settlement Agreement by June 9, 2025 and to consummate the transactions contemplated under the Settlement Agreement by June 13, 2025 (the "**Settlement Efforts**"). |
| | | As a condition precedent to the payment of the Initial Payment (as defined below), Powin shall (i) provide evidence sufficient to Akaysha (email from Powin to senior members of management (in the form of Exhibit B hereto) and such employees' subsequent acceptance and confirmation they will comply being sufficient ) that Powin has directed its management and relevant personnel to immediately provide to Akaysha all passwords, encryption keys and access for all Deposit Materials (as defined in the IP Escrow Agreements), including all software, source code, IP and other materials relevant to the |

| | | |
|---|---|---|
| | | Projects (including, but not limited to, urgent items set forth on <u>Exhibit A</u> hereto) and (ii) provide evidence that KKR has consented to the transactions contemplated by this Letter Agreement and the transactions contemplated by the Settlement Agreement (execution of this Letter Agreement by KKR being sufficient). |
| **3.** | **Ongoing Obligations** | Upon receipt of evidence of initiation of the Initial Payment and the execution of this Letter Agreement, Powin shall immediately provide all passwords, encryption keys and access for all Deposit Materials (as defined in the IP Escrow Agreements) and immediately provide and action all items set forth on <u>Exhibit A</u>, and will direct █████ to do so, as applicable. |
| **4.** | **Representations and Warranties** | Powin hereby represents and warrants to Akaysha:<br><br>(a) that it has all requisite corporate power and authority to execute and deliver this Letter Agreement and any and all instruments necessary or appropriate in order to effectuate fully the terms and conditions of this Agreement and to perform and consummate the transactions and obligations contemplated by this Agreement. This Agreement has been duly and validly authorized by all requisite action on the part of Powin, and has been duly and validly executed and delivered by Powin and constitutes a valid and legally binding obligation of Powin enforceable against Powin in accordance with its terms and conditions, except as limited by (i) applicable bankruptcy, reorganization, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally from time to time in effect or (ii) the availability of equitable remedies (regardless of whether enforceability is considered in a proceeding at law or in equity);<br><br>(b) that the execution and delivery of this Agreement and the performance by Powin of its obligations contemplated hereunder do not and will not conflict with, or result in any violation or termination of, or cause any default under, its constitutional documents, or any agreement, contract, obligation, promise, commitment, governmental order, undertaking or understanding (whether oral, written, express or implied), or any applicable law to which it is a party or by which it or any of its assets or properties may be bound or affected; and<br><br>(c) that no consent, approval, order or authorization of, or registration, declaration or filing with, or notice to any (i) governmental authority or (ii) any other person or entity is necessary or required to be made or obtained by Powin to enable Powin to lawfully execute and deliver, enter into, and perform its obligations under this Agreement. |
| **5.** | **Intellectual Property** | Powin, on behalf of itself and its affiliates, successors, and assigns, hereby acknowledges and agrees that the rights and licenses to the Supplier's Intellectual Property and Tech Escrow Documents (as defined in the ESAs) and Deposit Materials (as defined in the IP Escrow Agreements), including pursuant to Sections 36 and 45(i) of the Munmorah Battery ProjectCo Pty Ltd ESA, Sections 37 and 49(i) of the Ulinda Park ProjectCo Pty Ltd ESA and Sections 3.E and 23 of the IP Escrow Agreements shall continue to apply in full force and effect (notwithstanding, and fully surviving, the termination of |

