**DENTONS US LLP**

Lauren Macsoud (admitted)
101 JFK Parkway
Short Hills, NJ 07078
Telephone: (973) 912-7100
Facsimile: (973) 912-7199
Email:lauren.macsoud@dentons.com

Tania M. Moyron (admitted *pro hac vice*)
Van C. Durrer, II (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:  tania.moyron@dentons.com
          van.durrer@dentons.com

John D. Beck (admitted *pro hac vice*)
Sarah M. Schrag (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:  john.beck@dentons.com
          sarah.schrag@dentons.com

*Proposed Counsel for Debtors and
Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Amanda C. Glaubach (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  altogut@teamtogut.com
          aglaubach@teamtogut.com
          eblander@teamtogut.com

*Proposed Counsel for Debtors and
Debtors in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re:<br>Powin, LLC, *et al.*,[1]<br><br>          Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504]; (iii) PEOS Holdings, LLC [5476]; (iv) Powin China Holdings 1, LLC [1422]; (v) Powin China Holdings 2, LLC [9713]; (vi) Charger Holdings, LLC [5241]; (vii) Powin Energy Ontario Storage, LLC [ 8348]; (viii) Powin Energy Operating Holdings, LLC [22495]; and (ix) Powin Energy Operating, LLC [6487]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR  97062.

130652329

**MOTION OF THE DEBTORS FOR ENTRY OF AN
ORDER (I) DESIGNATING A STALKING HORSE BIDDER AND APPROVING STALKING
HORSE BIDDER PROTECTIONS (II) APPROVING BIDDING PROCEDURES BY WHICH
INTERESTED PARTIES MAY BID AND AN AUCTION SALE FORMAT IN CONNECTION
WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (III)
APPROVING FORM OF ASSET PURCHASE AGREEMENT, (IV) APPROVING FORM OF
NOTICE TO BE PROVIDED TO INTERESTED PARTIES, (V) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS AND NOTICE
PROCEDURES THERETO, (VI) SCHEDULING A COURT HEARING TO CONSIDER
APPROVAL OF THE SALE TO THE HIGHEST AND BEST BIDDER, AND (VII)
AUTHORIZING THE SALE OF DEBTORS' PROPERTY FREE AND CLEAR OF ALL
<u>CAUSES OF ACTION AND CLAIMS</u>**

Powin, LLC and the above-referenced affiliated debtors and debtors-in-possession
(collectively, the "<u>Debtors</u>") under chapter 11 of title 11 of the United States Code, §§ 101 et seq.
(the "<u>Bankruptcy Code</u>"), in these chapter 11 cases (the "<u>Chapter 11 Cases</u>"), by and through their
undersigned counsel, hereby move (the "<u>Motion</u>") this Court for entry of an order (substantially in
the form attached hereto as **<u>Exhibit A</u>**, the "<u>Order</u>"): (i) approving bidding procedures by which
interested parties may bid ("<u>Bid</u>") and an auction sale format in connection with the sale of
substantially all of the Debtors' assets, (ii) designating a stalking horse bidder and approving
stalking horse bidder protections; (iii) approving the form of Asset Purchase Agreement, (iv)
approving the form of notice to be provided to interested parties, (v) authorizing the assumption
and assignment of certain contracts (the "<u>Contracts</u>") that are selected for assumption and
assignment (the "<u>Assumed Contracts</u>") and notice procedures thereto, (vi) scheduling a court
hearing to consider approval of the sale to the highest and best bidder, and (vii) authorizing the
sale of the Debtors' property free and clear of all causes of action and claims.

In support of the Motion, the Debtors respectfully submit the *Declaration of Mitchener
Turnipseed in Support of the Debtors' Motion for Entry of an Order (I) Designating a Stalking
Horse Bidder and Approving Stalking Horse Bidder Protections, (II) Approving Bidding
Procedures by Which Interested Parties May Bid and an Auction Sale Format in Connection With*

130652329

*the Sale of Substantially All of the Debtors' Assets, (III) Approving Form of Asset Purchase
Agreement, (IV) Approving Form of Notice to be Provided to Interested Parties, (V) Authorizing
the Assumption and Assignment of Assumed Contracts and Notice Procedures Thereto, (VI)
Scheduling a Court Hearing to Consider Approval of the Sale to the Highest and Best Bidder, and
(VII) Authorizing the Sale of the Debtors' Property Free and Clear of All Causes of Action and
Claims* (the "<u>Declaration</u>") filed contemporaneously herewith.

In further support of the Motion, the Debtors respectfully state as follows:

## I.    <u>JURISDICTION AND VENUE</u>

1.    The United States Bankruptcy Court for the District of New Jersey (the "<u>Court</u>")
has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of
Reference from the United States District Court for the District of New Jersey* dated as of
September 18, 2012.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal
Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), to the entry of a final order by the Court
in connection with this Motion to the extent that it is later determined that the Court, absent consent
of the parties, cannot enter final orders or judgments in connection herewith consistent with Article
III of the United States Constitution.

2.    Venue of the Chapter 11 Cases and related proceedings is proper pursuant to 28
U.S.C. §§ 1408 and 1409.

3.    The bases for the relief requested herein are sections 105(a), 363, 365, 503, 507,
and 1113 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, 6006, 9007, 9008, and
9014, and rules 6004-1, 6004-2, 9013-1, and 9013-2(c) of the Local Rules of the United States
Bankruptcy Court, District of New Jersey (the "<u>Local Rules</u>").

130652329

## II.    **BACKGROUND**

### A.  **General Background**

4.      On June 9, 2025 (the "Petition Date"),  the Debtors each commenced a voluntary

case for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue

operating their businesses and managing their properties as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On June 27, 2025, the Office of the United States Trustee appointed an Official

Committee of Unsecured Creditors (the "Committee") in these Chapter 11 Cases.  [Docket No.

174].  No other trustee, examiner, or statutory committee has been appointed in these Chapter 11

Cases.

6.      Information regarding the Debtors' history and business operations, organizational

structure, and the events leading to the commencement of these Chapter 11 Cases can be found in

the *Declaration of Gerard Uzzi in Support of Emergency First Day Motions of the Debtors* [Docket

No. 13] (the "First Day Declaration").

### B.  **Specific Background**

a.  Proposed Sale Process

7.      The Debtors commenced these Chapter 11 Cases because their businesses were

suffering from liquidity constraints, an overdependence on trade credit, increasing assertions of

liquidated damages, and a credibility problem.  During the lead-up to and commencement of these

Chapter 11 Cases, it became clear that the best chance for the Debtors to repay their outstanding

debts would come via a value-maximizing transaction where the Debtors would sell substantially

all of their assets.  Only a short while ago, the Debtors were close to pursuing a liquidating

transaction.  However, after significant marketing and sale efforts described below, the Debtors

are now in a position to complete a going concern sale transaction for substantially all of their

130652329

assets.  As an industry leader in the energy storage industry and the possessors of valuable customer contracts and intellectual property, the Debtors believe that closing such a transaction could provide the Debtors and their constituents certainty and a path through these Chapter 11 Cases.

