# EXHIBIT C

## Engagement Letter



ONE LIBERTY PLAZA
165 BROADWAY, 23RD FLOOR
NEW YORK, NY 10006
(732) 675-9503

June 9, 2025

Via email: jbrecker@altitudein.com

John Brecker
Independent Manager
Powin LLC
c/o Altitude Investment Mgmt LLC
205 East 42nd Street, 20th Floor
New York, NY 10017

Dear John:

It is a privilege to welcome Powin LLC (the "**Client**" or "**you**") as a client of Uzzi & Lall, a division of CBMN Advisors LLC (the "**Firm**," "**we**" or "**us**"). The purpose of this letter is to confirm the terms and conditions of the Firm's engagement (the "**Engagement**") by you to act on your behalf in connection with the services set forth below (the "**Matter**"). This letter contains the entire agreement between the Firm and the Client and supersedes any prior agreements between the Client and the Firm.

**Services.** Specific services ("**Services**") to be performed by the Firm in connection with the Client's and certain related affiliates' (collectively, the "**Debtors**") bankruptcy and restructuring will include:

1. Assisting with the management of all aspects of the Debtors' operations, including all initiatives related to managing financial operations;

2. Evaluating cash and liquidity requirements, including assisting the Debtors in preparing and reporting on appropriate cash and liquidity forecasts, such as a rolling 13-week cash flow forecast;

3. Working with the Debtors' management to preserve and maximize cash availability while preserving value in the business;



4. Assisting with the evaluation of strategic alternatives, including evaluating the sale or winddown of the Debtors' assets;

5. Assisting with the preparation of reports required by title 11 of the United States Code and the Federal Rules of Bankruptcy Procedure, including statements of financial affairs, schedules of assets and liabilities, and monthly operating reports;

6. Assisting the Debtors' management in responding to requests from, and negotiation with, investors, lenders, creditors, any official committees, and other stakeholders as requested by the Debtors;

7. Assisting in the Debtors' strategic communications with employees, vendors and other stakeholders, as needed;

8. Directing the efforts of external professionals, consultants, and advisors in connection with liquidation initiatives, including the negotiation of any agreements with asset purchasers, potential investors, or funding sources; and

9. Performing such other services as may be reasonably requested by the Debtors and are customary in this type of engagement.

Additionally, Mr. Gerard Uzzi shall serve as the Chief Restructuring Officer to the Debtors. Mr. Uzzi's services shall be provided through the Firm. Generally, the Firm shall perform activities and services customarily performed by a chief restructuring officer, including assisting in: (a) the operational and cash management functions of the Debtors; (b) the development of any cost reduction programs or asset conservation measures with respect to the Debtors and any underlying analysis thereof; and (c) any elements of the restructuring process with respect to the Debtors.

**Cooperation.** The Client understands and agrees that (A) for the Firm to represent the Client effectively, it will be necessary for you to: (1) participate in meetings, preparation sessions, conference calls, and other activities in connection with the representation; and (2) provide complete and accurate information to the Firm on a timely basis; and (B) any services provided by the Firm will be limited by and subject to your cooperation with the foregoing.

**Fees and Expenses.** The Firm's fees are based on the actual time spent on the Matter. The Firm's rates are set forth on Schedule 1 annexed hereto. Rates and hours, together with a description of services provided, will be reflected on the backup summary enclosed with the invoices issued to you. From time to time, the Firm's rates may increase to take into account increases in costs and other factors and such rates will be applied prospectively from the date of change.



Certain out-of-pocket expenses, such as travel, third-party messenger services, computer database searches, and other reasonable out-of-pocket expenses incurred by the Firm for your benefit are billed separately from time charges, based on actual use and at the Firm's cost.

All fees and expenses incurred in a chapter 11 case involving the Company will be subject to Bankruptcy Court approval. As with any chapter 11 case, there is a risk to us, and if we achieve an extraordinary result for you, we reserve the right to seek additional fees, subject to the approval of the Independent Manager and the Bankruptcy Court.

