**GIBSON, DUNN & CRUTCHER LLP**
Jeffrey C. Krause, Esq. (*pro hac vice* pending)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
jkrause@gibsondunn.com

-and-

Michael J. Cohen, Esq.
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
mcohen@gibsondunn.com

**COLE SCHOTZ P.C.**
Felice R. Yudkin, Esq.
Daniel J. Harris, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
fyudkin@coleschotz.com
dharris@coleschotz.com

*Co-Counsel to BHER Ravenswood Solar 1, LLC*

*Co-Counsel to BHER Ravenswood Solar 1, LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re:<br><br>Powin, LLC, *et al*.,<br><br>              Debtors.[1] | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

**DECLARATION OF JOHN GUY IN SUPPORT OF**
**BHER RAVENSWOOD SOLAR 1, LLC'S OBJECTION TO MAINFREIGHT INC.'S**
**MOTION TO CONFIRM THAT THE AUTOMATIC STAY PURSUANT TO**
**11 U.S.C. § 362(A) DOES NOT APPLY TO CERTAIN GOODS IN ITS POSSESSION**

I, John Guy, hereby declare under penalty of perjury as follows:

1.	I am a Senior Vice President of BHE Renewables, LLC, the parent of BHER

Ravenswood Solar 1, LLC ("**Buyer**").  I submit this declaration in support of *BHER Ravenswood*

*Solar 1, LLC's Objection to Mainfreight Inc.'s Motion to Confirm That the Automatic Stay*

*Pursuant to 11 U.S.C. § 362(a) Does Not Apply to Certain Goods in Its Possession.*

---

[1]	The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583], (ii) Powin, LLC [0504], (iii) PEOS Holdings, LLC [5476], (iv) Powin China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [5241], (vii) Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [2495], (ix) Powin Energy Operating, LLC [6487]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

2.      Attached hereto as <u>Exhibit A</u> is a true and correct copy of the Energy Supply Agreement, between Buyer and Debtor Powin, LLC ("**Powin**"), dated July 12, 2024 (the "**Purchase Agreement**"). The attached copy of the Purchase Agreement does not include hundreds of pages of technical and other schedules and exhibits which are not relevant to the determination of the issues before the Court.

3.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of the Change Order, dated June 8, 2025 (the "**Change Order**"), without the schedules.

4.      Pursuant to the Change Order, on June 11, 2025, Buyer paid $3,162,613.87 to Powin. This payment reflected the full purchase price of the goods.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  July 8, 2025

*/s/ John Guy*
_____
John Guy

## **EXHIBIT A**

## **PURCHASE AGREEMENT**



*Execution version*
*Group 1 ESA*

# ENERGY SUPPLY AGREEMENT

**between**

**BHER Ravenswood Solar 1, LLC, as Buyer**

**and**

**POWIN, LLC, as Supplier**

## For Group 1

**July 12, 2024**

# Table of Contents

1.  **Definitions** ................................................................................................1

2.  **Contract and Order of Precedence** ............................................................25

3.  **Preparation for and Performance of the Work** ............................................27

4.  **Buyer Representative and Supplier Representative** ......................................27

5.  **Cooperation with Others; Project Site Access; Public Work Disclaimer** ..................28

6.  **Codes and Standards; Supplier Personnel** ................................................29

7.  **Physical Security; Cybersecurity** ............................................................31

8.  **Price and Payment** ..............................................................................31

9.  **Schedule and Delivery** .........................................................................36

10.  **Liquidated Damages** ...........................................................................40

11.  **Care, Control, and Risk of Loss; Title** ...................................................41

12.  **Final Mile Transport; Quality, Inspection and Factory Testing** ...................42

13.  **Technical Support; Installation Completion** ............................................43

14.  **Commissioning** ..................................................................................45

15.  **Final Acceptance** ...............................................................................47

16.  **Change Orders** ..................................................................................47

17.  **Warranty** .........................................................................................50

18.  **Tech Escrow** .....................................................................................51

19.  **Suspension** .......................................................................................51

20.  **Events of Default and Remedies** ............................................................52

21.  **Buyer's Termination for Convenience** .....................................................56

22.  **Recovery Plan** ...................................................................................57

23.  **Force Majeure** ...................................................................................57

24.  **Limitation of Liability** .........................................................................58

25.    **Waiver of Consequential Damages**.................................................................................**59**

26.    **Indemnity**.................................................................................**60**

27.    **Confidentiality**.................................................................................**61**

28.    **Performance Guarantees**.................................................................................**63**

29.    **Supplier's Intellectual Property** .................................................................................**64**

30.    **Intellectual Property Indemnity** .................................................................................**67**

31.    **Compliance** .................................................................................**68**

32.    **Export Compliance with United States Export Controls** .................................................................................**69**

33.    **Health and Safety** .................................................................................**70**

34.    **Dispute Resolution** .................................................................................**70**

35.    **Governing Law** .................................................................................**73**

36.    **Assignment** .................................................................................**73**

37.    **Insurance** .................................................................................**74**

38.    **Independent Contractor** .................................................................................**74**

39.    **Subcontracting** .................................................................................**75**

40.    **Record Keeping and Audit** .................................................................................**75**

41.    **Publicity** .................................................................................**76**

42.    **No Waiver** .................................................................................**76**

43.    **Miscellaneous** .................................................................................**77**

\*            \*            \*            \*            \*

## ENERGY SUPPLY AGREEMENT

This ENERGY SUPPLY AGREEMENT (this "Contract" or "Group 1 ESA") is entered into as of July 12, 2024 (the "Effective Date") by and between BHER Ravenswood Solar 1, LLC, a Delaware limited liability company, ("Buyer") and POWIN, LLC, a Delaware limited liability company ("Supplier"; together with Buyer, the "Parties"; each a "Party").

### RECITALS:

WHEREAS, Buyer is developing a solar plus energy storage project, the location of which is described in Exhibit A (the "Project");

WHEREAS, Buyer intends on the Project to be constructed, commissioned, and put into operation in three groups (each, a "Group", and individually "Group 1", "Group 2" and "Group 3", all as further defined in the MSA);

WHEREAS, Supplier is a supplier of utility-scale energy storage systems; and

WHEREAS, the Parties entered into that certain Master Supply Agreement dated on or about the date hereof (the "MSA") pursuant to which the Parties elected to execute this Contract and two correlative agreements for the other two Groups, each substantially in the form of this Contract (the "Related ESAs").

WHEREAS, Buyer wishes to purchase from Supplier, and Supplier wishes to sell to Buyer, an energy storage system for this Group, which constitutes a portion of the Project, in accordance with the terms and conditions hereof and the terms and conditions of the MSA.

NOW, THEREFORE, in consideration of the mutual promises set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## 1. Definitions

The following capitalized terms as used in this Contract shall have the meanings set forth below:

| Term | Meaning |
|------|---------|
| "AAA" | has the meaning set forth in Section 34(c). |
| "AAA Rules" | has the meaning set forth in Section 34(c). |
| "Abnormal Weather Condition" | unusual or atypical fog, snow, ice, rain, mud, smoke, smog, excessive heat, storms, wind and similar inclement weather conditions severe enough: |
| | (a) to prohibit or materially impair use of |

transportation systems such that a common carrier, acting reasonably, would not use such systems to transport ESS Equipment; or

(b) an experienced supplier, exercising Standards of Practice would, as a matter of safety, refrain from performing comparable work under comparable conditions.

"Affiliate"

an entity directly, or indirectly controlled by or under common control of a Party; *provided*, however, with respect to Buyer, "Affiliate" shall include *only* BHE Renewables, LLC, its subsidiaries, and Berkshire Hathaway Energy Company. "Control" for this definition (including, with correlative meanings, the terms "controlled by" and "under common control with"), means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through the ability to exercise voting power, by contract or otherwise.

"Alternate Delivery Location"

a location other than the Project Site to which Supplier Delivers ESS Equipment pursuant to Section 9(i)(iii), *provided* that such location (a) accords with the ESS Equipment storage requirements set forth in the Installation Manual, (b) is, to the extent reasonably practicable: (i), located within fifty miles of the Project Site and (ii) charges commercially reasonable market rates.

"Applicable Codes and Standards"

all national, state, and local engineering, environmental, construction, safety, and electrical generation codes and standards, applicable to the Work, including those made applicable pursuant to any Permit.

"Applicable Law(s)"

as amended from time to time, any act, statute, law, regulation, Permit ordinance, rule, judgment, order, decree, directive, guideline or policy (to the extent mandatory) applicable to Supplier, the Project, the Project Site, the ESS Equipment, or the Work; or any similar form of decision, determination, written interpretation or administration of any of the foregoing by any Governmental Authority, and

2

applicable ethics laws including anti-bribery and anti-kickback laws such as the U.S. Foreign Corrupt Practices Act.

"Backfeed Availability"

Buyer has made available sufficient backfeed power, including (a) the ability to export energy from the ESS Equipment to the Buyer's point of interconnection (or other agreed upon metered location) and to import energy at that same point of interconnection point and (b) completion of the Witness Test(s).

"Business Day"

any day other than a Saturday, a Sunday, U.S. federal holidays, or any other day on which banks are authorized to be closed in Portland, Oregon, or the state in which the Project is located.

"Buyer"

has the meaning set forth in the preamble, and includes such entity's successors and permitted assigns.

"Buyer-Caused Delay"

A demonstrable delay on the ability of Supplier to complete its obligations under this Contract due to:

(a) a failure by Buyer or any Buyer Responsible Party to timely perform its obligations required under this Contract, including failure to timely perform its obligations: (i) to procure and maintain all Buyer Permits as and when necessary to not delay the Work, or (ii) in support of Delivery and Commissioning;

(b) any act, omission or breach of this Contract by Buyer or any act or omission of any Buyer Responsible Party;

(c) any materially inaccurate, additional, or changed information from the information provided by Buyer or any Buyer Responsible Party and set forth in the other Exhibits as of the Effective Date;

(d) Soil or Subsurface Conditions;

3

(e) [reserved]

(f) Delivery Readiness Delays, or Buyer's failure to timely achieve Commissioning Readiness Date or other milestones for which Buyer is the "Responsible Party" in <u>Exhibit D</u>; or

(g) any other event or circumstance set forth in this Contract as "Buyer-Caused Delay";

*other than*, in each case, as a result of:

(i) any actions taken by Buyer pursuant to the express terms and conditions of this Contract to enforce its rights under this Contract in connection with a breach or default by Supplier of its covenants, obligations, representations or warranties set forth in this Contract;

(ii) a Force Majeure Event; or

(iii) Change in Law.

| | |
|---|---|
| "<u>Buyer-Furnished Equipment</u>" | The equipment to be provided by Buyer, as set forth in <u>Exhibit S</u>. |
| "<u>Buyer-Furnished Equipment Defects</u>" | (a) any (i) defects in the design, workmanship, or materials comprising the Buyer-Furnished Equipment, or (ii) damage to the Buyer-Furnished Equipment caused by Buyer or Buyer Responsible Party or occurring when in the care, custody, and control of Buyer, including, as with respect to software, any software error or other problem caused by Buyer's incorrect operation of the computer code in such software; or |
| | (b) any other failure of the Buyer-Furnished Equipment to comply with the Technical Specifications, Applicable Laws, or Standards of Practice. |
| "<u>Buyer Event of Default</u>" | has the meaning set forth in <u>Section 20(b)(i)</u>. |

"Buyer Hazardous Substances"    all Hazardous Substances, other than Supplier Hazardous Substances.

"Buyer Permits"    all Permits relating to the Project, the ESS Equipment and the Work, including the development, construction and operation of the Project, except for Supplier Permits.

"Buyer Representative"    the individual appointed by Buyer pursuant to the MSA.

"Buyer Responsible Party"    collectively, Buyer, Buyer's Affiliates, the Buyer Representative, all Other Contractors and their respective suppliers or subcontractors of any tier, or any other person directly employed by any of them, or any person for whose acts any of them are liable.

Buyer Responsible Parties excludes Supplier and Subcontractors.

"Buyer Taxes"    has the meaning set forth in Section 8(b)(iii)(B).

"Care, Control, and Risk of Loss"    the full responsibility for care, custody and control of the ESS Equipment and the risk of loss or damage thereto, as transferred between the Parties pursuant to Section 11(a).

"Centipede"    Supplier's proprietary, fully integrated modular energy storage system, comprised primarily of a Collection Segment(s), Energy Segments, along with enclosures, hardware and software.

"Change in Law"    after the Effective Date:

(a) the enactment of a new Applicable Law (including with respect to Import Duties) or Applicable Code and Standard;

(b) a change in, or repeal of, a then-existing Applicable Law (including with respect to Import Duties) or Applicable Codes and Standards; or

(c) a change in the interpretation of any Applicable Law or Applicable Code or Standard resulting

from a decision of, or ruling by, any Governmental Authority;

*but excluding*:

(i)  any of the foregoing that occurs prior to the Effective Date but the effectiveness of which occurs after the Effective Date;

(ii)  changes in Applicable Laws with respect to income, profits, assumed profits, capital gains, corporation tax, or turnover taxes; and,

(iii)  change in laws respecting general employee wages and benefits, excluding (1) changes directed at employees or wages in the renewable energy industry and (2) changes in prevailing wage requirements applicable to the Project as of the Effective Date.

"Change Order(s)"                a written order issued and signed by Buyer Representative and Supplier Representative adjusting the Work, the Contract Price and/or the Project Schedule, including the Guaranteed Dates, in accordance with Section 16.

"Code"                the Internal Revenue Code of 1986, as set forth in Title 26 of the United States Code, as amended and restated.

"Cold Commissioning"                The activities related to Commissioning, all of which can be conducted, on a Lineup-by-Lineup basis, prior to Backfeed Availability.

Cold Commissioning Commencement Date                for each Lineup, the date by which Buyer has achieved Lineup Completion so that the ESS Equipment in the Lineup is ready for Cold Commissioning, as such date is set forth in Exhibit D.

"Collection Segment"                the component of the Centipede that:

(a) manages and controls the Energy Segments;

(b) aggregates DC power and monitors both the grid

and its battery decisions on when and where to efficiently dispatch power; and

(c) houses the AC load panel, HVAC controls, fire panel, networking and communications equipment and controls.

| | |
|---|---|
| "Collection Segment Delivery LDs" | the liquidated damages applicable to Delivery of the Collection Segments, the value of which is set forth in Exhibit O. |
| "Commissioning" | Successful completion by Supplier of the Performance Tests, demonstrating that the Performance Guarantees have been achieved. |
| "Commissioning Certificate" | the certificate substantially in the form of Exhibit N-2. |
| "Commissioning Checklist" | has the meaning set forth in Section 14(b). |
| "Commissioning LDs" | the liquidated damages applicable to Commissioning, the value of which is set forth in Exhibit O. |
| "Commissioning LDs Cap" | Supplier's liability cap for the Commissioning LDs, as enumerated in Exhibit O. |
| "Commissioning Readiness Date" | the date (as set forth in Exhibit D) by which Installation Completion must occur so that the ESS Equipment is ready for Supplier to commence Commissioning. |
| "Completion Milestones" | Delivery of the Collection Segments;<br><br>Delivery of the Energy Segments; and<br><br>Commissioning. |
| "Confidential Information" | has the meaning set forth in Section 27(a). |
| "Contract" | this Energy Supply Agreement entered into by and between Buyer and Supplier, including all Exhibits referenced herein. |

7

"Contract Price"  the total amount payable by Buyer to Supplier in accordance with this Contract, as enumerated in Exhibit E, as may be amended by Change Orders in accordance with this Contract.

"COVID"  (a) the novel coronavirus SARS-CoV-2 and the associated disease named by the World Health Organization as "COVID-19" and declared by the World Health Organization to be a global pandemic on March 11, 2020; and

(b) any mutation, strain, or variant of COVID-19 or any disease attributable to such mutation, strain, or variant.

"COVID Impacts"  (a) (i) measures taken after the Effective Date by a Governmental Authority in connection with COVID, including quarantines; and/or (ii) the enactment, promulgation, modification, or repeal after the Effective Date of any Applicable Law as a result of COVID;

(b) circumstances occurring after the Effective Date related to COVID, including:

(i)    disruption to:

(A) production supply chains,

(B) activities conducted at a Worksite (including closures or partial closures of Manufacturing Worksites or the Project Site),

(C) import or export clearances; or

(D) transportation facilities or services (including loading, shipment, unloading and trans-shipping), and Final Mile Transport),

(ii)    impacts to:

(A)    labor or other human resources,

(B)    utility services, delays to import or

export clearances, or

other resources necessary for the production, Delivery, or storage of the ESS Equipment.

For the avoidance of doubt, safety and protection measures implemented or utilized generally prior to the Effective Date shall not be considered COVID Impacts solely because they are re-implemented after the Effective Date.

| | |
|---|---|
| "Cybersecurity Policy" | Buyer's Cybersecurity Policy, as set forth in Exhibit V, which maybe be updated from time to time (subject to Supplier's relief under clause "(c)" of the "Buyer-Caused Delay" definition). |
| "Countersigned Notice" | has the meaning set forth in Section 9(j)(iii)(A). |
| "Date of Delivery" | has the meaning determined pursuant to Section 9(j)(iv)(A) or Section 9(j)(vii)(A), as the case may be. |
| "DDP" | "Delivered Duty Paid", per INCOTERMS 2020. |
| "DDP Cost Amount" | the amount set forth on Exhibit E as an Effective Date estimate for DDP Costs. |
| "DDP Costs" | The actual costs incurred by Supplier for transportation and delivery of ESS Equipment to the Delivery Location, including loading and staging expenses, delivery costs, security fees, and other costs customarily associated with DDP (but excluding Import Duties and costs of Final Mile Transport), plus fifteen percent for overhead and profit. |
| "Deemed Delivery" | has the meaning set forth in Section 9(j)(vi). |
| "Defect" | (a) any (i) defects in the design, workmanship, or materials comprising the Warranted Equipment, or (ii) damage to the Warranted Equipment caused by Supplier or Subcontractors or occurring when in the care, custody, and control of Supplier, including, as with respect to |

software, any software error or other problem caused by Supplier's incorrect operation of the computer code in such software; or

(b) any other failure of the Warranted Equipment to comply with the Technical Specifications or Applicable Laws or Standards of Practice.

Anything to the contrary notwithstanding, "Defective" has the correlative meaning.

"Delivery"                  with respect to ESS Equipment:

(a) Supplier has transported and delivered such ESS Equipment (or, as applicable, a particular portion of it) to the Delivery Location, and made the ESS Equipment available to Buyer (or Other Contractors) for unloading, unpacking, and inspection in accordance with the Project Schedule; and

(b) the occurrence of: (i) a Countersigned Notice pursuant to Section 9(j)(iii), or (ii) Deemed Delivery.

"Deliver" and "Delivered" have correlative and equivalent meanings.

For avoidance of doubt, if applicable, Supplier's delivery of ESS Equipment pursuant to Final Mile Transport is not "Delivery."

"Delivery Inspection Checklist"    the checklist set forth in Exhibit N-1.

"Delivery LDs"              collectively, Collection Segment Delivery LDs, and Energy Segment Delivery LDs.

"Delivery LDs Cap"          Supplier's liability cap for the Delivery LDs, as enumerated in Exhibit O.

"Delivery Location"         (a) the location on the Project Site for Delivery of the applicable ESS Equipment, as such location is identified to Supplier by Buyer at least thirty days

10

prior to the Site Readiness Date; or

(b) the Alternate Delivery Location.

| | |
|---|---|
| "Delivery Notice" | has the meaning set forth in Section 9(j)(i). |
| "Delivery Notice Date" | has the meaning set forth in Section 9(j)(ii). |
| "Delivery Readiness Delay" | has the meaning set forth in Section 9(h)(iii). |
| "Delivery Readiness Delay Costs" | Supplier's reasonable, unavoidable, and documented demurrage, storage and standby charges, and any additional transportation costs incurred by Supplier in connection with a Delivery Readiness Delay. |
| "Disclosing Party" | has the meaning set forth in Section 27(a). |
| "Dispute" | has the meaning set forth in Section 34(a). |
| "Effective Date" | has the meaning set forth in the preamble. |
| "Energy Segment" | has the meaning set forth in Exhibit J-1. |
| "Energy Segment Delivery LDs" | the liquidated damages applicable to Delivery of the Energy Segments, the value of which is set forth in Exhibit O. |
| "Energy Segment Readiness" | (a) internet service is available at the Project Site with the bandwidth described in Exhibit C and<br><br>(b) auxiliary power is connected & energized. |
| "Energy Segment Readiness Date" | the date (as set forth in Exhibit D) by which Buyer must achieve Energy Segment Readiness. |
| "ESS" | the energy storage system consisting of one or more Centipedes, that includes:<br><br>(a) the ESS Equipment;<br><br>(b) Buyer-Furnished Equipment; and |

11

|  | (c) work for which Buyer and Buyer Responsible Parties is responsible pursuant to <u>Exhibit B</u>. |
|---|---|
| "<u>ESS Equipment</u>" | the Energy Segments, Collection Segments, PCS/MVT Sets, and all other Supplier-provided equipment, supplies, software and other goods, as enumerated in <u>Exhibit A</u>. |
| "<u>ESS Product Manual</u>" | the manual set forth in <u>Exhibit J-1</u>. |
| "<u>Excusable Event</u>" | has the meaning set forth in <u>Section 16(c)</u>. |
| "<u>Final Acceptance</u>" | Supplier's achievement of the following: |

"<u>Final Acceptance</u>" — Supplier's achievement of the following:

(a) Commissioning, along with receipt of Commissioning Certificate from Buyer;

(b) delivery to Buyer of final waivers and releases of liens, from Supplier, in accordance with <u>Section 8(c)</u>;

(c) payment of all Liquidated Damages, if any;

(d) Supplier has completed the Training;

(e) confirmation that the OEM Warranties are assignable to Buyer, and copies of such OEM Warranties have been delivered to Buyer in accordance with <u>Section 17(c)(i)</u>; and

(f) receipt of Buyer's Final Acceptance Certificate.

| "<u>Final Acceptance Certificate</u>" | the certificate Supplier shall deliver to Buyer upon Final Acceptance, in the form of <u>Exhibit N-3</u>. |
|---|---|
| "<u>Final Acceptance Date</u>" | the date on which Supplier achieves Final Acceptance, as such date is enumerated in the Final Acceptance Certificate. |
| "<u>Final Mile Transport</u>" | as applicable, Supplier's transportation, as agent for Buyer, after completion of the Warehousing Obligations, of the ESS Equipment from the Alternate Delivery Location to the Project Site. |

"Final Mile Transport Agreement"    as applicable, that certain agreement between the Parties, pursuant to which Supplier shall provide Final Mile Transport, the form of which will be agreed by the Parties within 120 days of the Effective Date and attached to the Agreement as Exhibit Y-2.

