| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>John W. Weiss<br>Leah M. Eisenberg<br>David E. Sklar<br>**PASHMAN STEIN WALDER HAYDEN, P.C.**<br>21 Main Street, Suite 200<br>Hackensack, New Jersey 07601<br>Telephone: (201) 270-5477<br>Email: jweiss@pashmanstein.com<br>          leisenberg@pashmanstein.com<br>          dsklar@pashmanstein.com<br><br>-and-<br><br>Joaquin M. C de Baca (admitted *pro hac vice*)<br>Richard A. Stieglitz (admitted *pro hac vice*)<br>Youmi Kim (admitted *pro hac vice*)<br>**MAYER BROWN LLP**<br>1221 Avenue of the Americas<br>New York, New York 10020-1001<br>Telephone: (212) 506-2500<br>Email: jcdebaca@mayerbrown.com<br>          rstieglitz@mayerbrown.com<br>          ykim@mayerbrown.com<br><br>*Counsel for (1) Leeward Renewable Energy, LLC, on behalf of Rabbitbrush Solar, LLC, Chaparral Springs, LLC, and Antelope Valley BESS, LLC, (2) Longroad Development Company, LLC, on behalf of Serrano Solar, LLC, Sun Streams PVS, LLC, and Sun Streams Expansion, LLC, and (3) DTE Electric Company* | |
| In Re:<br><br>POWIN, LLC, *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case Number: 25-16137 (MBK)<br><br>Jointly Administered |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583], (ii) Powin, LLC [0504], (iii) PEOS Holdings, LLC [5476], (iv) Powin China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [5241], (vii) Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [2495], and (ix) Powin Energy Operating, LLC [6487]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

**OBJECTION OF LICENSEES TO OMNIBUS MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING THE REJECTION OF LEGACY CUSTOMER CONTRACTS AND (II) GRANTING RELATED RELIEF**

Leeward Renewable Energy, LLC, on behalf of Rabbitbrush Solar, LLC, Chaparral Springs, LLC, and Antelope Valley BESS, LLC (collectively, the "Leeward Licensees"), Longroad Development Company, LLC, on behalf of Serrano Solar, LLC, Sun Streams PVS, LLC, and Sun Streams Expansion, LLC (collectively, the "Longroad Licensees"), and DTE Electric Company ("DTE" and, together with the Leeward Licensees and the Longroad Licensees, the "Licensees"), by and through their undersigned counsel, hereby file this objection (the "Objection") to the *Omnibus Motion of the Debtors For Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief* (the "Motion")[2] [ECF No. 88]. In support of this Objection the Licensees respectfully submit the *Declaration of Dustin Wambeke in Support of Objection of Licensees to Omnibus Motion of the Debtors for Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief*; the *Declaration of Ryan Fonbuena in Support of Objection of Licensees to Omnibus Motion of the Debtors for Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief*; and the *Declaration of Fred Ihimodu in Support of Objection of Licensees to Omnibus Motion of the Debtors for Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief*, each filed contemporaneously herewith. In support of the Objection, the Licensees respectfully submit as follows:

**PRELIMINARY STATEMENT**

1.  Since the filing of the Motion to Compel (as defined below) the Licensees have been engaged in discussions with the Debtors to attempt to resolve the issues raised in the Motion

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Motion.

2

to Compel and similar issues raised by the Debtors' Motion, including on potential terms for services. These discussions remain ongoing, and the parties continue to work toward a consensual resolution. However, in light of the hearing on the Motion currently scheduled for July 15, 2025, the Licensees submit this Objection to preserve their rights to the relief requested herein.[3]

2. The Debtors' Motion, which seeks to reject all legacy customer contracts, presents issues that far exceed a typical rejection motion and routine exercise of a debtor's business judgment. The Motion directly implicates critical obligations and access to technology that are essential for the safe and effective operation of the Licensees' solar plus energy storage projects (the "Projects"). The Licensees have invested substantial resources in reliance on the Debtors' commitments under their respective contracts, including, among other things, a broad license to the intellectual property necessary for the safe operation, maintenance, and repair of the Projects. These commitments also encompass continuous monitoring, battery balancing, responding to instructions from independent system operators ("ISOs"), and safety alerts provided through the Debtors' remote operations center (the "ROC").

