| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY |
|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>Franklin Barbosa, Jr., Esq.<br>**SCHENCK, PRICE, SMITH & KING, LLP**<br>220 Park Avenue<br>P.O. Box 991<br>Florham Park, New Jersey 07932-0991<br>(973) 539-1000<br>fb@spsk.com<br><br>*Counsel for CS Energy, LLC* |

| | |
|---|---|
| In re:<br><br>POWIN, LLC, *et al.*[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

**OBJECTION, JOINDER AND RESERVATION OF RIGHTS OF CS ENERGY, LLC REGARDING OMNIBUS MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING THE REJECTION OF LEGACY CUSTOMER CONTRACTS AND (II) GRANTING RELATED RELIEF**

CS Energy, LLC, by and through its undersigned attorneys, respectfully submits this objection (the "Objection") to the *Omnibus Motion of the Debtors For Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief* (the "Rejection Motion") [ECF No. 88]. In support of this Objection, CSE respectfully submits as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504]; (iii) PEOS Holdings, LLC [5476]; (iv) Powin China Holdings 1, LLC [1422]; (v) Powin China Holdings 2, LLC [9713]; (vi) Charger Holdings, LLC [5241]; (vii) Powin Energy Ontario Storage, LLC [8348]; (viii) Powin Energy Operating Holdings, LLC [2495]; and (ix) Powin Energy Operating, LLC [6487]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

1

**PRELIMINARY STATEMENT**

1. CSE is an Engineering, Procurement, and Construction (EPC) contractor that designs and builds battery energy storage projects for its various customers. In that capacity, CSE has worked closely with Powin, LLC ("Powin") on several projects to secure and/or incorporate Powin's battery storage components at the subject project sites.

2. Through the Rejection Motion, Debtors seek to reject nearly all of their contracts, including a purchase agreement between Powin and CSE for Powin's battery system, as well as additional contracts between Powin and a project owner relating to New York projects for which CSE serves as the EPC. The apparent rationale for the Rejection Motion appears to be that the listed contracts are "upside down," meaning the Debtors are incurring greater costs than revenues under those agreements.

3. CSE does not oppose the Debtors' efforts to maximize the value of their contracts in connection with a prospective sale of assets. However, the Rejection Motion is legally flawed and raises serious concerns regarding CSE's rights and interests in the projects affected by the proposed rejections.

4. First, Debtors seek to reject the contract between Powin and CSE and avoid their warranty and licensing obligations under the contract. CSE paid Powin in full for those rights and protections and intends to assign those rights to the project owner. Debtors are not losing money on their purchase agreement. Powin cannot be permitted to reject the contract absent any valid business purpose for that rejection. Rejection should not deprive CSE and/or its assignee of statutory and contractual rights to warranty protections and to continue using licensed intellectual property pursuant to the terms of the parties' contract.

5. Second, Debtors also seek to reject contracts with a project owner on three projects in which CSE serves as the EPC. Two of the three projects at issue suffered fires due to faulty designed and installation of battery systems provided by Debtors. The fires delayed the completion of the battery storage projects. As a result, the project owner has asserted certain damages, including delay damages, and has asserted those damages against CSE, even though the damages were caused by Debtors. It is CSE's understanding that Debtors made a claim under their insurance policies relating to the fire. Earlier today, Debtor's counsel provided CSE's counsel with some insurance documentation relating to the claim made by Debtor. CSE is in the process of reviewing the documentation and determining its completeness. The insurance policies and claims are relevant to Debtors' bankruptcy estate, in that it potentially affects Debtors' liabilities to the project owner, and it directly impacts CSE's potential exposure to the project owner on delay damage claims and other claims made by project owner related to the fires.

6. Prior to filing this Objection, CSE attempted to consensually resolve the substance of its Objection with Debtors. After receipt of the Rejection Motion and retention of counsel, CSE's counsel promptly contacted Debtors' counsel to initiate discussions as to CSE's concerns forming the basis of the Objection, with particular emphasis on the warranty and insurance concerns.

