**DENTONS US LLP**

Tania M. Moyron (admitted *pro hac vice*)
Van C. Durrer, II (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: tania.moyron@dentons.com
    van.durrer@dentons.com

John D. Beck (admitted *pro hac vice*)
Sarah M. Schrag (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
Email: john.beck@dentons.com
    sarah.schrag@dentons.com

*Proposed Counsel for Debtors and Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Email: frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Amanda C. Glaubach (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Email: altogut@teamtogut.com
    aglaubach@teamtogut.com
    eblander@teamtogut.com

*Proposed Counsel for Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>Powin, LLC, *et al.*,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504]; (iii) PEOS Holdings, LLC [5476]; (iv) Powin China Holdings 1, LLC [1422]; (v) Powin China Holdings 2, LLC [9713]; (vi) Charger Holdings, LLC [5241]; (vii) Powin Energy Ontario Storage, LLC [8348]; (viii) Powin Energy Operating Holdings, LLC [2495]; (ix) Powin Energy Operating, LLC [6487]; (x) Powin Energy Storage 2, Inc., [9926]; (xi) Powin Energy Ontario Storage II LP, [5787]; and (xii) Powin Canada B.C. Ltd. [2239]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

1

**DEBTORS' OMNIBUS (I) OBJECTION TO (A) EMERGENCY MOTION OF LICENSEES FOR ENTRY OF AN ORDER (1) COMPELLING THE DEBTORS TO COMPLY WITH SECTION 365(N)(4) OF THE BANKRUPTCY CODE, (2) GRANTING ADEQUATE PROTECTION UNDER SECTION 363(E) OF THE BANKRUPTCY CODE AND (B) RELATED JOINDERS AND (II) REPLY IN SUPPORT OF OMNIBUS MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (A) AUTHORIZING THE REJECTION OF LEGACY CUSTOMER CONTRACTS AND (B) GRANTING RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Powin, LLC and the affiliated debtors and debtors in possession (collectively, the "Debtors") under chapter 11 of title 11 of the United States Code §§ 101 et seq. (the "Bankruptcy Code"),[2] in the above-referenced chapter 11 cases (the "Chapter 11 Cases") file this omnibus objection to the *Emergency Motion of Licensees for Entry of an Order (I) Compelling the Debtors to Comply with Section 365(n)(4) of the Bankruptcy Code, (II) Granting Adequate Protection Under Section 363(e) of the Bankruptcy Code, and (III) Granting Other Appropriate Relief* [Docket No. 117] (the "Motion to Compel") and joinders to the Motion,[3] and reply in support of the *Omnibus Motion of the Debtors for Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief* [Docket No. 88] (the "Rejection Motion") (unless otherwise defined herein, all capitalized terms shall have the same meaning as in the Rejection Motion) and to the multiple responses (collectively, the "Responses")[4] to the Rejection Motion.

---

[2] All references to "§" and "section" are to sections of the Bankruptcy Code unless otherwise specified herein. All references to "Rules" are to the Federal Rules of Bankruptcy Procedure.

[3] Joinders to the Motion were filed by esVolta, LP [Docket No. 273], EDF power solutions, Inc. (f/k/a EDF Renewables, Inc.) [Docket No. 274], and Honeywell International Inc. [Docket No. 292]. As used herein, as applicable, the term "Licensees" includes these parties.

