# EXHIBIT C

**(DIP Credit Agreement)**

---

DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

dated as of [●], 2025

among

Powin Project LLC;
Powin, LLC;
PEOS Holdings, LLC;
Powin China Holdings 1, LLC;
Powin China Holdings 2, LLC;
Charger Holdings, LLC;
Powin Energy Ontario Storage, LLC;
Powin Energy Operating Holdings, LLC; and
Powin Energy Operating, LLC,
each as a Borrower,

CERTAIN SUBSIDIARIES OF THE BORROWERS PARTY HERETO,
as Guarantors

THE LENDERS PARTY HERETO

and

FlexGen Power Systems, LLC,
as Administrative Agent and Collateral Agent

---

## TABLE OF CONTENTS

**Page**

SECTION 1    DEFINITIONS AND INTERPRETATION ................................................................. 1

    1.1     **Definitions.** ................................................................................................ 2
    1.2     **Accounting Terms.** .................................................................................. 26
    1.3     **Interpretation, Etc.** ................................................................................. 27
    1.4     **Timing of Performance.** .......................................................................... 27
    1.5     **Currency Generally.** ................................................................................ 27
    1.6     **Divisions.** ................................................................................................ 27
    1.7     **Negative Covenant Compliance.** ............................................................ 27

SECTION 2    LOANS ............................................................................................................. 28

    2.1     **Loans.** ....................................................................................................... 28
    2.2     **Pro Rata Shares.** .................................................................................... 28
    2.3     **Use of Proceeds.** ..................................................................................... 29
    2.4     **Evidence of Debt; Notes.** ........................................................................ 29
    2.5     **Interest on Loans.** ................................................................................... 29
    2.6     **[Reserved].** .............................................................................................. 30
    2.7     **Default Interest.** ...................................................................................... 30
    2.8     **Fees.** ........................................................................................................ 30
    (a)     **Commitment Fee.** ................................................................................... 30
    (b)     **DIP Exit Fee.** .......................................................................................... 30
    (c)     **DIP Facility Fees.** ................................................................................... 30
    2.9     **Maturity.** ................................................................................................. 30
    2.10     **Voluntary Prepayments.** ......................................................................... 31
    2.11     **Mandatory Prepayments.** ........................................................................ 31
    2.12     **Application of Prepayments.** ................................................................... 32
    2.13     **General Provisions Regarding Payments.** .............................................. 33
    2.14     **Ratable Sharing.** ..................................................................................... 34
    2.15     **[Reserved].** .............................................................................................. 34
    2.16     **[Reserved].** .............................................................................................. 34
    2.17     **Taxes; Withholding, Etc.** ........................................................................ 34
    2.18     **Obligation to Mitigate.** ........................................................................... 38
    2.19     **Replacement of Lenders.** ........................................................................ 38
    2.20     **Defaulting Lenders.** ................................................................................ 38

SECTION 3    CONDITIONS PRECEDENT ........................................................................... 40

    3.1     **Closing Date.** ........................................................................................... 40
    3.2     **Conditions to Each Extension of Credit.** ............................................... 41

SECTION 4    REPRESENTATIONS AND WARRANTIES ...................................................... 42

    4.1     **Organization; Required Power and Authority; Qualification.** ............... 42
    4.2     **Equity Interests and Ownership.** ............................................................ 42
    4.3     **Due Authorization.** ................................................................................. 43
    4.4     **No Conflict.** ............................................................................................. 43
    4.5     **Governmental Consents.** ......................................................................... 43
    4.6     **Binding Obligation.** ................................................................................ 43
    4.7     **Historical Financial Statements.** ............................................................ 43
    4.8     **No Material Adverse Change.** ................................................................. 44

| 4.9 | Adverse Proceedings. | 44 |
| 4.10 | Payment of Taxes. | 44 |
| 4.11 | Title. | 44 |
| 4.12 | Real Estate Assets. | 44 |
| 4.13 | Environmental Matters. | 44 |
| 4.14 | Investment Company Regulation. | 45 |
| 4.15 | Margin Stock. | 45 |
| 4.16 | Employee Matters. | 45 |
| 4.17 | Employee Benefit Plans. | 45 |
| 4.18 | Use of Proceeds. | 46 |
| 4.19 | Compliance with Laws. | 46 |
| 4.20 | Collateral. | 46 |
| 4.21 | DIP Order. | 46 |
| 4.22 | Intellectual Property. | 47 |

| SECTION 5 | AFFIRMATIVE COVENANTS | 47 |
| 5.1 | Financial Statements and Other Reports and Notices. | 47 |
| 5.2 | Existence. | 50 |
| 5.3 | Payment of Taxes and Claims. | 50 |
| 5.4 | Maintenance of Properties. | 50 |
| 5.5 | Insurance. | 50 |
| 5.6 | Books and Records. | 50 |
| 5.7 | Inspections. | 50 |
| 5.8 | Lenders Meetings. | 51 |
| 5.9 | Compliance with Laws. | 51 |
| 5.10 | Environmental. | 51 |
| 5.11 | Subsidiaries. | 51 |
| 5.12 | Compliance with Milestones. | 52 |
| 5.13 | Use of Proceeds. | 52 |
| 5.14 | Further Assurances. | 53 |
| 5.15 | Post-Closing Obligations. | 53 |
| 5.16 | Bankruptcy Matters. | 53 |
| 5.17 | Operating Covenant. | 54 |

| SECTION 6 | NEGATIVE COVENANTS | 54 |
| 6.1 | Indebtedness. | 55 |
| 6.2 | Liens. | 56 |
| 6.3 | Payments and Prepayments of Junior Financing or Convertible Bond Indebtedness; Payments and Prepayments of Certain Indebtedness | 59 |
| 6.4 | Restricted Payments. | 60 |
| 6.5 | Burdensome Agreements. | 61 |
| 6.6 | Investments. | 63 |
| 6.7 | Fundamental Changes. | 64 |
| 6.8 | Asset Sales. | 64 |
| 6.9 | Sales and Lease-Backs. | 65 |
| 6.10 | Transactions with Affiliates. | 65 |
| 6.11 | Fiscal Year. | 66 |
| 6.12 | Lines of Business. | 66 |
| 6.13 | Budget Variance Covenant. | 67 |
| 6.14 | Prohibited Conduct. | 67 |

SECTION 7        GUARANTY ................................................................................................ 68

    7.1        **Guaranty of the Obligations. .** ....................................................................... 69
    7.2        **Contribution by Guarantors.** ....................................................................... 69
    7.3        **Payment by Guarantors.** .............................................................................. 69
    7.4        **Liability of Guarantors Absolute.** .............................................................. 70
    7.5        **Waivers by Guarantors.** .............................................................................. 71
    7.6        **Guarantors' Rights of Subrogation, Contribution, Etc.** ........................... 72
    7.7        **Subordination of Other Obligations.** ......................................................... 72
    7.8        **Continuing Guaranty.** ................................................................................. 73
    7.9        **Authority of Guarantors or the Borrower.** ............................................... 73
    7.10      **Financial Condition of the Borrower.** ........................................................ 73
    7.11      **Bankruptcy, Etc.** ......................................................................................... 73
    7.12      **Discharge of Guaranty Upon Sale of Guarantor. .** ................................... 74
    7.13      **Maximum Liability.** I ................................................................................. 74

SECTION 8        EVENTS OF DEFAULT .......................................................................... 74

    8.1        **Events of Default.** ........................................................................................ 74
    8.2        **Remedies Upon Event of Default.** ............................................................... 80
    8.3        **Application of Payments and Proceeds.** ..................................................... 81

SECTION 9        AGENTS ................................................................................................... 81

    9.1        **Appointment and Authority.** ...................................................................... 81
    9.2        **Rights as a Lender.** ...................................................................................... 82
    9.3        **Exculpatory Provisions** ................................................................................ 82
    9.4        **Reliance by Agents.** ..................................................................................... 84
    9.5        **Delegation of Duties.** ................................................................................... 84
    9.6        **Resignation of the Administrative Agent** .................................................. 84
    9.7        **Non-Reliance on Agents and Other Lenders.** ............................................ 85
    9.8        **Administrative Agent May File Proofs of Claim.** ...................................... 86
    9.9        **Collateral Documents and Guaranty.** ........................................................ 86
    9.10      **Withholding Taxes.** ...................................................................................... 87
    9.11      **Agent Discretion.** ........................................................................................ 88
    9.12      **Indemnification by Lenders.** ....................................................................... 88
    9.13      **Survival.** ....................................................................................................... 89

SECTION 10      MISCELLANEOUS .................................................................................. 89

    10.1      **Notices.** ......................................................................................................... 89
    10.2      **Expenses.** ...................................................................................................... 91
    10.3      **Indemnity; Certain Waivers.** ...................................................................... 92
    10.4      **Set-Off.** ......................................................................................................... 94
    10.5      **Amendments and Waivers.** .......................................................................... 94
    10.6      **Successors and Assigns; Participations.** ..................................................... 96
    10.7      **Independence of Covenants.** ........................................................................ 99
    10.8      **Survival of Representations, Warranties and Agreements.** ..................... 99
    10.9      **No Waiver; Remedies Cumulative.** .......................................................... 100
    10.10    **Marshalling; Payments Set Aside.** ........................................................... 100
    10.11    **Severability.**      100
    10.12    **Obligations Several; Independent Nature of the Lenders' Rights. .** ....... 100
    10.13    **Headings. ….** ............................................................................................. 100
    10.14    **Governing Law.** ......................................................................................... 100

10.15   **Consent to Jurisdiction.** .............................................................................. 101
10.16   **WAIVER OF JURY TRIAL.** ................................................................... 101
10.17   **Confidentiality.** .......................................................................................... 101
10.18   **Usury Savings Clause.** . ............................................................................. 103
10.19   **No Strict Construction** ............................................................................... 103
10.20   **Counterparts; Effectiveness.** ..................................................................... 103
10.21   **Integration.** . ................................................................................................ 103
10.22   **No Fiduciary Duty.** . ................................................................................... 104
10.23   **PATRIOT Act.** ........................................................................................... 104
10.24   **Judgment Currency.** ................................................................................... 104
10.25   **Acknowledgement and Consent to Bail-In of Affected Financial Institutions.** ...... 104
10.26   **Certain ERISA Matters** ............................................................................. 105

## APPENDICES:

Appendix A          –    Commitments and Percentages
Appendix B          –    Notice Addresses

## SCHEDULES:

Schedule 4.1          –    Organization
Schedule 4.2          –    Equity Interests and Ownership
Schedule 4.10         –    Taxes
Schedule 4.12         –    Real Estate Assets
Schedule 5.15         –    Post-Closing Obligations
Schedule 6.1(a)(ii)   –    Indebtedness
Schedule 6.2(a)(ii)   –    Liens
Schedule 6.5          –    Burdensome Agreements
Schedule 6.6(d)       –    Investments
Schedule 6.10(e)      –    Existing Transactions with Affiliates
Schedule 6.10(f)      –    Transactions with Affiliates

## EXHIBITS:

Exhibit A-1      –    Form of Funding Notice
Exhibit A-3      –    Form of Withdrawal Notice
Exhibit B        –    Form of Note
Exhibit C        –    Form of Compliance Certificate
Exhibit D-1      –    Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are Not
                      Partnerships For U.S. Federal Income Tax Purposes)
Exhibit D-2      –    Form of U.S. Tax Compliance Certificate (For Foreign Participants That Are Not
                      Partnerships For U.S. Federal Income Tax Purposes)
Exhibit D-3      –    Form of U.S. Tax Compliance Certificate (For Foreign Participants That Are
                      Partnerships For U.S. Federal Income Tax Purposes)
Exhibit D-4      –    Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are
                      Partnerships For U.S. Federal Income Tax Purposes)
Exhibit E        –    Form of Assignment and Assumption
Exhibit F        –    Form of Counterpart Agreement
Exhibit G        –    Form of Collateral Agreement
Exhibit H        –    Form of Interim DIP Order

## DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

This **DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT**, dated as of [●], 2025 (this "**Agreement**"), is entered into by and among (a) Powin Energy Intermediate, LLC ("**Parent Pledgor**"), a Delaware limited liability company, (b) (i) Powin Project LLC ("**Powin Project**"), a New Jersey limited liability company; (ii) Powin, LLC ("**Powin**"), a Delaware limited liability company; (iii) PEOS Holdings, LLC ("**PEOS**"), an Oregon limited liability company; (iv) Powin China Holdings 1, LLC ("**Powin China 1**"), an Oregon limited liability company; (v) Powin China Holdings 2, LLC ("**Powin China 2**"), an Oregon limited liability company; (vi) Charger Holdings, LLC ("**Charger**"), an Oregon limited liability company; (vii) Powin Energy Ontario Storage, LLC ("**Powin Ontario**"), an Oregon limited liability company; (viii) Powin Energy Operating Holdings, LLC ("**Powin Energy Holdings**"), a Delaware limited liability company; and (ix) Powin Energy Operating, LLC ("**Powin Energy**"), a Delaware limited liability company (Powin Energy Holdings, together with Powin Project, Powin, PEOS, Powin China 1, Powin China 2, Charger, Powin Onterio, Powin Energy Holdings, collectively, the "**Borrowers**" and each a "**Borrower**"), (c) certain Subsidiaries of the Borrowers party hereto, as Guarantors, (d) the Lenders party hereto, and (e) FlexGen Power Systems, LLC ("**FlexGen**"), as administrative agent (together with its permitted successors in such capacity, the "**Administrative Agent**"), and as collateral agent (together with its permitted successors in such capacity, the "**Collateral Agent**").

## RECITALS:

**WHEREAS**, capitalized terms used in these recitals shall have the respective meanings set forth for such terms in **Section 1.1** hereof;

**WHEREAS**, on June 10, 2025 (the "**Petition Date**"), each of the Borrowers and certain of the Borrower's Subsidiaries (collectively, the "**Debtors**") filed voluntary petitions with the Bankruptcy Court initiating their respective cases (except Powin Project who filed on June 9, 2025) that are pending under Chapter 11 of the Bankruptcy Code (the cases of each of the Borrower and each other Debtor, each a "**Chapter 11 Case**", and collectively the "**Chapter 11 Cases**") and have continued in the possession of their assets and the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Borrowers have requested that the Lenders provide a junior lien debtor-in-possession term loan facility denominated in Dollars in an aggregate principal amount not to exceed $27,500,000 (the "**DIP Facility**"), with all of the Borrower's obligations under the DIP Facility to be guaranteed by each Guarantor, and the Lenders have indicated their willingness to lend on the terms and subject to the conditions set forth herein;

**WHEREAS**, the priority of the DIP Facility with respect to the Collateral shall be as set forth in the Interim DIP Order and the Final DIP Order, in each case upon entry thereof by the Bankruptcy Court, and in the Collateral Documents;

**WHEREAS**, all of the claims and the Liens granted under the DIP Orders and the Credit Documents to the Administrative Agent and the Lenders in respect of the DIP Facility shall be subject to the Carve-Out;

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1    DEFINITIONS AND INTERPRETATION

1.1     **Definitions**. The following terms used herein, including in the preamble, recitals, appendices, schedules and exhibits hereto, shall have the following meanings:

"**Actual Disbursement Variance**" has the meaning assigned to such term in **Section 6.13**.

"**Administrative Agent**" has the meaning assigned to such term in the preamble hereto.

"**Adverse Proceeding**" means any action, suit, proceeding, hearing (in each case, whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of the Borrower or any of its Restricted Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign, whether pending or, to the knowledge of the Borrower or any of its Restricted Subsidiaries, threatened in writing against the Borrower or any of its Restricted Subsidiaries or any property of the Borrower or any of its Restricted Subsidiaries.

"**Affected Financial Institution**" shall mean (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" means, with respect to a specified Person, another Person that directly or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Notwithstanding the foregoing, neither any Agent nor any Lender shall be deemed an "Affiliate" of any Credit Party or of any Subsidiary of any Credit Party solely by reason of the provisions of the Credit Documents.

"**Agent**" means each of the Administrative Agent, the Collateral Agent and any sub-agent or supplemental agent appointed by the Administrative Agent or the Collateral Agent from time to time.

"**Agent Parties**" has the meaning assigned to such term in **Section 10.1(d)(ii)**.

"**Aggregate Payments**" has the meaning assigned to such term in **Section 7.2**.

"**Agreement**" has the meaning assigned to such term in the preamble hereto.

"**Alternative Stalking Horse**" has the meaning assigned to such term in **Section 5.18**.

"**AML Laws**" means all Laws of any jurisdiction applicable to any Lender, the Borrower or any of its Restricted Subsidiaries from time to time concerning or relating to anti-money laundering.

"**Anti-Corruption Laws**" means all Laws of any jurisdiction applicable to the Borrower or any of its Restricted Subsidiaries from time to time concerning or relating to bribery or corruption.

"**Anti-Terrorism Laws**" means any of the Laws relating to terrorism or money laundering, including Executive Order No. 13224, the PATRIOT Act, the Bank Secrecy Act, the Money Laundering Control Act of 1986 (i.e., 18 USC. §§ 1956 and 1957), the Laws administered by OFAC, and all Laws comprising or implementing these Laws.

"**Applicable Margin**" means 4.00% *per annum*.

"**Approved Budget**" has the meaning assigned to such term in **Section 5.1(j)**.

"**Approved Chapter 11 Plan**" means a plan of reorganization pursuant to Chapter 11 of the Bankruptcy Code (a "**Plan of Reorganization**") that:

(a)      (i) provides for the termination of any unused Commitments and the payment in full in cash and full discharge of the Obligations on the effective date thereof, or (ii) the Required Lenders have informed the Borrower in writing is an "Approved Chapter 11 Plan",

(b)      contains releases and other exculpatory provisions for the Agents and the Lenders in form and substance satisfactory to the Administrative Agent and the Required Lenders, and

(c)      is otherwise in form and substance satisfactory to the Agents and the Required Lenders.

"**Approved Fund**" means any Fund that is administered or managed by (i) a Lender, (ii) an Affiliate of a Lender or (iii) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale**" has the meaning assigned to such term in **Section 6.8**.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by **Section 10.6(b)(iii)**), and reasonably accepted by the Administrative Agent, in substantially the form of Exhibit E or any other form reasonably approved by the Administrative Agent; **provided** that the assigning Lender shall not be required to execute the assignment and assumption to the extent such Lender is replaced in accordance with **Section 2.19**.

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president or one of its vice presidents, chief compliance officer, a director, general counsel, company secretary,  or chief financial officer; provided, no individual shall be deemed to be an "Authorized Officer" of any Person unless and until an officer of such Person shall have delivered to the Administrative Agent an incumbency certificate as to the office of such individual with respect to such Person.

"**Avoidance Action**" means any and all actions of the Borrowers arising under Sections 502(d), 542, 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of New Jersey.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan."

"**Board of Directors**" means, with respect to any Person, (i) in the case of any corporation, the board of directors of such Person, (ii) in the case of any limited liability company, the board of managers or managing member of such Person, (iii) in the case of any partnership, the general partners of such partnership (or the board of directors of the general partner of such Person, if any) and (iv) in any other case, the functional equivalent of the foregoing.

"**Board of Governors**" means the Board of Governors of the United States Federal Reserve System.

"**Borrower**" has the meaning assigned to such term in the introductory paragraph.

"**Borrowing**" means any Loans of the same type and class made.

"**Budget**" means, in form acceptable to the Required Lenders in their sole discretion, a rolling cash flow budget depicting on a weekly basis, cash balances, cash inflows and cash outflows, payroll and other information for the period through August 15, 2025.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by Law or other governmental action to close.

"**Carve-Out**" has the meaning assigned to such term in the DIP Order.

"**Carve-Out Notice**" has the meaning assigned to such term in the DIP Order.

"**Cash Collateralize**" means in respect of an obligation, provide and pledge cash collateral in Dollars, pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent. "Cash Collateral" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"**Cash Equivalents**" means, as at any date of determination, any of the following: (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A 1 from S&P or at least P 1 from Moody's; (iii) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A 1 from S&P or at least P 1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within three months after such date and issued or accepted by any Lender or by any commercial bank organized under the Laws of the United States of

America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000; (v) shares of any money market mutual fund that (a) has substantially all of its assets invested continuously in the types of investments referred to in clauses (i) and (iv) above, (b) has net assets of not less than $5,000,000,000, and (c) has the highest rating obtainable from either S&P or Moody's and (vi) other cash management arrangements made in accordance with policy therefor approved by the Board of Directors of the Borrower. In the case of Investments by any Foreign Subsidiary or Investments made in a country outside the United States, Cash Equivalents shall also include (x) Investments of the type and maturity described in clauses (i) through (v) above of foreign obligors, which Investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (y) other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments.

"**Casualty Event**" means any event that gives rise to the receipt by Borrower or any Restricted Subsidiary of any casualty insurance proceeds (other than proceeds of business interruption insurance) or condemnation awards or that gives rise to a taking by a Governmental Authority in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace, restore or repair, or compensate for the loss of, such equipment, fixed assets or real property.

"**Change in Law**" means (a) the adoption of any rule, regulation, treaty or other law after the Closing Date, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation or application thereof by any Governmental Authority after the Closing Date or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date; **provided** that, notwithstanding anything herein to the contrary, (i) any requests, rules, guidelines or directives under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 or issued in connection therewith and (ii) any requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, in each case shall be deemed to be a "Change in Law," to the extent enacted, adopted, promulgated or issued after the Closing Date, but only to the extent such rules, regulations, or published interpretations or directives are applied to the Borrower and its Restricted Subsidiaries by the Administrative Agent or any Lender in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities.

"**Change of Control**" means any of the following:

      (i)      any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such Person or its Subsidiaries and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of thirty-five percent (35%) or more of the equity securities of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right);

      (ii)      the Borrower shall cease to be a direct or indirect, wholly-owned Subsidiary of the Parent Pledgor; or

(iii)    a "change of control" or similar provision as set forth in any indenture or other instrument evidencing any Material Indebtedness of the Parent Pledgor, the Borrower or any Restricted Subsidiary has occurred obligating the Borrower or any Restricted Subsidiary to repurchase, redeem or repay all or any part of the Indebtedness provided for therein (excluding, for the avoidance of doubt, any conversion obligations related thereto).

For purposes of this definition, (i) "beneficial ownership" shall be as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act, (ii) the phrase Person or "group" is within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person or "group" and its subsidiaries and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, and (iii) a Person acquiring voting interests in the Equity Interests shall not be deemed to have beneficial ownership of such voting interests subject to a stock purchase agreement, merger agreement or similar agreement, so long as such agreement contains a condition to the closing of the transactions contemplated thereunder that the Obligations (other than Remaining Obligations) shall be paid in full and the Commitments hereunder terminated prior to (or contemporaneously with) the consummation of such transactions.

"**Chapter 11 Case**" and "**Chapter 11 Cases**" have the meanings given to such terms in the recitals hereto.

"**Closing Date**" means the first date on which the conditions set forth in **Section 3.1** have been satisfied.

"**Code**" means the Internal Revenue Code of 1986, as amended, together with the regulations promulgated thereunder from time to time.

"**Collateral**" has the meaning assigned to "DIP Collateral" in the DIP Order.

"**Collateral Agent**" has the meaning assigned to such term in the preamble hereto.

"**Collateral Agreement**" means the Collateral Agreement substantially in the form of Exhibit G.

"**Collateral Documents**" means the DIP Order, the Collateral Agreement, the Intellectual Property Security Agreements, if any, and all other instruments, documents and agreements delivered by or on behalf or at the request of any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to, or perfect in favor of, the Collateral Agent, for the benefit of the Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

"**Commitment**" means the Draw No. 1 Commitment, the Draw No. 2 Commitment, the Draw No. 3 Commitment and the Draw No. the Commitment of a Lender, as applicable, and "Commitments" means such commitments of all of the Lenders in the aggregate. The aggregate amount of the Commitments extended by the Lenders for this DIP Facility is $27,500,000 (inclusive of the Draw No. 1 Commitment of $10,000,000 which was funded prior to the Closing Date).

"**Commitment Fees**" has the meaning assigned to such term in **Section 2.8(a)**.

"**Communications**" has the meaning assigned to such term in **Section 10.1(d)(ii)**.

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of **Exhibit C**.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument (other than a Credit Document) to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Contributing Guarantors**" has the meaning assigned to such term in **Section 7.2**.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. Any Person holding more than ten percent (10 %) of the voting Equity Interests in another Person shall be deemed to be in Control of such Person. "Controlling" and "Controlled" have meanings correlative thereto.

"**Controlled Foreign Corporation**" means a "controlled foreign corporation" (within the meaning of Section 957 of the Code).

"**Convertible Bond Indebtedness**" means unsecured Indebtedness having a feature which entitles the holder thereof to convert or exchange all or a portion of such Indebtedness into or by reference to Equity Interests of the Borrower (or other securities or property following a merger event or other change of the Equity Interests of the Borrower).

"**Counterpart Agreement**" means a joinder to this Agreement substantially in the form of **Exhibit F**.

"**Credit Document**" means any of this Agreement, the Notes, if any, each notice, each Counterpart Agreement, if any, the Collateral Documents, and each other document jointly identified by the Borrower and the Administrative Agent from time to time.

"**Credit Extension**" means the making of a Loan.

"**Credit Party**" means each Borrower, the Parent Pledgor and each other Guarantor.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"**Debtors**" has the meaning assigned to such term in the recitals hereto.

"**Declined Proceeds**" has the meaning assigned to such term in **Section 2.11(c)**.

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Defaulting Lender**" means any Lender that has (a) failed to fund any portion of its Loans within one Business Day of the date on which such funding is required hereunder, (b) notified the Borrower, the Administrative Agent or any Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement or provided any written notification to any Person to the effect that it does not intend to comply with its funding obligations under this Agreement or generally under other agreements in which it commits to extend credit, (c) failed, within three Business Days after request by the Administrative Agent (whether acting on its own behalf or at the reasonable

written request of the Borrower (it being understood that the Administrative Agent shall comply with any such reasonable request)) to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans, (d) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, unless the subject of a good faith dispute or subsequently cured, or (e)(i) become or is insolvent or has a parent company that has become or is insolvent, (ii) become the subject of a bankruptcy or insolvency proceeding or any action or proceeding of the type described in **Section 8.1(f)** or **(g)**, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or (iii) become the subject of a Bail-In Action or has a parent company that has become the subject of a Bail-In Action; **provided** that a Lender shall not be deemed to be a Defaulting Lender solely by virtue of the ownership or acquisition of any capital stock in such Lender or its direct or indirect parent by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. The Administrative Agent shall not be deemed to have knowledge or notice of designation of any Lender as a "Defaulting Lender" hereunder unless the Administrative Agent has received written notice as set forth above from such Lender, the Required Lenders or from the Borrower referring to this Agreement and notifying the Administrative Agent of the identity and designation of such Lender as a "Defaulting Lender" which the Administrative Agent may conclusively rely upon without incurring liability therefor, and absent receipt of such notice from such Lender, the Required Lenders or the Borrower, the Administrative Agent may conclusively assume that no Lender under this Agreement has been designated as a "Defaulting Lender".

"**DIP Exit Fees**" has the meaning assigned to such term in **Section 2.8(b)**.

"**DIP Facility**" has the meaning assigned to such term in the recitals hereto.

"**DIP Facility Fees**" has the meaning assigned to such term in **Section 2.8(b)**.

"**DIP Milestone**" has the meaning assigned to such term in **Section 5.12**.

"**DIP Order**" means

(a)    the Interim DIP Order at all times from and after the entry of the Interim DIP Order and until (but excluding) the entry of the Final DIP Order; and

(b)    the Final DIP Order at all times from and after the entry of the Final DIP Order.

"**DIP Term Sheet**" means the Term Sheet for the Secured Superpriority Debtor in Possession Financing executed in connection with the DIP Facility.

"**Disclosure Statement**" shall mean the disclosure statement (in form and substance acceptable to the Required Lenders and the Credit Parties) for an Approved Chapter 11 Plan.

