**Exhibit C**

US_ACTIVE\130759607

**ASSET PURCHASE AGREEMENT**

**by and among**

**FLEXGEN POWER SYSTEMS, LLC,**

**POWIN, LLC**

**and**

**its direct and indirect subsidiaries signatory hereto**

**July 6, 2025**

## TABLE OF CONTENTS

**Page**

Article I

DEFINITIONS...............................................................................2

Article II

PURCHASE AND SALE ...........................................................12

Section 2.1    **Purchase and Sale of Purchased Assets** .................12
Section 2.2    **Excluded Assets** ....................................................14
Section 2.3    **Assumption of Assumed Liabilities** ........................15
Section 2.4    **Excluded Liabilities** ...............................................16
Section 2.5    **Consideration** ........................................................16
Section 2.6    **Assumption and Assignment of Contracts.** ............17
Section 2.7    **Schedule Updates.** .................................................18
Section 2.8    **Closing** ..................................................................19
Section 2.9    **Deliveries at Closing.** .............................................19
Section 2.10   **Allocation** .............................................................20
Section 2.11   **Withholding.** ..........................................................20
Section 2.12   **Deposit**..................................................................21

Article III

SELLERS' REPRESENTATIONS AND WARRANTIES ...............21

Section 3.1    **Organization of Sellers; Good Standing.** ...............21
Section 3.2    **Authorization of Transaction**..................................22
Section 3.3    **Noncontravention; Consents and Approvals**............22
Section 3.4    **Compliance with Laws** ...........................................23
Section 3.5    **Title to Purchased Assets**.......................................23
Section 3.6    **Contracts** ...............................................................24
Section 3.7    **Intellectual Property.** ............................................24
Section 3.8    **Litigation**...............................................................26
Section 3.9    **Employees** ..............................................................26
Section 3.10   **Real Property.** ........................................................26
Section 3.11   **Tangible Personal Property** ...................................27
Section 3.12   **Permits.**..................................................................27
Section 3.13   **Purchased Inventory** ..............................................27
Section 3.14   **Environmental Matters** ..........................................28
Section 3.15   **Brokers' Fees** ........................................................28
Section 3.16   **No Other Agreements to Purchase** ..........................29
Section 3.17   **Taxes**......................................................................29
Section 3.18   **No Other Representations or Warranties**.................30

Article IV

BUYER'S REPRESENTATIONS AND WARRANTIES ...................31

i

**Section 4.1**    **Organization of Buyer** ..............................................................31
**Section 4.2**    **Authorization of Transaction** ......................................................31
**Section 4.3**    **Noncontravention** ......................................................................31
**Section 4.4**    **Litigation** ..................................................................................32
**Section 4.5**    **Adequate Assurances Regarding Executory Contracts** ............32
**Section 4.6**    **Brokers' Fees** ............................................................................32
**Section 4.7**    **No Outside Reliance** ..................................................................32

Article V
       PRE-CLOSING COVENANTS ..............................................................32

**Section 5.1**    **Notices and Consents.** ................................................................33
**Section 5.2**    **Bankruptcy Actions.** ..................................................................34
**Section 5.3**    **Conduct of Business** ..................................................................35
**Section 5.4**    **Notice of Developments** ............................................................37
**Section 5.5**    **Access** ........................................................................................37
**Section 5.6**    **Press Releases and Public Announcements** ..............................37
**Section 5.7**    **Bulk Transfer Laws** ..................................................................38
**Section 5.8**    **Release of Claims** ......................................................................38

Article VI
       OTHER COVENANTS ........................................................................38

**Section 6.1**    **Cooperation** ..............................................................................38
**Section 6.2**    **Further Assurances** ....................................................................38
**Section 6.3**    **Availability of Business Records** ..............................................39
**Section 6.4**    **Employee Matters.** ......................................................................39
**Section 6.5**    **Transfer Taxes** ..........................................................................40
**Section 6.6**    **Property Taxes.** ..........................................................................40
**Section 6.7**    **Insurance Policies** ......................................................................41
**Section 6.8**    **Collection of Accounts Receivable** ............................................41
**Section 6.9**    **Fiduciary Obligations** ..............................................................41
**Section 6.10**   **Covenant Not to Sue.** ................................................................42

Article VII
       CONDITIONS TO CLOSING ..............................................................42

**Section 7.1**    **Conditions to Buyer's Obligations.** ............................................42
**Section 7.2**    **Conditions to Sellers' Obligations** ............................................43
**Section 7.3**    **No Frustration of Closing Conditions** ......................................44
**Section 7.4**    **Waiver of Conditions** ................................................................44

Article VIII
       TERMINATION ....................................................................................44

**Section 8.1**    **Termination of Agreement** ........................................................44
**Section 8.2**    **Procedure upon Termination** ....................................................46
**Section 8.3**    **Breakup Fee and Expense Reimbursement.** ..............................46

ii

**Section 8.4**     **Effect of Termination.** ...............................................................47

Article IX

       MISCELLANEOUS ................................................................47

**Section 9.1**     **Remedies** ...............................................................47
**Section 9.2**     **Expenses** ...............................................................48
**Section 9.3**     **Entire Agreement** ...............................................48
**Section 9.4**     **Incorporation of Schedules, Exhibits and Disclosure Schedule** ..........48
**Section 9.5**     **Amendments and Waivers** ...............................48
**Section 9.6**     **Succession and Assignment** ...........................48
**Section 9.7**     **Notices** ...................................................................49
**Section 9.8**     **Governing Law; Jurisdiction** ..........................50
**Section 9.9**     **Consent to Service of Process** .........................50
**Section 9.10**    **WAIVERS OF JURY TRIAL** ..........................50
**Section 9.11**    **Severability** ..........................................................50
**Section 9.12**    **No Third Party Beneficiaries** ..........................50
**Section 9.13**    **No Survival of Representations, Warranties and Agreements** ............51
**Section 9.14**    **Non-Recourse** ......................................................51
**Section 9.15**    **Construction** .........................................................51
**Section 9.16**    **Computation of Time** .........................................52
**Section 9.17**    **Mutual Drafting** ..................................................52
**Section 9.18**    **Disclosure Schedule** ..........................................52
**Section 9.19**    **No Waiver or Release** .........................................52
**Section 9.20**    **Headings; Table of Contents** ...........................53
**Section 9.21**    **Counterparts; Facsimile and Email Signatures** ....................53
**Section 9.22**    **Time of Essence** ..................................................53

Exhibit A     -     Form of Bill of Sale
Exhibit B     -     Form of Assignment and Assumption Agreement

iii

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of July 6, 2025, by and among Powin, LLC, a Delaware limited liability company ("Powin"), and Powin's direct and indirect subsidiaries that are signatories below (together with Powin, "Sellers" or the "Debtors"), and FlexGen Power Systems, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Sellers and Buyer are referred to collectively herein as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

WHEREAS, Sellers presently conduct the business of providing service solutions using the Seller's proprietary intellectual property, cloud-based software, support systems, analytics and reporting and monitoring capabilities for battery energy storage systems (collectively, the "Business");

WHEREAS, on June 9, 2025 (the "Petition Date"), Sellers filed voluntary petitions for relief (the "Chapter 11 Cases") pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code");

WHEREAS, the Parties entered into a debtor-in-possession credit facility, pursuant to which certain lenders agreed to provide a secured super-priority debtor-in-possession loan facility to the Debtors pursuant to the DIP Order (as defined below) and the DIP Loan Documents (as defined below) (such credit facility, the "DIP Facility");

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Purchased Assets and the Assumed Liabilities upon the terms and subject to the conditions set forth herein;

WHEREAS, Sellers intend to seek entry of Sale Procedures Order by the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") upon the terms and subject to the conditions set forth herein and in the Sale Procedures Order;

WHEREAS, Sellers intend to seek the entry of the Sale Order by the Bankruptcy Court approving this Agreement and authorizing Sellers to consummate the Contemplated Transactions upon the terms and subject to the conditions set forth herein and in the Sale Order;

WHEREAS, the independent manager or other applicable governing body of each Seller has determined that it is advisable and in the best interests of such Seller's estate and the beneficiaries of such estate to consummate the Contemplated Transactions provided for herein pursuant to the Sale Procedures Order and the Sale Order and has approved this Agreement, subject to higher and better offers as contemplated by the Sale Procedures Order;

WHEREAS, the Contemplated Transactions are subject to the approval of the Bankruptcy Court, subject to higher and better offers as contemplated by the Sale Procedures Order, and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court; and

WHEREAS, concurrently with the execution and delivery of this Agreement, Buyer, Sellers and the Escrow Agent shall have entered into the Escrow Agreement.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

# ARTICLE I
# DEFINITIONS

"503(b)(9) Claim" means an Administrative Claim against any Seller under Section 503(b)(9) of the Bankruptcy Code.

"Accounts Receivable" means (a) all accounts, accounts receivable, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor and supplier rebates of Sellers and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Administrative Claim" means an allowed Claim arising under Sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternate Transaction" means the sale, transfer or other disposition (or agreement to sell, transfer or otherwise dispose) of all or any material portion of the Purchased Assets (whether effected (or to be effected) pursuant to a reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, plan of reorganization or liquidation, or restructuring or similar transaction), in a transaction or series of transactions, other than the Contemplated Transactions; provided, that with respect to any series of related transactions described herein, the first such transaction in such series constitutes an "Alternate Transaction" for purposes of Section 8.1 and Section 8.3.

"Assignment and Assumption Agreement" means a duly executed assignment and assumption agreement, substantially in the form attached as Exhibit B hereto.

"Assumed Contract List" means Schedule 2.6(a) hereto.

"Assumed Contracts" means those Leases and Contracts that have been assumed by Sellers and assigned to Buyer pursuant to Section 2.6 and Section 365 of the Bankruptcy Code, which, for

2

the avoidance of doubt shall not include any Non-Real Property Contract or Lease that is excluded pursuant to Section 2.6.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Permits" means all Permits relating to the Business that are transferable in accordance with their terms and under applicable Law, but excluding all Permits to the extent related exclusively to any Excluded Asset (including any Lease that is not an Assumed Contract).

"Auction" means the auction for the sale and assignment of the Purchased Assets as specified in the Sale Procedures Order.

"Back-Up Bidder" has the meaning specified in the Sale Procedures Order.

"Back-Up Termination Date" means the first to occur of (a) consummation of an Alternate Transaction, or (b) Buyer's receipt of notice from the Sellers of the release of Buyer's obligations as Back-Up Bidder under any order of the Bankruptcy Court approving bidding procedures in connection with the Contemplated Transactions or an Alternate Transaction.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bill of Sale" means a duly executed bill of sale, substantially in the form attached as Exhibit A hereto.

"Breakup Fee" means a breakup fee equal to $1,100,000.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Released Parties" has the meaning set forth in Section 5.8.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" means the closing of the transactions contemplated by this Agreement, which shall be deemed to have occurred at 12:01 p.m. (prevailing Eastern Time) on the Closing Date.

"Closing Date" means the second (2nd) Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or

3

waived by the Party entitled to waive that condition, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.

"<u>Committee</u>" means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

"<u>Consent</u>" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an order of the Bankruptcy Court that deems or renders any of the foregoing unnecessary.

"<u>Contemplated Transactions</u>" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Purchased Assets and the assumption by Buyer of the Assumed Liabilities.

"<u>Contract</u>" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission or commitment that, in each case, is legally-binding.

"<u>Credit Bid</u>" means a credit bid by the Buyer pursuant to section 363(k) of the Bankruptcy Code.

"<u>Credit Card Receivables</u>" means all Accounts Receivable and other amounts owed to any Seller (whether current or non-current) in connection with any customer purchases from any Seller that are made with credit cards or any other related amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to Sellers.

"<u>Cure Amount Cap</u>" has the meaning set forth in <u>Section 2.3(a)</u>.

"<u>Cure Amounts</u>" has the meaning set forth in <u>Section 2.6(b)</u>.

"<u>Current Employees</u>" means all individuals employed by Sellers as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"<u>Dataroom</u>" has the meaning set forth in <u>Section 4.7</u>.

"<u>Data Security Requirements</u>" means, collectively, all of the following to the extent relating to access, collection, use, processing, storage, sharing, distribution, transfer, disclosure, security, destruction, or disposal of any personal, sensitive, or confidential information or data (whether in electronic or any other form or medium), including any personal information protected under applicable laws, rules, or regulations, otherwise relating to privacy, security, or security breach notification requirements and applicable to the Sellers or to the conduct of the Business: (i) the Sellers' own rules, policies, and procedures; (ii) all applicable laws, rules and regulations; (iii) industry standards applicable to the industry in which the Business operates; and (iv) contracts into which the Sellers have entered or by which they are otherwise bound.

"DIP Budget" shall have the same meaning as the term "Approved Budget" as defined in the DIP Order.

