## **Exhibit A**

**Loan Agreement**

*Execution Version*

**Dated October 1, 2024**

**Loan Agreement**

between

**POWIN ENERGY INTERMEDIATE, LLC,**
as the Parent Pledgor

**POWIN, LLC,**
as the Borrower

**POWIN CHINA HOLDINGS 1, LLC,**
**CHARGER HOLDINGS, LLC,**
**POWIN ENERGY ONTARIO STORAGE, LLC,**
**POWIN ENERGY OPERATING, LLC,**
**POWIN ENERGY OPERATING HOLDINGS, LLC,**
**PEOS HOLDINGS, LLC,**
**POWIN CHINA HOLDINGS 2, LLC,** and
**POWIN EKS SELLCO, LLC**
as the Subsidiary Guarantors

**GLAS USA LLC,**
as Administrative Agent and Collateral Agent

and others

# Table of Contents

**Page**

| | | |
|---|---|---|
| 1. | Definitions; Rules of Construction. | 1 |
| 2. | The Loans. | 28 |
| 3. | Conditions Precedent. | 38 |
| 4. | Representations and Warranties. | 41 |
| 5. | Affirmative Covenants. | 48 |
| 6. | Negative Covenants. | 54 |
| 7. | Events of Default. | 60 |
| 8. | Rights and Remedies. | 61 |
| 9. | Pledge of Collateral. | 65 |
| 10. | Guaranty. | 71 |
| 11. | Miscellaneous. | 73 |
| 12. | Administrative Agent. | 82 |
| 13. | Collateral Agent. | 90 |

**This Loan Agreement** (as amended, restated, supplemented or otherwise modified from time to time, this "**Agreement**") is made on October 1, 2024

**Between:**

(1)     POWIN ENERGY INTERMEDIATE, LLC, a Delaware limited liability company (the "**Parent Pledgor**"),

(2)     POWIN, LLC, a Delaware limited liability company (the "**Borrower**")

(3)     POWIN CHINA HOLDINGS 1, LLC, an Oregon limited liability company, CHARGER HOLDINGS, LLC, an Oregon limited liability company, POWIN ENERGY ONTARIO STORAGE, LLC, an Oregon limited liability company, POWIN ENERGY OPERATING, LLC, a Delaware limited liability company, POWIN ENERGY OPERATING HOLDINGS, LLC, a Delaware limited liability company, PEOS HOLDINGS, LLC, an Oregon limited liability company, POWIN CHINA HOLDINGS 2, LLC, an Oregon limited liability company, and POWIN EKS SELLCO, LLC, a Delaware limited liability company (collectively, the "**Subsidiary Guarantors**")

(4)     GLAS USA LLC, as administrative agent (in such capacity, the "**Administrative Agent**") and collateral agent (in such capacity, the "**Collateral Agent**")

**Whereas:**

(A)     Subject to and upon the terms, conditions and provisions of this Agreement, the Lenders agree to make certain Loans from time to time, the proceeds of which may be used by the Borrower in accordance with this Agreement for the purposes set forth herein.

**It is agreed:**

**1.      Definitions; Rules of Construction**.

**1.1      Definitions**. The following terms, when used in this Agreement, shall have the following meanings unless otherwise indicated:

"**Account Bank**" means HSBC Bank USA, National Association or such other United States commercial bank or financial institution or United States branch of a foreign commercial bank reasonably acceptable to the Required Lenders and the Borrower.

"**Account Control Agreement**" means, with respect to any Loan Party, any account control agreement, in substantially the form attached hereto as **Exhibit F** or otherwise in form and substance satisfactory to the Required Lenders and the Collateral Agent, to be entered into by and among the Collateral Agent, such Loan Party and the Account Bank, with respect to any deposit account and securities account of each Loan Party (in each case, other than an Excluded Account), together with all Supplements thereto.

"**Account Debtor**" means each Person who is obligated on an Account.

"**Accounts**" means, as to each Loan Party, all of such Loan Party's "accounts" as defined in the UCC, whether now owned or hereafter acquired, including all present and future rights of such Loan Party to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered or (c) for a secondary obligation incurred or to be incurred.

"**Action**" means any litigation, cause of action, appeal, arbitration, audit, hearing, claim, suit, demand, inquiry, charge, complaint, dispute, grievance, investigation or proceeding (whether civil, criminal, administrative, investigative, or informal and whether at law or at equity)

commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority, arbitrator or any other Person.

"**Administrative Agent**" has the meaning provided in the introductory paragraph hereto.

"**Affiliate**" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with the Person specified, or who holds or beneficially owns fifty percent (50%) or more of the equity interests in the Person specified or fifty percent (50%) or more of any class of voting securities of the Person specified; **provided, however,** that an "Affiliate" of any Lender shall include any Person that is administered or managed by an Affiliate of such Lender.  For the avoidance of doubt, in no event shall any Lender be deemed to be an Affiliate of the Borrower solely as a result of holding any Warrants or exercising any rights with respect thereto.

"**Agent Fee Letter**" means the Fee Letter, dated as of the Effective Date, by and among the Borrower and the Agents.

"**Agents**" means the Administrative Agent and the Collateral Agent.

"**Aggregate Borrowing Base**" means, as of any date of determination:

(a)     an amount equal to 100% of the Eligible Accounts of the Loan Parties at such time; <u>minus</u>

(b)     any Reserves established or required to be applied by the Calculation Agent (acting at the direction of the Required Lenders in their Permitted Discretion) at such time.

"**Aggregate Commitment Amount**" means $200,000,000; as may be reduced in accordance with **Section 2.3(d)**.

"**Agreement**" has the meaning provided in the introductory paragraph hereto.

"**Ancillary Rights**" means all rights with respect to any Intellectual Property (i) to income, royalties, damages and other payments (including in respect of all past, present or future infringements) now or hereafter due or payable under or with respect to any of the foregoing, (ii) to sue for all past, present and future infringements with respect to any of the foregoing and (iii) otherwise accruing under or pertaining to any of the foregoing throughout the world.

"**Anti-Terrorism Law**" means any Applicable Law related to money laundering or financing terrorism including the PATRIOT Act, The Currency and Foreign Transactions Reporting Act (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959) (also known as the "Bank Secrecy Act"), the Trading With the Enemy Act (50 U.S.C. § 1 et seq.) and Executive Order 13224 (effective September 24, 2001).

"**Applicable Interest Rate**" means a rate equal to 13.5% per annum.

"**Applicable Laws**" means, with respect to any Person, all laws, statutes, rules, regulations, ordinances, judgments, settlements, orders, decrees, injunctions, permits and writs of any Governmental Authority having jurisdiction over such Person or any of its Assets, as applicable.

"**Approved Fund**" means, with respect to any Lender, (a) any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans, or similar extensions of credit in the ordinary course and is administered or managed by such Lender, (b) an Affiliate of such Lender, (c) an entity or an Affiliate of an entity that administers or manages such Lender, or (d) any Person, fund or account that is managed or advised by the same entity, manager or advisor as such Lender.

"**Asset Sale**" means any Disposition of property or series of related Dispositions of property.

"**Assets**" means, with respect to any Person, all right, title and interest of such Person in and to assets and rights of any kind, whether tangible or intangible, real or personal, including land and properties (or interests therein, including rights of way, leaseholds and easements), buildings, equipment, machinery, improvements, fixtures, Contracts, environmental attributes, Governmental Approvals, Intellectual Property, Software, inventory, books and records, proprietary rights, return and other rights under or pursuant to all warranties, representations and guarantees, cash, accounts receivable, deposits and prepaid expenses.

"**Assigned Agreements**" has the meaning set forth in **Section 9.1(l)**.

"**Authorized Officer**" of any Person means the individual or individuals authorized to act on behalf of such Person by the managing member, board of directors, board of managers or similar governing body of such Person as designated from time to time in a certificate of such Person.

"**Bankruptcy Event**" means, with respect to any Person:

(a)     such Person shall commence any case, proceeding or other action (i) under any existing or future Applicable Laws relating to bankruptcy, insolvency, reorganization, or other relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (ii) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or such Person shall make a general assignment for the benefit of its creditors;

(b)     there shall be commenced against such Person any case, proceeding or other action of a nature referred to in paragraph (a) above which (i) results in the entry of an order for relief or any such adjudication or appointment, (ii) remains undismissed, undischarged or unbonded for a period of sixty (60) days or (iii) the petition commencing the involuntary case is not timely controverted;

(c)     there shall be commenced against such Person any case, proceeding or other action seeking issuance of a warrant of attachment, execution or similar process against any Assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof;

(d)     such Person shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in paragraphs (a), (b) or (c) above; or

(e)     such Person shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan."

"**Borrower**" shall have the meaning set forth in the preamble to this Agreement.

"**Borrower's Knowledge**" means the actual knowledge, after reasonable inquiry of their direct reports, of the persons listed in **Schedule 1.1(a)**.

"**Borrowing**" means a borrowing comprised of any Loan.

"**Borrowing Base Certificate**" means a certificate of an Authorized Officer of the Borrower substantially in the form of **Exhibit I**, with such amendments, modifications and/or supplements to form and presentation as the Administrative Agent or the Calculation Agent (each acting at the direction of the Required Lenders) may reasonably request from time to time to reflect changes to the Aggregate Borrowing Base in accordance with the definition thereof and the definitions of Eligible Accounts, as delivered by the Borrower pursuant to **Section 5.2(b)(i)**. Each Borrowing Base Certificate shall be accompanied by (i) a Payment Date Report, (ii) each invoice with respect to each Eligible Account described therein and evidence of satisfaction of all conditions to payment set out in each such invoice, (iii) copies of bills of lading evidencing shipment of the Eligible Equipment related to each Eligible Account described therein, (iv) evidence of delivery of Eligible Equipment related to each Eligible Account described therein, if applicable, and (v) an aging report with respect to all Eligible Accounts.

"**Business Day**" means any day other than Saturday, Sunday or any other day on which commercial banks in the State of New York are authorized or required to close.

"**Calculation Agent**" means (i) on the Effective Date, the Required Lenders and (ii) after the Effective Date, Finacity or any other institution appointed by the Required Lenders from time to time.

"**Cash**" means money, currency or a credit balance in any demand or deposit account.

"**Cash Equivalents**" means (a) securities with maturities of ninety (90) days or less from the date of acquisition issued or fully guaranteed or insured by the United States or any agency thereof, (b) certificates of deposit and time deposits with maturities of ninety (90) days or less from the date of acquisition and overnight bank deposits of any commercial bank having capital and surplus in excess of $500,000,000, (c) repurchase obligations of any commercial bank satisfying the requirements of section (b) of this definition, having a term of not more than seven days with respect to securities issued or fully guaranteed or insured by the United States, (d) commercial paper of a domestic issuer rated at least "A-1" or the equivalent thereof by "S&P" or "P-1" or the equivalent thereof by Moody's and in either case maturing within ninety (90) days after the day of acquisition, (e) securities with maturities of ninety (90) days or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States (other than Puerto Rico), by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least "A" by S&P or "A2" by Moody's, (f) securities with maturities of ninety (90) days or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of section (b) of this definition, (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of section (a) through (f) of this definition, or (h) investments in money market or common trust funds having a rating from each of Moody's and S&P in the highest investment category for short term unsecured debt obligations or certificates of deposit granted thereby.

"**Casualty Insurance Proceeds**" means, with respect to any Assets, any and all payments (in any form whatsoever) of any insurance (including title insurance), indemnity, warranty or guaranty payment from time to time with respect to any damage to, impaired title to, or destruction in whole or in part of, such Assets.

"**Change in Law**" means the occurrence, after the Effective Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or material change in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) the making or

4

issuance of any rule, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Change of Control**" means, at any date:

(a)     the sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation or an Asset Sale permitted hereunder), in one or a series of related transactions, of all or substantially all of the Borrower's and its Subsidiaries' Assets, taken as a whole;

(b)     (i) at any time prior to a Qualifying IPO, (x) the Permitted Holders cease to directly or indirectly own and Control at least 50.1% of the voting, economic or ownership interest of the Borrower or (y) Trilantic shall cease to directly or indirectly own and Control at least 14.6% of the voting, economic or ownership interests of the Borrower, and (ii) at any time upon and after a Qualifying IPO, any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Effective Date), other than the Permitted Holders, shall have acquired beneficial ownership of at least 35.0% on a fully diluted basis of the voting interests of Borrower or economic interests of Borrower;

(c)     the Borrower shall cease to be a direct, wholly-owned Subsidiary of the Parent Pledgor; or

(d)     the Parent Pledgor shall cease to be a direct Subsidiary of the Warrant Issuer.

As used in this definition of Change of Control, Equity Interest is limited to clause (a) of the definition of Equity Interest.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means all property which is subject or is intended to become subject to the security interests or liens granted in favor of the Collateral Agent by any Loan Party under any of the Loan Documents (including, for the avoidance of doubt, under any Supplement to this Agreement), including pursuant to **Section 9.1**.

"**Collateral Agent**" has the meaning provided in the introductory paragraph hereto.

"**Commitment**" means the commitments established hereunder.  The Commitment for each Lender shall be as set forth in **Schedule 1.2**, or as may be reduced in accordance herewith and subject to change pursuant to **Section 11.6**.

"**Commitment Fee**" is defined in **Section 2.4(f)**.

"**Commitment Period**" means the period from the Effective Date to but excluding the Commitment Termination Date.

"**Commitment Termination Date**" means the earliest to occur of (i) April 1, 2027, (ii) the date the Commitments are permanently reduced to zero pursuant to **Section 2.3(d)**, (iii) the date of the termination of the Commitments pursuant to **Section 8.1** and (iv) the occurrence of an Event of Default (unless each Lender otherwise consents in writing).

"**Contract**" means, with respect to any Person, any agreement, license, sublicense, assignment, purchase agreement, indenture, lease, sublease, instrument of Indebtedness, security agreement, purchase order, sales order, offer to sell, option, right of first refusal, distribution agreement, right to discounts, maintenance agreement or undertaking or instrument of any kind, obligation or other arrangement or agreement, in each case whether oral or written, including any amendments and other modifications thereto, in each case that legally binds such Person, its Assets or its Real Property.

5

"**Contractual Obligation**" means, with respect to any Person, any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound, other than the Obligations.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Controlled Account**" means each deposit account and securities account of each Loan Party (other than Excluded Accounts) covered by an Account Control Agreement and maintained with the Account Bank (including, without limitation, the Core Controlled Account).

"**Controlled Foreign Corporation**" means a controlled foreign corporation (within the meaning of Section 957 of the Code) in respect of which there is a United States shareholder (within the meaning of Section 951(b) of the Code) as measured for purposes of Section 958(a) of the Code.

"**Copyrights**" means, collectively, (a) all copyrights, copyright registrations and applications for copyright registrations, (b) all renewals and extensions of all copyrights, copyright registrations and applications for copyright registration and (c) all rights, now existing or hereafter coming into existence otherwise accruing under or pertaining to any of the foregoing throughout the world.

"**Core Controlled Account**" means an account of the Borrower having account number 963022679 covered by an Account Control Agreement and maintained with the Account Bank.

"**Credit Date**" means the date of a Credit Extension.

"**Credit Extension**" means the making of a Loan.

"**Default**" is defined in **Section 7**.

"**Default Rate**" is defined in **Section 8.3**.

"**Defaulting Lender**" means any Lender that (a) has failed to pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, (b) has notified the Borrower and the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (**provided**, that such Lender shall cease to be a Defaulting Lender pursuant to this <u>clause (c)</u> upon receipt of such written confirmation by the Administrative Agent and Borrower) or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any existing or future Applicable Laws relating to bankruptcy, insolvency, reorganization, or other relief of debtors or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state, federal or national regulatory authority acting in such a capacity; **provided**, that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interests in that Lender or any direct or indirect

6

parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of <u>clauses (a)</u> through <u>(d)</u> above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Borrower and each other Lender; **provided, however,** that the Administrative Agent has no obligation to make such determination or otherwise monitor or inquire whether any Lender qualifies as a Defaulting Lender and provide notice thereof, absent receipt of notice thereof and request to provide such notice in accordance with the notice provisions hereunder.

"**Disposition**" means, with respect to any Assets (including, for the avoidance of doubt, Real Property) of any Person, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof. For the avoidance of doubt, a Disposition of such property includes any Division of such Person that is an obligor with respect to any Obligation where any such assets, property or rights are allocated to a successor or resulting Person or subunit of such Person to which such Obligation is not also allocated under the terms of such Division. The terms "**Dispose**" and "**Disposed of**" have meanings correlative thereto.

"**Division**", with respect to any Person, means (a) a reorganization of such Person (the dividing Person) resulting in two (2) or more Persons as successors to the dividing Person or resulting from the reorganization, where the assets, property and rights and liabilities of the dividing Person may be divided among such successor or resulting Persons, or (b) a reorganization of such Person resulting in one or more series or other subordinate units of such Person, where such series or other subordinate units may have separate assets, property and rights and liabilities from each other series or other subordinate units or from such Person generally.

"**Dollars**" and "$" means the lawful currency of the United States of America.

"**Domestic Subsidiary**" is a Subsidiary organized under the laws of the United States or any state or territory thereof or the District of Columbia other than (a) any Foreign Subsidiary Holding Company and (b) any Subsidiary that is a direct or indirect Subsidiary of a Subsidiary that is a Controlled Foreign Corporation.

"**Draw Request**" is defined in **Section 2.2(a)**.

"**Effective Date**" means the date on which the conditions specified in **Section 3.1** are satisfied (or waived in accordance with **Section 11.1**).

"**Effective Date Fee Letters**" means, collectively, the Fee Letter and Agent Fee Letter.

"**Eligible Accounts**" means, as at any date of determination, the aggregate amount of all Accounts of the Loan Parties; **provided** that the following Accounts of the Loan Parties are not Eligible Accounts:

(a)      Accounts which do not consist of accounts receivable and contract receivables that are owed to and owned by the Borrower arising or resulting from the sale of goods by the Borrower under an Energy Supply Agreement, or retainage accounts or escrow accounts maintained in connection with any shipping or delivery milestone pursuant to an Energy Supply Agreement (provided that the Borrower shall have the right to require release of the amounts in any such retainage accounts or escrow accounts upon delivery to the customer without satisfaction of any other substantive condition upon completion of shipment or delivery, as applicable);

(b)      Accounts arising pursuant to an Energy Supply Agreement unless (x) such agreement has been delivered to the Administrative Agent and is not materially less favorable to

the Lenders' interests than (i) any Energy Supply Agreement set forth on **Schedule 1.3** or (ii) the form Energy Supply Agreement attached hereto as **Exhibit H** or any other form previously approved by the Administrative Agent (acting at the direction of the Required Lenders), provided that if there are three (3) or fewer Accounts included in the Aggregate Borrowing Base at such time, such agreement is in form and substance reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders), it being understood and agreed that the Borrower may request approval of any Energy Supply Agreement for purposes of this proviso prior to the Aggregate Borrowing Base including only three (3) or fewer Accounts or (y) the Administrative Agent (acting at the direction of the Required Lenders) has approved in writing such Energy Supply Agreement;

(c)     Accounts arising pursuant to an Energy Supply Agreement unless the Account Debtor or the Person obligated under such agreement is (i) sufficiently creditworthy, as reasonably determined by the Administrative Agent (acting at the direction of the Required Lenders) in its Permitted Discretion and (ii) not the United States, any state or any municipality, or any department, agency or instrumentality thereof, unless the Borrower has, with respect to the Accounts thereunder, complied with the Federal Assignment of Claims Act of 1940 as amended (31 U.S.C. Section 3727 et seq.) or any applicable statute or municipal ordinance of similar purpose and effect;

(d)     Accounts arising pursuant to an Energy Supply Agreement which Accounts are not assignable, or where the Energy Supply Agreement is not assignable as collateral pursuant to its terms without the consent the Account Debtor or the Person obligated under such agreement, or where the transactions contemplated by the Loan Documents or the exercise of remedies under any of the Loan Documents violate the terms of such Energy Supply Agreement or otherwise give the Account Debtor or the Person obligated thereunder the right to terminate, amend or renegotiate such Energy Supply Agreement or make an indemnity claim thereunder;

(e)     Accounts arising pursuant to an Energy Supply Agreement unless such Energy Supply Agreement is in full force and effect, and constitutes a legal, valid, binding and enforceable obligation as to each Loan Party that is a party thereto and the Account Debtor and Person obligated thereunder, except in each case, as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights and subject to general equitable principles;

(f)     Accounts arising under an Energy Supply Agreement (i) if the Borrower is or, to the Borrower's Knowledge, any other party thereto is in breach, or in default under, such agreement in any material respect, (ii) if any event has occurred which with the passage of time or giving of notice or both would (A) constitute such a material breach or default (by the Borrower, or to the Borrower's Knowledge, any other party), result in a loss of rights (by the Borrower, or to the Borrower's Knowledge, any other party) or permit termination, modification or acceleration under, or result in the creation of any Lien (other than Permitted Liens) under such Energy Supply Agreement or (B) otherwise permit offset or withholding in an amount in excess of ten percent (10%) of the total stated purchase price of such Energy Supply Agreement or (iii) without limiting clause (ii)(B), to the extent such Accounts are subject to offset or withholding under such Energy Supply Agreement, but, for the avoidance of doubt, such Accounts shall only be deemed ineligible by the amount of such actual offset or withholding amount;

(g)     Accounts arising pursuant to an Energy Supply Agreement to the extent in excess of thirty-five percent (35%) of the total stated purchase price to be earned thereunder;

(h)        Accounts arising pursuant to an Energy Supply Agreement other than (i) Accounts consisting of installment payments generated with respect to Eligible Equipment for which shipment has commenced and is in process and (ii) Accounts consisting of installment payments generated with respect to goods which have been delivered (excluding, for the avoidance of doubt, purchase price installments due in connection with commissioning or final acceptance);

(i)        Accounts due from a Person to the extent that such Accounts, together with all other Accounts owed to the Borrower or any other Loan Party by such Person or any Affiliate thereof, exceed in the aggregate an amount equal to the Single Customer Concentration Limit, but only to the extent of such excess; **provided** that solely with respect to the Serrano and Sun Streams 4 projects, each such project shall be subject to its own cap such that the Account due from Longroad Energy in connection with the Serrano project is subject to an independent cap and the Account due from Longroad Energy in connection with the Sun Streams 4 project is subject to an independent cap;

(j)        Accounts which, at the date of issuance of the respective invoice therefor, were payable more than thirty (30) days after the date of issuance;

(k)        Accounts that remain unpaid for more than sixty (60) days after the due date specified in the original invoice(s) to the extent any such Accounts exceed $100,000 per individual Account and $250,000 in the aggregate for all such Accounts;

(l)        Accounts due from a Person if more than fifty percent (50%) of the aggregate amount of Accounts of such Person and its Affiliates are ineligible as a result of the application of clause (k) of this definition;

(m)        [Reserved];

(n)        Accounts due from a Person (A) who is not organized under the laws of the United States or a State thereof or the District of Columbia or (B) whose principal place of business is located outside of the United States, unless such Person is disclosed to the Administrative Agent and such Account is otherwise satisfactory to the Administrative Agent (acting at the direction of the Required Lenders) in its sole discretion; **provided**, that notwithstanding anything in this Agreement to the contrary this clause (n) shall not apply to any Accounts due from Akaysha Energy in respect of the ULINDA PARK PROJECTCO PTY LTD project and Pulse Clean Energy, Ltd. in respect of the PULSE CLEAN ENERGY SPV WATT LIMITED project, but only to the extent that the aggregate Accounts due from (x) Akaysha Energy in respect of the ULINDA PARK PROJECTCO PTY LTD project do not exceed in the aggregate an amount equal to 33% of the aggregate of all Accounts included in the Aggregate Borrowing Base as of such date and (y) Pulse Clean Energy in respect of the PULSE CLEAN ENERGY SPV WATT LIMITED project do not exceed in the aggregate an amount equal to 33% of the aggregate of all Accounts included in the Aggregate Borrowing Base as of such date;

(o)        Accounts with respect to which the Account Debtor or the Person obligated is an Affiliate of a Loan Party or a director, officer, agent, stockholder, member or employee of a Loan Party or any of their Affiliates;

(p)        Accounts with respect to which there is any unresolved dispute with the respective Account Debtor or the Person obligated on such Account (but only to the extent of such dispute);

(q)        Accounts with respect to which the Collateral Agent, on behalf of itself and the other Lenders, does not have a valid, first priority perfected security interest (including, without limitation, Accounts representing any Eligible Equipment that is subject to a

Lien of the type described in clause (c) or clause (d) of "Permitted Liens", whether or not the lien of the Collateral Agent was perfected prior to the perfection of such Permitted Lien);

(r)     Accounts with respect to which the Account Debtor or the Person obligated on the Account, or any Affiliate thereof that is obligated on any other Account included in the Aggregate Borrowing Base at such time, is the subject of any bankruptcy or other insolvency proceeding;

(s)     Accounts with respect to which the obligation to pay is conditional or subject to a repurchase obligation or right to return, including bill and hold sales, guarantied sales, sale or return transactions, sales on approval or consignments;

(t)     Accounts with respect to which the Account Debtor or the Person obligated on Account is a creditor of a Loan Party or a Subsidiary thereof (unless such Person has executed an agreement in favor of the Administrative Agent and in form and substance satisfactory to the Administrative Agent (acting at the direction of the Required Lenders) waiving any right of off-set or other rights with respect to amounts owed to such Person by such Loan Party or Subsidiary thereof); **provided**, **however**, that any such Account shall only be ineligible as to that portion of such Account which is less than or equal to the amount owed by such Loan Party or Subsidiary thereof to such Person;

(u)     Accounts including an accrual of any taxes, including sales tax, use tax, excise tax or similar taxes, but only to the extent of such accrual;

(v)     Accounts representing any inventory that has been, or for which the Borrower has received or has delivered, as applicable, notice that such inventory will be, returned, rejected or repossessed; and

(w)     Accounts representing any Eligible Equipment if and to the extent that the aggregate amount of insurance coverage of the Loan Parties with respect to such Eligible Equipment is less than the purchase price of such Eligible Equipment under the related Energy Supply Agreement.

"**Eligible Assignee**" means, with respect to any Lender, an Affiliate or Approved Fund of such Lender.

"**Eligible Equipment**" means complete battery storage systems manufactured by the Borrower or by third parties contracted by the Borrower to manufacture such battery storage systems, tested by the Borrower in accordance with customary testing standards, and satisfying all requirements under the Energy Supply Agreement pursuant to which it is to be sold by the Borrower; **provided** that, for the avoidance of doubt, Eligible Equipment shall include each energy segment that has been shipped in accordance with and pursuant to any Energy Supply Agreement; **provided further** that the value attributable to such energy segment for purposes of calculating the Aggregate Borrowing Base shall be equal to the product of (i) (A) the amount of energy segments shipped to date in connection with such Energy Supply Agreement divided by (B) the total amount of energy segments to be shipped for such Energy Supply Agreement, multiplied by (ii) 100% of purchase price installments (A) invoiced in connection with shipment of battery storage systems and (B) to be invoiced upon delivery and for which shipment has already occurred (excluding, for the avoidance of doubt, purchase price installments due in connection with commissioning or final acceptance) of such storage systems.

"**Energy Supply Agreement**" means any energy supply agreement or services agreement between the Borrower or any Subsidiary of the Borrower and one or more counterparties.

"**Enforcement Costs**" is defined in **Section 8.4**.

10

"**Environmental Claim**" means any and all liabilities, losses, expenses or other costs incurred in connection with, otherwise arising out of, or the existence of any administrative, regulatory or judicial actions, suits, demands, decrees, claims, liens, judgments, warning notices, notices of noncompliance or violation, investigations, proceedings, removal or remedial actions or orders, or damages, penalties, fees, out-of-pocket costs, expenses, disbursements or reasonable and documented attorneys' or consultants' fees, arising from (a) injury to health, safety or the environment, (b) a violation or alleged violation of any Environmental Laws or Governmental Approvals issued under any Environmental Laws, or (c) a Release or threatened Release of Hazardous Substances, whether or not arising out of legal or administrative proceedings relating to any of the above.

"**Environmental Laws**" means any Applicable Law pertaining to: (a) the quality, protection, clean-up, remediation or damage of or to the environment; (b) emissions, disposals, discharges, releases or threatened releases of any Hazardous Substances into ambient air, land, soil, subsoil, surface water or groundwater; (c) any adverse impacts or damage to natural resources (including protection of species formally listed or designated under Applicable Law as threatened or endangered); or (d) protection of cultural or historic resources; including the following laws as the same may be from time to time amended: the Clean Air Act, as amended, 42 U.S.C. §7401, et seq.; the Clean Water Act, 33 U.S.C. §1251, et seq.; the Resource, Conservation and Recovery Act, 42 U.S.C. §6901, et seq.; the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C.§ 9601, et seq. (CERCLA); the Safe Drinking Water Act, 42 U.S.C. §300f, et seq.; the Toxic Substances Control Act, 15 U.S.C. §2601, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq.; the Rivers and Harbors Act, 33 U.S.C. §401, et seq.; the Transportation Safety Act of 1974, 49 U.S.C. §1801 et seq.; the Endangered Species Act, 16 U.S.C. §1531, et seq.; Migratory Bird Treaty Act of 1918 16 U.S.C. § 703, et seq., Bald and Golden Eagle Protection Act 16 U.S.C. § 668 et seq.; the National Environmental Policy Act, 42 U.S.C § 4321 et seq. (NEPA); the National Historic Preservation Act, 16 U.S.C. § 470 et seq.; and the Federal Land Policy and Management Act, 43 U.S.C. § 1701 et seq. and any state and local laws analogous thereto.

"**Equity Interest**" means, with respect to a Person, (a) any stock, partnership interest, membership interest or other equity interest in such Person or (b) any option, warrant or other direct or indirect right to acquire, convert into or exchange for an equity interest in such Person.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

"**ERISA Event**" means (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Pension Plan (other than an event for which the 30-day notice period is waived); (b) the determination that any Pension Plan is considered an at- risk plan or that any Multiemployer Plan is endangered or is in critical status within the meaning of Sections 430, 431 or 432 of the Code or Sections 303, 304 or 305 of ERISA, as applicable; (b) the incurrence by any Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA, other than for PBGC premiums not yet due; (d) the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan or the occurrence of any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (e) the appointment of a trustee to administer any Pension Plan under Section 4042 of ERISA; (f) the withdrawal of any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or the cessation of operations by any

11

Loan Party or any ERISA Affiliate that would be treated as a withdrawal from a Pension Plan under Section 4062(e) of ERISA; (g) the partial or complete withdrawal by any Loan Party or any ERISA Affiliate from any Multiemployer Plan or a notification that a Multiemployer Plan is insolvent; (h) the taking of any action to terminate any Pension Plan or Multiemployer Plan under Section 4041 or 4041A of ERISA or (i) the occurrence of any similar event or the incurrence of any liability with respect to a Foreign Pension Plan.

"**Erroneous Payment**" has the meaning specified in **Section 12.9**.

"**Erroneous Payment Subrogation Rights**" has the meaning specified in **Section 12.9(d)**.

"**Event of Default**" is defined in **Section 7**.

