**DENTONS US LLP**

Lauren Macksoud (admitted)
101 JFK Parkway
Short Hills, NJ 07078
Telephone: (973) 912-7100
Facsimile: (973) 912-7199
Email:  lauren.macksoud@dentons.com

Tania M. Moyron (admitted *pro hac vice*)
Van C. Durrer, II (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:  tania.moyron@dentons.com
           van.durrer@dentons.com

John D. Beck (admitted *pro hac vice*)
Sarah M. Schrag (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:  john.beck@dentons.com
           sarah.schrag@dentons.com

*Proposed Counsel for Debtors and
Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Amanda C. Glaubach (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  altogut@teamtogut.com
           aglaubach@teamtogut.com
           eblander@teamtogut.com

*Proposed Counsel for Debtors and
Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>Powin, LLC, *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504], (iii) PEOS Holdings, LLC [5476], (iv) Powin China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [15241], (vii) Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [22495], (ix) Powin Energy Operating, LLC [6487] (x) Powin Energy Storage 2, Inc., [9926]; (xi) Powin Energy Ontario Storage II LP,

**MOTION OF DEBTORS FOR ENTRY OF ORDER
(I) APPROVING KEY EMPLOYEE RETENTION PLAN AND
KEY EMPLOYEE INCENTIVE PLAN AND (II) GRANTING RELATED RELIEF**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Powin, LLC and the affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-referenced chapter 11 cases (the "Chapter 11 Cases") hereby move (the "Motion"), pursuant to §§ 363(b) and 503(c) under chapter 11 of title 11 of the United States Code §§ 101 *et seq.* (the "Bankruptcy Code"),[2] for a final order in the form attached hereto as **Exhibit A** (the "Order"): (i) approving the Debtors' proposed key employee retention plan (the "KERP") for certain employees (the "KERP Participants"); (ii) approving the Debtors' proposed key employee incentive plan (the "KEIP") for certain employees (the "KEIP Participants"); and (iii) granting related relief.  In further support of the Motion, the Debtors respectfully state as follows:

## I.    PRELIMINARY STATEMENT

1.    The Debtors entered these Chapter 11 Cases with a substantially-reduced workforce, without DIP financing and without any bids to buy their assets.  Thanks to the heroic efforts of the Debtors' remaining employees, the Debtors now have financing and are pursuing an orderly, but speedy, sale process.  As the Debtors have emphasized from the beginning of these Chapter 11 Cases, they need all of their employees to remain and be incentivized in order to maximize sale value and creditor-recovery.   Therefore, the Debtors have developed the KERP and KEIP in order to pay all of their employees an equal percentage – ten (10) – of salary due upon any sale closing for the KERP Participants and that is earned by KEIP Participants for compliance

---

[5787]; and (xii) Powin Canada B.C. Ltd. [2239].  The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR  97062.

[2] All references to "§" or "section" herein are to sections of the Bankruptcy Code.  All references to "Bankruptcy Rules" are to provisions of the Federal Rules of Bankruptcy Procedure.  All references to "Local Rules" are to provisions of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of New Jersey (the "Court").

with the DIP budget and for closing a sale in excess of $40 million in cash or cash considerations.

The total cost for the Debtors, if all milestones are hit and all Employees remain, will be

approximately $1.2 million. This is a good investment. The Debtors cannot sell their assets

without their employees, and the KERP and the KEIP are reasonable and necessary for the success

of the sale process and the Chapter 11 Cases.

2.      In support of this Motion, the Debtors rely upon and refer this Court to the

Declaration of Gerald Uzzi (the "Uzzi Declaration") and the *Declaration of Gerard Uzzi in*

*Support of Emergency First Day Motions* (the "First Day Declaration"). [Docket No. 13].

## II.    JURISDICTION AND VENUE

3.      The United States Bankruptcy Court for the District of New Jersey (the "Court")

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of*

*Reference* from the United States District Court for the District of New Jersey dated as of

September 18, 2012. The Debtors confirm their consent, pursuant to Rule 7008 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court

in connection with this Motion to the extent that it is later determined that the Court, absent consent

of the parties, cannot enter final orders or judgments in connection herewith consistent with Article

III of the United States Constitution.

4.      Venue of the Chapter 11 Cases and related proceedings is proper pursuant to 28

U.S.C. §§ 1408 and 1409.

5.      The predicates for the relief requested herein are sections 105(a), 363(b) and 503(c).

## III.   BACKGROUND

### A.    General Background

6.      On June 9 and 10 (as applicable, the "Petition Date"), the Debtors each commenced

a voluntary case for relief under chapter 11 of the Bankruptcy Code.[3]  The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      Additional information regarding the Debtors, including their business and the events leading to the commencement of these Chapter 11 Cases is set forth in the First Day Declaration.

8.      On June 27, 2025, the Office of the United States Trustee (the "<u>UST</u>") appointed an official committee of unsecured creditors (the "<u>Committee</u>") [Docket No. 174].

**B.      <u>Specific Background</u>**

**a.      The Debtors' Employees**

9.      Before the Petition Date, the Debtors significantly reduced their workforce.  The Debtors also issued multiple pre-petition notices under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Chapter 23 (the "<u>WARN Act</u>").

10.      The Debtors undertook their largest reduction-in-force on June 6, 2025, wherein they terminated 285 employees.

11.      The Debtors' remaining seventy-two (72) Employees represent approximately 15% of the Debtors' workforce compared to January 1, 2025.  These Employees remain because they are critical for operating and maintaining the value of the Debtors' business. The  Employees largely support the project and technology branches of their services business.  Further, the Debtors employ the five (5) KEIP Participants, who manage the Debtors' business.  *See infra.*  The Employees cannot be replaced, and without the Employees' services, the Debtors will no longer be able to provide products and services to their customers.

---

[3] Lead Debtor Case No. 25-16137 (MBK) for Debtor Powin Project LLC was filed on June 9, 2025, and the remaining Debtors were thereafter on June 10, 2025 and June 22, 2025, as applicable (Powin Energy Storage 2, Inc., Powin Energy Ontario Storage II LP, and Powin Canada B.C. Ltd. filed on June 22, 2025).

US_ACTIVE\130708693\V-13

12.     As a part of their first-day relief, the Debtors filed their Wage Motion.[4]  The Wage
Motion sought authorization to pay Employees in the ordinary course and make certain payments
to Employees on account of prepetition obligations.  On July 15, 2025, the Court entered a final
order granting the Wage Motion.  [Docket No. 395].

13.     Though the Debtors' Employees ordinarily receive compensation through base
salary and bonus, in the Wage Motion the Debtors did not seek approval to pay bonuses to
Employees.  Instead, in the Wage Motion, the Debtors stated: "Soon, the Debtors anticipate filing
a motion seeking authorization to further retain and incentivize employees through bonuses to be
issued under newly designed 'KEIP' and 'KERP' programs."  Wage Motion at ¶ 1.  At the first-
day, interim hearing for the Wage Motion, counsel for the Debtors stated: "[T]he employees here
are our priority, and retaining and incentivizing them [is] a top priority in the case.  [The Debtors]
hope to develop and file further retention and incentive programs."  *See* Tr. of June 11, 2025
Hearing at 36-37.

