**FARELLA BRAUN + MARTEL LLP**
Gary M. Kaplan, Esq. (*pro hac vice* pending)
One Bush Street, Suite 900
San Francisco, California 94104
Telephone: (415) 954-4940
Facsimile: (415) 954-4480
gkaplan@fbm.com

-and-

**RIKER DANZIG LLP**
Joseph L. Schwartz, Esq.
Gregory S. Toma, Esq.
7 Giralda Farms, Suite 250
Madison, New Jersey  07940-1051
Telephone: (973) 538-0800
Facsimile: (973) 538-1984
jschwartz@riker.com
gtoma@riker.com

*Co-Counsel to Front Range–Midway Solar Project, LLC*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Powin, LLC, *et al.*,[1] | Case No. 25-16137 (MBK) |
| Debtors. | (Jointly Administered) |

**FRONT RANGE-MIDWAY SOLAR PROJECT, LLC's OBJECTION AND
RESERVATION OF RIGHTS TO DEBTORS' NOTICE OF POTENTIALLY ASSUMED
EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Front Range-Midway Solar Project, LLC ("FRM"), by and through its undersigned

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504]; (iii) PEOS Holdings, LLC [5476]; (iv) Powin China Holdings 1, LLC [1422]; (v) Powin China Holdings 2, LLC [9713]; (vi) Charger Holdings, LLC [5241]; (vii) Powin Energy Ontario Storage, LLC [8348]; (viii) Powin Energy Operating Holdings, LLC [2495]; (ix) Powin Energy Operating, LLC [6487]; (x) Powin Energy Storage 2, Inc. [9926]; (xi) Powin Energy Ontario Storage II LP, [5787]; and (xii) Powin Canada B.C. Ltd. [2239]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

counsel, hereby submits this objection and reservation of rights (the "Objection") to the *Notice Of Potentially Assumed Executory Contracts And Unexpired Leases* [Docket No. 446] (the "Notice") filed by the above-captioned Debtors with respect to the following two agreements between Debtor Powin, LLC ("Powin") and FRM listed on Exhibit A to the Notice (at p. 16):

- Battery Energy Supply Agreement with proposed default cure amount of $0.00 (the "ESA").

- Settlement Agreement with proposed default cure amount of $0.00 (the "Settlement Agreement").

In support of this Objection, FRM respectfully states as follows:

## OBJECTION

As discussed below:  (1) the ESA is not an executory contract subject to potential assumption under section 365 of the Bankruptcy Code, as that agreement was expressly terminated prior to the Debtors' bankruptcy filings pursuant to the parties' Settlement Agreement (discussed herein); and (2) the proposed ($0.00) cure payment that the Debtors list with respect to the Settlement Agreement is incorrect and invalid, in light of Powin's undisputed failure to make the $2,854,975.71 payment that was due thereunder by April 30, 2025, which was unambiguously admitted by Powin in that FRM's claim is clearly reflected in Powin's bankruptcy schedules as a non-contingent, liquidated and undisputed debt [Docket No. 427, at page 90 of 119, Line 3.161].

A.    **Background**

1.    Powin and FRM entered into the ESA on November 17, 2021.  A true and correct copy of the ESA is annexed hereto (without its voluminous exhibits) as Exhibit 1.

2.      After a dispute thereafter arose with respect to the ESA, on December 31, 2024, Powin and FRM entered into the Settlement Agreement.  A true and correct copy of the Settlement Agreement is annexed hereto as Exhibit 2.

3.      Section 1.2 of the Settlement Agreement provides, in relevant part:

> *[T]he Parties mutually agree to terminate the ESA*, and the only obligations by either party hereafter are contained in this Settlement Agreement. Therefore, upon executing this Settlement Agreement, *the ESA will be null and void with no further effect or obligations between the Parties existing thereunder*.

See Exhibit 2, § 1.2 (emphasis added).

4.      Section 1.3 of the Settlement Agreement provides:  "A payment of $2,854,975.71 shall be made by [Powin] to [FRM] on or before April 30th, 2025" (the "4/30/25 Settlement Payment"). See Exhibit 2, § 1.3.

5.      Powin indisputably failed to timely (or ever) make the 4/30/25 Settlement Payment.

**B.      Powin's Bankruptcy Schedules**

6.      Powin readily admits that it failed to ever make the 4/30/25 Settlement Payment. In particular, on *Schedule F* of its bankruptcy schedules [Docket No. 427, at page 90 of 119, Line 3.161], Powin lists FRM as a general unsecured creditor having a claim in the amount of $2,854,975.71 (the same amount as the 4/30/25 Settlement Payment), and lists FRM's claim as *not* contingent, disputed or unliquidated.

7.      Further, Powin also lists FRM's claim in the same amount ($2,854,975.71) on its *Amended List of Consolidated Creditors Who Have the 50 Largest Unsecured Claims and Are Not Insiders* [Docket No. 70, at p. 3, Line 22] ("Largest Creditor List").

## LEGAL ARGUMENT

### A.    Powin May Not Assume The ESA Because It Was Expressly Terminated Prepetition Pursuant To The Parties' Settlement Agreement

8.    According to the Notice, Powin potentially seeks to assume and assign the ESA to the Stalking Horse Bidder[2] or another winning bidder pursuant to section 365 of the Bankruptcy Code.  However, it is well settled that:

> Section 365 applies only to a contract or lease in existence at the commencement of the case.  If the contract or lease has expired by its own terms or has been terminated under applicable law before commencement of the bankruptcy case, there is nothing to assume or assign.

3 *Collier on Bankruptcy* (16th ed. 2022) ¶ 365.02[2][e], at 365-22 (citations omitted).

9.    As discussed above, pursuant to Section 1.2 of the Settlement Agreement, the ESA was expressly terminated on December 31, 2024, well before the commencement of the above-captioned bankruptcy cases, on June 9, 2025 (the "Petition Date").  As a result, Powin may ***not*** seek to assume the ESA as a matter of law.

### B.    Powin's Proposed $0.00 Cure Payment With Respect To The Settlement Agreement Is Incorrect And Invalid

10.    Section 365(b)(1) of the Bankruptcy Code provides, in relevant part:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> (B) compensates, or provides adequate assurance that the trustee

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the *Motion of the Debtors for entry of an order (i) designating a stalking horse bidder and approving stalking horse bidder protections; (ii) approving bidding procedures by which interested parties may bid and an auction sale format in connection with the sale of substantially all of the Debtors' assets; (iii) approving the form of Asset Purchase Agreement; (iv) approving form of notice to be provided to interested parties; (v) authorizing the assumption and assignment of assumed contracts and notice procedures thereto; (vi) scheduling a court hearing to consider approval of the sale to the highest and best bidder; and (vii) authorizing the sale of the Debtors' property free and clear of all causes of action and claims* [Docket No. 228].

> will promptly compensate, a party other than the debtor to such
> contract or lease, for any actual pecuniary loss to such party
> resulting from such default; and
> (C) provides adequate assurance of future performance under such
> contract or lease.

11 U.S.C. § 365(b)(1).

11.     It is undisputed that Powin is in default under the Settlement Agreement as a result

of its failure to timely (or ever) make the 4/30/25 Settlement Payment, in accordance with Section

1.3 thereof.  The amount necessary to compensate FRM for Powin's default includes the

$2,854,975.71 owed for the 4/30/25 Settlement Payment, as acknowledged by Powin on both

*Schedule F* of its bankruptcy schedules that Powin filed with the Court under penalty of perjury,

as well as on Powin's Largest Creditor List.

12.     Powin is also liable to FRM under New York law for applicable interest on such

arrearage.   Section 2.7 of the Settlement Agreement provides:   "This Settlement shall be

interpreted and construed and enforced in accordance with the laws of the State of New York."

See Exhibit 2, § 2.7.

13.     Section 5001 of New York's Civil Practice Law and Rules provides, in relevant

part:

> (a) Interest shall be recovered upon a sum awarded because of a
> breach of performance of a contract . . .
> (b) Interest shall be computed from the earliest ascertainable date
> the cause of action existed . . . .

N.Y. CPLR § 5001.

14.     Section 5004(a) of New York's Civil Practice Law and Rules further provides, in

relevant part:

> Interest shall be at the rate of nine per centum per annum, except
> where otherwise provided by statute . . . .

N.Y. CPLR § 5004(a).

15.     Based on the foregoing, Powin is liable for prepetition interest at 9% per annum for the period from April 30, 2025 (due date of 4/30/25 Settlement Payment) until June 9, 2025 (the Petition Date) in the amount of $28,158.80 ($703.97/day x 40 days).  Consequently, the amount needed to cure the default under the Settlement Agreement is $2,883,134.51 ($2,854,975.71 + $28,158.80).

16.     Accordingly, FRM submits that the Court should condition Powin's potential assumption of the Settlement Agreement on its making of a cure payment to FRM of $2,883,134.51.

## **<u>RESERVATION OF RIGHTS</u>**

17.     This Objection is without prejudice to, and with a full reservation of rights by, FRM to supplement, amend, and/or to further object to any further attempt by the Debtors to assume and/or assign the ESA and/or the Settlement Agreement.

[*Remainder of the page intentionally left blank*]

## CONCLUSION

**WHEREFORE**, for all the reasons set forth herein, FRM respectfully requests that the

Court deny Powin's proposed assumption of the ESA, condition Powin's proposed assumption of

the Settlement Agreement on its making of a cure payment to FRM of $2,883,134.51, and provide

FRM with such other and further relief as is just and proper.

July 28, 2025
Madison, New Jersey

**RIKER DANZIG LLP**

By:  /s/ *Joseph L. Schwartz*
Joseph L. Schwartz, Esq.
Gregory S. Toma, Esq.
7 Giralda Farms, Suite 250
Madison, New Jersey  07940-1051
Telephone: (973) 538-0800
Facsimile: (973) 538-1984
jschwartz@riker.com
gtoma@riker.com

-and-

**FARELLA BRAUN + MARTEL LLP**
Gary M. Kaplan, Esq. (*pro hac vice* pending)
One Bush Street, Suite 900
San Francisco, California 94104
Telephone: (415) 954-4940
Facsimile: (415) 954-4480
gkaplan@fbm.com

*Co-Counsel to Front Range–Midway Solar
Project, LLC*

4924-5813-3079, v. 5

# EXHIBIT 1



*Execution Version*

# BATTERY ENERGY SUPPLY AGREEMENT

**between**

**FRONT RANGE-MIDWAY SOLAR PROJECT, LLC, as Buyer**

**and**

**POWIN, LLC, as Supplier**

November 17, 2021

## Table of Contents

1.      **Definitions** ....................................................................................................................1

2.      **Contract and Order of Precedence** ...........................................................................14

3.      **Preparation for and Performance of the Work** .........................................................15

4.      **Buyer Representative and Supplier Representative** ...................................................16

5.      **Cooperation with Others; Project Site Access** ...........................................................17

6.      **Standards, Codes and, Data Protection** .....................................................................17

7.      **Physical Security** .......................................................................................................18

8.      **Price and Payment** ....................................................................................................19

9.      **Schedule and Delivery** ..............................................................................................21

10.     **Liquidated Damages** .................................................................................................23

11.     **Title and Risk of Loss** ...............................................................................................24

12.     **[RESERVED]** ..........................................................................................................25

13.     **Quality, Inspection and Testing** ................................................................................25

14.     **Technical Support; Training; Installation; Installation Acceptance** ..........................26

15.     **Commissioning** .........................................................................................................27

16.     **Punchlist and Final Acceptance** ................................................................................28

17.     **Change Orders** .........................................................................................................29

18.     **Warranty** ..................................................................................................................31

19.     **Operating Spare Parts** ..............................................................................................31

20.     **Suspension** ...............................................................................................................31

21.     **Termination for Default** ............................................................................................32

22.     **Buyer's Termination for Convenience** .......................................................................35

23.     **Recovery Schedule** ...................................................................................................36

24.     **Force Majeure** ..........................................................................................................36

**25.**      **Limitation of Liability** ...................................................................................... 37

**26.**      **Waiver of Consequential Damages** ...................................................................... 38

**27.**      **Indemnity** ............................................................................................................. 38

**28.**      **Confidentiality** .................................................................................................... 39

**29.**      **Supplier Self-Audit for Intellectual Property Control** ..................................... 39

**30.**      **Use of Supplier's Intellectual Property** ............................................................ 40

**31.**      **Intellectual Property Indemnity** ........................................................................ 41

**32.**      **Compliance** ......................................................................................................... 41

**33.**      **Export Compliance with United States Export Controls** .................................. 42

**34.**      **Health and Safety** ............................................................................................... 43

**35.**      **Representations** .................................................................................................. 43

**36.**      **Dispute Resolution** ............................................................................................. 45

**37.**      **Governing Law** ................................................................................................... 47

**38.**      **Assignment** ......................................................................................................... 47

**39.**      **Insurance** ............................................................................................................ 47

**40.**      **Independent Contractor** ..................................................................................... 47

**41.**      **Subcontracting** ................................................................................................... 48

**42.**      **Record Keeping and Audit** ................................................................................. 48

**43.**      **Publicity** .............................................................................................................. 48

**44.**      **No Waiver** ........................................................................................................... 48

**45.**      **Miscellaneous** ..................................................................................................... 49

\*       \*       \*       \*       \*

46834146.6

## BATTERY ENERGY SUPPLY AGREEMENT

This BATTERY ENERGY SUPPLY AGREEMENT (this "Contract") is entered into as of November 17, 2021 (the "Effective Date") by and between FRONT RANGE-MIDWAY SOLAR PROJECT, LLC, a Delaware limited liability company ("Buyer") and POWIN, LLC, a Delaware limited liability company ("Supplier").

RECITALS:

WHEREAS, Buyer is developing a solar plus battery energy storage project located in Fountain, Colorado;

WHEREAS, Supplier is a supplier of utility-scale battery energy storage systems; and

WHEREAS, Buyer wishes to purchase from Supplier, and Supplier wishes to sell to Buyer, a battery energy storage system, for such project, in accordance with the terms and conditions hereof.

NOW, THEREFORE, in consideration of the mutual promises set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## 1.    Definitions

The following capitalized terms as used in this Contract shall have the meanings set forth below:

| Term | Meaning |
|---|---|
| "Abnormal Weather Condition" | fog, snow, ice, rain, mud, and similar inclement weather conditions severe enough:<br> (a) to prohibit or impair use of road transportation systems such that a common carrier, acting reasonably, would not use such systems to transport BESS Equipment that is required to be at the Project Site when contemplated by the Project Schedule for Supplier to perform the Work; or<br> (b) that (i) safe performance of the scheduled Work is prevented or substantially hindered, or (ii) an experienced supplier, exercising Standards of Practice would, as a matter of safety, refrain from performing comparable work under comparable conditions. |
| "Affiliate" | with respect to a specified entity, another entity that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the entity specified. For purposes of this definition "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), means the possession, directly |

|  | or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through the ability to exercise voting power, by contract or otherwise. |
| --- | --- |
| "Alternate Delivery Location" | a location to which Buyer directs Deliveries to be made by Supplier as described in Section 9(h)(iii), that is (a) not on the Project Site, (b) within twenty-five miles of the Project Site, and (c) accords with the BESS Equipment storage requirements set forth in Exhibit L. |
| "Applicable Law(s)" | as amended from time to time, any act, statute, law, regulation, permit, license, ordinance, rule, judgment, order, decree, directive, guideline or policy (to the extent mandatory) or any similar form of decision or determination by, or any written interpretation or administration of, any of the foregoing by any Governmental Authority with jurisdiction over Supplier, Buyer, the Project, the Project Site, or the performance of the Work. |
| "Applicable Codes and Standards" | all national, state, and local engineering, environmental, construction, safety, and electrical generation codes and standards, applicable to the BESS Equipment or the Work. |
| "Battery Segment" | the part of the Centipede that houses one Stack, a controller, the battery management system ("BMS"), two HVAC units, and cabling trays. |
| "Battery Segment Delivery LDs" | has the meaning set forth in Exhibit O. |
| "Battery Segment Readiness" | Buyer has prepared the Project Site for Delivery of the Battery Segments by establishing internet service and connecting and energizing auxiliary power. |
| "Battery Segment Readiness Date" | the date by which Buyer shall have achieved Battery Segment Readiness, which projected date is set forth in Exhibit D. |

2

"BESS"

the battery energy storage system, comprising a component of the Project and consisting of one or more Centipedes, that includes (a) the BESS Equipment (b) Buyer-Furnished Equipment and (c) work for which Buyer is responsible pursuant to Exhibit B.