2

| | | |
|---|---|---|
| | | the ESAs), irrevocably in perpetuity, and are hereby incorporated by reference. |
| | | This Section I-5 shall survive any termination of this Letter Agreement. |
| **6.** | **Initial Payment** | <u>Initial Payment</u>: USD ▮▮▮▮▮ (the "**Initial Payment**"), payable by Akaysha in the aggregate for both Projects, provided all of the conditions precedent set forth in Section I-2 are waived by Akaysha or satisfied.<br><br>All payments made hereunder and pursuant to the Settlement Agreement will represent the final payments under the ESAs and will reflect the value of verified software access and access to employees, which is necessary to operationalize the software to achieve commissioning and final completion of the Projects. Payments made under this Letter Agreement and the Settlement Agreement shall be apportioned between the two Projects as provided in the Settlement Agreement. |
| **7.** | **Non-Solicit** | Subject to Section I-2, above, Akaysha and its controlled affiliates hereby agree not to solicit any employees of Powin for 15 calendar days from the execution hereof; *provided* that this Section I-6 shall not apply to (i) any solicitations or offers of employment made prior to execution of this Agreement and (ii) any employee who responds to general solicitations through a public medium by Akaysha or its affiliates. |
| **8.** | **Termination of Settlement Efforts** | If the parties do not enter into a Settlement Agreement on or prior to June 13, 2025 (as such date may be extended by written agreement of Powin and Akaysha), Parties' Settlement Efforts obligations shall terminate as of 11:59 pm EST on June 13, 2025. |
| **9.** | **Governing Law and Venue** | This Letter Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to the choice of law provisions thereof. The parties hereby agree to the exclusive jurisdiction in the courts of New York County with respect to any dispute relating to this Letter Agreement. |

## II.   Settlement Agreement

| | | |
|---|---|---|
| **1.** | **Conditions Precedent to the Settlement Agreement** | Under the Settlement Agreement:<br><br>As a condition precedent to consummating the transactions contemplated under the Settlement Agreement, including Akaysha's payment of the Final Payment (which conditions precedent can be waived in Akaysha's absolute and sole discretion), Powin shall (or shall cause its applicable affiliate to): |
| | | (i)   fully cooperate with Akaysha to confirm whether any software or code base provided or required to be provided as part of Supplier's Intellectual Property or Deposit Materials (including Missing IP) includes any encryption libraries or other items that could be subject to US export controls or US export license requirements; |
| | | (ii)   provide all ECCNs for all Supplier's Intellectual Property or Deposit Materials (including Missing IP) provided or required to be provided, and provide all required, necessary or helpful |

3

assistance in connection with any export control restrictions on the software and other IP that is or should have been subject to the IP Escrow Agreement;

(iii)     notwithstanding Section I-6, immediately upon Akaysha's initiation of the Initial Payment make available to Akaysha all employees and personnel with necessary, appropriate or helpful technical knowledge relevant to the Projects and continue to make such employees and personnel available for a period of five business days;

(iv)     cause KKR to acknowledge and consent to the Settlement Agreement and the terms thereof (including release subject to Final Payment as noted below); and

(v)      notwithstanding Section I-6, direct its employees and personnel with relevant, appropriate or helpful technical information, know-how or operation knowledge relating to either or both of the Projects to fully cooperate with Akaysha for the purpose of identifying and verifying any missing technology, software, IP or other assets that constitute Deposit Materials under the IP Escrow Agreement but which have not yet been deposited into the ███████ escrow as of the date hereof (the "**Missing IP**") and (1) cooperate with Akaysha to identify relevant account managers with respect to third party software licensors and service providers and (2) provide, or otherwise deliver in a medium acceptable to Akaysha, the Missing IP.

The Settlement Agreement will provide that, conditional upon and immediately effective upon, the initiation of the Final Payment by Akaysha:

(i)      Powin and its applicable affiliates (1) assign all ownership of and title to all spare parts and other equipment, including, without limitation, such spare parts and equipment held by ██████████ for which Akaysha or its affiliates has paid or will pay directly to Powin's subcontractors, and (2) shall acknowledge and execute any document relevant or necessary to effect or evidence such assignment (*i.e. further assurances*);

(ii)     KKR (and/or the relevant collateral agent) releases any liens and/or securities interests granted in connection with any contract, arrangement, indebtedness or collateral agreement of any fashion by and between Powin and any of its affiliates, on the one hand, and KKR and any of its affiliates (including by the relevant collateral agent on KKR's behalf), on the other hand, on any Supplier's Intellectual Property (as defined in the ESAs) and Deposit Materials (as defined in the IP Escrow Agreements) transferred pursuant to the Letter Agreement or Settlement Agreement (and will include further assurances to execute any additional documents/instruments necessary to effectuate such release); and