      b.  <u>Marketing and Sale Efforts</u>

8.    In May 2025, the Debtors engaged Huron Transaction Advisory LLC ("<u>Huron</u>") as investment banker to assist with soliciting third-party proposals to raise capital and generate interest in a strategic sale transaction.  In connection with that process, the Debtors, with the assistance of Huron, launched an extensive marketing process to solicit third-party proposals to raise capital and evaluate a potential sale transaction.  Huron reached out to 94 prospective third-party DIP lenders, adjacent operators, private equity sponsors, inventory financers, customers, and the Prepetition Secured Parties, 23 of whom executed non-disclosure agreements ("<u>NDAs</u>").  The Debtors and their advisors simultaneously made progress in negotiating with key customers and other parties in interest towards a viable path forward.  FlexGen Power Systems, LLC ("<u>FlexGen</u>" or the "<u>Stalking Horse Bidder</u>"), emerged as a party with interest in a potential transaction with the Debtors for the sale of substantially all of their assets.

      c.  <u>The Sale of Debtors' Assets</u>

9.    The Debtors anticipate filing an executed asset purchase agreement with FlexGen ("<u>Stalking Horse APA</u>") on or about July 3, 2025, under which FlexGen agrees to purchase substantially all of the Debtors' assets (the "<u>Assets</u>"), as described in the Stalking Horse APA, for a purchase price of $36 million (the "<u>Purchase Price</u>").

      d.  <u>Proposed Sale Timeline</u>

10.    As described above, following arms' length negotiation, the Debtors and the

130652329

Stalking Horse Bidder reached an agreement on a Stalking Horse APA which seeks to sell the Assets to the Stalking Horse Bidder. The Debtors propose that the bidding, auction, and sale process be conducted in accordance with the below proposed expedited timeline, given the Debtors' ongoing liquidity issues. This sale timeline will allow the Debtors to solicit further bids on a potential sale transaction to maximize the value of their Assets (the resulting transaction from such marketing and sale process being the "Sale Transaction").

| Date | Event | Description |
|---|---|---|
| July 3, 2025 | Deadline to File Stalking Horse APA | The deadline for the Debtors to file the executed Stalking Horse APA with the Court. |
| July 15, 2025 at 9:30 a.m. (EST) | Hearing on Motion | The date and time at which the Court will consider the relief requested by this Motion. |
| July 16, 2025 at 5:00 p.m. (EST) | Deadline to Submit Non-Binding Indications of Interest | The deadline for submitting non-binding indications of interest to the proposed counsel for the Debtors for the Assets. |
| July 28, 2025 | Bid Deadline for Qualified Bids | The deadline by which all binding Bids shall be submitted.<br><br>Such binding Bids must include a deposit equal to 10% of the purchase price and a signed form of asset purchase agreement and blackline of any changes to the Stalking Horse APA.<br><br>Such Bids must also be binding and not subject to any approvals or finance or diligence contingencies. |
| 4:00 p.m. (EST) on the day before the Auction | Baseline Bid Deadline | The deadline for the Debtors to identify the Qualified Bid that is, in the Debtors' reasonable business judgment, the highest or otherwise best bid. |
| July 30, 2025 at 9:00 a.m. (EST) | Auction | The date and time of the Auction for the Assets, if one is needed. The Auction shall be held at the offices of Dentons US LLP, 1221 Avenue of the Americas, New York, NY 10020. |
| As soon as practicable after the Auction. | Notice of Winning Bidder and Back-Up Bidder | As soon as reasonably practicable after the conclusion (or cancellation) of the Auction, the Debtors will file on the docket a notice identifying |

6

130652329

| | | the Winning Bidder and Back-Up Bidder (the "Notice of Winning Bidder"). |
|---|---|---|
| August 1, 2025 at 5:00 p.m. (EST) | Deadline to file Objections to Sale | Deadline to file objections to Sale that are unrelated to the identity or consideration offered by bidder. |
| August 4, 2025 at 12:00 pm (EST). | Sale Order Deadline | The deadline by which a proposed Sale Order must be filed with the Court and served. |
| August 5, 2025 at 5:00 p.m. (EST). | Deadline to file any Objections to the Sale to Bidder | The deadline by which objections to the Sale to the Winning Bidder must be filed with the Court and served, other than objections subject to the August 1, 2025 objection deadline. |
| August 6, 2025, at 9:30 a.m. (EST). | Sale Hearing | The hearing before the Court to consider approval of the Winning Bid (as defined below). |

Local Rule 6004-1 requires, among other things, that the debtor include the "material terms of the proposed sale" in a sale motion. The Debtors submit that the summary in the paragraphs above memorializes the material terms of the Stalking Horse APA for purposes of Local Rule 6004-1.

### III.    RELIEF REQUESTED

11.    The Debtors seek entry of the Order: (i) designating FlexGen as the stalking horse bidder and approving stalking horse bidder protections; (ii) approving bidding procedures by which interested parties may bid and an auction sale format in connection with the sale of substantially all of the Debtors' assets; (iii) approving form of Asset Purchase Agreement; (iv) approving form of notice to be provided to interested parties; (v) authorizing the assumption and assignment of assumed contracts and notice procedures thereto; (vi) scheduling a court hearing to consider approval of the sale to the highest and best bidder; and (vii) authorizing the sale of the Debtors' property free and clear of all causes of action and claims.

### IV.    PROPOSED SALE AND BIDDING PROCEDURES

12.    In connection with the Sale of the Assets, the Debtors submit that conducting an

130652329

Auction in accordance with the bidding procedures among Qualified Bidders will obtain the highest or otherwise best offer for the Assets and will maximize the value of the Debtors' estates. The proposed bidding procedures ("Bidding Procedures") for Qualified Bidders to bid on some or all of the Assets are attached to the Order as **Exhibit 1**.  A summary of some of the significant provisions of the Bidding Procedures is set forth below.[2]

## I.    Stalking Horse

13.    FlexGen shall be deemed the Stalking Horse Bidder in accordance with the terms of the Stalking Horse APA which conditions FlexGen's Bid upon it being deemed the Stalking Horse Bidder.  The Stalking Horse Bidder will be granted certain bidding protections, including a breakup fee (the "Break-Up Fee") of $1,100,000 and an Expense Reimbursement of up to $500,000.

## II.    Bidding Procedures

14.    The Debtors are in the process of soliciting Bids for some or all of the Assets.  The Bidding Procedures provide that only Qualified Bidders may participate in the Auction.  To be a Qualified Bidder, a party wishing to submit a Bid must first become a Potential Bidder, which requires that such party provide the Debtors:

   a.    An executed confidentiality agreement (a "Confidentiality Agreement") in form and substance acceptable to the Debtors.

   b.    Sufficient information that the Potential Bidder has sufficient cash on hand or has received sufficient non-contingent debt and/or equity funding commitments to consummate a purchase of the Assets subject to the contemplated Bid; *provided* that this and any other consultation rights provided to the Committee in these bidding procedures shall exclude any member of the Committee that is actively participating in the bidding process and any such Committee member shall not

---

[2] If there exists any omission or discrepancy between the following summary and the actual terms of the Bidding Procedures, the actual terms of the Bidding Procedures shall control.  Capitalized terms used but not otherwise defined herein shall have the meaning affording in the Bidding Procedures.