**Billing.** The Firm will bill you on a bimonthly (every two weeks) basis or as frequently as is appropriate under the circumstances for hourly fees and for expenses, and it will expect to be paid within 3 business days of the date of the invoice. Billing for ancillary services may lag because of delays in the receipt of third-party bills and the posting of accounts. Payments made by wire transfer shall be made to the following account:

| | |
|---|---|
| Account Name: | CBMN Advisors LLC |
| Account Number: | 80010502411 |
| Bank Name: | JP Morgan Chase Bank<br>270 Park Avenue<br>New York, New York 10017 |
| ABA Number: | 021 000 021 |
| SWIFT Code: | CHASUS33 |

**Retainer.** You agree that an initial retainer in the amount of $250,000 (the "**Retainer**") will be paid to the Firm upon execution of this Engagement Letter. You further agree to pay our invoices by the due date without us utilizing the Retainer. In the event you fail to timely pay any invoice, you further agree that the Retainer may be applied to satisfy any fees and expenses outstanding with respect to the Engagement and authorize the Firm to draw upon the Retainer without further notice. To the extent the Retainer should ever, for any reason, fall below $250,000, you agree to immediately provide any and all additional funds necessary to restore the balance of the Retainer to $250,000. We reserve the right to require an additional Retainer should circumstances warrant. Any balance of the Retainer remaining at the completion of the Engagement will be returned to you.

**Relationship of the Parties**. The parties intend that an independent contractor relationship will be created by the agreement. As an independent contractor, the Firm will have complete and exclusive charge of the management and operation of its business, including hiring and paying the wages and other compensation of all its employees and agents, and paying all bills, expenses and other charges incurred or payable with respect to the operation of its business. Employees and agents of the Firm will not be entitled to receive from the Client any vacation pay, sick leave, retirement, pension or social security benefits, workers' compensation, disability, unemployment insurance benefits or any other employee benefits. The Firm will be responsible for all employment, withholding, income and other taxes incurred in connection with the operation and conduct of its business.



Certain Firm personnel providing services hereunder in connection with the Matter may do so as agents under consulting and contract arrangements with the Firm (each, a "**Firm Consultant**"). Accordingly, such personnel may provide services directly or indirectly to entities unrelated to the Firm, including through separate consulting and/or direct employment arrangement relationships with such other unrelated entities. Any Confidential Information (as defined below) provided to a Firm Consultant in connection with the Matter is provided to such Firm Consultant solely in their capacity as a Firm Consultant, will be treated as Confidential Information hereunder and, except as otherwise expressly permitted hereunder, will not be shared or disclosed to any party unrelated to the Firm.

The Firm is not an accounting firm and does not give accounting advice or guidance. While the Firm's work may involve analysis of accounting, business and other related records, this Engagement does not constitute an audit in accordance with either generally accepted auditing standards or the standards of the Public Company Accounting Oversight Board or any other similar governing body.

The Firm is not an investment bank or law firm. No services provided under this agreement are intended to be, nor should be construed to be, investment and/or legal advice and/or investment banking and/or legal services.