"Financing Parties"    (a) any and all lenders providing senior or subordinated construction, interim or long-term debt or other financing or refinancing to a Party or its Affiliates;

(b) any and all equity investors in a Party or its Affiliates, including those providing tax equity investment or leveraged lease-financing or refinancing (or any other equity investor that makes a capital contribution to a Party or its Affiliates in cash or in kind); or

(c) any person or entity providing credit support to a Party or its Affiliates;

in each case, in connection with the Project, a portfolio of projects of which the Project is a part, this Contract, or such Party's business generally and, in each case, any trustee or collateral agent acting behalf of the foregoing.

"Force Majeure Event"    an event or circumstance that:

(a) is beyond the reasonable control of the Party claiming relief;

(b) prevents such Party from performing its obligations under this Contract (other than any obligation for the payment of money); and

(c) is not the result of the fault or negligence of such Party (including: in the case of Supplier, its Subcontractors; in the case of Buyer, any Buyer Responsible Party).

When meeting the foregoing criteria, examples of Force Majeure Events include:

(i) acts of god or natural disasters, including earthquakes, floods, fires and explosions,

13

tidal waves, hurricanes, monsoons, cyclones, typhoons, tropical storms, perils of the sea, tornadoes, volcanic activity or eruptions, lightning strikes, landslides, mudslides, sinkholes, or drought;

(ii)    Abnormal Weather Conditions;

(iii)    war (declared or undeclared), acts of the public enemy, terrorism and threats of terrorism, piracy, insurrection, riot, revolution, civil commotion, invasion, or other armed conflict, malicious damage, vandalism, or sabotage;

(iv)    acts of any Governmental Authorities, including expropriation, requisition, confiscation or nationalization, embargos, sanctions, rationing, allocation, export or import restrictions, injunction, or any other act that would render performance of an obligation by the claiming Party illegal, including the other Party or its Affiliate becoming a Restricted Party;

(v)    closure to, blockade of, or other incidents at, ports, harbors, docks, canals, railway, railhead, or adjuncts of shipping or the transportation industry;

(vi)    national or regional labor difficulties, industrial disturbances, pickets, lockouts or strikes;

(vii)    ionizing radiation or contamination by radioactivity; or

(viii)    quarantine, epidemic, pandemics, and COVID Impacts.

Notwithstanding the foregoing, Force Majeure Events shall not include:

(A)    unforeseen difficulties in manufacturing, except where the direct result of an independent Force Majeure Event;

(B)    late delivery of or in ability to obtain equipment or materials or supplies for the Work, except where the direct result of an independent force

14

majeure;

(C)   strikes limited to employees of the impacted Party;

(D)   difficulty in obtaining supplies, shortage of labor, or non-performance by Subcontractors or Buyer Responsible Parties, except where the direct result of an independent Force Majeure Event;

(E)   market price fluctuations with respect to labor or materials, supplies or components of the ESS Equipment; and

(F)   mere economic hardship, including Buyer's failure to obtain, or the cancellation of, financing for the Project.

Force Majeure Events expressly exclude Changes in Law (including any of the express exclusions to the definition of Change in Law), Buyer-Caused Delays, and Utility Delays, relief for which are addressed under other provisions of the Contract.

| | |
|---|---|
| "Governmental Authority" | any national, state, municipal or local government (including any subdivision, court, administrative agency or commission or other authority thereof) exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority. |
| "Group" | has the meaning set forth in the Recitals. |
| "Guaranteed Collection Segment Delivery Date" | the date by which Delivery of all of the Collection Segments must have occurred, as set forth in Exhibit D. |
| "Guaranteed Commissioning Date" | the date by which Supplier shall achieve Commissioning, as set forth in Exhibit D. |
| "Guaranteed Dates" | the Guaranteed Collection Segment Delivery Date, the Guaranteed Energy Segment Delivery Date, |

|  | and the Guaranteed Commissioning Date, |
|  | as such dates may be extended in accordance with this Contract. |
| "Guaranteed Energy Segment Delivery Date" | the date by which Delivery of all of the Energy Segments must have occurred, as set forth in Exhibit D. |
| "Hazardous Substances" | all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances, pollutants or wastes of any nature regulated pursuant to any Applicable Laws. |
| "Health-Monitoring Data" | all cell-level data and string level data, as identified in Exhibit J-2. |
| "Import Duties" | tariffs, import duties, customs fees, or other taxes, fees or charges payable upon the importation of the ESS Equipment into the United States. |
| "Indemnified Parties" | has the meaning set forth in Section 26(a). |
| "Indemnifying Party" | has the meaning set forth in Section 26(a). |
| "Installation Completion" | Buyer's achievement of the conditions set forth in Section 13(b), as evidenced by Supplier's acceptance of the Notice of Installation Completion. |
| "Installation Completion Date" | has the meaning set forth in Section 13(d)(v). |
| "Installation Manual" | the requirements and instructions for installing the ESS Equipment set forth in Exhibit L. |
| "Installation Requirements" | has the meaning set forth in Section 13(a). |

"IRA Requirements"

Buyer-imposed obligations on the Work related to the "Prevailing Wage Requirements" and the "Apprenticeship Requirements" as set forth in Exhibit W-1.

"Late Payment Rate"

has the meaning set forth in Section 8(h).

"License"

has the meaning set forth in Section 29(b)(ii).

"Licensed Technology"

all of the following owned by Supplier or its Affiliates and licensed to Buyer pursuant to the Contract:

(a) the copyright and any other intellectual property rights embodied in the processes and contents of any Manuals or other use instructions or documentation relating to the ESS Equipment that are provided to Buyer;

(b) the following patents that are issued to Supplier or its Affiliates and that would be infringed by their use of any part of the ESS Equipment as permitted and contemplated by the Contract:

 (i) all patents issued as of the Effective Date;

 (ii) any patents that issue from patent applications pending as of, or filed after, the Effective Date; and

 (iii) any continuations, continuations in part, divisions, reissues, and all patents issuing therefrom; including the technology defined by the claims of the patents;

(c)  intellectual property rights embodied in the Work Product;

(d) software and firmware embedded in or used in connection with the ESS Equipment and any other materials provided by Supplier under the Contract;

(e) any other trade secrets, proprietary information, and know-how incorporated in the ESS Equipment or otherwise provided or disclosed by

17

|  | Supplier for Buyer's use under this Contract; and |
|--|--|
|  | (f) any improvements of or updates to any of the foregoing provided by Supplier or its Affiliates to Buyer. |
| "Lineup" | An assembly of one PCS/MVT Sets, one Collection Segments, and twenty-one Energy Segments. |
| "Lineup Completion" | has the meaning set forth in Section 13(b)(i). |
| "Liquidated Damages" or "LDs" | collectively, the Delivery LDs and the Commissioning LDs. |
| "Liquidated Damages Cap" | Supplier's liability cap for the Liquidated Damages, as enumerated in Exhibit O. |
| "Losses" | has the meaning set forth in Section 26(a). |
| "Major Subcontract" | any Subcontract that has an aggregate value in excess of Five Hundred Thousand Dollars ($500,000). |
| "Major Subcontractor List" | Exhibit X. |
| "Manuals" | collectively, the ESS Product Manual, the Operational Data & Health-Monitoring Data Manual, and the Installation Manual. |
| "Manufacturing Worksite" | any Worksite (including that of a Subcontractor, but excluding the Project Site) where manufacturing, production, fabrication, assembly, or integration of the ESS Equipment (or component thereof) occurs. |
| "MSA" | has the meaning set forth in the Recitals. |
| "Notice of Installation Completion" | Buyer's written notice of Installation Completion, substantially in the form of Exhibit L-3. |

"OEM(s)"                                    the original equipment manufacturer(s) of the
                                            PCS/MVT Sets.

"OEM Warranty(ies)"                         the product warranty(ies) for the PCS/MVT Sets, as
                                            set forth in Exhibit G.

"Operational Data"                          the data identified in Exhibit J-2 as an Operational
                                            data type.

"Operational Data & Health-                 the manual set forth in Exhibit J-2.
Monitoring Data Manual"

"Other Contractors"                         contractors, consultants or suppliers (excluding
                                            Supplier and Subcontractors) engaged by or on behalf
                                            of Buyer or any Buyer Responsible Party to:

                                            (a) perform services (other than the Work), including
                                                operation and maintenance services,

                                            (b) undertake work other than the Work, or

                                            (c) provide materials or equipment at or to the Project
                                                Site.

"Party(ies)"                                has the meaning set forth in the preamble.

"Party Representative                       has the meaning set forth in Section 34(b).
Negotiations"

"Payment Milestone"                         Those milestones identified in the first table on
                                            Exhibit E.

"PCS/MVT Set"                               One transformer and one inverter, as further specified
                                            in Exhibit C.

"Performance Guarantees"                    the performance guarantees set forth in Exhibit F-1.

"Performance Tests"                         the tests to be conducted by Supplier to demonstrate
                                            that achievement of the Performance Guarantees, as
                                            such tests are described in Exhibit F-1.

| | |
|---|---|
| "Permits" | any valid waiver, exemption, variance, franchise, permit, authorization, license or similar order of or from, or filing or registration with, or notice to, any Governmental Authority having jurisdiction over the matter in question. |
| "PRAXIS" | PRAXIS Technology Escrow, LLC, and its successors and permitted assigns. |
| "Press Release" | has the meaning set forth in Section 41(b). |
| "Project" | has the meaning set forth in the Recitals. |
| "Project Schedule" | the sequential milestone dates set forth in Exhibit D, including the Guaranteed Dates. |
| "Project Site" | the real property upon which the Project is to be located, including the locations where ESS Equipment is to be incorporated into the Project, as more specifically described in Exhibit K. |
| "Publicity" | has the meaning set forth in Section 41(b). |
| "Receiving Party" | has the meaning set forth in Section 27(a). |
| "Recovery Plan" | has the meaning set forth in Section 22. |
| "Rejection Notice" | has the meaning set forth in Section 9(j)(iii)(B). |
| "Related ESA" | has the meaning set forth in the Recitals. |
| "Request for Payment" | Supplier's form of invoice, the form of which is set forth in Exhibit M. |
| "Restricted Party" | has the meaning set forth in Section 32(b). |
| "Sales Taxes" | has the meaning set forth in Section 8(b)(iii). |
| "Senior Representative Negotiations" | has the meaning set forth in Section 34(b). |

"Site Readiness"    Buyer has prepared the Project Site for Delivery of the Collection Segments and PCS/MVT Sets by completing:

(a) the pouring and sufficient curing of foundations for such ESS Equipment; or

(b) a suitable laydown area large enough, and with sufficient ingress and egress, for Delivery of such ESS Equipment at the pace set forth in Exhibit D.

"Site Readiness Date"    the date (as set forth in Exhibit D) by which Buyer is required to achieve Site Readiness.

"Soil or Subsurface Condition"    any soil, geotechnical or subsurface condition including any geological condition, groundwater condition, type of surface or subsurface soil, erosion, the presence of any cavern or void, religious artifact, archaeological item, biological matter, the presence of Buyer Hazardous Substances at the Project Site or any Delivery Location, and the existence, location or condition of any underground pipeline and conduit or other manmade structure, material or equipment.

"Technical Specifications"    the drawings, technical description of the Work, or packing instructions contained or referred to in Exhibit C.

"Standards of Practice"    the standards, methods, skill, care, techniques, principles, and practices that are recognized and generally accepted by leading companies in the energy storage system industry for energy systems of similar size, geographic location, and scope as the ESS. Standards of Practice are not intended to be limited to optimum standards, practices or methods, but rather to be a spectrum of reasonable and prudent standards, practices and methods that must take the conditions specific to any given facility or project under consideration.

"Subcontract"    any agreement, written or oral, between Supplier and any Subcontractor.

21

"Subcontractor(s)"                      any person or entity, that furnishes directly to
                                        Supplier, pursuant to a Subcontract, labor, services,
                                        material, or equipment for the performance of the
                                        Work or any portion thereof.

"Supplier"                              has the meaning set forth in the preamble, and
                                        includes such entity's successors and permitted
                                        assigns.

"Supplier Event of Default"             has the meaning set forth in Section 20(a)(i).

"Supplier Hazardous Substances"         Hazardous Substances brought onto or generated on
                                        the Project Site by Supplier or its Subcontractors.

"Supplier Permits"                      the Permits for which Supplier is responsible for
                                        procuring and maintaining as part of the Work, if any,
                                        as set forth in Exhibit A.

"Supplier Representative"               the individual appointed by Supplier pursuant to the
                                        MSA.

"Supplier Taxes"                        has the meaning set forth in Section 8(b)(iii)(A).

"Taxes"                                 any taxes or charges of any kind or nature, including
                                        ad valorem, consumption, excise, franchise, gross
                                        receipts, license, property, sales, stamp, storage,
                                        transfer, turnover, use and value-added taxes
                                        (including, any and all items of withholding,
                                        deficiency, penalty, addition to tax, interest, or
                                        assessment related thereto), that are imposed by any
                                        Governmental Authority having jurisdiction.
                                        "Taxes" exclude Import Duties, and any tariffs,
                                        duties, customs fees or other taxes, fees or charges
                                        payable in connection with export of any ESS
                                        Equipment or any component thereof from its country
                                        of origin into the United States.

"Tech Escrow Agreement"                 has the meaning set forth in the MSA.

"Tech Escrow Rider"                     has the meaning set forth in the MSA.

"Termination Payment"

an amount equal to the applicable percentage of the Contract Price, as set forth in the column entitled "*Total Termination Payment as Percentage of Contract Price*" in Section 3 of <u>Exhibit E</u>, less any amounts actually paid as of the termination date.

"Trademarks"

has the meaning set forth in <u>Section 41(a)</u>.

"Training"

Supplier provided training to Buyer's personnel respecting the operation and maintenance of the ESS, as set forth in <u>Exhibit A</u>.

"Unpermitted Lien"

has the meaning set forth in <u>Section 8(d)</u>.

"Utility"

the provider of local electric distribution service to the Project Site and/or onto whose transmission system energy from the ESS Equipment is discharged.

"Utility Delay"

any demonstrable delay in Supplier's performance of the Work resulting from:

(a) the failure of the Utility to perform any obligations under the relevant agreement(s) between Utility and Buyer;

(b) without limitation to clause "<u>(a)</u>", Utility's failure to issue an interconnection approval, install infrastructure or make upgrades or modifications necessary for the Project's interconnection, or to test, inspect or energize the Project;

(c) grid operating restrictions imposed by the Utility;

(d) any transmission or distribution system or substation not operating within the operating parameters of the ESS Equipment as described in the Technical Specifications; or

(e) any operating restrictions imposed by Governmental Authority on the Project,

in each case, unattributable to the acts or omissions of Supplier or Subcontractors.

| | |
|---|---|
| "Warehousing Agreement" | as applicable, that certain agreement between the Parties, pursuant to which Supplier shall provide Warehousing Obligations at the Alternate Delivery Location, the form of which will be agreed by the Parties within 120 days of the Effective Date and attached to the Agreement as Exhibit Y-1. |
| "Warehousing Obligations" | Supplier's obligations to provide Buyer the following services for the ESS Equipment: |

(a) offloading at the Warehousing Worksite;

(b) storage on the cadence set forth in the Warehousing Agreement, in compliance with the storage conditions set forth in Exhibit C;

(c) wrapping and re-wrapping for Buyer's inspection pursuant to Section 9(j); and

(d) re-loading for Final Mile Transport.

| | |
|---|---|
| "Warranted Equipment" | the ESS Equipment warrantied under the Warranty. |
| "Warranty" | Supplier's "Limited Commercial Warranty," attached as Exhibit F-2. |
| "Warranty Period" | the time period set forth in the Warranty. |
| "Witness Test(s)" | the test(s) conducted by the local fire Governmental Authority, as scheduled and coordinated by Buyer with Supplier's reasonable cooperation prior to energization of the ESS. |
| "Work" | all activities, services, and obligations to be performed, and all ESS Equipment to be provided, by or on behalf of Supplier under this Contract, including those set forth in Exhibit A and Supplier's obligations in Exhibit B. |
| "Work Product" | has the meaning set forth in Section 11(c). |
| "Worksite" | any location or place on, under, in, or through which Work or any activities in connection with Work are |

24

to be performed, including, Manufacturing Worksites locations where Warehousing Obligations are performed, other storage facilities and including the Project Site; *provided*, that Worksite shall not include any location, vessel or place used during transportation to and from Worksites, including during Final Mile Transport.

Any capitalized terms used in this Contract but not otherwise defined have the meaning given to them in the MSA.

**2.**     **Contract and Order of Precedence**

(a)     This Contract consists of the following documents which are attached:

(i)     This Energy Supply Agreement

(ii)     Exhibit A – Scope of Work

(iii)     Exhibit B – Division of Responsibility

(iv)     Exhibit C – Technical Specifications

(v)     Exhibit D – Project Schedule

(vi)     Exhibit E – Payment and Termination Payment Schedule

(vii)     Exhibit F-1 – Performance Guarantee

(viii)     Exhibit F-2 – Limited Commercial Warranty

(ix)     Exhibit G – OEM Warranties

(x)     Exhibit H - Insurance Requirements

(xi)     Exhibit I – Commissioning Checklist

(xii)     Exhibit J-1 – ESS Product Manual

(xiii)     Exhibit J-2 – Operational Data & Health-Monitoring Data Manual

(xiv)     Exhibit K – Project Site Layout

(xv)     Exhibit L-1 – Installation Manual

(xvi)     Exhibit L-2 – Installation Checklist

(xvii)     Exhibit L-3 – Form of Notice of Installation Completion

(xviii)  Exhibit M – Form of Request for Payment

(xix)    Exhibit N-1 – Delivery Inspection Checklist

(xx)     Exhibit N-2 – Form of Commissioning Certificate

(xxi)    Exhibit N-3 – Form of Final Acceptance Certificate

(xxii)   Exhibit O – Liquidated Damages

(xxiii)  Exhibit P – Form of Change Order

(xxiv)   Exhibit Q – Form of Lien Waiver

(xxv)    Exhibit R –Account Setup Form

(xxvi)   Exhibit S – Buyer-Furnished Equipment

(xxvii)  Exhibit T-1 – [RESERVED]

(xxviii) Exhibit T-2 – [RESERVED]

(xxix)   Exhibit U – [RESERVED]

(xxx)    Exhibit V – Cybersecurity Policy

(xxxi)   Exhibit W-1 – Prevailing Wage Requirements and Apprenticeship Requirements

(xxxii)  Exhibit W-2 – Domestic Content Requirements

(xxxiii) Exhibit X – Major Subcontractors List

(xxxiv)  Exhibit Y – Network Connection Components List

(xxxv)   Exhibit Y-1 – Form of Warehousing Agreement

(xxxvi)  Exhibit Y-2 – Form of Final Mile Transport Agreement

(b)    If any conflict, inconsistency or ambiguity is believed to exist among any of the documents comprising or relating to this Contract or among any of the requirements or provisions thereof, the conflict, inconsistency or ambiguity shall be resolved by applying the following order of precedence:

(i)     The body of this Energy Supply Agreement;

(ii)    Exhibit C;

(iii)   Exhibit A;

(iv)     Exhibit B;

(v)      Exhibits W-1 and W-2

(vi)     The other Exhibits; and

(vii)    Any other document incorporated by reference into any of these documents.

(c)     The Parties shall promptly notify each other of any conflict, inconsistency or ambiguity in the Contract documents, and Buyer shall resolve such conflict in writing within five Business Days.   Any Work involving such conflict, inconsistency or ambiguity that is performed by Supplier without Buyer's written determination, shall be at Supplier's sole risk and expense, and Buyer shall be free thereafter to resolve the issue differently from the approach taken by Supplier.

**3.     Preparation for and Performance of the Work**

(a)     Each Party has fully informed itself with all matters relevant for the performance of its respective obligations under this Contract.   Any failure by a Party to take account of any such matters shall not relieve such Party from its obligations under this Contract.

(b)     Subject to clause "(c)" of the "Buyer-Caused Delay" definition, Supplier is solely responsible for, and, except with respect to the Table in Section F of Exhibit C, Buyer makes no guarantee or warranty, express or implied, as to the correctness, adequacy, sufficiency and consistency of the Technical Specifications.

(c)     Supplier shall perform the Work in conformity with this Contract, all Applicable Laws, all Applicable Codes and Standards and the Standards of Practice.   Supplier has in place (or shall develop) and shall comply with procedures for quality control, quality assurance, and management that, in each case, are consistent with the Standards of Practice for such items.