3. The Debtors now seek to reject these vital commitments, which would terminate the Licensees' access to certain technology platforms that are currently maintained by the Debtors that help to ensure safety and, more broadly, operation of the Licensees' Projects. The proposed rejection of the Licensees' contracts not only heightens the risk of safety incidents at the Projects, but also impairs the Licensees' ability to respond to and mitigate such risks.

4. Under section 365(n)(1) of the Bankruptcy Code, which was enacted because of unique harms recognized by Congress, the licensees of a debtor's intellectual property are entitled to elect to continue using all licensed intellectual property notwithstanding rejection. 11 U.S.C. §

---

[3] In furtherance of these discussions, the Licensees and the Debtors, through their respective counsels, agreed to extend the deadline to file this Objection to July 10, 2025.

365(n)(1)(B). Therefore, even if the Court were to authorize rejection, the Licensees remain statutorily entitled to the continued, unfettered use of the intellectual property granted to them under their intellectual property licenses. Without such intellectual property, potentially harmful effects of terminating access to the technology platforms and services that would follow rejection could be exacerbated.

## BACKGROUND

5.  On June 9 and 10, 2025 (the "Petition Date"), the Debtors commenced the above-captioned, jointly administered voluntary cases under chapter 11 of title 11 of the Bankruptcy Code (the "Chapter 11 Cases").

6.  On June 17, 2025, the Debtors filed the Motion.

7.  On June 21, 2025, the Licensees filed the *Emergency Motion of the Licensees for Entry of an Order (I) Compelling the Debtors to Comply with Section 365(n)(4) of the Bankruptcy Code, (II) Granting Adequate Protection Under Section 363(e) of the Bankruptcy Code, and (III) Granting Other Appropriate Relief* [ECF No. 117] (the "Motion to Compel").

8.  On June 21, 2025, the Debtors filed the *Motion of the Debtors for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; (IV) Scheduling A Final DIP Hearing; And (V) Granting Related Relief* [ECF No. 120] (the "Original DIP Motion"). Then, on June 23, 2025, the Debtors filed the *Notice of Amended Motion of the Debtors for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; (IV) Scheduling A Final DIP Hearing; And (V) Granting Related Relief* [ECF No. 143] (the "Amended DIP Motion" and, together with the Original DIP Motion, the "DIP Motion").

4

### A. The Licenses.

9. The Licensees are the owners and operators of renewable energy and/or stand-alone battery projects throughout the United States, each of which rely on large-scale battery energy storage systems supplied and supported by one of the Debtors, Powin, LLC ("Powin").

10. Prior to the Petition Date, each of the Licensees and Powin entered into an energy supply agreement or energy system supply agreement (collectively, the "ESAs"), pursuant to which Powin agreed to provide an energy storage system for certain energy storage projects developed by the respective Licensees. In addition to the ESAs, certain Licensees entered into long-term services agreements (the "LTSAs" and, together with the ESAs, the "Contracts") with Powin.[4]

11. Pursuant to each respective ESA and LTSA, Powin granted each applicable Licensee a broad license to use, among other things, any of Powin's intellectual property in and to the technology for certain energy storage system equipment (collectively, the "Licenses"). Motion to Compel, Ex. A.

12. Certain ESAs also required Powin to enter into an escrow agreement, pursuant to which Powin agreed to deposit into escrow important intellectual property and other materials necessary for the operation of the applicable Licensee's Projects. *Id.*

13. In furtherance of the foregoing, certain of the Licensees were added as beneficiaries under a two-party master escrow agreement (the "IP Escrow Agreement"), by and between Powin Energy Corporation and an escrow agent ("Escrow Agent"). Pursuant to the IP Escrow Agreement, tangible embodiments of the intellectual property licensed to certain Licensees under the applicable ESAs were deposited into escrow along with other related materials, including software

---

[4] Due to the confidential nature of the Contracts, a table listing the specific Contracts and the relevant portions thereof was attached as an exhibit to the Motion to Compel and filed with the Court under seal. Copies of the Contracts themselves were also submitted to the Court in connection with the Motion to Compel.