## FACTUAL BACKGROUND

**The Purchase Order and Licenses relating to the Countryside Project**

7. CSE and Powin Energy Corporation, which upon information and belief is now Powin, LLC ("Powin"), a debtor in these proceedings, are parties to a certain Purchase Order No. 2001700-1, dated September 29, 2020 (the "Purchase Order"), pursuant to which Powin agreed to supply CSE with 40 units of Powin Stack Energy Storage Systems and component/attendant

3

parts, a 53-foot enclosure and component/attendant parts, and a Powin EMS Controller (collectively, the "Powin System"), for the project site located at 3065 Buffalo Road, Allegany, NY 14706 (sometimes referred to as "Countryside Project") and install the Powin System at the Countryside Project site.

8. CSE is the Engineering, Procurement, and Construction (EPC) contractor of the Countryside Project pursuant to a certain EPC Contract with Allegany CSG, LLC (the "Owner Contract"). The Countryside Project involves the construction of an energy storage facility.

9. Pursuant to paragraph 31 of the Purchase Order and the June 19, 2019 Non-Disclosure Agreement executed by CSE and Powin, the Purchase Order and its terms are subject to confidentiality and non-disclosure terms. For that reason, the Purchase Order is not annexed hereto but will be made available on request pursuant to appropriate confidentiality protections. CSE cites to the relevant portions of the Purchase Order for the Court's edification.

10. Relevant to this matter are the installation warranties licenses extended by Powin to CSE. Pursuant to paragraph 30 of the Purchase Order, Powin extended licenses to CSE for the use/operation and installation/commissioning of the Powin System. Pursuant to Exhibit A to the Purchase Order, Debtors also extended warranties to CSE, including a ten-year performance guarantee (the "Performance Guarantee").

**The West Warwick Project**

11. The Rejection Motion seeks to avoid contracts dated February 12, 2022 between Debtors and Convergent Energy and Power LP ("Convergent"), the project owner, relating to projects known as West Warwick I, West Warwick II, and West Warwick III (the "Warwick Project").

4

12. Convergent retained CSE to serve as the EPC on the Warwick Project and to construct a battery storage facility pursuant to separate Engineering, Procurement and Construction Agreements dated April 22, 2022, with West Warwick Energy Storage 2 LLC and West Warwick Energy Storage 3 LLC.

13. The Warwick Project suffered fire damage on or around June 27, 2023.

14. The fire damage was caused when certain equipment supplied and installed by Powin (and purchased by Convergent) suddenly ignited due to heavy rainfall without any causation alleged or considered to be CSE's fault. Independent investigators determined that the fire was caused by a manufacturing defect in the Powin-branded Centipede models, which enabled water to enter the Powin units, resulting in an electrical fire.[2]

15. The fire delayed the completion of the Warwick Project.

16. Convergent has asserted delay damages relating to the delay caused by the fire and also seeks reimbursement for about $1 million in expert fees.

17. Convergent has asserted those damages against Debtors and CSE, even though CSE bears no fault or responsibility for the fire.

18. Upon information and belief, the damages caused by the fire total millions of dollars.

19. CSE sought to obtain information relating to any insurance claims made by Debtors to address the damages caused by the fire. Debtors' counsel has graciously provided CSE's counsel with an initial production of some insurance documentation. CSE is reviewing the documentation and expects to have follow-up document requests.

---

[2] See Gail Hoffer-Loibl, *Manufacturing defect blamed for battery fires at Convergent storage facilities*, Warwick Advertiser, Oct. 23, 2023, https://www.warwickadvertiser.com/news/local-news/manufacturing-defect-blamed-for-battery-fires-at-convergent-storage-facilities-NG2800384 (last accessed July 11, 2025).

20. The insurance claim is relevant to both CSE's potential exposure and the claim it may need to file against Debtors <u>and</u> Debtors' liabilities in connection with this case. Insurance coverage and proceeds are valuable assets of the Debtors' estates and could increase the total recovery for creditors.