[4] Arevon Energy Inc. and Apex Clean Energy Holdings, LLC and certain of its affiliates filed separate reservations of rights. [Docket Nos. 281; 291]. Yuma Solar Energy LLC ("Yuma") and KCE NY 3, LLC, KCE TX 2, LLC, KCE TX 7, LLC, KCE TX 8, LLC, and Key Capture (together, the "KCE Companies") filed separate limited objections. [Docket Nos. 287; 293]. Mitsubishi Power Americas, Inc. and Prevalon Energy LLC (together, the "Mitsubishi Customers"), EDF Power Solutions Inc. ("EDF"), Lone Star Solar, LLC, 2 Idaho Power Company, West Warwick Energy Storage 1, LLC, West Warwick Energy Storage 2, LLC, and West Warwick Energy Storage 3, LLC3 (collectively, the "Ad Hoc Customer Group"), and esVolta, LP ("esVolta") each filed separate limited objections and reservations of rights. [Docket Nos. 288 (joined by Honeywell International Inc. at [Docket No. 292]); 295; 296; 300]. Leeward Renewable Energy, LLC, on behalf of Rabbitbrush Solar, LLC, Chaparral Springs, LLC, and Antelope Valley BESS, LLC, Longroad Development Company, LLC, on behalf of Serrano Solar, LLC, Sun Streams PVS, LLC, and Sun Streams Expansion, LLC, and DTE Electric Company (the "Leeward/Longroad Licensees") filed an

2

**PRELIMINARY STATEMENT**

1. As noted in certain of the pleadings related to the Rejection Motion and as articulated in the Customer Program Motion, the Debtors desire to reach agreement with the Licensees regarding the Customer Program, and such negotiations remain ongoing. In the event such negotiations are not successful, the Debtors' Rejection Motion should be granted, and the Motion to Compel (and certain licensees' related requests for relief) should be denied, for at least five reasons. First, no party in interest has challenged the Debtors' business judgment that the Contracts are burdensome. Second, it cannot be seriously disputed that the rejection of the Contracts severely curtails any ability of the Licensees to enforce them, including under Section 365(n). Third, it is likewise beyond dispute that the Debtors have unequivocally released the existing intellectual property escrows, which is all that section 365(n) requires under the circumstances. Fourth, notwithstanding Licensees' protestations to the contrary, "passwords" are not intellectual property, either under the Bankruptcy Code or applicable nonbankruptcy law. Fifth, the Debtors have not deviated from any monitoring protocols (safety or otherwise) since the Petition Date, such that any claims of safety concerns are simply a red herring. In short, the Debtors developed the Customer Program to provide a fair and equitable means for Licensees to compensate the Debtors for access they desire; there is no basis at law for the Licensees to compel the Debtors to provide those services (plus additional services) for free.[5] In addition, the Debtors qualify for *nunc pro tunc* rejection of the Contracts.

**BACKGROUND**

2. Although the Debtors terminated the employment of most employees before the Petition Date, as of the Petition Date, they maintained a core group of employees, including fifty-nine (59) devoted to operations and seven (7) with intellectual property expertise. *Declaration of Gerard Uzzi* [Docket No. 88] at ¶ 5. Therefore, some of the Licensees invocation of a pre-petition

---

objection. [Docket No. 323]. Collectively, the foregoing are referred to herein as "Respondents." The Respondents are included in the term Licensees.

[5] Certain Licensees raise other miscellaneous contentions, addressed in more detail below.

reduction in force to contend that the Debtors do not have employees to service the LTSA Program is inaccurate. *See* Motion to Compel at 15.

3. On June 10, 2025, the Debtors filed their Customer Program Motion seeking approval of the LTSA Program in which they proposed a "reduced scope of service" "at pricing that is designed to be cash flow positive." Customer Program Motion at ¶ 9. On June 13, 2025, the Court approved the Customer Program Motion. Docket No. 62. The Licensees did not object, nor did they seek different or alternative relief.

4. On June 16, 2025, the Debtors sent a notice to customers, including the Licensees, confirming that the Debtors would be "implement[ing] a new Customer program" as approved by the Court, were filing the Rejection Motion and therefore "suspending services" under the existing contracts. *See* **Exhibit A**. In this notice, the Debtors advised the Licensees that a "Summit" would be held on Tuesday, June 17 and Wednesday, June 18, 2025, in Dallas, Texas (both in person and virtual) to negotiate and finalize the Customer Program.

5. On June 17, 2025, the Debtors indeed filed their Rejection Motion and identified the Licensees' Contracts as too burdensome for the estates. Docket No. 88 at Schedule 1. In so doing, the Debtors confirmed that there were two paths, either a re-negotiation or a rejection.