"**Disqualified Equity Interest**" means any Equity Interest which is not Qualified Equity Interests.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Domestic Subsidiary**" means a Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia.

"**Draw No. 1**" has the meaning assigned to such term in **Section 2.01(a)(i)**.

"**Draw No. 1 Commitment**" means the commitment of FlexGen Power Systems, LLC, in its capacity as a Lender to make or otherwise fund Draw No. 1 on or prior to the Closing Date. The aggregate amount of the Draw No. 1 Commitment was $10,000,000 which was funded prior to the Closing Date.

"**Draw No. 2**" has the meaning assigned to such term in **Section 2.01(a)(ii)**.

"**Draw No. 2 Commitment**" means the commitment of FlexGen Power Systems, LLC, in its capacity as a Lender to make or otherwise fund Draw No. 2 upon the satisfaction of all applicable conditions set forth in Section 3.2 The aggregate amount of the Draw No. 2 Commitment is $5,000,000.

"**Draw No. 2 Funding Date**" has the meaning assigned to such term in **Section 2.01(a)(ii)**.

"**Draw No. 3**" has the meaning assigned to such term in **Section 2.01(a)(iii)**.

"**Draw No. 3 Commitment**" means the commitment of FlexGen Power Systems, LLC, in its capacity as a Lender to make or otherwise fund Draw No. 3 upon the satisfaction of all applicable conditions set forth in Section 3.2. The aggregate amount of the Draw No. 3 Commitment is $7,500,000.

"**Draw No. 3 Funding Date**" has the meaning assigned to such term in **Section 2.01(a)(iii)**.

"**Draw No. 4**" has the meaning assigned to such term in **Section 2.01(a)(iv)**.

"**Draw No. 4 Commitment**" means the commitment of FlexGen Power Systems, LLC, in its capacity as a Lender to make or otherwise fund Draw No. 4. The aggregate amount of the  Draw No. 4 Commitment is $5,000,000; *provided, however*, that the Draw No. 4 Commitment shall be reduced by (i) $4,000,000 to the extent the stalking horse bidder in connection with a Sale of the Borrowers' assets agrees to assume the employment agreements of substantially all of Borrowers' employees as part of the Sale, and (ii) $1,000,000 to the extent the stalking horse bidder in connection with a Sale of the Borrowers' assets agrees to purchase substantially all of the Borrowers' inventory as part of the Sale (excluding any inventory transferred or to be transferred to Ulinda Park ProjectCo Pty Ltd. and Munmorah Battery ProjectCo Pty Ltd. in connection with that certain Settlement and Release Agreement dated June 25, 2025.

"**Draw No. 4 Funding Date**" has the meaning assigned to such term in **Section 2.01(a)(iv)**.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in **clause (a)** of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in **clauses (a)** or **(b)** of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under **Section 10.6(b)(iii)**, **10.6(b)(iv)** and **10.6(b)(v)** (subject to such consents, if any, as may be required under **Section 10.6(b)(i)**).

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA (regardless of whether such plan is subject to ERISA, but other than any Multiemployer Plan or Foreign Pension Plan) which is sponsored, maintained or contributed to by, or required to be contributed by, the Borrower or any of its Restricted Subsidiaries or, solely with respect to such a plan subject to Title IV of ERISA, any of their respective ERISA Affiliates, or with respect to which the Borrower or any of its Restricted Subsidiaries has any material liability.

"**Environmental Claim**" means any notice of violation, claim, action, suit, proceeding, demand, abatement order or other written notice or order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health or safety (with respect to exposure to Hazardous Materials), natural resources or the environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal or state (or any subdivision of either of them) Laws, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (i) pollution or the protection of the environment, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health (with respect to exposure to Hazardous Materials), industrial hygiene, land use or the protection of human, plant or animal health or welfare (in each case with respect to exposure to Hazardous Materials), in any manner applicable to the Borrower or any of its Restricted Subsidiaries or any real property thereof.

"**Equity Interests**" means all shares of capital stock, partnership interests (whether general or limited), limited liability company membership interests, beneficial interests in a trust and any other interest or participation that confers on a Person the right to receive a share of profits or losses, or distributions of assets, of an issuing Person, including any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing, but excluding any debt Securities convertible into or exchangeable for such Equity Interests (including, for the avoidance of doubt, any Convertible Bond Indebtedness).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, and any successor thereto.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code of which that Person

10

is a member; and (iii) solely for purposes of Section 412 of the Code, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Code of which that Person is a member.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043(c) of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30 day notice to the PBGC has been waived by regulation); (ii) with respect to any Pension Plan, the failure to meet the minimum funding standard of Section 412 of the Code (whether or not waived in accordance with Section 412(c) of the Code) or the failure to make by its due date a required installment under Section 430(j) of the Code or, with respect to any Multiemployer Plan, the failure to make any required contribution in accordance with Section 515 of ERISA except where such failure to make a required contribution does not result and would not reasonably be expected to result in a Material Adverse Effect or the application for a waiver of the minimum funding standard or an extension of any amortization period, within the meaning of Sections 412(c) or 431(d) of the Code with respect to any Pension Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by the Borrower or any of its Restricted Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to the Borrower or any of its Restricted Subsidiaries pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan or Multiemployer Plan, or the occurrence of any event or condition which would reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on any ERISA Party pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) with respect to a Multiemployer Plan, the withdrawal of any ERISA Party in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) if there is any potential liability to the ERISA Parties therefor, or the receipt by any ERISA Party of notice that such plan is in insolvency pursuant to Section 4245 of ERISA, or that such plan is to terminate or has terminated under Section 4041A of ERISA (to the extent such termination will or is likely to result in a liability to the ERISA Parties) or under 4042 of ERISA; (viii) the occurrence of an act or omission which would reasonably be expected to give rise to the imposition on the ERISA Parties of fines, penalties, taxes or related charges under Chapter 43 of Title 26 of the Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan to the extent that such fines, penalties, taxes or related charges result in or would reasonably be expected to result in a Material Adverse Effect; (ix) the assertion of a material claim (other than routine claims for benefits), suit, action, proceeding, hearing, audit or, to the knowledge of the Borrower, investigation against any Foreign Pension Plan or the assets thereof, Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against an ERISA Party in connection with any Employee Benefit Plan or Foreign Pension Plan that results in or would reasonably be expected to result in a Material Adverse Effect; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Code, or the receipt of notice of the failure of a Foreign Pension Plan to qualify for any applicable tax-favored status or to be registered and maintained in good standing with the applicable Governmental Authority; or (xi) the imposition of a lien on the assets of the Borrower or any of its Restricted Subsidiaries pursuant to Section 430(k) of the Code or Section 303(k) or Section 4068 of ERISA.

"**ERISA Party**" means the Borrower, any of its Restricted Subsidiaries or any ERISA Affiliate of either of the foregoing.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" has the meaning assigned to such term in **Section 8.1**.

"**Exchange Act**" means the Securities Exchange Act of 1934, and any successor statute.

"**Excluded Assets**" has the meaning assigned to such term in the Collateral Agreement.

"**Excluded Earnout**" means any obligations of Borrower or any Subsidiary to pay additional consideration in connection with an acquisition if such additional consideration is payable (i) in capital stock or Equity Interests, (ii) in cash or (iii) any combination of the foregoing.

"**Excluded Subsidiary**" means

(a)     any Subsidiary that is prohibited or restricted by applicable law, rule or regulation or by any contractual obligation existing on the Closing Date or at the time of acquisition thereof after the Closing Date, in each case, from guaranteeing or granting a Lien on its assets to secure the Obligations or which would require governmental (including regulatory) consent, approval, license or authorization to provide a bank guarantee unless such consent, approval, license or authorization has been received,

(b)     not-for-profit Subsidiaries,

(c)     (i) any Controlled Foreign Corporation, (ii) any direct or indirect subsidiary of a Controlled Foreign Corporation, (iii) any Foreign Subsidiary Holding Company (other than PEOS and Powin China 2) and (iv) any direct or indirect Subsidiary of a Foreign Subsidiary Holding Company (other than PEOS and Powin China 2),

any other Subsidiary with respect to which, in the reasonable judgment of the Required Lenders and the Borrower, the cost or other consequences of guaranteeing the Obligations would be excessive in view of the benefits to be obtained by the Lenders therefrom.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the applicable Commitment or, if such Lender did not fund the applicable Loan pursuant to a prior Commitment, on the date such Lender acquires the applicable interest in such Loan (in each case, other than pursuant to an assignment request by the Borrower under **Section 2.19** or **Section 2.20**) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to **Section 2.17**, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with **Section 2.17(g)** or (i) and (d) any withholding Taxes imposed under FATCA.

"**Executive Order No. 13224**" means that certain Executive Order No. 13224, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"**Exposure**" means, as of any date of determination, the outstanding principal amount of the Loans owing to a Lender under the DIP Facility; **provided**, at any time prior to the making of such Loans under the DIP Facility, the Exposure of any Lender shall be equal to such Lender's Commitment under the DIP Facility.

"**Fair Share**" has the meaning assigned to such term in **Section 7.2**.

"**Fair Share Contribution Amount**" has the meaning assigned to such term in **Section 7.2**.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations thereunder or official interpretations thereof, any agreements entered into pursuant to current Section 1471(b)(1) (or any amended or successor version described above) of the Code, and any fiscal or regulatory legislation, rules, or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"**Federal Funds Effective Rate**" means for any day, the rate per annum (expressed, as a decimal) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; **provided**, (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the rate charged to a financial institution selected by the Required Lenders on such day on such transactions as determined by the Administrative Agent, which rate must be administratively feasible for the Administrative Agent.

"**FEMA**" means the Federal Emergency Management Agency, a component of the U.S. Department of Homeland Security that administers the NFIP.

"**Final DIP Order**" means an order from the Bankruptcy Court in the Chapter 11 Cases in form and substance acceptable to the Required Lenders approving, on a final basis, among other things, in each case, on terms acceptable to the Required Lenders,

(i)     the super-priority debtor-in-possession financing on the terms and subject to the conditions set forth in this Agreement and

(ii)     the incurrence of the Obligations and the Loans hereunder,

which order shall be in full force and effect, and shall not, be reversed, stayed, amended, supplemented or otherwise modified without the prior written consent of the Required Lenders.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer or chief restructuring officer of the Borrower that such financial statements fairly present, in all material respects, the financial condition of the Borrower and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of the Borrower and its Restricted Subsidiaries ending on December 31 of each calendar year, as may be adjusted pursuant to this Agreement.

"**Foreign Lender**" means (i) if the Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (ii) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes.

"**Foreign Pension Plan**" means any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside of the United States by the Borrower or any of its Restricted Subsidiaries primarily for the benefit of employees of the Borrower or any of its Restricted Subsidiaries residing outside of the United States that provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"**Foreign Subsidiary**" means a Subsidiary that is not a Domestic Subsidiary.

"**Foreign Subsidiary Holding Company**" means any Domestic Subsidiary of the Borrower substantially all of the assets of which consist of the Equity Interests (or Equity Interests and other Securities) of one or more Controlled Foreign Corporations or other Foreign Subsidiary Holding Companies.

"**Fund**" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"**Funding Date**" means

       (i)     in the case of Draw No. 1 Commitments, the date of the Initial Advance (as defined in the DIP Order).

       (ii)    in the case of Draw No. 2 Commitments, the Draw No. 2 Funding Date;

       (iii)   in the case of Draw No. 3 Commitments, the Draw No. 3 Funding Date; and

       (iv)   in the case of Draw No. 4 Commitments, the Draw No. 4 Funding Date.

"**Funding Guarantor**" has the meaning assigned to such term in **Section 7.2**.

"**Funding Notice**" means a written notice substantially in the form of **Exhibit A-1** or any other form reasonably approved by the Administrative Agent.

"**GAAP**" means, subject to the limitations on the application thereof set forth in **Section 1.2**, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Guaranteed Obligations**" has the meaning assigned to such term in **Section 7.1**.

"**Guarantor**" means the Parent Pledgor and each Restricted Subsidiary of the Borrower that is a signatory hereto or that executes a Counterpart Agreement until such time as such Restricted Subsidiary is released in accordance with **Section 7.12**.

"**Guaranty**" means the guaranty of each Guarantor set forth in **Section 7**.

"**Hazardous Materials**" means any hazardous or toxic chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or would pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any facility or to the environment, in each case due to its dangerous and deleterious properties or characteristics.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the Laws applicable to any Lender which are presently in effect or, to the extent allowed by Law, under such applicable Laws which may hereafter be in effect and which allow a higher maximum non usurious interest rate than applicable Laws now allow.

"**Historical Financial Statements**" means (i) the audited consolidated balance sheet of the Borrower and its subsidiaries as of [December 31, 2023] and the related consolidated statements of operations, and stockholders' deficit and cash flows for such Fiscal Year and (ii) the unaudited consolidated balance of the Borrower and its subsidiaries as of [December 31, 2024] and the related consolidated statements of operations, and stockholders' deficit and cash flows for such Fiscal Quarter.

"**Indebtedness**" as applied to any Person, means, without duplication,

(i)    indebtedness for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(ii)    all obligations of such Person under leases which are or should be, in accordance with GAAP, recorded as capital leases in respect of which such Person is liable, all obligations of such Person to purchase securities (or other property) which arise out of or in connection with the sale of the same or substantially similar securities (or property);

(iii)    any obligation owed for all or any part of the deferred purchase price of property or services, including earn-outs earned but past due (excluding trade or similar payables, accrued income taxes, VAT, deferred taxes, sales taxes, equity taxes and accrued liabilities incurred in the ordinary course of such Person's business and excluding Excluded Earnouts);

15

(iv)    the undrawn face amount of any letter of credit, bankers' acceptances, bank guarantees, surety bonds, performance bonds, and similar instruments issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings;

(v)    Disqualified Equity Interests;

(vi)    the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the Indebtedness of another;

(vii)    any obligation of such Person in respect of the Indebtedness described in **clauses (i)** through **(vi)** hereof the primary purpose or intent of which is to provide assurance to an obligee that the Indebtedness of the primary obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof;

(viii)    any liability of such Person for the Indebtedness of another in respect of the Indebtedness described in **clauses (i)** through **(vi)** hereof through any agreement (contingent or otherwise) (a) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (b) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under **subclauses (a)** or **(b)** of this **clause (viii)**, the primary purpose or intent thereof is as described in **clause (vii)** above;

(ix)    [reserved]; and

(x)    Indebtedness of the type referred to in **clauses (i)** through **(ix)** above secured by a Lien on any property or asset owned or held by that Person regardless of whether the Indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person;

**provided**, **further** that the following shall not constitute Indebtedness:

(i)    [reserved],

(ii)    liabilities recorded under GAAP related to lease accounting (ASC 840) (other than in respect of capital leases),

(iii)    any liabilities resulting from equity awards accounted for as a liability,

(iv)    prepaid or deferred revenue arising in the ordinary course of business and purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase price of an asset to satisfy unperformed obligations of the seller of such asset,

(v)    [reserved],

(vi)    purchase price adjustments and Earn-Out obligations (until such obligations or adjustments become a liability on the balance sheet of

such Person in accordance with GAAP and solely if not paid after becoming due and payable),

(vii)    royalty payments made in the ordinary course of business in respect of licenses (to the extent such licenses are permitted hereby),

(viii)    any accruals for payroll and other non-interest bearing liabilities accrued in the ordinary course of business, including tax accruals,

(ix)    deferred rent obligations, taxes and compensation,

(x)    customary payables with respect to money orders or wire transfers,

(xi)    customary obligations under employment arrangements,

(xii)    obligations in respect of any license, permit or other approval arising in the ordinary course of business, and

(xiii)    any obligations attributable to the exercise of appraisal rights and the settlement or resolution of any claims or actions (whether actual, contingent or potential) with respect thereto.

"**Indemnified Taxes**" means (i) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Credit Document and (ii) to the extent not otherwise described in **clause (i)**, Other Taxes.

"**Indemnitee**" has the meaning assigned to such term in **Section 10.3(a)**.

"**Initial Approved Budget**" means the Budget in form and substance acceptable to the Required Lenders in their sole discretion and delivered to the Required Lenders and Lender Advisors at least two days prior to the Petition Date.

"**Initial Reporting Date**" has the meaning assigned to such term in **Section 5.1(j)**.

"**Intellectual Property**" has the meaning assigned to such term in the Prepetition Credit Agreement (as in effect on the date hereof)).

"**Intellectual Property Security Agreement**" has the meaning assigned to such term in the Prepetition Credit Agreement.

"**Interest Payment Date**" means the last Business Day of each calendar month of the Borrower, upon any prepayment due to acceleration and on the Termination Date.

"**Interim DIP Order**" means the order of the Bankruptcy Court attached hereto as **Exhibit H** and in form and substance satisfactory to the Required Lenders; it being agreed that the form attached as **Exhibit H** is satisfactory.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by the Borrower or any of its Restricted Subsidiaries of, or of a beneficial interest in, any of the Securities, Equity Interests or any other assets constituting a business line or unit of, or a division of, or make any other investment in, any other Person; and (ii) any direct or indirect loan, advance or capital contribution by the Borrower or any of

its Restricted Subsidiaries to any other Person. For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made), without adjustment for subsequent increases or decreases in the value of such Investment less any returns to the Borrower or any of its Restricted Subsidiaries in respect of such Investment made in cash or Cash Equivalent; **provided** that, the aggregate amount of such returns shall not exceed the original amount of such Investment.

"**IRS**" means the United States Internal Revenue Service.

"**Junior Financing**" means Junior Indebtedness or any other Indebtedness of the Borrower or any Restricted Subsidiary, in each case, that is unsecured or is required to be subordinated in payment, lien priority or any other manner to the Obligations.

"**Junior Financing Documentation**" means any documentation governing any Junior Financing.

"**Junior Indebtedness**" means Indebtedness of any Person so long as (a) such Indebtedness is either unsecured or Subordinated Indebtedness; and (b) if such Indebtedness is Subordinated Indebtedness, the other terms and conditions contained in the relevant definitions thereof shall be satisfied.

"**Junior Restricted Financing**" has the meaning assigned to such term in **Section 6.3**.

"**Laws**" means any and all federal, state, local and foreign statutes, laws, judicial decisions, regulations, guidance, guidelines, ordinances, rules, judgments, orders, decrees, codes, plans, injunctions, permits, concessions, grants, franchises, governmental agreements and governmental restrictions, whether now or hereafter in effect.

"**Lender**" means, at any time, any Lender that holds Loans or Commitments at such time.

"**Lender Advisors**" means Latham & Watkins LLP and [●].

"**Lender Affiliated Parties**" has the meaning assigned to such term in **Section 10.22**.

"**Lender Party**" has the meaning assigned to such term in **Section 10.17**.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, but not including the interest of a lessor under a lease which is not a capital lease.

"**Loan**" means any loans (including paid-in-kind loans), advances and any extension of credit by a Lender to the Borrower pursuant to this Agreement.

"**Margin Stock**" has the meaning assigned thereto in Regulation U of the Board of Governors.

"**Material Adverse Effect**" means any event, change or condition that, individually or in the aggregate, has had, or would reasonably be expected to have (i) a material adverse effect on the business, assets, results of operations or financial condition of the Borrower and its Restricted Subsidiaries, taken as a whole, other than as a result of the Chapter 11 Cases or any event, circumstance or condition leading up to, related to or resulting from the Chapter 11 Cases, or (ii) a material adverse effect on the rights and remedies of Agent and any other Secured Party under the Credit Documents, taken as a whole, including

the legality, validity, binding effect or enforceability of the Credit Documents; provided, that any change in law, regulation, sub-regulatory guidance or condition generally that impacts the energy industry in which any of the Credit Parties operate shall not in and of itself constitute a "Material Adverse Effect".

"**Material Indebtedness**" means

(i)     any Indebtedness (other than the Obligations) of any one or more of the Borrower and its Restricted Subsidiaries in an aggregate outstanding principal amount of at least $5,000,000,

(ii)    any Indebtedness (other than the Obligations) of any one or more of the Borrower and its Restricted Subsidiaries in an aggregate outstanding principal amount of at least any "material indebtedness", "threshold amount" or similar threshold amount under any Indebtedness that constitutes "Material Indebtedness" pursuant to **clause (i)** of this definition and

(iii)   Indebtedness under the Prepetition Credit Agreement.

"**Material Real Estate**" means any wholly-owned, fee-owned Real Estate Asset having a fair market value in excess of $1,000,000.

"**MD&A Report**" means, with respect to the financial statements for which such report is required, a "Management's Discussion and Analysis of Financial Condition and Results of Operations" report.

"**Moody's**" means Moody's Ratings and any successor thereto.

"**Multiemployer Plan**" means any "multiemployer plan" as defined in Section 4001(a)(3) of ERISA which is sponsored, maintained or contributed to by, or required to be contributed to by, the Borrower or any of its Restricted Subsidiaries or any of their respective ERISA Affiliates, or with respect to which the Borrower or any of its Restricted Subsidiaries has any material liability.

"**NAIC**" means The National Association of Insurance Commissioners, and any successor thereto.

"**NFIP**" means the National Flood Insurance Program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, as revised by the National Flood Insurance Reform Act of 1994 and the Flood Insurance Reform Act of 2004, that mandates the purchase of flood insurance to cover real property improvements located in Special Flood Hazard Areas in participating communities and provides protection to property owners through a federal insurance program.

"**Non-Public Information**" shall mean information which has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD promulgated by the SEC under the Securities Act and the Exchange Act.

"**Note**" means a promissory note in the form of **Exhibit B**.

"**Obligations**" means all obligations of every nature of each Credit Party from time to time owed to any Agent (including any former Agent), any Lender, whether for principal, interest (including interest which, but for the filing of a petition in any proceeding under any Debtor Relief Law with respect to such Credit Party, would have accrued on the Obligations, whether or not a claim is allowed against such Credit Party for such interest in such proceeding), fees, expenses, indemnification or otherwise.

"**Obligee Guarantor**" has the meaning assigned to such term in **Section 7.7**.

"**OFAC**" means the US Department of Treasury Office of Foreign Assets Control, or any successor thereto.

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation, memorandum and articles of association, constitution or organization and its by-laws (or other formative documents however described peculiar to the jurisdiction of the corporation in question); (ii) with respect to any limited partnership, its certificate of limited partnership and its partnership agreement; (iii) with respect to any general partnership, its partnership agreement; (iv) with respect to any limited liability company, its articles of organization and its operating agreement; and (v) relative to any Person that is any other type of entity, such documents as shall be comparable to the foregoing. In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a Governmental Authority, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such Governmental Authority.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to **Section 2.19** or **Section 2.20**).

"**Outstanding Amount**" means with respect to the Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any Borrowings and prepayments or repayments of the Loans occurring on such date.

"**Owned IP**" means all of the Intellectual Property owned, or purported to be owned, by the Borrower or any Credit Party or any Restricted Subsidiary of a Credit Party.

"**Participant**" has the meaning assigned to such term in **Section 10.6(d)**.

"**Participant Register**" has the meaning assigned to such term in **Section 10.6(d)**.

"**Parent Pledgor**" has the meaning set forth in the preamble to this Agreement.

"**PATRIOT Act**" means USA PATRIOT Improvement and Reauthorization Act, Title III of Pub. L. 109-177.

"**Payment Office**" means the account of the Administrative Agent as provided to the Borrower and the Lenders in writing or such other account as the Administrative Agent may hereafter designate in writing as such to the Borrower and Lenders.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Code or Section 302 of ERISA.

"**Permitted Disbursement Variance**" has the meaning assigned to such term in **Section 6.13**.

"**Permitted Encumbrance**" has the meaning assigned to such term in **Section 6.2(b)**.

"**Permitted Lien**" means each Lien permitted pursuant to **Section 6.2**.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Petition Date**" has the meaning assigned to such term in the recitals hereto.

"**Plan of Reorganization**" has the meaning assigned to such term in the definition of "Approved Chapter 11 Plan" set forth in this **Section 1.1**.

"**Platform**" has the meaning assigned to such term in **Section 10.1(d)(i)**.

"**Pledged Equity Interests**" has the meaning assigned to such term in the Collateral Agreement.

"**Prepetition Agent**" means GLAS USA LLC, as the administrative agent and collateral agent under the Prepetition Credit Agreement.

"**Prepetition Collateral**" means all Collateral (as defined in the Prepetition Credit Agreement as in effect on the Closing Date).

"**Prepetition Credit Agreement**" means that certain Loan Agreement, dated as of October 1, 2024, by and among the Powin, LLC, as the Borrower, the subsidiaries of Powin, LLC from time to time party thereto as guarantors, the lenders from time to time party thereto and GLAS USA LLC, as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Closing Date.

"**Prepetition Liens**" means the liens granted by the Prepetition Loan Parties to the Prepetition Agent the benefit of itself and the lenders party to the Prepetition Credit Agreement on the Prepetition Collateral.

"**Prepetition Loan Documents**" means that the "Loan Documents" or analogous term in the Prepetition Credit Agreement.

"**Prepetition Secured Obligation**" means the indebtedness and liability due from the Prepetition Loan Parties to the Prepetition Secured Parties as provided in the Prepetition Loan Documents; **provided** that as of the Petition Date, the outstanding principal amount of such Prepetition Secured Obligations was not less than $25,612,281.51 plus certain reimbursement obligations, fees, costs, expenses (including, without limitation, certain attorneys' fees and related fees, charges and disbursements), indemnification obligations, and any other amounts, contingent or otherwise, whenever arising or accruing, that may be due, owing or chargeable in respect thereof; **provided** that such Prepetition Secured Obligations shall be reduced by any payments received by the Prepetition Secured Parties during the Chapter 11 Cases to reduce such obligations.

"**Pro Rata Share**" means, with respect to any Lender, with respect to all payments, computations and other matters relating to the DIP Facility, the percentage obtained by dividing (a) the Exposure of such Lender under the DIP Facility by (b) the aggregate Exposure of all of the Lenders under the DIP Facility.

"**PTE**" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Lender**" shall mean any Lender that does not wish to receive Non-Public Information with respect to the Borrower or its Subsidiaries or their respective securities.

"**Qualified Equity Interests**" means any Equity Interests (other than warrants, rights or options referenced in the definition thereof) that (a) does not have a maturity and is not mandatorily redeemable; (b) by its terms (or by the terms of any employee stock option, incentive stock or other equity-based plan or arrangement under which it is issued or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (x) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable (excluding any mandatory redemption resulting from an asset sale or change in control so long as no payments in respect thereof are due or owing, or otherwise required to be made, until all Obligations have been paid in full), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case, at any time on or after the ninety-first (91st) day following the Scheduled Maturity Date, or (y) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (A) debt securities or (B) any Equity Interests referred to in clause (x) above, in each case, at any time on or after the ninety-first (91st) day following the Scheduled Maturity Date; or (c) is preferred stock, so long as (x) no holder thereof can require the issuer to redeem any such stock for cash prior to the Scheduled Maturity Date and (y) any redemption feature of such stock is available only if permitted under this Agreement.

"**Real Estate Asset**" means an interest in any real property.

"**Recipient**" means (i) any Agent or (ii) any Lender, as applicable.

"**Register**" has the meaning assigned to such term in **Section 10.6(c)**.

"**Regulation D**" means Regulation D of the Board of Governors, as in effect from time to time.

"**Regulation FD**" means Regulation FD as promulgated by the US Securities and Exchange Commission under the Securities Act and Exchange Act as in effect from time to time.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the officers, directors, employees, agents, advisors, attorneys representatives, trustees, administrators, managers, and partners of such Person and of such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, or leaching of any Hazardous Material into the environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material).

"**Remaining Obligations**" means, as of any date of determination, the Obligations that as of such date of determination are Obligations under the Credit Documents that survive termination of the Credit

Documents, but as of such date of determination are not due and payable and for which no claims have been made.

"**Removal Effective Date**" has the meaning assigned to such term in **Section 9.6(b)**.

"**Reporting Date**" has the meaning assigned to such term in **Section 5.1(j)**.