"DIP Indebtedness" means all "DIP Obligations" as defined in the DIP Order.

"DIP Lenders" shall have the same meaning given such term in the DIP Order.

"DIP Loan Documents" shall have the meaning given such term in the DIP Order.

"DIP Order" means as of any date of determination (i) the *Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying Automatic Stay, and (VI) Scheduling a Final Hearing* that was entered by the Bankruptcy Court on June 26, 2025 (the "Interim Order") or (ii) the Final Order (as defined in the Interim Order), whichever such Order is then in effect.

"DIP Secured Parties" shall have the same meaning given such term in the DIP Order.

"Decree" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"Deposit" has the meaning set forth in Section 2.11(a).

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" means (a) any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), (b) employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, program, policy, agreement or arrangement and (c) any other benefit or compensation plan, program, agreement or arrangement of any kind, providing for compensation, bonuses, profit-sharing, or other forms of incentive or deferred compensation, vacation benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, disability or sick leave benefits or post-employment or retirement benefits, in each case, maintained or contributed to by any Seller or in which any Seller participates or participated and that provides benefits to any Current Employee or Former Employee.

"Employee Roster" has the meaning set forth in Section 3.9.

"Environmental Laws" all applicable Laws concerning pollution or protection of the environment, human health and safety, and natural resources.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"Escrow Agent" means Stretto, Inc.

5

"Escrow Agreement" means that certain Escrow Agreement, dated on or about the date hereof, by and among the Sellers, Buyer and the Escrow Agent.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Claims" means all rights (including rights of set-off and rights of recoupment), refunds, claims, counterclaims, demands, causes of action and rights to collect damages of Sellers against third parties (including, without limitation, avoidance actions and claims against the Sellers' former officers, managers, independent managers, directors, employees, equity holders, private equity sponsors, or lenders, in each case in their capacity as such, or any other person or entity subject to investigation by the Committee pursuant to that final cash collateral order entered by the Bankruptcy Court, including, without limitation, those set forth on Schedule [ ● ] to this Agreement).  Notwithstanding the foregoing, "Excluded Claims" do not include any such rights with respect to (i) the Intellectual Property owned by the Sellers as of the time immediately preceding the Closing or (ii) any causes of action by a Seller against any of its customers, including avoidance claims or causes of action under Chapter 5 of the Bankruptcy Code, other than (A) the Specified Customer Claim and (B) any claim, if any, with respect to any customer who is also a Seller's equity holder, private equity sponsor, or lender, to the extent such claim exists in respect of such customer's capacity as a Seller's equity holder, private equity sponsor, or lender (and not in its capacity as a customer), or any other person or entity subject to investigation by the Committee pursuant to that final cash collateral order entered by the Bankruptcy Court and set forth on Schedule [ ● ] to this Agreement (all such rights that pursuant to this sentence are excluded from the "Excluded Claims," collectively, the "IP and Customer Claims").

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Expense Reimbursement" means an expense reimbursement of the reasonable and documented out of pocket expenses associated with this Agreement in an aggregate amount not to exceed $500,000.

"Express Representations" has the meaning set forth in Section 4.7.

"Final Order" means an order of the Bankruptcy Court, which is in full force and effect, which has not been modified, amended, reversed, vacated or stayed and as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Former Employees" means all individuals who have been employed by the Sellers (or any of their predecessors) who are not Current Employees.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Governmental Entity" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Hazardous Substance" means any toxic or hazardous material, substance or waste as to which Liability or standards of conduct may be imposed under any Environmental Laws.

"Insurance Policy" means each primary, excess and umbrella insurance policy, bond and other forms of insurance owned or held by or on behalf, or providing insurance coverage to the Business, Sellers and their operations, properties and assets, including, without limitation, all stop-loss insurance policies with respect to Sellers' self-insured medical and/or dental insurance programs.

"Intellectual Property" means any and all rights, title and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction throughout the world, including: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions and reexaminations in connection therewith; (b) trademarks, service marks, trade dress, logos, slogans, trade names, service names, brand names, Internet domain names and all other source or business identifiers and general intangibles of a like nature, along with all applications, registrations and renewals in connection therewith, and all goodwill associated with any of the foregoing; (c) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof; (d) trade secrets; (e) rights in software and firmware, data files, source code, object code, application programming interfaces, architecture, files, records, schematics, computerized databases and other related specifications and documentation, internally developed automation scripts, and administrative tools; and (f) all other intellectual property rights related to the Business or held by any Seller.

"Intellectual Property Assignments" has the meaning set forth in Section 2.9(a).

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"IT Systems" means any and all information, payment and communications technologies owned or controlled by the Sellers, including all computers, hardware, software (whether in object or source code form), databases, servers, workstations, routers, hubs, switches, data communication lines, networks and all other information technology systems, included therein.

"Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity, or court of competent jurisdiction, or other legal requirement or rule of law, including applicable building, zoning, subdivision, health and safety and other land use Laws.

"Leased Real Property" means all (a) leasehold or sub-leasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real

property which is used in or otherwise related to the Business, including the right to all security deposits and other amounts and instruments deposited by or on behalf of Sellers thereunder, and (b) any buildings, structures, improvements and fixtures located on any Leased Real Property which are owned by Seller, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property ("Leasehold Improvements").

"Leasehold Improvements" has the meaning set forth in the definition of "Leased Real Property".

"Leases" means all leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which any Seller holds any Leased Real Property.

"Liability" means, as to any Person, any debt, Claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

"Lien" means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, judgments, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, Law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability).

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity or arbitrator.

"Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to the condition (financial or otherwise), value or results of operations of the Purchased Assets (taken as a whole); provided, however, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) the filing of a voluntary petition under Chapter 11 of the Bankruptcy Code or the effect, directly or indirectly, of

8

such filing; (ii) acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreements, except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iii) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, except to the extent that such change has a materially disproportionate adverse effect on Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iv) resulting from any act of God or other force majeure event (including natural disasters); or (v) changes in Law or in GAAP or interpretations thereof; or (b) would reasonably be expected to prevent, materially delay or materially impair to the ability of any Seller to consummate the transactions contemplated by this Agreement or the Related Agreements on the terms set forth herein and therein.

"Non-Real Property Contracts" means the Contracts to which any Seller is a party other than the Leases.

"Offeree" has the meaning set forth in Section 6.4.

"Ordinary Course of Business" means the ordinary and usual course of business of Sellers taken as a whole consistent with past custom and practice and taking into account the commencement of the Chapter 11 Cases.

"Outside Date" means September 12, 2025.

"Parties" has the meaning set forth in the preamble.

"Permit" means any and all franchise, approval, permit (including environmental, construction and operation permits), license, order, registration, certificate, variance, Consent, exemption or similar right issued, granted, given or otherwise obtained or required to be obtained, from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"Permitted Liens" means (a) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted; (b) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair value or the use or occupancy of such real property or materially interfere with the operation of the Business at such real property; (c) with respect to Leasehold Improvements, any reversion or similar rights to the landlord or other third party upon expiration or termination of the applicable Lease; and (d) any Liens associated with or arising in connection with any Assumed Liabilities.

"<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"<u>Personal Property Leases</u>" means all leases of personal property relating to personal property used by Sellers or to which any Seller is a party or by which the properties or assets of any Seller are bound, in each case relating to the Business.

"<u>Petition Date</u>" has the meaning set forth in the recitals.

"<u>PII</u>" means "personally identifiable information" within the meaning of section 101(41A) of the Bankruptcy Code.

"<u>Post-Closing Tax Period</u>" means any Tax period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"<u>Pre-Closing Tax Period</u>" means any Tax period ending on or before the Closing Date and that portion of any Straddle Period ending on the Closing Date.

"<u>Priority Claim</u>" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

"<u>Professional Services</u>" means any legal services, accounting services, financial advisory services, investment banking services or any other professional services provided by the Sellers' advisers obtained pursuant to any order of the Bankruptcy Court.

"<u>Property Taxes</u>" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"<u>Purchase Consideration</u>" has the meaning set forth in <u>Section 2.5</u>.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.5</u>.

"<u>Purchased Assets</u>" has the meaning set forth in <u>Section 2.1</u>

"<u>Purchased Inventory</u>" means the assets listed on <u>Schedule 2.1(a)</u>.

"<u>Qualified Bid</u>" means competing bids qualified for the Auction in accordance with the Sale Procedures Order.

"<u>Records</u>" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, customer relationship management software data and records, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

"Related Agreements" means the Escrow Agreement, the Bill of Sale, the Assignment and Assumption Agreement and the Intellectual Property Assignments and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Purchased Assets to Buyer.

"Representative" means a Person's officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents.

"Retention Fund" means a cash payment of $2,000,000, payable at the Closing, to reimburse the Sellers for employee costs associated with the continuation of the Business and support of its customers through the Closing.

"Sale Hearing" means the hearing conducted in the Bankruptcy Court to seek approval of the Sale Motion and the Contemplated Transactions.

"Sale Motion" means a motion filed by the Sellers with the Bankruptcy Court in connection with the Chapter 11 Cases requesting the entry of the Sale Procedures Order and the Sale Order.

"Sale Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases consistent with the terms of this Agreement approving the Sale Motion and sale to Buyer in form and substance satisfactory to Buyer.

"Sale Order Deadline" means August 7, 2025, unless extended by Buyer.

"Sale Procedures Order" means an order of the Bankruptcy Court approving the sale procedures relief requested in the Sale Motion in the form attached hereto or otherwise in form and substance satisfactory to Buyer.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Sellers' Knowledge" (or words of similar import) means the actual knowledge, after due inquiry (which includes reasonable inquiry of such person's direct reports), of each of the individuals listed on Schedule 1.1(a).

"Specified Customer Claim" means the customer claim set forth on Schedule 1.1(b).

"Straddle Period" means any Tax period beginning before or on and ending after the Closing Date.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination

11

thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Successful Bidder" has the meaning specified in the Sale Procedures Order.

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, escheat, unclaimed property, sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever (however denominated), whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Event" has the meaning set forth in Section 8.1.

"Transfer Tax" means any stamp, documentary, registration, transfer, added-value or similar Tax imposed under any applicable Law in connection with the transactions contemplated by this Agreement.

"Transferring Party" has the meaning set forth in Section 5.1(c).

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1** **Purchase and Sale of Purchased Assets**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement (including, without limitation, Section 4.7 below), at the Closing, Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of the Seller's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than Permitted Liens and any Liens included in the Assumed Liabilities), for the consideration specified in Section 2.5. "Purchased Assets" shall mean all of the, direct or indirect, right, title and interest of Sellers in, to and under the tangible and intangible assets (including goodwill), properties, rights, going concern value, claims and Contracts used, useful, or held for use in, or related to, the Business (but excluding Excluded Assets) wherever situated and of whatever kind and nature, real or personal, as of the Closing, including:

12

(a)    all Purchased Inventory of Sellers as of the Closing set forth on Schedule 2.1(a) hereto, including all rights of Sellers to receive such Purchased Inventory, supplies and materials which are on order as of the Closing;

(b)    all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to Section 2.6;

(c)    all Intellectual Property owned by Sellers, including, without limitation, the Intellectual Property set forth on Schedule 2.1(c) hereto;

(d)    all items of machinery, equipment, supplies, furniture, fixtures, Leasehold Improvements (to the extent of Sellers' rights to any Leasehold Improvements under the Leases that are Assumed Contracts) owned by Sellers as of the Closing and related to the Business, as set forth on Schedule 2.1(d) hereto;

(e)    all Records related to the Business, including Records related to Taxes paid or payable by any Seller (provided that Sellers are entitled to retain copies of all Records for legal compliance purposes), but excluding (i) personnel files for Current Employees and Former Employees of Sellers who are not hired by Buyer as of the Closing Date and (ii) any materials exclusively related to any Excluded Assets;

(f)    all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(g)    all rights of Sellers under non-disclosure or confidentiality, noncompete, assignment of inventions, or nonsolicitation agreements with Current or Former Employees, directors, consultants, independent contractors and agents of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(h)    all of the Assumed Permits;

(i)    the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Purchased Assets, occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(j)    the IP and Customer Claims;

(k)    all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, or products sold, to Sellers to the extent such equipment or products are included in the Purchased Assets and/or Assumed Liabilities;

(l)    all of the Sellers' telephone numbers, e-mail addresses, websites, URLs and internet domain names related to the Business;

13

(m)    all IT Systems, content, text, graphics, pictures, tools, code, log files, usernames, passwords and other log-in information (e.g. security questions and answers and related linkages) or used or held for use in connection with the operation or conduct of the Business and other materials, information and items contained or incorporated in or used or held for use in conjunction therewith, including historical usage and analytics data and all diagrams, data, specifications, user manuals, instructional materials and other documentation, information and data relating thereto; and

(n)    all other assets that are related to or used in connection with the Purchased Assets or the Business (but excluding all of the Excluded Assets).