"**Event of Eminent Domain**" means, with respect to any Loan Party, any compulsory transfer or taking by requisition, confiscation, condemnation, seizure or forfeiture, eminent domain or exercise of a similar power, or transfer under threat of such compulsory transfer or taking of any part of the Real Property or other tangible Assets of such Person by any agency, department, authority, commission, board, instrumentality or political subdivision of any state, the United States or another Governmental Authority having jurisdiction or any other Person acting under color of any such Governmental Authority.

"**Excess Availability**" means, at any time, the amount by which (x) the lesser of (A) the Aggregate Commitment Amount at such time and (B) the Aggregate Borrowing Base at such time exceeds (y) the Total Utilization of Commitments at such time.

"**Excess Cash**" means Unrestricted Cash in excess of $50,000,000 on any date of determination; **provided** that the following amounts shall not be included in the calculation of Unrestricted Cash for purposes of determining the amount of Excess Cash: (i) the amount of accrued income Taxes of the Loan Parties measured as of such date of determination, (ii) the amount of Permitted Tax Distributions required to be paid or reasonably estimated to be payable in cash with respect to tax periods (or portions thereof) ending on or prior to the date of such determination, and (iii) in respect of otherwise Unrestricted Cash of any Foreign Subsidiary or subsidiary thereof as of such date of determination, the amount of withholding Taxes that are or would reasonably be expected to be payable in cash if such cash were repatriated to the United States (regardless of whether such cash is actually repatriated), taking into account any reduced rate of withholding under applicable tax treaties.

"**Excluded Accounts**" shall mean (a) each account that is solely used for the holding of (i) funds used for payroll, payroll taxes, healthcare and other employee benefit payments to or for the benefit of a Loan Party's employees, (ii) taxes required to be collected, remitted or withheld (including federal and state withholding taxes (including the employer's share thereof)), and (iii) funds which any Loan Party holds in trust or as an escrow or fiduciary for another Person that is not a Loan Party in the ordinary course of business and (b) "zero balance" accounts.

"**Excluded Assets**" means:

(a)     (i) assets located outside the United States (other than Eligible Equipment in transit pursuant to an Energy Supply Agreement) and (ii) assets that require action under the law of any non-U.S. jurisdiction to create or perfect a security interest in such assets under such non-U.S. jurisdiction, including any intellectual property registered as of the Effective Date in any non-U.S. jurisdiction;

(b)     Equity Interests constituting an amount greater than 65% of each class of the Equity Interests entitled to vote (within the meaning of Treas. Reg. Sec. 1.956-2(c)(2)) of a Subsidiary that is a Controlled Foreign Corporation or a Foreign Subsidiary Holding Company, in each case, directly owned by a Loan Party; and

(c)     Equity Interests in EKS HoldCo, LLC, a Delaware limited liability company and Qingdao CIMC-Powin New Energy Technology Co., Ltd., a Chinese limited liability company.

"**Excluded Subsidiary**" means a Subsidiary that is a:

(a)     Controlled Foreign Corporation;

(b)     Foreign Subsidiary Holding Company (other than PEOS HOLDINGS, LLC, an Oregon limited liability company, POWIN CHINA HOLDINGS 2, LLC, an Oregon limited liability company); or

(c)     Subsidiary that is a direct or indirect Subsidiary of a Controlled Foreign Corporation or a Foreign Subsidiary Holding Company.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Lender or required to be withheld or deducted from a payment to a Lender: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Lender being organized under the laws of, or having its principal office, in the case of any Lender, or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an interest in a Loan pursuant to a law in effect on the date on which (i) such Lender makes or acquires such interest in the Loan (other than pursuant to an assignment request by the Borrower under **Section 2.6(h)**) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to **Section 2.6** or **Section 2.7,** amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Lender's failure to comply with **Section 2.6(f)** and (d) any withholding Taxes imposed under FATCA.

"**Exposure**" means, at any time, the aggregate principal amount of the Loans outstanding at such time.

"**FATCA**" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code, and any intergovernmental agreement entered into in connection with any of the foregoing and any fiscal or regulatory legislation, rules or practices adopted pursuant to any such intergovernmental agreement.

"**FCPA**" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"**Fee Letter**" means the Fee Letter, dated as of the Effective Date, by and among the Borrower and the Lenders party thereto.

"**Filing Statement**" means the UCC financing statements (Form UCC-1) attached hereto as Exhibit E.

"**Foreign Pension Plan**" means any defined benefit plan sponsored, maintained, or contributed to outside of the United States by any Loan Party or any Subsidiary, primarily for the benefit of employees of such Loan Party or Subsidiary residing outside of the United States, which under applicable law is required to be funded through a trust or other funding vehicle, other than a trust or funding vehicle maintained exclusively by a Governmental Authority.

"**Foreign Subsidiary**" means any Subsidiary that is not a Domestic Subsidiary.

"**Foreign Subsidiary Holding Company**" means (a) any Domestic Subsidiary of Borrower all or substantially all of the assets of which consist of the equity interests of (or debt obligations of) one or more Controlled Foreign Corporations or Foreign Subsidiary Holding Companies and (b) any Subsidiary of a Person or Persons described in clause (a) of this definition.

"**Forward Looking Information**" is defined in **Section 4.21**.

"**Funding Date**" is defined in **Section 2.2(b)**.

"**Funding Rules**" means the requirements relating to the minimum required contributions (including any installment payments) to Pension Plans and Multiemployer Plans, as applicable, and set forth in Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"**GAAP**" means generally accepted accounting principles in the United States of America consistently applied.

"**Governmental Approvals**" means, with respect to any Person, (a) any authorization, consent, approval, license, ruling, permit, certification, waiver, exemption, filing, variance, order, judgment, determination, decree or publication of, by or with, (b) any notice to, (c) any declaration of, by or with or (d) any registration by or with, any Governmental Authority required to be obtained or made by such Person.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state, territorial or local, and any agency, commission, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Guaranteed Obligations**" is defined in **Section 10.1**.

"**Guarantor**" is defined in **Section 10.1**.

"**Guaranty**" means the undertakings of each Guarantor in **Section 10**.

"**Hazardous Substances**" means any hazardous substances, pollutants, contaminants, wastes, or materials that is defined or regulated as hazardous or toxic or words of similar import or meaning or with respect to which liability or standards of conduct may be imposed under applicable Environmental Law due to their hazardous, toxic, dangerous or deleterious properties or characteristics, including petroleum (including crude oil or any fraction thereof), petroleum wastes, radioactive material, hazardous wastes, toxic substances, or asbestos.

"**Hedging Agreement**" means any agreement with respect to any swap, forward, cap, floor, collar, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"**Indebtedness**" means, with respect to any Person at any date, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising in the ordinary course of business, (d) all obligations of such Person under leases which are or should be, in accordance with GAAP, recorded as capital leases in respect of which such Person is liable, all obligations of such Person to purchase securities (or other property) which arise out of or in connection with the sale of the same or substantially similar securities (or property), (e) all deferred obligations of such Person to reimburse any bank or other Person in respect of amounts paid or advanced under a letter of credit or other instrument, (f) all Indebtedness of

others secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person or is non-recourse to such Person, (g) all Indebtedness of others guaranteed directly or indirectly by such Person or as to which such Person has an obligation substantially the economic equivalent of a guarantee, (h) all net ordinary course settlement or other obligations of such Person under any Hedging Agreement, (i) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement are limited to repossession or sale of such property) or (j) all obligations of such Person to reimburse any other Person in respect of amounts for which such other Person is obligated, irrespective of whether such amounts are actually paid or advanced, under any letter of credit, surety bond or other instrument or banker's acceptances; **provided** that notwithstanding the foregoing, Indebtedness shall be deemed not to include (1) contingent obligations incurred in the ordinary course of business which are not past due, (2) prepaid or deferred revenue arising in the ordinary course of business which are not past due, (3) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase price of an asset to satisfy warrants or other unperformed obligations of the seller of such asset; **provided**, **however**, that, at the time of closing, the amount of any such payment is not determinable and, to the extent such payment thereafter becomes fixed and determined, the amount is paid in a timely manner and is not past due, (4) any balance that constitutes a trade payable or similar obligation to a trade creditor, accrued in the ordinary course of business and, commencing January 1, 2025, are not more than 60 days past due unless such obligations are being contested in good faith by appropriate proceedings diligently conducted, (5) any earn-out obligation until such obligation is reflected as a liability on the balance sheet of such Person in accordance with GAAP or (6) any obligations attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto which are not past due.

"**Indemnified Party**" is defined in **Section 11.8(a)**.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in section (a), Other Taxes.

"**Information**" is defined in **Section 11.8(a)**.

"**Intellectual Property**" means all Copyrights, all Patents and all Trademarks, together with rights in all inventions, processes, production methods, proprietary information, know-how and trade secrets, including all information, customer lists, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, recorded knowledge, surveys, engineering reports, test reports, manuals, materials standards, processing standards, performance standards, catalogs, computer and automatic machinery software and programs, all field repair data, sales data and other information relating to sales or service of products now or hereafter manufactured, all accounting information and all media in which or on which any information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data, and all applicable Governmental Approvals now held or hereafter obtained by any Loan Party in respect of any of the foregoing. It is understood that Intellectual Property shall include all of the foregoing owned or acquired by any Loan Party on a worldwide basis.

"**Intellectual Property Security Agreement**" is defined in **Section 3.1(e)(iv)**.

"**Investments**" is defined in **Section 6.6**.

"**Lender**" means (a) as of the Effective Date, each of Forethought Life Insurance Company, Commonwealth Annuity and Life Insurance Company, First Allmerica Financial Life Insurance Company and FS KKR Capital Corp. and (b) after the Effective Date, each Person who from time to time holds Commitments and/or Loans.

"**Lien**" means, with respect to any Asset, any mortgage, pledge, hypothecation, assignment (as security), deposit arrangement, encumbrance, lien (statutory or other), charge, warrant, deed of trust, claim, restriction (whether on voting, sale, transfer, disposition or otherwise), easement or other security interest, or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever having substantially the same economic effect as any of the foregoing (including any conditional sale or other title retention agreement and any capital lease), or any interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement; **provided** that in no event shall an operating lease be deemed to constitute a Lien.

"**Liquidity**" means, (a) for purposes of **Section 5.15**, the Unrestricted Cash measured after giving effect to any borrowing or repayment to be made on the applicable Liquidity Testing Date and (b) for purposes of **Section 5.1(d)**, the monthly average projected Unrestricted Cash in respect of each month during the applicable 12-month measurement period.

"**Liquidity Testing Date**" means each Payment Date and the date of each Borrowing.

"**Loan**" has the meaning set forth in **Section 2.1**.  For the avoidance of doubt, any PIK Interest shall be added to (and form part of) the principal amount of the Loans for all purposes for this Agreement and the other Loan Documents.

"**Loan Documents**" means this Agreement, each Note, each Account Control Agreement, the Effective Date Fee Letters, any financing statements or other similar documents filed, recorded or delivered in connection with the foregoing, any fee letter entered into between the Borrower and any Agent or the Calculation Agent, and any other instrument or agreement both now and hereafter executed, delivered or furnished by any Loan Party evidencing, guaranteeing, securing, or in connection with this Agreement or all or any part of the Obligations, or designated by the Borrower to the Required Lenders in writing as a "Loan Document", in each case together with all Supplements thereto.

"**Loan Party**" means each of the Parent Pledgor, the Borrower and the Subsidiary Guarantors.

"**Loan Proceeds**" means all amounts advanced as part of the Loan, whether advanced directly to the Borrower or otherwise.

"**Material Adverse Effect**" means (a) when such phrase is used with respect to any specific Loan Party, any change, circumstance or occurrence that would reasonably be expected to have a material adverse effect on (i) the operations, business or financial condition of such Loan Party and its Subsidiaries, taken as a whole; or (ii) the ability of such Loan Party to perform its material obligations under the Loan Documents to which it is party; (b) when such phrase is used without reference to any specific Loan Party, any of the items described in clause (a) of this defined term, as to Borrower and the Subsidiary Guarantors, taken as a whole; (c) any material adverse effect on the legality, validity, binding effect or enforceability of this Agreement or any other Loan Document; (d) any material adverse effect on the rights of any Lender under this Agreement; or (e) a material adverse effect on the validity or priority of the security interest in any material portion of the Collateral.

"**Material Contract**" means (a) each Energy Supply Agreement and (b) each contract involving aggregate consideration in excess of $10,000,000 pursuant to which a Loan Party purchases components utilized to manufacture Eligible Equipment.

"**Maturity Date**" means the earlier of (a) the Scheduled Maturity Date and (b) the date on which all monetary Obligations shall become due and payable in full under this Agreement, whether by acceleration, pursuant to **Section 2.3(d)(ii)** or otherwise.

"**Moody's**" means Moody's Investors Service, Inc.

16

"**Multiemployer Plan**" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA to which the Loan Party or ERISA Affiliate is obligated to contribute or has any liability.

"**New York UCC**" means the UCC as from time to time in effect in the State of New York.

"**Note**" is defined in **Section 2.5**.

"**Obligations**" means all present and future Indebtedness, loans, advances, debts, liabilities (including any indemnification or other obligations that survive the termination of this Agreement and the other Loan Documents) and obligations of any kind and nature whatsoever (including guarantee obligations) of the Borrower and the Guarantors to the Lenders of any kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, due or to become due, both now existing and hereafter arising under, as a result of, on account of, or in connection with, the Loans (including, for the avoidance of doubt, PIK Interest), this Agreement and any and all Supplements thereto, or any of the other Loan Documents, including future disbursements, principal, interest, indemnities, fees, late charges, Enforcement Costs, and other costs and expenses, whether direct, contingent, joint, several, matured or unmatured, whether from time to time reduced and thereafter increased, or entirely extinguished and thereafter reincurred, together with all extensions, renewals and replacements thereof, and including any such interests, fees and other costs and expenses that accrue after the commencement by or against the Borrower, any Guarantor or any of its Affiliates of any proceeding under any existing or future Applicable Laws relating to bankruptcy, insolvency, reorganization, or other relief of debtors, naming such Person as the debtor in such proceeding, regardless of whether such interest, fees or other costs and expenses are allowed claims in such proceeding.

"**OFAC**" is defined in the definition of "**Sanctions**."

"**Order**" means any legally binding award, injunction, judgment, decree, order, writ, prohibition, ruling, subpoena, verdict or other decision issued, promulgated or entered by or with any Governmental Authority (including an arbitrator of competent jurisdiction), applicable directly to any Person, its Assets, or its Real Property.

"**Organizational Documents**" means, with respect to any Person (other than a natural Person), the certificate or articles of incorporation, the certificate or articles of organization, bylaws, partnership agreement, limited liability company agreement, operating agreement, stockholders' agreement, trust agreement and/or similar organizational documents or agreements, as applicable, of such Person, including all amendments thereto.

"**Other Connection Taxes**" means, with respect to any Lender, Taxes imposed as a result of a present or former connection between such Lender and the jurisdiction (or any political subdivision thereof) imposing such Tax (other than connections arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means any and all present or future stamp, court, recording, filing, intangible, transfer, documentary or similar Taxes from any payment made by any Lender hereunder or from the execution, delivery, filing, recording, enforcement or registration of, or performance under, or from the receipt or perfection of a security interest under or otherwise with respect to this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to **Section 2.6(h)**).

"**Parent Pledgor**" has the meaning set forth in the preamble to this Agreement.

"**Party**" and "**Parties**" have the meaning set forth in the preamble to this Agreement.

"**Patents**" means, collectively, (a) all patents and patent applications, (b) all reissues, divisions, continuations, renewals, extensions and continuations-in-part of all patents or patent applications and (c) all rights, now existing or hereafter coming into existence otherwise accruing under or pertaining to any of the foregoing throughout the world, including all inventions and improvements described or discussed in all such patents and patent applications.

"**PATRIOT Act**" is defined in **Section 11.19**.

"**Payment Date**" means the 15th day of each calendar month, or if such day is not a Business Day, the immediately preceding Business Day.

"**Payment Date Report**" means a certificate of an Authorized Officer of the Borrower in a form reasonably acceptable to the Required Lenders and the Borrower, with such amendments, modifications and/or supplements to form and presentation as the Administrative Agent or the Calculation Agent (each acting at the direction of the Required Lenders) may reasonably request from time to time.

"**Payment Recipient**" has the meaning specified in **Section 12.9(a)**.

"**PBGC**" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"**Pension Plan**" means any employee pension benefit plan as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or with respect to which any Loan Party or any ERISA Affiliate has any liability.

"**Permitted Discretion**" means the reasonable exercise of the Required Lenders' good faith judgment in consideration of any factor which is reasonably likely to (i) adversely affect the value of any Collateral, the enforceability or priority of the Liens thereon or the amount that the Administrative Agent, the Collateral Agent and the Lenders would be likely to receive (after giving consideration to delays in payment and costs of enforcement) in the liquidation thereof, (ii) suggest that any collateral report or financial information delivered to the Administrative Agent, the Collateral Agent or the Lenders by any Person on behalf of the Borrower or any Subsidiary Guarantor is incomplete, inaccurate or misleading in any material and adverse respect, or (iii) materially increase the likelihood that the Administrative Agent, the Collateral Agent and the Lenders would not receive payment in full in cash for all of the Obligations. In exercising such judgment, the Required Lenders may consider such factors already included in or tested by the definition of Eligible Accounts, as well as any of the following: (i) changes in collection history and dilution with respect to the Accounts; (ii) changes in any concentration of risk with respect to any Loan Party's Accounts; and (iv) any other factors that change the credit risk of lending to any Loan Party on the security of any Loan Parties' Accounts. The burden of establishing lack of good faith hereunder shall be on the Loan Parties.

"**Permitted Dispositions**" means:

(a)     the Borrower and its Subsidiaries may Dispose of property or assets to the Borrower or its Subsidiaries; **provided** that if the transferor of such property or assets is a Loan Party the transferee thereof must be a Loan Party;

(b)     the Borrower and any Subsidiary Guarantor may lease, sublease, license or sublicense (on a non-exclusive basis with respect to any Intellectual Property) real, personal or Intellectual Property in the ordinary course of business consistent with past practice;

18

(c)    Dispositions (including like-kind exchanges) of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are applied to the purchase price of such replacement property, in each case in the ordinary course of business consistent with past practice;

(d)    Dispositions listed on **Schedule 6.5**;

(e)    the lapse or abandonment in the ordinary course of business of any registrations or applications for registration of any immaterial Intellectual Property rights that is, in the reasonable good faith judgment of the Borrower, no longer economically practicable or commercially desirable to maintain or useful in the conduct of the business of the Borrower or any of its Subsidiaries, consistent with past practice; and

(f)    Dispositions of any assets (other than equipment or other assets which a Loan Party is contracted to deliver pursuant to an Energy Supply Agreement) having a fair market value not to exceed $5,000,000 in the aggregate during any 12-month period; **provided** that (x) any such Disposition is for fair market value and pursuant to an arm's-length transaction with a Person that is not a Subsidiary or an Affiliate of the Borrower and (y) the consideration received in connection with such Disposition consists of Cash or Cash Equivalents.

"**Permitted Equity Liens**" means, with respect to any Equity Interest:

(a)    Liens for any Tax, assessment or other governmental charges (i) not yet due and owing or (ii) that are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, to the extent required by GAAP, or if such Liens are secured by a bond;

(b)    restrictions on the sale, transfer, pledge, or other disposition of securities or other equity interests under any law, rule, regulation or treaty by any Governmental Authority relating to securities or other equity interests; and

(c)    Liens arising under the Organizational Documents of the Borrower or any Subsidiary which do not secure Indebtedness for borrowed money.

"**Permitted Holders**" means (a) each of TCP Powin SPV LLC, Trilantic Energy Partners II Mini-Master (North America) L.P., EIF II PWE Holdings LLC, Single Element LLC, Parthian Holdings, Meadowlark Energy Finance, LLC, Forethought Life Insurance Company, Commonwealth Annuity and Life Insurance Company, First Allmerica Financial Life Insurance Company, FS KKR Capital Corp. or any Affiliate thereof; (b) any Affiliate, fund, entity or investment vehicle directly or indirectly advised, managed or controlled by any of Trilantic Capital Management L.P., Greenbelt Capital Management L.P., Energy Impact Partners LP, GIC Private Limited, GIC Infra Holdings Pte. Ltd., Esquarre Capital, Arroyo Energy Investment Partners LLC Forethought Life Insurance Company, Commonwealth Annuity and Life Insurance Company, First Allmerica Financial Life Insurance Company, FS KKR Capital Corp. or an Affiliate thereof; (c) present and former officers, directors and employees of the Warrant Issuer and Powin Energy Corporation, provided that the holders of Equity Interests in Powin Energy Corporation that otherwise constitute Permitted Holders under this clause (c) shall continue to hold, in the aggregate, at least fifty percent (50%) of the Equity Interests in Powin Energy Corporation as they own on the Effective Date; and (d) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act) of which any of the Permitted Holders under clauses (a) or (b) are members.

"**Permitted Indebtedness**" means:

(a)     Indebtedness of (i) the Borrower or any Subsidiary Guarantor owing to the Borrower or any Subsidiary Guarantor, (ii) any Subsidiary that is not a Subsidiary Guarantor owing to any other Subsidiary that is not a Subsidiary Guarantor and (iii) to the extent permitted by this Agreement, any Subsidiary that is not a Subsidiary Guarantor owing to the Borrower or any Subsidiary Guarantor;

(b)     Indebtedness incurred in connection with the issuance of letters of credit, bank guaranties, bankers' acceptances and similar obligations on behalf of the Borrower or any Subsidiary in the ordinary course of business or consistent with past practice in respect of workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or other Indebtedness with respect to reimbursement obligations regarding workers compensation claims, in each case which is not more than sixty (60) days past due or which is being contested in good faith by appropriate proceedings diligently conducted;

(c)     subject to compliance with **Section 6.6** (other than **Section 6.6(d)**), unsecured guarantees by (i) Subsidiaries in respect of Indebtedness of the Borrower or Subsidiary Guarantors that is permitted to be incurred under this Agreement and (ii) the Borrower in respect of Indebtedness of Subsidiary Guarantors that is permitted to be incurred under this Agreement; **provided** that if the Indebtedness being guaranteed under this clause (c) is subordinated to the Obligations, such guaranteed obligations shall also be subordinated to the Guaranteed Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(d)     Guarantees incurred in the ordinary course of business in respect of obligations of (or to) suppliers, customers, franchisees, lessors, licensees or sublicensees not for borrowed money;

(e)     Indebtedness (including Indebtedness arising under capital leases or purchase money obligations) incurred within 365 days of the acquisition, construction, lease, repair, replacement, expansion or improvement of fixed or capital assets to finance the acquisition, construction, lease, repair, replacement expansion, or improvement of such fixed or capital assets; **provided** that Indebtedness outstanding at any time pursuant to this clause (e) shall not exceed $5,000,0000;

(f)     Indebtedness outstanding on the date hereof listed on **Schedule 6.1**;

(g)     Indebtedness of a Person or Indebtedness attaching to the assets of a Person that, in either case, becomes a Subsidiary Guarantor (or is a Subsidiary Guarantor that survives a merger with such Person or any of its Subsidiaries) or Indebtedness attaching to the assets that are acquired by the Borrower or any Subsidiary Guarantor, in each case after the Effective Date as the result of an acquisition permitted pursuant to **Section 6.6** (and not incurred in contemplation of such acquisition);

(h)     Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds, stay bonds, customs bonds, appeal bonds and completion guarantees and similar obligations and obligations in respect of letters of credit, bank guaranties or instruments related thereto, in each case provided in the ordinary course of business or consistent with past practice or industry practice, including those incurred to secure health, safety and environmental obligations in the ordinary course of business and consistent with past practice or industry practice and not more than sixty (60) days past due; **provided** that Indebtedness outstanding at any time pursuant to this clause (h) shall not exceed $75,000,000; **provided**, **further**, to the extent that any Indebtedness incurred pursuant to this clause (h) is cash collateralized, the cash collateralized portion of such amount of Indebtedness shall not be counted in the $75,000,000 cap on Indebtedness pursuant this clause (h);

(i)  Indebtedness of the Borrower or any Subsidiary Guarantor consisting of obligations to pay insurance premiums arising in the ordinary course of business or consistent with past practice or industry practice; and

(j)  Indebtedness representing deferred compensation to employees, consultants or independent contractors of the Borrower (or, to the extent such work is done for the Borrower or its Subsidiaries, any direct or indirect parent thereof) and the Subsidiary Guarantors incurred in the ordinary course of business or consistent with past practice or Prudent Industry Practice and not more than 30 days past due.

"**Permitted Investments**" means:

(a)  Investments in Dollars;

(b)  Investments in securities issued or unconditionally guaranteed by the United States government or any agency or instrumentality thereof, in each case having maturities and/or reset dates of not more than 24 months from the date of acquisition thereof;

(c)  [reserved];

(d)  extensions of trade credit and purchases of assets and services (including purchases of inventory, supplies and materials) in the ordinary course of business and on arm's-length terms;

(e)  loans and advances to officers, directors, employees and consultants of the Borrower (or any direct or indirect parent thereof) or any of the Subsidiary Guarantors for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes (including employee payroll advances);

(f)  Investments existing or contemplated on, or made pursuant to commitments in existence or contemplated on, the Effective Date as set forth on **Schedule 6.6**;

(g)  [reserved];

(h)  Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(i)  Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices or industry practice;

(j)  advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business;

(k)  guarantee obligations of the Borrower or any Subsidiary Guarantor of leases (other than capital leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business; and

(l)  Investments held by a Person acquired (including by way of merger, amalgamation or consolidation) after the Effective Date otherwise in accordance with this **Section 6.6** to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation.

"**Permitted Liens**" means:

(a)     the rights and interests of the Collateral Agent created by this Agreement and the other Loan Documents;

(b)     Liens for any Tax, assessment or other governmental charges (i) not yet due and owing or (ii) that are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, to the extent required by GAAP, or if such Liens are secured by a bond;

(c)     materialmen's, mechanics', workers', repairmen's, employees' or other like Liens, arising in the ordinary course of business for amounts that are not overdue for a period of more than sixty (60) days or which are being contested in good faith and by appropriate proceedings diligently conducted, so long as such proceedings shall not interfere in any material respect with the normal operation or disposition of any Assets and adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, to the extent required by GAAP, or if such Liens are secured by a bond;

(d)     deposits or pledges to secure statutory obligations or performance of tenders, statutory obligations, surety, stay, customs and appeal bonds, bids, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (including letters of credit issued in lieu of such bonds or to support the issuance thereof), contracts (other than for the repayment of Indebtedness or as covered under paragraph (c) of this definition) or leases, incurred in the ordinary course of business, not to exceed $5,000,000 in the aggregate for all such items at any time; **provided** that the right to request cash collateral pursuant to the terms of any such bond shall not be deemed to create a Lien;

(e)     Liens arising out of judgements or awards for the payment of money not constituting an Event of Default under **Section 7.8,** so long as an appeal or proceeding for review is being prosecuted in good faith, and for the payment of which adequate reserves have been made in accordance with GAAP or bonds of other acceptable security have been provided or are fully covered by insurance;

(f)     minor defects, easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and encumbrances consisting of zoning restrictions, licenses, restrictions on the use of property or minor imperfections or exceptions in title which do not impair in any material respect the use of the property affected thereby for the purpose for which it was acquired;

(g)     [reserved];

(h)     [reserved];

(i)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)     leases, licenses, subleases or sublicenses granted to others constituting Permitted Dispositions and not interfering in any material respect with the business of the Borrower and the Subsidiaries taken as a whole;

(k)     Liens arising from precautionary Uniform Commercial Code financing statement or similar filings made in respect of operating leases entered into by the Borrower or any Subsidiary Guarantor;

(l)     Liens created in the ordinary course of business in favor of banks and other financial institutions over credit balances of any bank accounts, commodity trading accounts or

other brokerage accounts of the Borrower and the Subsidiary Guarantors held at such banks or financial institutions, as the case may be, in the ordinary course of business;

(m)     security given to a public utility or any municipality or governmental authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business;

(n)     any Permitted Equity Lien;

(o)     Liens securing Indebtedness permitted under clause (e) of the definition of Permitted Indebtedness; provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and (ii) the Indebtedness secured thereby does not exceed the cost or fair market value, whichever is lower, of the property being acquired on the date of acquisition; and

(p)     the Lien evidenced by UCC-1 financing statement number 20241242724 naming the Borrower as debtor and Munmorah Battery ProjectCo Pty Ltd as secured party.

With respect to assets of the Loan Parties and Collateral, in each case consisting of Equity Interests (including Pledged Ownership Collateral), only the items included in clause (a) and clause (n) shall be Permitted Liens.

"**Permitted Tax Distributions**" means without duplication, (i) in respect of any taxable period (or portion thereof) for which the Borrower or any Subsidiary is treated as a partnership, disregarded entity or other flow-through entity for U.S. federal income tax (other than a disregarded entity described in clause (ii)), distributions, directly or indirectly, to Parent Pledgor or such other direct or indirect parent of the Borrower in amounts in respect of any taxable year that shall not be greater than the amount equal to the product of (A) the sum of the amount of aggregate taxable income of Borrower or the applicable Subsidiary, as the case may be (taking into account any applicable loss carryforwards, interest carryforwards, credit carryforwards and other similar tax attributes of, or generated by, the Borrower or the applicable Subsidiary from prior periods that are available to offset such taxable income, or Taxes, of the applicable direct or indirect owner of Borrower, taking into account any applicable limitations), allocated to its equity holders for such taxable year, multiplied by (B) the highest combined marginal federal, state and local income tax rate applicable to any individual or corporation (whichever is higher) resident in New York, New York, after taking into account the character of any income, gain or loss and taking into account any basis step-ups under Section 734(b) or 743(b) of the Code, provided that, if, pursuant to Section 5.02 of the Limited Liability Company Agreement of the Warrant Issuer, as amended, the Board of the Warrant Issuer elects to adjust the Assumed Tax Rate (as defined therein) with respect to each member that is treated as an association taxable as a corporation for U.S. federal income tax purposes, to a lower effective marginal combined U.S. federal, state and local income tax rate generally applicable for such members, then the tax rate described in clause (B) shall be similarly reduced solely for purposes of taxable income of the Warrant Issuer allocable to such member (and for the avoidance of doubt, Borrower or any applicable Subsidiary shall be permitted to make such distributions for taxes on a quarterly basis during such taxable year based on its best estimate of the amounts specified in the preceding sentence); provided that the total amount of such quarterly distributions for the taxable year shall (x) be reduced by any Taxes paid directly by the Borrower or any other Subsidiary on behalf of any direct or indirect owner of the Borrower and (y) not exceed the total amount otherwise distributable in accordance with the preceding sentence with any such excess being required to offset proceeding distributions entitlement (for the avoidance of doubt, and shall not be required to be clawed back); and (ii) in respect of any taxable period for which the Borrower or any other Subsidiary is a member of a group filing a consolidated, combined affiliated or unitary income Tax return with Parent Pledgor or any other direct or indirect parent of the Borrower or for which the Borrower is a disregarded entity for U.S. federal income tax purposes that is wholly owned (directly or indirectly) by a corporation

for U.S. federal income tax purposes, distributions, directly or indirectly, to Parent Pledgor or such other direct or indirect parent of the Borrower in amounts in respect of any Tax year does not, in the aggregate, exceed the amount that the Borrower and the other Subsidiaries that are members of such consolidated, combined affiliated or unitary group would have been required to pay in respect of such Taxes in respect of such year if the Borrower and the other Subsidiaries paid such income Taxes directly on a separate company basis or as a stand-alone consolidated or combined income Tax group (reduced by any such Taxes paid directly by the Borrower or any other Subsidiary).