14.     Even with the relief provided in the Wage Motion, the Debtors have still
experienced attrition, with at least sixteen resignations since the Petition Date and numerous other
Employees expressing concern or previewing their potential resignation to the Debtors.   During
the Chapter 11 Cases, the Debtors' own customers, in fact, have approached and hired away several
of the Debtors' skilled Employees.

15.     On June 12, 2025, a former employee filed the adversary proceeding of a proposed
class action against the Debtors asserting violations of the WARN Act.  *See* Case No. 25-01249
(Bankr. D. N.J.).

---

[4] *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Employee
Obligations and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief* [Docket No. 7] (the
"Wage Motion").

b.      **The DIP Financing**

16.     On July 15, 2025, the Court ruled that it would approve, on a final basis, the Debtors' DIP Facility (as defined in Docket No. 169) with FlexGen Power Systems, LLC (the "DIP Lender").  Under the final DIP Facility, the Debtors are required to comply with a budget (the "Approved Budget").

c.      **The Sale Process**

17.     On June 27, 2025, the Debtors filed a motion [Docket No. 228][5] seeking approval of "Bidding Procedures" (as defined in Docket No. 413), including approval of a "Stalking Horse APA" (as defined in Docket No. 413) with the "Stalking Horse Bidder" (as defined in Docket No. 413).  Under the Bidding Procedures, in order for the Debtors to complete a Sale Transaction (these terms are used herein as defined in the Bidding Procedure Motion).  On July 3, 2025, the Debtors filed an amended Bidding Procedures Order (these terms are used herein as defined in the Bidding Procedures Motion).  Docket No. 257-1.

18.     On July 7, 2025, the Debtors filed the Stalking Horse APA.  Docket No. 271, Exhibit A.  Under the Stalking Horse APA, the Stalking Horse Bidder has discretion to offer employment to "certain of the Current Employees to support the continuation of the Business." *Id.* at § 6.4(a).  Under the Stalking Horse APA, the Stalking Horse Bidder may terminate the APA if the Sale Order (as defined in the Stalking Horse APA) is not entered by August 7, 2025.  *Id.* at § 8.1(e).

---

[5] *Motion of the Debtors for Entry of an Order (I) Designating a Stalking Horse Bidder and Approving Stalking Horse Bidder Protections (II) Approving Bidding Procedures by Which Interested Parties May Bid and an Auction Sale Format in Connection with the Sale of Substantially All of the Debtors' Assets, (III) Approving Form of Asset Purchase Agreement, (IV) Approving Form of Notice to be Provided to Interested Parties, (V) Authorizing the Assumption and Assignment of Assumed Contracts and Notice Procedures Thereto, (VI) Scheduling a Court Hearing to Consider Approval of the Sale to the Highest and Best Bidder, and (VII) Authorizing the Sale of Debtors' Property Free and Clear of All Causes of Action and Claims* (the "Bidding Procedures Motion").

19.    On July 17, 2025, the Court entered the Bidding Procedures Order approving the Bidding Procedures.  [Docket No. 413].  The Court set a Sale Hearing (as defined in the Bidding Procedures) for August 6, 2025.  *Id.*

20.    Upon information and belief, the Stalking Horse Bidder, if they are the winning bidder, will not offer employment to all of the Employees given redundancies with the Stalking Horse Bidder's business.  If no offer is given by a winning bidder, the Debtors, having sold their assets, will be forced to terminate the positions of these employees without cause (with such terminated employees, the "Terminated Employee").  During and after the sale process, the Debtors have and will continue to be transparent with Employees whose position may or will be terminated after a sale.

21.    The Debtors are actively conducting their sale process.  Multiple bidders have inquired regarding whether and how the Debtors will retain employees through closing.   These bidders recognize the value that all the employees provide to preserving value of the business, whether those employees are selected or not to continue on working for any given bidder.

### d.    The Development of the KERP and KEIP.

22.    From the beginning of the Chapter 11 Cases, the Debtors have determined that there is an acute need to retain and incentivize their key employees for the success of their Chapter 11 Cases (*see* infra concerning the roles of the KERP Participants and KEIP Participants).

23.    The Debtors enlisted the services of Uzzi & Lall ("Uzzi & Lall") and their investment banker Huron Transaction Advisory LLC ("Huron") to support the development of the KERP and KEIP.  The Debtors and their professionals, including Uzzi & Lall and Huron, reviewed and considered: (i) the Debtors' financial resources and employment requirements during these Chapter 11 Cases; (ii) the views of the Debtors' management with respect  to what was necessary and appropriate to achieve the stated goals and (iii) employee programs approved by bankruptcy

courts.  As discussed *infra*, the KERP and the KEIP, unlike many other plans that disproportionally reward a small number of employees, provide bonuses to all employees.   The Debtors made this decision given the limited amount of remaining employees and the willingness of management to support such programs.  The KERP and KEIP were therefore designed to enable the success of the Chapter 11 Cases while recognizing the economic realities of the Chapter 11 Cases.

24.    The Debtors presented the KERP and KEIP for consideration to the Debtors' independent director (the "Independent Director") who approved the programs.

25.    The Debtors also consulted with and addressed questions from the Committee, in developing the KERP and the KEIP.  The Debtors will engage with and provide reasonable information about the KERP and the KEIP to the Committee, the Office of the United States Trustee and other stakeholders in an effort to obtain their consent or at least eliminate or minimize any objection to the KERP and KEIP.

   **e.**  **The KERP**

    ***i.*  *The KERP Participants and their Value***

26.    The Debtors have identified sixty-seven (67) Employees as KERP Participants. The KERP Participants are all the Employees of the Debtors that are not KEIP Participants.

27.    The KERP Participants are integral to the Debtors' business.  The KERP Participants, unlike the majority of the Debtors' pre-petition employees, remain because the Debtors determined their services were necessary to the success of the Debtors' Chapter 11 Cases and the sale process.  From an operational standpoint, the Employees are necessary for the Debtors to have the capacity to answer customer questions and manage servicing of the Debtor's assets and contracts.  From a sale-process standpoint, the Employees will maintain going-concern value, including concerning transitioning the assets to new operations and maintaining customer support, and as needed, will assist the Debtors' leadership in responding to inquiries concerning diligence

28.     The KERP Participants are not responsible for setting company policy and generally do not attend senior management meetings or participate in meetings of the Debtors' Board of Directors or any of its committees.  In fact, many of the KERP Participants' duties are limited to implementing tasks within a particular division or department.  As such, their titles reflect their relative position below upper management and functions within the organization and do not reflect any real insider status or responsibility.