"BESS Equipment"

the Battery Segments, Collection Segments, PCS/MVT Sets, and all other Supplier-provided equipment, supplies, software and other goods, as enumerated in Exhibit A.

"BESS Product Manual"

the manual set forth in Exhibit J.

"Business Day"

any day other than a Saturday, Sunday, U.S. federal holiday, or any other day on which banks are authorized to be closed in Portland, Oregon, or the state in which the Project is located.

"Buyer"

has the meaning set forth in the preamble, and includes such entity's successors and permitted assigns.

"Buyer-Caused Delay"

an actual delay in Supplier's performance of the Work directly resulting from and to the extent of any of the following:

(a) a failure by Buyer to timely perform its material obligations as required under this Contract (including Buyer's failure to timely perform its obligations in support of Commissioning as described in Section 15);

(b) any breach of this Contract by Buyer, its Affiliates, Buyer Representative, or Other Contractors;

(c) any change to the Delivery Location pursuant to Section 9(h);

(d) Buyer's failure to timely achieve the Site Readiness Date, Battery Segment Readiness Date, and Installation Acceptance, extended day for day any delay by Supplier of the preceding milestones caused by Supplier; or

(e) inaccurate, additional, or changed information from the information provided by Buyer and set forth

3

in the Exhibits hereto as of the Effective Date,

other, in each case, than as a result of (i) an act, omission, delay or failure by Supplier or its Subcontractors, or (ii) a Force Majeure Event or Change In Law.

"Buyer Event of Default"     has the meaning set forth in Section 21(i).

"Buyer-Furnished Equipment"     Any equipment for the BESS that is neither BESS Equipment nor otherwise provided by Supplier's for the Work, as set forth on Exhibits A and B.

"Buyer Representative"     Elisa Ferrando Juncosa.

"Centipede"     Supplier's proprietary, fully integrated modular battery energy storage system, comprised primarily of a Collection Segment and multiple Battery Segments, along with enclosures, hardware and software.

"Change in Codes and Standards"     a change after the Effective Date in Applicable Codes and Standards that could not have been anticipated or foreseen by a prudent contractor experienced in the types of work to be carried out under the Contract and acting in accordance with the Standards of Practice.

"Change in Law"     a change in Applicable Law or Applicable Codes and Standards promulgated after the Effective Date that could not have been anticipated or foreseen by a prudent contractor experienced in the types of work to be carried out under this Contract and acting in accordance with the Standards of Practice, but specifically excluding all Excluded Changes in Law.

"Change Order(s)"     a written order issued and signed by Buyer Representative adjusting the Work, this Contract Price and/or the Project Schedule in accordance with Section 17.

"Collection Segment"     the component of the Centipede that:
(a) interconnects multiple Battery Segments, and
(b) houses the DC disconnect cabinet, AC load panel, HVAC controls, fire panel, networking and

4

|  | communications equipment and controls. |
|---|---|
| "Collection Segment Delivery LDs" | has the meaning set forth in Exhibit O. |
| "Commissioning" | Successful completion by Supplier of the Performance Tests, demonstrating that the Performance Guarantees have been met. |
| "Commissioning Certificate" | has the meaning set forth in Section 15(e). |
| "Commissioning Commencement Date" | the date by which Buyer shall have achieved Installation Acceptance so that the BESS Equipment is ready for Supplier to commence Commissioning, as such date is set forth in Exhibit D. |
| "Commissioning LDs" | has the meaning set forth in Exhibit O. |
| "Commissioning LDs Cap" | has the meaning set forth in Exhibit O. |
| "Completion Milestones" | (a) Delivery of the Collection Segments; (b) Delivery of the PCS/MVT Sets; (c) Delivery of the Battery Segment; and (d) Commissioning. |
| "Confidential Information" | has the meaning set forth in Section 28(a). |
| "Contract" | this Battery Energy Supply Agreement entered into by and between Buyer and Supplier, including all Exhibits referenced herein. |
| "Contract Price" | the total amount payable by Buyer to Supplier in accordance with this Contract, as enumerated in Exhibit E, as may be amended by Change Orders in accordance with this Contract. |
| "COVID" | the (a) novel coronavirus SARS-CoV-2 and the associated disease named by the World Health Organization as "COVID-19" and declared by the |

5

World Health Organization to be a global pandemic on March 11, 2020, and (b) any mutation, strain, or variant of COVID-19 or any disease associated with such mutation, strain, or variant.

"COVID Impacts"

(a) measures taken by a Governmental Authority in connection with COVID, including quarantines and/or the enactment, promulgation, modification, or repeal after the Effective Date of any Applicable Law as a result of COVID; or

(b) circumstances related to COVID that delay the progress of the Work or increase Supplier's cost to perform the Work.

"Date of Delivery"

the date on which the BESS Equipment is Delivered, or deemed Delivered (as described in Section 9(k)(iii).

"DDP"

"Delivery Duty Paid", per INCOTERMS 2020.

"DDP Costs"

The costs incurred by Supplier for transportation and delivery of BESS Equipment from the EXW location to the Delivery Location, including loading expenses, delivery costs, export/import duties, taxes and tariffs, security fees, and other costs customarily associated with DDP.

"Defect"

(a) any defects in the design, workmanship or materials of or comprising the BESS Equipment (including without limitation, as with respect to software, any software error or other problem caused by Supplier's incorrect operation of the computer code in such software); or

(b) any other non-conformity or failure of the Work to comply with the requirements of this Contract (including non-compliance caused by any defect as described in clause "(a)"), Applicable Laws or Standards of Practice.

Anything to the contrary notwithstanding, Defective" has the correlative meaning.

"Delivery"

with respect to BESS Equipment, means (a) Supplier

6

has transported and delivered such BESS Equipment (or, as applicable, a particular portion of it) DDP to the Delivery Location, and made the BESS Equipment available to Buyer (or its representatives or Other Contractors) for unloading and inspection, and (b) Buyer has issued (or been deemed to have issued) a Delivery Acceptance Certificate with respect to such BESS Equipment pursuant to <u>Section 9(i)</u>.

"<u>Deliver</u>" and "<u>Delivered</u>" have correlative meanings.

| | |
|---|---|
| "<u>Delivery LDs</u>" | collectively, Collection Segment Delivery LDs, PCS/MVT Set LDs, and Battery Segment Delivery LDs. |
| "<u>Delivery LDs Cap</u>" | has the meaning set forth in <u>Exhibit O</u>. |
| "<u>Delivery Location</u>" | (a) the location on the Project Site, as identified to Supplier by Buyer prior the Site Readiness Date, for Delivery of the applicable BESS Equipment; or<br>(b) the Alternate Delivery Location. |
| "<u>Dispute</u>" | has the meaning set forth in <u>Section 36(a).</u> |
| "<u>Effective Date</u>" | has the meaning set forth in the preamble. |
| "<u>Excluded Changes in Law</u>" | (a) any change in Applicable Law with respect to any national, federal, state or local tax, including any taxes imposed in connection with Supplier's performance of its obligations under this Contract, (b) the final enactment, adoption, promulgation, modification or repeal of any Applicable Law prior to the Effective Date with an effective date of such action that falls after the Effective Date, (c) any change in Applicable Law relating to COVID-19 Impacts (as these shall be addressed as Force Majeure), (d) any change in Applicable Law applicable to the place of manufacturing of any of the BESS Equipment or any component thereof, (e) any change in Applicable Law with respect to taxes, duties, tariffs, levies, imposts, charges, fees, expenses or similar charges associated with the importation of the BESS Equipment, and (f) any Applicable Standard that constitutes an optional or |

7

|  |  |
|---|---|
|  | recommended change and does not constitute a Standard of Practice |
| "Excusable Event" | has the meaning set forth in Section 36(a). |
| "EXW" | "Ex Works", per INCOTERMS 2020. |
| "Final Acceptance" | Supplier's achievement of the following:<br>(a) Commissioning, along with receipt of Commissioning Certificate from Buyer;<br>(b) delivery to Buyer of final waivers and releases of liens, from Supplier, in the form of Exhibit Q;<br>(c) payment of all Liquidated Damages, if any;<br>(d) completion of all Punchlist Items (except those delayed by seasonal constraints);<br>(e) proper assignment of the OEM Warranties to Buyer;<br>(f) removal from the Project Site of all waste materials, debris, rubbish, tools, equipment and machinery used by Supplier to perform commissioning and that are not (1) Buyer's responsibility to remove from the Project Site, or (2) otherwise permanently incorporated into the Project; and<br>(g) receipt of Buyer's Final Acceptance Certificate. |
| "Force Majeure Event" | an event or circumstance that:<br>(a) is unforeseeable and beyond the reasonable control of the Party claiming relief;<br>(b) prevents such Party from performing its obligations under this Contract; and<br>(c) is not the result of the fault or negligence of such Party or its subcontractors or personnel or the breach of such Party's obligations under this Contract.<br>With reference to clause "(a)" above, examples of events or circumstances beyond a Party's control may include: acts of god; earthquakes; floods; fires; tidal waves, hurricanes, monsoons, cyclones, or tropical storms; perils of the sea; tornadoes; other Abnormal Weather Conditions; war (declared or undeclared), acts of the public enemy; acts of any Governmental Authorities; riot, revolution, civil commotion, national or regional labor difficulties or strike; quarantine, epidemic, pandemics, and COVID Impacts. |

8

Notwithstanding the foregoing, unless if the result is a discrete Force Majeure Event; Force Majeure Events shall <u>not</u> include Changes in Law; unforeseen difficulties in manufacture; late delivery of or in ability to obtain equipment or materials or supplies for the Work; strikes, difficulty in obtaining supplies, shortage of labor, or non-performance by Subcontractors; market price fluctuations with respect to labor or materials, supplies or components of the Work; or mere economic hardship.

"<u>Forced Labor</u>"

has the meaning set forth in <u>Section 6(e)(i)</u>.

"<u>Governmental Authority</u>"

any national, state, municipal or local government (including any subdivision, court, administrative agency or commission or other authority thereof) exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority.

"<u>Guaranteed Commissioning Date</u>"

the date by which Commissioning must be achieved, as set forth in <u>Exhibit D</u>.

"<u>Guaranteed Dates</u>"

the Guaranteed Collection Segments Delivery Date,
the Guaranteed PCS/MVT Sets Delivery Date,
the Guaranteed Battery Segment Delivery Date, and
the Guaranteed Commissioning Date,
as such dates may be extended in accordance with this Contract.

"<u>Guaranteed Battery Segment Delivery Date</u>"

the date by which Delivery of the Battery Segments must occur, as set forth in <u>Exhibit D</u>.

"<u>Guaranteed Collection Segment Delivery Date</u>"

the date by which Delivery of the Collection Segments must occur, as set forth in <u>Exhibit D</u>.

"<u>Guaranteed PCS/MVT Sets Delivery Date</u>"

the date by which Delivery of the Battery Segments must occur, as set forth in <u>Exhibit D</u>.

"<u>Import Tariff Assumption</u>"

an amount equal to $2,625,000.

46834146.6

"Import Tariff Change"

A cost change in Import Tariffs after the Effective Date in Applicable Laws including a change in tariff rates under existing Applicable Laws that results in an increase above or decrease below the Import Tariff Assumption.

"Import Tariffs"

tariffs, import duties, customs fees, or other taxes, fees or charges payable upon the importation of the BESS Equipment into the United States.

"Increased Import Tariff Floor"

an amount equal to $875,000.

"Indemnified Parties"

has the meaning set forth in Section 27(a).

"Indemnifying Parties"

has the meaning set forth in Section 27(a).

"Installation Acceptance"

has the meaning set forth in Section 14(e).

"Installation Acceptance Date"

has the meaning set forth in Section 14(f).

"Installation Manual"

the requirements and instructions for installing the BESS Equipment set forth in Exhibit L.

"Installation Requirements"

has the meaning set forth in Section 14(b).

"Liquidated Damages" or "LDs"

collectively, the Delivery LDs and the Commissioning LDs.

"Losses"

has the meaning set forth in Section 27(a).

"Notice of Installation Completion"

has the meaning set forth in Section 14(d).

"Other Contractors"

contractors, consultants or suppliers engaged by or on behalf of Buyer to perform services (other than the Work), including operation and maintenance services, undertake works or provide materials or equipment at

10

or to the Project Site, but excluding Supplier and any Subcontractors.

"Party"                          Buyer or Supplier.

                                 "Parties" has the correlative meaning.

"Payment Milestone"              Those milestones identified in the first table on Exhibit E.

"PCS/MVT Set"                    One transformer and one inverter.

"PCS/MVT Set Delivery LDs"       has the meaning set forth in Exhibit O.

"Performance Bond"               has the meaning set forth in Section 3(e)(i).

"Performance Guarantees"         the performance guarantees set forth in Exhibit F-2.

"Performance Tests"              the tests to be conducted by Supplier to demonstrate that achievement of the Performance Guarantees, as such tests are described in Exhibit F-2.

"Project"                        the combined solar photovoltaic and battery energy storage power project being developed by Buyer.

"Project Schedule"               the sequential milestone dates as set forth in Exhibit D, including the Guaranteed Dates, as the same may be adjusted pursuant to this Contract.

"Project Site"                   the real property where the Project is to be located, including the locations thereupon where BESS Equipment is to be incorporated into the Project, as more specifically described in Exhibit K.

"Punchlist"                      has the meaning set forth in Section 16(a).

"Request for Payment"            Supplier's form of invoice, as detailed in Exhibit M.

11

46834146.6

"Restricted Party"

has the meaning set forth in Section 33(b).

"Senior Representative Negotiations"

has the meaning set forth in Section 36(b).

"Site Readiness"

Buyer has prepared the Project Site for Delivery of the Collection Segments and PCS/MVT Sets by completing and curing concrete foundations for such equipment.

"Site Readiness Date"

the date required of Buyer for Site Readiness, as such date is set forth in Exhibit D.

"Specifications"

the drawings, technical description of the Work, or packing instructions contained or referred to in Exhibit C.

"Stack"

Supplier's Stack750E, as described in Table 1 of Section 2 of the BESS Product Manual.

"Standards of Practice"

the standards, methods, skill, care, techniques, principles, and practices that are recognized and generally accepted by leading companies in the battery energy storage system industry for battery systems of similar size, geographic location, and scope as the BESS.

"Subcontract"

any agreement, written or oral, between Supplier and any Subcontractor.

"Subcontractor(s)"

any person or entity, that furnishes, pursuant to a Subcontract, labor, services, material, or equipment to Supplier for the performance of the Work or any portion thereof or for the supply of BESS Equipment to Supplier.

"Supplier"

has the meaning set forth in the preamble, and includes such entity's successors and permitted assigns.

12

"Supplier Event of Default"    an event listed under Section 21.1(a).

"Supplier Representative"    Sara Mulhauser

"Termination Payment"    the applicable amount set forth in the column entitled "*Total Termination Payment as Percentage of Contract Price*" in Section 3 of Exhibit E, less any amounts already paid Supplier.