(iii)    the parties to the Settlement Agreement mutually release one another (as negotiated and included in the Settlement Agreement) of any and all claims and liabilities under the Project Documents (including but not limited to with respect to delay liquidated damages payable or that may become payable by Powin to

4

| | | |
|---|---|---|
| | | Akaysha and any remaining milestone payments payable or that may become payable by Akaysha to Powin, subject to applicable law). |
| **2.** | **Final Payment** | Final Payment: USD ███████ (the "**Final Payment**"), payable by Akaysha, provided all of the conditions set forth in Section II-1, above, are waived or satisfied.<br><br>All payments made hereunder or pursuant to the Settlement Agreement will represent the final payments under the ESAs and will reflect the value of verified software access and access to employees, which is necessary to operationalize the software to achieve commissioning and final completion of the Projects. Payments made under this Letter Agreement and the Settlement Agreement shall be apportioned between the two Projects as provided in the Settlement Agreement. |

**Disclaimer**

This Letter Agreement is intended to be binding on the parties hereto. This Letter Agreement may be executed in any number of counterparts, each of which shall be deemed an original as against any party who signed such counterpart, and all of which together constitute one and the same instrument.

*[Signature pages to follow]*

**POWIN**

**POWIN, LLC**

By: _Gerard Uzzi_

Name:   Gerard Uzzi

Title:   Independent Manager

# AKAYSHA

**EXECUTED** by **MUNMORAH BATTERY PROJECTCO PTY LTD (ACN 662 894 699)**:

_____
Signature of director

_____
Signature of director/secretary

Paul Curnow
_____
Name

Andrew Wegman
_____
Name

**EXECUTED** by **ULINDA PARK PROJECTCO PTY LTD (ACN 659 144 484)**:

_____
Signature of director

_____
Signature of director/secretary

Paul Curnow
_____
Name

Andrew Wegman
_____
Name

2

## ACKNOWLEDGEMENT AND CONSENT

The undersigned hereby acknowledges and consents to the transactions set forth in the Letter Agreement dated as of June 6, 2025 (the "**Specified Transactions**") to which this signature page is attached and such Specified Transactions shall in no event constitute a default or event of default under any loan documents (or similar agreements) in which the undersigned and Powin (as defined in the Letter Agreement) and any of their affiliates are a party thereto.  To the extent any of the liens or security interests granted under such loan documents restrict the Specified Transactions, conditional upon receipt by Powin of the Final Payment, the undersigned hereby waives any such restrictions and hereby agrees such liens or security interests are hereby released to the extent required to consummate the Specified Transactions and agrees to execute any further documents necessary to effectuate such release.

*[Signature Pages Follow]*

**FS KKR CAPITAL CORP.**

By: _Samuel Mencoff_

Name: Samuel Mencoff

Title: Authorized Signatory


**KKR FS INCOME TRUST**

By: _Samuel Mencoff_

Name: Samuel Mencoff

Title: Authorized Signatory


**KKR FS INCOME TRUST SELECT**

By: _Samuel Mencoff_

Name: Samuel Mencoff

Title: Authorized Signatory


**FORETHOUGHT LIFE INSURANCE COMPANY**

By: _Samuel Mencoff_

Name: Samuel Mencoff

Title: Authorized Signatory


**COMMONWEALTH ANNUITY AND LIFE INSURANCE COMPANY**

By: _Samuel Mencoff_

Name: Samuel Mencoff

Title: Authorized Signatory


**FIRST ALLMERICA FINANCIAL LIFE INSURANCE COMPANY**

By: _Samuel Mencoff_

Name: Samuel Mencoff

Title: Authorized Signatory

## <u>EXHIBIT A</u>

Itemized Assets to be Disclosed or Provided

1.  ███ Account – Powin will request that Powin's ███ account for Akaysha (as it relates to Waratah Super Battery ("Waratah") and Ulinda Park ("UP") Battery Projects) be assigned to Akaysha with immediate effect. If ███ is unwilling to facilitate the assignment of Powin's (Waratah and UP accounts) Powin will support Akaysha in setting up a new ███ account and will migrate all Waratah and UP-related resources into it, including data, services, and configurations. Confirm if the ███ access is hosted inside the ███ database or separately? If separate, provide the database. Note: Powin accesses ███ instances through ███.