130652329

receive any information on account of its membership in the Committee that it would not otherwise be entitled to receive as a Potential Bidder.

c.   A statement detailing whether the Potential Bidder is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint Bid to the extent reasonably practicable.

d.   On or before **July 16, 2025**, a non-binding Indication of Interest to purchase the Assets to the Debtors, which includes (1) the proposed structure of the transaction and assets to be purchased, purchase price and any material terms; (2) a description of the acquiring entity and relevant experience; (3) disclosure of any of the potential bidder's connections with the debtors, the debtors' officers and directors, or other potential bidders; (4) disclosure of the identity of any entity that holds a "substantial interest" in the potential bidder (as defined in 31 CFR § 800.244); (5) evidence of financial capacity to complete the transaction; (6) authority and approval to complete the transaction; (7) a detailed description of the due diligence information and / or investigation you may require to submit a Bid; (8) a proposed timetable for consummating the transaction; and (9) contact information for the Potential Bidder.

15.    Upon qualifying as a Potential Bidder, the Debtors will notify such Potential Bidder that it is an Acceptable Bidder and such party may then receive due diligence information from the Debtor, including access to the Debtors' online data room, the CIM and potentially other nonpublic information relating to the Debtors' Assets.

16.    The Bidding Procedures also set forth the requirements for a Potential Bidder to become a Qualified Bidder, including (without limitation):

a.   Each Bid must clearly state: (i) the particular Assets to be purchased (ii) the liabilities and obligations to be assumed, including any debt and cure costs to be assumed, and (iii) the Contracts to be assumed by the bidder;

b.   Provide a clean and marked-up copy of the proposed asset purchase agreement against the Stalking Horse APA;

c.   Provide a copy of the draft Sale Order marked-up to reflect any amendments and modifications compared to the form of the Sale Order posted in the Debtors' on-line data room;

d.   Each Bid by an Acceptable Bidder must clearly set forth the purchase price to be paid ("Purchase Price") and identify the cash and/or non-cash components of the

130652329

Purchase Price. The Purchase Price should be a single point value in U.S. Dollars for the applicable Assets on a cash-free, debt-free basis. Any bid for substantially all of the Assets must also include a statement as to whether the bid is conditioned on purchasing all Assets or whether the Qualified Bid should be viewed as separate bid for one or more sets of Assets. The Debtors reserve the right to ask any Acceptable Bidder to further allocate the value ascribed to a bid for any particular Asset and to inquire about any significant assumptions on which such valuations are based beyond information provided in the applicable bid;

e. Each Bid must include a proposed Purchase Price of at least $38,320,000[3] for the Assets;

f. A good faith deposit ("Deposit") by wire transfer in an amount equal in an amount equal to 10% of the proposed Purchase Price;

g. A Qualified Bid, other than the Stalking Horse Bidder's bid, must include a statement that the bid does not entitle the bidding party to a break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the applicable Assets;

h. Bids may not be conditioned on the obtaining or sufficiency of financing or the completion of due diligence. Only financially qualified parties will be eligible to participate in the Auction – with financially qualified parties to mean parties who have demonstrated that they have financial means to consummate their purchase of the Assets without financing unless the financing to be used by them is already committed (meaning that any Overbid may not contain any financing contingency). All diligence must be completed before the Bid Deadline;

i. Each bid must include a statement that the Bid is formal, binding, and unconditional, is not subject to any further due diligence or financing contingency, and is irrevocable until the Debtors notify the Potential Bidder that such Bid is not the Winning Bid or a Back-Up Bid, or with respect to a Back-Up Bid until the earlier of (a) the first business day after the closing of the Sale with the Winning Bidder for the Assets bid upon by such Back-up Bidder or (b) 60 days after entry of an order approving the Sale with the Winning Bidder for the Assets bid upon by such Back-Up Bidder;

j. Each bid must contain evidence that the Acceptable Bidder has obtained the necessary authorizations or approvals, as required by that Acceptable Bidder's governing documents, with respect to the submission of the bid and the consummation of the Sale Transaction;

---

[3] This amount is equal to the sum of the Stalking Horse Bidder's Purchase Price of $36 million, the Break-Up Fee of $1.1 million, Expense Reimbursement of $500,000, and Minimum Overbid Increment of $720,000.

130652329

k.  Each bid must include a statement or evidence reflecting (i) that the Bidder is prepared to consummate the transaction upon entry of an order of the Bankruptcy Court approving the Sale to the Winning Bidder (the "Sale Order") and consummation shall not be contingent on obtaining requisite government, regulatory, or other third-party approvals, (ii) the government, regulatory, or other third-party approvals that will be required for the Bidder to consummate the Sale; (iii) that the Bidder has made or will make as soon as reasonably practicable all necessary filings, if any, with respect to any regulatory, antitrust and other laws and pay the fees associated therewith; and (iv) the Bidder's plan and ability to obtain all requisite governmental, regulatory, or other third party approvals (including, without limitation, CFIUS approvals), and the proposed timing for the Bidder to undertake the actions required to obtain such approvals, if any;

l.  Each bid must include written evidence that demonstrates that the Bidder has the necessary financial ability to consummate the contemplated Sale and comply with section 365 of the Bankruptcy Code, including providing adequate assurance of future performance under all contracts to be assumed and assigned in such Sale, including that such Bidder has all authorizations and registrations necessary to perform the Contracts to be assumed by the Bidder, as well as a confirmation that the Bidder is in compliance with any applicable NERC requirements necessary to perform the Contracts to be assumed by the Bidder.  Such information must include, *inter alia*, the following:

   i.   Contact names and information for verification of financing sources;
   ii.  Evidence of Bidder's internal resources and proof of unconditional debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such bid, in each case, as are needed to consummate such Sale;
   iii. The Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtors;
   iv.  A description of the Bidder's pro forma capital structure; and
   v.   Any such other form of financial disclosure or credit-quality support information or enhancement demonstrating that such Bidder has the ability to consummate the contemplated Sale.

m.  Each bid must contain an acknowledgement in writing that the bidder (a) has not engaged in any collusion with respect to any bids or the Sale, specifying that it did not agree with any Qualified Bidders or Potential Bidders to control price, (b) agrees not to engage in any collusion with respect to any bids, the Auction, or the Sale, and (c) by submitting a bid is agreeing, and shall be deemed to have agreed,

(i) to abide by and honor the terms of these Bidding Procedures, and (ii) after the conclusion of the Auction, if any, not to submit a bid, or seek to reopen the Auction.

n.   Each Bid must include a statement that, in the event the Debtors select the Bidder to serve as the Winning Bidder or the Back-Up Bidder (as defined below), such Qualified Bidder's offer is irrevocable until two (2) business days after the closing of the Transaction.  Each Bidder must acknowledge that by submitting a Bid, the Bidder agrees to be a Back-Up Bidder in accordance with the terms of these Bid Procedures, should the Bid be so selected.

o.   Each Bid must provide that the Debtors have the right to pursue all available damages in the event of the Bidder's breach of, or failure to perform under, the Proposed Agreement.

p.   Each Bid shall be based on the Stalking Horse Bid and must exceed, either on its own terms or, in the case of a Bid for a portion or subset of the Debtors' assets, in combination with another Qualified Bid(s) (which combination shall be done by the Debtors), the Stalking Horse Bid in relation to the Purchased Assets. For the avoidance of doubt, joint Bids submitted by multiple Bidders will not be considered.

q.   A Bid by a Bidder must be reasonably likely to be consummated, if selected as the Winning Bid, within a time frame acceptable to the Debtors.

r.   Acceptable Bidders must only submit bids in good faith and as bona fide offers to consummate the Sale Transaction.