**Confidentiality.** Each party shall use reasonable efforts, but in no event less effort than it would use to protect its own confidential information, to keep confidential all non-public confidential or proprietary information obtained from the other party during the performance of the Firm's services hereunder (the "**Confidential Information**"), and neither party will disclose any Confidential Information to any other person or entity. "Confidential Information" includes the terms of this agreement, non-public confidential and proprietary data, plans, reports, schedules, drawings, accounts, records, calculations, specifications, flow sheets, computer programs, source or object codes, results, models or any work product relating to the business of either party, its subsidiaries, distributors, affiliates, vendors, customers, employees, contractors and consultants. The foregoing is not intended to prohibit, nor shall it be construed as prohibiting, the Firm from making such disclosures of Confidential Information that the Firm reasonably believes are required by law or any regulatory requirement or authority to clear the Client conflicts. The Firm may also disclose Confidential Information to its partners, directors, officers, employees, independent contractors and agents who have a need to know the Confidential Information as it relates to the services being provided under this agreement, provided the Firm is responsible for any breach of these confidentiality obligations by any such parties. The Firm may make reasonable disclosures of Confidential Information to third parties, such as the Client's suppliers and/or vendors, in connection with the performance of the Firm's obligations and assignments hereunder, provided the Firm reasonably believes that such third party is bound by confidentiality obligations. In addition, the Firm will have the right to disclose to any person that it provided services to the Client or its affiliates and a general description of such services, but shall not provide any other information about its involvement with the Client. The obligations of the parties under this section "Confidentiality" shall survive the end of any engagement between the parties for a period of three (3) years. The parties acknowledge and agree that (i) all information (written or oral), including advice and work product generated by the Firm in connection with this Engagement is intended solely for the benefit and use of the



Client in connection with this agreement, and (ii) no such information shall be used for any other purpose or disseminated to any third parties, or, quoted or referred to with or without attribution to the Firm at any time in any manner or for any purpose without the Firm's prior approval (not to be unreasonably withheld or delayed), except as required by law. The Client may not rely on any draft or interim work product.

**Limitation of Liability.** The Firm and its affiliates and its and their partners, directors, officers, employees and agents (collectively, the "**Firm Parties**") shall not be liable to the Client, or any party asserting claims on behalf of the Client, except for direct damages found in a final determination to be the direct result of the gross negligence, bad faith, self-dealing or intentional misconduct of Firm Parties. The Firm Parties shall not be liable for incidental, consequential or special damages, lost profits, lost data, reputational damages, punitive damages or any other similar damages under any circumstances, even if they have been advised of the possibility of such damages. The Firm Parties' aggregate liability, whether in tort, contract, or otherwise, is limited to the amount of fees paid to the firm for services under this agreement (or if the claim arises from an addendum to this agreement, under the applicable addendum) (the "**Liability Cap**"). The Liability Cap is the total limit of the Firm Parties' aggregate liability for any and all claims or demands by anyone pursuant to this agreement, including liability to the Client, to any other parties hereto, and to any others making claims relating to the work performed by the Firm pursuant to this agreement. Any such claimants shall allocate any amounts payable by the Firm Parties among themselves as appropriate, but if they cannot agree on the allocation it will not affect the enforceability of the Liability Cap. Under no circumstances shall the aggregate of all such allocations or other claims against the Firm Parties pursuant to this agreement exceed the Liability Cap. The Firm is not responsible for any third-party products or services separately procured by the Client. The Client's sole and exclusive rights and remedies with respect to any such third-party products or services are against the third-party vendor and not against the Firm, whether or not the Firm is instrumental in procuring such third-party product or service. The provisions of this section "Limitation of Liability" shall survive termination.

**Indemnification and Other Matters.** The Client shall indemnify, hold harmless and defend Firm Parties from and against all claims, liabilities, losses, expenses and damages arising out of or in connection with this Engagement. The Client shall pay damages and expenses as incurred, including reasonable legal fees and disbursements of counsel. If, in the opinion of counsel, representing both parties in the matter covered by this indemnification creates a potential conflict of interest, the Firm Parties may engage separate counsel to represent them at the Client's expense. In addition to the above indemnification, Firm employees serving as managers, directors or officers of the Client or its affiliates will receive the benefit of the most favorable indemnification provisions provided by the Client to its directors, officers and any equivalently placed employees, whether under the Client's charter or by-laws, organic documents, by contract or otherwise. The Client shall specifically include and cover Firm employees and agents serving as members, directors or officers of the Client or affiliates from time to time with direct coverage under the Client's policy for liability insurance covering its directors, officers and any equivalently placed employees ("**D&O insurance**"). Prior to the Firm accepting any officer position, the Client shall, at the request of the Firm, provide the Firm a copy of its current D&O policy, a certificate(s) of insurance evidencing the policy is in full force and effect, and a copy of the signed board resolutions and any other documents as the Firm may