(d)     Permits.   Supplier shall, as part of the Work, be responsible for procuring and maintaining all Supplier Permits.   Buyer shall be responsible for, at its cost and expense, procuring and maintaining all Buyer Permits.

**4.     Buyer Representative and Supplier Representative**

(a)     Buyer Representative.

(i)     Buyer has appointed Buyer Representative to represent Buyer in all matters under this Contract.   Buyer may change its representative at any time by notifying Supplier in writing.   Buyer Representative may delegate responsibilities to a nominated deputy and shall notify Supplier in writing. Only written instructions issued by Buyer Representative (or such deputy), are binding on Buyer.

(ii)  Buyer Representative (and individuals designated by Buyer Representative) shall have access at all reasonable times, upon reasonable prior written notice, to any Manufacturing Worksite during regular business hours.

(iii)  Except as expressly stated in this Contract, Buyer Representative has no powers to amend this Contract or to relieve Buyer from any of its obligations.

(b)  <u>Supplier Representative</u>.

(i)  Supplier has appointed Supplier Representative to represent Supplier in all matters under this Contract.  Supplier may change its representative at any time by notifying Buyer in writing.  Only Supplier Representative, or a nominated deputy, is authorized to receive on behalf of Supplier notifications, information and decisions of Buyer under this Contract.  Only written instructions issued by Supplier Representative (or deputy) are binding on Supplier.

(ii)  Except as expressly stated in this Contract, Supplier Representative has no powers to amend this Contract or to relieve Supplier from any of its obligations.

**5.  <u>Cooperation with Others; Project Site Access; Public Work Disclaimer</u>**

(a)  <u>Cooperation</u>.  Each Party acknowledges that, concurrently with Supplier's performance of its obligations under this Contract, Buyer and Other Contractors may be working at the Project Site during the performance of this Contract. Supplier shall reasonably cooperate with Buyer and Other Contractors and coordinate its activities on the Project Site with the work of each such party to avoid or mitigate possible interference with their work.  Similarly, Buyer shall, and shall cause its Other Contractors to reasonably cooperate with Supplier and Subcontractors and to coordinate its activities on the Project Site with the Work and the work of Subcontractors' work to avoid or mitigate unreasonable interference.

(b)  <u>Site Access</u>.  Buyer shall: (i) provide unrestricted access to Supplier to the Project Site for Supplier to perform the Work; and (ii) defend Supplier against any action in trespass or otherwise resulting from failure by Buyer to have obtained legal rights for access to the Project Site.  Supplier shall coordinate and cooperate with Buyer regarding entry onto the Project Site, and shall comply with Standards of Practice, Applicable Codes and Standards, Applicable Laws, and <u>Exhibit L-1</u>.  Buyer shall cause all Buyer Responsible Parties to make commercially reasonable efforts to coordinate with and minimize interference with operations by Supplier and Subcontractors at the Project Site according to the schedule contemplated for such performance.

(c)  <u>Public Work Disclaimer</u>.  Buyer represents that the Project is not a "Public Work," as such term (or its corollary) is defined under Applicable Law in West Virginia.

28

6.      **Codes and Standards; Supplier Personnel**

(a)    Codes and Standards.  Wherever references are made in this Contract to Applicable Codes and Standards, the edition or revision of the Applicable Codes and Standards current on the date such Work is to be performed shall apply unless otherwise expressly stated; *provided*, *however* that if any new edition or revision to any such Applicable Codes and Standards occurs after the Effective Date then Supplier shall be entitled to a Change Order for a Change in Law in accordance with Section 16(c)(v).  In case of conflict between any referenced Applicable Codes and Standards and any Contract documents brought to Buyer's attention under this clause, Buyer shall resolve the conflict in writing.  To the extent such change affects the Project Schedule or Contract Price, Supplier shall be entitled to a Change Order in accordance with Section 16(f).

(b)    Supplier Personnel.  Supplier shall use only competent and skilled personnel to perform the Work.  Supplier shall permanently remove from the Project Site any person reasonably determined by Buyer to be unfit, unqualified, or to be acting in violation of any obligation of Supplier under this Contract.  In addition, Buyer may, at its sole but reasonable discretion, deny access to the Project Site to any person; *provided*, *however*, such denial of access shall, subject to Section 16(f), entitle Supplier to a Change Order for a Buyer-Caused Delay if such denial is not based upon grounds for removal of persons set forth in the prior sentence.

(c)    [RESERVED]

(d)    Alcohol and Drugs.

(i)    Supplier shall not possess, consume, import, sell, give, barter, or otherwise dispose of any alcoholic beverages or drugs (excluding drugs for proper medical purposes and then only in accordance with Applicable Laws) at the Project Site, or permit or suffer any such possession, consumption, importation, sale, gift, barter, or disposal by its personnel or Subcontractors.

(ii)    Supplier shall have in place a drug and alcohol testing program that includes reasonable cause-based drug testing.  Additionally, to the maximum extent allowed by Applicable Law, Supplier shall perform (and cause its Subcontractors and agents to perform) a drug and alcohol test on each of their respective employees prior to any such employee's initial access of the Project Site to perform any Work.

(iii)    Supplier shall require its Subcontractors to maintain drug and alcohol testing policies and procedures that comply with the terms of the Supplier's drug and alcohol testing policies and procedures, and further shall ensure that Subcontractors comply with the terms of their drug and alcohol testing policies and procedures.

(iv)    Supplier shall perform, and shall require its Subcontractors to perform, a drug and alcohol test on any person employed by Supplier or a

29

Subcontractor, as applicable, who Buyer or Supplier reasonably suspects is in possession of or under the influence of any drug, alcohol, or other such substance at any time during such person's performance of any portion of the Work at the Project Site.

(v)     Supplier shall immediately identify and permanently remove from the Project Site, or, as applicable, require its Subcontractors' to remove from the Project Site any person (whether in the charge of Supplier or any of its Subcontractors) who is in possession of or under the influence of any dangerous or controlled drug, alcohol, or other such substance at any time during such person's performance of any portion of the Work, excluding any person using a prescription drug under supervision and approval from a medical doctor, or any other person who does or whose actions may create any unsafe condition or other situation that may cause damage or harm to any person or property, including any person using a prescription drug under supervision and approval from a medical doctor.

(e)     <u>Arms and Ammunition</u>.  Supplier and its personnel shall not possess, give, barter, or otherwise dispose of, to any person, any arms or ammunition of any kind at the Project Site, or permit or suffer the same.  No hunting of any kind by Supplier or its personnel, or other invitees, shall be permitted on the Project Site.  Supplier shall immediately identify and permanently remove from the Project Site any Supplier or Subcontractor personnel that violates this provision.

(f)     <u>Disorderly Conduct</u>.  As between Buyer and Supplier, Supplier shall be responsible for the conduct and deeds of its and its Subcontractors' personnel relating to the Contract and the consequences thereof.  Supplier shall at all times take all reasonable precautions to prevent any unlawful, riotous or disorderly conduct by or among such personnel and for the preservation of peace, protection and safety of persons and property in the area of the Project Site against the same.  Supplier shall not interfere with any members of any authorized police, military or security force in the execution of their duties.

(g)     Replacement of Personnel.  If an individual is removed from the Work or excluded from the Project Site, Supplier shall promptly replace such individual with another who is fully competent and skilled to perform the Work.  All actions by Supplier regarding removal and replacement of personnel shall be at Supplier's sole expense.

(h)     Limitation on Project Site Responsibility.  Supplier is responsible for maintaining labor relations with respect to its personnel and Subcontractors in such manner that there is harmony among workers.  Supplier shall comply with and enforce, with respect to its personnel and Subcontractors, Project Site procedures, regulations, work rules, and work hours established by Buyer.  Supplier shall have no obligation to enforce any Project Site procedures, regulations, work rules, and work hours with respect to Buyer Responsible Parties.

(i) <u>Compliance with IRA Requirements</u>.  In an effort to comply with the IRA Requirements and allocate the risk for some uncertainties with respect to such IRA Requirements, the Parties agree to cooperate with each other and take the actions specified in <u>Exhibit W-1</u> to work in good faith to comply with (and to demonstrate compliance with) any future guidance or information related to the IRA Requirements that is provided by the IRS or the Secretary of Labor or any other agency with oversight over the IRA Requirements, subject to reasonable adjustments to the Project Schedule and Contract Price as provided in this Contract.

**7.  <u>Physical Security; Cybersecurity</u>**

(a) Supplier shall at all times conduct all operations under this Contract in a manner to minimize the risk of loss, theft, or damage by vandalism, sabotage or any other means to any equipment, materials, work or other property; *provided, however,* Buyer shall be solely responsible for physical security of the Project Site and for the risk of loss or damage to the ESS Equipment after risk of loss passes from Supplier to Buyer in accordance with <u>Section 11(a)</u>.  Supplier shall regularly inspect all equipment, materials and work to discover and determine any conditions which might involve such risks.

(b) Supplier shall comply with Buyer's security requirements for the Project Site, as set forth in <u>Exhibit T</u>, as may be revised in writing from time to time (subject to Supplier's relief under clause "(<u>c</u>)" of the "Buyer-Caused Delay" definition). Supplier shall cooperate with Buyer on all security matters and shall promptly comply with any Project Site security arrangements established by Buyer.

(c) Notwithstanding anything to the contrary in this Contract, if Buyer requires background-screening of Supplier's employees (or employees of any Subcontractors) as a condition of conducting the Work, Supplier may utilize its own criminal background-checking and drug-screening policies for such personnel. For the avoidance of doubt, Supplier shall not be obliged to provide Buyer with employees' (or Subcontractor personnel's) personal Confidential Information, including social security numbers, driver's license numbers, birthdates, and personal addresses.  Supplier shall be responsible for verification of the identity of its and its Subcontractors' personnel for entry to the Project Site.

(d) Supplier shall comply with the Cybersecurity Policy, attached hereto as <u>Exhibit V</u>. The ESS Equipment and all Supplier software shall be compliant with the Cybersecurity Policy.

**8.  <u>Price and Payment</u>**

(a) <u>Contract Price</u>.  In consideration of the execution and due performance of all obligations by Supplier under this Contract, Buyer shall pay the Contract Price to Supplier as specified in <u>Exhibit E</u> and in this <u>Section 8</u>.

(b) <u>Certain Inclusions and Exclusions from the Contract Price; Taxes</u>.

(i)  Subject to this Section 8(b), Sections 9(f) and 9(i), and Section 16, all prices for the Work are firm and are not subject to price escalation for any reason whatsoever.

(ii)  The Contract Price expressly includes all costs associated with:

(A)  manufacturing, handling, and packaging of the ESS Equipment;

(B)  Import Duties;

(C)  the DDP Cost Amount;

(D)  Delivery of the ESS Equipment DDP to the Delivery Location (subject to the provisions in Section 9(f));

(E)  achievement of Commissioning and Final Acceptance;

(F)  performance of all Work;

(G)  Supplier's obligations under the Contract, including the Warranty; and,

(H)  all Supplier overhead, administration, fees and profits (excepting mark-ups to be added to Change Orders, pursuant to this Contract).

(iii)  The Contract Price includes Supplier Taxes but excludes, and Buyer shall be responsible for, all Buyer Taxes.

(A)  "Supplier Taxes" include, and Supplier shall be responsible for and shall pay, unless expressly listed as Buyer Taxes: (1) all Taxes based on or related to the income, receipts, capital or net worth of Supplier, including the receipt of payment of the Contract Price; (2) all Taxes assessed against Supplier-owned, leased or rented equipment; (3) all payroll taxes and contributions which are measured by remuneration paid to persons employed by Supplier in connection with the Work or which arise by virtue of their employment; and (4) all Taxes levied against Supplier or on the ESS Equipment or the production thereof prior to the Delivery of the ESS Equipment at the Delivery Location.

(B)  "Buyer Taxes" include, and Buyer shall be responsible for and shall pay all other Taxes, including: (1) all Taxes based on or related to the income, receipts, capital or net worth of Buyer; (2) all Taxes directly imposed upon Buyer due to the execution of any agreement, receipt of the ESS Equipment or the Work hereunder, or the possession or use of the ESS Equipment; (3) all sales, use or similar taxes imposed by any Governmental Authority in connection with the purchase of the ESS Equipment, the Work, or the performance

32

of Supplier's other obligations under this Contract ("Sales Taxes"), payment of which shall occur via reimbursement of Supplier pursuant to Section 8(b)(iii)(C), below; and (4) all Taxes on the ESS Equipment or Work at and after delivery of the ESS Equipment to the Delivery Location.

(C)     Following the transfer of title for ESS Equipment pursuant to Section 11(b), or at the time that Supplier completes its performance with reference to the physical Delivery of the ESS Equipment, whichever is earlier, Supplier will submit an invoice for Buyer for the relevant Sales Taxes paid by Supplier on Buyer's behalf.  Unless Buyer provides Supplier with a valid tax exemption certificate authorized by the appropriate taxing authority, Buyer shall make payment on such invoice within twenty days of receipt, without withholdings or offsets.

(D)     Buyer shall reimburse Supplier for any interest, penalties, fines, and additions that Supplier is required to pay due to Buyer's failure to timely remit Sales Taxes to Supplier.

(E)     Without limiting Section 8(b)(iii)(C), if a Party is required to remit or pay Taxes that are the other Party's responsibility under this Contract, the Party responsible for such Taxes shall promptly reimburse the other Party for such Taxes.

(F)     Supplier will, to the extent that there will be no material increase in Supplier's obligations under this Contract and to the extent that no additional cost or expenses will be incurred by Supplier, cooperate with Buyer to maximize the benefit of available Tax exemptions. Buyer reserves the right to issue a properly executed exemption certificate to Supplier prior to receipt of ESS Equipment to document any potential exemptions from Sales Taxes.  Upon Supplier's acceptance of such certificate, Supplier shall not issue Buyer any further Sales Tax invoices, unless such certificate is rescinded or otherwise becomes void.

(G)     The Contract Price expressly includes compliance with the IRA Requirements set forth in Exhibit W-1 as of the Effective Date.

(H)     After the Effective Date, Supplier shall be entitled to a Change Order for any (1) Change in Law respecting the IRA Requirements, or (2) change by Buyer to the IRA Requirements, in each case, to the extent of any documented increase in costs and Project Schedule delays resulting from such change.

(I)     If it is determined that Supplier must pay prevailing wages under Applicable Law in West Virginia because the Project is deemed to

be a Public Work, then Supplier shall be entitled to a Change Order for (1) any increase in wage costs above the wages required to be paid under the IRA Requirements and (2) any Project Schedule delays resulting from these prevailing wage requirements.

(c)    <u>Requests for Payment and Lien Waiver</u>.

(i)    Supplier may issue a Request for Payment for Payment Milestone # 1 on the Effective Date, and Buyer shall make payment thereon, without withholding or offset, in accordance with the payment terms and other requirements set forth in <u>Exhibit E</u>.    Thereafter, upon Supplier's achievement of each additional Payment Milestone, Supplier may issue a Request for Payment for the amount associated with such Payment Milestone, along with other documentation required by this <u>Section 8</u>, and Buyer shall make payment on such Request for Payment in accordance with <u>Section 8(f)</u> and any requirements set forth in Section 2 of <u>Exhibit E</u>.

(ii)    As a condition precedent to Buyer's obligation to make each payment due under this Contract (other than the first payment), Supplier shall furnish, with its Request for Payment for such payment, a lien waiver and release of liens, conditioned solely upon receipt of such payment from Buyer and any amounts withheld by Buyer and then subject to dispute under <u>Section 34</u>, in the form of <u>Exhibit Q</u>, covering all labor and other Work performed and ESS Equipment supplied as of the date of such Request for Payment, sufficient to waive and release all liens and rights to claim a lien under Applicable Law, for such labor, Work and ESS Equipment.  The lien waiver associated with the final payment shall cover all amounts due under the Contract and confirm all amounts to be paid under any Major Subcontract have been paid.

(d)    <u>Liens</u>.  To the fullest extent permitted by Applicable Law, and provided Buyer has timely paid Supplier all undisputed amounts then due and payable for Work performed and ESS Equipment supplied hereunder in accordance with this Contract, Supplier shall not directly or indirectly create, incur, assume, or suffer to be created by it or any Subcontractor, any lien on the Work, the ESS Equipment, the Project Site, the Project, or any part thereof or interest therein.  To the extent that, other than as provided in the foregoing sentence, a lien is filed or recorded against the Work, the ESS Equipment, the Project Site, or the Project by or on behalf of Supplier or any Subcontractors (an "<u>Unpermitted Lien</u>"), Supplier shall arrange for the immediate discharge or cancellation of such Unpermitted Lien by payment, bonding or otherwise.

(e)    <u>Removal of Unpermitted Liens</u>.  If Supplier shall fail to discharge any Unpermitted Lien, which arises out of, in connection with or as a result of the ESS Equipment furnished under this Contract, within fifteen days after receipt of notice then Buyer shall have the right, at its option, after written notice to Supplier, to satisfy or discharge the Unpermitted Lien or to establish a bond.  Supplier shall be

responsible, and shall reimburse Buyer on demand, for all costs incurred by Buyer with respect to the defense, bonding, removal or discharge of any Unpermitted Lien.

(f)    <u>Notice of Disputed Amounts; Payment on Requests for Payment</u>.  Except with respect to Payment Milestone # 1, within twenty days of Buyer's receipt of a Request for Payment, Buyer shall notify Supplier in writing of any intention, per <u>Section 8(g)</u>, to withhold any amounts from its payment on the Request for Payment.  If Buyer has not timely disputed any Request for Payment, Buyer shall pay the requested Payment Milestone in full within thirty days of receipt of such Request for Payment.  If Buyer does timely notify Supplier of its intent to withhold amounts in accordance with <u>Section 8(g)</u>, Buyer shall pay the balance of the amount due on such Request for Payment within thirty days of receipt of such Request for Payment.

(g)    <u>Withholding Rights</u>.  Buyer may, on written notice to Supplier in accordance with <u>Section 8(f)</u>, withhold payments to Supplier from any Request for Payment (but not invoices for Sales Taxes), for the following:

(i)    any Liquidated Damages due or accrued, but not paid, from Supplier to Buyer hereunder; or

(ii)    any amounts due but not paid to Buyer under this Contract;

*provided, however*, in either case, such Liquidated Damages or other amounts due but not paid to Buyer are not then subject to a good faith Dispute under <u>Section 34</u>.  Any exercise by Buyer of its rights under this provision shall be without prejudice to any other rights or remedies available to Buyer.

(h)    <u>Late Payments</u>.  Without prejudice to any other right or remedy under this Contract, any late payment, including any withheld or offset amount which is ultimately determined to have been payable prior to the actual date of payment shall be paid with interest, at the rate of 18% per annum, or the highest rate under Applicable Law, whichever is lower ("<u>Late Payment Rate</u>"), from the date due to the date of payment, and such Party failing to make payment when due shall be responsible for all costs of collection.

(i)    <u>Offset</u>.  Any provision hereof to the contrary notwithstanding, upon the occurrence of an uncured Supplier Event of Default (including for non-payment) that is not then the subject of a good faith dispute under <u>Section 34</u>, Buyer, upon written notice to Supplier, may set off such portion (including all) of any payment due to Supplier under this Contract (except against payments due on invoices for Sales Taxes) that is equal to the reasonable cost to cure such Supplier Event of Default, as reasonably determined by Buyer and subject to <u>Section 24</u>.  If any amount set off (in whole or in part) is subsequently found to have been improper by a court or arbitrator of competent jurisdiction, Buyer shall, within ten days of the issuance of such final and non-appealable judgment, refund any and all offset amount that is found to be

35

ungrounded or inappropriate, together with interest at the Late Payment Rate from the date of the notice of set off until the date such amounts are refunded in full.

9.    **Schedule and Delivery**

(a)    <u>Project Schedule</u>.  Supplier shall perform the Work, and Buyer shall perform its obligations under the Contract, including matters for which it is responsible in <u>Exhibit B</u> with all due diligence.  Without limiting the generality of the foregoing, Supplier guarantees that all Completion Milestones shall be achieved on or before the corresponding Guaranteed Dates, as such Guaranteed Dates may be adjusted in accordance with this Contract, including for Excusable Events.

(i)    Within 90 days of the Effective Date, Buyer may elect to adjust Buyer's Responsible Dates (as set forth in Exhibit D). Supplier shall reasonably cooperate with Buyer in such adjustment; provided, however, such adjustment of Buyer's Responsible Dates shall entitle Supplier to an equitable adjustment of (1) Supplier's Target Dates and Supplier's Guaranteed Dates (as set forth in Exhibit D) and (2) to the extent Supplier has documented reasonable fees and costs attributable to Buyer's schedule adjustment, the Contract Price.

(b)    <u>Production Schedule</u>.  Supplier may, upon Buyer's request (but no more frequently than once per month), provide Buyer with a production schedule showing the manufacturing position of the ESS Equipment, and the estimated date of shipment.

(c)    <u>Notice of Delays</u>.  Each Party shall notify the other Party in writing of any actual, anticipated or probable causes of delay in its performance of its obligations under this Contract in writing, and the actual or anticipated extent of such delay.

(d)    <u>INCOTERMS</u>.  Any delivery terms relating to ESS Equipment specified in this Contract shall be interpreted in accordance with INCOTERMS 2020 (International Rules for the Interpretation of Trade Terms) published by the International Chamber of Commerce and its supplements, subject to this Contract.