5

code. Under the IP Escrow Agreement, Powin warranted that all relevant passwords or other access methods were deposited into escrow or provided separately. IP Escrow Agreement, 3C.[5] The Debtors instructed the Escrow Agent to release the deposit materials to applicable Licensees, but the deposit materials do not appear to contain everything the Licensees need to safely and reliably operate their Projects independently if the Debtors successfully reject the Contracts, nor do they contain everything the Licensees are entitled to under the Licenses or the Contracts. Certain Licensees have received some of the requested intellectual property as a result of this escrow release, but they are still verifying whether those escrowed materials contain the licensed intellectual property that is needed to operate their Projects effectively, including all passwords and encryption keys.

### B. Powin's Failures to Perform Under the Licenses and the Resulting Harm to the Licensees and the Safe Operations of Their Projects.

14. The Licensees rely on the licensed intellectual property as part of a number of safeguards to ensure safe and reliable operation of their energy storage systems. To maintain a safe environment, preserve grid reliability, and comply with other applicable standards, the Licensees need continuous access to Powin's cloud-based services in order to use certain online software platforms and services currently provided by the Debtors under the Contracts they seek to reject. Absent that, the Licensees would require complete intellectual property packages, appropriate time for transition away from Powin online services (with some Licensees needing to work with third-party service providers to replace Powin's prior duties), and related passwords and credentials required to run unique instances of computer software, to maintain source code, to

---

[5] The form of the IP Escrow Agreement is attached to the ESAs, which were provided to the Court in connection with the Motion to Compel.

access related instructions, and to obtain vendor support. The Licensees are contractually entitled to such intellectual property packages.

15. Among other things, the Projects cannot operate at peak efficiency, nor can they operate with optimal safety protocols, without full access to key cloud software tools, such as Kobold, Command Center UI ("CCUI"), and the EMS software, StackOS. *See Declaration of Gerard Uzzi in Support of Emergency First Day Motions of the Debtors* 16-17 [ECF No. 13] (the "First Day Declaration") ("[t]he Debtors' proprietary cloud-based technology and related servicing functionality is highly valuable to their Customers," and "[t]he termination of the Debtors LTSA Line of Business would have a severely detrimental impact on Customers who are largely incapable of replacing those functions without the Debtors' assistance"). The Licensees are committed to preserving operational safety, and access to these materials would allow them to maintain all safeguards. Powin has not provided the requisite credentials, such as encryption keys, or passwords to other key software, nor the corresponding intellectual property manuals and client data that would enable parties to take those protective steps, appearing to levy these services as supposed motivation to join its new customer program or a future program with it or a potential purchaser of the Debtors' assets. *See* Motion, Preliminary Statement ("[T]he Debtors seek to reject their existing Customer Contracts…to make clear to customers that the only way to utilize the Debtors' technology and services is in connection with the new LTSA Program.").

16. As part of the Contracts and Licenses, Powin is contractually obligated to maintain the health and proper functioning of the batteries at the Projects. To fulfill this obligation, upon information and belief, Powin relies primarily on Powin StackOS and other key software for the continued operation of the machinery at the Projects and to ensure that the batteries receive necessary maintenance. *See* First Day Declaration 15. These batteries are essential to the Projects'

7

operations and require consistent and attentive care to perform at the levels contractually mandated and necessary to meet the energy output and charging commitments certain Licensees have made to third parties.

17. The Licensees' concerns are not hypothetical. Powin has already failed to perform critical maintenance and troubleshooting as required by the Contracts. In response, the Licensees have made diligent efforts to mitigate Powin's failures by attempting to perform the necessary battery maintenance themselves. Despite these efforts, though, the Licensees are unable to adequately maintain the batteries without the continued access to Powin's cloud-based tools, such as Kobold and CCUI, or to the extent such access is affected by the Court's approval of the Motion, the requisite passwords to independently operate critical software.