21. After their retention, CSE's counsel promptly contacted Debtors' counsel to obtain information and documentation about any insurance claims made by Debtors in connection with the fire at the Warwick Project. Debtors' counsel advised that an insurance claim had been made and that he did not possess details regarding the conclusion of that claims process, but that counsel would investigate same and get back to CSE's counsel. Debtors' counsel cooperatively provided CSE's counsel with an initial document production that CSE is reviewing. CSE expects to have follow up requests.

**Powin's Bankruptcy Filing and Related Motion Practice**

22. On June 9, 2025, June 10, 2025, and June 22, 2025, Powin and affiliated debtors (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). The cases are jointly administered under Case No. 25-16137 before the Honorable Michael B. Kaplan, in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").

23. On June 17, 2025, the Debtors filed their Omnibus Motion of the Debtors for Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief [Docket No. 88] (the "Rejection Motion"). The hearing on the Rejection Motion is scheduled for July 15, 2025.

24. Pursuant to the terms of the Rejection Motion, the Debtors seek to reject the Purchase Order and the contracts relating to the Warwick Project. <u>Ibid.</u>

6

25. On June 21, 2025, several licensees of Powin's product filed the *Emergency Motion of Licensees for Entry of an Order (I) Compelling the Debtors to Comply with Section 365(n)(4) of the Bankruptcy Code, (II) Granting Adequate Protection Under Section 363(e) of the Bankruptcy Code, and (III) Granting Other Appropriate Relief* [Docket No. 117] (the "Licensee Motion").

### BASIS FOR RELIEF REQUESTED

#### A. Rejection of the Purchase Order and the Warwick Project Contracts is Inappropriate under the Circumstances.

26. Debtors fail to demonstrate that rejection of the Purchase Order and contract relating to the Warwick Project is in the best interests of Debtors' bankruptcy estate.

27. Pursuant to 11 U.S.C. § 365(d)(2), in a case under chapter 9, 11, 12, or 13 of this title, a debtor may assume or reject an executory contract at any time before the confirmation of a plan.

28. Rejection will not be disturbed if a debtor satisfies the "business judgment" test. The "business judgment" test requires a showing that rejection of the executory contract or unexpired lease will benefit the debtor's estate. In re Extraction Oil & Gas, 622 B.R. 608, 614–15 (Bankr. D. Del. 2020), motion to certify appeal granted sub nom. FERC v. Extraction Oil & Gas, Inc., No. 20-11548 (CSS), 2021 U.S. Dist. LEXIS 158537 (D. Del. Aug. 23, 2021); In re Trans World Airlines, 261 B.R. 103, 121 (Bankr. D. Del. 2003). ("A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'") (quoting Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 849-50 (Bankr. W.D. Pa. 1987)); In re Trans World Airlines, Inc., 2001 Bankr. LEXIS 722 (Bankr. D. Del. Mar. 16, 2001) (noting that the standard under section 365 requires consideration of the benefit of the rejection to the debtor's estate).

7

29. If a debtor meets its burden, the objecting party "bears the burden of proving that the debtor's decision derives from bad faith, whim or caprice." In re Central Jersey Airport Services, 282 B.R. 176, 183 (Bankr. D.N.J. 2002) (citing In re Sharon Steel, 872 F.2d 36 (3d Cir. 1989) and In re Audra-John Corp., 140 B.R. 752, 759 (Bankr. D. Minn. 1992)).

30. That said, Debtors may be subject to a higher burden of proof under circumstances such as these, where critical utility infrastructure is involved. See, e.g., Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.), 378 F.3d 511, 525 (5th Cir. 2004) (heightened standard of review applicable to rejection of wholesale electricity sale contract because it "would not account for the public interest inherent in the transmission and sale of electricity").

31. Because Powin's battery system handles large quantities of energy and can be vulnerable to catastrophic fire if not properly designed, manufactured, installed and maintained, thereby potentially impacting public health, safety and welfare, a heightened level of scrutiny should apply to the Rejection Motion.