6. On June 17 and 18, 2025, the Debtors, the Licensees, and approximately 100 representatives attended the Summit. On both days of the Summit, the Debtors reaffirmed to the Licensees that the Debtors could not fully perform under the LTSAs.

7. As admitted by the Licensees, many, if not all, of their Contracts contain an escrow provision wherein the Debtors deposited intellectual property into escrow (the "IP Escrows") for the Contracts. The parties bargained that the IP Escrows would be available to satisfy any obligation to provide the Licensees with intellectual property. On June 17 and 18, 2025, the without charge to the Licensees, the Debtors issued letters to PRAXIS Technology Escrow ("PRAXIS"), its vendor for the IP Escrows, instructing PRAXIS to release intellectual property to the Licensee Customers. Copies of such letters are attached to this Objection as **Exhibits B and C**, respectively. The Debtors continue, and will continue, to support the release of the IP Escrows.

4

Indeed multiple Licensees admit in their filings that "[a]s of the date of this [filing, July 7, 2025], Powin has authorized the IP Escrow Agent to release the escrowed Licensed IP to the … Licensees …"  Docket Nos. 273, 274 at ¶7; 295 at ¶12; 300 at ¶13.

8. On June 19, 2025, the Debtors' professionals sent an email to Longroad Energy Holdings, LLC confirming "[w]e are delivering letters to PRAXIS authorizing the release of IP escrows and waiver of any 30 day hold.  Some letters have already issued."[6]  *See* **Exhibit D.**

9. On June 26, 2025, the Court approved the Debtors' DIP Facility (as defined in Docket No. 169) on an interim basis.  Docket No. 169.

10. On July 1, 2025, the Debtors filed a motion seeking approval of the bidding procedures for the sale of substantially all of their assets.[7]  The Bidding Procedures Motion is set for hearing on July 15, 2025.  On July 7, 2025, the Debtors filed the Stalking Horse APA (as defined in the Bidding Procedures Motion) for the sale of their assets.  [Docket No. 271].  Under the Stalking Horse APA, the Debtors negotiated for a provision that title is "subject to the rights of licensees under section 365(n) of the Bankruptcy Code."  [Docket No. 271-1 at § 3.5].

11. During the Chapter 11 Cases, the Debtors have maintained their remote operations center (the "ROC") and have responded to Customer inquiries and questions, including from the Licensees.  There has been no postpetition disruption to ROC operations.

12. During the past week, the Licensees filed their papers, which all relate to the Contracts and the Rejection Motion.  Some Licensees have requested sprawling, affirmative, injunctive relief well beyond what is required by section 365(n):

   a. EDF and esVolta seek an affirmative injunction of, "confirm[ation that] the costs and fees associated with the Cloud-Based IP . . . have been paid and are up to date,"

---

[6] The attachments to this email reflect confidential settlement communications and are not included in the Exhibit.

[7] *Motion of the Debtors for Entry of an Order (I) Designating a Stalking Horse Bidder and Approving Stalking Horse Bidder Protections (II) Approving Bidding Procedures by Which Interested Parties May Bid and an Auction Sale Format in Connection with the Sale of Substantially All of the Debtors' Assets, (III) Approving Form of Asset Purchase Agreement, (IV) Approving Form of Notice to be Provided to Interested Parties, (V) Authorizing the Assumption and Assignment of Assumed Contracts and Notice Procedures Thereto, (VI) Scheduling a Court Hearing to Consider Approval of the Sale to the Highest and Best Bidder, and (VII) Authorizing the Sale of Debtors' Property Free and Clear of All Causes of Action and Claims* [Docket No. 228] (the "Bidding Procedures Motion").