"**Required Lenders**" means, as of any date of determination, Lenders having at least 66.67% of the sum of the (a) Total Outstandings and (b) aggregate unused Commitments; **provided** that the unused Commitments of, and the portion of the Total Outstandings held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders; **provided**, **further**, that so long as FlexGen Power Systems, LLC and any of its Affiliates (collectively, the "**FlexGen Entities**") hold any Loans and/or Commitments the vote of the FlexGen Entities shall be required to constitute "Required Lenders".

"**Resignation Effective Date**" has the meaning assigned to such term in **Section 9.6(a)**.

"**Resolution Authority**" shall mean an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Officer**" means, with respect to any entity, its the chief executive officer, president, chief financial officer, treasurer, assistant treasurer, vice president, assistant vice president, or secretary.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of the Borrower or any of its Restricted Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the Borrower's or a Restricted Subsidiary's stockholders, partners or members (or the equivalent Persons thereof).

"**Restricted Subsidiary**" means any Subsidiary of the Borrower.

"**S&P**" means S&P Global Ratings, and any successor to its rating agency business.

"**Sale**" has the meaning assigned to such term in **Section 5.12(b)**.

"**Sale Motion**" has the meaning assigned to such term in **Section 5.12(b)**.

"**Sanctioned Country**" means, at any time, a country or territory which is, or whose government is, the subject or target of any Sanctions broadly restricting or prohibiting dealings with such country, territory or government.

"**Sanctioned Person**" means, at any time, any Person with whom dealings are restricted or prohibited under Sanctions, including (i) any Person listed in any Sanctions-related list of designated Persons maintained by the United States (including by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce), the United Nations Security Council, the European Union or any of its member states, His Majesty's Treasury, Switzerland or any other relevant authority, (ii) any Person located, organized or resident in, or any Governmental Authority or governmental instrumentality of, a Sanctioned Country or (iii) any Person 50% or more directly or indirectly owned by, controlled by, or acting for the benefit or on behalf of, any Person described in **clauses (i)** or **(ii)** hereof.

"**Sanctions**" means economic or financial sanctions or trade embargoes or restrictive measures enacted, imposed, administered or enforced from time to time by (i) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce; (ii) the United Nations Security Council; (iii) the European Union or any of its member states; (iv) Her Majesty's Treasury; or (v) Switzerland.

"**Scheduled Maturity Date**" has the meaning assigned to such term in the definition of "Termination Date".

"**Secured Parties**" (a) the Lenders, (b) the Administrative Agent, (c) the Collateral Agent and (d) the successors and permitted assigns of each of the foregoing.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, and any successor statute.

"**Securities and Exchange Commission**" means the US Securities and Exchange Commission, or any successor thereto.

"**Software**" has the meaning assigned to such term in the Prepetition Credit Agreement.

"**Special Flood Hazard Area**" means an area that FEMA's current flood maps indicate has at least a one percent (1%) chance of a flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year.

"**Specified Indebtedness**" has the meaning assigned to such term in **Section 8.1(b)**.

"**Stalking Horse Purchase Agreement**" shall mean that certain Asset Purchase Agreement, dated as of July 6, 2025, by and among FlexGen, Powin, LLC and the other parties from time to time party thereto in the form filed with the Bankruptcy Court or as otherwise agreed by FlexGen in its sole discretion.

"**Subordinated Indebtedness**" means any unsecured Junior Indebtedness of the Borrower the payment of principal and interest of which and other obligations of the Borrower in respect thereof are subordinated to the prior payment in full of the Obligations on terms and conditions reasonably satisfactory to the Required Lenders and the Administrative Agent.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity deemed to constitute a subsidiary of such Person under GAAP. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a direct or indirect Subsidiary or direct or indirect Subsidiaries of the Borrower, unless the context otherwise requires.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Termination Date**" means the earliest of:

(a)        August 8, 2025 (the "**Scheduled Maturity Date**");

(b)        the date of termination of the Commitments under the DIP Facility and/or acceleration of any outstanding borrowings under the DIP Facility, in each case, by the Administrative Agent and/or the Required Lender following the occurrence of an Event of Default an upon the delivery of a Termination Notice;

(c)        the first Business Day on which the Interim DIP Order expires by its terms or is terminated, unless the Final DIP Order has been entered and become effective prior thereto;

(d)        the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing (which may be e-mail) by the Required Lenders;

(e)        the dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing (which may be e-mail) by the Required Lenders; or

(f)        the date on which the Borrower has repaid, in full, in cash, of all Obligations and termination of all Commitments under the DIP Facility.

"**Test Period**" means the cumulative period from the beginning date of the Approved Budget through the Sunday that is eight calendar days prior to the applicable Reporting Date.

"**Testing Date**" means the last day of each Testing Period.

"**Total Disbursements**" means all disbursements of the Credit Parties, but excluding payment for fees for professional services.

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York; **provided**, if by reason of mandatory provisions of Law, the perfection, the effect of perfection or non-perfection or the priority of the security interests of the Collateral Agent in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"**UK Financial Institution**" shall mean any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" shall mean the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Government Securities Business Day**" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**U.S. Tax Compliance Certificate**" has the meaning assigned to such term in **paragraph (g)** of **Section 2.17**.

"**Variance Report**" has the meaning assigned to such term in **Section 5.1(k)**.

"**Variance Report Certificate**" has the meaning assigned to such term in **Section 5.1(l)**.

"**Withholding Agent**" means the Borrower, the Administrative Agent and any other applicable withholding agent.

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2    **Accounting Terms**. Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Financial statements and other information required to be delivered by the Borrower to the Lenders pursuant to **Section 5.1(a)**, **5.1(b)** and **5.1(c)** shall be prepared in accordance with GAAP as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in **Section 5.1(e)**, if applicable) (except for the lack of footnotes and being subject to year-end adjustments). If at any time any change in GAAP would affect the computation of any financial ratio or financial requirement set forth in any Credit Document, and either the Borrower or the Required Lenders shall so request, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); **provided**, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent (for distribution to the Lenders) financial statements and other documents required under this Agreement which include a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Subject to the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements except for any calculations otherwise permitted to be made in accordance with this Agreement to the extent not addressed in the preparation of the Historical Financial Statements. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect, including Accounting Standards

Codification "ASC" 820, ASC 825) to value any Indebtedness or other liabilities of the Borrower or any of its Subsidiaries at "fair value," as defined therein.

1.3 **Interpretation, Etc**. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in any Credit Document), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections, Appendices, Exhibits and Schedules shall be construed to refer to Sections of, and Appendices, Exhibits and Schedules to, this Agreement, (e) any reference to any Law herein shall, unless otherwise specified, refer to such Law as amended, modified or supplemented from time to time, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Securities, accounts and contract rights. The term "enforceability" and its derivatives when used to describe the enforceability of an agreement shall mean that such agreement is enforceable except as enforceability may be limited by any Debtor Relief Law and by general equitable principles (whether enforcement is sought by proceedings in equity or at law). Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

1.4 **Timing of Performance**. When the performance of any covenant, duty or obligation under any Credit Document is required to be performed on a day which is not a Business Day, the date of such performance shall extend to the immediately succeeding Business Day.

1.5 **Currency Generally**. For purposes of determining compliance with **Section 6.1**, **Section 6.2** and **Section 6.6** with respect to any amount of Indebtedness, Lien or Investment in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness, Lien or Investment is incurred or granted (so long as such Indebtedness, Lien or Investment, at the time incurred or granted, made or acquired, was permitted hereunder).

1.6 **Divisions**. For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

1.7 **Negative Covenant Compliance**. For purposes of determining whether the Borrower and its Restricted Subsidiaries comply with any exception to **Section 6** where compliance with any such exception is based on a financial ratio or metric being satisfied as of a particular point in time, it is understood that (a) compliance shall be measured at the time when the relevant event is undertaken, as such financial ratios and metrics are intended to be "incurrence" tests and not "maintenance" tests,

(b) correspondingly, any such ratio and metric shall only prohibit the Borrower and its Restricted Subsidiaries from creating, incurring, assuming, suffering to exist or making, as the case may be, any new, for example, Liens, Indebtedness or Investments, but shall not result in any previously permitted, for example, Liens, Indebtedness or Investments ceasing to be permitted hereunder.

## SECTION 2    LOANS

2.1    **Loans**.

(a)    **Commitments**. Subject to the terms and conditions set forth in **Section 3**, each Lender severally agrees to make to the Borrower:

(i)    a single loan denominated in Dollars in a principal amount equal to its Draw No. 1 Commitment (the "**Draw No. 1**") prior to the Closing Date; and

(ii)    a single loan denominated in Dollars in a principal amount equal to its Draw No. 2 Commitment (the "**Draw No. 2**") on or after the date the Final DIP Order shall have been entered by the Bankruptcy Court (such date, the "**Draw No. 2 Funding Date**");

(iii)    a single loan denominated in Dollars in a principal amount equal to its Draw No. 3 Commitment (the "**Draw No. 3**") on or after the date the Final DIP Order shall have been entered by the Bankruptcy Court (such date, the "**Draw No. 3 Funding Date**");

(iv)    a single loan denominated in Dollars in a principal amount equal to its Draw No. 4 Commitment (the "**Draw No. 4**") on or after the date the Final DIP Order shall have been entered by the Bankruptcy Court (such date, the "**Draw No. 4 Funding Date**");

provided, that (x) the Borrower may make only one borrowing under each Commitment and (y) each Lender's applicable Commitment shall terminate immediately and without further action on the applicable Funding Date after giving effect to the funding of such Lender's applicable Commitment on such date.

(b)    **Repayments and Prepayments**. Any amount of the Loans that is subsequently repaid or prepaid may not be reborrowed.

(c)    **Funding Notice**. The Borrower shall deliver to the Administrative Agent a fully executed Funding Notice for the Loans no later than 1:00 p.m. (New York City time) at least five Business Day in advance of each Funding Date (or such later time as the Administrative Agent may agree) and, promptly upon receipt thereof, the Administrative Agent shall notify each Lender of the proposed borrowing.

(d)    **Funding of Loans**. Each Lender shall make each Loan to be made by it hereunder on the proposed Funding Date thereof by wire transfer of immediately available funds by 1:00 p.m. (New York City time) to the Payment Office. Upon satisfaction or waiver of the conditions precedent specified in **Section 3** and receipt of all requested funds, the Administrative Agent shall make the proceeds of the Loans available to the Borrower on each Funding Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by the Administrative Agent from the Lenders to be wired to the account of the Borrower or to such other account as may be designated in writing to the Administrative Agent by the Borrower.

2.2    **Pro Rata Shares**. All Loans shall be made, and all participations purchased, by the Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that (i) the

failure of any Lender to fund any such Loan shall not relieve any other Lender of its obligation hereunder and (ii) no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby nor shall any Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby.

2.3    **Use of Proceeds**. The proceeds of the Loans will be used in accordance with **Section 5.13**.

2.4    **Evidence of Debt; Notes**.

(a)    **Evidence of Debt**. Each Lender shall maintain on its internal records an account or accounts evidencing the Indebtedness of the Borrower to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on the Borrower, absent manifest error; **provided**, failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's Obligations in respect of any applicable Loans; and **provided**; **further**, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)    **Notes**. If so requested by any Lender by written notice to the Borrower at least two Business Days prior to the Closing Date, or at any time thereafter, the Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to **Section 10.6**) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after the Borrower's receipt of such notice) a Note or Notes to evidence such Lender's Loans (including those funded prior to the Closing Date pursuant to such Lender's Draw No. 1 Commitments).

2.5    **Interest on Loans**.

(a)    **Interest**. Except as otherwise set forth herein, each Loan shall bear interest on the unpaid principal amount thereof from the date made to repayment thereof (whether by acceleration or otherwise) at an interest rate equal to the Applicable Margin.

(b)    **Computation of Interest**. Interest payable pursuant to **Section 2.5(a)** shall be computed on the basis of a 360-day year, in each case for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan shall be included, and the date of payment of such Loan shall be excluded; **provided**, if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(c)    **Interest Payable**. Except as otherwise set forth herein, interest on each Loan shall accrue on a daily basis and be payable in arrears in kind and capitalized:

(i)    on each Interest Payment Date applicable to that Loan;

(ii)    concurrently with any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and

(iii)    on the Termination Date.

The amounts so capitalized and added to the principal in accordance with the immediately preceding sentence shall be treated as principal for all purposes of this Agreement and bear interest in accordance with the terms hereof from (and including) the applicable Interest Payment Date or

such other date of payment, in each case on which such interest was paid "in kind" and capitalized. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Laws.

Notwithstanding anything to the contrary herein, all accrued and unpaid interest required to be paid at maturity (whether by acceleration or otherwise) of the Loans shall be paid in cash in Dollars.

2.6    **[Reserved]**.

2.7    **Default Interest**. Upon the occurrence and during the continuance of an Event of Default, the overdue portion of any principal amount of all Loans and, to the extent permitted by applicable Law, any overdue interest payments on the Loans or any overdue premium, fees or other amounts owed hereunder not paid when due, in each case whether at stated maturity, by notice of prepayment, by acceleration or otherwise, shall bear interest (including post-petition interest in any proceeding under any Debtor Relief Law) from the date of such Event of Default, payable in kind and capitalized at a rate that is 2.00% per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans. Payment or acceptance of the increased rates of interest provided for in this **Section 2.7** is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.

2.8    **Fees**.

(a)    **Commitment Fee**. The Borrower agrees to pay to the Administrative Agent, for the ratable account of each of the Lenders, a non-refundable upfront fee equal to 1.5% of the aggregate principal amount Commitments in respect of the DIP Facility; such fees shall be earned upon entry of the Interim DIP Order, but shall only become payable on the applicable Funding Date (whether or not DIP Facility Loans are actually advanced to the Borrowers on such date), which fee shall be earned, due and payable in kind in the form of additional Loans (such fees pursuant to this **clause (a)**, the "**Commitment Fees**").

(b)    **DIP Exit Fee**. The Borrower agrees to pay to the Administrative Agent, for the ratable account of each of the Lenders, a non-refundable exit fee equal to 1.5% of the aggregate principal amount of the Loans actually disbursed to the Borrower on the applicable Funding Date (including, for the avoidance of doubt, the Draw No. 1), which fee shall be earned, due and payable in kind in the form of additional Loans (such fees pursuant to this **clause (b)**, the "**DIP Exit Fees**" and together with the Commitment Fee, the "**DIP Facility Fees**").

(c)    **DIP Facility Fees**. Once earned, the DIP Facility Fees shall be added to the principal amount of the Loans and shall thereafter be treated as principal for all purposes under the DIP Facility, including the accrual of interest thereon at the non-default and default rates set forth above; **provided** that, any DIP Facilities Fees related to Loans extended to the Borrower prior to the Closing Date (including, for the avoidance of doubt, the Draw No. 1) shall be deemed to have begun accruing interest from the applicable Funding Date (rather than the Closing Date).

2.9    **Maturity**. The outstanding Loans, together with all other amounts owed hereunder with respect thereto, shall be paid in full in cash no later than the Scheduled Maturity Date (or, if earlier, the Termination Date).

2.10    **Voluntary Prepayments**. Any time and from time to time, the Borrower may prepay, without premium or penalty, any Loan on any Business Day in whole or in part, and upon delivery of the prepayment notice in each case given to the Administrative Agent, as the case may be, by 1:00 p.m. (New York City time) on the date required and the Administrative Agent will promptly notify each applicable Lender of such prepayment. Upon delivery of the prepayment notice, the principal amount of the Loans specified in such written notice shall become due and payable on the prepayment date specified therein; **provided**, such prepayment obligation may be conditioned on the occurrence of any subsequent event (including a Change of Control or refinancing transaction).

2.11    **Mandatory Prepayments**.

(a)    **Issuance of Debt or Equity**. No later than the third Business Day following the date of receipt of the proceeds of (i) the incurrence of any Indebtedness by the Borrower or any of its Restricted Subsidiaries (unless such Indebtedness is permitted to be incurred pursuant to **Section 6.1**) or (y) the issuance of any Equity Interests in any Borrower, the Borrower shall prepay the Loans as set forth in **Section 2.12(b)** in an aggregate amount equal to 100% of the net cash proceeds from such incurrence or issuance, net of any underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses and the amount of any reserves established by the Borrower and the Restricted Subsidiaries to fund contingent liabilities reasonably estimated to be payable, in each case, in respect of such event, **provided** that any reduction at any time in the amount of any such reserves (other than as a result of payments made in respect thereof) shall be deemed to constitute the receipt by the Borrower at such time of net cash proceeds in the amount of such reduction.

(b)    **Asset Sales; Casualty and Condemnation; Extraordinary Receipts**. In the event and on each occasion that any net cash proceeds are received by or on behalf of the Borrower or any of its Restricted Subsidiaries:

(i)    in respect of any Asset Sale in reliance on **Section 6.8(j)**;

(ii)    in respect of any Casualty Event; and

(iii)    not in the ordinary course of business, including but not limited to tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments (other than casualty and condemnation event proceeds);

then the Borrower shall, within three Business Days (or, if later, within three Business Days after the later of the date the threshold referred to above is first exceeded and the date the relevant net cash proceeds are received) after such net cash proceeds are received, prepay the Loans as set forth in **Section 2.12(b)** in an aggregate amount equal to 100% of the net cash proceeds (net of any expenses associated therewith, including reasonable legal fees and expenses and the amount of any reserves established by the Borrower and the Restricted Subsidiaries to fund contingent liabilities or remedy any underlying concern reasonably estimated to be payable, in each case, in respect of such event), **provided** that any reduction at any time in the amount of any such reserves (other than as a result of payments made in respect thereof) shall be deemed to constitute the receipt by the Borrower at such time of net cash proceeds in the amount of such reduction.

(c)    **Notice to the Administrative Agent**. The Borrower shall deliver a prepayment notice to the Administrative Agent of any mandatory prepayment required to be made pursuant to **clauses (a)** and **(b)** of this **Section 2.11** at least two Business Days (or such shorter period as the Administrative Agent may agree in its reasonable discretion) prior to the date of such prepayment **provided**, such prepayment obligation may be conditioned on the occurrence of such event (including a Change of Control

or refinancing transaction). Each such prepayment notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the aggregate amount of such prepayment to be made by the Borrower. The Administrative Agent will promptly notify each Lender of the contents of the Borrower's prepayment notice. Any Lender may elect, by written notice to the Administrative Agent by 12:00 p.m. (New York City time) at least one Business Day prior to the prepayment date, to decline all or any portion of any prepayment of its Loans pursuant to **Section 2.11(b)** (such amounts, "**Declined Proceeds**"). Any Lender that fails to provide written notice to the Administrative Agent in the time frame set forth above shall be deemed to have accepted the prepayment. Any Declined Proceeds shall be retained by the Borrower.

(d)     Notwithstanding any other provisions of this **Section 2.11**, (i) to the extent that any or all of the net cash proceeds of any Asset Sale by a Foreign Subsidiary (or a Domestic Subsidiary of a Foreign Subsidiary) (a "**Foreign Disposition**") or the net cash proceeds of any Casualty Event from a Foreign Subsidiary (or a Domestic Subsidiary of a Foreign Subsidiary) (a "**Foreign Casualty Event**"), in each case giving rise to a prepayment event pursuant to **Section 2.11(b)** is prohibited, restricted or delayed by applicable local law, rule or regulation (including, without limitation, financial assistance and corporate benefit restrictions and fiduciary and statutory duties of any director or officer of such Subsidiaries) from being repatriated to the Borrower or so prepaid or such repatriation or prepayment would present a material risk of liability for the applicable Restricted Subsidiary or its directors or officers (or gives rise to a material risk of breach of fiduciary or statutory duties by any director or officer), in each case, as determined by the Borrower in good faith, then the portion of such net cash proceeds so affected will not be required to be applied to repay Loans at the times provided in this **Section 2.11** but may be retained by the applicable Foreign Subsidiary and (ii) to the extent that the Borrower has determined in good faith that repatriation of any or all of the net cash proceeds of any Foreign Disposition or any Foreign Casualty Event, in each case giving rise to a prepayment event pursuant to **Section 2.11(b)**, would result in adverse tax or regulatory consequences (as determined by the Borrower in good faith), the net cash proceeds so affected will not be required to be applied to repay Loans at the times provided in this **Section 2.11** but may be retained by the applicable Foreign Subsidiary.

(e)     Notwithstanding anything in this **Section 2.11** to the contrary, no mandatory prepayment of outstanding Loans that would otherwise be required to be made under **Section 2.11(a)** or **(b)** shall be required to be made unless and until all commitments under the Prepetition Credit Agreement shall have been terminated and the principal of and interest on all Indebtedness under the Prepetition Credit Agreement and all fees, expenses and other amounts payable (other than contingent amounts not yet due and payable) in respect thereof shall have been paid in full.

2.12    **Application of Prepayments**.

(a)     **Application of Voluntary Prepayments**. Any prepayment of any Loan pursuant to **Section 2.10** shall be applied to the principal repayment installments thereof as specified by the Borrower in the applicable notice of prepayment (and absent such direction in direct order of maturity); **provided**, any such prepayment of the Loans shall be applied to prepay the Loans of each of the Lenders on a pro rata basis (in accordance with the respective outstanding principal amounts thereof).

(b)     **Application of Mandatory Prepayments**. Any prepayment of any Loan required to be made pursuant to **Section 2.11(a)** or **(b)** shall be applied to the principal repayment installments thereof as specified by the Borrower in the applicable notice of prepayment (and absent such direction in direct order of maturity); **provided**, any such prepayment of the Loans shall be applied to prepay the Loans of each of the Lenders on a pro rata basis (in accordance with the respective outstanding principal amounts thereof).

(c)    Notwithstanding anything herein to the contrary set forth in this **Section 2.12** or any other provision of this Agreement, any and all repayments and prepayments of the Loans pursuant to **Section 2.11** shall be applied in accordance with the DIP Order.

2.13    **General Provisions Regarding Payments**.

(a)    **Payments Due**. All payments by the Borrower of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the Administrative Agent not later than 2:00 p.m. (New York City time) on the date due at the Payment Office for the account of the Lenders, or in any other manner expressly provided for in this Agreement; for purposes of computing interest and fees, funds received by the Administrative Agent after that time on such due date may in the discretion of the Administrative Agent be deemed to have been paid by the Borrower on the next succeeding Business Day.

(b)    **Presumptions by Administrative Agent**. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may (but shall not be obligated to), in reliance upon such assumption, distribute to the Lenders, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(c)    **Payments to Include Interest**. All payments in respect of the principal amount of any Loan shall include payment of accrued interest on the principal amount being repaid or prepaid, and all such payments (and, in any event, any payments in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest then due and payable before application to principal.

(d)    **Distribution of Payments**. The Administrative Agent shall promptly distribute to each Lender at such account as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including all fees payable with respect thereto, to the extent received by the Administrative Agent.

(e)    **Payment Due on Non-Business Day**. Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

(f)    **Non-Conforming Payment**. In the event any payment by or on behalf of the Borrower hereunder required to be paid in cash pursuant to the terms of this Agreement is not made in same day funds prior to 2:00 p.m. (New York City time), the Administrative Agent may deem such payment to be a non-conforming payment and if so, shall give prompt written notice thereof to the Borrower and each applicable Lender. Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of **Section 8.1(a)**. Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined

pursuant to **Section 2.7** from the date such amount was due and payable until the date such amount is paid in full.

2.14     **Ratable Sharing**. Subject to **Section 10.6(b)(iv)** and **(vii)**, if any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its Pro Rata Share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent in writing of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; **provided**: (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and (ii) the provisions of this **Section 2.14** shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement, or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or Participant, other than to the Borrower or any of its Restricted Subsidiaries (other than pursuant to **Section 10.6(d)**), as to which the provisions of this Section shall apply. Each Credit Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Credit Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of each Credit Party in the amount of such participation.

2.15     **[Reserved]**.

2.16     **[Reserved]**.

2.17     **Taxes; Withholding, Etc.**

(a)     **Defined Terms**. For purposes of this **Section 2.17**, the term "applicable law" includes FATCA.

(b)     **Payments Free of Taxes**. Any and all payments by or on account of any obligation of any Credit Party under any Credit Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Credit Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)     **Payment of Other Taxes by the Borrower**. The Credit Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)        **Indemnification by the Borrower**. The Credit Parties shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)        **Indemnification by the Lenders**. Each Lender shall severally indemnify the Administrative Agent, within 10 Business Days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of **Section 10.6(d)** relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this **paragraph (e)**.

(f)        **Evidence of Payments**. As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority pursuant to this **Section 2.17**, such Credit Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)        **Status of Lenders**.

(i)        Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in **Section 2.17(g)(ii)(A)**, **2.17(g)(ii)(B)** and **2.17(g)(ii)(D)**) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing:

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(i)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Credit Document, executed copies of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Credit Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(ii)    executed copies of IRS Form W-8ECI;

(iii)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit D-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(iv)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-2 or Exhibit D-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; **provided** that if the Foreign Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-4 on behalf of such direct and indirect partner(s);

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable

request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the Closing Date.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal ineligibility to do so.

(h)     **Treatment of Certain Refunds**. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this **Section 2.17** (including by the payment of additional amounts pursuant to this **Section 2.17**), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out of pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this **paragraph (h)** (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this **paragraph (h)**, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     **Status of Administrative Agent**. On or before the date the Administrative Agent becomes a party to this Agreement, the Administrative Agent shall provide to the Borrower two duly-executed copies of IRS Form W-9. The Administrative Agent agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower in writing of its legal ineligibility to do so.

(j)      **Survival**. Each party's obligations under this **Section 2.17** shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.

2.18    **Obligation to Mitigate**. If any Lender requires the Borrower to pay additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to **Section 2.17**, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (a) would eliminate or reduce amounts payable pursuant to **Section 2.17**, as the case may be, in the future, and (b) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

2.19    **Replacement of Lenders**. (i) If the Borrower is required to pay additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to **Section 2.17**, or (ii) if any Lender is a Defaulting Lender or (iii) if any Lender declines to approve any waiver, amendment or modification of this Agreement or any Credit Document that requires approval of all Lenders (directly affected or otherwise) pursuant to **Section 10.5** and to which the Required Lenders have consented (or a majority of the Lenders directly affected) or (iv) if any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon written notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, **Section 10.6**), all of its interests, rights and obligations under this Agreement and the related Credit Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); **provided**:

(a)      the Administrative Agent shall have received the assignment fee (if any) specified in **Section 10.6(b)(iii)** and if such assignee Lender is not an existing Lender, it shall provide the Administrative Agent and, in the case of an IRS Form W-9, Borrower, with all requested "know your customer" documentation, a duly executed IRS Form W-9 or such other applicable IRS Form and an administrative questionnaire;

(b)      such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Credit Documents (including any amounts under **Section 2.19(c)** from or on behalf of the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts));

(c)      in the case of any such assignment resulting from a claim for payments required to be made pursuant to **Section 2.17**, such an assignment will result in a reduction in such compensation or payments thereafter; and

(d)      such assignment does not conflict with applicable Law.

2.20    **Defaulting Lenders**.

(a)      **General**. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)       **Waivers and Amendments**. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in **Section 10.5**.

(ii)      **Reallocation of Payments**. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to **Section 8** or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to **Section 10.4**), shall be applied at such time or times as may be determined by the Administrative Agent as follows:

**first**, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder;

**second**, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent;

**third**, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement;

**fourth**, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement;

**fifth**, so long as no Default or Event of Default exists, to the payment of any amounts owing to any Credit Party as a result of any judgment of a court of competent jurisdiction obtained by any Credit Party against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and

**sixth**, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction;

**provided** that if such payment is a payment of the principal amount of any Loans and such Lender is a Defaulting Lender under clause (a) of the definition thereof, such payment shall be applied solely to pay the relevant Loans of the relevant non-Defaulting Lenders on a pro rata basis prior to being applied pursuant to this **Section 2.20(a)(ii)**.