**Section 2.2    Excluded Assets**. Notwithstanding Section 2.1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and the Sellers are not selling or assigning, any right, title or interest (direct or indirect) in or to any of the following assets, properties and rights of Sellers (the "Excluded Assets"):

(a)    all cash and cash equivalents of any Seller;

(b)    all of Sellers' certificates of formation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, unit certificates and other documents relating to the organization, maintenance and existence of any Seller as a limited liability company or other entity;

(c)    all equity securities of any Seller or securities convertible into, exchangeable, or exercisable for any such equity securities and all net operating losses of any Seller;

(d)    all Leases (and related Leased Real Property, if any) and Contracts, in each case, other than the Assumed Contracts;

(e)    the Excluded Claims;

(f)    any loans or notes payable to any Seller or any of its Affiliates from any employee of any Seller or any of its Affiliates (other than Ordinary Course of Business employee advances);

(g)    any (i) Records containing confidential personal private information including confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (ii) other Records that Sellers are required by Law to retain and (iii) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; provided that Buyer shall have the right to make copies of any portions of such retained Records (other than the Records referenced in subsection (iii)) to the extent that such portions relate to the Business or any Purchased Asset;

(h)    all Permits other than the Assumed Permits;

14

(i)      all directors' and officers' liability Insurance Policies, including any tail Insurance Policies, including the rights of the directors and officers thereunder for coverage (i.e., advancement of expenses and liability coverage with respect to claims made against such officers and directors); provided that for the avoidance of doubt, any proceeds or right to proceeds under such policies payable or paid to the Seller (other than for purposes of paying, reimbursing or advancing the expenses and liability coverage to or on behalf of any director or officer covered under such policy and payable to a third party with respect to claims made against such director or officer) including for damages and reimbursement for losses or otherwise, shall be payable to Buyer as a Purchased Asset from and after the Closing;

(j)      all Employee Benefit Plans;

(k)      the assets of Powin EKS SellCo, LLC set forth on Schedule 2.2(j);

(l)      the Accounts Receivable of Sellers;

(a)      any Tax refunds, credits or other Tax assets of Sellers attributable to Taxes that are Excluded Liabilities; and

(b)      the rights of Sellers under this Agreement and the Related Agreements and all consideration payable or deliverable to Sellers under this Agreement.

**Section 2.3**    **Assumption of Assumed Liabilities**. On the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing (or, with respect to Assumed Liabilities under Assumed Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in Sections 2.6 and Section 2.7), Buyer shall assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably convey, transfer, and assign to Buyer, the following Liabilities, without duplication and only to the extent not paid prior to the Closing and no other Liabilities (collectively, the "Assumed Liabilities"):

(a)      all Cure Amounts under any and all Assumed Contracts; provided, however, that the Buyer shall not be obligated to assume or pay any Cure Amounts with respect to the Assumed Contracts set forth on Schedule 2.3(a) (as the same may be amended from time to time pursuant to Section 2.6) in excess of such Assumed Contract's Cure Amount Cap;

(b)      Liabilities under the Assumed Contracts and Assumed Permits solely to the extent arising from and after the Closing Date as well as any Liabilities to the extent arising exclusively out of the Purchased Assets, in each case, solely to the extent arising from and after the Closing Date;

(c)      Liabilities expressly assumed by Buyer under the Agreement;

(d)      Claims for stub-rent pursuant to section 503(b) of the Bankruptcy Code with respect to Leases that are also Assumed Contracts (it being understood that Buyer shall pay

15

such amounts no later than the later of (a) 10 days following Closing and (b) the last day of the month in which the Closing occurs); and

(e)    all Transfer Taxes in accordance with Section 6.5.

**Section 2.4    Excluded Liabilities**. Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities, including any Liability of any Seller, or otherwise imposed on the Purchased Assets or with respect to the Business, in respect of any Tax, including without limitation any Liability of any Seller for the Taxes of any other Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or non-United States Law), as a transferee or successor, by Contract or otherwise, but excluding any Property Taxes to the extent specifically allocated to Buyer pursuant to Section 6.6 and any Transfer Taxes (all such Liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities").

**Section 2.5    Consideration**.

(a)    In aggregate consideration for the sale and transfer of the Purchased Assets (the "Purchase Consideration") shall be composed of the following:

      i.    $36,000,000 (the "Purchase Price"), comprised, in the Buyer's sole discretion, of (A) the Credit Bid and (B) cash;

      ii.    the assumption by Buyer of the Assumed Liabilities; and

      iii.    the Retention Fund.

(b)    The Purchase Consideration shall be satisfied at the Closing as to:

      i.    the Credit Bid, by causing the DIP Lenders to (A) acknowledge satisfaction of the portion of the DIP Indebtedness covered by the Credit Bid and (B) to the extent the Credit Bid covers all DIP Indebtedness, release all guarantees of the DIP Indebtedness and security interests and liens securing the DIP Indebtedness (collectively, (i)(A) and (i)(B) above, the "Credit Bid And Release");

      ii.    to the extent that the Purchase Price and the Retention Fund, in the aggregate, exceeds the amount of the Credit Bid, the Deposit, by Buyer and the Sellers instructing the Escrow Agent to pay the Deposit to the Sellers, by wire transfer of immediately available funds, in accordance with the terms of the Escrow Agreement (and to the extent that the amount of the Deposit exceeds the amount by which the Purchase Price and the Retention Fund, in the aggregate, exceeds the amount of the Credit Bid, the remaining portion of the Deposit shall be returned to Buyer at the Closing);

      iii.    to the extent that the Purchase Price and the Retention Fund, in the aggregate, exceeds the sum of (A) the Credit Bid and (B) the Deposit, cash consideration to be paid by Buyer to Sellers; and

iv.    the amount of the Assumed Liabilities described in <u>Section 2.3</u>, by assuming such Assumed Liabilities through one or more Assignment and Assumption Agreements.

**Section 2.6    <u>Assumption and Assignment of Contracts</u>.**

(a)    The Assumed Contract List sets forth a list of all Contracts and Leases to which a Seller is a party and which Buyer has designated to be included as an Assumed Contract, together with estimated Cure Amounts for each Assumed Contract.

(b)    In connection with the assumption and assignment to Buyer of any Assumed Contract pursuant to this <u>Section 2.6</u>, (i) the cure amounts, if any, necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults under the Assumed Contracts (such amounts, the "<u>Cure Amounts</u>"), in each case as of the Petition Date and to the extent required by Section 365(b) of the Bankruptcy Code and any order of the Bankruptcy Court, shall be paid by Buyer at the Closing, except as otherwise provided in this Agreement, and neither the Cure Amounts paid by Buyer nor any other expense or obligation set forth in this <u>Section 2.6(b)</u> shall reduce, directly or indirectly, any consideration payable to Sellers hereunder and (ii) Buyer shall provide sufficient adequate assurance of future performance as of the Sale Hearing necessary to satisfy the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to Assumed Contracts.

(c)    Sellers shall use their respective commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Assumed Contracts to Buyer on the terms set forth in this <u>Section 2.6</u>. In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all Consents from Governmental Entities and third parties necessary to assume and assign such Assumed Contracts to Buyer.

(d)    Notwithstanding the foregoing, but subject to <u>Section 5.1</u>, a Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by a Seller or terminated by a Seller in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the Closing and is not continued or otherwise extended upon assumption; (ii) requires a Consent of any Governmental Entity or other third party (except as permitted by the Bankruptcy Code) in order to permit the sale or transfer to Buyer of Sellers' rights under such Contract, and no such Consent has been obtained prior to the Closing or (iii) the Cure Amount exceeds the Cure Amount Cap with respect to such Contract and neither Sellers nor Buyer are willing to pay the amount of the Cure Amount that exceeds the Cure Amount Cap with respect to such Contract.  In the absence of an agreement by the parties as to the payment of a Cure Amount in excess of the Cure Amount Cap, the subject contract shall be deemed rejected by Sellers.

(e)    In addition, a Permit shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity or other third party

(other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing.

**Section 2.7      Schedule Updates**.

(a)      Notwithstanding anything to the contrary in this Agreement, and without any increase or decrease in the Purchase Price (other than (i) with respect to the addition of any Contract to the Purchased Assets, any resulting increase or decrease in Cure Amounts, without regard to Cure Amount Caps and (ii) with respect to the addition of any inventory to the Purchased Assets, the Buyer shall either assume or pay to Sellers the amount of any debt or other Liability associated with such inventory or required to satisfy any Liens associated with such inventory), the Buyer may, on or prior to the Business Day immediately preceding the Auction (other than with respect to removing a Contract, which may be done at any time prior to the Closing Date), in its sole discretion, revise, by written notice to Sellers, amend or modify this Agreement and any schedule setting forth the Purchased Assets and the Excluded Assets prior to the Closing to (i) include in the definition of Purchased Assets (pursuant to the applicable schedule) and to exclude from the definition of Excluded Assets, any Contract or inventory of the Sellers not previously included in the Purchased Assets and require (A) the Sellers to file a notice of assumption and assignment with the Bankruptcy Court and (B) the Sellers to provide any necessary notice to the parties to any such Contract and (ii) to exclude from the definition of Purchased Assets (pursuant to the applicable schedule) and to include in the definition of Excluded Assets, any Assumed Contract, Assumed Plan or other asset of the Sellers previously included in the Purchased Assets and not otherwise included in the definition of Excluded Assets.

(b)      If any Contract is added to (or removed from) the Purchased Assets as permitted by this <u>Section 2.7</u>, the Sellers shall promptly take such steps as are reasonably necessary, including, if applicable, payment or adequate assurance of payment of all Cure Amounts and prompt delivery of notice to the non-debtor counterparty, to cause such Contracts to be assumed by the Sellers, and assigned to the Buyer, on the Closing Date (other than as excluded under the Sale Order and this Agreement).

(c)      If any Contract is removed from the Purchased Assets as permitted by this <u>Section 2.7</u>, all Liabilities to third parties arising under such Contract shall be Excluded Liabilities.  Without limiting any of the Buyer's rights pursuant to this <u>Section 2.7</u>, in the event that the Sale Order does not approve the assignment or transfer of one or more of the Assumed Contracts to the Buyer as Purchased Assets, the Buyer may, in its sole discretion and at any time prior to the Closing Date, exclude any or all of the Assumed Contracts from the Purchased Assets.

(d)      Notwithstanding the foregoing, if any Purchased Inventory is subject to a Lien or Liability (or claim of a Lien or Liability) not reflected in <u>Schedule 2.1(a)</u> (each, an "<u>Unscheduled Inventory Liability</u>"), Buyer shall be responsible for the payment of such Unscheduled Inventory Liabilities up to an aggregate amount of $1,000,000 (the "<u>Unscheduled Inventory Liability Cap</u>") for all such Unscheduled Inventory Liabilities.

18

Unless otherwise agreed by Buyer, all Purchased Inventory that is subject to an Unscheduled Inventory Liability shall remain included in the Purchased Assets, with Seller responsible for the payment of any Unscheduled Inventory Liabilities in excess of the Unscheduled Inventory Liability Cap.

**Section 2.8**     **Closing**. The Closing shall take place remotely by electronic exchange of counterpart signature pages commencing at 10:00 a.m. Eastern time on the Closing Date.

**Section 2.9**     **Deliveries at Closing**.

(a)     At the Closing, Sellers shall deliver to Buyer the following documents and other items, duly executed by Sellers, as applicable:

i.     all Bills of Sale reasonably requested by Buyer;

ii.     all Assignment and Assumption Agreements reasonably requested by Buyer;

iii.     instruments of assignment in form and substance to be agreed to by the Parties in their reasonable discretion for each Registered trademark and domain name, respectively, transferred or assigned hereby and for each pending application therefor, and general assignments of all other Intellectual Property of the Sellers, in each case as reasonably requested by Buyer (collectively, the "Intellectual Property Assignments");

iv.     a properly completed and duly executed IRS Form W-9 from each Seller or, if applicable, its regarded owner for U.S. federal income tax purposes;

v.     the officer's certificates required to be delivered pursuant to Section 7.1(j);

vi.     such other bills of sale, special warranty deeds, completed Transfer Tax returns, title affidavits, assignments of leases, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to the Buyer (in each case signed and acknowledged as appropriate), as the Buyer may reasonably request to vest in the Buyer all the right, title and interest of the Sellers in, to or under any or all the Purchased Assets; provided that all of the reasonable and documented out-of-pocket post-Closing costs incurred by the Sellers in preparing and delivering the foregoing shall be borne by the Buyer and paid promptly after demand therefor and receipt of supporting invoices; and

vii.     all other previously undelivered certificates, agreement and other documents required to be delivered by this Agreement by the Sellers at or prior to the Closing in connection with the transactions contemplated by this Agreement.