"**Person**" means any individual, trustee, corporation, general partnership, limited partnership, limited liability company, limited liability limited partnership, joint stock company, trust, unincorporated organization, bank, business association, firm, joint venture or Governmental Authority.

"**PIK Interest**" is defined in **Section 2.4(b)**.

"**Plan**" means any employee benefit plan as defined in Section 3(3) of ERISA that is subject to ERISA (including a Pension Plan but excluding a Multiemployer Plan) maintained, contributed to, or required to be maintained or contributed to, by any Loan Party or with respect to which any Loan Party has any liability.

"**Pledged Ownership Collateral**" is defined in **Section 9.1(a)**.

"**Pledged Ownership Interests**" is defined in **Section 9.1(a)**.

"**Pro Rata Share**" means, with respect to all payments, computations and other matters relating to the Commitment or Loans of any Lender, the percentage obtained by dividing (a) the Commitment of that Lender by (b) the Aggregate Commitment Amount. If the Commitments have terminated or expired, Pro Rata Shares shall be determined based upon the Commitments most recently in effect, giving effect to any assignments that occur thereafter.

"**Prudent Industry Practice**" means the practices, methods and acts, of which there may be more than one, and as the same may change from time to time, engaged in or approved by a significant portion of the battery storage industry in the United States during the relevant time period, which practices, methods, and acts, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been reasonably expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition. Prudent Industry Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather is intended to include prudent practices, methods, and acts generally accepted in the United States.

"**PTE**" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Qualifying IPO**" means an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8 (or any successor form)) of the common equity of the Borrower or any of its direct or indirect equity holders (or a corporate successor of any of the foregoing) pursuant to an effective registration statement filed with the United Stated Securities and Exchange Commission in accordance with the Securities Act (whether along or in conjunction with a secondary public offering).

"**Real Property**" means, with respect to any Loan Party, all estates and interests in real property owned or leased by such Loan Party.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, brokers, trustees, administrators, managers, advisors and representatives, including accountants, auditors, and legal counsel of such Person and of such Person's Affiliates.

24

"**Release**" means disposing, discharging, injecting, spilling, leaking, leaching, dumping, pumping, pouring, emitting, escaping, emptying, seeping, placing or the like, into or upon any land or water or air, or otherwise entering into the environment.

"**Required Lenders**" means, at any time, the Lender or Lenders (other than Defaulting Lenders) holding more than 50% of the sum of (a) the aggregate outstanding amount of all Loans and (b) the aggregate amount of unused Commitments; **provided** that the Commitments (and after such Commitments are terminated, the Exposure) of any Defaulting Lender will be disregarded in determining Required Lenders; **provided**, **further**, that Defaulting Lenders will be included in determining Required Lenders with respect to any amendment that would disproportionately affect the obligation of the Borrower to make any payment with respect to the Loans or Commitments of such Defaulting Lender as compared to other Lenders.

"**Reserves**" means such reserves against (x) Eligible Accounts of any Loan Party or (y) the Aggregate Borrowing Base, in either case that the Calculation Agent (acting at the direction of the Required Lenders in their Permitted Discretion) may, in each case, establish from time to time, including reserves established on account of any Liens which are (or may be) prior in right to the Lien of the Collateral Agent for the benefit of the Lenders. Notwithstanding the foregoing, the Administrative Agent shall not establish any reserves that duplicate any reserves or adjustments that have already been taken into account in determining Eligible Accounts.

"**Restricted**" means Cash or Cash Equivalents of the Borrower or any of its Subsidiaries that (i) appears (or would be required to appear) as "restricted" on a consolidated balance sheet of the Borrower or of any such Subsidiary, (ii) are subject to any Lien in favor of any Person other than the Collateral Agent for the benefit of the Lenders or (iii) are not otherwise generally available for use by the Borrower or any of its Subsidiaries.

"**S&P**" means S&P Global Ratings, a Standard & Poor's Financial Services LLC business or any successor to the rating agency business thereof.

"**Sanctioned Country**" means a country or territory that is the subject or target of comprehensive Sanctions (as of the Effective Date, including the Crimea region of Ukraine, the Donetsk People's Republic, the Luhansk People's Republic, Cuba, Iran, North Korea and Syria, as this list may be amended from time to time).

"**Sanctions**" means all economic or financial sanctions, sectoral sanctions, secondary sanctions, or trade embargoes administered or enforced by the U.S. Government (including, but not limited to, the Department of Treasury's Office of Foreign Assets Control ("**OFAC**") and the U.S. Department of State), the United Nations Security Council, the European Union, His Majesty's Treasury, or other relevant sanctions authority.

"**Sanctioned Person**" means, at any time, any Person: (i) that is designated on any list of Persons targeted by Sanctions; (ii) that is located, organized, operating from, or ordinarily resident in, a Sanctioned Country; (iii) that is the target or subject of Sanctions due to any direct or indirect relationship of ownership, control, or agency with, a Person described in (i) or (ii); or (iv) that is otherwise the target or subject of any Sanctions

"**Scheduled Maturity Date**" means October 1, 2027.

"**Security Documents**" means this Agreement and each Account Control Agreement.

"**Single Customer Concentration Limit**" means, as of any date of determination, thirty-three percent (33%) of the aggregate of all Accounts included in the Aggregate Borrowing Base as of such date; **provided** that, if there are three (3) or fewer Accounts included in the Aggregate Borrowing Base at such time, the "Single Customer Concentration Limit" shall be the greater of (a) $45,000,000 and (b) thirty-three percent (33%) of the aggregate of all Accounts included in the Aggregate Borrowing Base as of such date.

"**Software**" means all computer programs, object code, source code and supporting documentation, including, without limitation, "software" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York and computer programs that may be construed as included in the definition of "goods" in the Uniform Commercial Code as in effect on the date hereof in the State of New York, including any licensed rights to Software, and all media that may contain Software or recorded data of any kind.

"**Subsidiary**" means with respect to any Person, any corporation, partnership, limited liability company, joint venture, trust or estate of or in which more than fifty percent (50%) of (i) the issued and outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time capital stock of any other class of such corporation may have voting power upon the happening of a contingency), (ii) the interest in the capital or profits of such partnership, limited liability company, or joint venture or (iii) the beneficial interest in such trust or estate, in each case, is at the time directly or indirectly owned or controlled through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" has the meaning set forth in the preamble to this Agreement; provided, for the avoidance of doubt, no Excluded Subsidiary shall be required to be a Subsidiary Guarantor.

"**Supplement**" means any and all extensions, renewals, modifications, amendments, restatements, consents, supplements and substitutions.

"**Tax Return**" means any return, report, statement, form or other documentation (including any additional or supporting material and any amendments or supplements) filed, or required to be filed, with respect to Taxes.

"**Taxes**" means any and all present or future taxes, levies, imposts, duties, deductions, assessments, fees or, withholdings (including backup withholding) or other charges, in each case in the nature of a tax, imposed by any Governmental Authority, together with any interest, additions to tax or penalties applicable thereto.

"**Termination Date**" means the date on which (a) all Commitments have been terminated, (b) all outstanding Loans have been terminated or fully utilized and (c) all amounts payable in respect of the Obligations (including any principal and interest on the Loans, all fees and other expenses) have been paid in full in cash (other than contingent obligations that survive the termination of this Agreement).

"**Total Utilization of Commitments**" means, as of any date of determination, the aggregate principal amount of all outstanding Loans.

"**Trademarks**" means, collectively, (a) all trade names, trademarks and service marks, logos, domain names, trademark and service mark registrations and applications for trademark and service mark registrations, (b) all renewals and extensions of any of the foregoing and (c) all rights, now existing or hereafter coming into existence otherwise accruing under or pertaining to any of the foregoing throughout the world, together, in each case, with the product lines and goodwill of the business connected with the use of, or otherwise symbolized by, each such trade name, trademark and service mark.

"**Trilantic**" means any Affiliate, fund, entity or investment vehicle directly or indirectly advised, managed or controlled by Trilantic Capital Management L.P. or Greenbelt Capital Management L.P.

"**UCC**" means the Uniform Commercial Code as in effect in the applicable state of jurisdiction.

"**Unrestricted Cash**" means Cash or Cash Equivalents of the Borrower and its Subsidiaries that is not Restricted.

"**USCO**" means the United States Copyright Office.

"**USPTO**" means the United States Patent and Trademark Office.

"**Warrant Agreement**" is defined in **Section 2.6(k)**.

"**Warrant Holders**" means each of Forethought Life Insurance Company, Commonwealth Annuity and Life Insurance Company, First Allmerica Financial Life Insurance Company, FS KKR Capital Corp., KKR FS Income Trust, KKR FS Income Trust Select or any designee of the foregoing to whom the foregoing would be permitted to transfer the Warrant pursuant to Section 1 of the Warrant as if each of the foregoing was an original holder under the form of Warrant attached hereto as **Exhibit G**.

"**Warrant Issuer**" means Powin Energy Holdings, LLC.

"**Warrants**" means (i) each of the Series A Preferred Unit Purchase Warrants in respect of the Series A Preferred Units of Warrant Issuer the form attached as **Exhibit G** hereto and (ii) each of the Class A Common Unit Purchase Warrants in respect of the Class A Common Units of Warrant Issuer in the form attached as **Exhibit G** hereto and, in each case, issued to the Warrant Holders within the time period set forth on **Schedule 5.14**.

"**Withholding Agent**" means the Borrower, any Loan Party and the Administrative Agent.

1.2    **Accounting Terms and Determinations**. Except as otherwise expressly provided herein, all accounting terms used herein shall be interpreted, and all financial statements and certificates and reports as to financial matters required to be delivered to the Lenders hereunder shall be prepared in accordance with GAAP, in each case, applied on a basis consistent with that used in the preparation of the latest financial statements furnished to the Lenders hereunder.

1.3    **Rules of Interpretation**.

(a)    The singular includes the plural and the plural includes the singular.

(b)    The word "or" is not exclusive.

(c)    A reference to any Applicable Law includes any amendment or modification to such Applicable Law, and all regulations, rulings and other Applicable Laws promulgated under such Applicable Law.

(d)    A reference to a Person includes its successors and permitted assigns.

(e)    Accounting terms have the meanings assigned to them by GAAP, as applied by the accounting entity to which they refer.

(f)    The words "include," "includes" and "including" are not limiting.

(g)    A reference in a document to an Article, Section, Exhibit, Schedule, Annex or Appendix is to the Article, Section, Exhibit, Schedule, Annex or Appendix of such document unless otherwise indicated. Exhibits, Schedules, Annexes or Appendices to any document shall be deemed incorporated by reference in such document.

(h)    References to or definitions of any document, instrument or agreement (i) shall include all exhibits, schedules and other attachments thereto, (ii) shall include all documents, instruments or agreements issued or executed in replacement thereof, and (iii) shall mean such document, instrument or agreement, or replacement or predecessor thereto,

as amended, modified and supplemented from time to time (to the extent permitted under the Loan Documents) and in effect at any given time.

(i)     The words "hereof," "herein" and "hereunder" and words of similar import when used in any document shall refer to such document as a whole and not to any particular provision of such document.

(j)     References to "days" shall mean calendar days, unless the term "Business Days" shall be used. References to a time of day shall mean such time in New York City, New York, unless otherwise specified.

(k)     The Loan Documents are the result of negotiations between, and have been reviewed by the Loan Parties, the Agents, the Lenders and their respective counsel. Accordingly, the Loan Documents shall be deemed to be the product of all parties thereto, and no ambiguity shall be construed in favor of or against any of the Loan Parties, the Agents or the Lenders.

(l)     The words "will" and "shall" shall be construed to have the same meaning and effect.

(m)     The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(n)     The term "Lender" or "Lenders" shall include all Lenders, unless otherwise expressly indicated or unless the context otherwise requires.

1.4     **Divisions**. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

## 2.     The Loans.

2.1     **The Loans**. During the Commitment Period, subject to the terms and conditions of this Agreement and relying upon the representations and warranties herein set forth, each Lender severally, but not jointly, agrees to advance to the Borrower, in accordance with its respective Commitment, from time to time, loans in an amount not to exceed such Lender's Commitment (the "**Loans**"); **provided** that, after giving effect to the making of any Loans, in no event shall the Total Utilization of Commitments exceed the lesser of (i) the Aggregate Commitment Amount then in effect and (ii) the Aggregate Borrowing Base then in effect. Amounts borrowed pursuant to this **Section 2.1** may be repaid and, subject to the terms and conditions of this Agreement, reborrowed during the Commitment Period. Each Lender's Commitment shall expire on the Commitment Termination Date.

2.2     **Loan Disbursement Procedures**.

(a)     **Minimum Amount**. Loans shall be in an aggregate minimum of $1,000,000 and integral multiples of $100,000 in excess of that amount.

(b)     **Draw Request**. Other than the initial Draw Request (as defined below), which can occur simultaneously with the Effective Date, not later than 1:00 p.m. at least five (5) Business Days (or such shorter period acceptable to the Administrative Agent (acting at the direction of the Required Lenders)) prior to any borrowing, the Borrower shall submit to the Administrative Agent and the Calculation Agent a draw request in the

28

form of **Exhibit A** attached hereto (the "**Draw Request**"); **provided** that the Borrower will not deliver Draw Requests requesting more than two disbursements of Loans in any calendar month; **provided further** that a Draw Request may only request a borrowing of Loans to be disbursed on a Payment Date or on the last Business Day of any calendar month (except that, no more than twice in any calendar year, the Borrower may request a borrowing of Loans to occur on a date that is not a Payment Date or the last Business Day of a calendar month) (any such date that Loans are requested to be disbursed, a "**Funding Date**"). Following receipt of a Draw Request, the Calculation Agent shall review the same, together with the corresponding Borrowing Base Certificate and accompanying materials, and notify the Administrative Agent and the Lenders (no later than one (1) Business Day prior to the requested Funding Date) of the Aggregate Borrowing Base and Excess Availability and the amount of Loans which may be requested by the Borrower or which must be prepaid by the Borrower (as applicable) on the applicable Funding Date. The Administrative Agent shall promptly provide notice of receipt of each Draw Request, together with the amount of each Lender's Pro Rata Share of the Loans requested, to each Lender. Each Lender shall make a disbursement of its Pro Rata Share of each Loan to the Administrative Agent not later than 1:00 p.m. on the applicable Credit Date, and the Administrative Agent shall then promptly deposit the proceeds of any such Loan into the Core Controlled Account.

(c)     **Core Controlled Account**.

(i)     All Loans funded hereunder shall be disbursed into the Core Controlled Account. The Borrower may from time to time withdraw amounts from the Core Controlled Account for the purposes specified in **Section 5.7**; **provided** that at the time of such withdrawal the Total Utilization of Commitments shall not exceed the lesser of (A) the Aggregate Commitment Amount and (B) the Aggregate Borrowing Base then in effect.

(ii)    On each Payment Date, the Borrower shall ensure that all cash on deposit in the Core Controlled Account is applied to satisfy the Obligations to the extent prepayment of the Obligations is required on such Payment Date pursuant to **Section 2.3(c)(i)** (it being understood and agreed that (x) interest on the Loans shall be paid in kind to the extent provided in **Section 2.4** and (y) the Borrower may request a disbursement of Loans on any Payment Date if, after giving effect to the sweep of cash from the Core Controlled Account as provided in this clause (ii), the Borrower would be permitted to request a disbursement of Loans in accordance with **Section 2.2**).

2.3     **Repayments, Prepayments and Commitment Reductions.**

(a)     **Repayment on the Maturity Date**. The Borrower shall repay to each Lender its Pro Rata Share of all unpaid principal amount of all Loans on the Maturity Date.

(b)     **Optional Prepayments**. From time to time on any Business Day, the Borrower may make a voluntary prepayment, in whole or in part, of the outstanding principal amount of the Loans by submitting at least three (3) Business Days' (or such shorter period acceptable to the Administrative Agent (acting at the direction of the Required Lenders)) prior written notice to the Administrative Agent before 11:00 a.m. in the form of **Exhibit C**. All partial prepayments of any Loans pursuant to this clause (b) shall be in an aggregate minimum amount of $1,000,000.

(c)     **Mandatory Prepayments**.

(i)     The Borrower shall, on each Payment Date, immediately prepay the Loans to the extent necessary so that the Total Utilization of Commitments shall not at

any time exceed the lesser of (x) the Aggregate Commitment Amount then in effect and (y) the Aggregate Borrowing Base then in effect; **provided** that, to the extent that the Aggregate Commitment Amount is reduced pursuant to **Section 2.3(d)(ii)**, the Borrower shall not be required to repay the Total Utilization of Commitments by the amount that the Total Utilization of Commitments exceeds the Aggregate Commitment Amount until such time as the Aggregate Borrowing Base is determined to be less than the Total Utilization of Commitments.

(ii)   Following the end of the Commitment Period, all cash on deposit or that is subsequently deposited into the Core Controlled Account shall be promptly (and in any event within two (2) Business Days) applied by the Borrower to repay the outstanding Loans.

(iii)   If on any date the Borrower receives Casualty Insurance Proceeds in respect of Eligible Equipment, 100% of the net proceeds therefrom shall be applied no later than two (2) Business Days following receipt of such net proceeds to prepay the Loans as set forth in **Section 2.3(e)**.

(iv)   The Borrower shall make a mandatory prepayment of the Loans no later than the date (if any) required pursuant to **Section 2.3(d)(ii)** or **Section 2.3(d)(iii)**.

(d)   **Commitment Reductions**.

(i)   The Borrower may, upon not less than three (3) Business Days (or such shorter period acceptable to the Administrative Agent (acting at the direction of the Required Lenders)) prior written notice to the Administrative Agent before 11:00 a.m., at any time and from time to time permanently reduce the Aggregate Commitment Amount, in whole or in part, up to the amount by which the Aggregate Commitment Amount exceeds the Total Utilization of Commitments at the time of such proposed termination or reduction; **provided** that any such partial reduction of the Aggregate Commitment Amount shall be in a minimum amount of $1,000,000 and integral multiples of $100,000 in excess of that amount.

(ii)   No later than thirty (30) days following each anniversary of the Effective Date, the Borrower shall determine whether the Total Utilization of Commitments did not exceed $100,000,000 for at least thirty-five (35) consecutive calendar days at any point during the prior twelve (12) month period ended upon such anniversary.  If the Total Utilization of Commitments did not exceed $100,000,000 for at least thirty-five (35) consecutive calendar days during such twelve month period, then the Aggregate Commitment Amount will be permanently reduced to $100,000,000; **provided** that if at the time of such reduction, the Total Utilization of Commitments exceeds $100,000,000, then the Borrower (A) shall not be required to repay the Total Utilization of Commitments by the amount of such excess until such time as it is otherwise required to do so pursuant to **Section 2.3(c)(i)**, and (B) will not be able to borrow additional Loans until the Total Utilization of Commitments falls below $100,000,000.

(iii)   No later than thirty (30) days following each anniversary of the Effective Date, the Borrower shall determine whether the Total Utilization of Commitments did not exceed $50,000,000 for at least thirty (30) calendar days at any point during the prior twelve (12) month period ended upon such anniversary.  If the Total Utilization of Commitments did not exceed $50,000,000 for at least thirty-five (35) consecutive calendar days during such twelve month period, then the unpaid principal amount of the Loan, together with accrued and unpaid

interest thereon and all other Obligations then outstanding shall be due and payable thirty (30) days after the end of such twelve month period by the Borrower to the Lenders and the Commitments shall automatically be terminated in full.

(e)    **Application of Prepayments**. Each prepayment of Loans shall be applied *first* to all fees, costs and expenses, including reasonable and documented attorneys' fees, incurred by the Lenders or the Agents and then due and payable, *second* to interest to be paid on the amount of the Loan that is subject to such prepayment, and *third* on a pro rata basis, to the outstanding principal amount thereof (including, for the avoidance of doubt, PIK Interest). The Borrower shall make all such payments to each Lender on a pro rata basis based on the unpaid principal amount of Loans held by such Lender (other than any such payments referenced in clause *first*, which shall be paid to the applicable Agents and Lenders).

**2.4     Interest and Fee Provisions.**

(a)    Subject to the terms and conditions of this Agreement, interest shall accrue on the outstanding principal balance of the Loans at a rate equal to the Applicable Interest Rate.

(b)    Accrued interest on the Loans shall be payable in arrears on each Payment Date and the Maturity Date; **provided** that prior to the Maturity Date, unless Excess Cash on such Payment Date exceeds $50,000,000, accrued interest shall be capitalized on each Payment Date (any such capitalized interest, "**PIK Interest**"). If Excess Cash exceeds $50,000,000 on any Payment Date, (i) fifty percent (50%) of the amount of accrued interest on the Loans shall be payable in cash on such date and (ii) and fifty percent (50%) of the amount of accrued interest on the Loans shall be capitalized on such date. In the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable in cash on the date of such repayment or prepayment.

(c)    Interest and fees shall be calculated on the basis of a year of 360 days for the actual number of days elapsed during the period for which interest is calculated. Interest shall be so calculated with respect to each day during such period by multiplying the outstanding principal balance of the Loan on such day at the close of business on such day by a daily interest factor, which interest factor shall be calculated by dividing the interest rate per annum in effect on such day with respect to such Loan by 360.

(d)    After the date any Obligation is due and payable (whether on any Maturity Date, upon acceleration or otherwise), or after any other monetary obligation hereunder shall have become due and payable (in each case without regard to any applicable grace periods), the Borrower shall pay, but only to the extent permitted by Applicable Law, interest (after as well as before judgment) on such amounts that are overdue at the Default Rate.

(e)    Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by Applicable Law (the "**Maximum Rate**"). If any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loan or if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by any Lender exceeds the Maximum Rate, such Lender may, to the extent permitted by Applicable Law, (i) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (ii) exclude voluntary prepayments and the effects thereof, and (iii) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

31

(f)     The Borrower agrees to pay to the Lenders a fee (the "**Commitment Fee**") equal to, for any period, (i) the average for such period of the daily difference between (x) the Aggregate Commitment Amount and (y) the aggregate principal amount of outstanding Loans multiplied by (ii) 1.50% per annum.  The Commitment Fee shall be paid to the Administrative Agent monthly on each Payment Date, commencing with the first such date to occur after the Effective Date, and on the Commitment Termination Date.  The Administrative Agent shall promptly distribute such Commitment Fee after receipt thereof to each Lender in accordance with its Pro Rata Share.

(g)     The Borrower agrees to pay to the Agents, the Calculation Agent and the Lenders such other fees in the amounts and at the times separately agreed upon (including, without limitation, pursuant to the Effective Date Fee Letters and pursuant to any fee letter entered into with a Calculation Agent appointed by the Required Lenders after the Effective Date).

**2.5**     **Promissory Notes**. The obligation of the Borrower to repay the Loans made by the Lenders and to pay interest thereon at the rates provided herein, if requested by any Lender, shall be evidenced by promissory notes in the form of **Exhibit B** (the "**Notes**"), payable to such Lender and in the aggregate principal amount of such Lender's Commitment. The Borrower authorizes each Lender to record on the schedule annexed to such Note the date and amount of each Loan made by such Lender and each payment or prepayment of principal thereunder; **provided** that neither the failure to make any such notation nor any error in such notation shall affect the Borrower's obligations to repay the full unpaid principal amount of the Loans or the other obligations of the Borrower hereunder or under the Notes. The Borrower further authorizes each Lender to attach to and make a part of the Notes continuations of the schedule attached thereto as necessary.

**2.6**     **Taxes**.

(a)     Any and all payments by or on account of any obligation of the Borrower under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by Applicable Laws. If Applicable Laws (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Taxes from any payments by a Withholding Agent, then: (i) if such Tax is an Indemnified Tax, the amount payable by the Borrower shall be increased as necessary so that after all such required deductions or withholdings have been made for such Indemnified Taxes (including deductions or withholdings applicable to additional amounts payable under this **Section 2.6**), the applicable Agent or Lender receives an amount equal to the amount it would have received had no such deduction or withholding for such Indemnified Taxes been made, and (ii) the applicable Withholding Agent shall be entitled to make such deductions or withholdings and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Laws.

(b)     The Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with Applicable Laws, or at the option of the Administrative Agent or any applicable Lender timely reimburse the Administrative Agent or such Lender for its payment of any Other Taxes.

(c)     The Borrower shall indemnify each Agent and Lender, within thirty (30) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed on or attributable to amounts payable under this **Section 2.6**) paid or payable by any Agent or Lender or required to be withheld or deducted from a payment to any Agent or Lender, together with any reasonable and documented expenses arising therefrom or with respect thereto, other than any penalties determined by a final and non-appealable judgment of a court of competent jurisdiction (or documented in any

settlement agreement) to have resulted from the gross negligence, bad faith or willful misconduct of the Administrative Agent or such Lender, and in each case, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by any Lender shall be conclusive absent manifest error.

(d)     Each Lender hereby agrees to severally indemnify each Agent, within thirty (30) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Agents for such Indemnified Taxes and without limiting the obligations of the Borrower to do so), and (ii) any Excluded Taxes attributable to such Lender, in each case that are payable or paid by such Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A notice as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.

(e)     As soon as practicable after any payment of Indemnified Taxes by the Borrower to a Governmental Authority pursuant to this **Section 2.6**, the Borrower shall deliver to the Administrative Agent the original or certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the relevant return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments under this Agreement, shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Applicable Laws or reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding Tax or at a reduced rate of withholding Tax. In addition, each Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Laws or requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements and to enable the Borrower to comply with such requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation shall not be required if in any Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender. Without limiting the generality of the foregoing, each Lender shall deliver to the Borrower on or prior to the Effective Date (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of the U.S. Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax. For avoidance of doubt, if any Lender is a disregarded entity for U.S. federal Tax purposes, its direct or indirect owners, as applicable, shall provide such a properly completed U.S. Internal Revenue Service Form W-9 establishing that payments made by the Borrower to such Lender under any Loan Documents are exempt from U.S. federal backup withholding Tax.

(g)     If a payment made by the Borrower to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower at the time or times prescribed by Applicable Laws and at such

33

time or times reasonably requested by the Borrower such documentation prescribed by Applicable Laws (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with its obligations under FATCA and to determine that such Lender has complied with its Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this **Section 2.6(e),** "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)    If any Lender requests compensation under **Section 2.7,** or requires the Borrower to pay any Indemnified Taxes or additional amounts to such Lender or any Governmental Authority for the account of such Lender pursuant to this **Section 2.6,** then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking the Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to **Sections 2.6** or **2.7,** as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(i)    If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this **Section 2.6** (including by the payment of additional amounts pursuant to this **Section 2.6**), it shall pay promptly to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this **Section 2.6** with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid pursuant to this paragraph (i) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (i), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (i) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(j)    Each party's obligations under this **Section 2.6** shall survive any replacement or assignment of rights by any Lender and the repayment, discharge or satisfaction of all obligations under any Loan Document or the expiration or termination of this Agreement.

(k)    For U.S. federal (and applicable state and local) income tax purposes, the Borrower and the Lender agree to treat (i) the Loan as "debt," (ii) any warrants issued pursuant to that certain Series A Preferred Unit Purchase Warrant Agreement or Class A Common Unit Purchase Warrant Agreement, in each case in the form attached as **Exhibit G** hereto, respectively, and entered into among the Warrant Issuer and Warrant Holders within the time period set forth on **Schedule 5.14** (collectively, the "**Warrant**

**Agreements**") that are Tax Equity Warrants (as defined in the Warrant Agreements) as equity of the Warrant Issuer as of the issuance date, (iii) any warrants issued pursuant to the Warrant Agreements that are Tax Option Warrants (as defined in the Warrant Agreements) as a noncompensatory option of the Warrant Issuer, pursuant to Treasury Regulations Section 1.721-2 and (iv) the Loan, the Tax Equity Warrants and Tax Option Warrants as having been issued as an "investment unit" under Section 1.1273-2(h) of the U.S. Treasury Regulations and shall allocate the issue price of the investment unit between the Loan, the Tax Equity Warrants and the Tax Option Warrants as provided for in the Warrant Agreements. The Borrower and the Lender agree not to take any action or position contrary thereto unless required pursuant to a determination (as defined in Section 1313(a) of the Code or any similar provision of other applicable Tax law).

**2.7**    **Recovery of Additional Costs.**

(a)      **Change in Law**. If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan insurance charge, or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)     subject any Agent or Lender to any Taxes (other than Indemnified Taxes and Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Agent or Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or the Loan made by any Lender;

and the result of any of the foregoing shall be to demonstrably increase the cost to such Lender of making, converting to, continuing or maintaining the Loans made by it or of maintaining its obligation to make Loans, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered that is directly related to the Loan as demonstrated by such Lender; **provided** that such Lender has made reasonable efforts to mitigate any such increase in cost and such increase in cost is not the result of any change to such Lender's business; and **provided further** upon delivery of a notice demanding compensation under this **Section 2.7(a),** the Borrower shall be entitled to prepay the Loans and terminate the Commitment of such Lender in full without penalty.

(b)      **Capital Requirements**. If, as a consequence of this Agreement, any Lender demonstrates that any Change in Law affecting such Lender regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered that is directly related to the Loan; **provided** that such Lender has made reasonable efforts to mitigate any such reduction of return and such reduction in return is not the result of any change to such Lender's business; and **provided further** upon delivery of a notice demanding compensation under this **Section 2.7(b),** the Borrower shall be entitled to prepay the Loans and terminate the Commitment of such Lender in full without penalty.

35

(c)  **Certificates for Reimbursement**. A certificate of the Administrative Agent or any Lender setting forth the amount or amounts necessary to compensate the Administrative Agent or such Lender or its holding company, as the case may be, and a calculation or other demonstration of how such amounts were determined, as specified in paragraph (a) or (b) of this **Section 2.7** and delivered to the Borrower, shall be conclusive absent manifest error. The Borrower shall pay the Administrative Agent or such Lender, as the case may be, the amount shown as due on any such certificate within ten (10) Business Days after receipt thereof.

(d)  **Delay in Requests**. Failure or delay on the part of any Lender to demand compensation pursuant to this **Section 2.7** shall not constitute a waiver of such Lender's right to demand such compensation; **provided** that the Borrower shall not be required to compensate a Lender pursuant to this **Section 2.7** for any increased costs incurred or reductions suffered more than six (6) months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

2.8    **Payment Terms**. Without limiting **Sections 2.6** and **2.7** and except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made by the Borrower to the applicable Lender. All payments shall be made in Dollars free and clear of and without condition or deduction for any counterclaim, defense, recoupment or setoff not later than 12:00 p.m. New York, New York time on the date due in same day or immediately available funds. Funds received after that time may be deemed to have been received on the next succeeding Business Day at the receiving Lender's sole discretion.

2.9    **Defaulting Lenders**.

(a)  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by Applicable Laws:

(i)  **Waivers and Amendments.**  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders".