### ii.      The Terms of the KERP

29.     Under the proposed KERP, each KERP Participant will receive monetary awards (the "KERP Award(s)") (with such payments of the KERP Awards, the "KERP Payment(s)").

30.     KERP Participants will earn a KERP Award of ten (10) percent of the their annual salary through one or more payment(s) upon a closing of a Sale Transaction (the "Closing"), which KERP Award will be payable at or shortly after a Closing (the "KERP Retention Bonus").

31.     If the KERP Participant voluntarily leaves employment prior to the Closing, or such KERP Participant is terminated for cause, that KERP Participant will forfeit the entire KERP Award.  For the avoidance doubt, the termination of a KERP Participant because of redundancies of a Sale Transaction and/or the failure of any Buyer to offer employment to a KERP Participant after a Closing will not be considered termination "for cause."[6]   Neither the (i) termination of the employment of a KERP Participant without cause nor (ii) death or disability shall affect any right of a KERP Participant to a KERP Award, and KERP Awards will be earned upon the occurrence of any triggering event(s), regardless of whether the event(s) occurred after (i) termination without cause or (ii) death or disability.

---

[6] For purposes of the KEIP and KERP, "cause" means (i) failure to materially perform the duties for which they are employed, (ii) willful violation of a material policy of the Debtors, (iii) commission of any act or acts of fraud, embezzlement, dishonesty, or other willful misconduct, (iv) material breach of any of their obligations under any written agreement or covenant with the Debtors, or (v) an act of dishonesty resulting or intended to result, directly or indirectly, in their gain for personal enrichment at the expense of the Debtors.

32.    If every KERP Participant remains eligible, total KERP Payments are estimated to be $993,936 (the "KERP Maximum").  The KERP Maximum, however, shall be reduced dollar for dollar based upon attrition due to termination for cause or resignation.

33.    KERP Payments will be made after payments of the secured amounts owed to the Debtors Prepetition Secured Parties (as defined in the First Day Declaration) (or applicable holders) and DIP Lender.

f.    **The KEIP**

i.    ***The KEIP Participants and their Value***

34.    The KEIP Participants are five (5) members of the Debtors' senior leadership team, consisting of the Debtors' (i) Chief Executive Officer, (ii) General Counsel, (iii) Chief Financial Officer, (iv) Chief Operating Officer and (v) Head of Human Resources. This team is responsible for executing the Debtors' operating and strategic plans, including maintaining the Debtors' business operations with reduced staff, overseeing and addressing issues during these Chapter 11 Cases, interfacing with customers, and maintaining a culture among the Debtors' employees during these Chapter 11 Cases.  In addition, the KEIP Participants shoulder the burden of moving the Debtors' sale forward, answering bidder questions and providing information to the Debtors' professionals.  The KEIP Participants are vital to the on-going stability, continuity, and strength of the Debtors during these Chapter 11 Cases and the sale process.

35.    This challenge is compounded by the nature of the Debtors' business, which is built on trust, reputation and communication that the KEIP Participants have earned from counterparties. Vendors, partners and customers may be cautious to continue to do business with the Debtors in the face of a challenging market and press coverage.  The KEIP Participants have offset such fears through outreach and open communication with their employees and customers, and, now, will do the same when communicating with bidders.

### g.    Terms of the KEIP

36.    Under the proposed KEIP, the KEIP Participants may earn bonuses (the "KEIP Award(s)," and with payments of these amounts as the "KEIP Payment(s)").  A KEIP Participant may earn up to two KEIP Bonuses: (i) a KEIP Bonus earned upon compliance with DIP Financing milestones and parameters (the "KEIP DIP Bonus"); and/or (ii) a KEIP Bonus payable upon a Closing (the "KEIP Sale Bonus").

37.    The KEIP DIP Bonus will be earned if the Debtors comply with the Approved Budget before Closing, and will be payable at or shortly after Closing (when it is anticipated that the DIP Facility will be repaid).   The KEIP DIP Bonus for each eligible KEIP Participant will be five (5) percent of their annual salary.

38.    The KEIP Sale Bonus will be earned upon the occurrence of a  successful closing under which the Debtors receive proceeds of $40 million or greater in cash or cash equivalents (including retirement of secured debt) (a "Successful Closing") and will be payable at or shortly after a Successful Closing.  The KEIP Sale Bonus for each eligible KEIP Participant will be five (5) percent of their annual salary.

39.    Therefore, each KEIP Participant may earn up to ten (10) percent of their salaries if the Debtors perform under the Approved Budget and execute a Successful Closing.   The maximum amount payable under the KEIP is estimated to be $205,500 (the "KEIP Maximum").

40.    If a KEIP Participant is terminated for "cause," or voluntarily ends his or her employment, he or she will not receive any future KEIP Award.  For the avoidance doubt, the termination of a KERP Participant because of redundancies of a Sale Transaction and/or the failure of any Buyer to offer employment to a KERP Participant after a Closing will not be considered termination "for cause."   Neither the (i) termination of the employment of a KEIP Participant without cause nor (ii) death or disability shall affect any right of a KEIP Participant to a KEIP

Award, and KEIP Awards will be earned upon the occurrence of any triggering event(s), regardless of whether the event(s) occurred after (i) termination without cause or (ii) death or disability.

41.    KEIP Payments will be made after payments of the secured amounts owed to the Debtors Prepetition Secured Parties (as defined in the First Day Declaration) (or applicable holders) and DIP Lender.

## II.    RELIEF REQUESTED

42.    By this Motion, pursuant to §§ 105(a), 363(b) and 503(c)(1) and Bankruptcy Rule 6004, the Debtors request the entry of the Order (i) approving the KERP and KEIP, and (ii) granting related relief, including, but not limited to, granting the Debtors discretion to effectuate the KERP and KEIP.

## III.    BASIS FOR RELIEF

### A.    The KERP Is Warranted Under Sections 363(b)(1) and 503(c)(3) as an Appropriate Exercise of the Debtors' Business Judgment.

43.    "The [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate," as long as the debtor can "show that a sound business purpose justifies such actions."  11 U.S.C. § 363(b)(1); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999).  Where there is a reasonable basis for a debtor's business decisions, courts generally do not contradict the proposed course of conduct.  *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").[7]

---

[7] Section 503(c)(3) is in harmony with section 363(b) by prohibiting transfers made to officers, managers, consultants, and others that are not justified by the facts and circumstances of the case.  *See* 11 U.S.C. § 503(c)(3).  Section 503(c)(3)'s "facts and circumstances" justification test "creates a standard no different that the business judgment standard under section 363(b)" of the Bankruptcy Code.  *In re Borders Group, Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011) (citations omitted); *In re Nobex Corp.*, Case No. 05-20050 (MFW), 2006 WL 4063024, at * 3 (Bankr. D. Del. Jan. 19, 2006) (concluding that the standard under section 503(c)(3) reiterates the business judgment standard).