"Transoceanic Shipping"    means, for the battery cells and/or modules comprising the Battery Segments, the then-current daily FBX01, divided by 4.80, then multiplied by the number of Battery Segments, as such formula is illustrated below:

([FBX01] ÷ 4.80) x quantity of Battery Segments

FBX01 rate is available at https://fbx.freightos.com/freight-index/FBX01

"Warranty"    Supplier's Limited Commercial Warranty, attached hereto as Exhibit F-1.

"Warranty Period"    the time period set forth in the Warranty.

"Work"    all activities, services, and obligations to be performed and all BESS Equipment to be provided by or on behalf of Supplier under this Contract, including but not limited to those set forth in Exhibit A and Exhibit B.

"Work Product"    has the meaning set forth in Section 11(c).

"Worksite"    any lands, waters, and other places on, under, in, or through which Work or any activities in connection with Work are to be performed, including, but not limited to manufacturing, fabrication, assembly, or storage facilities, vessels, offices, workshops, camps, or messing facilities and including the Project Site. Worksite does not include any lands, waters, or other places used during transportation to and from Worksites.

13

2.      **Contract and Order of Precedence**

(a)     This Contract consists of the following documents which are attached:

(i)      this Battery Energy Supply Agreement, as may be amended;

(ii)     Exhibit A – Scope of Work

(iii)    Exhibit B – Division of Responsibility

(iv)     Exhibit C – Technical Specifications

(v)      Exhibit D – Project Schedule

(vi)     Exhibit E – Payment and Termination Payment Schedule

(vii)    Exhibit F-1 – Limited Commercial Warranty

(viii)   Exhibit F-2 – Performance Guarantee

(ix)     Exhibit G – Form of Performance Bond

(x)      Exhibit H - Insurance Requirements

(xi)     Exhibit I – Commissioning Checklist

(xii)    Exhibit J – BESS Product Manual

(xiii)   Exhibit K – Project Site Layout

(xiv)    Exhibit L – Installation Manual

(xv)     Exhibit M – Form of Request for Payment

(xvi)    Exhibit N1 – Form of Delivery Acceptance Certificate

(xvii)   Exhibit N2 – Form of Commissioning Certificate

(xviii)  Exhibit N3 – Form of Final Acceptance Certificate

(xix)    Exhibit O – Liquidated Damages

(xx)     Exhibit P – Form of Change Order

(xxi)    Exhibit Q – Form of Final Lien Waiver

(xxii)   Exhibit R –Account Setup Form

(xxiii)  Exhibit S – Operating Spare Parts

14

(b)     If any conflict, inconsistency or ambiguity is believed to exist among any of the documents comprising or relating to this Contract or among any of the requirements or provisions thereof, the conflict, inconsistency or ambiguity shall be resolved by applying the following order of precedence:

   (i)     The body of this Battery Energy Supply Agreement, as may be amended;

   (ii)    Exhibit C;

   (iii)   Exhibit A;

   (iv)    Exhibit B;

   (v)     The other Exhibits; and

   (vi)    Any other document incorporated by reference into any of these documents.

(c)     Supplier shall promptly notify Buyer of any conflict, inconsistency or ambiguity in the Contract documents and Buyer shall resolve such conflict in writing.  Any work performed by Supplier without Buyer's written determination, shall be at Supplier's sole risk and expense, and Buyer shall be free thereafter to resolve the issue differently from the approach taken by Supplier.  In such event, Supplier shall not be entitled to receive, and Buyer shall have no obligation to grant a Change Order in relation to this Contract Price, Project Schedule, or other provision of this Contract, nor shall Buyer have any liability toward Supplier or others for any work performed without Buyer's written determination.

## 3.     **Preparation for and Performance of the Work**

(a)     Supplier has fully informed itself with all matters relevant for the performance of the Work.  Any failure by Supplier to take account of any such matters shall not relieve Supplier from its obligations under this Contract nor form the basis for a Change Order.

(b)     Supplier is solely responsible for, and Buyer makes no guarantee or warranty, express or implied, as to the correctness, adequacy, sufficiency and consistency of any technical information in this Contract.

(c)     Supplier shall design, engineer, supply, fabricate, inspect, factory test, ship, commission, and field test the BESS, including the BESS Equipment, in accordance with the Specifications, and furnish all adequate labor, supervision, tools (including all specialty tools, if required), components, installed and consumable materials, and other goods and services constituting the Work.  Supplier shall perform the Work in conformity with this Contract, all Applicable Laws, all Applicable Codes and Standards and the Standards of Practice.  Supplier has in place (or shall develop) and shall comply with procedures for quality control, quality assurance, and management that are consistent with the Standards of Practice for such items.

(d)     Supplier is not relieved of any obligation or liability under this Contract, by any review, approval, consent to progress, certificate, advice, and the like, provided (or omitted) by Buyer (whether in writing or not), or any inspection or witnessing of tests.

(e)     Performance Bond.

(i)     No later than fifteen (15) days after the Effective Date, as security for the faithful payment and performance of Supplier's obligations under this Contract, Supplier will deliver to Buyer a performance bond substantially in the form set forth in <u>Exhibit G</u>, in an amount not less than ten percent (10%) of the Contract Price (the "<u>Performance Bond</u>").  Supplier shall maintain the Performance Bond through the time period set forth therein.

(ii)    Upon delivery of the Performance Bond to Buyer, Supplier shall invoice Buyer for reimbursement for direct costs associated with obtaining the Performance Bond, without markup, which amount shall not exceed 5.0% of the amount of the Performance Bond.  Buyer shall pay such invoice within fifteen (15) days of receipt.

(iii)   The Performance Bond shall be issued by a surety that is (i) an admitted insurer in, and is duly licensed and authorized to issue bonds of such size in, the state where the Project Site is located, (ii) subject to regulation by the applicable Governmental Authorities with jurisdiction over sureties doing business in that state, and (iii) rated at least "A" by both Standard & Poor's and A.M. Best.  If the surety on the Performance Bond furnished by Supplier is declared bankrupt or becomes insolvent or it no longer meets the requirements hereof, Supplier shall, at its expense, substitute another Performance Bond and surety meeting the requirements hereof within fifteen (15) days thereafter.  If requested by Buyer, Supplier will cause the surety to extend coverage under the Performance Bond to Buyer's lenders pursuant to an industry standard dual obligee rider

**4.     Buyer Representative and Supplier Representative**

4.1     Buyer Representative

(a)     Buyer has appointed Buyer Representative to represent Buyer in all matters under this Contract.  Buyer may change its representative at any time and shall notify Supplier in writing.  Buyer Representative may delegate any of his/her responsibilities to a nominated deputy and shall notify Supplier in writing.  Only written instructions issued by Buyer Representative, or his or her nominated deputy, are binding on Buyer.

(b)     Buyer Representative and individuals designated by him/her shall have access at all reasonable times to any Worksite.

(c)     Except as expressly stated in this Contract, Buyer Representative has no powers to amend this Contract or to relieve Supplier from any of its obligations.

4.2     Supplier Representative

Supplier has appointed Supplier Representative to represent Supplier in all matters under this Contract.  Only Supplier Representative, or his or her nominated deputy, is authorized to receive on behalf of Supplier notifications, information and decisions of Buyer under this Contract.

**5.     Cooperation with Others; Project Site Access**

(a)     Cooperation. Buyer  and Other Contractors may be working at the Project Site during the performance of this Contract and Supplier's work or use of certain facilities may be interfered with as a result of such concurrent activities.  Supplier shall reasonably cooperate with Buyer and Other Contractors and coordinate its activities on the Project Site with the work of each such party to avoid or mitigate possible interference with their work.

(b)     Site Access. Buyer shall (i) provide reasonable access to Supplier to the Project Site for Supplier to perform the Work; and (ii) defend Supplier against any action in trespass or otherwise resulting from failure by Buyer to have obtained legal rights for access to the Project Site.  Supplier shall coordinate and cooperate with Buyer regarding entry onto the Project Site, and shall comply with Standards of Practice, Applicable Codes and Standards, Applicable Laws, and Exhibit L.  Buyer shall make commercially reasonable efforts to coordinate with and minimize interference with operations by Supplier and its Subcontractors at the Project Site according to the schedule contemplated for such performance.

**6.     Standards, Codes and, Data Protection**

(a)     Wherever references are made in this Contract to Applicable Codes and Standards, the edition or revision of the Applicable Codes and Standards current on the date such Work is to be performed shall apply unless otherwise expressly stated; provided, however that if any new edition or revision to any such Applicable Codes and Standards occurs after the Effective Date then Supplier shall be eligible for a Change Order for a Change in Law in accordance with Section 17(c)(viii).  In the event of changes to any referenced Applicable Codes and Standards during performance of the Work, Supplier shall provide Buyer written notice immediately upon Supplier's knowledge of the change.   In case of conflict between any referenced Applicable Codes and Standards and any Contract documents brought to Buyer's attention under this clause, Buyer shall resolve the conflict in writing. To the extent such change materially affects the Project Schedule or Contract Price, Supplier shall be eligible for a Change Order in accordance with Section 17(c)(v).

(b)     Supplier shall use only competent and skilled personnel to perform the Work. Supplier shall remove from the Project Site any person reasonably determined by Buyer or otherwise to be unfit, unqualified, or to be acting in violation of any

17

obligation of Supplier under this Contract.  In addition, Buyer may, at its sole but reasonable discretion, deny access to the Project Site to any person.

(c)    In the event a person is removed from the Work or excluded from the Project Site, Supplier shall promptly replace such individual with another who is fully competent and skilled to perform the work.  All actions by Supplier regarding removal and replacement of personnel shall be at Supplier's sole expense.

(d)    Supplier is responsible for maintaining labor relations in such manner that there is harmony among workers and shall comply with and enforce Project Site procedures, regulations, work rules, and work hours established by Buyer.

(e)    In performing its obligations under this Contract, Supplier must, and must ensure that:

(i)    its Affiliates, Subcontractors and their respective employees and agents will take all reasonable steps (including undertaking reasonable due diligence) to ensure there is no slavery or slavery-like practices (including servitude, convict, indentured or forced labor, and deceptive recruiting for labor or services), human trafficking, or child labor ("Forced Labor") in its extraction of raw materials, manufacturing operations or supply chains;

(ii)    personnel of Supplier and its Affiliates will keep appropriate records evidencing the reasonable steps taken to ensure compliance with Section 6(e)(i) and provide such records in the form maintained by Supplier to Buyer or provide to Buyer an attestation of such compliance in a form reasonably satisfactory to Buyer, in either case upon Buyer's request; and

(iii)    immediately notify Buyer if it becomes aware of any Forced Labor in its supply chains with respect to the BESS Equipment or the component parts thereof.

(f)    Without limiting the generality of Section 6(e), the BESS Equipment provided under this Contract, including any components thereof, were not and shall not be produced using Forced Labor, and were not procured from any person or entity that: (i) provided mass surveillance technology to the region of Xinjiang, China; (ii) built or ran detention facilities in the region of Xinjiang, China; (iii) subsidized manufacturing facilities in the region of Xinjiang, China; or (iv) is subject to a US Customs and Border Protection Agency "Withhold Release Order".

(g)    Supplier's violation of the terms of Section 6(e) or Section 6(f) shall be considered a Supplier Event of Default

## 7.    Physical Security

(a)    Supplier shall at all times conduct all operations under this Contract in a manner to minimize the risk of loss, theft, or damage by vandalism, sabotage or any other means to any equipment, materials, work or other property at the Project Site.

18

Supplier shall continuously inspect all equipment, materials and work to discover and determine any conditions which might involve such risks.

(b)      Supplier shall comply with Buyer's security requirements for the Project Site. Supplier shall cooperate with Buyer on all security matters and shall promptly comply with any Project Site security arrangements established by Buyer. Such compliance with these security requirements shall not relieve Supplier of its responsibility for maintaining proper security required under this Contract, nor shall it be construed as limiting in any manner Supplier's obligation with respect to all Applicable Laws and to undertake reasonable action to establish and maintain secure conditions at the Project Site.

## 8.     Price and Payment

(a)      In consideration of the execution and due performance of all obligations by Supplier under this Contract, Buyer shall pay the Contract Price to Supplier at the times, in the manner, and in the currency specified in Exhibit E and in this Section 8. Supplier waives any rights to payment in excess of or in addition to the Contract Price, except as provided for under this Contract.

(b)      Subject to this Section 8(b) and Section 9(h), all prices for the Work are firm and are not subject to price escalation for any reason whatsoever.

(i)      The Contract Price expressly includes all costs associated with manufacturing, handling, packaging, and DDP Costs.

(ii)      (The Contract Price excludes the Transoceanic Shipping. Nonetheless, Supplier has an obligation to Deliver the BESS Equipment DDP to the Delivery Location, subject to the provisions in Section 9(h).

(iii)      The Parties acknowledge that the Contract Price assumes, as of the Effective Date the Import Tariff Assumption. Notwithstanding anything herein to the contrary if any Import Tariff Change occurs, an adjustment to increase or decrease the Contract Price will be due as follows:

a)      If the Import Tariff Change is greater than the Increased Import Tariff Floor, the Contract Price shall be increased by an amount equal to the difference between the Import Tariff Change and the Increased Import Tariff Floor.

b)      If the Import Tariff Change is less than the Import Tariff Assumption, then the Contract Price will be reduced by the amount of the Import Tariff Change.

Any change in the Contract Price pursuant to this Section (iii) shall be effectuated pursuant to Section 17(c).

(iv)

46834146.6

(c)     As a condition precedent to Buyer's obligation to make final payment due under this Contract, Supplier shall furnish, with its invoice for the final payment, a lien waiver and release of liens in the form of <u>Exhibit Q</u>.

(d)     To the fullest extent permitted by law, and provided Buyer has issued all undisputed payments then-owing, Supplier, on behalf of itself and its Subcontractors, waives and releases any and all liens, claims or rights of lien which it has or may have against Buyer, the Project Site or equipment, material or fixtures on the job site for which the BESS Equipment are furnished, on account of labor, services, materials, or equipment furnished pursuant to this Contract.  In the event an unpermitted lien is filed against Buyer, the Project Site or equipment, material or fixtures on the job site by or on behalf of Supplier or any of its Subcontractors, Supplier shall arrange for the immediate discharge or cancellation of such lien by payment, bonding or otherwise.

(e)     If Supplier shall default in discharging any unpermitted lien, which arises out of, in connection with or as a result of the BESS Equipment furnished under this Contract, within fifteen (15) days after receipt of notice then Buyer shall have the right, at its option, after written notice to Supplier, to satisfy or discharge the lien or to establish a bond and Supplier shall, within five days of Supplier's receipt of a written request from Buyer, promptly reimburse Buyer for all amounts paid and all costs and expenses incurred by Buyer in satisfying or discharging claim and lien or in establishing a bond to secure the claim or lien.

(f)     Supplier shall pay or cause to be paid when due, all payroll taxes and contributions which are measured by remuneration paid to persons employed by Supplier in connection with the Work or which arise by virtue of their employment and which now or hereafter are imposed by any Governmental Authority.

(g)     Except with respect to Payment Milestone #1, within twenty days of Buyer's receipt of an invoice, Buyer shall notify Supplier in writing of any dispute or intention, per Section 8(h), to withhold payment.  If Supplier has not received such notice, Buyer shall pay the invoiced milestone payment in full within thirty days of receipt of such invoice. If Buyer does timely notice Supplier of a disputed invoice, any subsequent invoice for the same milestone must be reviewed within ten days.

(h)     Buyer may, on written notice to Supplier, withhold payments to Supplier, for the following:

(i)     any Liquidated Damages due or accrued, but not paid, from Supplier to Buyer hereunder; or

(ii)    any amounts due but not paid to Buyer under this Contract.