2.  ███ – Powin will replicate the ███ source code and transfer the data to Akaysha

3.  ███ – Powin will replicate the artifacts and transfer the data to Akaysha

4.  ███ (Site Controller) – details of functionality of this software and a process flow

5.  ███ – Powin will provide Akaysha access to or copies of relevant documents in the database as needed to facilitate the transfer of relevant data to Akaysha

6.  ███ and ███ – Powin will transfer available, persisted historic data related to Waratah and UP. Powin will also facilitate Akaysha building its own ███ workspace to capture ongoing site data.

7.  ███ Configurator ███ – full details of the functionality and process flow

8.  ███ - full details of functionality and process flow

9.  Powin will ensure that Akaysha retains access to its Sites via ███ Powin will work with Akaysha to ensure that Powin transfers access to Akaysha to manage independently

10. Powin will ensure that Akaysha retains access to its Sites via ███ Powin will work with Akaysha to ensure that Powin transfers access to Akaysha to manage independently

## EXHIBIT B

Email to Powin Management and Relevant Employees

## QUOTE

Powin management and employees, you are hereby instructed and directed by the board of Powin to immediately transfer all passwords, encryption keys and access for all software, source code, IP and other materials relevant to the Waratah Super Battery Project and Ulinda Park Project to Akaysha (including, without limitation, items listed below) and cooperate with Akaysha with respect to such transfer.



1.   ██████ Account – Powin will request that Powin's ██████ account for Akaysha (as it relates to Waratah Super Battery ("Waratah") and Ulinda Park ("UP") Battery Projects) be assigned to Akaysha with immediate effect. If ██████ is unwilling to facilitate the assignment of Powin's (Waratah and UP accounts) Powin will support Akaysha in setting up a new ██████ account and will migrate all Waratah and UP-related resources into it, including data, services, and configurations. Confirm if the ██████ access is hosted inside the ██████ database or separately? If separate, provide the database. Note: Powin accesses ██████ instances through ██████

2.   ██████ – Powin will replicate the ██████ source code and transfer the data to Akaysha

3.   ██████ – Powin will replicate the artifacts and transfer the data to Akaysha

4.   ██████ (Site Controller) – details of functionality of this software and a process flow

5.   ██████ – Powin will provide Akaysha access to or copies of relevant documents in the ██████ database as needed to facilitate the transfer of relevant data to Akaysha

6.   ██████ and ██████ – Powin will transfer available, persisted historic data related to Waratah and UP. Powin will also facilitate Akaysha building its own ██████ workspace to capture ongoing site data.

7.   ██████ Configurator (██████) – full details of the functionality and process flow

8.   ██████ - full details of functionality and process flow

9.   Powin will ensure that Akaysha retains access to its Sites via ██████ Powin will work with Akaysha to ensure that Powin transfers access to Akaysha to manage independently

10.  Powin will ensure that Akaysha retains access to its Sites via ██████ Powin will work with Akaysha to ensure that Powin transfers access to Akaysha to manage independently

 Please acknowledge receipt of this direction and confirm your compliance with the direction set forth above.

## UNQUOTE

Exhibit D[8]

Work Plan

| TOPICS | TASKS / OUTCOMES | APPROACH AND CURRENT STATUS | LEADS (POWIN) | LEADS (PROJECT GROUP) |
|---|---|---|---|---|
| Overall | • Complete IP transfer | • Manage and execute list below | • ███████ <br> • ███████ <br><br> Note: once ████ and ████ take lead they may assign other people than those listed below. | |
| ██ | • Architecture documentation <br> • Account transfer including credentials | • Extract architecture documentation and send to the Project Group (partially complete) <br> • Arch discussions and walkthrough (pending) <br> • Work with ████ and the Project Group to transfer accounts (pending) | • ███████ (account transfer) <br> • ███████ (architecture) | • ████████ <br> • ███████ <br> • ████ <br> • █████████ <br> • ██████ <br> • ██████████ <br> • ██████ |