17.    A Bid that satisfies each of the Bid Requirements (including but not limited to those mentioned in the foregoing paragraph), as determined by the Debtors in its reasonable discretion, in consultation with the Committee, shall constitute a "Qualified Bid," and such Potential Bidder submitting such Bid will be deemed a "Qualified Bidder."  Prior to, or immediately before the commencement of the Auction, the Debtors shall file and serve on each Potential Bidder a notice indicating the identity of all Qualified Bidders, and a copy of the Bid which is deemed to be the Opening Bid at the Auction.

18.    The Debtors reserve the right to sell their Assets to multiple Qualified Bidders in separate lots and the right to link Qualified Bids together.

130652329

III.    **Auction**

19.    If the Debtors receive more than one Qualified Bid, the Debtors will conduct an

Auction at the offices of Dentons US LLP, 1221 Avenue of the Americas, New York, NY 10020

on July 30, 2025, in accordance with the Bidding Procedures.

20.    The Auction shall be governed by the following procedures:

a.    Except as otherwise determined by the Debtors in their business judgment, only the Debtors, the U.S. Trustee, any Qualified Bidders, the Committee, and, in each case, the respective representatives and professionals of the foregoing parties, shall be entitled to attend the Auction.

b.    Except as otherwise provided herein, only Qualified Bidders shall be entitled to bid at the Auction.

c.    The Qualified Bidders may appear virtually themselves or through duly-authorized representatives at the Auction.

d.    At the commencement of the Auction, the Debtors may announce additional procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive bid(s).

e.    Bidding shall begin at the amount of the best or highest Qualified Bid (that Qualified Bid being the "Starting Bid"). Subsequent bids (each an "Overbid") shall be an increase over the Starting Bid or previous Overbid, as applicable. Each Overbid shall provide net value to the estates in an amount equal to or greater than $720,000 more than the Starting Bid, and each subsequent Overbid must provide net value to the estates in an amount equal to or greater than $720,000 more than the previous Overbid (each, a "Minimum Overbid Increment"). The Debtors reserve the right to reduce or increase the Minimum Overbid Increments in their discretion, after consultation with the Committee. To the extent the Stalking Horse Bidder submits higher bids, the Stalking Horse Bidder shall have the right (but not the obligation) to increase its bid by using, as a credit, the amount of the Bid Protections when determining whether the Stalking Horse Bidder has topped the previous bid by the required amount.

f.    Any Overbid made from time to time by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (i) the Debtors accept a Bid submitted by another Qualified Bidder during the Auction as an Overbid and (ii) such prior Overbid is not selected as the Back-Up Bid. To the extent not previously provided (which will be determined by the Debtors in consultation with the

13

Committee), a Qualified Bidder submitting an Overbid must submit at the Debtors'
request (in consultation with the Committee), as part of its Overbid, written
evidence that such Qualified Bidder has sufficient cash on hand or has received
sufficient non-contingent debt and/or equity funding commitments to consummate
the proposed transaction at the purchase price contemplated by such Overbid.

g.  Each Qualified Bidder will be permitted a reasonable time to respond to previous
Bids at the Auction, as determined by the Debtors.

h.  During the course of the Auction, the Debtors shall, after submission of each
Overbid, promptly inform each Qualified Bidder of the terms of the previous Bids
and inform each Qualified Bidder which Overbid(s) reflect, in the Debtors' view,
the highest or otherwise best Bid(s) for the applicable Assets.

i.  To remain eligible to participate in the Auction, in each round of bidding, (i) each
Qualified Bidder must submit a Bid in such round of bidding that is a higher or
otherwise better offer than the immediately preceding Bid submitted by a Qualified
Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid
in such round of bidding or to submit a Bid in such round of bidding that is a higher
or otherwise better offer than the immediately preceding Bid submitted by a
Qualified Bidder in such round of bidding, as determined by the Debtors in their
reasonable business judgment, following consultation with the Committee, such
Qualified Bidder shall be disqualified from continuing to participate in the Auction.

j.  The Auction will be transcribed to ensure an accurate recording of the bidding at
the Auction.

k.  Each Qualified Bidder will be required to confirm on the record that it has not
engaged, and will not engage, in any collusion with respect to the bidding or the
Sale Transaction.

l.  Each Qualified Bidder will be required to confirm that its Bid is a good faith, bona
fide offer and it intends to consummate the Sale Transaction if selected as the
Winning Bidder.

m.  The Debtors will not consider bids made after the Auction has been closed.

n.  The Debtors, in their reasonable business judgment and consistent with the
Debtors' fiduciary obligations to maximize the value of their estates and to consider
the interests of their stakeholders may reject, at any time before entry of an order
of the Court approving a Winning Bid, any Bid (other than the Stalking Horse Bid)
that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity
with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms
and conditions of the Sale Transaction, (iii) contrary to the best interests of the

14

Debtors, their estates, their creditors, and other stakeholders, (iv) likely to lack the support of its stakeholders in seeking Court approval thereof, or (v) otherwise violative of any of the Debtors' fiduciary obligations.

o.  The Debtors have the right to request any additional information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the applicable Auction.

p.  The Debtors reserve the right, in their reasonable business judgment, in consultation with the Committee, to adjourn the Auction one or more times to, among other things, (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require that the Qualified Bidder has sufficient cash on hand or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount. The Debtors shall promptly file notice of such adjournment with the Court.

q.  The Debtors, in their business judgment and after consultation with the Committee, reserve the right to amend, waive, or otherwise modify the Auction Procedures at any time, including without limitation, the time, place, attendance, and format of the Auction in a manner that they determine will maximize value.

## IV.    <u>Acceptance of the Winning Bid</u>

21.    Upon the conclusion of the Auction (if such Auction is conducted), the Debtors, in the exercise of their reasonable, good-faith business judgment, shall identify the Winning Bidder, which is the highest and best Qualified Bid submitted at the Auction.  The Debtors shall also identify a Qualified Bidder, in consultation with the Committee, that submitted the next highest or otherwise best Qualified Bid as a back-up bid (a "<u>Back-Up Bid</u>" and the bidder submitting such bid, a "<u>Back-Up Bidder</u>").

22.    The Back-Up Bid, if any, will remain open and binding on the Back-Up Bidder until the first business day after the closing of the Sale with the Winning Bidder for the Assets bid

upon by such Back-up Bidder; provided, that if the Stalking Horse Bid is selected as the Back-Up

Bid, it must remain irrevocable only for so long as is required under the Stalking Horse APA. If

the Winning Bidder fails to consummate the Winning Bid within the time set forth therein, the

Debtors will be authorized, but not required, in consultation with the Committee, to select the

Back-Up Bidder, if any, as the new Winning Bidder, in which case the Debtors shall proceed to

consummate the Winning Bid of the new Winning Bidder.

### V.    __The Sale Hearing__

23.     As part of this Motion, the Debtors ask this Court to schedule a sale hearing (the

"Sale Hearing") on August 6, 2025, at 9:30 a.m. (EST).  The Debtors will present the results of

the Auction to the Court at the Sale Hearing, at which time certain findings will be sought from

the Court regarding the Auction, including, among other things, that: (i) the Auction was properly

conducted, and the Winning Bidder was properly selected, in accordance with the Bidding

Procedures; (ii) the Auction was fair in substance and procedure; (iii) the Winning Bid was a

Qualified Bid; (iv) the closing of the Sale Transaction in accordance with the Winning Bid will

provide the highest or otherwise best value for the Assets and is in the best interests of the Debtors;

and (v) the Winning Bidder is deemed to be a purchaser of the Assets in good faith as set forth in

§ 363(m).