reasonably request evidencing the appointment and coverage of the indemnitees. The Client will maintain such D&O insurance coverage for the period through which claims can be made against such persons. The Client disclaims a right to distribution from the D&O insurance coverage with respect to such persons. In the event that the Client is unable to include the Firm employees and agents under the Client's policy or does not have first dollar coverage acceptable to the Firm in effect for at least $10 million (e.g., there are outstanding or threatened claims against officers and directors alleging prior acts that may give rise to a claim), the Firm may, at its option, attempt to purchase a separate D&O insurance policy that will cover Firm employees and agents only. The cost of the policy shall be invoiced to the Client as an out-of-pocket expense. If the Firm is unable or unwilling to purchase such D&O insurance, then the Firm reserves the right to terminate the agreement. The Client's indemnification obligations in this section shall be primary to, and without allocation against, any similar indemnification obligations that the Firm may offer to its personnel generally, and the Client's D&O insurance coverage for the indemnitees shall be specifically primary to, and without allocation against, any other valid and collectible insurance coverage that may apply to the indemnitees (whether provided by the Firm or otherwise). The provision of this section "Indemnification and other matters" shall survive termination.

**Termination of Representation.** The Client may terminate this representation at any time, subject to the payment of any final billings. The Firm may withdraw from this representation for good cause, on reasonable notice, without the Client's consent. Good cause includes but is not limited to: (1) the Client's failure to cooperate with the Firm, as provided above; (2) the failure to pay any bill issued by the Firm when due, as provided above; and (3) any fact or circumstance that would render our continuing representation unlawful or unethical. Any termination of our representation would be subject to such approval as may be required from any tribunal in which we are appearing on the Client's behalf. Upon termination, we will have no duty to take any further action in connection with the Matter.

Our representation of the Client will conclude when we have completed our services as described in the first paragraph on page one of this letter.

**Related Proceedings or Activities.** If at any time we are asked to testify (by deposition or otherwise) or respond to a subpoena or other discovery request as a result of our representation of you, or if we must defend the confidentiality of communications in any proceeding, you agree to pay us for any resulting costs, including for our time, calculated at the hourly rate at the time for the particular individuals involved, even if our representation of you has ended.

**Governing Law.** This agreement shall be governed by the internal laws of the State of New York, without regard to choice of law principles.

**Construction.** This agreement shall be construed according to its terms and not in favor of, or against, any party as the drafter. This letter agreement supersedes any prior agreements or understandings, whether written or oral. The parties acknowledge that they are not relying on any statement, representation, assertion or thing not expressly stated in this letter agreement.



This letter agreement may not be modified except by a further written agreement signed by all parties.

If the foregoing accurately reflects our agreement, please confirm that by signing below and returning a copy of this letter to me. By signing below, you agree that this agreement has been duly executed by you or an authorized representative with authority to bind you to the terms of this agreement. Unless we hear otherwise from you immediately, we will assume that these terms are acceptable and proceed accordingly with our work, as you have requested. With respect to any work previously requested, and any additional work that you ask us to perform on this Engagement after receipt of this agreement, we will assume that you have agreed to its terms, even though you may not yet have returned an executed copy to me, and the terms of this agreement will be applicable to our work.

We look forward to working with you.

Yours sincerely,

UZZI & LALL

Signed by:

By: Gerard Uzzi
C933082321E44B5...
Gerard Uzzi

ACCEPTED AND AGREED:

DocuSigned by:

John Brecker
14B500C37E95409...
Name: John Brecker
Independent Manager



## Schedule 1

### Uzzi & Lall Hourly Rates

| Hourly Rates | $/hr |
|---|---|
| **Managing Partner** | 1,500 |
| **Managing Director** | 1,200 |
| **Senior Director** | 1,000 |
| **Director** | 900 |
| **Vice President** | 700 |
| **Associate** | 500 |
| **Analyst** | 400 |