(e)    <u>Packaging of ESS Equipment</u>.  Supplier shall pack the ESS Equipment so that it may be safely transported, and then unloaded and unpacked safely by Buyer.  The method of packing shall be in accordance with Supplier's general practices. Supplier shall take commercially reasonable steps to prevent damage to or deterioration of the ESS Equipment in transit to their destination, in accordance with customary seaworthy export packing standards and antirust, oxidation standards.

(f)    <u>Delivery of ESS Equipment</u>.  Supplier shall be responsible for Delivery of the ESS Equipment DDP to the Delivery Location via common carrier(s), all in accordance with the Project Schedule (including the Completion Milestones) and subject to the following:

36

(i)     Within ten days of Supplier's receipt of all third-party invoices for DDP Costs, Supplier shall provide Buyer with an itemized statement of the DDP Costs, supported by reasonable documentation.

(ii)    If the DDP Costs *differ from* the DDP Cost Amount, the Parties shall enter into a Change Order to adjust the Contract Price by the difference (such amount the "DDP Cost Adjustment").  Supplier shall provide detailed records demonstrating the change in the DDP Costs.  Upon execution of the applicable Change Order, the DDP Cost Adjustment shall be trued up at time of Supplier's Request for Payment of the Payment Milestone for Commissioning (or upon termination of this Contract, if this Contract is terminated prior to Commissioning).

(iii)   Commencing prior to the first scheduled Delivery, each Tuesday, Supplier shall endeavor to provide Buyer with electronic notice (which shall not be subject to Section 43(k)) of the scheduled Deliveries for the following week consistent with the Project Schedule; *provided*, *however*; failure to provide this notice shall not be the basis for an Event of Default.

(iv)    Upon Buyer's request, following Supplier's transfer of any ESS Equipment from a Manufacturing Worksite to a common carrier for shipment, Supplier shall execute and provide to Buyer a bill of lading with respect to such shipment of ESS Equipment and such other information as Buyer may reasonably request.

(v)     Upon Supplier's completion of Delivery of each shipment of ESS Equipment, Buyer shall or shall cause its Other Contractors to, arrange and pay for all costs associated with off-loading of the ESS Equipment at the Delivery Location.

(g)     Labeling and Marking.  Supplier represents that, on Delivery, the ESS Equipment shall have been accurately described, classified, marked, and labeled, in accordance with this Contract, all Applicable Laws, and Standards of Practice.

(h)     Buyer's Achievement of Site Readiness and Energy Segment Readiness.

(i)     Buyer shall cause Site Readiness to occur no later than the Site Readiness Date.  Buyer acknowledges and agrees that achievement of Site Readiness by the Site Readiness Date is a necessary condition precedent for Supplier's obligation to begin Delivery of the Collection Segments and PCS/MVT Sets and to complete Delivery of the Collection Segments by the Guaranteed Collection Segment Delivery Date and for Supplier's achievement of all other later-scheduled Completion Milestones by their respective Guaranteed Dates.

(ii)    Buyer shall cause Energy Segment Readiness to occur no later than the Energy Segment Readiness Date.  Buyer acknowledges and agrees that achievement of Energy Segment Readiness by the Energy Segment

Readiness Date, is a necessary condition precedent for Supplier's obligation to Deliver the Energy Segments by the Guaranteed Energy Segment Delivery Date and for Supplier's achievement of all other later-scheduled Completion Milestones by their respective Guaranteed Dates.

(iii)     Buyer's failure to timely achieve Site Readiness or Energy Segment Readiness, as the case may be, shall constitute a "<u>Delivery Readiness Delay</u>."

(iv)     Buyer shall promptly notify Supplier of any Delivery Readiness Delay, and of any Buyer-anticipated Delivery Readiness Delay.

(i)     <u>Delivery Readiness Delay</u>. Upon the occurrence of a Delivery Readiness Delay, Supplier, at its sole discretion, shall elect one of the following:

(i)     Delivery of the ESS Equipment at the Project Site, which receipt by Buyer shall trigger the ESS Equipment inspection process set forth in <u>Section 9(j)</u>; or

(ii)     Supplier shall arrange for standby of shipment of the ESS Equipment until Delivery Readiness is achieved, provided that Buyer shall:

(A)     within fifteen days of receipt of Supplier's invoice, pay Supplier the Delivery Readiness Delay Costs (plus 10% markup for overhead and profit) incurred by Supplier in connection with such standby; and

(B)     execute with Supplier a Change Order extending the Project Schedule (including all Guaranteed Dates) in accordance with <u>Section 16(d)</u> on account of such Buyer-Caused Delay; or

(iii)     Supplier shall identify an Alternate Delivery Location to which Supplier will Deliver the ESS Equipment.

(A)     Such Alternate Delivery Location shall be deemed the "Delivery Location" for purposes of <u>Section 9(j)</u> and the other provisions of this Contract.

(B)     Buyer shall pay Supplier the Delivery Readiness Delay Costs (plus 10% markup for overhead and profit) incurred by Supplier in connection with Delivery to the Alternate Delivery Location within ten days of receipt of Supplier's invoice(s).

(C)     Within seven days of Supplier's identification of the Alternate Delivery Location, the Parties shall execute the Warehousing Agreement in substantially the form of <u>Exhibit W-1</u>, pursuant to which Supplier shall perform the Warehousing Obligations at the Alternate Delivery Location.

38

(D)     Promptly upon Buyer's achievement of Site Readiness or Energy Segment Readiness, as case may be, Buyer shall notify Powin that it is prepared for Final Mile Transport, and the Parties shall execute a Final Mile Transport Agreement, pursuant to Section 12(a).

(j)     Delivery Notice; Inspection of ESS Equipment; Deemed Delivery.

(i)     Commencing on arrival of the first ESS Equipment at the Delivery Location, Supplier shall issue Buyer electronic notice on a weekly basis of the ESS Equipment that arrived at the Delivery Location during such week (the "Delivery Notice").

(ii)    The date on which Supplier issues each weekly Delivery Notice is the "Delivery Notice Date" for the ESS Equipment referenced therein.

(iii)   Promptly upon receipt of the Delivery Notice, Buyer (with Seller's cooperation) shall, pursuant to the Delivery Inspection Checklist, inspect the condition of the ESS Equipment.  Buyer shall then:

(A)     if Buyer accepts the ESS Equipment, countersign the Delivery Notice (a "Countersigned Notice"); or

(B)     if Buyer rejects the ESS Equipment due to damage and/or deficiencies in the ESS Equipment, issue electronic notice to Supplier (the "Rejection Notice").

(iv)    With respect to any Countersigned Notice:

(A)     for purposes of title transfer under Section 11(b)(i), the Date of Delivery shall be deemed the date of such Countersigned Notice;

(B)     for purposes of determining: (1) Delivery LDs (if any), (2) if applicable, the Guarantee Period Commencement Date (as defined in Exhibit F-1), Delivery is deemed to have occurred on the Delivery Notice Date.

(v)     With respect to any Rejection Notice that Supplier does not Dispute, Supplier will promptly, as Buyer's sole remedy (but without waiving any of Buyer's right to Liquidated Damages, if applicable), repair or replace the damaged or deficient ESS Equipment so that the ESS Equipment complies with this Contract

(vi)    Without waiving any rights, including respecting the repair or replacement of damaged or deficient ESS Equipment, if, within ten days of the Delivery Notice Date, Buyer does not issue either (A) a Countersigned Notice or (B) a Rejection Notice, the ESS Equipment subject to such Delivery Notice shall be deemed Delivered ("Deemed Delivery"):

(vii)    With respect to any Deemed Delivery:

    (A)    for purposes of title transfer under Section 11(b)(i), the Date of Delivery shall be deemed the tenth day after the Delivery Notice Date;

    (B)    for purposes of determining: (1) Delivery LDs (if any), and (2) if applicable, the Guarantee Period Commencement Date (as defined in Exhibit F-1), Delivery is to deemed to have occurred on the Delivery Notice Date; and

    (C)    Deemed Delivery does not waive Buyer's rights regarding subsequently discovered Defects.

## 10.    Liquidated Damages

(a)    Liquidated Damages.  If any Completion Milestone has not occurred on or before its applicable Guaranteed Date, Supplier shall pay Buyer, as liquidated damages and not as a penalty, the applicable amounts set forth in Exhibit O.

(b)    Payment of Liquidated Damages.  Liquidated Damages shall be due and payable within thirty days after Supplier receives Buyer's invoice therefor; *provided, however*, Buyer shall limit its invoice submittal to once per thirty-day period.  At Buyer's option, Liquidated Damages may be deducted by Buyer from any payments due by Buyer to Supplier.  If Supplier disputes Buyer's claim that some or all Liquidated Damages contained in Buyer's Request for Payment are due, Supplier shall notify Buyer in writing prior to the date payment is due and shall pay the undisputed Liquidated Damages in accordance with this Section.  If amounts withheld by Supplier are ultimately determined to have been payable, the provisions of Section 8(h) shall apply.

(c)    Caps on Liquidated Damages.  The Parties agree that the (i) Delivery LDs shall be capped at the Delivery LDs Cap, (ii) Commissioning LDs shall be capped at the Commissioning LDs Cap, and (iii) Liquidated Damages shall be capped at the Liquidated Damages Cap.

(d)    Nature of Liquidated Damages.  The Parties agree that it would be extremely difficult to precisely determine the amount of actual damages that would be suffered due to a delay to any Completion Milestone, but that the Liquidated Damages are a genuine pre-estimate, and a fair and reasonable determination of the amount of actual damages which would be suffered by Buyer for Supplier's delay in achieving a Completion Milestone beyond its Guaranteed Date, and that the Liquidated Damages do not constitute a penalty.

(e)    Sole Remedies.  Without prejudice to Supplier's obligations set forth in Section 14(b), and subject to Section 24, Buyer's sole remedies for Supplier's failure to achieve a Completion Milestone on or before its Guaranteed Date are: (i)

payment by Supplier of the applicable Liquidated Damages under this <u>Section 10</u>; and (ii) Buyer's rights under <u>Section 20(a)(i)(B)</u>.

**11.    <u>Care, Control, and Risk of Loss; Title</u>**

(a)    <u>Care, Control, and Risk of Loss</u>.

(i)    Notwithstanding passage of title, Supplier shall retain Care, Control, and Risk of Loss as follows:

(A)    for Deliveries at the Project Site: until Buyer commences unloading of the ESS Equipment at the Delivery Location; and

(B)    for Deliveries at an Alternate Delivery Location, until the Date of Delivery.

(ii)    Notwithstanding the foregoing and any provisions in the Warehousing Agreement or Final Mile Transport Agreement to the contrary, Buyer shall at all times be liable, whether at the Project Site or (if applicable) an Alternate Delivery Location, for all loss or damage to the extent caused by it or any Buyer Responsible Party.

(b)    <u>Title to ESS Equipment and Warranty of Title</u>.

(i)    Title to the ESS Equipment, or part thereof, shall transfer to Buyer and become the property of Buyer upon the earlier of: (A) the Date of Delivery or (B) upon termination of this Contract (following payment by Buyer of any amounts required to be paid hereunder as a result of such termination).

(ii)    Supplier warrants that title to the ESS Equipment is free of any liens, claims, interests or rights of others that may be created by or through Supplier, subject to Supplier's and Subcontractors' rights to retain a lien or security interest in such ESS Equipment until payment has been received in full in accordance with <u>Section 8</u>. In the event of any defect in title, Supplier shall immediately, upon the request of Buyer, at Supplier's sole cost and expense, remove any defect, claim or encumbrance on the title to the ESS Equipment. Transfer of title to Buyer shall in no way affect the Parties' rights and obligations as set forth in other provisions of this Contract.

(c)    <u>Title to Work Product</u>. Title to all drawings, designs, Technical Specifications, reports, test results, specimens, Operational Data and other work product (collectively "<u>Work Product</u>"), other than ESS Equipment, prepared by Supplier in connection with this Contract shall transfer to Buyer and become the property of Buyer upon the date of payment for the Work Product, or part thereof, is made by Buyer (without regard to any withholdings). Supplier shall have the right to retain a copy of the Work Product for its records. Buyer acknowledges that the Work Product is prepared by Supplier as instruments of service for the Work and that it is not intended for re-use on any other project. Buyer waives and releases Supplier

41

from any liability with respect to use of the Work Product for any purpose other than the installation, use, operation, maintenance and repair of the Project. Buyer shall defend, indemnify and hold harmless Supplier and its Indemnified Parties from and against any Losses arising out of any modification of the Work Product or the unauthorized use of the Work Product by Buyer or any other person or entity (other than Supplier or its Subcontractors).

(d)    <u>Licensed Technology</u>. In no event will title to the Licensed Technology transfer to Buyer. Title to the Work Product is to the paper, electronic or other media representing the Work Product, and Supplier's intellectual property is licensed to Buyer under <u>Section 29</u> as part of the Licensed Technology.

## 12.    <u>Final Mile Transport; Quality, Inspection and Factory Testing</u>

(a)    Final Mile Transport.

    (i)    Supplier will provide Final Mile Transport.

    (ii)    Within three days of Buyer's notice that it has achieved Site Readiness or Energy Segment Readiness, as the case may be, pursuant to <u>Section 9(i)(iii)(D)</u>, the Parties shall execute a Final Mile Transport Agreement in substantially the form of <u>Exhibit Y-2</u>, which shall address, *inter alia*, division of responsibility and cost-allocation for Final Mile Transport.

(b)    Supplier must have quality assurance programs in place adequate to support its performance of the Work.

(c)    Before shipping ESS Equipment, Supplier shall, or shall cause its Subcontractors to, carefully inspect and test the ESS Equipment for compliance with applicable requirements of this Contract. Supplier shall use reasonable efforts to give Buyer at least five business days' prior written notice before any such inspection or test and Buyer (or Buyer's authorized agent) shall be entitled to attend such inspection or test and shall receive copies of all data, results, certifications and other records relating to the inspection or test promptly following Supplier's receipt of the results of and certifications relating to such inspection or test from Subcontractors.

    (i)    If Supplier needs to reschedule the date of an inspection and or test, Supplier shall give a minimum of two days' prior notification to Buyer. As a condition of attending inspections and tests, Buyer shall and shall cause any other Buyer Responsible Parties to, comply with all policies, protocols and directives required of third parties entering Manufacturing Worksites, including having Buyer's agents and representatives agree to any confidentiality agreement required by Subcontractors as a condition of such entry.

(d)    In no event may Buyer's attendance at such inspection or test be interpreted as in any way implying acceptance of such ESS Equipment by Buyer and shall not relieve Supplier from any liability, obligation or responsibility in connection with

any Defects discovered in the ESS Equipment at any time through the expiration of the Warranty Period.

(e)  All material and equipment furnished and work performed shall be properly inspected and tested by Supplier at its expense in accordance with Exhibits A, B, and C and with any other Contract requirements, and shall, at all times be subject to Buyer's quality surveillance and quality audit (which shall conform with Standards of Practice), Buyer's authorized representatives who, at Buyer's cost and upon reasonable notice, shall be afforded reasonable access to the Manufacturing Worksites and all relevant documentation for such quality surveillance or audit; *provided*, *however*, Buyer's surveillance rights with respect to PCS/MVT Sets shall be limited to the correlative rights granted by the OEM to Supplier.

(f)  Failure of Buyer to make such quality surveillance or to discover Defects shall not relieve Supplier of its obligations under this Contract nor prejudice the rights of Buyer thereafter to reject or require the correction of Defects in accordance with the provisions of this Contract.

(g)  If any ESS Equipment is determined by Buyer to be Defective at any time prior to Commissioning, Buyer shall have the right to reject such Defective ESS Equipment.

## 13.  Technical Support; Installation Completion

(a)  Installation of ESS Equipment.  Buyer (itself or through Other Contractors) shall be solely responsible for the installation of the ESS Equipment in accordance with the Manuals, Technical Specifications, all Applicable Law, and Standards of Practice (the "Installation Requirements").  Buyer is responsible for all other work including civil, engineering, interconnect, and permitting relating to the Project other than the Work.

(b)  Conditions to Lineup Completion.

(i)  Upon Buyer's completion of Lineup installation in accordance with the Installation Requirements and meeting the requirements set forth in Section 13(b)(ii), Buyer shall provide Supplier with a written notice of such completion (such notice, the "Notice of Lineup Completion").

(ii)  Supplier, within ten (10) Business Days of its receipt of a Notice of Lineup Completion, shall review Buyer's Lineup installation work and either accept or reject the Notice of Lineup Completion.  Supplier's approval of Buyer's Notice of Lineup Completion shall not be unreasonably delayed, conditioned, or withheld.  Supplier's rejection of the Notice of Lineup Completion, if applicable, shall be accompanied by a written description of the basis for such rejection in sufficient detail and scope to permit Buyer and its Other Contractors to correct any Defects or deficiencies.

    (iii)    Supplier shall accept the Notice of Lineup Completion if the following requirements for such Lineup are met to Supplier's reasonable satisfaction

    1.   all civil work relating to the installation of the ESS Equipment within the Lineup has been completed, and safe access to the Project Site has been provided to Supplier for Cold Commissioning;

    2.   auxiliary power is available to provide power to the Lineup,

    3.   all Buyer-Furnished Equipment for the Lineup has been commissioned, tested, and is ready to be energized;

    4.   internet service is available with sufficient bandwidth (as described in Exhibit C) for remote access by Supplier and to support Supplier's application programming interface ("API") or other necessary systems;

    5.   the ESS Equipment contained within the relevant Lineup is installed per the Installation Requirements; and

    6.   the applicable AC power, communication, and DC power cables are installed.

("1" through "6", collectively, "Lineup Completion").

    (iv)    In the event Supplier rejects the Notice of Lineup Completion, Buyer shall correct any Defects or deficiencies and provide Supplier with a revised Notice of Lineup Completion, and the process shall repeat until Buyer's installation is in conformance with the Installation Requirements and Supplier has accepted the Notice of Lineup Completion.

    (v)    Upon each Lineup Completion, Supplier shall commence Cold Commissioning.  During Cold Commissioning, the Buyer or any Other Contractors shall not access ESS Equipment in a Lineup, nor interfere with Supplier's Cold Commissioning activities.

(c)    Conditions to Installation Completion.  Upon Buyer's completion to Supplier's reasonable satisfaction (or Supplier's waiver) of all the requirements set forth below, Buyer shall provide Supplier with a Notice of Installation Completion:

    (i)    All Lineups have achieved Lineup Completion;

    (ii)    Backfeed Availability;

    (iii)    all Buyer-Furnished Equipment (e.g., switchgear) is free from Buyer-Furnished Equipment Defects and ready to be energized ;

     (iv)    the ESS Equipment is capable of, and has the requisite permissions for, pushing and pulling power;

     (v)    completion of the "Installation Checklist," as delineated in <u>Exhibit L-2</u>.

(d)    <u>Supplier's Acceptance of Installation Completion</u>.

     (i)    Within ten Business Days of its receipt of a Notice of Installation Completion, Supplier shall review Buyer's installation work.  In connection with such review, Supplier shall ensure that the ESS Equipment is electrically and mechanically checked and verified.

     (ii)    Within the foregoing ten Business Day period, Supplier shall either accept or reject the Notice of Installation Completion.

     (iii)    Supplier's rejection of the Notice of Installation Completion, if applicable, shall be accompanied by a written description of the basis for such rejection in sufficient detail and scope for Buyer and its Other Contractors to correct any defects or deficiencies.

     (iv)    If Supplier rejects the Notice of Installation Completion, Buyer shall correct any defects or deficiencies (including any Buyer-Furnished Equipment Defects) and provide Supplier with a revised Notice of Installation Completion, and the process shall repeat until Supplier accepts the Notice of Installation Completion.

     (v)    The date on which Buyer submits the Notice of Installation Completion that Supplier accepts shall be the "<u>Installation Completion Date</u>".

     (vi)    For the avoidance of doubt, the acceptance by Supplier of the Notice of Installation Completion shall not in any way relieve Buyer of its liability, obligation or responsibility in connection with the installation of the ESS Equipment.

## 14. <u>Commissioning</u>

(a)    Buyer acknowledges and agrees that achievement of Installation Completion by the Commissioning Readiness Date is a necessary condition precedent for Supplier's obligation to achieve Commissioning by the Guaranteed Commissioning Date.

(b)    <u>Completion of Commissioning</u>.

     (i)    When Supplier considers the criteria for Commissioning to have been met, Supplier shall provide Buyer a completed "<u>Commissioning Checklist</u>" (in substantially the form of <u>Exhibit I</u>).

     (ii)    Within seven days thereafter, Buyer shall either (A) issue to Supplier the Commissioning Certificate or (B) advise Supplier in writing that

Commissioning has not been achieved, including advising Supplier of any omissions for which Supplier is responsible or of any other reason why the requirements of Commissioning have not been met. Upon receipt of any deficiency notice from Buyer, Supplier shall correct such omission, and the foregoing notice procedure shall be repeated until Buyer issues a Commissioning Certificate confirming that the requirements for Commissioning have been met; *provided, however*, that Buyer shall have seven days to review Supplier's corrected or additional items.

(iii) If Buyer fails to so respond within the seven-day period, Commissioning shall be deemed to have occurred and Buyer shall be deemed to have issued Supplier the Commissioning Certificate as of the date of Supplier's notice issued pursuant to this Section 14(b).

(iv) For purposes of calculating Commissioning LDs, if applicable, the date on which Commissioning occurs shall be the date on which Supplier submitted the Commissioning Checklist to Buyer if such Commissioning Checklist is accepted by Buyer and a Commissioning Certificate is issued (or deemed issued). Commissioning LDs shall not accrue between the date on which a Commissioning Checklist is submitted and the date on which it is accepted (or deemed accepted) or rejected by Buyer.