18. In addition, the Licensees are contractually entitled to the monitoring services provided by the ROC, which is meant to operate around the clock to respond to any systems issues as they arise.[6] Rejection of the Contracts would remove this key safety protocol. As a consequence, the Licensees are currently unable to troubleshoot effectively key and critical issues on the Projects.

19. Furthermore, Powin has acknowledged that its intellectual property is important to ensure safe operation of its battery energy storage systems. *See* First Day Declaration 6 ("[w]ithout Powin's Stack OS™, these [battery energy storage systems] cannot operate safely"). The Debtors' ongoing failure to provide the passwords necessary for the Licensees to independently operate their Projects, particularly in light of the possible cessation of access to Powin's cloud, which is necessary to run Kobold and other critical intellectual property, upon rejection of the Contracts, exposes the Projects to imminent risks. Lack of sufficient access to the intellectual property

---

[6] *See* Powering a Cleaner Tomorrow. Safely: Powin's Approach to Battery Safety, https://powin.com/wp-content/uploads/2024/02/Safety_White-Paper_Powin.pdf.

hinders the Licensees' ability to prevent safety incidents and magnifies the potential for irreparable damage to property, public safety, and the Licensees' business interests.

## OBJECTION[7]

20.    As an initial matter, the Court should consider adjourning any hearing on the Motion until there is greater clarity regarding the potential sale of the Debtors' assets and the identity of any prospective buyer. Given the potential for catastrophic loss of value and the risk of safety issues that will be borne by the Licensees upon the rejection of their Contracts, the rejection of the Contracts should not be undertaken at such an expedited pace and without knowing what the potential resolution of these Chapter 11 Cases might be. Instead, any decision regarding rejection should be considered in the context of the sale of the Debtors' assets rather than through outright rejection at this stage.

21.    Indeed, the Licensees are willing to consider the potential commercial benefits of programs offered by the Debtors or any purchaser of the Debtors' assets, but they cannot accept being forced into a position where they are improperly deprived of contractually mandated services and intellectual property needed to maximize independently stable system operations. Should the Court nevertheless decide to address the relief sought in the Motion at this time, it should take into account the following considerations.

### I. PUBLIC POLICY AND SAFETY CONCERNS WEIGH AGAINST THE REJECTION OF THE LICENSEES' CONTRACTS.

22.    The Contracts are not ordinary commercial agreements; rather, they govern the operation and maintenance of large-scale battery energy storage systems that are integrated into

---

[7] DTE also objects to the Debtors' proposed rejection of the ESA, dated January 24, 2024, listed as entry no. 86 of Schedule 1 to the Motion (the "Trenton ESA") on the basis that the Trenton ESA was terminated prior to the Petition Date pursuant to that certain Notice of Termination sent to Powin on May 19, 2025. Accordingly, the Trenton ESA cannot be rejected by the Debtors pursuant to the Motion and should not be subject to any of the relief sought in the Motion.

9

the United States power grid and are subject to stringent safety and regulatory requirements. The safe and reliable operation of these battery energy storage systems, and the Projects as a whole, depend not only on the Licensees' continued access to and use of Powin's cloud-based systems and intellectual property, but also on Powin's obligations to provide ongoing maintenance, training, and monitoring, as required under the Contracts.

23. Powin's ongoing withholding of the passwords (and, depending on what has been released from escrow, copies of software) necessary for the Projects to "stand up" independent copies of software and other systems, particularly for tasks that Powin has indicated it will no longer perform, combined with its efforts to eliminate the Licensees' access to critical cloud-based tools, such as Kobold, and services provided by the ROC, puts the Projects at unreasonable risk of catastrophic damage, rapid value diminution, and loss of important safety mechanisms. Powin should not be allowed to reject contracts with the aim of producing post-petition cash flow where it does so by eliminating critical operational and safety services and while simultaneously refusing to provide licensed intellectual property and other materials that would otherwise allow Licensees to protect themselves from the loss of those services. To do so would be an unreasonable exercise of business judgment, and the Licensees respectfully request that all related requests for relief be denied.