32. Ultimately, whether the Court applies the heightened scrutiny or the standard business judgment rule, rejection is improper under the circumstances.

33. The Purchase Order is not a contract for which Debtors are losing money. CSE paid Powin in full for the system it supplied to the Countryside Project, including the Performance Guarantee that accompanies that system. This is not a situation where Debtors are mid-project or are not being paid for services they are rendering. A rejection is not based upon any good faith basis, but rather arbitrariness and/or a failure to properly investigate the status of the Purchase Order and Countryside Project. CSE simply asks that the Court deny the rejection of the Purchase Order and require Debtors (or their assignee) to uphold their Performance Guarantee to CSE,

8

should CSE even need to invoke that right. CSE should not be left "holding the bag" if a warranty claim needs to be made in connection with Debtors' power system at the Countryside Project site.

34. Furthermore, there is a question about whether the Purchase Order is even an executory contract that can be rejected. Vern Countryman defined an executory contract as "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Sharon Steel Corp. v. National Fuel Gas Dist. Corp. (In re Sharon Steel), 872 F.2d 36, 39 (3d Cir. 1989). "Under this definition, a court must first determine that there was a contract between the parties, and if so, whether that contract was so far unperformed, as of the petition date, that the failure to perform the remaining obligations would be a material breach of said contract." In re Bennett Enters., 628 B.R. 481, 487 (Bankr. D.N.J. 2021).

35. In relation to the Purchase Order, CSE has already paid Powin in full for its system and related warranties and services. The only remaining contractual obligations under the Purchase Order concern the Performance Guarantee and certain indemnification obligations owed by the parties to each other. The Bankruptcy Court for the District of Delaware determined that mutual indemnification obligations and a warranty did not render a contract executory for purposes of rejection under 11 U.S.C. 365(d). Cooper v. Lantern Entm't LLC (In re Weinstein Co. Holdings, LLC), No. 18-10601-MFW, 2020 U.S. Dist. LEXIS 48464, at *34-36 (D. Del. Mar. 20, 2020). The mere obligation to refrain from breaching an agreement does not render a contract executory. Thus, Powin may not be able to reject the Purchase Order.

36. For these reasons, the Court should deny the Rejection Motion.

B. **The Insurance Information Relating to the Warwick Project is Crucial to Administration of Debtors' Bankruptcy Estates**

37. As previously explained, the Warwick Project suffered a fire that resulted in property damage and delayed the completion of construction at the Warwick Project. An investigation conducted by independent agents determined the fire was caused by a manufacturing defect in the Powin-branded Centipede models, which enabled water to enter the Powin units, resulting in an electrical fire.

38. Convergent, the project owner, has asserted damages relating to that fire against CSE, even though CSE bears no responsibility for the fire. CSE requested from Debtors information and documentation relating to any insurance claims made by Debtors in relation to the fire at the Warwick Project. Debtors' counsel advised that Debtor made an insurance claim, and has provided some insurance documentation, which CSE is evaluating.

39. The insurance information is important to the administration of the bankruptcy case.

40. First party insurance that directly compensates Debtors for their damages arising from the Warwick Project fire are unquestionably assets of the bankruptcy estate under section 541 of the Bankruptcy Code. See 11 U.S.C. § 541(a)(1) (defining property of the estate broadly to include "all legal or equitable interests of the debtor in property as of the commencement of the case . . . wherever located and by whomever held"), (a)(6) (property of the state includes "[p]roceeds ... of or from property of the estate. . . ."). Even contingent interests of the estate meet the broad definition of property of the estate. In re Howley, 446 B.R. 506, 510-11 (Bankr. D. Kan. 2011) ("An interest may be property of the estate even if it is novel or contingent. Every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of 11 U.S.C. § 541").