5

       the Debtors "providing direct access" to subcontractors, for the Debtors to perform diligence for the licenses, and for the Debtors to affirmatively transfer and assign rights. [Docket No. 295 at ¶16; Docket No. 300. at ¶17]. Section 365(n) does not contemplate access to intellectual property of non-debtors (which the Cloud-Based IP represents); nor does it speak to access to subcontractors.

    b.  The Ad Hoc Customer Group seeks, in conjunction with an incorporated, concurrently-filed motion [Docket No. 297], entry of an order for an affirmative injunction requiring the Debtors, *after* rejection to, *inter alia* provide training to the Ad Hoc Customer Group, provide "access" to the Debtors' (extremely busy with the sale and Chapter 11 Cases) personnel on a "24/7" basis, and to provide any documentation that the "Customer may request." [Docket No. 297-1 at ¶ 5]. Again, section 365(n) does not contemplate access to human beings—only intellectual property of the Debtors.

    c.  The Leeward/Longroad Licensees request that the Debtors must continue to provide access to all "critical software" or ensure the "transition to independent project-level operation of those systems [used] by the Licensees pursuant to the Licenses." ]Docket No. 323 at ¶13]. Section 365(n) does not contemplate requiring a debtor to "transition" anything to an "independent" party.

13.    The Debtors have circulated, and will submit, a revised form of Order for their Rejection Motion, which provides:

> Nothing in this Order (i) limits intellectual property licensees' rights under section 365(n) of the Bankruptcy Code, including pursuant to, in connection with, or otherwise related to any Contracts rejected pursuant to this Order (and any such rights are hereby expressly preserved) or (ii) excuses the Debtors from performance of any obligations under executory contracts for which rejection has not yet been expressly approved by an order of this Court.

**Exhibit E** at ¶3.

    A.  <u>No Party has Questioned the Debtors' Business Judgment to Reject the Contracts and the Licensees are not Entitled to Adequate Protection for Rejected Contracts Beyond a Rejection Damages Claim.</u>

14.    The Debtors, in their business judgment, have designated the Licensees' Contracts for rejection. No Licensee has presented a evidence that the Contracts are not burdensome (and, in fact their demands for injunctive relief in line with the Contracts belies any such argument). The Rejection Motion should therefore be granted under section 365. *See e.g., In re Extraction Oil & Gas*, 622 B.R. 608, 615 (Bankr. D. Del. 2020) (citations omitted) ("Courts generally will not second-guess a debtor's business judgment concerning the rejection of an executory contract

or unexpired lease [and t]he "business judgment" test merely requires a showing that rejection will benefit the debtor's estate. A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'").

15. Under section 365, "[t]he correct form of adequate protection to be offered by the estate in every executory contract case will always be an offer to assume or reject the executory contract by a date certain." *In re El Paso Refinery, L.P.*, 220 B.R. 37, 45 (Bankr. W.D. Tex. 1998) (followed by *In re Alongi*, 272 B.R. 148, 152, n.1 (Bankr. D. Md. 2001). This is because "if the estate decides to reject the contract, then any outstanding defaults, including those generated post-petition, will be converted into a pre-petition unsecured claim, equal in priority of distribution with other unsecured creditors," which is "after all, what the Bankruptcy Code already provides with respect to the treatment of non-debtor parties to executory contracts with which the estate decides not further to proceed." *Id.*

16. The rejection of the Contracts moots the Motion to Compel. Other than "reserving rights" in a footnote,[8] the Motion to Compel is conspicuously silent with respect to the fact that, unless agreement is reached otherwise, the LTSAs and ESAs are dead-men-walking. This is because the Motion to Compel asks for *pre-rejection relief*, and with rejection, the Licensees will not be entitled to the protections under these sections for contracts the estates will not be using and will have rejected. The Motion to Compel is therefore moot.

B. The Debtors are Complying with Section 365(n) on Both a Pre and Post Rejection Basis.

17. Section 365(n)(4) provides licensees' limited protections (either before or after rejection). Here the Debtors have complied in both instances. *Pending* rejection, the Debtors are only required to (i) *either* (a) perform under the contract *or* (b) "provide" the intellectual property to the Licensees as set forth in the contract(s); *and* (ii) *not* interfere with the Licensee's rights, 11 U.S.C. § 365(n)(4), and, *after* rejection to "provide" intellectual property to the customer "to the

---

[8] Motion to Compel at ¶8, n. 7.