(b)       **Defaulting Lender Cure**. If the Borrower and the Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with their Commitments, whereupon that Lender will cease to be a Defaulting Lender; **provided** that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from

39

Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

## SECTION 3    CONDITIONS PRECEDENT

3.1    **Closing Date**. The obligations of each Lender to make Loans on the initial Funding Date are effective upon the satisfaction, or waiver by such Lender, of the following conditions (in addition to the conditions precedent set forth in **Section 3.2**) on or before the Closing Date, each to the satisfaction of the Administrative Agent and the Required Lenders:

(a)    **Credit Agreement and Collateral Documents**. The Agents shall have received fully executed copies of (i) this Agreement (together with the schedules and exhibits thereto) and (ii) the other Collateral Documents, including the Collateral Agreement (together with the schedules and exhibits thereto).

(b)    **Funding Notice**. The Administrative Agent shall have received a fully executed and delivered Funding Notice, no later than 1:00 p.m. (New York City time) at least five Business Day in advance of the Closing Date (or such later time as the Administrative Agent may agree), together with a flow of funds memorandum attached thereto with respect to the initial funding of Loans on the Funding Date.

(c)    **Interim DIP Order**. The Interim DIP Order (i) shall have been entered on or before June 26, 2025 (or such longer period as the Required Lenders may agree) and shall be in full force and effect and (ii) shall not have been amended, supplemented, appealed, altered, stayed, vacated, rescinded or otherwise modified, without the prior written consent of the Required Lenders.

(d)    **First Day Orders**. The "first day" orders (including a cash management order), which shall be in form and substance satisfactory to the Required Lenders, shall have been entered upon an application or motion of the Credit Parties in form and substance satisfactory to the Required Lenders.

(e)    **Approved Budget**. The Required Lenders shall have received and approved, in their sole discretion, the Initial Approved Budget.

(f)    **Fees**. The Borrower shall have paid to the Administrative Agent and the Collateral Agent the fees payable to each such Person on the Closing Date referred to in **Section 2.8(a)**, in each case, to the extent due and payable on the Closing Date.

(g)    **Secretary's Certificate and Attachments**. The Administrative Agent shall have received an executed officer's certificate of each Credit Party, together with all applicable attachments, certifying as to the following:

(i)    *Organizational Documents*. Attached thereto is a copy of each Organizational Document of such Credit Party, to the extent applicable and customary in the relevant jurisdiction of such Credit Party, certified as of a recent date by the appropriate governmental official, each dated the Closing Date or a recent date prior thereto.

(ii)    *Signature and Incumbency*. Set forth therein are the signature and incumbency of the officers or other authorized representatives of such Credit Party executing the Credit Documents to which it is a party.

(iii)    ***Resolutions***. Attached thereto are copies of resolutions of the Board of Directors of such Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date as being in full force and effect without modification or amendment.

(iv)    ***Good Standing Certificates***. Attached thereto is a good standing certificate (if applicable) from the applicable Governmental Authority of such Credit Party's jurisdiction of incorporation, organization or formation dated as of a recent date prior to the Closing Date.

(h)    **"Know-Your-Customer", Etc**. The Administrative Agent and each applicable Lender shall have received all documentation and other information required under Anti-Terrorism Laws and applicable "know-your-customer" and anti-money laundering Laws, including certificates required under the Beneficial Ownership Regulation, including, without limitation, a duly executed W-9 (or such other applicable tax form) of the Borrower.

(i)    **Promissory Notes**. Delivery of each Note requested by a Lender in accordance with **Section 2.4(b)**, if any.

(j)    **Expenses**. The Administrative Agent and each Lender shall have received to the extent invoiced at least two Business Days prior to the Closing Date (except as otherwise reasonably agreed by the Borrower), reimbursement or payment in full, in cash, of all reasonable and documented out-of-pocket expenses (including fees, charges and disbursements of Latham & Watkins LLP and [●]) required to be reimbursed or paid by any Credit Party under any Credit Document; ***provided***, that, [each] of Latham & Watkins LLP [and [●]] may provide summary copies of its invoices (which shall not be required to contain time entries, if any, and which may be redacted or modified to delete any privileged information or any other confidential information but shall include a general brief description of the nature of the matters for which services were performed), and it is understood and agreed that such summary copies shall constitute sufficient documentation in accordance with this **paragraph (j)**.

3.2    **Conditions to Each Extension of Credit**. The agreement of each Lender to make any extension of credit requested to be made by it on any Funding Date is subject to the satisfaction of the following conditions precedent:

(a)    **Representations and Warranties**. Each of the representations and warranties made by any Credit Party in or pursuant to the Credit Documents shall be true and correct in all material respects (unless qualified by materiality, in which case they shall be true and correct in all respects) on and as of such date as if made on and as of such date (except to the extent made as of a specific date, in which case such representation and warranty shall be true and correct in all material respects (unless qualified by materiality, in which case they shall be true and correct in all respects) on and as of such specific date). The Administrative Agent shall have received a certificate from an Authorized Officer of the Borrower certifying as to the conditions contained in this **Section 3.2(a)**.

(b)    **No Default**. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(c)    **Notices**. The Borrower shall have delivered to the Administrative Agent the notice of borrowing or Application, as the case may be, for such extension of credit in accordance with this Agreement.

(d)        **MAE**. Since the Petition Date, no Material Adverse Effect shall have occurred.

(e)        **Draw No. 2 Funding**. Solely in respect of the Draw No. 2 Funding, the Bankruptcy Court shall have entered the Final DIP Order prior to funding such Draw No. 2 Funding.

(f)        **Draw No. 3 Funding**. Solely in respect of the Draw No. 3 Funding, such Draw No. 3 Funding shall occur on August 4, 2025 (or such other date as may be agreed by the Required Lenders).

(g)        **Draw No. 4 Funding**. Solely in respect of the Draw No. 4 Funding, such Draw No. 4 Funding shall occur on August 4, 2025 (or such other date as may be agreed by the Required Lenders).

(h)        **DIP Order**. The DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or subject to a stay without the prior written consent of the Required Lenders.

Each borrowing by the Borrower hereunder shall constitute a representation and warranty by the Borrower as of the date of such extension of credit that the conditions contained in this **Section 3.2** have been satisfied.


**SECTION 4    REPRESENTATIONS AND WARRANTIES**

In order to induce the Lenders and each Agent to enter into this Agreement, and the Lenders to make each Credit Extension, each Credit Party represents and warrant to the Lenders and the Agents on the Closing Date that the following statements are true and correct:

4.1        **Organization; Required Power and Authority; Qualification**. Except as permitted under **Section 6.7**, each Credit Party: (a) is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization or incorporation as identified in **Schedule 4.1**, (b) subject to the entry of the DIP Order and subject to the terms thereof and any restrictions arising on account of such Credit Party's status as a "debtor" under the Bankruptcy Code, has all requisite corporate (or equivalent) power and authority to own and operate its properties, to lease the property it operates as lessee, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) except as a result of the commencement of the Chapter 11 Cases, is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except, in each case, in jurisdictions where the failure to be so qualified or in good standing would not be reasonably expected to have a Material Adverse Effect.

4.2        **Equity Interests and Ownership**. The Equity Interests constituting Pledged Equity Interests have been duly authorized and validly issued and are fully paid and non-assessable. Except as set forth on **Schedule 4.2**, there is no existing option, warrant, call, right, commitment or other agreement (including preemptive rights) to which Borrower or any of its Restricted Subsidiaries is a party requiring, and there is no Equity Interest constituting Pledged Equity Interests outstanding which upon conversion or exchange would require, the issuance by Borrower or any of its Restricted Subsidiaries of any additional Equity Interests constituting Pledged Equity Interests of Borrower or any of its Restricted Subsidiaries or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, Equity Interests constituting Pledged Equity Interests of Borrower or any of its Restricted Subsidiaries. **Schedule 4.2** correctly sets forth the ownership interest of the Borrower and its Restricted Subsidiaries in

their respective Restricted Subsidiaries in which Equity Interests constituting Pledged Equity Interests are held as of the Closing Date.

4.3     **Due Authorization**. Subject to the entry of the DIP Order and subject to the terms thereof, the execution, delivery and performance of the Credit Documents have been duly authorized by all necessary corporate or limited liability or other entity action, as applicable, on the part of each Credit Party that is a party thereto.

4.4     **No Conflict**. Subject to the entry of the DIP Order and subject to the terms thereof, the execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate any of the Organizational Documents of the Borrower or any Guarantor or otherwise require any approval of any stockholder, member or partner of the Borrower or any Guarantor, except for such approvals or consents which will be obtained on or before the Closing Date; (b) violate any provision of any Law applicable to or otherwise binding on the Borrower or any Guarantor, except to the extent such violation would not be reasonably expected to have a Material Adverse Effect; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of the Borrower or any Guarantor (other than any Liens created under any of the Credit Documents in favor of the Collateral Agent on behalf of the Secured Parties or any other Permitted Lien); or (d) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under, or otherwise require any approval or consent of any Person under, any material Contractual Obligation relating to any Indebtedness of the Borrower or any Guarantor (other than the Prepetition Credit Agreement), except to the extent such conflict, breach or default would not reasonably be expected to have a Material Adverse Effect, and except for such approvals or consents (i) which will be obtained on or before the Closing Date and have been disclosed in writing to the Lenders or (ii) the failure of which to obtain would not reasonably be expected to have a Material Adverse Effect.

4.5     **Governmental Consents**. Subject to the entry of the DIP Order and subject to the terms thereof, the execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority, except (a) such as have been obtained and are in full force and effect, (b) for filings and recordings with respect to the Collateral to be made, or otherwise delivered to the Required Lenders for filing and/or recordation, as of the Closing Date, subject to the DIP Order, or (c) those which, if not obtained or made, would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.6     **Binding Obligation**. Subject to the entry of the DIP Order and subject to the terms thereof, each Credit Document has been duly executed and delivered by each Credit Party that is a party thereto and is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

4.7     **Historical Financial Statements**. The Historical Financial Statements were prepared in conformity with GAAP and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments.

4.8    **No Material Adverse Change**. Since the Petition Date, no event or change has occurred that has caused or would reasonably be expected to cause, either in any case or in the aggregate, a Material Adverse Effect.

4.9    **Adverse Proceedings**. Except for the Chapter 11 Cases, there are no Adverse Proceedings that are not stayed as a result of the commencement of the Chapter 11 Cases, individually or in the aggregate, that would reasonably be expected to have a Material Adverse Effect. Neither the Borrower nor any of its Restricted Subsidiaries is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any Governmental Authority, domestic or foreign, that are not stayed as a result of the commencement of the Chapter 11 Cases that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

4.10    **Payment of Taxes**. Subject to applicable bankruptcy law, the terms of the DIP Order and any required approval or order by the Bankruptcy Court and except for any Taxes disclosed on **Schedule 4.10**, as of the Closing Date, the Borrower and its Restricted Subsidiaries have paid all Taxes that were due and payable (including in the capacity as a withholding agent), other than any Tax being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) reserves or other appropriate provisions, as shall be required in conformity with GAAP shall have been made therefor, (b) the failure to so pay would not reasonably be expected, or (c) such payment has been stayed by the commencement of the Chapter 11 Cases.

4.11    **Title**. Except as a result of the commencement of the Chapter 11 Cases, each of the Borrower and its Restricted Subsidiaries has (a) good, sufficient and legal title to (in the case of fee interests in real property), (b) valid leasehold interests in (in the case of leasehold interests in real or personal property), (c) to each of the Borrower's and its Restricted Subsidiaries' knowledge, valid license rights in (in the case of license interests in Intellectual Property), and (d) good title to or right to use (in the case of all other personal property), all of their respective properties and assets reflected in their respective Historical Financial Statements referred to in **Section 4.7** and in the most recent financial statements delivered pursuant to **Section 5.1**, in each case except for (x) assets disposed of since the date of such financial statements in the ordinary course of business or as otherwise permitted under **Section 6.8** or (y) except for such defects in title as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Except for Permitted Encumbrances and as otherwise permitted by this Agreement including by **Section 6.2**, all such properties and assets are free and clear of Liens.

4.12    **Real Estate Assets**. As of the Closing Date, **Schedule 4.12** is a complete and correct list of (a) all Real Estate Assets, and (b) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Estate Asset of any Credit Party, regardless of whether such Credit Party is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment.

4.13    **Environmental Matters**. Neither the Borrower nor any of its Restricted Subsidiaries nor any of their respective properties or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity, in each case which individually or in the aggregate has had, or would reasonably be expected to have, a Material Adverse Effect. Neither the Borrower nor any of its Restricted Subsidiaries has received any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 USC. § 9604) or any comparable state Law that individually or in the aggregate has had, or would reasonably be expected to have, a Material Adverse Effect. To each of the Borrower's and its Restricted Subsidiaries' knowledge, there are and have been, no conditions, occurrences, or Hazardous Materials Activities which would reasonably be expected to form the basis of an Environmental Claim against the Borrower or any of its Restricted Subsidiaries that,

44

individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. Except as would not reasonably be expected to have a Material Adverse Effect, neither the Borrower nor any of its Restricted Subsidiaries has filed any notice under any Environmental Law indicating past or present treatment of Hazardous Materials at any facility, and none of the Borrower's or any of its Restricted Subsidiaries' operations involves the generation, transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R. Parts 260-270 or any state equivalent that individually or in the aggregate has had, or would reasonably be expected to have, a Material Adverse Effect. No event or condition has occurred or is occurring with respect to the Borrower or any of its Restricted Subsidiaries relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity which individually or in the aggregate has had, or would reasonably be expected to have, a Material Adverse Effect. The representations and warranties in this __Section 4.13__ are the sole representations and warranties of Borrower with respect to environmental matters, including matters arising under Environmental Law or involving Environmental Claims, Hazardous Materials, or Hazardous Materials Activities.

4.14    __Investment Company Regulation__. Neither the Borrower nor any of the Guarantors is, or is required to be, registered under the Investment Company Act of 1940.

4.15    __Margin Stock__. Neither the Borrower nor any of its Restricted Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No part of the proceeds of any Credit Extension made to or for the benefit of any Credit Party will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors.

4.16    __Employee Matters__. Neither the Borrower nor any of its Restricted Subsidiaries is engaged in any unfair labor practice that would reasonably be expected to result in a Material Adverse Effect. There is (a) no unfair labor practice complaint pending against the Borrower or any of its Restricted Subsidiaries or, to the knowledge of the Borrower, threatened against any of them before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is pending against the Borrower or any of its Restricted Subsidiaries or, to the knowledge of the Borrower, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving the Borrower or any of its Restricted Subsidiaries, (c) to the knowledge of the Borrower, no union representation question existing with respect to the employees of the Borrower or any of its Restricted Subsidiaries and (d) to the knowledge of the Borrower, no union organization activity that is taking place, except, with respect to any matter specified in __clause (a)__, __(b)__, __(c)__ or __(d)__ above, either individually or in the aggregate, that would not reasonably be likely to give rise to a Material Adverse Effect.

4.17    __Employee Benefit Plans__. Except to the extent excused by the Bankruptcy Court, as a result of the filing of the Chapter 11 Cases or as would not result in a Material Adverse Effect: (i) with respect to each Employee Benefit Plan and Foreign Pension Plan, the Borrower and its Restricted Subsidiaries are in material compliance with all applicable Laws, including the provisions and requirements of ERISA and the Code, and have performed all their obligations under each Employee Benefit Plan; (ii) each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter which would reasonably be expected to cause such Employee Benefit Plan to lose its qualified status; (iii) no liability to the PBGC (other than required premium payments) has been or is expected to be incurred by any ERISA Party; (iv) no ERISA Event has occurred or is reasonably expected to occur; (v) no ERISA Party is in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan; and (vi) neither the Borrower nor any of its Restricted Subsidiaries has incurred any material obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan.

4.18    **Use of Proceeds**. The proceeds of the Loans shall be used in accordance with the terms of the DIP Order, the Credit Documents and the Approved Budget. The proceeds of the Loans may not be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to, the DIP Facility, the DIP Term Sheet, or the Credit Documents, or the security interests and liens securing any of the Obligations, or to fund prosecution or assertion of any claims, or to otherwise litigate against any Lender.

4.19    **Compliance with Laws**.

(a)    **Generally**. Subject to the entry of the DIP Order and the terms thereof, each of the Borrower and its Restricted Subsidiaries is in compliance with all applicable Laws in respect of the conduct of its business and the ownership of its property, except such non-compliance that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(b)    **Anti-Terrorism Laws**. None of the Borrower or any of its Restricted Subsidiaries (and, to the knowledge of each such Person, no joint venture or subsidiary thereof) is in violation in any material respect of any Anti-Terrorism Law. As of the Closing Date, to the knowledge of the Borrower, the information included in the Beneficial Ownership Certification is true and correct.

(c)    **AML Laws; Anti-Corruption Laws and Sanctions**. None of (i) the Borrower, any of its Restricted Subsidiaries or any of their respective directors or officers, or, to the knowledge of the Borrower, any of their respective employees, or (ii) to the knowledge of the Borrower, any agent of the Borrower, any of its Restricted Subsidiaries that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Loan, use of proceeds or other transaction contemplated by this Agreement will cause a violation of AML Laws, Anti-Corruption Laws or applicable Sanctions by any Person participating in the transactions contemplated by this Agreement, whether as lender, borrower, guarantor, agent, or otherwise.

(d)    **Disclosure**. No representation or warranty of any Credit Party contained in any Credit Document or in any other documents, certificates or written statements furnished to any Agent or the Lenders by or on behalf of the Borrower or any of its Restricted Subsidiaries for use in connection with the transactions contemplated hereby, taken as a whole, contains any untrue statement of a material fact or omits to state a material fact (known to the Borrower, in the case of any document not furnished by either of them) necessary in order to make the statements contained herein or therein, taken as a whole, not materially misleading in light of the circumstances in which the same were made (after giving effect to all supplements thereto). Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by the Borrower to be reasonable at the time made, it being recognized by the Agents and the Lenders that such projections as to future events are not to be viewed as facts or a guarantee of performance and are subject to significant uncertainties and contingencies many of which are beyond the control of the Borrower and its Restricted Subsidiaries and that actual results during the period or periods covered by any such projections may differ significantly from the projected results and such differences may be material.

4.20    **Collateral**. Subject to **Section 5.15** of this Agreement and the entry of the DIP Order, the security interest of the Collateral Agent in the Collateral constitutes a valid, perfected second priority security interest in and continuing Lien on all of each Credit Party's right, title and interest in, to and under the Collateral (subject to Permitted Encumbrances and other Permitted Liens).

4.21    **DIP Order**. The DIP Order is valid, genuine, legal and enforceable against the Credit Parties and the other parties subject thereto, and has not been reversed, stayed (whether by statutory stay or otherwise), modified, waived or amended without the consent of the Required Lenders.

4.22    **Intellectual Property**. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) the Borrower or the other Credit Parties own all Software that was developed by, for, or on behalf of Borrower or any of its Restricted Subsidiaries for use in the business, and (ii) each Credit Party has sufficient rights pursuant to a license or other valid and enforceable rights to all other Intellectual Property used in, or held for use in, the operation of each Credit Party's business as currently conducted. To the knowledge of any Credit Party, all Owned IP is subsisting, valid, and enforceable. Each Credit Party exclusively owns and possesses all right, title and interest in and to the Owned IP free and clear of all Liens, other than Permitted Liens.

## SECTION 5    AFFIRMATIVE COVENANTS

On and after the Closing Date, so long as any Commitment is in effect, and until payment in full of all Obligations (other than Remaining Obligations), each Credit Party shall, and shall cause each of its Restricted Subsidiaries to:

5.1    **Financial Statements and Other Reports and Notices**. Deliver to (x) the Administrative Agent (for further distribution to the Lenders) and (y) solely in the case of **Sections 5.1(k)**, **5.1(l)**, **5.1(m)**, **5.1(n)** and **5.1(o)**, the Lender Advisors (for further distribution the Lenders, as applicable):

(a)    **Quarterly Financial Statements**. 45 days after the end of each Fiscal Quarters of each Fiscal Year of the Borrower ending after the Closing Date, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such Fiscal Quarter and the related unaudited consolidated statements of income or operations, stockholders' equity (to the extent required on Form 10-Q) and cash flows for such Fiscal Quarter and the portion of the Fiscal Year through the end of such Fiscal Quarter, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail, together with a Financial Officer Certification and an MD&A Report with respect thereto.

(b)    **Annual Financial Statements**. 90 days after the end of each Fiscal Year, beginning with the Fiscal Year ending December 31, 2025, (i) the consolidated balance sheets of the Borrower and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year, all in reasonable detail, together with an MD&A Report with respect thereto; and (ii) with respect to such consolidated financial statements a report thereon by an independent certified public accountant of recognized national standing selected by the Borrower and reasonably satisfactory to the Required Lenders, which report shall not contain any going concern, scope of audit or similar qualification (other than resulting from (1) the maturity of the Loans at the Scheduled Maturity Date or any other Indebtedness maturing within one year from the time such report is delivered or (2) any prospective or actual default as a result of a breach of any financial covenant in documentation governing any Indebtedness permitted hereunder), and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of the Borrower and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements).

(c)    **[Reserved].**

(d)    **Compliance Certificate**.

(i)    Together with each delivery of financial statements of the Borrower and its Subsidiaries pursuant to **Sections 5.1(a)** and **5.1(b)**, a duly executed and completed Compliance Certificate.

(e)    **[Reserved]**.

(f)    **[Reserved]**

(g)    **Notices.** Promptly upon any officer of any Credit Party obtaining knowledge of any of the following, a certificate of its Authorized Officer specifying the nature and period of existence thereof, and what action the Borrower has taken, is taking and proposes to take with respect thereto:

(i)    any Default or Event of Default (other than as a result of the commencement of the Chapter 11 Cases);

(ii)    the institution of, or non-frivolous threat by, any Adverse Proceeding that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect;

(iii)    the occurrence of or forthcoming occurrence of any ERISA Event that would result in a Material Adverse Effect;

(iv)    (A) any Release required to be reported to any Governmental Authority under any applicable Environmental Laws that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, and (B) any remedial action taken by the Borrower or any of its Restricted Subsidiaries in response to (1) any Hazardous Materials Activities the existence of which would reasonably be expected to result in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (2) any Environmental Claims that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect; and

(v)    following the Petition Date, any event or change that, individually or in the aggregate, would reasonably be expected to have Material Adverse Effect.

(h)    [reserved].

(i)    **Other Information.** Promptly, all such financial and other information as the Administrative Agent shall reasonably request relating to (i) the Collateral, (ii) the assets and business and operations of the Borrower, the Guarantors and their respective Subsidiaries, (iii) the Chapter 11 Cases and (iv) the compliance with any Credit Document.

(j)    **Approved Budget.** No later than 1:00 p.m., New York City time, every Monday (commencing on July 14, 2025, the "**Initial Reporting Date**", and with each subsequent Monday, collectively and individually, each a "**Reporting Date**"), a Budget. For the purposes of this Agreement, the "**Approved Budget**" shall refer, initially, to the Initial Approved Budget and, upon the delivery of an updated Budget to the Required Lenders, such updated Budget shall become the "Approved Budget" upon the date on which the Required Lenders, in their sole discretion, shall have approved such Budget (which approval may be by e-mail from the Lender Advisors). The then-existing Approved Budget shall remain the Approved Budget for the projection period, without giving effect to any update, modification or supplement (with appropriate adjustments for the timing of monthly or semi-monthly disbursements), until such time as another Budget is approved by the Required Lenders in their sole discretion. Notwithstanding anything to the contrary, the Required Lenders may approve, in their sole discretion, all, none or only a

48

portion of such update, modification or supplement to the Budget for any period covered by such update, modification or supplement as determined by the Required Lenders in their sole discretion; **provided**, however, once any period or any portion of a Budget has been approved it may not later be rejected, modified or supplemented by the Required Lenders.

(k)    **Variance Report**. No later than 3:00 p.m., New York City time, every Monday (commencing on June 30, 2025),

(i)    an aggregate variance report (a "**Variance Report**"), which shall be substantially consistent in form, scope and detail as the Approved Budget, and which will contain: (x) the actual disbursements of the Borrowers and actual receipts during the applicable Test Period and (y) any variance (whether positive or negative, expressed as a percentage) between the actual disbursements during such Test Period against the estimated disbursements for the applicable Test Period, as set forth in the applicable Approved Budget and (z) written commentary from management of the Borrower explaining all variances between budgeted and actual disbursements; and

(ii)    a description of cash movements and other transactions between any Credit Party and any affiliate (other than another Credit Party) during the prior two week period.

(l)    **Variance Report Certificate**. Concurrently with the delivery of each Variance Report pursuant to **Section 5.01(k)** above, a certificate prepared in respect of such Variance Report certifying compliance by the Credit Parties with the Permitted Disbursement Variance and confirming that no Default or Event of Default shall exist or be continuing as of such time, or shall be reasonably expected to occur or arise (**provided**, that, if such certification and confirmation cannot be provided for any reason, such certificate shall specifically identify and describe the instance of any non-compliance or default, and the facts, circumstances, extent/amount of, reason for, and other information relevant to, such non-compliance or default; **provided**, **however**, that, the compliance with the foregoing shall in any event not be deemed to cure or negate any non-compliance with the Permitted Disbursement Variance or any Default or Event of Default) (a certificate that complies with the foregoing requirements, a "**Variance Report Certificate**").

(m)    [Reserved].

(n)    **Bankruptcy Documents**. As promptly as practicable prior to such filing (and in no event later than two business days prior to such filing), drafts of all pleadings, motions, applications, responses, oppositions, judicial information, financial information, notices, reports, orders and other documents intended to be filed by or on behalf of any Credit Party with the Bankruptcy Court in the Chapter 11 Cases, and consult in good faith with the Required Lenders regarding the form and substance of any of the foregoing documents in advance of such proposed filing, execution, distribution or use (as applicable).

(o)    **Additional Reporting**. All written reports provided by the Credit Parties to any statutory committee, the U.S. Trustee (as defined in the DIP Order), or any other party in interest in the Chapter 11 Cases. In addition, the Credit Parties shall provide, any reporting that any Credit Party agrees or is obligated, under any Material Indebtedness or otherwise, to provide to the lenders under any Material Indebtedness, as and when required thereunder. Upon written request by the Required Lenders, promptly provide the Administrative Agent and the Required Lenders with updates on any material developments in connection with the Credit Parties' reorganization efforts under the Chapter 11 Cases, and documents related thereto, or otherwise.

5.2    **Existence**. Except as otherwise permitted under **Sections 6.8** and **6.9**, at all times preserve and keep in full force and effect its existence and, subject to any restriction on account of any Credit Party's status as a "debtor" under the Bankruptcy Code, all rights and franchises, licenses and permits material to its business; **provided**, any Restricted Subsidiary of the Borrower shall not be required to preserve any such existence, right or franchise, licenses and permits if the preservation thereof is no longer desirable in the conduct of the business of the Borrower and its Restricted Subsidiaries, taken as a whole, and that the loss thereof would not reasonably be expected to have a Material Adverse Effect.

5.3    **Payment of Taxes and Claims**. Subject to the DIP Order, applicable bankruptcy law and any required approval by the Bankruptcy Court, pay all applicable Taxes imposed upon it or any of its properties or assets for sums that have become due and payable with respect thereto except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and adequate reserves in conformity with GAAP are being maintained, (b) the failure to make a payment would not reasonably be expected, or (c) the requirement to so pay applicable Taxes has been stayed by virtue of the Chapter 11 Cases.

5.4    **Maintenance of Properties**. Maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear and casualty and condemnation excepted, all material properties useful and necessary in the business of the Borrower and its Restricted Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof, except where the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.5    **Insurance**. Use commercially reasonable efforts to maintain or cause to be maintained, with financially sound and reputable insurers, such public liability insurance, third party property damage insurance, business interruption insurance and casualty insurance (including customary flood insurance with respect to any Material Real Estate located in a Special Flood Hazard Area) with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Borrower and its Restricted Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons. Without limiting the generality of the foregoing, the Borrower and its Restricted Subsidiaries will maintain or cause to be maintained actual cash value casualty insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses.