(b)     At the Closing, Buyer shall deliver to Sellers the following documents and other items, duly executed by Buyer, as applicable:

19

i.      any and all Assignment and Assumption Agreements to which the Buyer is party;

ii.      the Purchase Price;

iii.      the Retention Fund;

iv.      the Credit Bid And Release, in form reasonably satisfactory to the Sellers (including documentation reasonably acceptable to the Sellers evidencing satisfaction of the DIP Indebtedness);

v.      the officer's certificates required to be delivered pursuant to <u>Section 7.2(e)</u>; and

vi.      all other previously undelivered certificates, agreements and other documents required by this Agreement to be delivered by the Buyer at or prior to the Closing in connection with the Contemplated Transactions.

**Section 2.10    <u>Allocation</u>**. Within fifteen (15) calendar days after the Closing Date, Buyer shall in good faith prepare an allocation of the Purchase Price and the Retention Fund (and all capitalized costs, assumed liabilities, and other amounts treated as purchase price for U.S. federal income Tax purposes) among the Purchased Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate). Sellers shall have fifteen (15) calendar days following receipt of Buyer's proposed allocation to review and comment on such proposed allocation and Buyer shall consider such comments in good faith. Thereafter, Buyer shall provide Sellers with Buyer's final allocation schedule, and Buyer and Sellers shall report, act and file Tax Returns (including IRS Form 8594) in all respects and for all purposes consistent with such allocation. Neither Buyer nor Sellers shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with such allocation; provided that nothing contained herein shall prevent Buyer or Sellers from settling any proposed deficiency or adjustment by any Governmental Entity based upon or arising out of such allocation, and neither Buyer nor Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Entity challenging the allocation. Notwithstanding the foregoing, the Parties recognize that certain allocations of purchase price may be necessary prior to the schedule set forth above, such as in the case of any Transfer Tax filings, and the Parties agree to reasonably cooperate in determining the appropriate allocation  in a timely manner in advance of such filings and the payment of Transfer Taxes.

**Section 2.11    <u>Withholding</u>**.  Buyer, the Escrow Agent and any other Person making a payment hereunder (in each case, a "<u>Payor</u>"), shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Seller or any other Person such amounts as such Payor is required to deduct and withhold under the IRC, or any applicable Law, with respect to the making of such payment.  To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

US_ACTIVE\130687448

**Section 2.12    Deposit**.

(a)    No later than one (1) Business Day after the date on which the parties enter into the Escrow Agreement, Buyer will make an earnest money deposit (the "Deposit") into escrow with the Escrow Agent in the amount equal to $3,600,000 by wire transfer of immediately available funds. The Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of any of the Sellers or Buyer and shall be applied against payment of the Purchase Price. At the Closing, the Deposit shall be delivered to the Sellers in accordance with Section 2.5(b) and the terms of the Escrow Agreement and credited toward payment of the Purchase Price.

(b)    If this Agreement has been validly terminated prior to the Closing by the Seller pursuant to Section 8.1(g) then, within three (3) Business Days after the date of such termination, Buyer and the Sellers shall jointly instruct the Escrow Agent to disburse the Deposit to the Sellers.

(c)    If this Agreement has been validly terminated prior to the Closing by any Party hereto for any reason other than as contemplated by Section 2.12(b) then, within three (3) Business Days after the date of such termination, Buyer and the Sellers shall jointly instruct the Escrow Agent to disburse the Deposit to Buyer.

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers hereby represent and warrant to Buyer as of the date hereof and as of the Closing Date that, except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"), the statements contained in this Article III are true and correct.

**Section 3.1    Organization of Sellers; Good Standing**.

(a)    Each Seller is duly organized, validly existing and in good standing under the Laws of its state of formation and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which the Business is currently being conducted. Each Seller has all requisite corporate or similar power and authority to own, lease and operate its assets and to carry on the Business as currently conducted.

(b)    Except solely as a result of the commencement of the Chapter 11 Cases, each Seller is duly authorized to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Purchased Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

(c)    None of the Sellers has any Subsidiaries (other than other Sellers, if applicable).

21

**Section 3.2** **Authorization of Transaction**. Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)    each Seller has all requisite limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which a Seller is a party have been duly authorized by such Seller and no other company action on the part of any Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)    this Agreement has been duly and validly executed and delivered by each Seller, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which any Seller is a party will have been duly and validly executed and delivered by each such Seller, as applicable. Subject to approval of the Bankruptcy Court, assuming that this Agreement constitutes a valid and legally binding obligation of Buyer, this Agreement constitutes the valid and legally-binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Subject to approval of the Bankruptcy Court, assuming, to the extent that it is a party thereto, that each Related Agreement constitutes a valid and legally binding obligation of Buyer, each Related Agreement to which any Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against Sellers, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3** **Noncontravention; Consents and Approvals**.

(a)    Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements), subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, (i) will conflict with or result in a breach of the certificate of formation, operating agreement or other organizational documents of any Seller, (ii) will violate any Law to which any Seller is, or its respective assets or properties are, subject, (iii) subject to the entry of the Sale Order, will conflict with any Assumed Contract or Assumed Permit, or (iv) subject to and assuming entry of the Sale Order, will conflict with, or result in any violation of or constitute a breach or default under, any order of any Governmental Entity applicable to the Sellers or any of the Purchased Assets, and, in the case of clauses (ii), (iii) and (iv) for such conflicts, breaches, violations, defaults, accelerations, rights or failures to give notice, would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    Except as set forth in Schedule 3.3(b) of the Disclosure Schedule, subject to the Sale Order having been entered and still being in effect (and not subject to any stay pending appeal at the time of Closing), no Consent, notice or filing is required to be

22

obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement. After giving effect to the Sale Order and any applicable order of the Bankruptcy Court authorizing the assignment and assumption of any Contract that is an Assumed Contract hereunder, no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Person that is not a Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.4** **Compliance with Laws**.

(a)    Sellers are in compliance with all Laws applicable to the Business or the Purchased Assets in all material respects. Sellers have not received any written notice of violation of any Law with respect to any Seller, the Business or the Purchased Assets and there is no reasonable basis for the issuance of any such notice or the taking of any action for such violation.

(b)    To Sellers' Knowledge, Sellers do not engage in (a) the design, fabrication, development, testing, production or manufacture of one or more "critical technologies" within the meaning of the Defense Production Act of 1950, as amended, including all implementing regulations thereof (the "DPA"); (b) the ownership, operation, maintenance, supply, manufacture, or servicing of "covered investment critical infrastructure" within the meaning of the DPA (where such activities are covered by column 2 of Appendix A to 31 C.F.R. Part 800); or (c) the maintenance or collection, directly or indirectly, of "sensitive personal data" of U.S. citizens within the meaning of the DPA. The Seller has no current intention of engaging in such activities in the future.

(c)    Sellers have not, nor have they taken any action during the past two (2) years that would reasonably result in any such Person being deemed, a "foreign entity of concern" under 15 U.S.C. §4651 (including the corresponding definitional and interpretative guidance referenced therein).

**Section 3.5** **Title to Purchased Assets**. Sellers, as of immediately prior to the Closing, have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in (subject to the effect on enforceability of (a) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law)), the Purchased Assets, free and clear of all Liens (except for Permitted Liens), subject to entry of the Sale Order. At the Closing or such time as title is conveyed under Section 2.6, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Liens (except for Permitted Liens), to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees

23

under section 365(n) of the Bankruptcy Code.  No Person other than Sellers are engaged in the operation of, or hold rights, title and interest in (except for Permitted Liens), the Purchased Assets.

Section 3.6    **Contracts**. Schedule 3.6 of the Disclosure Schedule sets forth an accurate list, as of the date hereof, of all material Contracts, including any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof, to which a Seller is a party with respect to the Business as of the date hereof (and Sellers have made available to Buyer true and complete copies of all such Contracts).  Except as set forth in Schedule 3.6 of the Disclosure Schedule, no Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract.  The Assumed Contracts include all Contracts material to the ownership and/or operation of the Business.  Sellers have not, and, to Sellers' Knowledge, no other party to any Assumed Contract has, commenced any action against any of the parties to any Assumed Contract or given or received any written notice of any default or violation under any Assumed Contract that has not been withdrawn or dismissed. To Sellers' Knowledge, each Assumed Contract is, or will be upon the Closing, valid, binding and in full force and effect in accordance with its terms.

Section 3.7    **Intellectual Property**.

(a)    Schedule 3.7 of the Disclosure Schedule sets forth a true and complete list of (i) all Registered Intellectual Property that is owned by any Seller, (ii) all material Contracts pursuant to which any Seller obtains the right to use any Intellectual Property, excluding, specifically, shrink-wrap or off-the-shelf software and open source licenses, and (iii) all material Contracts pursuant to which any Seller grants to any other Person the right to use any Intellectual Property. Sellers own all Registered Intellectual Property free and clear of all Liens (except for Permitted Liens and subject to entry of the Sale Order), and all such Registered Intellectual Property is valid, subsisting and, enforceable, and is not subject to any outstanding Decree adversely affecting Sellers' use thereof or rights thereto.

(b)    To Sellers' Knowledge and except as set forth on Schedule 3.7 of the Disclosure Schedule, none of the use of the Intellectual Property included in the Purchased Assets, the conduct of the Business as currently conducted, nor any of the products sold or services provided by Sellers or any of their Affiliates in connection therewith, infringes upon or otherwise violates the Intellectual Property of any other Person, nor has any other Person made or threatened in writing any claim of such infringement or other violation. To Sellers' Knowledge, no third party is infringing any Intellectual Property owned by any Seller and included in the Purchased Assets, except as would not reasonably be expected to have a Material Adverse Effect.

(c)    Each Person who has contributed to, developed or conceived of any Intellectual Property for or on behalf of any member of the Seller either (i) has entered into a valid and enforceable written agreement pursuant to which such Person assigned  to a member of the Sellers exclusive ownership of all such Person's right, title and interest in and to such Intellectual Property or (ii) contributed to, developed or conceived of such Intellectual Property in a manner such that ownership of all right, title and interest in and to such Intellectual Property automatically vested in the Sellers as a matter of applicable Law.

24

(d)     The Sellers have used commercially reasonable efforts to maintain and protect the confidentiality of all trade secrets and other confidential information included in the Purchased Assets, and the Sellers have not disclosed any such trade secrets or other confidential information to any third party other than to Persons subject to contractual, legal, or otherwise binding ethical obligations to maintain the confidentiality thereof, in each case other than the release of the information described on Schedule 3.7(d) of the Disclosure Schedule from escrows of intellectual property to existing customers (the "Escrow Release").  Without limiting the foregoing, other than the Escrow Release, the Sellers have not disclosed, delivered, licensed, escrowed, released, or otherwise made available, nor does any Seller have a duty or obligation (whether present, contingent, or otherwise) to disclose, deliver, license, escrow, or otherwise make available, any source code that embodies any of the Purchase Assets or that is proprietary and included in any Company Product (to any third Person (other than Persons working for or on behalf of the Sellers and subject to written and valid confidentiality obligations).

(e)     There are not, and in the past three (3) years have not been, any defects or other problems in any of the products or services from which the Sellers have derived, or are currently deriving, revenue from the sale, license, maintenance or other provision thereof ("Company Products"), in each case that would prevent the same from performing substantially in accordance with their user specifications or functionality descriptions (collectively, "Technical Deficiencies").

(f)     The computer systems, software, computer hardware (whether general or special-purpose), telecommunications, networks, servers, peripherals, and other information technology equipment that is used by the Sellers in the conduct of the Business ("Business Systems") are sufficient in all material respects for conduct of the Business.  In the past three (3) years, there has not been any material failure with respect to any of the Business Systems that has not been remedied or replaced in all material respects.

(g)     The Sellers have taken commercially reasonable actions to protect the security and integrity of the Business Systems and the data stored or contained therein or transmitted thereby including by implementing industry standard procedures preventing unauthorized access and the introduction of any virus, worm, Trojan horse or similar disabling code or program ("Malicious Code"), and the taking and storing on-site and off-site of back-up copies of critical data. There is no Malicious Code in any of the Company Products or the Business Systems, and the Company has not received any complaints from any customers related to any Malicious Code or Technical Deficiencies.

(h)     The Sellers and the conduct of the Business are in compliance in all material respects with, and have been in compliance in all material respects with all Data Security Requirements and there have not been any material actual or alleged incidents of data security breaches, unauthorized access or use of any of the Business Systems, or material unauthorized acquisition, destruction, damage, disclosure, loss, corruption, alteration, or use of any business information and all personally-identifying information and data that is processed by the Sellers or the Business Systems.

**Section 3.8**    **Litigation**. Other than the Chapter 11 Cases, Schedule 3.8 of the Disclosure Schedule sets forth all unresolved Litigation brought by or against any Seller, and to Sellers' Knowledge, there is no other Litigation threatened in writing against any Seller.