(ii)  **Reallocation of Payments.**  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to **Section 8.1** or otherwise), shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent and the Collateral Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing trust or deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to any Loan Party as a

result of any judgment of a court of competent jurisdiction obtained by any Loan Party against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and sixth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction.

(iii)   **Certain Fees.** That Defaulting Lender shall not be entitled to receive or accrue any Commitment Fee pursuant to **Section 2.4(f)** for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)   If the Borrower and the Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded on a pro rata basis by the Lenders in accordance with their Pro Rata Share, whereupon that Lender will cease to be a Defaulting Lender; **provided** that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and **provided**, **further**, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(c)   The rights and remedies against a Defaulting lender under this **Section 2.09** are in addition to other rights and remedies which the Loan Parties, the Administrative Agent and the Lenders may have against such Defaulting Lender.

**2.10**   **Sharing of Payments**.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (x) notify the Administrative Agent of such fact, and (y) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; **provided** that:

(a)   if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(b)   the provisions of this **Section 2.10** shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or Commitments to any assignee or participant.

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Loan Party rights of setoff and counterclaim with

respect to such participation as fully as if such Lender were a direct creditor of each Loan Party in the amount of such participation.

## 3.    Conditions Precedent.

**3.1**    **Conditions Precedent to Effective Date**. The occurrence of the Effective Date and the obligation of each Lender to make its Pro Rata Share of the Loans are subject to the prior satisfaction of each of the following conditions, each in form and substance satisfactory to each Lender, unless waived by the Administrative Agent and each Lender in writing:

(a)    **Draw Request**. The Administrative Agent shall have received a Draw Request in respect of the Loans requested to be disbursed on the Effective Date (if any), duly executed and delivered by the Borrower in accordance with **Section 2.2(a)**.

(b)    **Loan Documents**. The Lenders shall have received the Loan Documents, duly executed and delivered by the other Parties.

(c)    **Corporate Documents**. The Lenders shall have received a certificate of each Loan Party, dated as of the Effective Date and executed by an Authorized Officer thereof certifying:

(i)    that attached to such certificate is a true and complete copy of the Organizational Documents of such Person, as in effect on the date of such certificate and certified as of a recent date by the Secretary of State of State of Delaware or such other equivalent Governmental Authority; that attached to such certificate is a true and complete copy of a certificate as to the good standing (where available) of, and payment of franchise taxes by, such Person from the Secretary of State of the State of Delaware or such other equivalent Governmental Authority, and from the Secretary of State or other equivalent Governmental Authority of each material jurisdiction in which such Person is qualified as a foreign corporation or other entity to do business, in each case, dated as of a no greater than thirty (30) days prior to the Effective Date (or such earlier date acceptable to the Lenders); that attached to such certificate is a true and complete copy of resolutions duly adopted by the board, members or managing member, as applicable, of such Person, authorizing the execution, delivery and performance of the Loan Documents to which such Person is or is intended to be a party and such other acts and things necessary for the consummation of the transactions contemplated by the Loan Documents to which such Person is or is intended to be a party and that such resolutions have not been modified, rescinded or amended and are in full force and effect; as to the incumbency and specimen signature of each officer, member, manager or partner (as applicable) of such Person executing the Loan Documents to which such Person is or is intended to be a party and each other document to be delivered by such Person from time to time pursuant to the terms hereof or thereof; and as to the absence of any Bankruptcy Event for such Person.

(ii)    **Closing Certificate**. The Lenders shall have received a certificate of an Authorized Officer of the Borrower certifying the conditions set forth in paragraphs (k) and (l) shall have been satisfied.

(d)    **Legal Opinions**. The Lenders shall have received favorable written opinions, addressed to each Agent and Lender and dated the Effective Date, of (i) Kirkland & Ellis LLP, counsel for the Loan Parties covering such New York law, Delaware law and UCC matters and other matters relating to the Loan Parties, the Loan Documents or the transactions contemplated thereby as any Lender shall reasonably request and (ii) Miller Nash LLP, counsel for the Loan Parties covering such Oregon law and UCC

matters and other matters relating to the Loan Parties, the Loan Documents and the transactions contemplated thereby as any Lender shall reasonably request.

(e) **Security Interest; Lien Searches**.

    (i) The Lenders shall have received an Account Control Agreement with respect to each deposit account and securities account of each Loan Party (including, without limitation, the Core Controlled Account and excluding, for the avoidance of doubt, each Excluded Account) duly executed by all parties thereto.

    (ii) The Collateral Agent shall have received all Pledged Ownership Interests, together with all certificates, instruments, transfer powers and other items required to be delivered in connection therewith pursuant to **Sections 9.6(a)(i)** and **(ii)**.

    (iii) Each Filing Statement and other document required by this Agreement or under Applicable Law to be filed, registered or recorded in order to create in favor of the Collateral Agent, a perfected first priority lien on the Collateral, prior and superior in right to any other Person, shall have been filed, registered or recorded or shall have been delivered to the Collateral Agent in proper form for filing, registration or recordation.

    (iv) One or more Intellectual Property security agreements in form and substance satisfactory to the Collateral Agent and the Lenders containing a description of all Collateral consisting of Patents (and Patents for which registration applications are pending), Trademarks (and Trademarks for which United States registration applications are pending) and Copyrights (each, an "**Intellectual Property Security Agreement**"), shall have been executed and delivered by each applicable Loan Party and shall have been filed with the USPTO (in the case of Patents and Trademarks) and the USCO (in the case of Copyrights).

    (v) All other actions contemplated or required to be taken pursuant to **Section 9.6** to create in favor of the Collateral Agent, a perfected first priority lien on any Collateral other than bank accounts or any property in respect of which a security interest may not be perfected by filing a Filing Statement shall have been taken.

    (vi) The Lenders shall have received the results of a recent lien search in each of the jurisdictions in which UCC financing statements or other filings or recordations should be made to evidence or perfect security interests in the Collateral, and each such search shall reveal no Liens on any of the Collateral, other than applicable Permitted Liens.

(f) **Insurance**. The Borrower shall have delivered to the Lenders at least five (5) days prior to the Effective Date evidence of the existence of insurance required to be maintained pursuant to **Section 5.8**.

(g) **Financial Statements**. The Lenders shall have received the most recently available quarterly unaudited and audited annual consolidated balance sheets of the Borrower and each of its Subsidiaries (taken as a whole) and related consolidated statements of income, stockholders' equity and cash flows of the Borrower and each of its Subsidiaries (taken as a whole) for the applicable most recent periods, all of which shall have been prepared in accordance with GAAP.

(h) **Due Diligence**. The Lenders shall have completed an economic, commercial, financial, legal, environmental, regulatory, accounting and tax due diligence review of the Borrower and its Subsidiaries, with results reasonably satisfactory to each Lender.

(i) **[Reserved]**.

(j) **Know Your Client**. The Lenders and Administrative Agent shall have received all such documentation and information requested by them that is necessary (including the names and addresses of each Loan Party and documents and copies of government-issued identification of such Loan Party) for each Lender to identify each Loan Party in accordance with the requirements of all applicable "know your customer" and similar laws and regulations thereunder (including, without limitation, the PATRIOT Act). Without limitation of the foregoing, at least three (3) Business Days prior to the Effective Date, if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, then the Borrower shall have delivered to the Administrative Agent and the Lenders a certification in relation to the Borrower regarding individual beneficial ownership solely to the extent required by the Beneficial Ownership Regulation.

(k) **Representations and Warranties**. The representations and warranties set forth in **Section 4** and in the other Loan Documents shall be true and correct in all material respects (other than representations and warranties which are already qualified as to materiality, which shall be true and correct in all respects) as of the Effective Date, before and immediately after giving effect to the Loan requested to be made on the Effective Date (if any), except for representations and warranties that expressly refer to an earlier date which shall be true and correct as of such earlier date.

(l) **Absence of Default**. As of the Effective Date, no event shall have occurred and be continuing or would result from the making of the Loans on the Effective Date (if any) that would constitute a Default or an Event of Default.

(m) **Fees**. Each Agent and Lender shall have received payment of all fees and other amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower pursuant to the Loan Documents.

(n) **Borrowing Base Certificate**. The Lenders and the Calculation Agent shall have received a Borrowing Base Certificate and a Payment Date Report as of the Effective Date.

(o) **Solvency**. The Lenders shall have received a certificate from the chief financial officer (or equivalent officer) of the Borrower certifying as to the solvency of the Borrower and its Subsidiaries, in form and substance reasonably satisfactory to the Lenders.

3.2 **Conditions Precedent to Each Credit Extension**. The obligation of each Lender to make any Loan on any Credit Date are subject to the prior satisfaction, or waiver in accordance with **Section 11.1**, of the following conditions precedent:

(a) **Draw Request**. The Administrative Agent shall have received a Draw Request in respect of the Loans requested to be disbursed, duly executed and delivered by the Borrower in accordance with **Section 2.2(a)**.

(b) **Utilization of Commitments**. After making the Credit Extensions requested on such Credit Date, the Total Utilization of Commitments shall not exceed the lesser of (x) the Aggregate Commitment Amount then in effect and (y) the Aggregate Borrowing Base then in effect.

(c)     **Representations and Warranties**.  At the time of, and immediately after giving effect to, the applicable Credit Extension, the representations and warranties set forth in **Section 4** and in the other Loan Documents shall be true and correct in all material respects (other than representations and warranties which are already qualified as to materiality, which shall be true and correct in all respects) as of the applicable Credit Date, before and immediately after giving effect to the Loan requested to be made on the Credit Date, except for representations and warranties that expressly refer to an earlier date which shall be true and correct as of such earlier date.

(d)     **Absence of Default**.  As of such Credit Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Credit Extension that would constitute a Default or an Event of Default.

## 4.     Representations and Warranties.

Each Loan Party (as to itself and each of its Subsidiaries) represents and warrants to each Agent and Lender that the following statements are true, correct and complete, as of the Effective Date:

**4.1     Organization, Authority, Validity and Non-Contravention.**

(a)     Each of Parent Pledgor, the Borrower and its Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as it is currently conducted and to own, lease and operate its Assets where such Assets are now owned, leased or operated and is duly qualified or licensed to do business in and is in good standing in each jurisdiction in which its ownership of property or the character of its business requires such qualification, license or standing, except, in each case (other than with respect to the Borrower and Parent Pledgor), where the failure to maintain such qualification, license or standing would not reasonably be expected to result in a Material Adverse Effect.

(b)     Each Loan Party has all requisite power and authority to execute and deliver this Agreement and each other Loan Document to which it is a party and to perform its obligations hereunder and thereunder. The execution, delivery and performance by each Loan Party of this Agreement and each other Loan Document to which it is party have been duly authorized by all necessary corporate or limited liability company action, as applicable, on the part of such Loan Party.

(c)     This Agreement and each other Loan Document to which it is a party has been duly executed and delivered by such Person and constitutes the legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights and subject to general equitable principles.

(d)     None of the execution and delivery by any Loan Party of this Agreement or any other Loan Document to which it is party nor the performance of the obligations of any Loan Party hereunder or thereunder, will (i) require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other Person, except such as have been obtained or made and are in full force and effect, (ii) conflict with or result in any violation or breach of or default under (or constitute an event that, with notice or lapse of time or both, would constitute a default under) or give rise to a right of termination, cancellation, modification or acceleration of any obligation, to any put or call or similar rights, or to loss of a benefit under, any provision of the Organizational Documents of such Person, (iii) result in any violation or breach of or default under (or constitute an event that, with notice or lapse of time or both, would

constitute a default under) or give rise to a right of termination, cancellation, modification, acceleration or payment of any obligation, to any put or call or similar rights, or to loss of a benefit under any indenture, material agreement or other material instrument binding upon any such Person, (iv) result in the imposition or creation of any Lien, other than Permitted Liens described in the last sentence of the definition thereof, upon or with respect to any material portion of the Collateral or (v) conflict with or result in the violation of any Applicable Law to which any such Person or any of its Assets are subject, except in the cases of clause (i), (iii) or (v), as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**4.2    Equity Interests.**

(a)    All of the Equity Interests held by the Borrower directly or indirectly in each Subsidiary are depicted in the organizational structure diagram set forth on **Schedule 4.2**.

(b)    All of the outstanding Equity Interests held by the Parent Pledgor in the Borrower and all of the outstanding Equity Interests held directly or indirectly by the Borrower in each Subsidiary, in each case, (i) have been duly authorized, validly issued and were not issued in violation of any Person's preemptive or other purchase rights, (ii) in the case of Equity Interests described in clause (a) of the definition thereof, subject to Applicable Law, are fully paid and have no requirements for the owner thereof to make additional contributions to such Person, (iii) subject to Applicable Law, are non-assessable and were issued in compliance with Applicable Laws, and (iv) are owned by the Person identified as the owner thereof on **Schedule 4.2,** free and clear of all Liens (other than Permitted Liens).

(c)    All certificates and other instruments evidencing the Equity Interests in the Borrower and in each Subsidiary of the Borrower or any other Loan Party have been delivered to the Collateral Agent.

(d)    No Person owns or has any interest in, or option or other right (contingent or otherwise), including any right of first refusal or right of first offer, to acquire the Equity Interests of the Borrower, and no Person, other than the Borrower or another Subsidiary Guarantor, owns or has any interest in, or option or other right (contingent or otherwise), including any right of first refusal or right of first offer, to acquire the Equity Interests of any other Subsidiary. Except for Organizational Documents of any Subsidiary of the Borrower, there is no (i) voting trust or agreement, membership agreement, pledge agreement, buy-sell agreement, right of first refusal, preemptive right, "drag- along" or "tag-along" right, stock appreciation right, redemption or repurchase right, anti-dilutive right or proxy relating to such Subsidiary's Equity Interests or (ii) option, warrant, call, right or other Contract to issue, transfer, deliver, grant, convert, exchange, sell, subscribe for, purchase, redeem or acquire any equity, security or other ownership interest in such Subsidiary or agreement to enter into any Contract with respect thereto.

(e)    Other than as set forth in **Schedule 4.2**, no Loan Party (i) owns, of record, or beneficially, or controls, directly or indirectly, any Equity Interest in any Person (or any option, warrant, security or other right to convertible, exchangeable or exercisable therefor), or (ii) is directly or indirectly, a participant in any joint venture, partnership, trust, association or other Person.

**4.3    Organizational Documents, Books and Records**. The records and minute books, or equivalent records and documents of each Loan Party have been kept and maintained in all material respects as required by Applicable Law, and such records and minutes accurately reflect all transactions referred to in such records and minutes.

**4.4**    **No Adverse Order or Injunctions; Burdensome Obligations**.

    (a)    None of the Borrower or any other Loan Party or any Subsidiary or any of their respective Assets (including, without limitation, Real Property) is subject to or bound by any Order and none of the Borrower or any other Loan Party or any Subsidiary has received notice of any such Order entered or threatened against the Borrower, any other Loan Party, or any of their respective Assets (including, without limitation, Real Property), in each case which would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

    (b)    Neither the Borrower nor any other Loan Party nor any Subsidiary is a party to, subject to or bound by any Contract, which would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**4.5**    **Solvency; Bankruptcy Event.**

    (a)    On the Effective Date, and immediately prior to and after giving effect to the borrowing of the Loans and the use of the proceeds thereof, with respect to each Loan Party, individually, (i) the fair value of its Assets is greater than the amount of its liabilities (including disputed, contingent and unliquidated liabilities) as such value is established and liabilities evaluated, (ii) the present fair saleable value of its assets is not less than the amount that will be required to pay the probable liability on its debts as they become absolute and matured, (iii) it is able to realize upon its Assets and pay its debts and other liabilities (including disputed, contingent and unliquidated liabilities) as they mature in the normal course of business, (iv) it does not intend to, and does not believe that it will, incur debts or liabilities beyond its ability to pay as such debts and liabilities mature and (v) it is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which its property would constitute unreasonably small capital.

    (b)    No petition or notice has been presented, no Order has been made and no resolution has been passed for the bankruptcy, liquidation, winding-up or dissolution of any Loan Party or any Subsidiary. No receiver, trustee, custodian or similar fiduciary has been appointed over the whole or any part of any Loan Party or any Subsidiary. No Loan Party or any Subsidiary has any plan or intention of filing, making or obtaining any such petition, notice, order or resolution or of seeking the appointment of a receiver, trustee, custodian or similar fiduciary.

**4.6**    **Litigation**. Except as set forth on **Schedule 4.6**, there is no Action pending or, to the Borrower's Knowledge, threatened in writing (i) in which any Loan Party or any of its Subsidiaries has appeared or has been named or served as a party (either as a plaintiff or defendant) before any Governmental Authority, (ii) that would adversely affect the execution, delivery or performance of this Agreement, any other Loan Document, or, in any material respect, any Material Contract by any Loan Party thereto or (iii) that involves this Agreement or any other Loan Document that would, in the case of clauses (i) and (iii), reasonably be expected to result in a Material Adverse Effect.

**4.7**    **Assets; Real Property; Intellectual Property.**

    (a)    Each of the Loan Parties and each of the Subsidiaries has (i) in the case of owned personal property, good and valid title to and (ii) in the case of leased real or personal property, valid and enforceable leasehold interests (as the case may be) in, all its real and personal property necessary or used in the ordinary conduct of its business, except for defects in title that could not, individually or in the aggregate, reasonably be expected to adversely affect the operation of its business as currently conducted. The property of the Borrower and the other Loan Parties is subject to no Liens, other than Permitted Liens.

(b)     Each of the Loan Parties and each of the Subsidiaries owns, or is licensed to use, all Intellectual Property used in its business, other than where any lack of such ownership or license would not be expected to have a Material Adverse Effect. None of the Borrower or any of the Loan Parties or Subsidiaries has infringed, nor has received any notice of a claim for the infringement of any Intellectual Property of any other Person, other than where any such infringement would not be expected to have a Material Adverse Effect.

**4.8     Financial Condition; No Undisclosed Liabilities; No Material Adverse Effect.**

(a)     All balance sheets, statements of income and of cash flows and all other financial information of the Borrower and its Subsidiaries furnished pursuant to **Section 3.1(h)** have been and will be prepared in accordance with GAAP, using the same accounting principles, policies and methods as had been historically used in connection with the calculation of the items reflected thereon, are based on the books and records and present fairly in all material respects the financial condition of the Borrower and its consolidated Subsidiaries (and the results of operations, cash flows and equity thereof) as of the date thereof, subject to normal year-end adjustments.

(b)     Neither the Borrower nor any Subsidiaries has any material liabilities, contingent or otherwise, or forward or long-term commitments that are not disclosed in the financial statements referred to in clause (a) or in the notes thereto.

(c)     Since the date of the most recent financial statements described in clause (a), there has not been any event or occurrence that, individually or in the aggregate, has resulted in, or would reasonably be expected to result in, a Material Adverse Effect.

**4.9     Tax Matters.**

(a)     All Tax Returns required to be filed by each Loan Party and each Subsidiary have been timely filed (taking into account available extensions), and each such Tax Return was prepared in compliance with all Applicable Laws and is true and correct in all material respects, except where failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(b)     All Taxes required to have been paid, or claimed by any Governmental Authority to be payable, by any Loan Party or any Subsidiary (whether pursuant to, or shown to be due on, any Tax Return or otherwise) have been duly paid in full on a timely basis, except where failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(c)     No claims or adjustments proposed for any of such Loan Party's or any of its respective Subsidiaries' prior tax years which could result in additional taxes becoming due and payable by such Loan Party or such Subsidiary, except, such claims or adjustments that could not reasonably be expected to result in a Material Adverse Effect.

**4.10    Brokers**. Neither the Borrower nor any of its Subsidiaries or Affiliates has engaged any broker, finder or agent in connection with the Loans so as to give rise to any claim against any Agent or Lender or any of their Affiliates for any brokerage or finder's commission, fee or similar compensation.

**4.11    Compliance with Laws and Agreements**. Each Loan Party and each of its Subsidiaries is in compliance with (a) all Applicable Laws (other than Environmental Laws, which are addressed in **Section 4.12**) and (b) with all indentures, agreements and other instruments binding upon it or its property, in each case except such instances in which (i) such requirement of Applicable Law is being contested in good faith by appropriate proceedings diligently conducted or (ii) the failure to so comply, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. No Loan Party nor any of its Subsidiaries has received any

written notification from any Governmental Authority indicating the material violation of, or material non-compliance with, any Applicable Law (other than Environmental Laws, which are addressed in **Section 4.12**) or any investigation with respect to any of the foregoing, other than any such notification that has been withdrawn or otherwise resolved or is described on **Schedule 4.11**.

**4.12**    **Environmental Laws**.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to result in, a Material Adverse Effect: (i) each of the Loan Parties and its Subsidiaries is in compliance with applicable requirements under Environmental Laws, (ii) no Action has been filed or commenced or, to the Borrower's Knowledge, threatened against any of the Loan Parties alleging any failure of such Person to comply with any applicable Environmental Law, and (iii) no Loan Party nor any of its Subsidiaries has received any written notice (including any written request for information, demand, inquiry, subpoena, complaint or claim) from any Governmental Authority alleging any failure of a Loan Party to comply with any applicable Environmental Law or alleging any failure of a Loan Party to comply with any applicable Environmental Law, other than any such notice that has been withdrawn or otherwise fully and finally resolved and is described on **Schedule 4.12**.

(b)    The Borrower has delivered to the Lenders at least five (5) days prior to the Effective Date copies of all material environmental investigations, studies, audits, tests, reviews sampling, or other reports prepared in relation to the Real Property or any Asset located thereon, to the extent commissioned by and in the possession of any Loan Party or any of its Affiliates, to the Lenders.

(c)    To the Borrower's Knowledge there is no condition, fact or circumstance that would reasonably be expected to result in the imposition of with respect to any Real Property of the Borrower or its Subsidiaries, any liabilities under, or any noncompliance with, any Environmental Law, except as would not, individually or in the aggregate, reasonably be expected to result in, a Material Adverse Effect.

**4.13**    **[Reserved]**.

**4.14**    **Guarantees**. No Loan Party or Subsidiary, except as set forth on **Schedule 4.14** and pursuant to **Section 10,** has guaranteed or otherwise become responsible for any Indebtedness of any Person.

**4.15**    **Employee Matters**.

(a)    Except as would not reasonably be expected to result in a Material Adverse Effect, (i) each Plan and each Foreign Pension Plan is in compliance with all applicable requirements of ERISA, the Code and other Applicable Law, (ii) no ERISA Event has occurred or is reasonably expected to occur, (iii) each Loan Party and each ERISA Affiliate is in compliance with the Funding Rules with respect to each Pension Plan, and no waiver of the minimum funding requirements under the Funding Rules has been applied for or obtained and (iv) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that would be subject to Section 4069 or 4212(c) of ERISA.

(b)    Except as would not reasonably be expected to have a Material Adverse Effect, (i) no Loan Party or Subsidiary is subject to any labor or collective bargaining agreement, (ii) there are no existing or threatened strikes, lockouts or other labor disputes involving any Loan Party and (iii) hours worked by and payment made to employees of the Loan Parties are not in material violation of the Fair Labor Standards Act or any other Applicable Law dealing with such matters.

**4.16**  **Investment Company**. No Loan Party is an "investment company" or a company controlled by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

**4.17**  **Bank Accounts; Powers of Attorney**. The Loan Parties and Subsidiaries do not have any bank accounts (whether deposit accounts, savings accounts, other bank accounts, brokerage accounts or any other accounts howsoever qualified), safe deposit boxes, or related powers of attorney other than the Controlled Accounts, the Excluded Accounts and the Account Control Agreements, as set forth on **Schedule 4.17**. No Loan Party or Subsidiary has any outstanding powers of attorney for banking or other purposes.

**4.18**  **Insurance**. **Schedule 4.18** sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Effective Date.  All insurance policies of the Loan Parties and Subsidiaries in effect as of the Effective Date have been delivered to the Lenders and all premiums with respect to such insurance policies have been paid to the extent due and payable. No written notice of cancellation or termination has been received by any Loan Party or Subsidiary with respect to any such policies. To the Borrower's Knowledge, there is no default under, or failure to comply with, any provision contained in any such insurance policy.

**4.19**  **Federal Reserve Board Regulations**. No Loan Party or Subsidiary is engaged in the business of extending credit for the purpose of purchasing or carrying "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System of the United States and no part of the Loan Proceeds will be used for any purpose which entails a violation of Regulations U, T or X of the Board of Governors of the Federal Reserve System of the United States.

**4.20**  **PATRIOT Act; OFAC and Other Regulations**.

(a)  No Loan Party, nor any of its Subsidiaries, nor any director, officer, or employee of the foregoing, nor, to the Borrower's Knowledge, any broker, agent or representative of such Loan Party or Subsidiary has violated any Anti-Terrorism Laws.

(b)  No Loan Party, nor any of its Subsidiaries, nor any director, or officer of the foregoing, nor, to the Borrower's Knowledge, any employee, agent or representative of such Loan Party or Subsidiary has taken or will take any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage.

(c)  Each Loan Party and its Subsidiaries, and each of their respective directors, officers and employees and, to the Borrower's Knowledge, the agents and representatives of such Loan Party or Subsidiary are in compliance with all applicable Sanctions and are in compliance with the FCPA and any other applicable anti-corruption laws. Each Loan Party and its Subsidiaries have instituted and maintain and will continue to maintain policies and procedures designed to promote and ensure compliance by it and its directors, officers, employees and agents with such laws (including, for the avoidance of doubt, Sanctions laws) and with the representation and warranty contained herein.

(d)  No Loan Party, nor any of its Subsidiaries, nor any director, officer or employee of the foregoing, nor, to the Borrower's Knowledge, any broker, agent or representative of such Loan Party or Subsidiary, is a Sanctioned Person. To the Loan Parties' knowledge, no Loan Party or any Subsidiary thereof is the subject of an investigation or any other

proceeding for an alleged breach of Sanction(s) by a Governmental Authority that enforces Sanctions.

**4.21**  **Disclosure**. All of the information, data, representations, or other materials, other than any other forward-looking projections, estimates or other expressions of view as to future circumstances (hereinafter collectively "**Forward Looking Information**"), in each case, that is furnished to any Lender by any Loan Party or any Subsidiary in connection with the transactions contemplated by this Agreement, or the other Loan Documents, (such information, data, representations or other material to be taken as a whole) is, to the Borrower's Knowledge, complete and correct in all material respects and do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading. All Forward Looking Information is based on reasonable assumptions in light of the circumstances under which such assumptions are made as to all factual and legal matters material to the estimates therein, it being expressly understood and agreed, however, that such Forward Looking Information is subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrower, and that no assurance can be given that such Forward Looking Information will be realized.

**4.22**  **Security**.

(a)    This Agreement creates in favor of the Collateral Agent, for the benefit of the Lenders, legal, valid, continuing and enforceable security interests in the Collateral, the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(b)    The Filing Statements are in appropriate form and have been or will be filed in the offices specified in **Schedule 4.22(b)**. Upon such filings and/or the obtaining of "control" (as defined in the UCC), the Collateral Agent, for the benefit of the Lenders, will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected by filing, recording or registering a financing statement (including the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, under the UCC (in effect on the date this representation is made) in each case prior and superior in right to any other Person, except for Liens permitted under **Section 6.2**.

(c)    **Schedule 4.22(c)** correctly sets forth the full and correct legal name, type of organization, jurisdiction of organization, organizational identification number (if applicable), chief executive office, place of business and mailing address of each Loan Party as of the date of this Agreement. No Loan Party has within the past five (5) years (i) changed its location (as defined in Section 9-307 of the UCC), (ii) previously changed its name or (iii) previously become a "new debtor" (as defined in the UCC) with respect to a currently effective security agreement entered into by another Person, except, in each case, as set forth on **Schedule 4.22(c)**.

(d)    **Schedule 4.22(d)** sets forth a complete and correct list of all Copyrights, Patents and Trademarks that are owned by the Loan Parties and registered or issued in the United States as of the date hereof.

(e)    **Schedule 4.22(e)** sets forth a complete and correct list of all Commercial Tort Claims (as defined in Section 9-102 of the UCC) with an estimate value in excess of two million five hundred thousand dollars ($2,500,000) of the Loan Parties in existence on the date hereof.

4.23    **Governmental Approvals.** All material Governmental Approvals which under Applicable Laws are required to have been obtained by the Loan Parties and the Subsidiaries in connection with the conduct of its business and Assets currently owned, leased, managed, operated or to be acquired by such Loan Party or Subsidiary have been obtained by or on behalf of such Loan Party or Subsidiary and are in full force and effect except where the failure to obtain such approvals and the failure to be in full force and effect would not reasonably be expected to result in a Material Adverse Effect.

4.24    **No Default or Event of Default**. (a) No Default or Event of Default has occurred and is continuing under or with respect to the Loan Documents, and (b) no default has occurred and is continuing under or with respect to any Contractual Obligation of any Loan Party that would reasonably be expected to have a Material Adverse Effect with respect to the Loan Parties, taken as a whole.

4.25    **Aggregate Borrowing Base and Excess Cash Calculations**. The calculation by the Borrower of the Aggregate Borrowing Base as set forth in the most recent Borrowing Base Certificate delivered to the Administrative Agent and the Calculation Agent and the valuation thereunder is complete and accurate as of the date of such Borrowing Base Certificate. The calculation by the Borrower of Excess Cash as set forth in the most recent certificate delivered to the Administrative Agent and the Calculation Agent is complete and accurate as of the date thereof. The information included in the most recent Payment Date Report delivered to the Administrative Agent and the Calculation Agent is complete and accurate as of the date thereof.

5.    **Affirmative Covenants.** Each Loan Party covenants and agrees that so long as any of the Obligations (other than contingent indemnity obligations that survive the termination of the Agreement and for which no claim has been made) or Commitments remain outstanding, each of the Borrower and the Guarantors shall, and shall cause each Subsidiary to:

5.1    **Financial Statements and Other Financial Information**. Maintain at all times a system of accounting established and administered in accordance with sound business practices and GAAP and deliver to the Lenders, in form and detail reasonably satisfactory to each Lender:

(a)    quarterly, (i) within ninety (90) days after the end of the fiscal quarter of the Borrower ending September 30, 2024, and (ii) for each fiscal quarter thereafter within seventy-five (75) days after the end of each fiscal quarter of the Borrower, commencing with the fiscal quarter ending March 31, 2025, quarterly management-prepared consolidated unaudited financial statements of the Borrower and, to the extent not consolidated with the financial statement of the Borrower, each other Loan Party, prepared in accordance with GAAP, which shall present fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis and include a balance sheet, an income statement and a statement of cash flows as of such fiscal quarter end and year-to-date income statement;

(b)    annually, (i) within one hundred eighty (180) days after the end of the fiscal year of the Borrower ending December 31, 2024 and (ii) for each fiscal year ended thereafter within one hundred fifty (150) days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending on December 31, 2025, annual management-prepared consolidated audited financial statements for the Warrant Issuer, Parent Pledgor or the Borrower, as applicable, and, to the extent not consolidated with such financial statement, each Loan Party, prepared in accordance with GAAP and reported on by independent public accountants of recognized national standing acceptable to the Lenders (without a "going concern" or like qualification, commentary or exception, and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied,

48

which shall include a balance sheet, an income statement, and a statement of cash flows; **provided** that, to the extent such financial statements are delivered with respect to Warrant Issuer or Parent Pledgor, such financial statements shall be accompanied by consolidating information that explains in reasonable detail the differences between the information relating to Warrant Issuer or Parent Pledgor, on the one hand, and the information relating to the Borrower and its Subsidiaries on a standalone basis, on the other hand;

(c)     promptly upon request of any Lender, such other information, reports or documents respecting the business, properties, operations, or financial condition of the Borrower or any Subsidiary, as any Lender may at any time and from time to time reasonably request; and

(d)     monthly, within ten (10) Business Days after the end of each month, commencing with the month ending October 31, 2024, a Liquidity forecast (on a monthly basis) for the twelve (12) month period following the end of such fiscal quarter with respect to the Borrower and its Subsidiaries, in form customarily prepared by the Borrower, it being understood that (i) any forecasts are not to be viewed as facts and are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties, (ii) no assurance can be given that any particular forecasts will be realized and (iii) actual results during the period or periods covered thereby may differ significantly from the projected results and such differences may be material.