US_ACTIVE\130708693\V-13

44.     The reasonable use of bonuses like the KERP Payments are considered a proper exercise of a debtor's business judgment. *See In re Global Home Prods., LLC*, 369 B.R. 778, 784 (Bankr. D. Del. 2007) (citing *In re U.S. Airways, Inc.*, 329 B.R. 793, 795 (Bankr. E.D. Va. 2005)). The Debtors designed the KERP to motivate employees to stay and perform during these Chapter 11 Cases and the upcoming sale process. The KERP provides a fair amount of a retention premium given the uncertainty created by the Chapter 11 Cases paired with the market-value of the KERP Participants' skills. *See generally In re Glob. Aviation Holdings Inc.*, 478 B.R. 142, 151 (Bankr. P. Del. 2009)("no showing of a bona fide job offer or any other evidence of an intent to leave is required to pay a bonus to non-insiders [under a KERP]") (finding KERP reasonable under business judgment where Debtors concluded that "at least one" KERP employee would, without the KERP, leave). Thus, the KERP should be approved under section 363(b). *See, e.g., In re Mesa Air Group, Inc*., Case No. 10-10018 (MG), 2010 WL 3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010)(bonus payments were "'justified by the facts and circumstances of the case' under section 503(c)(3) [where] they [were] within the 'sound business judgment' of the Debtors" (citation omitted)).

45.     In approving the KERP, the Debtors considered the economic realities of the Chapter 11 cases, so that the KERP is similar to retention plans approved in other courts and in this district. *See In re Sam Ash Music Corp.*, Case No. 24-14727 (SLM) (Bankr. D.N.J. June 13, 2024) (approving KERP for ten (10) percent of salary for 21 employees in aggregate of $234,000); *In re Agway Farm & Home Supply, LLC*, Case No. 22-10602 (JKS) (Bankr. D. Del. Nov. 21, 2022) (debtor had terminated approximately half of employees before filing for bankruptcy and undertook sale process in bankruptcy) (approving KERP for fourteen employees in aggregate of $285,000); *In re SLT HoldCo, Inc.*, Case No. 20-18368 (MBK) (Bankr. D. N.J. July 22, 2020) (approving KERP for $217,284 for eight (8) employees during sale process, ranging from

approximately 17 to 25% of the employees' salary); *In re MobiTV*, Case No. 21-10457 (LSS) (Bankr. D. Del. Apr. 7, 2021) (approving KERP for all non-insider employees after debtor had reduced its workforce pre-petition) (awards ranged from 5.0% to 25.1% of their base salary); *In re Oneweb Global Limited, et. al.*, Case No. 20-22437 (RDD) (Bankr. S.D.N.Y. May 29, 2020) (debtors executed prepetition RIF of 90% of workforce, and Court approved (i) KERP for 47 remaining employee totaling $3 million (40% of salary paid in quarterly installments); *In re KB Toys, Inc.*, No. 08-13269 (KJC) (Bankr. D. Del. Jan. 6, 2009) (approving retention plan for 28 non-insider employees contemplating payments of approximately $300,000); *In re Mervyn's Holdings, LLC*, No. 08-11586 (KG) (Bankr. D. Del. Oct. 30, 2008) (approving retention plan for 93 non-insider employees contemplating payments of approximately $1.3 million).[8]

B.      **Because the KERP does not Include Insiders, it is not Subject to §§ 503(c)(1) and (2) of the Bankruptcy Code**

46.      The KERP is not subject to the restrictions set forth in sections 503(c)(1) and (2) because the KERP is not applicable to any "insiders" (as such term is defined by § 101(31)). Generally, the Bankruptcy Code defines an "insider" to include, among other things, "an officer of the debtor" and a "person in control of the debtor." 11 U.S.C. § 101(31). Courts have also concluded that an employee may be an "insider" if that employee has "at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiedly dictate corporate policy and the disposition of corporate assets." *In re Velo Holdings, Inc.*, 472 B.R. 201, 208 (Bankr. S.D.N.Y. 2012) (citation omitted) (emphasis added).

47.      Although certain of the KERP Participants hold titles such as "manager" they do not take part in the strategic management or decide "critical financial decisions" of the Debtors, and thus are not "insiders" within the meaning of the Bankruptcy Code. *See In re Foothills Texas,*

---

[8] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

*Inc.*, 408 B.R. 573, 579 (Bankr. D. Del. 2009) (the "mere title of a person does not end the inquiry" of whether they are an insider) (cited by *In re Glob. Aviation Holdings Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) ("[T]itles such as 'vice president' are not determinative [as to insider status].")). For example, in *In re NMI Systems, Inc.*, 179 B.R. 357, 370 (Bankr. D.D.C. 1995), the court found that a vice president was not an insider because [et. al. he was not] 'in the inner circle making the company's critical financial decisions.'"). The KERP Participants' respective scopes of authority are limited and their titles reflect only their relative position below upper management and functions within the organization and not any real insider status or responsibility.

### C.    The KEIP Is Warranted Under Sections 363(b)(1) and 503(c)(3) as an Appropriate Exercise of the Debtors' Business Judgment.

48.    Likewise, the KEIP is reviewed under a business judgment standard, and here, the KEIP represents a sound exercise of the Debtors' business judgment. *See In re Global Home Prods., LLC*, 369 B.R. at 784 (reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment) (citing *In re U.S. Airways, Inc.*, 329 B.R. 793, 795 (Bankr. E.D. Va. 2005)). The KEIP is an incentive plan for five (5) key employees that is designed to motivate them to achieve the best possible outcome of an expedient and lucrative sale in these Chapter 11 Cases. Consequently, the KEIP is not prohibited under the inapplicable § 503(c)(1) (concerning solely retentive programs) or § (c)(2) (concerning severance programs), but, rather, is permitted under § 503(c)(3). *See, e.g., In re Alpha Natural Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) ("On its face, § 503(c)(1) does not apply to a KEIP because the payments thereunder are incentive and not purely retentive."); *In re Nobex Corp.*, 2006 Bankr. LEXIS 417, at *8 (Bankr. D. Del. Jan. 19, 2006) ("The sale-related incentive pay to [senior management] is not governed by §§ 503(c)(1) or 503(c)(2) of the Bankruptcy Code."). The Debtors, in their sound business judgment, believe that the implementation of the KEIP is well

justified under the circumstances and will benefit the Debtors' estates and their creditor constituencies; and therefore the Court should approve the KEIP.

   a.   **Approval of the Proposed KEIP Is Justified by the Facts and Circumstances of these Chapter 11 Cases and Therefore Satisfies § 503(c)(3).**