Any exercise by Buyer of its rights under this provision shall be without prejudice to any other rights or remedies available to Buyer.

20

(i)     Any provision hereof to the contrary notwithstanding, upon the occurrence of an uncured Supplier Event of Default (including for non-payment), Buyer, upon written notice to Supplier, shall set off such portion (including all) of any payment due to Supplier under this Contract that is equal to the reasonable cost to cure such Supplier Event of Default, as reasonably determined by Buyer.

**9.**   **Schedule and Delivery**

(a)     Supplier shall perform the Work and guarantees that all Completion Milestones shall be achieved on or before the Guaranteed Dates and with all due diligence and without delay.

(b)     Schedule for Manufacturing.

(i)     Supplier shall notify Buyer in writing at least ten days prior to commencing manufacturing of any BESS Equipment ("Notice of Manufacturing Start").

(ii)    Within five days' of Buyer's receipt of the Notice of Manufacturing Start, Buyer shall notify Supplier in writing if Buyer elects to suspend the commencement of manufacturing ("Notice of Manufacturing Suspension"). Buyer's failure to timely notify of suspension will be deemed confirmation that Buyer elects Supplier to commence manufacturing.

(iii)   Buyer's Notice of Manufacturing Suspension shall be deemed a suspension for convenience pursuant to Section 20, and for which Supplier shall be entitled for a Change Order pursuant to Section 17(c)(iv).

(iv)    After sending the Notice of Manufacturing Suspension, if 365 days pass before Buyer withdraws such suspension, Supplier may, at its election, treat such delayed suspension as if a notice of termination had been issued pursuant to Section 22, for which Buyer shall be liable for the Termination Payment.

(v)     Upon commencement of manufacturing, Supplier shall, upon Buyer's request, provide Buyer with a production schedule showing the manufacturing position of the BESS Equipment, and promptly provide confirmation to Buyer of the date of shipment.

(c)     Supplier shall notify Buyer in writing of any actual, anticipated or probable delay in meeting the Guaranteed Dates, including the causes for such delay, promptly after Supplier becomes aware of such delay.

(d)     Buyer may, for expediting purposes, send its own staff or other personnel whom Buyer has retained to any Worksite where the BESS Equipment is manufactured, packed or transported.

(e)     Nothing in this Section 9 shall in any way relieve Supplier from its obligation of timely performance pursuant to this Contract.

21

(f)     Any delivery terms relating to BESS Equipment specified in this Contract shall be interpreted in accordance with INCOTERMS 2020 (International Rules for the Interpretation of Trade Terms) published by the International Chamber of Commerce and its supplements, subject to this Contract.

(g)     Supplier shall pack the BESS Equipment so that it may be transported and unloaded safely.  The method of packing shall be in accordance with Supplier's general practices.  In the absence of specific instruction concerning the method of packing, Supplier shall take reasonable steps to prevent damage to or deterioration of the BESS Equipment in transit to their destination, in accordance with customary seaworthy export packing standards and anti-rust, oxidation standards.

(h)     Supplier shall be responsible for Delivery of the BESS Equipment DDP to the Delivery Location via common carrier(s), all in accordance with the Project Schedule (including the Completion Milestones) and subject to the following:

(i)     Upon receipt of a bill of lading for battery modules that will be shipped from the module vendor to Supplier's manufacturing Worksite, Supplier will invoice Buyer with an itemized statement of the Transoceanic Shipping for such battery modules. Buyer shall pay the invoice within thirty days of receipt.

(ii)    Upon Buyer's request, following Supplier's transfer of any BESS Equipment from a manufacturing Worksite to a common carrier for shipment, Supplier shall execute and provide to Buyer a bill of lading with respect to such shipment of BESS Equipment and such other information as Buyer may reasonably request.

(i)     Supplier or its designated agent shall be the importer of record for all BESS Equipment manufactured or assembled outside of the United States and Supplier shall be responsible for ensuring that all such BESS Equipment are properly entered and released through U.S. Customs & Border Protection.

(j)     Supplier represents that, on Delivery, the BESS Equipment shall have been accurately described, classified, marked, and labeled, in accordance with this Contract, all Applicable Laws, and Standards of Practice.

(k)     Buyer shall have the Project Site ready for Delivery of the Collection Segments and the PCS/MVT Sets no later than the Site Readiness Date.  Buyer shall have the Project Site ready for Delivery of the Battery Segments no later than the Battery Segments Readiness Date.  If Buyer does not have the Project Site prepared for the applicable Delivery described in the preceding sentences, Buyer shall notify Supplier in writing and, at Buyer's sole election may:

(i)     receive the BESS Equipment at the Project Site, which receipt shall trigger the inspection process set forth in Section 9(l); or

22

(ii)     agree to a costplus (with 15% markup) Change Order for any reasonable, unavoidable, and documented demurrage, storage, or standby charges (for Buyer's failure to comply with the storage requirements in accordance with Exhibit L) incurred by Supplier as well as any additional transportation costs until the date the Project Site is prepared for Delivery; or

(iii)    provide an Alternate Delivery Location to Supplier by giving Supplier not less than twenty (20) Business Days' notice of the Alternate Delivery Location to which Supplier may Deliver the BESS Equipment. Upon notice of the Alternate Delivery Location, such Alternate Delivery Location shall be deemed the "Delivery Location" for purposes of Section 9(l) and the other provisions of this Contract. Supplier's reasonable and documented additional costs associated with delivery to the Alternate Delivery Location shall be subject to a cost-plus (with 15% markup) Change Order.

(l)     Once the BESS Equipment has arrived at the Delivery Location, Buyer shall promptly inspect the condition of the BESS Equipment. Within ten days after arrival at the Delivery Location, Buyer (i) shall deliver to Supplier the written Delivery Acceptance Certificate in substantially the form of Exhibit N-1, which certificate shall confirm the Date of Delivery; or (ii) (A) shall advise Supplier in writing of any missing items, or damage and/or deficiencies in the BESS Equipment for which Supplier is responsible, and (B) may reject such BESS Equipment and may require Supplier to repair or replace the rejected BESS Equipment with BESS Equipment which complies with this Contract. If Buyer does not inspect the BESS Equipment and notify Supplier within the time period set forth in this Section 9(l), without waiving Buyer's rights regarding subsequently discovered defects, the Equipment shall be deemed Delivered for the purposes of Delivery LDs. Upon receipt of any notice from Buyer of damage or deficiencies, Supplier shall repair or correct such damage or deficiencies or replace rejected BESS Equipment and/or perform such Work, and the foregoing notice procedure shall be repeated until Buyer delivers the Delivery Acceptance Certificate to Supplier. For the avoidance of doubt, the Date of Delivery shall be the date set forth on the Delivery Acceptance Certificate ultimately issued by Buyer.

**10.    Liquidated Damages**

(a)     Liquidated Damages. If any Completion Milestone has not occurred on or before its applicable Guaranteed Date, Supplier shall pay Buyer, as liquidated damages and not as a penalty, the applicable amounts set forth in Exhibit O.

(b)     Payment of Liquidated Damages. Liquidated Damages shall be due and payable within thirty days after Supplier receives Buyer's invoice therefor. At Buyer's option, Liquidated Damages may be deducted by Buyer from any payments due by Buyer to Supplier.

(c)     Caps on Liquidated Damages. The Parties agree that the (i) the Delivery LDs shall be capped at the Delivery LDs Cap, (iii) the Commissioning LDs shall be capped

23

at the Commissioning LDs Cap, and (iii) the Liquidated Damages shall be capped at the Liquidated Damages Cap.

(d) <u>Nature of Liquidated Damages</u>.  The Parties agree that it would be extremely difficult to precisely determine the amount of actual damages that would be suffered due to a delay to any Completion Milestone, but that the Liquidated Damages are a genuine pre-estimate, and a fair and reasonable determination of the amount of actual damages which would be suffered by Buyer for Supplier's delay in achieving a Completion Milestone beyond its Guaranteed Date, and that the Liquidated Damages do not constitute a penalty.

(e) <u>Sole Remedies</u>.  Without prejudice to Supplier's obligations set forth in <u>Section 15(e)</u>, and subject to <u>Section 25</u>, Buyer's sole remedies for a failure to achieve a Completion Milestone on or before its Guaranteed Date are: (i) payment by Supplier of the applicable Liquidated Damages under this <u>Section 10</u>; and (ii) Buyer's rights under <u>Section 21.1(a)</u>.

(f) <u>Refund of Delivery LDs</u>.  Notwithstanding anything contrary as set forth herein, if (i) Delivery was not achieved on or before the Guaranteed Delivery Date; (ii) Supplier has consequently paid Delivery LDs to Buyer according to <u>Section 10(a)</u>; and (iii) Supplier subsequently achieves Commissioning on or before the Guaranteed Commissioning Date, then Buyer shall refund the Delivery LDs paid by Supplier to Buyer within thirty days after the date of Commissioning, without any interests, penalties, charges or adjustments.

(g) <u>Refund of Commissioning LDs</u>. If Buyer is not harmed by Supplier's failure to achieve Commissioning by the Guaranteed Commissioning Date, Buyer shall refund the Commissioning LDs paid by Supplier within thirty days after the date of Commissioning, without any interests, penalties, charges or adjustments. Harm can be demonstrated by evidence of: (i) Buyer incurring liability for delay-related liquidated damages pursuant to an offtake agreement related to the Project; or (ii) Buyer expenses associated with Commissioning by the Guaranteed Milestone Date.

**11.** <u>**Title and Risk of Loss**</u>

(a) Supplier shall have the full responsibility for care, custody and control of the BESS Equipment and shall bear the risk of loss thereof or damage thereto until the Date of Delivery, at which time risk of loss or damage shall pass to Buyer; provided, that Buyer shall at all times be liable for all loss or damage to the extent caused by it or its personnel, and Other Contractors.

(b) Upon the earlier of: (i) the Date of Delivery, (ii) the date payment for the BESS Equipment, or part thereof, is made by Buyer (without regard to any withholdings), or (iii) upon termination of this Contract (following payment by Buyer of any amounts required to be paid hereunder as a result of such termination), title to the BESS Equipment, or part thereof, shall transfer to Buyer and become the property of Buyer.  Supplier warrants that title to the BESS Equipment is free of any liens,

claims, interests or rights of others, subject to <u>Section 8(d)</u>.  In the event of any defect in title, Supplier shall immediately, upon the request of Buyer, at Supplier's sole cost and expense, remove any defect, claim or encumbrance on the title to the BESS Equipment.

(c)     Title to all drawings, designs, Specifications, reports, test results, specimens, data and other work product (collectively "<u>Work Product</u>"), other than BESS Equipment, prepared by Supplier in connection with this Contract shall transfer to Buyer and become the property of Buyer upon the date of payment for the Work Product, or part thereof, is made by Buyer (without regard to any withholdings). Supplier shall have the right to retain a copy of the Work Product for its records.

**12.    [RESERVED]**

**13.    <u>Quality, Inspection and Testing</u>**

(a)     Supplier must have quality assurance programs in place adequate to support its performance of the Work and consistent with the Standards of Performance.

(b)     Before shipping BESS Equipment, Supplier shall carefully inspect and test the BESS Equipment for compliance with applicable requirements of this Contract. Supplier shall use reasonable efforts to give Buyer at least seven days' prior written notice before any such inspection or test and Buyer (or Buyer's authorized agent) shall be entitled to attend such inspection or test and shall receive copies of all data, results, certifications and other records relating to the inspection or test promptly following such inspection or test.  In the event Supplier needs to reschedule the date of such inspection and or test, Supplier shall give a minimum of two days' prior notification to Buyer.

(c)     In no event may Buyer's attendance at such inspection or test be interpreted as in any way implying acceptance of such BESS Equipment by Buyer and shall not relieve Supplier from any liability, obligation or responsibility in connection with any Defects discovered in the BESS Equipment at any time through the expiration of the Warranty Period.

(d)     All material and equipment furnished and work performed shall be properly inspected and tested by Supplier at its expense in accordance with <u>Exhibits A</u>, <u>B</u>, and <u>C</u> and with any other Contract requirements, and shall, at all times be subject to quality surveillance and quality audit by Buyer, Buyer's authorized representatives who, upon reasonable notice, shall be afforded full and free access to the shops, factories or other places of business of Supplier and its Subcontractors for such quality surveillance or audit.

(e)     Failure of Buyer to make such quality surveillance or to discover Defects shall not relieve Supplier of its obligations under this Contract nor prejudice the rights of Buyer thereafter to reject or require the correction of Defects in accordance with the provisions of this Contract.

(f)     If any good is determined by Buyer to be Defective with this Contract at any time, Buyer shall have the right to reject any such Defective good.

**14.    Technical Support; Training; Installation; Installation Acceptance**

(a)     Supplier shall in accordance with the Project Schedule provide such training to Buyer's personnel as described in Exhibit A.

(b)     Buyer (itself or through Other Contractors) shall be solely responsible for the installation of the BESS Equipment in accordance with the Installation Manual, Specifications, all Applicable Law, and Standards of Practice (the "Installation Requirements").  Supplier shall arrange to have its or the manufacturer's field services personnel (i) observe the erection and installation of the BESS Equipment, and (ii) advise Buyer or Other Contractors on proper installation procedures.  Buyer is responsible for all other work including civil, engineering, interconnect, and permitting relating to the Project other than the Work.

(c)     Upon Buyer's completion, or anticipated completion, of installation in accordance with the Installation Requirements and meeting the requirements set forth in Section 14(d), Buyer shall provide Supplier with a written notice of such completion (such notice, the "Notice of Installation Completion").

(d)     Supplier, within ten Business Days of its receipt of a Notice of Installation Completion, shall review Buyer's installation work and either accept or reject the Notice of Installation Completion.  Supplier's approval of Buyer's Notice of Installation Completion shall not be unreasonably delayed, conditioned, or withheld.  Supplier's rejection of the Notice of Installation Completion, if applicable, shall be accompanied by a written description of the basis for such rejection in sufficient detail and scope to permit Buyer and its Other Contractors to correct any defects or deficiencies.

(e)     Supplier shall accept the Notice of Installation Completion if the following requirements are met to Supplier's satisfaction:

(i)      all civil work relating to the installation of the BESS Equipment has been completed, and safe access to the Project Site has been provided to Supplier for its performance of the Commissioning work;

(ii)     backfeed power is available to provide power to BESS Equipment, auxiliary circuit, and balance of system, and the connection, including all permissions received, is ready for pushing or pulling power when needed;

(iii)    all Buyer-Furnished Equipment (e.g., switchgear) has been commissioned, tested, and is ready to be energized;

(iv)    the relevant BESS Equipment is able to push and pull power;

26

(v)     internet service is available with sufficient bandwidth (as described in Exhibit C) for remote access by Supplier and to support Supplier's API or other necessary systems;

(vi)    the BESS Equipment is installed per the Installation Requirements;

(vii)   the applicable AC power, communication, and DC power cables are installed; and

(viii)  completion to Supplier's satisfaction of all prerequisites to Commissioning, as delineated in Section 3.1 of Exhibit I.

("(i)" through "(viii)", collectively, "Installation Acceptance").

(f)     In the event Supplier rejects the Notice of Installation Completion, Buyer shall correct any defects or deficiencies and provide Supplier with a revised Notice of Installation Completion, and the process shall repeat until Buyer's installation is in conformance with the Installation Requirements and Supplier has accepted the Notice of Installation Completion (such date the "Installation Acceptance Date").

(g)     If installation is to occur in phases, Buyer is required to provide Supplier a separate Notice of Installation Completion for each phase of installation work as detailed in Exhibit D.  Supplier is only required to review Buyer's installation work for the specific phase of installation work identified in the specific Notice of Installation Completion.  For sake of clarity, each phase of installation work completed by Buyer shall have a separate Notice of Installation Completion and Supplier shall accept or reject each Notice of Installation Completion separately.