---

[8] **NTD**: Leads columns to be redacted pre-filing.

| TOPICS | TASKS / OUTCOMES | APPROACH AND CURRENT STATUS | LEADS (POWIN) | LEADS (PROJECT GROUP) |
|---|---|---|---|---|
| ██████ and | • Establishing working code and artifacts in the Project Group's instance | • Documentation (in progress)<br>• Expert sessions with the Project Group to help them setup capability (pending) | • ████████ | • ████████████<br>• ██████████<br>• ██████████████<br>• ██████████<br>• ████████ |
| ████ Site Controller | • Enable the Project Group to use and manage site controllers | • Provide access (pending)<br>• Documentation (in progress)<br>• Expert training sessions (pending) | • ████████ | • ███████<br>• █████<br>• █████ |
| ███████ Documentation | • Establish a ████████ repo at the Project Group that mirrors Powin's with designs, best practices, troubleshooting, test reports. Etc. | • Develop ████████ design for the Project Group that mirrors existing Powin design (pending)<br>• Develop tooling to mirror (in progress)<br>• Copy/transfer and test (pending)<br>• Include documentation on unit/system/regression test | • ████████ (tooling and transfer)<br>• ████████████ (firmware content)<br>• ████████ ██████ and test content) | • ██████████<br>• ██████<br>• ████████<br>• ████████ |

| TOPICS | TASKS / OUTCOMES | APPROACH AND CURRENT STATUS | LEADS (POWIN) | LEADS (PROJECT GROUP) |
|---|---|---|---|---|
| | | reports regarding how the system operates in practices. (pending) | | |
| ███ and | • Establish the Project Group's know-how for managing scripts for commissioning and change management | • Documentation including functionality and process flow (in progress)<br>• Expert sessions (pending)<br>• Test support (pending) | • ██████ or delegate | • ████████████<br>• ████████████<br>• ████████████ |
| ██████ | • Enable the Project Group to independently manage all local site access | • Transfer credentials (pending)<br>• Support use and test (pending) | • ████████<br>• ████████ (for local site access) | • ██████████<br>• ██████████<br>• ██████ (█████ |
| Firmware | • Enable the Project Group to build and test firmware | • Documentation on firmware designs, test reports, managing remote updates, troubleshooting (pending)<br>• Access to hardware or specs of hardware that they can | • ████████ | |

| TOPICS | TASKS / OUTCOMES | APPROACH AND CURRENT STATUS | LEADS (POWIN) | LEADS (PROJECT GROUP) |
|---|---|---|---|---|
| | | procure to their own builds (pending) | | |

<u>Exhibit E-1</u>

Desired Munmorah Contracts[9]



_____

[9] To be updated in accordance with Section 1(c) (unless waived by the Project Group).

<u>Exhibit E-2</u>

Desired Ulinda Contracts[10]



---

[10] To be updated in accordance with Section 1(c) (unless waived by the Project Group).

<u>Exhibit E-3</u>

U.S. Test Houses



<u>Exhibit E-4</u>

Data Room Index

(See attached)

**<u>OMITTED</u>**

<u>Exhibit F</u>

Ulinda Deeds

Direct Deeds:

1.      Deed of Amendment to the Consent and Conditional Substitution Agreement between Powin, Ulinda, ███████████████████ ████████ dated 24 June 2024;

2.      Consent and Conditional Substitution Agreement between Powin, Ulinda and ███████████████████;

3.      Consent and Conditional Substitution Agreement between Powin, Ulinda and ████████████████ and

4.      Consent and Conditional Substitution Agreement between Powin, Ulinda and ████████████████.

Title Assignment:

Deed of title assignment of contractual rights ("<u>Title Assignment Deed</u>") between Powin and Ulinda.

Exhibit G

████████ Liens


(See attached)

**<u>OMITTED</u>**

<u>Exhibit H</u>

Powin Australian Employees



17. Any other Powin employees based in Australia as mutually agreed by Powin and
the Project Group and Akaysha in writing (e-mail confirmation shall suffice)