24.     At the Sale Hearing, the Debtors shall request the Bankruptcy Court to enter an

order approving the Winning Bid (the "Sale Order").  Except to the extent revised by the Debtors

in their discretion, after consultation with the Committee, and the Winning Bidder, the proposed

Sale Order presented to the Bankruptcy Court at the Sale Hearing shall be in the form submitted

as part of the Winning Bid.

130652329

### VI.    **Return of Deposits**

25.    Upon closing of the Sale Transaction with the Winning Bidder, the Deposit of the Winning Bidder shall be credited to the Purchase Price.  If the Winning Bidder, if any, fails to consummate the Sale Transaction, then the Winning Bidder's Deposit will be irrevocably forfeited to the Debtors and may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, pursuant to the applicable asset purchase agreement.

26.    The Deposits of any unsuccessful Qualified Bidders, including the Back-Up Bidder, will be promptly returned following closing of the Sale.

### VII.   **Notice Procedures**

27.    The Debtors proposes that any objections to the Sale Transaction (other than an Assumption Objection (defined herein) which shall be governed by the procedures set forth below) (a "Sale Objection"), must be filed with the Court on or before the Sale Objection Deadline set forth in the Bidding Procedures Order and also: (i) be in writing; (ii) comply with the Rules and the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of New Jersey; (iii) set forth the specific basis for the Sale Objection; and (iv) be served, so as to be actually received on or before the Sale Objection Deadline, upon the Notice Parties.  If a Sale Objection is not filed and served on or before the Sale Objection Deadline, the Debtors requests that the objecting party be barred from objecting to the Sale and not be heard at the Sale Hearing, and this Court may enter the Sale Order without further notice to such party.  The Debtors also request that the Court approve the form of the notice of sale procedures (the "Procedures Notice") substantially in the form to be filed by the Debtors before the hearing on this Motion.  The Debtors will serve a copy of the Procedures Notice on the Notice Parties and all parties which have requested to receive

17

130652329

notice under Rule 2002 (the "Procedures Notice Parties").

28.    The Debtors propose to file with the Court and serve the Procedures Notice within one (1) business day following entry of the Bidding Procedures Order, by first-class mail, postage prepaid on the Procedures Notice Parties.  The Procedures Notice provides that any party that has not received a copy of the Motion or the Bidding Procedures Order that wishes to obtain a copy of the Motion or the Bidding Procedures Order, including all exhibits thereto, may make such a request in writing to Dentons US LLP, 601 S. Figueroa Street #2500 Los Angeles, CA 90017, or by emailing van.durrer@dentons.com and tania.moyron@dentons.com.

29.    The Debtors submit that the foregoing notices comply fully with Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, Auction and Sale, and Sale Hearing to the Debtors' creditors and other parties in interest as well as to those who have expressed an interest or are likely to express an interest in bidding on the Assets.  Based on the foregoing, the Debtors respectfully request that the Court approve these proposed notice procedures.

## VIII.  Assumption and Assignment Procedures

30.    The Debtors propose the following procedures for notifying each non-Debtor counterparty to a proposed Assumed Contract (each, a "Assumed Contract Counterparty") of proposed cure amounts in connection with the assumption and assignment of any Assumed Contract:

    a.  **Contract Assumption Notice**.  As soon as reasonably practicable upon conclusion of an Auction, if any, or the filing of a Notice of Winning Bidder (the "Assumption and Assignment Service Deadline"), the Debtors shall serve a notice of contracts proposed to be assumed and assigned by the Winning Bidder, to the extent known by the Debtors and the Winning Bidder (the "Contract Assumption Notice"), in substantially the form attached to the Bidding Procedures as Schedule 2 via first class mail on each applicable Assumed Contract Counterparty at the notice addresses set forth in the applicable Contract and on their counsel of record via

email, each to the extent known. The Contract Assumption Notice, with respect to the assumption and assignment of contracts, shall inform each recipient of the timing and procedures relating to such assumption and assignment, and, to the extent applicable, (i) the title of the Contract, (ii) the name of the counterparty to the Contract, (iii) the Debtors' good faith estimates of the Cure Payments, if any, required in connection with the Contract, and (iv) the applicable objection deadline; provided, however, that service of a Contract Assumption Notice does not constitute an admission that any Contract listed thereon is an executory contract or that such stated Cure Payment constitutes a claim against the Debtors or a right against the Winning Bidder, all rights with respect thereto being expressly reserved. Further, the inclusion of a contract on the Contract Assumption Notice is not a guarantee that such contract will ultimately be assumed and assigned.

b. **Cure Payments**. The payment of the applicable Cure Payments by the Debtors and/or the Winning Bidder shall (i) effect a cure of all defaults existing thereunder, (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default, and (iii) together with the assumption of the ultimately assumed Contract by the Debtors and the assignment of such Contract by the Winning Bidder, constitute adequate assurance of future performance thereof.

c. **Supplemental Contract Assumption Notice**. To the extent the Debtors, at any time after the Assumption and Assignment Service Deadline (i) identify additional Contracts that may be assumed by and assigned to the Winning Bidder, (ii) remove any Contracts from the list attached to the Contract Assumption Notice, (iii) and/or modify the previously stated Cure Payment associated with any Contract, the Debtors will promptly file with this Court and serve by first-class mail a supplemental notice of contract assumption (a "Supplemental Assumption Notice") on each of the Assumed Contract Counterparties affected by the Supplemental Assumption Notice. Each Supplemental Assumption Notice will include the same information with respect to listed Contracts as was included in the Contract Assumption Notice. The Winning Bidder may designate additional Contracts to be assumed and assigned up to two business days prior to closing and may remove Contracts from the list of Contracts up to two business days prior to closing or in accordance with the Winning Bid.

d. **Objections**. Objections, if any, to the proposed assumption and assignment of any Contract, adequate assurance of the Winning Bidder's ability to perform under any Contract, or the Cure Payment proposed with respect thereto, must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payment, state the correct Cure Payment alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon (collectively, the "Objection Notice Parties") (a) the Bid Notice Parties (defined in the Bidding Procedures), (b) the Office of the United States Trustee for the District of New Jersey, (c) counsel to the Committee, (d) the Winning Bidder, and (e) any

130652329

other party that has filed a notice of appearance in these chapter 11 cases, so as actually to be received on or before the objection deadline set forth in the Contract Assumption Notice or Supplemental Assumption Notice, as applicable, which such objection deadline shall be no less than ten calendar days after the Contract Assumption Notice or Supplemental Assumption Notice, as applicable, is served.

e. **No Objection**:  If no Objection to the proposed assumption and assignment of any Assumed Contract is timely filed, each Assumed Contract shall be assumed as of the date set forth in the applicable Contract Assumption Notice or such other date as the Debtors, the Proposed Assignee, and the applicable Assumed Contract Counterparties agree, and the Cure Payment shall be binding, as applicable, on the Debtors, the Proposed Assignee, and the Assumed Contract Counterparties and no amount in excess thereof shall be paid for cure purposes; provided, however that the assignment date for an Assumed Contract shall not occur earlier than the date the Debtors filed and served the applicable Contract Assumption Notice.

f. **Dispute Resolution**.  In the event that the Debtors and Assumed Contract Counterparty cannot resolve an objection to a Cure Payment, the Contract at issue may be assumed by the Debtors and assigned to the Winning Bidder, provided that the Debtors shall segregate the Cure Payment that the Assumed Contract Counterparty asserts is required to be paid, pending a resolution of the dispute by the Court or mutual agreement by the parties. Any objection to the proposed assumption and assignment of a Contract or related Cure Payment proposed in connection with the Sale Transaction that remains unresolved as of the Sale Hearing, shall be heard at such Sale Hearing (or at a later date as fixed by the Court).

g. **Contract Assumption**.  Except as set forth pursuant to subparagraph (f) above, no Contract shall be deemed assumed and assigned pursuant to section 365 of the Bankruptcy Code until the later of (i) the date the Court has entered an order assuming and assigning such Contract or (ii) the date the Sale Transaction has closed.