(c) Delayed Commissioning.

(i) Upon Delivery of the last-Delivered ESS Equipment, if more than 120 days of Buyer-Caused Delay occur, then, in addition to Supplier's rights for relief under Section 16(c), Supplier will be deemed to have achieved Commissioning, *provided, however*, such deemed achievement shall be strictly for the purposes of Commissioning LDs, Buyer's obligation to pay Payment Milestone # 4, and (as applicable) commencement of the Warranty Period pursuant to Exhibit F-2, and in no event will such deemed achievement relieve Supplier, upon cessation of the Buyer-Caused Delay, from its obligation to commence and diligently continue completion of Commissioning.

(ii) If the occurrence of Buyer-Caused Delay(s) results in an aggregate delay to Supplier of more than fifteen days beyond the Guaranteed Commissioning Date, Supplier will be deemed to have achieved Commissioning; *provided, however*, such deemed achievement shall be strictly for the purposes of Commissioning LDs and Buyer's obligation to pay the Payment Milestone # 4, and (as applicable) commencement of the Warranty Period pursuant to Exhibit F-2. In no event will such deemed achievement relieve Supplier, upon cessation of the Buyer-Caused Delay(s), from its obligation to commence and diligently continue completion of Commissioning.

(d)    <u>Training Completion and Operation Prior to Training Completion</u>.

Within seven (7) days after Supplier achieves Commissioning, Supplier shall complete the Training. Prior to completion of the Training, Supplier shall provide necessary personnel for operation of the ESS consistent with the Manuals.

**15.    Final Acceptance**

(a)    When Supplier considers that the criteria for Final Acceptance have been met, Supplier shall so notify Buyer in writing.  Within seven days thereafter, Buyer shall either (i) deliver to Supplier the Final Acceptance Certificate, or (ii) advise Supplier in writing that Final Acceptance has not been achieved, including advising Supplier of any omissions or Defects for which Supplier is responsible or of any other reason why the requirements of Final Acceptance have not been met.  Upon receipt of any deficiency notice from Buyer, Supplier shall correct such deficiency, and the foregoing notice procedure shall be repeated until the requirements for Final Acceptance have been met; *provided, however*, that Buyer shall have seven days to review Supplier's corrected or additional items.  If Buyer fails to so respond within the seven-day period, Final Acceptance shall be deemed to have occurred and Buyer shall be deemed to have provided Supplier with the Final Acceptance Certificate as of the date of Supplier's notice issued pursuant to this <u>Section 15</u>.

**16.    Change Orders**

(a)    Supplier shall not make any change in the Work, including the Technical Specifications, quantities, methods of shipment, Project Schedule or places of Delivery without prior written consent of Buyer.

(b)    <u>Request for Changes</u>.  Buyer may at any time request, in writing by Buyer Representative and Buyer Representative only, changes in the Work, including changes in the Technical Specifications, quantities, methods of shipment, Project Schedule, or place of Delivery of the ESS Equipment.

(c)    <u>Change Orders for Excusable Events</u>.  Subject to Supplier's compliance with <u>Section 16(f)</u>, Supplier shall be entitled to a Change Order adjusting the Contract Price and the Project Schedule (including the Guaranteed Dates) upon the occurrence of an Excusable Event.  For purposes of this Contract, in each case to the extent that such event demonstrably increases the actual, direct cost of Supplier's performance of the Work or affects the Work such that Supplier's ability to timely perform is temporarily or permanently inhibited such that Supplier's ability to meet the Project Schedule is demonstrably impacted, an "<u>Excusable Event</u>" shall, mean and refer to:

(i)    any written instructions referred to in <u>Section 16(b)</u>;

(ii)    a Force Majeure Event;

(iii)    a Buyer-Caused Delay;

47

      (iv)     a suspension for convenience by Buyer pursuant to <u>Section 18</u>, or any other suspension or stoppages of the Work or Supplier's other obligations under the Contract instructed by or on behalf of Buyer;

      (v)     a Change in Law;

      (vi)     Utility Delays; or

      (vii)     any other event or circumstance set forth in this Contract that affords Supplier the right to receive a Change Order.

(d)     <u>Adjustments to the Contract Price and Project Schedule for Excusable Events</u>.  The adjustment (if any) of the Contract Price as a result of the occurrence of any of the events under <u>Section 16(c)</u> (except <u>Section 16(c)(i)</u>, which is governed by <u>Section 16(e)</u>) is limited to the demonstrable direct cost increase or decrease of performing the Work as a direct result of the occurrence of the Excusable Event. The adjustment (if any) of the Project Schedule as a result of the occurrence of any of the aforementioned events under <u>Section 16(c)</u> shall be determined taking into account the following:

      (i)     the adjustment of the Project Schedule shall be equitable but limited to the demonstrable impact on the Project Schedule as a direct result of the occurrence of the Excusable Event; and

      (ii)     limited by all other relevant factors including any failure of Supplier to reasonably mitigate any effects on the Project Schedule

(e)     <u>Disagreement on Adjustments to Contract Price for Buyer-Directed Changes</u>.  If the Parties are unable to agree upon a lump sum price for a Buyer directed change under <u>Section 16(b)</u>, Buyer may in its sole discretion, direct Supplier to proceed with the changed Work on the following basis: direct documented costs actually incurred by Supplier in executing the change plus 10% for overhead and profit. Buyer or its designated representative shall have reasonably sufficient audit rights with respect to the documentation and information pertaining to such change and Supplier shall furnish to Buyer, and/or its designated representatives, such records as may be required to enable Buyer to verify and evaluate direct and indirect costs, expenses, Requests for Payment, payments, or claims based on Supplier's or its Subcontractors' actual costs incurred, or number of man-hours, or man-days claimed in the performance of the change.

(f)     <u>Process for Change Orders on Account of Excusable Events</u>.  If Supplier believes it is entitled to a Change Order under this Contract, including as a result of an Excusable Event under <u>Section 16(c)</u> or a Buyer-asserted Force Majeure Event under <u>Section 16(g)</u>, Supplier shall give Buyer written notice of its claim, along with its proposed Change Order in substantially the form of <u>Exhibit P</u>, within fifteen days after Supplier becomes aware of the event(s) giving rise to the request for a Change Order. Such claim shall include an appropriate statement setting forth the reasons for and basis of the claim, the additional work necessary as a result of the

Excusable Event, the probable length of delay resulting from such Excusable Event, and the adjustments to the Contract Price, if any, on account of such Excusable Event; *provided, however*, to preserve Supplier's claim for relief, Supplier may delay its issuance of the proposed Change Order until after the impact of the Excusable Event on the Work the Contract Price, and/or the Project Schedule can be accurately quantified provided that Supplier has delivered the required notice(s) and associated information relating to a Force Majeure as required in this Contract. For the avoidance of doubt, if the impact on the Work, the Contract Price, or the Project Schedule on account of an Excusable Event cannot be fully quantified when Supplier submits its proposed Change Order under this Section 16(f), Supplier has the right to issue additional notices and proposed Change Orders under this Section 16(f) to the extent the impact of the Excusable Event(s) necessitate.

(i)     If Supplier fails to notify Buyer of an Excusable Event within the fifteen-day period, such event or condition shall be deemed not to be an Excusable Event, as the case may be, and Supplier shall not be entitled to a Change Order as a result thereof, until such time as Supplier complies with the requirements of Section 16(f), and then only for the period of time and to the extent Supplier would otherwise have been entitled to a Change Order *less* the number of days by which Buyer's receipt of such notice exceeded fifteen days.  By way of example, if Supplier would otherwise have been entitled to five days of time extension for an Excusable Event, but did not give notice until the seventeenth day, then Supplier's extension of the Project Schedule shall be reduced to three days.

(ii)    Buyer shall, within ten Business Days of receiving Supplier's claim and proposed Change Order under Section 16(f), either accept, execute, and deliver such Change Order, or object to such Change Order in writing, setting forth, in good faith, reasons for such objection based upon the Contract, including objections as to whether an Excusable Event has occurred, the claimed relief set forth in the proposed Change Order, or procedural deficiencies of Supplier's claim.  Upon execution of the Change Order, the Work, Project Schedule or Contract Price, as applicable, shall be adjusted in accordance with the terms of such Change Order.  If Buyer objects, and such objection would not otherwise be resolved by Section 16(f)(iv), then either Party may refer such matter for resolution in accordance with Section 34.  During pendency of such Dispute, Supplier shall continue to perform its obligations under the Contract, but the Parties shall operate as though the Project Schedule and all Guaranteed Dates have been extended in accordance with Supplier's proposed Change Order (provided such schedule relief set forth in the proposed Change Order is not frivolous and is made in good faith).  Accordingly, no Liquidated Damages shall become due and payable by Supplier to Buyer, unless the same would otherwise be due based upon the Project Schedule, as extended for Supplier's proposed Change Order and any other Change Orders entered or deemed accepted under this Section 16 at the time Liquidated Damages are assessed.  If it is determined upon resolution of the Dispute that Supplier is

not entitled to all or a portion of the schedule relief it claimed, then Supplier shall promptly pay Liquidated Damages that are due and owing, if any, based upon the then-current Project Schedule, as adjusted for any partial schedule relief granted, and based upon the dates on which Supplier achieved the relevant Completion Milestones.

(iii)   If Buyer fails to so respond in accordance with Section 16(f)(ii) within the ten Business Day period, Supplier's requested Change Order shall be deemed accepted as proffered under this Section 16(f), and Buyer shall immediately execute and return the proffered Change Order upon Supplier's request in order to document such acceptance.

(iv)   If Buyer agrees that a Change Order is warranted pursuant to this Section 16(f), but the Parties are unable to agree on the applicable adjustment to the Contract Price with respect to such Change Order, then the Parties shall adjust the Contract Price in the manner as Section 16(e). Supplier will promptly resubmit a proposed Change Order indicating that the Contract Price will be adjusted in accordance with Section 16(e), and Buyer shall execute and return such Change Order within two (2) Business Days of receipt.

(g)   Change Orders for Force Majeure Events Affecting Buyer.  If Buyer seeks relief on account of a Force Majeure Event, within fifteen days following Buyer's delivery of notice under Section 23(b)(v) regarding the cessation of such Force Majeure Event, Supplier shall submit a proposed Change Order in accordance with Section 16(f), and Supplier shall also be entitled to an adjustment in the Work, extension of the Project Schedule and Guaranteed Dates, and an increase in the Contract Price as though it was the claiming Party.

## 17.   **Warranty**

(a)   Supplier Warranty.  Supplier's warranty for the ESS Equipment and Work is set forth in Exhibit F-2.

(b)   No Implied Warranties.   EXCEPT AS EXPRESSLY PROVIDED IN THIS CONTRACT, SUPPLIER MAKES NO WARRANTIES OR GUARANTEES, EXPRESS OR IMPLIED, AND SUPPLIER DISCLAIMS ANY WARRANTY OR GUARANTEE IMPLIED BY LAW, INCLUDING IMPLIED WARRANTIES OF PERFORMANCE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND IMPLIED WARRANTIES OF CUSTOM OR USAGE, OR ANY ASPECT OF ENGINEERING OR DESIGN.  Supplier makes no representation or warranty with respect to: (i) any forecasts, projections, estimates or budgets delivered or made available to Buyer of future revenues, future results of operations (or any component thereof), future cash flows or future financial conditions (or any component thereof) of the ESS or Project, or (ii) any other information or documents made available to Buyer or its counsel, accountants or advisors with respect to the ESS or Project, except as expressly set forth in this Contract.

(c)     <u>OEM Warranties</u>.

      (i)     <u>Copies</u>. Within twenty days after delivery from Subcontractor to Powin of the respective OEM Warranty set forth in <u>Exhibit G</u>, but no later than the Final Acceptance Date (as stipulated in the Final Acceptance Certificate), Supplier shall provide Buyer with copies of the OEM Warranties set forth in <u>Exhibit G</u> and containing the minimum warranty terms identified in <u>Exhibit G</u>.

      (ii)     <u>Administration of Warranties</u>. Supplier hereby agrees to administer such OEM Warranties in favor of Buyer during the Warranty Period, unless such warranties have been assigned to Buyer, at Buyer's written request, at an earlier date.

      (iii)     <u>Assignment of OEM Warranties</u>. Provided Supplier has been paid by Buyer for the relevant ESS Equipment, Supplier hereby assigns all OEM Warranties that extend beyond the Warranty Period to Buyer upon expiration of the Warranty Period or earlier termination of this Contract or shall otherwise procure for Buyer the right to proceed directly against the relevant Subcontractor under its OEM Warranty. Upon assignment of OEM Warranties to Buyer, Supplier shall be relieved of further liability with respect to the ESS Equipment which are the subject of the assigned OEM Warranties.

## 18.    <u>Tech Escrow</u>

The Tech Escrow Agreement shall be governed by the MSA.

## 19.    <u>Suspension</u>

(a)     Buyer may at any time, by written notice, suspend all or part of the Work to be performed under this Contract for cause or for convenience. Supplier shall suspend performance of the Work specified in Buyer's notice as of the effective date specified therein.

(b)     Upon receipt of a notice to suspend from Buyer, Supplier shall, unless the notice requires otherwise:

      (i)     Immediately (but no sooner than prudent safety measures warrant) discontinue Work on the date and to the extent specified in the notice;

      (ii)     Execute no additional Subcontracts with respect to suspended Work other than to the extent required in the notice;

      (iii)     Promptly make reasonable efforts to obtain suspension upon terms satisfactory to Buyer of all Subcontracts to the extent they relate to performance of suspended Work;

(iv)    Continue to protect and maintain the Work including those portions on which Work has been suspended;

(v)    Take any other reasonable steps to minimize costs associated with such suspension; and

(vi)    Except in cases of a suspension for cause, provide Buyer with estimates of potential suspension costs.

(c)    Buyer may at any time withdraw the suspension of all or part of the suspended Work by written notice to Supplier, specifying the effective date and scope of work to be resumed.  Following receipt of such notice, Supplier shall (i) promptly and with all diligence resume performance of the Work for which the suspension is withdrawn on the effective date of withdrawal specified in Buyer's written notice of withdrawal, and (ii) be entitled to a Change Order under Section 16(c)(iv).

(d)    Supplier may, without prejudice to any other right or remedy under this Contract, suspend performance of its obligations under this Contract where the Buyer has failed to pay an undisputed amount due and payable to the Supplier within ten Business Days after notice from Supplier to Buyer that such amount was due and payable and has not been paid, and such suspension shall, without limiting any other provision of this Contract, constitute a Buyer-Caused Delay.

(e)    If Buyer suspends the Work in whole or substantial part for ninety consecutive days or one hundred eighty days in the aggregate under Section 19(a) other than for cause, and, after receiving notice from Supplier demanding such suspension be withdrawn, Buyer fails to withdraw the suspension of the suspended Work in accordance with Section 19(c) within ten Business Days, Supplier may, upon notice terminate this Contract.  Such termination shall be deemed a Buyer's termination for convenience under Section 21.  Should Buyer withdraw such suspension and thereafter proceed to suspend the Work for its convenience, in whole or in part, for ten (10) days or more within six (6) months of the withdrawal of such suspension, then Supplier may, upon notice, terminate this Contract, and such termination shall be deemed a Buyer termination for convenience under Section 21.

## 20.    Events of Default and Remedies

(a)    Supplier Events of Default; Buyer Remedies.

(i)    Supplier shall be considered in default of its contractual obligations under this Contract:

(A)    if Supplier performs Work which fails to materially conform to the requirements of this Contract and fails to commence remedy of the same within ten days after receipt of notice from Buyer and fails to complete such remedy within thirty days of such notice; *provided*, *however*, that if such remedy cannot be completed within such thirty-day period due to procurement of long-lead equipment, such

thirty-day period shall be extended for a period not to exceed 180 days in total, provided that Supplier diligently pursues completion of the remedy;

(B)     on the date Supplier's liability for Liquidated Damages reaches the Liquidated Damages Cap unless Supplier agrees in writing to pay the amount of such excess Liquidated Damages at the applicable Liquidated Damages rate without regard to the Liquidated Damages Cap;

(C)     if Supplier fails to make payment of any undisputed amount when due under this Contract, which failure continues for twenty Business Days following receipt of written notice of such non-payment from Buyer;

(D)     if Supplier makes a general assignment for the benefit of its creditors, or if a receiver is appointed on account of the insolvency of Supplier, or if Supplier files a petition seeking to take advantage of any other Applicable Law relating to bankruptcy, insolvency, reorganization, winding up or composition of or readjustment of debts and, in the case of any such proceeding instituted against Supplier (but not by Supplier) such proceeding is not dismissed within sixty days of such filing.

(E)     if Supplier fails to timely prepare a Recovery Plan when requested by Buyer, or implement actions in such Recovery Plan pursuant to Section 22, and thereafter fails to remedy the same within ten days after receipt of notice from Buyer; *provided, however*, for the avoidance of doubt, Supplier shall not be in breach or default under this Section if implementation of the Recovery Plan in accordance with its terms does not result in Supplier's recovery of the Project Schedule;

(F)     if any representation, covenant or warranty of Supplier in this Contract shall prove to be false or misleading at the time such representation, covenant or warranty is made, and such false or misleading representation, covenant or warranty continues uncured for thirty days after receipt of written notice from Buyer containing the particulars thereof;

(G)     if Supplier becomes a Restricted Party;

(H)     if, prior to Commissioning, (1) a "Supplier Event of Default" occurs under a Related ESA, and is not cured pursuant to the terms of such Related ESA; or (2) a "Supplier MSA EoD" occurs under the MSA, and is not cured pursuant to the terms of the MSA; or

(I)    for any default not otherwise addressed in this Section 20(a)(i) above, if Supplier fails to fulfill or comply with any of the other material terms of this Contract, and fails to commence remedy of the same within ten days after receipt of notice from Buyer and thereafter fails to complete such remedy within thirty days of such notice; *provided*; *however*, if such remedy cannot be completed within such thirty-day period despite Supplier's diligent effort to effect the remedy, such thirty-day period shall be extended for an additional ninety days in total, provided that Supplier diligently pursues completion of the remedy.

Each of the foregoing a "Supplier Event of Default."

(ii)    Termination by Buyer for Supplier Event of Default.

Upon the occurrence and during the continuation of any Supplier Event of Default, Buyer may, in its sole discretion, notify Supplier in writing of Buyer's decision to terminate this Contract or a specified portion of the Work and shall specify the date for termination and the portion of the Work being terminated; *provided*, *however*, in the event of Buyer's termination under Section 20(a)(i)(H), Buyer's notice shall also stipulate whether Buyer is terminating the MSA or one or more of the Related ESAs.

(iii)    Supplier Obligations on Termination.  Upon termination for Supplier Event of Default, Supplier shall at its sole expense:

(A)    Immediately (but no sooner than prudent safety measures warrant) discontinue Work on the date and to the extent specified in the notice and execute no additional Subcontracts to the extent that they relate to the performance of the terminated Work;

(B)    Inventory, maintain and turn over to Buyer all ESS Equipment, all Work Product, and all other materials, tools, and property furnished by Supplier or provided by Buyer for performance of the terminated Work;

(C)    Promptly obtain cancellation upon terms satisfactory to Buyer of all Subcontracts existing for performance of the terminated work or assign those agreements and Supplier's rights and claims thereunder, as may be directed by Buyer;

(D)    Comply with other reasonable requests from Buyer regarding the terminated portions of the Work; and

(E)    Continue to perform in accordance with all of the terms and conditions of this Contract such portion of the Work that is not terminated.

(iv)    <u>Supplier's Liability on Termination</u>.    Subject to <u>Section 24</u> if Buyer terminates this Contract pursuant to <u>Section 20(a)(ii)</u> and provided Buyer uses its commercially reasonable efforts to mitigate its damages, Buyer shall be entitled to, as its sole and exclusive remedy (in addition to termination) for a Supplier Event of Default, the sum of: (A) all direct costs in excess of the remaining unpaid portion of the Contract Price reasonably and necessarily incurred by Buyer to complete (or cure deficiencies in) the Work, as reasonably documented by Buyer; *plus* (B) all other reasonable, direct, documented fees and costs of Buyer as a result of the Supplier Event of Default and termination of the Contract in order to complete the Work; minus (C) the portion of the Contract Price for Work completed which was due but had not been paid to Supplier at the time of termination.  Supplier shall not be entitled to any payment for the terminated Work, except for amounts due and not previously paid to Supplier for the ESS Equipment and Work completed in accordance with this Contract prior to such notice of termination for default.  Upon termination of this Contract, payment of all amounts due Supplier for Work performed under this Contract may be withheld pending completion of the Work, and may be used to offset liabilities of Supplier under this Contract.

(v)    <u>Impact on License</u>.  All licenses and rights granted to Buyer in <u>Section 29</u> shall remain in effect and shall not terminate following termination of this Contract by Buyer for a Supplier Event of Default.

(vi)    <u>Wrongful Termination by Buyer</u>.  If, after termination pursuant to this <u>Section 20(a)</u>, it is determined for any reason that Supplier was not in default, the rights and obligations of the Parties shall be the same as if the notice of termination had been issued pursuant to <u>Section 21</u>.

(b)    <u>Buyer Events of Default; Supplier Remedies</u>.