**A. The Effect of Rejection of the Contracts on Public Welfare May Warrant a Heightened Standard of Business Judgment.**

24. While the business judgment standard typically governs motions to reject executory contracts, courts have recognized that public policy considerations and similar concerns may warrant the application of a heightened standard in certain circumstances. *See*, *e.g.*, *Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 378 F.3d 511, 525 (5th Cir. 2004) (rejection of "contract for the interstate sale of electricity at wholesale" subject to heightened standard because

10

business judgment standard "would not account for the public interest inherent in the transmission and sale of electricity"); *see also In NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 525 (1984) (superseded by statute) (holding that stricter test was required for rejection of collective bargaining agreement). The battery energy storage systems at issue handle very large quantities of energy, and they require vigilant upkeep and maintenance to ensure safe and reliable operation, directly implicating public safety and welfare issues for this Court to consider.

25. At least one court has suggested that an "imminent threat to health or safety" may trigger a heightened standard of review of a debtor's decision to reject a contract. *See, e.g., In re Old Carco LLC*, 406 B.R. 180, 190 (Bankr. S.D.N.Y. 2009) (rejecting application of such higher standard for franchise and dealership agreements). The Debtors should not be permitted to unburden themselves of all responsibility for the battery energy storage systems they constructed and sold to the Licensees, particularly where rejection of the Contracts, even if a potentially good business decision, could result in potential safety risks that will be borne by the public. *Cf. Midatlantic Nat'l Bank v. N.J. Dept't of Envtl. Prot.*, 474 U.S. 494, 506-07 (1986) (denying request to abandon assets because of imminent threat to health or safety).

26. The Licensees' ability to operate their energy storage systems safely is predicated on uninterrupted access to Powin's cloud and its cloud-based software. Key software, such as Kobold, is necessary to stabilize batteries so that the Projects remain safe and reliable. If access is withdrawn upon rejection of the Contracts, the Licensees require encryption keys, passwords, user credentials to the software (and, if not already provided, copies of the software), their data, and intellectual property manuals in order to maintain independently the safe and reliable operation

11

of the Projects and to respond to directives from the relevant grid authorities and ISOs to change the timing, amounts, and patterns of energy production and/or battery system charging schedules.[8]

27.  Further, the Contracts require the Debtors to operate the ROC around the clock in order to respond to any systems issues. The sudden lack of support from the ROC upon rejection of the Contracts will render the Licensees unable to troubleshoot effectively any issues on the Projects, which could cause immediate and irreparable harm to public safety, property, and the integrity of the power grid, outweighing any purported business justification for rejection.

28.  Additionally, the Debtors are now operating with the benefit of DIP financing, which was not available at the time the Motion was filed, and this new liquidity and the emergence of a viable sale process should allow (if not require) the Debtors to continue performing under the Contracts. The Debtors have stated that their goal in rejecting all legacy customer contracts is "to make clear to customers that the only way to utilize the Debtors' technology and services is in connection with the new LTSA Program." Motion, Preliminary Statement. It is fundamentally unfair and potentially unsafe for the Debtors to halt customers' operations—customers who have already paid for the Debtors' technology and services under existing contracts—without also granting the Licensees access to materials necessary for their intellectual property licenses only to attempt to renegotiate for necessary services to which they should already be entitled.

29.  During the hearing for the DIP Motion, the Debtors' Chief Restructuring Officer testified that "the Debtors were able to secure DIP financing and a stalking horse bid, which is, at least in part, in lieu of the customer program." Audio Recording of DIP Motion Hearing 29:16,

---

[8] Powin currently provides Kobold as a cloud-based software application. We understand that not all of the Licensees are currently able to access all necessary project-level controls within the current application. This would be potentially catastrophic if not for the fact that the current Kobold service ensures the automatic operation of critical functions, the loss of which may lead to immediate operational problems. The Licensees either already have or should be given copies of Kobold and other important software pursuant to their Contracts and seek all other necessary materials needed to run their own instances of this software in order to protect against that possibility.