41. "It has long been the rule in this Circuit that insurance policies are considered part of the property of the bankruptcy estate." ACandS, Inc. v. Travelers Cas. and Sur. Co., 435 F.3d 252, 260 (3d Cir. 2006) (citation omitted). Proceeds under an insurance policy are property of the estate when the policy provides the debtor with direct coverage. See In re Allied Digital Techs., 306 B.R. 505, 511 (Bankr. D. Del. 2004) ("when a liability insurance policy provides direct coverage to a debtor the proceeds of the policy are property of the bankruptcy estate. Thus, the debtor is entitled to payment of the proceeds and those proceeds should be protected as property of the estate."). "In fact, every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of section 541." In re Conex Holdings, LLC, 518 B.R. 792, 802 (Bankr. D. Del. 2014) (citation omitted). "Examples of insurance policies whose proceeds are property of the estate include ... fire insurance policies in which the debtor is a beneficiary." Houston v. Edgeworth, M.D. (In re Edgeworth), 993 F.2d 51, 56 (5th Cir. 1993).

42. As such, to the extent Debtor made a claim under a first party insurance policy and the claim is still pending or proceeds have been paid, that information is relevant to the assessment of Debtors' assets.

43. Furthermore, available third-party liability insurance is also relevant to the administration of Debtors' estates as it can serve as a source to reduce claims of certain creditors and increase the potential recovery for other creditors. See e.g., UNR Industries, Inc. v. Continental Casualty Co., 942 F.2d 1101, 1103 (7th Cir. 1991) (finding asbestos liability insurance policies were property of the estate because debtor's interest in the policy "affects the amount of property available for distribution.") (internal citations omitted); see also A.H. Robins Co. v. Piccinin, 788 F.2d 994, 1001 (4th Cir. 1986) (finding that products liability policy issued

11

to debtor was property of the estate because insurance policies are "valuable property of a debtor, particularly if the debtor is confronted with substantial liability claims within the coverage of the policy.").

44. Upon information and belief, Convergent asserted claims for damages against the Debtors arising from the Warwick Project and CSE may possess claims against Debtors as well. To the extent insurance coverage or proceeds are available to offset these damages, other creditors could potentially benefit from increased recoveries in this case. However, such determinations cannot be made without full and transparent disclosure of the Debtors' insurance policies and claims. It remains unclear why, prior to the commencement of this case, CSE was not provided with access to documentation and information relating to Debtors' insurance claims or related activity.

45. Debtors should not be permitted to reject any contracts relating to the Warwick Project until they produce all non-privileged documents and communications relating to claims made under their insurance policies for damages arising from the Warwick Project fire and ensuing delays.

C. **CSE Reserves its Rights with Respect to the Licenses Granted Under the Purchase Order.**

46. CSE's rights with respect to licenses granted by Debtors in relation to Debtors' battery system must be preserved to ensure safe and reliable operation of the Countryside Project. Although CSE is not the direct beneficiary of any licenses in relation to the Warwick Project, the same reasoning applies to that project, namely that access to Debtors' proprietary software and other technology is crucial for safe operation of the Warwick Project.

47. As it concerns the treatment of licenses in bankruptcy cases, Section 365(n)(1) of the Bankruptcy Code states, in relevant part:

12

> If the [debtor] rejects an executory contract under which the debtor is a licensor of intellectual property, licensee under such contract may elect— (B) to retain its rights . . . under such contract . . . to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced, for—
>
> (i) the duration of such contract.
>
> [11 U.S.C. § 365(n)(1)(B)].

48.     Thus, even if Debtors successfully reject their contracts with licensees, those licensees may, nonetheless, be permitted to avail themselves of the relevant licenses and intellectual property. Ibid.; see also Apple, Inc. v. Spansion, Inc. (In re Spansion Inc.), No. 09-10690 (KJC), 2011 U.S. Dist. LEXIS 82829, at *24 (D. Del. July 28, 2011), aff'd sub nom. In re Spansion, Inc., 507 F. App'x 125 (3d Cir. 2012) (quoting In re Exide Techs., 607 F.3d 957, 966 (3d Cir. 2010), as amended (June 24, 2010) (Ambro, J., concurring)) ("[I]n the event that a bankrupt licensor rejects an intellectual property license, § 365(n) allows a licensee to retain its licensed rights—along with its duties absent any obligations owed by the debtor-licensor.").