extent provided in such contract, or any agreement supplementary to such contract," *See* 11 U.S.C. § 365(n)(3)(A); (2)(B) and (3)(B).  As summarized by this Court, "when a debtor-licensor rejects a software license, § 365(n) would not require the licensor to provide continuing updates or maintenance to the licensee" and "[i]f the licensee chooses to retain its rights, the licensor is not bound by any continuing obligations under § 365(n)." *In re Crumbs Bake Shop, Inc.*, 522 B.R. 766, 771, n. 2 (Bankr. D.N.J. 2014).

        i.    *The Debtors have Provided the Licensees with the Intellectual Property.*

18.    The Licensees admit that the Debtors have released the IP Escrows.  Per the Motion to Compel, the Debtors' intellectual property "necessary for the operation" of the projects was deposited into escrow before the cases were filed.  Motion to Compel at ¶ 11.  The Licensees point to no provision in their contracts by which the Debtors must do more to "provide" this information.

19.    Some Licensees request access to passwords, keys, pins and other devices to access the Debtors' encrypted administrator-level information (collectively, "<u>Passwords</u>").  Many Licensees admit they have not been able to fully digest the information received in the IP Escrows, and reserve rights.  Docket Nos. 295 ¶ 12; 300 ¶ 13; 323 ¶ 13; 326 (testimony that "[t]he Longroad Licensees have received some of the requested intellectual property as a result of this escrow release, but they are still verifying whether those escrowed materials contain the licensed intellectual property that is needed to operate their Projects effectively, including all passwords and encryption keys.").  As the Order explicitly preserves Section 365(n) rights, there is no need to delay the relief of rejection while these Licensees review the release of the escrowed information.

        ii.    *Passwords are not Intellectual Property*

20.    First and foremost, it is well settled that Passwords are not "intellectual property" that the Debtors must provide. *See N. Star Media, LLC v. Winogradsky Sobel*, 2011 WL 13220157, at *11 (C.D. Cal. May 23, 2011) (a password is neither an embodiment nor a replication of

intellectual property). Courts have clarified that section 365(n) extends only to the licensed intellectual property and its "embodiments," which include tangible manifestations like software code, prototypes, or technical documentation and not to ancillary mechanisms like Passwords. *In re Tempnology LLC*, 541 B.R. 1, 7 (Bankr. D.N.H. 2015) (section 365(n) is "narrow" and its protections should not be extended beyond intellectual property itself).

        ii.    *The Licensees Neither Allege any Actions of the Debtors "Interfering" with the Licensees or Not "Allowing" the Licensees to obtain Intellectual Property.*

21.    The Debtors have provided the Licensees with intellectual property, and there is no allegation that the Debtors are not allowing or otherwise interfering with the Licensees' rights. Thus, the Debtors have complied with section 365(n) on both a pre and post rejection basis.

22.    For instance, when used in a statute, like in section 365(n)(4)(B), "the word … 'interfere' has such a clear, specific and well-known meaning …[which is] to interpose, intervene, [or] intermeddle. *See generally United States v. Gwyther*, 431 F.2d 1142, 1144 (9th Cir. 1970) (citing Webster's Third New International Dictionary). That is, the word "interfere" contemplates the taking of an affirmative action. Notably, the Licensees only allege what the Debtors are allegedly not doing (that is not allegedly fully performing under the contracts) and allege no interference with intellectual property rights.

23.    Likewise, the statutory word "allow" in section 365(n) is passive. *See Erickson v. Wis. Dep't of Corr.*, 2004 WL 2309045, at *5, 2004 U.S. Dist. LEXIS 20770, at *15 (W.D. Wis. Sept. 29, 2004) ("The word [allow] implies passivity, as when a person lets something occur without acting to make it occur.") (followed by *Hitachi Home Elecs. (Am.), Inc. v. United States*, 661 F.3d 1343, 1358 (Fed. Cir. 2011) ("[T]his court's precedent is replete with opinions consistently using the word 'allow' in accordance with its ordinary meaning of permitting by inaction.")). The verb "allow" thus furthers the balance of section 365's goals of allowing a debtor to shed affirmative obligations of a burdensome contract, but to allow a counterparty to elect to continue its own performance. Here, the Debtors have expressly "allowed" for the preservation of

section 365(n) right by their proposed paragraph three reservation of section 365(n) rights in the Rejection Motion Order.