5.6    **Books and Records**. Keep proper books of record and accounts in which full, true and correct entries in conformity in all material respects with GAAP shall have been made.

5.7    **Inspections**. Permit each of the Administrative Agent and any authorized representatives designated by the Administrative Agent to visit and inspect any of the properties of the Borrower and its Restricted Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants (and the Borrower will be given the opportunity to participate in any such discussion with such independent public accountants), all upon reasonable prior notice and at such reasonable times during normal business hours and as often as may reasonably be requested and at the Credit Parties' expense. Notwithstanding anything to the contrary in this **Section 5.7**, none of the Borrower or any of its Restricted Subsidiaries shall be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the

Administrative Agent or any Lender (or their respective representatives) is prohibited by applicable Law or any third party contract legally binding on Borrower or such Restricted Subsidiary, or (iii) is subject to attorney, client or similar privilege or constitutes attorney work-product.

5.8     **Lenders Meetings**. Participate in a telephone meeting of the Required Lenders every week (commencing with the week beginning July 14, 2025) (at a time mutually agreed upon by the Borrower and the Required Lenders) with all Lenders who choose to attend such conference call and management of the Borrower, and other advisors to the Company requested to join by the Required Lenders, at which conference call shall be discussed any matters material to the business of the Borrower and its Subsidiaries, including, but not limited to, those items covered in the Approved Budget and/or the reports delivered pursuant to **Sections 5.1(l)**, **5.1(n)** and **5.1(o)** and any asset sale (including the Sale), preparation for strategic processes and/or any issues related to the financial affairs, finances, business, assets, operations or condition (financial or otherwise) of the Credit Parties and their Subsidiaries, including such matters as may be requested by the Required Lenders; ***provided***, that the requirements set forth in this **Section 5.8** may be waived in the sole and absolute discretion of the Required Lenders in writing (including via e-mail of the Lender Advisors).

5.9     **Compliance with Laws**.

(a)     **Generally**. Comply with the requirements of all applicable Laws (including all Environmental Laws), except for any noncompliance which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     **Anti-Terrorism Laws**. Comply in all material respects with all Anti-Terrorism Laws applicable thereto.

(c)     **Anti-Corruption Laws**. Maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Restricted Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws, applicable AML Laws and applicable Sanctions in all material respects.

5.10    **Environmental**. Promptly take any and all actions necessary and required under Environmental Laws to (a) cure any violation of applicable Environmental Laws by the Borrower or its Restricted Subsidiaries that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (b) make an appropriate response to any Environmental Claim against the Borrower or any of its Restricted Subsidiaries and discharge any legally binding obligations it may have to any Person thereunder, in each case, where failure to do so would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.11    **Subsidiaries**. Within 45 days (or such longer period as acceptable to the Required Lenders) after the date any Person becomes a Restricted Subsidiary of the Borrower, or ceases to be an Excluded Subsidiary, shall (provided that during the pendency of the Chapter 11 Cases, the foregoing 45-day period shall be shortened to 10 days, or such longer period as acceptable to the Required Lenders):

(a)     **Notice to Administrative Agent**. Promptly send to the Administrative Agent written notice setting forth with respect to such Person, if applicable, (x) the date on which such Person became a Restricted Subsidiary of the Borrower or ceased to be an Excluded Subsidiary, and (y) all of the data required to be set forth in **Schedules 4.1** and **4.2** with respect to all Restricted Subsidiaries of the Borrower, and such written notice shall be deemed to supplement **Schedules 4.1** and **4.2** for all purposes hereof;

(b)    **Counterpart Agreement**. Other than with respect to an Excluded Subsidiary, promptly cause such Restricted Subsidiary to become a Guarantor hereunder by executing and delivering to the Administrative Agent and the Collateral Agent a Counterpart Agreement, upon which time such Restricted Subsidiary (i) shall automatically become a Guarantor and thereupon shall have all of the rights, benefits, duties and obligations in such capacity under the Credit Documents and (ii) will grant Liens to the Collateral Agent, for the benefit of the Administrative Agent and the Lenders in any property of such Restricted Subsidiary which constitutes Collateral;

(c)    **Corporate Documents**. Other than with respect to an Excluded Subsidiary, take all such corporate or limited liability company or other entity organizational actions, as applicable, and execute and deliver, or cause to be executed and delivered, all such applicable documents, instruments, agreements, and certificates as are similar to those described in **Section 3.1(g)** and **(h)**; and

(d)    **Collateral Documents**. Other than with respect to an Excluded Subsidiary, deliver all such applicable documents, instruments, agreements, and certificates consistent with those delivered on the Closing Date and take all of the actions necessary to grant and to perfect a second priority Lien (subject to Permitted Liens) in favor of the Collateral Agent, for the benefit of the Secured Parties (subject to any limitations sets forth in the DIP Order) in the Equity Interests of such Restricted Subsidiary and in substantially all of the personal property of such Restricted Subsidiary (other than Excluded Assets).

5.12    **Compliance with Milestones**. Each Credit Party shall, and shall cause each of its Subsidiaries to, satisfy and comply with the requirements of each of the milestones set forth below (each, a "**DIP Milestone**") by the deadlines stated below (as such deadlines may be extended upon the terms and conditions of the DIP Order or in the sole and absolute discretion of the Required Lenders in writing (including via e-mail of the Lender Advisors)):

(a)    The Bankruptcy Court shall have entered the Interim DIP Order by no later than June 24, 2025;

(b)    The Borrowers shall file, by June 27, 2025, a motion to sell all or substantially all of the Debtors' assets through a sale pursuant to Section 363 of the Bankruptcy Code (the "**Sale**"), which motion shall be in form and substance acceptable to the Required Lenders (the "**Sale Motion**").

(c)    The Bankruptcy Court shall have entered the Final DIP Order by no later than July 15, 2025;

(d)    The Bankruptcy Court shall have entered an order approving the bidding procedures contemplated by the Sale Motion (with Flexgen as stalking horse bidder) by July 15, 2025;

(e)    The Bankruptcy Court shall have entered an order approving the Sale by no later than August 8, 2025, and such order shall be in form and substance acceptable to the Required Lender in its sole and exclusive discretion; and

(f)    The Sale shall be consummated, and the Prepetition Secured Obligations shall be paid off in full, by no later than August 11, 2025.

5.13    **Use of Proceeds**.

(a)    **Approved Budget**. Use the proceeds of any Credit Extension in accordance with the terms of the DIP Order, the Credit Documents and the Approved Budget, including, without limitation: (i) to pay amounts due to Lenders and the Agents hereunder and professional fees and expenses (including

legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Agents, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby and (ii) to provide working capital and for other general corporate purposes of the Credit Parties, in each case, in accordance with the DIP Order and the Approved Budget. The Borrower will not permit the proceeds of the Loans to be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to, the DIP Facility, the DIP Term Sheet, or the Credit Documents, or the security interests and liens securing any of the Obligations, or to fund prosecution or assertion of any claims, or to otherwise litigate against any Lender.

(b)    **Margin Regulations**. The Borrower and its Restricted Subsidiaries shall not use any portion of the proceeds of any Credit Extension in any manner that causes such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors or any other regulation thereof applicable to Margin Stock.

(c)    **Anti-Corruption Laws, AML Laws and Sanctions**. The Borrower shall not request any Credit Extension, nor use, and shall not permit that its Restricted Subsidiaries and its or their respective directors, officers and employees (in such individual's capacity as such) to use, directly or indirectly, the proceeds of any Credit Extension, or lend, contribute or otherwise make available such proceeds to any Restricted Subsidiary, other Affiliate, joint venture partner or other Person, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or AML Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (iii) in any manner that would result in the violation of any Sanctions by any Person (including any Person participating in the transactions contemplated hereunder, whether as underwriter, advisor lender, investor or otherwise).

5.14    **Further Assurances**. Subject to the express limitations set forth herein and in the Collateral Documents, at any time or from time to time upon the request of the Administrative Agent or the Required Lenders, each Credit Party will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Required Lenders, the Administrative Agent or the Collateral Agent may reasonably request in order to effect fully the purposes of the Credit Documents. In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as the Required Lenders, the Administrative Agent or the Collateral Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by substantially all of the assets of the Parent Pledgor, the Borrower, and its Restricted Subsidiaries that are Guarantors and all of the outstanding Equity Interests of the Restricted Subsidiaries of the Borrower (subject to limitations contained in the Credit Documents with respect to Foreign Subsidiaries and any Excluded Subsidiaries), in each case, in accordance with the DIP Order.

5.15    **Post-Closing Obligations**. Execute and deliver the documents and complete the tasks set forth on **Schedule 5.15**, in each case within the time limits specified on such schedule (which may be extended by the Required Lenders which extension may be granted by electronic e-mail).

5.16    **Bankruptcy Matters**. Each Credit Party shall:

(a)    Provide the Administrative Agent, the Lenders and the Lender Advisors with draft copies of all material motions, applications, supporting papers and notices prepared by any Borrower (including forms of orders and notices to interested parties) relating to the assumption and assignment of any executory contract or unexpired lease, or otherwise relating to the transactions contemplated by the Sale not later than two business days prior to filing.

(b)       cause all proposed (i) orders related to the Loans and other Obligations and the Credit Documents, seeking approval of any other financing or use of cash collateral, adequate protection, any Plan of Reorganization and/or any disclosure statement related thereto and (ii) orders seeking relief under Section 363 of the Bankruptcy Code or Section 9019 of the Federal Rules of Bankruptcy Procedure, in each case, proposed by the Credit Parties to be in accordance with and permitted by the terms of this Agreement and acceptable to the Agents and the Required Lenders, in each case, in their discretion in all respects;

(c)       comply in a timely manner with their obligations and responsibilities as debtors in possession under the Bankruptcy Code, the Bankruptcy Rules, the DIP Order and any other order of the Bankruptcy Court;

(d)       comply with the Approved Budget (subject to the Permitted Disbursement Variance); and

(e)       provide prior written notice as soon as reasonably practicable to the Required Lenders prior to any assumption or rejection of any Credit Party's or any Subsidiary's contracts or real property leases pursuant to Section 365 of the Bankruptcy Code.

5.17    **Operating Covenant**.

(a)       Each Credit Party shall operate its business and that of its direct and indirect subsidiaries in the ordinary course in a manner that is consistent with this Agreement, the most current business plan provided to the Lenders, past practices, and, except as expressly contemplated or provided in this Agreement, use commercially reasonable efforts to preserve intact such Credit Party's and each of its direct and indirect subsidiaries' business organization and relationship with third parties (including lessors, licensors, suppliers, distributors and customers) and employees; **provided** that, the Borrower (i) may continue to implement the LTSA Program (defined in the Motion of the Debtors for Entry of an Order) (I) authorizing the debtors thereunder to enter into a new customer program with existing customers and (II) Granting Related Relief [Docket No. 15]; and (ii) shall not grant "IP access" to any customers unless contractually obligated to do so.

(b)       Each Credit Party and its subsidiaries shall operate its business in compliance with Section 5.3 of the Stalking Horse Purchase Agreement.

5.18    **Right of First Refusal**. Each Credit Party hereby acknowledges and agrees that the Required Lenders hereunder shall have and maintain a right of first refusal to act as the stalking horse bidder in connection with the Sale of the Borrowers' assets. To the extent the Required Lenders elect not to serve as the stalking horse bidder in connection with the Sale, the Borrowers shall have the right to select an alternative stalking horse bidder (an "**Alternative Stalking Horse**") and the Lenders shall have the continued right to credit bid the Obligations in any auction. To be acceptable, any bid by an Alternative Stalking Horse must provide a reasonable offer representing the highest and best bid received by the Borrowers at the time the bid was made by the Alternative Stalking Horse, which bid shall be consistent with the bidding procedures and subject to the approval of the Bankruptcy Court and shall include funding for repayment of the Obligations in full and allowed closing costs.

## SECTION 6    NEGATIVE COVENANTS

On and after the Closing Date, so long as any Commitment is in effect and until payment in full of all Obligations (other than Remaining Obligations), no Credit Party shall, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly:

6.1    **Indebtedness**. Subject to compliance with the Approved Budget, create, incur, assume or suffer to exist any Indebtedness, except:

(a)

(i)    the Obligations;

(ii)    Indebtedness existing on the Closing Date and set forth in **Schedule 6.1(a)(ii)**; and

(iii)    Indebtedness under the Prepetition Credit Agreement outstanding on the Closing Date;

(b)    Indebtedness that may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations (but not with respect to letters of credit) incurred in the ordinary course of business or in respect of workers' compensation claims, health, disability or other employee benefits or property, banker's acceptances, customs, Taxes and other similar tax guarantees, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims;

(c)    Indebtedness of the Borrower or any of its Restricted Subsidiaries in respect of cash pooling, customary cash management, setting off, netting services, overdraft protections and otherwise in connection with deposit and securities accounts arising in the ordinary course of business;

(d)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided, such Indebtedness is extinguished within 30 days after its incurrence;

(e)    Indebtedness consisting of

(i)    unpaid insurance premiums (not in excess of eighteen months' premiums) owing to insurance companies and insurance brokers incurred in connection with the financing of insurance premiums in the ordinary course of business, in the ordinary course of business;

(ii)    take-or-pay obligations contained in supply arrangements, in the ordinary course of business; and

(iii)    Indebtedness incurred by the Borrower or any of its Restricted Subsidiaries in respect of bank guarantees, warehouse receipts, letters of credit, or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance, or other Indebtedness with respect to reimbursement type obligations regarding workers compensation claims; **provided** that any reimbursement obligations in respect thereof are reimbursed within 30 days following the due date thereof;

(f)    guaranties in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of the Borrower and its Restricted Subsidiaries;

(g)

(i)       endorsements for collection, deposit or negotiation and warranties of products or services, in each case incurred in the ordinary course of business and

(ii)      treasury and cash management obligations, including depository, credit or debit card, purchasing cards, electronic funds transfer and other cash management arrangements;

(h)      Indebtedness and guaranties of the Borrower or any of its Restricted Subsidiaries owing to (or made by) the Borrower or any of its Restricted Subsidiaries to the extent the Investment made by the person extending such credit or making such guaranty is permitted under **Section 6.6(d)**;

(i)      guarantees of the Borrower or any Restricted Subsidiary in respect of Indebtedness otherwise permitted hereunder of the Borrower or any Restricted Subsidiary, so long as, in the case of a guarantee provided by a Credit Party in respect of Indebtedness of a Restricted Subsidiary that is not a Credit Party, such guarantee is in the ordinary course of business and made in accordance with the Approved Budget;

(j)      subject to the Approved Budget, Indebtedness (other than for borrowed money) in respect of bid bonds, performance bonds, surety bonds, appeal bonds, completion guaranties and similar obligations, in each case, incurred by Borrower or any of its Restricted Subsidiaries in the ordinary course of business, including guaranties or obligations with respect to letters of credit supporting such bid bonds, performance bonds, surety bonds, appeal bonds, completion guaranties and similar obligations;

(k)      Indebtedness representing deferred compensation to employees of the Borrower or any of its Restricted Subsidiaries; and

(l)      Indebtedness arising from judgments or decrees not constituting an Event of Default under **Section 8.1(h)**.

Notwithstanding anything in this Agreement to the contrary, from and after the date of the Closing Date, no Indebtedness, other than as permitted pursuant to **Section 6.1(a)(iii)**, shall be issued with a Lien on the Collateral which is pari passu with or senior to the Lien in favor of the Secured Parties hereunder.

6.2    **Liens**. Subject to compliance with the Approved Budget, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind of the Borrower or any of its Restricted Subsidiaries, whether now owned or hereafter acquired, except:

(a)

(i)      Liens in favor of the Collateral Agent for the benefit of the Secured Parties granted pursuant to any Credit Document,

(ii)      Liens existing on the Closing Date and set forth on **Schedule 6.2(a)(ii)**, and

(iii)     the Prepetition Liens;

(b)      each of the following Liens (each, a "**Permitted Encumbrance**"), excluding any such Lien imposed by any section of ERISA:

(i)      Liens for Taxes, assessments, charges or other governmental levies if the applicable Person is in compliance with **Section 5.3** with respect thereto;

(ii)    statutory or common law (or restatements of such laws in underlying contracts) Liens of landlords, sub-landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens arising in the ordinary course of business;

(iii)    (A) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (B) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Restricted Subsidiaries;

(iv)    pledges or deposits to secure the performance of bids, trade contracts, utilities, governmental contracts and leases (other than Indebtedness for borrowed money), statutory or regulatory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(v)    covenants, conditions, easements, rights-of-way, building codes, restrictions (including zoning restrictions), encroachments, licenses, protrusions and other similar encumbrances and minor title defects or survey matters, in each case affecting Real Estate Assets and that do not in the aggregate materially interfere with the ordinary conduct of the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

(vi)    Liens (A) in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business or (B) on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such person to facilitate the purchase, shipment or storage of such inventory or other goods in the ordinary course of business;

(vii)    Liens (A) of a collection bank arising under Section 4-208 or 4-210 of the Uniform Commercial Code on items in the course of collection and (B) in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institutions general terms and conditions;

(viii)    (A) other than with respect to Intellectual Property, any interest or title of a lessor, sub-lessor, licensor or sub-licensor under leases, subleases, licenses or sublicenses entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business or not otherwise materially interfering with the Borrower's or any of its Restricted Subsidiaries' business taken as a whole and (B) non-exclusive licenses, sublicenses, leases or subleases with respect to any assets granted to third Persons or the Borrower or a Restricted Subsidiary in the ordinary course of business;

(ix)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business permitted by this Agreement;

57

(x)    Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(xi)    Liens that are contractual, statutory or common law provision relating to banker's liens, rights of set-off, rights of pledge or similar rights and remedies (A) relating to the establishment of depository relations with banks or other deposit-taking financial institutions or investment or securities accounts, (B) relating to pooled deposit or sweep accounts of the Borrower or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any of its Restricted Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(xii)    Liens solely on any cash earnest money deposits made by the Borrower or any of its Restricted Subsidiaries in connection with any letter of intent or purchase agreement in connection with any Investment, Asset Sale, letter of intent or other transaction permitted hereunder;

(xiii)    ground leases in respect of Real Estate Assets on which facilities owned or leased by the Borrower or any of its Restricted Subsidiaries are located;

(xiv)    (A) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business complies, and (B) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

(xv)    Liens arising from precautionary Uniform Commercial Code financing statement or similar filings;

(xvi)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(xvii)    Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(xviii)    deposits of cash with the owner or lessor of premises leased and operated by the Borrower or its Restricted Subsidiaries to secure the performance of the Borrower's or such Restricted Subsidiary's obligations under the terms of the lease for such premises;

(xix)    in the case of any non-wholly owned Restricted Subsidiary, any put and call arrangements or restrictions on disposition related to its Equity Interests set forth in its organizational documents or any related joint venture or similar agreement;

(xx)    Liens arising by operation of law in the United States under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(xxi)    Liens deemed to exist in connection with repurchase agreements, reverse repurchase agreements, securities lending and borrowing agreements and similar transactions;

(xxii)    Liens on amounts deposited as "security deposits" (or their equivalent) and other Liens relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Restricted Subsidiaries in the ordinary course of business in the ordinary course of business in connection with actions or transactions not prohibited by this Agreement;

(xxiii)    [reserved];

(xxiv)    Liens encumbering property or assets under construction (and proceeds or products thereof) arising from progress or partial payments by a customer of the Borrower or its Restricted Subsidiaries relating to such property or assets;

(xxv)    Liens on cash, Cash Equivalents or other property arising in connection with any defeasance, discharge or redemption of Indebtedness;

(xxvi)    Liens deemed to exist in connection with Investments in repurchase agreements under **Section 6.6**;

(c)    Liens securing judgments or orders for the payment of money not constituting an Event of Default under **Section 8.1(h)**;

(d)    Liens on Margin Stock owned by the Borrower and Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes; and

(e)    Liens (i) in favor of the Borrower or a Restricted Subsidiary on assets of a Restricted Subsidiary that is not a Credit Party securing permitted intercompany Indebtedness and (ii) in favor of the Borrower or any Guarantor; **provided** that any Lien made in favor of the Borrower or any Guarantor shall constitute Collateral.

6.3    **Payments and Prepayments of Junior Financing or Convertible Bond Indebtedness; Payments and Prepayments of Certain Indebtedness**.

(a)    Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Junior Financing or Convertible Bond Indebtedness (collectively, the "**Junior Restricted Financing**"), other than

(i)    payments made in compliance in all respects with the Approved Budget,

(ii)    payments agreed to in writing by the Required Lenders, or

(iii)    pursuant to the DIP Orders.

(b)    Make any payment of principal or interest or otherwise on account of any Indebtedness under the Prepetition Credit Agreement other than (i) payments made in compliance in all respects with the Approved Budget (subject to Permitted Disbursement Variance), (ii) payments agreed to in writing by the Required Lenders or (iii) pursuant to the DIP Orders.

(c)    Amend, modify or change any term or condition of any Junior Financing Documentation in violation of the applicable definition or criteria thereof of the applicable subordination terms or intercreditor agreement, or in any manner that is materially adverse to the interests of the Lenders.

6.4      **Restricted Payments**. Declare, order, pay or make any Restricted Payment (other than dividends payable solely in common stock of the Person making such dividend) except that, without duplication:

(a)      each Restricted Subsidiary may make Restricted Payments to the Borrower and other Credit Party;

(b)      subject to compliance with the Approved Budget, the Borrower may make Restricted Payments:

(i)      to (1) purchase its Equity Interests from present or former officers, directors, employees or consultants of the Borrower or Subsidiary upon the death, disability or termination of employment or services of such individual, (2) purchase, redeem or otherwise acquire any Equity Interests from employees, officers, directors and consultants of the Borrower or any Subsidiary by net exercise, net settlement, net withholding or otherwise, pursuant to the terms of any employee stock option, incentive stock or other equity-based plan or arrangement, and (3) consummate ordinary course net settlements made pursuant to its equity incentive program as in effect on the Closing Date;

(ii)      the proceeds of which shall be used by a parent entity to pay its operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business in any fiscal year plus any reasonable and customary indemnification claims made by directors or officers of the Borrower attributable to the ownership or operations of its Restricted Subsidiaries;

(iii)      the proceeds of which shall be used by the Borrower to pay franchise or similar taxes and other fees and expenses required to maintain its corporate existence;

(iv)      the proceeds of which shall be used to pay customary salary, bonus and other benefits payable to officers and employees of the Borrower to the extent such salaries, bonuses and other benefits are attributable to the ownership or operations of its Restricted Subsidiaries; and

(v)      to allow any parent entity of the Borrower to pay fees and expenses (other than to Affiliates) related to any unsuccessful equity or debt offering by any parent entity of the Borrower that is directly attributable to the ownership or operations of the Borrower and its Subsidiaries;

(c)      subject to compliance with the Approved Budget and the DIP Order, (i) in respect of any taxable period (or portion thereof) for which the Borrower or any Subsidiary is treated as a partnership, disregarded entity or other flow-through entity for U.S. federal income tax (other than a disregarded entity described in clause (ii)), distributions, directly or indirectly, to a direct or indirect parent of the Borrower in amounts in respect of any taxable year that shall not be greater than the amount equal to the product of (A) the sum of the amount of aggregate taxable income of Borrower or the applicable Subsidiary, as the case may be (taking into account any applicable loss carryforwards, interest carryforwards, credit carryforwards and other similar tax attributes of, or generated by, the Borrower or the applicable Subsidiary from prior periods that are available to offset such taxable income, or Taxes, of the applicable direct or indirect owner of Borrower, taking into account any applicable limitations), allocated to its equity holders for such taxable year, multiplied by (B) the highest combined marginal federal, state and local income tax rate applicable to any individual or corporation (whichever is higher) resident in New

York, New York, after taking into account the character of any income, gain or loss and taking into account any basis step-ups under Section 734(b) or 743(b) of the Code (and for the avoidance of doubt, Borrower or any applicable Subsidiary shall be permitted to make such distributions for taxes on a quarterly basis during such taxable year based on its best estimate of the amounts specified in the preceding sentence); provided that the total amount of such quarterly distributions for the taxable year shall (x) be reduced by any Taxes paid directly by the Borrower or any other Subsidiary on behalf of any direct or indirect owner of the Borrower and (y) not exceed the total amount otherwise distributable in accordance with the preceding sentence; and (ii) in respect of any taxable period for which the Borrower or any other Subsidiary is a member of a group filing a consolidated, combined affiliated or unitary income Tax return with any direct or indirect parent of the Borrower or for which the Borrower is a disregarded entity for U.S. federal income tax purposes that is wholly owned (directly or indirectly) by a corporation for U.S. federal income tax purposes, distributions, directly or indirectly, to such direct or indirect parent of the Borrower in amounts in respect of any Tax year does not, in the aggregate, exceed the amount that the Borrower and the other Subsidiaries that are members of such consolidated, combined affiliated or unitary group would have been required to pay in respect of such Taxes in respect of such year if the Borrower and the other Subsidiaries paid such income Taxes directly on a separate company basis or as a stand-alone consolidated or combined income Tax group (reduced by any such Taxes paid directly by the Borrower or any other Subsidiary).

6.5    **Burdensome Agreements**. Create or otherwise cause or suffer to exist or become effective any Contractual Obligation that encumbers or restricts the ability of the Borrower or any of its Restricted Subsidiaries to:

(a)    pay dividends or make any other distributions on any of such Restricted Subsidiary's Equity Interests owned by the Borrower or any other Restricted Subsidiary of the Borrower; or

(b)    create, incur, assume or suffer to exist any Lien upon any of its property or revenues;

**provided**, notwithstanding anything herein to the contrary, this **Section 6.5** shall not apply to Contractual Obligations that:

(i)    are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Restricted Subsidiary (and any amendments or modifications thereof that do not materially expand the scope of any such prohibition restriction or condition);

(ii)    represent Indebtedness of a Restricted Subsidiary that is not a Credit Party which is permitted by **Section 6.1** and which does not apply to any Credit Party;

(iii)    are customary restrictions that arise in connection with (x) any Permitted Lien and relate to the property subject to such Lien or (y) arise in connection with any disposition permitted by **Section 6.8** or **6.9** and relate solely to the assets or Person subject to such disposition;

(iv)    are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under **Section 6.6**;

(v)      are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under **Section 6.1** but solely to the extent any negative pledge relates to the property financed by such Indebtedness and the proceeds, accessions and products thereof;

(vi)      are customary restrictions on leases, subleases, licenses or contemplated by asset sale, merger, purchase or other similar agreements not prohibited hereby so long as such restrictions relate to the property interest, rights or the assets subject thereto;

(vii)      are customary provisions restricting subletting, transfer or assignment of any lease governing a leasehold interest of the Borrower or any of its Restricted Subsidiaries;

(viii)      are customary provisions restricting assignment or transfer of any agreement entered into in the ordinary course of business;

(ix)      are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(x)      arise in connection with cash or other deposits permitted under **Sections 6.2** and **6.6** and limited to such cash or deposit;

(xi)      are restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(xii)      are restrictions regarding licensing or sublicensing by the Borrower and its Restricted Subsidiaries of intellectual property in the ordinary course of business;

(xiii)      are restrictions on cash earnest money deposits in favor of sellers in connection with acquisitions not prohibited hereunder;

(xiv)      are customary provisions in partnership agreements, limited liability company organizational governance documents, asset sale and stock sale agreements and other similar agreements entered into in the ordinary course of business that restrict the transfer of ownership interests in such partnership, limited liability company or similar person;

(xv)      are in existence on the Closing Date and set forth on **Schedule 6.5** or any amendment thereto;

(xvi)      are restrictions with respect to a Restricted Subsidiary imposed pursuant to an agreement that has been entered into in connection with the disposition of all or substantially all of the Equity Interests or assets of such Restricted Subsidiary;

(xvii)      are customary restrictions or conditions imposed by any agreement relating to Liens permitted by this Agreement but solely to the extent that such restrictions or conditions apply only to the property or assets subject to such permitted Lien;

(xviii)      are customary restrictions pursuant to applicable Law, rule, regulation or order or the terms of any license, authorization, concession or permit; and

(xix)      are set forth in any agreement governing Indebtedness not prohibited by **Section 6.1**; **provided** that such restrictions and conditions are customary for such Indebtedness.