**Section 3.9**    **Employees**. All employees of Sellers are authorized to work in the United States.  Sellers have provided Buyer as of a date no earlier than five Business Days before the date of this Agreement a complete and correct list of all employees who are reasonably expected to be Current Employees by: name; title or position; status (part-time, full-time, exempt, non-exempt, etc.); whether paid on a salaried, hourly or other basis; current base salary or wage rate; current target bonus; start date; service reference date (if different from the start date); work location; vacation entitlement formula; and an indication of whether or not such employee is on leave of absence (the "Employee Roster").

**Section 3.10**    **Real Property**.

(a)    Sellers do not own any real property.

(b)    Schedule 3.10(b) of the Disclosure Schedule sets forth the address of each Leased Real Property used in connection with the Business, and a true and complete list of all Leases that are Assumed Contracts (including the date and name of the parties to such Lease document). Sellers have made available to Buyer a true and complete copy of all Leases that are Assumed Contracts (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for such Leased Real Property, as amended through the date hereof.  Except as set forth in Schedule 3.10(b) of the Disclosure Schedule, with respect to each of the Leases that are Assumed Contracts: (i) to Sellers' Knowledge and subject to the effect on enforceability of (A) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting creditors' rights generally and (B) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law), such Lease is legal, valid, binding, enforceable and in full force and effect in accordance with its terms; (ii) Sellers' possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed, and to Sellers' Knowledge, there are no disputes with respect to Sellers' obligations under such Lease that will not be satisfied by the Sale Order; (iii) to Sellers' Knowledge, no other party to a Lease is in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default; (iv) no security deposit or portion thereof deposited with respect such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited in full; (v) the other party to such Lease is not an Affiliate of, and otherwise does not have any economic interest in, Sellers; (vi) the Sellers have not subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; and (vii) there are no liens or encumbrances (other than Permitted Liens) on the estate or interest created by such Lease.

(c)    Schedule 3.10(c) of the Disclosure Schedule sets forth a description of all material Leasehold Improvements for each Leased Real Property related to the Business.

26

(d)      The Leased Real Property identified in <u>Schedule 3.10(b) of the Disclosure Schedule</u> and the Leasehold Improvements comprise all of the real property used in or otherwise related to the operation by Sellers of, the Business.

(e)      Sellers have received no notice of any condemnation, expropriation or other proceeding in eminent domain pending or, to Sellers' Knowledge, which is threatened, affecting any real property underlying the Leased Real Property or any portion thereof or interest therein.

(f)      To Sellers' Knowledge, no condition exists at any Leased Real Property, or at any other real property owned, leased or otherwise utilized by Sellers, that could reasonably be expected to (i) cause a fire hazard, or create conditions that could induce a battery-related fire, or (ii) result in material non-compliance with applicable fire safety codes.

**Section 3.11    Tangible Personal Property**. Schedule 3.11 of the Disclosure Schedule sets forth all material Personal Property Leases related to the Business, and, to Sellers' Knowledge, each such material Personal Property Lease is valid and enforceable.

**Section 3.12    Permits**. Schedule 3.12 of the Disclosure Schedule contains a list of all material Permits related to the Business that Sellers hold as of the date hereof in connection with the operations of the Business. As of the date hereof, there is no Litigation pending or, to Sellers' Knowledge, threatened in writing that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Assumed Permits, except where a failure of this representation and warranty to be so true and correct would not be material to the ownership and operation of the Business. All required filings with respect to the Assumed Permits have been made and all required applications for renewal thereof have been filed, except where a failure of this representation and warranty to be so true and correct would not be material to the ownership and operation of the Business.

**Section 3.13    Purchased Inventory**.

(a)      To Sellers' Knowledge, no Purchased Inventory is materially damaged in any significant way, except for any such damage which would not be material to the Purchased Inventory taken as a whole;

(b)      To Sellers' Knowledge, none of the Purchased Inventory has been part of a current or past product recall, except for any such recall which would not be material to the Purchased Inventory taken as a whole;

(c)      To Sellers' Knowledge, the Purchased Inventory is in material compliance with United States federal and applicable state guidelines for such products as of the date hereof, except for any such noncompliance which would not be material to the Purchased Inventory taken as a whole; and

(d)      To Sellers' Knowledge, the Purchased Inventory is in working condition or in a condition fit for sale and consumption in accordance with all applicable Laws, as the

case may be, except for such failure to be in such condition which would not have a Material Adverse Effect on the Purchased Inventory taken as a whole.

(e)     With respect to the Purchased Inventory, Sellers have complied, in all material respects, with Title 19 of the United States Code and with all other applicable customs and import Laws and have paid all tariffs and penalties imposed upon such Seller by the U.S. Customs and Border Protection Agency, U.S. Department of Commerce, or any other U.S. or non-U.S. governmental authority on the importation of goods ("Import Duties"), and has not imported or attempted to import any goods prohibited by any applicable customs or import Laws. Seller has not received any written notice of, nor to the Seller's Knowledge is there any pending or threatened, audit, examination, investigation, or other proceeding by any governmental authority relating to any Import Duties applicable to the Purchased Inventory. The Sellers are in compliance in all material respects with all applicable Laws relating to the payment of Import Duties and the importation and exportation of goods, including all applicable recordkeeping, classification, valuation, marking, labeling, country of origin, and free trade agreement requirements, in each case, with respect to the Purchased Inventory.

**Section 3.14   Environmental Matters**.   Except as set forth in Schedule 3.14 of the Disclosure Schedule:

(a)     Each Seller is, and has been during the prior two (2) years, in compliance in all material respects with all applicable Environmental Laws, which compliance has included obtaining and maintaining all Permits, licenses and authorizations required under applicable Environmental Laws;

(b)     No Seller has received during the prior two (2) years written notice from any Governmental Entity or third party regarding any actual or alleged violation of or Liability under Environmental Laws;

(c)     To Sellers' Knowledge, no Hazardous Substance has been released at any current or former Leased Real Property, or other real property, by Sellers in violation of any Environmental Law;

(d)     Sellers have made available to Buyer copies of all material environmental audits, assessments and reports in its possession relating to Sellers, any actual or potential Liabilities under Environmental Laws and the Leased Real Property; and

(e)     This Section 3.14 contains the sole and exclusive representations and warranties of Sellers with respect to any environmental, health or safety matters, including any arising under any Environmental Law or with respect to any Hazardous Substance.

**Section 3.15   Brokers' Fees**.   Except for amounts due to Huron Transaction Advisory LLC (which amounts are to be paid by the Seller), no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated to pay.

28

**Section 3.16    No Other Agreements to Purchase**. Sellers have not entered into any agreement with any other Person (written or oral) which grants such third party the right or option purchase or acquire from Sellers any Purchased Asset, other than purchase orders for Purchased Inventory accepted by Sellers in the Ordinary Course of Business.

**Section 3.17    Taxes**.

(1)    Each Seller has duly and timely filed all income and other material Tax Returns that it was required to file, and all such filed Tax Returns were true, correct and complete in all material respects. All material Taxes owed by the Sellers and all material Taxes owed with respect to the Purchased Assets (in each case, whether or not shown on any Tax Return) have been paid. In the last three (3) years, no claim has been made in writing by a Governmental Entity in a jurisdiction where the Sellers do not file Tax Returns that the Sellers or the Business is or may be subject to taxation by that jurisdiction.

(2)    There is no audit, dispute, claim or controversy concerning any Tax Liability or Tax Return of Sellers or with respect to the Purchased Assets or the Business in progress or pending by any taxing authority.  No Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency that could result in a Lien on the Purchased Assets or the imposition of any liability for Taxes on Buyer, its direct or indirect equityholders, or their Affiliates.

(a)    There are no Liens on any Purchased Asset or the Business for Taxes (other than for current Taxes not yet due and payable).

(3)    No Seller is party to any Tax sharing, Tax allocation or Tax indemnity agreement, except for (i) any such agreement solely between the Sellers or (ii) customary gross-up or indemnification provisions in commercial agreements entered into in the ordinary course of business, the primary subject matter of which is not related to Taxes, in each case that would be binding on the Buyer.

(4)    No Seller has participated in any "reportable transaction" within the meaning of Treasury Regulation section 1.6011-4(b).

(5)    Each Seller has collected or withheld all material Taxes required to have been collected or withheld (including from payments made to employees, independent contractors, creditors, stockholders and other Persons) and such collected and withheld Taxes have been or will be duly paid to the proper Governmental Entity, and each of the Seller has complied in all material respects with all Laws relating to withholding, including any reporting and record keeping requirements.

(6)    Each Seller has collected all material amounts of sales and use Taxes required to be collected, and has remitted, or will remit on a timely basis, such amounts to the appropriate Governmental Entity, or has been furnished properly completed exemption certificates and has, in all material respects, maintained all such records and supporting documents in the manner required by all applicable sales and use Tax statutes and regulations.

US_ACTIVE\130687448

(b)    Powin is classified as a partnership for U.S. federal income Tax purposes, and each other Seller is classified as an entity disregarded from its owner for U.S. federal income Tax purposes, and Powin and each other Seller have been so classified since the date of their formations, respectively.  No Seller has filed any election or taken any other action to be classified as an association taxable as a corporation for U.S. federal income Tax purposes.

(c)    No Purchased Asset represents an interest in a partnership or other entity for any applicable Tax purpose.

(g)    Sellers are not foreign persons within the meaning of section 1445 of the IRC.

**Section 3.18    No Other Representations or Warranties**.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), NEITHER A SELLER NOR ANY OTHER PERSON MAKES (AND BUYER IS NOT RELYING UPON) ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE BUSINESS, THE PURCHASED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY PURCHASED ASSET), THE ASSUMED LIABILITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), EACH SELLER EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS OR THE PURCHASED ASSETS BY BUYER AFTER THE CLOSING). THE DISCLOSURE OF ANY MATTER OR ITEM IN THE DISCLOSURE SCHEDULE SHALL NOT BE DEEMED TO CONSTITUTE AN ACKNOWLEDGMENT THAT ANY SUCH MATTER IS REQUIRED TO BE DISCLOSED OR IS MATERIAL OR THAT SUCH MATTER WOULD RESULT IN A MATERIAL ADVERSE EFFECT.

BUYER HAS PERFORMED AN INDEPENDENT INVESTIGATION, ANALYSIS, AND EVALUATION OF THE PURCHASED ASSETS.

THE PROVISIONS OF THIS SECTION 3.18 SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT AND SHALL BE INCORPORATED INTO THE CLOSING DOCUMENTS TO BE DELIVERED AT CLOSING.

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows as of the date hereof and as of the Closing Date:

**Section 4.1    Organization of Buyer**. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2    Authorization of Transaction**.

(a)    Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)    The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c)    This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. To the extent this Agreement constitutes a valid and legally-binding obligation of Sellers, this Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. To the extent each Related Agreement constitutes a valid and legally-binding obligation of each Seller party thereto, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3    Noncontravention**. Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the assignments and assumptions referred to in Section 2.6) will (i) conflict with or result in a breach of the certificate of formation, operating agreement, or other organizational documents, of Buyer, (ii) subject to any consents required to be obtained from any Governmental Entity, violate any Law to which Buyer is, or its assets or properties are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations or rights as

31

would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements. Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity in order for the Parties to consummate the transactions contemplated by this Agreement or any of the Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements.

Section 4.4    **Litigation**.  There are no Litigation pending or, to Buyer's knowledge, threatened against or affecting Buyer that will adversely affect Buyer's performance under this Agreement or the consummation of the transactions contemplated by this Agreement.

Section 4.5    **Adequate Assurances Regarding Executory Contracts**. Buyer will be capable of satisfying as of the Sale Hearing (i) its obligations under this Agreement and (ii) the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

Section 4.6    **Brokers' Fees**. Buyer has not entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which any Seller could become liable or obligated to pay.

Section 4.7    **No Outside Reliance**.  Notwithstanding anything contained in this Article IV or any other provision of this Agreement the contrary, Buyer acknowledges and agrees that the representations and warranties made by the Sellers to Buyer in Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") are the sole and exclusive representations, warranties, and statements of any kind made by Sellers to Buyer in connection with the transactions contemplated by this Agreement.  Buyer acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations), that certain datasite administered by SmartRoom (the "Dataroom"), any projections, meetings, calls or correspondence with management of Sellers and their Representatives, or any other Person on behalf of Sellers or any of their respective Affiliates or Representatives and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, and prospects of Sellers, or the quality, quantity or condition of Sellers assets, are, in each case, specifically disclaimed by Sellers and that Buyer has not relied on any such representations, warranties or statements. Buyer will accept the Purchased Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" and "WITH ALL FAULTS."