**5.2     Notices.**

(a)     Promptly, and, unless otherwise noted below, in any event no later than ten (10) Business Days after acquiring notice, giving notice or obtaining knowledge thereof, give written notice to the Administrative Agent of:

    (i)     (A) no later than three (3) Business Days after the occurrence of any Default or Event of Default and (B) no later than seven (7) Business Days after the occurrence of any other event, development or circumstance which could reasonably be expected to have a Material Adverse Effect;

    (ii)     (A) any action, suit or proceeding instituted or threatened in writing, or investigation is commenced, against any Loan Party or any judgment is entered against any Loan Party that (1) concerns or relates to any Loan Document, (2) alleges a material violation of, or seeks to impose remedies under, any Environmental Law where the amount of damage or loss is reasonably expected to exceed five million dollars ($5,000,000) or (3) relates to any Intellectual Property or (B) any action, suit or proceeding instituted or threatened in writing, or investigation is commenced, against any Loan Party or any judgment is entered against the Borrower where the claims amount under investigation or judgment exceed five million dollars ($5,000,000);

    (iii)     any action, suit or proceeding instituted or threatened in writing with respect to any Energy Supply Agreement or the occurrence of any other event that would allow any Account Debtor to setoff any amounts thereunder (including, without limitation, any delay in shipment or delivery) or receive liquidated damages thereunder, in each case where the claims or amount in dispute exceed two million dollars ($2,000,000);

    (iv)     any default, event of default or material breach under any Material Contract to which any Loan Party is a party, which would reasonably be expected to result in a Material Adverse Effect;

(v)      no later than ten (10) Business Days following any material event of casualty, damage or loss, whether or not insured, through fire, theft, other hazard or casualty, or any initiation of any condemnation proceedings, involving any Loan Party or any of its Subsidiaries or any of their Assets (including, without limitation, Real Property) where the amount of damage or loss is reasonably expected to exceed (x) two million dollars ($2,000,000) with respect to any Eligible Equipment and (y) fifteen million dollars ($15,000,000) with respect to any other Assets;

(vi)     any cancellation, suspension or material change in the terms, coverage or amounts of any insurance or the submission of claims (A) under any insurance policy of the any Loan Party or any of its Subsidiaries with respect to any equipment being sold pursuant to any Energy Supply Agreement or (B) otherwise, in excess of ten million dollars ($10,000,000) under any insurance policy of any Loan Party or any of its Subsidiaries;

(vii)    a copy of any "management letter" received by a Loan Party from its certified public accountants and the management's responses thereto, or any change in accounting or financial reporting practices by any Loan Party;

(viii)   the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect; or

(ix)     any serial defect claim by any customer of the Borrower or any Subsidiary under an Energy Supply Agreement.

(b)    The Borrower shall deliver:

(i)      to the Administrative Agent and the Calculation Agent, (x) no later than three (3) Business Days prior to each Payment Date and (y) by 5:00 p.m. (New York City time) on the fourth Business Day of each week following the occurrence and during the continuance of an Event of Default, on a weekly basis until such Event of Default is cured or waived in accordance with the terms of this Agreement, a Borrowing Base Certificate, which shall be prepared (A) in the case of the initial Borrowing Base Certificate, as of the Effective Date in respect of the Loan Parties, (B) as of the last day of the preceding fiscal month, in the case of each subsequent Borrowing Base Certificate delivered in accordance with preceding sub-clause (x) and (C) as of the last Business Day of the preceding calendar week, in the case of each subsequent Borrowing Base Certificate delivered in accordance with the preceding sub-clause (y), together with, in each case, any additional schedules and other information that the Administrative Agent (acting at the direction of the Required Lenders) may reasonably request;

(ii)     to the Administrative Agent and the Calculation Agent, together with the delivery of each Borrowing Base Certificate, (x) a Payment Date Report and (y) a reasonably detailed calculation of Liquidity and Excess Cash as of the date of such Borrowing Base Certificate (giving effect to any borrowing or repayment of Loans to be made on the related Payment Date or borrowing date in respect of which such Borrowing Base Certificate was delivered), certified by an Authorized Officer of the Borrower; and

(iii)    to the Administrative Agent, on an annual basis, an updated **Schedule 4.2** reflecting all of the Equity Interests held by the Borrower directly or indirectly in each Subsidiary.

**5.3**    **Conduct of Business and Maintenance of Existence; Maintenance of Properties.**

    (a)    Continue to engage in business of the same general type as now being conducted by it and now proposed to be conducted by it, and do and cause to be done all things necessary to maintain and keep in full force and effect its existence in good standing in its jurisdiction of formation and qualified to do business in each jurisdiction in which it conducts business, except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect, and at all times hold itself out to the public as a legal entity separate and distinct from any other entity (including any Affiliate of any Loan Party).

    (b)    Keep, maintain, store, transport and operate all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and make all necessary repairs thereto and renewals and replacements thereof, in each case in accordance with Prudent Industry Practice.

**5.4**    **Compliance with Laws; Government Approvals; Title**. (a) Comply with all Applicable Laws and Governmental Approvals to which it is subject, and comply, and ensure that its Subsidiaries and the directors, officers, employees and/or agents of any Loan Party or Subsidiary thereof comply, in all respects, with all Sanctions, Anti-Terrorism Laws; (b) obtain and maintain in full force and effect all material Governmental Approvals and other consents and approvals required at any time in connection with its business as currently conducted and as proposed to be conducted, as applicable; and (c) preserve and maintain good and valid title to its properties and assets (subject to no Liens other than Permitted Liens), in each case except to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect.

**5.5**    **Payment of Liabilities and Taxes**.

    (a)    Pay, when due, all of its Indebtedness and other obligations, except to the extent the amount or validity thereof is contested in good faith by appropriate proceedings so long as such Person has established adequate reserves therefor in accordance with GAAP and the failure to make payment pending such contest could not reasonably be expected to have a Material Adverse Effect.

    (b)    Pay, when due, all of its Indebtedness and other obligations, and timely file all Tax returns and pay and discharge promptly all Taxes imposed except (i) where failure to do so could not reasonably be expected to result in a Material Adverse Effect or (ii) to the extent such Taxes or Tax Return are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made therefor.

**5.6**    **Organizational Documents; Loan Documents and Contractual Obligations.**

    (a)    Comply in all material respects with each Organizational Document, Loan Document and any other Material Contract to which it is party.

    (b)    Take such action as it determines in its reasonable commercial judgment to be appropriate to enforce against the relevant counterparty to each Material Contract to which it is party its material rights and material obligations thereunder and the material covenants thereof in accordance with its terms.

**5.7**    **Use of Loan Proceeds**. Except as otherwise expressly required of permitted by this Agreement, use the Loan Proceeds (a) to pay third-party costs associated with performance under supply and service agreements and (b) to pay general and administrative expenses of the Loan Parties and for general corporate purposes.

**5.8** **Insurance**. Maintain insurance in such amounts and covering such risks as is consistent the Borrower's and its Subsidiaries' past practice and with Prudent Industry Practice. Such insurance shall include any coverage required under applicable Governmental Approvals. The Borrower shall pay or cause to be paid when due all premiums on such insurance and, upon reasonable request, will furnish to the Lenders evidence of payment of such premiums and such other information as any Lender may request with respect to such insurance, including determinations as to compliance with Prudent Industry Practice. The Loan Parties shall ensure that such policies shall include endorsements in form and substance satisfactory to the Collateral Agent, naming the Collateral Agent as a lender's loss payable or additional insured, as appropriate, as its interest may appear. Each policy of insurance or endorsement shall contain a clause requiring the insurer to give not less than ten (10) days' prior written notice to Administrative Agent in the event of cancellation of the policy for nonpayment of premium and not less than thirty (30) days' prior written notice to Administrative Agent in the event of cancellation of the policy for any other reason whatsoever.

**5.9** **Event of Eminent Domain**. If an Event of Eminent Domain shall occur with respect to any of the Assets (including, for the avoidance of doubt, Real Property) of a Loan Party, pursue in a commercially reasonable manner, taking into account the anticipated costs and benefits of such pursuit, all its rights to compensation against the relevant Governmental Authority in respect of such Event of Eminent Domain.

**5.10** **Inspection**. Permit each Lender, the Administrative Agent and the Calculation Agent, by its representatives, agents, consultants and other advisors, to visit and inspect any of its properties, books and financial records, to examine and make copies of its books of accounts and other financial records, and to discuss the affairs, finances and accounts of any Loan Party, and to be advised as to the same by, any Loan Party (or its representatives) at such reasonable times and intervals as such Lender, the Administrative Agent or the Calculation Agent may designate, in compliance with all safety and security procedures of the Borrower (as such procedures are disclosed to such Lender or Administrative Agent or their other applicable representatives); **provided** that so long as no Event of Default shall have occurred and be continuing, such inspection shall occur during business hours after providing reasonable advance notice to the Borrower or such Loan Party and only one such inspection during any 12-month period shall be at the cost of the Borrower (with additional inspections permitted at the expense of the Lenders). Each Loan Party will permit any authorized representatives designated by the Administrative Agent or the Calculation Agent (in each case, acting at the direction of the Required Lenders), including a third party appraiser and/or third party consultant, to conduct (at the Loan Parties' expense and at the Administrative Agent's or the Calculation Agent's request), once per fiscal year (plus additional times at the expense of the Lenders), complete appraisals, audits and/or other examination of all books, records, and Accounts of the Loan Parties, each such audit and appraisal to be in scope and substance reasonably satisfactory to the Administrative Agent or the Calculation Agent (in each case, acting at the direction of the Required Lenders) all upon reasonable notice and at such reasonable times as may reasonably be requested, or, upon the occurrence and continuance of an Event of Default, at any time at the request of (and as frequently as may be requested by) the Administrative Agent or the Calculation Agent (in each case, acting at the direction of the Required Lenders).

**5.11** **Accounts**.

(a)    The Borrower shall cause each Loan Party and Subsidiary to remit all revenues from operations received by it or by third parties on its behalf, including all Cash received with respect to Energy Supply Agreements, into the Core Controlled Account.

(b)    Each Loan Party shall promptly deliver to the Administrative Agent copies of each Energy Supply Agreement upon the execution thereof, as well as each invoice with respect thereto and evidence of shipment and delivery of Eligible Equipment thereunder.

5.12    **Further Assurances**.

(a)    From time to time, at Administrative Agent's reasonable request and at the Borrower's expense, execute, deliver, acknowledge and cause to be duly filed, recorded or registered any statement, assignment, instrument, agreement or other document and take any other action that may, in the Administrative Agent's judgment, be reasonably necessary, in order to (i) ensure that the Obligations are (A) secured by substantially all of the assets of the Loan Parties and (B) guaranteed by the Parent Pledgor and each Subsidiary Guarantor, including financing statements and other documents, and the filing or recoding of any of the foregoing and the delivery of certificated securities with respect to which perfection is obtained by possession and (ii) create, preserve, continue, perfect, or confirm the security interests and liens created in favor of the Collateral Agent on behalf of the Lenders under, or to enable the Lenders to obtain the full benefits of, this Agreement and the other Loan Documents or to exercise and enforce any of the Lenders' rights, powers and remedies hereunder, thereunder, or under Applicable Laws.

(b)    Not later than five (5) Business Days after delivery of financial statements pursuant to **Section 5.1(b),** the Borrower shall deliver to the Administrative Agent a certificate executed by an Authorized Officer of the Borrower (i) setting forth the information required pursuant to **Schedules 4.22(d)** and **(e)** or (ii) confirming that there has been no change in such information since the date of the Schedules delivered on the Effective Date or the date of the most recent certificate delivered pursuant to this **Section 5.12**.

5.13    **Separateness**. Take all commercially reasonable steps, including all steps that the Administrative Agent may reasonably request, to maintain its identity as a separate legal entity, including that it has and will:

(a)    Maintain its accounts separate from those of any Person (other than any other Loan Party) with commercial banking institutions and not commingle their funds with those of any Person (other than any other Loan Party);

(b)    Act solely in its name and through its duly authorized officers, managers, representatives or agents in the conduct of its businesses, and at all times using its own stationery, invoices and checks separate from those of any other Person;

(c)    Conduct its business solely in its own name, in a manner not misleading to other Persons as to its identity and maintain accurate and separate books, records and accounts and financial statements;

(d)    Maintain in full effect its existence, rights and franchises as a limited liability company or corporation, as applicable, under the laws of the formation state and obtain and preserve its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement and each other instrument or agreement necessary or appropriate to properly administer this Agreement and permit and effectuate the transactions contemplated hereby and thereby;

(e)    Obtain proper authorization from member(s), director(s) and manager(s) as required by its Organizational Documents for all of its company actions;

(f)    Comply with the terms of its Organizational Documents;

(g)    Conduct all material transactions between itself and any of its Affiliates on an arm's length basis and on a commercially reasonable basis;

(h)    Allocate fairly and reasonably the cost of any shared office space with any other Person (including any of its Affiliates);

(i)      Not hold itself out as having agreed to pay, or as being liable for, the, obligations of any Person, including any of its Affiliates, except as required pursuant to the Loan Documents;

(j)      Pay its operating expenses, debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its own assets;

(k)      Maintain all of its assets in its own name and not commingle its assets with those of any other Person;

(l)      Maintain adequate capital for the normal obligations reasonably foreseeable in light of its contemplated business operations; and

(m)      Not pledge its assets for the benefit of any Person, except as permitted in the Loan Documents.

**5.14**    **Post-Closing Matters**. Notwithstanding any provision herein or in any other Loan Document to the contrary, to the extent not actually delivered on or prior to the Effective Date, the Borrower shall, and shall cause each applicable Loan Party, to take such actions set forth on **Schedule 5.14** by the times specified on such **Schedule 5.14** with respect to such actions, or such later time as the Administrative Agent (acting at the direction of the Required Lenders) may agree in its sole discretion. All conditions precedent, covenants and representations and warranties contained in this Agreement and the other Loan Documents shall be deemed modified to the extent necessary to effect the foregoing (and to permit the taking of the actions described on **Schedule 5.14** within the time periods required by this **Section 5.14**, rather than as elsewhere provided in the Loan Documents).

**5.15**    **Minimum Liquidity**. On each Liquidity Testing Date, the Borrower shall have had Liquidity of at least $20,000,000.

**6.**    **Negative Covenants** Each Loan Party covenants and agrees that so long as any of the Obligations (other than contingent indemnity obligations that survive termination of this Agreement and for which no claim has been made) or Commitments remain outstanding each of the Borrower and the Guarantors shall not, and shall not permit any Subsidiary to, without the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders):

**6.1**    **Indebtedness**. Create, incur, assume or permit to exist any Indebtedness except:

(a)      The Obligations;

(b)      Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts in the ordinary course of business;

(c)      Indebtedness in respect of guarantees entered into in the ordinary course of business in respect of the obligations of any Loan Party or Subsidiary to purchase or sell equipment in an aggregate amount not to exceed $200,000,000;

(d)      Permitted Indebtedness; and

(e)      all premiums (if any), interest (including post-petition interest), fees, expenses, charges, and additional or contingent interest on obligations described in clauses (a) through (d) above.

**6.2**    **Liens**. Create, incur, assume or permit to exist any Lien on any of its Assets, both now owned and hereafter acquired, and including the Collateral or portion thereof, except for Permitted Liens.

**6.3**    **Distributions**. Declare or pay any dividend or distribution (whether in Cash, Cash Equivalents, securities or other property) with respect to any of its Equity Interests or Indebtedness that is unsecured or subordinated in right of payment or lien priority, or make any payment (whether in Cash, Cash Equivalents, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, defeasance, retirement, acquisition, cancellation or termination of any such Equity Interest or Indebtedness that is unsecured or subordinated in right of payment or lien priority or of any option, warrant or other right to acquire any such Equity Interest or subordinated Indebtedness, or make any tax distributions, or other payments to an Affiliate of the Borrower; **provided, however,** the Borrower, Parent Pledgor and each Subsidiary may, at any time, make Permitted Tax Distributions.

**6.4**    **Limitations on Restrictive Agreements**. Enter into, incur or permit to exist any agreement or other arrangement, directly or indirectly, that prohibits, restricts or imposes any condition upon (a) its ability to create, incur or permit to exist any Lien upon any of its property or (b) its ability to pay dividends or other distributions with respect to any shares of its Equity Interests or to make or repay loans or advances to the Borrower or any other Loan Party or to guarantee Indebtedness of the Borrower or any other Loan Party or transfer any of its properties to the Borrower or any other Loan Party; **provided** that the foregoing shall not apply to restrictions and conditions (i) imposed by Applicable Law or the Loan Documents, (ii) that exist on the Effective Date and are listed on **Schedule 6.4**, (iii) that are binding on a Subsidiary at the time such subsidiary first becomes a Subsidiary Guarantor, so long as such restrictions and conditions were not entered into in contemplation of such entity becoming a Subsidiary Guarantor of the Borrower, (iv) that represent Indebtedness of a Subsidiary of the Borrower that is not a Subsidiary Guarantor to the extent such Indebtedness is permitted by **Section 6.1** so long as such restrictions and conditions apply only to such Subsidiary, (v) that are customary provisions in joint venture agreements and other similar agreements permitted by **Section 6.6** and applicable solely to joint ventures, (vi) are customary restrictions on leases, subleases, licenses or asset sale agreements entered into in the ordinary course of business otherwise permitted hereby so long as such restrictions relate to the assets subject thereto, (vii) are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any subsidiary, (viii) are customary provisions restricting assignment of any agreement entered into in the ordinary course of business, (ix) restrict the use of cash or other deposits imposed by customers under contracts entered into in the ordinary course of business, and (x) any restrictions regarding licenses or sublicenses by the Borrower and the Subsidiary Guarantors of Intellectual Property in the ordinary course of business (in which case such restriction shall relate only to such Intellectual Property).

**6.5**    **Sale of Assets**. Dispose of any of its Assets, whether now owned or hereafter acquired, or issue or sell any Equity Interests to any Person, except:

(a)    Dispositions of obsolete or worn-out Assets that are no longer economically practicable to maintain, in the ordinary course of business;

(b)    The sale or issuance of Equity interests in any Subsidiary Guarantor to the Borrower or any other Subsidiary Guarantor as allowed pursuant to **Sections 6.6** and **6.7**;

(c)    Dispositions of Cash Equivalents in the ordinary course of business and for fair market value;

(d)    Dispositions of Intellectual Property, to the extent such Intellectual Property is Disposed pursuant to non-exclusive leases, licenses, subleases, or sublicenses granted in the ordinary course of business and on ordinary commercial terms that do not interfere in any material respect with its business and the lapse or abandonment in the ordinary course of business of any registrations or applications for registration of any immaterial Intellectual Property that is no longer used or useful in its business in the Borrower's reasonable business judgment;

(e)    To the extent constituting a Disposition, the creation of Permitted Liens, the making of Investments permitted by **Section 6.6,** and the making of distributions to the extent permitted by **Section 6.3**; and

(f)    Permitted Dispositions.

6.6    **Loans; Investments; Etc.** Make or permit to remain outstanding any loan, advance, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase or own any Equity Interests, bonds, notes, debentures or other debt securities of or make any other investment in (including, without limitation, the purchase or other acquisition of all or substantially all of the assets of, or of a division, line of business or other business unit of, any other Person), any Person or enter into any partnership, limited liability company or joint venture in any other Person (all of the foregoing, "**Investments**"), except:

(a)    Cash Equivalents;

(b)    Investments by any Loan Party in the Equity Interests of its Subsidiaries; **provided** that (x) no Loan Party shall be permitted to form, acquire or make any additional Investments in any Excluded Subsidiary after the Effective Date and (y) with respect to any Subsidiary Guarantor formed after the Effective Date, such Equity interests shall be pledged pursuant to **Section 9** and such Subsidiary shall deliver to the Administrative Agent, substantially simultaneously with such formation or acquisition, a joinder agreement to become a Subsidiary Guarantor hereunder;

(c)    loans or advances made by or to any Subsidiary to the Borrower or any other Loan Party, provided that any such loans and advances made by a Loan Party shall be evidenced by a promissory note in form and substance reasonably satisfactory to the Required Lenders and pledged to the Collateral Agent pursuant to **Section 9**;

(d)    guarantees constituting Indebtedness to the extent permitted by **Section 6.1**;

(e)    bank deposits in the ordinary course of business; and

(f)    Permitted Investments.

6.7    **Fundamental Changes**. Merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or any substantial part of its assets, or any of the Equity Interests of any Subsidiary (in each case, whether now owned or hereafter acquired), or undertake a division, or liquidate or dissolve, or purchase or otherwise acquire all or substantially all of the assets or any Equity Interests of any class of, or any partnership or joint venture interest in, any other Person, or change its jurisdiction of incorporation or organization or the form or type of its organization, except that, if at the time thereof and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing:

(a)    any Subsidiary may merge into the Borrower in a transaction in which the Borrower is the surviving corporation;

(b)    any Subsidiary may merge into any other Subsidiary; **provided,** that such internal reorganization does not cause any Subsidiary Guarantor to cease to be a Subsidiary Guarantor or any Pledged Ownership Interests to cease to be Pledged Ownership Interests;

(c)    any Subsidiary may sell, transfer, lease or otherwise dispose of its assets to the Borrower or any other Subsidiary Guarantor;

(d)    any Subsidiary may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and such

liquidation or dissolution would not reasonably be expected to result in a Material Adverse Effect and would not cause the material assets of any Subsidiary Guarantor to be held by any entity that is not a Subsidiary Guarantor; and

(e) any internal reorganization where the direct or indirect ownership of a Subsidiary may change, but such Subsidiary continues to be a Subsidiary of the Borrower; **provided,** that such internal reorganization does not cause any Subsidiary Guarantor to cease to be a Subsidiary Guarantor or any Pledged Ownership Interests to cease to be Pledged Ownership Interests.

6.8     **Change of Business**. Change the nature of its business or expand its business beyond businesses of the type conducted by the Borrower and its Subsidiaries on the Effective Date and businesses reasonably related thereto.

6.9     **Modification of Organizational Documents or Certain Other Documents**.

(a) Enter into any Supplement to or terminate any of its Organizational Documents, or waive any provisions thereof or grant any consents thereunder to the extent such Supplement, termination or waiver or consent is adverse to the interests of the Lenders in any material respect.

(b) Enter into any Supplement to any document governing or evidencing any Indebtedness that is unsecured or subordinated in right of payment or lien priority, to the extent such Supplement is adverse to the interests of the Lenders in any material respect.

6.10    **Transactions with Affiliates**. Except pursuant to a transaction permitted by **Section 6.7**, make any payment to or enter into or participate in any transaction with an Affiliate, unless such transaction is in the ordinary course of business of the Borrower and such Affiliate, the terms of such transaction are no more favorable to such Affiliate than those which would have prevailed in an arm's length transaction between unrelated third parties, and such Affiliate does not benefit from any Lien or other security.

6.11    **Accounts**.

(a) Establish or maintain any deposit or other bank account other than the Controlled Accounts and the Excluded Accounts.

(b) Unless otherwise expressly permitted by this Agreement, including **Section 5.11**, cause all amounts payable in cash to, or otherwise received in cash by, a Loan Party to be paid or transferred to any account other than a Controlled Account or an Excluded Account.

6.12    **Loan Proceeds**. Directly or indirectly use, pay, transfer, distribute or dispose of any Loan Proceeds, in any manner or for any purposes except as provided in **Section 5.7**.

6.13    **Anti-Terrorism Laws; OFAC; Other Regulations**. (a) Violate any Anti-Terrorism Laws or otherwise take any action that would result in the representation set forth in **Section 4.20** no longer being true; (b) conduct any business with, or engage in making or receiving any contribution of goods, services or money to or for the benefit of, any Sanctioned Person or any Sanctioned Country in violation of Sanctions; (c) directly or knowingly indirectly use the Loan Proceeds, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of the FCPA or any other applicable anti-corruption law,  (ii) to fund any activities or business of or with any Sanctioned Person or Sanctioned Country in violation of Sanctions, (iii) in any other manner that could reasonably be expected to result in any Person becoming a Sanctioned Person, or (iv) otherwise in violation of Sanctions; (d) deal in, or otherwise engage in any transaction related to, any property or interests in property blocked pursuant to any Anti-

Terrorism Law in violation of such Anti-Terrorism Law; or (e) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

**6.14** **Federal Reserve Board Regulations**. Directly or indirectly apply any part of the proceeds of the Loan to the purchasing or carrying of any margin stock within the meaning of Regulations T, U or X of the Federal Reserve Board, or any regulations, interpretations or rulings thereunder.

**6.15** **Name and Location; Fiscal Year; Accounting Policies**. (a) Unless ten (10) Business Days' (or such shorter period acceptable to the Administrative Agent (acting at the direction of the Required Lenders)) advance notice in writing is delivered to the Administrative Agent, change its name, its jurisdiction of organization, its organization identification number, federal identification number, the location of its chief executive office, or its principal place of business, or (b) change its fiscal year, accounting policies or reporting practices, except as required by GAAP.

**6.16** **Environmental Laws and Hazardous Substances**.

(a)     Release, or cause or permit any other Subsidiary to Release, into the environment any Hazardous Substances in material violation of or material non-compliance with any Environmental Laws, Applicable Laws or applicable Governmental Approvals, except as would not reasonably be expected to result in a Material Adverse Effect with respect to the Borrower and its Subsidiaries taken as a whole, or store, treat or dispose or allow the storage, treatment or disposal of any Hazardous Substances at, on or under the Real Property, except for the storage of Hazardous Substances in accordance with Environmental Laws, Applicable Laws and applicable Governmental Approvals or as would not reasonably be expected to result in a Material Adverse Effect with respect to the Borrower and its Subsidiaries taken as a whole.

(b)     Conduct actions, or fail to take required actions, which result in material adverse impacts to threatened or endangered species or habitat that is formally listed, cultural resources, or jurisdictional streams or wetlands, except for actions or inactions in accordance in all material respects with Environmental Laws and Governmental Approvals or as would not reasonably be expected to result in a Material Adverse Effect with respect to the Borrower and its Subsidiaries taken as a whole.

**6.17** **Disputes**. Agree, authorize or otherwise consent without the prior authorization of the Required Lenders (such authorization not be unreasonably delayed or withheld) to any proposed settlement, resolution or compromise of any litigation, arbitration or other dispute with any Person that requires a Loan Party to make a payment in an amount in excess of fifteen million dollars ($15,000,000) after taking into account the amount of any insurance proceeds received by such Loan Party or acknowledged (in writing) by the applicable insurer that it is obligated to pay (as and when due in accordance with the terms of any such settlement, resolution or compromise) in respect of such dispute and the amount (if any) of funds from equity contributions in the form of cash or Cash Equivalents by Parent Pledgor or any of its Affiliates (other than the Borrower and its Subsidiaries) received by Borrower that must be used for payment in such dispute.

**6.18** **Activities of Parent Pledgor**.  Notwithstanding anything to the contrary contained herein, Parent Pledgor shall not:

(a)     incur, directly or indirectly, any Indebtedness or any other material obligation or liability whatsoever other than (i) the Obligations and (ii) obligations incidental to the transactions contemplated hereby and the nature of its existence as a holding company in respect of the Borrower and its Subsidiaries;

(b)       create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it (other than the Liens created under this Agreement);

(c)       Divide, amalgamate, consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any Person; **provided** that, so long as no Default or Event of Default exists or would result therefrom, (A)  Parent Pledgor may consolidate or amalgamate with, or merge with or into, any other Person (other than the Borrower and any of its Subsidiaries) so long as (i) Parent Pledgor is the continuing or surviving Person or (ii) if the Person formed by or surviving any such consolidation, amalgamation or merger is not Parent Pledgor, the successor Person expressly assumes all obligations of Parent Pledgor under this Agreement and the other Loan Documents to which Parent Pledgor is a party pursuant to a supplement hereto and/or thereto in a form reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders) and (B) Parent Pledgor may convey, sell or otherwise transfer all or substantially all of its assets to any other Person (other than the Borrower and any of its Subsidiaries) so long as the Person acquiring such assets expressly assumes all of the obligations of Parent Pledgor under this Agreement and the other Loan Documents to which Parent Pledgor is a party pursuant to a supplement hereto and/or thereto in a form reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders); **provided**, **further**, that if the conditions set forth in the preceding proviso are satisfied, the successor to Parent Pledgor will succeed to, and be substituted for, Parent Pledgor under this Agreement;

(d)       sell or otherwise dispose of any Equity Interests of the Borrower;

(e)       create or acquire any direct Subsidiary or make or own any direct Investment in any Person other than ownership of Equity Interests of the Borrower;

(f)       fail to hold itself out to the public as a legal entity separate and distinct from all other Persons; or

(g)       engage in any business or activity or own any assets other than (i) its ownership of the Equity Interests of the Borrower and activities incidental thereto, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations as a Guarantor, (iv) if applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group of the Borrower and its Subsidiaries, (v) providing indemnification to its officers and directors in the ordinary course of business, (vi) activities required to comply with Applicable Laws and (vii) any activities incidental or reasonably related to the foregoing.

**6.19**    **Material Contracts**. Enter into any Supplement to any Material Contract, (b) assign or consent to the assignment of any Material Contract (other than assignments to other Subsidiaries in the ordinary course of business), or (c) waive or accept any waiver of any provision of any Material Contract, or grant any consents thereunder, in each case, that could reasonably be expected to (i) reduce the value of any Account included in the most recent calculation of the Aggregate Borrowing Base or (ii) materially and adversely impact the Lenders with respect to the Borrower.

**6.20**    **Excluded Subsidiaries**. Form or directly or indirectly acquire Equity Interests of any Excluded Subsidiary or take any action that would cause any Subsidiary Guarantor to become an Excluded Subsidiary.

7.    **Events of Default.** The term "**Event of Default**" shall mean, whenever it is used in this Agreement, any one or more of the following events (and the term "**Default**" whenever it is used herein, means any one or more of the following events, that with the giving of notice, the lapse of time, or both would be Event of Default):

7.1    **Payment of Obligations**. The failure of any Loan Party to pay, in accordance with the terms of this Agreement, (a) any principal on the Loans, including any principal due in respect of a mandatory prepayment or any interest on the date when due, (b) any fee due and owing to any Agent or Lender on the date that such sum is due or (c) any other amount, cost, charge or other sum due under this Agreement or any other Loan Document, in each case under this clause (c), within ten (10) days after the date that such sum is due.