49.   Section 503(c)(3) prohibits transfers or obligations outside the ordinary course of business "not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition." 11. U.S.C. § 503(c)(3). As discussed, the majority of other courts have found that this standard is no different from the business judgment standard under § 363(b). *See Global Home Prods.*, 369 B.R. at 783-84; *In re Nobex Corp.*, 2006 Bankr. LEXIS 417. Section 503(c)(3) was a reiteration of the standard under § 363 under which courts had previously authorized transfers outside the ordinary course of business based on the business judgment of the debtor); *see also In re Velo Holdings, Inc.*, 472 B.R. at 212 (collecting cases). Given the presumption of good faith for a debtor, courts presume that "an incentive plan established postpetition by a debtor-in-possession for the benefit of senior management is in the ordinary course of the Debtors' business." *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 798 (Bankr. D. Del. 2007).

   b.   **The Dana Factors.**

50.   Relatedly, courts assessing a debtor's business judgment relating to an incentive program under § 503(c)(3) look at six factors (the "Dana Factors"): (a) whether a reasonable relationship existed between the proposed plan and the desired results; (b) whether the cost of the plan was reasonable in light of the overall facts of the case; (c) whether the scope of the plan was fair and reasonable; (d) whether the plan was consistent with industry standards; (e) whether the debtor had put forth sufficient due diligence efforts in formulating the plan; and (f) whether the

debtor received sufficient independent counsel in performing any due diligence and formulating the plan. *See e.g. In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006).

        **c.**       **The KEIP Satisfies Each of the Dana Factors.**

51.      *Factor (a): The KEIP is Structured to Achieve the Desired Performance and is an Incentive Plan*.  The KEIP Participants are essential to the Debtors' operations and their services are necessary to maximize the value of these Debtors' estates.  The KEIP establishes the goal of an efficient closing for the KEIP Participants that, if achieved, will have a meaningful impact on the Debtors' restructuring efforts.  The conditions to earn the KEIP Bonuses are not only essential for success in these Chapter 11 Cases, they also require substantial outperformance and dedication by the KEIP Participants through Closing.[9]

52.      The KEIP Participants have already worked strenuously to get the Debtors to the precipice of a sale process, with the valuable Stalking Horse APA and the DIP Facility in hand.  This is a remarkable achievement given the state of affairs on the Petition Date (with no offer and no DIP financing).  Where the Debtors have broadcast their desire to file and make payments under the KEIP from the Petition Date forward, the fact that, as of the filing of this Motion, a portion of performance objectives have become more achievable, resulting *from work performed by management*, does not indicate that the targets were insufficiently aspirational.

53.      The KEIP Participants have stayed with the Debtors and worked hard and worked well.  This hard work has been in part because, to incentive the employees, Debtors told their KEIP Participants they would be rewarded through a KEIP both privately and in public (such as

---

[9] The KEIP was not designed to retain the KEIP Participants, although a prerequisite to receiving a payment under the KEIP is that the KEIP Participant must be employed at the time of the payment unless such employee's employment was terminated without cause.  *See, e.g., In re Global Home Prods., LLC*, 369 B.R. at 786 ("The fact, as Debtors pointed out, that all compensation has a retention element does not reduce the Court's conviction that Debtors' primary goal [is] to create value by motivating performance.  All companies seek to retain employees they value by fairly compensating them.").

at the Wage Motion hearing). This fluid situation is closely analogous to that of *In re Aralez Pharm. US Inc.*, 18-12425 (MG), 2018 WL 6060356 (Bankr. S.D.N.Y. Nov. 19, 2018), where Judge Glenn considered a KEIP that had been developed and crafted weeks before the debtors actually filed their motion seeking approval of the same. In the interim, the debtors performed admirably on a financial basis and negotiated a stalking horse bid for $240 million. The debtors thus met certain budget metrics and a KEIP goal of a sale of $230 million before their motion was heard. Judge Glenn approved the KEIP and ruled:

> The Committee argues that the KEIP amounts to no more than a "layup." At the evidentiary hearing, the Committee claimed that several of the KEIP targets now appear achievable. They note that the Debtors now have $240 million of bids in hand and now estimate that they are on track to outperform the DIP Budget by increasing cash flow by $7-10 million. These figures would translate to payments of 81% of the KEIP Participants' base salaries.
>
> **The Court is unpersuaded that the targets are not sufficiently challenging because some of these targets now appear achievable in hindsight**. The Debtors explain that the KEIP Motion was not filed until roughly two months after the Petition Date because their post-petition financing facility required the Debtors to obtain the approval of their post-petition lenders before presenting the KEIP to the Court, and the post-petition lenders asked the Debtors to obtain stalking horse bids before seeking approval of the KEIP. (ECF Doc. 274 ¶ 1.) Once the KEIP Motion was filed, the hearing was delayed further to allow the Debtors to negotiate the terms of the KEIP with the U.S. Trustee. **The Court will not punish the Debtors for this delay by discounting the work the KEIP Participants have already performed. The Debtors and their financial advisors developed the KEIP in August 2018 [three months before decision] and the KEIP Participants operated with the understanding that the Debtors would be seeking authority to implement the KEIP. The Court sees no issue with reviewing a KEIP that was designed to incentivize work that is already partially performed.** *See In re Mesa Air Grp., Inc.*, 2010 WL 3810899, at *3 (Bankr. S.D.N.Y. Sept. 24, 2010) (approving

incentive plan that awarded payments for services already rendered).

*Id.* at **4-6 (emphasis added) (citations included).[10]

54.    ***Factors (b) and (c): The Costs and Scope of the KEIP Are Reasonable***.  The KEIP concerns only five (5) employees, and is targeted towards those with the most macro-influence over the Debtors' business and responsibility for achievement of Chapter 11 goals.  As to cost, the KEIP Maximum of $ 205,500 is a fraction of the consideration provided in the Stalking Horse Bid. The KEIP's cost and scope is also in line with the economic realities of these Chapter 11 Cases, and the KEIPs is similar to those approved by this court and other courts in this District.  *In re Sam Ash Music Corp.*, Case No. 24-14727 (SLM) (Bankr. D.N.J. June 13, 2024) (approving KEIP for four employees in maximum aggregate of $107,000 for asset sales targeting at $10 million); *In re Agway Farm & Home Supply, LLC*, Case No. 22-10602 (JKS) (Bankr. D. Del. Nov. 21, 2022) (approving KEIP for President and CEO in maximum of two (2) percent of sale proceeds, up to a maximum of $75,000 (24.6 of the executive's salary) payable upon closing of sales of substantially all of the debtor's assets); *In re Ashley Steward Holdings, Inc.*, 2014 WL 2013372 (MBK) (Bankr. D. N.J. Apr. 23, 2014) (for $23 million stalking horse bid, approving KEIP in aggregate of in range of $350,000 to $1.4 million to ten employees);  *In re Revel AC, Inc.*, Case No. 14-22654 (MBK) Bankr. D. N.J. June 30, 2014) (approving KEIP of aggregate amount of $1,525,000 for five (5) employees for meeting cash flow goals and additional amount for sale closing above threshold amount); *see also In re Velo Holdings Inc.*, 472 B.R. 201, 211 (Bankr. S.D.N.Y. 2012)  (approving

---

[10]Judge Glenn presaged his decision on the record in addressing objecting counsel's arguments regarding hindsight of the likelihood of goals occurring: "The Key Employees certainly knew that the debtor was going to propose a KEIP [later in the case, though the KEIP was yet] not approved … [Y]our [objecting counsel] argument would, it seems to me, lead to a conclusion that you should not consider any work that the debtor's key employees have done before this Court signs an order approving a KEIP.  And I have a problem with that." *In re Aralez Pharm. US Inc.*, 18-12425 (MG) [Docket No. 294 at 46](Bankr. S.D.N.Y. Nov. 14, 2018).

payment of 1% of sale proceeds to single executive under KEIP); *In re Alpha Nat. Res. Inc.*, 546 B.R. at 362 (KEIP of 60-175% of salary approved).