15.    **Commissioning**

(a)     Buyer shall provide Notice of Installation Completion to Supplier not less than thirty-five days prior to the Commissioning Commencement Date. After the Installation Acceptance Date, Supplier shall promptly commence and diligently continue to complete Commissioning. If Buyer provides Notice of Installation Completion to Supplier less than thirty five days prior to the Commissioning Commencement Date, Supplier will use reasonable efforts to accommodate such accelerated request for commencement of commissioning.

(b)     Commissioning is reliant on Buyer having achieved Installation Acceptance.

(c)     In parallel with its verification of Installation Acceptance, Supplier shall ensure that the BESS Equipment is electrically and mechanically checked and verified as operational by Supplier's qualified field technicians.

(d)     Buyer shall have necessary permissions to import/export power.

(e)     Completion of Commissioning. When Supplier considers the criteria for Commissioning to have been met, Supplier shall provide Buyer a completed

27

Commissioning Checklist (in substantially the form of Exhibit I) and so notify Buyer in writing.  Within seven days thereafter, Buyer shall either (i) deliver to Supplier the "Commissioning Certificate" in substantially the form of Exhibit N-2 or (ii) advise Supplier in writing that Commissioning has not been achieved, including advising Supplier of any omissions for which Supplier is responsible or of any other reason why the requirements of Commissioning have not been met. Upon receipt of any deficiency notice from Buyer, Supplier shall correct such omission, and the foregoing notice procedure shall be repeated until Buyer issues a Commissioning Certificate confirming that the requirements for Commissioning have been met; provided, however, that Buyer shall have seven days to review Supplier's corrected or additional items. If Buyer fails to so respond within the seven-day period, Commissioning shall be deemed to have occurred and Buyer shall be deemed to have provided Supplier with the Commissioning Certificate as of the date of Supplier's notice issued pursuant to this Section 15(e).

(f)     Upon Delivery of the last-Delivered BESS Equipment, if more than one-hundred twenty days of Buyer-Caused Delay occur,  then, in addition to Supplier's rights for relief under Section 17(c), Supplier will be deemed to have achieved Commissioning and Final Acceptance, *provided*, *however*, such deemed achievement shall be strictly for the purposes of Buyer's obligation to pay the payment milestones described in Exhibit E, and in no event will such deemed achievement relieve Supplier, upon cessation of the Buyer-Caused Delay, from its obligation to commence and diligently continue completion of Commissioning and Final Acceptance.

(g)     Any Buyer-Caused Delay shall result in an equitable extension of the Guaranteed Commissioning Date, including but not limited to: improper installation; lack of backfeed power; or inability of Buyer to accept the BESS Equipment at the Project Site (or Delivery Location, if applicable) on the Site Readiness Date or Battery Segment Readiness Date, as the case may be. If the occurrence of Buyer-Caused Delay(s) results in an aggregate delay to Supplier of more than thirty days beyond the Guaranteed Commissioning Date, Supplier will be deemed to have achieved Commissioning; provided, however, such deemed achievement shall be strictly for the purposes of Buyer's obligation to pay the Commissioning payment milestone described in Exhibit E, and in no event will such deemed achievement relieve Supplier, upon cessation of the Buyer-Caused Delay(s), from its obligation to commence and diligently continue completion of Commissioning.

**16.     Punchlist and Final Acceptance**

(a)     Punchlist.

(i)      Prior to the date when Supplier completes Commissioning, the Parties shall inspect the BESS Equipment, and on the basis thereof Buyer shall prepare for Supplier's review and approval a list of the outstanding items that remain to be completed (the "Punchlist").  The Punchlist may not include any items not within the Supplier scope as set forth in Exhibit B.  Supplier

28

shall review and reasonably approve or disapprove the Punchlist provided by Buyer not later than five days after receipt, and Buyer shall issue a revised Punchlist to Supplier that takes account of or responds to Supplier's comments not later than five days after Buyer's receipt of such comments. This process shall continue until an approved Punchlist is provided. The Parties shall also agree upon a reasonable schedule for Punchlist completion.

(ii)    Until Supplier completes the Punchlist, Buyer shall retain an amount equal to 150% of the value of the Punchlist items (not to exceed 5% of the Contract Price) (the "Punchlist Holdback Amount").

(b)    Final Acceptance. When Supplier considers that the criteria for Final Acceptance have been met, Supplier shall so notify Buyer in writing. Within seven days thereafter, Buyer shall either (i) deliver to Supplier the "Final Acceptance Certificate" in substantially the form of Exhibit N-3 or (ii) advise Supplier in writing that Final Acceptance has not been achieved, including advising Supplier of any omissions or Defects for which Supplier is responsible or of any other reason why the requirements of Final Acceptance have not been met. Upon receipt of any deficiency notice from Buyer, Supplier shall correct such deficiency, and the foregoing notice procedure shall be repeated until the requirements for Final Acceptance have been met; provided, however, that Buyer shall have seven days to review Supplier's corrected or additional items. If Buyer fails to so respond within the seven-day period, Final Acceptance shall be deemed to have occurred and Buyer shall be deemed to have provided Supplier with the Final Acceptance Certificate as of the date of Supplier's notice issued pursuant to this Section 16(b).

## 17.    Change Orders

(a)    Supplier shall not make any change in the Specifications, quantities, methods of shipment, Project Schedule or places of Delivery without prior written consent of Buyer.

(b)    Buyer may at any time direct, in writing by Buyer Representative and Buyer Representative only, changes in the Work, including, but not limited to changes in the Specifications, quantities, methods of shipment, Project Schedule, or place of Delivery of the BESS Equipment.

(c)    The Contract Price and the Project Schedule are subject to adjustment if and only if any of the following events occur (each, an "Excusable Event"):

(i)    any written instructions referred to in Section 17(b) above;

(ii)    Force Majeure Events;

(iii)    Buyer-Caused Delay;

(iv)    suspension for convenience by Buyer pursuant to Section 20;

29

46834146.6

(v)     a Change in Law; or

(vi)    An Import Tariff Change pursuant to Section 8(b)(iii).

(d)     The adjustment (if any) of the Contract Price as a result of the occurrence of any of the aforementioned events under Section 17(c) is limited to the cost increase or decrease of performing the Work as a direct result of the occurrence of the event. The adjustment (if any) of the Project Schedule as a result of the occurrence of any of the aforementioned events under Section 17(c) shall be determined taking into account the following:

(i)     the adjustment of the Project Schedule shall be equitable but limited to the impact of the increased or decreased Work on the Project Schedule as a direct result of the occurrence of the event; and

(ii)    all other relevant factors including any failure of Supplier to mitigate any effects on the Project Schedule.

(e)     In the event that the Parties are unable to agree upon a lump sum price for a Buyer directed change under Section 17(b), Buyer may in its sole discretion, direct Supplier to proceed with the changed Work on the following basis: direct documented costs actually incurred by Supplier in executing the change plus 15% for overhead and profit.  Buyer or its designated representative shall have reasonably sufficient audit rights with respect to the documentation and information pertaining to such change and Supplier shall furnish to Buyer, and/or its designated representatives, such records as may be required to enable Buyer to verify and evaluate direct and indirect costs, expenses, invoices, payments, or claims based on Supplier's or its Subcontractors' actual costs incurred, or number of man-hours, or man-days claimed in the performance of the change.

(f)     If at any time Supplier believes it is entitled to seek a Change Order under this Contract, Supplier shall give Buyer written request of such Change Order in substantially the form of Exhibit P within fifteen days after Supplier becomes aware of the event(s) giving rise to the request for a Change Order, which request shall include an appropriate statement setting forth the reasons for the request, the scope of work of the request, the probable length of delay resulting from such requested Change Order and the adjustments to the Contract Price, if any.  Failure of Supplier to give this fifteen -day notice shall be deemed to have waived its right to a Change Order for the subject of such Change Order request, notwithstanding any prior course of conduct between the parties, verbal indication of Buyer's approval of a Change Order, or Supplier's completion of the work which is the subject of the Change Order request.  If Buyer, within five Business Days, accepts such Supplier requested Change Order, a Change Order shall be executed by the Parties and the Work, Project Schedule or Contract Price, as applicable, shall be adjusted in accordance with the terms of such Change Order.  If Buyer agrees that a Change Order is warranted pursuant to this Section 17(f), but the Parties are unable to agree on the applicable adjustment to the Contract Price with respect to such Change

Order, then the Parties shall adjust the Contract Price in the manner as <u>Section 17(e)</u>.

(g)     Buyer shall consider Supplier's requests for a Change Order only if such requests are timely, in writing, and are directed to specific clauses in this Contract.

## 18.   <u>Warranty</u>

(a)     Supplier's warranty for the BESS Equipment and Work is set forth in <u>Exhibit F-2</u>.

(b)     On the Final Acceptance Date (as stipulated in the Final Acceptance Certificate), Supplier shall provide Buyer with copies applicable OEM Warranties.

## 19.   <u>Operating Spare Parts</u>

All Spare and Replacement Parts are included in the scope as set forth in <u>Exhibit A</u>.

If, after the Effective Date, Buyer elects to purchase from Supplier spare parts for Buyer's operation of the BESS ("Operating Spare Parts") the parties will agree to a list of Operating Spare Parts materially in the form of <u>Exhibit S</u>. Supplier shall deliver all Operating Spare Parts to Buyer prior to Final Acceptance. The fixed cost of the Operating Parts will not be included in the Contract Price; however, risk of loss and transfer of title to the Operating Spare Parts shall follow the process applicable to other BESS Equipment, as such process is set forth in <u>Section 11</u>.

## 20.   <u>Suspension</u>

(a)     Buyer may at any time, by written notice, suspend all or part of the Work to be performed under this Contract for cause or for convenience. Supplier shall suspend performance of the work specified in Buyer's notice as of the effective date specified therein.

(b)     Upon receipt of a notice to suspend from Buyer, Supplier shall, unless the notice requires otherwise:

(i)     Immediately (but no sooner than prudent safety measures warrant) discontinue work on the date and to the extent specified in the notice;

(ii)    Place no further orders or subcontracts for material, services, or facilities with respect to suspended work other than to the extent required in the notice;

(iii)   Promptly make every reasonable effort to obtain suspension upon terms satisfactory to Buyer of all orders, subcontracts and rental agreements to the extent they relate to performance of suspended work;

(iv)    Continue to protect and maintain the Work including those portions on which work has been suspended;

31

    (v)    Take any other reasonable steps to minimize costs associated with such suspension; and

    (vi)    Except in cases of a suspension for cause, provide Buyer with estimates of potential suspension costs.

(c)    Buyer may at any time withdraw the suspension of all or part of the suspended Work by written notice to Supplier, specifying the effective date and scope of work to be resumed.  Following receipt of such notice, Supplier shall (i) promptly and with all diligence resume performance of the Work for which the suspension is withdrawn on the effective date of withdrawal specified in Buyer's written notice of withdrawal, and (ii) with respect to a suspension for convenience only, be eligible for a Change Order under Section 17(c)(iv).

## 21.    Termination for Default

21.1    Buyer's Right to Terminate

(a)    Notwithstanding any other provisions of this Contract, Supplier shall be considered in default of its contractual obligations under this Contract if:

    (i)    Supplier performs work which fails to conform to the requirements of this Contract and (1) fails to commence remedy of the same within twenty five days after receipt of notice from Buyer, or (2) fails to remedy the same within sixty (60) days after receipt of notice from Buyer (unless such remedy cannot be reasonably implemented within sixty (60) days, in which case one hundred twenty (120) days shall apply); provided, however, if one hundred (120) days is insufficient to address long-lead procurement requirements, Supplier shall have additional time as necessary and documented to remedy the failed work;

    (ii)    Supplier's liability for Liquidated Damages, in the aggregate, reaches the Liquidated Damages Cap;

    (iii)    Supplier abandons or inexcusably refuses to proceed with any of the Work, including any reasonable instructions directed by Buyer or any Change Orders issued by Buyer such that it is reasonably likely that such abandonment or refusal shall prevent Commissioning from being achieved by the Guaranteed Commissioning Date;

    (iv)    Supplier makes a general assignment for the benefit of its creditors, or if a receiver is appointed on account of the insolvency of Supplier, or if Supplier files a petition seeking to take advantage of any other Applicable Law relating to bankruptcy, insolvency, reorganization, winding up or composition of or readjustment of debts and, in the case of any such proceeding instituted against Supplier (but not by Supplier) such proceeding is not dismissed within sixty days of such filing.

(v) Supplier fails to timely implement a recovery schedule pursuant to <u>Section 23</u> and fails to remedy the same within seven days after receipt of notice from Buyer;

(vi) Supplier becomes a Restricted Party; or

(vii) Supplier fails to materially fulfill or comply with any of the other terms of this Contract and fails to commence a remedy the same within twenty five days after receipt of notice from Buyer; or

(viii) Supplier fails to complete Commissioning within ninety days after the Guaranteed Commissioning Date.

Each of the foregoing a "<u>Supplier Event of Default</u>."

(b) Upon the occurrence of any of items above except "(vi)", Buyer shall notify Supplier in writing of the nature of the failure and of Buyer's intention to terminate this Contract or a specified portion of the Work for default.  If Supplier does not commence to cure such failure within seven days from receipt of notification, or fails to provide satisfactory evidence to Buyer that such Supplier Event of Default shall be corrected within a longer timeframe acceptable to Buyer, Buyer may by written notice to Supplier terminate all or part of the Work.

(c) Upon the occurrence of item "(vi)" above, Buyer shall notify Supplier in writing of the event and the date termination is effective.

(d) In the event of termination under <u>Section 21.1(b)</u>, Buyer may complete the Work by any method deemed expedient.  Buyer may take possession of and utilize any data, designs, licenses, equipment, materials, plant, tools, and property of any kind (including intellectual property and computer software) used by Supplier and necessary to complete the Work.

(e) Upon termination for Supplier Event of Default, Supplier shall at its sole expense:

(i) Immediately (but no sooner than prudent safety measures warrant) discontinue work on the date and to the extent specified in the notice and place no further purchase orders or subcontracts to the extent that they relate to the performance of the terminated work;

(ii) Inventory, maintain and turn over to Buyer all BESS Equipment, all Work Product, and all other materials, tools, and property furnished by Supplier or provided by Buyer for performance of the terminated Work;

(iii) Promptly obtain cancellation upon terms satisfactory to Buyer of all purchase orders, subcontracts, rentals, or any other agreements existing for performance of the terminated work or assign those agreements and Supplier's rights and claims thereunder, as may be directed by Buyer;

33

(iv)    Cooperate with Buyer in the transfer of data, designs, licenses and information and disposition of work in progress so as to mitigate damages;

(v)    Comply with other reasonable requests from Buyer regarding the terminated work; and

(vi)    Continue to perform in accordance with all of the terms and conditions of this Contract such portion of the Work that is not terminated.

(f)    Upon termination of this Contract due to a Supplier Event of Default, but subject to Section 25, Supplier shall be liable for all costs in excess of the remaining unpaid portion of the Contract Price reasonably incurred in the completion of the Work as well as all fees and costs in exercising any remedy, and all costs incurred by Buyer for Supplier's breach of this Contract.  Supplier shall not be entitled to any payment for the terminated work, except for amounts due and not previously paid to Supplier for the BESS Equipment and Work completed in accordance with this Contract prior to such notice of termination for default.  Upon termination of this Contract, payment of all amounts due Supplier for Work performed under this Contract may be withheld pending completion of the Work, and may be used to offset liabilities of Supplier under this Contract.  Supplier agrees to indemnify and hold Buyer harmless from any loss, penalty or damages arising out of, in connection with or resulting from Supplier's failure to make progress or Supplier's refusal or failure to comply with any provision in this Contract.