## V.   BASIS FOR RELIEF

## I.   The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Debtors' Estates and Stakeholders and Should Be Approved.

31.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [debtor] to show that a sound business purpose justifies such actions.' If the [debtor's] decision evidences a sound business

130652329

purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991)); *Schipper*, 933 F.2d at 515 (internal citations and quotations omitted) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); s*ee In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (applying business judgment rule to bidding procedures and incentives and noting that "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence").

32.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *Integrated Res., Inc.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the [Debtor]'s duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." (citation omitted)).

33.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions.  *See Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate

130652329

basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"). Where there is a court-approved auction process, the assets are presumed to sell for a full and fair price because the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

34.    Approval of bidding procedures on or around the Petition Date is appropriate where the debtors demonstrate that such approval maximizes estate value, and this Court has approved bidding procedures on such a timeline several times. *See, e.g., In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Dec. 20, 2023) [Docket No. 129]; *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. April 25, 2023) [Docket No. 92]; *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. April 17, 2023) [Docket No. 72]; *In re SLT Holdco, Inc.*, No. 20-18368 (MBK) (Bankr. D.N.J. July 13, 2020) [Docket No. 72].

35.    Here, the proposed Bidding Procedures will promote active bidding from seriously interested parties and will maximize the value of the Assets for the benefit of the Debtors' estates. The proposed Bidding Procedures will allow the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who can demonstrate the ability to close the Sale.

36.    In particular, the Bidding Procedures contemplate an open and public marketing process and provide Potential Bidders with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid. The Debtors believe that substantially all, if not all, parties that may be interested in acquiring a material portion of the

22

Debtors' assets are already aware of the ongoing sale and marketing process due to the Debtors' prepetition efforts. An extended sale process is both unnecessary and impractical in these Chapter 11 Cases.

37.     Courts have approved bidding procedures that allow for accelerated sale timelines when the debtor must sell its assets quickly and/or has already undertaken a comprehensive prepetition marketing effort. *See, e.g.*, *In re Hornblower Holdings LLC*, No. 24-90061 (Bankr. S.D. Tex. Feb. 28, 2024) [Docket No. 166] (approving bidding procedures with a bid deadline 33 days after the petition date and an auction 35 days after the petition date); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (Bankr. D.N.J. Apr. 25, 2023) [Docket No. 92] (approving bidding procedures with a bid deadline 35 days after the petition date and an auction 40 days after the petition date); *see also In re National Realty Investment Advisors, LLC*, No. 22-14539 (Bankr. D.N.J. June 21, 2022) [Docket No. 62] (authorizing the private sale of real estate properties on six days' notice (and 14 days after the petition date) where the debtors marketed the properties extensively prepetition); *In re SLT Holdco, Inc.*, No. 20-18368 (Bankr. D.N.J. July 13, 2020) [Docket No. 307] (approving bidding procedures with a bid deadline 26 days after the petition date and an auction 28 days after the petition date); *In re Lehman Brothers Holdings Inc., et al.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 19, 2008) [Docket No. 258] (approving the sale of the debtors' brokerage business four days after the petition date and two days after an order establishing sales procedures therefor after finding the estates would be irreparably harmed by delay). Similarly, the Debtors' proposed Sale Schedules are appropriate in light of the prepetition marketing process conducted, and swift action is necessary to maximize value for creditors.

38.     The Debtors also submit that the Break-Up Fee is a normal and oftentimes necessary component of sales outside the ordinary course of business under § 363 of the

Bankruptcy Code. In particular, such a protection encourages a potential purchaser to invest the requisite time, money, and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process. *See, e.g., In re Comdisco, Inc.,* Case No. 01 24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, *inter alia,* an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); *Integrated Res., Inc.,* 147 B.R. at 660 (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid, for the expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject to higher and better offers).  As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate.  *See In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate.") (internal quotations omitted); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010); *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527 (3d Cir. 1999). The Debtors believe that approval of payment of the Break-Up Fee to the Stalking Horse Bidder is in the best interests of the Debtors' estates and their creditors, as the Stalking Horse Bidder will establish a floor for further bidding that may increase the consideration given in exchange for the Assets for the benefit of the Debtors' estates.

39.      In the Third Circuit, bidding protections, such as the Break-Up Fee and Expense Reimbursement, are subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code. *Energy Future*, 904 F.3d at 313 (*citing O'Brien*, 181 F.3d at 535);

24

*Reliant Energy*, 594 F.3d at 206 (holding that the general standard used for all administrative expenses applies to break-up fees). Thus, "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Reliant Energy*, 594 F.3d at 206 (internal quotations omitted) (*quoting O'Brien*, 181 F.3d at 535).

40.     Courts in this district have routinely approved break-up fees and/or expense reimbursements offered to stalking horse bidders. *See, e.g., In re Alliant Techs., L.L.C.*, No. 21-19748 (JKS) (Bankr. D.N.J. Jan. 21, 2022) [Docket No. 101] (approving bidding procedures and bidding protections including an expense reimbursement payable to the stalking horse bidder); *In re RTW Retailwinds, Inc.*, No. 20-18445 (JKS) (Bankr. D.N.J. Aug. 8, 2020) [Docket No. 192] (approving bidding procedures and bidding protections including a break-up fee payable to the stalking horse bidder); *In re SLT Holdco, Inc.*, No. 20-18368 (MBK) (Bankr. D.N.J. July 13, 2020) [Docket No. 72] (same); *In re New England Motor Freight, Inc.*, No. 19-12809 (JKS) (Bankr. D.N.J. April 8, 2019) [Docket No. 427] (same); *In re Aceto Corp.*, No. 19-13448 (VFP) (Bankr. D.N.J. Mar. 19, 2019) [Docket No. 174] (same).