(i)    Buyer shall be considered in default of its contractual obligations under this Contract if:

(A)    Buyer fails to pay an undisputed amount to Supplier that is properly presented, due, and payable, and is not paid to Supplier within twenty Business Days after written notice from Supplier of such non-payment;

(B)    any representation or warranty of Buyer in this Contract shall prove to be false or misleading at the time such representation or warranty is made, and such false or misleading representation or warranty continues uncured for thirty days after receipt of written notice from Supplier;

(C)    Buyer makes a general assignment for the benefit of its creditors, or if a receiver is appointed on account of the insolvency of Buyer, or

if Buyer files a petition seeking to take advantage of any other Applicable Law relating to bankruptcy, insolvency, reorganization, winding up or composition of or readjustment of debts and, in the case of any such proceeding instituted against Buyer (but not by Buyer) such proceeding is not dismissed within sixty days of such filing;

(D)    Buyer, except as expressly permitted under this Contract, assigns or otherwise transfers this Contract;

(E)    Buyer becomes a Restricted Party; or

(F)    except as otherwise addressed in this Section 20(b)(i), Buyer fails to materially fulfill or comply with any of the other material terms of this Contract, and fails to commence remedy of the same within ten days after receipt of notice from Supplier and fails to complete such remedy within thirty days of such notice; *provided* that if such remedy cannot be completed within such thirty-day period despite Buyer's diligent effort to effect the remedy, such thirty-day period may be extended for an additional ninety days in total, provided that Buyer diligently pursues completion of the remedy.

Each of the foregoing a "Buyer Event of Default."

(ii)    Non-Payment Due to Withholding or Offset.  Where non-payment by Buyer is related to the exercise of a valid set-off or withholding right, the termination rights in Section 20(b)(i)(A) shall not apply.

(iii)    Supplier Remedies.  Upon the occurrence of a Buyer Event of Default, Supplier may, until and unless the condition underlying the Buyer Event of Default is cured and without prejudice to other rights or remedies under this Contract or at law or equity, upon giving notice to Buyer: (A) terminate this Contract; (B) seek specific performance of Buyer's obligations where monetary damages would be inadequate or as otherwise expressly permitted by this Contract, including seeking an injunction; or (C) suspend performance of the Work until Buyer cures such Buyer Event of Default. In the case of termination of this Contract by Supplier for reasons permitted under Section 20(b)(i), Buyer shall pay the Termination Payment that would be due to Supplier in the event of a termination for convenience by Buyer as set forth in Section 21.

## 21.    Buyer's Termination for Convenience

(a)    Buyer may, at its option, terminate for convenience any of the Work under this Contract in whole or in part, at any time with three days' written notice to Supplier. Such notice shall specify the extent to which the performance of the Work is terminated and the effective date of such termination.  Upon receipt of such notice Supplier shall:

(i)     Immediately discontinue the Work terminated on the date and to the extent specified in the notice and execute no additional Subcontracts for equipment, materials, services, or facilities, other than as may be required for completion of such portion of the Work that is not terminated;

(ii)    Unless directed otherwise by Buyer, promptly obtain cancellation of all Subcontracts existing for the performance of the terminated Work, or assign those Subcontracts as directed by Buyer, *provided* that Buyer reimburses Supplier for all costs that Buyer has paid to such Subcontractor under such Subcontracts and thereafter assumes all obligations of Supplier under such Subcontracts;

(iii)   Assist Buyer in the maintenance, protection, and disposition of Work in progress, plant, tools, equipment, property, and materials acquired by Supplier or furnished by Buyer under this Contract;

(iv)   Complete performance of such portion of the Work which is not terminated; and

(v)    Assign the OEM Warranties to Buyer.

(b)   Upon any such termination under this Section 21, Supplier shall waive any claims for damages including loss of anticipated profits on account thereof, but as the sole right and remedy of Supplier, Buyer shall pay the Termination Payment within thirty days after issuing the notice of termination.

(c)   Payment of the Termination Payment constitutes Buyer's sole and exclusive liability to Supplier and Supplier's sole and exclusive remedy in the event that this Contract shall be terminated as provided in this Section 21. Supplier's acceptance of such Termination Payment constitutes an acknowledgment that Buyer has fully satisfied and discharged all obligations under this Contract.

## 22.   Recovery Plan

Unless attributable to an Excusable Event, if the progress of Work is delayed or is foreseen to be delayed for more than fifteen days beyond any Guaranteed Date, Supplier, may on its own initiative, or if requested by Buyer, within five Business Days of such request, prepare a recovery schedule to demonstrate how it shall perform Work ("Recovery Plan"). The Recovery Plan shall be prepared with a level of detail showing, where relevant, additional shifts, hiring additional manpower, paying or authorizing overtime, providing additional Supplier equipment, and resequencing activities. Any and all costs associated with preparing a Recovery Plan and executing Work under a Recovery Plan shall be at Supplier's sole cost and expense.

## 23.   Force Majeure

(a)   The Parties are each excused from performance of the affected part of an obligation of this Contract (except payment obligations) while performance is prevented by a

Force Majeure Event unless the Force Majeure Event was contributed to by the fault of the party making such claim or was due to circumstances that could have been avoided or mitigated by the exercise of reasonable diligence.

(b)   A Party seeking relief for a Force Majeure Event shall:

(i)   verbally and by electronic mail (where practicable) inform the other Party promptly after becoming aware of the occurrence of the Force Majeure Event; *provided*, failure to provide this notice shall not be the basis for an Event of Default;

(ii)   provide written notice within the time period set forth in <u>Section 16(f)</u>;

(iii)   use commercially reasonable efforts, to mitigate the impact from the Force Majeure Event, including continuing to perform all obligations which can reasonably be performed;

(iv)   provide, on a regular basis, plans for resumed performance and revised schedules; and

(v)   after cessation of the Force Majeure Event, notify the other Party in writing of the cessation, and promptly resume performance of its obligations under this Contract.

**24.**   <u>**Limitation of Liability**</u>

(a)   SUBJECT TO <u>SECTION 24(b)</u>, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS CONTRACT, AND WITHOUT MODIFICATION OF OTHER LIMITS OF LIABILITY SET FORTH HEREIN (INCLUDING THOSE SET FORTH IN <u>SECTION 10(c)</u>), IN NO EVENT SHALL:

(i)   SUPPLIER OR ITS AFFILIATES BE LIABLE, ALONE OR IN THE AGGREGATE, TO BUYER FOR ANY LOSSES, LIQUIDATED DAMAGES AND/OR OTHER LIABILITIES ARISING UNDER THIS CONTRACT IN EXCESS OF AN AMOUNT EQUAL TO ONE HUNDRED PERCENT (100%) OF THE CONTRACT PRICE REGARDLESS OF WHETHER SUCH LIABILITY ARISES OUT OF BREACH OF CONTRACT, GUARANTY, WARRANTY, TORT (INCLUDING NEGLIGENCE) PRODUCT LIABILITY, INDEMNITY, CONTRIBUTION, STRICT LIABILITY OR ANY OTHER LEGAL THEORY.  Except for liabilities excluded under <u>Section 24(b)</u>, all amounts paid by Supplier to Buyer under this Contract, any Losses, the actual, direct costs of Warranty parts, and other costs incurred by Supplier in connection with implementing any remedies required under this Contract and credits toward the Contract Price associated with liability for Liquidated Damages and/or other liabilities of Supplier arising under this Contract, shall be

applied towards the foregoing aggregate liability cap (i.e., shall reduce Supplier's liability under this Contract on a dollar-for-dollar basis).

(ii) BUYER OR ITS AFFILIATES BE LIABLE, ALONE OR IN THE AGGREGATE, TO SUPPLIER FOR ANY LOSSES, LIQUIDATED DAMAGES AND/OR OTHER LIABILITIES ARISING UNDER THIS CONTRACT IN EXCESS OF AN AMOUNT EQUAL TO ONE HUNDRED PERCENT (100%) OF THE CONTRACT PRICE, REGARDLESS OF WHETHER SUCH LIABILITY ARISES OUT OF BREACH OF CONTRACT, GUARANTY, WARRANTY, TORT (INCLUDING NEGLIGENCE) PRODUCT LIABILITY, INDEMNITY, CONTRIBUTION, STRICT LIABILITY OR ANY OTHER LEGAL THEORY.

(b) Neither Party's liability shall be limited by Section 24(a) for any liabilities arising in connection with obligations in the following areas, and these amounts shall not be counted in assessing whether the limitation of liability has been reached:

(i) third-party indemnity obligations set forth in this Contract;

(ii) obligations relating to title and liens set forth in Section 11;

(iii) amounts recovered from any applicable insurance;

(iv) violation of Applicable Laws or any illegal or unlawful acts;

(v) claims based on willful misconduct or gross negligence; or

(vi) any liability that cannot be excluded or limited under Applicable Laws.

## 25. Waiver of Consequential Damages

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS CONTRACT, BUT SUBJECT TO THE LAST SENTENCE OF THIS SECTION 25, NEITHER PARTY, NOR SUCH PARTY'S AFFILIATES OR ITS RESPECTIVE MEMBERS, SHAREHOLDERS, OFFICERS, DIRECTORS, AGENTS OR EMPLOYEES, SHALL BE LIABLE TO THE OTHER PARTY FOR CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES OF ANY NATURE WHATSOEVER, RESULTING FROM OR ARISING OUT OF THIS CONTRACT, INCLUDING LOSS OF PROFITS OR REVENUE, LOSS OF TIME, LOSS OF BUSINESS OPPORTUNITY, IDLE OR ADDITIONAL FACILITIES OR RESOURCES (INCLUDING EQUIPMENT AND OPERATING COSTS), LOSS (INCLUDING BY A THIRD PARTY) OF PROPERTY OR PROPERTY RIGHTS, LOSSES BASED ON CLAIMS OF CUSTOMERS OR OTHER LOSSES INCURRED BY A PARTY TO A THIRD PARTY (UNLESS EXPRESSLY SET FORTH IN THIS CONTRACT), COST OF CAPITAL, LOSS OF FINANCING, LOSS OF BONDING CAPACITY, LOSS OF TAX CREDITS, DAMAGE TO GOODWILL OR REPUTATION, DAMAGE TO CREDIT RATING, OR BUSINESS

INTERRUPTION, AND REGARDLESS OF WHETHER SUCH LIABILITY ARISES IN CONTRACT, GUARANTY OR WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, PRODUCT LIABILITY, INDEMNITY, CONTRIBUTION OR OTHERWISE.  BUYER AND SUPPLIER WAIVE AND RELEASE ALL CLAIMS AGAINST EACH OTHER AND AGAINST THE AFFILIATES OF EACH, AND THEIR RESPECTIVE MEMBERS, SHAREHOLDERS, OFFICERS, DIRECTORS, AGENTS AND EMPLOYEES FOR SUCH DAMAGES.  The Parties agree that the following items are excluded from the above waiver and release: (a) damages claimed by third parties, who are not Affiliates of a Party, for which a Party has a duty to indemnify the other Party or such Party's other Indemnified Parties under this Contract; (b) damages caused by gross negligence, willful misconduct, fraud or other unlawful acts; (c) damages arising out of a Party's violation of <u>Section 27</u>; and (d) any Liquidated Damages.

**26.**   <u>**Indemnity**</u>

(a)    To the fullest extent permitted by Applicable Law, each Party (the "<u>Indemnifying Party</u>") shall fully indemnify, and save harmless the other Party (along with its directors, officers, shareholders, partners, agents and employees, and Affiliates, the "<u>Indemnified Parties</u>") from and against, and shall defend the Indemnified Parties against claims, actions, demands or suits for, any and all loss, damage, fines, penalties, expense and liability whatsoever, including court costs, reasonable attorneys' fees, and interest (collectively, "<u>Losses</u>") incurred by any Indemnified Parties in connection with or arising from third party claims involving:

    (i)    any claim for physical damage to or physical destruction of any real or personal property (excluding the Work), or death of or bodily injury to any person, to the extent caused by the actions, inactions, negligence or willful misconduct of the Indemnifying Party arising out of or in connection with the performance of this Contract;

    (ii)    any violation of Applicable Law by the Indemnifying Party or other persons for whom it is responsible;

    (iii)    any claims by a Governmental Authority to the extent claiming Taxes for which the Indemnifying Party is liable; and

    (iv)    in the case of Buyer as the Indemnifying Party, the presence or release of Buyer Hazardous Substances (unless such release was caused by the negligence of Supplier or Subcontractors, in which case, Supplier shall indemnify Buyer and its Indemnified Parties for such release), or in the case of Supplier as the Indemnifying Party, the release of Supplier Hazardous Substances (unless such release was caused by the negligence of Buyer or any other Buyer Responsible Party, in which case, Buyer shall indemnify Supplier and its Indemnified Parties for such release).

(b)    Upon receipt of any claim for which indemnification is sought, the Indemnified Party shall notify the Indemnifying Party of the nature of the action and deliver

copies of any demand letter or legal process relating to the matter for which indemnification is sought. Failure of the Indemnified Party to give such notice will not reduce or relieve the Indemnifying Party of liability hereunder unless and only to the extent that the Indemnifying Party was actually prejudiced by the failure of the Indemnified Person to give such notice. The Indemnifying Party shall pay all costs of defense of the action, except the Indemnified Party shall be responsible for costs of its separate counsel where the Indemnifying Party has assumed defense of the matter unless there is a conflict that requires separate counsel for both Indemnifying Party and Indemnified Party. If the Indemnifying Party has assumed defense of the matter, the Indemnifying Party shall be entitled to settle the matter except the Indemnifying Party may not, without the prior written consent of the Indemnified Party, consent to any judgment or settlement that (i) provides for injunctive or other non-monetary relief affecting the Indemnified Party, (ii) requires payment of money by the Indemnified Party, or (iii) does not provide for an unconditional and full release of the Indemnified Party.  If the Indemnifying Party, within a reasonable time after receipt of a request for indemnification, fails to take reasonable steps to defend the Indemnified Party against a claim, the Indemnified Party may undertake the defense of such claim without waiving its rights and remedies under this Contract.

(c)     If any Loss subject to an indemnity obligation under this <u>Section 26</u> is caused by the joint or concurrent negligence of Supplier and Buyer, the Loss shall be borne by each Party in proportion to its respective degree of fault or negligence.

(d)     If either Party becomes aware of any incident likely to give rise to an indemnity claim under this <u>Section 26</u>, that party shall notify the other Party, and both Parties shall cooperate fully in the investigation of the incident.

(e)     Notwithstanding the fact that any Indemnified Party may have the right to assert claims for indemnification under or in respect of more than one provision of this Contract, no Indemnified Party shall be entitled to recover the amount of any Losses suffered by such person more than once, regardless of whether such Losses may be as a result of a breach of more than one representation or warranty or covenant.

## 27.    <u>Confidentiality</u>

(a)     <u>Definition; Non-Disclosure and Non-Use</u>.  "<u>Confidential Information</u>" means the Technical Specifications and any drawings, designs, technical information, technical and performance data, standards, dimensions, equipment test results, computer software or programs (including source codes and object codes), business practices, shop procedures, improvements, know how, inventions, intellectual property, patent applications, reports, financial information, financial data, commercial information, business strategies, customer lists, or customer contact information and any other information (whether written, verbal or otherwise and whether or not marked as "confidential," "proprietary," or similar language or orally designated) and that are disclosed to a Party (the "<u>Receiving Party</u>") by the other Party (the "<u>Disclosing Party</u>").  Confidential Information shall be treated as

confidential by the Receiving Party and shall not be (i) disclosed to any third party without the Disclosing Party's prior written consent, except as otherwise permitted in <u>Section 27(b)</u> or <u>Section 27(f)</u>, nor (ii) used for any purpose other than as required in connection with performing or administering this Contract (or any dispute arising under this Contract) or owning, operating or maintaining, updating, configuration, repair, upgrade, alternation or modification of the ESS or the Project, or financing or selling the Project or any equity interest in Buyer.  Each Party, as the Receiving Party, shall protect the other Party's Confidential Information from disclosure and unauthorized use with the same degree of protection that is used by the Receiving Party to protect its own Confidential Information, but in no event less than reasonable care.   For clarity, this Contract is considered Confidential Information of both Parties.

(b)     <u>Permitted Disclosures</u>.   Notwithstanding the foregoing, Receiving Party may disclose Confidential Information, without Disclosing Party's written consent, to Receiving Party's employees, directors, officers, representatives, legal counsel, accountants, engineers, auditors, insurers, other advisors, Financing Parties, Subcontractors (in the case of Supplier as the Receiving Party), and Other Contractors (in the case of Buyer as the Receiving Party), in each case, who (i) reasonably need the Confidential Information for the performance of the Work under this Contract or to advise the Receiving Party on the Project or any reconfiguration thereof, this Contract, or its business, and (ii) have been both informed of the confidential nature of the Confidential Information and either have a professional duty or contractual obligations to not further disclose such Confidential Information or use such Confidential Information in a manner not otherwise permitted under this <u>Section 27</u>.

(c)     <u>Survival of Obligations</u>.   The obligations of confidentiality and restricted use stipulated herein shall remain in full force and effect for a period of five (5) years after the completion of this Contract or the earlier termination or cancellation of this Contract.  Such obligations shall not be affected by bankruptcy, receivership, assignment, attachment or seizure procedures, whether initiated by or against the Receiving Party, nor by the rejection of this Contract in bankruptcy.

(d)     <u>Liability for Breach by Others</u>.  The Receiving Party shall be liable for a breach of this <u>Section 27</u> by any employee or other person to whom the Receiving Party has disclosed Disclosing Party's Confidential Information.

(e)     <u>Exclusions from "Confidential Information"</u>.  Confidential Information shall not include and the requirements of <u>Section 27(a)</u> shall not apply to any information that the Receiving Party can demonstrate: (i) is in the public domain at the time or receipt thereof or which subsequently becomes part of the public domain by publication or otherwise, except by a wrongful act of Receiving Party or any person to whom Receiving Party disclosed such information; or (ii) is already in the lawful possession of the Receiving Party at the time of the disclosure without an obligation of confidentiality; or (iii) information subsequently received by Receiving Party from a third party not known to the Receiving Party to be under any confidentiality

obligation; or (iv) was independently developed by the Receiving Party without use of or reference to Disclosing Party's Confidential Information.

(f) <u>Compelled or Required Disclosures</u>.  Each Party shall be permitted to disclose the Confidential Information to the extent required by Applicable Law, a judicial order, any regulatory requirement, or control area or independent system operator rule, tariff or agreement; *provided* that the Receiving Party required to disclose such Confidential Information shall, where permitted by law, give prior notice to the Disclosing Party of such required disclosure to allow the Disclosing Party, at the Disclosing Party's cost, to oppose the requested disclosure as appropriate under the circumstances or to seek, through a protective order or other appropriate mechanism, to maintain the confidentiality of the Confidential Information (the reasonable costs of which shall be reimbursed by the Disclosing Party).  If a protective order or a similar order limiting disclosure is not obtained, the compelled Party shall furnish only that portion of the other Party's Confidential Information that, upon the advice of its legal counsel, it is legally required to disclose.  Further, each Party shall be permitted to file this Contract with the Securities and Exchange Commission, *provided* that such Party filing this Contract shall work with the other Party to determine what information (such as pricing and other proprietary business information) will be the subject of a confidential treatment request or "CTR."

(g) <u>Ownership of Confidential Information</u>.  Each Party shall retain all right and title to, and interest in, its own Confidential Information.  Except as expressly provided in this Contract, the Parties' entry into this Contract is not intended to grant any rights to either Party under any intellectual property right or the Confidential Information of the other Party.

(h) <u>Equitable Relief</u>.  The Parties acknowledge that the covenants in this <u>Section 27</u> are reasonable and necessary for the protection of the proprietary interests of each other.  The Parties further agree that Confidential Information is valuable and unique and that the improper disclosure or use of one Party's Confidential Information by the other Party in breach of this Contract may result in irreparable injury for which remedies at law may be inadequate.  In the event of a breach or threatened breach of the terms of this <u>Section 27</u>, the Disclosing Party shall be entitled to seek the granting of an injunction prohibiting any such breach without posting of a bond.  Any such relief shall be in addition to and not in lieu of any appropriate relief in the way of money damages.  Each Party agrees to reimburse the other Party (if such other Party is successful on the merits) for all court costs and legal fees, including reasonable attorneys' fees, incurred in obtaining relief under this Section.

## 28.   **Performance Guarantees**

From and after the Commissioning Date, Supplier guarantees that the ESS shall meet the Performance Guarantees attached hereto in <u>Exhibit F-1</u>.

The Performance Guarantee shall be limited as provided in <u>Exhibit F-1</u>, and Buyer's sole and exclusive remedy for Supplier's failure to achieve the Performance Guarantees is set forth in <u>Exhibit F-1</u>.

**29.**   <u>**Supplier's Intellectual Property**</u>

(a)   Supplier represents that the Licensed Technology includes all the intellectual property required by Buyer to own and operate the ESS as contemplated in this Contract.

(b)   <u>Grant of License</u>.

(i)   Upon Delivery (and Buyer's payment to Supplier of undisputed amounts then-due), Supplier hereby grants to Buyer a worldwide, perpetual, non-exclusive, royalty-free, fully paid, irrevocable, non-transferable (except as permitted herein) right and limited license to use the Licensed Technology as necessary to install and commission the ESS at the Project Site and solely in accordance with the terms of this Contract.

(ii)   Upon Commissioning (and Buyer's payment to Supplier of undisputed amounts then due), Supplier hereby grants to Buyer a worldwide, perpetual, non-exclusive, royalty free, non-transferable (except as permitted herein) license to the Licensed Technology as necessary to finance, own, operate, maintain, update, configure, repair, upgrade, alter or modify the ESS at the Project Site consistent with the terms of this license (the "<u>License</u>").