June 24, 2025, ECF No. 153. Therefore, the purported rationale for rejecting legacy customers' contracts—namely, to compel those customers to participate in the new customer program—no longer holds, as the DIP financing now provides the cash flow the Debtors sought to obtain from the new customer program. *Id.* ("[T]he $10 million dollars that we seek in interim financing is essentially replacing the $9 million or so of the [ServiceCo] receivables in the original forecast.").

**B. The Debtors Should Not Be Allowed to Cease Giving the Licensees Access to Kobold and Other Critical Software.**

30. In the event the Court authorizes the Debtors to reject the Contracts, the Debtors should nevertheless be prohibited from terminating, restricting, or otherwise interfering with the Licensees' continued access to Powin's cloud, Kobold, StackOS, and other critical software necessary for the safe and effective operation of the Projects. As already detailed, this software is integral to the ongoing operation, monitoring, and maintenance of the Projects, and their uninterrupted availability is essential to ensure operational safety and grid reliability.

31. Denying access to the cloud, which is necessary to run Kobold and other key software, would deprive the Licensees of the ability to monitor their systems, have all tools available to respond to safety concerns, and perform the necessary maintenance. Such a situation would not only jeopardize the safety and integrity of the Projects, but also it would expose the Licensees, the public, and surrounding property to significant risk of harm.

32. Moreover, such impairment would cause irreparable damage to the Licensees' business operations and could result in substantial financial and reputational losses. Therefore, in order to ensure the ongoing safe operation of the Projects and prevent undue harm to the Licensees, the Debtors must continue to provide access to the cloud, Kobold, StackOS, and all critical software after rejection or ensure the safe transition to independent project-level operation of those systems by the Licensees pursuant to their Licenses.

### C. Rejection *Nunc Pro Tunc* Is Inappropriate Under These Circumstances.

33. The Debtors' request that the Contracts be rejected effective as of the date the Motion was filed is inappropriate. One reason the Debtors may be seeking this relief is to reconcile that fact that they have not been delivering all licensed intellectual property (including materials not held in escrow) as required under the Contracts and section 365(n)(4)(A)(i) of the Bankruptcy Code, which provides that, until they reject the Contracts, they "*shall*—[] to the extent provided in [contracts under which the debtor is a licensor of intellectual property] or any agreement supplementary to such contract—[] *perform such contract* . . ." 11 U.S.C. § 265(n)(4)(A)(i) (emphasis added). Performance, as is relevant here and in the Motion to Compel, would include delivery of all licensed intellectual property requested by the Licensees needed to ensure independent operation of their projects. Refusal to perform and noncompliance with the Bankruptcy Code should not be condoned given the operational and safety issues described herein.

34. Retroactive application of an order rejecting contracts is the exception to the general rule that rejection is effective upon entry of the order. *Stonebriar Mall L.P. v. CCI Wireless, LLC (In re CCI Wireless, LLC)*, 297 B.R. 133, 140 (D. Colo. 2003); *see also In re O'Neil Theatres, Inc.*, 257 B.R. 806, 808 (Bankr. E.D. La. 2000) (only in exceptional circumstances will a court adopt a retroactive date for rejection).

35. Further, the court in *Jamesway Corp.* affirmed a retroactive rejection solely because the lease counterparty caused the delay in the bankruptcy court's order approving the rejection. *Constant L.P. v. Jamesway Corp. (In re Jamesway Corp.),* 179 B.R. 33, 39 (S.D.N.Y. 1995) ("While it is unsettled whether a bankruptcy court can authorize retroactive rejection without a strong reason, it can do so to avoid penalizing the debtor for an unnecessary delay caused by the creditor."); *In re CCI Wireless*, *LLC*, 297 B.R. at 140 (discussing that the *Jamesway Corp.* holding was narrow and based solely on the lessors having caused the delay in entry of the rejection order).

14

36. Here, the Debtors have failed to demonstrate or even allege that circumstances beyond their control prevented a timely rejection. In fact, the Debtors should be able to pursue rejection on a going-forward basis without the need to deprive the Licensees and broader public of critical safeguards that remain in place unless and until the Court approves rejection because they now have access to DIP financing and can perform their obligations until these Contracts are rejected.