49.     Where a licensee elects to retain its rights pursuant to a license agreement, the debtor must:

> (A) to the extent provided in such contract, or any agreement supplementary to such contract, provide to the licensee any intellectual property (including such embodiment) held by the trustee; and
>
> (B) not interfere with the rights of the licensee as provided in such contract, or any agreement supplementary to such contract, to such intellectual property (including such embodiment) including any right to obtain such intellectual property (or such embodiment) from another entity.
>
> [11 U.S.C. § 365(n)(3)].

50. As such, even if Debtor is successful in rejecting contracts, it cannot deprive a contract counterparty of its licensing rights. See In re Crumbs Bake Shop, Inc., 522 B.R. 766, 772 (Bankr. D.N.J. 2014) (". . . it would be inequitable to strip the . . . [l]icensees of their rights in the event of rejection, as those rights had been bargained away but the [d]ebtors.").

51. In sum, Debtors must be directed to provide continuous access to all its licensed intellectual property necessary to the operation of the Countryside and Warwick Projects, including by turning over passwords or other pins that would allow the interested parties to access the necessary intellectual property. Debtors must also be required to cooperate with Debtors' reasonable and necessary requests for information regarding the intellectual property and Debtors' files regarding the Countryside and Warwick Projects. Lastly, to the extent feasible and permissible, Debtors should transfer and assign any subcontractor or other warranties to CSE or the project owners of the Countryside and Warwick Projects.

52. CSE and/or the relevant project owners must be able to monitor, diagnose and maintain the power systems at the Countryside and Warwick Projects so as to ensure optimal operation and to avoid catastrophic fires. The health, safety and welfare of the general public is advanced by CSE's request for access to licensed intellectual property and project documentation.

## JOINDER

53. CSE hereby joins and incorporates the following objections to the Rejection Motion, to the extent not inconsistent with the relief requested herein:

a. *Objection of Licensees to Omnibus Motion of the Debtors for Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief*, [Dkt. No. 323];

    b. *ES Volta, LP's Limited Objection to and Reservation of Rights Regarding Omnibus Motion of the Debtors for Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief*, [Dkt. No. 300];

    c. *Limited Objection and Reservation of Rights of Ad Hoc Customer Group to Omnibus Motion of the Debtors for Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief*, [Dkt. No. 296]; and

    d. *EDF Power Solutions Inc.'s Limited Objection and Reservation of Rights Regarding Omnibus Motion of the Debtors for Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief*, [Dkt. No. 295].

## RESERVATION OF RIGHTS

54. CSE reserves its right to supplement this Objection and make such other and further objections as it deems necessary or appropriate.

55. CSE hereby joins any other objections filed by Debtors' licensees to the extent such objections are not inconsistent with the relief sought herein.

56. CSE reserves its rights to assert any claims against Debtors, whether sounding in tort, contract or otherwise, pursuant to the Purchase Order, the Countryside Project and the Warwick Project, and any other related contracts, agreements or documentation.

**WHEREFORE,** CSE respectfully requests that the Court deny the relief requested in the Rejection Motion as it concerns the Purchase Order, the Countryside Project and the Warwick Project, and (ii) granting such other and further relief as this Court deems just and proper.

Date:  July 11, 2025         **SCHENCK, PRICE, SMITH & KING, LLP**
       Florham Park, NJ

By:    */s/ Franklin Barbosa, Jr.*
       Franklin Barbosa, Jr.
       220 Park Avenue
       P.O. Box 991
       Florham Park, New Jersey 07932-0991
       Telephone: (973) 539-1000
       Facsimile: (973) 540-7300
       fb@spsk.com
       *Counsel for CS Energy, LLC*