        iii.    *The Licensees' Requests for Affirmative Injunctions Exceed the Bounds of the Bankruptcy Code and Are Improper Requests for Specific Performance Violating Section 365(n)(1)(B).*

24.    In seeking injunctive relief, the Licensees argue that the "equitable powers" of the Court enable sweeping relief to be entered [Docket Nos. 295 at ¶23; 300 at ¶24].[9] "When the Bankruptcy Code provides a specified means for a debtor to obtain a specific form of equitable relief, those standards and procedures must be observed." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004), as amended (Feb. 23, 2005). Here, section 365(n)(1)(B) specifically forbids a licensee, after rejection, to compel "specific performance of such contract" after its rejection election. 11 U.S.C. § 365(n)(1)(B).

25.    Yet here, the Licensees seek "24/7" care and numerous other specific performance remedies. The case of *Gateway Sys., Inc. v. Chesapeake Sys. Sols., Inc.*, cited by the Leeward/Longroad Licensees to argue they should be given information and services beyond the release of the IP Escrows, does not help the Licensees. 836 F. Supp. 2d 625 (N.D. Ill. 2011) (cited by [Docket No. 323 at ¶40]). *Gateway* is a civil case under Illinois law with licensee suing a licensor under a license of software. It is not a bankruptcy case, let alone a section 365(n) case. In fact, in *Gateway*, the court granted the licensee "specific performance" for the "continued" duty to supply license keys. *Id.* at 639-640 ("The record in this case supports a partial grant of this exceptional remedy [of specific performance]."). However, again, after rejection, under section 365(n)(1)(B), a licensee loses its "right under applicable nonbankruptcy law to specific performance of such contract." 11 U.S.C. § 365(1)(B). Again, *Crumbs*, from this Court, analyzing section 365(n), is the *applicable* precedent here and is *contra* to the Licensees' requests for specific performance. *In re Crumbs Bake Shop, Inc.*, 522 B.R. at 771, n. 4 (Bankr. D.N.J. 2014) (licensor

---

[9] For pre-rejection relief, the Leeward/Longwood Customers invoke section 363(e) which is inapplicable to a rejected contract, assuming *arguendo* it is applicable to any executory contract.

not bound to continue performing under contract after providing intellectual property upon rejection).

### C. The Licensees Identify No Public Safety Threat and There is None.

26. Contrary to the Licensees' allegations, the Debtors never contracted to provide primary safety services to any Licensee, only monitoring services. As a matter of fact, applicable non-bankruptcy law puts the safety burden on the Licensees' themselves. Any contention that safety concerns impact the decision to reject the Contracts is a red herring.

27. It is true that the Debtors operating systems create a convenient process for monitoring certain elements of the Licensees' projects, but the Debtors have already demonstrated they cannot economically provide these benefits in the Contracts (and these contentions are unchallenged).

28. Furthermore, the argument that the United States power grid will be affected so as to impact public safety is outrageous. The Licensees represent a small fraction (solar energy companies) of a small fraction of an industry (solar as to energy generally), and they point to no evidence of any effect on the grid itself other than potentially losing energy sources (which happens commonly, including on cloudy days, and may affect energy prices, but not safety). The case they cite, *In re Mirant Corp.*, presented a different situation wherein FERC intervened (again here, the dispute is solely between private actors) and the debtor was "one of the largest regulated public utilities in the United States." 378 F.3d 511, 515 (5th Cir. 2004). The Fifth Circuit found that "[t]he FPA and the filed rate doctrine protect the public interest by imposing severe limitations upon a public utility's ability to alter the terms of those [wholesale] contracts [for the interstate sale of electricity] after they are certified by FERC" and noted FERC should participate in the contested matter concerning rejection. *Id.* Here, however, the contracts are *service contracts for existing projects*. This situation is far from *Mirant* and the rejection of interstate purchase agreements for power.