6.6    **Investments**. Make or own any Investment in any Person except Investments, in compliance with the Approved Budget, in or constituting:

(a)    cash and Cash Equivalents;

(b)    Investments detailed in the Approved Budget;

(c)    Investments of the Borrower or a Subsidiary in another Subsidiary to the extent existing as of the Closing Date;

(d)

(i)    intercompany Investments by the Borrower or any Restricted Subsidiary in any Credit Party;

(ii)    intercompany Investments by any Restricted Subsidiary that is not a Credit Party to any other Restricted Subsidiary that is not a Credit Party,

(iii)    intercompany Investments by any Credit Party in any Restricted Subsidiary in the ordinary course of business and made in compliance with the Approved Budget,

(iv)    investments in connection with cash management, cash pooling and other similar arrangements in the ordinary course of business and made in compliance with the Approved Budget, and/or

(v)    investments held by the Borrower or any Restricted Subsidiary on the Closing Date and set forth on **Schedule 6.6(d)**;

(e)    accounts receivable arising and trade credit granted in the ordinary course of business;

(f)    (i) Securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors or pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such account debtors, (ii) deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with the past practices of the Borrower and its Restricted Subsidiaries and (iii) Securities of trade creditors or customers that are received in settlement of bona fide disputes;

(g)    Investments made in the ordinary course of business consisting of negotiable instruments held for collection in the ordinary course of business and lease, utility and other similar deposits in the ordinary course of business and deposits with suppliers in the ordinary course of business and customary trade arrangements with customers consistent with past practice;

(h)    to the extent constituting Investments, deposit and securities accounts maintained in the ordinary course of business and in compliance with the provisions of the Credit Documents; and

(i)    Investments consisting of Indebtedness, Liens, fundamental changes, Asset Sales and Restricted Payments permitted under **Sections 6.1**, **6.2**, **6.4**, **6.7** and **6.8**, respectively (other than by reference to this **Section 6.6(i)**); **provided** that no Investment can be made solely pursuant to this **Section 6.6(i)**;

Notwithstanding anything in this **Section 6.6** to the contrary, in no event will any Credit Party (directly or indirectly through one or a series of transactions) sell, transfer, assign or grant an exclusive license with respect to or contribute any material Intellectual Property to any non-Credit Party.

6.7    **Fundamental Changes**. Other than with the consent of the Required Lenders, merge into, or consolidate or amalgamate with, any other person, or permit any other person to merge into or consolidate with it, or sell, transfer, license, lease or otherwise dispose of (in one transaction or in a series of transactions) all or any part of its assets, or issue, sell, transfer or otherwise dispose of any equity interests of any Borrower or any subsidiary of any Borrower, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other person or any division, unit or business of any other person, other than:

(a)    Asset Sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the Required Lenders in its reasonable discretion or is otherwise in accordance with the Approved Budget;

(b)    asset Sales in the ordinary course of business and consistent with past practice; and

(c)    dispositions of obsolete, worn out, used or surplus property in the ordinary course of business and consistent with past practice.

Notwithstanding anything in this **Section 6.7** to the contrary, in no event will any Credit Party, (directly or indirectly through one or a series of transactions) sell, transfer, assign or grant an exclusive license with respect to or contribute any material Intellectual Property to any non-Credit Party.

6.8    **Asset Sales**. Sell, lease or sub-lease (as lessor or sublessor), sell and leaseback, assign, convey, license (as licensor or sublicensor), transfer or otherwise dispose to (any of the foregoing, an "**Asset Sale**"), any Person, in one transaction or a series of transactions, of all or any part of the Borrower's or any of its Restricted Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed, including the Equity Interests of any of the Restricted Subsidiaries of the Borrower, except:

(a)    dispositions of obsolete, worn-out, used or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and dispositions of property no longer used or useful in the conduct of the business of the Borrower and the Subsidiaries;

(b)    the sale, lease, assignment, conveyance, transfer, license, exchange or disposition of inventory or other assets (other than Intellectual Property), in each case, in the ordinary course of business;

(c)    the sale, lease, assignment, conveyance, transfer, license, exchange or disposition of used, worn out, obsolete or surplus property by the Borrower or its Restricted Subsidiaries (other than Intellectual Property), in each case, which, in the reasonable judgment of the Borrower, is no longer economically practicable to maintain or necessary for or useful in the conduct of the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

(d)    any conveyance, transfer, exchange or disposition of assets which would constitute a Restricted Payment permitted under **Section 6.4** or an Investment permitted under **Section 6.6** (other than, in each case, by reference to this **Section 6.8(d)**);

64

(e)      the sale, lease, assignment, conveyance, transfer, license, exchange or disposition of assets resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset, or consisting of or subsequent to a total loss or constructive total loss of property;

(f)      assignments, licenses, cross-licenses, or sublicenses with respect to Intellectual Property granted to third parties on a non-exclusive basis in the ordinary course of business which, in the aggregate, do not materially detract from the value of the Collateral taken as a whole or materially interfere with the business of the Credit Parties and their Restricted Subsidiaries;

(g)      Asset Sales to, between or among the Borrower and any Guarantor;

(h)      Asset Sales (x) between or among any Restricted Subsidiary that is not a Guarantor or any other Restricted Subsidiary that is not a Guarantor or joint venture, (y) by a Restricted Subsidiary that is not a Guarantor to Borrower or any other Guarantor;

(i)      [reserved];

(j)      Asset Sales made in compliance with the Approved Budget (including the Sale);

(k)

(i)      the issuance or sale of shares of any Restricted Subsidiary's Equity Interests to (1) the Borrower or any Guarantor, or (2) if such Restricted Subsidiary is not a Credit Party, to another Restricted Subsidiary, and

(ii)      compensatory issuances or grants of Equity Interests of the Borrower approved by the Borrower's board of directors, any committee thereof or any designee of either to employees, officer, directors or consultants made pursuant to equity-based compensation plans or arrangements that have been approved by the shareholders of the Borrower; and

(l)      dispositions of leases entered into in the ordinary course of business, to the extent that they do not materially interfere with the business of the Borrower or any Restricted Subsidiary, taken as a whole;

Notwithstanding anything in this **Section 6.8** to the contrary, in no event will any Credit Party (directly or indirectly through one or a series of transactions) (i) sell, transfer, assign or grant an exclusive license with respect to or contribute any material Intellectual Property to any non-Credit Party, (ii) grant any non-Credit Party a license or other right with respect to any Owned IP not in effect on the date hereof, (iii) deposit any Software or other Owned IP into escrow, or (iii) provide any non-Credit Party with access to any Software or Owned IP which such non-Credit Party does not have access to as of the date hereof.

6.9      **Sales and Lease-Backs**. Become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Person (a) has sold or transferred or is to sell or to transfer to any other Person (other than the Borrower or any Guarantor), or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Person to any Person (other than the Borrower or any Guarantor) in connection with such lease, in each case other than as permitted by **Section 6.1**.

6.10      **Transactions with Affiliates**. Enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of the

Borrower (other than between or among the Borrower and its Restricted Subsidiaries), on terms that are materially less favorable to the Borrower or any of its Restricted Subsidiaries (taken as a whole), as the case may be, than those that might be obtained at the time from a Person who is not such an Affiliate; **provided**, the foregoing restriction shall not apply to:

(a)    any transaction between or among the Borrower and any of its Restricted Subsidiaries not otherwise restricted hereunder; provided that any transaction between or among any Credit Party and any non-Credit Party in reliance of this **clause (a)** shall be made in accordance with the Approved Budget;

(b)    subject to the Approved Budget, reasonable and customary indemnities (including the provision of directors and officers insurance) provided to, and reasonable and customary fees and out-of-pocket expense reimbursement paid to, members of the Board of Directors, officers and other employees of the Borrower and its Restricted Subsidiaries;

(c)    subject to the Approved Budget, reasonable and customary employment, compensation (including bonus) and severance arrangements for members of the Board of Directors, officers and other employees of the Borrower and its Restricted Subsidiaries and other employee benefit arrangements paid to or provided for the benefit of, directors, officers or employees thereof, each in the ordinary course of business;

(d)

(i)    Restricted Payments to the extent permitted under **Section 6.4**,

(ii)    Investments to the extent permitted under **Section 6.6**;

(e)    any transaction other than those that are otherwise exempt pursuant to this **Section 6.10**, existing on the Closing Date and set forth on **Schedule 6.10(e)** or any amendment thereto to the extent such amendment is not adverse to the Lenders;

(f)    employment arrangements entered into in the ordinary course of business between the Borrower or any Restricted Subsidiary and any employee thereof; and

(g)    transactions with customers, clients, suppliers, or purchasers or sellers of goods or services or providers of employees or other labor, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower or the Restricted Subsidiaries, in the reasonable determination of the members of the Board of Directors of the Borrower or the senior management thereof, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated Person.

6.11    **Fiscal Year**. Change its Fiscal Year-end from December 31; provided, that Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Required Lenders, in which case, the Borrower and the Required Lenders will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

6.12    **Lines of Business**. Enter into any business, either directly or through any Restricted Subsidiary, except for those businesses in which the Borrower and its Restricted Subsidiaries are engaged on the Closing Date or that are similar, corollary, reasonably related, incidental, ancillary or complementary thereto; **provided**, that during the pendency of the Chapter 11 Case, no Credit Party shall enter into any

business, either directly or through any Restricted Subsidiary, except for those businesses in which the Borrower and its Restricted Subsidiaries are engaged on the Closing Date or with the prior written consent of the Required Lenders.

6.13 **Budget Variance Covenant**. Pay any expenses or other disbursements other than in accordance with the Approved Budget, subject to the Permitted Distribution Variance. As of any applicable Testing Period, commencing on July 15, 2025, Total Disbursements shall not exceed Total Disbursements in the Approved Budget for such Test Period (the difference between such actual disbursements and such disbursements as reflected in the Approved Budget, the "**Actual Disbursement Variance**"), by more than 15% (the "**Permitted Disbursement Variance**").  If the Actual Disbursement Variance for such period is less than or equal to the Permitted Disbursement Variance, the dollar amount by which such Actual Disbursement Variance is less than the Permitted Disbursement Variance may either (i) be used to increase the amount held in the reserve line item for the Borrowers' wind down expenses or (ii) be carried forward to the next Testing Date and factored into the calculation of the Permitted Disbursement Variance for such next Testing Date.

6.14 **Prohibited Conduct**. Without the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders), no Credit Party shall, nor shall it permit any of its Subsidiaries to, do any of the following:

(a) seek any other debtor-in-possession financing with liens senior or pari passu to the Lender's liens during the pendency of the Chapter 11 Case;

(b) open any new deposit or securities accounts; **provided** however, the Borrower may open deposit or securities accounts if such account is pledged to the Lenders and the Administrative Agent has received an account control agreement in form and substance reasonably acceptable to the Required Lender.

(c) make or agree to make any amendment, modification or change to its Organizational Documents (or the Organizational Documents related to any Pledged Equity Interests) except as required by the Bankruptcy Code or a Plan of Reorganization;

(d) engage in any activities that would result in such Credit Party becoming an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940;

(e) without the prior written consent of the Required Lenders (not to be unreasonably withheld), assume or reject any executory contract or unexpired lease;

(f) purchase, hold, or acquire (including pursuant to any merger, consolidation or amalgamation with a person that is not a wholly owned subsidiary immediately prior to such merger, consolidation or amalgamation) any Equity Interests, evidences of Indebtedness or other securities of, make or permit to exist any loans or advances to or guarantees of the obligations of, or make or permit to exist any investment or any other interest in any other person other than the subsidiaries of the Borrower as of the Petition Date, other than as permitted by **Section 6.6**;

(g) create, incur, assume or permit to exist any indebtedness or liens, other than in respect of the DIP Facility, Prepetition Loan Documents, or Adequate Protection Obligations, except as permitted by **Section 6.1** or **Section 6.2**;

(h)    object to or contest the validity or enforceability of the DIP Order, any Liens granted to the Collateral Agent and Lenders therein, or any terms of the Credit Documents or cooperate with any party with respect to such an objection or contest;

(i)    seek to modify the DIP Order to any of the Administrative Agent, the Collateral Agent or the Lenders in any manner;

(j)    use any portion of proceeds of the Loans, directly or indirectly,

(i)    except as permitted by the Approved Budget (including Permitted Disbursement Variance), to (x) transfer any cash or cash equivalents that constitute Collateral to a subsidiary of any Borrower or (y) make any payment in settlement of any claim, action, or proceeding in excess of $100,000 in the aggregate, in each case, without the prior written consent of the Required Lenders;

(ii)    to object to, seek subordination of, prevent, hinder, delay or contest the validity, extent, perfection, priority or enforceability of any of the Secured Parties' rights, remedies, claims, liens, security interests, defenses, or realization upon any of the Collateral or enforcement or assertion of any of their respective rights thereto;

(iii)    for any purpose that is prohibited under the DIP Order, the Credit Documents or the Bankruptcy Code;

(iv)    to initiate, assert, prosecute or finance in any way any claim, defense, demand, cause of action, adversary action, suit, arbitration, proceeding, application, motion, or other litigation of any type adverse to the interests of any or all of the Secured Parties, any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, partners, managers, employees, agents, representatives, subsidiaries, security-holders or equity-holders, or their respective rights and remedies under Credit Documents or the DIP Order, or under or relating to any other loan or extensions of credit or other agreement provided to any of the Borrower or its predecessors or affiliates, in each case, including, without limitation, any Avoidance Actions or any other avoidance actions arising under other applicable non-bankruptcy law (state, federal, or foreign) or otherwise;

(v)    to seek to amend or modify any of the rights granted to the Secured Parties under the DIP Order or the Credit Documents;

(vi)    to seek to subordinate, recharacterize, disallow, or avoid the Obligations;

(vii)    to object to or challenge in any way the claims, liens, or interests held by or on behalf of the Secured Parties; or

(viii)    to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of, or seek equitable relief from, any of the Obligations, the Liens of the Collateral Agent or any other rights or interests of the Secured Parties; or (x) to file any motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Credit Parties without the prior written consent of the Required Lenders.

**SECTION 7    GUARANTY**

7.1    **Guaranty of the Obligations**. Subject to the provisions of **Section 7.2**, Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to the Administrative Agent for the ratable benefit of the Secured Parties the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code following an Event of Default, collectively, the "**Guaranteed Obligations**").

7.2    **Contribution by Guarantors**. All Guarantors desire to allocate among themselves (collectively, the "**Contributing Guarantors**"), in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any day by a Guarantor (a "**Funding Guarantor**") under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date. "**Fair Share**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (x) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (y) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors **times** (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the Guaranteed Obligations. "**Fair Share Contribution Amount**" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state Law; **provided**, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of this **Section 7.2**, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor. "**Aggregate Payments**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (i) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including in respect of this **Section 7.2**), **minus** (ii) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this **Section 7.2**. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor. The allocation among Contributing Guarantors of their obligations as set forth in this **Section 7.2** shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this **Section 7.2**.

7.3    **Payment by Guarantors**. Subject to **Section 7.2**, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Secured Party may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due following an Event of Default but for the operation of the automatic stay in connection with the Chapter 11 Cases or otherwise under Section 362(a) of the Bankruptcy Code), Guarantors will upon demand pay, or cause to be paid, in cash, to the Administrative Agent for the ratable benefit of Secured Parties, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Borrower's becoming the subject of a proceeding under any Debtor Relief Law, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Borrower for such interest in such proceeding) and all other Guaranteed Obligations then owed to Secured Parties as aforesaid.

69

7.4    **Liability of Guarantors Absolute**. Except as otherwise provided in any order of the Bankruptcy Court, each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations (other than Remaining Obligations). In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)    this Guaranty is a guaranty of payment when due and not of collectability;

(b)    this Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(c)    the Administrative Agent may enforce this Guaranty upon the occurrence and during the continuance of an Event of Default notwithstanding the existence of any dispute between the Borrower and any Secured Party with respect to the existence of such Event of Default;

(d)    the obligations of each Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor to enforce this Guaranty whether or not any action is brought against the Borrower or any of such other guarantors and whether or not the Borrower is joined in any such action or actions;

(e)    payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid when due. Without limiting the generality of the foregoing, if the Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(f)    any Secured Party, upon such terms as it deems appropriate, without notice or demand (except to the extent notice is required to be provided hereunder, in any other Credit Document or under applicable Law) and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Secured Party in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Secured Party may have against any such security, in each case as such Secured Party in its reasonable discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (but so long as such sale is in accordance with applicable Law), and even though such action operates to impair or

70

extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Borrower or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents; and

(g)     this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations (other than Remaining Obligations) or unless the obligations of the Guarantors are reduced or terminated by the Agent and applicable Secured Parties in accordance with the terms of this Agreement), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them:

(i)     any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations;

(ii)     any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents, or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document or any agreement relating to such other guaranty or security;

(iii)     the application of payments received from any source (other than payments received pursuant to the other Credit Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Secured Party might have elected to apply such payment to any part or all of the Guaranteed Obligations;

(iv)     any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; and

(v)     any defenses, set-offs or counterclaims which the Borrower may allege or assert against any Secured Party in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and

(vi)     any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

7.5     **Waivers by Guarantors**. Each Guarantor hereby waives, to the extent permitted by applicable Law, for the benefit of the Secured Parties: (a) any right to require any Secured Party, as a condition of payment or performance by such Guarantor, to (i) proceed against the Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Secured Party in favor of the Borrower or any other Person, or (iv) pursue any other remedy in the power of any

Secured Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations (other than Remaining Obligations); (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) (i) any principles or provisions of Law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof (other than the default of payment), (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Secured Party protect, secure, perfect or insure any security interest or lien or any property subject thereto; (e) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Borrower and notices of any of the matters referred to in **Section 7.4** and any right to consent to any thereof; and (f) any defenses or benefits that may be derived from or afforded by Law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof (other than the defense of payment).

7.6    **Guarantors' Rights of Subrogation, Contribution, Etc**. Until the Guaranteed Obligations (other than Remaining Obligations) shall have been paid in full, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Borrower or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Secured Party now has or may hereafter have against the Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Secured Party. In addition, until the Guaranteed Obligations (other than Remaining Obligations) shall have been paid in full, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by **Section 7.2**. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Secured Party may have against the Borrower, to all right, title and interest any Secured Party may have in any such collateral or security, and to any right any Secured Party may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations (other than Remaining Obligations) shall not have been finally and paid in full, such amount shall be held in trust for the Administrative Agent on behalf of Secured Parties and shall forthwith be paid over to the Administrative Agent for the benefit of Secured Parties to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof and of the other Credit Documents.

7.7    **Subordination of Other Obligations**. Any Indebtedness of the Borrower or any Guarantor now or hereafter held by any Guarantor (the "**Obligee Guarantor**") is hereby subordinated in right of

payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default under **Section 8.1(a)**, **8.1(f)** or **8.1(g)** has occurred and is continuing shall be held in trust for the Administrative Agent on behalf of Secured Parties and shall forthwith be paid over to the Administrative Agent for the benefit of Secured Parties to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

7.8    **Continuing Guaranty**. This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been paid in full. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

7.9    **Authority of Guarantors or the Borrower**. It is not necessary for any Secured Party to inquire into the capacity or powers of any Guarantor or the Borrower or the officers, members of the Board of Directors or any agents acting or purporting to act on behalf of any of them.

7.10    **Financial Condition of the Borrower**. Any Credit Extension may be made to the Borrower or continued from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of the Borrower at the time of any such grant or continuation, as the case may be. No Secured Party shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Borrower. Each Guarantor has adequate means to obtain information from the Borrower on a continuing basis concerning the financial condition of the Borrower and its ability to perform its obligations under the Credit Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Secured Party to disclose any matter, fact or thing relating to the business, operations or conditions of the Borrower now known or hereafter known by any Secured Party.

7.11    **Bankruptcy, Etc.**

(a)    The obligations of the Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by the Chapter 11 Cases or any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Borrower or any other Guarantor or by any defense which the Borrower or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)    Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Secured Parties that the Guaranteed Obligations pursuant hereto should be determined without regard to any rule of law or order which may relieve the Borrower of any portion of such Guaranteed Obligations. Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar Person to pay the Administrative Agent, or allow the claim of the Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)    In the event that all or any portion of the Guaranteed Obligations are paid by the Borrower, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be

73

reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Secured Party as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

7.12    **Discharge of Guaranty Upon Sale of Guarantor**. If all of the Equity Interests of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions hereof to a Person that is not the Borrower or a Subsidiary of the Borrower, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Secured Party or any other Person effective as of the time of such sale or disposition. In addition, a Guarantor shall automatically be discharged and released of its Guaranty (i) upon the consummation of any transaction permitted by this Agreement as a result of which such Guarantor ceases to be a Restricted Subsidiary or (ii) upon the request of the Borrower, upon any Guarantor becoming an Excluded Subsidiary.

7.13    **Maximum Liability**. It is the desire and intent of the Guarantors and the Secured Parties that this Guaranty shall be enforced against the Guarantor to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. The provisions of this Guaranty are severable, and in any action or proceeding in the Chapter 11 Cases or otherwise under the Bankruptcy Code or involving any state corporate law, or any state, Federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Guarantor's liability under this Guaranty, then, notwithstanding any other provision of this Guaranty to the contrary, the amount of such liability shall, without any further action by the Guarantors or the Secured Parties, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "**Maximum Liability**"). Each Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Guarantor without impairing this Guaranty or affecting the rights and remedies of the Secured Parties hereunder; **provided**, nothing in this sentence shall be construed to increase any Guarantor's obligations hereunder beyond its Maximum Liability.


**SECTION 8    EVENTS OF DEFAULT**

8.1    **Events of Default**. The occurrence and continuance of any one or more of the following conditions or events shall constitute an "Event of Default":

(a)    **Failure to Make Payments When Due**. Failure by any Credit Party to pay:

(i)    when due any principal of any Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise or

(ii)    any interest on any Loan or any fee, expenses or any other amount due hereunder, under the DIP Order or under any other Credit Document within two Business Days after the date due; or

(b)    [**Default in Other Agreements.**

(i)        (i) Failure of the Borrower or any of its Restricted Subsidiaries to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Material Indebtedness (such Material Indebtedness, the "**Specified Indebtedness**") beyond the grace period, if any, provided therefor, in each case, to the extent the holders thereof are not stayed from exercising remedies as a result of the Chapter 11 Cases;

(ii)        breach or default by the Borrower or any of its Restricted Subsidiaries with respect to any other term of (A) one or more items of Specified Indebtedness or (B) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Specified Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of such Specified Indebtedness (or a trustee on behalf of such holder or holders), to cause, such Specified Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be (it being understood, for the avoidance of doubt, that the satisfaction of any customary "conversion conditions" set forth in the instruments governing any Convertible Bond Indebtedness will not be deemed to constitute a default under this **clause (b)** on account of such satisfaction giving any holder of such Convertible Bond Indebtedness the right to convert the same); or]

(c)        **Breach of Certain Covenants**. Failure of the Borrower or any Restricted Subsidiary of the Borrower to perform or comply with any term or condition contained in any of **Sections 5.1(a)**, **5.1(b)**, **5.1(c)**, **5.1(d)**, **5.1(g)(i)**, **5.1(j)**, **5.1(k)**, **5.1(l)**, **5.1(n)** or **5.1(o)**, **5.2** (as it relates to the existence of the Borrower in its jurisdiction of organization), **5.8**, **5.9**, **5.12**, **5.13**, **5.16**, **5.17** or **6**; or

(d)        **[Breach of Representations, Etc**. Any representation, warranty or certification made or deemed made by any Credit Party in any Credit Document or in any statement, instrument, report or certificate at any time given by such Credit Party in writing pursuant hereto or thereto or in connection herewith or therewith shall be incorrect or misleading in any material respect (or, in the case of any representation or warranty qualified by materiality, in all respects); or]

(e)        **[Other Defaults Under Credit Documents**. The Borrower or any Restricted Subsidiary of the Borrower shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other subsection of this **Section 8.1**, and such default shall not have been remedied or waived within five consecutive Business Days after receipt by the Borrower of notice from the Administrative Agent or any Lender of such default; or]

(f)        **Involuntary Bankruptcy; Appointment of Receiver, Etc**. Other than the Chapter 11 Cases, (i) a court of competent jurisdiction shall enter a decree or order for relief in respect of the Borrower or any of its Restricted Subsidiaries in an involuntary case under any Debtor Relief Law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal or state Law; or (ii) an involuntary case shall be commenced against the Borrower or any of its Restricted Subsidiaries under any Debtor Relief Law now or hereafter in effect; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over the Borrower or any of its Restricted Subsidiaries, or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of the Borrower or any of its Restricted Subsidiaries for all or a substantial part of its property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of the Borrower or any of its Restricted Subsidiaries, and any such event described in this clause (i) and (ii) shall continue for 60 days without having been dismissed, vacated, bonded or discharged; or

(g)    **Voluntary Bankruptcy; Appointment of Receiver, Etc**. Other than the Chapter 11 Cases, (i) the Borrower or any of its Restricted Subsidiaries shall have an order for relief entered with respect to it or shall commence a voluntary case under any Debtor Relief Law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such Law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or the Borrower or any of its Restricted Subsidiaries shall make any assignment for the benefit of creditors; or (ii) the Borrower or any of its Restricted Subsidiaries shall be unable, or shall fail generally, or shall admit in writing its inability, to pay its debts as such debts become due; or (iii) the Board of Directors of the Borrower or any of its Restricted Subsidiaries (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in **Section 8.1(f)**; *provided* that this **clause (g)** shall not apply to the extent that, with respect to the case of any Credit Party, within five Business Days after the commencement thereof, such case becomes jointly administered with the Chapter 11 Cases with the reasonable consent of the Required Lenders; or

(h)    **Judgments and Attachments**. Other than as may be stayed as a result of the Chapter 11 Cases or being determined in the Chapter 11 Cases, any final, non-appealable money judgment, writ or warrant of attachment or similar process involving in any individual or aggregate proceeding at any time an amount in excess of $10,000,000 (in each case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company does not deny coverage or a third party indemnity and taking into account any deductibles) shall be entered or filed against the Borrower or any of its Restricted Subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of 30 days (or in any event later than five adays prior to the date of any proposed sale thereunder); or

(i)    **Employee Benefit Plans**. (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or would reasonably be expected to result in a Material Adverse Effect; or (ii) there exists any fact or circumstance that results in the imposition of a Lien pursuant to Section 430(k) of the Code or Section 303(k) or 4068 of ERISA on the assets of the Borrower or its Restricted Subsidiaries that primes the Liens that secure the Obligations; or

(j)    **Change of Control**. A Change of Control shall occur; or

(k)    **Guaranties, Collateral Documents and other Credit Documents**. At any time after the execution and delivery thereof, except as permitted under the DIP Order, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations (other than Remaining Obligations), shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, or (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations (other than Remaining Obligations)) in accordance with the terms hereof) or shall be declared null and void, or the Collateral Agent shall not have or shall cease to have a valid and perfected Lien in a material portion of the Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document or the Lien securing the Obligations shall cease to constitute first priority security interests (subject to Permitted Liens, including, without limitation, Liens securing Indebtedness incurred under the Prepetition Credit Agreement), or (iii) the Borrower or any of its Restricted Subsidiaries shall contest in writing the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability, or (iv) the Borrower or any of its Restricted Subsidiaries shall contest in writing the validity or perfection of any Lien in a material portion of Collateral purported to be covered by the Collateral Documents; or

76

(l)    **Bankruptcy Matters**. Any of the following shall have occurred in the Chapter 11 Cases:

(i)    the DIP Order (A) at any time ceases to be in full force and effect or (B) shall be vacated, reversed, stayed, amended, supplemented or modified without the prior written consent of the Administrative Agent and the Required Lenders (which, for the avoidance of doubt, can be communicated via e-mail, including e-mail of the Lender Advisors and counsel to the Administrative Agent);