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

**Section 5.1**    <u>**Notices and Consents**</u>.

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third party Consents or sublicenses; provided, however, that neither Seller nor Buyer shall be required to incur any Liabilities or provide any financial accommodation, in order to obtain any such third party Consent with respect to the transfer or assignment of any Purchased Asset.

(b)    Sellers and Buyer shall cooperate with one another (i) in promptly determining whether any filings are required to be or should be made or consents, approvals, Permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and (ii) in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, Permits, authorizations, approvals or waivers; provided, however, that Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

(c)    To the extent permitted by applicable Law and the terms of the Purchased Assets, in the event any third party Consent has not been obtained by the Closing, at the Buyer's request, the Party contemplated to be transferring such Purchased Asset under this Agreement (the "<u>Transferring Party</u>") shall hold in trust for the Buyer, as applicable, the relevant Purchased Asset until the earlier of such time as (i) the third party Consent is obtained, (ii) the Chapter 11 Cases are closed or dismissed or (iii) Buyer elects not to assume such Purchased Asset.

(d)    Subject to the terms and conditions set forth in this Agreement and applicable Law, Buyer and Sellers shall (i) promptly notify the other Party of any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the Contemplated Transactions, (ii) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the transactions contemplated by this Agreement and consider in good faith the other Party's reasonable comments, (iii) not participate in any substantive meeting or discussion with any Governmental Entity in respect of any filing, investigation, or inquiry concerning this Agreement and the transactions contemplated by this Agreement unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to attend, and (iv) furnish the other Party with copies of all correspondences, filings, and written communications between them and their Subsidiaries and Representatives, on the one hand, and any Governmental Entity or its respective staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement, <u>provided</u>, <u>however</u>, that any materials or information provided pursuant to any

33

provision of this Section 5.1(d) may be redacted before being provided to the other Party (A) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (B) financing arrangements, (C) as necessary to comply with contractual arrangements, and (D) as necessary to address reasonable privilege or confidentiality issues. Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any commercially or competitively sensitive material provided to the other under this Section 5.1(d) as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be). Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any third party has any objection to the Agreement on antitrust or anti-competitive grounds.

**Section 5.2    Bankruptcy Actions**.

(a)     The Sellers shall have filed the Sale Motion no later than July 1, 2025, which motion shall seek the Bankruptcy Court's: (i) entry of the Sale Procedures Order by no later than July 16, 2025, (ii) entry of the Sale Order by no later than the Sale Order Deadline.

(b)     Sellers will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers relating to the transactions contemplated by this Agreement prepared by Sellers or any Affiliates (including forms of orders and notices to interested parties) prior to the filing thereof in the Chapter 11 Cases. All motions, applications, and supporting papers prepared by Sellers and relating to the transactions contemplated by this Agreement to be filed on behalf of Sellers after the date hereof must be approved in form and substance by Buyer.

(c)     Each of Buyer and Sellers shall continue to act in good faith and without any improper conduct, including collusion or fraud of any kind.

(d)     Each of Buyer and Sellers will promptly take such actions as are reasonably requested by the other Party to assist in obtaining entry of the Sale Order and the Sale Procedures Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Sellers of their obligations under this Agreement and the Related Agreements and demonstrating that Buyer is a good faith buyer under Section 363(m) of the Bankruptcy Code.

(e)     Pursuant to the terms of the proposed Sale Procedures Order, Sellers will, among other things, solicit bids from other prospective purchasers for the sale of all or substantially all of the Purchased Assets on terms and conditions substantially the same in all respects to this Agreement (or more favorable terms to Sellers) and in accordance with the procedures set forth in the proposed Sale Procedures Order, and Sellers shall adhere to those procedures. The Sellers and Buyer agree, and the Sale Procedures Order shall reflect the fact that, the provisions of this Agreement are reasonable, were a material inducement

34

to the Buyer to enter into this Agreement and are designed to achieve the highest or best offer for the Purchased Assets.

(f)     Sellers shall use commercially reasonable efforts to provide appropriate notice of the hearings on the Sale Motion to all Persons entitled to notice, including, but not limited to, all Persons that have asserted Liens in the Purchased Assets, all parties to the Assumed Contracts and all Taxing authorities in jurisdictions applicable to Sellers and as otherwise required by the Bankruptcy Code and bankruptcy rules.

(g)     Sellers shall serve a cure notice by first class mail on all non-debtor counterparties to all Non-Real Property Contracts and Leases as required by the Sale Procedures Order and provide a copy of the same to Buyer.

**Section 5.3    Conduct of Business**. Until the earlier of the termination of this Agreement and the Closing, subject to the terms and conditions of the DIP Order and the DIP Budget, and except as expressly contemplated by this Agreement or as set forth on Schedule 5.3, or required under the Bankruptcy Code or other applicable Law and except with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed), subject to the Chapter 11 Cases (including authorization provided by the Bankruptcy Court in such Chapter 11 Cases):

(a)     Sellers shall comply with the DIP Order in all material respects;

(b)     Sellers shall use commercially reasonable efforts to conduct the Business in the Ordinary Course of Business, and operate and maintain, preserve and protect all of the Purchased Assets in the condition in which they exist on the date hereof, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business;

(c)     Sellers shall use commercially reasonable efforts not to take, or agree to or commit to assist any other Person in taking, any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

(d)     Except as permitted by this Agreement, no Seller shall, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Purchased Assets, other than up to $500,000 in the aggregate in the Ordinary Course of Business;

(e)     No Seller shall, directly or indirectly, permit, offer, agree or commit to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Lien or Claim except for Permitted Liens;

(f)     No Seller shall assume, reject or assign any (i) Contract that may become an Assumed Contract other than (A) through the assumption and assignment of the Assumed Contracts, as contemplated by this Agreement, to Buyer, and (B) through the rejection, if approved by the Bankruptcy Court, of the Contracts that are the subject of the

*Omnibus Motion for Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief* filed at Docket Number 88, or (ii) Lease;

(g)     No Seller shall enter into new Contracts or amend or modify Contracts, and no Seller shall amend, modify, extend, renew or terminate any Lease, nor enter into any new Lease;

(h)     No Seller shall remove or permit to be removed from any building, facility, or real property any Purchased Asset or any Purchased Inventory (other than the sale of Purchased Inventory in the Ordinary Course of Business);

(i)     No Seller shall return Purchased Inventory with an aggregate value of more than $5,000 to any single vendor unless defective;

(j)     No Seller shall enter into any commitment with respect to remodeling, except as required by the terms of any Lease for Leased Real Property;

(k)     Sellers shall make all post-petition payments related to Assumed Contracts that become or became due or payable pursuant to the terms thereof to the extent provided in the DIP Budget;

(l)     Sellers shall comply in all material respects with all material Laws applicable to them or having jurisdiction over the Business or any Purchased Asset;

(m)     No Seller shall, directly or indirectly, cancel, forgive or compromise any material debt or claim or waive or release any material right of any Seller, in each case that constitutes a Purchased Asset;

(n)     Sellers shall maintain in full force and effect each Assumed Permit held by any Seller as of the date hereof or otherwise obtained by any Seller prior to the Closing, and shall comply in all material respects with the terms of each such Permit and no Seller shall permit any such Permit to terminate, expire or lapse other than in the Ordinary Course of Business;

(o)     Sellers shall, in all material respects (i) conduct the Business in the Ordinary Course of Business, (ii) use commercially reasonable efforts to preserve the existing business organization and keep management of the Business intact, (iii) use commercially reasonable efforts to keep available the services of the Current Employees, to the extent reasonably feasible, and (iv) use commercially reasonable efforts to maintain the existing relations with customers, carriers, suppliers, creditors, business partners, Current Employees and others having business dealings with the Business, to the extent reasonably feasible;

(p)     No Seller shall (i) dispose, sell, assign, transfer, license, agree not to assert, abandon or permit to lapse any material Intellectual Property owned by Sellers, (ii) disclose any trade secrets or other confidential information to any third party; and

36

(q)     No Seller shall (i) make, change or revoke any Tax election, (ii) change an annual accounting period, (iii) adopt or change any accounting method with respect to Taxes, (iv) file any amended Tax Return, (v) enter into any closing agreement, (vi) settle or compromise any Tax claim or assessment, or (vii) consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to Taxes, in each case (i) through (vii), to the extent such action could be reasonably expected to increase the amount of Taxes attributable to the Purchased Assets or the Business in a Post-Closing Tax Period; furthermore, no Seller shall file any Tax election or take any other action which, in each case, could cause such Seller to change in entity Tax classification.

Nothing contained in this Agreement is intended to give Buyer or its Affiliates, directly or indirectly, the right to control or direct the business of Sellers prior to the Closing.

**Section 5.4      Notice of Developments**. From the date hereof until the Closing Date, each of the Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing (in the form of an updated Disclosure Schedule, if applicable) after attaining knowledge (as applicable to each of Sellers and Buyer) of any real or alleged failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.4 shall not limit or otherwise affect the remedies available to the Party receiving such notice under this Agreement if such Party objects to the disclosures contained in such notice within five (5) days of receipt of such notice.

**Section 5.5      Access**.  Upon reasonable advance written request by Buyer, Sellers shall permit Buyer and its Representatives to have reasonable access to, and make reasonable investigation of, during normal business hours, subject to the terms of Leases and in a manner so as not to interfere unreasonably with the normal business operations of Sellers, to all of the books and records, premises, properties, personnel, Records, Contracts, customers, businesses, assets, accountants, auditors, counsel and operations of the Sellers related to the Business; provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law. Sellers shall cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Buyer and Buyer's Representatives in connection with such investigation and examination, and Buyer and its Representatives shall cooperate with Sellers and their respective Representatives and shall use their reasonable efforts to minimize any disruption to the Business.  Without limiting the foregoing, Powin's management team shall be available for meetings with Buyer within two (2) Business Days of any request for such a meeting by Buyer.

**Section 5.6      Press Releases and Public Announcements**. After notice to and consultation with Buyer, Sellers shall be entitled to disclose, only to the extent required by applicable Law or by order of the Bankruptcy Court, this Agreement and all information provided by Buyer in connection herewith to the Bankruptcy Court, the United States Trustee, the Committee, parties in interest in the Chapter 11 Cases. Other than statements made in the Bankruptcy Court (or in pleadings filed therein), no Party shall issue (prior to, on or after the Closing) any press release or make any public statement or public communication without the prior

37

written consent of the other Parties, which shall not be unreasonably withheld or delayed; provided, however, Sellers, without the prior consent of Buyer, may (i) make any such public announcement in connection with the Auction after having provided Buyer at least one (1) Business Day to review and comment on such release or announcement (which comments shall be reasonably considered by the Seller) and (ii) communicate with its and its Affiliates' investors and potential investors relating to the transactions contemplated by this Agreement.

**Section 5.7    Bulk Transfer Laws**. Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the non-compliance therewith. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens on the Purchased Assets (other than Permitted Liens), including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**Section 5.8    Release of Claims**. Notwithstanding anything contained herein to the contrary (including any restriction contained in Section 5.3) prior to the Closing, the Sellers shall deliver to Buyer and the DIP Secured Parties, a full, irrevocable and unconditional release of any and all claims, actions, refunds, causes of action, choses in action, actions, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against Buyer, the DIP Secured Parties and their respective current and former officers, directors, stockholders, employees, agents, representatives, attorneys, investors, parents, predecessors, Subsidiaries, successors, assigns, and Affiliates, each of the foregoing in their capacity as such (individually and collectively, the "Buyer Released Parties"), from all actions, causes of action, damages, claims, and demands whatsoever, in law or in equity, known or unknown, contingent or liquidated, whether direct claims or for indemnification or contribution, that the Sellers ever had, now has, or may have against the Buyer Released Parties in connection with any event, conduct or circumstance occurring prior to the Closing.

## ARTICLE VI
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing:

**Section 6.1    Cooperation**. Each of the Parties shall cooperate with each other and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.

**Section 6.2    Further Assurances**. In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of

sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Purchased Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this Section 6.2, to the extent that either Buyer or Sellers discovers any additional assets or properties which the Parties mutually agree should have been transferred or assigned to Buyer as Purchased Assets but were not so transferred or assigned, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer.

**Section 6.3**    **Availability of Business Records**. From and after the Closing, Buyer shall promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Purchased Assets for periods prior to the Closing to the extent such access is necessary in order for Sellers (as applicable) to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) six (6) years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (iv) in the case of Records related to Taxes, the expiration of the statute of limitation applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Sellers have the right to retain originals or copies of all of Records included in the Purchased Assets for periods prior to the Closing. Prior to destroying any Records included in the Purchased Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense. With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Sellers may request in defending or prosecuting such Litigation or claim and shall make available to Sellers such personnel as are most knowledgeable about the matter in question, all without charge.