7.2    **Failure to Perform Provisions of Loan Documents**.

(a)    The failure of any Loan Party to perform, observe or comply with **Sections 5.1(b)(i)** or **(ii)** (*Financial Statements and Other Financial Information*), **5.2(a)(i)** (*Notices*), **5.7** (*Use of Loan Proceeds*), **5.10** (*Inspection*), **5.11** (*Accounts*), **5.14** (*Post-Closing Matters*), **5.15** (*Minimum Liquidity*) or **Section 6** (*Negative Covenants*) (except **Section 6.16** (*Environmental Laws and Hazardous Substances*)).

(b)    The failure of any Loan Party to perform, observe or comply with **Sections 5.2** (*Notices*) (other than **Section 5.2(a)(i)**), **5.6(b)** (*Organizational Documents, Loan Documents and Contractual Obligations*), **5.8** (*Insurance*) and **5.9** (*Event of Eminent Domain*) and such failure is not cured to the satisfaction of the Required Lenders within a period of seven (7) Business Days after the date of written notice thereof by the Administrative Agent or any Lender to the Borrower or the date any Loan Party becomes aware thereof.

(c)    The failure of any Loan Party to perform, observe or comply with any of the provisions of any Loan Document, other than those covered by **Sections 7.1, 7.2(a), 7.2(b)** or **7.3,** and such failure is not cured to the satisfaction of the Required Lenders within a period of thirty (30) days after the date of written notice thereof by the Administrative Agent or any Lender to the Borrower or the date any Loan Party becomes aware thereof.

7.3    **Representations and Warranties**. If any representation or warranty of any Loan Party contained herein or in any other Loan Document or any statement or representation made in any certificate by any Loan Party pursuant to this Agreement or any of the other Loan Documents shall prove to be false, incorrect or misleading in any material respect (or, with respect to any representation or warranty qualified by "materiality" or "Material Adverse Effect" qualifiers, false, incorrect or misleading in any respect) on the date as of which made.

7.4    **Unenforceability of Loan Documents; Impairment of Security Interests**. At any time after the execution and delivery thereof, (a) any material provision of any Loan Document shall cease to be in full force and effect or the Loan Party shall make any assertion or claim to such effect or any Loan Document or material provisions thereof shall be declared null and void by a Governmental Authority of competent jurisdiction or (b) there shall occur any loss of perfection, first priority status or enforceability of the security interest of the Collateral Agent in any of the Collateral, except to the extent solely as a result of acts or omissions of the Collateral Agent or a Lender or, solely with respect to priority, the incurrence of Permitted Liens.

7.5    **Default under Other Indebtedness**.

(a)    Any Loan Party or any Subsidiary shall default in any payment of any Indebtedness owing to any other Person(s) in an aggregate principal amount, individually or in the aggregate, in excess of five million ($5,000,000), beyond the period of grace, if any,

provided in the instrument or agreement under which such Indebtedness was created; or

(b)     Any default occurs in the observance or performance of any other agreement or condition relating to any Indebtedness described in **clause (a)** or contained in any instrument or agreement evidencing, securing or relating thereto, beyond the period of grace, if any, provided in such instrument or agreement, or any other event shall occur the effect of which default or other event is to cause or to permit the holder of such Indebtedness to cause, with the giving of notice, if required, such Indebtedness to become due prior to its stated maturity, except to the extent the amount or validity of any such Indebtedness owing to any Person other than the Lenders is contested in good faith by appropriate proceedings, so long as adequate reserves have been set aside therefor.

**7.6     Liquidation, Termination, Dissolution, Etc**. Any Loan Party or any Subsidiary shall liquidate, dissolve or terminate its existence, without the prior written consent of each Lender.

**7.7     Bankruptcy**. A Bankruptcy Event shall occur with respect to any Loan Party or any Subsidiary.

**7.8     Judgments**. One or more judgments or decrees shall be entered against any Loan Party or any Subsidiary involving, individually or in the aggregate, a liability in excess of five million ($5,000,000), and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within forty-five (45) days after the entry thereof.

**7.9     ERISA**. An ERISA Event shall have occurred that when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect.

**7.10    Change of Control**. A Change of Control shall occur.

**7.11    Material Adverse Effect**. The occurrence of any Material Adverse Effect with respect to any Loan Party and each of its Subsidiaries taken as a whole.

## 8.     Rights and Remedies.

**8.1     Rights and Remedies**. If any Event of Default shall occur and be continuing, the Lenders may refuse to make any additional disbursements of Loan Proceeds, and the Required Lenders or the Administrative Agent (acting at the direction of the Required Lenders) may, by notice to Borrower, terminate the Commitments and declare the unpaid principal amount of the Loans together with accrued and unpaid interest thereon and any other Obligations then outstanding to be immediately due and payable, whereupon the same shall become and be forthwith due and payable; **provided,** that no further notice of default, presentment, demand, protest or notice of any kind, all of which are expressly waived by the Borrower, shall be required; **provided, further,** that, in the case of any Event of Default described in **Section 7.7,** the unpaid principal amount of the Loan, together with accrued and unpaid interest thereon and all other Obligations then outstanding, shall be automatically and immediately due and payable by the Borrower to the Lenders and the Commitments shall automatically be terminated in full, in each case, without notice, presentment, demand, protest or other action of any kind, all of which are expressly waived by the Borrower. Upon the occurrence and during the continuation of any Event of Default the Administrative Agent or the Collateral Agent (in each case, acting at the direction of the Required Lenders) shall be entitled to exercise in any jurisdiction in which enforcement thereof is sought, all rights and remedies available to the Lenders under the other provisions of this Agreement and the other Loan Documents, the rights and remedies of a secured party under the UCC with respect to the Collateral and all other rights and remedies available to the Lenders under other Applicable Law, all such rights and remedies being cumulative and enforceable alternatively, successively or concurrently.

**8.2**     **Cure by the Lenders**. If any Event of Default shall occur and be continuing, without any obligation to do so, any Lender may make disbursements of Loan Proceeds to or on behalf of the Borrower to cure any Event of Default hereunder and to cure any default as the Required Lenders in their sole, good faith discretion may consider necessary or appropriate, whether to preserve and protect the Collateral or the Lenders' interests therein or for any other reason, and all sums so expended, together with interest on such total amount at the Default Rate (but in no event shall the rate exceed the maximum lawful rate), shall be repaid by the Borrower to the Lenders on demand and shall be guaranteed and secured as provided by the Loan Documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the Aggregate Commitment Amount and/or the Aggregate Borrowing Base.

**8.3**     **Default Rate**. Notwithstanding the entry of any decree, order, judgment or other judicial action, or anything to the contrary herein, upon the occurrence of an Event of Default under **Section 7.1,** the amount of monetary Obligations outstanding or becoming outstanding while such Event of Default exists shall bear interest from the date of such Event of Default caused by such failure to make timely payment until such Event of Default has been cured to the satisfaction of the Required Lenders, at a rate that is five percent (5%) per annum in excess of the Applicable Interest Rate (the "**Default Rate**"), irrespective of whether or not as a result thereof, the Loan or any Obligations have been declared due and payable or the maturity thereof accelerated. The Borrower shall on demand from time to time pay such interest to the Lenders and the same shall be a part of the Obligations hereunder.

**8.4**     **Enforcement Costs**. The Loan Parties shall pay to each Agent and Lender on demand all reasonable Enforcement Costs paid, incurred or advanced by or on behalf of any Agent or Lender and (b) interest on such Enforcement Costs from the date paid, incurred or advanced until paid in full at a per annum rate of interest equal at all times to the Default Rate. As used herein, the term "**Enforcement Costs**" shall mean and include collectively all documented out of pocket expenses, charges, recordation or other Taxes, costs and fees (including all fees, charges and expenses of one external counsel in each applicable jurisdiction to the Agents, one external counsel in each applicable jurisdiction to the Calculation Agent and one external counsel in each applicable jurisdiction to the Lenders) of any nature whatsoever advanced, paid or incurred by or on behalf of any Lender in connection with the enforcement of this Agreement or the other Loan Documents, including (i) the collection of the Obligations, (ii) the enforcement of this Agreement or any of the other Loan Documents, (iii) the creation, perfection, maintenance, preservation, defense, protection, realization upon, disposition, collection, sale or enforcement of all or any part of the Collateral, and (iv) the exercise by the Administrative Agent or Collateral Agent of any rights or remedies available to them under the provisions of this Agreement, or any of the other Loan Documents. All Enforcement Costs, with interest as above provided, shall be a part of the Obligations hereunder.

**8.5**     **Application of Proceeds**. Any proceeds of the collection of the Obligations and/or the sale or other disposition of the Collateral will be applied by the Administrative Agent to the payment of Enforcement Costs, and any balance of such proceeds (if any) will be applied by the Administrative Agent to the payment of the remaining Obligations (whether then due or not), in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest but including fees, charges and disbursements of counsel to the Agents) payable to the Agents in their capacities as such, ratably, among them in proportion to the amounts described in this clause First payable to them;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Fourth held by them;

Fifth, to the payment of all other Obligations of the Loan Parties that are then due and payable to the Agents and the Lenders on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Agents and the Lenders on such date; and

Sixth, the balance, if any, after all of the Obligations have been paid in full (excluding, for this purpose, any contingent indemnity claims for which no claim has been made), to the Borrower or as otherwise required by Applicable Law.

If the sale or other disposition of the Collateral fails to satisfy all of the Obligations, the Borrower shall remain liable to the Lenders for any deficiency.

**8.6     Remedies, Etc.; Cumulative**. Each right, power and remedy of the Lenders or Agents as provided for in this Agreement or in the other Loan Documents or now or hereafter existing under Applicable Laws or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power or remedy provided for in this Agreement or in the other Loan Documents or now or hereafter existing under Applicable Laws or otherwise, and the exercise or beginning of the exercise by the Lenders or Agents of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise by the Lenders or Agents of any or all such other rights, powers or remedies.

**8.7     Attorney-In-Fact**.

(a)     For the purpose of allowing the Collateral Agent to exercise its rights and remedies provided in this **Section 8** following the occurrence and during the continuation of an Event of Default, each Loan Party hereby constitute and appoint the Collateral Agent its true and lawful attorney-in-fact, with full power of substitution, to enforce any and all rights, interest and remedies of such Loan Party with respect to the Collateral; **provided** that the Collateral Agent shall not enforce any such rights, interest or remedies until the occurrence of an Event of Default and during the continuance thereof, including the right to take any and all appropriate action and to execute any document or instrument that may be necessary or desirable to accomplish the purposes of this Agreement, to preserve the validity, perfection and priority of the Liens granted by this Agreement, and to exercise its rights, remedies, powers and privileges under this Agreement.

(b)     This power of attorney shall be deemed to be a power coupled with an interest and shall be irrevocable but shall automatically terminate upon the payment in full of the Obligations.

**8.8     Sale.**

(a)     The Collateral Agent may dispose of all or any part of the Collateral in accordance with the UCC or any other Applicable Law, at such place or places as are commercially reasonable, and for cash or for credit or for future delivery (without thereby assuming any credit risk), at a public or private sale (as the Required Lenders may direct). Without limiting the foregoing, the Collateral Agent shall give the Borrower ten (10) days' written notice (which the Borrower agrees is reasonable notice within the meaning of Section 9-611 of the UCC or its equivalent in other jurisdictions) of the Collateral Agent's intention to make any sale of Collateral. Such notice, in the case of

63

a public sale, shall state the time and place for such sale. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice of such sale. At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may (acting at the direction of the Required Lenders in their sole and absolute discretion) determine. None of the Agents or Lenders shall be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given. The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. At any public (or, to the extent permitted by Applicable Law, private) sale made pursuant to this Agreement, the Administrative Agent (acting at the direction of the Required Lenders) may bid for the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to the Lenders from the Borrower as a credit against the purchase price. Unless required by the UCC or any other Applicable Law, none of the Agents or Lenders shall have any obligation to engage in public sales or to delay the sale of any Collateral for the period of time necessary to permit the respective issuer thereof to register it for public sale, provided that the Collateral Agent shall use commercially reasonable efforts with respect to any such sale as required by applicable law. As an alternative to exercising the power of sale herein conferred upon it, the Administrative Agent may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver. Any sale pursuant to the provisions of this **Section 8.8** shall be deemed to conform to the commercially reasonable standards as provided in Section 9-610(b) of the UCC or its equivalent in other jurisdictions.

(b)    Each Loan Party recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and applicable state securities laws, the Collateral Agent may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to distribution or resale. Each Loan Party acknowledges that any such private sales may be at prices and on terms less favorable to the Lenders than those obtainable through a public sale without such restrictions. Each Loan Party hereby waives any claims against any Agent or Lender arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, even if the Collateral Agent accepts the first offer received and does not offer the Collateral to more than one offeree, so long as such private sale was conducted in a commercially reasonable manner.

**8.9    Cash Proceeds of Collateral.**

(a)    If so requested by the Collateral Agent (acting at the direction of the Required Lenders) in writing at any time after the occurrence and during the continuation of an Event of Default, each Loan Party shall instruct all of its account debtors in respect of Accounts, Chattel Paper and General Intangibles and all obligors on Instruments to make all payments in respect thereof either (i) directly to the Collateral Agent (by instructing that such payments be remitted to a post office box which shall be in the name and under the control of the Collateral Agent) or (ii) to one or more other banks in the United States of America (by instructing that such payments be remitted to a post office box which shall be in the name and under the control of the Collateral Agent) under arrangements, in form and substance reasonably satisfactory to the Required Lenders,

pursuant to which such Loan Party shall have instructed such other bank (and such other bank shall have agreed) to remit all net Cash proceeds of such payments directly to the Collateral Agent for deposit in accordance with the terms of **Section 8.5**.

(b)    In addition to the foregoing, each Loan Party agrees that, at any time after the occurrence and during the continuation of an Event of Default, if the net Cash proceeds of any Collateral hereunder (including the payments made in respect of Accounts, subject to the requirements of **Section 5.11**) shall be received by it, such Loan Party shall as promptly as possible deposit such net Cash proceeds in a Controlled Account for application in accordance with the terms of **Section 8.5**. Until so deposited, all such net Cash proceeds shall be held in trust by such Loan Party for and as the property of the Collateral Agent and shall not be commingled with any other funds or property of such Loan Party.

## 9.    Pledge of Collateral.

**9.1    Pledge**. Each Loan Party hereby pledges and grants to the Collateral Agent, for the benefit of the Lenders, a security interest in and a Lien on all of such Loan Party's right, title and interest in and to the following property**,** wherever located, whether now owned or in the future acquired by such Person and whether now existing or in the future coming into existence:

(i)    (i) all of the Equity Interests (other than any Equity Interests to the extent an Excluded Asset) now or hereafter owned by such Loan Party in each of its Subsidiaries, in each case together with all certificates evidencing the same (collectively, the "**Pledged Ownership Interests**" and, together with all other items described in clauses (ii)-(vii) of this **Section 9.1(a),** the "**Pledged Ownership Collateral**");

(ii)    all shares, partnership interests, membership interests, Securities, monies or property representing a dividend on any of the Pledged Ownership Interests, or representing a distribution or return of capital upon or in respect of the Pledged Ownership Interests, or resulting from a split-up, revision, reclassification or other like change of the Pledged Ownership Interests or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Ownership Interests;

(iii)    in the event of any consolidation or merger in which any Person identified in **Section 9.1(a)(i)** above is not the surviving Person, all Equity Interests of any class or character in the successor Person (unless that successor Person is the Parent Pledgor or the Borrower, as applicable) formed by or resulting from that consolidation or merger;

(iv)    all rights, privileges, authority and power of such Loan Party, as applicable, under the applicable Organizational Documents of each Person identified in **clause 9.1(a)(i)** above;

(v)    all proceeds, products, accessions, rents, profits and other payments now or hereafter due and payable with respect to any of the Collateral;

(vi)    all books and records of such Loan Party, as applicable, pertaining to any of the Collateral;

(vii)    all claims of such Loan Party for damages arising out of, or for any breach or default relating to, the Pledged Ownership Interests.

(b)    Any and all Casualty Insurance Proceeds;

(c)    all Accounts, Instruments, Documents, Chattel Paper (whether Tangible Chattel Paper or Electronic Chattel Paper), Goods (including Inventory, Equipment, Fixtures and motor vehicles), Payment Intangibles, Software and other General Intangibles and all Letters of Credit and Letter-of-Credit Rights;

(d)    all Deposit Accounts including (i) the Controlled Accounts and all funds and Financial Assets from time to time credited thereto, and all certificates and instruments, if any, from time to time representing or evidencing such accounts and (ii) all interest, dividends, distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the items included in **clause (c);**

(e)    all Investment Property, Financial Assets and Securities Accounts not covered by the foregoing **clauses (c)** and **(d);**

(f)    all Intellectual Property and Ancillary Rights (excluding intent-to-use Trademark applications prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto and acceptance thereof by the United States Patent and Trademark Office, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of or void such intent-to-use trademark application or any registration that may issue therefrom under applicable federal law);

(g)    all Software;

(h)    all Payment Intangibles, Software and all other General Intangibles whatsoever not covered by the preceding clauses of this **Section 9.1;**

(i)    all Commercial Tort Claims described in **Schedule 4.22(e);**

(j)    each and every easement and right-of-way in favor of the Borrower, all other tangible and intangible property of the Loan Parties, including all books, correspondence, credit files, records, invoices, tapes, cards, computer runs and other papers and documents in the possession or under the control of the Loan Parties or any computer bureau or service company from time to time acting for the Loan Parties;

(k)    all rights arising under any contracts, instruments, permits, leases, licenses or other documents (collectively, the "**Assigned Agreements**"); and

(l)    all Proceeds and products in whatever form of all or any part of the other Collateral, including all rents, profits, income and benefits and all Proceeds of insurance and all condemnation awards and all other compensation for any event of loss with respect to all or any part of the other Collateral (together with all rights to recover and proceed with respect to the same), and all accessions to, substitutions for and replacements of all or any part of the other Collateral.

Notwithstanding the foregoing, if any Assigned Agreements or similar rights that by their terms or by operation of Applicable Law would become void, voidable, terminable or revocable or, without limiting the obligation under **Section 9.6(a)** to procure any consent from any third party, in respect of which the applicable Loan Party would be deemed to be in breach or default thereunder if pledged or assigned hereunder or if a security interest therein were granted hereunder, such Assigned Agreement or similar right, as applicable, is expressly excepted and excluded from the Collateral and terms of this Agreement to the extent necessary to avoid such voidness, voidability, terminability, revocability, breach or default.

Notwithstanding anything herein to the contrary, the "Collateral" does not include any Excluded Assets; **provided** that if and when any such item, category or type of property

shall cease to be Excluded Assets, such property shall be deemed at all times from and after such date to constitute Collateral.

**9.2** **Defined Terms**. All terms used in **Section 8.8** and **8.9** and this **Section 9** that are defined in the New York UCC but are not defined in **Section 1.1** shall have the respective meanings assigned to such terms in the New York UCC.

**9.3** **Reinstatement**. The obligations of the Loan Parties under this **Section 9** and the security interest in, and the Lien on, the Collateral shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

**9.4** **Remedies**. Each Loan Party agrees that, as between the Loan Parties, on the one hand, and the Lenders or Agents, on the other hand, any Obligations of the Loan Parties to the Lenders or Agents under this Agreement may, to the extent so permitted by this Agreement and by Applicable Law, be declared to be forthwith due and payable, notwithstanding any stay, injunction or other prohibition (except any applicable prohibitions set forth in this Agreement) preventing such declaration or preventing such Obligations from becoming automatically due and payable, as against the Loan Parties and that, in the event of such declaration or such Obligations being deemed to have become automatically due and payable under this Agreement, such Obligations shall forthwith be deemed to have become due and payable for purposes of this Agreement.

**9.5** **Continuing Obligation**. The obligations provided in this **Section 9** are continuing obligations and shall apply to all Obligations whenever arising.

**9.6** **Perfection**.

(a)    Each Loan Party, as applicable, shall promptly from time to time give, execute, deliver, file, record, authorize or obtain such financing statements and continuation statements and other notices, instruments, documents, agreements or consents in such offices as are or shall be necessary or as the Agents or Required Lenders may determine to be appropriate to create, perfect and establish the first priority of the Liens granted by this Agreement in any and all of the Collateral, to preserve the validity, perfection or first priority of the Liens granted by this Agreement in any and all of the Collateral or to enable the Agents or Lenders to exercise their remedies, rights, powers and privileges under this Agreement (**provided** that, except as otherwise expressly required under this Agreement or with respect to any Energy Supply Agreement or other Material Contract, in no event will any Loan Party be required to procure any consent from any counterparty to a Contract for the benefit of a Lender). Without limiting the foregoing, (i) the Loan Parties shall deliver to the Collateral Agent any and all certificates for all Pledged Ownership Interests, along with (A) an irrevocable proxy substantially in the form of **Exhibit D-1** and (B) an executed transfer document substantially in the form of **Exhibit D-2**; (ii) the Loan Parties shall, with respect to any part of the Pledged Ownership Interests that are not certificated, cause the issuer thereof to register the Collateral Agent as the registered owner thereof, for the benefit of the Lenders, or to enter into agreements to establish the Collateral Agent's control (within the meaning of Section 8-106 of the New York UCC) thereof; (iii) the Loan Parties shall deliver to the Collateral Agent any and all Instruments constituting part of the Collateral in which the Loan Parties purport to grant a security interest hereunder that may be reasonably necessary to perfect, create, establish and preserve the validity, perfection and priority of such security interest, endorsed and/or accompanied by such instruments of assignment and transfer in such form and substance as the Collateral Agent (acting at the direction of the Required Lenders) may reasonably request (**provided,** that so long as no Event of Default shall have occurred and be continuing, the Loan Parties may

retain for collection in the ordinary course any Instruments received by the Loan Parties in the ordinary course of its business and the Agents or the Lenders shall, promptly upon request of the Borrower, make appropriate arrangements for making any Instrument pledged by the Loan Parties available to the Loan Parties for purposes of presentation, collection or renewal (any such arrangement to be effected, to the extent deemed appropriate by the Collateral Agent, against trust receipt or like document)); (iv) the Loan Parties shall give, execute, deliver, file, record, authorize or obtain all such financing statements, notices, instruments, documents, agreements or consents or other papers as may be necessary or desirable in the reasonable judgment of the Collateral Agent (acting at the direction of the Required Lenders) to create, preserve, perfect or validate the security interest granted pursuant hereto or to enable the Agents or the Lenders to exercise and enforce their rights hereunder with respect to such pledge and security interest; **provided** that notices to account debtors in respect of any Accounts, Chattel Paper or General Intangibles and to obligors on Instruments shall be subject to the provisions of **clause (v)** below; (v) the Loan Parties shall, following the occurrence and during the continuation of any Event of Default, upon written request of the Collateral Agent (acting at the direction of the Required Lenders), promptly notify (and the Borrower hereby authorizes the Collateral Agent so to notify) each account debtor in respect of any Accounts, Chattel Paper, Instruments or General Intangibles of the Loan Parties that such Collateral has been assigned to the Collateral Agent hereunder, and that any payments due or to become due in respect thereof are to be made directly to the Agents; (vi) the Loan Parties shall from time to time upon the reasonable written request of the Collateral Agent (acting at the direction of the Required Lenders), cause the Collateral Agent to be listed as the lienholder on any certificate of title covering any motor vehicle owned by the Loan Parties and within forty-five (45) days of such request deliver evidence of the same to the Collateral Agent; (viii) the Loan Parties shall take such actions as the Collateral Agent (acting at the direction of the Required Lenders) may reasonably request in order to grant control in favor of the Collateral Agent with respect to any bill of lading in respect of Eligible Equipment and (ix) the Loan Parties shall take all such other actions, and authenticate or sign and file or record such other records or instruments, as are necessary or as the Agents or the Required Lenders may reasonably request to perfect and establish the first priority of the Liens granted by this Agreement in any and all of the Collateral, to preserve the validity, perfection or first priority of the Liens granted by this Agreement in any and all of the Collateral or to enable the Agents or the Lenders to exercise their remedies, rights, powers and privileges under this Agreement. The Collateral Agent is hereby authorized to file financing or continuation statements and amendments to any of the foregoing, in any jurisdictions and with any filing offices as the Collateral Agent may determine are necessary or advisable to perfect or otherwise protect the security interest granted to the Collateral Agent for the benefit of the Lenders herein. Such financing statements may describe the Collateral in the same manner as described herein or, with respect to each Loan Party as "Debtor" may contain an indication or description of collateral as "all or substantially all assets" of such Loan Party. The Collateral Agent is further authorized to file any Intellectual Property Security Agreements with the USPTO and USCO. The Loan Parties shall furnish to the Collateral Agent from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Collateral Agent may reasonably request, all in reasonable detail. Notwithstanding anything to the contrary in any Loan Document, no Loan Party shall be required, nor shall any Agent be authorized, to perfect any pledge, security interest, or mortgage with respect to Intellectual Property by any means other than through a filing with the USPTO or the USCO, respectively and filing of a UCC-1 financing statement.

(b)      Each Loan Party agrees to (i) with respect to the registration or pending application of each item of its Intellectual Property, take, at its expense, all commercially reasonable

68

steps in its reasonable business judgment, including, without limitation, in the USPTO, the USCO, to pursue the registration and maintenance of each such Patent, Trademark, or Copyright registration or application now or hereafter owned by any such Loan Party, (ii) take all reasonable steps in its reasonable business judgment to preserve and protect each item of its Intellectual Property, including, without limitation, maintaining the quality of any and all products or services used or provided in connection with any of the Trademarks, consistent with the quality of the products and services as of the date hereof, and taking reasonable steps necessary to ensure that all licensed users of any of the Trademarks abide by the applicable license's terms with respect to standards of quality and (iii) concurrently with the delivery of financial statements pursuant to **Sections 5.1(a)** or **5.1(b)**, (x) provide a list of any registrations and applications for registration of United States Intellectual Property not previously disclosed to the Administrative Agent including such information as is necessary for such Loan Party to make appropriate filings in the USPTO and USCO, including if any intent-to-use trademark application has converted to an actual use based application (or otherwise issued as a registration); and (ii) execute and deliver to the Administrative Agent Intellectual Property Security Agreements containing descriptions of such Intellectual Property in appropriate form for filing and recording in the USPTO and/or USCO, as applicable, and promptly file such Intellectual Property Security Agreements with the USPTO and/or USCO; for the avoidance of doubt, the provisions hereof shall automatically apply to such Intellectual Property and such Intellectual Property shall automatically constitute Collateral hereunder.

(c)    (i) No Loan Party shall file or suffer to be on file, or authorize or permit to be filed or to be on file, in any jurisdiction, any financing statement or like instrument with respect to any of the Collateral in which the Collateral Agent is not named as the sole secured party or with respect to any other Pledged Ownership Collateral other than Permitted Liens and (ii) the Loan Parties shall not cause or permit any Person other than the Collateral Agent to have "control" (as defined in Sections 9-104, 9-105, 9-106 or 9-107 of the UCC) of any Controlled Account or Deposit Account, Electronic Chattel Paper, Investment Property or Letter-of-Credit Right constituting part of the Collateral.

(d)    (i) For the purpose of enabling the Collateral Agent to exercise the rights, remedies, powers and privileges under **Section 8** following the occurrence and continuation of an Event of Default and **provided** that the Collateral Agent is lawfully entitled to exercise those rights, remedies, powers and privileges, and for no other purpose, the Loan Parties hereby grant to the Collateral Agent, to the extent assignable, an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to the Loan Parties) to use, assign, license or sublicense any of the Intellectual Property and Ancillary Rights of the Loan Parties, together with reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout of those items; **provided** that such license, and any sublicense thereof, with respect to Trademarks, shall be subject to the maintenance of reasonable quality standards with respect to the goods and services on which such Trademarks are used sufficient to preserve the validity of such Trademarks.

(i)    Notwithstanding anything contained herein to the contrary, but subject to the provisions of **Section 6** of this Agreement, so long as no Event of Default shall have occurred and be continuing, the Loan Parties will be permitted to exploit, use, enjoy, protect, license, sublicense, assign, sell, dispose of or take other actions with respect to the Intellectual Property in the ordinary course of the business. In furtherance of the foregoing, unless an Event of Default shall have occurred and be continuing the Agents or Lenders shall from time to time, upon the request of the Borrower and at the Borrower's expense, execute and deliver any instruments, certificates or other documents, in the form so requested, that the Borrower shall request and deem appropriate (in its judgment) to allow the

Loan Parties to take any action permitted above (including relinquishment of the license provided pursuant to clause (i) immediately above as to any specific Intellectual Property). Further, upon the Termination Date or earlier expiration of this Agreement or release of the Collateral, the license granted pursuant to clause (i) shall immediately and automatically revert back to the Loan Parties without any further action by the Parties hereto. The exercise of rights and remedies under **Section 8** by the Agents or Lenders shall not terminate the rights of the holders of any licenses or sublicenses theretofore granted by the Loan Parties in accordance with the first sentence of this clause (ii).

(e) Each Loan Party agrees that, if it shall acquire any interest in any Commercial Tort Claim (whether from another Person or because such Commercial Tort Claim shall have come into existence), (i) such Loan Party shall, as promptly as commercially reasonable upon such acquisition, deliver to the Collateral Agent, a notice of the existence and nature of such Commercial Tort Claim and deliver a supplement to **Schedule 4.22(e)** containing a specific description of such Commercial Tort Claim, certified by such Loan Party as true, correct and complete, (ii) the provision of **Section 9.1(j)** shall apply to such Commercial Tort Claim (and such Loan Party authorizes the Collateral Agent to supplement such annex with a description of such Commercial Tort Claim if such Loan Party fails to deliver the supplement described in clause (i)), and (iii) such Loan Party shall execute and deliver to the Collateral Agent, in each case in form and substance reasonably satisfactory to the Collateral Agent (acting at the direction of the Required Lenders), any certificate, agreement and other document, and take all other action, deemed by the Collateral Agent (acting at the direction of the Required Lenders) to be reasonably necessary or appropriate for the Collateral Agent to obtain a first-priority, perfected security interest in all such Commercial Tort Claims. Any supplement to **Schedule 4.22(e)** delivered pursuant to this **Section 9.6(e)** shall become part of such **Schedule 4.22(e)** for all purposes hereunder.

**9.7** **Special Provisions Relating to Securities.**

(a) So long as no Event of Default has occurred and is continuing, the Loan Parties shall have the right to exercise all voting, consensual rights and other powers of ownership pertaining to all Pledged Ownership Collateral for all purposes not inconsistent with the terms of the Loan Documents **(provided, however,** that the Loan Parties shall not vote any Pledged Ownership Collateral in any manner that is inconsistent with any of the terms of any Loan Document or the Organizational Documents of the pledged entity).

(b) If an Event of Default has occurred and is continuing: (i) all rights of the Loan Parties to exercise or refrain from exercising the voting, consensual rights and other powers of ownership pertaining to the Collateral which it would otherwise be entitled to exercise shall cease and all such rights shall thereupon become vested in the Collateral Agent, for the benefit of the Lenders, who shall thereupon have the sole right, but shall be under no obligation, to exercise or refrain from exercising such voting, consensual rights and other powers of ownership and (ii) the Collateral Agent (acting at the direction of the Required Lenders) shall have the right, without notice to any Loan Party, to transfer all or any portion of the Collateral to its name or the name of its nominee or agent.