55.    ***Factors (d), (e), and (f):  The Debtors Developed the KEIP with Independent Advice and Oversight and were Diligent in this Development***.  The Debtors actively sought input from their advisors during the KEIP development process.  The Debtors, with the assistance of Uzzi & Lall and their other restructuring advisors, performed diligence on their Current Employees' existing compensation levels and other approved bankruptcy bonus plans vis-à-vis the Debtors' resources and Chapter 11 goals.

### IV.   <u>WAIVER OF MEMORANDUM OF LAW</u>

56.    The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

### V.   <u>WAIVER OF RULE 6004</u>

57.    The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

### V.   <u>NOTICE</u>

58.    Notice of this Motion will be provided to the following parties, or, in lieu thereof, their counsel, if known:  (i) the UST; (ii) the Committee; (iii) the Debtors' Stalking Horse Bidder; (iv) the Prepetition Secured Parties; (v) the known KERP and KEIP Participants; and (vi) those persons who have requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that no other or further notice need be provided.

## VI.  <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request that the Court: (i) enter the Order as set forth herein; and (ii) grant the Debtors such other and further relief is just and proper under the circumstances.

Dated: July 23, 2025

**DENTONS US LLP**

*/s/ Lauren Macksoud*
Lauren Macksoud (admitted)
101 JFK Parkway
Short Hills, NJ 07078
Telephone: (973) 912-7100
Facsimile: (973) 912-7199
Email: lauren.macksoud@dentons.com

Tania M. Moyron (admitted pro hac vice)
Van C. Durrer, II (admitted pro hac vice)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email: tania.moyron@dentons.com
         van.durrer@dentons.com

John D. Beck (pro hac vice pending)
Sarah M. Schrag (pro hac vice pending)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email: john.beck@dentons.com
         sarah.schrag@dentons.com
- and -

**TOGUT, SEGAL & SEGAL LLP**
Frank A. Oswald (admitted)
550 Broad Street, Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email: frankoswald@teamtogut.com

Albert Togut (admitted pro hac vice)
Amanda C. Glaubach (admitted pro hac vice)
Eitan Blander (admitted pro hac vice)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email: altogut@teamtogut.com
        aglaubach@teamtogut.com
        eblander@teamtogut.com

*Proposed Counsel for Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>Powin, LLC, *et al.*,[1]<br><br>         Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

**<u>DECLARATION OF GERARD UZZI</u>**

I, Gerard Uzzi, hereby state and declare as follows:

1.      I am the Chief Restructuring Officer (the "<u>CRO</u>") of Powin, LLC ("<u>Powin</u>") and

the above-referenced affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>"). I

testify in support of the *Debtors' Motion for Entry of an Order (I) Approving Key Employee*

*Retention Plan and Key Employee Incentive Plan and (II Related Relief* (the "<u>Motion</u>") (unless

otherwise defined herein, all capitalized terms shall have the same meaning as in the Motion).

2.      Except as otherwise indicated herein, this declaration (the "<u>Declaration</u>") is based

upon my personal knowledge, my review of relevant documents, information provided to me by

employees of the Debtors or the Debtors' advisors and professionals, and my opinion is based

upon my experience, knowledge, and information concerning the Debtors' operations and this

industry. If called upon to testify, I would testify competently to the facts set forth in this

Declaration.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504], (iii) PEOS Holdings, LLC [5476], (iv) Powin China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [15241], (vii) Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [22495], (ix) Powin Energy Operating, LLC [6487] (x) Powin Energy Storage 2, Inc., [9926]; (xi) Powin Energy Ontario Storage II LP, [5787]; and (xii) Powin Canada B.C. Ltd. [2239].  The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR  97062.

3.      In incorporate my testimony in my previous *Declaration of Gerard Uzzi in Support of Emergency First Day Motions* (the "<u>First Day Declaration</u>").  [Docket No. 13].

4.      I am a Managing Partner and Founder of CBMN Advisors LLC d/b/a Uzzi & Lall ("<u>Uzzi & Lall</u>").  I have extensive experience advising companies, boards of directors, senior management, creditors, equity holders, and investors in stressed and distressed situations, including chapter 11, out-of-court work outs, and rescue financings across industries and jurisdictions. I also serve in a number of fiduciary capacities, including presently as the Chairman of the Celsius Litigation Oversight Committee.

5.      Prior to co-founding Uzzi & Lall, I was a senior restructuring partner at Milbank LLP and White & Case LLP for over 18 years in the aggregate. During that time, I was personally involved in senior roles in some of the nation's largest and most complex chapter 11 cases, including Lehman Brothers, Washington Mutual, American Airlines, Rescap, Charter Communications, Mirant, Adelphia Communications, Purdue Pharma, and ZAIS. I have been recognized for my work in Chambers, Euromoney's IFLR, The Legal 500, and Expert Guides as one of the World's Leading Insolvency and Restructuring Professionals.

6.      The Debtors entered these Chapter 11 Cases with a substantially-reduced workforce, without DIP financing and without any bids to buy their assets.  Thanks to the heroic efforts of the Debtors' remaining employees, the Debtors now have financing and are pursuing an orderly, but speedy, sale process.

7.      From the beginning of the Chapter 11 Cases, the Debtors have determined that there is an acute need to retain and incentivize their key employees for the success of their Chapter 11 Cases (*see* infra concerning the roles of the KERP Participants and KEIP Participants).   Both before the Chapter 11 Cases and before the Motion was filed, the Debtors have communicated to

1

Employees that the Debtors would develop and seek approval of retention and incentive bonus programs.

     **a.**     **The Debtors' Employees**

8.     Before the Petition Date, the Debtors significantly reduced their workforce.  The Debtors also issued multiple pre-petition notices under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Chapter 23 (the "WARN Act").