(g)    If, after termination pursuant to this Section 21.1, it is determined for any reason that Supplier was not in default, the rights and obligations of the Parties shall be the same as if the notice of termination had been issued pursuant to Section 22.

(h)    Supplier shall continue the performance of this Contract to the extent not terminated under the provisions of this Section 21.1.  The rights and remedies of Buyer provided in this Section 21.1 shall not be exclusive and are in addition to any other rights and remedies provided by law, in equity, or under this Contract.

21.2    Supplier's Right to Terminate

(i)    Supplier may by written notice to Buyer terminate this Contract if Buyer:

(i)    fails to pay an undisputed amount to Supplier that is properly presented, due, and payable for more than fifteen days;

(ii)    except as to nonpayment addressed in Section 21.2(a)(i), fails to materially fulfill or comply with any of the other terms of this Contract, and fails to cure or commence to cure such failure within twenty-five days after written notice is made by Supplier;

(iii)    makes a general assignment for the benefit of its creditors, or if a receiver is appointed on account of the insolvency of Buyer, or if Buyer files a petition seeking to take advantage of any other Applicable Law relating to

34

bankruptcy, insolvency, reorganization, winding up or composition of or readjustment of debts and, in the case of any such proceeding instituted against Buyer (but not by Buyer) such proceeding is not dismissed within sixty days of such filing.

Each of the foregoing a "Buyer Event of Default."

(j)     Where non-payment by Buyer is related to the exercise of a valid set-off or withholding right, the termination rights in Section 21.2(a)(i) above shall not apply.

(k)     In the case of termination of this Contract by Supplier for reasons permitted under Section 21.2(a) above, Buyer shall pay the Termination Payment that would be due to Supplier in the event of termination for convenience as set forth in Section 22. Payment of the Termination Payment constitutes the Buyer's sole and exclusive liability to the Supplier and Supplier's sole and exclusive remedy in the event that this Contract is terminated by Supplier for reasons permitted under Section 21.

## 22.    Buyer's Termination for Convenience

(a)     Buyer may, at its option, terminate for convenience any of the Work under this Contract in whole or in part, at any time with three days' written notice to Supplier. Such notice shall specify the extent to which the performance of the Work is terminated and the effective date of such termination. Upon receipt of such notice Supplier shall:

(i)     Immediately discontinue the Work terminated on the date and to the extent specified in the notice and place no further purchase orders or subcontracts for equipment, materials, services, or facilities, other than as may be required for completion of such portion of the Work that is not terminated;

(ii)     Promptly obtain cancellation upon terms satisfactory to Buyer of all purchase orders, subcontracts, rentals, or any other agreements existing for the performance of the terminated Work or assign those agreements as directed by Buyer;

(iii)     Assist Buyer in the maintenance, protection, and disposition of work in progress, plant, tools, equipment, property, and materials acquired by Supplier or furnished by Buyer under this Contract;

(iv)     Complete performance of such portion of the Work which is not terminated; and

(v)     Assign all warranties to Buyer.

(b)     Upon any such termination under this Section 22, Supplier shall waive any claims for damages including loss of anticipated profits on account thereof, but as the sole right and remedy of Supplier, Buyer shall pay the Termination Payment within thirty days after issuing the notice of termination.

35

(c)     Payment of the Termination Payment constitutes Buyer's sole and exclusive liability to Supplier and Supplier's sole and exclusive remedy in the event that this Contract shall be terminated as provided in this <u>Section 22</u>.  Supplier's acceptance of such Termination Payment constitutes an acknowledgment that  Buyer has fully satisfied and discharged all obligations under this Contract.  For clarity, the provisions of this <u>Section 22</u> do not apply to any termination by Buyer for the default of Supplier or for any other cause allowed by law or under this Contract, other than <u>Section 21.1(f)</u> or this <u>Section 22</u>.

**23.     <u>Recovery Schedule</u>**

If the progress of Work is delayed or is foreseen to be delayed so that any Guaranteed Date may not be met, Supplier, shall on its own initiative, or if requested by Buyer, within five Business Days of such request, prepare a recovery schedule to demonstrate how it shall perform Work to regain compliance with the Project Schedule.  The recovery schedule shall be prepared with a level of detail showing, where relevant, additional shifts, hiring additional manpower, paying or authorizing overtime, providing additional Supplier equipment, and resequencing activities.  If Supplier fails to timely provide a recovery schedule or fails to comply with a recovery schedule, Buyer shall be entitled to treat such failure as a Supplier Event of Default.  For clarity, any and all costs associated with preparing a recovery schedule and executing Work under a recovery schedule shall be at Supplier's sole cost and expense unless the request for a recovery schedule is due to events or circumstances for which Supplier is entitled to schedule relief under <u>Section 17(c)</u>.

**24.     <u>Force Majeure</u>**

(a)     The Parties are each excused from performance of the affected part of an obligation of this Contract (except payment obligations due as of the declaration of Force Majeure Event) while performance is prevented by a Force Majeure Event unless the Force Majeure Event was contributed to by the fault of the party making such claim or was due to circumstances that could have been avoided or mitigated by the exercise of reasonable diligence.

(b)     A Party seeking relief for a Force Majeure Event shall:

(i)     advise the other Party as soon as practicable by electronic communication and, in any event, in writing within five days of the requesting Party's knowledge of the occurrence of the event (or when the Party should reasonably have known of the occurrence);

(ii)     use all reasonable endeavors to mitigate the impact from the Force Majeure Event;

(iii)     provide on a continuing basis plans for resumed performance and revised schedules; and

36

(iv)    after cessation of the Force Majeure Event, notify the other Party in writing of the cessation, and promptly resume performance of its obligations under this Contract.

(c)    The impact of any Force Majeure Event on a Party's performance of its obligations under this Contract shall be of no greater scope and no longer duration than is reasonably required by such Force Majeure Event.  The burden of proof with respect to a Force Majeure Event shall be on the Party claiming the same.  The Party claiming any Force Majeure Event shall have a continuing obligation to deliver to the other Party regular updated reports and any additional documentation and analysis supporting its claim regarding a Force Majeure Event promptly after such information is available.

(d)    Delays associated with a Force Majeure Event shall be addressed through a Change Order in accordance with <u>Section 17(c)(ii)</u>, but each Party shall bear its own costs related to or as a consequence of the Force Majeure Event.

## 25.   <u>Limitation of Liability</u>

(a)    Neither Party's liability to the other Party for breach of this Contract or for negligence shall exceed the Contract Price.

(b)    Supplier's liability shall not be limited by this Section for any liabilities arising in connection with Supplier's obligations in the following areas and these amounts shall not be counted in assessing whether the limitation of liability has been reached:

(i)    Supplier's obligations relating to title and liens set forth in <u>Section 11</u>;

(ii)    Supplier's indemnity obligations set forth in this Contract;

(iii)    amounts recovered from any applicable insurance;

(iv)    Supplier's violation of Applicable Laws or any illegal or unlawful acts;

(v)    Supplier's violation of the confidentiality requirements of <u>Section 28</u>;

(vi)    Supplier's obligations relating to intellectual property obligations set forth in <u>Section 29</u>;

(vii)    claims based on electronic access, use, or exploitation of Buyer's property due to negligent acts or omissions of Supplier to maintain reasonable cybersecurity protections;

(viii)    claims based on willful misconduct or gross negligence; or

(ix)    any liability that cannot be excluded or limited under Applicable Laws.

26.   **Waiver of Consequential Damages**

Neither party shall be liable to the other for special, punitive, incidental, exemplary or consequential damages resulting from or arising out of this Contract, including without limitation, loss of profit, loss of business opportunity, idle facilities or resources (including equipment), loss (including by a third party) of property or property rights, cost of capital, or business interruption, whether such liability arises in contract, negligence or otherwise. The Parties agree that the following items are excluded from the above release: (i) costs recoverable under the Defect correction obligations, (ii) damages recoverable under the intellectual property indemnity, (iii) damages claimed by third parties for which Supplier has a duty to indemnify, (iv) damages caused by willful misconduct or unlawful acts or a violation of <u>Section 28</u>, and (v) any liquidated damages set forth in this Contract.

27.   **Indemnity**

(a)     To the fullest extent permitted by Applicable Law, each Party (the "<u>Indemnifying Party</u>") shall fully indemnify, and save harmless the other Party (along its directors, officers, shareholders, partners, agents and employees, and Affiliates, the "<u>Indemnified Parties</u>") from and against, and shall defend the Indemnified Parties against claims, actions, demands or suits for, any and all loss, damage, expense and liability whatsoever, including court costs, reasonable attorneys' fees, and interest (collectively, "<u>Losses</u>") incurred by any Indemnified Parties in connection with or arising from third party claims involving (i) any claim for physical damage to or physical destruction of any real or personal property, or death of or bodily injury to any person, to the extent caused by the negligence or willful misconduct of the Indemnifying Party arising out of or in connection with the performance of this Contract; (ii) any violation of Applicable Law by the Indemnifying Party or other persons for whom it is responsible; and (iii) any claims by a Governmental Authority to the extent claiming taxes for which the Indemnifying Party is liable. The Indemnifying Party may not, without the prior written consent of the Indemnified Party, consent to any judgment or settlement that (x) provides for injunctive or other non-monetary relief affecting the Indemnified Party or (y) does not provide for an unconditional and full release of the Indemnified Party.  If the Indemnifying Party, within a reasonable time after receipt of a request for indemnification, fails to take reasonable steps to defend the Indemnified Party against a claim, the Indemnified Party may undertake the defense of such claim without waiving its rights and remedies under this Contract.

(b)     In the event any such damage or injury subject to an indemnity obligation under this <u>Section 27</u> is caused by the joint or concurrent negligence of Supplier and Buyer, the loss shall be borne by each Party in proportion to its respective degree of fault or negligence.

(c)     If either party becomes aware of any incident likely to give rise to an indemnity claim under this <u>Section 27</u>, that party shall notify the other party, and both parties shall cooperate fully in the investigation of the incident.

28.     **Confidentiality**

(a)      "Confidential Information" means the Specifications and any drawings, designs, technical and performance data, standards, dimensions, equipment test results, computer software or programs (including source codes and object codes), business practices, shop procedures, improvements, know how, inventions, intellectual property, patent applications, reports, financial data, commercial information, business strategies, customer lists, or customer contact information and any other information (whether written, verbal or otherwise) and that are disclosed to a party (the "Receiving Party") by the other (the "Disclosing Party"). Confidential Information shall be treated as confidential by the Receiving Party and shall not be disclosed to any third party, nor used for any purpose, other than as required in connection with performing or administering this Contract (or any dispute arising under this Contract) or owning, operating or maintaining the BESS or financing or selling the Project or any equity interest in Buyer.  Confidential Information shall be returned to the Disclosing Party whenever the Disclosing Party so demands.  For clarity, this Contract is considered Confidential Information.

(b)      Notwithstanding the foregoing, Receiving Party may disclose Confidential Information, without Disclosing Party's written consent, to Receiving Party's employees and representatives who reasonably need the Confidential Information for the performance of the Work under this Contract.  In the case of highly sensitive Confidential Information identified by Disclosing Party, Disclosing Party reserves the right to require Receiving Party to identify specific individuals intended to access said information that is clearly identified as such by Disclosing Party.

(c)      The obligations of confidentiality and restricted use stipulated herein shall remain in full force and effect even after the completion of this Contract or the earlier termination or cancellation of this Contract.

(d)      The Receiving Party shall be liable for a breach of this Section 28 by any employee or other person to whom the Receiving Party has disclosed Disclosing Party's Confidential Information.

(e)      Confidential Information shall not include and the requirements of Section 28(a) shall not apply to any information that the Receiving Party can demonstrate (i) is in the public domain, or (ii) is already in the lawful possession of the Receiving Party at the time of the disclosure by Disclosing Party and were not acquired under a pledge of secrecy.

(f)      Buyer may require Supplier to provide its plans to control and prevent an unauthorized disclosure of Confidential Information, at Buyer's written request, and such plan and/or implementation of such plan shall be subject to audit by Buyer.

29.     **Supplier Self-Audit for Intellectual Property Control**

(a)      Buyer intends to prevent Buyer's Confidential Information from being transmitted by Supplier to any Subcontractor or within Supplier's companies and or employees.

Buyer requires that Supplier require each Subcontractor and company employee that may have access to Buyer's Confidential Information to sign and Supplier to keep on file, current confidentiality agreements and conduct self-evaluations on an annual basis to demonstrate Supplier's compliance to intellectual property control processes required by Buyer.  Supplier audits should cover Subcontractors as well as companies and or employees, to insure documentation control and proper handling of Buyer's Confidential Information.

(b)     When work involving Buyer's Confidential Information is given to a sub-supplier, an agreement incorporating nondisclosure clauses shall be required by Supplier and such sub-supplier.  The agreements shall include the following points:

(i)     The entrusted Confidential Information is immediately returned to Supplier and Buyer or disposed of immediately after completion of the requested work;

(ii)    Supplier-conducted audits to check subsuppliers as to whether stipulated measures are being complied with; and

(iii)   If a subsupplier entrusts the work to another or third party, it obtains permission in advance from Supplier and Buyer and ensures an agreement for nondisclosure of the same type is signed with that third party.

(c)     Buyer may conduct Confidential Information protection audits annually.  Supplier shall conduct self-audits and Buyer may also request additional official audits from Supplier.  Buyer may check to confirm that the agreements signed with Supplier and/or sub-suppliers are available and properly filed for retrieval when requested by Buyer.  Buyer may evaluate the self-certification by Supplier on maintaining and protecting Buyer's Confidential Information and the processes that provide control of Supplier's sub-suppliers.  Supplier must demonstrate that it has a procedure deemed satisfactory to Buyer for receiving/delivering/controlling Buyer's Confidential Information within Supplier's company and applicable sub-suppliers.  These items must be clearly outlined and administered effectively.

(d)     The methods for confirmation may include, but are not limited to: checking documents and noting procedures for receiving/delivering/controlling Buyer's intellectual confidential property information to each sub-supplier.  Assessment criteria include evaluation of procedures to confirm that they are clear and concise, and are being carried out as indicated.  Confirmation must be made as to whether Supplier and/or sub-supplier is properly handling Buyer's intellectual property and confidential information (in writing or electronic data), and as such are complying with the agreements mentioned above.

## 30.     Use of Supplier's Intellectual Property

(a)     Upon Delivery (and Buyer's payment to Supplier of undisputed amounts then-due), Supplier hereby grants to Buyer a worldwide, perpetual, non-exclusive,

royalty-free, transferable right and license to use Supplier's intellectual property as necessary to install and commission the BESS.

(b)     Upon Commissioning (and Buyer's payment to Supplier of undisputed amounts then-due), Supplier hereby grants to Buyer a worldwide, perpetual, non-exclusive, royalty-free, transferable right and license to use Supplier's intellectual property as necessary to operate, maintain and repair the BESS.

## 31.    **Intellectual Property Indemnity**

(a)     Each Party hereby indemnifies and shall defend and hold harmless the other Party from and against any and all claims, actions, losses, damages, and expenses, including attorney's fees, arising from any claim, whether rightful or otherwise, that any concept, product, design, equipment, material, process, copyrighted material or confidential information, or any part thereof, furnished by the other Party under this Contract constitutes an infringement of any patent or copyrighted material or a theft of trade secrets.  If use of any part of such concept, product, design, equipment, material, process, copyrighted material or confidential information is limited or prohibited, the indemnifying Party shall, at its sole expense, procure the necessary licenses to use the infringing or a modified but non-infringing concept, product, design, equipment, material, process, copyrighted material or confidential information or, with the other Party's prior written approval, replace it with substantially equal but non infringing concepts, products, designs, equipment, materials, processes, copyrighted material or confidential information; provided, however,

   (i)     any such substituted or modified concepts, products, designs, equipment, material, processes, copyrighted material or confidential information shall meet all the requirements and be subject to all the provisions of this Contract; and

   (ii)    such replacement or modification shall not modify or relieve the indemnifying Party of its obligations under this Contract.