41.     Courts typically approve break-up fees and expense reimbursement which are at or above 4% of the purchase price. *See In re East Orange Gen. Hosp.*, No. 15-31232 (VFP) (Bankr. D.N.J. Dec. 15, 2015) [Docket No. 171] (approving break-up fee of approximately four percent of the proposed aggregate consideration); *In re Women First Healthcare, Inc.,* 332 B.R. 115, 118, (Bankr. D. Del. 2005) (court approved break-up fee and expense reimbursement that equaled 4.7% percent of the purchase price); *In re Kaiser Aluminum Corp.*, Case No. 02-10429 (JFK) (Bankr. D. Del. June 21, 2004) (court approved break-up fee of 4.6% or $1.05 million in connection with a $23 million sale transaction); *In re Chi-Chi's, Inc.*, Case No. 03-13063 (CGC)

130652329

(Bankr. D. Del. Nov. 4, 2003) (court approved break-up fee of 5% or $200,000 in connection with a $4 million sale transaction); *In re America Classic Voyages Co*., Case No. 01-10954 (EIK) (Bankr. D. Del. March 20, 2002) (court approved break-up fee of 6.6% or $250,000 in connection with a $3.75 million sale transaction); *In re Verity Health System of California, Inc*., No. 18-20151 (Bankr. C.D. Cal. Oct. 30, 2018) (approving break-up fee equal to 4% of the cash purchase price); *In re Gardens Reg. Hosp. & Med. Ctr., Inc.,* 2016 WL 10564427 (Bankr. C.D. Cal. July 6, 2016) (approving a break-up fee equal to approximately 5% of cash consideration portion of purchase price); *In re Lake Burton Dev., LLC,* No. 09-22830 (Bankr. N.D. Ga. Apr. 1, 2010) (court approved break-up fee equal to 4.75% of cash purchase price); *In re Dan River, Inc.,* No. 04-10990 (Banker. N.D. Ga. Dec. 17, 2004) (court approved break-up fee equal to 5.3% of the cash purchase price).

42.    The Debtors submit that all of the proposed Bidding Procedures, including the proposed Break-Up Fee and Expense Reimbursement to the Stalking Horse Bidder, satisfy three useful functions set forth above: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; and (3) to attract additional bidders. The proposed Break-Up Fee and Expense Reimbursement totaling $1,600,000.00, which is approximately 4.4% of the Purchase Price, is well within the percentage parameters that have been approved by many other courts. Thus, the Debtors believe that the proposed Break-Up Fee is fair and reasonably compensates the Stalking Horse Bidder for taking actions that will benefit the Debtors' estates. The Break-Up Fee compensates the Stalking Horse Bidder for diligence and professional fees incurred in negotiating the terms of the Stalking Horse APA on an expedited timeline.

43.    The proposed Bidding Procedures will encourage competitive bidding, are

26

130652329

appropriate under the relevant standards governing auction proceedings in bankruptcy proceedings, and are consistent with the controlling legal standard in the Third Circuit. Approval of the Bidding Procedures and entry of the proposed Bidding Procedures Order is necessary on an expedited basis in order to facilitate the time-sensitive Sale Transaction processes. Accordingly, the Debtors request that the Court approve the Bidding Procedures as a valid exercise of the Debtors' business judgment.

**II.      The Form and Manner of Notice Should Be Approved.**

44.      Pursuant to Bankruptcy Rule 2002(a)(2), the Debtors are required to provide creditors with 21 days' notice of a sale hearing unless the court finds cause to shorten such time. Fed. R. Bankr. P. 2002(a)(2); *see also* Fed. R. Bankr. P. 9006(c)(1) (permitting the court to shorten notice for cause). Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the auction and the sale hearing and the deadline for filing any objections to such a sale. *Id.* 2002(c). This Motion will be served on the Notice Parties more than 21 days prior to the first proposed Sale Hearing. In accordance with the Bidding Procedures and following entry of the proposed Order, the Debtors will cause the Auction and Sale Hearing Notice to be served upon the Notice Parties.

45.      The Debtors submit that the notice of this motion, combined with the Auction and Sale Hearing Notice and the Notice of Winning Bidder, which will be filed after the conclusion of the Auction, constitutes good and adequate notice of the Auction and the Sale Hearing, and the proceedings with respect thereto, and that cause exists to waive the applicable requirements of Bankruptcy Rule 2002 in accordance with Bankruptcy Rule 9006(c)(1). Accordingly, no further notice is necessary and the Debtors request that this Court approve the form and manner of the notice of the Auction and Sale Hearing Notice.

130652329

III.    **The Sale Transaction Should be Approved as an Exercise of Sound Business Judgment.**

46.    Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate [.]" 11 U.S.C. § 363(b)(1).  Section 105(a) provides in pertinent part that "[t]he Court may issue any order, process or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Rules 2002 and 6004 govern the scope of the notice to be provided in the event a debtor elects to sell property of the estate under § 363.

47.    With respect to the procedures to be adopted in conducting a sale outside the ordinary course of a debtor's business, Rule 6004 provides only that such sale may be by private sale or public auction, and requires only that the debtor provide an itemized list of the property sold together with the prices received upon consummation of the sale.  Fed. R. Bankr. P. 6004(f).

48.    Neither the Bankruptcy Code nor the Rules contain specific provisions with respect to the procedures to be employed by a debtor in conducting a public or private sale.  Nonetheless, as one court has stated, "[i]t is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).  Additionally, courts have long recognized the need for competitive bidding at hearings; "[c]ompetitive bidding yields higher offers and thus benefits the estate. Therefore, the objective is 'to maximize bidding, not restrict it.'" *Id.*; *see also Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor's fiduciary duties included maximizing and protecting the value of the estate's assets); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand.").  Courts

28

uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate and, therefore, are appropriate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 536-37 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide benefit to debtor's estate); *In re Integrated Res.,* 147 B.R. at 659 (such sale procedures "encourage bidding and to maximize the value of the Assets").

49.    Here, a sound business purpose exists for the Sale Transaction because the Debtors believe that the Sale Transaction will maximize the value of their estates.  Additionally, the ability for a robust bidding and auction process will allow the Debtors to seek out the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practically available alternative. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure[, t]he auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").  As noted above, prior to the Bid Deadline, the Debtors will continue to market the Assets and solicit other offers consistent with the Bidding Procedures.  In this way, the number of bidders will be maximized.

50.    Thus, the Debtors submit that the Winning Bid will constitute the highest or otherwise best offer and will provide a greater recovery for the Debtors' estates than would be provided by any alternative.  The Debtors will also follow the adequate notice procedures as described more fully in the Order and Bidding Procedures.

51.    The Debtors also request that the Court find the Winning Bidder in the Sale Transaction be entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of Assets.

130652329

52.     Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

53.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made.  *See, e.g., In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

54.     The Debtors submit that the Winning Bidder will be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and any purchase agreement with respect to the Assets would be a good-faith, arms' length agreement entitled to the protections of section 363(m) of the Bankruptcy Code.  First, as set forth in more detail above, the consideration to be received by the Debtors from the Winning Bidder will be substantial, fair, and reasonable.  Second,

130652329

the Winning Bidder APA will presumably be the culmination of a competitive Auction process in

which all parties will be represented by counsel and all negotiations will be conducted on an arm's

length, good-faith basis.  Third, there has been and the Debtors anticipate that no indication of any

"fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take

grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale

to be avoided under section 363(n) of the Bankruptcy Code.  And the Bidding Procedures are

designed to ensure that no party is able to exert undue influence over the process.  Finally, the

Winning Bid will have been evaluated and approved by the Debtors in consultation with their

advisors.  Accordingly, the Debtors believe that the Winning Bidder should be entitled to the full

protections of section 363(m) of the Bankruptcy Code and may not be avoided under section

363(n) of the Bankruptcy Code.