The Licensed Technology is licensed solely for use at the Project Site and Buyer may not (i) separate it from any part of the ESS Equipment with which it may be integrated except to repair, replace, maintain or store or (ii) distribute or use the Licensed Technology to create a derivative work or sell, lease, loan, publish, disclose, sublicense, grant have made rights, rent, assign, transfer, deploy or otherwise make available the Licensed Technology, in whole or in part, to any third party except as expressly permitted in this Contract. Buyer may disclose Licensed Technology, in whole or in part, as permitted in <u>Section 27</u>.  The Licensed Technology is the "Confidential Information" of Supplier.

(c)   <u>No Copies</u>.  Except as otherwise permitted by this Contract, including <u>Section 27</u>, or required in the ordinary course of business for purposes of the financing, ownership, repair, maintenance and operation of the Project, Buyer shall not make any copies of Manuals, use instructions and other documentation provided by Supplier to Buyer, all of which shall be deemed the Confidential Information of Supplier.  For the avoidance of doubt, and subject to <u>Section 27</u>, Buyer may make copies for internal purposes.

(d)   <u>Proprietary Notices</u>.  Buyer shall not, and shall cause all Buyer Responsible Parties to not, remove or alter any proprietary notices or legends that appear on or with the Licensed Technology.

64

(e)    <u>No Reverse Engineering; Escrow Agreement</u>.  Except as provided in this Contract or in the Escrow Agreement, Buyer shall not translate, decompile, reverse engineer, decrypt, extract or disassemble the Licensed Technology or otherwise reduce or attempt to reduce any software or firmware in the Licensed Technology to source code form.  Notwithstanding the foregoing, solely in connection with the operation, maintenance, repair, alteration or upgrade of the Project, but subject in all respects to <u>Section 27</u>, Buyer shall be entitled to translate, decompile, reverse engineer, decrypt, extract or disassemble the Licensed Technology or otherwise reduce or attempt to reduce any software or firmware in the Licensed Technology to source code form, to the extent necessary to troubleshoot problems, analyze Defects and faults, perform root cause analysis, perform repairs, replace parts and otherwise maintain, operate, repair, alter or upgrade the ESS Equipment.

(f)    <u>Improvements to Licensed Technology</u>.

    (i)    <u>By Supplier</u>.  Any improvement hereafter made by or for Supplier or any of its Affiliates in the Licensed Technology that is approved and adopted by Supplier for use by Buyer under this Contract shall be included in the "Licensed Technology" for purposes of the License.  The Parties agree that due to the background and expertise of Supplier and its Affiliates in the Licensed Technology and its vested interest in maintaining the quality of its products, Supplier may decide in its sole discretion which improvements it shall approve and adopt for purposes of Buyer's use under the License.

    (ii)    <u>By Buyer</u>.  Any modification or alteration by Buyer without the prior written approval of Supplier of the Licensed Technology shall be solely at Buyer's risk, including limitation or voiding of the Performance Guarantee as provided in Exhibit F-1.  Buyer may suggest modifications in the Licensed Technology to Supplier, *however*, Buyer is not obligated to share any Buyer modifications to the Licensed Technology with Supplier.  Buyer shall retain all right, title and interest in and to such improvements in the Licensed Technology to Supplier.  If needed to complete the Work, Buyer shall, in its sole discretion, grant to Supplier and its Affiliates a non-exclusive, perpetual, irrevocable, worldwide, fully-paid, royalty-free, transferrable license to use and sublicense others to use these modifications or improvements for all purposes.

(g)    <u>Ownership</u>.

    (i)    <u>By Supplier</u>.  As between the Parties, Supplier or its Affiliates shall own the Licensed Technology and any modifications, discoveries, derivative works and improvements related to it, developed by Supplier or by the Parties jointly, all intellectual property therein and any intellectual property developed by Supplier during, or arising out of, the performance of Supplier's obligations under this Contract.  Buyer acquires only the license rights as provided in this Contract, and does not acquire any ownership rights or title to the Licensed Technology.

(ii) <u>By Buyer</u>.  As between the Parties, Buyer or its Affiliates shall own any intellectual property rights developed or acquired by Buyer, which shall not include any Licensed Technology.  Buyer hereby grants to Supplier and its Affiliates a non-exclusive, perpetual, worldwide, royalty-free license to use and sublicense others to use any intellectual property owned by Buyer that is used or incorporated in the Licensed Technology or the ESS Equipment or Work, through the last day of any obligations of Supplier under this Contract, for the sole purposes of (1) Supplier's or its Affiliates' energy storage research and development purposes and (2) Supplier's performance under this Contract.

(h) <u>Data</u>.

(i) Supplier retains all rights to, and ownership of, any Health-Monitoring Data.  Upon request of Buyer, and in accordance with <u>Exhibit J-2</u>, Supplier shall provide a summary of Health-Monitoring Data (as described in <u>Exhibit F-1</u>) to the extent required solely for Buyer's validation of ESS use curtailment, Warranty violations, and Performance Guarantee violations. In the event of a Dispute to which the Health-Monitoring Data is relevant, Buyer shall be entitled to receive all relevant Health-Monitoring Data for use in connection with such Dispute. Buyer's use of this Health-Monitoring Data is subject to <u>Section 27</u>.

(ii) Buyer retains all rights to, and ownership of, all Operational Data, and hereby grants to Supplier a non-exclusive, royalty-free, non-transferrable license and right to access and utilize the Operational Data, *provided*, Supplier may not use such Operational Data for any purpose other than as required to perform its Work under this Contract, without the express written consent of Buyer. Supplier shall not use Operational Data for purposes including but not limited to tracking or reverse-engineering Buyer's energy market bidding strategies, and such use is subject to <u>Section 27</u>.

(i) <u>Duration and Transfers</u>.  The Licensed Technology is inseparable from the ESS Equipment furnished under this Contract.  Accordingly, the License (i) shall continue for so long as Buyer or any successor retains ownership of the ESS Equipment and continues operating the same, and (ii) shall transfer to any of Buyer's successors and permitted assigns under <u>Section 36</u>.  If Buyer sells or transfers the Project, the ESS Equipment, or any portion thereof to a third party (other than to a Financing Party or as permitted under <u>Section 36</u>), such License will terminate as to Buyer, and Buyer must, as a condition thereof, notify Supplier in writing and assign to the transferee thereof the License, and procure from the transferee an assumption of the License, on substantially the same terms set forth in this <u>Section 29</u>, to the extent the License is applicable to the assets being sold or transferred.  The License shall not be assigned, transferred or sublicensed except as expressly permitted in this <u>Section 29(i)</u>.  Supplier may terminate the License, except with respect to any Licensed Technology that are integrated in any ESS that

has been Delivered to Buyer and title to which has transferred to Buyer hereunder, on written notice to Buyer if Buyer fails to cure any material breach of an obligation in this <u>Section 29</u> within thirty days after Supplier's written notice specifying the breach, *provided*, that if Buyer is unable to cure the breach within such thirty-day period but is acting diligently to cure the breach, then such period shall be extended for the additional period reasonably required to cure such breach not to exceed 180 days. Upon termination of the License in respect of the software as provided above, Buyer shall immediately discontinue use of the software and, at Buyer's option, return to Supplier or erase all complete or partial copies of the software from all forms of storage within ten days of the termination; *provided* that if such software is stored as part of an automated backup system, so long as it is not copied or otherwise saved, deletion of such software may occur in the ordinary cycle of deletion of such backups. Buyer shall provide a written certificate to Supplier verifying that the software and all complete or partial copies thereof have been destroyed, erased or returned to Supplier.

(j)  <u>No Transfer of Intellectual Property; Reservation of Rights</u>. Except as expressly set forth in this Contract, no right or license to any Licensed Technology is granted by Supplier to Buyer under this Contract. Supplier reserves all rights in the Licensed Technology not expressly granted to Buyer in this Contract.

## 30.  <u>Intellectual Property Indemnity</u>

(a)  <u>Indemnification</u>. Each Party hereby indemnifies and shall defend and hold harmless the other Party from and against any and all Losses arising from any third-party claim, whether rightful or otherwise, that any concept, product, design, equipment, material, process, copyrighted material or confidential information, or any part thereof, furnished by the other Party under this Contract constitutes an infringement of any third party's intellectual property rights, including patents, copyrights or trade secrets. If use of any part of such concept, product, design, equipment, material, process, copyrighted material or confidential information is limited or prohibited, the indemnifying Party shall, at its sole expense, procure the necessary licenses to use the infringing or a modified but non-infringing concept, product, design, equipment, material, process, copyrighted material or confidential information or, with the other Party's prior written approval, replace it with substantially equal but non infringing concepts, products, designs, equipment, materials, processes, copyrighted material or confidential information; *provided, however*:

(i)  any such substituted or modified concepts, products, designs, equipment, material, processes, copyrighted material or confidential information shall meet all the requirements and be subject to all the provisions of this Contract; and

(ii)  such replacement or modification shall not modify or relieve the indemnifying Party of its obligations under this Contract.

(b)    <u>Buyer-Furnished Information</u>.  For any Buyer-furnished concept, product, design, equipment, material, process, copyrighted material or Confidential Information, Buyer shall indemnify Supplier against Losses arising from third-party claims that such Buyer-furnished material constitutes an infringement of any patent or copyrighted material or a theft of trade secrets; *provided, however*, Supplier has treated such Buyer-furnished material as Confidential Information.

(c)    <u>Exceptions to Indemnification Obligations</u>.  Supplier's indemnification obligations under <u>Section 30(a)</u> shall not apply to the extent arising as a direct result of:

    (i)    alteration of the ESS Equipment by Buyer or any Buyer Responsible Party (except for alterations at the express written direction or recommendation of Supplier);

    (ii)    the combination or use of the ESS Equipment with other products not provided by Supplier or at Supplier's express written direction or recommendation when the combination is part of any allegedly infringing process, except relief shall not apply to a combination of the ESS Equipment with Buyer-Furnished Equipment;

    (iii)    failure of Buyer to implement any update provided by Supplier pursuant to <u>Section 30(a)</u> that would have prevented the infringement and resulting Loss; or

    (iv)    the ESS Equipment (or portion thereof) was manufactured by Supplier (or Subcontractors) to custom specifications provided by Buyer, and such custom specifications caused the ESS Equipment to be infringing.

(d)    <u>Entire Liability</u>.  THE FOREGOING PROVISIONS OF THIS <u>SECTION 30</u> STATE THE ENTIRE LIABILITY AND OBLIGATION OF SUPPLIER AND ITS AFFILIATES AND THE EXCLUSIVE REMEDY OF BUYER, WITH RESPECT TO ANY ALLEGED INFRINGEMENT OF PATENTS, COPYRIGHTS, TRADEMARKS, TRADE SECRETS OR OTHER INTELLECTUAL PROPERTY BY THE WORK, THE ESS EQUIPMENT OR THE LICENSED TECHNOLOGY OR ANY PART THEREOF, EXCEPT TO THE EXTENT THAT SUCH LIABILITY CANNOT BE EXCLUDED IN ACCORDANCE WITH MANDATORY LEGAL REQUIREMENTS.

**31.    <u>Compliance</u>**

(a)    Supplier represents that it is familiar with and shall comply with all Applicable Laws in effect at the time the Work under this Contract is performed.

(b)    Supplier shall notify Buyer in writing of any material breaches of Applicable Laws related to the performance of this Contract and shall remedy (or cause its Subcontractors to remedy) any non-compliance promptly.

(c)     Supplier further warrants that all Work shall be in compliance with all Applicable Laws.  Supplier shall execute and deliver to Buyer any documents as may be required to effect or to evidence such compliance.  If any ESS Equipment is, or is likely to be, subject to any restriction arising from such Applicable Laws, Supplier shall promptly notify Buyer in writing and Supplier shall take any and all necessary actions to ensure that the ESS Equipment conforms to all Applicable Laws; *provided, however*, such actions may be eligible for relief under Section 16(c)(v).

## 32.    <u>Export Compliance with United States Export Controls</u>

(a)     <u>Export Restrictions</u>.  Buyer acknowledges that the ESS Equipment and the Licensed Technology may be subject to the export regulations of the United States of America regarding export and re-export of certain commodities, software, and technology from the United States, including, the *Export Administration Regulations*, 15 C.F.R. Parts 730-774, maintained by the U.S. Department of Commerce, trade and economic sanctions maintained by the Treasury Department's Office of Foreign Assets Control ("OFAC"), 31 C.F.R. Parts 500 et seq., and the *International Traffic in Arms Regulations*, 22 C.F.R. Parts 120-130, maintained by the Department of State.  Buyer shall not, directly or indirectly, sell, export, re-export, transfer, divert or otherwise dispose of the ESS Equipment or the Licensed Technology in violation of U.S. export control laws and regulations (including to any country or Restricted Party or for any use in violation of U.S. export control laws), nor shall Buyer export or re-export, either directly or indirectly, any information or data received from Supplier in connection with the performance under this Contract to any country or Restricted Party or for any use in contravention of said export control laws and regulations.  Buyer shall indemnify Supplier to the fullest extent permitted by Applicable Law from and against any Losses that may arise as a result of Buyer's breach of this Section 32(a).

(b)     <u>Restricted Parties</u>.  Each Party represents that it is not (and that its Subcontractors or Other Contractors, as the case may be, are not) a "Restricted Party", which for the purposes of this Contract shall be deemed to include any person or entity that is:

(i)      a national of, located in, or organized under the laws of Cuba, Iran, North Korea, Syria, sanctioned regions of Ukraine (Crimea, Luhansk People's Republic, Donetsk People's Republic), Russia, Belarus, Venezuela, Burma, Cambodia, or owned or controlled by any such person;

(ii)     named on applicable government lists of export or sanctions-related prohibited or restricted parties, including OFAC's Specially Designated Nationals and Blocked Persons List or Sectoral Sanctions Identifications List; the Commerce Department's Denied Persons List, Entity List or Unverified List; the State Department's Debarred Parties List; or owned or controlled by any such person;

(iii)    subject to nonproliferation sanctions under the laws of the United States;

69

(iv)    designated as an institution of primary money laundering concern;

(v)    engaged in activities involving nuclear weapons materials, missile or rocket technologies, or the proliferation of chemical or biological weapons;

(vi)    part of or affiliated with any non-U.S. military or paramilitary organization; or

(vii)   owned or controlled by any non-U.S. government.

(c)    Each Party shall promptly notify the other Party if it becomes a Restricted Party.

## 33.    Health and Safety

Supplier shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent damage, injury, or loss to: (a) personnel of Supplier and Subcontractors performing Work; and (b) ESS Equipment, under the care, custody, and control of Supplier or Subcontractors.

## 34.    Dispute Resolution

(a)    Generally.  Except for third-party claims and cross-claims filed by parties not governed by these dispute resolution provisions in which a Party must implead or otherwise join another Party, any claim, controversy, dispute or matter in question between the Parties arising out of or related to this Contract (a "Dispute") shall be subject to and resolved solely pursuant to the dispute resolution process set forth in this Section 34 following compliance with any other requirements of this Contract concerning any such Dispute.  The Parties agree that these Dispute resolution procedures are binding upon them and represent the exclusive procedures to resolve any Disputes.  Except as set forth in Section 34(d), neither Party shall pursue court action unless and until permitted by these procedures, and any Party breaching this covenant shall be responsible for all costs, fees and expenses (including reasonable attorneys' fees) incurred by the other Party in defending and disposing of such court action.  All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while these procedures are pending.

(b)    Notice of Dispute; Meeting of Representatives.  Any Dispute shall first be referred to Buyer Representative and Supplier Representative for negotiation and resolution by delivery of a notice by one Party to the other Party requesting such negotiation and resolution of the Dispute, which notice shall specify in reasonable detail the nature of the Dispute and the resolution sought by the Party giving the notice ("Party Representative Negotiations").  If the Parties do not reach a resolution of the Dispute within ten days following the receipt of such notice for Party Representative Negotiations by the other Party, either Party may request by a notice to the other Party a meeting between senior representatives of each Party with decision making authority to attempt in good faith to negotiate a resolution of the Dispute ("Senior Representative Negotiations"), which meeting shall take place

within ten Business Days of receipt of such notice requesting the Senior
Representative Negotiations.

(c)    <u>Binding, Confidential Arbitration</u>.

(i)    <u>Generally</u>.  The arbitration procedures hereunder are self-executing, and it
shall not be necessary to petition a court to compel arbitration.  Any Dispute
that has not been resolved through the Senior Representative Negotiations
within thirty days from the notice requesting such negotiations (or such
longer period as the Parties may agree in writing) shall be settled by binding,
confidential arbitration administered by the American Arbitration
Association ("<u>AAA</u>") in accordance with the Commercial Arbitration Rules
of the American Arbitration Association ("<u>AAA Rules</u>"); *however*, in the
event of any conflict between this <u>Section 34</u> and the AAA Rules, the
procedures in this <u>Section 34</u> shall control.  The arbitration shall be
conducted by three independent and impartial arbitrators, none of whom
shall be current or previous officers, directors or employees of either Party
or their respective Affiliates, or have any financial, legal, or other conflicts
of interest with respect to the Parties.  The Party who submits the Dispute
to arbitration shall select and identify the first arbitrator in its notice of
arbitration.  The other Party shall identify the second arbitrator in a notice
to be given not more than fifteen days after it receives the notice of
arbitration.  The first two such arbitrators shall both be persons who have at
least five years' experience in the renewable power or construction industry
and shall be attorneys with at least ten years of experience in the practice of
law; *however*, the Parties may waive any or all of the foregoing
requirements by written agreement.  Within twenty days of the second
arbitrator's selection, the two arbitrators shall select a third arbitrator, who
shall serve as chairperson of the arbitrators' panel.  If the two selected
arbitrators cannot agree on a third arbitrator within twenty days of the
second arbitrator's selection, the third arbitrator shall be appointed by the
AAA as provided in the AAA Rules.  In that regard, the Parties hereby
waive the right to nominate the third arbitrator and hereby accept the
appointments by the AAA.

(ii)    <u>Authority of Arbitral Tribunal</u>.  The arbitral tribunal shall determine all
questions of fact and law relating to any Dispute submitted to arbitration.
The arbitral tribunal shall have no authority or power to enter an award
which is in conflict with any of the provisions of this Contract.  The decision
or award must be in writing and must contain findings of fact on which it is
based.  The decision and award of the arbitral panel shall be final and
binding on the Parties, may be challenged only on the ground set forth on
the Federal Arbitration Act, 9 U.S.C. §1 et seq., and judgment on the award
may be entered and enforced by any court having jurisdiction over the
Parties or any of their assets.

(iii)   <u>Joinder</u>.   If the Dispute involves substantially the same facts and circumstances and/or same questions of facts or law as exist within a dispute between Buyer and an Other Contractor, then the Parties shall not object to joining the Other Contractor into the arbitration for concurrent resolution of such other dispute or having the Dispute consolidated into an existing arbitration proceeding with the Other Contractor; *provided, however*, the parties joined must agree to resolution of the common dispute using the procedures set forth in this <u>Section 34(c)</u>, unless Supplier and Buyer agree in writing to use different dispute resolution procedures.

(iv)   <u>Costs; Attorneys' Fees</u>.   The expense of arbitration shall be shared equally by the Parties, but each Party shall be responsible for the fees of its own legal counsel, experts, and any witnesses.

(v)   <u>Seat and Language</u>.   The seat of the arbitration shall be in New York, New York.   The language of the arbitration shall be English.

(d)   <u>Confidentiality of Disputes</u>.   Any proceedings and negotiations between the Parties relating to any Dispute, offers of settlement and any information, documentation or materials produced by a Party and delivered to the other Party solely for the purposes of negotiations or resolution of any Dispute shall be confidential and shall not be disclosed to any other person without the other Party's prior written consent; *however*, disclosure of the foregoing may be made:

(i)   in order to enforce the obligation to first comply with the dispute resolution procedures;

(ii)   as necessary to enforce an arbitration award;

(iii)   to such disclosing Party's auditors, legal advisers, consultants, insurers, employees, officers, directors, and Affiliates of that Party who have a legitimate need to know such information and are subject to the confidentiality provisions of this Contract, a separate agreement containing substantially similar confidentiality provisions, or another professional obligation of confidentiality; or

(iv)   where that Party is under a legal or regulatory obligation to make such disclosure, subject to the same requirements as set forth in <u>Section 27(f)</u> relating to compelled disclosures of Confidential Information.   The arbitrator shall be bound by the same confidentiality requirements.

(e)   <u>Equitable Remedies</u>.

(i)   Notwithstanding anything to the contrary in this <u>Section 34</u>, the Parties expressly reserve the right to, and noting shall preclude a Party at any time from seeking or commencing any judicial proceeding for injunctive or equitable relief from a court of competent jurisdiction if in such Party's sole judgment such action is necessary to avoid irreparable damage or to

preserve the status quo. Despite such action, the Parties shall continue to participate in good faith in the procedures specified in this <u>Section 34</u>.

(ii) If a Party commences an action seeking equitable remedies as allowed by this <u>Section 34(e)</u>, the Parties agree that the action may be brought in any state or federal court located in the Borough of Manhattan (New York County), state of New York, and each Party unconditionally: (A) consents to nonexclusive personal jurisdiction in the Borough of Manhattan (New York County), state of New York; (B) waives any objection as to jurisdiction or venue in the Borough of Manhattan (New York County), state of New York, including on the basis of inconvenient forum; and (C) agrees not to assert any defense based on lack of jurisdiction or venue in the aforesaid courts.

(f) <u>Obligations Continue</u>. Notwithstanding the existence of any Dispute, the Parties will continue to perform their respective obligations under the Contract, unless the Parties otherwise mutually agree in writing.