II. **SECTION 365(N) OF THE BANKRUPTCY CODE PRESERVES THE LICENSEES' INTELLECTUAL PROPERTY RIGHTS NOTWITHSTANDING REJECTION OF THE CONTRACTS.**

37. Section 365(n) of the Bankruptcy Code expressly safeguards the rights of intellectual property licensees in the event that a debtor-licensor seeks to reject an executory contract. Specifically, section 365(n)(1)(B) provides:

> If the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect—
>
> (B) to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced…

11 U.S.C. § 365(n)(1).

38. The plain language of section 365(n) is clear that, even if the Debtors succeed in rejecting the Contracts, the Licensees may elect to retain all rights to the intellectual property granted under the Licenses as those rights existed immediately prior to the commencement of these Chapter 11 Cases. *Id.*; *see also Apple, Inc. v. Spansion, Inc. (In re Spansion Inc.)*, 2011 WL 3268084, at *8 (D. Del. July 28, 2011), *aff'd sub nom. In re Spansion, Inc.*, 507 F. App'x 125 (3d Cir. 2012) (quoting *In re Exide Techs.*, 607 F.3d 957, 966 (3d Cir. 2010), as amended (June 24, 2010) (Ambro, J., concurring)) ("[I]n the event that a bankrupt licensor rejects an intellectual

15

property license, § 365(n) allows a licensee to retain its licensed rights—along with its duties—absent any obligations owed by the debtor-licensor.").

39. Congress enacted section 365(n) in response to "industry concerns that . . . any patent or trademark licensor could go into Chapter 11 and invalidate a license perfectly valid under contract law." *In re Exide Techs.*, 607 F.3d at 965 (Ambro, J., concurring) (internal quotation marks and citation omitted); *see also* S. Rep. 100–505, at 9 (1988), reprinted in, 1988 U.S.C.C.A.N. 3200, 3206. As the legislative history confirms Congress sought "to make clear that the rights of an intellectual property licensee to use the licensed property cannot be unilaterally cut off as a result of the rejection of the license pursuant to Section 365 in the event of the licensor's bankruptcy." *Id.* (quoting S. Rep. No. 100–505, at 1 (1988), reprinted in 1988 U.S.C.C.A.N. 3200, 3206); *see In re Crumbs Bake Shop, Inc.*, 522 B.R. 766, 770-71 (Bankr. D.N.J. 2014).

40. Thus, regardless of whether the Contracts are rejected, the Licensees have a statutory right under section 365(n) to retain all of their rights with respect to the Licenses. Further, section 365(n)(3) of the Bankruptcy Code provides that:

> If the licensee elects to retain its rights, as described in paragraph (1)(B) of this subsection, then on the written request of the licensee the trustee shall—
>
> (A) to the extent provided in such contract, or any agreement supplementary to such contract, provide to the licensee any intellectual property (including such embodiment) held by the trustee; and
>
> (B) not interfere with the rights of the licensee as provided in such contract, or any agreement supplementary to such contract, to such intellectual property (including such embodiment) including any right to obtain such intellectual property (or such embodiment) from another entity.

11 U.S.C. § 365(n)(3). The Licenses, as set forth in the Contracts, include the right to use the intellectual property as necessary to, among other things, operate, maintain, and repair the battery energy storage systems. *See* Motion to Compel, Ex. A. This right necessarily encompasses continued access to Kobold and other essential software, as well as the supply of passwords,

encryption keys, and other intellectual property, as it is required for the Licensees to fully operate, maintain, and repair the battery energy storage systems at their Projects. Moreover, under the IP Escrow Agreement, the applicable Licensees have a right to all passwords or other access methods. IP Escrow Agreement, 3C. In addition to the explicit provisions in the Contracts, courts also require a software licensor to provide necessary passwords and access credentials to allow for the "use" of the software as licensed. *See, e.g., Gateway Sys., Inc. v. Chesapeake Sys. Sols., Inc.*, 836 F.Supp.2d 625, 640 n.17 (N.D. Ill., 2011*)* ("[T]o the extent Chesapeake also requires "license keys" to enable its customers to use the Gateway software, Gateway has an implicit obligation to continue to provide license keys."). Upon the rejection of the Contracts, under section 365(n), the Licensees retain their rights to the Licenses and to everything needed to operate, maintain, and repair the battery energy storage systems, and the Debtors may not interfere with the Licensees' realization of such rights. 11 U.S.C. §§ 365(n)(1), (3).