29. The Debtors filed their Motion to Reject a month ago, and the licensees have had ample time to make decisions and take steps to mitigate. Though most Respondents complain about breaches by the Debtors and lack of service, they still made the decision to maintain their projects operating. The Debtors and their estates do not have any obligation to subsidize projects for-profit.

D. Any Sale-Related Objections are Premature.

30. Yuma "objects to any relief requested in the [Motion] to the extent that such relief may be inconsistent with the Debtors' proposed sale of 'substantially all of the Debtors' assets' . . . ." [Docket No. 287 at 4]. This objection is both incorrect and unripe. The Debtors are in control of the sale process and in discussion with bidders, but have not selected a winning bid. In fact, under the proposed Bidding Procedures, binding bids are due by July 28, 2025, and the deadline to object to the sale is August 1, 2025. [Docket No. 271-2 at 7; 14]. If bidders wish to assume or assign a contract before rejection is final, the Debtors will consider any such request and act accordingly. Currently, Yuma's Contracts are scheduled to be rejected, and Yuma's purported confusion as to whether their Contracts are to be rejected is not convincing given that the Order identifies their Contracts as to be rejected.

E. The Debtors have Satisfied the Standard for Nunc Pro Tunc Rejection.

31. Though the Leeward/Longroad Licensees argue elsewhere in their objection that the hearing for rejection should be postponed, *see supra*, they also seek to adjust the effective date of rejection until later by arguing that the Debtors waited too long to seek to reject. Docket No. 323 at ¶¶33-34 This strains logic. *Nunc pro tunc* relief is proper when it "promotes the purposes of Section 365(a) and is supported by "balancing the equities." *In re Extraction Oil & Gas*, 622 B.R. 608, 630 (Bankr. D. Del. 2020)

32. Here, *nunc pro tunc* relief is proper and equitable. As stated above, the Debtors filed their cases on July 9. In their first-day Customer Program Motion the Debtors indicated the Contracts were not sustainable. On the Monday following court approval of the Customer Program, the Debtors gave unequivocal notice that the Contracts were slated for rejection, that the

Debtors were suspending performance immediately, and that the Debtors were proposing alternative arrangements. Since that communication and, subsequent to the filing of the Rejection Motion, the Debtors have not wavered from that position.

33. <u>The Licensees' Inappropriately Seeks Injunctive Relief under Rule 7001(g)</u>

34. "An action to obtain equitable relief, including an injunction, generally requires an adversary proceeding [under Rule 7001(g)]." *In re Forever 21, Inc.,* 623 B.R. 53, 64 (Bankr. D. Del. 2020) (citations omitted). Here, the Licensees seek injunctive relief, including that the Court order the Debtors to take specific action of, when requested by the Licensees to provide information "promptly, but in any event within three calendar days, comply with such request." Order at ¶ 5, and to comply with Section 365(n)(4), not as set forth by Congress, but instead "as set forth in the Motion." Order at ¶ 4.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (i) grant the Rejection Motion (i) deny the Motion to Compel; and (iii) grant the Debtors such other and further relief is just and proper under the circumstances.

[*Signature Page Follows*]

Dated: July 11, 2025

**TOGUT, SEGAL & SEGAL LLP**

*/s/ Frank A. Oswald*
Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Email: frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Amanda C. Glaubach (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Email: altogut@teamtogut.com
aglaubach@teamtogut.com
eblander@teamtogut.com

- and -

**DENTONS US LLP**

Tania M. Moyron (*pro hac vice* pending)
Van C. Durrer, II (*pro hac vice* pending)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: tania.moyron@dentons.com
van.durrer@dentons.com

John D. Beck (*pro hac vice* pending)
Sarah M. Schrag (*pro hac vice* pending)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
Email: john.beck@dentons.com
sarah.schrag@dentons.com

*Proposed Counsel for Debtors and Debtors in Possession*

14