(ii)    the entry of an order of the Bankruptcy Court in any of the Chapter 11 Cases finding that the Debtors have breached or failed to satisfy any requirement under the DIP Order or the Credit Documents;

(iii)    except with the prior written consent of the Administrative Agent and the Required Lenders (which, for the avoidance of doubt, can be communicated via e-mail, including e-mail of the Lender Advisors and counsel to the Administrative Agent), the entry of an order in any of Chapter 11 Cases (A) staying, reversing, amending, supplementing, vacating or otherwise modifying any of the Credit Documents, or (B) impairing or modifying any of the liens, security interests, claims, rights, remedies, privileges, benefits or protections granted under the Credit Documents or under the DIP Order to the Secured Parties;

(iv)    the dismissal of any of the Chapter 11 Cases or conversion of any Chapter 11 Case to a Chapter 7 case or any Debtor shall have filed (or failed to object to) a motion or other pleading seeking such dismissal without the prior written consent of the Required Lenders (which, for the avoidance of doubt, can be communicated via e-mail, including e-mail of the Lender Advisors);

(v)    the appointment or election of a Chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner) under Section 1104 of the Bankruptcy Code with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Debtor in the Chapter 11 Cases;

(vi)    the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any Credit Parties in the Chapter 11 Cases, or the entry of an order (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment in full, in cash, of all Obligations under the Credit Documents or (B) to grant any Lien, other than Liens expressly permitted under this Agreement and the DIP Order, upon or affecting any Collateral;

(vii)    the entry of an order by the Bankruptcy Court in favor of any statutory Committee, any ad hoc committee, or any other party in interest, (i) sustaining an objection to claims of the Lenders, or (ii) avoiding any liens held by the Lender;

(viii)    subject to the DIP Order and the Carve-Out, and except as expressly permitted hereunder, the entry of an order in any of the Chapter 11 Cases granting any claim against any Debtor entitled to superpriority administrative expense status in any of the Chapter 11 Cases pursuant to Section 364(c)(2) of the Bankruptcy Code that is pari passu with or senior to the claims of the Secured Parties or any 507(b) claim, without the prior written consent of the Administrative Agent and the Required Lenders (which, for the avoidance of doubt, can be communicated via e-mail, including e-mail of the Lender Advisors and counsel to the Administrative Agent);

(ix)    except as provided in the DIP Order or herein, the making of any adequate protection payment or the granting of any adequate protection (including, without limitation, the granting of any Liens on the Collateral, superpriority claims, the right to receive cash payments or otherwise), without the prior written consent of the Administrative Agent and the Required Lenders (which, for the avoidance of doubt, can be communicated via e-mail, including e-mail of the Lender Advisors and counsel to the Administrative Agent);

(x)    the Debtors' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing and/or solicitation of a chapter 11 plan is terminated for any reason;

(xi)    the payment of any prepetition debt or other prepetition claim other than

(A)    as provided in any of the orders (in form and substance acceptable to the Required Lenders) approving the "first day" motions filed in the Chapter 11 Cases,

(B)    to the extent such payment is expressly permitted pursuant to this Agreement or otherwise expressly provided in the Approved Budget (including any Permitted Disbursement Variance),

(C)    pursuant to an order (in form and substance acceptable to the Required Lenders) of the Bankruptcy Court, or

(D)    with the prior written consent of the Administrative Agent and the Required Lenders (which, for the avoidance of doubt, can be communicated via e-mail, including e-mail of the Lender Advisors and counsel to the Administrative Agent);

(xii)    except for an order granting the currently pending Expedited Motion of Applied Surety Underwriters, Siriuspoint America Insurance Company and Pennsylvania Insurance Company for Relief from the Automatic Stay with Respect to Customs Bond [Docket No. 85], the Bankruptcy Court shall enter one or more orders during the pendency of the Chapter 11 Cases granting relief from the automatic stay to the holder or holders of any lien evidencing indebtedness in excess of $150,000 to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on assets of any Borrower;

(xiii)    the filing of any pleading by any Borrower seeking or otherwise consenting to or supporting any of the matters set forth in **Section 8.1(l)(iv), (v)** or **(ix)**;

(xiv)

(A)    any Debtor shall

(i)    engage in or support any challenge or contest the validity or enforceability of the DIP Order or any Credit Document or deny that it has further liability thereunder,

(ii)    challenge or contest the nature, extent, amount, enforceability, validity, priority or perfection of the Obligations, Liens securing the Obligations, Credit Documents, Adequate Protection Liens (as defined in the DIP Order) or Adequate Protection Claims (as defined in the DIP Order),

(iii)     assert any claim, defense or cause of action that seeks to avoid, recharacterize, subordinate, disgorge, disallow, impair or offset all or any portion of the Obligations, Liens securing the Obligations, Credit Documents, Adequate Protection Liens or Adequate Protection Claims, or

(iv)     join or file any motion, application or other pleading in support of, or publicly support any other Person that has asserted any of the claims, challenges or other requested relief contemplated in **clauses (i)** or **(ii)** above; or

(B)     the entry of a judgment or order in any of the Chapter 11 Cases sustaining any of the claims, challenges or other relief contemplated in **clauses (i)** or **(ii)** above;

(xv)     any Debtor shall consummate or seek to obtain Bankruptcy Court approval of any sale or other disposition of any material portion of the Collateral without the prior written consent of the Required Lenders (other than through the contemplated Sale or a sale in the ordinary course of business that is contemplated by the Approved Budget);

(xvi)     the entry of an order in any of the Chapter 11 Cases, avoiding, disallowing, offsetting, recharacterizing, subordinating, disgorging or requiring repayment of any payments made to the Secured Parties on account of the Obligations owing under the DIP Order, this Agreement, and the other Credit Documents;

(xvii)     the entry of any order in any of the Chapter 11 Cases charging any of the Collateral with respect to the Secured Parties, whether under Section 506(c) of the Bankruptcy Code or otherwise;

(xviii)     any Debtor shall seek to withdraw or modify the Approved Chapter 11 Plan or the Disclosure Statement in respect thereof or file any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement or the Approved Chapter 11 Plan and entry of an order of the Bankruptcy Court approving such withdrawal, modification, motion, or pleading;

(xix)     (x) the entry of an order approving a disclosure statement with respect to a Plan of Reorganization or (b) the entry of an order confirming a Plan of Reorganization, in each case, unless such Plan of Reorganization is acceptable to the Agents and the Required Lenders;

(xx)     (A) the consensual use of prepetition cash collateral by any of the Debtors is terminated or modified or (B) the entry of an order in any of the Chapter 11 Cases terminating or modifying the use of cash collateral other than as provided in this Agreement and the DIP Order, without the prior written consent of the Administrative Agent and the Required Lenders (which, for the avoidance of doubt, can be communicated via e-mail, including e-mail of the Lender Advisors and counsel to the Administrative Agent);

(xxi)     any Debtor uses or seeks to use any proceeds of any Credit Extension in any manner inconsistent with the terms of the DIP Order, the Credit Documents or the Approved Budget;

(xxii)     [reserved];

(xxiii)  any of the Debtors shall use, or seek to use, Collateral, including Cash Collateral in any manner inconsistent with the terms of the DIP Order; or

(xxiv)  if any Debtor or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order or a Governmental Authority from continuing to conduct all or any material part of the business affairs of the Debtors and their Subsidiaries.

8.2    **Remedies Upon Event of Default**. Subject to the DIP Order and the terms thereof,

(a)    upon the occurrence of any Event of Default described in **Section 8.1(f)** or **8.1(g)**, automatically, and

(b)    upon the occurrence of any other Event of Default and subject to the Remedies Notice Period (as defined below), the Administrative Agent may, and at the request of the Required Lenders shall:

(i)    issue a written notice (the "**Remedies Notice**") (which may be by e- mail) to the Borrowers and their counsel, counsel for any committee appointed in the Chapter 11 Cases by the U.S. Trustee (as defined in the DIP Order) (each, a "**Committee**"), and the U.S. Trustee (as defined in the DIP Order) (the "**Remedies Notice Parties**") declaring the occurrence of the Termination Date;

(ii)    declare all accrued and unpaid interest thereon, all fees and all other Obligations under this Agreement and the other Credit Documents, to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are hereby expressly waived by each Credit Party;

(iii)    the Collateral Agent shall exercise any and all of its other rights and remedies under applicable Law (including the UCC) or at equity, hereunder and under the other Credit Documents;

(iv)    declare the suspension or termination of the DIP Facility as to any further liability or obligation of the Lenders hereunder, but without affecting the Liens securing the Obligations (the "**Termination Notice**");

(v)    issue a Carve-Out Notice; and/or

(vi)    charge the default rate of interest pursuant to **Section 2.7** (unless otherwise waived by the Required Lenders).

(c)    During the five business days immediately following the date the Administrative Agent or the Required Lenders deliver a Remedies Notice to the Remedies Notice Parties (the "**Remedies Notice Period**"), the Administrative Agent, Required Lenders and/or Borrowers may seek an emergency hearing (a "**Stay Relief Hearing**") to determine whether an Event of Default has occurred, and the filing of any such motion shall toll the Remedies Notice Period. In the event the Bankruptcy Court determines during a Stay Relief Hearing that an Event of Default has occurred, the Court may fashion an appropriate remedy, which may include the exercise of any and all rights available to the Lenders under the DIP Term Sheet, the DIP Facility, the Interim DIP Order, and/or the Final DIP Order, as applicable. Upon expiration of the Remedies Notice Period, if a motion seeking emergency relief has not been filed or unless ordered otherwise by the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall

be vacated and modified without further order of the Bankruptcy Court to the extent necessary to permit the Lenders to exercise any and all remedies against the Collateral permitted under state law.

8.3    **Application of Payments and Proceeds**.  After the acceleration of the principal amount of any of the Loans in accordance with **Section 8.2**, all payments and proceeds in respect of any of the Obligations received by any Agent or any Lender under any Credit Document, including any proceeds of any sale of, or other realization upon, all or any part of the Collateral, shall be applied as follows:

(i)    *first*, to all fees, costs, indemnities, liabilities, obligations and expenses (including the fees and expenses of counsel) incurred by or owing to the Administrative Agent or the Collateral Agent with respect to this Agreement, the other Credit Documents or the Collateral;

(ii)    *second*, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to any Lender with respect to this Agreement, the other Credit Documents or the Collateral;

(iii)    *third*, to the principal amount of the Obligations constituting unpaid principal of the Loans, ratably among the applicable Secured Parties in proportion to the respective amounts described in this **clause third** held by them;

(iv)    *fourth*, to any other Indebtedness or obligations of any Credit Party owing to the Administrative Agent, the Collateral Agent or any Lender under the Credit Documents; and

(v)    *fifth*, to the Borrower or to whoever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct to the Borrower.

In carrying out the foregoing, (a) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category, and (b) each of the Persons entitled to receive a payment in any particular category shall receive an amount equal to its pro rata share of amounts available to be applied pursuant thereto for such category. Each Credit Party irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by the Administrative Agent or the Collateral Agent from or on behalf of any Credit Party, and, as between each Credit Party on the one hand and the Administrative Agent, the Collateral Agent and the other Secured Parties on the other, the Administrative Agent shall have the continuing and exclusive right to apply and to reapply any and all payments received against the Obligations in such manner as the Administrative Agent may deem advisable notwithstanding any previous application by the Administrative Agent.

## SECTION 9    AGENTS

9.1    **Appointment and Authority**. Each of the Lenders hereby irrevocably appoints FlexGen to act on its behalf as the Administrative Agent hereunder and under the other Credit Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Each of the Lenders hereby irrevocably appoints FlexGen to act on its behalf as the Collateral Agent hereunder and under the other Credit Documents and authorizes the Collateral Agent to take such actions on its behalf and to exercise such powers as are delegated to the Collateral Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Except as expressly set forth in **Sections 9.6(a)** and **9.6(b)**, the provisions of this Section are solely for the benefit of the Agents, the Lenders, and neither the Borrower nor any of its Subsidiaries shall have rights as

a third-party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent", "administrative agent" and "collateral agent" herein or in any other Credit Document (or any other similar term) with reference to an Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

9.2 **Rights as a Lender**. The Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as an Agent hereunder in its individual capacity, if applicable. Such Person and its Affiliates may accept deposits from, lend money to, own Securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, the Borrower or any of its Subsidiaries or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

9.3 **Exculpatory Provisions**.

(a) No Agent shall have any duties or obligations except those expressly set forth herein and in the other Credit Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, no Agent:

(i) shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(ii) shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Credit Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents); **provided**, no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Credit Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law; and

(iii) shall not, except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Affiliates in any capacity.

(b) No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in **Sections 10.5** and **Sections 8.1**, **8.2** and **8.3**), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment. As to any matters not expressly provided for by this Agreement or any other Credit Document, each Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder or thereunder in accordance with written instructions given by the Required Lenders (or, where expressly required by the terms of any Credit Document, a greater proportion of the Lenders), and such instructions, and any action taken or failure to act pursuant thereto, shall be binding on all Lenders. No Agent shall have any liability for any failure or delay in taking any actions contemplated herein as a result of the failure or delay on the part of the Required Lenders to provide such instructions. No Agent shall be deemed to have

knowledge of any Default or Event of Default unless and until notice conspicuously labeled as a "notice of default" and describing such Default is given to such Agent in writing by the Borrower or a Lender.

(c)     No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Credit Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Credit Document or any other agreement, instrument or document, (v) the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Credit Document or (vi) the satisfaction of any condition set forth in **Section 3** or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

(d)     For the avoidance of doubt, each Agent's rights, protections, indemnities and immunities provided herein shall apply to each Agent for any actions taken or omitted to be taken under this Agreement or any other Credit Documents and any other related agreements in any of their respective capacities and Agent shall be afforded all of the rights, powers, immunities and indemnities set forth in this Agreement in all of the other Credit Documents to which it is a signatory as if such rights, powers, immunities and indemnities were specifically set out in each such other Credit Document.

(e)     No Agent shall be required to risk or expand its own funds in performing its obligations hereunder or under any other Credit Document or to take any action which in its reasonable judgment may cause it to incur any expense or financial or other liability for which it is not indemnified to its satisfaction.

(f)     No Agent shall be responsible or liable for delays or failures in performance resulting from acts beyond its control (such acts shall include, but are not limited to, acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes or other disasters, the unavailability of communications or computer facilities, the failure of equipment or interruption of communications or computer facilities, or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility) nor shall Agent have any liability for losses arising from (i) any cause beyond its control, (ii) any delay, error, omission or default of any mail, telegraph, cable or wireless agency or operator or (iii) the acts or edicts of any government or governmental agency or other group or entity exercise governmental powers.

(g)     No Agent shall be liable for any indirect, special, punitive or consequential damages (including but not limited to lost profits) whatsoever, even if it has been informed of the likelihood thereof and regardless of the form of action.

(h)     No Agent shall have any liability for any failure, inability or unwillingness on the part of any Lender or Credit Party to provide accurate and complete information on a timely basis to such Agent, or otherwise on the part of any such party to comply with the terms of this Agreement, and shall not have any liability for any inaccuracy or error in the performance or observance on such Agent's part of any of its duties hereunder that is caused by or results from any such inaccurate, incomplete or untimely information received by it, or other failure on the part of any such other party to comply with the terms hereof.

9.4    **Reliance by Agents**. Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, each Agent may presume that such condition is satisfactory to such Lender unless such Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.5    **Delegation of Duties**. Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Credit Document by or through any one or more trustees, agents, co-agents, sub-agents, supplemental agents, employees, attorneys-in-fact or any other Person (including any Secured Party) appointed by such Agent, including any Affiliate of any Agent. Each Agent and any such trustee, agent, co-agent, sub-agent, supplemental agent or other Person may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this **Article IX** shall apply to any such sub agent or supplemental agent and to the Related Parties of each Agent and any such sub-agent or supplemental agent. No Agent shall be responsible for the negligence or misconduct of any sub-agents or supplemental agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents or supplemental agents. In connection with the designation of any such sub-agent or supplemental agent, this Agreement and the other Credit Documents may be amended solely to implement mechanical provisions customarily requested by such sub-agent or supplemental agent so long as such amendment is reasonably satisfactory to the Borrower and the Administrative Agent.

9.6    **Resignation of the Administrative Agent**.

(a)    Each Agent may at any time give notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right to appoint a successor with the consent of the Borrower; provided, (x) no such consent of the Borrower shall be required while an Event of Default exists and (y) such consent shall not be unreasonably withheld, delayed or conditioned, and shall be deemed to have been given unless the Borrower shall have objected to such appointment by written notice to the Required Lenders and such Agent within ten Business Days after having received notice thereof. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "**Resignation Effective Date**"), then the retiring Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Agent meeting the qualifications set forth above. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)    Solely to the extent that the Administrative Agent is a Lender, (i) if the Administrative Agent (x) becomes a Defaulting Lender and is not performing its role hereunder as Administrative Agent or (y) declines to approve any waiver, amendment or modification of this Agreement or any Credit Document that requires approval of all Lenders pursuant to **Section 10.5** or if any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, the Administrative Agent may be removed as the Administrative Agent hereunder at the request of the Borrower and the Required Lenders and (ii) the Required Lenders may, by notice in writing to the Borrower

and the applicable Agent remove such Person as an Administrative Agent and/or Collateral Agent and, with the consent of the Borrower (**provided**, (x) no such consent of the Borrower shall be required while under this clause (b) if an Event of Default under **Section 8.1(a)**, **(f)** or **(g)** exists and (y) such consent shall not be unreasonably withheld, delayed or conditioned, and shall be deemed to have been given unless the Borrower shall have objected to such appointment by written notice to the Administrative Agent within ten Business Days after having received notice thereof), appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty days (or such earlier day as shall be agreed by the Required Lenders) (the "**Removal Effective Date**"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)     With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents, (except that in the case of any Collateral held by the Collateral Agent on behalf of the Secured Parties, the retiring or removed Collateral Agent shall continue to hold such Collateral until such time as a successor Collateral Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Agent as provided for above. Upon the acceptance of a successor's appointment as an Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Agent, and the retiring or removed Agent (to the extent not already discharged as provided above) shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Agent's resignation or removal hereunder and under the other Credit Documents, the provisions of this Section and **Sections 10.2** and **10.3** shall continue in effect for the benefit of such retiring or removed Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as an Agent.

(d)     Any entity into which an Agent may be merged or converted or with which it may be consolidated, or any corporation or association resulting from any merger, conversion or consolidations which an Agent may be party, or any corporation or association to which all or substantially all of the corporate trust or agency business and assets as a whole or substantially as a whole of an Agent may be transferred or sold, shall be the successor Agent under this Agreement and each Credit Document and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or any further action.

9.7     **Non-Reliance on Agents and Other Lenders**. Each Lender acknowledges that it has, independently and without reliance upon either Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Credit Document or any related agreement or any document furnished hereunder or thereunder. Without limiting the foregoing, each Lender acknowledges and agrees that neither such Lender, nor any of its respective Affiliates, participants or assignees, may rely on the Administrative Agent to carry out such Lender's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the PATRIOT Act or the regulations thereunder, including the regulations contained in 31 C.F.R. 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any of the Credit Parties, their Affiliates or their agents, the Credit Documents or the transactions hereunder or contemplated hereby:

(a) any identity verification procedures, (b) any recordkeeping, (c) comparisons with government lists, (d) customer notices or (e) other procedures required under the CIP Regulations or such other Laws.

9.8     **Administrative Agent May File Proofs of Claim**. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under **Sections 2.8**, **10.2** and **10.3**) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under **Sections 2.8**, **10.2** and **10.3**.

9.9     **Collateral Documents and Guaranty**.

(a)     The Secured Parties irrevocably authorize the Collateral Agent,

(i)     to release any Lien on any property granted to or held by the Collateral Agent under any Credit Document (x) upon termination of all Commitments and payment in full of all Obligations (other than Remaining Obligations), (y) that is sold or otherwise disposed of or to be sold or otherwise disposed of to a Person that is not a Credit Party as part of or in connection with any sale or other disposition permitted under the Credit Documents, or (z) subject to **Section 10.5**, if approved, authorized or ratified in writing by the Required Lenders;

(ii)     to subordinate any Lien on any property granted to or held by the Collateral Agent under any Credit Document to the holder of any Lien on such property that is permitted by **Section 6.2(d)**; and

(iii)     to release any Guarantor from its Guaranty upon consummation of any transaction not prohibited hereunder resulting in such Guarantor ceasing to constitute a Guarantor or otherwise becoming an Excluded Subsidiary (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Credit Party upon its reasonable request without further inquiry); **provided** that in no event shall any Guarantor cease to constitute a Guarantor solely as a result of (i) such Guarantor ceasing to constitute a wholly owned Subsidiary of the Borrower after the Closing Date (unless such Person otherwise constitutes an Excluded Subsidiary (other than solely on account or constituting a non-wholly owned Subsidiary of the Borrower)).

Upon request by the Collateral Agent at any time, the Required Lenders will confirm in writing the Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this **Section 9.9(a)**. Notwithstanding anything contained herein or in any other Credit Document to the contrary, in no event shall any Agent be obligated to execute or deliver any document evidencing or authorizing any release, subordination or re-conveyance without receipt of a certificate executed by an Authorized Officer of the Borrower certifying that such release, subordination or re-conveyance, as applicable, complies with the DIP Order, this Agreement, and the other Credit Documents, and that all conditions precedent to such release, subordination or re-conveyance have been complied with.

(b)     Anything contained in any of the Credit Documents to the contrary notwithstanding, each Credit Party, the Administrative Agent, the Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Credit Documents may be exercised solely by the Administrative Agent or the Collateral Agent, as applicable, for the benefit of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by the Collateral Agent for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition (including pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), the Collateral Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code,) may, directly or through one or more acquisition vehicles, be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon the direction of the Required Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any or all of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other disposition.

(c)     Neither the Administrative Agent nor the Collateral Agent shall be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Credit Party in connection therewith, and neither the Administrative Agent nor the Collateral Agent shall be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

9.10    **Withholding Taxes**. To the extent required by any applicable Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the IRS or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered, was not properly executed or was invalid or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out of pocket expenses) incurred, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to

such Lender under this Agreement or any other Credit Document against any amount due the Administrative Agent under this **Section 9.10**.

9.11    **Agent Discretion**. Notwithstanding anything set forth herein or in the other Credit Documents to the contrary, to the extent any such Credit Document grants any Agent discretion to act or refrain from acting without the direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in **Sections 10.5** and **Sections 8.1**, **8.2** and **8.3**), such Agent shall nonetheless be entitled to request direction from the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in **Sections 10.5** and **Sections 8.1**, **8.2** and **8.3**) as to the matter over which such Agent has been granted discretion, and no Agent shall be required to exercise or be liable for failure to exercise such discretion until such time as it has obtained the requested direction from the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in **Sections 10.5** and **Sections 8.1**, **8.2** and **8.3**). For purposes of clarity, and without limiting any rights, protections, immunities or indemnities afforded to any Agent hereunder (including without limitation this **Article IX**), phrases such as "satisfactory to the Administrative Agent", "approved by the Administrative Agent", "acceptable to the Administrative Agent", "as determined by the Administrative Agent", "in the Administrative Agent's discretion", "selected by the Administrative Agent", "elected by the Administrative Agent", "requested by the Administrative Agent", "satisfactory to the Collateral Agent", "approved by the Collateral Agent", "acceptable to the Collateral Agent", "as determined by the Collateral Agent", "in the Collateral Agent's discretion", "selected by the Collateral Agent", "elected by the Collateral Agent", "requested by the Collateral Agent", "satisfactory to the Agent", "approved by the Agent", "acceptable to the Agent", "as determined by the Agent", "in the Agent's discretion", "selected by the Agent", "elected by the Agent", "requested by the Agent", and phrases of similar import that authorize and permit an Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to such Agent receiving written direction from the Required Lenders (or, where expressly required by the terms of any Credit Document, a greater proportion of the Lenders), as applicable, to take such action or to exercise such rights. Nothing contained in this Agreement shall require any Agent to exercise any discretionary acts and any permissive grant of power to any Agent hereunder shall not be construed to be a duty to act.

9.12    **Indemnification by Lenders**. Each Lender severally agrees to indemnify and hold harmless each Agent and each of its Related Parties, to the extent that such Agent shall not have been timely reimbursed by the Borrower, based on and to the extent of such Lender's pro rata share (determined as of the time that the applicable unreimbursed indemnity payment is sought) from, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) and disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Agent or Related Parties in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Agent in any way relating to or arising out of or in connection with this Agreement or the other Credit Documents; provided no Lender shall be liable to any Agent for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction (it being understood and agreed that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in **Sections 10.5** and **Sections 8.1**, **8.2** and **8.3**) shall constitute gross negligence or willful misconduct). If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided

in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's pro rata share. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the outstanding Loans at such time (or if such indemnity payment is sought after the date on which the Loans have been paid in full in accordance with such Lender's pro rata share immediately prior to the date on which the Loans are paid in full).

9.13    **Survival**. The agreements in this **Section 9** and **Sections 10.2** and **10.3** shall survive the resignation of any Agent, the termination of the Credit Documents and payment of the obligations hereunder.

## SECTION 10    MISCELLANEOUS

10.1    **Notices**.

(a)    **Notices Generally**. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in **Section 10.1(b)**), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, addressed (a) in the case of the Credit Parties, as follows, (b) in the case of an Agent, to it at its address (or facsimile number) as set forth on **Appendix B**, (c) in the case of the Lenders, at their primary address set forth below their name on **Appendix B** or otherwise indicated to Administrative Agent in writing or, in the case of a Lender which becomes a party to this Agreement pursuant to an Assignment and Assumption, in such Assignment and Assumption or (d) in the case of any party, to such other address as such party may hereafter notify to the other parties hereto. Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications, to the extent provided in **Section 10.1(b)**, shall be effective as provided in **Section 10.1(b)**.

the Credit Parties:

Powin, LLC
20550 SW 115th Ave
Tualatin, Oregon 97062
Attention: Chad Paulson
E-mail Address: notice@powin.com

with a copy to (which shall not constitute notice):

Dentons US LLP
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Attention: Tania M. Moyron and Van C. Durrer, II
E-mail Address: tania.moyron@dentons.com
                van.durrer@dentons.com

(b)    **Electronic Communications**. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, **provided**, the foregoing shall not apply to Notices to any Lender if such Lender has notified the Administrative Agent that it is incapable of receiving Notices by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; **provided**, approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefore; **provided**, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)    **Change of Address, Etc**. Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

(d)    **Platform**.

(i)    Each Credit Party agrees that the Administrative Agent may, but shall not be obligated to, make the Communications (as defined below) available to the other Lenders by posting the Communications on Debt Domain, IntraLinks, Syndtrak or a substantially similar electronic transmission system (the "**Platform**").

(ii)    The Platform is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third- party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Borrower or the other Credit Parties, any Lender or any other Person or entity for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's, any Credit Party's or the Administrative Agent's transmission of communications through the Platform. Each party hereto agrees that no Agent has any responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Communication or otherwise required for the Platform. In no event shall any Agent or any of its Related Parties have any liability to any Credit Party, any Lender or any other Person or entity for damages of any kind, whether or not based on strict liability and including, without limitation, direct damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Credit Party's or any Agent's transmission of communications through the Platform, except to the extent the same resulted primarily from the gross negligence or willful misconduct of such Agent or its Related Parties, in each case as determined by a court of competent jurisdiction in a final and non-appealable judgment. In no event shall any Agent or any of its Related Parties have any liability for any damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems. Each Credit Party, each Lender and

each Agent agrees that the Administrative Agent may, but shall not be obligated to, store any Communications on the Platform in accordance with the Administrative Agent's customary document retention procedures and policies. All uses of the Platform shall be governed by and subject to, in addition to this **Section 10.1(d)**, separate terms and conditions posted or referenced in such Platform and related agreements executed by the Lenders and their Affiliates in connection with the use of such Platform. Each Credit Party understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the willful misconduct or gross negligence of the Administrative Agent, in each case as determined by a court of competent jurisdiction in a final and non-appealable judgment. "**Communications**" means, collectively, any notice, demand, communication, information, document or other material that any Credit Party provides to the Administrative Agent pursuant to any Credit Document or the transactions contemplated therein which is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through the Platform.