**Section 6.4**    **Employee Matters**.

(a)    Within twenty (20) Business Days prior to Closing, Sellers will update the Employee Roster.  Prior to Closing, Buyer may offer employment to certain of the Current Employees to support the continuation of the Business, at its sole discretion (each, an "Offeree"), on such employment terms as Buyer may determine in its sole discretion.

(b)    Following the date of this Agreement:

i.    Sellers will allow Buyer or any of its Representatives reasonable access upon reasonable advance notice to meet with and interview the individuals listed on the Employee Roster during normal business hours;

ii.    Sellers shall not, nor shall any Seller authorize or direct or give express permission to any Affiliate, officer, director or employee of any Seller or any Affiliate, to (A) interfere with Buyer's or its Representatives' rights under

39

Section 6.4(a) to make offers of employment to any Offeree, or (B) solicit or encourage any Offeree not to accept, or to reject, any such offer of employment;

iii.    Sellers shall provide reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such Representative with respect to its determination of terms and conditions of employment for any Offeree; and

iv.    Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable on or prior to the Closing Date with respect to all employees of Sellers. Sellers shall withhold and remit all applicable payroll Taxes as required by Law on or prior to the Closing Date with respect to all employees of Sellers as of such date.

(c)    Nothing in this Section 6.4 shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring Buyer to continue any specific employee benefit plan or to continue the employment of any specific person. Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' employee benefit plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Current Employee, Offeree or upon any other person, other than the Parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

**Section 6.5    Transfer Taxes**. To the extent not exempt under section 1146 of the Bankruptcy Code, Buyer shall pay all Transfer Taxes. Sellers and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence.

**Section 6.6    Property Taxes**. Sellers shall be responsible for and shall promptly pay when due all Property Taxes levied with respect to the Purchased Assets attributable to the Pre-Closing Tax Period, in accordance with applicable Law. All Property Taxes levied with respect to the Purchased Assets for the Straddle Period shall be apportioned between Buyer and Sellers based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period. Sellers shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period. Upon receipt of any bill for such Property Taxes, Buyer or Sellers, as applicable, shall present a statement to the other setting forth the amount of reimbursement to which each is entitled under this Section 6.6 together with such supporting evidence as is reasonably necessary to calculate the proration amount. The proration amount shall be paid by the party owing it to the other within ten (10) days after delivery of such statement. In the event that Buyer or Sellers makes any payment for which it is entitled to reimbursement under this Section 6.6, the applicable party shall make such reimbursement promptly but in no event later than ten (10) days after the presentation of a statement setting forth the amount of reimbursement

40

to which the presenting party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.

**Section 6.7    Insurance Policies**.  Other than as provided in <u>Section 2.2(l)</u> above, upon Closing, the Sellers shall cause the assignment of all rights of the Sellers in and to all insurance coverage provided in relation to Sellers and the Purchased Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) to the Buyer as soon as reasonably practicable (and in no event within forty-five (45) days following the Closing).

**Section 6.8    Collection of Accounts Receivable**.

(a)    As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to any Seller relating to the Business or the Purchased Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to accounts receivable relating to work performed by Buyer after the Closing made payable or endorsed to any Seller or Sellers' order, for Buyer's own account.

(b)    As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to accounts receivable relating to work performed by Buyer after the Closing shall be held in trust by such Seller for Buyer's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall pay over to Buyer or its designee the amount of such payments. In addition, Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Sellers, from time to time as and when received by Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that Buyer or its Affiliates may receive on or after the Closing which properly belongs to Sellers hereunder, including any Excluded Assets.

(c)    As of the Closing Date, Buyer shall have the sole authority to bill and collect accounts receivable relating to work performed by Buyer after the Closing.

**Section 6.9    Fiduciary Obligations**.  Without limiting the rights of Buyer under this Agreement and rights to receive the Breakup Fee and Expense Reimbursement pursuant to Section 8.3, nothing in this Agreement will require Sellers or any of their respective managers to take any action, or to refrain from taking any action, to the extent any such manager determines, in good faith, upon the advice of counsel, that taking or failing to take such action is required in order for such manager to comply with its fiduciary obligations under applicable Law.  Without limiting the rights of Buyer in this Agreement and rights to receive the Breakup Fee and Expense Reimbursement pursuant to <u>Section 8.3</u>, for the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy, including an Alternate Transaction, that, in the good faith and business judgment of the managers of any Seller, upon the advice of counsel, is required in order for such manager to comply with its fiduciary duties under applicable Law to maximize the value of their businesses and estates; provided that Sellers must use their reasonable

41

best efforts to respond promptly to information requests from Buyer relating to any Alternate Transaction.

Section 6.10    <u>Covenant Not to Sue</u>.    Buyer hereby covenants and agrees that it is not acquiring rights to, and shall not have the right to bring suit or otherwise assert, or assign, any claims before any court, arbitrator, mediator or administrative agency anywhere in the world against Sellers' current or former officers, directors, managers or independent managers; provided, that Buyer retains all rights to enforce this Agreement. Buyer further covenants and agrees that it shall not assign the customer claims included in the IP and Customer Claims. With respect to officers, managers or directors who are hired by Buyer, such individuals shall be released by Sellers at Closing for pre-Closing actions.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1    <u>Conditions to Buyer's Obligations</u>.

Subject to <u>Section 7.3</u>, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Sellers and the Buyer in whole or in part to the extent permitted by applicable Law):

(a)    as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in <u>Section 3.1</u>, <u>Section 3.2</u> or <u>Section 3.3</u> shall be true and correct in all respects other than *de minimis* exceptions, and (ii) each other representation or warranty set forth in <u>Article III</u> shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; <u>provided</u>, <u>however</u>, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)    Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by <u>Section 2.9(a)</u> to be delivered to Buyer (or tendered subject only to Closing);

(c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)    the amount of Cure Amounts paid with respect to the Assumed Contracts set forth on <u>Schedule 2.3(a)</u> as of the date of this Agreement does not, in the aggregate, exceed the Cure Amount Caps;

42

(e)    Buyer shall have received all of the Consents from third parties (including any Governmental Entities) and Permits listed on <u>Schedule 7.1</u> (as the same may be revised, amended or modified by the Buyer in its sole discretion up until the Auction);

(f)    the Sale Order shall have been entered by the Bankruptcy Court and shall be a Final Order (unless such Final Order requirement is waived by the Buyer);

(g)    no Event of Default (as defined in the DIP Order) shall have occurred and be continuing under the DIP Order;

(h)    The DIP Order shall have been approved and shall not have been terminated; and

(i)    Sellers shall have delivered a certificate from an authorized officer of Sellers to the effect that each of the conditions specified in <u>Section 7.1(a)</u> and <u>Section 7.1(b)</u> has been satisfied.

**Section 7.2    <u>Conditions to Sellers' Obligations</u>.** Subject to <u>Section 7.3</u>, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Sellers and the Buyer in whole or in part to the extent permitted by applicable Law):

(a)    as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in <u>Section 4.1</u>, <u>Section 4.2</u> or <u>Section 4.3</u> shall be true and correct in all respects other than *de minimis* exceptions, and (ii) each other representation or warranty set forth in <u>Article IV</u> shall be true and correct in all material respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions or by any Related Agreement; <u>provided</u>, <u>however</u>, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)    Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by <u>Section 2.9(b)</u> to be delivered to Sellers (or tendered subject only to Closing);

(c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)    the Sale Order shall have been entered by the Bankruptcy Court and shall be a Final Order (unless such Final Order requirement is waived by the Buyer); and

43

(e)    Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) has been satisfied.

**Section 7.3    No Frustration of Closing Conditions**. Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

**Section 7.4    Waiver of Conditions**.  Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.

## ARTICLE VIII
## TERMINATION

**Section 8.1    Termination of Agreement**. This Agreement may be terminated in accordance with this Article VIII and the Contemplated Transactions abandoned at any time prior to the Closing (each a "Termination Event"):

(a)    by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

(b)    by written notice of either Buyer or Sellers, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or upon the issuance by any Governmental Entity of an Decree restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Decree having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Decree was caused by the breach or action or inaction of such Party;

(c)    by written notice of either Buyer or Sellers, if the Closing shall not have occurred on or before the Outside Date;

(d)    by written notice of either Buyer or Sellers, if any of the Chapter 11 Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Sellers is appointed in the Chapter 11 Cases;

(e)    by Buyer, if (i) the Sale Procedures Order shall not have been entered by the Bankruptcy Court on or before July 16, 2025, (ii) the Auction has not concluded by midnight August 1, 2025, (iii) the Sale Order shall not have been entered by the Bankruptcy Court on or before August 7, 2025, (iv) at any time after entry of the Sale Procedures Order,

44

such Sale Procedures Order (including, without limitation, the provisions therein relating to the bid protections) is reversed, stayed, vacated or otherwise modified by the Bankruptcy Court, or (v) at any time after entry of the Sale Order, such Sale Order is reversed, stayed, vacated or otherwise modified;

(f)     by Buyer by giving written notice to Sellers at any time prior to Closing in the event Sellers have breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Sections 7.1(a) and 7.1(b) hereof, as the case may be, would not then be satisfied at the time of such breach, Buyer has notified Sellers of the breach, and the breach has continued without cure for the earlier of (i) ten (10) days following the proposed Closing Date so long as all other conditions of Buyer have been satisfied or (ii) for a period of thirty (30) days after the notice of the breach, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Buyer;

(g)     by Sellers by giving written notice to Buyer at any time prior to Closing in the event Buyer has breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Sections 7.2(a) and 7.2(b) hereof, as the case may be, would not then be satisfied at the time of such breach, Sellers have notified Buyer of the breach, and the breach has continued without cure for the earlier of (i) ten (10) days following the proposed Closing Date so long as all other conditions of Buyer have been satisfied or (ii) for a period of thirty (30) days after the notice of the breach, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants hereof to be performed or complied with by them prior to the Closing, and such condition is not waived by Sellers;

(h)     by written notice from Sellers to Buyer, if all of the conditions set forth in Section 7.1 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Buyer fails to complete the Closing at the time required by Section 2.8;

(i)     by Buyer if (i) any Seller withdraws the Sale Motion, (ii) any Seller moves to voluntarily dismiss the Chapter 11 Cases, (iii) any Seller moves for conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iv) any Seller moves for appointment of an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code or a trustee in the Chapter 11 Cases, (v) Buyer is not selected as the Successful Bidder or Back-Up Bidder at the conclusion of the Auction, (vi) Buyer has been selected as Back-Up Bidder and the Back-Up Termination Date has occurred, or (vii) there is in effect a Final Order of a Governmental Authority of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the transactions;

(j)     by written notice from Buyer to the Sellers upon the occurrence of any Default or Event of Default (as defined in the DIP Order or any DIP Loan Documents);

(k)     by Buyer if any secured creditor of any Seller obtains relief from the stay to foreclose on a material portion of the Purchased Assets;

45

(l)      by Buyer if any Affiliates of the Sellers that, directly or indirectly through one or more intermediaries, controls Sellers, files for relief pursuant to the Bankruptcy Code;

(m)      by Buyer if Sellers enter into a definitive agreement with respect to an Alternate Transaction; or

(n)      automatically and without any action or notice by Sellers to Buyer, or Buyer to Sellers, immediately upon:

i.      approval by the Bankruptcy Court of Alternate Transaction, unless Buyer is a Back-Up Bidder under the Sale Procedures Order with respect to such Alternate Transaction; or

ii.      the consummation of an Alternate Transaction.

Notwithstanding anything to the contrary contained herein, (i) in no event may Buyer terminate this Agreement under Section 8.1(f) on account of Buyer's failure to satisfy the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to any proposed Assumed Contract, and (ii) a Party shall not be permitted to terminate this Agreement pursuant to this Article VIII if the applicable Termination Event was caused by the breach of such Party or such Party's gross negligence, willful misconduct, or bad faith.

**Section 8.2      Procedure upon Termination**. In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

**Section 8.3      Breakup Fee and Expense Reimbursement.**

(a)      In consideration of Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Purchased Assets, and to compensate Buyer as a stalking horse bidder, (i) if this Agreement is terminated by Buyer pursuant to Section 8.1(f), 8.1(i) or 8.1(m), (ii) if this Agreement is terminated by Buyer or Sellers pursuant to Section 8.1(c) at a time when Buyer would have been permitted to terminate pursuant to Section 8.1(f), 8.1(i) or 8.1(m); (iii) if this Agreement is terminated pursuant to Section 8.1(n); (iv) upon consummation of an Alternate Transaction, or (v) if, at any time, the Bankruptcy Court issues an order approving the termination of this Agreement by Sellers in order to allow the respective boards of directors of Sellers to fulfill their respective fiduciary duties under applicable Law, then, in each case of the foregoing clauses (i) – (v), Sellers shall immediately pay to Buyer the Breakup Fee and the Expense Reimbursement.

(b)      Sellers' obligation to pay the Breakup Fee and Expense Reimbursement pursuant to this Section 8.3 shall survive termination of this Agreement and shall constitute superpriority administrative expense Claims against each of the Sellers under section 503(b) of the Bankruptcy Code.

46

(c)      The Sellers acknowledge and agree that (i) the payment of the Breakup Fee and Expense Reimbursement is an integral part of the transactions contemplated by this Agreement, (ii) in the absence of the Sellers' obligations to make this payment, the Buyer would not have entered into this Agreement, (iii) time is of the essence with respect to the payment of the Breakup Fee and Expense Reimbursement and (iv) the Breakup Fee and Expense Reimbursement shall constitute part of the DIP Indebtedness and shall be secured by the DIP Lien (as defined in the DIP Order) on the Collateral (as defined in the DIP Order) and be entitled to the other DIP Protections (as defined in the DIP Order). If the Sellers fail to take any action necessary to cause the delivery of the Breakup Fee and Expense Reimbursement under circumstances where the Buyer is entitled to the Breakup Fee and Expense Reimbursement and, in order to obtain such Breakup Fee or Expense Reimbursement the Buyer commences a suit which results in a judgment in favor of the Buyer, the Sellers shall pay to the Buyer, in addition to the Breakup Fee and Expense Reimbursement, an amount in cash equal to the costs and expenses (including reasonable attorney's fees) incurred by the Buyer in connection with such suit.

(d)      The Parties further acknowledge that the damages resulting from termination of this Agreement under circumstances where Buyer is entitled to the Breakup Fee are uncertain and incapable of accurate calculation and that the delivery of the Breakup Fee to the Buyer is not a penalty but rather shall constitute liquidated damages in a reasonable amount that will compensate the Buyer in the circumstances where the Buyer is entitled to the Breakup Fee for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Contemplated Transactions, and that, without these agreements, the Buyer would not enter into this Agreement.

**Section 8.4**      **Effect of Termination**. In the event that this Agreement is validly terminated pursuant to a right of termination as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to Buyer or the Sellers; provided, however, that Section 8.1, Section 8.2, Section 8.3 this Section 8.4, Article IX and the Sale Procedures Order (if entered), and in each case the rights and obligations of each of the Parties thereunder, shall survive any such termination and shall be enforceable hereunder. In no event shall any termination of this Agreement relieve any Party hereto of any Liability for any breach of this Agreement by such Party.

**ARTICLE IX**
**MISCELLANEOUS**

**Section 9.1**      **Remedies**. The Parties recognize that if a Party breaches or refuses to perform any of their covenants set forth in this Agreement, monetary damages alone would not be adequate to compensate the non-breaching Party for their injuries. The non-breaching Party shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants. If any Litigation is brought by the non-breaching Party to enforce such covenants, the breaching Party shall waive the defense that there is an adequate remedy at Law. The Parties agree to waive any requirement for the security or posting of any bond in connection with any Litigation seeking specific performance

47

of, or to enjoin the violation of, such covenants. The Parties agree that the only permitted objection that they may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

Section 9.2    **Expenses**. Except as otherwise provided in this Agreement, the DIP Order, the DIP Loan Agreements or a Related Agreement, the Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

Section 9.3    **Entire Agreement**. This Agreement (including the schedules and exhibits hereto and other documents specifically referred to herein) and the Related Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof.

Section 9.4    **Incorporation of Schedules, Exhibits and Disclosure Schedule**. The schedules, appendices and exhibits to this Agreement, the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.5    **Amendments and Waivers**. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

Section 9.6    **Succession and Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that Buyer shall be permitted to assign any of its rights hereunder to one or more of its Affiliates, as designated by Buyer in writing to Sellers; provided, however, Buyer shall remain liable for all of its obligations under this Agreement after any such assignment; provided, further, that Sellers shall be permitted to assign any of their rights hereunder pursuant to a confirmed chapter 11 plan or pursuant to an order of the Bankruptcy Court.

**Section 9.7**    **Notices**. All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Sellers, then to:

> Brian Kane
> Chief Executive Officer
> 20550 SW 115th Ave.
> Tualatin, OR 97062
> Email: brian.kane@powin.com

with a copy to:

> Van C. Durrer, II
> Tania M. Moyron
> Dentons US LLP
> 601 S. Figueroa Street
> Suite 2500
> Los Angeles, CA 90017-5704
> Email: van.durrer@dentons.com
>         tania.moyron@dentons.com

If to Buyer, then to:

> FlexGen Power Systems, LLC
> 280 S. Mangum Street, Suite 150
> Durham, NC 27701
> Attention: Kelcy Pegler, Chief Executive Officer
>         Aruna Chandra, EVP and General Counsel
> Email: kpegler@flexgen.com
>         achandra@flexgen.com

with copies (which shall not constitute notice) to:

> Latham & Watkins LLP
> 1271 Avenue of the Americas
> New York, NY 10020
> Attention: Joe Alexander; Jen Smith
> Email:  joe.alexander@lw.com
>         jen.smith@lw.com

49

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this <u>Section 9.7</u>.

**Section 9.8    Governing Law; Jurisdiction**. This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws. The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; <u>provided</u> that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Delaware, sitting in New Castle County, Delaware, and the federal courts of the United States of America sitting in New Castle County, Delaware, shall have exclusive jurisdiction over such Litigation.

**Section 9.9    Consent to Service of Process**. Each of the Parties hereby consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 9.7</u>.

**Section 9.10   WAIVERS OF JURY TRIAL**. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

**Section 9.11   Severability**. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any Party. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to find a suitable and equitable provision that shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**Section 9.12   No Third Party Beneficiaries**. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

50

**Section 9.13**   **No Survival of Representations, Warranties and Agreements**. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing.  Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for six (6) years following the Closing Date, and nothing in this <u>Section 9.13</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement.   Buyer and Sellers acknowledge and agree, on their own behalf and, with respect to Buyer that the agreements contained in this <u>Section 9.13</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for six (6) years; and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 9.13</u>, none of the Parties would enter into this Agreement.

**Section 9.14**   **Non-Recourse**. This Agreement may only be enforced against, and any Litigation based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as Parties to this Agreement. Except to the extent named as a Party to this Agreement, and then only to the extent of the specific obligations of such Parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or representative of any Party to this Agreement will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the Parties to this Agreement or for any Litigation based upon, arising out of or related to this Agreement.

**Section 9.15**   **Construction**. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars.

US_ACTIVE\130687448

**Section 9.16    Computation of Time**. In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

**Section 9.17    Mutual Drafting**. Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.18    Disclosure Schedule**. The Disclosure Schedule has been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; however, each section of the Disclosure Schedule will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Disclosure Schedule will be deemed a disclosure against any representation or warranty set forth in this Agreement if the purpose for disclosure in such other section of the Schedules or again any other representation or warranty is reasonably apparent on its face. Capitalized terms used in the Disclosure Schedule and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Disclosure Schedule or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business or consistent with past practice, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Disclosure Schedule or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Disclosure Schedule or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business. In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Disclosure Schedule will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Disclosure Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan or arrangement which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Disclosure Schedule and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of contract.

**Section 9.19    No Waiver or Release**. Notwithstanding anything herein to the contrary, all terms, conditions, covenants, representations and warranties contained in the DIP Order and the DIP Loan Documents, and all rights, powers and remedies of the DIP Secured Parties and all of the obligations of the Sellers thereunder are reserved and are not amended, modified, limited or otherwise affected by the terms and conditions of this Agreement.

**Section 9.20**    **Headings; Table of Contents**. The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.21**    **Counterparts; Facsimile and Email Signatures**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

**Section 9.22**    **Time of Essence**. Time is of the essence of this Agreement.

[END OF PAGE]
[SIGNATURE PAGES FOLLOW]

53

## SIGNATURE PAGE TO
## ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

<u>**SELLERS**</u>:

**POWIN, LLC**
**PEOS HOLDINGS, LLC**
**POWIN CHINA HOLDINGS 1, LLC**
**POWIN CHINA HOLDINGS 2, LLC**
**CHARGER HOLDINGS, LLC**
**POWIN ENERGY ONTARIO STORAGE, LLC**
**POWIN ENERGY OPERATING, LLC**
**POWIN ENERGY OPERATING HOLDINGS, LLC**
**POWIN PROJECT LLC**

By_____
    Name: Gerard Uzzi
    Title:   Chief Restructuring Officer

<u>**BUYER**</u>:

**FLEXGEN POWER SYSTEMS, LLC**

By_____
    Name:
    Title:

**EXHIBIT A**

**Form of Bill of Sale**

A-1

## BILL OF SALE

This Bill of Sale, dated as of [＿＿＿＿＿], 2025 (this "Bill of Sale"), is made and entered into by and among Powin, LLC, a Delaware limited liability company ("Powin"), and Powin's direct and indirect subsidiaries that are signatories below (together with Powin, "Sellers" or the "Debtors"), and FlexGen Power Systems, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer").  Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of July 6, 2025 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens); and

WHEREAS, Sellers desire to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of Sellers' right, title and interest in and to the Purchased Assets.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens).

2.      From time to time after the Closing Date, each Seller shall, upon the reasonable request of Buyer, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as Buyer may reasonably request in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Bill of Sale.

3.      This Bill of Sale is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.      No provision of this Bill of Sale, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Bill of Sale or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Bill of Sale shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

A-2

5.      None of the provisions of this Bill of Sale may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

6.      This Bill of Sale is subject in all respects to the terms and conditions of the Asset Purchase Agreement.  Nothing contained in this Bill of Sale shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Bill of Sale as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement.  To the extent any provision of this Bill of Sale is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      This Bill of Sale shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

8.      This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Bill of Sale or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature Page Follows]*

A-3

IN WITNESS WHEREOF, the parties have caused this Bill of Sale to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS:**

**POWIN, LLC**
**PEOS HOLDINGS, LLC**
**POWIN CHINA HOLDINGS 1, LLC**
**POWIN CHINA HOLDINGS 2, LLC**
**CHARGER HOLDINGS, LLC**
**POWIN ENERGY ONTARIO STORAGE, LLC**
**POWIN ENERGY OPERATING, LLC**
**POWIN ENERGY OPERATING HOLDINGS, LLC**
**POWIN PROJECT LLC**


By_____
    Name: Gerard Uzzi
    Title:   Chief Restructuring Officer

**BUYER:**

**FLEXGEN POWER SYSTEMS, LLC**


By_____
    Name:
    Title:

US_ACTIVE\130687448

**EXHIBIT B**

**Form of Assignment and Assumption Agreement**

US_ACTIVE\130687448

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement, dated as of [_____], 2025 (this "Agreement"), is made and entered into by and among Powin, LLC, a Delaware limited liability company ("Powin"), and Powin's direct and indirect subsidiaries that are signatories below (together with Powin, "Sellers" or the "Debtors"), and FlexGen Power Systems, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of July 6, 2025 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets including, without limitation, the Assumed Contracts, free and clear of all Liens (other than Permitted Liens); and

WHEREAS, pursuant to Section 2.3 of the Asset Purchase Agreement, Buyer has agreed to assume, effective as of the Closing, the Assumed Liabilities.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Sellers hereby assign and delegate the Assumed Contracts and the Assumed Liabilities to Buyer and Buyer hereby accepts assignment and delegation of and assumes the Assumed Contracts and the Assumed Liabilities as set forth in the Asset Purchase Agreement. Buyer assumes none of the Excluded Liabilities and the parties agree that all such Excluded Liabilities remain the responsibility of Sellers.

2.      From time to time after the Closing Date, each Seller shall, upon the reasonable request of Buyer, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as Buyer may reasonably request in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Agreement.

3.      This Agreement is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.      No provision of this Agreement, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Agreement or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

US_ACTIVE\130687448

5.      None of the provisions of this Agreement may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

6.      This Agreement is subject in all respects to the terms and conditions of the Asset Purchase Agreement.  Nothing contained in this Agreement shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Agreement as provided and subject to the limitations set forth in the Asset Purchase Agreement.  To the extent any provision of this Agreement is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

8.      This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature page follows]*

B-3

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS:**

**POWIN, LLC**
**PEOS HOLDINGS, LLC**
**POWIN CHINA HOLDINGS 1, LLC**
**POWIN CHINA HOLDINGS 2, LLC**
**CHARGER HOLDINGS, LLC**
**POWIN ENERGY ONTARIO STORAGE, LLC**
**POWIN ENERGY OPERATING, LLC**
**POWIN ENERGY OPERATING HOLDINGS, LLC**
**POWIN PROJECT LLC**

By_____
    Name: Gerard Uzzi
    Title:   Chief Restructuring Officer

**BUYER:**

**FLEXGEN POWER SYSTEMS, LLC**

By_____
    Name:
    Title:

B-4