**9.8** **Rights and Obligations**. No reference in this Agreement to proceeds or to the sale or other disposition of Collateral shall authorize any Loan Party to pledge, sell or otherwise dispose of any Collateral, except as otherwise permitted under this Agreement. None of the Agents or Lenders shall be required to take steps necessary to preserve any rights against prior parties to any part of the Collateral. Each Loan Party shall remain liable to perform its duties and obligations under the Assigned Agreements in accordance with their respective terms to the

same extent as if this Agreement had not been executed and delivered. The exercise by the Agents or the Lenders of any right, remedy, power or privilege in respect of this Agreement shall not release any Loan Party from any of its duties and obligations under those contracts and agreements. None of the Agents or Lenders shall have any duty, obligation or liability under those Assigned Agreements included in the Collateral by reason of this Agreement, any other Loan Document, nor shall the Lenders or Agents be obligated to perform any of the duties or obligations of any Loan Party under any such Assigned Agreement or to take any action to collect or enforce any claim (for payment) under any such Assigned Agreement.

**9.9**    **Termination and Release of Collateral**.

(a)    Upon any Subsidiary ceasing to be a Subsidiary of the Borrower or a Subsidiary Guarantor as a result of a transaction permitted under the Loan Documents, the Liens, security interests and all other rights granted hereby in respect of the Collateral consisting of the Pledged Ownership Collateral in such Subsidiary shall automatically terminate and shall revert to the Borrower or such Subsidiary Guarantor, as applicable.

(b)    Upon the Termination Date, and subject to **Section 9.3,** this Agreement and the Liens, security interests and all other rights granted hereby shall automatically terminate and all rights to the Collateral shall revert to the Loan Parties.

# 10.    Guaranty.

**10.1**    **Guaranty**. Parent Pledgor and each Subsidiary Guarantor (each, a "**Guarantor**") hereby guarantees, as a primary obligor and not as a surety to the Agents and the Lenders and their respective successors and assigns, the prompt payment in full when due or performance by the Borrower of all Obligations of the Borrower now or hereafter existing under the Loan Documents, including the full and punctual payment when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including any such interest, fees and other costs and expenses that accrue after the commencement by or against the Borrower, any Guarantor or any of its Affiliates of any proceeding under any existing or future Applicable Laws relating to bankruptcy, insolvency, reorganization, or other relief of debtors, naming such Person as the debtor in such proceeding, regardless of whether such interest, fees or other costs and expenses are allowed claims in such proceeding), of all principal, interest, fees, expenses or otherwise (the "**Guaranteed Obligations**"). Each Guarantor hereby agrees that if the Borrower shall fail to pay in full when due or perform any of the Guaranteed Obligations, such Guarantor will promptly pay the same in cash or perform, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due in accordance with the terms of such extension or renewal.

**10.2**    **Obligations Unconditional**. The obligations of each Guarantor under **Section 10.1** shall constitute a guarantee of payment and performance and to the fullest extent permitted by Applicable Law, are absolute, irrevocable and unconditional irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Loan Parties under this Agreement, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor (except for payment, performance or satisfaction in full of the Guaranteed Obligations). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of any Guarantor hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above: (i) at any time or from time to time, without notice to any Guarantor, to the fullest extent permitted by Applicable Law, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived; (ii) any of the acts mentioned in any of the provisions of this

Agreement or any other agreement or instrument referred to herein or therein shall be done or omitted; (iii) the maturity of any of the Obligations that comprise Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or, except as permitted pursuant to **Section 10.6,** any security therefor shall be released or exchanged in whole or in part or otherwise dealt with; or (iv) any Lien or security interest granted to, or in favor of the Collateral Agent as security for any of the Guaranteed Obligations shall fail to be perfected.  Notwithstanding anything set forth herein, and in addition thereto, if at any time all or any part of any payment received by any Lender or Agent from any Guarantor under or with respect to this under this **Section 10** is or must be rescinded or returned for any reason whatsoever (including, but not limited to, a determination that said payment was a voidable preference or fraudulent transfer under insolvency, bankruptcy or reorganization laws), then the Guarantor's obligations hereunder shall, to the extent of the payment rescinded or returned or is subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid, be deemed to have continued in existence, notwithstanding such previous receipt of payment by the applicable Lender or Agent, and such Guarantor's obligations hereunder shall continue to be effective or be automatically reinstated as to such payment, all as though such previous payment to such Lender or Agent had never been made and, in such event, the Guarantor will pay to such Lender or Agent upon demand an amount equal to any such payment that has been rescinded, returned, invalidated, declared to be fraudulent or preferential, set aside and/or repaid. The provisions of the foregoing sentence shall survive termination hereof, and shall remain a valid and binding obligation of the Guarantor until the Guaranteed Obligations and the other obligations of the Guarantor hereunder are indefeasibly satisfied in full.

Each Guarantor hereby expressly waives diligence, presentment, demand of payment, protest and, to the fullest extent permitted by Applicable Law, all notices whatsoever (other than notices expressly provided for in this Agreement or the other Loan Documents to such Guarantor), and any requirement that the Agents or the Lenders exhaust any right, power or remedy or proceed against any Loan Party under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. Each Guarantor waives, to the extent permitted by law, any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by the Agents or Lenders upon this Guaranty or acceptance of this Guaranty, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guaranty, and all dealings between the Loan Parties and the Agents or Lenders shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guaranty. This Guaranty shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by the Agents or the Lenders, and the obligations and liabilities of each Guarantor hereunder shall not be conditioned or contingent upon the pursuit by the Agents or Lenders or any other Person at any time of any right or remedy against any Loan Party or against any other Person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guaranty shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon each Guarantor and the successors and assigns thereof, and shall inure to the benefit of the Agents and the Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

**10.3**   **Reinstatement**. The obligations of each Guarantor under this **Section 10** shall not be satisfied and shall be automatically reinstated if and to the extent that for any reason any payment by or

on behalf of the Borrower or any Guarantor in respect of the Obligations that comprise the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

10.4    **Subrogation**. Each Guarantor hereby agrees that until the payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Loans and the Commitments under this Agreement, it shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in **Section 10.1,** whether by subrogation or otherwise, against the Borrower or any other guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.

10.5    **Remedies**. Each Guarantor agrees that, as between such Guarantor on the one hand and the Agents and Lenders on the other hand, the obligations of the Borrower under this Agreement and the Notes that constitute the Guaranteed Obligations, if any, may be declared to be forthwith due and payable as provided in **Section 8.1** for purposes of **Section 10.1,** notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by such Guarantor for purposes of **Section 10.1**.

10.6    **Release of Subsidiary Guarantors**.

(a)    Upon any Subsidiary Guarantor ceasing to be a Subsidiary of the Borrower as a result of a transaction permitted under the Loan Documents, the Guaranteed Obligations of such Subsidiary Guarantor shall terminate.

(b)    Upon the Termination Date, subject to **Section 10.3,** this Agreement and the guarantees made herein shall terminate with respect to all Guaranteed Obligations.

(c)    Upon any such termination pursuant to **Section 10.6(a)** or **Section 10.6(b)**, the Agents and Lenders shall, at the expense of and upon written direction from the Borrower, execute and deliver to the Borrower such documents as the Borrower shall reasonably request to evidence such termination and to release the Guaranty, in each case, without recourse, representation or warranty; **provided** at any Agent's reasonable request, the Borrower shall have delivered to the Agents a certificate of an Authorized Officer of the Borrower certifying that any such transaction has been consummated in compliance with this Agreement and the other Loan Documents and that such release is not prohibited hereby.

# 11.    **Miscellaneous.**

11.1    **Course of Dealing; Amendment**. No course of dealing between any Agent, the Lenders and the Borrower shall be effective to amend, modify or change any provision of this Agreement or the other Loan Documents. The Agents and the Lenders shall have the right at all times to enforce the provisions of this Agreement and the other Loan Documents in strict accordance with the provisions hereof and thereof, notwithstanding any conduct or custom on the part of the Lenders in refraining from so doing at any time or times. The failure of the Agents or Lenders at any time or times to enforce its respective rights under such provisions, strictly in accordance with the same, shall not be construed as having created a custom in any way or manner contrary to specific provisions of this Agreement or the other Loan Documents or as having in any way or manner modified or waived the same. This Agreement and the other Loan Documents may not be amended, modified, or changed in any respect except by an agreement in writing signed by the Agents, the Required Lenders and the Borrower and, in the case of **Sections 9 and 10** and any provision of **Section 10** applicable to the Guarantors, the

Guarantors; **provided** that, no amendment, modification or change shall be effective if the effect thereof would:

(a)     extend or increase the Commitment of any Lender without the consent of such Lender;

(b)     reduce or forgive the principal amount of, the rate of interest specified herein on, any Loan, or any fees, interest or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender that would be directly and adversely affected thereby;

(c)     postpone any date scheduled for any payment of interest, fees or principal (including final maturity) hereunder (or any grace period with respect thereto) without the written consent of each Lender that would be directly and adversely affected thereby;

(d)     change the application of proceeds among the Lenders pursuant to this Agreement or any applicable Loan Document, including the order of application of any prepayment of Loans from the application thereof as set forth in **Section 2.3(e)** or the provisions of **Section 8.5**, or any provision providing for the pro rata sharing of payments among the Lenders (including **Section 2.10**) without the written consent of each Lender that would be directly and adversely affected thereby;

(e)     amend, modify, terminate or waive any provision of this **Section 11.1** without the written consent of each Lender;

(f)     subordinate (x) the Liens on the Collateral securing any of the Obligations to Liens securing any other Indebtedness or other obligations or (y) any Obligations in right of payment to any other Indebtedness or other obligations without the written consent of each Lender;

(g)     change the voting percentage in the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder and thereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

(h)     release all or substantially all of the value of the Collateral in any transaction or series of related transactions without the written consent of each Lender; or

(i)     release all or substantially all of the value of the Guaranty without the written consent of each Lender.

**11.2**     **Notices**. All notices to or upon the Parties, required or permitted hereunder, shall be given by delivery to a nationally recognized overnight express courier service which provides a receipt for delivery, or by certified mail, postage prepaid, return receipt requested, or by electronic mail transmission, addressed to the Person to whom such communication is to be given, at the following addresses:

If to any Lender:     As separately designated in writing by such Lender to the Administrative Agent.

If to the Administrative Agent or Collateral Agent:

GLAS USA LLC
3 Second Street, Suite 206
Jersey City, NJ 07311
Attention: Transaction Management Team – Powin LLC

|                          | Email: tmgus@glas.agency;<br>clientservices.americas@glas.agency |
|--------------------------|------------------------------------------------------------------|

|                          |                                                                  |
|--------------------------|------------------------------------------------------------------|
| With a copy to:          | Reed Smith<br>599 Lexington Avenue, 22nd Floor<br>New York, NY 10022<br>Attention: Nicholas Vislocky<br>Email: nvislocky@reedsmith.com |
| If to the Calculation Agent: | As separately designated in writing to the Borrower, the Administrative Agent and the Lenders. |
| If to the Borrower:      | Powin, LLC<br>20550 SW 115th Ave.<br>Tualatin, OR 97062<br>Attention: Chad Paulson<br>Email: Chad.Paulson@powin.com |
| With a copy to:          | Kirkland & Ellis LLP<br>609 Main Street<br>Houston, TX 77002<br>Attention: Lucas E. Spivey<br>Email: lucas.spivey@kirkland.com |

Notices shall be deemed given on receipt or upon refusal of delivery if sent by recognized overnight express courier or electronic mail, or United States postal service, if by certified mail, postage prepaid, return receipt requested. Any of the persons listed above may, by notice given hereunder, designate any further or different addresses to which subsequent notices, certificates or other communications shall be sent, such further or different address to be effective at the later of ten (10) days after notice of such further or different address is sent or the date designated in such notice.

**11.3**  **Costs and Expenses**. The Borrower shall pay to the Agents and Lenders on demand all fees, recordation, reasonable and documented costs and expenses of whatever kind and nature, including reasonable and documented attorneys' fees of one external counsel in each applicable jurisdiction to the Agents, one external counsel in each applicable jurisdiction to the Calculation Agent and one external counsel in each applicable jurisdiction to the Lenders, and disbursements, which the Agents or Lenders may incur or which are payable in connection with the administration of the Commitments and the Loans, including the administration hereof and of the other Loan Documents and any disbursements, amendments, modifications or waivers of the provisions hereof or thereof, the recording or filing of any and all of the Loan Documents and obtaining lien searches, appraisals, engineering reports, environmental reports, audits, and title insurance policies.

**11.4**  **Applicable Law; Consent to Jurisdiction**. This Agreement and the other Loan Documents have been delivered to and accepted by the Agents and Lenders and will be deemed to be made in the State of New York. This Agreement and any other Loan Document (unless otherwise expressly provided for therein), and the rights and obligations of the parties hereunder shall be governed by and determined in accordance with the laws of the State of New York, both in interpretation and performance (and whether in law or in equity, whether in contract or tort or otherwise), **provided** that the law governing perfection, the effect of perfection or non-perfection, and the priority of security interests, shall be determined in accordance with Part 3 Subpart 1 of Article 9 of the UCC. The Loan Parties irrevocably and unconditionally agree that

75

they will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against any Agent or Lender in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by Applicable Law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or in any other Loan Document shall affect any right that the Agents or Lenders may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Loan Parties or their properties in the courts of any jurisdiction. The Loan Parties irrevocably and unconditionally waive, to the fullest extent permitted by Applicable Law, any objection that any of them may now or hereafter have to the laying of venue of any action or proceeding relating to this Agreement or any other Loan Document in any court referred to in this **Section 11.4**. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by Applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

11.5   **Waiver of Jury Trial**. TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE AGENTS, THE LENDERS AND LOAN PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH, THE LOANS, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN), OR ACTIONS OF THE AGENTS, THE LENDERS OR THE LOAN PARTIES (IN EACH CASE, WHETHER IN LAW OR IN EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LOAN PARTIES, THE AGENTS AND THE LENDERS TO ENTER INTO THIS AGREEMENT.

11.6   **Assignment and Participations**. The Loan Parties shall not have the right to assign their respective rights or obligations hereunder or any interest herein without the prior written consent of the Administrative Agent and the Lenders. Any Lender may, upon notice to the Administrative Agent, sell, assign or transfer to any Person (other than to a Loan Party, and Permitted Holder (other than any Warrant Holder) or an Affiliate thereof), all or any part of the Obligations or all or any part of the Loan Documents (including all or a portion of the Commitments outstanding and the Loans at that time owing) and, in each case, such transferee shall have the right to enforce the provisions of the Loan Documents and any of the Obligations as fully as a Lender; **provided** that the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required for such assignment unless the transferee is FS KKR Capital Corp., Asset Based Finance Partners I, Asset Based Finance Partners II or an entity wholly owned (directly or indirectly) or managed by Global Atlantic Financial Company or any other Lender or Eligible Assignee; **provided, further,** that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the transferring Lender within ten (10) Business Days after having received notice thereof; **provided, further**, that no consent of the Borrower shall be required if an Event of Default has occurred and is continuing. The transferring Lender shall provide, and Borrower

and Administrative Agent shall retain, a copy of any document affecting any such assignment. The Administrative Agent shall maintain a register for the recordation of the names and addresses of each Lender and any assignee, the commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender or assignee pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, each Lender and their respective assignees shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice. In addition, any Lender may, upon notice to the Administrative Agent but without the consent of the Borrower, sell or grant to any Person (other than to a Loan Party or an Affiliate thereof) participations in all or any part of the Obligations or all or any part of the Loan Documents. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Obligations or other obligations under the Loan Documents (a "**Participant Register**"); **provided** that no Lender or assignee shall have any obligation to disclose all or any portion of such Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in such Participant Register shall be conclusive absent manifest error, and such Lender that sells a participation shall treat each Person whose name is recorded in such Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

**11.7**   **Limitation on Liability**. No claim shall be made by any Loan Party against either Agent, any Lender or any of their Affiliates, or any of their directors, employees, attorneys or agents, on the one hand, or by the Agents or the Lender against the Loan Parties or any of its Affiliates, or any of its directors, employees, attorneys or agents, on the other hand, for any loss of profits, business or anticipated savings, special or punitive damages or any indirect or consequential loss whatsoever in respect of any breach or wrongful conduct (whether or not the claim therefor is based on contract, tort or duty imposed by law), in connection with, arising out of or in any way related to the transactions contemplated by this Agreement or the other Loan Documents or any act or omission or event occurring in connection therewith, and the Loan Parties and the Agents and Lenders each hereby waives, releases and agrees not to sue upon any such claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

**11.8**   **Indemnification**.

(a)   The Borrower hereby agrees to indemnify and defend each Agent, the Calculation Agent and Lender and each legal entity, if any, who controls, is controlled by or is under common control with, either Agent, the Calculation Agent or any Lender, as the case may be, and each of their respective directors, officers, employees, attorneys, agents and their respective successors (each an "**Indemnified Party**") against, all liabilities, losses, damages (including all reasonable fees and charges of one external counsel in each applicable jurisdiction to the Agents, one external counsel in each applicable jurisdiction to the Calculation Agent and one external counsel in each applicable jurisdiction to the Lenders with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor), causes of action, suits, claims, costs and expenses, demands and judgments of any nature incurred by, imposed upon or asserted against any Indemnified Party, arising out of, in connection with, or by reason of (i) the execution or delivery of any Loan Document or any agreement or instrument contemplated by any Loan Document, the performance (or failure to perform) by the parties thereto of their respective obligations under any Loan

Document or the consummation of the transactions contemplated by the Loan Documents, (ii) the Commitments, any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Substances on or from the Real Property or on or from any property currently or formerly owned, leased or operated by any Loan Party, or any Environmental Claim related to the Borrower or any of its Affiliates relating to the Real Property in any way, or (iv) any actual or prospective claim, investigation, litigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any of its Affiliates, and regardless of whether any Indemnified Party is a party thereto; **provided** that such indemnity shall not be available to any Indemnified Party to the extent that such causes of action, suits, claims, damages, demands, judgements, losses, liabilities or related costs or expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnified Party. This **Section 11.8(a)** shall not apply with respect to Taxes directly imposed on any Agent, the Calculation Agent or Lender other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(b)      The Borrower shall pay all amounts due under this **Section 11.8** promptly after demand therefor.

(c)      The provisions of this **Section 11.8** shall survive the termination of this Agreement, the resignation or removal of any Agent, the termination of the Commitments, the payment in full of the Obligations and the assignment of any rights hereunder by any Agent or Lender.

**11.9      Entire Agreement**. This Agreement, the other Loan Documents and any agreement, document or instrument referred to herein to which the Administrative Agent, the Collateral Agent, the Lender or the Borrower are parties integrate all the terms and conditions mentioned herein or incidental hereto and supersede all oral negotiations and prior writings with respect to the subject matter hereof. In the event of any conflict between the terms, conditions and provisions of this Agreement and any such agreement, document or instrument, the terms, conditions and provisions of this Agreement shall control.

**11.10      No Advisory or Fiduciary Responsibility; No Partnership, Etc**.

(a)      The Agents, the Lenders and the Loan Parties intend that the relationship between them shall be solely that of creditor, on the one hand, and debtor on the other. Nothing contained in this Agreement, the Note or in any of the other Loan Documents shall be deemed or construed to create a partnership, tenancy-in-common, joint tenancy, joint venture or co-ownership by or between the Agents, the Lenders and the Loan Parties or any other Person. None of the Agents or the Lenders shall be in any way responsible or liable for the debts, losses, obligations or duties of the Loan Party or any Affiliate of any of the Loan Parties.

(b)      In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its respective Subsidiaries' understanding, that: (a) (i) the arranging and other services regarding this Agreement provided by the Agents and the Lenders are arm's-length commercial transactions between the Loan Parties and each of their respective Affiliates, on the one hand, and the Agents and Lenders, on the other hand, (ii) the Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate, and (iii) the Loan Parties are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) each Agent

and Lender is and has been acting solely as a principal and each Agent is acting as agent of the Lenders and, except as expressly agreed in writing, none of any Lender or Agent has been, is, or will be acting as an advisor, agent or fiduciary for the Loan Parties or any of their respective Affiliates, or any other Person and (ii) no Agent or Lender has any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (c) each Agent, each Lender and their Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Agents or Lenders have any obligation to disclose any of such interests to the Loan Parties or their respective Affiliates. To the fullest extent permitted by Applicable Law, each Loan Party hereby waives and releases any claims that it may have against any Agent or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**11.11** **Severability**. In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby, and the Parties shall enter into good faith negotiations to replace the invalid, illegal or unenforceable provision.

**11.12** **Survival**. All representations, warranties and covenants contained among the provisions of this Agreement and the other Loan Documents shall survive the execution and delivery of this Agreement and all the other Loan Documents until the termination of this Agreement (other than indemnity or other obligations that expressly survive the termination of this Agreement as stated herein or in any other Loan Document).

**11.13** **Time of Essence**. Time is of the essence in connection with all obligations of the Loan Parties hereunder and under any of the other Loan Documents.

**11.14** **Duplicate Originals and Counterparts**. This Agreement and any Supplements hereto or in connection herewith may be executed in any number of duplicate counterparts, each of which shall be deemed to be an original, and all taken together shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart. The words "execution," "signed," "signature," and words of like import in this Agreement and the other Loan Documents and any Supplements hereto or in connection herewith shall be deemed to include electronic signatures or the keeping of electronic records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**11.15** **No Third Party Beneficiary**. This Agreement is made solely and specifically by and for the benefit of the Parties, and their respective permitted successors and assigns, and no other Person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise; **provided,** that for the avoidance of doubt, this **Section 11.15** shall not apply to or limit in any way the rights, benefits or remedies of any Indemnified Party.

**11.16** **Non-Usurious Interest**. Notwithstanding any provision of this Agreement to the contrary, in no event shall the interest contracted for, charged or received in connection with the Loan (including any other costs or considerations that constitute interest under Applicable Law which are contracted for, charged or received pursuant to this Agreement) exceed the maximum rate of interest allowed under Applicable Law.

**11.17**    **Publicity**. Any publicity and press releases that the Loan Parties may wish to publish mentioning the either or both Agents or any Lender, and any publicity and press releases that the Agents or any Lender may wish to publish mentioning any of the Loan Parties or any of their respective Affiliates, shall in each case be subject to the other Parties' prior written approval, such approval not to be unreasonably withheld, conditioned or delayed; **provided** that no approval shall be required for any public disclosure that is required to comply with Applicable Law.

**11.18**    **Confidentiality**.

(a)    Each of the Agents, the Calculation Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), and use the Information only in connection with the transactions contemplated hereby, except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, investment partners, members, directors, officers, employees, agents, trustees, advisors, auditors, insurers and representatives (**provided** that the Person to whom such disclosure is made needs to know such Information in connection with the transactions contemplated hereby and it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and shall either (i) be bound by professional duties to keep such information confidential, or (ii) have agreed to be bound by the confidentiality and use provisions of this **Section 11.18** to the same extent as if they were parties hereto and that the disclosing Person shall be responsible for any breach of this provision), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it or any stock exchange on which the shares of the participating fund or its Affiliates are listed, (c) to the extent required by Applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto on a confidential basis, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) to any assignee of or participant in, or any prospective assignee of or participant in, any of the Agents' or Lenders' rights or obligations under this Agreement, **provided** that such party is subject to a confidentiality agreement with the respective Agent or Lender containing substantially similar provisions as those of this **Section 11.18**, (g) to any current or potential source of debt, equity or other financing to any Agent or Lender; **provided** that such party is subject to a confidentiality agreement with such Agent or Lender containing substantially similar provisions as those of this **Section 11.18**, (h) with the prior written consent of the Borrower, or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this **Section 11.18** or other known confidentiality agreement or obligation, (y) becomes available to any Agent, the Calculation Agent or Lender on a nonconfidential basis from a source other than the Borrower that was not known to be bound by a confidentiality agreement or obligation or (z) is independently developed by any Agent, the Calculation Agent or any Lender without the use of such information; **provided** that with respect to clauses (b) and (c), such Agent, the Calculation Agent or Lender provides notification to the Borrower within a reasonable time prior to any disclosure or, if such prior notification is not reasonably practicable, then as soon as reasonably practicable, in either case to the extent such notification is not prohibited by the regulatory authority to which such disclosure is made, the legal process in which such disclosure is made and Applicable Law, as applicable. For purposes of this **Section 11.18**, "**Information**" means all information received from or on behalf of the Borrower or any of its Affiliates relating to any of its businesses or Affiliates, other than any such information that is available to either Agent, the Calculation Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower or such Affiliate. Each Agent, the Calculation Agent and Lender shall be considered to have complied with its obligation to do so if such Person

has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)       Each of the Agents and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a subsidiary thereof, as the case may be, (b) it has developed reasonable and customary compliance procedures regarding the use of material nonpublic information and (c) it will handle such material non-public information in accordance with Applicable Law, including United States Federal and state securities laws. The obligations contained in this **Section 11.18** shall survive the expiration or termination of this Agreement.

**11.19   USA PATRIOT Act**. Each Lender and Agent hereby notifies the Loan Parties that pursuant to the requirements of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "**PATRIOT Act**") and the Beneficial Ownership Regulation, it is required to obtain, verify, and record information that identifies the Loan Parties, which information includes the name and address of each Loan Party and other information that will allow such Lender or Agent to identify each Loan Party in accordance with the PATRIOT Act, and each Loan Party agrees to provide such information from time to time to the Lenders.

**11.20   Headings**. Paragraph headings and a table of contents have been inserted in this Agreement as a matter of convenience for reference only and it is agreed that such paragraph headings are not a part of this Agreement and shall not be used in the interpretation of any provision of this Agreement.

**11.21   Other Transactions**. Nothing contained herein shall preclude any Agent or Lender from engaging in any transaction, in addition to those contemplated by the Loan Documents, with the Borrower or a subsidiary thereof or any of its Affiliates that is not otherwise prohibited under this Agreement.

**11.22   Certain ERISA Matters.**

(a)       Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of any Loan Party, that at least one of the following is and will be true:

(i)       such Lender is not using "plan assets" (within the meaning of the Plan Asset Regulations) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement,

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable, and the conditions of such exemption have been satisfied, with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)     (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such

81

Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)     such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)     In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of any Loan Party, that the Administrative Agent is not a fiduciary with respect to the Collateral or the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

## 12.     Administrative Agent

### 12.1     Appointment and Authority.

(a)     Each of the Lenders hereby irrevocably appoints GLAS USA LLC to act on its behalf as the administrative agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Except as otherwise provided in **Section 12.6(b),** the provisions of this Section are solely for the benefit of the Administrative Agent and the Lenders, and the Borrower shall not have rights as a third-party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Document (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b)     The Administrative Agent shall not be required to expend or risk any of its own funds or otherwise incur any liability, financial or otherwise, in the performance or any of its duties under the Loan Documents.

(c)     Notwithstanding anything herein to the contrary, the Administrative Agent may:

(i)     refrain from acting or continuing to act in accordance with any instructions given under the Security Documents to begin any legal action or proceeding or to take any other remedial action arising out of or in connection with any Loan Document until it shall have received such indemnity or security from the

instructing Lenders as it may reasonably require (whether by payment in advance or otherwise) for all reasonable costs, claims, losses, damages, expenses (including reasonable legal fees and expenses) and liabilities, including taxes (other than taxes based upon, measured by or determined by its income or that are franchise taxes or branch profits taxes), which it will or may expend or incur in complying or continuing to comply with such instructions; provided, that nothing in this subclause (i) shall be deemed to obligate the instructing Lenders to provide any such indemnity or security;

(ii)    seek instructions from the Lenders as to the exercise of any of its rights, powers, authorities or discretions hereunder or under any Loan Document (including any consents, notices, requests, amendments, waivers, modifications, acceptances or remedies) (including, for the avoidance of doubt, the making of any draws under, delivering any certificates in connection with, surrendering, or otherwise taking actions related to, any letter or letters of credit of which the Administrative Agent is a beneficiary as part of the transactions contemplated by the Loan Documents), and in the event that it does so, it shall not be considered as having acted unreasonably when acting in accordance with such instructions or, in the absence of any clear instructions, when refraining from taking any action or exercising any right, power or discretion hereunder or thereunder; and

(iii)    in its exclusive discretion, to obey and comply with all writs, orders, judgments, or decrees issued by any court or administrative agency of competent jurisdiction affecting any monies, documents or other property held by them in connection with the Loan Documents. The Administrative Agent shall not be liable to any of the parties hereto or the Collateral Agent or its successors, heirs, or personal representatives by reason of the Administrative Agent's compliance with such writs, orders, judgments or decrees, notwithstanding such writ, order, judgment or decree is later reversed, modified, set aside or vacated.

(d)    The Administrative Agent may request that the Borrower deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Loan Documents, which certificate may be signed by any person authorized to sign such a certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(e)    The Administrative Agent may consult with counsel, and the advice of such counsel selected by the Administrative Agent in good faith and with due care or any opinion of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in accordance with the written opinion and advice of such counsel.

**12.2**    **Rights as a Lender**. The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its branches and Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, the Borrower or any Subsidiary or other Affiliate thereof as if such Person

were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

**12.3    Exculpatory Provisions**.

(a)    The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

   (i)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

   (ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders; provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or Applicable Law;

   (iii)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its branches or Affiliates in any capacity; and

   (iv)    shall not have any duty to monitor or maintain the Collateral.

(b)    The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders, or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment. The Administrative Agent shall not incur any liability to any Person by reason of so refraining and if, in performing its duties under this Agreement, the Administrative Agent is required to decide between alternative courses of action or has received conflicting directions or any other directions from any other Lender, the Administrative Agent may refrain from taking any action until it receives instructions from the Required Lenders.  The Administrative Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until notice describing such Default is given to the Administrative Agent in writing by the Borrower or a Lender in accordance with this Agreement.

(c)    The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance by any other party to this Agreement of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in **Section 3** or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

(d)    It is understood and agreed by each Lender (for itself and any other Person claiming through it) that, except as expressly set forth herein, each Lender has itself been, and will continue to be, solely responsible for making its own independent appraisal of, and

investigations into, the financial condition, creditworthiness, condition, affairs, status and nature of each Person and, accordingly, each Lender warrants to the Administrative Agent that it has not relied on and will not hereafter rely on the Administrative Agent:

    (i)        to check or inquire on its behalf into the adequacy, accuracy or completeness of any information provided by any Person in connection with any Loan Document or the transactions therein contemplated (whether or not such information has been or is hereafter circulated to such Person by the Administrative Agent); or

    (ii)       to assess or keep under review on its behalf the financial condition, creditworthiness, condition, affairs, status or nature of any Person.

**12.4**    **Reliance by Administrative Agent**. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**12.5**    **Delegation of Duties**. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub agents appointed by the Administrative Agent. The Administrative Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this **Section 12** shall apply to any such sub agent and to the Related Parties of the Administrative Agent and any such sub agent, and shall apply to their respective activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub agents.

**12.6**    **Resignation of Administrative Agent**.

    (a)    The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right to appoint a successor, which shall be a Lender, or an Affiliate of the Administrative Agent or of any Lender or, in consultation with the Borrower, a third party. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "**Resignation Effective Date**"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor or petition to a court of competent jurisdiction (at the expense of Borrower) to appoint such a successor meeting the qualifications set forth above.

Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)     With effect from the Resignation Effective Date (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (ii) except for any indemnity payments owed to the retiring Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Administrative Agent (other than any rights to indemnity payments owed to the retiring Administrative Agent), and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents. The fees payable by the Borrower to a successor Administrative Agent, if any, shall be the same as those payable to its predecessor, if any, unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this **Section 12** shall continue in effect for the benefit of such retiring Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

12.7    **Non-Reliance on Agents and Other Lenders**. Each Lender expressly acknowledges that none of the Agents has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to, and acceptance of any assignment or review of the affairs of the Borrower or any Affiliate thereof, shall be deemed to constitute any representation or any warranty by any Agent to any Lender as to any matter, including whether any Agent has disclosed material information in their (or their Related Parties') possession. Each Lender represents to each Agent that it has, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis of, appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and its Subsidiaries, and all applicable bank or other regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower hereunder. Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower. Each Lender represents and warrants that (i) the Loan Documents set forth the terms of a commercial lending facility and certain other facilities set forth herein and (ii) it is engaged in making, acquiring or holding commercial loans, issuing or participating in letters of credit or providing other similar facilities in the ordinary course and is entering into this Agreement as a Lender for the purpose of making, acquiring or holding commercial loans, issuing or participating in letters of credit and providing other facilities set forth herein as may be applicable to such Lender, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument, and each Lender agrees not to assert a claim in contravention of the foregoing. Each Lender represents and warrants that it is sophisticated with respect to decisions to make, acquire or hold commercial loans, issue or participate in letters of credit and to provide other facilities set forth herein, as may be applicable to such Lender, and either it, or the Person exercising discretion

in making its decision to make, acquire or hold such commercial loans, issue or participate in letters of credit or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans, issue or participate in letters of credit or providing such other facilities.

**12.8**   **Administrative Agent May File Proofs of Claim**. In case of the pendency of any proceeding under any judicial proceeding relative to the Borrower, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

    (a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under **Section 11.3**) allowed in such judicial proceeding; and

    (b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under **Section 11.3**.

**12.9**   **Erroneous Payments.**

    (a)    If the Administrative Agent (x) notifies a Lender or any Person who has received funds on behalf of a Lender (any such Lender or other recipient (and each of their respective successors and assigns), a "**Payment Recipient**") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds (as set forth in such notice from the Administrative Agent) received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender or other Payment Recipient on its behalf) (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "**Erroneous Payment**") and (y) demands in writing the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent pending its return or repayment as contemplated below in this **Section 12.9** and held in trust for the benefit of the Administrative Agent, and such Lender shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two (2) Business Days thereafter (or such later date as the Administrative Agent may, in its sole discretion, specify in writing), return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received). A notice of the Administrative

Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)    Without limiting immediately preceding clause (a), each Lender or any Person who has received funds on behalf of a Lender (and each of their respective successors and assigns), agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case:

    (i)    it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) or (y), an error and mistake shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

    (ii)    such Lender shall use commercially reasonable efforts to promptly (and, in all events, within one (1) Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this **Section 12.9(b)**.

For the avoidance of doubt, the failure to deliver a notice to the Administrative Agent pursuant to this **Section 12.9(b)** shall not have any effect on a Payment Recipient's obligations pursuant to **Section 12.9(a)** or on whether or not an Erroneous Payment has been made.

(c)    Each Lender hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender under any Loan Document with respect to any payment of principal, interest, fees or other amounts, against any amount that the Administrative Agent has demanded to be returned under immediately preceding clause (a).

(d)    The parties hereto agree that (x) irrespective of whether the Administrative Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received funds on behalf of a Lender, to the rights and interests of such Lender, as the case may be) under the Loan Documents with respect to such amount (the "**Erroneous Payment Subrogation Rights**") and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower; provided that this **Section 12.9** shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrower relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous

Payment not been made by the Administrative Agent; provided, further, that for the avoidance of doubt, immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from, or on behalf of (including through the exercise of remedies under any Loan Document), the Borrower for the purpose of a payment on the Obligations.

(e)    To the extent permitted by Applicable Law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

(f)    Each party's obligations, agreements and waivers under this **Section 12.9** shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of a Lender, the termination of this Agreement, and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

**12.10**    **Discretionary Matters**. For purposes of clarity, and without limiting any rights, protections, immunities or indemnities afforded to the Administrative Agent hereunder or under any other Loan Document (including without limitation this **Section 12**), phrases such as "satisfactory to the Administrative Agent," "approved by the Administrative Agent," "acceptable to the Administrative Agent," "as determined by the Administrative Agent," "in the Administrative Agent's discretion," "selected by the Administrative Agent," "elected by the Administrative Agent," "requested by the Administrative Agent," and phrases of similar import in this Agreement and in any other Loan Document that authorize and permit the Administrative Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to the Administrative Agent receiving written direction (which may be over e-mail) from the Required Lenders (or such other number or percentage of the Lenders as expressly required hereunder or under the other Loan Documents) to take such action or to exercise such rights.

**12.11**    **Indemnification**.  Each Lender hereby severally agrees to pay any amount required to be paid by the Borrower under **Section 11.8(a)** to each Agent and each Indemnified Party of such Agent to the extent not reimbursed by the Borrower and have not been reimbursed within thirty (30) Business Days of the date such expenses are payable hereunder and without limiting the obligation of the Borrower to do so, including to severally indemnify and defend each Agent and the Calculation Agent and their related Indemnified Parties against, all liabilities, losses, damages (including all reasonable fees and charges of one external counsel in each applicable jurisdiction to the Agents with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor), causes of action, suits, claims, costs and expenses, demands and judgments of any nature incurred by, imposed upon or asserted against any Indemnified Party, arising out of, in connection with, or by reason of (i) the execution or delivery of any Loan Document or any agreement or instrument contemplated by any Loan Document, the performance (or failure to perform) by the parties thereto of their respective obligations under any Loan Document or the consummation of the transactions contemplated by the Loan Documents, (ii) the Commitments, any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Substances on or from the Real Property or on or from any property currently or formerly owned, leased or operated by any Loan Party, or any Environmental Claim related to the Borrower or any of its Affiliates relating to the Real Property in any way, or (iv) any actual or prospective claim, investigation, litigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any of its Affiliates, and regardless of whether any Indemnified Party is a party thereto; provided that such indemnity shall not be available to any Indemnified Party to the extent that such causes of action, suits,

claims, damages, demands, judgements, losses, liabilities or related costs or expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnified Party. This **Section 12.11** shall not apply with respect to Taxes directly imposed on any Agent or the Calculation Agent other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

**12.12**   **Calculation Agent**. The provisions of this Section 12 shall apply to and for the benefit of the Calculation Agent as if each reference to the Administrative Agent herein was a reference thereto.

# 13.   Collateral Agent

**13.1**   **Appointment of Collateral Agent.**

(a)   The Administrative Agent (acting at the direction of the Required Lenders pursuant to this Agreement) hereby designates and appoints GLAS USA LLC to act as the Collateral Agent, and GLAS USA LLC hereby agrees to act as the Collateral Agent, under the express terms of the Loan Documents to which it is a party. The Collateral Agent is authorized by the Administrative Agent to exercise such rights, powers, authorities and discretions and perform such duties as are specifically delegated to the Collateral Agent by the terms of the Loan Documents to which it is a party, together with all such rights, powers, authorities and discretions as are reasonably incidental thereto.

(b)   The Collateral Agent shall not be required to expend or risk any of its own funds or otherwise incur any liability, financial or otherwise, in the performance or any of its duties under the Loan Documents.

(c)   The Collateral Agent may execute any of its duties any of its duties under the Loan Documents by or through agents or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Collateral Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care or for acting in good faith in accordance with the advice of counsel unless any such agent or attorney-in-fact was grossly negligent or acting with willful misconduct, as determined in a final, non-appealable decision by a court of competent jurisdiction.

**13.2**   **Duties and Responsibilities.**

(a)   Notwithstanding any provision to the contrary elsewhere in any of the Loan Documents, the Collateral Agent shall not have any duties or responsibilities except those expressly set forth in the Loan Documents to which it is a party, and no implied covenants, functions, responsibilities, duties, liabilities or obligations shall be read into the Loan Documents against the Collateral Agent. The Collateral Agent shall not be liable or responsible to take action except for the performance of such expressed duties and obligations as are specifically set forth in the Loan Documents to which it is a party. The Collateral Agent shall not have any fiduciary relationship with the Borrower or any other Person arising out of or in connection with the Loan Documents. The relationship between the Collateral Agent, on the one hand, and the Borrower, on the other, in connection with the Loan Documents is solely that of a debtor and a creditor. None of the Loan Documents create a partnership or similar joint venture between the parties. The Collateral Agent shall not have any duty to take any discretionary action or exercise any discretionary power under the Security Documents to which it is a party or under any other Loan Document. The permissive authorizations, entitlements, powers and rights (including the right to request that the Borrower take an action or

90

deliver a document and the exercise of remedies following an Event of Default) granted to the Collateral Agent herein and in the Security Documents to which it is a party are solely to protect the Collateral Agent's interests in the Collateral and shall not impose any duty upon the Collateral Agent to exercise any such authorizations, entitlements, powers or rights.

(b)     The Collateral Agent shall not have any obligation to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties under the Security Documents to which it is a party. The Collateral Agent shall not be liable for any error of judgment made in good faith by any of its respective officers, directors, employees, agents, advisors, attorney's-in-fact or Affiliates, unless the Collateral Agent or any of its officers, directors, employees, agents, advisors, attorney's-in-fact or Affiliates, as the case may be, was grossly negligent or acting with willful misconduct, as determined in a final, non-appealable decision by a court of competent jurisdiction. The rights, privileges, protections and benefits given to the Collateral Agent, including each of its rights to be indemnified, are extended to, and shall be enforceable by, the Collateral Agent in each of its capacities under the Security Documents to which it is a party, and to each agent, custodian and other Persons employed by the Collateral Agent in accordance herewith to act under such Security Documents. The Collateral Agent (i) shall have no duty to calculate any amounts to be distributed under the terms of the Security Documents to which it is a party and shall have no liability for the accuracy of, or compliance with the terms of any other Loan Document, any such calculations provided to it, (ii) shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Agent in good faith and with due care, and (iii) shall be fully justified in failing or refusing to take any action under the Security Documents to which it is a party (a) if such action would, in the reasonable opinion of the Collateral Agent be contrary to applicable law or the terms of such Security Documents or (b) if such action is not specifically provided for in such Security Documents.

## 13.3     Rights and Obligations.

(a)     Notwithstanding anything herein or any Security Document to the contrary, the Collateral Agent may:

(i)     assume, absent written notice to the contrary given in accordance with **Section 13.2,** that (A) any representation made by any Person in connection with any Loan Document is true, (B) no Default or Event of Default exists, (C) no Person is in breach of or in default under its obligations under any Loan Document, (D) any right, power, authority or discretion vested herein upon any other Agent has not been exercised, and (E) the amounts required to be paid to the Administrative Agent pursuant to the Security Documents are the amounts that the Administrative Agent has notified the Collateral Agent to be due;

(ii)     assume, absent written notice to the contrary, that any notice or certificate given by any Person has been validly given by a Person authorized to do so and act upon such notice or certificate unless the same is revoked or superseded by a further such notice or certificate;

(iii)     assume, absent written notice to the contrary, that the address, facsimile, email and telephone numbers for the giving of any written notice to any Person hereunder or under the Security Documents is that identified in **Section 13.2** to which such Person is a party until the Collateral Agent has received from such Person a written notice designating some other office of such Person to

replace any such address, telecopy or telephone number, and act upon any such notice until the same is superseded by a further such written notice;

(iv)    employ at the expense of the Borrower, one external counsel in each applicable jurisdiction to the Agents, one external counsel in each applicable jurisdiction to the Calculation Agent and one external counsel in each applicable jurisdiction to the Lenders and, with the advance written consent of the Borrower (such consent not to be unreasonably withheld, conditioned or delayed), accountants, financial advisors or other experts whose advice or services the Collateral Agent may reasonably determine are necessary, may pay the reasonable, documented out-of-pocket fees and expenses for the advice or service of any such Person and may rely upon any advice so obtained which will be reimbursed as fees and expenses of the Collateral Agent under the Security Documents; and the Collateral Agent shall not be liable for any action taken, or not taken, in good faith reliance upon the opinion of such attorneys, accountants, financial advisors or other experts except with respect to any action taken or not taken upon the opinion of attorneys, accountants, financial advisors or such other experts;

(v)    rely, in good faith on any matters of fact contained in a certificate signed by or on behalf of such party by a Person reasonably believed to be authorized to do so;

(vi)    rely upon any communication, instruction, certification, notice or document believed by it in good faith to be genuine, and the Collateral Agent shall have no liability for its actions taken, suffered or omitted to be taken upon any such communication, instruction, certificate, notice or other document, except to the extent caused by the Collateral Agent's willful misconduct, or gross negligence as determined in a final, non-appealable decision by a court of competent jurisdiction. The Collateral Agent shall have no duty whatsoever to investigate or verify whether any such signature is genuine or authorized or whether the information in any such communication, instruction, certificate, notice or other document is genuine or accurate;

(vii)    refrain from acting or continuing to act in accordance with any instructions given under the Security Documents to begin any legal action or proceeding or to take any other remedial action arising out of or in connection with any Loan Document until it shall have received such indemnity or security from the instructing Lenders as it may reasonably require (whether by payment in advance or otherwise) for all reasonable costs, claims, losses, damages, expenses (including reasonable legal fees and expenses) and liabilities, including taxes (other than taxes based upon, measured by or determined by its income or that are franchise taxes or branch profits taxes), which it will or may expend or incur in complying or continuing to comply with such instructions; provided, that nothing in this subclause (vii) shall be deemed to obligate the instructing Lenders to provide any such indemnity or security;

(viii)    seek instructions from the Lenders as to the exercise of any of its rights, powers, authorities or discretions hereunder or under the Security Documents to which it is a party or under any other Loan Document (including any consents, notices, requests, amendments, waivers, modifications, acceptances or remedies) (including, for the avoidance of doubt, the making of any draws under, delivering any certificates in connection with, surrendering, or otherwise taking actions related to, any letter or letters of credit of which the Collateral Agent is a beneficiary as part of the transactions contemplated by the Loan Documents), and in the event that it does so, it shall not be considered

as having acted unreasonably when acting in accordance with such instructions or, in the absence of any clear instructions, when refraining from taking any action or exercising any right, power or discretion hereunder or thereunder; and

(ix)     in its exclusive discretion, to obey and comply with all writs, orders, judgments or decrees issued by any court or administrative agency of competent jurisdiction affecting any monies, documents or other property held by them in connection with the Security Documents or the other Loan Documents. The Collateral Agent shall not be liable to any of the parties hereto or the Administrative Agent or its successors, heirs or personal representatives by reason of the Collateral Agent's compliance with such writs, orders, judgments or decrees, notwithstanding such writ, order, judgment or decree is later reversed, modified, set aside or vacated.

(b)     The Collateral Agent shall:

(i)     promptly deliver to the Administrative Agent and Lenders the notices, certificates, reports, opinions, agreements and other documents which it receives under the Security Documents, the other Loan Documents in its capacity as Collateral Agent;

(ii)     except as otherwise expressly provided in any Loan Document, promptly perform its duties in accordance with any written instructions given to it by the Administrative Agent or Required Lenders, which instructions shall be binding;

(iii)     if so instructed in writing by the Administrative Agent or Required Lenders, refrain from exercising any right, power, authority or discretion vested in it hereunder (other than rights arising under this **Section 13**);

(c)     Notwithstanding anything herein or in any Security Document to the contrary, except for the safe custody of Collateral in its possession and accounting for moneys actually received by it under the Loan Documents, the Collateral Agent will not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority, maintenance, continuation or enforceability of the Liens in any of the Collateral (including no obligation to prepare, record, file, re-record or re-file any financing statement, perfection statement, continuation statement or any other instrument in any public office unless directed in writing by the Borrower, the Administrative Agent or the Required Lenders to file a continuation statement previously prepared by the Borrower, the Administrative Agent or the Required Lenders), for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title to the Collateral, for insuring the Collateral, for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral or for the preservation of any rights against any third parties with respect to the Collateral.

(d)     The Collateral Agent may execute any of the rights or powers hereunder or under the Security Documents to which it is a party or perform any duties hereunder or thereunder either directly or by or through agents or other designees selected by it in good faith as it may reasonably require and it shall not be liable for the misconduct or negligence of any such parties selected in good faith, provided, the Collateral Agent shall remain obligated pursuant to the Security Documents. The Collateral Agent shall be entitled to conclusively rely upon and shall not be bound to make any investigation into the facts or matters stated in any written direction, notice or certificate (including any electronic transmission, cable, telegram, telecopy or telex) reasonably believed by it to be genuine and to have been signed or sent by or on behalf of the proper Person or

Persons, and upon advice and statement of legal counsel, independent accountants and other experts selected by the Collateral Agent and shall have no liability for its actions taken thereupon, unless due to its own gross negligence or willful misconduct, as determined in a final, non- appealable decision by a court of competent jurisdiction.

(e)    Without limiting the generality of Section 13.3(b), the parties hereto acknowledge and agree that the Collateral Agent shall, in exercising its rights and performing its obligations under the other Loan Documents, act in accordance with the terms and conditions of the Security Documents.

(f)    Anything in the Security Documents notwithstanding, in no event shall the Collateral Agent be liable for special, indirect, exemplary, incidental, punitive, or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Collateral Agent has been advised as to the likelihood of such loss or damage and regardless of the form of action.

(g)    The Collateral Agent may request that the Borrower deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Security Documents or any of the other Loan Document, which certificate may be signed by any person authorized to sign such a certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(h)    The Collateral Agent may consult with counsel, and the advice of such counsel selected by the Collateral Agent in good faith and with due care or any opinion of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder or under the Security Documents to which it is a party in good faith and in accordance with the written opinion and advice of such counsel.

**13.4    No Responsibility for Certain Conduct.**

(a)    Notwithstanding anything to the contrary expressed or implied herein or in any Security Document, the Collateral Agent shall not:

(i)    be bound to inquire as to (w) whether or not any representation made by any other Person in connection with any Loan Document is true, (x) the occurrence or otherwise of any Default or Event of Default, (y) the performance by any other Person of its obligations under any Loan Documents or (z) any breach of or default by any other Person of its obligations under any Loan Documents;

(ii)    be bound to account to any Person for any sum or the profit element of any sum received by it for its own account except as expressly provided in the Security Documents; or

(iii)    be bound to disclose to any Person any information if such disclosure would, or might in its reasonable opinion, constitute a breach of any Applicable Law or be otherwise actionable at the suit of any Person, it being understood that the Collateral Agent shall not have any obligation to determine if disclosure would constitute a breach of Applicable Law or be actionable at the suit of any Person.

(b)    The Collateral Agent shall have no responsibility for the accuracy or completeness of any information supplied by any Person (other than itself) or for the legality, validity, effectiveness, adequacy or enforceability of any Loan Document or any other document referred to in any Security Document or provided for herein or therein or for any recitals, statements, representations or warranties made by the Borrower or any other Person contained in the Security Documents or any other Loan Document or in any

certificate or other document referred to or provided for, or received by the Collateral Agent, hereunder or thereunder. The Collateral Agent shall not be liable as a result of any failure by the Borrower or its Affiliates or any Person (except itself) party hereto or to any other Loan Document to perform its obligations hereunder or under any other Loan Document.

(c)     It is understood and agreed by each Lender (for itself and any other Person claiming through it) that, except as expressly set forth herein, each Lender has itself been, and will continue to be, solely responsible for making its own independent appraisal of, and investigations into, the financial condition, creditworthiness, condition, affairs, status and nature of each Person and, accordingly, each Lender warrants to the Collateral Agent that it has not relied on and will not hereafter rely on the Collateral Agent:

(i)     to check or inquire on its behalf into the adequacy, accuracy or completeness of any information provided by any Person in connection with any Loan Documents or the transactions therein contemplated (whether or not such information has been or is hereafter circulated to such Person by the Collateral Agent); or

(ii)    to assess or keep under review on its behalf the financial condition, creditworthiness, condition, affairs, status or nature of any Person.

(d)     The Collateral Agent shall not be required to take any action under the Security Documents or any other Loan Document, in the event that, in the Collateral Agent's sole discretion, the Collateral Agent determines that taking such action either would be contrary to Applicable Laws or regulations or would cause the Collateral Agent to advance, risk or expend any funds or otherwise incur liability for which the Collateral Agent has not been indemnified against to its satisfaction.

13.5    **Defaults**. The Collateral Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless an officer of the Collateral Agent has received written notice from a Person referring to the Security Documents, describing such Default or Event of Default and stating that such notice is a "Notice of Default". The Collateral Agent shall take such action with respect to such Event of Default as is provided in the Security Documents; provided, however, that, notwithstanding any other provision of the Security Documents to the contrary, unless and until the Collateral Agent shall have received direction from the Administrative Agent or Required Lenders, it may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable and in the best interest of the Lenders and any such action so taken shall be deemed to be taken pursuant to direction from the Administrative Agent or the Required Lenders, as applicable.

13.6    **Liability**.

(a)     None of the Collateral Agent, or any of its officers, directors, employees, agents, advisors, attorneys-in-fact or Affiliates, shall be liable to any Person for any action taken or omitted to be taken by it or such Person under the Security Documents or under the other Loan Documents, or in connection therewith, except to the extent caused by the gross negligence or willful misconduct of the Collateral Agent or any of its officers, directors, employees, agents, advisors, attorneys-in-fact or Affiliates, as determined by a final, non-appealable judgment of a court of competent jurisdiction. The Administrative Agent (for itself and any Person claiming through it) hereby releases, waives, discharges and exculpates the Collateral Agent for any action taken or omitted under the Security Documents or under the other Loan Documents, or in connection therewith, except to the extent caused by the gross negligence or willful misconduct of the Collateral Agent, as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(b)    The Collateral Agent shall not incur any liability for not performing any act or not fulfilling any duty, obligation or responsibility under any Security Document to which it is a party or under any other Loan Document by reason of any occurrence beyond the control of the Collateral Agent (including any act or provision of any present or future law or regulation or Governmental Authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility, and interruptions, loss or malfunction of utilities or computer services, whether hardware or software).

**13.7    Resignation and Removal.**

(a)    Subject to **Section 13.8,** the Collateral Agent may resign from its appointment hereunder at any time without providing any reason therefor upon at least thirty (30) days' prior notice to each of the Administrative Agent and the Borrower.

(b)    Subject to **Section 13.8,** the Administrative Agent (acting at the direction of the Required Lenders) may remove the Collateral Agent from its appointment hereunder with or without cause by giving at least thirty (30) days' prior written notice to that effect to each of the Collateral Agent and the Borrower.

**13.8    Successor Collateral Agents.**

(a)    No resignation or removal pursuant to this **Section 13.8** shall be effective until:

(i)    a successor for the Collateral Agent is appointed in accordance with (and subject to) the provisions of this Section 13.8;

(ii)    the resigning Collateral Agent has transferred to its successor (A) all of its rights and obligations in its capacity as a Collateral Agent under the Security Documents and the other Loan Documents and (B) all documentation held by it and relating to the Loan Documents (other than such documentation that the Collateral Agent is required to retain pursuant to Applicable Law); and

(iii)    the successor Collateral Agent has executed and delivered an agreement to be bound by the terms of the Security Documents and the other Loan Documents and to perform all duties required of the Collateral Agent under the Security Documents to which it is a party and under the other Loan Documents;

(iv)    provided, that for the avoidance of doubt, a removal of the Collateral Agent shall be effective notwithstanding the non-satisfaction of subclause 13.8(a)(ii) above.

(b)    If the Collateral Agent has given notice of its resignation pursuant to **Section 13.8(a)** or if the Administrative Agent gives the Collateral Agent notice of removal thereof pursuant to **Section 13.8(b),** then a successor to the Collateral Agent may be appointed by the Administrative Agent (and, unless an Event of Default has occurred and is then continuing, with the written consent of the Borrower, such consent not to be unreasonably withheld, conditioned or delayed) during a thirty (30) day period beginning on the date of such notice but, if no such successor is so appointed within thirty (30) days after the above notice, the resigning (but not removed) Collateral Agent may appoint such a successor or petition to a court of competent jurisdiction (at the expense of the Borrower) to appoint such a successor. If a resigning or removed Collateral Agent, or a court of competent jurisdiction appoints a successor, such successor must (i) be authorized under all Applicable Laws to exercise corporate trust powers, (ii) organized under the laws of the United States of America or of the State of New York, (iii) have a combined capital and surplus of at least $500,000,000 or a combined capital surplus of at least $100,000,000 that is a wholly-owned subsidiary of

a bank or trust company that has a combined capital surplus of at least $500,000,000, and (iv) be reasonably acceptable to the Administrative Agent (and, unless an Event of Default has occurred and is then continuing, be reasonably acceptable to the Borrower) (unless a thirty (30) day period has run, in which case no such consent from the Borrower or the Administrative Agent shall be required).

(c)    If a successor to the Collateral Agent is appointed under the provisions of this **Section 13.8,** then:

    (i)    the predecessor Collateral Agent shall be discharged from any further obligation hereunder and under the Security Documents to which it is a party (but without prejudice to any accrued liabilities);

    (ii)    the resignation pursuant to **Section 13.8(a)** or removal pursuant to **Section 13.8(b)** of the predecessor Collateral Agent notwithstanding, the provisions of the Security Documents shall inure to the predecessor Collateral Agent's benefit as to any actions taken or omitted to be taken by it under the Security Documents and the other Loan Documents while it was Collateral Agent; and

    (iii)    the successor Collateral Agent and each of the other parties hereto shall have the same rights and obligations amongst themselves as they would have had if such successor Collateral Agent had been a party hereto beginning on the date of this Agreement.

13.9    **Authorization**. The Collateral Agent is hereby authorized to execute, deliver and perform each of the Loan Documents to which the Collateral Agent is or is intended to be a party.

13.10    **Indemnity**. Each of the Lenders shall pay the Collateral Agent promptly upon demand for its ratable share of any reasonable, documented out-of-pocket expenses (including reasonable legal fees and expenses) incurred by it in connection with the preparation, execution, administration or enforcement of, or legal advice in respect of rights or responsibilities under, the Loan Documents, to the extent that the Collateral Agent have sought reimbursement for such expenses by the Borrower and have not been reimbursed within thirty (30) Business Days of the date such expenses are payable hereunder; **provided, however**, if any amount shall be payable by the Collateral Agent to an Account Bank under an Account Control Agreement, including without limitation any amounts for the fees, expenses or indemnities of an Account Bank, or if an Account Bank shall otherwise make any claim upon the Collateral Agent under such agreement, then each Lender shall be jointly and severally liable to pay such amount to the Collateral Agent promptly upon demand from the Collateral Agent, and the Collateral Agent shall not be required to demand payment of such amount from the Borrower prior to demanding payment of such amount from the Lenders. The Borrower indemnifies the Lenders for amounts paid by it pursuant to this **Section 13.10**. The provisions of this **Section 13.10** shall survive the termination of the Security Documents and the other Loan Documents and the resignation or removal of the Collateral Agent.

13.11    **Discretionary Matters**. For purposes of clarity, and without limiting any rights, protections, immunities or indemnities afforded to the Collateral Agent hereunder or under any other Loan Document (including without limitation this Section 13), phrases such as "satisfactory to the Collateral Agent," "approved by the Collateral Agent," "acceptable to the Collateral Agent," "as determined by the Collateral Agent," "in the Collateral Agent's discretion," "selected by the Collateral Agent," "elected by the Collateral Agent," "requested by the Collateral Agent," and phrases of similar import in this Agreement and in any other Loan Document that authorize and permit the Collateral Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to the Collateral Agent receiving written direction (which may be over e-mail) from the Required Lenders (or such other number or percentage of the Lenders as expressly required hereunder or under the other Loan Documents) or the Administrative Agent (acting at the direction of the Required Lenders or such other number or percentage of the

97

Lenders as expressly required hereunder or under the other Loan Documents) to take such action or to exercise such rights.

[Signatures appear on the following page]

**IN WITNESS WHEREOF,** intending to be legally bound hereby, each of the undersigned have caused this Agreement to be executed and delivered as of the day and year first written above.

<u>**PARENT PLEDGOR:**</u>                    <u>**BORROWER:**</u>

**POWIN ENERGY INTERMEDIATE, LLC**    **POWIN, LLC**

By: _____         By: _____
  Name: Chad Paulson                        Name: Chad Paulson
  Title: Senior Vice President and Secretary   Title: Senior Vice President and Secretary

<u>**SUBSIDIARY GUARANTORS:**</u>

**POWIN ENERGY OPERATING**              **POWIN ENERGY OPERATING, LLC**
**HOLDINGS, LLC**

By: _____         By: _____
  Name: Chad Paulson                        Name: Chad Paulson
  Title: Senior Vice President and Secretary   Title: Senior Vice President and Secretary

**PEOS HOLDINGS, LLC**                  **POWIN CHINA HOLDINGS 1, LLC**

By: _____         By: _____
  Name: Chad Paulson                        Name: Chad Paulson
  Title: Senior Vice President and Secretary   Title: Senior Vice President and Secretary

**POWIN CHINA HOLDINGS 2, LLC**         **CHARGER HOLDINGS, LLC**

By: _____         By: _____
  Name: Chad Paulson                        Name: Chad Paulson
  Title: Senior Vice President and Secretary   Title: Senior Vice President and Secretary

*Signature Page to Loan Agreement*

**POWIN ENERGY ONTARIO STORAGE, LLC**

By: _____
Name: Chad Paulson
Title: Senior Vice President and Secretary

**POWIN EKS SELLCO LLC**

By: _____
Name: Chad Paulson
Title: General Counsel

*Signature Page to Loan Agreement*

**ADMINISTRATIVE AGENT AND**
**COLLATERAL AGENT:**

**GLAS USA LLC**

_____

Name: Vairon Inamagua
Title: Assistant Vice President

**LENDERS:**

**FORETHOUGHT LIFE INSURANCE
COMPANY**

By: _____
Name: Avi Korn
Title:  Authorized Signatory

*Signature Page to Loan Agreement*

**COMMONWEALTH ANNUITY AND LIFE INSURANCE COMPANY**

By: _____
Name:  Avi Korn
Title:   Authorized Signatory

*Signature Page to Loan Agreement*

**FIRST ALLMERICA FINANCIAL LIFE INSURANCE COMPANY**

By: _____

Name:  Avi Korn

Title:   Authorized Signatory

*Signature Page to Loan Agreement*

**FS KKR CAPITAL CORP**

By: _____

Name:  Avi Korn

Title:   Authorized Signatory

*Signature Page to Loan Agreement*

**KKR FS INCOME TRUST**

By: _____
Name: Avi Korn
Title:   Authorized Signatory

*Signature Page to Loan Agreement*

**KKR FS INCOME TRUST SELECT**

By: _____
Name: Avi Korn
Title:  Authorized Signatory

*Signature Page to Loan Agreement*