9.     The Debtors undertook their largest reduction-in-force on June 6, 2025, wherein they terminated 285 employees.

10.     The Debtors' remaining seventy-two (72) Employees represent approximately 15% of the Debtors' workforce compared to January 1, 2025.  These Employees remain because they are critical for operating and maintaining the value of the Debtors' business. The  Employees largely support the project and technology branches of their services business.  Further, the Debtors employ the five (5) KEIP Participants, who manage the Debtors' business.  *See infra.*   The Employees cannot be replaced, and without the Employees' services, the Debtors will no longer be able to provide products and services to their customers.

11.     Though the Debtors' Employees ordinarily receive compensation through base salary and bonus, in the Wage Motion the Debtors did not seek approval to pay bonuses to Employees.  Instead, in the Wage Motion, the Debtors stated: "Soon, the Debtors anticipate filing a motion seeking authorization to further retain and incentivize employees through bonuses to be issued under newly designed 'KEIP' and 'KERP' programs."  Wage Motion at ¶ 1.  At the first-day, interim hearing for the Wage Motion, counsel for the Debtors stated: "[T]he employees here are our priority, and retaining and incentivizing them [is] a top priority in the case.  [The Debtors]

2

hope to develop and file further retention and incentive programs." *See* Tr. of June 11, 2025 Hearing at 36-37.

12.     Even with the relief provided in the Wage Motion, the Debtors have still experienced attrition, with at least sixteen resignations since the Petition Date and numerous other Employees expressing concern or previewing their potential resignation to the Debtors.   During the Chapter 11 Cases, the Debtors' own customers, in fact, have approached and hired away several of the Debtors' skilled Employees.

**b.      The Sale Process and the Need to Retain and Incentivize Employees**

13.     Upon information and belief, the Stalking Horse Bidder, if they are the winning bidder, will not offer employment to all of the Employees given redundancies with the Stalking Horse Bidder's business.  If no offer is given by a winning bidder, the Debtors, having sold their assets, will be forced to terminate the positions of these employees without cause (with such terminated employees, the "Terminated Employee").   During and after the sale process, the Debtors have and will continue to be transparent with Employees whose position may or will be terminated after a sale.

14.     The Debtors are actively conducting their sale process.   Multiple bidders have inquired regarding whether and how the Debtors will retain employees through closing.   These bidders recognize the value that all the employees provide to preserving value of the business, whether those employees are selected or not to continue on working for any given bidder.

**c.      The Development of the KERP and KEIP**

15.     The Debtors enlisted Uzzi & Lall and their investment banker Huron Transaction Advisory LLC ("Huron") to support the development of the KERP and KEIP.  The Debtors,  their professionals and I reviewed and considered: (i) the Debtors' financial resources and employment

requirements during these Chapter 11 Cases; (ii) the views of the Debtors' management with respect  to what was necessary and appropriate to achieve the stated goals; and (iii) employee programs approved by bankruptcy courts.

16.     These comparable plans include various cases in this district and other districts, including, as the KERP: *In re Sam Ash Music Corp.*, Case No. 24-14727 (SLM) (Bankr. D.N.J. June 13, 2024) (approving KERP for ten (10) percent of salary for 21 employees in aggregate of $234,000); *In re Agway Farm & Home Supply, LLC*, Case No. 22-10602 (JKS) (Bankr. D. Del. Nov. 21, 2022) (debtor had terminated approximately half of employees before filing for bankruptcy and undertook sale process in bankruptcy) (approving KERP for fourteen employees in aggregate of $285,000); *In re SLT HoldCo, Inc.*, Case No. 20-18368 (MBK) (Bankr. D. N.J. July 22, 2020) (approving KERP for $217,284 for eight (8) employees during sale process, ranging from approximately 17 to 25% of the employees' salary); *In re MobiTV*, Case No. 21-10457 (LSS) (Bankr. D. Del. Apr. 7, 2021) (approving KERP for all non-insider employees after debtor had reduced its workforce pre-petition) (awards ranged from 5.0% to 25.1% of their base salary); *In re Oneweb Global Limited, et. al.*, Case No. 20-22437 (RDD) (Bankr. S.D.N.Y. May 29, 2020) (debtors executed prepetition RIF of 90% of workforce, and Court approved (i) KERP for 47 remaining employee totaling $3 million (40% of salary paid in quarterly installments); *In re KB Toys, Inc.*, No. 08-13269 (KJC) (Bankr. D. Del. Jan. 6, 2009) (approving retention plan for 28 non-insider employees contemplating payments of approximately $300,000); *In re Mervyn's Holdings, LLC*, No. 08-11586 (KG) (Bankr. D. Del. Oct. 30, 2008) (approving retention plan for 93 non-insider employees contemplating payments of approximately $1.3 million); and, as to the KEIP: *In re Sam Ash Music Corp.*, Case No. 24-14727 (SLM) (Bankr. D.N.J. June 13, 2024) (approving KEIP for four employees in maximum aggregate of $107,000 for asset sales targeting at $10

million), *In re Agway Farm & Home Supply, LLC*, Case No. 22-10602 (JKS) (Bankr. D. Del. Nov.

21, 2022) (approving KEIP for President and CEO in maximum of two (2) percent of sale proceeds,

up to a maximum of $75,000 (24.6 of the executive's salary) payable upon closing of sales of

substantially all of the debtor's assets), *In re Ashley Steward Holdings, Inc.*, 2014 WL 2013372

(MBK) (Bankr. D. N.J. Apr. 23, 2014) (for $23 million stalking horse bid, approving KEIP in

aggregate of in range of $350,000 to $1.4 million to ten employees), and *In re Revel AC, Inc.*, Case

No. 14-22654 (MBK) Bankr. D. N.J. June 30, 2014) (approving KEIP of aggregate amount of

$1,525,000 for five (5) employees for meeting cash flow goals and additional amount for sale

closing above threshold amount).

**d.      The KERP and KEIP are Reasonable and Should be Approved**

17.      I believe that both the KERP and KEIP are reasonable and a sound exercise of the

Debtors' business judgment.  In fact, they are on the low end on a per-capita basis given the size

and complexity of the Chapter 11 Cases.  Commonly in such complex Chapter 11 Cases, the

Debtors would seek much higher bonuses for top executives and not seek to pay rank-and-file

employees at the same percentage.  The KERP and KEIP were therefore designed to enable the

success of the Chapter 11 Cases while recognizing the economic realities of the Chapter 11 Cases.

**e.      Approval of the KERP and KEIP**

18.      The Debtors presented the KERP and KEIP for consideration to the Debtors'

Independent Director who approved the programs.

**f.      The KERP**

i.      *The KERP Participants and their Value*

19.      The Debtors have identified sixty-seven (67) Employees as KERP Participants.

The KERP Participants are all the Employees of the Debtors that are not KEIP Participants.

5

20.    The KERP Participants are integral to the Debtors' business.  The KERP Participants, unlike the majority of the Debtors' pre-petition employees, remain because the Debtors determined their services were necessary to the success of the Debtors' Chapter 11 Cases and the sale process.  From an operational standpoint, the Employees are necessary for the Debtors to have the capacity to answer customer questions and manage servicing of the Debtor's assets and contracts.  From a sale-process standpoint, the Employees will maintain going-concern value, including concerning transitioning the assets to new operations and maintaining customer support, and as needed, will assist the Debtors' leadership in responding to inquiries concerning diligence.

21.    The KERP Participants are not responsible for setting company policy and generally do not attend senior management meetings or participate in meetings of the Debtors' Board of Directors or any of its committees.  In fact, many of the KERP Participants' duties are limited to implementing tasks within a particular division or department.  As such, their titles reflect their relative position below upper management and functions within the organization and do not reflect any real insider status or responsibility.   Although certain of the KERP Participants hold titles such as "manager" they do not take part in the strategic management or decide "critical financial decisions" of the Debtors.

ii.    *The Terms of the KERP*

22.    Under the proposed KERP, each KERP Participant will receive monetary awards (the "KERP Award(s)") (with such payments of the KERP Awards, the "KERP Payment(s)").

23.    KERP Participants will earn a KERP Award of ten (10) percent of the their annual salary through one or more payment(s) upon a closing of a Sale Transaction (the "Closing"), which KERP Award will be payable at or shortly after a Closing (the "KERP Retention Bonus").

6

24.    If the KERP Participant voluntarily leaves employment prior to the Closing, or such KERP Participant is terminated for cause, that KERP Participant will forfeit the entire KERP Award.  For the avoidance doubt, the termination of a KERP Participant because of redundancies of a Sale Transaction and/or the failure of any Buyer to offer employment to a KERP Participant after a Closing will not be considered termination "for cause."[2]   Neither the (i) termination of the employment of a KERP Participant without cause nor (ii) death or disability shall affect any right of a KERP Participant to a KERP Award, and KERP Awards will be earned upon the occurrence of any triggering event(s), regardless of whether the event(s) occurred after (i) termination without cause or (ii) death or disability.

25.    If every KERP Participant remains eligible, total KERP Payments are estimated to be $993,936 (the "KERP Maximum").  The KERP Maximum, however, shall be reduced dollar for dollar based upon attrition due to termination for cause or resignation.

26.    KERP Payments will be made after payments of the secured amounts owed to the Debtors' Prepetition Secured Parties (or applicable holders) and DIP Lender.

**g.    The KEIP**

27.    The KEIP Participants are five (5) members of the Debtors' senior leadership team, consisting of the Debtors' (i) Chief Executive Officer, (ii) General Counsel, (iii) Chief Financial Officer, (iv) Chief Operating Officer and (v) Head of Human Resources. This team is responsible for executing the Debtors' operating and strategic plans, including maintaining the Debtors' business operations with reduced staff, overseeing and addressing issues during these Chapter 11

---

[2] For purposes of the KEIP and KERP, "cause" means (i) failure to materially perform the duties for which they are employed, (ii) willful violation of a material policy of the Debtors, (iii) commission of any act or acts of fraud, embezzlement, dishonesty, or other willful misconduct, (iv) material breach of any of their obligations under any written agreement or covenant with the Debtors, or (v) an act of dishonesty resulting or intended to result, directly or indirectly, in their gain for personal enrichment at the expense of the Debtors.

US_ACTIVE\130825375\V-4

Cases, interfacing with customers, and maintaining a culture among the Debtors' employees during these Chapter 11 Cases. In addition, the KEIP Participants shoulder the burden of moving the Debtors' sale forward, answering bidder questions and providing information to the Debtors' professionals. The KEIP Participants are vital to the on-going stability, continuity, and strength of the Debtors during these Chapter 11 Cases and the sale process.

28.    This challenge is compounded by the nature of the Debtors' business, which is built on trust, reputation and communication that the KEIP Participants have earned from counterparties. Vendors, partners and customers may be cautious to continue to do business with the Debtors in the face of a challenging market and press coverage. The KEIP Participants have offset such fears through outreach and open communication with their employees and customers, and, now, will do the same when communicating with bidders.

29.    Under the proposed KEIP, the KEIP Participants may earn bonuses (the "<u>KEIP Award(s)</u>," and with payments of these amounts as the "<u>KEIP Payment(s)</u>"). A KEIP Participant may earn up to two KEIP Bonuses: (i) a KEIP Bonus earned upon compliance with DIP Financing milestones and parameters (the "<u>KEIP DIP Bonus</u>"); and/or (ii) a KEIP Bonus payable upon a Closing (the "<u>KEIP Sale Bonus</u>").

30.    The KEIP DIP Bonus will be earned if the Debtors comply with the Approved Budget before Closing, and will be payable at or shortly after Closing (when it is anticipated that the DIP Facility will be repaid). The KEIP DIP Bonus for each eligible KEIP Participant will be five (5) percent of their annual salary.

31.    The KEIP Sale Bonus will be earned upon the occurrence of a successful closing under which the Debtors receive proceeds of $40 million or greater in cash or cash equivalents (including retirement of secured debt) (a "<u>Successful Closing</u>") and will be payable at or shortly

after a Successful Closing.  The KEIP Sale Bonus for each eligible KEIP Participant will be five (5) percent of their annual salary.

32.     Therefore, each KEIP Participant may earn up to ten (10) percent of their salaries if the Debtors perform under the Approved Budget and execute a Successful Closing.  The maximum amount payable under the KEIP is estimated to be $205,500 (the "KEIP Maximum").

33.     If a KEIP Participant is terminated for "cause," or voluntarily ends his or her employment, he or she will not receive any future KEIP Award.  For the avoidance doubt, the termination of a KERP Participant because of redundancies of a Sale Transaction and/or the failure of any Buyer to offer employment to a KERP Participant after a Closing will not be considered termination "for cause."  Neither the (i) termination of the employment of a KEIP Participant without cause nor (ii) death or disability shall affect any right of a KEIP Participant to a KEIP Award, and KEIP Awards will be earned upon the occurrence of any triggering event(s), regardless of whether the event(s) occurred after (i) termination without cause or (ii) death or disability.

34.     KEIP Payments will be made after payments of the secured amounts owed to the Debtors' Prepetition Secured Parties (or applicable holders) and DIP Lender.

35.     The KEIP Participants have already worked strenuously to get the Debtors to the precipice of a sale process, with a Stalking Horse APA for $36 million plus the $2 million Retention Payment (as defined in the Stalking Horse APA) and the DIP Facility in hand.  This is a remarkable achievement given the state of affairs on the Petition Date (with no offer and no DIP financing).

36.     The KEIP Participants have stayed with the Debtors and worked hard and worked well.  I believe that this hard work has been in part because, to incentive the employees, Debtors

9

told their KEIP Participants they would be rewarded through a KEIP both privately and in public (such as at the Wage Motion hearing).

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 23rd day of July 2025, at Sea Bright, New Jersey in Monmouth County.


_____*/s/ Gerard Uzzi*_____
Gerard Uzzi