(b)     For any concept, product, design, equipment, material, process, copyrighted material or confidential information, the instructions or detailed design of which (excluding rating and/or performance specifications) Buyer has been furnished to Supplier in writing.  Buyer shall indemnify Supplier against liabilities arising from third party claims that such material furnished by Buyer constitutes an infringement of any patent or copyrighted material or a theft of trade secrets.

## 32.    **Compliance**

(a)     Supplier represents that it is familiar with and shall strictly comply with all Applicable Laws in effect at the time the Work under this Contract is performed. Supplier shall notify Buyer in writing of any material breaches of Applicable Laws related to the performance of this Contract and shall remedy (or cause its Subcontractors to remedy) any non-compliance immediately.

41

(b)     Supplier further warrants that all Work shall be in strict compliance with all Applicable Laws at the time of Delivery of the BESS Equipment  and at the time of performance of the Work.  Supplier shall execute and deliver to Buyer any documents as may be required to effect or to evidence such compliance.  In the event that any BESS Equipment are, or are likely to be, subject to any restriction arising from such Applicable Laws, Supplier shall promptly notify Buyer in writing and Supplier shall take any and all necessary actions to ensure that the BESS Equipment supplied strictly conform to all Applicable Laws; provided however such actions may be eligible for relief under <u>Section 17(c)(v)</u>.

## 33.   <u>Export Compliance with United States Export Controls</u>

(a)     The Parties recognize that Buyer may be subject to the export regulations of the United States of America regarding export and re-export of certain commodities, software, and technology from the United States.  Supplier agrees that it shall not export or re-export, either directly or indirectly, any information or data received from Buyer in connection with the performance under this Contract to any country in contravention of said export regulations, or which, if done by Buyer, would violate the laws of the United States of America.

(b)     Supplier represents that it is not (and that its Subcontractors are not) a "<u>Restricted Party</u>", which for the purposes of this Contract shall be deemed to include any person or entity that is:

(i)      a national of, located in, or organized under the laws of Cuba, Iran, North Korea, Sudan or Syria;

(ii)     named on the Treasury Department list of Specially Designated Nationals; the Commerce Department Denied Persons, Entity; the State Department Debarred Parties List; or the General Services Administration Excluded Parties List System;

(iii)    subject to nonproliferation sanctions under the laws of the United States;

(iv)     designated as an institution of primary money laundering concern;

(v)      engaged in activities involving nuclear weapons materials, missile or rocket technologies, or the proliferation of chemical or biological weapons;

(vi)     part of or affiliated with any nonU.S.  military or paramilitary organization; or

(vii)    owned or controlled by any nonU.S. government.

(c)     Supplier shall promptly notify Buyer if it becomes a Restricted Party.

46834146.6

34. **Health and Safety**

Supplier shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent damage, injury, or loss to: (1) employees of Supplier and Subcontractors performing Work; and (2) Supplier's BESS Equipment, under the care, custody, and control of Supplier or its Subcontractors.

35. **Representations**

(a)     Representations by Supplier.  Supplier hereby represents and warrants to Buyer as follows as of the Effective Date:

(i)     Supplier is a limited liability company duly incorporated under the laws of the State of Delaware, and is duly organized, validly existing and in good standing in each other jurisdiction where the failure to so qualify would have a material adverse effect on its ability to perform its obligations under this Contract.   No action relating to the insolvency, liquidation or suspension of payments of Supplier has been taken by Supplier or any of its Affiliates or, to the best knowledge of Supplier, any third party.

(i)     The execution, delivery and performance of this Contract by Supplier have been duly authorized by all necessary corporate or company action on the part of Supplier and do not and will not require the consent of any trustee or holder of any indebtedness or other obligation of Supplier or any other party to any other agreement with Supplier except for any consents that have been obtained.

(i)     This Contract has been duly executed and delivered by Supplier.  This Contract constitutes the legal, valid and binding obligation of Supplier, enforceable against Supplier in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally and by general equitable principles.

(i)     No governmental authorization, approval, order, license, permit, franchise or consent, and no registration, declaration or filing with any Governmental Authority is required on the part of Supplier in connection with the execution, delivery and performance of this Contract (including the delivery of the BESS Equipment to the Delivery Location) except those which have already been obtained or which Supplier anticipates will be timely obtained in the ordinary course of performance of this Contract and before being required by Applicable Laws.

(i)     The Installation Manual, together with the Specifications, fairly present, in all material respects, manufacturers' procedures, specifications and requirements for the installation, maintenance, and operation of the BESS Equipment.

43

(i)     The execution, delivery and performance by Supplier of this Contract will not conflict with or cause any default under (A) its organizational documents, (B) any indebtedness or other obligation of Supplier or any contract to which Supplier is a party or by which it or its properties may be bound or (C) as of the date hereof, any Applicable Law governing Supplier or the Supplier's performance under this Contract; and will not subject Buyer or the Project or any component thereof (including the BESS Equipment) to any Lien other than as expressly contemplated under this Contract.

(i)     There are no actions, suits, or proceedings (including patent or license infringement actions or proceedings) pending or threatened against it or its Affiliates at law or in equity before any court (United States or otherwise) or before any Governmental Authority (whether or not covered by insurance) that individually or in the aggregate could result in a materially adverse effect on the business, properties or assets or the condition, financial or otherwise, of Supplier or in any impairment of Supplier's ability to perform its obligations under this Contract.  Supplier has no knowledge of any violation or default with respect to any order, writ, injunction or decree of any court or any Governmental Authority that may result in any such materially adverse effect or such impairment.

(i)     For all purposes of this Contract, including with respect to the Project Schedule, Guaranteed Dates and Contract Price set forth herein, Supplier has taken into account all known impacts and effects of COVID-19 as of the Effective Date.  Supplier is not aware of any adverse impact on its ability to perform its obligations under this Contract as a result of COVID-19.

(a)     <u>Representations by Buyer</u>.  Buyer hereby represents and warrants to Supplier as follows as of the Effective Date:

(i)     Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware and is qualified to do business in each jurisdiction where failure to so qualify would have a material adverse effect on its ability to perform its obligations under this Contract.  No action relating to the insolvency, liquidation or suspension of payments of Buyer has been taken by Buyer or any of its Affiliates or, to the best knowledge of Buyer, any third party.

(i)     The execution, delivery and performance of this Contract by Buyer have been duly authorized by all necessary company or corporate action on the part of Buyer and do not and will not require the consent of any trustee or holder of any indebtedness or other obligation of Buyer or any other party to any other contract with Buyer, except for any such consents that have been obtained.

44

(i)     This Contract has been duly executed and delivered by Buyer.  This Contract constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally and by general equitable principles.

(i)     No governmental authorization, approval, order, license, permit, franchise or consent, and no registration, declaration or filing with any Governmental Authority is required on the part of Buyer in connection with the execution, delivery and performance of this Contract except those which have already been obtained or which Buyer anticipates will be timely obtained in the ordinary course of performance of this Contract and before being required by Applicable Laws.

(i)     The execution, delivery and performance by Buyer of this Contract will not conflict with or cause any default under (A) its organizational documents, (B) any indebtedness or other obligation of Buyer or any contract to which Buyer is a party or by which it or its properties may be bound or (C) as of the date hereof, any Applicable Law governing Buyer or the performance of its obligations under this Contract.

(ii)    There are no actions, suits or proceedings pending or threatened against it or its Affiliates at law or in equity before any court (United States or otherwise) or before any Governmental Authority (whether or not covered by insurance) that individually or in the aggregate could result in any materially adverse effect on the business, properties or assets or the condition, financial or otherwise, of Buyer or in any impairment of Buyer's ability to perform its obligations under this Contract.  Buyer has no knowledge of any violation or default with respect to any order, writ, injunction or decree of any court or any Governmental Authority that may result in any such materially adverse effect or such impairment.

**36.**  **Dispute Resolution**

(a)     Except for third-party claims and cross-claims filed by parties not governed by these dispute resolution provisions in which a Party hereto must implead or otherwise join another Party hereto, any dispute or matter in question between the Parties arising out of or related to this Contract (a "Dispute") shall be subject to and resolved pursuant to the dispute resolution process set forth in this Section 35 following compliance with any other requirements of this Contract concerning any such Dispute.

(b)     Any Dispute shall first be referred to Buyer's Representative and Supplier's Representative for negotiation and resolution by delivery of a notice by one Party to the other Party requesting such negotiation and resolution of the Dispute, which notice shall specify in reasonable detail the nature of the Dispute and the resolution

sought by the Party giving the notice ("Party Representative Negotiations"). In the event that the Parties do not reach a resolution of the Dispute within ten days following the receipt of such notice for Party Representative Negotiations by the other Party, either Party may request by a Notice to the other Party a meeting between senior representatives of each Party with decision making authority to attempt in good faith to negotiate a resolution of the Dispute ("Senior Representative Negotiations"), which meeting shall take place within ten (10) Business Days of receipt of such Notice requesting the Senior Representative Negotiations.

(c)     Any Dispute that has not been resolved through the Senior Representative Negotiations shall be settled by arbitration administered by the American Arbitration Association ("**AAA**") in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("**AAA Rules**"). The arbitration shall be conducted by three independent and impartial arbitrators, none of whom shall be current or previous officers, directors or employees of either Party or their respective Affiliates. The Party who submits the Dispute to arbitration shall select and identify the first arbitrator in its notice of arbitration. The other Party shall identify the second arbitrator in a notice to be given not more than twenty-five days after it receives the notice of arbitration. The first two such arbitrators shall both be persons who are knowledgeable about the subject matter of the Dispute and shall have at least five  years' experience in the electric power industry. Within twenty-five days of the second arbitrator's selection, the two arbitrators shall select a third arbitrator, who shall serve as chairperson of the arbitrators' panel. If the two selected arbitrators cannot agree on a third arbitrator within twenty-five days of the second arbitrator's selection, the third arbitrator shall be appointed by the AAA as provided in the AAA Rules. In that regard, the Parties hereby waive the right to nominate the third arbitrator and hereby accept the appointments by the AAA, as it deems best.

(d)     The arbitrator or arbitration panel shall have no authority or power to enter an award which is in conflict with any of the provisions of this Contract. The decision or award must be in writing and must contain findings of fact on which it is based. The decision and award of the arbitrator or arbitral panel shall be final and binding on the Parties and may be challenged only on the ground set forth on the Federal Arbitration Act, 9 U.S.C. §1 et seq.

(e)     If the Dispute involves substantially the same facts and circumstances and/or same questions of facts or law as exist within a dispute between Buyer and an Other Contractor, then the Parties shall not object to joining the Other Contractor into the arbitration for concurrent resolution of such other dispute or having the Dispute consolidated into an existing arbitration proceeding with the Other Contractor.

(f)     Neither Party shall challenge the choice of a potential arbitrator solely because the arbitrator is of the same nationality as one of the Parties subject to the arbitration. The award rendered by the arbitrator(s) shall be final and binding upon both Parties,

46

and judgment upon the award may be entered in any court having jurisdiction thereof.  The seat of the arbitration shall be in New York, New York.

37. **Governing Law**

Unless otherwise agreed, this Contract shall be governed by and construed in accordance with the laws of the state of New York, without regard to principles of conflicts of laws. IN ACCORDANCE WITH SECTION 6 OF THE UNITED NATIONS CONVENTION ON CONTRACTS FOR THE INTERNATIONAL SALE OF GOODS ("UN CONVENTION"), THE PARTIES AGREE THAT THE UN CONVENTION SHALL NOT APPLY TO THIS CONTRACT.

38. **Assignment**

(a)    Subject to Section 37(b), neither Party shall assign or in any other manner transfer any of its rights or obligations under this Contract without the prior written consent of the other Party which consent shall not be unreasonably withheld.  No such purported assignment or transfer without such consent, whether voluntary or involuntary, by operation of Applicable Law, under legal process or proceedings, by receivership, in bankruptcy or otherwise, shall be valid or effective.

(b)    Notwithstanding Section 37(a), Buyer may, without Supplier's consent, assign this Contract to (A) any subsidiary or Affiliate, (B) a purchaser of all or substantially all of Buyer's assets or Buyer's successor in interest as part of a corporate reorganization, consolidation, take-over, merger, statutory share exchange or other business combination, or (C) its lenders by way of collateral assignment to secure financing of the Project.  Any assignment of this Contract by Buyer pursuant to this Section 37(b) (other than pursuant to clause "(C)" above) shall release Buyer from its liabilities under this Contract, however such assignment shall not be valid unless the assignee has equal or greater ability to fulfill Buyer's obligations (including its financial obligations) and to grant to Supplier the rights granted under this Contract than Buyer.  A permitted assignee of Buyer under this Section 37(b) (other than a collateral assignee, unless such collaterally assignee assumes this Contract in writing) shall be bound by the obligations of this Contract and shall, upon Supplier's request, deliver a written assumption of Buyer's rights and obligations under this Contract to Supplier.

39. **Insurance**

During the entire term of this Contract, including the Warranty Period, Supplier shall maintain or cause to be maintained, at Supplier's sole cost and expense, the insurance coverages set forth in Exhibit H.

40. **Independent Contractor**

Nothing in this Contract shall be deemed to constitute Supplier, nor any Subcontractors, nor their respective employees or agents to be the agent, representative or employee of Buyer.  Supplier shall at all times be an independent contractor and shall have sole

47

responsibility for and control over the details and means for performing the Work.  Supplier covenants and agrees that in the performance of the Work, neither Supplier nor its Subcontractors shall perform any act or make any representation to any person to the effect that Supplier, or any of its agents, representatives or Subcontractors, or any of their respective employees, agents or representatives is an employee, agent, or representative of Buyer.

41.    **Subcontracting**

(a)    Supplier guarantees that work by any of its Subcontractors shall conform with the terms of this Contract.

(b)    Notwithstanding the subcontracting of any portion of the Work by Supplier, Supplier shall remain primarily and fully responsible for the complete, proper and safe performance of the Work in strict conformity with the requirements of this Contract.  Supplier shall be liable for any and all acts and omissions of its Subcontractors and their respective employees.  Nothing contained in this Contract may be construed as imposing any obligation or liability on the part of Buyer toward the Subcontractors.

42.    **Record Keeping and Audit**

Supplier shall maintain records and accounts in connection with the performance of this Contract as is consistent with Supplier's internal retention policies, unless a longer period is otherwise specified by Applicable Law.  Supplier shall maintain its records and accounts in accordance with U.S.  Generally Accepted Accounting Principles (U.S.  GAAP) or with International Accounting Standards Committee (IASC) standards consistently applied, as applicable.  Buyer and its representatives shall have the right to examine and copy, at all reasonable times and with advance notification, such records and accounts for the purposes of confirming compliance with Contract provisions, verifying payments or requests for payment when costs are the basis of such payment and evaluating the reasonableness of proposed Contract Price adjustments and claims.

43.    **Publicity**

Neither Party shall issue any news release or permit any publicity or advertisement, or otherwise use the other Party's trade name, logo, trademark, trade device, service mark or symbol owned by such Party, its Affiliates or parent companies concerning this Contract or Project without the  other Party's prior written approval.  Each Party, its employees, and Subcontractors and their employees shall not make any announcement, take any photographs, or release any information concerning this Contract, or the Project, or any part thereof to any member of the public, press, business entity, or any official body unless prior written consent is obtained from the other Party.

44.    **No Waiver**

(a)    Neither Party's failure to enforce any provisions of this Contract shall in no way be construed as a waiver of such provisions nor in any way affect the rights of that

Party thereafter to enforce any such provisions.  No waiver by a Party of any default of the other Party hereunder shall constitute a waiver of any subsequent default, whether or not the subsequent default is of a similar or different nature.

(b)     None of the following shall operate as, or be deemed to be, a waiver or release of Supplier's obligations under this Contract:

(i)      Failure by Buyer to insist upon strict performance of any terms or conditions of this Contract;

(ii)     Failure or delay to exercise any rights or remedies provided herein or by law;

(iii)    Failure to properly notify Supplier in the event of breach of any obligation;

(iv)    The acceptance of or payment for any portion of the Work;

(v)     The review or failure to review any Supplier submissions;

(vi)    Any inspection or test by Buyer or the failure to inspect or test any aspect of the Work; and

(vii)   The termination either in whole or in part of the Work under this Contract.

(c)     The remedies provided to Buyer are not mutually exclusive and Buyer's exercise of any remedy or remedies shall not prevent Buyer from exercising any other remedy or remedies it has under this Contract or at law.

## 45.    <u>Miscellaneous</u>

(a)     <u>Survival</u>: Notwithstanding the completion of the Work, or the earlier termination of this Contract, the Parties shall continue to be bound by the provisions of this Contract which by their terms or by their nature shall survive such completion or termination, including but not limited to the provisions of Section 18, *Warranty*; Section 19, *Operating Spare Parts*; Section 27, *Indemnity*; Section 32, *Compliance*; Section 33, *Export Compliance with United States Export Controls*; Section 35, *Dispute Resolution*; Section 36, *Governing Law*; and Section 42, *Publicity*.

(b)     <u>Entire Agreement</u>: This Contract shall constitute the entire agreement between the Parties with respect to the subject matter hereof matter and supersedes any other agreements or statements pertaining to the same subject matter.  The Parties shall not be bound by any statement, representation, promise, inducement, or understanding of any kind not set forth in this Contract.  No change, amendment, or modification of any of the provisions of this Contract or waiver of any of the provisions shall be effective unless in writing and signed by Buyer Representative.  No acknowledgment form or other form of Supplier containing terms and conditions submitted by Supplier shall have the effect of modifying the terms and conditions hereof.

49

(c)     <u>Headings</u>: Titles and headings are for convenience of reference only.  They shall not be taken into consideration in interpreting this Contract.

(d)     <u>Language</u>: The language to be used in all documents comprising or relating to this Contract and in all other communications relating to this Contract shall be English, unless otherwise required in writing by Buyer.

(e)     The parties retain their rights and remedies under Applicable Laws, subject to any provisions in this Contract that provide otherwise.

(f)     This Contract may be signed in any number of counterparts, all of which constitute a single instrument.

(g)     <u>Notice</u>: All notices or other communications under this Contract must be in English and in writing, and:

　　　(i)     delivered by hand;

　　　(ii)     sent by prepaid courier;

　　　(iii)     sent by certified mail; or

　　　(iv)     sent by email with confirmation of receipt by response email

Notices to Buyer shall be sent to:

　　Front Range-Midway Solar Project, LLC
　　Avenida de América, 38
　　28028 Madrid, Spain
　　Attn: Elisa Ferrando Juncosa
　　Email: eferrando@globalpower-generation.com

　With copy to:

　　Front Range-Midway Solar Project, LLC
　　Ignacio Dominguez Dávila
　　Avenida de América, 38
　　28028 Madrid, Spain
　　Email: idominguezd@naturgy.com

Notices to Supplier shall be sent to:

　　Powin, LLC
　　20550 SW 115th Avenue
　　Tualatin, OR 97062
　　Attn.:  President
　　Email: geoffb@powin.com

46834146.6

With copy to:

    Powin, LLC
    20550 SW 115th Avenue
    Tualatin, OR 97062
    Attn.:  Legal Department
    Email: notices@powin.com

and:

    Justin D. Markell
    Winthrop & Weinstine, P.A.
    225 South Sixth Street, #3500
    Minneapolis, MN 55402
    Email: jmarkell@winthrop.com

22736632v8

*[Signature Page Follows]*

46834146.6

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Contract in the spaces provided below, effective as the Effective Date.


**Front Range-Midway Solar Project, LLC**
   **(Buyer)**

By: _____

Print: <u>Jesús San Emeterio Simón</u>

Title: <u>Operations Director</u>


**Powin, LLC**
   **(Supplier)**

By: <u>Geoff Brown</u>
     C05853AC6A904D3...

Print: <u>Geoff Brown</u>

Title: <u>Chief Executive Officer</u>

# EXHIBIT 2

# SETTLEMENT AGREEMENT

This **SETTLEMENT AGREEMENT** ("Settlement") is made effective as of December 31, 2024 ("Effective Date") between FRONT RANGE-MIDWAY SOLAR PROJECT, LLC, a Delaware limited liability company ("Buyer") and POWIN, LLC, a Delaware limited liability company ("Supplier") (collectively, "Parties"), to memorialize the terms of a settlement.

## RECITALS

**WHEREAS**, the Parties entered into a Battery Energy Supply Agreement dated November 17, 2021, and subsequent Change Orders ("ESA");

**WHEREAS**, Supplier, Buyer and Nationwide Mutual Insurance Company entered into a performance Bond with for $4,747,017.20 on December 9, 2021;

**WHEREAS**, Buyer has, to date, paid to Supplier $19,962,156.72 (42% of the total $47,470,172.00 Contract Price) ("Paid Amount"), as payments set forth in the ESA for Effective Date, Manufacturing Start Date and Shipment of First Collection Segment.

**WHEREAS**; Supplier has procured (17) PCS and MVT under the ESA for Buyer's benefit;

**WHEREAS**, a dispute between the Parties has arisen regarding whether Buyer is entitled to a return or refund of all or part of the Paid Amount ("Dispute");

**WHEREAS**, the Parties, without admitting any liability as to the foregoing allegations regarding the Dispute, and solely to avoid the cost and uncertainties of litigation over the Dispute, the Parties are entering into this Agreement for the purposes of fully and finally resolve and settle all claims, disputes and controversies associated with the Dispute in an amicable and efficient manner, including termination of the underlying ESA.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Settlement**
   1.1 **First Cash Payment**. Supplier will pay Buyer $2,000,000 within 7 (seven) days after the parties execute this Agreement,

   1.2 **Cancellation of Performance Bond**. Buyer will issue a cancellation letter, on its letterhead, in the form of Exhibit A, simultaneous with the execution of this Agreement. Buyer further agrees to use its best efforts to secure the return of the physical bond to Supplier within 15 days of the execution of this Agreement.

1.3 **Second Cash Payments**: A payment of $2,854,975.71 shall be made bv Supplier to Buyer on or before April 30th, 2025.

1.4 **Credit for Future Purchases:** Supplier will issue Buyer a credit of $15,107,181.01 for the acquisition of products from Supplier or its Affiliates, subject to the following conditions:

    a) **Validity:** The credit shall remain valid until December 31, 2029.

    b) **Transferability:** The credit may be assigned to any Front Range-Midway Solar Project, L.L.C. ("FRM") Affiliate. Transfer to any third-party shall be done with Powin's prior written consent, which shall not be unreasonably withheld.

    c) **Contract Value:** FRM or Affiliates´ commitment shall be equivalent to $47,470,172.00. The credit may be proportionally applied to one or more contracts that reach, in aggregate, that minimum purchase value.

    d) **Market Price:** The equipment sold under the new agreements to utilize the credit should be competitive with the then current Market Price. If FRM rejects Powin's proposal after an internal market price evaluation, FRM may launch a competitive process including Powin. If FRM determines that Powin's price is not reasonably competitive compared to the other competitive bids, FRM may engage an independent third party to engage in a confidential review of relevant Powin information to confirm that Powin's bid pricing is substantially similar to that offered to similarly situated customers during the same time period.

    e) Financial Information: Upon reasonable request of FRM, during the validity of the credit, Powin shall provide its annual audited financial statements.

    b. **Termination of ESA**. The Parties acknowledge their limited rights to terminate the ESA under Section 21 and Section 22 of the ESA. Despite the language contained in the ESA, the Parties mutually agree to terminate the ESA, and the only obligations by either party hereafter are contained in this Settlement Agreement. Therefore, upon executing this Settlement Agreement, the ESA will be null and void with no further effect or obligations between the Parties existing thereunder.

2. **Releases**.

2.1 **Mutual Waiver and Release of Claims**. In consideration of the terms and provisions of this Settlement, each Party hereby completely remises, releases, holds harmless and forever discharges each other Party, and, as applicable, its respective attorneys, agents, successors, heirs, employees, representatives, affiliates, registered representatives, assigns and any other related persons or entities acting or purporting to act by, through, or on their behalf of and from any and all causes of action, claims, debts, demands, damages, costs, attorneys' fees and expenses, known or unknown, accrued or unaccrued, contingent or not contingent, of every nature and kind, from any and all

claims of whatever kind or nature arising from the transactions and occurrences surrounding the Agreement prior to the Effective Date.

2.2 **Confidentiality**. As further consideration for this Settlement, the Parties agree that the facts underlying the Agreement, as well as the terms of this Settlement, shall be kept strictly confidential and will not be disclosed to any person or entity not party to this Settlement. Notwithstanding the foregoing, the Parties may disclose the terms of this Settlement to their parent entity(ies), investors, and legal and tax advisors where necessary. The Parties further agree that, other than as necessary to enforce the provisions of this Settlement or as compelled by a court of competent jurisdiction, the terms of this Settlement shall not be used or disclosed in any court, arbitration, or other legal proceeding.

2.3 **No Third-party Beneficiaries**. The Parties acknowledge and agree that the Parties do not intend to confer any benefit or defense by or under this Settlement upon any other person or entity other than the Parties hereto, and the related parties identified in the releases set forth in this Settlement, and their respective permitted successors and assigns. Without limiting the generality of the foregoing, the release provided by each of the Parties shall not encompass, affect, diminish, or impair any claims against any third party not identified in this Settlement and the Parties expressly reserve any and all rights, remedies and claims against such third parties.

2.4 **Authority of Signatories**. Each person signing this Settlement on behalf of a Party hereto hereby warrants, represents and covenants to the other Parties hereto that (i) such signatory is authorized to sign this Settlement on behalf of the Party he or she represents; and (ii) the execution of this Settlement by such signatory serves to bind such Party to the terms and conditions of this Settlement. The provisions of this Settlement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.

2.5 **Knowing and Voluntary Assent**. The Parties acknowledge that they have each entered into and signed this Settlement knowingly, voluntarily, freely, and of their own volition, and with such consultation with counsel as they deemed appropriate. Each Party is fully aware of the Settlement's content, purpose, and effect based upon each of their sole judgment, belief, and knowledge, and were not coerced to do so nor under duress at the time of executing this Settlement.

2.6 **Waiver**. No waiver, modification, or amendment of any term, condition, or provision of this Settlement shall be valid or of any effect unless made in writing, signed by the Party to be bound or its duly authorized representative and specifying with particularity the nature and extent of such waiver, modification or amendment. Any waiver by any Party of any default of the other shall not affect or impair any right arising from any subsequent default. Nothing herein shall limit the rights and remedies of the Parties under and pursuant to this Settlement.

2.7 **Governing Law**. This Settlement shall be interpreted and construed and enforced in accordance with the laws of the State of New York. The Parties hereby stipulate and

agree that, in the event a dispute arises regarding or relating to the Settlement, the Parties are subject to jurisdiction in New York, and any related litigation shall be venued in the state or federal courts located in New York.

2.8 **Prior Agreements**. The Parties acknowledge and agree that this Settlement supersedes all prior oral and written agreements and communications between them.

2.9 **Entire Agreement**. This Settlement sets forth the entire agreement between the Parties. The above Recitals are part of this Settlement. Each Party hereto represents and acknowledges that in executing this Settlement that each does not rely, and has not relied, upon any representation or statement made by any other Party or by any other Party's agents, representatives, or attorneys with regard to the subject matter, basis or effect of this Settlement or otherwise. Each Party further represents and acknowledges that no oral understanding or promises exist contrary to the terms of this Settlement.

2.10 **Representation by Counsel**. The Parties stipulate and agree that they have each been represented by counsel and that neither has relied upon any statements made by the other not set forth in this Settlement. The Parties agree that this Settlement shall not be construed against any Party to the Settlement on the grounds that such Party drafted this Settlement, but shall be construed as if all Parties jointly prepared this Settlement. This Settlement shall in all cases be construed as a whole and not strictly for or against any of the Parties.

2.11 **Construction**. The Parties acknowledge that they jointly participated in the drafting of this Settlement. This Settlement shall be construed without regard to any presumption or other rule requiring construction against the Party who caused the document to be drafted. In the event of any ambiguity regarding the breadth of the releases and waivers in this Settlement, the Parties agree that such ambiguity shall be resolved by construing the releases and waivers broadly, as opposed to narrowly. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The use of the singular form of any word includes the plural and vice versa.

2.12 **Further Assurances**. The Parties shall execute and deliver any document or instrument reasonably requested by any of them after the date of the Settlement that may be necessary or desirable to obtain the approvals required hereby and consummate or effectuate the intent of this Settlement.

2.13 **Counterparts**. This Settlement may be executed by the Parties in separate counterparts, each of which, when executed and delivered, shall be an original, but which together shall constitute one and the same instrument. In addition, the facsimile transmission or the email transmittal of a validly signed counterpart (or the signature page(s) of an otherwise unmodified copy of this Settlement) shall be deemed conclusive evidence of execution, whether or not original signature copies are produced or delivered.

Docusign Envelope ID: 4D52BGDD-7A09-42AB-8C89-3B88A5F7D055

2.14   **Severability**. Should any provision of this Settlement be declared or be determined by any court to be illegal or invalid, the validity of the remaining parts, terms, or provisions shall not be affected thereby and said illegal or invalid part, term, or provision shall be deemed not to be a part of this Settlement.

2.15   **Captions**. The captions in this Settlement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of the intent of this Settlement.

2.16   **Attorneys' Fees**. Each Party shall bear its own attorney's fees and costs incurred in connection with the Claims and through the execution of the Settlement Agreement. In the event any litigation or other proceeding is brought for the interpretation or enforcement of this Agreement, or because of an alleged dispute, default, misrepresentation, or breach in connection with any of the provisions of this Agreement, the successful or prevailing Party shall be entitled to recover its reasonable attorneys' fees, costs, and expenses actually incurred and actually paid in connection therewith, in addition to any other relief to which he, she or they may be entitled.

*[signature page follows]*

**IN WITNESS WHEREOF**, the Parties hereunder enter into the Settlement:

**Front Range-Miday Solar Project, LLC**
    **(Buyer)**

By: _____

Print: Edgar Arvizu

Title: Chief Renewables Officer, VP


**Powin, LLC**
    **(Supplier)**

By: _____

Print: Chad Paulson

Title: General Counsel

*[Settlement Agreement – signature page]*

EXHIBIT _

*Obligee letterhead*

## <u>RELEASE</u>

Nationwide Mutual Insurance Company issued Bond No. 7901016779 in the amount of $4,747,017.20 (the "Bond") at the request of Powin, LLC, as Principal, for the benefit of Front Range-Midway Solar Project LLC, as obligee ("Obligee").

Obligee hereby fully and unconditionally discharges and releases the Bond and releases Nationwide Mutual Insurance Company, its parents, affiliates and subsidiaries ("Nationwide") from any and all past, present and future liability under said Bond. The undersigned warrants that he or she has the authority to execute this Release on behalf of the Obligee and to bind the Obligee hereunder.

_____
Signed by officer with requisite authority to sign on Obligee's behalf

*[Settlement Agreement – signature page]*