55.    Lastly, Section 363(f) of the Bankruptcy Code permits a debtor to sell property free

and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits

such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the

sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject

of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable

proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

56.    Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the

requirements enumerated therein will suffice to warrant the Debtors' sale of the Assets free and

clear of all Encumbrances, except with respect to any interests that may be assumed liabilities

under the applicable Purchase Agreement.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793

(Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to

conduct the sale free and clear of all liens.").

31

57.    Any interest in the Assets that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such interest will be adequately protected by either being paid in full at the time of closing of the Sale Transaction, or by having it attach to the net proceeds of the Sale Transaction, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors accordingly request authority to convey the Assets to the Winning Bidder in the Sale Transaction free and clear of all Encumbrances, with any such Encumbrances to attach to the proceeds of the Sale Transaction.

## IV.    The Assumption and Assignment of the Contracts Should be Approved.

### A. The Assumption and Assignment of the Contracts Reflects the Debtors' Reasonable Business Judgment.

58.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g.*, *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77(b), predecessor to section 365 of the Bankruptcy Code, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); *In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr.

32

D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard.")

59.     Here, the Court should approve the decision to assume and assign the Assumed Contracts in connection with any Sale Transaction(s) as a sound exercise of the Debtors' business judgment.  *First*, certain of the Contracts may be necessary to operate the Assets and, as such, are essential to inducing the best offer for the Assets.  *Second*, any Contracts assumed and assigned will necessarily have all defaults cured, including monetary defaults, thus reducing the claims pool against the Debtors.  *Finally*, the Assumed Contracts will be assumed and assigned though the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

60.     Accordingly, the Debtors submit that the assumption and assignment of the Assumed Contracts by way of the Assumption and Assignment Procedures should be approved as an appropriate exercise of their business judgment.

### B. Defaults Under the Assumed Contracts Will Be Cured Through the Sale Transaction.

61.     Upon finding that a debtor has exercised its business judgment in determining that assuming a Contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. Section 365 "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

130652329

62.    The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because any form purchase agreement with respect to the Assets and any marked copy thereof submitted by a Potential Bidder will require that the Debtors cure all defaults associated with, or that are required to properly assume, any Contracts. Because the Assumption and Assignment Procedures (once approved) provide a clear process by which to resolve disputes over cure payments or other defaults, including noticing Assumed Contract Counterparties upon announcement of the Winning Bid that the Debtors intend to assume the applicable Contracts, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of Assumed Contract Counterparties.

## C. Contract Counterparties Will Be Adequately Assured of Future Performance.

63.    Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  The phrase 'adequate assurance of future performance', adopted from section 2-609(1) of the Uniform Commercial Code, is determined by the factual conditions, with the inquiry focusing on the seller's good faith and observance of commercial standards.  *In re Texas Health Enterprises, Inc.*, 246 B.R. 832, 835 (Bankr. E.D. Tex. 2000).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance."  *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

130652329

64.    The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assumed Contracts by the Winning Bidder will be satisfied.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of Potential Bidders before designating such party a Qualified Bidder (e.g., financial credibility, willingness, and ability of the interested party to perform under any Contracts to be assumed) and will demonstrate such financial wherewithal, willingness, and ability to perform under any Contracts to be assumed and assigned by the Winning Bidder.  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity following announcement of the Winning Bid to evaluate and, if necessary, challenge the ability of the Winning Bidder to provide adequate assurance of future performance and object to the assumption of the Contracts or proposed cure payments.  The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign any Contract to be assumed and assigned by the Winning Bidder.

## VI.    SATISFACTION OF BANKRUPTCY RULE 6003 AND WAIVER OF BANKRUPTCY RULES 6004(a), 6004(h) and 6006(d)

65.    Bankruptcy Rule 6003(a) empowers a court to authorize the sale of property within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(a). Irreparable harm is that which "cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801–02 (3d Cir. 1989).

66.    As set forth in this Motion and the Declaration in support hereof, the timelines contemplated by the proposed Bidding Procedures, including the proposed Sale Hearing for Assets just under 21 days after the Petition Date, is critical to maximize the value of the Debtors' estates and support the orderly transition of the Debtors' business.  Further delays will only harm the

Debtors and their businesses, which harm cannot be redressed.  Accordingly, the Debtors submit

they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003(a) to

support the relief requested herein.

67.    To implement the foregoing successfully, the Debtors also seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a), 6004(h), and 6006(d).

68.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease

of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless

the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order

authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the

expiration of fourteen days after the entry of the order, unless the court orders otherwise."  The

Debtors request that any Sale Order be effective immediately upon its entry by providing that the

fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

69.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time

for an objecting party to appeal before an order can be implemented. See Advisory Committee

Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d)

and the Advisory Committee Notes are silent as to when a court should "order otherwise" and

eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that

the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately

"where there has been no objection to the procedure."  10 COLLIER ON BANKRUPTCY ¶

6004.11 (Richard Levin & Henry J. Sommer eds., 16th ed.).  Furthermore, if an objection is filed

and overruled, and the objecting party informs the court of its intent to appeal, the stay may be

reduced to the amount of time actually necessary to file such appeal.  *Id.*

70.    To maximize the value received for the Assets, the Debtors seek to close the Sale

Transaction as soon as possible after the Sale Hearing. Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

71.     To implement the foregoing successfully, the Debtors also seek a waiver of the notice requirements under Bankruptcy Rule 6004(a).

## VII.    WAIVER OF MEMORANDUM OF LAW

72.     The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

## VIII.    RESERVATION OF RIGHTS

73.     Nothing contained in this Motion or any order granting the relief requested in this Motion, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

130652329

## IX.    NO PRIOR REQUEST

74.    No prior request for the relief sought in this motion has been made to this or any

other court.

## X.    NOTICE

Pursuant to Local Rule 9013-5(c), notice of this Motion shall be given to the following

parties: (a) the Office of the United States Trustee; (b) counsel for the Debtors' Prepetition Secured

Parties; and (c) the Debtors' fifty largest unsecured creditors on a consolidated basis.  The Debtors

submit that, in light of the nature of the relief requested, no other or further notice need be given.

## XI.    CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Order (i) granting the relief

requested herein; and (ii) granting the Debtors such other and further relief as the Court deems just

and proper.

[*Signature page to follow*]

130652329

Dated: July 1, 2025

**DENTONS US LLP**

*/s/ Lauren Macksoud*
Lauren Macksoud (admitted)
101 JFK Parkway
Short Hills, NJ 07078
Telephone: (973) 912-7100
Facsimile: (973) 912-7199
Email: lauren.macksoud@dentons.com

Tania M. Moyron (admitted pro hac vice)
Van C. Durrer, II (admitted pro hac vice)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email: tania.moyron@dentons.com
         van.durrer@dentons.com

John D. Beck (pro hac vice pending)
Sarah M. Schrag (pro hac vice pending)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email: john.beck@dentons.com
         sarah.schrag@dentons.com

- and –

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email: frankoswald@teamtogut.com

Albert Togut (admitted pro hac vice)
Amanda C. Glaubach (admitted pro hac vice)
Eitan Blander (admitted pro hac vice)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email: altogut@teamtogut.com
         aglaubach@teamtogut.com
         eblander@teamtogut.com

*Proposed Counsel for Debtors and*
*Debtors in Possession*