## 35. <u>Governing Law</u>

Unless otherwise agreed, this Contract shall be governed by and construed in accordance with the laws of the state of New York, without regard to principles of conflicts of laws (except Section 5-1401 of the New York General Obligations Law) that would cause the application of the laws of any jurisdiction other than the internal laws of the State of New York. IN ACCORDANCE WITH SECTION 6 OF THE UNITED NATIONS CONVENTION ON CONTRACTS FOR THE INTERNATIONAL SALE OF GOODS ("<u>UN CONVENTION</u>"), THE PARTIES AGREE THAT THE UN CONVENTION SHALL NOT APPLY TO THIS CONTRACT.

## 36. <u>Assignment</u>

(a) <u>Restriction on Assignment</u>. Subject to <u>Sections 36(b)</u> and <u>36(c)</u>, neither Party shall assign or in any other manner transfer any of its rights or obligations under this Contract without the prior written consent of the other Party which consent shall not be unreasonably withheld. No such purported assignment or transfer without such consent, shall be valid or effective. This Contract, and any rights or obligations hereunder, may only be assigned in whole, and not in part. Nothing in this <u>Section 36(a)</u> shall prohibit a Party from delegating or subcontracting all or any portion of its obligations under this Contract to a Subcontractor (in the case of a delegation by Supplier) or Other Contractor (in the case of a delegation by Buyer) in accordance with this Contract, *provided* that no such delegating or subcontracting shall relieve the delegating Party of any obligation under this Contract.

(b) <u>Permitted Assignments by Buyer</u>. Notwithstanding <u>Section 36(a)</u>, Buyer may, without Supplier's consent but upon ten days' prior written notice to Supplier, assign this Contract to:

(i)　　any Affiliate for the purpose of developing, financing or owning the Project,

(ii)　　a purchaser of all or substantially all of Buyer's assets or Buyer's successor in interest as part of a corporate reorganization, consolidation, take-over, merger, statutory share exchange or other business combination; *provided, however*, such person(s) are not a competitor of Supplier (or its Affiliates) in the manufacture and/or design of energy storage and related systems and such person(s) are not then-engaged in litigation or arbitration proceeding with Supplier, or

(iii)　　its Financing Parties by way of collateral assignment to secure financing of the Project.

Any assignment of this Contract by Buyer pursuant to this <u>Section 36(b)</u> (other than pursuant to clause "(iii)" above) shall release Buyer from its liabilities under this Contract, *however* such assignment shall not be valid (A) unless the assignee has equal or greater ability than Buyer to fulfill Buyer's obligations (including its financial obligations) under this Contract and (B) until the assignee delivers a written assumption of Buyer's rights and obligations under this Contract to Supplier.  A permitted assignee of Buyer under this <u>Section 36(b)</u> (other than a collateral assignee, unless such collaterally assignee assumes this Contract in writing) shall be bound by the obligations of this Contract.

(c)　　<u>Permitted Assignments by Supplier</u>.  Notwithstanding <u>Section 36(a)</u>, Supplier may, without Buyer's consent but upon written notice, assign this Contract to:

(i)　　any Affiliate, or

(ii)　　by way of collateral assignment, any Financing Parties.

Assignment of this Contract pursuant to <u>Section 36(c)(i)</u> shall release Supplier from its liabilities under this Contract, upon delivery to Buyer of the permitted assignee's written assumption of Supplier's rights and obligations under this Contract *however* such assignment shall not be valid (A) unless the assignee has equal or greater ability than Supplier to fulfill Supplier's obligations (including its financial obligations) under this Contract and (B) until the assignee delivers a written assumption of Supplier's rights and obligations under this Contract to Buyer.  A permitted assignee of Supplier under this <u>Section 36(c)</u> (other than a collateral assignee, unless such collaterally assignee assumes this Contract in writing) shall be bound by the obligations of this Contract.

## 37.　**Insurance**

During the entire term of this Contract, including the Warranty Period, the Parties shall maintain (or cause to be maintained) the insurance coverages set forth in <u>Exhibit H</u>.

## 38.　**Independent Contractor**

Nothing in this Contract shall be deemed to constitute Supplier, nor any Subcontractors, nor their respective employees or agents to be the agent, representative or employee of Buyer.  Supplier shall at all times be an independent contractor and shall have sole responsibility for and control over the details and means for performing the Work.  Supplier covenants and agrees that in the performance of the Work, neither Supplier nor its Subcontractors shall perform any act or make any representation to any person to the effect that Supplier, or any of its agents, representatives or Subcontractors, or any of their respective employees, agents or representatives is an employee, agent, or representative of Buyer.

**39.    Subcontracting**

(a)    Supplier guarantees that work by any of its Subcontractors shall conform with the terms of this Contract.

(b)    Notwithstanding the subcontracting of any portion of the Work by Supplier, Supplier shall remain primarily and fully responsible for the complete, proper and safe performance of the Work in strict conformity with the requirements of this Contract.  Supplier shall be liable for any and all acts and omissions of its Subcontractors and their respective employees.  Nothing contained in this Contract may be construed as imposing any obligation or liability on the part of Buyer toward the Subcontractors.

(c)    Buyer agrees to Supplier's use and engagement of Subcontractors; provided Supplier may not enter into any Major Subcontract with any Subcontractor that is (1) not on the Major Subcontractor List or (2) not approved by Buyer in writing, which approval shall not be unreasonably conditioned, withheld or delayed.

(d)    Supplier shall endeavor to include in all Major Subcontracts the right of Supplier to assign the contract to Buyer consistent with the requirements of this Contract.

**40.    Record Keeping and Audit**

Without limiting or modifying any specific recordkeeping or reporting obligations provided for elsewhere in this Contract, Supplier shall maintain records and accounts in connection with the performance of this Contract as is consistent with Supplier's internal retention policies, unless a longer period is otherwise specified by Applicable Law.  Supplier shall maintain its records and accounts in accordance with U.S.  Generally Accepted Accounting Principles (U.S.  GAAP) or with International Accounting Standards Committee (IASC) standards consistently applied, as applicable.  Buyer and its representatives shall have the right to examine and copy, at Buyer's expense, at all reasonable times (but no more frequently than once per calendar quarter) and with advance notification, such records and accounts for the purposes of confirming compliance with Contract provisions, verifying payments or requests for payment when costs are the basis of such payment and evaluating the reasonableness of proposed Contract Price adjustments and claims.  Buyer representatives shall have no right to audit, investigate, analyze, copy or otherwise review documents related to the value of Subcontracts, cost of the ESS

Equipment, or Supplier's build-up or components of any hourly rates charged where costs are the basis of payment.

**41.    <u>Publicity</u>**

    (a)    <u>Trademarks</u>.

        (i)    Except as set forth herein, neither Party shall issue any news release or permit any publicity or advertisement, or otherwise use the other Party's trade name, logo, trademark, trade device, service mark or symbol owned by such Party (the foregoing, "<u>Trademarks</u>").

        (ii)    Buyer acknowledges and agrees that certain of the ESS Equipment is branded with Supplier's Trademarks, which Buyer will not obscure, remove, or otherwise modify.

    (b)    Neither Party will issue any press release or other public statement regarding this Contract or the contents hereof without the prior written consent of the other Party.

**42.    <u>No Waiver</u>**

    (a)    Neither Party's failure to enforce any provisions of this Contract shall in any way be construed as a waiver of such provisions nor in any way affect the rights of that Party thereafter to enforce any such provisions.  No waiver by a Party of any breach or default of the other Party hereunder shall constitute a waiver of any subsequent breach or default, whether or not the subsequent breach or default is of a similar or different nature.  Any waiver by a Party under this Contract must be in writing and signed by the Party's representative to be effective.

    (b)    None of the following shall operate as, or be deemed to be, a waiver or release of a Party's obligations under this Contract:

        (i)    Failure by a Party to insist upon strict performance of any terms or conditions of this Contract;

        (ii)    Failure or delay to exercise any rights or remedies provided herein or by Applicable Law;

        (iii)    Failure to properly notify a Party in the event of breach of any obligation;

        (iv)    With respect to Supplier's obligations, the acceptance of or payment for any portion of the Work;

        (v)    With respect to Supplier's obligations, the review or failure to review any Supplier submissions;

        (vi)    With respect to Supplier's obligations, any inspection or test by Buyer or the failure to inspect or test any aspect of the Work; and

(vii)    The termination either in whole or in part of this Contract.

**43.**    <u>**Miscellaneous**</u>

(a)    <u>Survival</u>.  Notwithstanding the completion of the Work, or the earlier termination of this Contract, the Parties shall continue to be bound by the provisions of this Contract which by their terms survive such completion or termination, including the provisions of <u>Section 17(c)</u>, *Assignment of OEM Warranties* (in the event of termination); <u>Section 17</u>, *Warranty* (shall survive completion of the Work but not earlier termination of the Contract); <u>Section 18</u>, *Tech Escrow*; <u>Section 20</u>, *Events of Default and Remedies*; <u>Section 21</u>, *Buyer's Termination for Convenience*; <u>Section 24</u>, *Limitation of Liability*; <u>Section 25</u>, *Waiver of Consequential Damages*, <u>Section 26</u>, *Indemnity*; <u>Section 27</u>, *Confidentiality*; <u>Section 29</u>, *Use of Supplier's Intellectual Property*; <u>Section 31</u>, *Compliance with Applicable Law*; <u>Section 32</u>, *Export Compliance with United States Export Controls*; <u>Section 34</u>, *Dispute Resolution*; <u>Section 35</u>, *Governing Law*; <u>Section 41</u>, *Publicity*; <u>Section 42</u>, *No Waiver*; and this <u>Section 43</u>, *Miscellaneous*.

(b)    <u>Entire Agreement; Amendments</u>.  This Contract shall constitute the entire agreement between the Parties with respect to the subject matter hereof and supersedes any other agreements or statements pertaining to the same subject matter.  The Parties shall not be bound by any statement, representation, promise, inducement, or understanding of any kind not set forth in this Contract.  No change, amendment, or modification of any of the provisions of this Contract shall be effective unless in writing and signed by both Parties.  No acknowledgment form or other form of Supplier containing terms and conditions submitted by Supplier shall have the effect of modifying or supplementing the terms and conditions hereof.

(c)    <u>Headings</u>.  Titles and headings are for convenience of reference only.  They shall not be taken into consideration in interpreting this Contract.

(d)    <u>Language</u>.  The language to be used in all documents comprising or relating to this Contract and in all other communications relating to this Contract shall be English, unless otherwise required in writing by Buyer.

(e)    <u>Reservation of Rights</u>.  The Parties retain their rights and remedies under Applicable Laws, subject to any provisions in this Contract that provide otherwise.

(f)    <u>Counterparts</u>.  This Contract may be signed in any number of counterparts, all of which constitute a single instrument.  Delivery hereof may be performed by electronic transmission of scanned signature pages.

(g)    <u>Rules of Interpretation</u>.

(i)    References to Articles, Sections and Exhibits are, unless otherwise indicated, to Articles of, Sections of and Exhibits to this Contract.  All Exhibits attached to this Contract are incorporated herein by this reference

and made a part hereof for all purposes.  References to an Exhibit shall mean the referenced Exhibit and any sub-exhibits, sub-parts, components or attachments included therewith.

(ii)    As used in this Contract, the masculine gender shall include the feminine and neuter and the singular number shall include the plural, and vice versa unless the context requires otherwise.

(iii)    Unless expressly stated otherwise, references to a person or entity includes its successors and permitted assigns and, in the case of a Governmental Authority, any person succeeding to its functions and capacities.

(iv)    As used in this Contract, references to "days" shall mean calendar days, unless the term "Business Day" is used.  If the time for performing an obligation under this Contract expires on a day that is not a Business Day, the time shall be extended until that time on the next Business Day.

(v)    As used in this Contract, where a word or phrase is specifically defined, other grammatical forms of such word or phrase have corresponding meanings; the words "herein," "hereunder" and "hereof" refer to this Contract, taken as a whole, and not to any particular provision of this Contract; "including" means "including, for example and without limitation," and other forms of the verb "to include" are to be interpreted similarly; and the word "or" is not exclusive.

(vi)    As used in this Contract, all references to a given agreement, instrument or other document shall be a reference to that agreement, instrument or other document as modified, amended, supplemented and restated through the date as of which such reference is made.  Any term defined or provision incorporated in this Contract by reference to another document, instrument or agreement shall continue to have the meaning or effect ascribed thereto whether or not such other document, instrument or agreement is in effect.

(vii)    Preparation of this Contract has been a joint effort of the Parties and the resulting document shall not be construed more severely against one of the Parties than against the other.  Any rule of construction that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Contract or any amendments or Change Orders.

(h)    <u>Commencement of Claims</u>.

(i)    Any legal action with respect to claims or actions by Buyer arising under <u>Section 17</u>, must be commenced within one year after expiration or termination of the Warranty Period.

(ii)    Any other legal action of either Party arising under this Contract must be commenced prior to the expiration of the statute of limitations provided by Applicable Laws respecting such claims.

(i)    <u>Releases Valid in All Events</u>.  The Parties intend that the waivers and disclaimers of liability, releases from liability, limitations and apportionments of liability, and indemnity and hold harmless provisions expressed throughout this Contract shall apply to the extent provided in the particular provision.

(j)    <u>Severability</u>.  If any provision of this Contract is determined to be illegal or unenforceable: (i) such provision shall be deemed restated in accordance with Applicable Laws to reflect, as nearly as possible, the original intention of the Parties and (ii) such determination shall not affect any other provision of this Contract and all other provisions shall remain in full force and effect.

(k)    <u>Notice</u>.  All notices or other communications under this Contract must be in English and in writing, and:

    (i)    delivered by hand;

    (ii)    sent by recognized overnight mail or prepaid courier service;

    (iii)    sent by certified mail, return receipt requested; or

    (iv)    sent by email with confirmation of receipt by response email

Notices to Buyer shall be sent to:

    BHER Ravenswood Solar 1, LLC
    c/o BHE Renewables, LLC
    4124 NW Urbandale Drive
    Urbandale, IA 50322
    Attn: Senior Vice President, Development
    Email: John.Guy@bherenewables.com

With copy to:

    BHER Ravenswood Solar 1, LLC
    c/o BHE Renewables, LLC
    4124 NW Urbandale Drive
    Urbandale, IA 50322
    Attn: General Counsel
    Email: GeneralCounsel@bherenewables.com

Notices to Supplier shall be sent to:

    Powin, LLC
    20550 SW 115th Avenue
    Tualatin, OR 97062
    Attn.: Legal Department
    Email: notice@powin.com

Any technical or other communications pertaining to the Work shall be between Supplier Representative and Buyer Representative, or such other representatives as agreed to by both Parties.

The date of receipt of each such notice, demand or other communication will be (A) the date of delivery thereof if delivered by hand, overnight mail, or courier, (B) the date of the return receipt, if sent by certified mail, or (C) if sent by electronic mail, the date of delivery shall be the date sent, *provided* that the sender does not receive an automated undeliverable or out-of-office message and, if the notice involves any matter under Section 20 or Section 34, the sending Party sends notice by other permitted means within two Business Days of sending notice by electronic mail. Each Party shall have the right to change the place to which notice shall be sent or delivered or to specify additional addresses to which copies of notices may be sent pursuant to this Section 43(j), in either case by similar notice sent or delivered in like manner to the other Party.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Contract in the spaces provided below, effective as the Effective Date.

**Buyer: BHER Ravenswood Solar 1, LLC**        **Supplier: Powin, LLC**

By: _____        By: _____

Print: Alicia R. Knapp        Print: Jeff Waters

Title: President & CEO        Title: Chief Executive Officer

*Group 1 ESA – signature page*

DocuSign Envelope ID: 155476A2-74F1-4B16-AFD3-274DF6B49D45

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Contract in the spaces provided below, effective as the Effective Date.

**Buyer: BHER Ravenswood Solar 1, LLC**          **Supplier: Powin, LLC**

By: _____          By: _____

Print: Alicia R. Knapp          Print: Jeff Waters

Title: President & CEO          Title: Chief Executive Officer

*Group 1 ESA – signature page*

## **EXHIBIT B**

## **CHANGE ORDER**

Docusign Envelope ID: 6B516A23-3875-4D48-8794-062F39F51F14

Case 25-16137-MBK    Doc 286-1    Filed 07/08/25    Entered 07/08/25 15:10:20    Desc
Declaration of John Guy in Support of Objection    Page 90 of 92

**Change Order**

Change Order #:        2
Date:                          June 8, 2025
Powin Project #:        BHE0030 Ravenswood 1


Defined terms have the meaning given to them under the Energy Supply Agreement dated July 12, 2024 (the "Contract"), by and between Powin, LLC ("Supplier"), and BHER Ravenswood Solar 1, LLC ("Buyer").

WHEREAS, Executive Orders dated February 1, 2025, March 3, 2025, April 2, 2025, April 8, 2025, April 9, 2025 and May 12, 2025, related to increased tariffs have been issued (the "Tariff Increases");

WHEREAS, the above referenced Executive Orders each constitute a change in the Applicable Law, and consequently, a Change in Law under the Contract.

WHEREAS, Change in Law notices were issued to the Buyer on February 7, 2025, March 5, 2025, April 7, 2025, April 14, 2025, and May 15, 2025;

WHEREAS, Section 16(c) of the Contract sets forth that the Contract Price is subject to an equitable adjustment if a Change in Law occurs;

WHEREAS, certain Energy Segments were imported into the United States on or around May 30, 2025, and are currently in the Port of Norfolk, Virginia;

WHEREAS, certain ancillary equipment necessary for the installation and Commissioning of the Energy Segments is in storage in Mesa, Arizona;

WHEREAS, Supplier has outstanding fees owed to Mainfreight Inc. ("Mainfreight") respecting transportation and logistical support associated with the Energy Segments and the ancillary equipment (as set out on Exhibit A, "Imported Equipment"), which Buyer is willing to pay and accept immediate delivery of the Imported Equipment at the current locations of the equipment;

NOW THEREFORE, the undersigned agree to the following changes to the Contract.

With the exception of the changes specifically described in this document, the Contract is not otherwise amended, nor does it change any other terms or conditions in the Contract. The below adjustment to the Contract Price will constitute the full and complete settlement for the changes, unless otherwise provided in the detailed description below.

Description of the Contract changes:

1.  Contract Price Adjustment.

    The Contract Price shall be increased by $4,763,310.00 due to the Tariff Increases applicable to the Energy Segments ("Tariff Amount").

Docusign Envelope ID: 6B516A23-3875-4D4B-8794-062F38051F14

Case 25-16137-MBK    Doc 286-1    Filed 07/08/25    Entered 07/08/25 15:10:20    Desc
          Declaration of John Guy in Support of Objection    Page 91 of 92

The Contract Price shall be decreased by $2,900,000 for Buyer's direct payment of Transport Costs to Mainfreight ("Transport Costs").

The final Delivery Milestone Payment paid to Powin will be $3,162,613.87.

Exhibit E to the Contract (and to the Energy Supply Agreements for Group 2 and Group 3) is replaced in its entirety with the Exhibit E attached hereto.

2.  Payment.

Buyer shall pay the full Tariff Amount ($4,763,310.00) owing to the United States Customs and Border Patrol ("USCBP") to the USCBP account or Powin USCBP bond provider account for the Imported Equipment and as directed in writing by Powin promptly after Powin provides such direction.

Buyer shall pay the Transport Costs directly to Mainfreight in accordance with an agreement to be entered into between Buyer and Mainfreight and arrange for transport of the Imported Equipment from the Delivery Location (as amended by Section 3 below) to the Buyer's Project Site.

Buyer shall pay the Delivery Milestone Payment ($3,162,613.87) to Powin promptly after the execution of this Change Order notwithstanding any other provision of the Contract.

| | |
|---|---|
| The original Contract Price is: | $ 28,869,589.79 |
| The change in the Contract Price after CO No.2 is: | $ 1,863,310.00 |
| The revised Contract Price (including this change) is: | $ 30,732,899.79 |

3.  Delivery; Title.
With respect to the Imported Equipment, the Delivery Location for the Imported Equipment is amended to be the current location where the Imported Equipment is being stored by Mainfreight, which identified in Exhibit A. The Parties agree that, notwithstanding any other provision of the Agreement and solely with respect to the Imported Equipment, Delivery has occurred and title has transferred to Buyer pursuant to Section 11(b) as of the execution of this Change Order.

4.  Mainfreight Costs.
Buyer agrees to pay to Mainfreight outstanding amounts owed by Powin in respect of the Imported Equipment in the amount of $2,900,000 upon transport of the Imported Equipment from the Delivery Location to Buyer's Project Site in accordance with an agreement between Mainfreight and Buyer.

EXECUTION OF THIS CHANGE ORDER BY BOTH PARTIES CONSTITUTES A BINDING AGREEMENT. EXCEPT AS SPECIFICALLY MODIFIED HEREIN, ALL THE TERMS AND CONDITIONS OF THE CONTRACT, AS AMENDED, REMAIN IN FULL FORCE AND EFFECT.

Docusign Envelope ID: 6B516A23-3875-4D4B-8794-962F38051F14

Case 25-16137-MBK    Doc 286-1    Filed 07/08/25    Entered 07/08/25 15:10:20    Desc
Declaration of John Guy in Support of Objection    Page 92 of 92

IN WITNESS WHEREOF, Buyer and Supplier have executed this Change Order as of the date first above written.

**BUYER**

BHER Ravenswood Solar 1, LLC

By: _____

Name: Alicia Knapp

Title: President

Date: June 8, 2025

**SUPPLIER**

POWIN, LLC

By: _____

Name: Brian Kane

Title: Chief Projects Officer

Date: 6/8/2025