41.     Critically, the rights afforded by section 365(n) ensure that the Licensees may maintain their *existing* Licenses. Any suggestion that the Licensees *do* have access to the intellectual property underlying the Licenses if they would only opt in to the Debtors' new customer program or any similar program that may be proposed by a future purchaser of the Debtors' intellectual property directly contravenes the statute.[9] *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 381 (2019) (stating that "[t]he debtor can stop performing its remaining obligations under the agreement. But the debtor cannot rescind the license already conveyed. So the licensee can continue to do whatever the license authorizes.").

---

[9] The Licensees understand that the Debtors are running a sale process. It should be noted that this Court has held that a sale of assets under section 363(f) of the bankruptcy code does not extinguish the rights afforded to licensees of intellectual property by section 365(n). *See In re Crumbs Bake Shop, Inc.*, 522 B.R. at 780.

17

42. Indeed, a situation in which a licensee is unilaterally cut off from its intellectual property license by virtue of rejection and forced to repurchase it from the debtor or its successor (at an increased price) is precisely the harm that section 365(n)(1) was enacted to prevent.

43. In addition, the Licensees agree with the arguments made in the *Limited Objection of Yuma Solar Energy LLC to Debtors' Omnibus Motion for Entry of Order (I) Authorizing the Rejection of legacy Customer Contracts and (II) Granting Related Relief and Final Orders Authorizing Use of Cash Collateral and Approving Terms of Post-Petition Financing* [ECF No. 287] and the *Limited Objection and Reservation of Rights of Ad Hoc Customer Group to Omnibus Motion of the Debtors for Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief* [ECF No. 296].

## RESERVATION OF RIGHTS

44. The Licensees hereby reserve all of their rights, claims, defenses, and remedies under the Contracts and pursuant to applicable law, including, without limitation, the right to amend, modify, or supplement this Objection and to raise additional objections during any hearings on the Motion.

## CONCLUSION

WHEREFORE, the Licensees respectfully request that this Court, (i) to the extent necessary, deny or modify the relief requested in the Motion in accordance with this Objection, (ii) grant the Licensees any other necessary relief consistent with this Objection, and (iii) grant such other and further relief as the Court may deem necessary and proper under the circumstances.

*[Remainder of page intentionally left blank.]*

Dated: July 10, 2025

Respectfully submitted,

/s/ Leah M. Eisenberg
John W. Weiss
Leah M. Eisenberg
David E. Sklar
**PASHMAN STEIN WALDER & HAYDEN, P.C.**
21 Main Street, Suite 200
Hackensack, New Jersey 07601
Telephone: (201) 270-5477
Email: jweiss@pashmanstein.com
    leisenberg@pashmanstein.com
    dsklar@pashmanstein.com

-and-

Joaquin C de Baca (admitted *pro hac vice*)
Richard A. Stieglitz (admitted *pro hac vice*)
Youmi Kim (admitted *pro hac vice*)
**MAYER BROWN LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 506-2500
Facsimile: (212) 262-1910
Email: JCdeBaca@mayerbrown.com
    RStieglitz@mayerbrown.com
    YKim@mayerbrown.com

*Counsel for (1) Leeward Renewable Energy, LLC, on behalf of Rabbitbrush Solar, LLC, Chaparral Springs, LLC, and Antelope Valley BESS, LLC, (2) Longroad Development Company, LLC, on behalf of Serrano Solar, LLC, Sun Streams PVS, LLC, and Sun Streams Expansion, LLC, and (3) DTE Electric Company*