(iii)    The Borrower and each Lender acknowledge that certain of the Lenders may be Public Lenders and, if documents or notices required to be delivered pursuant to **Section 5.1** or otherwise are being distributed through the Platform, any document or notice that the Borrower has indicated contains Non-Public Information shall not be posted on that portion of the Platform designated for Public Lenders. The Borrower agrees to clearly designate all information provided to the Administrative Agent by or on behalf of the Credit Parties which is suitable to make available to Public Lenders. If the Borrower has not indicated whether a document or notice delivered pursuant to **Section 5.1** or otherwise contains Non-Public Information, the Administrative Agent reserves the right to post such document or notice solely on that portion of the Platform designated for Lenders who wish to receive material non-public information with respect to the Borrower, its Subsidiaries and their respective securities. Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable requirements of Law, including the U.S. Federal and state securities Laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of the U.S. Federal or state securities Laws. In the event that any Public Lender has elected for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) the Agents and other Lenders may have access to such information and (ii) neither the Borrower nor any Agent or other Lender with access to such information shall have (x) any responsibility for such Public Lender's decision to limit the scope of information it has obtained in connection with this Agreement and the other Credit Documents or (y) any duty to disclose such information to such electing Lender or to use such information on behalf of such electing Lender, and shall not be liable for the failure to so disclose or use such information.

10.2   **Expenses**.

(a)    **Borrower Expenses**. The Borrower shall pay, promptly following receipt of a written demand with a summary statement, (a) all reasonable, documented, out of pocket expenses incurred by (x) the Agents and Lenders (including the reasonable fees, out of pocket charges and disbursements of one outside legal counsel for the Agents and Lenders, and, if necessary or appropriate, one local outside counsel in each reasonably necessary and materially relevant jurisdiction and in the case of other consultants and advisers, to the extent such persons are approved by the Borrower),in connection with the

Commitments, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Credit Documents, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (b) all reasonable, documented out-of-pocket expenses incurred by any Agent or any Lender (including the reasonable, documented out-of-pocket expenses, charges and disbursements of the Lender Advisors and one outside counsel for the Agents (and, in the case of a conflict of interest, additional counsels, as appropriate) and if necessary or appropriate, of any special counsel and one local counsel in each reasonably necessary and materially relevant jurisdiction (and in the case of a conflict of interest, additional counsels as appropriate and in the case of other consultants and advisers, to the extent such persons are approved by the Borrower) (in each case, except allocated costs of in-house counsel)) in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Credit Documents, including its rights under this Section, or (B) in connection with the Loans made hereunder, including all such reasonable, documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)    **Lender Expenses**. Each Lender shall promptly following written demand therefor, pay or reimburse each Agent based on and to the extent of such lender's pro rata share of all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this Agreement or the other Credit Documents, including all such out-of-pocket costs and expenses incurred during any legal proceeding (including any proceeding under any Debtor Relief Law) and all respective fees, charges and disbursements of a primary counsel and local counsel for the Agent Indemnitees, to the extent that the Agent Indemnitees are not timely reimbursed for such expenses by or on behalf of the Borrower (solely to the extent, that the Borrower for any reason fails to pay any amount required under **Section 10.2** or **Section 10.3(a)** to be paid by it to any Agent (or any sub-agent thereof), or any Related Party of any of the foregoing). For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the outstanding Loans at such time (or if such indemnity payment is sought after the date on which the Loans have been paid in full in accordance with such Lender's pro rata share immediately prior to the date on which the Loans are paid in full). The obligations of the Lenders under this **Section 10.2(b)** are subject to the provisions of **Section 10.12**.

10.3    **Indemnity; Certain Waivers**.

(a)    **Indemnification by Borrower**. The Borrower shall indemnify each Agent (and any sub-agent or Related Party thereof) (each such Person being called an "**Agent Indemnitee**"), each Lender (and any Related Party thereof) (each Person called a "**Lender Indemnitee**"; together with the Agent Indemnitee, each an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including, without limitation, the reasonable, documented out-of-pocket fees, charges and disbursements of outside counsel for Agent and Lender Indemnitees (except allocated costs of in-house counsel and if reasonably necessary (as determined by the Agent and Lender Indemnitees, as applicable)), a single regulatory counsel and a single local counsel in each appropriate jurisdiction for the Agent Indemnitees and a single regulatory counsel and a single local counsel in each appropriate jurisdiction for the Lender Indemnitees (plus additional counsel desirable due to actual or reasonably perceived conflict of interest among such parties)), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Borrower or any of its Subsidiaries) other than such Indemnitee and its Related Parties arising out of, in connection with, or as a result of:

(i)    the execution or delivery of this Agreement, any other Credit Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby,

(ii)     any Loan or the use of the proceeds therefrom,

(iii)     any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by the Borrower or its Subsidiaries, or any environmental liability related in any way to the Borrower or its Subsidiaries, or

(iv)     any actual or prospective claim, investigation, litigation, or proceeding (including preparation of a defense) relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower, any of its Subsidiaries, its Affiliates, its equity holders or creditors, and regardless of whether any Indemnitee is a party thereto;

**provided**, such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses:

(v) solely with respect to the Lender Indemnitees (and specifically excluding the Agent Indemnitees), arising from any settlement effected without the Borrower's prior written consent (such consent not to be unreasonably withheld, delayed or conditioned),

(w) are determined by a court of competent jurisdiction in a final and nonappealable judgment to have resulted from the gross negligence, or willful misconduct of such Indemnitee (or any of its Affiliates or their respective officers, directors, employees, advisors and agents),

(x) solely with respect to the Lender Indemnitees (and specifically excluding the Agent Indemnitees), a material breach of the Credit Documents by, any Lender Indemnitee (or any of its Affiliates or their respective officers, directors, employees, advisors and agents),

(y) relate to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim or

(z) arise out of, or in connection with, any proceeding that does not involve an act or omission by the Borrower or its Subsidiaries or any of their respective affiliates or that is brought by an Indemnitee against any other Indemnitee (other than disputes involving claims by or against any Agent in its capacity as such or in a similar agency or arranger role, but not any other person or entity party to any such proceeding).

(b)     **Waiver of Consequential Damages, Etc**. To the fullest extent permitted by applicable law, no party hereto shall assert, and each party hereto hereby waives, any claim against any Indemnitee or any other party hereto, including the Parent, the Borrower, and the Guarantors, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan, or the use of the proceeds thereof; provided that the foregoing shall not limit any Credit Party's indemnity obligations to the extent special, indirect, consequential or punitive damages are included in any third party claim in connection with which such Indemnitee is entitled to receive indemnification hereunder. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby.

(c)      **Payments**. All amounts due under **Section 10.3** shall be payable within ten Business Days after written demand therefor, together with supporting documentation in reasonable detail.

(d)      **Survival**. Each party's obligations under **Sections 10.2** and **10.3** shall survive the resignation or removal of any Agent, the termination of the Credit Documents and payment of the obligations hereunder.

10.4      **Set-Off**. If an Event of Default shall have occurred and be continuing, each Lender, and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency, but in any event, excluding Excluded Assets) at any time held, and other obligations (in whatever currency) at any time owing, by such Lender, or any such Affiliate, to or for the credit or the account of the Borrower or any other Credit Party against any and all of the obligations of the Borrower or such Credit Party now or hereafter existing under this Agreement or any other Credit Document to such Lender or its respective Affiliates, irrespective of whether or not such Lender, or Affiliate shall have made any demand under this Agreement or any other Credit Document and although such obligations of the Borrower or such Credit Party may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness; **provided** that in the event that any Defaulting Lender shall exercise any such right of setoff, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of **Section 2.20** and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender and its respective Affiliates under this **Section 10.4** are in addition to other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may have. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided, the failure to give such notice shall not affect the validity of such setoff and application.

10.5      **Amendments and Waivers**.

(a)      **Required Lenders' Consent**. Subject to **Sections 10.5(b)**, **10.5(c)** and **10.5(d)**, no amendment, modification, termination or waiver of any term or condition of any Credit Document, or consent to any departure by any Credit Party therefrom, shall be effective without the written consent of the Required Lenders.

(b)      **Affected Lenders' Consent**. No amendment, modification, termination or waiver of any term or condition of any Credit Document, or consent to any departure by any Credit Party therefrom, shall:

(i)      increase or extend the Commitment of any Lender or extend the scheduled final maturity of any Loan without the written consent of the Lender holding such Commitment or Loan;

(ii)      reduce the principal amount of any Loan without the written consent of the Lender holding such Loan;

(iii)      waive, reduce or postpone any scheduled repayment of principal of any Loan or elect to make any payment due under any Credit Document not in immediately available

funds in US dollars without the written consent of the Lender holding such Loan; <u>provided</u>, that, mandatory prepayments may be waived with the consent of the Required Lenders only;

(iv)     reduce the rate of interest on any Loan without the written consent of the Lender holding such Loan; **<u>provided</u>**, that, the imposition of default interest may be waived with the consent of the Required Lenders only;

(v)     reduce any fee or premium payable under any Credit Document without the written consent of the Lender that is entitled to receive such fee or premium;

(vi)     extend the time for payment of any interest on any Loan without the written consent of the Lender holding such Loan; **<u>provided</u>**, that, default interest may be extended or waived with the consent of the Required Lenders only; or

(vii)     extend the time for payment of any fee or premium payable under any Credit Document without the written consent of the Lender that is entitled to receive such fee or premium;

(c)     **<u>Consent of all Lenders</u>**. Without the written consent of all Lenders (other than, in the case of the **<u>clauses (iv)</u>** and **<u>(v)</u>**, a Defaulting Lender), no amendment, modification, termination or waiver of any term or condition of any Credit Document, or consent to any departure by any Credit Party therefrom, shall:

(i)     amend, modify, terminate or waive any term or condition of **<u>Section 10.5</u>** or **<u>10.6(b)(v)</u>**;

(ii)     amend, modify, terminate or waive any term or condition of this Agreement or any other Credit Document that expressly provides that the consent of all Lenders is required;

(iii)     subordinate in right of payment the Obligations to any other Indebtedness;

(iv)     amend, modify, terminate or waive any provision of **<u>Section 2.14</u>**, **<u>Section 8.3</u>**, or of the definition of "**<u>Required Lenders</u>**" or "**<u>Pro Rata Share</u>**";

(v)     release the Liens of the Secured Parties in all or substantially all of the Collateral, or release all or substantially all of the value of the guarantees;

(vi)     subordinate the Liens of the Secured Parties in any Collateral; and

(vii)     consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document (except as expressly provided in the Credit Documents).

Notwithstanding the foregoing, no agreement shall amend, modify or otherwise affect the rights or duties of any Agent hereunder or under any other Credit Document without the prior written consent of such Agent.

Notwithstanding the foregoing, this Agreement and the other Credit Documents may be amended (or amended and restated), modified or supplemented with the written consent of the Administrative Agent and the Borrower (or the Administrative Agent and the Borrower may enter into additional Credit

Documents as the Administrative Agent reasonably deems appropriate) (a) to cure any ambiguity, error, omission or inconsistency of a technical nature, defect or inconsistency, so long as such amendment, modification or supplement does not adversely affect the rights of any Lender (as certified by the Borrower), (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders and (c) to implement changes contemplated by **Section 6.11** with respect to a change in the Borrower's fiscal year.

Anything herein to the contrary notwithstanding, during such period as a Lender is a Defaulting Lender, to the fullest extent permitted by applicable law, such Lender will not be entitled to vote in respect of amendments and waivers hereunder and the Commitment and the outstanding Loans or other extensions of credit of such Lender hereunder will not be taken into account in determining whether the Required Lenders or all of the Lenders, as required, have approved any such amendment or waiver (and the definitions of "Required Lenders") will automatically be deemed modified accordingly for the duration of such period; **provided** that, subject to the limitations set forth in the first paragraph of this **Section 10.5**, any such amendment or waiver that would increase or extend the term of the Commitment of such Defaulting Lender, extend the date fixed for the payment of principal or interest owing to such Defaulting Lender hereunder, reduce the principal amount of any obligation owing to such Defaulting Lender, reduce the amount of or the rate or amount of interest on any amount owing to such Defaulting Lender or of any fee payable to such Defaulting Lender hereunder, reduce any percentage specified in the definition of Required Lender, disproportionately affect such Defaulting Lender as compared to other Lenders holding the same class of Loans, or alter the terms of this proviso, will require the consent of such Defaulting Lender.

Notwithstanding anything in this Agreement or the other Credit Documents, any Lender that is at the time a Defaulting Lender shall not have any voting or approval rights under the Credit Documents and shall be excluded in determining whether all or all affected Lenders or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to this **Section 10.5**); **provided** that (i) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Defaulting Lender and (ii) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

(d)      **Execution of Amendments, Etc**. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances.

10.6      **Successors and Assigns; Participations**.

(a)      **Successors and Assigns Generally**. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any other Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Agents and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of **Section 10.6(b)**, or (ii) by way of participation in accordance with **Section 10.6(d)** (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in **Section 10.6(d)** and, to the extent expressly contemplated hereby, the Related

Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     **Assignments by Lenders**. Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); **provided**, each such assignment shall be subject to the following conditions:

(i)     *Minimum Amounts*.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Loans at the time owing to it or contemporaneous assignments to related Approved Funds that equal at least the amount specified in **Section 10.6(b)(i)(B)** in the aggregate, or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in **Section 10.6(b)(i)(A)**, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $100,000 in the case of any assignment in respect of any Loan, unless the Administrative Agent otherwise consents (each such consent not to be unreasonably withheld or delayed), or, in each case, if less, all of such assigning Lender's remaining Loans or Commitments hereunder.

(ii)     *Proportionate Amounts*. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned.

(iii)     *Assignment and Assumption*. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with all forms, certificates or other evidence each assignee is required to provide pursuant to **Section 2.17(c)** and a processing and recordation fee of $3,500; **provided**, the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.

(iv)     *No Assignment to Certain Persons*. No such assignment shall be made to the Borrower or any of the Borrower's Affiliates or Subsidiaries.

(v)     *No Assignment to Natural Persons*. No such assignment shall be made to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

(vi)     *Defaulting Lenders*. No such assignment shall be made to any Defaulting Lender.

(vii)     *Debt Repurchases*. Assignments of Loans to the Borrower or any of its Subsidiaries shall not be permitted.

(viii)    ***Administrative Questionnaire and Regulatory Matters***. If the assignee is not an existing Lender hereunder, the Administrative Agent shall have received (a) an administrative questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower and its Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws and (b) all documentation and other information reasonably determined by the Administrative Agent to be required by applicable regulatory authorities required under applicable "know your customer" and AML Laws, including the PATRIOT Act.

Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed administrative questionnaire (unless the assignee shall already be a Lender hereunder), any "know your customer" information requested by the Administrative Agent, the processing and recordation fee referred to in **Section 10.6(b)(iii)** and any written consent to such assignment required by **Section 10.6(b)(i)(B)**, the Administrative Agent shall accept such Assignment and Assumption and record the same in the Register. No assignment shall be effective for purposes of this Agreement unless and until it has been recorded in the Register as provided in this **Section 10.6(b)**.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to **Section 10.6(c)** of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of **Sections 2.17**, **10.2** and **10.3** with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with **Section 10.6(d)**.

(c)    **Register**. The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. In addition, the Administrative Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Lender as a Defaulting Lender. The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior written notice.

(d)    **Participations.** Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or the Borrower or any of the Borrower's Affiliates or Subsidiaries; **provided** that such restriction shall not apply to any Lender on the Closing Date or an Affiliate or Approved Fund of such Lender to the extent such Person becomes an Affiliate of the Borrower or its Subsidiaries after the Closing Date) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this

Agreement (including all or a portion of its Commitment and/or the Loans owing to it); **provided**, (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt, each Lender shall be responsible for the indemnity under **Section 10.3(b)** with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; **provided**, such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in **Section 10.5(b)** that affects such Participant. The Borrower agrees that each Participant shall be entitled to the benefits of **Section 2.17** (subject to the requirements and limitations of such sections) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to **Section 10.6(b)** (it being understood that the documentation required under **Section 2.17(g)** shall be delivered solely to the participating Lender); **provided**, such Participant shall be subject to the provisions of **Section 2.18** and **Section 2.19** as if it were an assignee under **Section 10.6(b)**. To the extent permitted by law, each Participant also shall be entitled to the benefits of **Section 10.4** as though it were a Lender; **provided**, such Participant shall be subject to **Section 2.17** as though it were a Lender. Each Lender that sells a participation pursuant to this Section shall maintain a register on which it records the name and address of each Participant and the principal amounts of each Participant's participation interest with respect to the Loans and the Commitments (each, a "**Participant Register**"). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of a participation with respect to such Loans or Commitments for all purposes under this Agreement, notwithstanding any notice to the contrary. In maintaining the Participant Register, such Lender shall be acting as the agent of the Borrower solely for this purpose and undertakes no duty, responsibility or obligation to the Borrower (without limitation, in no event shall such Lender be a fiduciary of the Borrower for any purpose, except that such Lender shall maintain the Participant Register); **provided**, no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, or its other obligations under this Agreement) except to the extent that such disclosure is necessary to establish in connection with a Tax audit that such Commitment, Loan, or other obligation is in registered form under Section 5f.103(c) and proposed Section 1.163-5(b) of the United States Treasury Regulations or, if different, under Sections 871(h) or 881(c) of the Code (and, in each case, any amended or successor versions). A Participant shall not be entitled to receive any greater payment under **Section 2.17** than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant (except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation) unless the sale of the participation to such Participant is made with the Borrower's prior written consent. For the avoidance of doubt, Administrative Agent shall have no duty to maintain any Participant Register.

10.7    **Independence of Covenants**. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

10.8    **Survival of Representations, Warranties and Agreements**. All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension. Notwithstanding anything herein or implied by law to the contrary, the agreements

of each Credit Party set forth in **2.17**, **10.2**, and **10.3** and the agreements of the Lenders set forth in **Sections 2.17**, **9.3(b)**, **9.7** and **9.10** shall survive the payment of the Loans and the termination hereof.

10.9    **No Waiver; Remedies Cumulative**. No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

10.10    **Marshalling; Payments Set Aside**. Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations; **provided** that, subject to the DIP Order, in the event of an enforcement of remedies hereunder, the Agent and each Lender shall use commercially reasonable efforts to recover from all other Collateral before recovering from (a) Avoidance Actions or (b) commercial tort claims. To the extent that any Credit Party makes a payment or payments to the Administrative Agent or any Lender (or to the Administrative Agent, on behalf of the Lenders), or any Agent or any Lender enforces any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any Debtor Relief Law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

10.11    **Severability**. In case any provision in or obligation hereunder or under any other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

10.12    **Obligations Several; Independent Nature of the Lenders' Rights**. The obligations of the Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder. Nothing contained herein or in any other Credit Document, and no action taken by the Lenders pursuant hereto or thereto, shall be deemed to constitute the Lenders as a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

10.13    **Headings**. Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

10.14    **Governing Law**. This Agreement and the other Credit Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Credit Document (except, as to any other Credit Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and

construed in accordance with, the law of the State of New York and, to the extent applicable, the Bankruptcy Code.

10.15    **Consent to Jurisdiction**. The Borrower and each other Credit Party irrevocably and unconditionally agrees that the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes between the Credit Parties, Agents, Lenders and Related Parties pertaining to this Agreement or any other Credit Document or the transactions relating hereto or thereto or to any matter arising out of or relating to this Agreement or any other Credit Document or the transactions relating hereto or thereto; **provided**, that the Agents, Lenders and the Credit Parties acknowledge that any appeals from the Bankruptcy Court may have to be heard by a court other than the Bankruptcy Court, **provided**, **further**, that nothing in this Agreement shall be deemed or operate to preclude any Agent from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations, or to enforce a judgment or other court order in favor of such Agent. Each Credit Party expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and each Credit Party hereby waives any objection that such Credit Party may have based upon lack of personal jurisdiction, improper venue or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court. Each party hereto irrevocably consents to service of process in the manner provided for notices in **Section 10.1**. Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

10.16    **WAIVER OF JURY TRIAL**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.17    **Confidentiality**. Each of the Agents and each of the Lenders (each, a "**Lender Party**") shall hold all information received from the Borrower or any of its Subsidiaries regarding any of their respective businesses (including the existence of this Credit Agreement, the transactions contemplated herein or the terms or conditions hereof or thereof) other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower or any Subsidiary (it being understood and agreed that all information received after the Closing Date from the Borrower or any of its Subsidiaries shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential), it being understood and agreed by the Borrower that, in any event, each Lender Party may make disclosures of such non-public information:

(a)    to its Affiliates (other than portfolio companies) and to such Lender Party's and its Affiliates' respective employees, actual and prospective limited partners and investors, directors, officers, managers, legal counsel, independent auditors and other experts or agents and advisors or to such Lender Party's current or prospective funding sources in connection with disclosures otherwise made in accordance with this **Section 10.17** (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential, and in the case of any Lender agrees that it will be held liable for such breach of this **Section 10.17**);

(b)        to any actual or potential assignee, transferee or Participant of any rights, benefits, interests and/or obligations under this Agreement or to any direct or indirect contractual counterparties (or the professional advisors thereto) in swap or derivative transactions related to the Borrower and its Obligations (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential, and in the case of any Lender agrees that it will be held liable for such breach of this **Section 10.17**);

(c)        to (A) any rating agency in connection with rating the Borrower or its Subsidiaries or the Loans and/or the Commitments or (B) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans;

(d)        as required or requested by any regulatory authority purporting to have jurisdiction over such Lender Party or its Affiliates (including any self-regulatory authority, such as the NAIC); **provided**, unless prohibited by applicable Law or court order, each Lender Party shall make reasonable efforts to notify the Borrower of any request by such regulatory authority (other than any such request in connection with any examination of the financial condition or other routine examination of such Lender Party by such regulatory authority) for disclosure of any such non-public information prior to the actual disclosure thereof;

(e)        to the extent required by order of any court, governmental agency or representative thereof or in any pending legal or administrative proceeding, or otherwise as required by applicable Law or judicial process; **provided**, unless prohibited by applicable Law or court order, each Lender Party shall make reasonable efforts to notify the Borrower of such required disclosure prior to the actual disclosure of such non-public information;

(f)        in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder,

(g)        for purposes of establishing a "due diligence" defense,

(h)        with the consent of the Borrower, or

(i)        to the extent such information (A) becomes publicly available other than as a result of a breach of this **Section 10.17**, (B) becomes available to such Lender Party or any of its Affiliates on a non-confidential basis from a source other than a Credit Party that does not have a duty of confidentiality to the Borrower, or (C) is independently developed by such Lender Party.

Each of the Administrative Agent, the Collateral Agent and the Lenders acknowledges that (a) the information provided by the Borrower or its Subsidiaries may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

All information, including requests for waivers and amendments furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement, will be syndicate-level information, which may contain material non-public information about the Borrower, the Credit Parties and their Related Parties or their respective securities. Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including federal and state securities laws.

Notwithstanding anything herein to the contrary, the Administrative Agent, the Lenders and their respective Affiliates shall not, directly or indirectly, use the name of the Borrower or its Affiliates in any publicity, advertising or other media and may not issue a press release or otherwise publicize to any person, directly or indirectly, orally or in writing, any information related to the existence of this Credit Agreement, the transactions contemplated herein or the terms or conditions hereof or thereof; **provided** that such party may repeat information about the transactions contemplated hereby that has been publicly announced by the Borrower and no additional information can be publicized.

10.18    **Usury Savings Clause**. Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable Law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrower shall pay to the Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of the Lenders and the Borrower to conform strictly to any applicable usury Laws. Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to the Borrower.

10.19    **No Strict Construction**. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

10.20    **Counterparts; Effectiveness**. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," "delivery," and words of like import in this Agreement, any Assignment and Assumption or any Credit Document shall be deemed to include electronic signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other state laws based on the Uniform Electronic Transactions Act, and the parties hereto consent to conduct the transactions contemplated hereunder by electronic means.

10.21    **Integration**. This Agreement and the other Credit Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof; provided that, for the avoidance of

doubt, nothing set forth in the Credit Documents shall impair in any manner the rights of the Agents and the Lenders in their other capacities under any other documents with the Borrower or any Subsidiary of the Borrower, including as holders in respect of any warrant issued by such Person.

10.22    **No Fiduciary Duty**. Each Agent, each Lender, and their Affiliates (collectively, the "**Lender Affiliated Parties**"), may have economic interests that conflict with those of the Credit Parties, and each Credit Party acknowledges and agrees (a) nothing in the Credit Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Lender Affiliated Parties and each Credit Party, its stockholders or its Affiliates; (b) the transactions contemplated by the Credit Documents are arm's-length commercial transactions between the Lender Affiliated Parties, on the one hand, and each Credit Party, on the other; (c) in connection therewith and with the process leading to such transaction each of the Lender Affiliated Parties is acting solely as a principal and not the agent or fiduciary of any Credit Party, its management, stockholders, creditors or any other Person; (d) none of the Lender Affiliated Parties has assumed an advisory or fiduciary responsibility in favor of any Credit Party with respect to the transactions contemplated hereby or the process leading thereto (regardless of whether any of the Lender Affiliated Parties or any of their respective Affiliates has advised or is currently advising any Credit Party on other matters) or any other obligation to any Credit Party except the obligations expressly set forth in the Credit Documents; (e) each Credit Party has consulted its own legal and financial advisors to the extent it deemed appropriate; (f) each Credit Party is responsible for making its own independent judgment with respect to such transactions and the process leading thereto; and (g) no Credit Party will claim that any of the Lender Affiliated Parties has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to any Credit Party, in connection with such transaction or the process leading thereto.

10.23    **PATRIOT Act**. Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Credit Parties that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies the Credit Parties, which information includes the name and address of each Credit Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Credit Parties in accordance with the PATRIOT Act.

10.24    **Judgment Currency**. In respect of any judgment or order given or made for any amount due under this Agreement or any other Credit Document that is expressed and paid in a currency (the "judgment currency") other than the currency in which it is expressed to be payable under this Agreement or other Credit Document, the party hereto owing such amount due will indemnify the party due such amount against any loss incurred by them as a result of any variation as between (a) the rate of exchange at which the United States dollar amount is converted into the judgment currency for the purpose of such judgment or order and (b) the rate of exchange, as quoted by the Administrative Agent or by a known dealer in the judgment currency that is designated by the Administrative Agent, at which such Lender is able to purchase Dollars with the amount of the judgment currency actually received by the Administrative Agent or such Lender. The foregoing indemnity shall constitute a separate and independent obligation of the applicable party and shall survive any termination of this Agreement and the other Credit Documents, and shall continue in full force and effect notwithstanding any such judgment or order as aforesaid. The term "rate of exchange" shall include any premiums and costs of exchange payable in connection with the purchase of or conversion into Dollars.

10.25    **Acknowledgement and Consent to Bail-In of Affected Financial Institutions**. Solely to the extent an Affected Financial Institution is a party to this Agreement and notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to

the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder that may be payable to it by any Lender that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

10.26    **[Certain ERISA Matters**.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement;

(ii)    the prohibited transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable so as to exempt from prohibitions of Section 406 of ERISA and Section 4975 of the Code such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement;

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of

PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement; or

        (iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

In addition, unless either (I) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (II) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that the Administrative Agent or any of its Affiliates is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Credit Document or any documents related hereto or thereto).]

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**[●].,**
as Borrower


By: _____
Name:
Title:

**FLEXGEN POWER SYSTEMS, LLC**,
as Administrative Agent and Collateral Agent

By: _____
Name:
Title:

FlexGen Power Systems, LLC,
as a Lender

By: _____
Name:
Title: