**DENTONS US LLP**

Lauren Macsoud (admitted)
101 JFK Parkway
Short Hills, NJ 07078
Telephone: (973) 912-7100
Facsimile: (973) 912-7199
Email: lauren.macsoud@dentons.com

Tania M. Moyron (admitted *pro hac vice*)
Van C. Durrer, II (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:  tania.moyron@dentons.com
          van.durrer@dentons.com

John D. Beck (admitted *pro hac vice*)
Sarah M. Schrag (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:  john.beck@dentons.com
          sarah.schrag@dentons.com

*Proposed Counsel for Debtors and
Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Amanda C. Glaubach (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  altogut@teamtogut.com
          aglaubach@teamtogut.com
          eblander@teamtogut.com

*Proposed Counsel for Debtors and
Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>Powin, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504], (iii) PEOS Holdings, LLC [5476], (iv) Powin China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [15241], (vii) Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [2495], (ix) Powin Energy Operating, LLC [6487] (x) Powin Energy Storage 2, Inc. [9926]; (xi) Powin Energy Ontario Storage II LP [5787]; and (xii) Powin Canada B.C. Ltd. [2239]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

**DEBTORS' WITNESS AND EXHIBIT LIST FOR HEARING ON AUGUST 6, 2025 AT
11:30 A.M. (PREVAILING EASTERN TIME) ON DEBTORS' MOTION FOR APPROVAL OF
KEY EMPLOYEE RETENTION PLAN AND KEY EMPLOYEE INCENTIVE PLAN**

Powin, LLC and the affiliated debtors and debtors in possession (collectively, the
"Debtors") under chapter 11 of title 11 of the United States Code §§ 101 et seq. (the "Bankruptcy
Code"),[2] in the above-referenced chapter 11 cases (the "Chapter 11 Cases"), hereby files this
witness and exhibit list (the "Witness and Exhibit List") for the hearing scheduled for August 6,
2025, at 11:30 a.m. (prevailing Eastern Time) for the *Motion of Debtors for Entry of Order (I)
Approving Key Employee Retention Plan and Key Employee Incentive Plan and (II) Granting
Related Relief* [Docket No. 493] (the "KEIP/KERP Motion"), before the Honorable Michael B.
Kaplan at the United States Bankruptcy Court for the District of New Jersey, Courtroom 8, 402
East State Street, Trenton, N.J. 08608 (the "Hearing").

## WITNESSES

The Debtors may call the following witnesses at the Hearing:

1. Brian Kane;

2. Gerard Uzzi;

3. Any witnesses called or listed by any other party; and

4. Any impeachment or rebuttal witnesses.

## EXHIBIT LIST

The Debtors may offer into evidence any one or more of the following exhibits:

| Exhibit | Description | Off. | Obj. | Adm. | Docket No. |
|---|---|---|---|---|---|
| 1. | *Motion of Debtors for Entry of Order (I) Approving Key Employee Retention Plan and Key Employee Incentive Plan and (II) Granting Related Relief* | | | | 493 |

---

[2] All references to "§" and "section" are to sections of the Bankruptcy Code unless otherwise specified herein.  All
references to "Rules" are to the Federal Rules of Bankruptcy Procedure.

| Exhibit | Description | Off. | Obj. | Adm. | Docket No. |
|---|---|---|---|---|---|
| 2. | Proposed Order for KEIP/KERP Motion | | | | |
| 3. | *Declaration of Gerard Uzzi in Support of Emergency First Day Motions of the Debtors* | | | | 13 |
| 4. | *Declaration of Gerard Uzzi* | | | | 493 |
| 5. | First Day Hearing Transcript | | | | |
| 6. | *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief* | | | | 7 |
| 7. | Notice of Winning Bidder | | | | 591 |
| 8. | KEIP Orders | | | | |
| 9. | KERP Orders | | | | |
| 10. | Any document or pleading filed in the above-captioned chapter 11 case including any transcripts of proceedings or testimony | | | | |
| 11. | Any exhibit listed by any other party | | | | |
| 12. | Rebuttal exhibits as necessary | | | | |

## RESERVATION OF RIGHTS

The Debtors reserve the right to call or to introduce one or more, or none, of the witnesses and exhibits listed above, and further reserve the right to amend or supplement this Witness and Exhibit List at any time prior to the Hearing.  Designation of any exhibit above does not waive any objections the Debtors may have to any exhibit listed on any other party's exhibit list.

Dated: August 1, 2025

**DENTONS US LLP**

*/s/ Lauren Macksoud*
Lauren Macksoud (admitted)
101 JFK Parkway
Short Hills, NJ 07078
Telephone: (973) 912-7100
Facsimile: (973) 912-7199
Email: lauren.macksoud@dentons.com

Tania M. Moyron (admitted *pro hac vice*)
Van C. Durrer, II (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:  tania.moyron@dentons.com
            van.durrer@dentons.com

John D. Beck (admitted *pro hac vice*)
Sarah M. Schrag (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:  john.beck@dentons.com
            sarah.schrag@dentons.com

-and-
**TOGUT, SEGAL & SEGAL LLP**
Frank A. Oswald (admitted)
550 Broad Street, Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  altogut@teamtogut.com
            eblander@teamtogut.com

*Proposed Counsel for Debtors and*
*Debtors in Possession*

4

## **Exhibit 1**

(Motion of Debtors Approving Key Employee Retention
Plan and Key Employee Incentive Plan)

**DENTONS US LLP**

Lauren Macksoud (admitted)
101 JFK Parkway
Short Hills, NJ 07078
Telephone: (973) 912-7100
Facsimile: (973) 912-7199
Email:  lauren.macksoud@dentons.com

Tania M. Moyron (admitted *pro hac vice*)
Van C. Durrer, II (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:   tania.moyron@dentons.com
            van.durrer@dentons.com

John D. Beck (admitted *pro hac vice*)
Sarah M. Schrag (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:   john.beck@dentons.com
            sarah.schrag@dentons.com

*Proposed Counsel for Debtors and
Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:   frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Amanda C. Glaubach (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:   altogut@teamtogut.com
            aglaubach@teamtogut.com
            eblander@teamtogut.com

*Proposed Counsel for Debtors and
Debtors in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>Powin, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504], (iii) PEOS Holdings, LLC [5476], (iv) Powin China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [15241], (vii) Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [22495], (ix) Powin Energy Operating, LLC [6487] (x) Powin Energy Storage 2, Inc., [9926]; (xi) Powin Energy Ontario Storage II LP,


2516137250723000000000023

**MOTION OF DEBTORS FOR ENTRY OF ORDER
(I) APPROVING KEY EMPLOYEE RETENTION PLAN AND
KEY EMPLOYEE INCENTIVE PLAN AND (II) GRANTING RELATED RELIEF**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Powin, LLC and the affiliated debtors and debtors in possession (collectively, the
"Debtors") in the above-referenced chapter 11 cases (the "Chapter 11 Cases") hereby move (the
"Motion"), pursuant to §§ 363(b) and 503(c) under chapter 11 of title 11 of the United States Code
§§ 101 *et seq.* (the "Bankruptcy Code"),[2] for a final order in the form attached hereto as **Exhibit
A** (the "Order"): (i) approving the Debtors' proposed key employee retention plan (the "KERP")
for certain employees (the "KERP Participants"); (ii) approving the Debtors' proposed key
employee incentive plan (the "KEIP") for certain employees (the "KEIP Participants"); and (iii)
granting related relief.  In further support of the Motion, the Debtors respectfully state as follows:

## I.    PRELIMINARY STATEMENT

1.      The Debtors entered these Chapter 11 Cases with a substantially-reduced
workforce, without DIP financing and without any bids to buy their assets.  Thanks to the heroic
efforts of the Debtors' remaining employees, the Debtors now have financing and are pursuing an
orderly, but speedy, sale process.  As the Debtors have emphasized from the beginning of these
Chapter 11 Cases, they need all of their employees to remain and be incentivized in order to
maximize sale value and creditor-recovery.   Therefore, the Debtors have developed the KERP
and KEIP in order to pay all of their employees an equal percentage – ten (10) – of salary due upon
any sale closing for the KERP Participants and that is earned by KEIP Participants for compliance

---

[5787]; and (xii) Powin Canada B.C. Ltd. [2239].  The Debtors' mailing address is 20550 SW 115th Avenue Tualatin,
OR  97062.

[2] All references to "§" or "section" herein are to sections of the Bankruptcy Code.  All references to "Bankruptcy
Rules" are to provisions of the Federal Rules of Bankruptcy Procedure.  All references to "Local Rules" are to
provisions of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of New Jersey (the
"Court").

with the DIP budget and for closing a sale in excess of $40 million in cash or cash considerations. The total cost for the Debtors, if all milestones are hit and all Employees remain, will be approximately $1.2 million. This is a good investment. The Debtors cannot sell their assets without their employees, and the KERP and the KEIP are reasonable and necessary for the success of the sale process and the Chapter 11 Cases.

2. In support of this Motion, the Debtors rely upon and refer this Court to the Declaration of Gerald Uzzi (the "Uzzi Declaration") and the *Declaration of Gerard Uzzi in Support of Emergency First Day Motions* (the "First Day Declaration"). [Docket No. 13].

## II.    JURISDICTION AND VENUE

3. The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference* from the United States District Court for the District of New Jersey dated as of September 18, 2012. The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4. Venue of the Chapter 11 Cases and related proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The predicates for the relief requested herein are sections 105(a), 363(b) and 503(c).

## III.    BACKGROUND

### A.    General Background

6. On June 9 and 10 (as applicable, the "Petition Date"), the Debtors each commenced

3

a voluntary case for relief under chapter 11 of the Bankruptcy Code.[3]  The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.    Additional information regarding the Debtors, including their business and the events leading to the commencement of these Chapter 11 Cases is set forth in the First Day Declaration.

8.    On June 27, 2025, the Office of the United States Trustee (the "UST") appointed an official committee of unsecured creditors (the "Committee") [Docket No. 174].

**B.    Specific Background**

**a.    The Debtors' Employees**

9.    Before the Petition Date, the Debtors significantly reduced their workforce.  The Debtors also issued multiple pre-petition notices under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Chapter 23 (the "WARN Act").

10.    The Debtors undertook their largest reduction-in-force on June 6, 2025, wherein they terminated 285 employees.

11.    The Debtors' remaining seventy-two (72) Employees represent approximately 15% of the Debtors' workforce compared to January 1, 2025.  These Employees remain because they are critical for operating and maintaining the value of the Debtors' business. The  Employees largely support the project and technology branches of their services business.  Further, the Debtors employ the five (5) KEIP Participants, who manage the Debtors' business. *See infra.*    The Employees cannot be replaced, and without the Employees' services, the Debtors will no longer be able to provide products and services to their customers.

---

[3] Lead Debtor Case No. 25-16137 (MBK) for Debtor Powin Project LLC was filed on June 9, 2025, and the remaining Debtors were thereafter on June 10, 2025 and June 22, 2025, as applicable (Powin Energy Storage 2, Inc., Powin Energy Ontario Storage II LP, and Powin Canada B.C. Ltd. filed on June 22, 2025).

12.    As a part of their first-day relief, the Debtors filed their Wage Motion.[4]  The Wage

Motion sought authorization to pay Employees in the ordinary course and make certain payments

to Employees on account of prepetition obligations.  On July 15, 2025, the Court entered a final

order granting the Wage Motion.  [Docket No. 395].

13.    Though the Debtors' Employees ordinarily receive compensation through base

salary and bonus, in the Wage Motion the Debtors did not seek approval to pay bonuses to

Employees.  Instead, in the Wage Motion, the Debtors stated: "Soon, the Debtors anticipate filing

a motion seeking authorization to further retain and incentivize employees through bonuses to be

issued under newly designed 'KEIP' and 'KERP' programs."  Wage Motion at ¶ 1.  At the first-

day, interim hearing for the Wage Motion, counsel for the Debtors stated: "[T]he employees here

are our priority, and retaining and incentivizing them [is] a top priority in the case.  [The Debtors]

hope to develop and file further retention and incentive programs."  *See* Tr. of June 11, 2025

Hearing at 36-37.

14.    Even with the relief provided in the Wage Motion, the Debtors have still

experienced attrition, with at least sixteen resignations since the Petition Date and numerous other

Employees expressing concern or previewing their potential resignation to the Debtors.   During

the Chapter 11 Cases, the Debtors' own customers, in fact, have approached and hired away several

of the Debtors' skilled Employees.

15.    On June 12, 2025, a former employee filed the adversary proceeding of a proposed

class action against the Debtors asserting violations of the WARN Act.  *See* Case No. 25-01249

(Bankr. D. N.J.).

---

[4] *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief* [Docket No. 7] (the "Wage Motion").

### b.     The DIP Financing

16.     On July 15, 2025, the Court ruled that it would approve, on a final basis, the

Debtors' DIP Facility (as defined in Docket No. 169) with FlexGen Power Systems, LLC (the

"<u>DIP Lender</u>").  Under the final DIP Facility, the Debtors are required to comply with a budget

(the "<u>Approved Budget</u>").

### c.     The Sale Process

17.     On June 27, 2025, the Debtors filed a motion [Docket No. 228][5] seeking approval

of "<u>Bidding Procedures</u>" (as defined in Docket No. 413), including approval of a "<u>Stalking Horse</u>

<u>APA</u>" (as defined in Docket No. 413) with the "<u>Stalking Horse Bidder</u>" (as defined in Docket No.

413).  Under the Bidding Procedures, in order for the Debtors to complete a Sale Transaction (these

terms are used herein as defined in the Bidding Procedure Motion).  On July 3, 2025, the Debtors

filed an amended Bidding Procedures Order (these terms are used herein as defined in the Bidding

Procedures Motion).  Docket No. 257-1.

18.     On July 7, 2025, the Debtors filed the Stalking Horse APA.  Docket No. 271,

Exhibit A.  Under the Stalking Horse APA, the Stalking Horse Bidder has discretion to offer

employment to "certain of the Current Employees to support the continuation of the Business."

*Id.* at § 6.4(a).  Under the Stalking Horse APA, the Stalking Horse Bidder may terminate the APA

if the Sale Order (as defined in the Stalking Horse APA) is not entered by August 7, 2025.  *Id.* at

§ 8.1(e).

---

[5] *Motion of the Debtors for Entry of an Order (I) Designating a Stalking Horse Bidder and Approving Stalking Horse Bidder Protections (II) Approving Bidding Procedures by Which Interested Parties May Bid and an Auction Sale Format in Connection with the Sale of Substantially All of the Debtors' Assets, (III) Approving Form of Asset Purchase Agreement, (IV) Approving Form of Notice to be Provided to Interested Parties, (V) Authorizing the Assumption and Assignment of Assumed Contracts and Notice Procedures Thereto, (VI) Scheduling a Court Hearing to Consider Approval of the Sale to the Highest and Best Bidder, and (VII) Authorizing the Sale of Debtors' Property Free and Clear of All Causes of Action and Claims* (the "<u>Bidding Procedures Motion</u>").

19.     On July 17, 2025, the Court entered the Bidding Procedures Order approving the Bidding Procedures.  [Docket No. 413].  The Court set a Sale Hearing (as defined in the Bidding Procedures) for August 6, 2025.  *Id.*

20.     Upon information and belief, the Stalking Horse Bidder, if they are the winning bidder, will not offer employment to all of the Employees given redundancies with the Stalking Horse Bidder's business.  If no offer is given by a winning bidder, the Debtors, having sold their assets, will be forced to terminate the positions of these employees without cause (with such terminated employees, the "Terminated Employee").  During and after the sale process, the Debtors have and will continue to be transparent with Employees whose position may or will be terminated after a sale.

21.     The Debtors are actively conducting their sale process.  Multiple bidders have inquired regarding whether and how the Debtors will retain employees through closing.  These bidders recognize the value that all the employees provide to preserving value of the business, whether those employees are selected or not to continue on working for any given bidder.

**d.     The Development of the KERP and KEIP.**

22.     From the beginning of the Chapter 11 Cases, the Debtors have determined that there is an acute need to retain and incentivize their key employees for the success of their Chapter 11 Cases (*see* infra concerning the roles of the KERP Participants and KEIP Participants).

23.     The Debtors enlisted the services of Uzzi & Lall ("Uzzi & Lall") and their investment banker Huron Transaction Advisory LLC ("Huron") to support the development of the KERP and KEIP.  The Debtors and their professionals, including Uzzi & Lall and Huron, reviewed and considered: (i) the Debtors' financial resources and employment requirements during these Chapter 11 Cases; (ii) the views of the Debtors' management with respect  to what was necessary and appropriate to achieve the stated goals and (iii) employee programs approved by bankruptcy

courts.  As discussed *infra*, the KERP and the KEIP, unlike many other plans that disproportionally

reward a small number of employees, provide bonuses to all employees.   The Debtors made this

decision given the limited amount of remaining employees and the willingness of management to

support such programs.  The KERP and KEIP were therefore designed to enable the success of the

Chapter 11 Cases while recognizing the economic realities of the Chapter 11 Cases.

24.     The Debtors presented the KERP and KEIP for consideration to the Debtors'

independent director (the "<u>Independent Director</u>") who approved the programs.

25.     The Debtors also consulted with and addressed questions from the Committee, in

developing the KERP and the KEIP.  The Debtors will engage with and provide reasonable

information about the KERP and the KEIP to the Committee, the Office of the United States

Trustee and other stakeholders in an effort to obtain their consent or at least eliminate or minimize

any objection to the KERP and KEIP.

> **e.     The KERP**

> > ***i.     The KERP Participants and their Value***

26.     The Debtors have identified sixty-seven (67) Employees as KERP Participants.

The KERP Participants are all the Employees of the Debtors that are not KEIP Participants.

27.      The KERP Participants are integral to the Debtors' business.   The KERP

Participants, unlike the majority of the Debtors' pre-petition employees, remain because the

Debtors determined their services were necessary to the success of the Debtors' Chapter 11 Cases

and the sale process.  From an operational standpoint, the Employees are necessary for the Debtors

to have the capacity to answer customer questions and manage servicing of the Debtor's assets and

contracts.  From a sale-process standpoint, the Employees will maintain going-concern value,

including concerning transitioning the assets to new operations and maintaining customer support,

and as needed, will assist the Debtors' leadership in responding to inquiries concerning diligence

28.      The KERP Participants are not responsible for setting company policy and generally do not attend senior management meetings or participate in meetings of the Debtors' Board of Directors or any of its committees.  In fact, many of the KERP Participants' duties are limited to implementing tasks within a particular division or department.  As such, their titles reflect their relative position below upper management and functions within the organization and do not reflect any real insider status or responsibility.

*ii.*      *The Terms of the KERP*

29.      Under the proposed KERP, each KERP Participant will receive monetary awards (the "KERP Award(s)") (with such payments of the KERP Awards, the "KERP Payment(s)").

30.      KERP Participants will earn a KERP Award of ten (10) percent of the their annual salary through one or more payment(s) upon a closing of a Sale Transaction (the "Closing"), which KERP Award will be payable at or shortly after a Closing (the "KERP Retention Bonus").

31.      If the KERP Participant voluntarily leaves employment prior to the Closing, or such KERP Participant is terminated for cause, that KERP Participant will forfeit the entire KERP Award.  For the avoidance doubt, the termination of a KERP Participant because of redundancies of a Sale Transaction and/or the failure of any Buyer to offer employment to a KERP Participant after a Closing will not be considered termination "for cause."[6]   Neither the (i) termination of the employment of a KERP Participant without cause nor (ii) death or disability shall affect any right of a KERP Participant to a KERP Award, and KERP Awards will be earned upon the occurrence of any triggering event(s), regardless of whether the event(s) occurred after (i) termination without cause or (ii) death or disability.

---

[6] For purposes of the KEIP and KERP, "cause" means (i) failure to materially perform the duties for which they are employed, (ii) willful violation of a material policy of the Debtors, (iii) commission of any act or acts of fraud, embezzlement, dishonesty, or other willful misconduct, (iv) material breach of any of their obligations under any written agreement or covenant with the Debtors, or (v) an act of dishonesty resulting or intended to result, directly or indirectly, in their gain for personal enrichment at the expense of the Debtors.

32.     If every KERP Participant remains eligible, total KERP Payments are estimated to be $993,936 (the "<u>KERP Maximum</u>").  The KERP Maximum, however, shall be reduced dollar for dollar based upon attrition due to termination for cause or resignation.

33.     KERP Payments will be made after payments of the secured amounts owed to the Debtors Prepetition Secured Parties (as defined in the First Day Declaration) (or applicable holders) and DIP Lender.

        **f.**        **The KEIP**

             *i.*        *The KEIP Participants and their Value*

34.     The KEIP Participants are five (5) members of the Debtors' senior leadership team, consisting of the Debtors' (i) Chief Executive Officer, (ii) General Counsel, (iii) Chief Financial Officer, (iv) Chief Operating Officer and (v) Head of Human Resources. This team is responsible for executing the Debtors' operating and strategic plans, including maintaining the Debtors' business operations with reduced staff, overseeing and addressing issues during these Chapter 11 Cases, interfacing with customers, and maintaining a culture among the Debtors' employees during these Chapter 11 Cases.  In addition, the KEIP Participants shoulder the burden of moving the Debtors' sale forward, answering bidder questions and providing information to the Debtors' professionals.  The KEIP Participants are vital to the on-going stability, continuity, and strength of the Debtors during these Chapter 11 Cases and the sale process.

35.     This challenge is compounded by the nature of the Debtors' business, which is built on trust, reputation and communication that the KEIP Participants have earned from counterparties. Vendors, partners and customers may be cautious to continue to do business with the Debtors in the face of a challenging market and press coverage.  The KEIP Participants have offset such fears through outreach and open communication with their employees and customers, and, now, will do the same when communicating with bidders.

g.      **Terms of the KEIP**

36.      Under the proposed KEIP, the KEIP Participants may earn bonuses (the "<u>KEIP Award(s)</u>," and with payments of these amounts as the "<u>KEIP Payment(s)</u>").  A KEIP Participant may earn up to two KEIP Bonuses: (i) a KEIP Bonus earned upon compliance with DIP Financing milestones and parameters (the "<u>KEIP DIP Bonus</u>"); and/or (ii) a KEIP Bonus payable upon a Closing (the "<u>KEIP Sale Bonus</u>").

37.      The KEIP DIP Bonus will be earned if the Debtors comply with the Approved Budget before Closing, and will be payable at or shortly after Closing (when it is anticipated that the DIP Facility will be repaid).   The KEIP DIP Bonus for each eligible KEIP Participant will be five (5) percent of their annual salary.

38.      The KEIP Sale Bonus will be earned upon the occurrence of a  successful closing under which the Debtors receive proceeds of $40 million or greater in cash or cash equivalents (including retirement of secured debt) (a "<u>Successful Closing</u>") and will be payable at or shortly after a Successful Closing.  The KEIP Sale Bonus for each eligible KEIP Participant will be five (5) percent of their annual salary.

39.      Therefore, each KEIP Participant may earn up to ten (10) percent of their salaries if the Debtors perform under the Approved Budget and execute a Successful Closing.   The maximum amount payable under the KEIP is estimated to be $205,500 (the "<u>KEIP Maximum</u>").

40.      If a KEIP Participant is terminated for "cause," or voluntarily ends his or her employment, he or she will not receive any future KEIP Award.  For the avoidance doubt, the termination of a KERP Participant because of redundancies of a Sale Transaction and/or the failure of any Buyer to offer employment to a KERP Participant after a Closing will not be considered termination "for cause."   Neither the (i) termination of the employment of a KEIP Participant without cause nor (ii) death or disability shall affect any right of a KEIP Participant to a KEIP

Award, and KEIP Awards will be earned upon the occurrence of any triggering event(s), regardless

of whether the event(s) occurred after (i) termination without cause or (ii) death or disability.

41.    KEIP Payments will be made after payments of the secured amounts owed to the

Debtors Prepetition Secured Parties (as defined in the First Day Declaration) (or applicable

holders) and DIP Lender.

## II.    RELIEF REQUESTED

42.    By this Motion, pursuant to §§ 105(a), 363(b) and 503(c)(1) and Bankruptcy Rule

6004, the Debtors request the entry of the Order (i) approving the KERP and KEIP, and

(ii) granting related relief, including, but not limited to, granting the Debtors discretion to

effectuate the KERP and KEIP.

## III.    BASIS FOR RELIEF

### A.    The KERP Is Warranted Under Sections 363(b)(1) and 503(c)(3) as an Appropriate Exercise of the Debtors' Business Judgment.

43.    "The [debtor], after notice and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate," as long as the debtor can "show that a sound

business purpose justifies such actions." 11 U.S.C. § 363(b)(1); *Dai-Ichi Kangyo Bank, Ltd. v.*

*Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153

(D. Del. 1999). Where there is a reasonable basis for a debtor's business decisions, courts

generally do not contradict the proposed course of conduct. *Stanziale v. Nachtomi (In re Tower*

*Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business

judgment rule on the merits is a near-Herculean task.").[7]

---

[7] Section 503(c)(3) is in harmony with section 363(b) by prohibiting transfers made to officers, managers, consultants, and others that are not justified by the facts and circumstances of the case. *See* 11 U.S.C. § 503(c)(3). Section 503(c)(3)'s "facts and circumstances" justification test "creates a standard no different that the business judgment standard under section 363(b)" of the Bankruptcy Code. *In re Borders Group, Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011) (citations omitted); *In re Nobex Corp.*, Case No. 05-20050 (MFW), 2006 WL 4063024, at * 3 (Bankr. D. Del. Jan. 19, 2006) (concluding that the standard under section 503(c)(3) reiterates the business judgment standard).

44.     The reasonable use of bonuses like the KERP Payments are considered a proper exercise of a debtor's business judgment.  *See In re Global Home Prods., LLC*, 369 B.R. 778, 784 (Bankr. D. Del. 2007) (citing *In re U.S. Airways, Inc.*, 329 B.R. 793, 795 (Bankr. E.D. Va. 2005)). The Debtors designed the KERP to motivate employees to stay and perform during these Chapter 11 Cases and the upcoming sale process.  The KERP provides a fair amount of a retention premium given the uncertainty created by the Chapter 11 Cases paired with the market-value of the KERP Participants' skills.  *See generally In re Glob. Aviation Holdings Inc.*, 478 B.R. 142, 151 (Bankr. P. Del. 2009)("no showing of a bona fide job offer or any other evidence of an intent to leave is required to pay a bonus to non-insiders [under a KERP]") (finding KERP reasonable under business judgment where Debtors concluded that "at least one" KERP employee would, without the KERP, leave).  Thus, the KERP should be approved under section 363(b).  *See, e.g., In re Mesa Air Group, Inc*., Case No. 10-10018 (MG), 2010 WL 3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010)(bonus payments were "'justified by the facts and circumstances of the case' under section 503(c)(3) [where] they [were] within the 'sound business judgment' of the Debtors" (citation omitted)).

45.     In approving the KERP, the Debtors considered the economic realities of the Chapter 11 cases, so that the KERP is similar to retention plans approved in other courts and in this district.  *See In re Sam Ash Music Corp.*, Case No. 24-14727 (SLM) (Bankr. D.N.J. June 13, 2024) (approving KERP for ten (10) percent of salary for 21 employees in aggregate of $234,000); *In re Agway Farm & Home Supply, LLC*, Case No. 22-10602 (JKS) (Bankr. D. Del. Nov. 21, 2022) (debtor had terminated approximately half of employees before filing for bankruptcy and undertook sale process in bankruptcy) (approving KERP for fourteen employees in aggregate of $285,000); *In re SLT HoldCo, Inc.*, Case No. 20-18368 (MBK) (Bankr. D. N.J. July 22, 2020) (approving KERP for $217,284 for eight (8) employees during sale process, ranging from

13

approximately 17 to 25% of the employees' salary); *In re MobiTV*, Case No. 21-10457 (LSS)

(Bankr. D. Del. Apr. 7, 2021) (approving KERP for all non-insider employees after debtor had

reduced its workforce pre-petition) (awards ranged from 5.0% to 25.1% of their base salary); *In re

Oneweb Global Limited, et. al.*, Case No. 20-22437 (RDD) (Bankr. S.D.N.Y. May 29, 2020)

(debtors executed prepetition RIF of 90% of workforce, and Court approved (i) KERP for 47

remaining employee totaling $3 million (40% of salary paid in quarterly installments); *In re KB

Toys, Inc.*, No. 08-13269 (KJC) (Bankr. D. Del. Jan. 6, 2009) (approving retention plan for 28 non-

insider employees contemplating payments of approximately $300,000); *In re Mervyn's Holdings,

LLC*, No. 08-11586 (KG) (Bankr. D. Del. Oct. 30, 2008) (approving retention plan for 93 non-

insider employees contemplating payments of approximately $1.3 million).[8]

> **B.     Because the KERP does not Include Insiders, it is not Subject to §§ 503(c)(1)
> and (2) of the Bankruptcy Code**

46.     The KERP is not subject to the restrictions set forth in sections 503(c)(1) and (2)

because the KERP is not applicable to any "insiders" (as such term is defined by § 101(31)).

Generally, the Bankruptcy Code defines an "insider" to include, among other things, "an officer

of the debtor" and a "person in control of the debtor." 11 U.S.C. § 101(31). Courts have also

concluded that an employee may be an "insider" if that employee has "at least a controlling interest

in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiedly dictate

corporate policy and the disposition of corporate assets." *In re Velo Holdings, Inc.*, 472 B.R. 201,

208 (Bankr. S.D.N.Y. 2012) (citation omitted) (emphasis added).

47.     Although certain of the KERP Participants hold titles such as "manager" they do

not take part in the strategic management or decide "critical financial decisions" of the Debtors,

and thus are not "insiders" within the meaning of the Bankruptcy Code. *See In re Foothills Texas,*

---

[8] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

*Inc.*, 408 B.R. 573, 579 (Bankr. D. Del. 2009) (the "mere title of a person does not end the inquiry" of whether they are an insider) (cited by *In re Glob. Aviation Holdings Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) ("[T]itles such as 'vice president' are not determinative [as to insider status].")). For example, in *In re NMI Systems, Inc.*, 179 B.R. 357, 370 (Bankr. D.D.C. 1995), the court found that a vice president was not an insider because [et. al. he was not] 'in the inner circle making the company's critical financial decisions.'"). The KERP Participants' respective scopes of authority are limited and their titles reflect only their relative position below upper management and functions within the organization and not any real insider status or responsibility.

**C.    The KEIP Is Warranted Under Sections 363(b)(1) and 503(c)(3) as an Appropriate Exercise of the Debtors' Business Judgment.**

48.    Likewise, the KEIP is reviewed under a business judgment standard, and here, the KEIP represents a sound exercise of the Debtors' business judgment. *See In re Global Home Prods., LLC*, 369 B.R. at 784 (reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment) (citing *In re U.S. Airways, Inc.*, 329 B.R. 793, 795 (Bankr. E.D. Va. 2005)). The KEIP is an incentive plan for five (5) key employees that is designed to motivate them to achieve the best possible outcome of an expedient and lucrative sale in these Chapter 11 Cases. Consequently, the KEIP is not prohibited under the inapplicable § 503(c)(1) (concerning solely retentive programs) or § (c)(2) (concerning severance programs), but, rather, is permitted under § 503(c)(3). *See, e.g., In re Alpha Natural Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) ("On its face, § 503(c)(1) does not apply to a KEIP because the payments thereunder are incentive and not purely retentive."); *In re Nobex Corp.*, 2006 Bankr. LEXIS 417, at *8 (Bankr. D. Del. Jan. 19, 2006) ("The sale-related incentive pay to [senior management] is not governed by §§ 503(c)(1) or 503(c)(2) of the Bankruptcy Code."). The Debtors, in their sound business judgment, believe that the implementation of the KEIP is well

justified under the circumstances and will benefit the Debtors' estates and their creditor constituencies; and therefore the Court should approve the KEIP.

> **a.    Approval of the Proposed KEIP Is Justified by the Facts and Circumstances of these Chapter 11 Cases and Therefore Satisfies § 503(c)(3).**

49.    Section 503(c)(3) prohibits transfers or obligations outside the ordinary course of business "not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition." 11. U.S.C. § 503(c)(3).  As discussed, the majority of other courts have found that this standard is no different from the business judgment standard under § 363(b).  *See Global Home Prods.*, 369 B.R. at 783-84; *In re Nobex Corp.*, 2006 Bankr. LEXIS 417.  Section 503(c)(3) was a reiteration of the standard under § 363 under which courts had previously authorized transfers outside the ordinary course of business based on the business judgment of the debtor); *see also In re Velo Holdings, Inc.*, 472 B.R. at 212 (collecting cases).  Given the presumption of good faith for a debtor, courts presume that "an incentive plan established postpetition by a debtor-in-possession for the benefit of senior management is in the ordinary course of the Debtors' business."  *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 798 (Bankr. D. Del. 2007).

> **b.    The Dana Factors.**

50.    Relatedly, courts assessing a debtor's business judgment relating to an incentive program under § 503(c)(3) look at six factors (the "Dana Factors"): (a) whether a reasonable relationship existed between the proposed plan and the desired results; (b) whether the cost of the plan was reasonable in light of the overall facts of the case; (c) whether the scope of the plan was fair and reasonable; (d) whether the plan was consistent with industry standards; (e) whether the debtor had put forth sufficient due diligence efforts in formulating the plan; and (f) whether the

debtor received sufficient independent counsel in performing any due diligence and formulating the plan.  *See e.g. In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006).

       **c.**       **The KEIP Satisfies Each of the Dana Factors.**

51.      ***Factor (a): The KEIP is Structured to Achieve the Desired Performance and is an Incentive Plan***.  The KEIP Participants are essential to the Debtors' operations and their services are necessary to maximize the value of these Debtors' estates.  The KEIP establishes the goal of an efficient closing for the KEIP Participants that, if achieved, will have a meaningful impact on the Debtors' restructuring efforts.  The conditions to earn the KEIP Bonuses are not only essential for success in these Chapter 11 Cases, they also require substantial outperformance and dedication by the KEIP Participants through Closing.[9]

52.      The KEIP Participants have already worked strenuously to get the Debtors to the precipice of a sale process, with the valuable Stalking Horse APA and the DIP Facility in hand. This is a remarkable achievement given the state of affairs on the Petition Date (with no offer and no DIP financing).  Where the Debtors have broadcast their desire to file and make payments under the KEIP from the Petition Date forward, the fact that, as of the filing of this Motion, a portion of performance objectives have become more achievable, resulting *from work performed by management*, does not indicate that the targets were insufficiently aspirational.

53.      The KEIP Participants have stayed with the Debtors and worked hard and worked well.  This hard work has been in part because, to incentive the employees, Debtors told their KEIP Participants they would be rewarded through a KEIP both privately and in public (such as

---

[9] The KEIP was not designed to retain the KEIP Participants, although a prerequisite to receiving a payment under the KEIP is that the KEIP Participant must be employed at the time of the payment unless such employee's employment was terminated without cause.  *See, e.g., In re Global Home Prods., LLC*, 369 B.R. at 786 ("The fact, as Debtors pointed out, that all compensation has a retention element does not reduce the Court's conviction that Debtors' primary goal [is] to create value by motivating performance.  All companies seek to retain employees they value by fairly compensating them.").

at the Wage Motion hearing). This fluid situation is closely analogous to that of *In re Aralez Pharm. US Inc.*, 18-12425 (MG), 2018 WL 6060356 (Bankr. S.D.N.Y. Nov. 19, 2018), where Judge Glenn considered a KEIP that had been developed and crafted weeks before the debtors actually filed their motion seeking approval of the same. In the interim, the debtors performed admirably on a financial basis and negotiated a stalking horse bid for $240 million. The debtors thus met certain budget metrics and a KEIP goal of a sale of $230 million before their motion was heard. Judge Glenn approved the KEIP and ruled:

> The Committee argues that the KEIP amounts to no more than a "layup." At the evidentiary hearing, the Committee claimed that several of the KEIP targets now appear achievable. They note that the Debtors now have $240 million of bids in hand and now estimate that they are on track to outperform the DIP Budget by increasing cash flow by $7-10 million. These figures would translate to payments of 81% of the KEIP Participants' base salaries.
>
> **The Court is unpersuaded that the targets are not sufficiently challenging because some of these targets now appear achievable in hindsight**. The Debtors explain that the KEIP Motion was not filed until roughly two months after the Petition Date because their post-petition financing facility required the Debtors to obtain the approval of their post-petition lenders before presenting the KEIP to the Court, and the post-petition lenders asked the Debtors to obtain stalking horse bids before seeking approval of the KEIP. (ECF Doc. 274 ¶ 1.) Once the KEIP Motion was filed, the hearing was delayed further to allow the Debtors to negotiate the terms of the KEIP with the U.S. Trustee. **The Court will not punish the Debtors for this delay by discounting the work the KEIP Participants have already performed. The Debtors and their financial advisors developed the KEIP in August 2018 [three months before decision] and the KEIP Participants operated with the understanding that the Debtors would be seeking authority to implement the KEIP. The Court sees no issue with reviewing a KEIP that was designed to incentivize work that is already partially performed.** *See In re Mesa Air Grp., Inc.*, 2010 WL 3810899, at \*3 (Bankr. S.D.N.Y. Sept. 24, 2010) (approving

18

incentive plan that awarded payments for services already
rendered).

*Id.* at **4-6 (emphasis added) (citations included).[10]

54.     ***Factors (b) and (c): The Costs and Scope of the KEIP Are Reasonable***.  The KEIP

concerns only five (5) employees, and is targeted towards those with the most macro-influence

over the Debtors' business and responsibility for achievement of Chapter 11 goals.  As to cost, the

KEIP Maximum of $ 205,500 is a fraction of the consideration provided in the Stalking Horse Bid.

The KEIP's cost and scope is also in line with the economic realities of these Chapter 11 Cases,

and the KEIPs is similar to those approved by this court and other courts in this District.  *In re Sam*

*Ash Music Corp.*, Case No. 24-14727 (SLM) (Bankr. D.N.J. June 13, 2024) (approving KEIP for

four employees in maximum aggregate of $107,000 for asset sales targeting at $10 million); *In re*

*Agway Farm & Home Supply, LLC*, Case No. 22-10602 (JKS) (Bankr. D. Del. Nov. 21, 2022)

(approving KEIP for President and CEO in maximum of two (2) percent of sale proceeds, up to a

maximum of $75,000 (24.6 of the executive's salary) payable upon closing of sales of substantially

all of the debtor's assets); *In re Ashley Steward Holdings, Inc.*, 2014 WL 2013372 (MBK) (Bankr.

D. N.J. Apr. 23, 2014) (for $23 million stalking horse bid, approving KEIP in aggregate of in range

of $350,000 to $1.4 million to ten employees);  *In re Revel AC, Inc.*, Case No. 14-22654 (MBK)

Bankr. D. N.J. June 30, 2014) (approving KEIP of aggregate amount of $1,525,000 for five (5)

employees for meeting cash flow goals and additional amount for sale closing above threshold

amount); *see also In re Velo Holdings Inc.*, 472 B.R. 201, 211 (Bankr. S.D.N.Y. 2012)  (approving

---

[10]Judge Glenn presaged his decision on the record in addressing objecting counsel's arguments regarding hindsight
of the likelihood of goals occurring: "The Key Employees certainly knew that the debtor was going to propose a
KEIP [later in the case, though the KEIP was yet] not approved … [Y]our [objecting counsel] argument would, it
seems to me, lead to a conclusion that you should not consider any work that the debtor's key employees have done
before this Court signs an order approving a KEIP.  And I have a problem with that." *In re Aralez Pharm. US Inc.*,
18-12425 (MG) [Docket No. 294 at 46](Bankr. S.D.N.Y. Nov. 14, 2018).

payment of 1% of sale proceeds to single executive under KEIP); *In re Alpha Nat. Res. Inc.*, 546 B.R. at 362 (KEIP of 60-175% of salary approved).

55.     ***Factors (d), (e), and (f):  The Debtors Developed the KEIP with Independent Advice and Oversight and were Diligent in this Development***.  The Debtors actively sought input from their advisors during the KEIP development process.  The Debtors, with the assistance of Uzzi & Lall and their other restructuring advisors, performed diligence on their Current Employees' existing compensation levels and other approved bankruptcy bonus plans vis-à-vis the Debtors' resources and Chapter 11 goals.

## IV.   WAIVER OF MEMORANDUM OF LAW

56.     The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

## V.   WAIVER OF RULE 6004

57.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

## V.   NOTICE

58.     Notice of this Motion will be provided to the following parties, or, in lieu thereof, their counsel, if known:  (i) the UST; (ii) the Committee; (iii) the Debtors' Stalking Horse Bidder; (iv) the Prepetition Secured Parties; (v) the known KERP and KEIP Participants; and (vi) those persons who have requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that no other or further notice need be provided.

# VI.  CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court: (i) enter the Order as set forth herein; and (ii) grant the Debtors such other and further relief is just and proper under the circumstances.

Dated: July 23, 2025               **DENTONS US LLP**

                                   */s/ Lauren Macksoud*
                                   Lauren Macksoud (admitted)
                                   101 JFK Parkway
                                   Short Hills, NJ 07078
                                   Telephone: (973) 912-7100
                                   Facsimile: (973) 912-7199
                                   Email: lauren.macksoud@dentons.com

                                   Tania M. Moyron (admitted pro hac vice)
                                   Van C. Durrer, II (admitted pro hac vice)
                                   601 S. Figueroa Street #2500
                                   Los Angeles, CA 90017
                                   Telephone:  (213) 623-9300
                                   Facsimile:  (213) 623-9924
                                   Email: tania.moyron@dentons.com
                                          van.durrer@dentons.com

                                   John D. Beck (pro hac vice pending)
                                   Sarah M. Schrag (pro hac vice pending)
                                   1221 Avenue of the Americas
                                   New York, NY 10020-1089
                                   Telephone:  (212) 768-6700
                                   Facsimile:  (212) 768-6800
                                   Email: john.beck@dentons.com
                                          sarah.schrag@dentons.com
                                   - and -

                                   **TOGUT, SEGAL & SEGAL LLP**
                                   Frank A. Oswald (admitted)
                                   550 Broad Street, Suite 1508
                                   Newark, NJ 07102
                                   Telephone:  (212) 594-5000
                                   Facsimile:  (212) 967-4258
                                   Email: frankoswald@teamtogut.com

21

Albert Togut (admitted pro hac vice)
Amanda C. Glaubach (admitted pro hac vice)
Eitan Blander (admitted pro hac vice)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  altogut@teamtogut.com
aglaubach@teamtogut.com
eblander@teamtogut.com

*Proposed Counsel for Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br>Powin, LLC, *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

### <u>DECLARATION OF GERARD UZZI</u>

I, Gerard Uzzi, hereby state and declare as follows:

1.       I am the Chief Restructuring Officer (the "<u>CRO</u>") of Powin, LLC ("<u>Powin</u>") and the above-referenced affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>"). I testify in support of the *Debtors' Motion for Entry of an Order (I) Approving Key Employee Retention Plan and Key Employee Incentive Plan and (II Related Relief* (the "<u>Motion</u>") (unless otherwise defined herein, all capitalized terms shall have the same meaning as in the Motion).

2.       Except as otherwise indicated herein, this declaration (the "<u>Declaration</u>") is based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors or the Debtors' advisors and professionals, and my opinion is based upon my experience, knowledge, and information concerning the Debtors' operations and this industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504], (iii) PEOS Holdings, LLC [5476], (iv) Powin China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [15241], (vii) Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [22495], (ix) Powin Energy Operating, LLC [6487] (x) Powin Energy Storage 2, Inc., [9926]; (xi) Powin Energy Ontario Storage II LP, [5787]; and (xii) Powin Canada B.C. Ltd. [2239].  The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR  97062.

3.      In incorporate my testimony in my previous *Declaration of Gerard Uzzi in Support of Emergency First Day Motions* (the "First Day Declaration").  [Docket No. 13].

4.      I am a Managing Partner and Founder of CBMN Advisors LLC d/b/a Uzzi & Lall ("Uzzi & Lall"). I have extensive experience advising companies, boards of directors, senior management, creditors, equity holders, and investors in stressed and distressed situations, including chapter 11, out-of-court work outs, and rescue financings across industries and jurisdictions. I also serve in a number of fiduciary capacities, including presently as the Chairman of the Celsius Litigation Oversight Committee.

5.      Prior to co-founding Uzzi & Lall, I was a senior restructuring partner at Milbank LLP and White & Case LLP for over 18 years in the aggregate. During that time, I was personally involved in senior roles in some of the nation's largest and most complex chapter 11 cases, including Lehman Brothers, Washington Mutual, American Airlines, Rescap, Charter Communications, Mirant, Adelphia Communications, Purdue Pharma, and ZAIS. I have been recognized for my work in Chambers, Euromoney's IFLR, The Legal 500, and Expert Guides as one of the World's Leading Insolvency and Restructuring Professionals.

6.      The Debtors entered these Chapter 11 Cases with a substantially-reduced workforce, without DIP financing and without any bids to buy their assets.  Thanks to the heroic efforts of the Debtors' remaining employees, the Debtors now have financing and are pursuing an orderly, but speedy, sale process.

7.      From the beginning of the Chapter 11 Cases, the Debtors have determined that there is an acute need to retain and incentivize their key employees for the success of their Chapter 11 Cases (*see infra* concerning the roles of the KERP Participants and KEIP Participants).   Both before the Chapter 11 Cases and before the Motion was filed, the Debtors have communicated to

Employees that the Debtors would develop and seek approval of retention and incentive bonus programs.

        **a.**      **The Debtors' Employees**

8.      Before the Petition Date, the Debtors significantly reduced their workforce.  The Debtors also issued multiple pre-petition notices under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Chapter 23 (the "<u>WARN Act</u>").

9.      The Debtors undertook their largest reduction-in-force on June 6, 2025, wherein they terminated 285 employees.

10.      The Debtors' remaining seventy-two (72) Employees represent approximately 15% of the Debtors' workforce compared to January 1, 2025.  These Employees remain because they are critical for operating and maintaining the value of the Debtors' business. The  Employees largely support the project and technology branches of their services business.  Further, the Debtors employ the five (5) KEIP Participants, who manage the Debtors' business. *See infra.*  The Employees cannot be replaced, and without the Employees' services, the Debtors will no longer be able to provide products and services to their customers.

11.      Though the Debtors' Employees ordinarily receive compensation through base salary and bonus, in the Wage Motion the Debtors did not seek approval to pay bonuses to Employees.  Instead, in the Wage Motion, the Debtors stated: "Soon, the Debtors anticipate filing a motion seeking authorization to further retain and incentivize employees through bonuses to be issued under newly designed 'KEIP' and 'KERP' programs."  Wage Motion at ¶ 1.  At the first-day, interim hearing for the Wage Motion, counsel for the Debtors stated: "[T]he employees here are our priority, and retaining and incentivizing them [is] a top priority in the case.  [The Debtors]

hope to develop and file further retention and incentive programs." *See* Tr. of June 11, 2025 Hearing at 36-37.

12.     Even with the relief provided in the Wage Motion, the Debtors have still experienced attrition, with at least sixteen resignations since the Petition Date and numerous other Employees expressing concern or previewing their potential resignation to the Debtors.   During the Chapter 11 Cases, the Debtors' own customers, in fact, have approached and hired away several of the Debtors' skilled Employees.

**b.     The Sale Process and the Need to Retain and Incentivize Employees**

13.     Upon information and belief, the Stalking Horse Bidder, if they are the winning bidder, will not offer employment to all of the Employees given redundancies with the Stalking Horse Bidder's business.  If no offer is given by a winning bidder, the Debtors, having sold their assets, will be forced to terminate the positions of these employees without cause (with such terminated employees, the "Terminated Employee").   During and after the sale process, the Debtors have and will continue to be transparent with Employees whose position may or will be terminated after a sale.

14.     The Debtors are actively conducting their sale process.  Multiple bidders have inquired regarding whether and how the Debtors will retain employees through closing.   These bidders recognize the value that all the employees provide to preserving value of the business, whether those employees are selected or not to continue on working for any given bidder.

**c.     The Development of the KERP and KEIP**

15.     The Debtors enlisted Uzzi & Lall and their investment banker Huron Transaction Advisory LLC ("Huron") to support the development of the KERP and KEIP.  The Debtors,  their professionals and I reviewed and considered: (i) the Debtors' financial resources and employment

3

requirements during these Chapter 11 Cases; (ii) the views of the Debtors' management with respect to what was necessary and appropriate to achieve the stated goals; and (iii) employee programs approved by bankruptcy courts.

16.    These comparable plans include various cases in this district and other districts, including, as the KERP: *In re Sam Ash Music Corp.*, Case No. 24-14727 (SLM) (Bankr. D.N.J. June 13, 2024) (approving KERP for ten (10) percent of salary for 21 employees in aggregate of $234,000); *In re Agway Farm & Home Supply, LLC*, Case No. 22-10602 (JKS) (Bankr. D. Del. Nov. 21, 2022) (debtor had terminated approximately half of employees before filing for bankruptcy and undertook sale process in bankruptcy) (approving KERP for fourteen employees in aggregate of $285,000); *In re SLT HoldCo, Inc.*, Case No. 20-18368 (MBK) (Bankr. D. N.J. July 22, 2020) (approving KERP for $217,284 for eight (8) employees during sale process, ranging from approximately 17 to 25% of the employees' salary); *In re MobiTV*, Case No. 21-10457 (LSS) (Bankr. D. Del. Apr. 7, 2021) (approving KERP for all non-insider employees after debtor had reduced its workforce pre-petition) (awards ranged from 5.0% to 25.1% of their base salary); *In re Oneweb Global Limited, et. al.*, Case No. 20-22437 (RDD) (Bankr. S.D.N.Y. May 29, 2020) (debtors executed prepetition RIF of 90% of workforce, and Court approved (i) KERP for 47 remaining employee totaling $3 million (40% of salary paid in quarterly installments); *In re KB Toys, Inc.*, No. 08-13269 (KJC) (Bankr. D. Del. Jan. 6, 2009) (approving retention plan for 28 non-insider employees contemplating payments of approximately $300,000); *In re Mervyn's Holdings, LLC*, No. 08-11586 (KG) (Bankr. D. Del. Oct. 30, 2008) (approving retention plan for 93 non-insider employees contemplating payments of approximately $1.3 million); and, as to the KEIP: *In re Sam Ash Music Corp.*, Case No. 24-14727 (SLM) (Bankr. D.N.J. June 13, 2024) (approving KEIP for four employees in maximum aggregate of $107,000 for asset sales targeting at $10

4

million), *In re Agway Farm & Home Supply, LLC*, Case No. 22-10602 (JKS) (Bankr. D. Del. Nov. 21, 2022) (approving KEIP for President and CEO in maximum of two (2) percent of sale proceeds, up to a maximum of $75,000 (24.6 of the executive's salary) payable upon closing of sales of substantially all of the debtor's assets), *In re Ashley Steward Holdings, Inc.*, 2014 WL 2013372 (MBK) (Bankr. D. N.J. Apr. 23, 2014) (for $23 million stalking horse bid, approving KEIP in aggregate of in range of $350,000 to $1.4 million to ten employees), and *In re Revel AC, Inc.*, Case No. 14-22654 (MBK) Bankr. D. N.J. June 30, 2014) (approving KEIP of aggregate amount of $1,525,000 for five (5) employees for meeting cash flow goals and additional amount for sale closing above threshold amount).

### d.    The KERP and KEIP are Reasonable and Should be Approved

17.    I believe that both the KERP and KEIP are reasonable and a sound exercise of the Debtors' business judgment.  In fact, they are on the low end on a per-capita basis given the size and complexity of the Chapter 11 Cases.  Commonly in such complex Chapter 11 Cases, the Debtors would seek much higher bonuses for top executives and not seek to pay rank-and-file employees at the same percentage.  The KERP and KEIP were therefore designed to enable the success of the Chapter 11 Cases while recognizing the economic realities of the Chapter 11 Cases.

### e.    Approval of the KERP and KEIP

18.    The Debtors presented the KERP and KEIP for consideration to the Debtors' Independent Director who approved the programs.

### f.    The KERP

i.    *The KERP Participants and their Value*

19.    The Debtors have identified sixty-seven (67) Employees as KERP Participants. The KERP Participants are all the Employees of the Debtors that are not KEIP Participants.

5

20.     The KERP Participants are integral to the Debtors' business.  The KERP Participants, unlike the majority of the Debtors' pre-petition employees, remain because the Debtors determined their services were necessary to the success of the Debtors' Chapter 11 Cases and the sale process.  From an operational standpoint, the Employees are necessary for the Debtors to have the capacity to answer customer questions and manage servicing of the Debtor's assets and contracts.  From a sale-process standpoint, the Employees will maintain going-concern value, including concerning transitioning the assets to new operations and maintaining customer support, and as needed, will assist the Debtors' leadership in responding to inquiries concerning diligence.

21.     The KERP Participants are not responsible for setting company policy and generally do not attend senior management meetings or participate in meetings of the Debtors' Board of Directors or any of its committees.  In fact, many of the KERP Participants' duties are limited to implementing tasks within a particular division or department.  As such, their titles reflect their relative position below upper management and functions within the organization and do not reflect any real insider status or responsibility.   Although certain of the KERP Participants hold titles such as "manager" they do not take part in the strategic management or decide "critical financial decisions" of the Debtors.

ii.     *The Terms of the KERP*

22.     Under the proposed KERP, each KERP Participant will receive monetary awards (the "KERP Award(s)") (with such payments of the KERP Awards, the "KERP Payment(s)").

23.     KERP Participants will earn a KERP Award of ten (10) percent of the their annual salary through one or more payment(s) upon a closing of a Sale Transaction (the "Closing"), which KERP Award will be payable at or shortly after a Closing (the "KERP Retention Bonus").

6

24.     If the KERP Participant voluntarily leaves employment prior to the Closing, or such KERP Participant is terminated for cause, that KERP Participant will forfeit the entire KERP Award.  For the avoidance doubt, the termination of a KERP Participant because of redundancies of a Sale Transaction and/or the failure of any Buyer to offer employment to a KERP Participant after a Closing will not be considered termination "for cause."[2]   Neither the (i) termination of the employment of a KERP Participant without cause nor (ii) death or disability shall affect any right of a KERP Participant to a KERP Award, and KERP Awards will be earned upon the occurrence of any triggering event(s), regardless of whether the event(s) occurred after (i) termination without cause or (ii) death or disability.

25.     If every KERP Participant remains eligible, total KERP Payments are estimated to be $993,936 (the "<u>KERP Maximum</u>").  The KERP Maximum, however, shall be reduced dollar for dollar based upon attrition due to termination for cause or resignation.

26.     KERP Payments will be made after payments of the secured amounts owed to the Debtors' Prepetition Secured Parties (or applicable holders) and DIP Lender.

**g.     The KEIP**

27.     The KEIP Participants are five (5) members of the Debtors' senior leadership team, consisting of the Debtors' (i) Chief Executive Officer, (ii) General Counsel, (iii) Chief Financial Officer, (iv) Chief Operating Officer and (v) Head of Human Resources. This team is responsible for executing the Debtors' operating and strategic plans, including maintaining the Debtors' business operations with reduced staff, overseeing and addressing issues during these Chapter 11

---

[2] For purposes of the KEIP and KERP, "cause" means (i) failure to materially perform the duties for which they are employed, (ii) willful violation of a material policy of the Debtors, (iii) commission of any act or acts of fraud, embezzlement, dishonesty, or other willful misconduct, (iv) material breach of any of their obligations under any written agreement or covenant with the Debtors, or (v) an act of dishonesty resulting or intended to result, directly or indirectly, in their gain for personal enrichment at the expense of the Debtors.

Cases, interfacing with customers, and maintaining a culture among the Debtors' employees during these Chapter 11 Cases.  In addition, the KEIP Participants shoulder the burden of moving the Debtors' sale forward, answering bidder questions and providing information to the Debtors' professionals.  The KEIP Participants are vital to the on-going stability, continuity, and strength of the Debtors during these Chapter 11 Cases and the sale process.

28.    This challenge is compounded by the nature of the Debtors' business, which is built on trust, reputation and communication that the KEIP Participants have earned from counterparties. Vendors, partners and customers may be cautious to continue to do business with the Debtors in the face of a challenging market and press coverage.  The KEIP Participants have offset such fears through outreach and open communication with their employees and customers, and, now, will do the same when communicating with bidders.

29.    Under the proposed KEIP, the KEIP Participants may earn bonuses (the "<u>KEIP Award(s)</u>," and with payments of these amounts as the "<u>KEIP Payment(s)</u>").  A KEIP Participant may earn up to two KEIP Bonuses: (i) a KEIP Bonus earned upon compliance with DIP Financing milestones and parameters (the "<u>KEIP DIP Bonus</u>"); and/or (ii) a KEIP Bonus payable upon a Closing (the "<u>KEIP Sale Bonus</u>").

30.    The KEIP DIP Bonus will be earned if the Debtors comply with the Approved Budget before Closing, and will be payable at or shortly after Closing (when it is anticipated that the DIP Facility will be repaid).   The KEIP DIP Bonus for each eligible KEIP Participant will be five (5) percent of their annual salary.

31.    The KEIP Sale Bonus will be earned upon the occurrence of a  successful closing under which the Debtors receive proceeds of $40 million or greater in cash or cash equivalents (including retirement of secured debt) (a "<u>Successful Closing</u>") and will be payable at or shortly

8

after a Successful Closing.  The KEIP Sale Bonus for each eligible KEIP Participant will be five (5) percent of their annual salary.

32.    Therefore, each KEIP Participant may earn up to ten (10) percent of their salaries if the Debtors perform under the Approved Budget and execute a Successful Closing.  The maximum amount payable under the KEIP is estimated to be $205,500 (the "KEIP Maximum").

33.    If a KEIP Participant is terminated for "cause," or voluntarily ends his or her employment, he or she will not receive any future KEIP Award.  For the avoidance doubt, the termination of a KERP Participant because of redundancies of a Sale Transaction and/or the failure of any Buyer to offer employment to a KERP Participant after a Closing will not be considered termination "for cause."  Neither the (i) termination of the employment of a KEIP Participant without cause nor (ii) death or disability shall affect any right of a KEIP Participant to a KEIP Award, and KEIP Awards will be earned upon the occurrence of any triggering event(s), regardless of whether the event(s) occurred after (i) termination without cause or (ii) death or disability.

34.    KEIP Payments will be made after payments of the secured amounts owed to the Debtors' Prepetition Secured Parties (or applicable holders) and DIP Lender.

35.    The KEIP Participants have already worked strenuously to get the Debtors to the precipice of a sale process, with a Stalking Horse APA for $36 million plus the $2 million Retention Payment (as defined in the Stalking Horse APA) and the DIP Facility in hand.  This is a remarkable achievement given the state of affairs on the Petition Date (with no offer and no DIP financing).

36.    The KEIP Participants have stayed with the Debtors and worked hard and worked well.  I believe that this hard work has been in part because, to incentive the employees, Debtors

9

told their KEIP Participants they would be rewarded through a KEIP both privately and in public (such as at the Wage Motion hearing).

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 23rd day of July 2025, at Sea Bright, New Jersey in Monmouth County.


_____*/s/ Gerard Uzzi*_____
Gerard Uzzi

US_ACTIVE\130825375\V-4

**EXHIBIT A**

(Proposed Form of Order)

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br>Powin, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

**ORDER GRANTING OMNIBUS MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING KEY EMPLOYEE RETENTION PLAN AND KEY EMPLOYEE INCENTIVE PLAN AND (II) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered three [3] through four [4], is

**ORDERED**.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504], (iii) PEOS Holdings, LLC [5476], (iv) Powin China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [15241], (vii) Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [2495], and (ix) Powin Energy Operating, LLC [6487]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

(Page 2)

Debtors:            Powin, LLC, *et al.*

Case No.            25-16137 (MBK)

Caption of Order: Order Granting Motion of the Debtors for Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

| **DENTONS US LLP** | **TOGUT, SEGAL & SEGAL LLP** |
|---|---|
| Tania M. Moyron (*pro hac vice* pending) | Frank A. Oswald (admitted) |
| Van C. Durrer, II (*pro hac vice* pending) | 550 Broad Street |
| 601 S. Figueroa Street #2500 | Suite 1508 |
| Los Angeles, CA 90017 | Newark, NJ 07102 |
| Telephone:  (213) 623-9300 | Telephone:  (212) 594-5000 |
| Facsimile:  (213) 623-9924 | Facsimile:  (212) 967-4258 |
| Email:  tania.moyron@dentons.com | Email:  frankoswald@teamtogut.com |
|           van.durrer@dentons.com | |
| | Albert Togut (*pro hac vice* pending) |
| John D. Beck (*pro hac vice* pending) | Amanda C. Glaubach (*pro hac vice* pending) |
| Sarah M. Schrag (*pro hac vice* pending) | Eitan Blander (*pro hac vice* pending) |
| 1221 Avenue of the Americas | One Penn Plaza, Suite 3335 |
| New York, NY 10020-1089 | New York, New York 10119 |
| Telephone:  (212) 768-6700 | Telephone:  (212) 594-5000 |
| Facsimile:  (212) 768-6800 | Facsimile:  (212) 967-4258 |
| Email:  john.beck@dentons.com | Email:  altogut@teamtogut.com |
|           sarah.schrag@dentons.com |           aglaubach@teamtogut.com |
| |           eblander@teamtogut.com |
| *Proposed Counsel for Debtors and* | |
| *Debtors in Possession* | *Proposed Counsel for Debtors and* |
| | *Debtors in Possession* |

2

(Page 3)

Debtors:          Powin, LLC, *et al.*

Case No.          25-16137 (MBK)

Caption of Order: Order Granting Motion of the Debtors for Entry of an Order (I) Authorizing
the Rejection of Legacy Customer Contracts and (II) Granting Related Relief

Upon consideration of the Motion[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Order"): (i) authorizing, but not directing, the

Debtors to implement the proposed key employee retention plan (the "KERP") and key employee

incentive plan (the "KEIP") and (b) granting related relief; all as more fully set forth in the Motion;

and upon the Declaration attached to the Motion and the First Day Declaration; and this Court

having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order*

*of Reference* from the United States District Court for the District of New Jersey dated as of

September 18, 2012; and that this Court may enter a final order consistent with Article III of the

United States Constitution; and this Court having found that venue of this proceeding and the

Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having

found that the relief requested in the Motion is in the best interests of the Debtors' estates, their

creditors, and other parties in interest; and this Court having found that the Debtors' notice of the

Motion and opportunity for hearing on the Motion were appropriate under the circumstances and

that no other notice need be provided; and this Court having determined that the legal and factual

bases set forth in the Motion and at the hearing thereon establish just cause for the relief granted

herein; and upon all of the proceedings before this Court; and after due deliberation and sufficient

cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      The KERP and KEIP are approved in their entirety.

3.      The Debtors are authorized, but not directed, to implement the KERP and KEIP as described

in the Motion, including by facilitating and making all KERP Payments and KEIP Payments.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

(Page 4)
Debtors:          Powin, LLC, *et al.*
Case No.          25-16137 (MBK)
Caption of Order: Order Granting Motion of the Debtors for Entry of an Order (I) Authorizing
the Rejection of Legacy Customer Contracts and (II) Granting Related Relief

4.      All amounts earned and payable under the KERP and KEIP shall have

administrative expense priority under sections 503(a) and 507(a)(2) of the Bankruptcy Code for

all purposes in these Chapter 11 Cases and in any other cases under the Bankruptcy Code to which

these Chapter 11 Cases may be converted.

5.      Nothing in the Motion or this Order: (i) is intended or shall be deemed to constitute an

assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the

validity of any claim against the Debtors and their estates or (ii) shall impair, prejudice, waive or otherwise

affect the rights of the Debtors and their estates with respect to the validity, priority or amount of any claim

against the Debtors and their estates.

6.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such

Motion and the requirements of the Local Rules are satisfied by such notice.

7.      Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of this Order

are immediately effective and enforceable upon entry.

8.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this

Order in accordance with the Motion.

9.      Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, the terms and conditions

of this Order are immediately effective and enforceable upon its entry.

10.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to

the implementation, interpretation, and enforcement of this Order.

**<u>Exhibit 2</u>**

(Proposed Order for KEIP/KERP Motion)

# **EXHIBIT A**

(Proposed Form of Order)

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>Powin, LLC, *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

## ORDER GRANTING OMNIBUS MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING KEY EMPLOYEE RETENTION PLAN AND KEY EMPLOYEE INCENTIVE PLAN AND (II) GRANTING RELATED RELIEF

The relief set forth on the following pages, numbered three [3] through four [4], is

**ORDERED**.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504], (iii) PEOS Holdings, LLC [5476], (iv) Powin China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [15241], (vii) Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [2495], and (ix) Powin Energy Operating, LLC [6487]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

(Page 2)
Debtors:            Powin, LLC, *et al.*
Case No.            25-16137 (MBK)
Caption of Order: Order Granting Motion of the Debtors for Entry of an Order (I) Authorizing
the Rejection of Legacy Customer Contracts and (II) Granting Related Relief

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

| **DENTONS US LLP** | **TOGUT, SEGAL & SEGAL LLP** |
|---|---|
| Tania M. Moyron (*pro hac vice* pending) | Frank A. Oswald (admitted) |
| Van C. Durrer, II (*pro hac vice* pending) | 550 Broad Street |
| 601 S. Figueroa Street #2500 | Suite 1508 |
| Los Angeles, CA 90017 | Newark, NJ 07102 |
| Telephone:  (213) 623-9300 | Telephone:  (212) 594-5000 |
| Facsimile:  (213) 623-9924 | Facsimile:  (212) 967-4258 |
| Email:  tania.moyron@dentons.com | Email:  frankoswald@teamtogut.com |
|           van.durrer@dentons.com | |
| | Albert Togut (*pro hac vice* pending) |
| John D. Beck (*pro hac vice* pending) | Amanda C. Glaubach (*pro hac vice* pending) |
| Sarah M. Schrag (*pro hac vice* pending) | Eitan Blander (*pro hac vice* pending) |
| 1221 Avenue of the Americas | One Penn Plaza, Suite 3335 |
| New York, NY 10020-1089 | New York, New York 10119 |
| Telephone:  (212) 768-6700 | Telephone:  (212) 594-5000 |
| Facsimile:  (212) 768-6800 | Facsimile:  (212) 967-4258 |
| Email:  john.beck@dentons.com | Email:  altogut@teamtogut.com |
|           sarah.schrag@dentons.com |           aglaubach@teamtogut.com |
| |           eblander@teamtogut.com |
| *Proposed Counsel for Debtors and* | |
| *Debtors in Possession* | *Proposed Counsel for Debtors and* |
| | *Debtors in Possession* |

2

(Page 3)

Debtors:          Powin, LLC, *et al.*

Case No.          25-16137 (MBK)

Caption of Order: Order Granting Motion of the Debtors for Entry of an Order (I) Authorizing
the Rejection of Legacy Customer Contracts and (II) Granting Related Relief

 

Upon consideration of the Motion[2] of the above-captioned debtors and debtors in possession
(collectively, the "Debtors") for entry of an order (this "Order"):  (i) authorizing, but not directing, the
Debtors to implement the proposed key employee retention plan (the "KERP") and key employee
incentive plan (the "KEIP") and (b) granting related relief; all as more fully set forth in the Motion;
and upon the Declaration attached to the Motion and the First Day Declaration; and this Court
having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order
of Reference* from the United States District Court for the District of New Jersey dated as of
September 18, 2012; and that this Court may enter a final order consistent with Article III of the
United States Constitution; and this Court having found that venue of this proceeding and the
Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having
found that the relief requested in the Motion is in the best interests of the Debtors' estates, their
creditors, and other parties in interest; and this Court having found that the Debtors' notice of the
Motion and opportunity for hearing on the Motion were appropriate under the circumstances and
that no other notice need be provided; and this Court having determined that the legal and factual
bases set forth in the Motion and at the hearing thereon establish just cause for the relief granted
herein; and upon all of the proceedings before this Court; and after due deliberation and sufficient
cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      The KERP and KEIP are approved in their entirety.

3.      The Debtors are authorized, but not directed, to implement the KERP and KEIP as described
in the Motion, including by facilitating and making all KERP Payments and KEIP Payments.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

(Page 4)
Debtors:          Powin, LLC, *et al.*
Case No.          25-16137 (MBK)
Caption of Order: Order Granting Motion of the Debtors for Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief

4.      All amounts earned and payable under the KERP and KEIP shall have administrative expense priority under sections 503(a) and 507(a)(2) of the Bankruptcy Code for all purposes in these Chapter 11 Cases and in any other cases under the Bankruptcy Code to which these Chapter 11 Cases may be converted.

5.      Nothing in the Motion or this Order: (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates or (ii) shall impair, prejudice, waive or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority or amount of any claim against the Debtors and their estates.

6.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of the Local Rules are satisfied by such notice.

7.      Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of this Order are immediately effective and enforceable upon entry.

8.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

9.      Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

10.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## **Exhibit 3**

(Declaration of Gerard Uzzi in Support of Emergency First Day Motions of the Debtor)

Docket #0013  Date Filed: 6/10/2025

**DENTONS US LLP**

Tania M. Moyron (*pro hac vice* forthcoming)
Van C. Durrer, II (*pro hac vice* forthcoming)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: tania.moyron@dentons.com
          van.durrer@dentons.com

John D. Beck (*pro hac vice* forthcoming)
Sarah M. Schrag (*pro hac vice* forthcoming)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
Email: john.beck@dentons.com
          sarah.schrag@dentons.com

*Proposed Counsel for Debtors and
Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Email: frankoswald@teamtogut.com

Albert Togut (*pro hac vice* forthcoming)
Amanda C. Glaubach (*pro hac vice*
forthcoming)
Eitan Blander (*pro hac vice* forthcoming)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Email: altogut@teamtogut.com
          aglaubach@teamtogut.com
          eblander@teamtogut.com

*Proposed Counsel for Debtors and
Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br>Powin, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Joint Administration Requested) |

**DECLARATION OF GERARD UZZI IN SUPPORT OF
EMERGENCY FIRST DAY MOTIONS OF THE DEBTORS**

I, Gerard Uzzi, hereby state and declare as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504]; (iii) PEOS Holdings, LLC [5476]; (iv) Powin China Holdings 1, LLC [1422]; (v) Powin China Holdings 2, LLC [9713]; (vi) Charger Holdings, LLC [5241]; (vii) Powin Energy Ontario Storage, LLC [8348]; (viii) Powin Energy Operating Holdings, LLC [2495]; and (ix) Powin Energy Operating, LLC [6487]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

US_ACTIVE\130481403



2516137250610000000000013

1.      I am the Chief Restructuring Officer (the "CRO") of Powin, LLC ("Powin"). I was appointed as CRO of Powin and the above-referenced affiliated debtors and debtors in possession (collectively, the "Debtors") effective on June 9, 2025.

2.      I am also a Managing Partner and Founder of CBMN Advisors LLC d/b/a Uzzi & Lall ("Uzzi & Lall"). I have extensive experience advising companies, boards of directors, senior management, creditors, equity holders, and investors in stressed and distressed situations, including chapter 11, out-of-court work outs, and rescue financings across industries and jurisdictions. I also serve in a number of fiduciary capacities, including presently as the Chairman of the Celsius Litigation Oversight Committee.

3.      Prior to co-founding Uzzi & Lall, I was a senior restructuring partner at Milbank LLP and White & Case LLP for over 18 years in the aggregate. During that time, I was personally involved in senior roles in some of the nation's largest and most complex chapter 11 cases, including Lehman Brothers, Washington Mutual, American Airlines, Rescap, Charter Communications, Mirant, Adelphia Communications, Purdue Pharma, and ZAIS. I have been recognized for my work in Chambers, Euromoney's IFLR, The Legal 500, and Expert Guides as one of the World's Leading Insolvency and Restructuring Professionals.

4.      On June 9, 2025 (the "Petition Date"),[2] Powin and certain of its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"). I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases (the "Chapter 11 Cases").

5.      Except as otherwise indicated herein, this declaration (the "Declaration") is based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors or the Debtors' advisors, my opinion based upon my experience,

---

[2] Lead Debtor Case No. 25-16137 (MBK) for Debtor Powin Project LLC was filed on June 9, 2025, and the remaining Debtors were filed shortly thereafter on June 10, 2025.

knowledge, and information concerning the Debtors' operations and this industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

6.      I make this Declaration for the purpose of apprising the Court and parties in interest of the circumstances that compelled the commencement of these Chapter 11 Cases, in support of the First Day Motions (as defined below), and to articulate the Debtors' goals in these Chapter 11 Cases.

7.      To enable the Debtors to minimize the adverse effects of the commencement of these Chapter 11 Cases on their business and its going concern value, the Debtors have requested various types of relief in a number of applications and motions (each a "First Day Motion," and, collectively, the "First Day Motions"). The First Day Motions seek relief intended to maintain the Debtors' business operations for their going concern value and to otherwise preserve value for the Debtors, its stakeholders, and parties in interest. Each First Day Motion is crucial to the Debtors' efforts. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.

8.      Section I is an overview of the Debtors' goals in these Chapter 11 Cases. Section II provides an overview of the Debtors' business and organizational structure. Section III describes the circumstances that compelled the commencement of the Chapter 11 Cases. Section IV describes the Debtors' capital structure. Section V provides a summary of the First Day Pleadings and factual bases for the relief requested therein.

## I.      OVERVIEW

9.      Debtor Powin, a Delaware limited liability corporation, and its affiliates are collectively an energy storage integrator based in Portland, Oregon, and with offices around the world in Vietnam, China, Canada, Australia, and Spain. As one of the leading global energy platform providers, Powin and its affiliates are at the forefront of the clean energy revolution. Powin focuses on advancing the next frontier of energy by ensuring access to clean, reliable, resilient, and affordable power through cutting-edge technology. The Debtors' business model

targets innovations in energy storage, which are essential to the planet's transition to a sustainable, carbon-free world.

10.     Before the filing of these Chapter 11 Cases, as a result of several factors described further below, the Debtors experienced challenges leading to financial constraints that required engagement with their Prepetition Lenders (defined below) and other parties in interest on an appropriate path forward for the Debtors' business.

11.     As explained in more detail in Sections II and IV below, on March 24, 2025, the Prepetition Agent (defined below) and the Debtors' lenders party to the Prepetition Loan Documents (the "Prepetition Lenders," and together with the Prepetition Agent, the "Prepetition Secured Parties") declared payment and covenants defaults and demanded payment in full of the Debtors' Prepetition Secured Debt (defined below). After consultation with Powin's management team and advisors, the Prepetition Agent also exercised its cash dominion rights over certain blocked accounts. On April 25, 2025, the Prepetition Agent exercised remedies against a portion of the Debtors' cash on hand and exercised its rights to appoint me as independent manager for Powin.

12.     Upon such appointment, and with the resources available to me at Uzzi & Lall, I took the following steps to stabilize the Debtors' situation:

a.  I quickly engaged Dentons LLP ("Dentons") as legal counsel to support our analysis of strategic alternatives.

b.  I undertook steps to understand the Debtors' liquidity position, and, working with Dentons, successfully negotiated an agreement with the Prepetition Secured Creditors to (i) release cash and (ii) relend $6.25 million to allow my team an opportunity to evaluate the Debtors' situation and develop a working strategy to maximize value.

c.  I then engaged Huron Transaction Advisory LLC ("Huron") as investment banker to assist the Debtors in raising needed capital and pursuing strategic alternatives.

d.  I participated with the Debtors' existing management in meetings with our largest stakeholders, including our largest vendor, Ace Engineering & Co., LTD ("ACE Engineering"), and our largest customers, to explore both near-term and long-term solutions to the Debtors' deepening liquidity crisis.

- 4 -

e.  During the course of those interactions, two things became clear: (a) the new project or "ESA"[3] side of the business was not immediately sustainable, in large part because two of the Debtors' largest customers terminated their projects during these discussions; and (b) the servicing or "LTSA"[4] side of the business was vitally important to the Debtors' customer base, and a community of customers were very interested in supporting this business line.

f.  While certain potential transactions remain in negotiation, we successfully negotiated an interim transaction with a key customer to bridge the Debtors for a period of weeks, and we developed a business model that contemplates sustaining the LTSA business line (the "LTSA Program") in a manner that preserves the customers projects during the Chapter 11 Cases. The feedback from customers also suggested that the LTSA Program would be best accomplished through a stand-alone entity that was removed and could be reorganized separately from Powin's legacy liabilities. Consequently, Powin formed a new subsidiary, Powin Project LLC for that purpose.

g.  If we are successful in implementing that LTSA Program, the Debtors will proceed to market their remaining assets for sale under the protection chapter 11 affords.

## II.    THE DEBTORS' BUSINESS AND ORGANIZATIONAL STRUCTURE[5]

13.    As part of their commitment to clean energy and to accelerate the shift to clean energy alternatives, Powin and its affiliates engineer and install battery energy storage systems ("BESS") in clean energy power projects. They then provide data-driven software controls, proven hardware, and experienced end-to-end project execution for cell-level monitoring and reporting, as well as other support services like comprehensive maintenance, wrapped warranties, and specialized training to ensure the long term benefits of their deployed BESS. Powin's products are more than just collections of battery cells; they are active intelligent energy storage and discharge systems powered by Powin's StackOS™, which are designed to bolster energy distribution to alleviate grid congestion, reduce costs, and strengthen aging infrastructure. [6]

---

[3] The ESA side of Powin's business is further discussed in Section II and V.
[4] The LTSA side of Powin's business is further discussed in Section II and V.
[5] Capitalized terms used but not defined in this overview section shall have the meanings assigned to them below.
[6] The information provided in ¶¶ 13-16 is largely derived from the Powin Sustainability Report 2024, *available at* https://powin.com/wp-content/uploads/2025/04/Powin-Sustainability-Report.pdf. The report is a public document maintained in the ordinary course of business, but I have not had an opportunity to independently verify it. I make no assurances that such report is accurate.

- 5 -

14.     This comprehensive proprietary system integrates an onboard battery management system, thermal management system, and energy management system seamlessly, which Powin continuously monitors remotely in real time from the Powin Battery Lab. The Powin Battery Lab relies on the latest testing facilities, equipment, and experienced specialists to enable better performance, control processes, and strategies for each of its products. With the Powin Battery Lab, Powin is able to provide unparalleled visibility and control into each and every battery cell in the field, empowering clients to make informed decisions on the operational performance of their energy storage assets. Every day, Powin monitors over 5 million battery cells in the field. Additionally, to counter cyber attack threats that could otherwise destabilize connected grids, Powin's system must be continually updated, requiring continual efforts by Powin's experts. Relentlessly focused on innovation and lasting value, Powin optimizes energy management, mitigates risk, and ensures predictable energy throughout the lifetime of its projects.

15.     Powin's system, which is now well ingrained into the clean energy landscape, is vital to the vast array of parties in the clean energy space and to future endeavors towards a carbon-free planet writ large. Currently deployed in the field are utility scale Powin BESS worth in excess of $2 billion that depend on Powin's StackOS™ for their continued operation over, which equates to over 17,000 megawatt-hour ("MWh") of energy storage systems deployed or under construction worldwide. Without Powin's Stack OS™, these BESS cannot operate safely and the worldwide system collapses, jeopardizing billions of dollars of investments in the clean energy space.

16.     As further background, in 2016, Powin began commercial operations with the launch of its first utility-scale project, the 9MWh Millikan BESS. Since then, Powin has continued to achieve significant growth, introducing new products and entering new markets. In 2017, Powin built the largest project in Canada, with 40MWh currently operating today in Stratford, Ontario. In 2018, Powin built the largest microgrid battery in Mexico in a project that introduced Powin's first containerized systems. In 2019, Powin expanded its international footprint with projects in Italy, Greece, and Israel. Then in 2020, Powin introduced its Stack 230™ product line and grew new commitments to 4GWh. In 2021, Powin acquired its first external investors. By 2022, Powin

- 6 -

had secured over 17 GWh of new committed installations.

17.    At a high level, Powin's business model has two lines of business:  (a) the engineering and installation of BESS, which are governed by various energy supply agreements (each, an "ESA"); and (b) the warranties, servicing and maintenance of BESS, which are governed by various long term servicing agreements (each, an "LTSA"). To implement Powin's business plan, Powin entered into these ESAs and LTSAs with its customers, and then used suppliers and vendors to support performance under the ESAs and LTSAs.

**A.    The Debtors' Organizational Structure.**

18.    Powin and its affiliated Debtors are as follows:

- Powin Project LLC (New Jersey);
- Powin, LLC (Delaware);
- PEOS Holdings, LLC (Oregon);
- Powin China Holdings 1, LLC (Oregon);
- Powin China Holdings 2, LLC (Oregon);
- Charger Holdings, LLC (Oregon);
- Powin Energy Ontario Storage, LLC (Oregon);
- Powin Energy Operating Holdings, LLC (Delaware); and
- Powin Energy Operating, LLC (Delaware).

19.    The Debtors' prepetition organizational structure is attached hereto as **Exhibit A**.

20.    **Non-Debtor Powin Entities.** The Debtors' are affiliated with the entities listed below that have not filed chapter 11 petitions at this time:

- Powin Energy Holdings, LLC (Delaware);
- Powin Energy Intermediate, LLC (Delaware);
- Powin Australia Pty Ltd. (Australia);
- Powin Netherlands B.V. (The Netherlands);
- Powin Energy Spain S.L. (Spain);
- Powin UK Ltd. (United Kingdom);
- Powin Canada B.C., Ltd. (Canada);
- Powin Energy Storage 2, Inc. (Canada);
- Powin Energy Ontario Storage II, LP (Canada);
- Yangzhou Finway Energy Tech Co., Ltd. (China);
- Qingdao CIMC-Powin New Energy Technology Co., Ltd. (China);
- Powin (Qingdao) New Energy Co., Ltd. (China);
- Powin EKS SellCo, LLC (Delaware); and
- EKS HoldCo, LLC (Delaware).

21.    Powin Energy Holdings, LLC (Delaware) and Powin Energy Intermediate, LLC

US_ACTIVE\130481403

(Delaware) are holding companies who own Powin, LLC. While Powin Energy Intermediate, LLC is an obligor on the Prepetition Loan Documents, neither Powin Energy Holdings, LLC (Delaware) nor Powin Energy Intermediate, LLC (Delaware) has any operations or any material assets other than their direct and indirect ownership of the Debtors. The governance and conduct of those entities is outside of the scope of the authority of my appointment as CRO and that of the independent manager, John R. Brecker.

**B.    The Debtors' Management.**

22.    As described below, pursuant to the terms of that certain Irrevocable Proxy, dated as of October 25, 2024 (the "Proxy"), Powin LLC's Parent, Powin Energy Intermediate, LLC ("Parent Pledgor"), appointed GLAS USA LLC, as collateral agent for the Prepetition Lenders under the Loan Agreement (the "Prepetition Agent"), as its proxy and attorney-in-fact entitling the Prepetition Agent to, upon an event of default, exercise Parent Pledgor's voting rights and all other rights, powers, privileges, and remedies to which a holder of such Pledged Stock (as defined in the Proxy) would be entitled (including giving or withholding written consents of shareholders, partners, or members). On April 25, 2025, the Prepetition Agent exercised the Proxy and provided notice to Powin and the Parent Pledgor that, from and after the date thereof, it was exercising its rights under the Loan Agreement and the Proxy to direct the voting of all of the Parent Pledgor's held equity interests in Powin to amend the operating agreement of Powin (the "LLC Agreement") to provide that Powin would be a manager-managed LLC and appointed me as independent manager of Powin.

23.    On June 8, 2025, the Prepetition Agent exercised its Proxy rights pursuant to Loan Agreement, amended the LLC Agreement for Powin, LLC to include up to two independent managers, and appointed John R. Brecker as an additional independent manager. John R. Brecker has over 30 years as a restructuring professional and is the founder of Drivetrain, LLC, a multi-disciplinary fiduciary services business serving the distressed investing industry with an investor's perspective. John R. Brecker has experience serving as a creditor representative on ad hoc and official creditor committees, as trustee, as examiner, and as independent and creditor-appointed

- 8 -

directorships.

24.     Other management remained in place to continue their focus on day-to-day operations, but certain personnel did resign since my appointment, including the Chief Executive Officer (the "CEO") and the Head of Human Resources. Following these resignations, the independent managers determined to elevate the CEO and Head of Human Resources' direct reports, Brian J. Kane and Arielle Pachecho, respectively. On June 9, 2025, I resigned as one of Powin's independent manager and the remaining independent manager, John R. Brecker (the "Independent Manager") determined to engage my firm to continue providing professional advice and to appoint me as Chief Restructuring Officer. The other management is now as follows:

| Name | Position |
| --- | --- |
| Brian J. Kane | Chief Executive Officer |
| Chad Paulson | Senior Vice President & Secretary |
| Kevin Paprzycki | Chief Financial Officer |
| Arielle Pachecho | Head of Human Resources |

**C.     Recent Financial Results.**

25.     In the last audited financials for the year ending on December 31, 2023, the company reported total assets of $1.16 billion and liabilities of $1.24 billion. The assets consisted mostly of accounts receivable and inventories related to projects in process. The liabilities related mostly to accounts payable and deferred revenue. The company has not yet closed its books for 2024 or any month in 2025.

**III.     THE NEED FOR CHAPTER 11 RELIEF AND THE EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES**

**A.     Historical Challenges.**

26.     Soon after my appointment, my team and I discovered that the Debtors suffered from the following inter-related problems, among others:  (a) severe liquidity constraints; (b) an extreme overdependence on trade credit; (c) increasing assertions of liquidated damages entitlements by customers aggrieved by alleged performance delays; and (d) a real credibility problem. My team has not yet had sufficient opportunity to investigate the root cause of these problems but rather, immediately focused on identifying a thoughtful approach to stabilize the

- 9 -

situation in a way to maximize value and minimize potential claims. We fully expect to work cooperatively with any official committee of unsecured creditors (if one is appointed) and any other parties in interest to investigate whether potential claims exist in connection with such root causes of the Debtors' prepetition challenges.

## IV.     CAPITAL STRUCTURE

### A.     Secured Debt.

27.     Prior to the Petition Date, the Debtors entered into that certain Loan Agreement, dated as of October 1, 2024 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and among Powin, the Parent Pledgor, the Subsidiary Guarantors party thereto (as such term is defined in the Loan Agreement), the Prepetition Agent, as administrative agent and collateral agent, and the Prepetition Lenders. The primary purpose of the credit available under the Loan Agreement was to bridge the debtors' working capital from acquisition of materials from vendors until customers made progress payments in connection with those materials.

28.     Under Section 9.1 of the Loan Agreement, each Loan Party (as defined therein) pledged and granted to the Prepetition Agent, for the benefit of the Prepetition Lenders, a security interest in and lien on all of such Loan Party's right, title, and interest in and to substantially of their assets, including the Loan Party's cash.[7] In connection therewith, Powin entered into (i) that certain Blocked Account Control Agreement dated as of November 12, 2024, by and among Powin, the Prepetition Agent, and JPMorgan Chase Bank, N.A.; and (ii) that certain Deposit Account Control Agreement, dated as of October 1, 2024, by and among Powin, Powin China Holdings 2 LLC, the Prepetition Agent, and HSBC Bank USA, National Association (together, the "Controlled Accounts").

29.     As further security for the benefit of the Prepetition Lenders, Parent Pledgor issued the Proxy appointing the Prepetition Agent as its proxy and attorney-in-fact entitling the

---

[7] On October 2, 2024, the Prepetition Agent filed UCC-1 Financing Statements with the applicable secretaries of state against each of the Loan Parties.

Prepetition Agent to, upon an event of default, exercise Parent Pledgor's voting rights and all other rights, powers, privileges, and remedies to which a holder of such Pledged Stock (as defined in the Proxy) would be entitled (including giving or withholding written consents of shareholders, partners, or members).

30.    On March 24, 2025, the Prepetition Agent sent a default notice (the "Default Notice"):  (i) notifying Powin of the occurrence and continuation of payment and covenants defaults; and (ii) terminating all Commitments and declaring all Loans, together with all other outstanding Obligations, immediately due and payable. The Prepetition Agent also exercised control over the Controlled Accounts by issuing two separate Shifting Control Notices and notifying JPMorgan Chase Bank and HSBC Bank of such exercise.

31.    On April 25, 2025, following consultation with Powin's management team and advisors, the Prepetition Agent exercised the Proxy and provided notice to Powin and the Parent Pledgor that, from and after the date thereof, it was exercising its rights under the Loan Agreement and the Proxy to direct the voting of all of the Parent Pledgor's held equity interests in Powin to amend the operating agreement of Powin to provide that Powin would be a manager-managed LLC and appoint me as the independent manager of Powin.

32.    After my appointment, it became evident that Powin's liquidity position was untenable. I immediately engaged in discussion with the Prepetition Lenders (among others) regarding potential ways to address Powin's liquidity shortfall. As a result of these discussions, the Prepetition Lenders (i) directed the Prepetition Agent to release a substantial amount of cash from the Controlled Account to sustain Powin's operations on multiple occasions and (ii) relent $6.25 million to Powin under the Prepetition Credit Agreement.

33.    On June 9, 2025, the Prepetition Lenders and the Prepetition Agent agreed to forbear from exercising their right, pursuant to the Control Agreements, to direct the Prepetition Agent to direct disbursements from the Controlled Accounts during the period until through June 11, 2025 pursuant to that certain Forbearance, Support and Joinder Agreement.

34.    As of the Petition Date, the outstanding secured obligations under the Loan

Agreement were no less than $25,612,281.51, plus any other fees, expenses, and other obligations owed under the Prepetition Loan Documents.

**B.     Unsecured Debt.**

35.     The Debtors estimate that unsecured claims against the Debtors as of the Petition Date are at least $300,000,000, including: (i) accrued and unpaid amounts owed to the Debtors' trade vendors and customers and other unsecured debt incurred in the ordinary course of the Debtors' business; and (ii) certain ongoing or threatened litigation claims, which are disputed.

## V.     First Day Pleadings

36.     The Debtors request that the relief described below in the First Day Motions be granted, as each request constitutes a critical element in achieving the successful restructuring of the Debtors for the benefit of their creditors.

**A.     Administrative Motions.**

37.     In the *Motion of the Debtors for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases; and (II) Granting Related Relief* (the "Joint Administration Motion"), the Debtors request entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes pursuant to Bankruptcy Rule 1015(b) and that the Court maintain one file and one docket for all of the Chapter 11 Cases under the lead case, Powin, LLC (Case No. 25-16137 (MBK)).

38.     Joint administration of the Chapter 11 Cases will provide significant administrative efficiencies without harming the substantive rights of any party in interest. Many of the motions, hearings and orders that will be filed in the Chapter 11 Cases almost certainly will affect each of the Debtors. The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings, objections, notices, and hearings, and will allow all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency. I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their business in chapter 11 with the least disruption.

39.     In the *Motion of the Debtors Seeking Entry Of an Order Extending Time To (I) File Schedules and Statements; and (II) Granting Related Relief* (the "Schedules and SOFA Motion"), the Debtors request entry of an order granting additional time to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs. As a consequence of the size and complexity of the Debtors' business operations, the number of creditors likely to be involved in these Chapter 11 Cases, and numerous critical operational matters that the Debtors' management and employees must address, a 28-day extension (without prejudice to further extensions) is necessary and appropriate.

40.     In the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, (B) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (C) Redact Certain Personally Identifiable Information of Natural Persons, and (II) Granting Related Relief* (the "Creditor Matrix Motion"), the Debtors seek entry of interim and final orders: (i) authorizing the Debtors to (a) file a consolidated list of the Debtors' fifty (50) largest unsecured creditors in lieu of filing separate creditor lists for each Debtor, (b) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, and (c) redact certain personally identifiable information of natural persons; and (ii) granting related relief, and permitting the Debtors' claims and noticing agent Verita (as defined below) to maintain and update a consolidated creditor matrix (the "Consolidated Creditor Matrix").

41.     Permitting the Debtors to file a Consolidated Creditor Matrix, as opposed to a separate creditor matrix for each Debtor, is, in my opinion, warranted under the circumstances of these Chapter 11 Cases. Indeed, because the Debtors estimate that they have hundreds of creditors and other parties in interest, I believe that filing separate creditor matrices for each Debtor would be duplicative and burdensome. Additionally, I understand that converting the Debtors' computerized information to a format compatible with the matrix requirements would be time-consuming and, more importantly, would greatly increase the risk of error. As such, I believe that the Debtors' request to file the Consolidated Creditor Matrix as it is currently formatted and in

- 13 -

accordance with the procedures outlined in the Creditor Matrix Motion is reasonable and warranted under the circumstances

42.    Additionally, the Debtors request authority to redact certain personally identifiable information from their lists of creditors. The Debtors respectfully submit that it is appropriate to authorize the Debtors to redact from any paper filed or to be filed with the Court in these Chapter 11 Cases, including the Consolidated Creditor Matrix and their Schedules and Statements, (i) the home, e-mail addresses and any other personally identifiable information, not including names of natural persons that the Debtors identified as employees, and (ii) the names, home addresses, and email addresses of natural persons that the Debtors identified as being customers of the Debtors, as known to the Debtors, unless such names have already been made public in litigation with the Debtors because such information can be used to perpetrate identity theft and phishing scams or to locate survivors of domestic violence, harassment, or stalking under 11 U.S.C. § 107(c)(1).

43.    In the *Debtors' Application for Entry of an Order Authorizing the Appointment of Kurtzman Carson Consultants, LLC DBA Verita Global as Claims and Noticing Agent Effective as of the Petition Date* (the "Claims Agent Application") the Debtors seek entry of an order appointing Kurtzman Carson Consultants, LLC dba Verita Global ("Verita") as the claims and noticing agent for the Debtors in connection with these Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim in these Chapter 11 Cases.

44.    I have reviewed Verita's services agreement, which is attached as an exhibit to the proposed order approving the Claims Agent Application, and the description of services that Verita has agreed to provide and the compensation and other terms of the engagement as provided in the services agreement. Based on that review, I believe that the Debtors' estates, creditors, parties in interest and the Court will benefit from Verita's experience and cost-effective methods. The Debtors believe, and I agree, that Verita's rates are competitive and reasonable given Verita's quality of service and expertise and that the appointment of Verita as claims and noticing agent is

- 14 -

the most effective and efficient manner by which to provide noticing and claims processing services in these Chapter 11 Cases.

45.    I believe that the relief requested in the Claims Agent Application is in the best interests of the Debtors' estates, creditors, and all other parties in interest. Accordingly, I respectfully submit that the Claims Agent Application should be approved.

**B.    Operational Motions Requesting Immediate Relief.**

46.    The Debtors intend to ask for immediate relief with respect to the following First Day Pleadings and, therefore, will present these motions at the First Day Hearing.

47.    The *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Cash Collateral Motion") seeks entry of interim and final orders: (i) authorizing the Debtors to use cash collateral ("Cash Collateral"); (ii) granting adequate protection, solely to the extent provided in the orders, to the Prepetition Secured Parties (as defined herein); (iii) modifying the automatic stay imposed by section 362 of the Bankruptcy Code (the "Automatic Stay") to the extent necessary to implement and effectuate the terms of the orders; (iv) scheduling a hearing to consider approval of the Cash Collateral Motion on a final basis; and (v) granting related relief.

48.    Recognizing their immediate need to access Cash Collateral, the Debtors swiftly engaged with the Prepetition Secured Parties on the consensual use of Cash Collateral in furtherance of a comprehensive restructuring transaction. As part of these negotiations, the Debtors and the Prepetition Secured Parties discussed, among other things, a form of budget for the duration of the Chapter 11 Cases, an adequate protection package, and a restructuring timeline that would allow the Debtors to continue to use Cash Collateral while they work expeditiously to seek to restructure their business during the pendency of these Chapter 11 Cases. After extended good faith and arm's length negotiations with the Prepetition Secured Parties, the Debtors reached an

US_ACTIVE\130481403

agreement with the Prepetition Secured Parties concerning the consensual use of Cash Collateral, as more fully described below.

49.     The *Motion of the Debtors for Entry of an Order:  (I) Authorizing the Debtors to Enter into New Customer Program with Existing Customers; (II) Scheduling a Hearing; and (III) Granting Related Relief* (the "<u>Customer Program Motion</u>") seeks entry of an order: (i) authorizing the Debtors to enter into a new Customer Program with existing customers ("<u>Customers</u>"); (ii) scheduling a hearing to consider approval of the Customer Program Motion on a final basis; and (iii) granting related relief.

50.     The Debtors commenced these Chapter 11 Cases to, among other things, reorganize their businesses around the Debtors' long term servicing line of business. Through this line of business, the Debtors provide their Customers with continuing maintenance and repair services with respect to previously installed Debtor battery systems at Customer sites. The Debtors' proprietary cloud-based technology and related servicing functionality is highly valuable to their Customers, and, in recent days, the Debtors have conducted in-depth discussions with Customers who have communicated a strong willingness to support the Debtors' efforts to continue this business line on a focused basis with pricing that is designed to allow the Debtors to continue this business. Successful implementation of this Customer Program will enable the Debtors to pursue a sale process of its remaining assets and therefore represents the most viable way to maximize value in these Chapter 11 Cases.

51.     Specifically, the Debtors have been working closely with Customers to develop a cost-plus, and cash flow positive, long term servicing program. Through such program, the Debtors would provide Customers with an amended suite of battery warranty services at a modified price point.

52.     The LTSA Program is entirely consistent with the Debtors' prepetition ordinary course of business. Under the proposed LTSA Program, the Debtors will be providing a reduced scope of service at pricing that is designed to be cash flow positive during the post-petition period. As noted, Customers are very desirous of the Debtors' continuation of their cloud-based

- 16 -

proprietary technology and related servicing functionality. The termination of the Debtors LTSA Line of Business would have a severely detrimental impact on Customers who are largely incapable of replacing those functions without the Debtors' assistance. In light of the commencement of these Chapter 11 Cases, the Debtors are seeking the instant relief in an effort to be transparent as well as assure Customers participating in the LTSA Program that it is fully authorized and viable.

53.     The *Motion of the Debtors for Entry of Interim and Final Orders: (I) Authorizing Use of Cash Management Procedures, Bank Accounts, Credit Cards, and Existing Business Forms; (II) Prohibiting Setoffs and Freezing of Bank Accounts; (Iii) Modifying Requirements of Section 345(b) of the Bankruptcy Code; and (Iv) for Related Relief* (the "Cash Management Motion") seeks entry of interim and final orders: (i) authorizing the Debtors to continue to use (as such capitalized terms are defined below) their existing Cash Management System, Bank Accounts, Credit Cards, and existing Business Forms in the ordinary course of business; (ii) authorizing the Debtors to open or close Bank Accounts or establish new or different Credit Cards, all in the ordinary course of business; (iii) prohibiting applicable banks from offsetting against or freezing any of the Debtors' deposit accounts; (iv) modifying the requirements of § 345(b) of the Bankruptcy Code; (v) scheduling a final hearing; and (vi) granting related relief.

54.     The *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Renew, Amend, Supplement, Extend, or Modify Insurance Programs and Pay Obligations Thereunder; and (II) Granting Related Relief* (the "Insurance Motion") seeks entry of interim and final orders: (i) authorizing the Debtors to maintain and renew, amend, supplement, extend, or modify insurance programs and pay obligations thereunder; and (ii) granting related relief.

55.     The Debtors maintain various insurance policies providing coverage for, among other things, the Debtors' general liability, workers' compensation, property, automobile liability, professional liability, cyber liability, stock throughput, and directors and officers coverage and excess liability (collectively the "Insurance Policies"), which the Debtors have obtained through

- 17 -

third-party insurance carriers (each an "<u>Insurance Carrier</u>").[8]

56.    The premium amounts for the Insurance Policies (the "<u>Insurance Premiums</u>") are determined annually and are due in their entirety at policy inception or renewal. The Debtors' aggregate annual Insurance Premiums under the Insurance Policies total approximately $2.21 million. As of the Petition Date, the Debtors believe they have paid all Insurance Premiums, but out of an abundance of caution, seek authority to satisfy any outstanding Insurance Premiums.

57.    Most of the Debtors' Insurance Policies will expire between June 11, 2025 and May 12, 2026. Specifically, the Debtors' cyber liability insurance policy and the director and officer liability insurance policies expire on June 11, 2025. It is critical that the Debtors continue to carry the necessary insurance coverage to operate their business. The Debtors have begun negotiating renewals, extensions and/or entries into new insurance policies with respect to the expiring Insurance Policies. The Debtors have obtained extensions of cyber liability and director and officer liability coverage through September 9, 2025.

58.    The Debtors employ USI Insurance Services (the "<u>Broker</u>") to assist them with the procurement and management of the Insurance Policies. The Broker receives compensation from the Debtors in the form of a commission fee in addition to the Insurance Premiums paid by the Debtors (the "<u>Broker's Fees</u>"). The employment of the Broker allows the Debtors to obtain and manage the Insurance Policies in an efficient manner and to realize considerable savings in the procurement of such policies.

59.    Certain Insurance Premiums and all Brokers Fees are financed through AFCO Credit Corporation (the "<u>Premium Financier</u>") over a twelve (12) month period through June, 2025. The monthly financing payment amount to the Premium Financier is approximately $190,000 per month, starting on June 12, 2025. Among the potential remedies available to the Premium Financier for non-payment is the ability to cancel the Insurance Policies and seek a refund of the Insurance Premiums it financed. As of the Petition Date, the Debtors have made all monthly financing payments and believe that they have satisfied all of their obligations to the

---

[8] A true and accurate schedule of the Debtors' Insurance Policies is attached as Exhibit C to the Insurance Motion.

Premium Financier (the "<u>Premium Financing Obligations</u>").

60.     Under the Insurance Policies, the Debtors may be required to pay various deductibles, retention amounts, and administrative fees (together with the Insurance Premiums, the "<u>Insurance Obligations</u>"), depending upon the type of policy and claim involved. As of the Petition Date, the Debtors to not believe that are any prepetition Insurance Obligations owed.

61.     The *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief* (the "<u>Wage Motion</u>") seeks entry of interim and final orders: (i) authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and costs related to these items, and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto (together, the "<u>Employee Compensation & Benefits</u>"); (ii) scheduling a final hearing; and (iii) granting related relief.

62.     As of the Petition Date, the Debtors employ approximately 85 non-insider individuals (of which a majority work in Oregon, with the others working in other states) in addition to their executive team (the "<u>Employees</u>").

63.     The Debtors have significantly reduced their workforce this year, including in a reduction-in-force that took place on June 6, 2025. The remaining Employees represent approximately 17% of the Debtors' workforce compared to January 1, 2025. These Employees remain, because they are critical for the Debtors' operations – particularly, with respect to the Debtors' Project and Technology branches of their services business – and to maintaining going concern value for the Debtors' business. The Employees are difficult to replace, and without the Employees' services, the Debtors will no longer be able to provide products and services to their customers. A number of the Debtors' employees have also resigned because of the uncertain situation. The Debtors cannot provide assurances that the Employee Benefit & Compensations will be provided in the ordinary course, the Debtors believe that more resignations will follow.

64.     The Debtors are not parties to any collective bargaining agreements.

US_ACTIVE\130481403

65.     The Debtors' Employees are paid either a salary or on an hourly basis as their primary form of compensation. Employees receive wages and salaries (the "Wages") on a bi-weekly basis every other Friday. The Debtors generally fund their payroll approximately two days before the applicable payday (on the applicable Wednesday).

66.     Payroll is generally paid one week in arrears. In the last regular payroll, on June 6, 2025,[9] the current Employees received payment for services provided through Friday, May 30, 2025. The next payroll, on June 20, 2025, will cover the pay-period of May 31 through June 13, 2025.[10] The Employees are therefore owed prepetition Wages.

67.     The Debtors estimate that they owe their Employees an aggregate of approximately $527,262.17 on account of accrued prepetition Wages (collectively, the "Unpaid Employee Wages"). However, this amount may fluctuate depending on contingencies.

68.     Postpetition, the Debtors estimate that their average gross payroll for their Employees will be (before Adjustments/deductions) approximately $1,150,000 per month.

69.     As of the Petition Date, the Debtors believe that they do not owe any Unpaid Employee Wages in excess of the statutory cap of $17,150 set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code (the "Statutory Cap") to any Employees(s).

70.     The Debtors utilize software and services from UKG (the "Payroll Provider") to support payroll processing, payroll tax calculations and filings, and other payroll-related services (all such associated costs, collectively, the "Payroll Costs"). The Debtors pay the Payroll Provider a quarterly fee, and the next payment will be due in July, 2025. The Debtors owe the Payroll Provider $90,616.61, which last payment was due in April, 2025. The Debtors seek authority to honor prepetition and postpetition amounts of Payroll Costs, including amounts owed to the Payroll Provider, to ensure continued payroll services during the Chapter 11 Cases.

---

[9] As referenced above, on June 6, 2025, the Debtors conducted a reduction-in-force, and prior to the bankruptcy filing, processed and fulfilled their remaining payment obligations to the terminated employees by depositing funds into the payroll account for the applicable amounts due.

[10] In these payrolls Debtors would ordinarily pay Employees amounts that had been reconciled or adjusted as owed from any previous underpayment, including recently submitted expenses, uncalculated overtime, etc. (with these amounts as the "Adjustments" and which, as applicable are included within the definition of Unpaid Employee Wages).

US_ACTIVE\130481403

71.     The Debtors may need to utilize independent contractors for services during the Chapter 11 Cases. These independent contractors (the "Supplemental Workforce") would be paid by the Debtors as needed. As of the Petition Date, the Debtors estimate that approximately $0 is owed to the Supplemental Workforce.

72.     In the ordinary course of business, the Debtors incur obligations on account of Payroll Deductions and Employee Payroll Taxes (each as defined below and collectively, the "Withholding Obligations").

73.     The Debtors routinely deduct amounts from Employees' wages, including garnishments and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of healthcare benefits and insurance premiums (the "Payroll Deductions").

74.     The Debtors are required by law to withhold from the Employees' wages amounts related to, among other things, national, regional, and local income tax (the "Employee Payroll Taxes") for remittance to the appropriate taxing authorities. The Employee Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority when the Employees' payroll checks are disbursed.

75.     In addition to their wages, the Debtors' Employees also generally are entitled to receive other forms of compensation, including health benefits, paid time off, and reimbursement of certain business expenses (collectively, the "Employee Benefit Programs"). The Employee Benefit Programs include, but are not limited to: (i) reimbursement of expenses; (ii) paid time off; (iii) a healthcare program, including dental and vision coverage; (iv) health savings accounts or flexible spending accounts; (v) life and disability coverage; (vi) workers' compensation; (vii) a 401(k) retirement savings plan; and (viii) an ethics and harassment platform.

76.     The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtor. Such expenses typically include, but are not limited to, business-related travel expenses (including mileage) and other items (the "Reimbursement Obligations"). Expense reports detailing the Reimbursement Obligations are

- 21 -

submitted for reimbursement by the Employees and generally must be supported by copies of receipts. Expenses are paid with payroll, and the Debtors utilize a vendor, Concur (the "Expense Vendor"). Employees expect that their business expenses will be paid promptly, and Employees may suffer hardship in delay of payment of these expenses.

77.     There is commonly delay between when an Employee incurs an expense and submits the corresponding expense report for processing. Therefore, it is difficult for the Debtors to determine the exact amount of Reimbursement Obligations that are due and owing for any particular time period. However, the Debtors believe that few, if any, Employees will be owed expenses earned within 180 days of the Petition Date that would require payment above the Statutory Cap. Upon information and belief, certain of the Debtors' executives are owed amounts that may exceed the Statutory Cap for recent business travel to Oregon.

78.     The Debtors provide eligible (non-insider) Employees with paid time off ("PTO"). Employees are eligible for varying amount of PTO, depending on their length of service and may exercise PTO according to company policy. Recently, the Debtors capped PTO at a maximum of 40 hours, but grandfathered in amounts exceeding 40 hours for Employees that had already accrued more than 40 hours. Upon an Employee's termination, the Debtors will cash out the Employee's PTO benefits to the extent required by applicable law.

79.     As of the Petition Date, the Debtors estimate they owe $691,170.14 (before adjustments/deductions) for accrued PTO for current Employees. The Debtors believe that the continuation of PTO policy in accordance with prior practice for their current Employees is essential to maintaining Employee wellness and morale during the Chapter 11 Cases. Further, the policies are broad-based programs upon which all Employees have come to depend, and the continuation of those programs will not create any material cash flow obligations beyond the Debtors' normal payroll obligations. Moreover, disruptions or changes to these policies could have a direct impact on Employee commitment, morale, and retention, to the detriment of the Debtors.

80.     The Debtors also offer parental, bereavement and other leave through their vendor, Voya.

- 22 -

81.     The Debtors offer eligible Employees and their eligible dependents (collectively, the "Dependents") the option of medical, dental and vision insurance. For medical insurance, including prescription drug coverage, the Debtors offer coverage (the "Medical Plan") through Regence ("Health Provider"). The Debtors bear a percentage of the costs of the Medical Plan for eligible Employees (which amount varies depending on their coverage and Dependents), and the Employees bear the remainder of the costs, based on dependent elections. In the ordinary course of their business, on the first of the month, the Debtors pay the Health Provider premiums for the following month, and, as of the Petition Date, the Debtors are current in payments to the Health Provider.

82.     For dental insurance, the Debtors also offer coverage through Delta Dental (the "Dental Plan"). The Debtors bear a percentage of the costs of the Dental Plan for eligible Employees (which amount varies depending on their coverage and Dependents). The Debtors pay for the Dental Plan on the first of the month.

83.     For vision insurance, the Debtors offer coverage through VSP (the "Vision Plan," and, together with the Medical Plan and Dental Plan, the "Health Plans"). The Debtors bear 100% of the costs of the Vision Plan for eligible Employees. The Debtors pay for the Vision Plan mid-month.

84.     Prepetition, the Debtors' monthly cost for the premiums of the Health Plans was approximately $420,000 per month, which amount should reduce during the Chapter 11 Cases due to the pre-petition reduction in force.[11]  The Debtors' Health Plans are fully insured, and there is no estate liability outside of payment of premiums and a monthly fee of $15,833.33 to the Debtors' broker, Alliant.

85.     The Debtors seek authority, but not direction, to pay any amounts due and to continue to pay, in their discretion, the premiums for the Health Plans incurred postpetition and to maintain their Health Plans.

---

[11] Given the reduction of the size of the Debtors' workforce, the providers for the Health Plans will likely have a right to re-negotiate terms of the Health Plans, which could result in a higher per-capita, but lower gross, amount owed by the Debtors.

US_ACTIVE\130481403

86.    The Debtors also offer their Employees the benefit of maintaining a respective health-savings account (the "HSA(s)") and a flexible savings account (the "FSA(s)") through Rocky Mountain Reserve (the "HSA & FSA Benefits"). Employees contribute to the FSAs at their election, and the Debtors do not contribute to the FSAs.

87.    The Debtors contribute to HSAs based on the type of coverage for the Employee. The Debtors contribute semi-annually to Employee HSAs, with the next payment due in July, 2025. Additionally, the Debtors pay a monthly administration fee to Rocky Mountain Reserve of approximately $3.75 per employee HSA enrollee and $2.75 per Employee FSA enrollee.

88.    The Debtors are required to offer certain of their former Employees certain health benefits following termination of employment under § 4980B of the Internal Revenue Code to administer Continuation Health Coverage ("COBRA") (*see* 26 U.S.C. § 4980B)  Pursuant to COBRA, former Employees of the Debtors (the "COBRA Eligible Employees") may continue using certain health benefits (the "COBRA Benefits"), and are entitled to continue to receive COBRA Benefits for up to eighteen, and occasionally thirty-six, months following termination of employment. The Debtors' COBRA Eligible Employees are typically responsible for paying all costs associated with the COBRA Benefits.

89.    The Debtors have also provided COBRA benefits to employees that have been previously terminated, for which the Debtors are responsible for payment, which responsibility extends, to the Debtors belief, through September, 2025. Certain current Employees also have similar COBRA benefits in their contract upon severance.

90.    The Debtors pay a 2% administrative fee for enrolled COBRA participants. The Debtors request authority, but not direction, to (a) pay any prepetition amounts outstanding on account of the COBRA Benefits; (b) to continue to offer the COBRA Benefits, including to Employees who may be terminated after the Petition Date, if any, and to honor all postpetition obligations related thereto in the ordinary course of business consistent with past practices; and (c) to continue to pay fees related to the COBRA Benefits in the ordinary course of business on a postpetition basis.

- 24 -

91.     The Debtors offer eligible Employees premium based group life insurance ("Life Insurance") and accidental death and dismemberment insurance, disability and other similar insurance ("AD&D Insurance") through Voya. The Debtors also offer background check insurance ("Background Check Insurance") through Accurate Ace. The Debtors pay premiums monthly, and the prepetition amount of monthly premiums for Life Insurance, AD&D Insurance and Background-Check Insurance total approximately $30,000 per month, less voluntary employee deductions, which amount should be reduced during the Chapter 11 Cases due to the prepetition reduction in force.

92.     The Debtors' Employees and their families depend on insurance provided by the Debtors as a fundamental aspect of compensation. Any disruption or perceived-disruption regarding insurance benefits or coverage would damage morale and may cause Employees to seek employment elsewhere. The Debtors are not current on their insurance obligations and owe Voya estimated amounts of $85,897.89 for AD&D Insurance and $111,591.37 for Life Insurance. The Debtors seek authority, in their discretion, to pay these amounts and any accrued and unpaid prepetition premiums and related charges, to continue the above benefits post-petition and to deliver the Employees' portion of any accrued and unpaid prepetition premiums for the AD&D Insurance and Life Insurance to the corresponding administrators in connection with the payment of the Wages and withholding obligations.

93.     The Debtors maintain workers' compensation insurance for their Employees at the statutorily required level for each state in which they have Employees (collectively, and as described herein, the "Workers' Compensation Program"). As part of the Workers' Compensation Program, the Debtors maintain a workers' compensation insurance policy with Zurich American Insurance Company (the "Workers' Compensation Insurance Policy"). The Debtors must continue claim assessment, determination, adjudication, and payment pursuant to the Workers' Compensation Program, without regard to whether such liabilities are outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements.

- 25 -

94.     The Debtors are not aware of any active, open claims under the Workers' Compensation Program. To the extent any Employees assert claims arising under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 to permit the Employees to proceed with such claims. This requested modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

95.     Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that potentially could disrupt the reorganization process. As of the Petition Date, the Debtors do not believe that there are any prepetition amounts outstanding on account of accrued but unpaid Workers' Compensation Program obligations.

96.     The Debtors offer eligible Employees the opportunity to participate in a defined 401(k) contribution plan through Empower, which allows for voluntary employee pre-tax deferrals (the "Retirement Plan"). Employees participating in this program may contribute up to 90% of their salary up to the federal statutory cap per year, and the Debtors deduct the employee pre-tax deferrals from Employee paychecks for each pay-cycle. The Debtors' Retirement Plan includes a match (each pay-period) by the Debtors of up to 100% up to the first 3%, and 50% on the next 2% of Employee contributions. Failure to timely forward the Employees' Retirement Plan deductions may be a violation of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), resulting in potential personal liability for the Debtors' officers for such deducted amounts. Maintaining the Retirement Plan as a part of the Employee Benefit Programs is critical to maintaining employee morale.

97.     Administration fees for the Retirement Plan are paid through plan assets.

98.     The Debtors maintain an ethics and harassment platform (the "Platform") with NAVEX Global to assist their Human Resources department and to provide mandatory and discretionary training to employees. The Debtors pay a $30,000 annual fee. The Debtors are not current, and, if the Debtors do not make payment by June 18, 2025, service will be suspended. The

- 26 -

Debtors seek authority, in their discretion, to pay this amount and amounts due relating to the

Platform.

US_ACTIVE\130481403

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 10th day of June 2025, at Sea Bright, New Jersey in Monmouth County.

Signed by:

*Gerard Uzzi*

C933082321E44B5...

Gerard Uzzi

## Exhibit A

**(Powin's Organizational Structure)**



**<u>Exhibit 4</u>**

(Declaration of Gerard Uzzi)

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re:<br>Powin, LLC, *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

## <u>DECLARATION OF GERARD UZZI</u>

I, Gerard Uzzi, hereby state and declare as follows:

1.       I am the Chief Restructuring Officer (the "<u>CRO</u>") of Powin, LLC ("<u>Powin</u>") and the above-referenced affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>"). I testify in support of the *Debtors' Motion for Entry of an Order (I) Approving Key Employee Retention Plan and Key Employee Incentive Plan and (II Related Relief* (the "<u>Motion</u>") (unless otherwise defined herein, all capitalized terms shall have the same meaning as in the Motion).

2.       Except as otherwise indicated herein, this declaration (the "<u>Declaration</u>") is based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors or the Debtors' advisors and professionals, and my opinion is based upon my experience, knowledge, and information concerning the Debtors' operations and this industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504], (iii) PEOS Holdings, LLC [5476], (iv) Powin China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [15241], (vii) Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [22495], (ix) Powin Energy Operating, LLC [6487] (x) Powin Energy Storage 2, Inc., [9926]; (xi) Powin Energy Ontario Storage II LP, [5787]; and (xii) Powin Canada B.C. Ltd. [2239].  The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR  97062.

3.      In incorporate my testimony in my previous *Declaration of Gerard Uzzi in Support of Emergency First Day Motions* (the "First Day Declaration").  [Docket No. 13].

4.      I am a Managing Partner and Founder of CBMN Advisors LLC d/b/a Uzzi & Lall ("Uzzi & Lall"). I have extensive experience advising companies, boards of directors, senior management, creditors, equity holders, and investors in stressed and distressed situations, including chapter 11, out-of-court work outs, and rescue financings across industries and jurisdictions. I also serve in a number of fiduciary capacities, including presently as the Chairman of the Celsius Litigation Oversight Committee.

5.      Prior to co-founding Uzzi & Lall, I was a senior restructuring partner at Milbank LLP and White & Case LLP for over 18 years in the aggregate. During that time, I was personally involved in senior roles in some of the nation's largest and most complex chapter 11 cases, including Lehman Brothers, Washington Mutual, American Airlines, Rescap, Charter Communications, Mirant, Adelphia Communications, Purdue Pharma, and ZAIS. I have been recognized for my work in Chambers, Euromoney's IFLR, The Legal 500, and Expert Guides as one of the World's Leading Insolvency and Restructuring Professionals.

6.      The Debtors entered these Chapter 11 Cases with a substantially-reduced workforce, without DIP financing and without any bids to buy their assets.  Thanks to the heroic efforts of the Debtors' remaining employees, the Debtors now have financing and are pursuing an orderly, but speedy, sale process.

7.      From the beginning of the Chapter 11 Cases, the Debtors have determined that there is an acute need to retain and incentivize their key employees for the success of their Chapter 11 Cases (*see* infra concerning the roles of the KERP Participants and KEIP Participants).   Both before the Chapter 11 Cases and before the Motion was filed, the Debtors have communicated to

1

Employees that the Debtors would develop and seek approval of retention and incentive bonus programs.

>    **a.    The Debtors' Employees**

8.    Before the Petition Date, the Debtors significantly reduced their workforce.  The Debtors also issued multiple pre-petition notices under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Chapter 23 (the "WARN Act").

9.    The Debtors undertook their largest reduction-in-force on June 6, 2025, wherein they terminated 285 employees.

10.    The Debtors' remaining seventy-two (72) Employees represent approximately 15% of the Debtors' workforce compared to January 1, 2025.  These Employees remain because they are critical for operating and maintaining the value of the Debtors' business. The  Employees largely support the project and technology branches of their services business.  Further, the Debtors employ the five (5) KEIP Participants, who manage the Debtors' business. *See infra.*    The Employees cannot be replaced, and without the Employees' services, the Debtors will no longer be able to provide products and services to their customers.

11.    Though the Debtors' Employees ordinarily receive compensation through base salary and bonus, in the Wage Motion the Debtors did not seek approval to pay bonuses to Employees.  Instead, in the Wage Motion, the Debtors stated: "Soon, the Debtors anticipate filing a motion seeking authorization to further retain and incentivize employees through bonuses to be issued under newly designed 'KEIP' and 'KERP' programs."  Wage Motion at ¶ 1.  At the first-day, interim hearing for the Wage Motion, counsel for the Debtors stated: "[T]he employees here are our priority, and retaining and incentivizing them [is] a top priority in the case.  [The Debtors]

2

hope to develop and file further retention and incentive programs." *See* Tr. of June 11, 2025 Hearing at 36-37.

12.     Even with the relief provided in the Wage Motion, the Debtors have still experienced attrition, with at least sixteen resignations since the Petition Date and numerous other Employees expressing concern or previewing their potential resignation to the Debtors.   During the Chapter 11 Cases, the Debtors' own customers, in fact, have approached and hired away several of the Debtors' skilled Employees.

### b.     The Sale Process and the Need to Retain and Incentivize Employees

13.     Upon information and belief, the Stalking Horse Bidder, if they are the winning bidder, will not offer employment to all of the Employees given redundancies with the Stalking Horse Bidder's business.  If no offer is given by a winning bidder, the Debtors, having sold their assets, will be forced to terminate the positions of these employees without cause (with such terminated employees, the "Terminated Employee").   During and after the sale process, the Debtors have and will continue to be transparent with Employees whose position may or will be terminated after a sale.

14.     The Debtors are actively conducting their sale process.  Multiple bidders have inquired regarding whether and how the Debtors will retain employees through closing.   These bidders recognize the value that all the employees provide to preserving value of the business, whether those employees are selected or not to continue on working for any given bidder.

### c.     The Development of the KERP and KEIP

15.     The Debtors enlisted Uzzi & Lall and their investment banker Huron Transaction Advisory LLC ("Huron") to support the development of the KERP and KEIP.  The Debtors, their professionals and I reviewed and considered: (i) the Debtors' financial resources and employment

3

requirements during these Chapter 11 Cases; (ii) the views of the Debtors' management with respect  to what was necessary and appropriate to achieve the stated goals; and (iii) employee programs approved by bankruptcy courts.

16.    These comparable plans include various cases in this district and other districts, including, as the KERP: *In re Sam Ash Music Corp.*, Case No. 24-14727 (SLM) (Bankr. D.N.J. June 13, 2024) (approving KERP for ten (10) percent of salary for 21 employees in aggregate of $234,000); *In re Agway Farm & Home Supply, LLC*, Case No. 22-10602 (JKS) (Bankr. D. Del. Nov. 21, 2022) (debtor had terminated approximately half of employees before filing for bankruptcy and undertook sale process in bankruptcy) (approving KERP for fourteen employees in aggregate of $285,000); *In re SLT HoldCo, Inc.*, Case No. 20-18368 (MBK) (Bankr. D. N.J. July 22, 2020) (approving KERP for $217,284 for eight (8) employees during sale process, ranging from approximately 17 to 25% of the employees' salary); *In re MobiTV*, Case No. 21-10457 (LSS) (Bankr. D. Del. Apr. 7, 2021) (approving KERP for all non-insider employees after debtor had reduced its workforce pre-petition) (awards ranged from 5.0% to 25.1% of their base salary); *In re Oneweb Global Limited, et. al.*, Case No. 20-22437 (RDD) (Bankr. S.D.N.Y. May 29, 2020) (debtors executed prepetition RIF of 90% of workforce, and Court approved (i) KERP for 47 remaining employee totaling $3 million (40% of salary paid in quarterly installments); *In re KB Toys, Inc.*, No. 08-13269 (KJC) (Bankr. D. Del. Jan. 6, 2009) (approving retention plan for 28 non-insider employees contemplating payments of approximately $300,000); *In re Mervyn's Holdings, LLC*, No. 08-11586 (KG) (Bankr. D. Del. Oct. 30, 2008) (approving retention plan for 93 non-insider employees contemplating payments of approximately $1.3 million); and, as to the KEIP: *In re Sam Ash Music Corp.*, Case No. 24-14727 (SLM) (Bankr. D.N.J. June 13, 2024) (approving KEIP for four employees in maximum aggregate of $107,000 for asset sales targeting at $10

4

million), *In re Agway Farm & Home Supply, LLC*, Case No. 22-10602 (JKS) (Bankr. D. Del. Nov.

21, 2022) (approving KEIP for President and CEO in maximum of two (2) percent of sale proceeds,

up to a maximum of $75,000 (24.6 of the executive's salary) payable upon closing of sales of

substantially all of the debtor's assets), *In re Ashley Steward Holdings, Inc.*, 2014 WL 2013372

(MBK) (Bankr. D. N.J. Apr. 23, 2014) (for $23 million stalking horse bid, approving KEIP in

aggregate of in range of $350,000 to $1.4 million to ten employees), and *In re Revel AC, Inc.*, Case

No. 14-22654 (MBK) Bankr. D. N.J. June 30, 2014) (approving KEIP of aggregate amount of

$1,525,000 for five (5) employees for meeting cash flow goals and additional amount for sale

closing above threshold amount).

      **d.**     **The KERP and KEIP are Reasonable and Should be Approved**

      17.     I believe that both the KERP and KEIP are reasonable and a sound exercise of the

Debtors' business judgment.  In fact, they are on the low end on a per-capita basis given the size

and complexity of the Chapter 11 Cases.  Commonly in such complex Chapter 11 Cases, the

Debtors would seek much higher bonuses for top executives and not seek to pay rank-and-file

employees at the same percentage.  The KERP and KEIP were therefore designed to enable the

success of the Chapter 11 Cases while recognizing the economic realities of the Chapter 11 Cases.

      **e.**     **Approval of the KERP and KEIP**

      18.     The Debtors presented the KERP and KEIP for consideration to the Debtors'

Independent Director who approved the programs.

      **f.**     **The KERP**

      i.     *The KERP Participants and their Value*

      19.     The Debtors have identified sixty-seven (67) Employees as KERP Participants.

The KERP Participants are all the Employees of the Debtors that are not KEIP Participants.

20.     The KERP Participants are integral to the Debtors' business.   The KERP Participants, unlike the majority of the Debtors' pre-petition employees, remain because the Debtors determined their services were necessary to the success of the Debtors' Chapter 11 Cases and the sale process.  From an operational standpoint, the Employees are necessary for the Debtors to have the capacity to answer customer questions and manage servicing of the Debtor's assets and contracts.  From a sale-process standpoint, the Employees will maintain going-concern value, including concerning transitioning the assets to new operations and maintaining customer support, and as needed, will assist the Debtors' leadership in responding to inquiries concerning diligence.

21.     The KERP Participants are not responsible for setting company policy and generally do not attend senior management meetings or participate in meetings of the Debtors' Board of Directors or any of its committees.  In fact, many of the KERP Participants' duties are limited to implementing tasks within a particular division or department.  As such, their titles reflect their relative position below upper management and functions within the organization and do not reflect any real insider status or responsibility.   Although certain of the KERP Participants hold titles such as "manager" they do not take part in the strategic management or decide "critical financial decisions" of the Debtors.

ii.     *The Terms of the KERP*

22.     Under the proposed KERP, each KERP Participant will receive monetary awards (the "KERP Award(s)") (with such payments of the KERP Awards, the "KERP Payment(s)").

23.     KERP Participants will earn a KERP Award of ten (10) percent of the their annual salary through one or more payment(s) upon a closing of a Sale Transaction (the "Closing"), which KERP Award will be payable at or shortly after a Closing (the "KERP Retention Bonus").

6

24.     If the KERP Participant voluntarily leaves employment prior to the Closing, or such KERP Participant is terminated for cause, that KERP Participant will forfeit the entire KERP Award.  For the avoidance doubt, the termination of a KERP Participant because of redundancies of a Sale Transaction and/or the failure of any Buyer to offer employment to a KERP Participant after a Closing will not be considered termination "for cause."[2]   Neither the (i) termination of the employment of a KERP Participant without cause nor (ii) death or disability shall affect any right of a KERP Participant to a KERP Award, and KERP Awards will be earned upon the occurrence of any triggering event(s), regardless of whether the event(s) occurred after (i) termination without cause or (ii) death or disability.

25.     If every KERP Participant remains eligible, total KERP Payments are estimated to be $993,936 (the "<u>KERP Maximum</u>").  The KERP Maximum, however, shall be reduced dollar for dollar based upon attrition due to termination for cause or resignation.

26.     KERP Payments will be made after payments of the secured amounts owed to the Debtors' Prepetition Secured Parties (or applicable holders) and DIP Lender.

**g.     The KEIP**

27.     The KEIP Participants are five (5) members of the Debtors' senior leadership team, consisting of the Debtors' (i) Chief Executive Officer, (ii) General Counsel, (iii) Chief Financial Officer, (iv) Chief Operating Officer and (v) Head of Human Resources. This team is responsible for executing the Debtors' operating and strategic plans, including maintaining the Debtors' business operations with reduced staff, overseeing and addressing issues during these Chapter 11

---

[2] For purposes of the KEIP and KERP, "cause" means (i) failure to materially perform the duties for which they are employed, (ii) willful violation of a material policy of the Debtors, (iii) commission of any act or acts of fraud, embezzlement, dishonesty, or other willful misconduct, (iv) material breach of any of their obligations under any written agreement or covenant with the Debtors, or (v) an act of dishonesty resulting or intended to result, directly or indirectly, in their gain for personal enrichment at the expense of the Debtors.

Cases, interfacing with customers, and maintaining a culture among the Debtors' employees during these Chapter 11 Cases.  In addition, the KEIP Participants shoulder the burden of moving the Debtors' sale forward, answering bidder questions and providing information to the Debtors' professionals.  The KEIP Participants are vital to the on-going stability, continuity, and strength of the Debtors during these Chapter 11 Cases and the sale process.

28.     This challenge is compounded by the nature of the Debtors' business, which is built on trust, reputation and communication that the KEIP Participants have earned from counterparties. Vendors, partners and customers may be cautious to continue to do business with the Debtors in the face of a challenging market and press coverage.  The KEIP Participants have offset such fears through outreach and open communication with their employees and customers, and, now, will do the same when communicating with bidders.

29.     Under the proposed KEIP, the KEIP Participants may earn bonuses (the "KEIP Award(s)," and with payments of these amounts as the "KEIP Payment(s)").  A KEIP Participant may earn up to two KEIP Bonuses: (i) a KEIP Bonus earned upon compliance with DIP Financing milestones and parameters (the "KEIP DIP Bonus"); and/or (ii) a KEIP Bonus payable upon a Closing (the "KEIP Sale Bonus").

30.     The KEIP DIP Bonus will be earned if the Debtors comply with the Approved Budget before Closing, and will be payable at or shortly after Closing (when it is anticipated that the DIP Facility will be repaid).   The KEIP DIP Bonus for each eligible KEIP Participant will be five (5) percent of their annual salary.

31.     The KEIP Sale Bonus will be earned upon the occurrence of a  successful closing under which the Debtors receive proceeds of $40 million or greater in cash or cash equivalents (including retirement of secured debt) (a "Successful Closing") and will be payable at or shortly

8

after a Successful Closing.  The KEIP Sale Bonus for each eligible KEIP Participant will be five (5) percent of their annual salary.

32.      Therefore, each KEIP Participant may earn up to ten (10) percent of their salaries if the Debtors perform under the Approved Budget and execute a Successful Closing.  The maximum amount payable under the KEIP is estimated to be $205,500 (the "KEIP Maximum").

33.      If a KEIP Participant is terminated for "cause," or voluntarily ends his or her employment, he or she will not receive any future KEIP Award.  For the avoidance doubt, the termination of a KERP Participant because of redundancies of a Sale Transaction and/or the failure of any Buyer to offer employment to a KERP Participant after a Closing will not be considered termination "for cause."  Neither the (i) termination of the employment of a KEIP Participant without cause nor (ii) death or disability shall affect any right of a KEIP Participant to a KEIP Award, and KEIP Awards will be earned upon the occurrence of any triggering event(s), regardless of whether the event(s) occurred after (i) termination without cause or (ii) death or disability.

34.      KEIP Payments will be made after payments of the secured amounts owed to the Debtors' Prepetition Secured Parties (or applicable holders) and DIP Lender.

35.      The KEIP Participants have already worked strenuously to get the Debtors to the precipice of a sale process, with a Stalking Horse APA for $36 million plus the $2 million Retention Payment (as defined in the Stalking Horse APA) and the DIP Facility in hand.  This is a remarkable achievement given the state of affairs on the Petition Date (with no offer and no DIP financing).

36.      The KEIP Participants have stayed with the Debtors and worked hard and worked well.  I believe that this hard work has been in part because, to incentive the employees, Debtors

9

told their KEIP Participants they would be rewarded through a KEIP both privately and in public (such as at the Wage Motion hearing).

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 23rd day of July 2025, at Sea Bright, New Jersey in Monmouth County.


_____*/s/ Gerard Uzzi*_____
Gerard Uzzi

10

## **Exhibit 5**

(First Day Hearing Transcript)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 25-16137 (MBK) |
| | . | Chapter 11 |
| POWIN, LLC, ET AL., | . | (Joint Administration Requested) |
| | . | |
| | . | U.S. Courthouse |
| Debtor. | . | 402 East State Street |
| | . | Trenton, NJ  08608 |
| | . | |
| | . | June 12, 2025 |
| . . . . . . . . . . . . . | . | 9:31 a.m. |

TRANSCRIPT OF FIRST-DAY MOTIONS
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:          Togut, Segal & Segal LLP
                         By:  ALBERT TOGUT, ESQ.
                              EITAN BLANDER, ESQ.
                         One Penn Plaza, Suite 3335
                         New York, NY  10119

                         Togut, Segal & Segal LLP
                         By:  FRANK A. OSWALD, ESQ.
                         550 Broad Street, Suite 1508
                         Newark, NJ 07102

                         Dentons US LLP
                         By:  VAN C. DURRER, II, ESQ.
                              TANIA M. MOYRON, ESQ.
                         601 S. Figueroa Street, Suite 2500
                         Los Angeles, CA  90017


Audio Operator:          Linda Brakel

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

APPEARANCES CONTINUED:

For the Debtor (cont'd): Dentons US LLP
                         By:  JOHN D. BECK, ESQ.
                         1221 Avenue of the Americas
                         New York, NY  10020-1089

                         Dentons US LLP
                         By:  CASEY DOHERTY, ESQ.
                         1300 Post Oak Blvd., Suite 650
                         Houston, TX  77056

For U.S. Trustee:        Department of Justice
                         Office of U.S. Trustee
                         By:  LAUREN BIELSKIE, ESQ.
                              JEFFREY M. SPONDER, ESQ.
                         One Newark Center, Suite 2100
                         1085 Raymond Boulevard, Suite 2100
                         Newark, NJ  07102

For the Surety Bond      Womble Bond Dickinson
Provider:                By:  LISA BITTLE TANCREDI, ESQ.
                         1313 North Market Street, Suite 1200
                         Wilmington, DE  19801

For Certain Funds and    White & Case
Accounts Managed by      By:  ANDREW ZATZ, ESQ.
KKR Credit Advisors:     1221 Avenue of the Americas
                         New York, NY  10020-1095

                         Gibbons P.C.
                         By:  JOHN S. MAIRO, ESQ.
                         One Gateway Center
                         Newark, NJ  07102

For DTE Electric         Pashman Stein Walder Hayden, P.C.
Company:                 By:  LEAH EISENBERG, ESQ.
                         21 Main Street, Suite 200
                         Hackensack, NJ  10020-1001

For Trilantic:           Kirkland & Ellis
                         By:  APARNA YENAMANDRA, P.C.
                         601 Lexington Avenue
                         New York, NY  10022

For Invenergy, LLC:      Holland & Knight
                         By:  BARBARA PARLIN, ESQ.
                         787 Seventh Avenue, 31st Floor
                         New York, NY  10019

APPEARANCES CONTINUED:

For Ace Engineering &      Sherman Silverstein
Co. Ltd.:                  By:  ARTHUR J. ABRAMOWITZ, ESQ.
                           308 Harper Drive, Suite 200
                           Moorestown, NJ  08057

                      -  -  -  -  -  -

4

**INDEX**

| **EXHIBITS** | **I.D.** | **EVD.** |
|---|---|---|
| Declaration of Gerard Uzzi | 10 | 10 |

5

1           (Proceedings commenced at 9:31 a.m.)

2           THE COURT:  All right.  Good morning, folks.  This is

3  Judge Kaplan.

4           We'll be hearing the Powin matters.  Hold on one

5  second.  Let everybody adjust their monitors.

6           This morning's hearing is being conducted on a hybrid

7  basis with counsel in the Court, which is a nice change, plus

8  remote appearances.  For those who are appearing remotely and

9  wish to be heard, please make use of the "raise hand" function

10 and we will do our best to spot you.

11          For those in Court, I'll ask that we have

12 appearances.

13          Good morning, Mr. Togut.  How are you?

14          MR. TOGUT:  I'm fine, Your Honor.  I've been here

15 many times, but only by Zoom.  So it's a pleasure to be here in

16 person.

17          THE COURT:  It threatens different when it's live.

18          MR. TOGUT:  Well, you have a beautiful courtroom.

19 It's very nice.

20          THE COURT:  Thank you.

21          MR. TOGUT:  You can't really see all that so well on

22 Zoom.

23          We're pleased to be here.  We filed these cases very

24 late on Monday night.  I want to thank your staff, the clerk of

25 the Court, the U.S. Trustee, for just being incredibly helpful

1  in doing what we needed to do to be able to be here today.

2          With me for my team is Eitan Blander, who will be

3  presenting some of the first days.  The rest of my team is

4  watching by Zoom, headed by Frank Oswald, who really led the

5  effort for my firm.

6          I'd like to introduce Van Durrer from the Dentons

7  firm, and he will do most of the talking.  I'll sit down.

8          THE COURT:  All right.  Thank you.

9          MR. TOGUT:  Thank you.

10         THE COURT:  Good morning, Mr. Durrer.

11         MR. DURRER:  Good morning, Your Honor.  Van Durrer of

12 Dentons.

13         I don't think I've seen you since the November Mass

14 Tort Bench Bar Conference up in D.C., but it's a pleasure to be

15 in your courtroom.

16         THE COURT:  Pleasure not to have a mass tort.

17                       (Laughter)

18         MR. DURRER:  I will second that emotion.

19         As Your Honor is aware and as Mr. Togut mentioned,

20 these debtors did not enter Chapter 11 on the typical cadence.

21 So I want to echo Mr. Togut's remarks about the resilience,

22 diligence, and professionalism of all the Court staff,

23 including chamber staff.

24         I also want to remark, I think Mr. Sponder is with us

25 by Zoom.  I wanted to remark that the United States Trustee's

7

1    Office actually provided comments and suggestions on our first

2    days in less than 24 hours from when we filed the papers,

3    vastly overexceeding what they had promised.  So thanks for

4    that.

5          I want to start, Your Honor, with a few

6    introductions.  First of all, our CEO, Brian Kane, is here with

7    us.

8          THE COURT:  Good morning.

9          MR. DURRER:  Mr. Kane hails from Collingswood, New

10    Jersey, just a bit further down the road and is a proud alum of

11    Rutgers.  These days, he lives a little further up north.

12          Also Gerard Uzzi is the CRO of the company.  He also

13    lives right here in New Jersey.

14          Finally, Mitchner Turnipseed is our investment banker

15    from Huron Transaction Advisory.

16          From Dentons, my partner John Beck is here, who will

17    be presenting cash collateral and cash management.  And our

18    Houston colleague, Casey Doherty, will be presenting the wages

19    motion.

20          Tania Moyron, the chair of our restructuring practice

21    at Dentons, is also on Zoom.  Among other things, she worked

22    tirelessly over the past couple of weeks on dealing with the

23    company's complex labor situation on three continents around

24    the globe, but we are not seeking any relief on those matters.

25          THE COURT:  All right.  Good morning.

1            MR. DURRER:  When the advisory team was originally

2    engaged, Your Honor, just a short bit ago, we quickly

3    discovered that Powin was deeply troubled and severely

4    liquidity constrained, more so than we had originally

5    understood.  Indeed, there are macroeconomic factors at play.

6    Due to certain policy changes, $8 billion worth of clean energy

7    deals have been canceled, even this year, 2025.

8            Two energy companies, Mosaic and Sunnova, have filed

9    in recent days.  To give you a sense of what the company does,

10   Powin engineers, supervises the installation of, and services

11   battery energy storage systems for green energy plants around

12   the planet.  Many of these systems, including in particular

13   solar, are really only sustainable where a battery system is

14   also deployed so that the system can run around the clock when

15   the sun goes down, for example.

16           Among the companies that supply this service, and

17   especially the ongoing repair and maintenance function, Powin

18   holds a 20 percent market share and is the largest provider,

19   according to some estimates.  Indeed, every other player in the

20   marketplace has teens or single digits market share.  Powin is

21   the largest.

22           So in short, Powin's failure would have a devastating

23   impact on that marketplace because it would effectively cut

24   customers off from critical data, functionality, and services.

25   With that understanding, we naturally turned to Powin's

1   customers to develop a pathway forward.

2          After a lot of engagement, the feedback from

3   customers was clear.  There was a strong desire for Powin to

4   remain viable on the one hand, but customers wanted some

5   assurance that projects would not be plagued with Powin's

6   legacy problems, on the other hand.  To that end, Powin formed

7   Powin Project LLC here in New Jersey.  Given the aforementioned

8   ties to the area, Powin's largest creditor has key personnel in

9   New Jersey as well.

10          So pending the customer relief we'll talk about soon,

11   Powin Project's primary asset today is a cash account held here

12   in Trenton.  Once we get through today's hearing, Your Honor,

13   hopefully successfully, we will turn to the business of our

14   employees.  We need to develop retention programs for them.

15   They're vital to the success of Powin, and that will be a top

16   priority once we clear today.

17          So on the basis of this customer strategy that we're

18   developing, a vital element of that was the debtors'

19   pre-petition secured lenders agreeing to allow the consensual

20   use of cash collateral.  That agreement is not without material

21   risk on their part, and we agreed to a commercial deal that

22   accommodates that risk and takes it into account and fairly

23   compensates them for it.  Candidly, the lenders have been very

24   good partners, and we would be in a very different place

25   without their support.

26          That's all I have to open, Your Honor, except for one

1 thing.  I do want to move the admission of Mr. Uzzi's first-day

2 declaration, if Your Honor will accept that into evidence.

3        THE COURT:  All right.  Let me hear from counsel

4 either present or appearing remotely, any objection to the

5 admission of the Uzzi declaration?

6                    (No audible response)

7        THE COURT:  Counsel?

8        MR. DURRER:  Oh, pardon me.

9        MS. TANCREDI:  Good morning, Your Honor.  Lisa

10 Tancredi on behalf of the surety bond provider in this case.

11        We have a $20 million customs bond that benefits the

12 debtor.  I have no objection to the admission of the

13 declaration so long as he's subject to cross-examination.

14        THE COURT:  Do you intend to cross-examine?

15        MS. TANCREDI:  I do have a few questions for him,

16 yes.

17        THE COURT:  All right.  We'll admit the declaration

18 subject to the cross-examination.

19      (Declaration of Gerard Uzzi admitted to evidence)

20        MR. DURRER:  Thank you, Your Honor.

21        THE COURT:  All right.

22        MR. DURRER:  I'm just going to yield the floor to

23 Mr. Blander to go over his matters, Your Honor.

24        THE COURT:  All right.  Thank you.

25        MR. BLANDER:  Good morning, Your Honor.  Eitan

1 Blander, Togut, Segal & Segal, co-counsel for the debtors.  My

2 Pro Hac Vice application was submitted previously.  It's at

3 Docket Number 20.

4          If acceptable, Your Honor, I'll continue with the

5 administrative motions which constitute the first five agenda

6 items.

7          THE COURT:  Welcome to New Jersey, yes.

8          MR. BLANDER:  Thank you, Your Honor.

9          I'm actually going to start with the second agenda

10 item, which is the debtors' motion for an order directing joint

11 administration of the Chapter 11 cases.  This was filed at

12 Docket Number 3.  We provided copies of the motion to the U.S.

13 Trustee with minor comments to the preamble of the order which

14 were incorporated in the red line that was sent to chambers

15 last night.  This is a standard motion, and unless Your Honor

16 has any questions, we'd ask that it be granted.

17          THE COURT:  Mr. Sponder or Ms. Bielskie.  I see

18 Mr. Sponder's name on the screen.  I understand that you're

19 engaged in juggling a couple of projects at the moment.  So to

20 make things more expedient, to the extent there are any

21 concerns of the U.S. Trustee's Office that go beyond the

22 comments that have already been submitted to the parties-in-

23 interest, you'll advise and you'll use either the raise-hand

24 function or simply weigh in.  Otherwise, I'll assume that your

25 concerns have been addressed.  Is that fair enough,

1  Mr. Sponder?

2          MR. SPONDER:  Thank you, Your Honor.  Jeff Sponder

3  from the Office of the United States Trustee.

4          I maybe can make it a little bit easier than that,

5  Your Honor.

6          THE COURT:  All right.

7          MR. SPONDER:  With respect to joint administration,

8  insurance, wages, cash management, the notice agent, creditor

9  matrix, the complex case designation, and then extension of

10  schedules, we were resolved on all eight of those motions and

11  the orders.  I will say that I believe we ended up with the

12  extension of schedules to July 17th with a proposed 341 date of

13  July 23.

14          But I understand all of our requested revisions have

15  been incorporated in those eight orders and what we have issues

16  with would just be the cash collateral and the customer program

17  one.

18          Thank you, Your Honor.

19          THE COURT:  All right.  Thank you.  That helps

20  tremendously.

21          Then, with respect to the second item on the agenda,

22  seeing no other raised hands, motion granted.

23          MR. BLANDER:  Thank you, Your Honor.

24          I'll then turn to the first agenda item, which is the

25  debtors' application for designation as a complex Chapter 11

13

1  case.  This was filed at Docket Number 6.

2          As stated in the application, these cases satisfy the

3  criteria as a complex case pursuant to Local Rule 1002(2).

4  Among other things, the debtors have more than $50 million in

5  assets and liabilities, and there are likely to be more than

6  1,000 creditors.

7          Unless Your Honor has any questions, we'd request

8  that the order be entered.

9          THE COURT:  All right.  Any opposition?

10                      (No audible response)

11          THE COURT:  Motion granted.

12          MR. BLANDER:  Thank you, Your Honor.

13          I'll then turn to Agenda Item Number 3, which is the

14  debtors' motion for an order extending the time to file

15  schedules and statements.  This was filed at Docket Number 10.

16          In the motion, the debtors had originally sought an

17  extension of 28 days, an additional extension for 28 days for a

18  total of 42 days.  As Mr. Sponder has stated, we have since

19  agreed to reduce the extension to, I believe, 24 days, which

20  would set the deadline at July 17, 2025.  This was not in the

21  red lines that were sent to chambers last night.  This is a

22  recent development, but they will be reflected in the red lines

23  to be sent after this hearing.

24          Unless Your Honor has any questions, we'd ask that

25  the order be entered.

14

1          THE COURT:  All right.  Again, I see no objections.

2   Motion will be granted.

3          With respect to all of the orders, the final

4   versions, with language that the parties have negotiated and

5   agreed upon, send them in one batch to chambers after the

6   hearing and that way, we don't get confused and enter an

7   earlier version.  All right.

8          MR. BLANDER:  We'll do Your Honor.

9          THE COURT:  Thank you.

10          MR. BLANDER:  Next is Agenda Item Number 4, which is

11   the debtors' motion for orders authorizing the filing of a

12   consolidated list of the 50 largest unsecured creditors, the

13   filing of a consolidated list of creditors in lieu of

14   submitting a separate matrix for each debtor, and authority to

15   redact certain personally identifiable information.

16          We've received minor comments from the U.S. Trustee

17   which were submitted in the red line to chambers last night.

18   This is common relief in this district, and unless Your Honor

19   has any questions, we'd again ask that this order be entered.

20          THE COURT:  I see no opposition.  Granted.  Thank

21   you.

22          MR. BLANDER:  Thank you, Your Honor.

23          The fifth agenda item is the debtors' application to

24   appoint KCC, doing business as Verita Global, as claims and

25   noticing agent effective as of the petition date.  This was

15

1  filed at Docket Number 9.

2          We received comments from the U.S. Trustee's office

3  which have been incorporated into the red lines that were sent

4  to chambers last night, and these have also been agreed to by

5  Verita.

6          Unless Your Honor has any questions, we'd ask that

7  the order be entered.

8          THE COURT:  All right.  Again, no opposition.  Motion

9  granted.

10          Thank you.

11          MR. BLANDER:  Thank you, Your Honor.

12          I will yield the podium to the Dentons team.

13          THE COURT:  Good morning, Counsel.

14          MR. BECK:  Good morning, Your Honor.  John Beck of

15  Dentons on behalf of the debtors and debtors-in-possession,

16  Your Honor.

17          I will be addressing the debtors' cash collateral

18  motion, which we filed on Tuesday at Docket Number 11.  Your

19  Honor, we also submitted red lines to Your Honor's chamber this

20  morning that detail changes that we've made after conversations

21  with a number of parties and also the U.S. Trustee's office.  I

22  think we have accepted and resolved most of the U.S. Trustee's

23  comments, except for a handful of issues, which I'll walk Your

24  Honor through, here in a minute.

25          The first, Your Honor, is Section 9, which is the

1  project contribution to the new Powin Project LLC of the IP.

2  The debtors have agreed to make that provision subject to the

3  final order so that it will not be sought in interim relief.

4  However, one caveat, Your Honor, and Mr. Zatz from White & Case

5  can speak to this if he'd like, but the pre-petition secured

6  lenders would like to go ahead and be able to perfect against

7  that entity, file UCC-1's, and anything else that they need to

8  perfect their liens against that entity.  But the actual IP

9  transfer to that entity would not happen until it is approved,

10  at the final order, Your Honor.

11          THE COURT:  All right.

12          MR. BECK:  Next, Your Honor, is -- it's really the

13  same issue that appears in both Sections 20 and 23.  Your

14  Honor, the U.S. Trustee had a number of comments that dealt

15  with the scope of the debtors' stipulations and whether or not

16  and to what extent they were binding on a Chapter 7 trustee.

17  We have not accepted the U.S. Trustee's language in total but

18  we have provided language that we believe addresses the same

19  issues, and that is we have extended the challenge period of

20  time to the earlier of 75 days from the interim order or 60

21  days from the time the committee is appointed.

22          And then, in addition, there is also a mechanism by

23  which if this case converts to Chapter 7, a Chapter 7 trustee

24  would get the later of 15 days from the Chapter 7 trustee's

25  appointment or the regularly scheduled challenge period if that

1 were further in time.

2          So that is our proposal to address the U.S.

3 Trustee's comments with regard to the challenge period.

4 However, we do think that it's important that the debtors'

5 stipulations are binding on its successors, including a

6 Chapter 7 trustee, subject to the challenge rights that are in

7 the DIP order.

8          Finally, Your Honor, is Section 7(b), which we

9 received comments from the U.S. Trustee's Office, as well as a

10 number of creditors, including a group of customers that filed

11 a limited objection this morning, I believe at Docket

12 Number 38.

13          THE COURT:  Licensees?

14          MR. BECK:  Yes, they are customers that have IP

15 escrows that the licenses are in the escrow accounts.

16          We have sought to address their objections with

17 language that I'll read to Your Honor that would go at the end

18 of section, it's now 10(b), I believe, but it will be 9(b) once

19 the project dropdown is removed or adjusted.  So, Your Honor,

20 that language is, "For the avoidance of doubt, if the

21 pre-petition liens are determined to be junior to any prior

22 permitted liens," which is a defined term in the document, "the

23 AP liens, or the adequate protection liens, shall also be

24 junior to such permitted prior liens to the same extent and the

25 same relative priority.  Furthermore, the adequate protection

1  liens shall not attach to any assets that are not or do not

2  become property of the debtors' estate."

3          And, Your Honor, I think the parties are on the line

4  so they can correct me if I'm wrong, but I believe that for the

5  interim order only, this language satisfies the customer

6  objectors represented by Mayer Brown and also satisfies Pulse

7  Clean Energy that gave us an informal comment in this regard.

8          It, however, does not, I think, they've been talking

9  about in the hall, right up until the moment I took the podium.

10  I think additional language is needed for Applied Surety

11  Underwriters who is here today and reserved the right to

12  cross-examine Mr. Uzzi.  So I don't know if we have a

13  resolution on that?  So I'm hoping that they have a resolution

14  in the hallway to address that point.

15          And finally, Your Honor, is the U.S. Trustee made

16  informal comments because the pre-petition secured lenders are

17  seeking on the interim order to have adequate protection liens

18  on proceeds of avoidance actions.  We think that that is

19  appropriate in this case, as Mr. Durrer alluded to.  The

20  lenders here really have been cooperative and we would not be

21  in this situation without their efforts to support this company

22  and provide liquidity at a very crucial time.  We think that it

23  is a fair trade-off for the risks that they are undertaking to

24  support the company at this time to provide them liens on those

25  avoidance action proceeds, even at the interim period, Your

1 Honor.

2          So with that, I'll cede the podium to Mr. Zatz, and

3 I'll address any questions or comments.

4          THE COURT:  All right.  Mr. Zatz, do you wish to

5 wait?  I mean, there are those raised hands, wish to comment or

6 object.  Do you want to address all, or do you want to --

7          MR. ZATZ:  I think, Your Honor, if it's all right,

8 I'd like to make some comments and then I'm happy to reappear

9 to address any additional objections --

10          THE COURT:  All right.

11          MR. ZATZ:  -- that debtors haven't already flagged.

12 But perhaps I can get ahead of them and help streamline things.

13          THE COURT:  Sure.

14          MR. ZATZ:  But first, I would like to make a few

15 introductory remarks, if I may.  Andrew Zatz from White & Case

16 on behalf of Certain Funds and Accounts Managed by KKR.  And

17 I'm joined by John Mairo of Gibbons as co-counsel.

18          KKR provided the entirety of a secured loan to Powin

19 in October 2024 with an overall commitment of $200 million.

20 They are thus referred to in the debtors' papers as the

21 pre-petition secured lenders.  The pre-petition agent, on

22 behalf of the pre-petition lenders, has all asset liens.

23 Approximately $25.6 million of principal amount is currently

24 outstanding under the facility.

25          On March 24, 2025, the pre-petition lenders called a

20

1   default and took control of blocked accounts.  After that, the

2   pre-petition lenders worked collaboratively with Powin to allow

3   the release of funds for ordinary course expenses, including

4   the payment of vendors and suppliers, and was negotiating the

5   terms of a potential forbearance with Powin and its equity

6   holders, which would have included a partial repayment of the

7   pre-petition lenders' loan.

8          Those negotiations broke down.  And as a result, on

9   April 25, 2025, the pre-petition lenders exercised their proxy

10  rights to appoint Gerard Uzzi as independent manager and swept

11  an amount of cash from the blocked accounts that the company

12  had stated was expendable.  Mr. Uzzi has no affiliation with

13  any of the pre-petition lenders.

14         Pre-petition lenders took this action specifically to

15  ensure that there was independent and experienced oversight and

16  to preserve the arm's-length relationship between themselves

17  and Powin.  Once Mr. Uzzi was appointed and got up to speed, a

18  number of things became clear.

19         First, the company's liquidity position was not as

20  stable as the company had previously claimed.  Second, it was

21  difficult for the company to get concessions from vendors,

22  suppliers, and customers as the company had already stretched

23  these third parties as far as possible, and Powin had serious

24  credibility issues.

25         And third, existing equity holders who still retained

1 their economic interests in Powin were not going to provide the

2 necessary capital to preserve the growing concern value of the

3 company.  In the face of these urgent problems, the

4 pre-petition lenders permitted sufficient cash to be

5 transferred from the blocked account to the company and lent

6 back $6.25 million to Powin.

7        At every turn, the pre-petition lenders have been a

8 supporter of Powin's business, going above and beyond what was

9 required of them.  There were numerous opportunities for the

10 pre-petition lenders to exercise rights and remedies, including

11 by sweeping significant additional amounts of cash.  Instead,

12 the pre-petition lenders refrained from taking such actions to

13 give Powin the best opportunity to continue its operations and

14 attempt to negotiate deals with customers and other third

15 parties.

16        Ultimately, it became clear that Powin needed a core

17 process to get to these deals in an organized fashion.  It is

18 the pre-petition lenders' sincere hope that Powin can sell

19 assets and create value out of the project co-entity in these

20 Chapter 11 cases.  Prior to the filing, the pre-petition

21 lenders entered into a forbearance and support agreement with

22 Powin, whereby the pre-petition lenders agreed not to exercise

23 rights in advance of filing.

24        The pre-petition lenders also successfully negotiated

25 with Powin on the terms of the consensual use of cash

22

1  collateral.  But the pre-petition lenders have no intention of

2  continuing to provide capital to Powin, nor do they want to own

3  the company.  The pre-petition lenders' goal is simply to be

4  repaid on their loan and hopefully give the company the freedom

5  to maximize value for other creditors.  We've worked

6  collaboratively with the debtors and their counsel on the

7  first-day motions and are supportive of all of them.

8        With respect to cash collateral in particular, as our

9  friends at Dentons have just mentioned, we spent the last 12 to

10 18 hours in conversations with them and the United States

11 Trustee through them to try to resolve a fairly comprehensive

12 market that we received on the cash collateral order from the

13 U.S. Trustee.  As was indicated, I think virtually all those

14 issues have been now resolved.

15       There is the issue of the liens on proceeds of

16 avoidance actions, and I will see if the U.S. Trustee wants to

17 press that objection in light of all the other concessions that

18 were made, and I think Dentons covered the issue well, so I'm

19 not going to expand on that for the time being.

20       On the issue of sureties and others who have raised

21 their hand looking for protective language, I think you heard

22 on the record the reservation that we are making, which I think

23 is fairly clear, but just to restate it in as clear terms as I

24 can put it.  For any diminution in value of our existing

25 security interest during the case, we are getting adequate

1   protection liens on all of the debtors' assets.  That's the

2   standard formulation that I think you'll see in every cash

3   collateral order.

4          We are not trying to have those adequate protection

5   liens prime liens that were ahead of our pre-petition liens,

6   nor are we trying to get liens on things that are not the

7   debtors' property, or will become the debtors' property.  I

8   think perhaps one thing that is still left to be resolved that

9   we're amenable to resolving is there's a term "permitted prior

10  liens" that's meant to address liens that may be senior, if any

11  exist, to the pre-petition lender's pre-petition liens.

12         That term, as it currently exists in the order,

13  refers back to a term that is in our loan agreement which is

14  not on file.  So I understand the concern.  We're amenable to

15  working out language that separates that term from the external

16  document.  The point is we're talking about valid, enforceable,

17  perfected liens that were senior to the pre-petition lenders'

18  liens as of the petition date.  That's my off-the-dome

19  description of what we're getting at, but we can find the right

20  legalese to get at the notion.

21         With that, Your Honor, I will cede the podium and

22  reserve the right to reappear to address any objections that

23  are raised.

24         THE COURT:  All right.  Thank you, Mr. Zatz.

25         Let me first turn to the U.S. Trustee, Mr. Sponder.

24

1          Good morning, again.

2          MR. SPONDER:  Good morning, again, Your Honor.  Jeff

3    Sponder from the Office of the United States Trustee.  Again, I

4    apologize if there's going to be any background noise.  I

5    unfortunately cannot help that.

6          So with respect to the cash collateral order, Your

7    Honor, Paragraph 7(b) was discussed.  And for that matter, let

8    me just start by saying that I do realize that a red line order

9    was submitted to the Court 7:00, 7:30'ish in the morning.  I

10   did try to review as much of it as I could.  I still need the

11   opportunity to review and decide whether or not revisions were

12   made that the United States Trustee requested.

13         As for Paragraph 7(b), Your Honor, Section 361(2), as

14   you know, allows for additional or replacement liens only to

15   the extent that such stay under 362 use, sale, lease, or grant

16   results in the decrease in the value of such entity's interest

17   in such property.  As such, we revised the language in

18   Paragraph 7(b) to reflect that the secured creditors are

19   receiving, and I quote, "valid, binding, continuing,

20   enforceable, fully perfected, non-avoidable replacement liens

21   to the extent the pre-petition secured parties have

22   pre-petition liens under Section 361(2) of the Bankruptcy Code,

23   all such liens and security interests, the adequate protection

24   liens.  To the extent cash collateral is used by the debtors,

25   to the same extent validity and priority and the debtors'

25

1  post-petition collateral as defined below, and proceeds thereof

2  that the pre-petition secured parties held in the debtors'

3  pre-petition collateral."

4          We believe that that is what the definition and what

5  adequate protection liens should be, and that's based on the

6  Code.  All the other language in there should be removed, Your

7  Honor.

8          As to Paragraph 20, which is the effect of

9  stipulations on third parties, the U.S. Trustee requested 60

10 calendar days from entry of the final order for parties-in-

11 interest other than any statutory committees, and 60 calendar

12 days for the statutory committee from the date the statutory

13 committee is appointed.

14         The U.S. Trustee will agree to the 75 days from

15 interim order for parties-in-interest and 60 days for the

16 committee from appointment, but will not agree that it's the

17 earlier of.  It should be 75 days then from interim for

18 purposes of parties-in-interest and 60 days for the committee.

19         Further with that, Your Honor, the U.S. Trustee

20 requested language that provided that basically provides this.

21 If prior to the end of the challenge period, the cases convert

22 to a Chapter 7 or a Chapter 11 trustee is appointed, then the

23 challenge period can be extended for the Chapter 7 trustee or

24 the Chapter 11 trustee by 45 days after their appointment or

25 such other time as the Court orders.

1          The U.S. Trustee believes that the lender is agreeing

2    to 15 days for a Chapter 7 trustee only.  We request the 45

3    days for both Chapter 7 trustee and Chapter 11 trustee and in

4    fact that was actually agreed to in either the CBRM order or

5    the Rite Aid order that we just did, Your Honor.

6          Moving on, the U.S. Trustee requests removal that

7    requires any motion filed with the Court seeking standing to

8    pursue a challenge, include a complaint.  The U.S. Trustee also

9    requested language that any trustee appointed or elected in

10   these cases shall, until the expiration of the challenge period

11   and thereafter for the duration of any adversary proceeding or

12   contested matter, be deemed to be a party other than the

13   debtors and shall not for purposes of the adversary proceeding

14   or contested matter be bound by the acknowledgments,

15   admissions, confirmations, and stipulations of the debtors in

16   this interim order.

17         The U.S. Trustee also requested language that the

18   filing of a motion seeking standing to file a challenge action

19   before the challenge period which attaches a proposed challenge

20   action shall extend the period with respect to that party until

21   two business days after the Court approves the standing motion.

22   I think that one may be included, Your Honor, and I can be

23   corrected if I'm wrong, in the in the latest version.

24         Last, with respect to the cash collateral order, Your

25   Honor, we requested language concerning the fact that some of

27

1    these debtors are Delaware limited liability companies and we

2    requested language about the ability of creditors to file

3    derivative suits on behalf of those limited liability

4    companies.  We've had that in several cases as well, but the

5    lender I don't believe agreed to include that.  So that's with

6    respect to -- oh, I'm sorry, with just respect to the

7    stipulations.

8            Next, Your Honor, is Paragraph 23, which is the

9    binding effect.  We just changed that large paragraph to say,

10   "The terms of this interim order shall be valid and binding

11   upon the debtors, all creditors of the debtors, and all

12   parties-in-interest from and after the entry of this interim

13   order by the Court."  That's the binding effect.  That should

14   be what's included.

15           Avoidance actions, Your Honor, those are typically

16   kept for the committee as you're aware.  The United States

17   Trustee objects to the order requesting the proceeds be granted

18   at the interim order without a committee having the opportunity

19   to review and possibly object.

20           And then, with respect to Paragraph 9, Your Honor,

21   that's the ProjectCo and what we've been talking about with

22   respect to the transfer of assets.  I understand that's going

23   to be revised and held over to the final hearing.

24           With respect to the UCCs at this time the United

25   States Trustee objects but, with that said, at the very least,

1  if the Court agrees to allow the UCCs to be filed, then

2  parties-in-interest, including the committee, should have the

3  ability to object and reserve their rights.

4             Thank you Your Honor.

5             THE COURT:  All right thank you Mr. Sponder.

6             Let me turn to raised hands.  I'll go left to right

7  on my screen.

8             Ms. Eisenberg.

9             MS. EISENBERG:  Good morning, Your Honor.

10            THE COURT:  Good morning.

11            MS. EISENBERG:  Leah Eisenberg from Pashman Stein.

12  We are serving as local counsel for Leeward Renewable Energy,

13  Longroad Energy, and DTE Energy.  And I'd like to introduce you

14  to Joaquin C deBaca who is a partner with Mayer Brown.  A Pro

15  Hac motion has been filed and we respectfully request that he

16  be permitted to speak today.

17            THE COURT:  Sure.

18            MS. EISENBERG:  Thank you.

19            THE COURT:  Welcome Mr. C deBaca.

20            MR. C deBACA:  Good morning, Your Honor.

21            THE COURT:  Good morning.

22            MR. C deBACA:  Joaquin C deBaca from Mayer Brown on

23  behalf of Leeward Renewable Energy, Longroad, and DTE, as just

24  mentioned by my colleague Ms. Eisenberg.

25            Your Honor, I think there are two different issues

1   here.  My colleagues at White & Case and Dentons have been

2   speaking about adequate protection liens.  Our motion, or

3   rather our objection gets at something different than that.

4           THE COURT:  That was the 365(n) issues, correct?

5           MR. C deBACA:  Correct.  That's right.

6           So each of my clients has very broad licenses to

7   existing IP.  Those licenses arise under a variety of different

8   documents.  But really the heart of the issue is that, as we

9   set forth in our objection, under Section 365(n)(4), it is

10  mandatory that we shall have access to the IP, such that we get

11  everything we need to perform the contract and for those

12  licenses to be performed.

13          So I don't think it's quite appropriate to entertain

14  exactly the carve out that was mentioned by Mr. Beck that, in

15  particular, this is not really a lien priority issue.  This is

16  assurance that our interests in those IP licenses shall not be

17  impaired.  So we would respectfully request that the proviso,

18  as set forth in our objection, the proviso that gets entered in

19  connection with this order.

20          I would also mention that I think in respect of

21  adequate protection, there is also a question of, and I think

22  it's appropriate to reserve on this until the final hearing, as

23  was mentioned by Mr. Beck, the transfer of that IP to the IP

24  Newco implicates use under Section 363(e), and parties that

25  have an interest in the IP specifically, as a result of their

30

1    licenses, should have the ability to seek adequate protection.

2        I think that does implicate potentially some of the

3    lien priority issues, but it's not apparent to me right now

4    that the construct that we would think about for an interest in

5    cash is precisely the same construct that we should be using

6    for an interest in IP, particularly to the extent that IP is

7    held in an escrow.

8        So we reserve our rights on that.

9        THE COURT:  All right.  Thank you.

10       Mr. Sponder, I see your hand still raised.  I didn't

11   know if you needed to raise another issue.

12       MR. SPONDER:  I didn't, Your Honor.  I mistakenly did

13   not lower my hand, so I will do that now.

14       THE COURT:  All right.

15       MR. SPONDER:  Thank you, Your Honor.

16       THE COURT:  Ms. Yenamandra, nice to see you again.

17       MS. YENAMANDRA:  Good morning, Your Honor.  Aparna

18   Yenamandra from K&E, on -- I almost said on behalf of the

19   debtors --

20       THE COURT:  Nope.

21       MS. YENAMANDRA:  -- because that's what I normally

22   say to you.

23       THE COURT:  Not this time.

24       MS. YENAMANDRA:  Not this time.

25       On behalf of Trilantic, Your Honor, which is one of

31

1  the equity sponsors.

2          Your Honor, we don't have any objection to any of the

3  relief that's in front of Your Honor today.  We rise, in fact,

4  we're supportive of additional cash coming into the company,

5  and over the last couple months, we have been working for a

6  while constructively with the company and the lenders to try to

7  get some additional cash in the door.

8          I rise simply to say that there were parts of

9  Mr. Zatz's summary over the last couple months on the course of

10 negotiations that we don't agree with.  Ultimately, though,

11 none of that is really relevant for today and the relief that's

12 being entered.  So we will reserve our rights with respect to

13 those and address them in due course if and when they become

14 relevant.

15         But with that, Your Honor, we don't have any

16 objection to the remaining relief that's being sought today.

17         THE COURT:  All right.  Thank you.

18         Ms. Parlin, good morning.

19         Good morning.

20         MS. PARLIN:  Good morning.  Barbara Parlin, Holland &

21 Knight for Invenergy.

22         Our client has similar issues as were just raised in

23 the, not prior but two objections ago with respect to interest

24 in IP and IP escrows.  So I just simply reserve our rights as

25 well in the same way.

32

1          THE COURT:  All right.  Thank you.

2          Let me ask this question at this juncture.  I don't

3 see any more raised hands.

4          Before I address the cash collateral on an interim

5 basis, Ms. Tancredi, you indicated a desire to cross-examine.

6 I don't know if it was relative to the cash collateral.  Do you

7 want to address your concerns now?

8          MS. TANCREDI:  Yes, Your Honor.  And I only have a

9 few questions.  I am hopeful that we will be able to resolve

10 our issues in the hallway, but they're not resolved now.  And

11 so I fear that if I don't ask now, I will be deemed --

12          THE COURT:  Forever hold your peace.

13          MS. TANCREDI:  Exactly.

14          THE COURT:  All right.

15          Counsel?

16          MR. DURRER:  We can pause this, Your Honor, and go on

17 to the wage motion after cash management if that makes sense to

18 give the parties some more time.  Because I'm fully confident

19 that it won't get worked out, but I don't want to waste the

20 Court's time with testimony that becomes unnecessary.

21          THE COURT:  Well, that's fine.  Why don't we

22 continue?  You have my attention for the morning, so we'll get

23 back.

24          Mr. Abramowitz?

25          MR. ABRAMOWITZ:  Your Honor, I'd like to put a short

33

1  objection on the record that could be addressed so that at

2  least if there's going to be any delay or suspension of

3  proceedings, that could be addressed as well if I could just

4  have a moment.

5           THE COURT:  Yes, please.

6           MR. ABRAMOWITZ:  Yes, Arthur Abramowitz with Sherman

7  Silverstein representing Ace Engineering.  I would note, Your

8  Honor, that Ace Engineering is probably the largest unsecured

9  creditor in the case with a claim of over $100 million.

10          Again, I was just got involved in the case last

11  night, had an opportunity to review the cash collateral

12  application as well as the budget, and I would draw the Court's

13  attention to the following so that you can understand where I'm

14  going with this.

15          I would look at Docket 11, and in Paragraph 6 on

16  Page 14.  I'm sorry, it's Page 41 of 79.  It talks about the

17  limitations of use of cash collateral, and particularly, that

18  it does not allow payments that are not made in accordance with

19  the approved budget.  Going further on Page 42 of 79, it then

20  refers to adequate protection payments.

21          The adequate protection payments in this case are $4

22  million per week beginning June 13th on an outstanding debt

23  that was indicated to be about $25 million.  That's substantial

24  in terms of what will happen to the cash flow.  I then took a

25  look at the budget which was attached, and I believe that's

34

1  attached at Page 64 of 79.  And in looking at the budget, I did

2  not see the entry of the $4 million weekly payments that are

3  being made as cash collateral, you know for protection for cash

4  collateral.  So my question, or the objection is, if you look

5  at the impact of that on cash available, it's going to have a

6  substantial impact, to the point where it would almost be a

7  negative.  And I just would like to raise the question so that

8  it is addressed during the argument before any order is

9  entered.

10        I would say, number one, that the $4 million, in

11  light of the $25 million, is a very difficult situation and is

12  not illustrated in the six weeks cash flow model.  What's

13  interesting is that within that six week period, if money is

14  not being advanced, it appears that that $25 million debt will

15  be pretty much extinguished, which I think is indicative of

16  what the lender has indicated that it would like to probably

17  sell assets and liquidate.  But I think it's accelerating to

18  the point where it's going to leave the debtor cash strapped.

19        We'll reserve other questions that we have, but I

20  felt it was appropriate to bring this up to the Court at this

21  time.

22        THE COURT:  Thank you, Mr. Abramowitz.

23        MR. ABRAMOWITZ:  Thank you.

24        THE COURT:  I appreciate the input.

25        MR. BECK:  Your Honor, John Beck with Dentons on

1 behalf of the debtors.

2          THE COURT:  Yes.

3          MR. BECK:  I do want to address that point but I

4 think Mr. Durrer suggested that we move to cash management and

5 come back to cash collateral.

6          THE COURT:  All right.

7          MR. BECK:  I'm happy to do it however Your Honor

8 wants.

9          THE COURT:  Why don't we defer on that issue and

10 resolve the other matters that can be addressed more easily.

11          MR. BECK:  Okay, Your Honor.

12          So the debtors also filed a motion to approve

13 continuation of its current cash management system at Docket

14 Number 12, Your Honor.  By this motion, the debtors seek to

15 continue to use their existing cash management system and

16 related practices.  As the U.S. Trustee noted earlier on the

17 phone, we accepted and incorporated a number of comments to

18 that order and sent it to your chambers this morning and I

19 believe they are resolved on this issue.

20          Just for Your Honor's benefit, there are a lot of

21 accounts that are listed in the motion.  But really to distill

22 it down into the most important facts, is there is a AR control

23 account that KKR has a DACA on and has control over that

24 account, and that's where all the receivables from the various

25 customers come in.  And then, through that account, money is

36

1  sent to either the main operating account, also at HSBC, or to

2  fund payroll two days in advance of the payroll.  So that's

3  really the core of the cash management system and a lot of the

4  other accounts or legacy accounts that may have *de minimis*

5  monies in there but are not actively contributing to the cash

6  management system, Your Honor.

7          Unless Your Honor has any questions on the cash

8  management motion, we would ask that Your Honor grant the

9  motion.

10          THE COURT:  All right.  I see no objections, hear no

11  objections, motion granted.  Thank you.

12          MR. BECK:  Thank you, Your Honor.

13          MR. DOHERTY:  Good morning, Your Honor.  Casey

14  Doherty --

15          THE COURT:  Good morning.

16          MR. DOHERTY:  -- representing the debtors and with

17  Dentons.  I've had a Pro Hac application filed as Docket 49.

18  With Your Honor's permission, I'll honor, or I will argue the

19  wage motion --

20          THE COURT:  Yes.  Welcome.

21          MR. DOHERTY:  -- filed as Docket 7.

22          Thank you, Your Honor.

23          My partner, in his opening remarks, mentioned that

24  the employees here are our priority and retaining and

25  incentivizing them are a top priority in the case, and that the

1    debtors, as they noted in the wage motion, hope to develop and

2    file further retention and incentive programs.  But step one is

3    the wage motion, which have the same goals, which is to retain

4    and incentivize the remaining employees.

5           Employee motions are important in every case, but

6    here, it's especially important.  As noted in the motion in the

7    first-day declaration, the employees here represent less than

8    20 percent of the workforce from January 1st.  And to retain

9    and incentivize them, the debtor asks to continue the existing

10   compensation and benefits programs.

11          There's no objections on the docket to the motion

12   last I looked.  We've received comments from the United States

13   Trustee and the order is presented to Your Honor.  I'm happy to

14   go through what I believe are a couple of the substantive ones,

15   if Your Honor would wish.

16          THE COURT:  Yes, please.

17          MR. DOHERTY:  Sure.

18          In Paragraph 3 of the order, and I'll let the U.S.

19   Trustee counsel, of course if I mischaracterize it, speak up.

20   The United States Trustee provided for a proviso at the end

21   that says, "provided the debtors shall provide seven days

22   notice of any material changes to the employee compensation

23   benefits and any other programs described in the motion to the

24   U.S. Trustee and counsel to any statutory committees appointed

25   in the case."  We have no objection to that provision.

38

1          In Paragraph 4, the United States Trustee struck

2   language that the debtor could pay above the priority cap under

3   Section 507 if required by applicable law on an interim basis,

4   and kept it just for the authority of an order of this Court,

5   which we also have no objections to.

6          THE COURT:  All right.

7          MR. DOHERTY:  With that, Your Honor, unless you have

8   any other questions, we would ask that you grant Docket

9   Number 7, the wage motion.

10         THE COURT:  All right.  I have no further questions.

11  I see no objections.  I will mark the motion granted.  All of

12  these are ordered to be submitted.

13         Thank you.

14         MR. DOHERTY:  Thank you, Your Honor.

15         THE COURT:  I believe that brings us to the customer

16  program?

17         MR. DURRER:  Yes, the customer program, Your Honor.

18  Van Durrer, again, for the debtors at Dentons.

19         The customer motion.

20         THE COURT:  And there's also the insurance motion.  I

21  don't know.  That seems to be pretty rogue.

22         MR. DURRER:  Yeah, there was just out of order, Your

23  Honor, since you raised it.  On the insurance motion, the U.S.

24  Trustee had requested that, to the extent the debtors engage in

25  any new programs or materially modified programs, that we would

1  disclose that, and if necessary, seek additional relief.  That

2  comment is fine with us.  But otherwise, that motion is

3  relatively routine and has no objections.

4        THE COURT:  Then why don't we just address that now

5  and grant it.  I don't see any objections subject to inclusion

6  of that language.

7        MR. DURRER:  Thank you, Your Honor.

8        And then, that takes us to the last item, other than

9  the reserve cash collateral, is Docket Number 15, the debtors'

10 motion to implement the customer program on a final basis.

11       I do have a brief proffer, Your Honor, of Mitchner

12 Turnipseed, the banker from Huron for Powin, if I may present

13 that.

14       THE COURT:  Yes.

15       MR. DURRER:  All right.

16       If called as a witness, Mr. Turnipseed is qualified

17 to and will testify as follows.  He is a senior director at

18 Huron Transaction Advisory with over a decade of experience and

19 a master's of science from the University of Virginia McIntire

20 School of Commerce.

21       Mr. Turnipseed would testify that he was retained by

22 Powin in early May 2025 in connection with raising capital and

23 engaging in strategic transactions.  After an initial review,

24 (indiscernible) initially recommended that the company take

25 advantage of Chapter 11 to stabilize the company and work

40

1  directly with customers who stood to benefit substantially and

2  immediately from Powin remaining in business, particularly with

3  respect to their long-term service agreement business, a

4  servicing element where Powin provides services to customers

5  who have already had their battery systems installed at their

6  sites.

7           Mr. Turnipseed would testify he worked closely with

8  management to develop a working business model with three major

9  drivers for that business.  One, a reduced suite of service

10 offerings in a new services company.  Two, increased pricing to

11 support that business line.  And, three, customer commitments

12 to provide funding through upfront and periodic service

13 payments.

14          Mr. Turnipseed would testify that an important

15 element of the feedback that he received from customers

16 directly was that they wanted clear delineation between legacy

17 Powin, on the one hand and its problems, and the new services

18 company.  That is why the debtors determined to form Powin

19 Project LLC for this effort.

20          In fact, the cash collateral agreement that Powin was

21 successful in negotiating with the secured creditors provides

22 that Powin Project is not required to make adequate protection

23 payments to the secured creditors during the initial term of

24 the cash collateral order.

25          Mr. Turnipseed would further testify that customers

1  obtain an enormous amount of vital data regarding their

2  projects and the Powin battery system performance and operation

3  from Powin's cloud-based proprietary technology.  Powin's

4  personnel operate remote operating center and provide around

5  the clock call center support in the event of disruptions or

6  other technical needs.  Powin also provides onsite services for

7  the routine and non-routine repair and maintenance of the

8  battery systems.

9       In the absence of Powin providing these functions,

10 Mr. Turnipseed would testify that customers effectively have no

11 alternative and will suffer enormous harm increasing potential

12 claims against the debtors' estates.

13      Mr. Turnipseed would testify that successful launch

14 of this customer program will provide a platform on which Powin

15 can develop a sales process as a going concern.  Failure to

16 timely launch the program will likely force a shift to a

17 pursuit of a liquidating transaction, which will have a severe

18 negative impact on value.

19      Finally, Mr. Turnipseed would testify that it's

20 important that Powin make a firm commitment to customers for

21 this program on a final basis.  Any delay would cause

22 irreparable loss of value to legacy Powin creditors in general

23 and cause customers to become creditors more specifically.

24      THE COURT:  All right.  The Court will accept the

25 proffer.  The Court will provide an opportunity to any counsel

42

1    or parties-in-interest wish the opportunity to cross-examine

2    Mr. Turnipseed.

3                         (No audible response)

4              THE COURT:  All right.  Hearing and seeing no one, I

5    appreciate the proffer.

6              MR. DURRER:  My understanding is that Mr. Sponder may

7    have comments with respect to this motion, Your Honor.

8              THE COURT:  Yes.

9              MR. DURRER:  I should note that we did agree with the

10   United States Trustee, as has already been stated in connection

11   with cash collateral, that transfers of assets to Powin Project

12   LLC will not occur pending, hopefully, final approval of the

13   Cash Collateral Award.

14             THE COURT:  That's important to the Court.  I

15   appreciate that.  I do need to have in place a structure to

16   safeguard and to ensure the transfer is subject to review by a

17   committee, that there are protections for the estate, just like

18   the cash collateral that we've been discussing.

19             Mr. Sponder, I see your hand raised, again.

20             Thank you.

21             MR. SPONDER:  This time, I lowered it again, Your

22   Honor.  Thank you.

23             With respect to the customer program, the U.S.

24   Trustee understands the debtors' need for the approval of the

25   customer programs.  However, Your Honor, when weighing this

1  against the rights of a committee to respond and/or object to

2  the order, I should say -- let me start over.

3          However, when weighing this against the rights of a

4  committee to respond and/or object, the order should be

5  interim, especially in light of the fact that this is day three

6  of these cases.

7          With that said, Your Honor, at the very least, the

8  U.S. Trustee requests that the order allow the committee the

9  ability to raise any issues with the motion after the order is

10 entered.

11         Thank you, Your Honor.

12         THE COURT:  Thank you, Mr. Sponder.

13         Counsel.

14         MR. DURRER:  Yeah, Van Durrer from Dentons for the

15 Debtor, Your Honor.

16         We're amenable to that in concept.  The U.S.

17 Trustee's Office had proposed language consistent with Local

18 Rule 9013(5)(e), which wouldn't necessarily include any

19 committee.  If Mr. Sponder would like us to add, "including,

20 but not limited to, the committee," we're happy to do that.

21         THE COURT:  All right.

22         I think those safeguards would satisfy the Court that

23 there can be eyes on this transaction, but the Court recognizes

24 from what it's heard and what it's read the importance of

25 giving the customers here, which will be the lifeblood of going

44

1  forward and revenue stream going forward, the confidence that

2  they're not going to be making an investment by making payments

3  and then be the target.

4      So I think it makes sense.  I will grant the motion

5  subject to the protections of the language that can be agreed

6  upon to preserve the U.S. Trustee's concerns with the committee

7  having an opportunity to weigh in.

8      MR. DURRER:  Thank you, Your Honor.

9      And with that, perhaps, Your Honor, we take a 15

10  minute recess.

11      THE COURT:  Well, I was going to suggest this.

12      And what I've just said as to the customer program

13  carries forward those same general terms with cash collateral.

14  Obviously, the Court needs to be assured that there can be eyes

15  on the transaction, or at least an avenue in going forward.

16      Generally, this Court does not have issues with

17  allowing, for instance, the lenders to perfect their liens even

18  on an interim basis.  To this extent, even the liens on

19  avoidance actions on an interim basis limited obviously to a

20  diminution in collateral.  It's not just for all purposes.  On

21  an interim basis, it would be a diminution in collateral.

22      The problem, of course, is the concern of the $4

23  million payment.  There's not going to be a diminution in value

24  if you have a payment.  But if you have a payment that's going

25  to place this debtor in default right away, I don't know what

1  we've accomplished.

2          As to the other language, the Court's prepared to

3  make final rulings if you all can't come to an agreement on

4  language or provisions.  I'm inclined to obviously approve an

5  interim collateral order, an arrangement that will facilitate

6  going forward with the intentions of right-tracking this

7  debtor.

8          I can, if presented with this is what we agree on,

9  this is where we just can't agree and throw it to the Court,

10  I'll make the call.  See what you can.

11          Why don't we take -- I have hearings that start at

12  11:30, so how about we come back at ten to 11:00.  Give you

13  roughly 25 minutes or so?

14          MR. DURRER:  I would say quarter of, Your Honor.

15          THE COURT:  Quarter of?

16          Well, I'll put more -- well, if you say quarter of,

17  it means ten of anyway.

18          So, why don't we come back at a quarter of?

19          MR. DURRER:  Thank you, Your Honor.

20          THE COURT:  All right.  Thank you.

21          So, we'll be adjourned until 10:45.

22          Thank you.

23          (Recess at 10:26 a.m./Reconvened at 10:55 a.m.)

24          THE COURT:  All right.  As they say in production,

25  we're back.

46

1              MR. DURRER:  Van Durrer with Dentons for the debtors,

2    Your Honor.  Thanks for the break.  I think it was productive.

3              On cash collateral, I'm going to yield the podium in

4    a moment to Mr. Beck, but he and Mr. Zatz were working with

5    Mr. Sponder while I was talking to Ms. Tancredi.  So I think I

6    have a resolution with Ms. Tancredi that I'll recite and she

7    will correct me if I mess it up.

8              THE COURT:  All right.

9              MR. DURRER:  Ms. Tancredi's clients filed objections

10   at Docket Number 47 on behalf of a group of surety bond

11   providers.  What we are stipulating to is as follows.

12             One, the cash collateral budget does not contain any

13   authorization or expected use to pay any customs duties that

14   are the subject of the bonds.

15             Number two, the budget does not contain any line item

16   or authorization to pay premiums to Ms. Tancredi's clients.

17   You might expect that might form the basis for a stay relief

18   motion on her client's behalf.  She intends to file that

19   promptly, and the debtors have agreed to an expedited

20   scheduling of that.

21             We haven't discussed the specific schedule.  Our aim

22   is to present you with a stipulated order on scheduling that.

23   Obviously, subject to Your Honor's availability, but we're

24   trying to be respectful of people's time and resources.  But I

25   believe that that should resolve that docket item.

47

1            THE COURT:  All right.

2            Ms. Tancredi?

3            MS. TANCREDI:  Yes.  That stipulation does as well as

4  language that was forwarded to me by counsel for KKR, which I

5  can read into the record, or do you want to read it into the

6  record.

7            MR. DURRER:  Be my guest.

8            MS. TANCREDI:  Okay.

9            "The adequate protection liens are subject and

10  subordinate only to those valid, enforceable, and non-avoidable

11  liens that are, one, in existence on the petition date; two,

12  either perfected as of the petition date or perfected

13  subsequent to the petition date solely to the extent permitted

14  by Section 546(b) of the Bankruptcy Code; and, three, senior in

15  priority to the pre-petition liens as of the petition date in

16  accordance with applicable law, such liens (indiscernible)

17  permitted prior liens.

18            THE COURT:  Okay.

19            MS. TANCREDI:  Thank you.

20            THE COURT:  All right.  Thank you.

21            Thank you, Counsel.

22            MR. BECK:  Your Honor, John Beck of Dentons on behalf

23  of the debtors, again.

24            As Mr. Durrer alluded to, we spent the break with

25  Mr. Zatz and the U.S. Trustee trying to get through a number of

48

1  issues.  I think we have resolved some of them, which I will

2  articulate for Your Honor.  Some I'm not sure we have resolved.

3          First of all, for the challenge period timing, what

4  we would propose is to get rid of all the earliers and laters,

5  etcetera, and it would simply be this construct where non-

6  committee challenges have 75 days.  The committee will have 60

7  days from its appointment.  And then, if a Chapter 7 trustee is

8  appointed prior to the expiration of the 75 challenge, it would

9  get 15 days flat.  We do not agree to any extension of the

10 challenge period for a Chapter 11 trustee.

11         Second, Your Honor, is the debtors can agree to add

12 language preserving the Delaware limited liability company

13 defenses that the U.S. Trustee requested.  So we will put that

14 in the turn of the order.

15         Next, Your Honor, we will add language to preserve

16 365(n) rights for the parties that were objecting on that

17 basis.

18         And then, finally, Your Honor, with respect to 7(b),

19 which I don't think we are agreed on on the language, we think

20 that the language as proposed addresses the concerns that

21 Mr. Sponder is raising.  And basically, the crux of the issue

22 is, I think we agree that to the extent that the pre-petition

23 secured parties did not have a lien or had a certain priority

24 prior to the petition date, that the adequate protection liens

25 would be to the same extent and the same relative priority as

49

1  those liens.

2          I think the issue is that the Trustee has preferred

3  language, which we just frankly don't understand, and we think

4  that our language is limited to the diminution in value as it

5  has to be.  So to the extent that the liens are invalidated or

6  something happens to where the actual underlying lien is cut

7  out, then by necessity, there's no diminution in value because

8  they never had a lien in the first place.

9          And so we think that the language that is already in

10 there, subject to the things we've read on the record today,

11 adequately addresses the U.S. Trustee's concerns.  I think he

12 has different language and we just aren't prepared to agree to

13 that, Your Honor.

14         THE COURT:  All right.  What about other issues that

15 were raised as far as the liens on avoidance claims, and the

16 payment, I guess what Mr. Abramowitz had raised, the payment of

17 the fees started to KKR.

18         MR. BECK:  Yes, Your Honor.

19         So on the avoidance actions, Your Honor, and Mr. Zatz

20 can speak to this, the pre-petition secured lenders do want

21 liens on proceeds avoidance actions at the interim period.

22 They do believe that, given the nature of the debtors'

23 liquidity situation and what they've been asked to do to

24 support this company warrants it in this circumstance.

25         With respect to the payments, the debtors would not

50

1  agree to this if we didn't think that we would be able to

2  either pay for it or that we have the trust of our lenders who

3  have worked constructively with us so far to waive that in

4  reasonable circumstances as they are required to do.

5        With respect to the budget, there are a lot of timing

6  issues that move around with the budget, and so I can

7  understand how it looks.  The debtors actually received a large

8  receivable last night at 5.6 million that's not reflected in

9  the budget.  So the debtors are confident that they will be

10 able to pay that payment.

11       And it really makes sense, Your Honor, because the

12 pre-petition secured lenders are allowing us to use their cash

13 collateral and don't want to be stuck in a long drawn-out

14 process, and so they want to see progress with the customer

15 program that we're trying to implement and various things and

16 they don't want to get paid down.  But if we are making

17 progress, then they are willing to work with us, and that's

18 really what the construct is meant to address.

19       THE COURT:  All right.  Thank you.

20       Mr. Abramowitz.

21       MR. ABRAMOWITZ:  Yes.

22       I'm not going to repeat the objection, but I would

23 note two items.

24       One, the cash flow is for six weeks, which to me is a

25 bit troublesome because I know in the long run we're all dead,

51

1  but the question is what is the long run?  Normally, when I see

2  these, it's usually 60 to 90 days.  I don't know that it's a

3  coincidence that it's a six-week period and that's about the

4  extent of the $4 million that would satisfy the debt.  So that

5  I believe that the cash flow, the projection should be extended

6  if possible to reflect what the debtor anticipates its ability

7  to sustain itself for the next 60 to 90 days.  I don't think

8  that's unreasonable.

9         I also don't think it's unreasonable that we have to

10  take into effect what the impact will be of that $4 million

11  payment per week on available cash.  If you look at the

12  projections, while it may be that they've received X millions

13  of dollars last night, I'd like to see that and I'd like to see

14  what the impact is because I'm uncertain where you are in other

15  weeks where you have cash flow being a negative.

16         Again, I understand that these are estimates.  But I

17  think that they should be accurate.  We know one thing, while

18  we can't tell about what the receivables may be, we know that

19  there's going to be a $4 million payment per week, so that

20  should be reflected in the budgets.

21         Thank you.

22         THE COURT:  Thank you.

23         All right.  Mr. Zatz.

24         MR. ZATZ:  Yes.  Thank you, Your Honor.

25         I did want to make a few additional comments if I

52

1  may.  I (indiscernible) the objection.  Again, Andrew Zatz from

2  White & Case on behalf of KKR as the pre-petition lender.

3       Mr. Beck accurately stated the state of play in terms

4  of what we're willing to do in response to the objections that

5  have been raised.  But I want to add some additional color.

6       On the Paragraph 7(b) issue, it feels like we're just

7  in a jam on drafting.  But, again, the key from our perspective

8  is that it all ties to diminution in value.  If there is a

9  diminution in value of our pre-petition liens, to the extent

10 they are deemed to be valid during this interim period, it

11 creates adequate protection liens on all the debtors' assets.

12 That's my layman's view.  And if Your Honor sees anything in

13 the drafting there that seems to state otherwise, I'm happy to

14 address it, but I think it's clear.

15      On liens on avoidance actions, this is I think

16 Mr. Beck accurately stated.  This is important to our clients

17 under the circumstances.  I know we don't have a committee yet

18 and I know that committees have a tendency to point at this as

19 something to argue about or perhaps trade.  At the end of the

20 day, this is an interim order.

21      There would have to be a diminution in value during

22 this interim period taking into account adequate protection

23 payments that we receive to extend the liens to those avoidance

24 actions.  I'm not saying that that's an unlikely occurrence,

25 but I am saying it limits, to some degree, what we're asking

1  for today.  And if a committee gets appointed between now and

2  the second-day hearing and wants to revisit this issue on a go-

3  forward basis beyond the interim period, we can address that.

4         But we think, ultimately, the ask is extremely fair.

5  These are unencumbered assets like any other.  I know

6  committees want to find unencumbered assets, but we need real

7  adequate protection here.  We have all asset liens.  We need

8  something beyond our existing package to look to.

9         On the adequate protection payments, this is a unique

10 case and it's tricky.  The customer programs order that Your

11 Honor indicated you're inclined to enter is key to the success

12 of these cases and how the next few weeks are going to

13 progress.  The budget shows my understanding, and it's the

14 debtors' budget, not ours.

15        But my understanding is it shows expected receivables

16 that they intend to collect compared to the operating expenses

17 of the business.  But there is very much a need to get to deals

18 with customers here.  Powin needs to engage with customers

19 pretty much immediately, and I think they already are well in

20 the process of doing so, on the customer programs framework to

21 get to deals, to get customers what they need to complete

22 projects, and to get the services that the company offers and

23 to bring revenue into the company.

24        If that can't be achieved, then these cases are

25 simply not going to be a success.  And I can't promise

1  Mr. Abramowitz or anyone else that there's going to be a great

2  end-game here or that there's going to be a 13-week budget.

3  That's the ambition that we're all playing into, and we really

4  hope to get engagement and for it to be a success.  But there

5  simply is no way to promise that everything is going to land

6  the way we want it to.  It's just the nature of the kind of

7  situation we find ourselves in.

8          But the adequate protection payments are crucial to

9  our clients and are the fair quid-pro-quo for what they're

10  allowing the rest of the cash to be used for here.

11          THE COURT:  All right.  Thank you, Mr. Zatz.

12          MR. ZATZ:  Thank you, Your Honor.

13          THE COURT:  I am looking at, I guess, a final hearing

14  date of July 7th.  It's a Monday.  I will be traveling, so I

15  will be doing this -- it will be remote.  If it turns out that

16  an evidentiary hearing is required, we're going to push it a

17  week to the 14th.  But to the extent we can do it remotely,

18  even if testimony is limited, I prefer that route.  I think it

19  makes sense for this case and this party.

20          So fixing a final hearing and a second-day hearing on

21  anything that was an interim to July 7th puts us from now about

22  three and a half weeks.  Today is the 12th, so it takes us past

23  the July 4th holiday.

24          I will approve use of cash, including the adequate

25  protection payments, but no more than two payments.  I'll let

55

1  the parties decide how to spread it out.  I think that will --

2  and when I -- and -- well, I'm sorry.

3         Mr. Sponder, I do see your hand.  I just saw that.

4  You wish to be heard?

5         MR. SPONDER:  I'm sorry, Your Honor.  Jeff Sponder

6  from the Office of the United States Trustee.

7         I was going to chime in also about the $4 million

8  payments that Mr. Abramowitz raised and neglected to do so and

9  apologize for that.

10         There is also a $1.5 million consent fee that's being

11  paid to the lenders.  So there are a lot of payments being made

12  here.  What I want to make clear and understood, Your Honor, is

13  that with respect to Paragraph 7(b) and adequate protection,

14  that the lender is only receiving a replacement lien as

15  adequate protection.  That's really all I'm asking for.

16         If that's what's being done here, then great.  That's

17  what the language provides, but it has more words than simply

18  the lender is receiving a replacement lien.

19         As to the challenge period, Your Honor, we are fine

20  again with the 75 days for all parties-in-interest other than

21  the committee from date of the interim and 60 days from

22  appointment for the committee, but we still believe a

23  Chapter 11 trustee should be included, as well as a Chapter 7

24  trustee and that it should be 45 days instead of 15 days to

25  allow those independent fiduciaries to get up to speed.

56

1           Avoidance actions, Your Honor, as I'm sure you know
2    we always raise it, it should be left for the committee or at
3    least Your Honor to reserve the right to the committee at the
4    final hearing.  That's all I have.
5           Thank you, Your Honor.
6           THE COURT:  All right.  Thank you, Mr. Sponder.
7           Mr. C deBaca.
8           MR. C deBACA:  Yes.  Thank you, Your Honor.
9           My clients don't have an issue with any of what was
10   just discussed in respect of adequate protection payments or
11   liens.  However, I did want to just take a moment to pick back
12   up on my earlier comments about Section 363(b), in particular,
13   and describe how I think that changes the landscape with
14   respect to IP in particular, that, I'm not lodging a request or
15   an objection right now.  However, I do think it's important to
16   note that adequate protection can take the form of more than
17   just liens, payments, and in particular, with respect to IP,
18   that protection may need to take the form of having my clients
19   get access to necessary IP to be able to protect their
20   projects.
21          So, for example, to the extent they need passwords to
22   get administrative access to critical software to be able to
23   run their projects, we may need to, to the extent we can't
24   consensually agree on a protocol to get that type of
25   information, we may need to revisit this issue in the broader

1  context of the final hearing.

2          THE COURT:  Fair enough.  Rights are reserved to

3  raise these issues as part of the final hearing.

4          Ms. Parlin.

5          MS. PARLIN:  I'm just going to piggyback on what my

6  learned colleague just said for our client is the same issues.

7  We are very concerned about access to the IP and access to the

8  process.  And I understand that my client is in the process of

9  talking with the debtors about the very type of new customer

10  program agreement as Mr. Durrer explained to the Court would be

11  crucial to the debtors' success going forward.

12          But, in any case, our client certainly has 365(n)

13  rights for the IP and the information and needs to preserve all

14  of its rights.  So, again, we reserve all of our rights on

15  behalf of Invenergy.

16          THE COURT:  Fair enough.  Court recognizes the

17  reservation of rights.  Thank you.

18          All right.  So as I indicated, I'm going to approve

19  cash collateral.  I'm going to authorize the payment of the

20  adequate protection fee of only two payments over that period

21  of time pending final hearing.  That should give the committee

22  that gets appointed an opportunity to vet the transaction.

23          The adequate protection liens that are being

24  proposed, I think we all agree on the concept.  They are to

25  serve as a form of adequate protection, the additional liens,

58

1    even on the avoidance actions.

2        If we're having $8 million in payments, I seriously

3    doubt we're going to have a diminution in value of the

4    collateral more than that amount in three and a half weeks.  If

5    we do, we're all in trouble in this case.

6        So I don't believe it's threatening the position of

7    the estate at this point to give the liens on the avoidance

8    actions on an interim basis only.  All bets are off as far as a

9    final subject to parties coming in and making their case.

10       As to the language on Paragraph 7, I think we're

11   there.  What I would ask is to submit the form of order with

12   the language you agree upon, highlight for me what's not in

13   agreement, and I'll see if I can massage it or choose one or

14   the other.

15       I believe rights are being preserved with respect to

16   the 365(n) issue, as well as the issues raised as far as

17   adequate protection for those licensees.

18       Have I missed anything, counsel?

19       MR. DURRER:  I'm sorry, Your Honor.  I'm loathe to

20   mess with success here, but I'd want to make sure when we go

21   back to negotiate the COC order with everyone that we're on the

22   same page, because I think there was one issue that fell by the

23   wayside.  It's this paragraph near the end about the binding

24   effect of the order.

25       We have competing language with the U.S. Trustee.  I

59

1  don't think there's a huge difference, substantively.  I think

2  the key from our perspective is we are counting on the active

3  protection package here, and that includes in the hopefully

4  unlikely instance that the case converts.  So we felt it was

5  important to make the mention of the successor cases in that

6  paragraph.

7         We'll try if we can find a resolution with the U.S.

8  Trustee.  If not, we'll do like you said, competing language

9  for you to work with.

10        THE COURT:  That's fine.

11        I recognize.  Again, I don't see on an interim basis

12  a Chapter 11 trustee being an issue in three and a half weeks.

13  So I don't think we have to stumble over that.

14        MR. DURRER:  Okay.  Thank you, Your Honor.

15        THE COURT:  Thank you.

16        UNIDENTIFIED SPEAKER:  Just a related issue, Your

17  Honor.  I think we need your guidance on the challenge period

18  duration.

19        THE COURT:  I thought there was a consensus.

20        It's 75 days for all parties.

21        UNIDENTIFIED SPEAKER:  I don't think they've agreed

22  on the 15 days for the Chapter 7 trustee or the exclusion of

23  the Chapter 11 trustee.

24        THE COURT:  I'm comfortable just allowing the 15

25  days.  I don't think 15 or 30 days is going to make a

60

1    difference with a Chapter 7 trustee at that point.  So they'll

2    get their act together quickly if need be.  And, again, I don't

3    see, I'm not going to require the inclusion of a Chapter 11

4    trustee.  I just don't think it's going to be relevant.

5              Counsel?

6              MR. DURRER:  Van Durrer of Dentons for the debtors,

7    Your Honor.

8              I think that's all we needed today.  We appreciate

9    the Court's time and going over time.

10             Just as a matter of housekeeping, if possible, if we

11   could move those suggested hearing dates to the Tuesday, just I

12   think it'll enhance our opportunity to present you with a

13   cleaner consensual package as opposed to the Monday.  So the

14   8th and the 15th, as opposed to the 7th and the 14th.

15             And as promised, I will work with Ms. Tancredi to

16   decide whether we even need a motion for lift stay.  But we

17   will, as I said, agree to expedite that.  So probably the last

18   week of June, if we do have to have a hearing, and we're fine

19   with that being virtual, if Ms. Tancredi is.

20             THE COURT:  All right.  Ms. Tancredi, check with

21   chambers.  It gets tight timeframe.

22             I don't have an issue if the parties are comfortable

23   with being the, nobody wants to start things on a Monday, but

24   the 8th and the 15th, that works for us.

25             All right.

1              MS. TANCREDI:  Thank you.

2              THE COURT:  All right.

3              And I thank you all.  I don't see any more raised

4  hands remotely.  So I appreciate all of the counsel --

5              MR. DURRER:  I apologize.  One more thing, Your

6  Honor.  Van Duren for the debtors.

7              We're working closely with the U.S. Trustee on

8  retention applications.  We would seek to make those *nunc pro*

9  *tunc*, there's been quite a bit of activity.  I'm just not

10 asking you to comment on that, Your Honor, but I wanted

11 Mr. Sponder to be aware.  I think he is, but I would be remiss

12 for all the professionals on my side of the aisle if I didn't

13 comment on that.

14             THE COURT:  That's fair enough.  I think we have a

15 significant practice here in Jersey of accommodating.

16             Thank you.

17             MR. DURRER:  Thank you, Your Honor.

18             THE COURT:  All right.

19             Thank you, folks.  I appreciate all of your time and

20 efforts.

21             THE CLERK:  A few more hands we have.

22             We have a few more hands.  Oh.  I tried.

23                        (Laughter)

24             THE COURT:  Mr. Sponder.

25                    (No audible response)

1          THE COURT:  Mr. Sponder, are you there?

2          MR. SPONDER:  Yes, Your Honor.  Can you hear me now?

3          THE COURT:  I can.  Thank you.

4          MR. SPONDER:  Great.

5          Your Honor, if we're going to do July 8th, I have a

6   341(a) meeting at 10:00 a.m., so I was hopeful that possibly we

7   could start at 11:30, unless that's a problem for everyone

8   else.  If it is, then I can hand off something, but it's one of

9   the larger cases, as well.

10         THE COURT:  It works for the Court as well.  11:30 is

11  fine.

12         Thank you.

13         MR. SPONDER:  Thank you, Your Honor.

14         THE COURT:  You're welcome.

15         Mr. Oswald.  Good morning, still.

16         MR. OSWALD:  Good morning, Your Honor.  Good to see

17  you.

18         THE COURT:  Yes.

19         MR. OSWALD:  I was just going to ask for that clarity

20  time of the hearing.  I got the two dates, but thank you,

21  11:30.

22         THE COURT:  11:30.  And, oh, let me also include that

23  those are final hearings.  Any opposition to the final hearing,

24  let's have close of business, July 1st.  All right?

25         MR. OSWALD:  Thank you.

63

1          THE COURT:  And, for all your benefit, we consider

2    close of business to be 4:30 when the clerk's office closes up.

3    I know it changes for the real world.

4          All right.  Thank you.

5          Thank you, folks.  Take care.

6          MR. BECK:  Thank you, Your Honor.

7          (Proceedings concluded at 11:20 a.m.)

8                    *  *  *  *  *


                    **C E R T I F I C A T I O N**

          I, Karen K. Watson, court-approved transcriber,

hereby certify that the foregoing is a correct transcript from

the official electronic sound recording of the proceedings in

the above-entitled matter, and to the best of my ability.


/s/ Karen Watson                    DATE:  June 13, 2025
KAREN WATSON, AAERT CET-1039

J&J COURT TRANSCRIBERS, INC.

## **Exhibit 6**

(Motion of the Debtors Authorizing Debtors to Pay Employee Obligations)

**DENTONS US LLP**

Tania M. Moyron (*pro hac vice* forthcoming)
Van C. Durrer, II (*pro hac vice* forthcoming)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:   tania.moyron@dentons.com
               van.durrer@dentons.com

John D. Beck (*pro hac vice* forthcoming)
Sarah M. Schrag (*pro hac vice* forthcoming)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:   john.beck@dentons.com
               sarah.schrag@dentons.com

*Proposed Counsel for Debtors and
Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:   frankoswald@teamtogut.com

Albert Togut (*pro hac vice* forthcoming)
Amanda C. Glaubach (*pro hac vice*
forthcoming)
Eitan Blander (*pro hac vice* forthcoming)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:   altogut@teamtogut.com
               aglaubach@teamtogut.com
               eblander@teamtogut.com

*Proposed Counsel for Debtors and
Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

In re:

Powin, LLC, *et al.*,[1]

Debtors.

Chapter 11

Case No. 25-16137 (MBK)

(Joint Administration Requested)

## MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) PAY EMPLOYEE OBLIGATIONS  AND (B) CONTINUE EMPLOYEE BENEFIT PROGRAMS, AND (II) GRANTING RELATED RELIEF

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504]; (iii) PEOS Holdings, LLC [5476]; (iv) Powin China Holdings 1, LLC [1422]; (v) Powin China Holdings 2, LLC [9713]; (vi) Charger Holdings, LLC [5241]; (vii) Powin Energy Ontario Storage, LLC [8348]; (viii) Powin Energy Operating Holdings, LLC [2495]; and (ix) Powin Energy Operating, LLC [6487]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR  97062.

US_ACTIVE\130483005\V-15

2516137250610000000000005

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Powin, LLC and the above-referenced affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>") under chapter 11 of title 11 of the United States Code, §§ 101 et seq. (the "<u>Bankruptcy Code</u>"), in these chapter 11 cases (the "<u>Chapter 11 Cases</u>"), by and through their undersigned counsel, hereby move (the "<u>Motion</u>")[2] for entry of an interim order (substantially in the form attached hereto as **Exhibit A**, the "<u>Interim Order</u>") and a final order (substantially in the form attached hereto as **Exhibit B**, the "<u>Final Order</u>"): (i) authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and costs related to these items, and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto (together, the "<u>Employee Compensation & Benefits</u>"); (ii) scheduling a final hearing; and (iii) granting related relief.

In further support of the Motion, the Debtors respectfully state as follows:

**<u>PRELIMINARY STATEMENT</u>**

1.    The Debtors seek authorization to continue to provide the Employee Compensation & Benefits to the Debtors' workforce without delay.  This Motion seeks relief necessary for the Debtors to retain the morale and services of their workforce that is necessary for the success of these Chapter 11 Cases.  Soon, the Debtors anticipate filing a motion seeking authorization to further retain and incentivize employees through bonuses to be issued under newly designed "KEIP" and "KERP" programs.

---

[2] Capitalized terms used but not defined in this motion have the meanings ascribed to them in the First Day Declaration (as defined below).

# I.    JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the District of New Jersey (the "Court")

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of

Reference* from the United States District Court for the District of New Jersey dated as of

September 18, 2012.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court

in connection with this Motion to the extent that it is later determined that the Court, absent consent

of the parties, cannot enter final orders or judgments in connection herewith consistent with Article

III of the United States Constitution.

3.      Venue of the Chapter 11 Cases and related proceedings is proper pursuant to 28

U.S.C. §§ 1408 and 1409.

4.      The predicates for the relief requested herein are sections 105(a), 362(d), 363(b),

507(a), and 541(b) of the Bankruptcy Code, Rules 6003 and 6004 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 9013-1, and 9013-5 of the

Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local

Rules").

# II.    BACKGROUND

A.      General Background

5.      On June 9, 2025 (the "Petition Date"), the Debtors each commenced a voluntary

case for relief under chapter 11 of the Bankruptcy Code.[3] The Debtors are authorized to continue

operating their businesses and managing their properties as debtors in possession pursuant to

---

[3] Lead Debtor Case No. 25-16137 (MBK) for Debtor Powin Project LLC was filed on June 9, 2025, and the
remaining Debtors were filed shortly thereafter on June 10, 2025.

sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee

has been appointed in the Chapter 11 Cases.

6.       Additional information regarding the Debtors, including their business and the

events leading to the commencement of these Chapter 11 Cases is set forth in the Declaration of

Gerard Uzzi in Support of Emergency First Day Motions (the "First Day Declaration"), filed

concurrently herewith.

B.       Specific Background

a.       **The Debtors' Employees**

7.       As of the Petition Date, the Debtors employ approximately 85 non-insider

individuals (of which a majority work in Oregon, with the others working in other states) in

addition to their executive team (the "Employees").

8.       The Debtors have significantly reduced their workforce this year, including in a

reduction-in-force that took place on June 6, 2025.  The remaining Employees represent

approximately 17% of the Debtors' workforce compared to January 1, 2025.  These Employees

remain, because they are critical for the Debtors' operations – particularly, with respect to the

Debtors' Project and Technology branches of their services business – and to maintaining going

concern value for the Debtors' business.  The Employees are difficult to replace, and without the

Employees' services, the Debtors will no longer be able to provide products and services to their

customers.  A number of the Debtors' employees have also resigned because of the uncertain

situation.  The Debtors cannot provide assurances that the Employee Benefit & Compensations

will be provided in the ordinary course, the Debtors believe that more resignations will follow

9.       The Debtors are not parties to any collective bargaining agreements.

4

**b.      Employee Base Pay and Payroll**

10.      The Debtors' Employees are paid either a salary or on an hourly basis as their

primary form of compensation.  Employees receive wages and salaries (the "<u>Wages</u>") on a bi-

weekly basis every other Friday.  The Debtors generally fund their payroll approximately two days

before the applicable payday (on the applicable Wednesday).

**c.      Unpaid Employee Wages**

11.      Payroll is generally paid one week in arrears.  In the last regular payroll, on June 6,

2025,[4] the current Employees received payment for services provided through Friday, May 30,

2025.  The next payroll, on June 20, 2025, will cover the pay-period of May 31 through June 13,

2025.[5]  The Employees are therefore owed prepetition Wages.

12.      The Debtors estimate that they owe their Employees an aggregate of approximately

$527,262.17 on account of accrued prepetition Wages (collectively, the "<u>Unpaid Employee

Wages</u>").  However, this amount may fluctuate depending on contingencies.

13.      Postpetition, the Debtors estimate that their average gross payroll for their

Employees will be (before Adjustments/deductions) approximately $1,150,000 per month.

14.      By this Motion, the Debtors seek authority, but not direction, to pay the Unpaid

Employee Wages in the ordinary course of business.  As of the Petition Date, the Debtors believe

that they do not owe any Unpaid Employee Wages in excess of the statutory cap of $17,150 set

forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code (the "<u>Statutory Cap</u>") to any

---

[4]   As referenced above, on June 6, 2025, the Debtors conducted a reduction-in-force, and prior to the bankruptcy
filing, processed and fulfilled their remaining payment obligations to the terminated employees by depositing funds
into the payroll account for the applicable amounts due.

[5] In these payrolls Debtors would ordinarily pay Employees amounts that had been reconciled or adjusted as owed
from any previous underpayment, including recently submitted expenses, uncalculated overtime, etc. (with these
amounts as the "Adjustments" and which, as applicable are included within the definition of Unpaid Employee
Wages).

Employees(s). However, out of an abundance of caution, the Debtors seek authority to pay any
amounts above the Statutory Cap solely on a final basis.

### d. Payroll Costs

15.     The Debtors utilize software and services from UKG (the "<u>Payroll Provider</u>") to
support payroll processing, payroll tax calculations and filings, and other payroll-related services
(all such associated costs, collectively, the "<u>Payroll Costs</u>").  The Debtors pay the Payroll Provider
a quarterly fee, and the next payment will be due in July, 2025.  The Debtors owe the Payroll
Provider $90,616.61, which last payment was due in April, 2025.  The Debtors seek authority to
honor prepetition and postpetition amounts of Payroll Costs, including amounts owed to the
Payroll Provider, to ensure continued payroll services during the Chapter 11 Cases.

### e. Supplemental Workforce

16.     The Debtors may need to utilize independent contractors for services during the
Chapter 11 Cases.  These independent contractors (the "<u>Supplemental Workforce</u>") would be paid
by the Debtors as needed. As of the Petition Date, the Debtors estimate that approximately $0 is
owed to the Supplemental Workforce. The Debtors request authority to pay the Supplemental
Workforce, as part of their ordinary course of business.

### f. Deductions and Withholding

17.     In the ordinary course of business, the Debtors incur obligations on account of
Payroll Deductions and Employee Payroll Taxes (each as defined below and collectively, the
"<u>Withholding Obligations</u>").

#### i.     Payroll Deductions

18.     The Debtors routinely deduct amounts from Employees' wages, including
garnishments and similar deductions, as well as other pre-tax and after-tax deductions payable
pursuant to certain employee benefit plans discussed herein, such as an Employee's share of

6

healthcare benefits and insurance premiums (the "Payroll Deductions").  The Debtors respectfully request that the Court authorize, but not direct, the Debtors to continue to honor their Payroll Deductions and to pay any prepetition claims with respect thereto in the ordinary course of business.

          *ii.*     *Payroll Taxes*

19.     The Debtors are required by law to withhold from the Employees' wages amounts related to, among other things, national, regional, and local income tax (the "Employee Payroll Taxes") for remittance to the appropriate taxing authorities. The Employee Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority when the Employees' payroll checks are disbursed.  The Debtors respectfully request that the Court authorize, but not direct, the Debtors to continue to honor their Employee Payroll Taxes and to pay any prepetition claims with respect thereto in the ordinary course of business.

**g.**     **The Debtors' Employee Benefit Programs**

20.     In addition to their wages, the Debtors' Employees also generally are entitled to receive other forms of compensation, including health benefits, paid time off, and reimbursement of certain business expenses (collectively, the "Employee Benefit Programs").  The Employee Benefit Programs include, but are not limited to: (i) reimbursement of expenses, (ii) paid time off, (iii) a healthcare program, including dental and vision coverage, (iv) health savings accounts or flexible spending accounts, (v) life and disability coverage, (vi) workers' compensation, (vii) a 401(k) retirement savings plan, and (viii) an ethics and harassment platform.

          *i.*     *Business Expense Reimbursements*

21.     The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtor.  Such expenses typically include, but are not limited to, business-related travel expenses (including mileage) and other items

(the "Reimbursement Obligations").  Expense reports detailing the Reimbursement Obligations are submitted for reimbursement by the Employees and generally must be supported by copies of receipts.  Expenses are paid with payroll, and the Debtors utilize a vendor, Concur (the "Expense Vendor").  Employees expect that their business expenses will be paid promptly, and Employees may suffer hardship in delay of payment of these expenses.

22.     There is commonly delay between when an Employee incurs an expense and submits the corresponding expense report for processing.  Therefore, it is difficult for the Debtors to determine the exact amount of Reimbursement Obligations that are due and owing for any particular time period.  However, the Debtors believe that few, if any, Employees will be owed expenses earned within 180 days of the Petition Date that would require payment above the Statutory Cap.  Upon information and belief, certain of the Debtors' executives are owed amounts that may exceed the Statutory Cap for recent business travel to Oregon, and the Debtors seek authority to pay these amounts (to the extent they cause the Employee to be paid over the Statutory Cap) only in the Final Order. Other than these expenses, the Debtors seek authority to pay Employees in the ordinary course all Reimbursement Obligations amounts, no matter when earned, and to continue to pay future amounts in the ordinary course of the Debtors' business.

        ii.     *Paid Leave*

23.     **PTO.**  The Debtors provide eligible (non-insider) Employees with paid time off ("PTO").  Employees are eligible for varying amount of PTO, depending on their length of service and may exercise PTO according to company policy.  Recently, the Debtors capped PTO at a maximum of 40 hours, but grandfathered in amounts exceeding 40 hours for Employees that had already accrued more than 40 hours.  Upon an Employee's termination, the Debtors will cash out the Employee's PTO benefits to the extent required by applicable law.

8

24.     As of the Petition Date, the Debtors estimate they owe $691,170.14 (before adjustments/deductions) for accrued PTO for current Employees.  The Debtors believe that the continuation of PTO policy in accordance with prior practice for their current Employees is essential to maintaining Employee wellness and morale during the Chapter 11 Cases.  Further, the policies are broad-based programs upon which all Employees have come to depend, and the continuation of those programs will not create any material cash flow obligations beyond the Debtors' normal payroll obligations.  Moreover, disruptions or changes to these policies could have a direct impact on Employee commitment, morale, and retention, to the detriment of the Debtors.

25.     The Debtors respectfully request that the Court authorize, but not direct, the Debtors to continue to pay amounts on account of PTO if and when they come due in the ordinary course of business and under applicable law.

26.     ***Other Leave.***  The Debtors also offer parental, bereavement and other leave through their vendor, Voya.  The Debtors seek authority, but not direction to pay, in their discretion and in the ordinary course of their business, amounts owed to Voya in the ordinary course and to administer these leave policies in the ordinary course of business.

*iii.    The Health Plans*

27.     The Debtors offer eligible Employees and their eligible dependents (collectively, the "Dependents") the option of medical, dental and vision insurance.  For medical insurance, including prescription drug coverage, the Debtors offer coverage (the "Medical Plan") through Regence ("Health Provider").  The Debtors bear a percentage of the costs of the Medical Plan for eligible Employees (which amount varies depending on their coverage and Dependents), and the Employees bear the remainder of the costs, based on dependent elections.  In the ordinary course

9

of their business, on the first of the month, the Debtors pay the Health Provider premiums for the

following month, and, as of the Petition Date, the Debtors are current in payments to the Health

Provider.

28.    For dental insurance, the Debtors also offer coverage through Delta Dental (the

"Dental Plan"). The Debtors bear a percentage of the costs of the Dental Plan for eligible

Employees (which amount varies depending on their coverage and Dependents). The Debtors pay

for the Dental Plan on the first of the month.

29.    For vision insurance, the Debtors offer coverage through VSP (the "Vision Plan,"

and, together with the Medical Plan and Dental Plan, the "Health Plans"). The Debtors bear 100%

of the costs of the Vision Plan for eligible Employees. The Debtors pay for the Vision Plan mid-

month.

30.    Prepetition, the Debtors' monthly cost for the premiums of the Health Plans was

approximately $420,000 per month, which amount should reduce during the Chapter 11 Cases due

to the pre-petition reduction in force.[6] The Debtors' Health Plans are fully insured, and there is no

estate liability outside of payment of premiums and a monthly fee of $15,833.33 to the Debtors'

broker, Alliant.

31.    The Debtors seek authority, but not direction, to pay any amounts due and to

continue to pay, in their discretion, the premiums for the Health Plans incurred postpetition and to

maintain their Health Plans. The Debtors further seek authority to make payments due or that will

be due to their broker(s) relating to the Health Plans and any other amounts necessary to maintain

the Health Plans.

---

[6] Given the reduction of the size of the Debtors' workforce, the providers for the Health Plans will likely have a
right to re-negotiate terms of the Health Plans, which could result in a higher per-capita, but lower gross, amount
owed by the Debtors.

US_ACTIVE\130483005\V-15

### iv.     FSAs and HSAs

32.     The Debtors also offer their Employees the benefit of maintaining a respective health-savings account (the "HSA(s)") and a flexible savings account (the "FSA(s)") through Rocky Mountain Reserve (the "HSA & FSA Benefits").  Employees contribute to the FSAs at their election, and the Debtors do not contribute to the FSAs.

33.     The Debtors contribute to HSAs based on the type of coverage for the Employee. The Debtors contribute semi-annually to Employee HSAs, with the next payment due in July, 2025.  Additionally, the Debtors pay a monthly administration fee to Rocky Mountain Reserve of approximately $3.75 per employee HSA enrollee and $2.75 per Employee FSA enrollee. The Debtors respectfully request that the Court authorize, but not direct, the Debtors to continue to honor their HSA & FSA Benefits and to pay any prepetition claims with respect thereto in the ordinary course of business.

### v.     COBRA

34.     The Debtors are required to offer certain of their former Employees certain health benefits following termination of employment under § 4980B of the Internal Revenue Code to administer Continuation Health Coverage ("COBRA") (*see* 26 U.S.C. § 4980B)  Pursuant to COBRA, former Employees of the Debtors (the "COBRA Eligible Employees") may continue using certain health benefits (the "COBRA Benefits"), and are entitled to continue to receive COBRA Benefits for up to eighteen, and occasionally thirty-six, months following termination of employment. The Debtors' COBRA Eligible Employees are typically responsible for paying all costs associated with the COBRA Benefits.

35.     The Debtors have also provided COBRA benefits to employees that have been previously terminated, for which the Debtors are responsible for payment, which responsibility

11

extends, to the Debtors belief, through September, 2025.  Certain current Employees also have similar COBRA benefits in their contract upon severance.

36.     The Debtors pay a 2% administrative fee for enrolled COBRA participants.  The Debtors request authority, but not direction, to (a) pay any prepetition amounts outstanding on account of the COBRA Benefits; (b) to continue to offer the COBRA Benefits, including to Employees who may be terminated after the Petition Date, if any, and to honor all postpetition obligations related thereto in the ordinary course of business consistent with past practices; and (c) to continue to pay fees related to the COBRA Benefits in the ordinary course of business on a postpetition basis.

*vi.*     *Employee Life, AD&D and Background Check Insurance*

37.     The Debtors offer eligible Employees premium based group life insurance ("Life Insurance") and accidental death and dismemberment insurance, disability and other similar insurance ("AD&D Insurance") through Voya.  The Debtors also offer background check insurance ("Background Check Insurance") through Accurate Ace.  The Debtors pay premiums monthly, and the prepetition amount of monthly premiums for Life Insurance, AD&D Insurance and Background-Check Insurance total approximately $30,000 per month, less voluntary employee deductions, which amount should be reduced during the Chapter 11 Cases due to the prepetition reduction in force.

38.     The Debtors' Employees and their families depend on insurance provided by the Debtors as a fundamental aspect of compensation.  Any disruption or perceived-disruption regarding insurance benefits or coverage would damage morale and may cause Employees to seek employment elsewhere.  The Debtors are not current on their insurance obligations and owe Voya estimated amounts of $85,897.89 for AD&D Insurance and $111,591.37 for Life Insurance.  The

12

Debtors seek authority, in their discretion, to pay these amounts and any accrued and unpaid prepetition premiums and related charges, to continue the above benefits post-petition and to deliver the Employees' portion of any accrued and unpaid prepetition premiums for the AD&D Insurance and Life Insurance to the corresponding administrators in connection with the payment of the Wages and withholding obligations.

        *vii.*      *Workers' Compensation*

39.     The Debtors maintain workers' compensation insurance for their Employees at the statutorily required level for each state in which they have Employees (collectively, and as described herein, the "Workers' Compensation Program"). As part of the Workers' Compensation Program, the Debtors maintain a workers' compensation insurance policy with Zurich American Insurance Company (the "Workers' Compensation Insurance Policy"). The Debtors must continue claim assessment, determination, adjudication, and payment pursuant to the Workers' Compensation Program, without regard to whether such liabilities are outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements.

40.     The Debtors are not aware of any active, open claims under the Workers' Compensation Program. To the extent any Employees assert claims arising under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 to permit the Employees to proceed with such claims. This requested modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

41.     Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences

that potentially could disrupt the reorganization process.  As of the Petition Date, the Debtors do not believe that there are any prepetition amounts outstanding on account of accrued but unpaid Workers' Compensation Program obligations.  However, out of an abundance of caution, the Debtors request authority, but not direction, to (a) pay prepetition amounts due on account of the Workers' Compensation Program and consistent with past practice, (b) continue the Workers' Compensation Program in the ordinary course of business, and (c) to the extent applicable, modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program.

<em>viii.    Retirement Plan</em>

42.    The Debtors offer eligible Employees the opportunity to participate in a defined 401(k) contribution plan through Empower, which allows for voluntary employee pre-tax deferrals (the "<u>Retirement Plan</u>").  Employees participating in this program may contribute up to 90% of their salary up to the federal statutory cap per year, and the Debtors deduct the employee pre-tax deferrals from Employee paychecks for each pay-cycle.  The Debtors' Retirement Plan includes a match (each pay-period) by the Debtors of up to 100% up to the first 3%, and 50% on the next 2% of Employee contributions.  Failure to timely forward the Employees' Retirement Plan deductions may be a violation of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), resulting in potential personal liability for the Debtor's officers for such deducted amounts.  Maintaining the Retirement Plan as a part of the Employee Benefit Programs is critical to maintaining employee morale.

43.    The Debtors seek authority to deliver the Employee contributions in connection with the payment of Wages and withholding obligations described above.  Administration fees for the Retirement Plan are paid through plan assets.  The Debtors respectfully request that the Court

14

authorize, but not direct, the Debtors to maintain their Retirement Plan, to deliver Employee contributions to continue to honor their matching contributions (whether for prepetition or postpetition amounts), and to pay any related fees and costs, if and when they come due in the ordinary course of business.

ix.    *Ethics and Harassment Platform*

44.    The Debtors maintain an ethics and harassment platform (the "Platform") with NAVEX Global to assist their Human Resources department and to provide mandatory and discretionary training to employees.  The Debtors pay a $30,000 annual fee.  The Debtors are not current, and, if the Debtors do not make payment by June 18, 2025, service will be suspended.  The Debtors seek authority, in their discretion, to pay this amount and amounts due relating to the Platform.

### III.  RELIEF REQUESTED

45.    The Debtors seek authority, (a) under the Interim Order, (i) to pay and administer the Employee Compensation & Benefits, including to pay (a) in the ordinary course as amounts arise post-petition, (b) in the ordinary course amounts up to the Statutory Cap for any individual Employee to the extent such amounts arise pre-petition and (c) identified third parties including the Health Provider and Payroll Vendor any amounts owed; (ii) to the extent applicable, modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program; (iii) authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion; (iv) waive any applicable stay and enter the Interim Order on an emergency or expedited basis; and (v) grant related relief, and (b) under the Final Order, to (i) exercise the relief granted in the Interim Order and (ii) as applicable, also to pay any amounts above the Statutory Cap sought herein.

15

## IV.  **BASIS FOR RELIEF**

A.    <u>A Substantial Portion of the Employee Compensation & Benefits are Entitled to Priority Treatment, and are Required to be Paid to Confirm a Plan.</u>

46.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation & Benefits owed to the Employees to priority treatment.  As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including sick leave pay earned by an individual, and (b) contributions to an employee benefit plan).  Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees, and should not materially affect recoveries for general unsecured creditors.  Indeed, payment of the Employee Compensation & Benefits at this time enhances value for the benefit of all interested parties.

47.    The majority of Employee Compensation & Benefits and related taxes that the Debtors request authority to pay and/or honor are amounts entitled to priority in payment under §§ 507(a)(4), (5) and (8)(D).  If the aggregate prepetition Wages, Employee Benefits and PTO that accrued within the 180 days prior to the Petition Date exceed the sum of $17,150 allowable as a priority claim under §§ 507(a)(4) and (5) for any individual Employee or member of the Supplemental Workforce, the Debtors are not requesting interim authority, by this Motion, to pay any such excess amounts.

48.    Thus, *on an interim basis*, the Debtors request authority to pay or honor all *prepetition* amounts of Employee Compensation & Benefits in the ordinary course of business, but only up to the $17,150 Statutory Cap for each Employee.  The Debtors only seek *final authority* to pay applicable pre-petition amounts above this cap.

B.    <u>Payment of Certain Employee Compensation & Benefits Is Required by Law</u>

49.    The Debtors seek authority to pay the applicable Withholding Obligations to the

appropriate third-parties.    These amounts principally represent wages that governments,

Employees, or judicial authorities have designated for deduction from the Employees' paychecks.

Indeed, certain Withholding Obligations are not property of the Debtors' estates, because the

Debtors have withheld such amounts from the Employees' paychecks on another party's behalf.

*See* 11 U.S.C. § 541(b)(1), (d); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97

(3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from

its employees' wages created a trust relationship between debtor and the city for payment of

withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that

individual officers of a company may be held personally liable for failure to pay trust fund taxes).

Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors

request authorization to transmit the Withholding Obligations on account of the Employees to the

proper parties in the ordinary course of business.    Failure to remit such Withholding Obligations

could subject the Debtors to disputes or collection efforts from governmental authorities or third-

parties that may not respect the automatic stay.

C.    <u>The Debtors May Pay Employees in the Ordinary Course of Business under Section
363</u>

50.    Section 363(c)(1) of the Bankruptcy Code expressly grants the Debtors the

authority to "enter into transactions . . . in the ordinary course of business" and "use property of

the estates in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).

Therefore, the Debtors believe they are permitted to pay all postpetition amounts due pursuant to

the Employee Compensation & Benefits, as such actions are in the ordinary course of the Debtors'

business.    Out of an abundance of caution, however, the Debtors seek entry of an order granting

17

the relief requested herein to provide certainty and avoid any disruptions to their business operations.

51.    In addition, the Court may grant authority to pay amounts arising prepetition pursuant to §§ 363(b) and 105(a).  Section 363 provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Under § 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *See, e.g., In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (requiring that the debtor show a "sound business purpose" to justify its actions under § 363) (internal citations omitted); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

D.    The Debtors May Pay Employees Under Section 105(a) and the Necessity of Payment Doctrine

52.    The Court may also authorize payment of prepetition claims in appropriate circumstances under § 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of a bankruptcy court and empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Specifically, the Court may use its power under § 105(a) to authorize the payment and continuation of the Employee Compensation & Benefits under the "necessity of payment" rule (also referred to as the "doctrine of necessity").  The doctrine is designed to foster a debtor's

18

rehabilitation, which courts have recognized is "the paramount policy and goal of chapter 11." *In re Ionosphere Clubs, Inc*., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Just for Feet, Inc*., 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization").

53.     The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id*. at 581 (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"). Moreover, in 2017, the U.S. Supreme Court, in *Czyzewski v. Jevic Holding Corp.*, recognized that courts "approve[] interim distributions that violate ordinary priority rules," generally when there are "significant Code-related objectives that the priority-violating distributions serve," including "***payment of employees' prepetition wages***." 137 S. Ct. 973, 985 (2017) (emphasis added). Therefore, the Debtors seek relief, as required, under this doctrine.

54.     Here, the majority of the Employees rely on the Employee Compensation & Benefits to satisfy their daily living expenses and to provide security and assurance for themselves and their families regarding reacting to and planning for major life-events. Consequently, the Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation & Benefits. Additionally, continuing ordinary course compensation and benefits will help maintain Employee morale, avoid Employee flight that could cripple the Debtors' ongoing business and endanger creditor recoveries.

19

55.     Moreover, the Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation & Benefits, the Debtors may experience turnover and instability at this critical time in their efforts to exit Chapter 11.  Given the pre-petition reductions, the Employees remain employed with the Debtors because they are vital, and the Debtors will face extreme difficulty in replacing them.

56.     Enterprise/going-concern value may be materially impaired to the detriment of all stakeholders in such a scenario.  The Debtors therefore believe that payment and honoring of their Employee Compensation & Benefits is a necessary and critical element of the Debtors' efforts to preserve value during the operation of their business during this case.  Retention and motivation of the Current Employees is essential for Debtors to preserve value of their assets and keep the company stable during these cases.

57.     Courts in this district have approved similar relief in chapter 11 cases.  *See, e.g., In re Cyxtera Technologies, Inc.* No. 23-14853 (JKS) (Bankr D.N.J. June 29, 2023) (authorizing the debtors to (a) pay prepetition employee wages, salaries, and other compensation, and reimbursable expenses, and (b) continue employee benefits programs on a final basis); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. May 18, 2023) (same); *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. Apr. 17, 2023) (same); *In re Block Fi, Inc*., No. 22-19361 (MBK) (Bankr. D.N.J. Jan. 17, 2023) (same); *In re Nat'l Realty Inv. Advisors, LLC*, No. 22-14539 (JKS) (Bankr. D.N.J. Jan. 3, 2023) (same); *In re Alliant Tech., L.L.C*., No. 21-19748 (JKS) (Bankr. D.N.J.

Jan. 25, 2022) (same); *In re Christopher & Banks Corp.*, No. 21-10269 (ABA) (Bankr. D.N.J. Feb. 8, 2021) (same).[7]

## V.  <u>REQUEST FOR HEARING</u>

58.   The Debtors request that the Court hold a hearing and enter the Interim Order on an emergency or expedited basis and schedule a hearing and grant this Motion on a final basis.

## VI.  <u>COMPLIANCE WITH BANKRUPTCY RULE 6003 AND WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)</u>

59.   The Debtors request that the Court determine that the relief requested in this Motion complies with Bankruptcy Rule 6003 and that waiver of Bankruptcy Rules 6004(a) and (h) is appropriate.

60.   Bankruptcy Rule 6003 provides:

> Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding the following: . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001. . . .

61.   The Third Circuit Court of Appeals has interpreted language similar to that used in Bankruptcy Rule 6003 in the context of preliminary injunctions.  In that context, irreparable harm has been interpreted as a continuing harm that cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.  *See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 Fed. Appx. 907, 910 (3d Cir. 2007) (citing *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)).  Further, the harm must be shown to be actual and imminent, not speculative or unsubstantiated.  *See, e.g., Acierno v. New Castle County*, 40 F.3d 645, 653-55 (3d Cir. 1994).

---

[7] Due to the volume of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

21

62.     As described in the Motion and supported by the First Day Declaration, the

Debtors' Employees depend on timely payment of their compensation, and the Debtors' face an

immediate risk of losing these Employees if their right to payment or access to benefits is delayed.

As a result, the Debtors respectfully submit that they have satisfied the "immediate and irreparable

harm" standard of Bankruptcy Rule 6003.

63.     The Debtors further seek a waiver of any stay of the effectiveness of the Order.

Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property

other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless

the court orders otherwise."  As set forth above, the Debtors submit that granting this Motion such

that it is effective immediately is essential to prevent irreparable damage to the Debtors and their

estates.

64.     Accordingly, the Debtors respectfully submit that the relief requested herein is

appropriate under the circumstances and under Bankruptcy Rules 6003 and 6004(h).

65.     Finally, should the Court be inclined to grant the Motion, the Debtors seek a waiver

of the notice requirements under Bankruptcy Rule 6004(a).

## VII.  WAIVER OF MEMORANDUM OF LAW

66.     The Debtors respectfully request that the Court waive the requirement to file a

separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon

which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

## VIII.  RESERVATION OF RIGHTS

67.     Nothing contained in this Motion or any order granting the relief requested in this

Motion, and no action taken pursuant to the relief requested or granted (including any payment

made in accordance with any such order), is intended as or shall be construed or deemed to be: (a)

an admission as to the amount of, basis for, or validity of any claim against the Debtors under the

22

Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

## IX.  NO PRIOR REQUEST

68.    No prior request for the relief sought in this motion has been made to this or any other court.

## X.  NOTICE

Pursuant to Local Rule 9013-5(c), notice of this Motion shall be given to the following parties: (a) the Office of the United States Trustee; (b) counsel for the Debtors' Prepetition Secured Parties; and (c) the Debtors' fifty largest unsecured creditors on a consolidated basis.  As this Motion is seeking "first day" relief, within 48 hours of the entry of the Order on this Motion, the Debtors will serve copies of the Order, as required by Local Rule 9013-5(f).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## XI.  CONCLUSION

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the relief requested herein on an interim basis; (ii) scheduling a hearing and granting the relief requested

herein on a final basis; and (iii) granting the Debtors such other and further relief as the Court

deems just and proper.

US_ACTIVE\130483005\V-15

Dated: June 10, 2025

**TOGUT, SEGAL & SEGAL LLP**

*/s/ Frank A. Oswald*
Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  frankoswald@teamtogut.com

Albert Togut (*pro hac vice* forthcoming)
Amanda C. Glaubach (*pro hac vice* forthcoming)
Eitan Blander (*pro hac vice* forthcoming)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  altogut@teamtogut.com
          aglaubach@teamtogut.com
          eblander@teamtogut.com

- and -

**DENTONS US LLP**

Tania M. Moyron (*pro hac vice* forthcoming)
Van C. Durrer, II (*pro hac vice* forthcoming)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:  tania.moyron@dentons.com
          van.durrer@dentons.com

John D. Beck (*pro hac vice* forthcoming)
Sarah M. Schrag (*pro hac vice* forthcoming)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:  john.beck@dentons.com
          sarah.schrag@dentons.com

*Proposed Counsel for Debtors and
Debtors in Possession*

## EXHIBIT A

(Proposed Form of Interim Order)

US_ACTIVE\130483005\V-15

(Page 1)
Debtors:                 Powin, LLC, et al.
Case No.                 25-16137 (MBK)
Caption of Order         Interim Order Granting Motion of the Debtors for Entry of an Order (I)
Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefits
Programs and (II) Granting Related Relief

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re:<br>Powin, LLC, *et al.*,[8]<br><br>       Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

## INTERIM ORDER GRANTING MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO (A) PAY EMPLOYEE OBLIGATIONS AND (B) CONTINUE EMPLOYEE BENEFIT PROGRAMS, AND (II) GRANTING RELATED RELIEF

The relief set forth on the following pages, numbered [•] ([•]) through [•] ([•]), is

ORDERED.

---

[8] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504], (iii) PEOS Holdings, LLC [5476], (iv) Powin China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [15241], (vii) Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [22495], and (ix) Powin Energy Operating, LLC [6487]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

US_ACTIVE\130483005\V-15

(Page 2)

Debtors:                  Powin, LLC, et al.

Case No.                  25-16137 (MBK)

Caption of Order          Interim Order Granting Motion of the Debtors for Entry of an Order (I)
Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefits
Programs and (II) Granting Related Relief

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

| **DENTONS US LLP** | **TOGUT, SEGAL & SEGAL LLP** |
|---|---|
| Tania M. Moyron (*pro hac vice* forthcoming) | Frank A. Oswald (admitted) |
| Van C. Durrer, II (*pro hac vice* forthcoming) | 550 Broad Street |
| 601 S. Figueroa Street #2500 | Suite 1508 |
| Los Angeles, CA 90017 | Newark, NJ 07102 |
| Telephone: (213) 623-9300 | Telephone: (212) 594-5000 |
| Facsimile: (213) 623-9924 | Facsimile: (212) 967-4258 |
| Email: tania.moyron@dentons.com | Email: frankoswald@teamtogut.com |
| van.durrer@dentons.com | |
| | Albert Togut (*pro hac vice* forthcoming) |
| John D. Beck (*pro hac vice* forthcoming) | Amanda C. Glaubach (*pro hac vice* |
| Sarah M. Schrag (*pro hac vice* forthcoming) | forthcoming) |
| 1221 Avenue of the Americas | Eitan Blander (*pro hac vice* forthcoming) |
| New York, NY 10020-1089 | One Penn Plaza, Suite 3335 |
| Telephone: (212) 768-6700 | New York, New York 10119 |
| Facsimile: (212) 768-6800 | Telephone: (212) 594-5000 |
| Email: john.beck@dentons.com | Facsimile: (212) 967-4258 |
| sarah.schrag@dentons.com | Email: altogut@teamtogut.com |
| | aglaubach@teamtogut.com |
| *Proposed Counsel for Debtors and* | eblander@teamtogut.com |
| *Debtors in Possession* | |
| | *Proposed Counsel for Debtors and* |
| | *Debtors in Possession* |

2

(Page 3)

| | |
|---|---|
| Debtors: | Powin, LLC, et al. |
| Case No. | 25-16137 (MBK) |
| Caption of Order | Interim Order Granting Motion of the Debtors for Entry of an Order (I) Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefits Programs and (II) Granting Related Relief |

Upon consideration of the Motion[9] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an  interim order (this "Order"): (i) authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and costs related to these items, and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto; and (ii) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference* from the United States District Court for the District of New Jersey dated as of September 18, 2012; and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for hearing on the Motion were appropriate under the circumstances and that no other notice be provided; and this Court having determined that the legal and factual bases set forth in the Motion and at the hearing thereon establish just cause for the relief granted herein; and upon all of the proceedings before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

---

[9] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

US_ACTIVE\130483005\V-15

(Page 4)

Debtors:                Powin, LLC, et al.

Case No.                25-16137 (MBK)

Caption of Order        Interim Order Granting Motion of the Debtors for Entry of an Order (I)
Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefits
Programs and (II) Granting Related Relief

2.     The final hearing (the "Final Hearing") on the Motion shall be held on [•], **2025, at**
[•]:[•]**., prevailing Eastern Time**. Any objections or responses to entry of a final order on the
Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on [•], 2025, and shall be
served on [•].  In the event no objections to entry of a final order on the Motion are timely received,
this Court may enter such final order without need for the Final Hearing.

3.     The Debtors are authorized, but not directed, to continue and/or modify, change,
and discontinue the Employee Compensation & Benefits and to implement new programs,
policies, and benefits in the ordinary course of business during these Chapter 11 Cases and without
the need for further Court approval, subject to applicable law.

4.     The Debtors are authorized, but not directed, to continue the Employee
Compensation & Benefits programs and to pay or honor prepetition and postpetition amounts
related to the Employee Compensation & Benefits programs and related incidental costs, absent
further order of this Court in the ordinary course of their business; *provided*, *however*, that no
payment to any individual Employee or member of the Supplemental Workforce of prepetition
Employee Compensation & Benefits shall exceed, in the aggregate for that individual Employee,
the US $17,150 statutory cap provided for under § 507(a)(4) unless otherwise required by
applicable law or ordered by this Court, including in the Final Order.

5.     Nothing herein shall be deemed to authorize the payment of any amounts which
violate, implicate, or are otherwise subject to § 503(c).  The Debtors will seek approval of any
insider bonus or incentive programs, if any, under separate motion under § 503(c) and nothing
herein shall prejudice the Debtors' ability to seek such relief pursuant to § 503(c) at a later time.

4

(Page 5)
Debtors:            Powin, LLC, et al.
Case No.            25-16137 (MBK)
Caption of Order    Interim Order Granting Motion of the Debtors for Entry of an Order (I)
Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefits
Programs and (II) Granting Related Relief

6.      Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order, or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to § 365; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of any or all such liens.

7.      The Debtors' banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized and directed to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

8.      The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these Chapter 11 Cases with respect to prepetition amounts owed in connection with the relief granted herein.

9.      Pursuant to section 362(d) of the Bankruptcy Code, the automatic stay is modified

5

(Page 6)
Debtors:              Powin, LLC, et al.
Case No.              25-16137 (MBK)
Caption of Order      Interim Order Granting Motion of the Debtors for Entry of an Order (I)
Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefits
Programs and (II) Granting Related Relief

solely to the extent necessary to allow Employees to proceed with their claims under the Workers'

Compensation Program in the appropriate judicial or administrative forum, and Employees are

authorized to so proceed. The Debtors are authorized, but not directed, to continue the Workers'

Compensation Program and pay all prepetition amounts relating thereto in the ordinary course of

business, consistent with prepetition practices. The modification of the automatic stay set forth in

this paragraph pertains solely to claims under the Workers' Compensation Program.

10.    Nothing in this Interim Order or any action taken by the Debtors in furtherance of

the implementation hereof shall be deemed to constitute an assumption or rejection of any

executory contract or unexpired lease pursuant to § 365, and all of the Debtors' rights with respect

to such matters are expressly reserved.

11.    Notwithstanding the relief granted herein and any actions taken hereunder, nothing

contained herein shall (a) create, nor is it intended to create, any rights in favor of, or enhance the

status of any claim held by, any person or entity, or (b) be deemed to convert the priority of any

claim from a prepetition claim into an administrative expense claim.

12.    Notice of the Motion as provided therein shall be deemed good and sufficient notice

of such Motion and the requirements of the Local Rules are satisfied by such notice.

13.    To the extent applicable, the requirements set forth by Bankruptcy Rule 6003 are

satisfied.

14.    Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of

this Order are immediately effective and enforceable upon entry.

6

(Page 7)

| | |
|---|---|
| Debtors: | Powin, LLC, et al. |
| Case No. | 25-16137 (MBK) |
| Caption of Order | Interim Order Granting Motion of the Debtors for Entry of an Order (I) |

Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefits
Programs and (II) Granting Related Relief

15.     The Debtors are authorized to take all actions necessary to effectuate the relief

granted in this Order in accordance with the Motion.

16.     This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Order.

**<u>EXHIBIT B</u>**

(Proposed Form of Final Order)

(Page 1)

| | |
|---|---|
| Debtors: | Powin, LLC, et al. |
| Case No. | 25-16137(MBK) |
| Caption of Order | Final Order Granting Motion of the Debtors for Entry of an Order |

Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefits
Programs and Granting Related Relief

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br>Powin, LLC, *et al.*,[10]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

## FINAL ORDER GRANTING MOTION OF THE DEBTORS FOR
## ENTRY OF AN ORDER AUTHORIZING DEBTORS TO (A) PAY EMPLOYEE
## OBLIGATIONS AND (B) CONTINUE EMPLOYEE BENEFIT PROGRAMS, AND (II)
## GRANTING RELATED RELIEF

The relief set forth on the following pages, numbered [•] ([•]) through [•] ([•]), is
ORDERED.

---

[10] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification
number, are: (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504], (iii) PEOS Holdings, LLC [5476], (iv) Powin
China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [15241], (vii)
Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [22495], and (ix) Powin
Energy Operating, LLC [6487]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

(Page 2)

| | |
|---|---|
| Debtors: | Powin, LLC, et al. |
| Case No. | 25-16137-MBK |
| Caption of Order | Final Order Granting Motion of the Debtors for Entry of an Order (I) |

Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefits
Programs and (II) Granting Related Relief

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**DENTONS US LLP**

Tania M. Moyron (*pro hac vice* forthcoming)
Van C. Durrer, II (*pro hac vice* forthcoming)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:  tania.moyron@dentons.com
            van.durrer@dentons.com

John D. Beck (*pro hac vice* forthcoming)
Sarah M. Schrag (*pro hac vice* forthcoming)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:  john.beck@dentons.com
            sarah.schrag@dentons.com

*Proposed Counsel for Debtors and
Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  frankoswald@teamtogut.com

Albert Togut (*pro hac vice* forthcoming)
Amanda C. Glaubach (*pro hac vice*
forthcoming)
Eitan Blander (*pro hac vice* forthcoming)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  altogut@teamtogut.com
            aglaubach@teamtogut.com
            eblander@teamtogut.com

*Proposed Counsel for Debtors and
Debtors in Possession*

(Page 3)
Debtors:              Powin, LLC, et al.
Case No.              25-16137-MBK
Caption of Order      Final Order Granting Motion of the Debtors for Entry of an Order (I)
Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefits
Programs and (II) Granting Related Relief

Upon consideration of the Motion[11] of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") for entry of a final order (this "<u>Order</u>"): (i) authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and costs related to these items, and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto; and (ii) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference* from the United States District Court for the District of New Jersey dated as of September 18, 2012; and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for hearing on the Motion were appropriate under the circumstances and that no other notice be provided; and this Court having determined that the legal and factual bases set forth in the Motion and at the hearing thereon establish just cause for the relief granted herein; and upon all of the proceedings before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

---

[11] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

(Page 4)
Debtors:            Powin, LLC, et al.
Case No.            25-16137-MBK
Caption of Order    Final Order Granting Motion of the Debtors for Entry of an Order (I)
Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefits
Programs and (II) Granting Related Relief

2.      The Debtors are authorized, but not directed, to continue and/or modify, change, and discontinue the Employee Compensation & Benefits and to implement new programs, policies, and benefits in the ordinary course of business during these Chapter 11 Cases and without the need for further Court approval, subject to applicable law.

3.      The Debtors are authorized, but not directed, to pay or honor prepetition and postpetition amounts related to the Employee Compensation & Benefits programs and related incidental costs in an absent further order of this Court.  For the avoidance of doubt, the Debtors may reimburse expenses to all Employees.

4.      Nothing herein shall be deemed to authorize the payment of any amounts which violate, implicate, or are otherwise subject to § 503(c). The Debtors will seek approval of any insider bonus or incentive programs, if any, under separate motion under § 503(c) and nothing herein shall prejudice the Debtors' ability to seek such relief pursuant to § 503(c) at a later time.

5.      Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order, or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to § 365; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise)

Debtors:              Powin, LLC, et al.
Case No.              25-16137-MBK
Caption of Order      Final Order Granting Motion of the Debtors for Entry of an Order (I)
Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefits
Programs and (II) Granting Related Relief

satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest

the extent, validity, or perfection or seek avoidance of any or all such liens.

6.      The Debtors' banks and financial institutions on which checks were drawn or

electronic payment requests made in payment of the prepetition obligations approved herein are

authorized and directed to receive, process, honor, and pay all such checks and electronic payment

requests when presented for payment, and all such banks and financial institutions are authorized

to rely on the Debtors' designation of any particular check or electronic payment request as

approved by this Final Order.

7.      The Debtors are authorized to issue postpetition checks, or to effect postpetition

fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored

as a consequence of these Chapter 11 Cases with respect to prepetition amounts owed in

connection with the relief granted herein.

8.      Pursuant to section 362(d) of the Bankruptcy Code, the automatic stay is modified

solely to the extent necessary to allow Employees to proceed with their claims under the Workers'

Compensation Program in the appropriate judicial or administrative forum, and Employees are

authorized to so proceed. The Debtors are authorized, but not directed, to continue the Workers'

Compensation Program and pay all prepetition amounts relating thereto in the ordinary course of

business, consistent with prepetition practices. The modification of the automatic stay set forth in

this paragraph pertains solely to claims under the Workers' Compensation Program

9.      Nothing in this Final Order or any action taken by the Debtors in furtherance of the

implementation hereof shall be deemed to constitute an assumption or rejection of any executory

(Page 6)
Debtors:              Powin, LLC, et al.
Case No.              25-16137-MBK
Caption of Order      Final Order Granting Motion of the Debtors for Entry of an Order (I)
Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefits
Programs and (II) Granting Related Relief

contract or unexpired lease pursuant to § 365, and all of the Debtors' rights with respect to such

matters are expressly reserved.

10.    Notwithstanding the relief granted herein and any actions taken hereunder, nothing

contained herein shall (a) create, nor is it intended to create, any rights in favor of, or enhance the

status of any claim held by, any person or entity, or (b) be deemed to convert the priority of any

claim from a prepetition claim into an administrative expense claim.

11.    Notice of the Motion as provided therein shall be deemed good and sufficient notice

of such Motion and the requirements of the Local Rules are satisfied by such notice.

12.    To the extent applicable, the requirements set forth by Bankruptcy Rule 6003 are

satisfied.

13.    Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of

this Order are immediately effective and enforceable upon entry.

14.    The Debtors are authorized to take all actions necessary to effectuate the relief

granted in this Order in accordance with the Motion.

15.    This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Order.

**<u>Exhibit 7</u>**

(Notice of Winning Bidder)

**DENTONS US LLP**

Lauren Macksoud (admitted)
101 JFK Parkway
Short Hills, NJ 07078
Telephone: (973) 912-7100
Facsimile: (973) 912-7199
Email: lauren.macksoud@dentons.com

Tania M. Moyron (admitted *pro hac vice*)
Van C. Durrer, II (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: tania.moyron@dentons.com
        van.durrer@dentons.com

John D. Beck (admitted *pro hac vice*)
Sarah M. Schrag (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
Email: john.beck@dentons.com
        sarah.schrag@dentons.com

*Proposed Counsel for Debtors and
Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Email: frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Amanda C. Glaubach (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Email: altogut@teamtogut.com
        aglaubach@teamtogut.com
        eblander@teamtogut.com

*Proposed Counsel for Debtors and
Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re:<br>Powin, LLC, *et al.*,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504]; (iii) PEOS Holdings, LLC [5476], (iv) Powin China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [5241], (vii) Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [2495], (ix) Powin Energy Operating, LLC [6487] (x) Powin Energy Storage 2, Inc., [9926]; (xi) Powin Energy Ontario Storage II LP, [5787]; and (xii) Powin Canada B.C. Ltd. [2239]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

2516137250731000000000014

## NOTICE OF WINNING BIDDERS

**PLEASE TAKE NOTICE** that, on July 17, 2025, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the *Order (I) Designating a Stalking Horse Bidder and Approving Stalking Horse Bidder Protections, (II) Approving Bidding Procedures by Which Interested Parties May Bid and an Auction Sale Format in Connection With the Sale of Substantially All of the Debtors' Assets, (III) Approving Form of Asset Purchase Agreement, (IV) Approving Form of Notice to be Provided to Interested Parties, (V) Authorizing the Assumption and Assignment of Assumed Contracts and Notice Procedures Thereto, (VI) Scheduling a Court Hearing to Consider Approval of the Sale to the Highest and Best Bidder, and (VII) Authorizing the Sale of the Debtors' Property Free and Clear of All Causes of Action and Claims* [Docket No. 413] (the "Bidding Procedures Order") in the chapter 11 cases of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"). The bidding procedures (the "Bidding Procedures") were attached to the Bidding Procedures Order as Exhibit 1.

**PLEASE TAKE FURTHER NOTICE** that, on July 30, 2025, the Debtors conducted the Auction[2] in accordance with the Bidding Procedures after receiving: (i) one Qualified Bid from Mainfreight Distribution Pty Ltd ("Mainfreight") for the MF Credit Bid Collateral (as defined in the MF Bill of Sale); (ii) one Qualified Bid from FlexGen Power Systems, LLC ("FlexGen") for the Purchased Assets (as defined in the FlexGen Asset Purchase Agreement); and (iii) one Qualified Bid from Hitachi Energy Ltd. ("Hitachi") for the EKS Interest (as defined below). No other Qualified Bids for the Debtors' assets were submitted.

**PLEASE TAKE FURTHER NOTICE** that the Auction has closed and the Debtors, in accordance with the Bidding Procedures, hereby declare (i) FlexGen as the Winning Bidder with

[2] Capitalized terms not otherwise defined herein shall have the meaning provided in the Bidding Procedures Order.

US_ACTIVE\130888875

respect to the Purchased Assets, and (ii) Mainfreight as the Winning Bidder with respect to the MF

Credit Bid Collateral.

      **PLEASE TAKE FURTHER NOTICE** that the Bill of Sale with Mainfreight (the "<u>MF

Bill of Sale</u>") is attached hereto as **<u>Exhibit A</u>** and the asset purchase agreement with FlexGen (the

"<u>FlexGen Asset Purchase Agreement</u>") is attached as **<u>Exhibit B</u>**.

      **PLEASE TAKE FURTHER NOTICE** that, in connection with the Debtors' efforts to

maximize the value of their estates through the auction process for the sale of substantially all of

their assets, the Debtors were presented with an opportunity to monetize, for the benefit of their

estates, their indirect 20% equity interest (the "<u>EKS Interest</u>") in non-debtor EKS HoldCo, LLC—

a joint venture with Hitachi—held by Powin EKS SellCo, LLC, a wholly owned non-debtor

subsidiary of Powin LLC. The terms of the proposed transaction are set forth in the term sheet

attached hereto as **<u>Exhibit C</u>** (the "<u>EKS Term Sheet</u>") and include a $15 million cash payment and

waiver of all claims against the Debtors' estates.  The Debtors believe that authorizing non-debtor

Powin EKS SellCo, LLC to consummate the transaction contemplated by the EKS Term Sheet is

in the best interest of their estates and stakeholders. At the Auction, other participants were offered

the opportunity to bid on the EKS Interest, but no other bids were received.  The Official

Committee of Unsecured Creditors supports and approves the EKS Term Sheet.  Accordingly, the

Debtors will seek authority to enter into the EKS Term Sheet at the Sale Hearing and respectfully

submit that no further notice is required under the circumstances.

      **PLEASE TAKE FURTHER NOTICE** that, in accordance with the Bidding Procedures

Order, the current deadline to file an objection with the Court to the entry of an order approving

the Sale is **August 4, 2025, at 12:00 p.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Court's request, **the time of the Sale Hearing has recently changed**.  The Sale Hearing will now be held on **August 6, 2025, at 10:00 a.m. (prevailing Eastern Time) instead of 11:30 a.m. (prevailing Eastern Time)**, before the Honorable Chief Judge Michael B. Kaplan, at the United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Courtroom 8, Trenton, New Jersey 08608.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in the Debtors' Chapter 11 Cases are available upon request to Verita Global by calling (866) 507-8031 (U.S./Canada) or (781) 575-2122 (international); (b) by visiting the Debtors' restructuring website at https://www.veritaglobal.net/powin; or (c) for a fee via PACER by visiting http://www.njd.uscourts.gov.

*[Signature page to follow]*

Dated: July 31, 2025

**DENTONS US LLP**

*/s/ Lauren Macksoud*
Lauren Macksoud (admitted)
101 JFK Parkway
Short Hills, NJ 07078
Telephone: (973) 912-7100
Facsimile: (973) 912-7199
Email: lauren.macksoud@dentons.com

Tania M. Moyron (admitted pro hac vice)
Van C. Durrer, II (admitted pro hac vice)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email: tania.moyron@dentons.com
        van.durrer@dentons.com

John D. Beck (pro hac vice pending)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email: john.beck@dentons.com

- and –

**TOGUT, SEGAL & SEGAL LLP**
Frank A. Oswald (admitted)
550 Broad Street, Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email: frankoswald@teamtogut.com

Albert Togut (admitted pro hac vice)
Amanda C. Glaubach (admitted pro hac vice)
Eitan Blander (admitted pro hac vice)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email: altogut@teamtogut.com
        aglaubach@teamtogut.com
        eblander@teamtogut.com

*Proposed Counsel for Debtors and Debtors-in-Possession*

### Exhibit A

**(MF Bill of Sale)**

# **Bill of Sale**

THIS BILL OF SALE ("Bill of Sale"), dated this _____ day of July, 2025, is made in favor of Mainfreight Distribution Pty Ltd (together with its parent, subsidiary or any other affiliate entities, included in the definition of "Mainfreight" under the Terms and Conditions, as defined in the MF Lien Notice, collectively, "<u>Mainfreight</u>"), by Powin, LLC and the below-referenced affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>")[1].

WHEREAS, by order of the United States Bankruptcy Court for the District of New Jersey (the "<u>Court</u>") dated August ___, 2025 (the "<u>Sale Order</u>"), the Court approved the sale of the MF Credit Bid Collateral (defined below) to Mainfreight, free and clear of all liens, claims, interests, or other encumbrances. *See* D.I. ___.

NOW, THEREFORE, for good and valuable consideration in the amount of $3,000,000 USD, the receipt and sufficiency of which are hereby acknowledged, the Debtors do hereby sell, assign, transfer and convey unto Mainfreight, its successors and assigns, all of Debtors' right, title and interest in the personalty, equipment and other goods located at, on or about the locations described on **Exhibit "A"** attached hereto and made a part hereof, and as further set forth in Mainfreight's Credit Bid titled Mainfreight's Credit Bid for the MF Collateral dated of July 28, 2025 (the "<u>MF Credit Bid Letter</u>") attached hereto as **Exhibit "B"** (together, the collateral referenced in Exhibit A and B shall be called the "<u>MF Credit Bid Collateral</u>").

TO HAVE AND TO HOLD the same unto Mainfreight, its successors and assigns forever.

And Debtors do for themselves and their successors and assigns, covenant and agree to and with Mainfreight, its successors and assigns, that the MF Credit Bid Collateral is free and clear of any and all liens, encumbrances, security interests, conditional sales agreements or other agreements whatsoever, and that Debtors are the true and lawful owner of the MF Credit Bid Collateral and have good right and lawful authority, pursuant to the Sale Order, to bargain and sell the same in the manner and form as aforesaid.

---

[1] The Debtors in the Chapter 11 Cases jointly administered at Case No. 25-16137 (MBK) in the United States Bankruptcy Court for the District of New Jersey, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583], (ii) Powin, LLC [0504], (iii) PEOS Holdings, LLC [5476], (iv) Powin China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [5241], (vii) Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [2495], and (ix) Powin Energy Operating, LLC [6487].  The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

For the avoidance of doubt, the MF Credit Bid Collateral is being sold free and clear of all liens, claims, interests, or other encumbrances to the greatest extent permitted by the Bankruptcy Code and applicable non-bankruptcy law. Whichever Mainfreight entity, together with its parent, subsidiary, or any other affiliate entities, holds the Mainfreight Liens[2] shall be permitted to assign a portion of their claim that supports Mainfreight's Credit Bid to the desired Mainfreight entity as the new owner.

This Bill of Sale is an absolute conveyance. It is the intention of the Debtors and Mainfreight that this Bill of Sale shall not be construed as a conveyance given as security for the amounts owed by the Debtors to Mainfreight or secured thereby or for any other matter.

This Bill of Sale and the sale of the MF Credit Bid Collateral shall not be effective and legally binding until the Sale Order becomes a final order approving the conveyance of the MF Credit Bid Collateral from the Debtors to Mainfreight.

IN WITNESS WHEREOF, Debtors have executed this Bill of Sale on the date set forth above.

**DEBTORS:**

**POWIN LLC**, a Delaware limited liability company

By: GERARD UZZI, DEBTORS' CHIEF RESTRUCTURING OFFICER

Signature: _____
Name: _____
Title: _____

---

[2] Capitalized terms used herein otherwise not defined shall have the meanings ascribed to them in the MF Credit Bid Letter.

# EXHIBIT A

## MAINFREIGHT COLLATERAL HOLDING (minus BHER & AKAYSHA goods)

| Current Location, Site of MF Goods; Description of Goods | Applicable Customer/Project | Mainfreight Entity Party to Terms & Conditions/Bill of Lading/Other Applicable Agreements[1] | Applicable Manufacturer of MF Goods | Party Currently Holding Title to MF Goods | MF Pre-Petition Information (Dates, Amounts, Description of Services) |
|---|---|---|---|---|---|
| Taiwan Warehouse/ CTWL Taiwan Warehouse | No Project (Parts & Spares) from Formosa 215 Pallet/Crates stc "Spares & Assorted Parts" | Agreement Standard Terms & Conditions | Formosa & Various Manufacturers | POWIN | Numerous invoices / Shipments / differing jobs |
| Aberdeen, UK/ ASCO Aberdeen Warehouse | Overhill Project (Pulse Energy) 4 x Pallets/Crates stc "Spares & Assorted Parts" | Agreement Standard Terms & Conditions | Manufacturer unknown, local Powin LLC stock | POWIN | HBL: USABD4977990 Electrical parts (3 PALLETS) ETD: 06-JAN-25 (USLAX) Eta: 05-FEB-25 (GBGLO)  HBL: S05065119 Electrical parts (1 pallet) ETD:13-APR-25 (USLAX) ETA:14-APR-25 (GBLHR) |
| Lisbon, Portugal/ Extra Gransportes Internacionais | GALP Project 1 x Crates stc "Spares & Assorted Parts" | Agreement Standard Terms & Conditions | Manufacturer Ultra Corpotech PVT. India | POWIN | HBL: INLIS5102487 Wire rope assembly ETD: 25-MAY-25 ETA: 27-MAY-25 |
| Detroit, MI USA/ MSA Laydown yard | Trenton Channel (DTE) Part Charter Shipment & Detroit Laydown yard | Agreement Standard Terms & Conditions | ACE Manufacturing Seojin Vietnam | POWIN | HBL: VNSAN5034316 66 x Collection Segments ETD 12- APR-25 (VHPH) ETA 08-MAY-25 (USSAN) |

---

[1] The Mainfreight Group is the party to the Terms & Conditions.

| Current Location, Site of MF Goods; Description of Goods | Applicable Customer/Project | Mainfreight Entity Party to Terms & Conditions/Bill of Lading/Other Applicable Agreements[1] | Applicable Manufacturer of MF Goods | Party Currently Holding Title to MF Goods | MF Pre-Petition Information (Dates, Amounts, Description of Services) |
|---|---|---|---|---|---|
| Houston, TX USA/ Mainfreight Houston Warehouse ▇▇▇▇▇ | 400x Packages stc "Packages stc HVAC units & Accessories" 48 x "HVAC Units" | Agreement Standard Terms & Conditions | Leader Energy Storage - Taiwan | POWIN | S05060029 HBL: TWHOU5060029 2x40'FCL 400xPackages stc HVAC units<br><br>S05050968 HBL: TWHOU5050968 8x40'FCL stc 48x"HVAC Units & Accessories" |
| Los Angeles, CA USA/ Mainfreight Los Angeles Warehouse ▇▇▇▇▇ | 9 x Pallets stc "Stand Alone EV Diffuser Plates" Serrano Project (Longroad Energy) | Agreement Standard Terms & Conditions | Manufacturer Ultra Corpotech PVT. India | POWIN | S05044467 HBL: INMZJ5052727 Stand Alone EV Diffuser Plates |
| | | | | | |
| | | | | | |

# EXHIBIT B

Kevin M. Capuzzi
1313 North Market Street, Suite 1201
Wilmington, Delaware 19801-6101
Direct Dial:  302.442.7063
Fax:  302.442.7012
kcapuzzi@beneschlaw.com

July 28, 2025

**Via Email**
DENTONS US LLP
Tania M. Moyron
Van C. Durrer, II
601 S. Figueroa Street #2500
Los Angeles, CA 90017
tania.moyron@dentons.com
van.durrer@dentons.com

Re:   **Mainfreight's Credit Bid for the MF Collateral**

Dear Tania and Van:

We write on behalf of Mainfreight Distribution Pty Ltd (together with its parent, subsidiary, or any other affiliate entities, included in the definition of "Mainfreight" under the Terms and Conditions, as defined in the MF Lien Notice, collectively, "Mainfreight").

Mainfreight hereby submits this Credit Bid in accordance with the Court's July 17, 2025 *Order (I) Designating a Stalking Horse Bidder and Stalking Horse Bidder Protections, (II) Approving Bidding Procedures by Which Interested Parties May Bid and an Auction Sale Format in Connection With the Sale of Substantially All of the Debtors' Assets, (III) Approving Form of Asset Purchase Agreement, (IV) Approving Form of Notice to be Provided to Interested Parties, (V) Authorizing the Assumption and Assignment of Assumed Contracts and Notice Procedures Thereto, (VI) Scheduling a Court Hearing to Consider Approval of the Sale to the Highest and Best Bidder, and (VII) Authorizing the Sale of the Debtors' Property Free and Clear of All Causes of Action and Claims* [Dkt. No. 413] (the "Bidding Procedures Order").

As set forth in *Mainfreight's Notice of Lien* [Dkt. No. 489] (the "MF Lien Notice"), timely filed on July 23, 2025, Mainfreight has valid, undisputed, and perfected liens in the MF Collateral, senior in priority to any other asserted liens.[1]  A copy of the MF Lien Notice is attached hereto as **Exhibit A** and incorporated by reference herein.  The MF Lien Notice sets forth, among other things, the amount of Mainfreight's secured claim as of the Petition Date (of at least $13,114,707.46, subject to ongoing accruals and additions for post-petition interest and other charges, including legal fees as permitted under applicable documents, the "MF Secured Claim") and describes the collateral currently in Mainfreight's possession that supports the MF Secured Claim.  That collateral includes liens on (a) the "BHER Goods" (as such term is defined in the MF

---

[1] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the MF Lien Notice.

Tania M. Moyron
Van C. Durrer, II
July 28, 2025
Page 2

Lien Notice[2]) (b) certain Goods in the Order Approving Settlement [Dkt. No. 283] (the "MF Akaysha Goods,"[3] and (c) all other goods that the Debtors claim ownership of as set forth in their Schedules (including at [Dkt. No. 427]) that are currently in the possession of Mainfreight, the "MF Credit Bid Collateral")

        Pursuant to Section VI of the Bidding Procedures, Mainfreight submits a Credit Bid of **$3,000,000 USD** for all of the MF Credit Bid Collateral, which Credit Bid is to be applied, if Mainfreight is the successful bidder, against its allowed secured claim subject to the provisions of section 363(k) of the Bankruptcy Code, *i.e.*, reducing the balance of the MF Secured Claim by **$3,000,000 USD**. As there are no liens on the MF Collateral that are senior to the Mainfreight Liens, there is no cash component of Mainfreight's Credit Bid. Moreover, Mainfreight is not interested in purchasing any Assets other than the MF Collateral and, as s,uch, no additional cash component is required.

        For the avoidance of doubt, because this is a Credit Bid and is submitted only with respect to the MF Collateral, the "Qualified Bidder" requirements of Section V of the Bidding Procedures are inapplicable but in any event the Debtors should declare, prior to the Auction, that Mainfreight is a Qualified Bidder entitled to attend and participate in the Auction. If the Debtors perceive a deficiency in this Credit Bid that would disqualify consideration of Mainfreight, please advise the undersigned immediately. All rights are reserved.

        Sincerely,

        BENESCH, FRIEDLANDER,
         COPLAN & ARONOFF LLP

        Kevin M. Capuzzi

cc:   Jeffrey S. Sabin, Esq.
     John C. Gentile, Esq.
     Xochitl S. Strohbehn, Esq.
     Rodd Morgan
     Brendan Roche
     James McCrone

---

[2] The Credit Bid assumes the validity and enforceability of the "Change Order" dated June 8, 2025, a copy of which is attached to Dkt. No. 286.

[3] This Credit Bid assumes that pursuant to the Bidding Procedures Order none of the Debtors are currently seeking to sell any of the BHER Goods and/or the MF Akaysha Goods. If, on or prior to the completion of the Auction, any Debtor seeks to offer for sale either the MF Akaysha Goods and/or the BHER Goods, Mainfreight reserves the right to also credit bid for such goods.

# EXHIBIT A

<table>
<tr><td colspan="2">

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(a)

</td></tr>
</table>

| | |
|---|---|
| **BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**<br>Kevin M. Capuzzi (NJ No. 173442015)<br>John C. Gentile, Esq.<br>Noelle B. Torrice (NJ No. 79132013)<br>Continental Plaza II<br>411 Hackensack Ave., 3rd Floor<br>Hackensack, NJ 07601-6323<br>Telephone: (302) 442-7010<br>Facsimile: (302) 442-7012<br>kcapuzzi@beneschlaw.com<br>jgentile@beneschlaw.com<br>ntorrice@beneschlaw.com<br><br>*Counsel to Mainfreight Distribution Pty Ltd, et al.* | |
| In re:<br><br>Powin, LLC, *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>Judge: Michael B. Kaplan<br><br>(Jointly Administered) |

## <u>MAINFREIGHT'S NOTICE OF LIEN</u>

Mainfreight Distribution Pty Ltd (together with its parent, subsidiary, or any other affiliate entities, included in the definition of "Mainfreight" under the Terms and Conditions, defined below, collectively, "<u>Mainfreight</u>"), by and through its undersigned counsel, hereby files this notice of lien (the "<u>Notice of Lien</u>") pursuant to the *Notice of Deadline to Assert Liens in Connection with Bidding Procedures and Upcoming Sale and Auction* [D.I. 318] (the "<u>Notice of</u>

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583], (ii) Powin, LLC [0504], (iii) PEOS Holdings, LLC [5476], (iv) Powin China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [5241], (vii) Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [2495], (ix) Powin Energy Operating, LLC [6487].  The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

<u>Deadline to Assert Lien</u>") filed by the above-captioned debtors and debtors in possession. In support of this Notice of Lien, Mainfreight respectfully states as follows:

## <u>GENERAL BACKGROUND</u>[2]

1. Since at least May 2021, Mainfreight and Powin LLC ("<u>Powin</u>") have had an ongoing business relationship. A true and correct copy of the Business Credit Application (the "<u>Application</u>") submitted by Powin to Mainfreight on or about May 17, 2021, including Mainfreight's Terms & Conditions of Service is attached hereto as **Exhibit A**.

2. In March 2023, Powin (with the now-defunct Powin Energy Holdings LLC, the "<u>Debtors</u>") opened a new business account with Mainfreight. A true and correct copy of the Mainfreight Group – Account Opening Form (the "<u>Account Form</u>") executed by a representative of the Debtors on or about March 29, 2023, including Mainfreight's Standard Terms & Conditions—November 2021, which expressly provide that they govern the services provided by Mainfreight (the "<u>Terms and Conditions</u>"), is attached hereto as **Exhibit B**.

3. The Terms and Conditions provide that Mainfreight holds a lien on any goods – whether property of the Debtors or of a downstream customer, such as BHER Ravenswood Solar I, LLC ("<u>BHER</u>") – that comes into and is currently in Mainfreight's possession or control (collectively, the "<u>MF Collateral</u>" and specifically as to the property in Mainfreight's possession to which BHER claims title, the "<u>BHER Goods</u>"), as well as any and all of the proceeds of the MF Collateral and BHER Goods. **Ex. A** at 2, § 15(a); **Ex. B**, §§ 2.9, 3.8. The Mainfreight liens ("<u>Mainfreight Liens</u>") on the MF Collateral and/or BHER Goods are also evidenced by various

---

[2]     Mainfreight hereby incorporates by reference *Mainfreight Inc.'s Motion to Confirm that the Automatic Stay Pursuant to 11 U.S.C. § 362(a) Does Not Apply to Certain Goods in Its Possession* [D.I. 180] (the "<u>Non-Stay Motion</u>"), and *Mainfreight Inc.'s Omnibus Reply in Support Motion to Confirm that the Automatic Stay Pursuant to 11 U.S.C. § 362(a) Does Not Apply to Certain Goods in Its Possession* [D.I. 341] (the "<u>Non-Stay Reply</u>"), including all exhibits thereto.

House Bills of Lading and the June 4, 2025 Notice of Lien for Unpaid Services attached as Exhibit C to Mainfreight's *Limited Objection and Reservation of Rights to the Debtors' Sale Motion* [D.I. 342]. Mainfreight believes its claim as of the date hereof is at least $13,114,707.46.

4. Mainfreight holds a perfected lien, secured by the MF Collateral and BHER Goods and the proceeds of the MF Collateral and BHER Goods, that is senior to any other lien purporting to be secured by the MF Collateral and/or the BHER Goods. The Mainfreight Liens extend to any and all charges, including Mainfreight's pre-petition claim (which the Debtors list on their schedules as undetermined, unsecured, unliquidated, and disputed, but list $13,018,289.97 as a "cure" amount on their *Notice of Potentially Assumed Executory Contracts and Unexpired Leases* [D.I. 446]) as well as post-petition amounts Mainfreight has incurred in connection with providing the Services (as defined below), including but not limited to storage costs, interest, and legal fees.[3] *See* **Ex. A** at 2, § 15(a); **Ex. B**, §§ 2.9, 3.4, 5.3, 5.5.

5. Specifically, the Terms and Conditions provide that, if the Debtors fail to pay outstanding amounts due upon notice from Mainfreight, Mainfreight may exercise its lien rights as to the MF Collateral and/or BHER Goods. Under the Terms and Conditions, Mainfreight shall have the right to exercise its liens against the MF Collateral and BHER Goods and apply the proceeds to the total owed to Mainfreight. **Ex. A** at 2, § 15(c); **Ex. B**, §§ 2.9, 3.8.

6. As part of Mainfreight and the Debtors' ongoing business relationship, Mainfreight would, at the Debtors' request, prior to the petition date, coordinate the warehousing, storage, order processing, pick and pack, inventory management, domestic road/rail transport, freight forwarding, customs clearance, regulatory clearance involving communication/submissions with

---

[3]    The Mainfreight Liens also apply to the insurance claim related to the two power units that were damaged in transit from Norfolk, Virginia to Millwood, West Virginia and the proceeds thereof. *See* Non-Stay Reply fn. 3.

government bodies, transport by air or sea (domestic and international), cartage, packing/unpacking of containers, and any ancillary services associated with any of the foregoing, of various goods on the Debtors' behalf pursuant to the Terms and Conditions and House Bills of Lading (collectively, the "Services").  Mainfreight's Liens, which are reflected in invoices provided to the Debtors, arise from the pre-petition provision of these Services; those Services included the movement of Goods as well as Services in connection with a significant contemplated movement of Goods, which Debtors cancelled prior to the Petition Date.

7.      Mainfreight also holds a valid maritime lien on the Goods and has a right, in accordance with applicable law, to sell them to satisfy the unpaid bills for the Services. Mainfreight is not aware of any applicable non-bankruptcy law that would allow the sale of the MF Collateral and/or BHER Goods free and clear of Mainfreight's interest therein because, under applicable law, Mainfreight's Liens, must be satisfied before all other interests in the MF Collateral and/or BHER Goods.  *In re World Imports Ltd.*, 820 F.3d 576, 584, 592 (3d Cir. 2016).

8.      On July 10, 2025, the Debtors filed the Notice of Deadline to Assert Lien.  The Notice of Deadline to Assert Lien states that, among other things, the failure of any party to provide a timely notice of lien may result in the expunction and forfeiture of any lien rights not properly noticed, including rights as applied to the Purchased Inventory and the proceeds of the Contemplated Transactions (each as defined in the Stalking Horse APA) (the "Inventory").  *See* Notice of Deadline to Assert Lien at 3.

9.      Neither the MF Collateral nor the BHER Goods are identified as part of the Inventory, or *vice versa*.  However, Mainfreight files this Notice of Lien out of an abundance of caution to avoid the potential expungement and forfeiture of the Mainfreight Liens.

4

10.     The Mainfreight Liens are perfected and senior to all other liens purporting to be against the MF Collateral and/or BHER Goods, and have been for the entire time that the MF Collateral and BHER Goods have been in Mainfreight's possession and control.  *See* Non-Stay Motion at 6-8.

11.     Mainfreight reserves all rights at law and in equity, including the right to enforce the Mainfreight Liens, the right to supplement or amend this Notice of Lien, and the right to object on any grounds that may be appropriate in connection with or relating to the Mainfreight Liens, or this Notice of Lien.

Dated: July 23, 2025

Respectfully submitted,

**BENESCH, FRIEDLANDER,**
**    COPLAN & ARONOFF LLP**

 */s/ Kevin M. Capuzzi*
Kevin M. Capuzzi (NJ No. 173442015)
John C. Gentile, Esq.
Noelle B. Torrice (NJ No. 79132013)
Continental Plaza II
411 Hackensack Ave., 3rd Floor
Hackensack, NJ 07601-6323
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
Email: kcapuzzi@beneschlaw.com
        jgentile@beneschlaw.com
        ntorrice@beneschlaw.com

*Counsel to Mainfreight Distribution Pty Ltd.*

# EXHIBIT A



USA Headquarters
1400 Glenn Curtiss Street
Carson, CA 90746
310-900-1974

## Business Credit Application

Return to: CreditApps@mainfreightusa.com

### Business Contact Information

| | |
|---|---|
| Business Legal Name: Powin LLC | |
| Other Names/Owner: | |
| Business Tax ID Number / Business Number: ▨ | |
| Phone Number: 503-598-6659 | Fax Number: |
| Registered Company Address: 20550 SW 115th Ave | |
| City: Tualatin | State: OR | Zip: 97062 |
| Expected Monthly Spend: | |

### Billing Contact Information

| | |
|---|---|
| Accounts Payable Contact: Sean Campbell | Phone Number: 503-598-6659 |
| A/P Contact Email Address: accounting@powin.com | |
| Preference in communication: ☑ Email | ☐ Phone |
| Billing Address (if different from above): | |
| City: | State: | Zip: |

### Business & Credit Information

Type of Business: ☐ Corporation  ☑ Partnership  ☐ Proprietorship  ☐ Other

| | |
|---|---|
| Bank Name: JP Morgan Chase | Bank Address: | 888 SW 5th Avenue Suite 1070, Floor 10, Portland, OR 97204 |
| Contact: Bryant Villalobos | Phone Number: 503-382-1608 |

| Type of Account | Account Number |
|---|---|
| Checking | ▨ |
| Savings | |
| Other | |

In consideration of credit extension, the Customer agrees that payments will be made within 15 days from the invoice date.
Customer hereby warrants that it has reviewed and agrees to be bound by the Mainfreight, Inc., service terms which are
incorporated herein by reference and can be found either on the next page or at
https://www.mainfreight.com/getmedia/902f7fa4-c341-4d69-b56e-21d06c0696c6/Terms-and-Conditions-of-Service_23-
JUN-2020.pdf
Customer further agrees that a service charge of 1.5% per month shall accrue on all invoices not paid per these terms. This
application is for the acceptance of Mainfreight in Los Angeles, California, and will be bound there. Customer hereby
authorizes its bank (named above) to release credit information to review by Mainfreight, Inc., with this application.

Certification of credit information, terms and conditions:

| Sean Campbell | *Sean Campbell* | Staff Accountant | 5/17/2021 |
|---|---|---|---|
| Print Name | Signature | Title | Date |

| Mainfreight Office Use Only | |
|---|---|
| Submitted by: | Branch: |
| Sales Representative: | |
| Completed by: | ORG: |

Case 2:25-cv-01313-MEMF-DFM Document 6689 Filed 08/07/25 Entered 08/07/25 12:42:03 Desc Main
Exhibit A - Terms and Conditions of Service Page 3 of 73

TERMS & CONDITIONS OF SERVICE

These terms and conditions of service constitute a legally binding contract between the "Company" and the "Customer". In the event the Company renders services and issues a document containing Terms and Conditions governing such services, the Terms and Conditions set forth in such other documents(s) shall govern these services.

**1. Definitions.**
(a) "Company" shall mean **MAINFREIGHT, INC.**, its subsidiaries, related companies, agents and/or representatives;
(b) "Customer" shall mean the person for which the Company is rendering service, as well as its agents and/or representatives, including, but not limited to, shippers, importers, exporters, carriers, secured parties, warehousemen, buyers and/or sellers, shipper's agents, insurers and underwriters, break-bulk agents, consignees, etc. It is the responsibility of the Customer to provide notice and copy(s) of these terms and conditions of service to all such agents or representatives;
(c) "Documentation" shall mean all information received directly or indirectly from Customer, whether in paper or electronic form;
(d) "Ocean Transportation Intermediaries" (OTI) shall include an "ocean freight forwarder" and a "non-vessel operating carrier";
(e) "Third parties" shall include, but not be limited to, the following: "carriers, truckmen, cartmen, lightermen, forwarders, OTIs, customs brokers, agents, warehousemen and others to which the goods are entrusted for transportation, cartage, handling and/or delivery and/or storage or otherwise".

**2. Company as agent.**
The Company acts as the "agent" of the Customer for the purpose of performing duties in connection with the entry and release of goods, post entry services, the securing of export licenses, the filing of export and security documentation on behalf of the Customer and other dealings with Government Agencies, or for arranging transportation services, both domestically and internationally, or other logistics services in any capacity other than as carrier.

**3. Limitation of Actions.**
**(a)** Unless subject to a specific statute or international convention, all claims against the Company for a potential or actual loss, must be made in writing and received by the Company, within ninety (90) days of the event giving rise to claim; the failure to give the Company timely notice shall be a complete defense to any suit or action commenced by Company.
**(b)** All suits against Company must be filed and properly served on Company as follows:
  **(i)** For claims arising out of ocean transportation, within one (1) year from the date of the loss;
  **(ii)** For claims arising out of brokering ground transportation, within two (2) years from the date of loss;
  **(iii)** For claims arising out of air transportation, within two (2) years from the date of the loss;
  **(iv)** For claims arising out of the preparation and/or submission of an import entry(s), within seventy-five (75) days from the date of liquidation of the entry(s);
  **(v)** For any and all other claims, within two (2) years from the date of the loss or damage.

**4. No Liability for the Selection or Services of Third Parties and/or Routes.**
Unless services are performed by persons or firms engaged pursuant to express written instructions from the Customer, Company shall use reasonable care in its selection of third parties, or in selecting the means, route and procedure to be followed in the handling, transportation, clearance and delivery of the shipment; advice by the Company that a particular person or firm has been selected to render services with respect to the goods, shall not be construed to mean that the Company warrants or represents that such person or firm will render such services nor does Company assume responsibility or liability for any action(s) and/or inaction(s) of such third parties and/or its agents, and shall not be liable for any delay or loss of any kind, which occurs while a shipment is in the custody or control of a third party or the agent of a third party; all claims in connection with the Act of a third party shall be brought solely against such party and/or its agents; in connection with any such claim, the Company shall reasonably cooperate with the Customer, which shall be liable for any charges or costs incurred by the Company.

**5. Quotations Not Binding.**
Quotations as to fees, rates of duty, freight charges, insurance premiums or other charges given by the Company to the Customer are for informational purposes only and are subject to change without notice; no quotation shall be binding upon the Company unless the Company in writing agrees to undertake the handling or transportation of the shipment at a specific rate or amount set forth in the quotation and payment arrangements are agreed to between the Company and the Customer.

**6. Reliance on Information Furnished.**
**(a)** Customer acknowledges that it is required to review all documents and declarations prepared and/or filed with U.S. Customs and Border Protection and/or other Government Agency and/or third parties, and will immediately advise the Company of any errors, discrepancies, incorrect statements, or omissions on any declaration filed on Customer's behalf;
**(b)** In preparing and submitting customs entries, export declarations, applications, security filings, delivery orders, documentation and/or export data to the United States and/or a third party, the Company relies on the correctness and completeness of all documentation, whether in written or electronic format, and Customer shall indemnify and hold the Company harmless from any and all claims asserted and/or liability or losses suffered by reason of the Customer's failure to disclose information or any incorrect or false statement by the Customer or any agent of Customer upon which the Company reasonably relied. The Customer agrees that the Customer has an affirmative non-delegable duty to disclose any and all information required to import, export or enter the goods.
**(c)** Customer warrants that the description, marks, numbers and quantities of the goods are accurate, complete and comply with all regulations. Customer shall have the exclusive burden to provide verified gross mass (VGM) of Goods as obtained on calibrated and certified equipment. Company shall be entitled to rely on the accuracy of the weight information provided by Customer for all purposes, including compliance with the VGM requirement under the Safety of Life at Sea Convention (SOLAS). Company shall be entitled to tender, counter-sign or endorse such certificates, weight tickets or other weight data provided by Customer as Company's own VGM to subcontractors, including any vessel operator.
**(d)** Customer shall not tender hazardous goods absent advance notice and consent of Company and shall in all events be responsible for compliance with all applicable hazardous material regulations.

**7. Declaring Higher Value to Third Parties.**
Third parties to whom the goods are entrusted may limit liability for loss or damage; the Company will request excess valuation coverage only upon specific written instructions from the Customer, which must agree to pay any charges therefor; in the absence of written instructions or the refusal of the third party to agree to a higher declared value, at Company's discretion, the goods may be tendered to the third party, subject to the terms of the third party's limitations of liability and/or terms and conditions of service.

**8. Insurance.**
Unless requested to do so in writing and confirmed to Customer in writing, Company is under no obligation to procure insurance on Customer's behalf; in all cases, Customer shall pay all premiums and costs in connection with procuring requested insurance.

**9. Disclaimers; Limitation of Liability.**
**(a)** Except as stated herein, Company makes no express or implied warranties relating to its services;
**(b)** Subject to (d) below, Customer agrees that in connection with any and all services performed by the Company, the Company shall only be liable for its negligent acts, which are the direct and proximate cause of any injury to Customer, including loss or damage to Customer's goods, and the Company shall in no event be liable for the acts of third parties;
**(c)** In connection with all services performed by the Company, Customer may obtain additional liability coverage, up to the actual or declared value of the shipment or transaction, by requesting such coverage and agreeing to make payment therefor, which request must be confirmed in writing by the Company prior to rendering services for the covered transaction(s).
**(d)** Unless additional coverage under (c) above, the Company's liability shall be limited to the following:
  **(i)** where the claim arises from activities other than those relating to customs brokerage, $50.00 per shipment or transaction, or
  **(ii)** where the claim arises from activities relating to "Customs business," $50.00 per entry or the amount of brokerage fees paid to Company for the entry, whichever is less;

**(e)** In no event shall Company be liable or responsible for consequential, indirect, incidental, statutory or punitive damages even if it has been put on notice of the possibility of such damages.
**(f)** In no event shall Company be liable or responsible for damages attributable to circumstances of Force Majeure. For purposes of these Terms and Conditions, Force Majeure includes, but is not limited to, natural disasters, acts of the public enemy, assailing thieves, Laws and Regulations, wars or warlike action (whether actual or impending) arrests and other restraints of government (civil or military), blockades, insurrections, riots, epidemics or other severe health crisis and associated containment efforts, landslides, lightning, earthquakes, fires, sabotage, tropical storms and hurricanes, civil disturbances, tidal waves, explosions, confiscation or seizure by any government or other public authority, and any other causes, whether of the kind herein enumerated or otherwise, that are not reasonably within the control of Company and that could not have been overcome by the exercise of ordinary diligence. Company shall notify Customer with reasonable promptness of the existence of any such Force Majeure and the probable duration thereof, and shall provide Customer from time to time with correct information concerning same.

**10. Advancing Money.**
All charges must be paid by Customer in advance unless the Company agrees in writing to extend credit to Customer; the granting of credit to a Customer in connection with a particular transaction shall not be considered a waiver of this provision by the Company.

**11. Indemnification/Hold Harmless.**
The Customer agrees to indemnify, defend, and hold the Company harmless from any claims and/or liability arising from the importation or exportation of Customer's merchandise and/or any conduct of the Customer, which violates any Federal, State and/or other laws, and further agrees to indemnify and hold the Company harmless against any and all liability, loss, damages, costs, claims and/or expenses, including but not limited to reasonable attorney's fees, which the Company may hereafter incur, suffer or be required to pay by reason of such claims; in the event that any claim, suit or proceeding is brought against the Company, it shall give notice in writing to the Customer by mail at its address on file with the Company.

**12. Inspection Consent.**
Company may, but shall not be obligated to, inspect any shipment. Cargo items tendered for transportation may be subject to security controls by carriers and to other government regulations. The customer expressly agrees and consents to searches / inspections / screenings of all cargo in accordance with applicable security controls, initiatives and regulations, including, but not limited to, the regulations of the U.S. Transportation and Security Administration.

**13. C.O.D. or Cash Collect Shipments.**
Company shall use reasonable care regarding written instructions relating to "Cash/Collect" or "Deliver (C.O.D.)" shipments, bank drafts, cashier's and/or certified checks, letter(s) of credit and other similar payment documents and/or instructions regarding collection of monies but shall not have liability if the bank or consignee refuses to pay for the shipment.

**14. Forfeiture of Discounts and Costs of Collection.**
All discounts offered, as indicated on the invoice faces, are forfeited should Customer fail to comply in all respects with payment terms. In any dispute involving monies owed to Company, the Company shall be entitled to all costs of collection, including reasonable attorney's fees and interest at 15% per annum or the highest rate allowed by law, whichever is less, unless a lower amount is agreed to by Company.

**15. General Lien and Right to Sell Customer's Property.**
**(a)** Company shall have a general and continuing lien on any and all property coming into Company's actual or constructive possession or control for any monies owed to Company, including but not limited to monies owing relating to the shipment on which the lien is claimed, a prior shipment(s) and/or both.
**(b)** Company shall provide written notice to Customer of its intent to exercise such lien, the exact amount of monies due and owing, as well as any on-going storage or other charges; Customer shall notify all parties having an interest in its shipment(s) of Company's rights and/or the exercise of such lien.
**(c)** Unless, within thirty days of receiving notice of lien, Customer posts cash or letter of credit at sight, or, if the amount due is in dispute, an acceptable bond equal to 110% of the value of the total amount due, in favor of Company, guaranteeing payment of the monies owed, plus all storage charges accrued or to be accrued, Company shall have the right to sell such shipment(s) at public or private sale or auction and any net proceeds remaining thereafter shall be refunded to Customer.

**16. No Duty to Maintain Records for Customer.**
Customer acknowledges that pursuant to Sections 508 and 509 of the Tariff Act, as amended, (19 USC §§1508 and 1509) it has the duty and is solely liable for maintaining all records required under the Customs and/or other Laws and Regulations of the United States; unless otherwise agreed to in writing, the Company shall only keep such records that it is required to maintain by Statute(s) and/or Regulation(s), but not act as a "recordkeeper" or "recordkeeping agent" for Customer.

**17. Obtaining Binding Rulings, Filing Protests, etc.**
Unless requested by Customer in writing and agreed to by Company in writing, Company shall be under no obligation to undertake any pre- or post Customs release action, including, but not limited to, obtaining binding rulings, advising of liquidations, filing of petition(s) and/or protests, etc.

**18. Preparation and Issuance of Bills of Lading.**
Where Company prepares and/or issues a bill of lading, Company shall be under no obligation to specify thereon the number of pieces, packages and/or cartons, etc.; unless specifically requested to do so in writing by Customer or its agent and Customer agrees to pay for same, Company shall rely upon and use the cargo weight supplied by Customer.

**19. No Modification or Amendment Unless Written.**
These terms and conditions of service may only be modified, altered or amended in writing signed by both Customer and Company; any attempt to unilaterally alter, modify, alter or amend same shall be null and void.

**20. Compensation of Company.**
Customer, shippers, consignees and bill-to parties are jointly and severally liable for the compensation of the Company for its services. The Company's charges may be reversed to the responsible parties if a shipment is refused or payment is not made by the original bill-to party. The compensation of the Company for its services shall be included with and is in addition to the rates and charges of all carriers and other agencies selected by the Company to transport and deal with the goods and such compensation shall be exclusive of any brokerage, commissions, dividends, or other revenue received by the Company from carriers, insurers and others in connection with the shipment. On ocean exports, upon request, the Company shall provide a detailed breakout of the components of all charges assessed and a true copy of each pertinent document relating to these charges. In any referral for collection or action against the Customer for monies due the Company, upon recovery by the Company, the Customer shall pay the expenses of collection and/or litigation, including a reasonable attorney fee.

**21. Severability.**
In the event any Paragraph(s) and/or portion(s) hereof is found to be invalid and/or unenforceable, then in such event the remainder hereof shall remain in full force and effect.

**22. Governing Law; Consent to Jurisdiction and Venue.**
These terms and conditions of service and the relationship of the parties shall be construed according to the laws of the State of California without consideration to principles of conflict of law. All disputes arising hereunder shall be resolved at Los Angeles, California and at no other place. Customer and Company:
**(a)** irrevocably consent to the jurisdiction of the State and Federal courts located in the County of Los Angeles, State of California.
**(b)** agree that any action relating to the services performed by Company, shall only be brought in said courts;
**(c)** consent to the exercise of in personam jurisdiction by said courts over it, and
**(d)** further agree that any action to enforce a judgment may be instituted in any jurisdiction.

# EXHIBIT B

   

# Mainfreight Group – Account Opening Form

Mainfreight Distribution Pty Ltd (ABN 85 003 840 319)
Owens Transport Pty Ltd (ABN 64 060 592 529)

Mainfreight Air & Ocean Pty Ltd (ABN 85 007 252 333)
Carotrans Oceania Pty Ltd (ABN 31 118 822 487)

Business Information:

| Registered Legal Name ("Customer") | Powin LLC | | | | |
|---|---|---|---|---|---|
| ACN | ██████ | Telephone | 503-598-6659 | Fax | |
| ABN | ██████ | Email | logistics@powin.com; accountspayable@powin.com | | |
| Registered Address | Powin LLC | | | | |
| Trading Name | N/A - Private Equity | | | | |

Are Trading and Postal Address the same as Registered Address?  Yes [x]  No [ ]
If no then please complete below:

| Trading Address | 20550 SW 115th Ave., Tulatain, OR 97062 |
|---|---|
| Postal Address | |

Entity Type:    Company [ ]    Trust [ ]    Sole Trader [ ]    Partnership [ ]    LLC [x]

| Parent Company (if applicable) | Powin Energy Holdings LLC |
|---|---|
| Business Commencement Date | Powin LLC Registry Date - 04-28-2021 |
| Directors (name, address, phone, DOB) | Geoff Brown, CEO |
| | 2035 NW Front Ave, Suite 600 |
| | Portland, OR 97209 - Telephone: 503-598-6659 |

Hire Pallets to be:  Transferred [ ]    Recovered [ ]    Not Required [x]

| CHEP Account Number | | LOSCAM Account Number | |
|---|---|---|---|

Please tick which region (if any) you currently trade with another Mainfreight entity in:

Asia [ ]    New Zealand [ ]    Europe [ ]    Americas [ ]    Australia [ ]

Conditions:

Customer acknowledges and agrees that:

1. payment terms are C.O.D, unless otherwise agreed or indicated on the Mainfreight Group invoice;

2. services provided by the Mainfreight Group are subject to the standard terms and conditions which are attached to this Account Opening Form;

3. information stated in this Account Opening Form is true and correct and has been relied upon by the Mainfreight Group to determine whether to grant credit and the signatory has full authority to complete this Account Opening Form on behalf of Customer; and

4. they consent to personal information being disclosed to a credit reporting agency for the sole purpose of assessing an application for commercial credit.

Important Term:

Clause 5 of the Mainfreight Group's standard terms and conditions states that risk in Customer's goods remains with Customer and that the Mainfreight Group is not responsible for any loss, detriment or damage suffered by Customer or any other person.

| Signature | *S. Bolland* | Position | Chief Operating Officer |
|---|---|---|---|
| Name | Stuart Bolland | Date | 29th March 2023 |



    

AMERICAS    ASIA    AUSTRALIA    EUROPE    NEW ZEALAND

## MAINFREIGHT GROUP (Mainfreight, Owens, Carotrans)
## STANDARD TERMS & CONDITIONS – NOVEMBER 2021

1    Definitions
     *Agreement* means this contract for the provision of the Services;
     *Consequential Loss* means any incidental or consequential loss which shall include, but not be limited to, loss of revenue, loss of profits, loss of business, interruption to business, loss of opportunity, loss of production, interruption to production or loss of contract regardless of whether Mainfreight was actually, or should have been, aware of the potential for such loss to occur;
     *Customer* means the person or entity for whom any Services are to be performed by Mainfreight under this Agreement;
     *Dangerous Goods* means all Goods which are in the reasonable opinion of Mainfreight, or at law, deemed noxious, dangerous, hazardous, explosive, radioactive, flammable, inflammable, combustible, volatile or by their nature are capable of causing damage or injury to other goods, persons, animals or any other thing in which such Goods are carried or stored including any vessel, vehicle, wagon, van, aircraft or other conveyance;
     *Goods* means the cargo or articles or goods perishable or otherwise (including animals of any description) which Customer or any other person has provided together with any container or any other packaging, pallets or other storage device supplied to Mainfreight;
     *Heavy Vehicle National Law* means the *Heavy Vehicle National Law Act 2012* (Qld) and all regulations made under that Act, as well as the associated State and Territory road transport acts and regulations adopting the *Heavy Vehicle National Law Act 2012* (Qld) and includes any subsequent replacement, modification or amendment to any of these acts and regulations;
     *Hire Pallets* means any pallets which are supplied by CHEP, Loscam or any other hire pallet provider;
     *Mainfreight* means *Mainfreight Distribution Pty Limited* (ABN 85 003 840 319), *Mainfreight Air & Ocean Pty Ltd* (65 007 252 333), *Owens Transport Pty Ltd* (64 060 592 529) and/or *Carotrans Oceania Pty Ltd* (31 118 822 487) (as applicable) carrying on business in its own name or under any other business name and unless the context otherwise requires includes its officers, employees, servants, agents and sub-contractors and their officers, employees, servants, agents and sub-contractors or any other party involved in the provision of the Services (as applicable);
     *Receiver* means the person or entity who the Goods are to be delivered to;
     *Service Information* means any statement, document or other form of communication, whether verbally or in writing, which contains information that may affect Mainfreight's ability to correctly, lawfully or safely perform the Services; and
     *Services* includes, but is not limited to, warehousing, storage, order processing, pick and pack, inventory management, domestic road/rail transport, freight forwarding, customs clearance, regulatory clearance involving communication/submissions with government bodies, transport by air or sea (domestic and international), cartage, packing/unpacking of containers, and any ancillary services associated with any of the foregoing.

2    Provision of Services
     2.1    This Agreement shall commence upon execution by Customer, or the commencement of the Services, whichever occurs earlier.
     2.2    Mainfreight is not a "common carrier" and will accept no liability as such. Mainfreight reserves the right to refuse the carriage or transport of goods for any person or entity and the carriage or transport of any class of goods in its absolute discretion.
     2.3    Mainfreight shall use reasonable endeavours to perform the Services within any timeframes provided or notified to, or requested by, Customer. However, Mainfreight does not guarantee that any Services will be performed within such timeframes.
     2.4    No marine transit insurance will be obtained by Mainfreight in relation to the Goods while performing the Services. Any such insurance must be taken out by Customer or Receiver at their own cost and expense.
     2.5    Any person at the delivery location shall be deemed to have the authority to sign the consignment note to accept receipt of the Goods.
     2.6    Mainfreight relies upon the information stated on the consignment note, or any other document or communication provided to Mainfreight in relation to the Goods, to enable the performance of the Services. Mainfreight does not warrant the accuracy or completeness of any such information and any receipt or signature provided is only an acknowledgement of the Goods being collected or delivered. Mainfreight's signature or acceptance shall not be construed as confirmation of the quality, quantity or condition of the Goods.
     2.7    Mainfreight may have the Goods carried, stored or otherwise handled by any servant or agent or sub-contractor of Mainfreight or any servant or agent of any sub-contractor or by any other person without Customer's consent and Customer hereby authorises any deviation from the usual route, manner of cartage, method or place of storage of Goods which may in the absolute discretion of Mainfreight be deemed desirable or necessary in the circumstances.
     2.8    If Customer expressly or impliedly instructs Mainfreight to use or it is expressly or impliedly agreed that Mainfreight will use a particular method of handling or storing the Goods or a particular method of carriage, whether by road, rail, sea or air, Mainfreight will give priority to that method but, if it cannot conveniently be adopted by Mainfreight, Customer hereby authorises Mainfreight to handle, store or to carry or to have the Goods carried by another method or methods. Mainfreight shall be entitled to open any document, wrapping, package or other container in which the Goods are placed or carried, to inspect the Goods to determine their nature, condition or for the purposes of determining their ownership or destination where any consignment note or other identifying document or mark is lost, damaged, destroyed or defaced.
     2.9    Mainfreight shall have a general lien and a particular lien on all Goods or documents in their possession for any and all sums due at any time from Customer. Mainfreight shall be entitled to sell or dispose of such Goods or documents at the expense of Customer and apply the proceeds in or towards the payment of such sums on 14 days' written notice to Customer if such undisputed outstanding amount remains unpaid.
     2.10   If Mainfreight is unable to perform their obligations under this Agreement due to events or circumstances which are outside of Mainfreight's reasonable control (**FM Event**), then Mainfreight shall advise Customer as soon as reasonably practicable. Customer may, at their cost and discretion, contract with a third party to enable the Services to continue to be provided. Mainfreight shall provide Customer with access to the Goods (if it is reasonable and safe to do so) and no payment shall be payable in respect of the Services that Mainfreight is unable to provide. Mainfreight shall use all reasonable endeavours to overcome or remove the FM Event as quickly as possible.

3    Fees & Charges
     3.1    Mainfreight's charges will be as provided or notified to Customer from time to time. Mainfreight shall be entitled to amend the charges, or include any new charge, at any time which will become effective upon notice to Customer (whether verbally or in writing). Any

**MAINFREIGHT GROUP (Mainfreight, Owens, Carotrans)**
**STANDARD TERMS & CONDITIONS – NOVEMBER 2021**

quotations are provided on the basis that they are immediately accepted and are subject to the right of withdrawal before acceptance and may be subject to revision after acceptance.

3.2 Certain charges are outside of Mainfreight's control and are subject to change (with or without notice) from time to time. Customer acknowledges and agrees that such charges may be passed on in full without prior notice. These charges include, but are not limited to, port infrastructure surcharges, tolls, stevedore fees, fumigation, etc.

3.3 Mainfreight's charges shall be deemed fully earned upon commencement of the Services and shall be non-refundable in any event. All charges must be paid in accordance with the payment terms in paragraph 1 on the Account Opening Form, unless otherwise specified by Mainfreight or agreed in writing. Any customs duty or excise charges must be paid prior to delivery of the Goods (where applicable) unless otherwise agreed to by Mainfreight in writing.

3.4 Any undisputed outstanding amount that is not paid by the due date will attract interest at the rates laid down, as amended from time to time, under the *Penalty Interest Rates Act 1983* (Vic).

3.5 Mainfreight may charge freight by weight, measurement or value and may at any time re-weigh or re-measure or re-value or require the Goods to be re-weighed or re-measured or re-valued and charge proportional additional fees accordingly.

3.6 Customer will indemnify Mainfreight against non-payment of any charge or expense incurred by Mainfreight where such charge or expense is to be paid for by another party and such party fails to make payment by the due date.

3.7 Customer will be responsible for any proper charge incurred by Mainfreight for any reason. A charge may be made by Mainfreight in respect of any delay in loading or unloading, other than from the default of Mainfreight. Such permissible delay period shall commence upon Mainfreight reporting for loading or unloading. Labour to load or unload Goods shall be the responsibility and expense of Customer or Receiver. Should Receiver not be in attendance during normal trading hours or at the time specified, Mainfreight reserves the right to make a further charge for every call made until final delivery occurs.

3.8 If the Goods cannot be delivered, after Mainfreight has made reasonable attempts to do so, then Mainfreight shall be entitled (at their discretion) to immediately maintain possession of the Goods (until Customer advises Mainfreight of an alternative delivery location), immediately return the Goods to Customer or sell or otherwise dispose of the Goods upon 14 days' written notice to Customer. Mainfreight shall be entitled to charge applicable storage fees until the Goods are finally delivered/returned/sold/disposed. All charges made by Mainfreight in relation to the Goods shall continue to be due and payable regardless of whether the Goods are delivered to the Receiver or not.

3.9 Notwithstanding clause 3.8, Mainfreight shall be able to dispose of Goods immediately in the case of Goods that pose an apparent or immediate danger to persons or property or Goods which are perishable.

3.10 Customer acknowledges and agrees that any claims for incorrect charges, or overcharges, which are not notified to Mainfreight within 90 days from the date of invoice shall not be claimable.

3.11 Customer is not entitled to offset any amounts which are owed by Customer to Mainfreight under this Agreement against any amounts which may be due by Mainfreight to Customer.

4 Customer's Obligations
4.1 Customer warrants that:
(a) they are the owner of the Goods or otherwise have the authority of the owner to consign the Goods upon and subject to this Agreement;
(b) the Goods comply with the requirement of any applicable law (including, but not limited to, the *Australian Code for the Transport of Dangerous Goods by Road and Rail* and Part 92 of the *Civil Aviation Safety Regulations 1998* (Cth)) relating to the consigning and packaging of the Goods and the expenses and any charges incurred by Mainfreight in complying with the provisions of such law or with any order or requirement thereunder or with the requirement of any harbor, dock, railway, shipping, customs, warehouse or other authority or company shall be paid for by Customer;
(c) if any of the Goods are subject to the legal control of the Australian Border Force then all customs duty, excise and costs which Mainfreight may become, or actually becomes, liable for in respect of such Goods pursuant to any law relating to customs duty or excise shall be immediately paid for by Customer. This shall also include any fine or penalty imposed on Mainfreight related to such customs duty or excise;
(d) they have complied with all applicable laws relating to Dangerous Goods by fully describing in writing whether on the consignment note, waybill, bill of lading or separately (and in the latter case has brought the description to the actual attention of Mainfreight) the name and nature of all Dangerous Goods and any additional charges shall be paid for by Customer in relation to such Goods if deemed necessary by Mainfreight;
(e) they will comply with all applicable laws and regulations applicable to the nature, condition or packaging of the Goods and that the Goods are packed in a manner, having regard to their nature, which is adequate to withstand the ordinary risk of carriage and that Customer has correctly declared the weight and dimensions of the Goods;
(f) they will, so far as is reasonably practicable, ensure the safety of any Services performed for or on behalf of Customer and that they will meet their obligations under the Heavy Vehicle National Law where Customer acts as a Consignor, Consignee, Loader or Packer of Goods (as those terms are defined in the Heavy Vehicle National Law);
(g) any containers, packaging or pallets (which contain or comprise the Goods) shall comply with any requirements of the Receiver and any expense incurred by Mainfreight, arising from any failure to conform, shall be borne or reimbursed by Customer;
(h) any Service Information will be materially accurate and contain no false, incorrect or misleading statements; and
(i) they will promptly comply with all reasonable requests from Mainfreight for information, in relation to Customer's compliance with the MS Act, or to assist Mainfreight to comply with Mainfreight's obligations under the Act.

5 Liability & Indemnity
5.1 The Customer acknowledges and agrees that risk in the Goods shall remain with Customer at all times whilst in the possession, custody or control of Mainfreight and that Mainfreight shall, under no circumstances (except where any statute otherwise requires) be under any liability whatever (whether in contract, tort or otherwise) for any:
(a) personal injury or property damage caused or contributed to by;
(b) loss or damage to; or

## MAINFREIGHT GROUP (Mainfreight, Owens, Carotrans)
## STANDARD TERMS & CONDITIONS – NOVEMBER 2021

   (c)  mis-delivery, delayed delivery or non-delivery of,

the Goods in relation to, or arising out of, the Services whether the foregoing is caused, or alleged to have been caused by, the negligence, wrongful act, breach or default of Mainfreight or by any cause whatever.

5.2    Mainfreight shall not be liable for any claim in relation to Consequential Loss which is suffered by Customer, Receiver or any third party whether arising from, or in relation to, the performance of the Services directly or indirectly from any breach of Mainfreight's obligations under this Agreement or from any negligence, misrepresentation or other act or omission or from any other cause whatsoever.

5.3    Except where any statute otherwise requires, Customer shall indemnify Mainfreight against any claim, liability, loss, damage, cost or expense, which is incurred or suffered by Mainfreight in relation to, or arising out of, the performance of the Services, to the extent that it is caused or contributed to by:

   (a)  the inherent nature or improper packaging of the Goods;

   (b)  the negligent act, omission or wilful default by Customer, any Receiver or any other person or entity acting on behalf of Customer; or

   (c)  Customer's breach of clause 4.1,

or which is otherwise necessarily incurred by Mainfreight in the proper performance of its obligations under this Agreement.

5.4    Without limiting clause 5.3, Customer and Receiver shall be liable for, and indemnify against, any and all liability for goods and services tax levied under the *A New Tax System (Goods and Services Tax) Act 1999* (Cth) (as amended) and any other goods and services tax, value added tax, consumption tax or tax of similar effect levied which Mainfreight may incur in relation to the Services.

5.5    Without limiting clause 2.8, 3.7 or 5.3, Customer indemnifies Mainfreight against all reasonable costs (including mercantile agent fees and solicitor-client legal costs) incurred by Mainfreight from any and all action taken in relation to any debt recovery arising from this Agreement.

5.6    Customer acknowledges and agrees that, every servant, sub-contractor or agent of Mainfreight shall have the benefit of all provisions herein as if such provisions were expressly for their benefit. In entering into this contract, Mainfreight, to the extent of those provisions, does so not only on its behalf, but as agent and trustee for such servants, sub-contractors and agents. Notwithstanding the foregoing, should any claim be made against any servants, subcontractors or agents, then Customer will indemnify Mainfreight against all consequences thereof.

5.7    If the Goods pose, or are likely to pose, a substantial risk to cause personal injury or property damage then Mainfreight may take any action that is reasonably necessary to reduce or eliminate such risk. This shall include, but not be limited to, destroying, disposing of or abandoning the Goods. Mainfreight shall not be liable for any loss or damage as a result of any action undertaken to reduce or eliminate such risk.

5.8    Notwithstanding the provisions hereof, this Agreement shall be read subject to any guarantees, implied terms, conditions or warranties imposed by Schedule 2 of the *Competition and Consumer Act 2010* (Cth) (as amended) or any other Commonwealth or State legislation (**Overriding Legislation**) insofar as such may be applicable and prevents either expressly or impliedly the exclusion or modification of any such guarantee, term, condition or warranty.

5.9    Mainfreight's liability as a result of a breach of any Overriding Legislation shall be limited to supplying the Services again or the payment of the cost of supplying the Services again.

5.10   Any proceedings against Mainfreight must be commenced in a court of competent jurisdiction within Victoria, and not elsewhere, within nine (9) months from the date of delivery, or intended delivery, of the Goods. Customer shall not be entitled to bring any proceedings against Mainfreight which are not commenced within such time. Any claim in relation to lost or damaged Goods which are the subject of air/sea transportation must be notified to Mainfreight within the timeframes stated in the *Carriage of Goods by Sea Act 1991* (Cth) or *Civil Aviation (Carrier's Liability) Act 1959* (Cth) (as applicable).

## 6   Containers & Demurrage/Detention/Storage Charges

6.1    Mainfreight may elect to provide Customer with container/s in order to pack the Goods prior to transportation. Customer must inspect any containers prior to loading the Goods into them and shall be deemed to have accepted the container in good repair and suitable condition should they load the Goods into the container.

6.2    Mainfreight shall not be liable for any loss or damage to the Goods which is caused or contributed to by the condition or unsuitability of the container.

6.3    Risk in the container shall pass to Customer upon delivery and Customer shall indemnify Mainfreight against any claim which relates to, or arises out of, any loss or damage to the container, or personal injury or property damage (excluding the Goods) which arises from the use or possession of the container, except to the extent that it is caused or contributed to by the negligence of Mainfreight.

6.4    Where the Goods are to be transported in containers (whether provided by Mainfreight or not), Customer undertakes that re-delivery of the container shall occur promptly.

6.5    Mainfreight must be provided with at least three business days' notice prior to the required collection date of the container. Mainfreight shall use reasonable endeavours to collect/return the container once notified. However, Mainfreight does not guarantee that such service will be completed within the relevant timeframe.

6.6    Customer acknowledges and agrees that events outside of Mainfreight's reasonable control may contribute to an inability to collect/return the container within the relevant timeframe. Such events may include, but are not limited to, government agencies undertaking their relevant obligations, insufficient fleet capacity, excessive storage of containers within Mainfreight's (or a third party's) yard, closure of empty container parks and redirections of containers by customer ports or shipping lines.

6.7    Mainfreight shall not be liable for, and Customer will indemnify Mainfreight against, any detention or demurrage charges which are incurred by the Customer, or any third party, except to the extent that such charge has been caused or contributed to by Mainfreight's negligence.

6.8    Where Mainfreight is unable to collect/return a container within the relevant timeframe, Mainfreight may elect to cancel the collection booking, return the container to the Customer or Receiver (at the Customer's cost) or charge storage fees to Customer until the container can be successfully returned. Mainfreight shall be entitled to return the container to the Customer or Receiver, or charge storage fees, regardless of whether the reason for such inability to return the container is due to Customer, Receiver or any other third party.

**MAINFREIGHT GROUP (Mainfreight, Owens, Carotrans)**
**STANDARD TERMS & CONDITIONS – NOVEMBER 2021**

7   Heavy Vehicle National Law
 7.1   Mainfreight is committed to taking all steps, so far as is reasonably practicable, to ensure that any Services are performed safely and in accordance with the Heavy Vehicle National Law.
 7.2   Mainfreight shall not comply with any direction or instruction provided by Customer or Receiver that might:
  (a)   have the effect of contributing to a breach of;
  (b)   prevent Mainfreight from taking all steps that are reasonably necessary to prevent a breach of; or
  (c)   prevent Mainfreight from complying with its obligations under,
  the Heavy Vehicle National Law.
 7.3   Without limiting any other clause of this Agreement, Mainfreight shall not be liable for any loss or damage whatsoever which may be suffered by another party as a result of any action or inaction undertaken by Mainfreight to ensure compliance with the Heavy Vehicle National Law.
 7.4   Customer acknowledges and agrees that they have ensured that any relevant party (including the Receiver or any supplier, but excluding Mainfreight) are aware of, and comply with, their obligations under the Heavy Vehicle National Law and that any such party is aware of any load restraint requirements applicable to the transportation of the Goods.

8   Hire Pallets
 8.1   Customer acknowledges and agrees that, if Hire Pallets are transferred to Mainfreight's account during the provision of the Services, Mainfreight shall be entitled to charge the Customer any fees which Mainfreight may incur from the Hire Pallet provider in relation to Mainfreight's inability to recover that Hire Pallet if:
  (a)   the Receiver does not have a Hire Pallet account; or
  (b)   Mainfreight is unable to transfer the Hire Pallet to the Receiver's account; and
  (c)   Mainfreight cannot physically recover an equal number of Hire Pallets from the Receiver at the time of delivery.
 8.2   Further to clause 8.1, any instruction to Mainfreight to exchange or transfer consigned pallets to Mainfreight's Hire Pallet account is accepted only on the basis that Customer will indemnify Mainfreight against any loss or non-recovery of the consigned pallets howsoever arising. Evidence of the instruction to Mainfreight and any non-recovery shall be as shown on the face of the consignment note which shall be deemed conclusive proof of the instruction and/or non-recovery. A charge may be made by Mainfreight for the cost of hiring, recovery and replacement (if applicable) for all Hire Pallets unless exchange pallets are available at the time of delivery.

9   Dispute Resolution Process
 9.1   If any dispute arises in connection with this Agreement, the following must be completed prior to the party requiring it to be resolved (**Disputing Party**) commencing proceedings in a court of competent jurisdiction (unless requiring urgent or injunctive relief):
  (a)   Disputing Party must promptly give the other party written notice providing sufficient details of the dispute (**Dispute Notice**);
  (b)   within 10 business days of receiving a Dispute Notice, the parties must attempt to resolve the dispute via negotiation;
  (c)   if the parties are unable to resolve the dispute via negotiation (or a party refuses to participate in the process outlined above) then either party (or the compliant party, if a party refuses to participate in the process outlined above) shall be entitled to commence proceedings in a court of competent jurisdiction.

10   Miscellaneous
 10.1   This Agreement is governed by the laws of Victoria.
 10.2   Mainfreight shall not be bound by any agreement purporting to vary this Agreement unless such agreement is in writing and signed by an authorised representative of Mainfreight. The parties agree that this Agreement shall prevail over any other terms, conditions, document or statement (whether verbally or in writing) provided by a party (subject to clause 10.3).
 10.3   Where a document is issued by or on behalf of Mainfreight and bears the title of, or includes the words, "bill of lading" (whether or not negotiable) and/or sea or air "waybill" and provides that Mainfreight contracts as carrier, the provisions set out in that document shall prevail to the extent of any inconsistency with this Agreement.
 10.4   When this Agreement applies to or forms part of a bill of lading or an air/sea waybill issued by Mainfreight in its capacity as a contracting party for air/sea transportation, it is agreed that the transportation to the airport/wharf of departure and from the airport/wharf of arrival does not constitute part of the contract of air/sea carriage. As far as Mainfreight takes over the arrangement of performance of such services, this is done under a separate contract which is subject to this Agreement and (to the extent only to which this Agreement does not or cannot exclude or modify the operation of any applicable legislation) to that legislation.
 10.5   This Agreement shall continue to apply and to be in full force and effect in all circumstances notwithstanding any breach or alleged breach by Mainfreight of this Agreement and in particular (but without limitation of the generality hereof), notwithstanding any departure by Mainfreight from this Agreement whether by way of deviation or otherwise howsoever.
 10.6   If one or more provisions of this Agreement shall be invalid or unenforceable the remaining provisions of this Agreement shall not be affected thereby and shall continue in full force and effect. If any provision of this Agreement is found to be invalid or unenforceable, that provision will be severed from this Agreement to the extent that it is invalid or unenforceable.
 10.7   This Agreement may be subject to change from time to time. Any changes to this Agreement will be effective upon written notice.

*Customer acknowledges and agrees that they have read and understand the above terms and conditions and that this Agreement shall be applicable for any Services which are performed by Mainfreight:*

Signature: _S Bolland_          Position: Chief Operating Officer

Name: Stuart Bolland          Date: 29th March 2023

   

# Mainfreight Group – Deviations from
# Standard Terms & Conditions

**info for customer:**

**POWIN ENERGY LLC**

**Address: 20550 SW 115th
Ave, Tualatin, OR 97062,
USA**

**General:**

1. Defined terms in this document shall have the same meaning as outlined in Mainfreight's standard terms and conditions unless otherwise specified in this document.

2. This document shall prevail to the extent of any inconsistency with Mainfreight's standard terms and conditions.

**Amendments to the T&Cs:**

3. In clause 2.9, the number "14" is replaced with "60".

4. In clause 3.1, insert "30 days'" before "notice to Customer".

5. In clause 3.8, the number "14" is replaced with "60".

6. Clause 3.9 is hereby deleted.

7. Insert the following at the end of clause 2.7:

    *Notwithstanding the foregoing, upon the written request of Customer, Mainfreight must provide Customer with any information which is reasonably requested in relation to such subcontractor utilised to perform the Services. Customer shall be entitled to suspend Mainfreight from utilising a particular subcontractor if they do not meet the minimum requirements as outlined in this Agreement.*

8. In clause 9.1(b), the number "10" is replaced with "30".

| Customer | Powin LLC | | |
|---|---|---|---|
| Signature | S. Bolland Type text here | Position | Chief Operating Officer |
| Name | Stuart Bolland | Date | 29th March 2023 |



**Mainfreight Air and Ocean Pty Ltd ABN 65 007 252 333**

**Liability info for customer:**

*POWIN ENERGY LLC*

*Address:* **20550 SW 115th Ave,
Tualatin, OR 97062, USA**

**Liability of Mainfreight:**

In the event of loss or damage to the cargo due to the negligence of Mainfreight, the liability of Mainfreight, howsoever arising, shall not exceed the lesser of:
(i)      the value of the goods per any one consignment and/or shipment., or
(ii)     AUD$300,000 per any one consignment and/or shipment.

Mainfreight shall not be liable for loss or damage howsoever caused (whether or not direct, indirect or consequential) to property other than the Goods themselves and shall not be liable for any pure economic loss or loss of profit (or similar claim), delay or deviation howsoever arising, except to the extent any loss or damage to the cargo caused by Mainfreight's negligence or breach of contract or bailment or wilful act or default of Mainfreight.

**International Transport:**

Customer needs to be aware that when cargo is travelling by air/sea international conventions apply, these international conventions limit the liability of the carrier.
The most common conventions are the Hague Visby Rules (sea) and Montreal Convention (Air).
The limitations are: -
Hague Visby: The higher of 2 SDR per kilo of the goods lost/damaged, or 666.7 SDR per unit of goods.
Montreal Convention: 22 SDR per kilo of the goods lost/damaged
1 SDR = $2 AUD approx. so there could be a shortfall between what the carrier is liable for under the conventions and the value of the cargo.

**General Note:**

We encourage customers, to ensure that they have all risk cargo insurance in place for their goods at all times. There are many circumstances where cargo loss/damage can occur which are not due to the fault of carriers (e.g. acts of god) and are therefore not recoverable from the carriers. Additionally, even where carriers are liable, the process of settling a liability claim can be much more time consuming than settling a cargo insurance claim. For a cargo claim the cargo insurer only needs evidence that the cargo is damaged before they pay out. For a liability claim the liability insurer needs evidence of the damage, as well as evidence that the carrier is liable – this can take some time to confirm. Best process for customer, is to claim under their cargo insurance policy in the first instance, so they receive their money asap, and then let their cargo insurer pursue a recovery claim against Mainfreight.

**Customer Authorized Signature:**     *S. Bolland*

**Customer Authorized Name:**     Stuart Bolland

**Title:** Chief Operating Officer

**Date:** 29th March 2023

## CERTIFICATE OF SERVICE

I, Kevin M. Capuzzi, Esq., hereby certify that *Mainfreight's Notice of Lien* was filed and

served on July 23, 2025 via CM/ECF on all parties registered to receive notice in this case.

*/s/ Kevin M. Capuzzi*
Kevin M. Capuzzi (NJ No. 173442015)

# Exhibit B

# (FlexGen APA)

ASSET PURCHASE AGREEMENT

by and among

FLEXGEN POWER SYSTEMS, LLC,

POWIN, LLC

and

its direct and indirect subsidiaries signatory hereto

July 6, 2025

# TABLE OF CONTENTS

**Page**

Article I

      DEFINITIONS..............................................................................................2

Article II

      PURCHASE AND SALE ...........................................................................12

| | | |
|---|---|---|
| **Section 2.1** | **Purchase and Sale of Purchased Assets** .............................. | 12 |
| **Section 2.2** | **Excluded Assets** ................................................................... | 14 |
| **Section 2.3** | **Assumption of Assumed Liabilities** ...................................... | 15 |
| **Section 2.4** | **Excluded Liabilities** ............................................................. | 16 |
| **Section 2.5** | **Consideration** ....................................................................... | 16 |
| **Section 2.6** | **Assumption and Assignment of Contracts.** ........................... | 17 |
| **Section 2.7** | **Schedule Updates.** ................................................................ | 18 |
| **Section 2.8** | **Closing.** ................................................................................ | 19 |
| **Section 2.9** | **Deliveries at Closing.** .......................................................... | 19 |
| **Section 2.10** | **Allocation** ............................................................................ | 20 |
| **Section 2.11** | **Withholding.** ......................................................................... | 20 |
| **Section 2.12** | **Deposit.** ................................................................................ | 21 |

Article III

      SELLERS' REPRESENTATIONS AND WARRANTIES ...............................21

| | | |
|---|---|---|
| **Section 3.1** | **Organization of Sellers; Good Standing.** ............................. | 21 |
| **Section 3.2** | **Authorization of Transaction** .............................................. | 22 |
| **Section 3.3** | **Noncontravention; Consents and Approvals** ......................... | 22 |
| **Section 3.4** | **Compliance with Laws** ......................................................... | 23 |
| **Section 3.5** | **Title to Purchased Assets** ................................................... | 23 |
| **Section 3.6** | **Contracts** ............................................................................. | 24 |
| **Section 3.7** | **Intellectual Property.** .......................................................... | 24 |
| **Section 3.8** | **Litigation** ............................................................................. | 26 |
| **Section 3.9** | **Employees** ............................................................................ | 26 |
| **Section 3.10** | **Real Property.** ...................................................................... | 26 |
| **Section 3.11** | **Tangible Personal Property** ................................................. | 27 |
| **Section 3.12** | **Permits.** ................................................................................ | 27 |
| **Section 3.13** | **Purchased Inventory** ............................................................ | 27 |
| **Section 3.14** | **Environmental Matters** ........................................................ | 28 |
| **Section 3.15** | **Brokers' Fees** ....................................................................... | 28 |
| **Section 3.16** | **No Other Agreements to Purchase** ...................................... | 29 |
| **Section 3.17** | **Taxes** ................................................................................... | 29 |
| **Section 3.18** | **No Other Representations or Warranties** ............................. | 30 |

Article IV

      BUYER'S REPRESENTATIONS AND WARRANTIES ...................................31

i

**Section 4.1**    **Organization of Buyer** ................................................................31
**Section 4.2**    **Authorization of Transaction** ...................................................31
**Section 4.3**    **Noncontravention** .....................................................................31
**Section 4.4**    **Litigation** ..................................................................................32
**Section 4.5**    **Adequate Assurances Regarding Executory Contracts** .........32
**Section 4.6**    **Brokers' Fees** ...........................................................................32
**Section 4.7**    **No Outside Reliance** ................................................................32

Article V

          PRE-CLOSING COVENANTS ........................................................32

**Section 5.1**    **Notices and Consents.** ...............................................................33
**Section 5.2**    **Bankruptcy Actions.** .................................................................34
**Section 5.3**    **Conduct of Business** .................................................................35
**Section 5.4**    **Notice of Developments** ...........................................................37
**Section 5.5**    **Access** ........................................................................................37
**Section 5.6**    **Press Releases and Public Announcements** ............................37
**Section 5.7**    **Bulk Transfer Laws** .................................................................38
**Section 5.8**    **Release of Claims** .....................................................................38

Article VI

          OTHER COVENANTS ...................................................................38

**Section 6.1**    **Cooperation** ..............................................................................38
**Section 6.2**    **Further Assurances** ..................................................................38
**Section 6.3**    **Availability of Business Records** ............................................39
**Section 6.4**    **Employee Matters** ....................................................................39
**Section 6.5**    **Transfer Taxes** .........................................................................40
**Section 6.6**    **Property Taxes.** .........................................................................40
**Section 6.7**    **Insurance Policies** ....................................................................41
**Section 6.8**    **Collection of Accounts Receivable.** ........................................41
**Section 6.9**    **Fiduciary Obligations** ..............................................................41
**Section 6.10**   **Covenant Not to Sue.** ...............................................................42

Article VII

          CONDITIONS TO CLOSING ........................................................42

**Section 7.1**    **Conditions to Buyer's Obligations.** ........................................42
**Section 7.2**    **Conditions to Sellers' Obligations.** ........................................43
**Section 7.3**    **No Frustration of Closing Conditions** ...................................44
**Section 7.4**    **Waiver of Conditions** ..............................................................44

Article VIII

          TERMINATION ..............................................................................44

**Section 8.1**    **Termination of Agreement** ......................................................44
**Section 8.2**    **Procedure upon Termination** ..................................................46
**Section 8.3**    **Breakup Fee and Expense Reimbursement.** ...........................46

ii

**Section 8.4**  **Effect of Termination.** ...........................................................................47

Article IX

       MISCELLANEOUS .........................................................................47

**Section 9.1**  **Remedies** ..........................................................................................47
**Section 9.2**  **Expenses** ..........................................................................................48
**Section 9.3**  **Entire Agreement** ............................................................................48
**Section 9.4**  **Incorporation of Schedules, Exhibits and Disclosure Schedule** ..........48
**Section 9.5**  **Amendments and Waivers** ................................................................48
**Section 9.6**  **Succession and Assignment** ..............................................................48
**Section 9.7**  **Notices** ............................................................................................49
**Section 9.8**  **Governing Law; Jurisdiction** ..........................................................50
**Section 9.9**  **Consent to Service of Process** ........................................................50
**Section 9.10**  **WAIVERS OF JURY TRIAL** ........................................................50
**Section 9.11**  **Severability** ..................................................................................50
**Section 9.12**  **No Third Party Beneficiaries** ........................................................50
**Section 9.13**  **No Survival of Representations, Warranties and Agreements** ...........51
**Section 9.14**  **Non-Recourse** ..............................................................................51
**Section 9.15**  **Construction** ................................................................................51
**Section 9.16**  **Computation of Time** ....................................................................52
**Section 9.17**  **Mutual Drafting** ............................................................................52
**Section 9.18**  **Disclosure Schedule** ....................................................................52
**Section 9.19**  **No Waiver or Release** ..................................................................52
**Section 9.20**  **Headings; Table of Contents** ........................................................53
**Section 9.21**  **Counterparts; Facsimile and Email Signatures** ..............................53
**Section 9.22**  **Time of Essence** ..........................................................................53

Exhibit A       -       Form of Bill of Sale
Exhibit B       -       Form of Assignment and Assumption Agreement

US_ACTIVE\130897759

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of July 6, 2025, by and among Powin, LLC, a Delaware limited liability company ("Powin"), and Powin's direct and indirect subsidiaries that are signatories below (together with Powin, "Sellers" or the "Debtors"), and FlexGen Power Systems, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Sellers and Buyer are referred to collectively herein as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

WHEREAS, Sellers presently conduct the business of providing service solutions using the Seller's proprietary intellectual property, cloud-based software, support systems, analytics and reporting and monitoring capabilities for battery energy storage systems (collectively, the "Business");

WHEREAS, on June 9, 2025 (the "Petition Date"), Sellers filed voluntary petitions for relief (the "Chapter 11 Cases") pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code");

WHEREAS, the Parties entered into a debtor-in-possession credit facility, pursuant to which certain lenders agreed to provide a secured super-priority debtor-in-possession loan facility to the Debtors pursuant to the DIP Order (as defined below) and the DIP Loan Documents (as defined below) (such credit facility, the "DIP Facility");

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Purchased Assets and the Assumed Liabilities upon the terms and subject to the conditions set forth herein;

WHEREAS, Sellers intend to seek entry of Sale Procedures Order by the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") upon the terms and subject to the conditions set forth herein and in the Sale Procedures Order;

WHEREAS, Sellers intend to seek the entry of the Sale Order by the Bankruptcy Court approving this Agreement and authorizing Sellers to consummate the Contemplated Transactions upon the terms and subject to the conditions set forth herein and in the Sale Order;

WHEREAS, the independent manager or other applicable governing body of each Seller has determined that it is advisable and in the best interests of such Seller's estate and the beneficiaries of such estate to consummate the Contemplated Transactions provided for herein pursuant to the Sale Procedures Order and the Sale Order and has approved this Agreement, subject to higher and better offers as contemplated by the Sale Procedures Order;

WHEREAS, the Contemplated Transactions are subject to the approval of the Bankruptcy Court, subject to higher and better offers as contemplated by the Sale Procedures Order, and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court; and

WHEREAS, concurrently with the execution and delivery of this Agreement, Buyer, Sellers and the Escrow Agent shall have entered into the Escrow Agreement.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

# ARTICLE I
# DEFINITIONS

"503(b)(9) Claim" means an Administrative Claim against any Seller under Section 503(b)(9) of the Bankruptcy Code.

"Accounts Receivable" means (a) all accounts, accounts receivable, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor and supplier rebates of Sellers and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Administrative Claim" means an allowed Claim arising under Sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternate Transaction" means the sale, transfer or other disposition (or agreement to sell, transfer or otherwise dispose) of all or any material portion of the Purchased Assets (whether effected (or to be effected) pursuant to a reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, plan of reorganization or liquidation, or restructuring or similar transaction), in a transaction or series of transactions, other than the Contemplated Transactions; provided, that with respect to any series of related transactions described herein, the first such transaction in such series constitutes an "Alternate Transaction" for purposes of Section 8.1 and Section 8.3.

"Assignment and Assumption Agreement" means a duly executed assignment and assumption agreement, substantially in the form attached as Exhibit B hereto.

"Assumed Contract List" means Schedule 2.6(a) hereto.

"Assumed Contracts" means those Leases and Contracts that have been assumed by Sellers and assigned to Buyer pursuant to Section 2.6 and Section 365 of the Bankruptcy Code, which, for

the avoidance of doubt shall not include any Non-Real Property Contract or Lease that is excluded pursuant to Section 2.6.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Permits" means all Permits relating to the Business that are transferable in accordance with their terms and under applicable Law, but excluding all Permits to the extent related exclusively to any Excluded Asset (including any Lease that is not an Assumed Contract).

"Auction" means the auction for the sale and assignment of the Purchased Assets as specified in the Sale Procedures Order.

"Back-Up Bidder" has the meaning specified in the Sale Procedures Order.

"Back-Up Termination Date" means the first to occur of (a) consummation of an Alternate Transaction, or (b) Buyer's receipt of notice from the Sellers of the release of Buyer's obligations as Back-Up Bidder under any order of the Bankruptcy Court approving bidding procedures in connection with the Contemplated Transactions or an Alternate Transaction.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bill of Sale" means a duly executed bill of sale, substantially in the form attached as Exhibit A hereto.

"Breakup Fee" means a breakup fee equal to $1,100,000.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Released Parties" has the meaning set forth in Section 5.8.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" means the closing of the transactions contemplated by this Agreement, which shall be deemed to have occurred at 12:01 p.m. (prevailing Eastern Time) on the Closing Date.

"Closing Date" means the second (2nd) Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or

3

waived by the Party entitled to waive that condition, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.

"Committee" means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an order of the Bankruptcy Court that deems or renders any of the foregoing unnecessary.

"Contemplated Transactions" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Purchased Assets and the assumption by Buyer of the Assumed Liabilities.

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission or commitment that, in each case, is legally-binding.

"Credit Bid" means a credit bid by the Buyer pursuant to section 363(k) of the Bankruptcy Code.

"Credit Card Receivables" means all Accounts Receivable and other amounts owed to any Seller (whether current or non-current) in connection with any customer purchases from any Seller that are made with credit cards or any other related amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to Sellers.

"Cure Amount Cap" has the meaning set forth in Section 2.3(a).

"Cure Amounts" has the meaning set forth in Section 2.6(b).

"Current Employees" means all individuals employed by Sellers as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Dataroom" has the meaning set forth in Section 4.7.

"Data Security Requirements" means, collectively, all of the following to the extent relating to access, collection, use, processing, storage, sharing, distribution, transfer, disclosure, security, destruction, or disposal of any personal, sensitive, or confidential information or data (whether in electronic or any other form or medium), including any personal information protected under applicable laws, rules, or regulations, otherwise relating to privacy, security, or security breach notification requirements and applicable to the Sellers or to the conduct of the Business: (i) the Sellers' own rules, policies, and procedures; (ii) all applicable laws, rules and regulations; (iii) industry standards applicable to the industry in which the Business operates; and (iv) contracts into which the Sellers have entered or by which they are otherwise bound.

4

"DIP Budget" shall have the same meaning as the term "Approved Budget" as defined in the DIP Order.

"DIP Indebtedness" means all "DIP Obligations" as defined in the DIP Order.

"DIP Lenders" shall have the same meaning given such term in the DIP Order.

"DIP Loan Documents" shall have the meaning given such term in the DIP Order.

"DIP Order" means as of any date of determination (i) the *Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying Automatic Stay, and (VI) Scheduling a Final Hearing* that was entered by the Bankruptcy Court on June 26, 2025 (the "Interim Order") or (ii) the Final Order (as defined in the Interim Order), whichever such Order is then in effect.

"DIP Secured Parties" shall have the same meaning given such term in the DIP Order.

"Decree" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"Deposit" has the meaning set forth in Section 2.11(a).

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" means (a) any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), (b) employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, program, policy, agreement or arrangement and (c) any other benefit or compensation plan, program, agreement or arrangement of any kind, providing for compensation, bonuses, profit-sharing, or other forms of incentive or deferred compensation, vacation benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, disability or sick leave benefits or post-employment or retirement benefits, in each case, maintained or contributed to by any Seller or in which any Seller participates or participated and that provides benefits to any Current Employee or Former Employee.

"Employee Roster" has the meaning set forth in Section 3.9.

"Environmental Laws" all applicable Laws concerning pollution or protection of the environment, human health and safety, and natural resources.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"Escrow Agent" means Stretto, Inc.

"Escrow Agreement" means that certain Escrow Agreement, dated on or about the date hereof, by and among the Sellers, Buyer and the Escrow Agent.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Claims" means all rights (including rights of set-off and rights of recoupment), refunds, claims, counterclaims, demands, causes of action and rights to collect damages of Sellers against third parties (including, without limitation, avoidance actions and claims against the Sellers' former officers, managers, independent managers, directors, employees, equity holders, private equity sponsors, or lenders, in each case in their capacity as such, or any other person or entity subject to investigation by the Committee pursuant to that final cash collateral order entered by the Bankruptcy Court, including, without limitation, those set forth on Schedule 1 to this Agreement). Notwithstanding the foregoing, "Excluded Claims" do not include any such rights with respect to (i) the Intellectual Property owned by the Sellers as of the time immediately preceding the Closing or (ii) any causes of action by a Seller against any of its customers, including, without limitation, avoidance claims or causes of action under Chapter 5 of the Bankruptcy Code, other than (A) the Specified Customer Claim and (B) any claim, if any, with respect to any customer of the Debtors to the extent such claim arose in a role other than as a customer of the Debtors (including but not limited to such customer's role as a former officer, manager, independent manager, director, employee, equity holder, private equity sponsor, or lender of the Debtors) (all such rights that pursuant to this sentence are excluded from the "Excluded Claims," collectively, the "IP and Customer Claims").

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Expense Reimbursement" means an expense reimbursement of the reasonable and documented out of pocket expenses associated with this Agreement in an aggregate amount not to exceed $500,000.

"Express Representations" has the meaning set forth in Section 4.7.

"Final Order" means an order of the Bankruptcy Court, which is in full force and effect, which has not been modified, amended, reversed, vacated or stayed and as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Former Employees" means all individuals who have been employed by the Sellers (or any of their predecessors) who are not Current Employees.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Governmental Entity" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Hazardous Substance" means any toxic or hazardous material, substance or waste as to which Liability or standards of conduct may be imposed under any Environmental Laws.

6

"<u>Insurance Policy</u>" means each primary, excess and umbrella insurance policy, bond and other forms of insurance owned or held by or on behalf, or providing insurance coverage to the Business, Sellers and their operations, properties and assets, including, without limitation, all stop-loss insurance policies with respect to Sellers' self-insured medical and/or dental insurance programs.

"<u>Intellectual Property</u>" means any and all rights, title and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction throughout the world, including: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions and reexaminations in connection therewith; (b) trademarks, service marks, trade dress, logos, slogans, trade names, service names, brand names, Internet domain names and all other source or business identifiers and general intangibles of a like nature, along with all applications, registrations and renewals in connection therewith, and all goodwill associated with any of the foregoing; (c) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof; (d) trade secrets; (e) rights in software and firmware, data files, source code, object code, application programming interfaces, architecture, files, records, schematics, computerized databases and other related specifications and documentation, internally developed automation scripts, and administrative tools; and (f) all other intellectual property rights related to the Business or held by any Seller.

"<u>Intellectual Property Assignments</u>" has the meaning set forth in <u>Section 2.9(a)</u>.

"<u>IRC</u>" means the United States Internal Revenue Code of 1986, as amended.

"<u>IRS</u>" means the Internal Revenue Service.

"<u>IT Systems</u>" means any and all information, payment and communications technologies owned or controlled by the Sellers, including all computers, hardware, software (whether in object or source code form), databases, servers, workstations, routers, hubs, switches, data communication lines, networks and all other information technology systems, included therein.

"<u>Law</u>" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity, or court of competent jurisdiction, or other legal requirement or rule of law, including applicable building, zoning, subdivision, health and safety and other land use Laws.

"<u>Leased Real Property</u>" means all (a) leasehold or sub-leasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property which is used in or otherwise related to the Business, including the right to all security deposits and other amounts and instruments deposited by or on behalf of Sellers thereunder, and (b) any buildings, structures, improvements and fixtures located on any Leased Real Property

which are owned by Seller, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property ("Leasehold Improvements").

"Leasehold Improvements" has the meaning set forth in the definition of "Leased Real Property".

"Leases" means all leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which any Seller holds any Leased Real Property.

"Liability" means, as to any Person, any debt, Claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

"Lien" means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, judgments, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, Law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability).

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity or arbitrator.

"Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to the condition (financial or otherwise), value or results of operations of the Purchased Assets (taken as a whole); provided, however, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) the filing of a voluntary petition under Chapter 11 of the Bankruptcy Code or the effect, directly or indirectly, of such filing; (ii) acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreements, except to the extent that such change has a materially disproportionate

8

adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iii) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, except to the extent that such change has a materially disproportionate adverse effect on Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iv) resulting from any act of God or other force majeure event (including natural disasters); or (v) changes in Law or in GAAP or interpretations thereof; or (b) would reasonably be expected to prevent, materially delay or materially impair to the ability of any Seller to consummate the transactions contemplated by this Agreement or the Related Agreements on the terms set forth herein and therein.

"Non-Real Property Contracts" means the Contracts to which any Seller is a party other than the Leases.

"Offeree" has the meaning set forth in Section 6.4.

"Ordinary Course of Business" means the ordinary and usual course of business of Sellers taken as a whole consistent with past custom and practice and taking into account the commencement of the Chapter 11 Cases.

"Outside Date" means September 12, 2025.

"Parties" has the meaning set forth in the preamble.

"Permit" means any and all franchise, approval, permit (including environmental, construction and operation permits), license, order, registration, certificate, variance, Consent, exemption or similar right issued, granted, given or otherwise obtained or required to be obtained, from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"Permitted Liens" means (a) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted; (b) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair value or the use or occupancy of such real property or materially interfere with the operation of the Business at such real property; (c) with respect to Leasehold Improvements, any reversion or similar rights to the landlord or other third party upon expiration or termination of the applicable Lease; and (d) any Liens associated with or arising in connection with any Assumed Liabilities.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

9

"Personal Property Leases" means all leases of personal property relating to personal property used by Sellers or to which any Seller is a party or by which the properties or assets of any Seller are bound, in each case relating to the Business.

"Petition Date" has the meaning set forth in the recitals.

"PII" means "personally identifiable information" within the meaning of section 101(41A) of the Bankruptcy Code.

"Post-Closing Tax Period" means any Tax period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and that portion of any Straddle Period ending on the Closing Date.

"Priority Claim" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

"Professional Services" means any legal services, accounting services, financial advisory services, investment banking services or any other professional services provided by the Sellers' advisers obtained pursuant to any order of the Bankruptcy Court.

"Property Taxes" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"Purchase Consideration" has the meaning set forth in Section 2.5.

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchased Assets" has the meaning set forth in Section 2.1

"Purchased Inventory" means the assets listed on Schedule 2.1(a).

"Qualified Bid" means competing bids qualified for the Auction in accordance with the Sale Procedures Order.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, customer relationship management software data and records, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

"Related Agreements" means the Escrow Agreement, the Bill of Sale, the Assignment and Assumption Agreement and the Intellectual Property Assignments and any other instruments of

10

transfer and conveyance as may be required under applicable Law to convey valid title of the Purchased Assets to Buyer.

"Representative" means a Person's officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents.

"Retention Fund" means a cash payment of $2,000,000, payable at the Closing, to reimburse the Sellers for employee costs associated with the continuation of the Business and support of its customers through the Closing.

"Sale Hearing" means the hearing conducted in the Bankruptcy Court to seek approval of the Sale Motion and the Contemplated Transactions.

"Sale Motion" means a motion filed by the Sellers with the Bankruptcy Court in connection with the Chapter 11 Cases requesting the entry of the Sale Procedures Order and the Sale Order.

"Sale Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases consistent with the terms of this Agreement approving the Sale Motion and sale to Buyer in form and substance satisfactory to Buyer.

"Sale Order Deadline" means August 7, 2025, unless extended by Buyer.

"Sale Procedures Order" means an order of the Bankruptcy Court approving the sale procedures relief requested in the Sale Motion in the form attached hereto or otherwise in form and substance satisfactory to Buyer.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Sellers' Knowledge" (or words of similar import) means the actual knowledge, after due inquiry (which includes reasonable inquiry of such person's direct reports), of each of the individuals listed on Schedule 1.1(a).

"Specified Customer Claim" means the customer claim set forth on Schedule 1.1(b).

"Straddle Period" means any Tax period beginning before or on and ending after the Closing Date.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons

11

shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Successful Bidder" has the meaning specified in the Sale Procedures Order.

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, escheat, unclaimed property, sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever (however denominated), whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Event" has the meaning set forth in Section 8.1.

"Transfer Tax" means any stamp, documentary, registration, transfer, added-value or similar Tax imposed under any applicable Law in connection with the transactions contemplated by this Agreement.

"Transferring Party" has the meaning set forth in Section 5.1(c).

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1    Purchase and Sale of Purchased Assets**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement (including, without limitation, Section 4.7 below), at the Closing, Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of the Seller's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than Permitted Liens and any Liens included in the Assumed Liabilities), for the consideration specified in Section 2.5. "Purchased Assets" shall mean all of the, direct or indirect, right, title and interest of Sellers in, to and under the tangible and intangible assets (including goodwill), properties, rights, going concern value, claims and Contracts used, useful, or held for use in, or related to, the Business (but excluding Excluded Assets) wherever situated and of whatever kind and nature, real or personal, as of the Closing, including:

(a)    all Purchased Inventory of Sellers as of the Closing set forth on Schedule 2.1(a) hereto, including all rights of Sellers to receive such Purchased Inventory, supplies and materials which are on order as of the Closing;

12

(b)     all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to Section 2.6;

(c)     all Intellectual Property owned by Sellers, including, without limitation, the Intellectual Property set forth on Schedule 2.1(c) hereto;

(d)     all items of machinery, equipment, supplies, furniture, fixtures, Leasehold Improvements (to the extent of Sellers' rights to any Leasehold Improvements under the Leases that are Assumed Contracts) owned by Sellers as of the Closing and related to the Business, as set forth on Schedule 2.1(d) hereto;

(e)     all Records related to the Business, including Records related to Taxes paid or payable by any Seller (provided that Sellers are entitled to retain copies of all Records for legal compliance purposes), but excluding (i) personnel files for Current Employees and Former Employees of Sellers who are not hired by Buyer as of the Closing Date and (ii) any materials exclusively related to any Excluded Assets;

(f)     all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(g)     all rights of Sellers under non-disclosure or confidentiality, noncompete, assignment of inventions, or nonsolicitation agreements with Current or Former Employees, directors, consultants, independent contractors and agents of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(h)     all of the Assumed Permits;

(i)     the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Purchased Assets, occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(j)     the IP and Customer Claims;

(k)     all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, or products sold, to Sellers to the extent such equipment or products are included in the Purchased Assets and/or Assumed Liabilities;

(l)     all of the Sellers' telephone numbers, e-mail addresses, websites, URLs and internet domain names related to the Business;

(m)     all IT Systems, content, text, graphics, pictures, tools, code, log files, usernames, passwords and other log-in information (e.g. security questions and answers and related linkages) or used or held for use in connection with the operation or conduct of

13

the Business and other materials, information and items contained or incorporated in or used or held for use in conjunction therewith, including historical usage and analytics data and all diagrams, data, specifications, user manuals, instructional materials and other documentation, information and data relating thereto; and

(n)     all other assets that are related to or used in connection with the Purchased Assets or the Business (but excluding all of the Excluded Assets).

**Section 2.2     Excluded Assets**.  Notwithstanding Section 2.1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and the Sellers are not selling or assigning, any right, title or interest (direct or indirect) in or to any of the following assets, properties and rights of Sellers (the "Excluded Assets"):

(a)     all cash and cash equivalents of any Seller;

(b)     all of Sellers' certificates of formation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, unit certificates and other documents relating to the organization, maintenance and existence of any Seller as a limited liability company or other entity;

(c)     all equity securities of any Seller or securities convertible into, exchangeable, or exercisable for any such equity securities and all net operating losses of any Seller;

(d)     all Leases (and related Leased Real Property, if any) and Contracts, in each case, other than the Assumed Contracts;

(e)     the Excluded Claims;

(f)     any loans or notes payable to any Seller or any of its Affiliates from any employee of any Seller or any of its Affiliates (other than Ordinary Course of Business employee advances);

(g)     any (i) Records containing confidential personal private information including confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (ii) other Records that Sellers are required by Law to retain and (iii) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; provided that Buyer shall have the right to make copies of any portions of such retained Records (other than the Records referenced in subsection (iii)) to the extent that such portions relate to the Business or any Purchased Asset;

(h)     all Permits other than the Assumed Permits;

(i)     all directors' and officers' liability Insurance Policies, including any tail Insurance Policies, including the rights of the directors and officers thereunder for coverage

14

(i.e., advancement of expenses and liability coverage with respect to claims made against such officers and directors); provided that for the avoidance of doubt, any proceeds or right to proceeds under such policies payable or paid to the Seller (other than for purposes of paying, reimbursing or advancing the expenses and liability coverage to or on behalf of any director or officer covered under such policy and payable to a third party with respect to claims made against such director or officer) including for damages and reimbursement for losses or otherwise, shall be payable to Buyer as a Purchased Asset from and after the Closing;

(j) all Employee Benefit Plans;

(k) the assets of Powin EKS SellCo, LLC set forth on <u>Schedule 2.2(j)</u>;

(l) the Accounts Receivable of Sellers;

(m) any Tax refunds, credits or other Tax assets of Sellers attributable to Taxes that are Excluded Liabilities; and

(n) the rights of Sellers under this Agreement and the Related Agreements and all consideration payable or deliverable to Sellers under this Agreement.

**Section 2.3 <u>Assumption of Assumed Liabilities</u>.** On the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing (or, with respect to Assumed Liabilities under Assumed Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in <u>Sections 2.6</u> and <u>Section 2.7</u>), Buyer shall assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably convey, transfer, and assign to Buyer, the following Liabilities, without duplication and only to the extent not paid prior to the Closing and no other Liabilities (collectively, the "<u>Assumed Liabilities</u>"):

(a) all Cure Amounts under any and all Assumed Contracts; provided, however, that the Buyer shall not be obligated to assume or pay any Cure Amounts with respect to the Assumed Contracts set forth on <u>Schedule 2.3(a)</u> (as the same may be amended from time to time pursuant to <u>Section 2.6</u>) in excess of such Assumed Contract's Cure Amount Cap;

(b) Liabilities under the Assumed Contracts and Assumed Permits solely to the extent arising from and after the Closing Date as well as any Liabilities to the extent arising exclusively out of the Purchased Assets, in each case, solely to the extent arising from and after the Closing Date;

(c) Liabilities expressly assumed by Buyer under the Agreement;

(d) Claims for stub-rent pursuant to section 503(b) of the Bankruptcy Code with respect to Leases that are also Assumed Contracts (it being understood that Buyer shall pay such amounts no later than the later of (a) 10 days following Closing and (b) the last day of the month in which the Closing occurs); and

US_ACTIVE\130897759

(e)     all Transfer Taxes in accordance with <u>Section 6.5</u>.

**Section 2.4     Excluded Liabilities**. Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities, including any Liability of any Seller, or otherwise imposed on the Purchased Assets or with respect to the Business, in respect of any Tax, including without limitation any Liability of any Seller for the Taxes of any other Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or non-United States Law), as a transferee or successor, by Contract or otherwise, but excluding any Property Taxes to the extent specifically allocated to Buyer pursuant to <u>Section 6.6</u> and any Transfer Taxes (all such Liabilities that Buyer is not assuming being referred to collectively as the "<u>Excluded Liabilities</u>").

**Section 2.5     Consideration**.

(a)     In aggregate consideration for the sale and transfer of the Purchased Assets (the "<u>Purchase Consideration</u>") shall be composed of the following:

     i.     $36,000,000 (the "<u>Purchase Price</u>"), comprised, in the Buyer's sole discretion, of (A) the Credit Bid and (B) cash;

     ii.     the assumption by Buyer of the Assumed Liabilities; and

     iii.     the Retention Fund.

(b)     The Purchase Consideration shall be satisfied at the Closing as to:

     i.     the Credit Bid, by causing the DIP Lenders to (A) acknowledge satisfaction of the portion of the DIP Indebtedness covered by the Credit Bid and (B) to the extent the Credit Bid covers all DIP Indebtedness, release all guarantees of the DIP Indebtedness and security interests and liens securing the DIP Indebtedness (collectively, (i)(A) and (i)(B) above, the "<u>Credit Bid And Release</u>");

     ii.     to the extent that the Purchase Price and the Retention Fund, in the aggregate, exceeds the amount of the Credit Bid, the Deposit, by Buyer and the Sellers instructing the Escrow Agent to pay the Deposit to the Sellers, by wire transfer of immediately available funds, in accordance with the terms of the Escrow Agreement (and to the extent that the amount of the Deposit exceeds the amount by which the Purchase Price and the Retention Fund, in the aggregate, exceeds the amount of the Credit Bid, the remaining portion of the Deposit shall be returned to Buyer at the Closing);

     iii.     to the extent that the Purchase Price and the Retention Fund, in the aggregate, exceeds the sum of (A) the Credit Bid and (B) the Deposit, cash consideration to be paid by Buyer to Sellers; and

16

iv.    the amount of the Assumed Liabilities described in <u>Section 2.3</u>, by assuming such Assumed Liabilities through one or more Assignment and Assumption Agreements.

**Section 2.6    <u>Assumption and Assignment of Contracts</u>.**

(a)    The Assumed Contract List sets forth a list of all Contracts and Leases to which a Seller is a party and which Buyer has designated to be included as an Assumed Contract, together with estimated Cure Amounts for each Assumed Contract.

(b)    In connection with the assumption and assignment to Buyer of any Assumed Contract pursuant to this <u>Section 2.6</u>, (i) the cure amounts, if any, necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults under the Assumed Contracts (such amounts, the "<u>Cure Amounts</u>"), in each case as of the Petition Date and to the extent required by Section 365(b) of the Bankruptcy Code and any order of the Bankruptcy Court, shall be paid by Buyer at the Closing, except as otherwise provided in this Agreement, and neither the Cure Amounts paid by Buyer nor any other expense or obligation set forth in this <u>Section 2.6(b)</u> shall reduce, directly or indirectly, any consideration payable to Sellers hereunder and (ii) Buyer shall provide sufficient adequate assurance of future performance as of the Sale Hearing necessary to satisfy the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to Assumed Contracts.

(c)    Sellers shall use their respective commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Assumed Contracts to Buyer on the terms set forth in this <u>Section 2.6</u>. In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all Consents from Governmental Entities and third parties necessary to assume and assign such Assumed Contracts to Buyer.

(d)    Notwithstanding the foregoing, but subject to <u>Section 5.1</u>, a Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by a Seller or terminated by a Seller in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the Closing and is not continued or otherwise extended upon assumption; (ii) requires a Consent of any Governmental Entity or other third party (except as permitted by the Bankruptcy Code) in order to permit the sale or transfer to Buyer of Sellers' rights under such Contract, and no such Consent has been obtained prior to the Closing or (iii) the Cure Amount exceeds the Cure Amount Cap with respect to such Contract and neither Sellers nor Buyer are willing to pay the amount of the Cure Amount that exceeds the Cure Amount Cap with respect to such Contract.  In the absence of an agreement by the parties as to the payment of a Cure Amount in excess of the Cure Amount Cap, the subject contract shall be deemed rejected by Sellers.

(e)    In addition, a Permit shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity or other third party

17

(other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing.

**Section 2.7    Schedule Updates.**

(a)    Notwithstanding anything to the contrary in this Agreement, and without any increase or decrease in the Purchase Price (other than (i) with respect to the addition of any Contract to the Purchased Assets, any resulting increase or decrease in Cure Amounts, without regard to Cure Amount Caps and (ii) with respect to the addition of any inventory to the Purchased Assets, the Buyer shall either assume or pay to Sellers the amount of any debt or other Liability associated with such inventory or required to satisfy any Liens associated with such inventory), the Buyer may, in its sole discretion, revise, by written notice to Sellers, amend or modify this Agreement and any schedule setting forth the Purchased Assets and the Excluded Assets prior to the Closing to (i) include in the definition of Purchased Assets (pursuant to the applicable schedule) and to exclude from the definition of Excluded Assets, any Contract or inventory of the Sellers not previously included in the Purchased Assets and require (A) the Sellers to file a notice of assumption and assignment with the Bankruptcy Court and (B) the Sellers to provide any necessary notice to the parties to any such Contract and (ii) to exclude from the definition of Purchased Assets (pursuant to the applicable schedule) and to include in the definition of Excluded Assets, any Assumed Contract, Assumed Plan or other asset of the Sellers previously included in the Purchased Assets and not otherwise included in the definition of Excluded Assets.

(b)    If any Contract is added to (or removed from) the Purchased Assets as permitted by this Section 2.7, the Sellers shall promptly take such steps as are reasonably necessary, including, if applicable, payment or adequate assurance of payment of all Cure Amounts and prompt delivery of notice to the non-debtor counterparty, to cause such Contracts to be assumed by the Sellers, and assigned to the Buyer, on the Closing Date (other than as excluded under the Sale Order and this Agreement).

(c)    If any Contract is removed from the Purchased Assets as permitted by this Section 2.7, all Liabilities to third parties arising under such Contract shall be Excluded Liabilities. Without limiting any of the Buyer's rights pursuant to this Section 2.7, in the event that the Sale Order does not approve the assignment or transfer of one or more of the Assumed Contracts to the Buyer as Purchased Assets, the Buyer may, in its sole discretion and at any time prior to the Closing Date, exclude any or all of the Assumed Contracts from the Purchased Assets.

(d)    Notwithstanding the foregoing, if any Purchased Inventory is subject to a Lien or Liability (or claim of a Lien or Liability) not reflected in Schedule 2.1(a) (each, an "Unscheduled Inventory Liability"), Buyer shall be responsible for the payment of such Unscheduled Inventory Liabilities up to an aggregate amount of $1,000,000 (the "Unscheduled Inventory Liability Cap") for all such Unscheduled Inventory Liabilities. Unless otherwise agreed by Buyer, all Purchased Inventory that is subject to an Unscheduled Inventory Liability shall remain included in the Purchased Assets, with Seller

18

responsible for the payment of any Unscheduled Inventory Liabilities in excess of the Unscheduled Inventory Liability Cap.

**Section 2.8** <u>Closing</u>. The Closing shall take place remotely by electronic exchange of counterpart signature pages commencing at 10:00 a.m. Eastern time on the Closing Date.

**Section 2.9** <u>Deliveries at Closing</u>.

(a)     At the Closing, Sellers shall deliver to Buyer the following documents and other items, duly executed by Sellers, as applicable:

i.     all Bills of Sale reasonably requested by Buyer;

ii.     all Assignment and Assumption Agreements reasonably requested by Buyer;

iii.     instruments of assignment in form and substance to be agreed to by the Parties in their reasonable discretion for each Registered trademark and domain name, respectively, transferred or assigned hereby and for each pending application therefor, and general assignments of all other Intellectual Property of the Sellers, in each case as reasonably requested by Buyer (collectively, the "<u>Intellectual Property Assignments</u>");

iv.     a properly completed and duly executed IRS Form W-9 from each Seller or, if applicable, its regarded owner for U.S. federal income tax purposes;

v.     the officer's certificates required to be delivered pursuant to <u>Section 7.1(j)</u>;

vi.     such other bills of sale, special warranty deeds, completed Transfer Tax returns, title affidavits, assignments of leases, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to the Buyer (in each case signed and acknowledged as appropriate), as the Buyer may reasonably request to vest in the Buyer all the right, title and interest of the Sellers in, to or under any or all the Purchased Assets; provided that all of the reasonable and documented out-of-pocket post-Closing costs incurred by the Sellers in preparing and delivering the foregoing shall be borne by the Buyer and paid promptly after demand therefor and receipt of supporting invoices; and

vii.     all other previously undelivered certificates, agreement and other documents required to be delivered by this Agreement by the Sellers at or prior to the Closing in connection with the transactions contemplated by this Agreement.

(b)     At the Closing, Buyer shall deliver to Sellers the following documents and other items, duly executed by Buyer, as applicable:

19

    i.      any and all Assignment and Assumption Agreements to which the Buyer is party;

    ii.      the Purchase Price;

    iii.      the Retention Fund;

    iv.      the Credit Bid And Release, in form reasonably satisfactory to the Sellers (including documentation reasonably acceptable to the Sellers evidencing satisfaction of the DIP Indebtedness);

    v.      the officer's certificates required to be delivered pursuant to <u>Section 7.2(e)</u>; and

    vi.      all other previously undelivered certificates, agreements and other documents required by this Agreement to be delivered by the Buyer at or prior to the Closing in connection with the Contemplated Transactions.

**Section 2.10**   <u>Allocation</u>. Within fifteen (15) calendar days after the Closing Date, Buyer shall in good faith prepare an allocation of the Purchase Price and the Retention Fund (and all capitalized costs, assumed liabilities, and other amounts treated as purchase price for U.S. federal income Tax purposes) among the Purchased Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate). Sellers shall have fifteen (15) calendar days following receipt of Buyer's proposed allocation to review and comment on such proposed allocation and Buyer shall consider such comments in good faith. Thereafter, Buyer shall provide Sellers with Buyer's final allocation schedule, and Buyer and Sellers shall report, act and file Tax Returns (including IRS Form 8594) in all respects and for all purposes consistent with such allocation. Neither Buyer nor Sellers shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with such allocation; provided that nothing contained herein shall prevent Buyer or Sellers from settling any proposed deficiency or adjustment by any Governmental Entity based upon or arising out of such allocation, and neither Buyer nor Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Entity challenging the allocation. Notwithstanding the foregoing, the Parties recognize that certain allocations of purchase price may be necessary prior to the schedule set forth above, such as in the case of any Transfer Tax filings, and the Parties agree to reasonably cooperate in determining the appropriate allocation  in a timely manner in advance of such filings and the payment of Transfer Taxes.

**Section 2.11**   <u>Withholding</u>. Buyer, the Escrow Agent and any other Person making a payment hereunder (in each case, a "<u>Payor</u>"), shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Seller or any other Person such amounts as such Payor is required to deduct and withhold under the IRC, or any applicable Law, with respect to the making of such payment.  To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

US_ACTIVE\130897759

**Section 2.12    Deposit.**

(a)    No later than one (1) Business Day after the date on which the parties enter into the Escrow Agreement, Buyer will make an earnest money deposit (the "Deposit") into escrow with the Escrow Agent in the amount equal to $3,600,000 by wire transfer of immediately available funds. The Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of any of the Sellers or Buyer and shall be applied against payment of the Purchase Price. At the Closing, the Deposit shall be delivered to the Sellers in accordance with Section 2.5(b) and the terms of the Escrow Agreement and credited toward payment of the Purchase Price.

(b)    If this Agreement has been validly terminated prior to the Closing by the Seller pursuant to Section 8.1(g) then, within three (3) Business Days after the date of such termination, Buyer and the Sellers shall jointly instruct the Escrow Agent to disburse the Deposit to the Sellers.

(c)    If this Agreement has been validly terminated prior to the Closing by any Party hereto for any reason other than as contemplated by Section 2.12(b) then, within three (3) Business Days after the date of such termination, Buyer and the Sellers shall jointly instruct the Escrow Agent to disburse the Deposit to Buyer.

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers hereby represent and warrant to Buyer as of the date hereof and as of the Closing Date that, except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"), the statements contained in this Article III are true and correct.

**Section 3.1    Organization of Sellers; Good Standing.**

(a)    Each Seller is duly organized, validly existing and in good standing under the Laws of its state of formation and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which the Business is currently being conducted. Each Seller has all requisite corporate or similar power and authority to own, lease and operate its assets and to carry on the Business as currently conducted.

(b)    Except solely as a result of the commencement of the Chapter 11 Cases, each Seller is duly authorized to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Purchased Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

(c)    None of the Sellers has any Subsidiaries (other than other Sellers, if applicable).

21

**Section 3.2    Authorization of Transaction**. Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)    each Seller has all requisite limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which a Seller is a party have been duly authorized by such Seller and no other company action on the part of any Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)    this Agreement has been duly and validly executed and delivered by each Seller, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which any Seller is a party will have been duly and validly executed and delivered by each such Seller, as applicable. Subject to approval of the Bankruptcy Court, assuming that this Agreement constitutes a valid and legally binding obligation of Buyer, this Agreement constitutes the valid and legally-binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Subject to approval of the Bankruptcy Court, assuming, to the extent that it is a party thereto, that each Related Agreement constitutes a valid and legally binding obligation of Buyer, each Related Agreement to which any Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against Sellers, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3    Noncontravention; Consents and Approvals**.

(a)    Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements), subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, (i) will conflict with or result in a breach of the certificate of formation, operating agreement or other organizational documents of any Seller, (ii) will violate any Law to which any Seller is, or its respective assets or properties are, subject, (iii) subject to the entry of the Sale Order, will conflict with any Assumed Contract or Assumed Permit, or (iv) subject to and assuming entry of the Sale Order, will conflict with, or result in any violation of or constitute a breach or default under, any order of any Governmental Entity applicable to the Sellers or any of the Purchased Assets, and, in the case of clauses (ii), (iii) and (iv) for such conflicts, breaches, violations, defaults, accelerations, rights or failures to give notice, would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    Except as set forth in Schedule 3.3(b) of the Disclosure Schedule, subject to the Sale Order having been entered and still being in effect (and not subject to any stay pending appeal at the time of Closing), no Consent, notice or filing is required to be

obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement. After giving effect to the Sale Order and any applicable order of the Bankruptcy Court authorizing the assignment and assumption of any Contract that is an Assumed Contract hereunder, no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Person that is not a Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.4    <u>Compliance with Laws</u>**.

(a)    Sellers are in compliance with all Laws applicable to the Business or the Purchased Assets in all material respects. Sellers have not received any written notice of violation of any Law with respect to any Seller, the Business or the Purchased Assets and there is no reasonable basis for the issuance of any such notice or the taking of any action for such violation.

(b)    To Sellers' Knowledge, Sellers do not engage in (a) the design, fabrication, development, testing, production or manufacture of one or more "critical technologies" within the meaning of the Defense Production Act of 1950, as amended, including all implementing regulations thereof (the "<u>DPA</u>"); (b) the ownership, operation, maintenance, supply, manufacture, or servicing of "covered investment critical infrastructure" within the meaning of the DPA (where such activities are covered by column 2 of Appendix A to 31 C.F.R. Part 800); or (c) the maintenance or collection, directly or indirectly, of "sensitive personal data" of U.S. citizens within the meaning of the DPA. The Seller has no current intention of engaging in such activities in the future.

(c)    Sellers have not, nor have they taken any action during the past two (2) years that would reasonably result in any such Person being deemed, a "foreign entity of concern" under 15 U.S.C. §4651 (including the corresponding definitional and interpretative guidance referenced therein).

**Section 3.5    <u>Title to Purchased Assets</u>**. Sellers, as of immediately prior to the Closing, have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in (subject to the effect on enforceability of (a) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law)), the Purchased Assets, free and clear of all Liens (except for Permitted Liens), subject to entry of the Sale Order. At the Closing or such time as title is conveyed under <u>Section 2.6</u>, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Liens (except for Permitted Liens), to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees

23

under section 365(n) of the Bankruptcy Code. No Person other than Sellers are engaged in the operation of, or hold rights, title and interest in (except for Permitted Liens), the Purchased Assets.

Section 3.6 **Contracts**. Schedule 3.6 of the Disclosure Schedule sets forth an accurate list, as of the date hereof, of all material Contracts, including any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof, to which a Seller is a party with respect to the Business as of the date hereof (and Sellers have made available to Buyer true and complete copies of all such Contracts). Except as set forth in Schedule 3.6 of the Disclosure Schedule, no Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract. The Assumed Contracts include all Contracts material to the ownership and/or operation of the Business. Sellers have not, and, to Sellers' Knowledge, no other party to any Assumed Contract has, commenced any action against any of the parties to any Assumed Contract or given or received any written notice of any default or violation under any Assumed Contract that has not been withdrawn or dismissed. To Sellers' Knowledge, each Assumed Contract is, or will be upon the Closing, valid, binding and in full force and effect in accordance with its terms.

Section 3.7 **Intellectual Property**.

(a) Schedule 3.7 of the Disclosure Schedule sets forth a true and complete list of (i) all Registered Intellectual Property that is owned by any Seller, (ii) all material Contracts pursuant to which any Seller obtains the right to use any Intellectual Property, excluding, specifically, shrink-wrap or off-the-shelf software and open source licenses, and (iii) all material Contracts pursuant to which any Seller grants to any other Person the right to use any Intellectual Property. Sellers own all Registered Intellectual Property free and clear of all Liens (except for Permitted Liens and subject to entry of the Sale Order), and all such Registered Intellectual Property is valid, subsisting and, enforceable, and is not subject to any outstanding Decree adversely affecting Sellers' use thereof or rights thereto.

(b) To Sellers' Knowledge and except as set forth on Schedule 3.7 of the Disclosure Schedule, none of the use of the Intellectual Property included in the Purchased Assets, the conduct of the Business as currently conducted, nor any of the products sold or services provided by Sellers or any of their Affiliates in connection therewith, infringes upon or otherwise violates the Intellectual Property of any other Person, nor has any other Person made or threatened in writing any claim of such infringement or other violation. To Sellers' Knowledge, no third party is infringing any Intellectual Property owned by any Seller and included in the Purchased Assets, except as would not reasonably be expected to have a Material Adverse Effect.

(c) Each Person who has contributed to, developed or conceived of any Intellectual Property for or on behalf of any member of the Seller either (i) has entered into a valid and enforceable written agreement pursuant to which such Person assigned to a member of the Sellers exclusive ownership of all such Person's right, title and interest in and to such Intellectual Property or (ii) contributed to, developed or conceived of such Intellectual Property in a manner such that ownership of all right, title and interest in and to such Intellectual Property automatically vested in the Sellers as a matter of applicable Law.

(d)    The Sellers have used commercially reasonable efforts to maintain and protect the confidentiality of all trade secrets and other confidential information included in the Purchased Assets, and the Sellers have not disclosed any such trade secrets or other confidential information to any third party other than to Persons subject to contractual, legal, or otherwise binding ethical obligations to maintain the confidentiality thereof, in each case other than the release of the information described on <u>Schedule 3.7(d) of the Disclosure Schedule</u> from escrows of intellectual property to existing customers (the "<u>Escrow Release</u>").  Without limiting the foregoing, other than the Escrow Release, the Sellers have not disclosed, delivered, licensed, escrowed, released, or otherwise made available, nor does any Seller have a duty or obligation (whether present, contingent, or otherwise) to disclose, deliver, license, escrow, or otherwise make available, any source code that embodies any of the Purchase Assets or that is proprietary and included in any Company Product (to any third Person (other than Persons working for or on behalf of the Sellers and subject to written and valid confidentiality obligations).

(e)    There are not, and in the past three (3) years have not been, any defects or other problems in any of the products or services from which the Sellers have derived, or are currently deriving, revenue from the sale, license, maintenance or other provision thereof ("<u>Company Products</u>"), in each case that would prevent the same from performing substantially in accordance with their user specifications or functionality descriptions (collectively, "<u>Technical Deficiencies</u>").

(f)    The computer systems, software, computer hardware (whether general or special-purpose), telecommunications, networks, servers, peripherals, and other information technology equipment that is used by the Sellers in the conduct of the Business ("<u>Business Systems</u>") are sufficient in all material respects for conduct of the Business.  In the past three (3) years, there has not been any material failure with respect to any of the Business Systems that has not been remedied or replaced in all material respects.

(g)    The Sellers have taken commercially reasonable actions to protect the security and integrity of the Business Systems and the data stored or contained therein or transmitted thereby including by implementing industry standard procedures preventing unauthorized access and the introduction of any virus, worm, Trojan horse or similar disabling code or program ("<u>Malicious Code</u>"), and the taking and storing on-site and off-site of back-up copies of critical data. There is no Malicious Code in any of the Company Products or the Business Systems, and the Company has not received any complaints from any customers related to any Malicious Code or Technical Deficiencies.

(h)    The Sellers and the conduct of the Business are in compliance in all material respects with, and have been in compliance in all material respects with all Data Security Requirements and there have not been any material actual or alleged incidents of data security breaches, unauthorized access or use of any of the Business Systems, or material unauthorized acquisition, destruction, damage, disclosure, loss, corruption, alteration, or use of any business information and all personally-identifying information and data that is processed by the Sellers or the Business Systems.

25

**Section 3.8**    **Litigation**. Other than the Chapter 11 Cases, <u>Schedule 3.8 of the Disclosure Schedule</u> sets forth all unresolved Litigation brought by or against any Seller, and to Sellers' Knowledge, there is no other Litigation threatened in writing against any Seller.

**Section 3.9**    **Employees**. All employees of Sellers are authorized to work in the United States.  Sellers have provided Buyer as of a date no earlier than five Business Days before the date of this Agreement a complete and correct list of all employees who are reasonably expected to be Current Employees by: name; title or position; status (part-time, full-time, exempt, non-exempt, etc.); whether paid on a salaried, hourly or other basis; current base salary or wage rate; current target bonus; start date; service reference date (if different from the start date); work location; vacation entitlement formula; and an indication of whether or not such employee is on leave of absence (the "<u>Employee Roster</u>").

**Section 3.10**    **Real Property**.

(a)    Sellers do not own any real property.

(b)    <u>Schedule 3.10(b) of the Disclosure Schedule</u> sets forth the address of each Leased Real Property used in connection with the Business, and a true and complete list of all Leases that are Assumed Contracts (including the date and name of the parties to such Lease document). Sellers have made available to Buyer a true and complete copy of all Leases that are Assumed Contracts (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for such Leased Real Property, as amended through the date hereof.  Except as set forth in <u>Schedule 3.10(b) of the Disclosure Schedule</u>, with respect to each of the Leases that are Assumed Contracts: (i) to Sellers' Knowledge and subject to the effect on enforceability of (A) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting creditors' rights generally and (B) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law), such Lease is legal, valid, binding, enforceable and in full force and effect in accordance with its terms; (ii) Sellers' possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed, and to Sellers' Knowledge, there are no disputes with respect to Sellers' obligations under such Lease that will not be satisfied by the Sale Order; (iii) to Sellers' Knowledge, no other party to a Lease is in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default; (iv) no security deposit or portion thereof deposited with respect such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited in full; (v) the other party to such Lease is not an Affiliate of, and otherwise does not have any economic interest in, Sellers; (vi) the Sellers have not subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; and (vii) there are no liens or encumbrances (other than Permitted Liens) on the estate or interest created by such Lease.

(c)    <u>Schedule 3.10(c) of the Disclosure Schedule</u> sets forth a description of all material Leasehold Improvements for each Leased Real Property related to the Business.

US_ACTIVE\130897759

    (d)     The Leased Real Property identified in <u>Schedule 3.10(b) of the Disclosure Schedule</u> and the Leasehold Improvements comprise all of the real property used in or otherwise related to the operation by Sellers of, the Business.

    (e)     Sellers have received no notice of any condemnation, expropriation or other proceeding in eminent domain pending or, to Sellers' Knowledge, which is threatened, affecting any real property underlying the Leased Real Property or any portion thereof or interest therein.

    (f)     To Sellers' Knowledge, no condition exists at any Leased Real Property, or at any other real property owned, leased or otherwise utilized by Sellers, that could reasonably be expected to (i) cause a fire hazard, or create conditions that could induce a battery-related fire, or (ii) result in material non-compliance with applicable fire safety codes.

    **Section 3.11**   **Tangible Personal Property**. <u>Schedule 3.11 of the Disclosure Schedule</u> sets forth all material Personal Property Leases related to the Business, and, to Sellers' Knowledge, each such material Personal Property Lease is valid and enforceable.

    **Section 3.12**   **Permits**. <u>Schedule 3.12 of the Disclosure Schedule</u> contains a list of all material Permits related to the Business that Sellers hold as of the date hereof in connection with the operations of the Business. As of the date hereof, there is no Litigation pending or, to Sellers' Knowledge, threatened in writing that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Assumed Permits, except where a failure of this representation and warranty to be so true and correct would not be material to the ownership and operation of the Business. All required filings with respect to the Assumed Permits have been made and all required applications for renewal thereof have been filed, except where a failure of this representation and warranty to be so true and correct would not be material to the ownership and operation of the Business.

    **Section 3.13**   **Purchased Inventory**.

    (a)     To Sellers' Knowledge, no Purchased Inventory is materially damaged in any significant way, except for any such damage which would not be material to the Purchased Inventory taken as a whole;

    (b)     To Sellers' Knowledge, none of the Purchased Inventory has been part of a current or past product recall, except for any such recall which would not be material to the Purchased Inventory taken as a whole;

    (c)     To Sellers' Knowledge, the Purchased Inventory is in material compliance with United States federal and applicable state guidelines for such products as of the date hereof, except for any such noncompliance which would not be material to the Purchased Inventory taken as a whole; and

    (d)     To Sellers' Knowledge, the Purchased Inventory is in working condition or in a condition fit for sale and consumption in accordance with all applicable Laws, as the

27

case may be, except for such failure to be in such condition which would not have a Material Adverse Effect on the Purchased Inventory taken as a whole.

(e)     With respect to the Purchased Inventory, Sellers have complied, in all material respects, with Title 19 of the United States Code and with all other applicable customs and import Laws and have paid all tariffs and penalties imposed upon such Seller by the U.S. Customs and Border Protection Agency, U.S. Department of Commerce, or any other U.S. or non-U.S. governmental authority on the importation of goods ("Import Duties"), and has not imported or attempted to import any goods prohibited by any applicable customs or import Laws. Seller has not received any written notice of, nor to the Seller's Knowledge is there any pending or threatened, audit, examination, investigation, or other proceeding by any governmental authority relating to any Import Duties applicable to the Purchased Inventory. The Sellers are in compliance in all material respects with all applicable Laws relating to the payment of Import Duties and the importation and exportation of goods, including all applicable recordkeeping, classification, valuation, marking, labeling, country of origin, and free trade agreement requirements, in each case, with respect to the Purchased Inventory.

**Section 3.14    Environmental Matters**.    Except as set forth in Schedule 3.14 of the Disclosure Schedule:

(a)     Each Seller is, and has been during the prior two (2) years, in compliance in all material respects with all applicable Environmental Laws, which compliance has included obtaining and maintaining all Permits, licenses and authorizations required under applicable Environmental Laws;

(b)     No Seller has received during the prior two (2) years written notice from any Governmental Entity or third party regarding any actual or alleged violation of or Liability under Environmental Laws;

(c)     To Sellers' Knowledge, no Hazardous Substance has been released at any current or former Leased Real Property, or other real property, by Sellers in violation of any Environmental Law;

(d)     Sellers have made available to Buyer copies of all material environmental audits, assessments and reports in its possession relating to Sellers, any actual or potential Liabilities under Environmental Laws and the Leased Real Property; and

(e)     This Section 3.14 contains the sole and exclusive representations and warranties of Sellers with respect to any environmental, health or safety matters, including any arising under any Environmental Law or with respect to any Hazardous Substance.

**Section 3.15    Brokers' Fees**.    Except for amounts due to Huron Transaction Advisory LLC (which amounts are to be paid by the Seller), no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated to pay.

US_ACTIVE\130897759

**Section 3.16**   **No Other Agreements to Purchase**. Sellers have not entered into any agreement with any other Person (written or oral) which grants such third party the right or option purchase or acquire from Sellers any Purchased Asset, other than purchase orders for Purchased Inventory accepted by Sellers in the Ordinary Course of Business.

**Section 3.17**   **Taxes**.

(1)      Each Seller has duly and timely filed all income and other material Tax Returns that it was required to file, and all such filed Tax Returns were true, correct and complete in all material respects. All material Taxes owed by the Sellers and all material Taxes owed with respect to the Purchased Assets (in each case, whether or not shown on any Tax Return) have been paid. In the last three (3) years, no claim has been made in writing by a Governmental Entity in a jurisdiction where the Sellers do not file Tax Returns that the Sellers or the Business is or may be subject to taxation by that jurisdiction.

(2)      There is no audit, dispute, claim or controversy concerning any Tax Liability or Tax Return of Sellers or with respect to the Purchased Assets or the Business in progress or pending by any taxing authority.  No Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency that could result in a Lien on the Purchased Assets or the imposition of any liability for Taxes on Buyer, its direct or indirect equityholders, or their Affiliates.

(a)      There are no Liens on any Purchased Asset or the Business for Taxes (other than for current Taxes not yet due and payable).

(3)      No Seller is party to any Tax sharing, Tax allocation or Tax indemnity agreement, except for (i) any such agreement solely between the Sellers or (ii) customary gross-up or indemnification provisions in commercial agreements entered into in the ordinary course of business, the primary subject matter of which is not related to Taxes, in each case that would be binding on the Buyer.

(4)      No Seller has participated in any "reportable transaction" within the meaning of Treasury Regulation section 1.6011-4(b).

(5)      Each Seller has collected or withheld all material Taxes required to have been collected or withheld (including from payments made to employees, independent contractors, creditors, stockholders and other Persons) and such collected and withheld Taxes have been or will be duly paid to the proper Governmental Entity, and each of the Seller has complied in all material respects with all Laws relating to withholding, including any reporting and record keeping requirements.

(6)      Each Seller has collected all material amounts of sales and use Taxes required to be collected, and has remitted, or will remit on a timely basis, such amounts to the appropriate Governmental Entity, or has been furnished properly completed exemption certificates and has, in all material respects, maintained all such records and supporting documents in the manner required by all applicable sales and use Tax statutes and regulations.

29

(b)    Powin is classified as a partnership for U.S. federal income Tax purposes, and each other Seller is classified as an entity disregarded from its owner for U.S. federal income Tax purposes, and Powin and each other Seller have been so classified since the date of their formations, respectively.  No Seller has filed any election or taken any other action to be classified as an association taxable as a corporation for U.S. federal income Tax purposes.

(c)    No Purchased Asset represents an interest in a partnership or other entity for any applicable Tax purpose.

(g)    Sellers are not foreign persons within the meaning of section 1445 of the IRC.

**Section 3.18    No Other Representations or Warranties**. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), NEITHER A SELLER NOR ANY OTHER PERSON MAKES (AND BUYER IS NOT RELYING UPON) ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE BUSINESS, THE PURCHASED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY PURCHASED ASSET), THE ASSUMED LIABILITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), EACH SELLER EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS OR THE PURCHASED ASSETS BY BUYER AFTER THE CLOSING). THE DISCLOSURE OF ANY MATTER OR ITEM IN THE DISCLOSURE SCHEDULE SHALL NOT BE DEEMED TO CONSTITUTE AN ACKNOWLEDGMENT THAT ANY SUCH MATTER IS REQUIRED TO BE DISCLOSED OR IS MATERIAL OR THAT SUCH MATTER WOULD RESULT IN A MATERIAL ADVERSE EFFECT.

BUYER HAS PERFORMED AN INDEPENDENT INVESTIGATION, ANALYSIS, AND EVALUATION OF THE PURCHASED ASSETS.

THE PROVISIONS OF THIS SECTION 3.18 SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT AND SHALL BE INCORPORATED INTO THE CLOSING DOCUMENTS TO BE DELIVERED AT CLOSING.

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows as of the date hereof and as of the Closing Date:

**Section 4.1**     **Organization of Buyer**. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2**     **Authorization of Transaction**.

(a)     Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)     The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c)     This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. To the extent this Agreement constitutes a valid and legally-binding obligation of Sellers, this Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. To the extent each Related Agreement constitutes a valid and legally-binding obligation of each Seller party thereto, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3**     **Noncontravention**. Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the assignments and assumptions referred to in Section 2.6) will (i) conflict with or result in a breach of the certificate of formation, operating agreement, or other organizational documents, of Buyer, (ii) subject to any consents required to be obtained from any Governmental Entity, violate any Law to which Buyer is, or its assets or properties are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations or rights as

31

would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements. Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity in order for the Parties to consummate the transactions contemplated by this Agreement or any of the Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements.

     **Section 4.4**   **Litigation**. There are no Litigation pending or, to Buyer's knowledge, threatened against or affecting Buyer that will adversely affect Buyer's performance under this Agreement or the consummation of the transactions contemplated by this Agreement.

     **Section 4.5**   **Adequate Assurances Regarding Executory Contracts**. Buyer will be capable of satisfying as of the Sale Hearing (i) its obligations under this Agreement and (ii) the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

     **Section 4.6**   **Brokers' Fees**. Buyer has not entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which any Seller could become liable or obligated to pay.

     **Section 4.7**   **No Outside Reliance**. Notwithstanding anything contained in this <u>Article IV</u> or any other provision of this Agreement the contrary, Buyer acknowledges and agrees that the representations and warranties made by the Sellers to Buyer in <u>Article III</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "<u>Express Representations</u>") are the sole and exclusive representations, warranties, and statements of any kind made by Sellers to Buyer in connection with the transactions contemplated by this Agreement. Buyer acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations), that certain datasite administered by SmartRoom (the "<u>Dataroom</u>"), any projections, meetings, calls or correspondence with management of Sellers and their Representatives, or any other Person on behalf of Sellers or any of their respective Affiliates or Representatives and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, and prospects of Sellers, or the quality, quantity or condition of Sellers assets, are, in each case, specifically disclaimed by Sellers and that Buyer has not relied on any such representations, warranties or statements. Buyer will accept the Purchased Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" and "WITH ALL FAULTS."

**ARTICLE V**
**PRE-CLOSING COVENANTS**

32

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

**Section 5.1    Notices and Consents.**

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third party Consents or sublicenses; provided, however, that neither Seller nor Buyer shall be required to incur any Liabilities or provide any financial accommodation, in order to obtain any such third party Consent with respect to the transfer or assignment of any Purchased Asset.

(b)    Sellers and Buyer shall cooperate with one another (i) in promptly determining whether any filings are required to be or should be made or consents, approvals, Permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and (ii) in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, Permits, authorizations, approvals or waivers; provided, however, that Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

(c)    To the extent permitted by applicable Law and the terms of the Purchased Assets, in the event any third party Consent has not been obtained by the Closing, at the Buyer's request, the Party contemplated to be transferring such Purchased Asset under this Agreement (the "Transferring Party") shall hold in trust for the Buyer, as applicable, the relevant Purchased Asset until the earlier of such time as (i) the third party Consent is obtained, (ii) the Chapter 11 Cases are closed or dismissed or (iii) Buyer elects not to assume such Purchased Asset.

(d)    Subject to the terms and conditions set forth in this Agreement and applicable Law, Buyer and Sellers shall (i) promptly notify the other Party of any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the Contemplated Transactions, (ii) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the transactions contemplated by this Agreement and consider in good faith the other Party's reasonable comments, (iii) not participate in any substantive meeting or discussion with any Governmental Entity in respect of any filing, investigation, or inquiry concerning this Agreement and the transactions contemplated by this Agreement unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to attend, and (iv) furnish the other Party with copies of all correspondences, filings, and written communications between them and their Subsidiaries and Representatives, on the one hand, and any Governmental Entity or its respective staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement, provided, however, that any materials or information provided pursuant to any

33

provision of this Section 5.1(d) may be redacted before being provided to the other Party (A) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (B) financing arrangements, (C) as necessary to comply with contractual arrangements, and (D) as necessary to address reasonable privilege or confidentiality issues. Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any commercially or competitively sensitive material provided to the other under this Section 5.1(d) as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be). Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any third party has any objection to the Agreement on antitrust or anti-competitive grounds.

**Section 5.2**     **Bankruptcy Actions**.

(a)     The Sellers shall have filed the Sale Motion no later than July 1, 2025, which motion shall seek the Bankruptcy Court's: (i) entry of the Sale Procedures Order by no later than July 16, 2025, (ii) entry of the Sale Order by no later than the Sale Order Deadline.

(b)     Sellers will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers relating to the transactions contemplated by this Agreement prepared by Sellers or any Affiliates (including forms of orders and notices to interested parties) prior to the filing thereof in the Chapter 11 Cases. All motions, applications, and supporting papers prepared by Sellers and relating to the transactions contemplated by this Agreement to be filed on behalf of Sellers after the date hereof must be approved in form and substance by Buyer.

(c)     Each of Buyer and Sellers shall continue to act in good faith and without any improper conduct, including collusion or fraud of any kind.

(d)     Each of Buyer and Sellers will promptly take such actions as are reasonably requested by the other Party to assist in obtaining entry of the Sale Order and the Sale Procedures Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Sellers of their obligations under this Agreement and the Related Agreements and demonstrating that Buyer is a good faith buyer under Section 363(m) of the Bankruptcy Code.

(e)     Pursuant to the terms of the proposed Sale Procedures Order, Sellers will, among other things, solicit bids from other prospective purchasers for the sale of all or substantially all of the Purchased Assets on terms and conditions substantially the same in all respects to this Agreement (or more favorable terms to Sellers) and in accordance with the procedures set forth in the proposed Sale Procedures Order, and Sellers shall adhere to those procedures. The Sellers and Buyer agree, and the Sale Procedures Order shall reflect the fact that, the provisions of this Agreement are reasonable, were a material inducement

34

to the Buyer to enter into this Agreement and are designed to achieve the highest or best offer for the Purchased Assets.

(f)     Sellers shall use commercially reasonable efforts to provide appropriate notice of the hearings on the Sale Motion to all Persons entitled to notice, including, but not limited to, all Persons that have asserted Liens in the Purchased Assets, all parties to the Assumed Contracts and all Taxing authorities in jurisdictions applicable to Sellers and as otherwise required by the Bankruptcy Code and bankruptcy rules.

(g)     Sellers shall serve a cure notice by first class mail on all non-debtor counterparties to all Non-Real Property Contracts and Leases as required by the Sale Procedures Order and provide a copy of the same to Buyer.

**Section 5.3     Conduct of Business**. Until the earlier of the termination of this Agreement and the Closing, subject to the terms and conditions of the DIP Order and the DIP Budget, and except as expressly contemplated by this Agreement or as set forth on <u>Schedule 5.3</u>, or required under the Bankruptcy Code or other applicable Law and except with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed), subject to the Chapter 11 Cases (including authorization provided by the Bankruptcy Court in such Chapter 11 Cases):

(a)     Sellers shall comply with the DIP Order in all material respects;

(b)     Sellers shall use commercially reasonable efforts to conduct the Business in the Ordinary Course of Business, and operate and maintain, preserve and protect all of the Purchased Assets in the condition in which they exist on the date hereof, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business;

(c)     Sellers shall use commercially reasonable efforts not to take, or agree to or commit to assist any other Person in taking, any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

(d)     Except as permitted by this Agreement, no Seller shall, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Purchased Assets, other than up to $500,000 in the aggregate in the Ordinary Course of Business;

(e)     No Seller shall, directly or indirectly, permit, offer, agree or commit to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Lien or Claim except for Permitted Liens;

(f)     No Seller shall assume, reject or assign any (i) Contract that may become an Assumed Contract other than (A) through the assumption and assignment of the Assumed Contracts, as contemplated by this Agreement, to Buyer, and (B) through the rejection, if approved by the Bankruptcy Court, of the Contracts that are the subject of the

35

*Omnibus Motion for Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief* filed at Docket Number 88, or (ii) Lease;

(g)     No Seller shall enter into new Contracts or amend or modify Contracts, and no Seller shall amend, modify, extend, renew or terminate any Lease, nor enter into any new Lease;

(h)     No Seller shall remove or permit to be removed from any building, facility, or real property any Purchased Asset or any Purchased Inventory (other than the sale of Purchased Inventory in the Ordinary Course of Business);

(i)     No Seller shall return Purchased Inventory with an aggregate value of more than $5,000 to any single vendor unless defective;

(j)     No Seller shall enter into any commitment with respect to remodeling, except as required by the terms of any Lease for Leased Real Property;

(k)     Sellers shall make all post-petition payments related to Assumed Contracts that become or became due or payable pursuant to the terms thereof to the extent provided in the DIP Budget;

(l)     Sellers shall comply in all material respects with all material Laws applicable to them or having jurisdiction over the Business or any Purchased Asset;

(m)     No Seller shall, directly or indirectly, cancel, forgive or compromise any material debt or claim or waive or release any material right of any Seller, in each case that constitutes a Purchased Asset;

(n)     Sellers shall maintain in full force and effect each Assumed Permit held by any Seller as of the date hereof or otherwise obtained by any Seller prior to the Closing, and shall comply in all material respects with the terms of each such Permit and no Seller shall permit any such Permit to terminate, expire or lapse other than in the Ordinary Course of Business;

(o)     Sellers shall, in all material respects (i) conduct the Business in the Ordinary Course of Business, (ii) use commercially reasonable efforts to preserve the existing business organization and keep management of the Business intact, (iii) use commercially reasonable efforts to keep available the services of the Current Employees, to the extent reasonably feasible, and (iv) use commercially reasonable efforts to maintain the existing relations with customers, carriers, suppliers, creditors, business partners, Current Employees and others having business dealings with the Business, to the extent reasonably feasible;

(p)     No Seller shall (i) dispose, sell, assign, transfer, license, agree not to assert, abandon or permit to lapse any material Intellectual Property owned by Sellers, (ii) disclose any trade secrets or other confidential information to any third party; and

36

(q)    No Seller shall (i) make, change or revoke any Tax election, (ii) change an annual accounting period, (iii) adopt or change any accounting method with respect to Taxes, (iv) file any amended Tax Return, (v) enter into any closing agreement, (vi) settle or compromise any Tax claim or assessment, or (vii) consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to Taxes, in each case (i) through (vii), to the extent such action could be reasonably expected to increase the amount of Taxes attributable to the Purchased Assets or the Business in a Post-Closing Tax Period; furthermore, no Seller shall file any Tax election or take any other action which, in each case, could cause such Seller to change in entity Tax classification.

Nothing contained in this Agreement is intended to give Buyer or its Affiliates, directly or indirectly, the right to control or direct the business of Sellers prior to the Closing.

**Section 5.4    Notice of Developments**. From the date hereof until the Closing Date, each of the Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing (in the form of an updated Disclosure Schedule, if applicable) after attaining knowledge (as applicable to each of Sellers and Buyer) of any real or alleged failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.4 shall not limit or otherwise affect the remedies available to the Party receiving such notice under this Agreement if such Party objects to the disclosures contained in such notice within five (5) days of receipt of such notice.

**Section 5.5    Access**.  Upon reasonable advance written request by Buyer, Sellers shall permit Buyer and its Representatives to have reasonable access to, and make reasonable investigation of, during normal business hours, subject to the terms of Leases and in a manner so as not to interfere unreasonably with the normal business operations of Sellers, to all of the books and records, premises, properties, personnel, Records, Contracts, customers, businesses, assets, accountants, auditors, counsel and operations of the Sellers related to the Business; provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law. Sellers shall cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Buyer and Buyer's Representatives in connection with such investigation and examination, and Buyer and its Representatives shall cooperate with Sellers and their respective Representatives and shall use their reasonable efforts to minimize any disruption to the Business.  Without limiting the foregoing, Powin's management team shall be available for meetings with Buyer within two (2) Business Days of any request for such a meeting by Buyer.

**Section 5.6    Press Releases and Public Announcements**.  After notice to and consultation with Buyer, Sellers shall be entitled to disclose, only to the extent required by applicable Law or by order of the Bankruptcy Court, this Agreement and all information provided by Buyer in connection herewith to the Bankruptcy Court, the United States Trustee, the Committee, parties in interest in the Chapter 11 Cases. Other than statements made in the Bankruptcy Court (or in pleadings filed therein), no Party shall issue (prior to, on or after the Closing) any press release or make any public statement or public communication without the prior

written consent of the other Parties, which shall not be unreasonably withheld or delayed; provided, however, Sellers, without the prior consent of Buyer, may (i) make any such public announcement in connection with the Auction after having provided Buyer at least one (1) Business Day to review and comment on such release or announcement (which comments shall be reasonably considered by the Seller) and (ii) communicate with its and its Affiliates' investors and potential investors relating to the transactions contemplated by this Agreement.

Section 5.7    **Bulk Transfer Laws**. Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the non-compliance therewith. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens on the Purchased Assets (other than Permitted Liens), including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

Section 5.8    **Release of Claims**. Notwithstanding anything contained herein to the contrary (including any restriction contained in Section 5.3) prior to the Closing, the Sellers shall deliver to Buyer and the DIP Secured Parties, a full, irrevocable and unconditional release of any and all claims, actions, refunds, causes of action, choses in action, actions, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against Buyer, the DIP Secured Parties and their respective current and former officers, directors, stockholders, employees, agents, representatives, attorneys, investors, parents, predecessors, Subsidiaries, successors, assigns, and Affiliates, each of the foregoing in their capacity as such (individually and collectively, the "Buyer Released Parties"), from all actions, causes of action, damages, claims, and demands whatsoever, in law or in equity, known or unknown, contingent or liquidated, whether direct claims or for indemnification or contribution, that the Sellers ever had, now has, or may have against the Buyer Released Parties in connection with any event, conduct or circumstance occurring prior to the Closing.

**ARTICLE VI**
**OTHER COVENANTS**

The Parties agree as follows with respect to the period from and after the Closing:

Section 6.1    **Cooperation**. Each of the Parties shall cooperate with each other and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.

Section 6.2    **Further Assurances**. In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of

sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Purchased Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this <u>Section 6.2</u>, to the extent that either Buyer or Sellers discovers any additional assets or properties which the Parties mutually agree should have been transferred or assigned to Buyer as Purchased Assets but were not so transferred or assigned, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer.

**Section 6.3    Availability of Business Records**. From and after the Closing, Buyer shall promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Purchased Assets for periods prior to the Closing to the extent such access is necessary in order for Sellers (as applicable) to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) six (6) years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (iv) in the case of Records related to Taxes, the expiration of the statute of limitation applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Sellers have the right to retain originals or copies of all of Records included in the Purchased Assets for periods prior to the Closing. Prior to destroying any Records included in the Purchased Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense. With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Sellers may request in defending or prosecuting such Litigation or claim and shall make available to Sellers such personnel as are most knowledgeable about the matter in question, all without charge.

**Section 6.4    Employee Matters**.

(a)    Within twenty (20) Business Days prior to Closing, Sellers will update the Employee Roster. Prior to Closing, Buyer may offer employment to certain of the Current Employees to support the continuation of the Business, at its sole discretion (each, an "<u>Offeree</u>"), on such employment terms as Buyer may determine in its sole discretion.

(b)    Following the date of this Agreement:

i.    Sellers will allow Buyer or any of its Representatives reasonable access upon reasonable advance notice to meet with and interview the individuals listed on the Employee Roster during normal business hours;

ii.    Sellers shall not, nor shall any Seller authorize or direct or give express permission to any Affiliate, officer, director or employee of any Seller or any Affiliate, to (A) interfere with Buyer's or its Representatives' rights under

Section 6.4(a) to make offers of employment to any Offeree, or (B) solicit or encourage any Offeree not to accept, or to reject, any such offer of employment;

iii.    Sellers shall provide reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such Representative with respect to its determination of terms and conditions of employment for any Offeree; and

iv.    Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable on or prior to the Closing Date with respect to all employees of Sellers. Sellers shall withhold and remit all applicable payroll Taxes as required by Law on or prior to the Closing Date with respect to all employees of Sellers as of such date.

(c)    Nothing in this Section 6.4 shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring Buyer to continue any specific employee benefit plan or to continue the employment of any specific person. Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' employee benefit plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Current Employee, Offeree or upon any other person, other than the Parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

**Section 6.5    Transfer Taxes**. To the extent not exempt under section 1146 of the Bankruptcy Code, Buyer shall pay all Transfer Taxes. Sellers and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence.

**Section 6.6    Property Taxes**. Sellers shall be responsible for and shall promptly pay when due all Property Taxes levied with respect to the Purchased Assets attributable to the Pre-Closing Tax Period, in accordance with applicable Law.  All Property Taxes levied with respect to the Purchased Assets for the Straddle Period shall be apportioned between Buyer and Sellers based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period.  Sellers shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period. Upon receipt of any bill for such Property Taxes, Buyer or Sellers, as applicable, shall present a statement to the other setting forth the amount of reimbursement to which each is entitled under this Section 6.6 together with such supporting evidence as is reasonably necessary to calculate the proration amount.  The proration amount shall be paid by the party owing it to the other within ten (10) days after delivery of such statement.  In the event that Buyer or Sellers makes any payment for which it is entitled to reimbursement under this Section 6.6, the applicable party shall make such reimbursement promptly but in no event later than ten (10) days after the presentation of a statement setting forth the amount of reimbursement

to which the presenting party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.

**Section 6.7** <u>**Insurance Policies**</u>. Other than as provided in <u>Section 2.2(l)</u> above, upon Closing, the Sellers shall cause the assignment of all rights of the Sellers in and to all insurance coverage provided in relation to Sellers and the Purchased Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) to the Buyer as soon as reasonably practicable (and in no event within forty-five (45) days following the Closing).

**Section 6.8** <u>**Collection of Accounts Receivable**</u>.

(a)     As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to any Seller relating to the Business or the Purchased Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to accounts receivable relating to work performed by Buyer after the Closing made payable or endorsed to any Seller or Sellers' order, for Buyer's own account.

(b)     As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to accounts receivable relating to work performed by Buyer after the Closing shall be held in trust by such Seller for Buyer's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall pay over to Buyer or its designee the amount of such payments. In addition, Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Sellers, from time to time as and when received by Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that Buyer or its Affiliates may receive on or after the Closing which properly belongs to Sellers hereunder, including any Excluded Assets.

(c)     As of the Closing Date, Buyer shall have the sole authority to bill and collect accounts receivable relating to work performed by Buyer after the Closing.

**Section 6.9** <u>**Fiduciary Obligations**</u>. Without limiting the rights of Buyer under this Agreement and rights to receive the Breakup Fee and Expense Reimbursement pursuant to Section 8.3, nothing in this Agreement will require Sellers or any of their respective managers to take any action, or to refrain from taking any action, to the extent any such manager determines, in good faith, upon the advice of counsel, that taking or failing to take such action is required in order for such manager to comply with its fiduciary obligations under applicable Law. Without limiting the rights of Buyer in this Agreement and rights to receive the Breakup Fee and Expense Reimbursement pursuant to <u>Section 8.3</u>, for the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy, including an Alternate Transaction, that, in the good faith and business judgment of the managers of any Seller, upon the advice of counsel, is required in order for such manager to comply with its fiduciary duties under applicable Law to maximize the value of their businesses and estates; provided that Sellers must use their reasonable

41

best efforts to respond promptly to information requests from Buyer relating to any Alternate Transaction.

     **Section 6.10**   <u>Covenant Not to Sue</u>.  Buyer hereby covenants and agrees that it is not acquiring rights to, and shall not have the right to bring suit or otherwise assert, or assign, any claims before any court, arbitrator, mediator or administrative agency anywhere in the world against Sellers' current or former officers, directors, managers or independent managers; provided, that Buyer retains all rights to enforce this Agreement. Buyer further covenants and agrees that it shall not assign the customer claims included in the IP and Customer Claims. With respect to officers, managers or directors who are hired by Buyer, such individuals shall be released by Sellers at Closing for pre-Closing actions.

**ARTICLE VII**
**CONDITIONS TO CLOSING**

**Section 7.1**   <u>Conditions to Buyer's Obligations</u>.

     Subject to <u>Section 7.3</u>, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Sellers and the Buyer in whole or in part to the extent permitted by applicable Law):

     (a)     as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in <u>Section 3.1</u>, <u>Section 3.2</u> or <u>Section 3.3</u> shall be true and correct in all respects other than *de minimis* exceptions, and (ii) each other representation or warranty set forth in <u>Article III</u> shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; <u>provided</u>, <u>however</u>, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

     (b)     Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by <u>Section 2.9(a)</u> to be delivered to Buyer (or tendered subject only to Closing);

     (c)     no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

     (d)     the amount of Cure Amounts paid with respect to the Assumed Contracts set forth on <u>Schedule 2.3(a)</u> as of the date of this Agreement does not, in the aggregate, exceed the Cure Amount Caps;

42

(e)     Buyer shall have received all of the Consents from third parties (including any Governmental Entities) and Permits listed on <u>Schedule 7.1</u> (as the same may be revised, amended or modified by the Buyer in its sole discretion up until the Auction);

(f)     the Sale Order shall have been entered by the Bankruptcy Court and shall be a Final Order (unless such Final Order requirement is waived by the Buyer);

(g)     no Event of Default (as defined in the DIP Order) shall have occurred and be continuing under the DIP Order;

(h)     The DIP Order shall have been approved and shall not have been terminated; and

(i)     Sellers shall have delivered a certificate from an authorized officer of Sellers to the effect that each of the conditions specified in <u>Section 7.1(a)</u> and <u>Section 7.1(b)</u> has been satisfied.

**Section 7.2     <u>Conditions to Sellers' Obligations</u>**. Subject to <u>Section 7.3</u>, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Sellers and the Buyer in whole or in part to the extent permitted by applicable Law):

(a)     as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in <u>Section 4.1</u>, <u>Section 4.2</u> or <u>Section 4.3</u> shall be true and correct in all respects other than *de minimis* exceptions, and (ii) each other representation or warranty set forth in <u>Article IV</u> shall be true and correct in all material respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions or by any Related Agreement; <u>provided</u>, <u>however</u>, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)     Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by <u>Section 2.9(b)</u> to be delivered to Sellers (or tendered subject only to Closing);

(c)     no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)     the Sale Order shall have been entered by the Bankruptcy Court and shall be a Final Order (unless such Final Order requirement is waived by the Buyer); and

43

(e)     Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> has been satisfied.

**Section 7.3     <u>No Frustration of Closing Conditions</u>**. Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in <u>Section 7.1</u> or <u>Section 7.2</u>, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

**Section 7.4     <u>Waiver of Conditions</u>**.  Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.

**ARTICLE VIII**
**TERMINATION**

**Section 8.1     <u>Termination of Agreement</u>**.  This Agreement may be terminated in accordance with this <u>Article VIII</u> and the Contemplated Transactions abandoned at any time prior to the Closing (each a "<u>Termination Event</u>"):

(a)     by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

(b)     by written notice of either Buyer or Sellers, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or upon the issuance by any Governmental Entity of a Decree restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Decree having become final, binding and non-appealable; provided that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Decree was caused by the breach or action or inaction of such Party;

(c)     by written notice of either Buyer or Sellers, if the Closing shall not have occurred on or before the Outside Date;

(d)     by written notice of either Buyer or Sellers, if any of the Chapter 11 Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Sellers is appointed in the Chapter 11 Cases;

(e)     by Buyer, if (i) the Sale Procedures Order shall not have been entered by the Bankruptcy Court on or before July 16, 2025, (ii) the Auction has not concluded by midnight August 1, 2025, (iii) the Sale Order shall not have been entered by the Bankruptcy Court on or before August 7, 2025, (iv) at any time after entry of the Sale Procedures Order,

44

such Sale Procedures Order (including, without limitation, the provisions therein relating to the bid protections) is reversed, stayed, vacated or otherwise modified by the Bankruptcy Court, or (v) at any time after entry of the Sale Order, such Sale Order is reversed, stayed, vacated or otherwise modified;

(f)     by Buyer by giving written notice to Sellers at any time prior to Closing in the event Sellers have breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Sections 7.1(a) and 7.1(b) hereof, as the case may be, would not then be satisfied at the time of such breach, Buyer has notified Sellers of the breach, and the breach has continued without cure for the earlier of (i) ten (10) days following the proposed Closing Date so long as all other conditions of Buyer have been satisfied or (ii) for a period of thirty (30) days after the notice of the breach, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Buyer;

(g)     by Sellers by giving written notice to Buyer at any time prior to Closing in the event Buyer has breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Sections 7.2(a) and 7.2(b) hereof, as the case may be, would not then be satisfied at the time of such breach, Sellers have notified Buyer of the breach, and the breach has continued without cure for the earlier of (i) ten (10) days following the proposed Closing Date so long as all other conditions of Buyer have been satisfied or (ii) for a period of thirty (30) days after the notice of the breach, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants hereof to be performed or complied with by them prior to the Closing, and such condition is not waived by Sellers;

(h)     by written notice from Sellers to Buyer, if all of the conditions set forth in Section 7.1 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Buyer fails to complete the Closing at the time required by Section 2.8;

(i)     by Buyer if (i) any Seller withdraws the Sale Motion, (ii) any Seller moves to voluntarily dismiss the Chapter 11 Cases, (iii) any Seller moves for conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iv) any Seller moves for appointment of an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code or a trustee in the Chapter 11 Cases, (v) Buyer is not selected as the Successful Bidder or Back-Up Bidder at the conclusion of the Auction, (vi) Buyer has been selected as Back-Up Bidder and the Back-Up Termination Date has occurred, or (vii) there is in effect a Final Order of a Governmental Authority of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the transactions;

(j)     by written notice from Buyer to the Sellers upon the occurrence of any Default or Event of Default (as defined in the DIP Order or any DIP Loan Documents);

(k)     by Buyer if any secured creditor of any Seller obtains relief from the stay to foreclose on a material portion of the Purchased Assets;

45

(l)     by Buyer if any Affiliates of the Sellers that, directly or indirectly through one or more intermediaries, controls Sellers, files for relief pursuant to the Bankruptcy Code;

(m)     by Buyer if Sellers enter into a definitive agreement with respect to an Alternate Transaction; or

(n)     automatically and without any action or notice by Sellers to Buyer, or Buyer to Sellers, immediately upon:

i.     approval by the Bankruptcy Court of Alternate Transaction, unless Buyer is a Back-Up Bidder under the Sale Procedures Order with respect to such Alternate Transaction; or

ii.     the consummation of an Alternate Transaction.

Notwithstanding anything to the contrary contained herein, (i) in no event may Buyer terminate this Agreement under Section 8.1(f) on account of Buyer's failure to satisfy the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to any proposed Assumed Contract, and (ii) a Party shall not be permitted to terminate this Agreement pursuant to this Article VIII if the applicable Termination Event was caused by the breach of such Party or such Party's gross negligence, willful misconduct, or bad faith.

Section 8.2     **Procedure upon Termination**. In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

Section 8.3     **Breakup Fee and Expense Reimbursement**.

(a)     In consideration of Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Purchased Assets, and to compensate Buyer as a stalking horse bidder, (i) if this Agreement is terminated by Buyer pursuant to Section 8.1(f), 8.1(i) or 8.1(m), (ii) if this Agreement is terminated by Buyer or Sellers pursuant to Section 8.1(c) at a time when Buyer would have been permitted to terminate pursuant to Section 8.1(f), 8.1(i) or 8.1(m); (iii) if this Agreement is terminated pursuant to Section 8.1(n); (iv) upon consummation of an Alternate Transaction, or (v) if, at any time, the Bankruptcy Court issues an order approving the termination of this Agreement by Sellers in order to allow the respective boards of directors of Sellers to fulfill their respective fiduciary duties under applicable Law, then, in each case of the foregoing clauses (i) – (v), Sellers shall immediately pay to Buyer the Breakup Fee and the Expense Reimbursement.

(b)     Sellers' obligation to pay the Breakup Fee and Expense Reimbursement pursuant to this Section 8.3 shall survive termination of this Agreement and shall constitute superpriority administrative expense Claims against each of the Sellers under section 503(b) of the Bankruptcy Code.

US_ACTIVE\130897759

(c)     The Sellers acknowledge and agree that (i) the payment of the Breakup Fee and Expense Reimbursement is an integral part of the transactions contemplated by this Agreement, (ii) in the absence of the Sellers' obligations to make this payment, the Buyer would not have entered into this Agreement, (iii) time is of the essence with respect to the payment of the Breakup Fee and Expense Reimbursement and (iv) the Breakup Fee and Expense Reimbursement shall constitute part of the DIP Indebtedness and shall be secured by the DIP Lien (as defined in the DIP Order) on the Collateral (as defined in the DIP Order) and be entitled to the other DIP Protections (as defined in the DIP Order). If the Sellers fail to take any action necessary to cause the delivery of the Breakup Fee and Expense Reimbursement under circumstances where the Buyer is entitled to the Breakup Fee and Expense Reimbursement and, in order to obtain such Breakup Fee or Expense Reimbursement the Buyer commences a suit which results in a judgment in favor of the Buyer, the Sellers shall pay to the Buyer, in addition to the Breakup Fee and Expense Reimbursement, an amount in cash equal to the costs and expenses (including reasonable attorney's fees) incurred by the Buyer in connection with such suit.

(d)     The Parties further acknowledge that the damages resulting from termination of this Agreement under circumstances where Buyer is entitled to the Breakup Fee are uncertain and incapable of accurate calculation and that the delivery of the Breakup Fee to the Buyer is not a penalty but rather shall constitute liquidated damages in a reasonable amount that will compensate the Buyer in the circumstances where the Buyer is entitled to the Breakup Fee for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Contemplated Transactions, and that, without these agreements, the Buyer would not enter into this Agreement.

**Section 8.4     Effect of Termination**. In the event that this Agreement is validly terminated pursuant to a right of termination as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to Buyer or the Sellers; provided, however, that Section 8.1, Section 8.2, Section 8.3 this Section 8.4, Article IX and the Sale Procedures Order (if entered), and in each case the rights and obligations of each of the Parties thereunder, shall survive any such termination and shall be enforceable hereunder. In no event shall any termination of this Agreement relieve any Party hereto of any Liability for any breach of this Agreement by such Party.

**ARTICLE IX
MISCELLANEOUS**

**Section 9.1     Remedies**. The Parties recognize that if a Party breaches or refuses to perform any of their covenants set forth in this Agreement, monetary damages alone would not be adequate to compensate the non-breaching Party for their injuries. The non-breaching Party shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants. If any Litigation is brought by the non-breaching Party to enforce such covenants, the breaching Party shall waive the defense that there is an adequate remedy at Law. The Parties agree to waive any requirement for the security or posting of any bond in connection with any Litigation seeking specific performance

47

of, or to enjoin the violation of, such covenants. The Parties agree that the only permitted objection that they may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

**Section 9.2**   **Expenses**. Except as otherwise provided in this Agreement, the DIP Order, the DIP Loan Agreements or a Related Agreement, the Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

**Section 9.3**   **Entire Agreement**. This Agreement (including the schedules and exhibits hereto and other documents specifically referred to herein) and the Related Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof.

**Section 9.4**   **Incorporation of Schedules, Exhibits and Disclosure Schedule**. The schedules, appendices and exhibits to this Agreement, the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

**Section 9.5**   **Amendments and Waivers**. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

**Section 9.6**   **Succession and Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that Buyer shall be permitted to assign any of its rights hereunder to one or more of its Affiliates, as designated by Buyer in writing to Sellers; provided, however, Buyer shall remain liable for all of its obligations under this Agreement after any such assignment; provided, further, that Sellers shall be permitted to assign any of their rights hereunder pursuant to a confirmed chapter 11 plan or pursuant to an order of the Bankruptcy Court.

48

**Section 9.7**     **Notices**. All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Sellers, then to:

> Brian Kane
> Chief Executive Officer
> 20550 SW 115th Ave.
> Tualatin, OR 97062
> Email: brian.kane@powin.com

with a copy to:

> Van C. Durrer, II
> Tania M. Moyron
> Dentons US LLP
> 601 S. Figueroa Street
> Suite 2500
> Los Angeles, CA 90017-5704
> Email: van.durrer@dentons.com
>     tania.moyron@dentons.com

If to Buyer, then to:

> FlexGen Power Systems, LLC
> 280 S. Mangum Street, Suite 150
> Durham, NC 27701
> Attention: Kelcy Pegler, Chief Executive Officer
>     Aruna Chandra, EVP and General Counsel
> Email: kpegler@flexgen.com
>     achandra@flexgen.com

with copies (which shall not constitute notice) to:

> Latham & Watkins LLP
> 1271 Avenue of the Americas
> New York, NY 10020
> Attention: Joe Alexander; Jen Smith
> Email:  joe.alexander@lw.com
>     jen.smith@lw.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this <u>Section 9.7</u>.

Section 9.8 **Governing Law; Jurisdiction**. This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws. The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; <u>provided</u> that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Delaware, sitting in New Castle County, Delaware, and the federal courts of the United States of America sitting in New Castle County, Delaware, shall have exclusive jurisdiction over such Litigation.

Section 9.9 **Consent to Service of Process**. Each of the Parties hereby consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 9.7</u>.

Section 9.10 **WAIVERS OF JURY TRIAL**. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

Section 9.11 **Severability**. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any Party. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to find a suitable and equitable provision that shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 9.12 **No Third Party Beneficiaries**. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

50

**Section 9.13   <u>No Survival of Representations, Warranties and Agreements</u>**. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing.  Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for six (6) years following the Closing Date, and nothing in this <u>Section 9.13</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement.   Buyer and Sellers acknowledge and agree, on their own behalf and, with respect to Buyer that the agreements contained in this <u>Section 9.13</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for six (6) years; and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 9.13</u>, none of the Parties would enter into this Agreement.

**Section 9.14   <u>Non-Recourse</u>**. This Agreement may only be enforced against, and any Litigation based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as Parties to this Agreement. Except to the extent named as a Party to this Agreement, and then only to the extent of the specific obligations of such Parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or representative of any Party to this Agreement will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the Parties to this Agreement or for any Litigation based upon, arising out of or related to this Agreement.

**Section 9.15   <u>Construction</u>**. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars.

**Section 9.16    Computation of Time**. In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

**Section 9.17    Mutual Drafting**. Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.18    Disclosure Schedule**. The Disclosure Schedule has been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; however, each section of the Disclosure Schedule will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Disclosure Schedule will be deemed a disclosure against any representation or warranty set forth in this Agreement if the purpose for disclosure in such other section of the Schedules or again any other representation or warranty is reasonably apparent on its face. Capitalized terms used in the Disclosure Schedule and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Disclosure Schedule or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business or consistent with past practice, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Disclosure Schedule or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Disclosure Schedule or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business. In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Disclosure Schedule will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Disclosure Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan or arrangement which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Disclosure Schedule and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of contract.

**Section 9.19    No Waiver or Release**. Notwithstanding anything herein to the contrary, all terms, conditions, covenants, representations and warranties contained in the DIP Order and the DIP Loan Documents, and all rights, powers and remedies of the DIP Secured Parties and all of the obligations of the Sellers thereunder are reserved and are not amended, modified, limited or otherwise affected by the terms and conditions of this Agreement.

**Section 9.20**   __Headings; Table of Contents__. The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.21**   __Counterparts; Facsimile and Email Signatures__. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

**Section 9.22**   __Time of Essence__. Time is of the essence of this Agreement.

[END OF PAGE]
[SIGNATURE PAGES FOLLOW]

# SIGNATURE PAGE TO
# ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLERS:**

**POWIN, LLC**
**PEOS HOLDINGS, LLC**
**POWIN CHINA HOLDINGS 1, LLC**
**POWIN CHINA HOLDINGS 2, LLC**
**CHARGER HOLDINGS, LLC**
**POWIN ENERGY ONTARIO STORAGE, LLC**
**POWIN ENERGY OPERATING, LLC**
**POWIN ENERGY OPERATING HOLDINGS, LLC**
**POWIN PROJECT LLC**

By_____
    Name: Gerard Uzzi
    Title:   Chief Restructuring Officer

**BUYER:**

**FLEXGEN POWER SYSTEMS, LLC**

By_____
    Name:
    Title:

# EXHIBIT A

## **Form of Bill of Sale**

US_ACTIVE\130897759

## BILL OF SALE

This Bill of Sale, dated as of [_____], 2025 (this "<u>Bill of Sale</u>"), is made and entered into by and among Powin, LLC, a Delaware limited liability company ("<u>Powin</u>"), and Powin's direct and indirect subsidiaries that are signatories below (together with Powin, "<u>Sellers</u>" or the "<u>Debtors</u>"), and FlexGen Power Systems, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "<u>Buyer</u>"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of July 6, 2025 (the "<u>Asset Purchase Agreement</u>"), by and among Buyer and Sellers.

WHEREAS, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens); and

WHEREAS, Sellers desire to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of Sellers' right, title and interest in and to the Purchased Assets.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens).

2.      From time to time after the Closing Date, each Seller shall, upon the reasonable request of Buyer, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as Buyer may reasonably request in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Bill of Sale.

3.      This Bill of Sale is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.      No provision of this Bill of Sale, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Bill of Sale or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Bill of Sale shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

A-2

5.      None of the provisions of this Bill of Sale may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

6.      This Bill of Sale is subject in all respects to the terms and conditions of the Asset Purchase Agreement.  Nothing contained in this Bill of Sale shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Bill of Sale as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement.  To the extent any provision of this Bill of Sale is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      This Bill of Sale shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

8.      This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Bill of Sale or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature Page Follows]*

A-3

IN WITNESS WHEREOF, the parties have caused this Bill of Sale to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS:**

**POWIN, LLC**
**PEOS HOLDINGS, LLC**
**POWIN CHINA HOLDINGS 1, LLC**
**POWIN CHINA HOLDINGS 2, LLC**
**CHARGER HOLDINGS, LLC**
**POWIN ENERGY ONTARIO STORAGE, LLC**
**POWIN ENERGY OPERATING, LLC**
**POWIN ENERGY OPERATING HOLDINGS, LLC**
**POWIN PROJECT LLC**

By_____
    Name: Gerard Uzzi
    Title:   Chief Restructuring Officer

**BUYER:**

**FLEXGEN POWER SYSTEMS, LLC**

By_____
    Name:
    Title:

A-4

# EXHIBIT B

## Form of Assignment and Assumption Agreement

# ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement, dated as of [_____], 2025 (this "Agreement"), is made and entered into by and among Powin, LLC, a Delaware limited liability company ("Powin"), and Powin's direct and indirect subsidiaries that are signatories below (together with Powin, "Sellers" or the "Debtors"), and FlexGen Power Systems, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of July 6, 2025 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets including, without limitation, the Assumed Contracts, free and clear of all Liens (other than Permitted Liens); and

WHEREAS, pursuant to Section 2.3 of the Asset Purchase Agreement, Buyer has agreed to assume, effective as of the Closing, the Assumed Liabilities.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Sellers hereby assign and delegate the Assumed Contracts and the Assumed Liabilities to Buyer and Buyer hereby accepts assignment and delegation of and assumes the Assumed Contracts and the Assumed Liabilities as set forth in the Asset Purchase Agreement. Buyer assumes none of the Excluded Liabilities and the parties agree that all such Excluded Liabilities remain the responsibility of Sellers.

2.      From time to time after the Closing Date, each Seller shall, upon the reasonable request of Buyer, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as Buyer may reasonably request in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Agreement.

3.      This Agreement is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.      No provision of this Agreement, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Agreement or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

US_ACTIVE\130897759

5.      None of the provisions of this Agreement may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

6.      This Agreement is subject in all respects to the terms and conditions of the Asset Purchase Agreement.  Nothing contained in this Agreement shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Agreement as provided and subject to the limitations set forth in the Asset Purchase Agreement.  To the extent any provision of this Agreement is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

8.      This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature page follows]*

B-3

US_ACTIVE\130897759

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS:**

**POWIN, LLC**
**PEOS HOLDINGS, LLC**
**POWIN CHINA HOLDINGS 1, LLC**
**POWIN CHINA HOLDINGS 2, LLC**
**CHARGER HOLDINGS, LLC**
**POWIN ENERGY ONTARIO STORAGE,**
**LLC**
**POWIN ENERGY OPERATING, LLC**
**POWIN ENERGY OPERATING**
**HOLDINGS, LLC**
**POWIN PROJECT LLC**


By_____
    Name: Gerard Uzzi
    Title:   Chief Restructuring Officer

**BUYER:**

**FLEXGEN POWER SYSTEMS, LLC**


By_____
    Name:
    Title:

B-4

**POWIN STALKING HORSE APA**

**SCHEDULES**

[*See attached*]

**Schedule 1**

**EXCLUDED CLAIMS**

1.  Powin LLC's claims against Customs and Border Protection (the "CBP") regarding CBP's HTS Code classification and country-of-origin ruling.

2.  The Sellers' claims against current defendants (as of the date of this Agreement) relating to *Powin Energy Corporation v. United States* (Case No. 23-00092), pending in the Court of International Trade.

3.  The Sellers' claims against current defendants (as of the date of this Agreement) relating to *Powin LLC v. United States* (Case No. 23-00092), pending in the Court of International Trade.

**Schedule 1.1(a)**

**INDIVIDUALS CONSTITUTING SELLER'S KNOWLEDGE**

Brian Kane

Adam Cordovva

Chad Paulson

Kirk Fleischhauer

Mahesh Sathe

Vytha Vadlamani

Kevin Paprzycki

Arielle Pacheco

Janice Mahn

Chris Baker

Mike Engle

Beth Hale

Freddy Banks

Lisa Veber

Gerard Uzzi

**Schedule 1.1(b)**

**SPECIFIED CUSTOMER CLAIM**

Causes of action and claims arising under chapter 5 of the Bankruptcy Code against DTE
Electric Company ("DTE") related to DTE's project in Trenton, Michigan.

3

**Schedule 2.1(a)**

**PURCHASED INVENTORY**

| Included Warehouses & 3PLs | Classification | Cure Cost ($'000s) | Lien(s) |
|---|---|---|---|
| Hub @ 202 Ownco (Mesa), Incl Fixed Assets | Powin Warehouse | $ 62 | Keyframe and FlexGen loans |
| Lu Pacific Properties, LLC (Tualatin), Incl Fixed Assets | Powin Warehouse | $ 47 | Keyframe and FlexGen loans |
| RH | 3PL | $ 2,998 | Keyframe and FlexGen loans |
| 8 Loop | 3PL | $ 385 | Keyframe and FlexGen loans |
| Trivergix | 3PL | $ 216 | Keyframe and FlexGen loans |
| OneSource | 3PL | $ 80 | Keyframe and FlexGen loans |
| Welldex | 3PL | $ 469 | Keyframe and FlexGen loans |
| SourceOne | 3PL | $ 46 | Keyframe and FlexGen loans |
| ATS | 3PL | $ 3 | Keyframe and FlexGen loans |
| American Lamprecht | 3PL | Nominal if any | Keyframe and FlexGen loans |
| Prolift | 3PL | $ 26 | Keyframe and FlexGen loans |
| Expeditors | 3PL | $ 2 | Keyframe and FlexGen loans |

To the extent that there is more than one of any of the items specified below at the relevant location, all such items are included as Purchased Inventory.

**Tualatin, OR WHSE Inventory**

| Item | Category |
|---|---|
| E-B-00708 | Breakers |
| E-B-00753 | Cables |
| E-B-00752 | Cables |
| E-B-00751 | Cables |
| E-B-00754 | Cables |
| M00101-00002-004 | Electronics |
| M00101-00002-005 | Electronics |
| M00102-00002-001 | Electronics |
| M00101-00002-012 | EMS Component |
| E-B-00715 | EMS Component |
| E-B-00716 | EMS Component |
| M00104-02000-007 | EMS Component |

US-DOCS\161434707.6

| | |
|---|---|
| ML510G-50 | EMS Component |
| M00103-00007-000 | EMS Component |
| E-B-00720 | EMS Component |
| M-B-00219 | EMS Component |
| E-B-00741 | EMS Component |
| E21703-00015-002 | EMS Component |
| E-B-00744 | EMS Component |
| E-B-00739 | EMS Component |
| E-B-00706 | EMS Component |
| E-B-00742 | EMS Component |
| M30112-04008-014 | EMS Component |
| E-B-00745 | EMS Component |
| E-B-00740 | EMS Component |
| E-B-00714 | EMS Component |
| ST201M-C16 | EMS Component |
| M00101-00002-013 | EMS Component |
| E-B-00724 | EMS Component |
| E-B-00712 | EMS Component |
| E-B-00711 | EMS Component |
| M70107-00011-046 | EMS Component |
| E-B-00743 | EMS Component |
| E-B-00746 | EMS Component |
| E-B-00710 | EMS Component |
| E-B-00709 | EMS Component |
| E21703-00012-001 | Enclosure Integration |
| E-B-00412 | Misc Items |
| E-B-00422 | Misc Items |
| E-B-00415 | Misc Items |
| E-B-00418 | Misc Items |
| E-B-00421 | Misc Items |
| M-B-00220 | Misc Items |
| M-B-00221 | Misc Items |
| E-B-00717 | Misc Items |
| E-B-00755 | Misc Items |

5

| | |
|---|---|
| E-B-00756 | Misc Items |
| E-B-00722 | PCS Add On |
| E-B-00721 | PCS Add On |
| E-B-00269 | PCS Add On |
| M00101-00002-017 | Switch |
| M00103-00005-000 | UPS |
| M00103-00008-000 | UPS |
| M00103-00006-000 | UPS |

**Mesa, AZ WHSE Inventory**

| Item | Category |
|---|---|
| A10800-10005-000 | AC Panel |
| A10800-11005-000 | AC Panel |
| A10800-06005-000 | AC Panel |
| A10800-04005-000 | AC Panel |
| LAP36250MB | AC Panel Spare |
| QOB3125VH | AC Panel Spare |
| M00111-00004-005 | AC Panel Spare |
| M00111-00003-006 | AC Panel Spare |
| M00111-00004-004 | AC Panel Spare |
| QOB230VH | AC Panel Spare |
| QO140VH | AC Panel Spare |
| QOB3150VH | AC Panel Spare |
| M00111-00004-007 | AC Panel Spare |
| LAP36200MB | AC Panel Spare |
| QO230VH | AC Panel Spare |
| MHKE20 | AC Panel Spare |
| LAP36300MB | AC Panel Spare |
| P10800-01083-006 | AC Panel Spare |
| QOB390VH | AC Panel Spare |
| M00111-00004-006 | AC Panel Spare |
| QO130VH | AC Panel Spare |
| QO115VH | AC Panel Spare |
| M00111-00001-002 | AC Panel Spare |

US-DOCS\161434707.6

| | |
|---|---|
| M00111-00002-002 | AC Panel Spare |
| QO120VH | AC Panel Spare |
| MH44KE | AC Panel Spare |
| QOC342MQS | AC Panel Spare |
| M30102-65401-006 | Battery Packs |
| P10900-07000-420 | Battery Packs |
| M30102-20420-017 | Breakers |
| M30102-20420-015 | Breakers |
| M30102-20420-020 | Breakers |
| M30102-20420-009 | Breakers |
| M30102-20420-002 | Breakers |
| M70112-00000-303 | Breakers |
| M30102-20420-010 | Breakers |
| M30102-20420-021 | Breakers |
| M70112-00000-306 | Breakers |
| M30102-20420-016 | Breakers |
| M30102-20420-018 | Breakers |
| M70112-00000-304 | Breakers |
| M30102-20420-032 | Breakers |
| M30102-20420-109 | Breakers |
| M30102-20420-033 | Breakers |
| M30102-20420-030 | Breakers |
| M30102-20420-013 | Breakers |
| M30102-20420-019 | Breakers |
| M30102-20420-031 | Breakers |
| M30102-20420-022 | Breakers |
| M70112-00000-305 | Breakers |
| M30102-20420-012 | Breakers |
| M30102-20420-113 | Breakers |
| M30103-00017-005 | Breakers |
| M30102-20420-058 | Breakers |
| A-M-00541 | Busbars |
| M-M-00750 | Busbars |
| M30104-12007-028_DO NOT USE, NOT A FG | Busbars |

7

| | |
|---|---|
| M30104-12007-027_DO NOT USE, NOT A FG | Busbars |
| P10900-07000-336 | Busbars |
| P10900-07000-337 | Busbars |
| P10900-02000-102 V2.0 | Busbars |
| P10900-07000-217 | Busbars |
| P10900-07000-106 | Busbars |
| P10900-07000-223 | Busbars |
| P10900-03001-118 | Busbars |
| P10900-07000-214 | Busbars |
| P10900-04000-209 | Busbars |
| E21706-00031-003-52 | Busbars |
| P10900-07009-138 | Busbars |
| P10900-03001-201 V2.0 | Busbars |
| A11501-01001-602 V2.1 | Busbars |
| P10900-07011-015 | Busbars |
| P10900-07011-017 | Busbars |
| P10900-07000-405 | Busbars |
| M30104-12007-027 | Busbars |
| M30104-12007-028 | Busbars |
| P10900-07000-416 | Busbars |
| M20103-02005-008 | Cables |
| M70112-00000-259 | Cables |
| M30104-12007-029_DO NOT USE, NOT A FG | Cables |
| E31703-00003-009 | Cables |
| E-B-00051 | Cables |
| E21703-00017-303 | Cables |
| E-B-00050 | Cables |
| E-B-00799 | Cables |
| M30104-12007-029 | Cables |
| E-B-00800 | Cables |
| E-M-00155 | Cables |
| E-B-00052 | Cables |
| E-M-00156 | Cables |
| E21703-00124-000 | Cables |

8

| | |
|---|---|
| A11501-01005-013 | Cables |
| E21703-00138-000 | Cables |
| A10400-00007-005 | Cables |
| OMNICABLE - A51003-BWG (same as M20103-01020-007) | Cables |
| A10400-00007-004 | Cables |
| E-B-00049 | Cables |
| A10400-00006-003 | Cables |
| A10400-00007-003 | Cables |
| E21703-00140-000 | Cables |
| A10400-00007-001 | Cables |
| A10400-00007-002 | Cables |
| A10400-00006-002 | Cables |
| E-B-00802 | Cables |
| E21703-00123-000 | Cables |
| A10400-00007-008 | Cables |
| A10400-00006-005 | Cables |
| E21703-00139-000 | Cables |
| E21704-00012-015 | Cables |
| E21703-00130-620 | Cables |
| E21703-00030-169 | Cables |
| A10400-00006-001 | Cables |
| A10400-00007-012 | Cables |
| A10400-00007-011 | Cables |
| A10400-00007-010 | Cables |
| E21703-00125-000 | Cables |
| A10400-00007-009 | Cables |
| E21703-00031-185 | Cables |
| A10400-00007-007 | Cables |
| A10400-00007-006 | Cables |
| E21703-00017-304 | Cables |
| E21704-00005-010 | Cables |
| GRAINGER 1W312 | Cables |
| E21703-00130-621 | Cables |
| A10400-00006-004 | Cables |

9

| | |
|---|---|
| E21703-00010-215 | Cables |
| E21704-00005-006 | Cables |
| E21703-00030-952 | Cables |
| E21703-00000-041 | Cables |
| E-B-00430 | Cables |
| E-B-00777 | Cables |
| E21703-00010-221 | Cables |
| E21703-00010-097 | Cables |
| E21703-00000-137 | Cables |
| E-B-00753 | Cables |
| E21703-00000-136 | Cables |
| E-B-00752 | Cables |
| E-B-00434 | Cables |
| E21703-00000-127 | Cables |
| E21703-00000-128 | Cables |
| E21703-00035-024 | Cables |
| P10904-01000-050 | Cables |
| E21703-00010-213 | Cables |
| E21703-00010-002 | Cables |
| E-B-00433 | Cables |
| E-B-00751 | Cables |
| E21703-00010-082 | Cables |
| E21703-00030-167 | Cables |
| E21703-00010-212 | Cables |
| E21703-00010-001 | Cables |
| E21701-05000-013 | Cables |
| E21704-00014-017 | Cables |
| E21703-00030-164 | Cables |
| E21703-00010-059 | Cables |
| E21703-00010-065 | Cables |
| E21704-00014-009 | Cables |
| E-B-00754 | Cables |
| M00101-00002-026 | Cables |
| E21703-00010-048 | Cables |

10

| | |
|---|---|
| E21703-00010-036 | Cables |
| E21703-00010-217 | Cables |
| E21703-00010-039 | Cables |
| E21703-00000-135 | Cables |
| E21703-00000-102 | Cables |
| E21703-00010-003 | Cables |
| E21703-00010-004 | Cables |
| E21703-00010-007 | Cables |
| E21703-00010-084 | Cables |
| E21703-00010-006 | Cables |
| E21703-00010-022 | Cables |
| E21703-00010-014 | Cables |
| E21703-00010-019 | Cables |
| E21703-00010-018 | Cables |
| E21703-00010-017 | Cables |
| E21703-00010-005 | Cables |
| E21703-00010-078 | Cables |
| E21703-00010-086 | Cables |
| E21703-00010-027 | Cables |
| E21703-00010-015 | Cables |
| E21703-00010-025 | Cables |
| E21703-00010-040 | Cables |
| E21703-00010-043 | Cables |
| E21703-00010-052 | Cables |
| E21703-00010-041 | Cables |
| E21703-00010-045 | Cables |
| E21703-00010-044 | Cables |
| E21703-00132-581 | Cables |
| E21703-00010-064 | Cables |
| E21703-00000-013 | Cables |
| E21703-00010-062 | Cables |
| E21703-00000-010 | Cables |
| E21703-00000-039 | Cables |
| E21703-00010-020 | Cables |

US-DOCS\161434707.6

| | |
|---|---|
| E21703-00031-075 | Cables |
| E21703-00000-093 | Cables |
| E21703-00000-062 | Cables |
| E21703-00000-094 | Cables |
| E21703-00000-046 | Cables |
| E21703-00010-216 | Cables |
| E21703-00000-095 | Cables |
| E21703-00000-216 | Cables |
| E21703-00132-580 | Cables |
| E21703-00000-054 | Cables |
| E21703-00000-217 | Cables |
| E21703-00000-218 | Cables |
| E21703-00000-057 | Cables |
| E21703-00000-089 | Cables |
| E21703-00010-219 | Cables |
| E21703-00000-007 | Cables |
| E21703-00000-004 | Cables |
| E21703-00000-205 | Cables |
| E21703-00000-015 | Cables |
| E21703-00000-203 | Cables |
| E21703-00000-063 | Cables |
| E21703-00000-016 | Cables |
| E21703-00000-064 | Cables |
| E21703-00010-046 | Cables |
| E21703-00000-014 | Cables |
| E21703-00000-049 | Cables |
| E21703-00000-208 | Cables |
| E21703-00000-219 | Cables |
| E21703-00000-011 | Cables |
| E21703-00000-059 | Cables |
| E21703-00000-047 | Cables |
| E21703-00000-060 | Cables |
| E21703-00000-048 | Cables |
| E21703-00000-003 | Cables |

12

| | |
|---|---|
| E21703-00000-005 | Cables |
| E21703-00000-050 | Cables |
| E21703-00000-214 | Cables |
| E21703-00000-213 | Cables |
| E21703-00000-210 | Cables |
| E21703-00000-037 | Cables |
| E21703-00000-020 | Cables |
| E21703-00000-036 | Cables |
| E21703-00000-022 | Cables |
| E21703-00000-209 | Cables |
| E21703-00000-002 | Cables |
| E21703-00000-009 | Cables |
| E21703-00000-001 | Cables |
| E21703-00000-006 | Cables |
| E21703-00034-022 | Cables |
| E21703-00034-028 | Cables |
| E21703-00034-038 | Cables |
| E21703-00034-045 | Cables |
| E21703-00034-034 | Cables |
| E21703-00034-040 | Cables |
| M30108-01106-047 | Collection Segment Component |
| M30101-00006-002 | Collection Segment Component |
| M70107-00011-159_DO NOT USE, NOT A FG | Collection Segment Component |
| M30108-01106-046 | Collection Segment Component |
| M30103-00018-016_DO NOT USE, NOT A FG | Collection Segment Component |
| M30103-00018-016 | Collection Segment Component |
| M30108-01106-049 | Collection Segment Component |
| M30112-04008-006_DO NOT USE, NOT A FG | Collection Segment Component |
| M30108-01106-044 | Collection Segment Component |
| A-M-00387 | Collection Segment Component |
| M30108-01106-037 | Collection Segment Component |
| M30101-00006-003 | Collection Segment Component |
| M30108-01205-011 | Collection Segment Component |
| M30112-04008-006 | Collection Segment Component |

| | |
|---|---|
| M30121-01001-002 | Collection Segment Component |
| M30108-01205-012 | Collection Segment Component |
| M00104-02000-004 | Collection Segment Component |
| M60102-40505-012 | Collection Segment Component |
| P10900-07001-032 | Collection Segment Component |
| M30107-00002-000 | Collection Segment Component |
| M70106-00013-020_DO NOT USE, NOT A FG | Collection Segment Component |
| M30107-00008-003 | Collection Segment Component |
| M30108-01205-010 | Collection Segment Component |
| M70106-00013-019_DO NOT USE, NOT A FG | Collection Segment Component |
| M30108-01106-026 | Collection Segment Component |
| M00108-00002-026 | Collection Segment Component |
| M70107-00011-159 | Collection Segment Component |
| M30104-12007-033 | Collection Segment Component |
| A10400-00005-846 | Collection Segment Component |
| M00108-00002-029 | Collection Segment Component |
| M30108-01206-000 | Collection Segment Component |
| Socomec, 14001050 | Collection Segment Component |
| E60100-00001-010 | Collection Segment Component |
| M00108-00002-030 | Collection Segment Component |
| M70104-00010-127 | Collection Segment Component |
| M00108-00002-031 | Collection Segment Component |
| M60102-30310-030 | Collection Segment Component |
| E21706-40000-002 | Collection Segment Component |
| E21706-40000-003 | Collection Segment Component |
| M30116-13215-034_DO NOT USE, NOT A FG | Collection Segment Component |
| M60102-30504-020 | Collection Segment Component |
| P10900-07001-512 | Dampers |
| P10900-07001-282 | Dampers |
| P10900-07001-283 | Dampers |
| M30102-65501-017 | DC Cabinet Component |
| M30108-01106-041 | DC Cabinet Component |
| M30108-01106-043 | DC Cabinet Component |
| M30102-65501-025 | DC Cabinet Component |

14

| | |
|---|---|
| M30102-65501-001 | DC Cabinet Component |
| M30108-01106-036 | DC Cabinet Component |
| M30102-65501-004 | DC Cabinet Component |
| M30108-01106-034 | DC Cabinet Component |
| M30102-65501-013 | DC Cabinet Component |
| 26PV8120 | DC Cabinet Component |
| M30108-01106-040 | DC Cabinet Component |
| M30108-01106-048 | DC Cabinet Component |
| P10907-01000-022 | DC Cabinet Component |
| M30108-01106-039 | DC Cabinet Component |
| EUU-1-500007479 | DC Cabinet Component |
| 26PV3051 | DC Cabinet Component |
| M30108-01106-024 | DC Cabinet Component |
| M30102-65501-018 | DC Cabinet Component |
| FAN-1-225230000 | DC Cabinet Component |
| M30108-01106-030 | DC Cabinet Component |
| M30108-01106-052 | DC Cabinet Component |
| M30108-01106-023 | DC Cabinet Component |
| FUS-1-125001500 | DC Cabinet Component |
| M30102-65501-016 | DC Cabinet Component |
| M30108-01106-035 | DC Cabinet Component |
| M30102-65501-003 | DC Cabinet Component |
| M30102-65501-023 | DC Cabinet Component |
| M30108-01106-045 | DC Cabinet Component |
| PLC-1-402019607 | DC Cabinet Component |
| M30108-01106-032 | DC Cabinet Component |
| M30108-01106-033 | DC Cabinet Component |
| 87P02040 | DC Cabinet Component |
| EUU-1-500007622 | DC Cabinet Component |
| M30102-65501-024 | DC Cabinet Component |
| EUU-1-500007601 | DC Cabinet Component |
| M30102-65501-019 | DC Cabinet Component |
| EUU-1-500007630 | DC Cabinet Component |
| EUU-1-500007609 | DC Cabinet Component |

US-DOCS\161434707.6

| | |
|---|---|
| EUU-1-500007618 | DC Cabinet Component |
| M30108-01106-029 | DC Cabinet Component |
| EUU-1-500008020 | DC Cabinet Component |
| M30102-06340-000 | DC Cabinet Component |
| M70101-01016-000 | DC Cabinet Component |
| 14232111 | DC Cabinet Component |
| EUU-1-500007593 | DC Cabinet Component |
| M70101-02004-000 | DC Cabinet Component |
| EUU-1-500007934 | DC Cabinet Component |
| M30102-65501-020 | DC Cabinet Component |
| KIT-7-C15061030 | DC Cabinet Component |
| 14001032 | DC Cabinet Component |
| M30102-65501-029 | DC Cabinet Component |
| VSA-1-000600110 | DC Cabinet Component |
| M30102-65501-006 | DC Cabinet Component |
| M30102-65501-026 | DC Cabinet Component |
| 14AD2111 | DC Cabinet Component |
| EUU-1-500004766 | DC Cabinet Component |
| M30102-65501-027 | DC Cabinet Component |
| M30102-65501-021 | DC Cabinet Component |
| FUS-1-001500000 | DC Cabinet Component |
| ISO-MBI-30M6 | DC Cabinet Component |
| ISO-MBI-25M6 | DC Cabinet Component |
| ISO-MBI-50M10 | DC Cabinet Component |
| 542070 | DC Cabinet Component |
| FUS-1-000100002 | DC Cabinet Component |
| 548590 | DC Cabinet Component |
| SM-7120AX52 | DC Cabinet Component |
| M30102-65501-030 | DC Cabinet Component |
| A10200-04010-049 | Electrical Assy. |
| A10200-04010-031 | Electrical Assy. |
| A10200-04010-043 | Electrical Assy. |
| E-M-00077 | Electrical Assy. |
| M00102-00002-001 | Electronics |

16

US-DOCS\161434707.6

| | |
|---|---|
| M00101-00002-004 | Electronics |
| M30106-00008-017_DO NOT USE, NOT A FG | Electronics |
| E-B-00053 | Electronics |
| M30106-00008-017 | Electronics |
| M00102-00002-002 | Electronics |
| M00101-00002-011 | Electronics |
| E-B-00807 | Electronics |
| M30107-00005-002 | Electronics |
| M00101-00002-005 | Electronics |
| M00106-02003-004 | Electronics |
| E31703-00003-001 | Electronics |
| M30106-00008-010 | Electronics |
| M70112-00000-266 | Electronics |
| E-B-00075 | Electronics |
| E21703-00004-358 | Electronics |
| M30103-00018-020 | Electronics |
| E21703-00004-356 | Electronics |
| M30112-04008-010 | Electronics |
| Phoenix Contact 2903703 | Electronics |
| M30104-08002-005 | Electronics |
| E21703-00030-241 | Electronics |
| M30112-04008-012 | Electronics |
| M30108-01205-003 | Electronics |
| E21703-00004-357 | Electronics |
| M30112-04008-007 | Electronics |
| M30115-04021-002_DO NOT USE, NOT A FG | Electronics |
| M30116-40010-001 | Electronics |
| M30106-00008-009 | Electronics |
| E21703-00030-453 | Electronics |
| E21703-00030-455 | Electronics |
| Phoenix Contact 2903306 | Electronics |
| Phoenix Contact 2900961 | Electronics |
| E21703-00030-242 | Electronics |
| M30106-00008-021 | Electronics |

| | |
|---|---|
| M00106-02003-006 | Electronics |
| E-B-00380 | Electronics |
| Phoenix Contact 2900960 | Electronics |
| M30112-04008-016 | Electronics |
| M30104-12007-023 | Electronics |
| M30104-12007-024 | Electronics |
| M30112-04008-005 | Electronics |
| M00110-00001-002 | Electronics |
| M00110-00001-003 | Electronics |
| M70112-00001-003 | Electronics |
| M30104-12007-021 | Electronics |
| M30103-00018-007 | Electronics |
| M50116-01116-000_DO NOT USE, NOT A FG | Electronics |
| E21703-00030-578 | Electronics |
| E21703-00030-577 | Electronics |
| M30103-00014-020 | Electronics |
| M30112-04008-003 | Electronics |
| M30120-01001-004 | Electronics |
| M30106-00009-003 | Electronics |
| M30112-04008-018 | Electronics |
| M30103-00014-002 | Electronics |
| M30103-00014-025 | Electronics |
| E21703-00136-866 | Electronics |
| M30103-00014-019 | Electronics |
| M30103-00014-003 | Electronics |
| M30108-01205-002 | Electronics |
| M20109-00001-001 | Electronics |
| M20105-01109-044 | Electronics |
| M50116-01116-000 | Electronics |
| M00108-00004-007 | Electronics |
| A-M-00552 | EMS |
| M00103-00007-000 | EMS Component |
| M00101-00002-002 | EMS Component |
| M00101-00002-012 | EMS Component |

18

| | |
|---|---|
| E-B-00715 | EMS Component |
| M-B-00219 | EMS Component |
| M00101-00002-013 | EMS Component |
| M00104-02000-007 | EMS Component |
| E-B-00716 | EMS Component |
| ARK-3530F-00A1E BTO | EMS Component |
| ADAM-6017-D | EMS Component |
| E21703-00015-002 | EMS Component |
| 1588H12B1JV | EMS Component |
| E-B-00720 | EMS Component |
| E-B-00740 | EMS Component |
| E-B-00711 | EMS Component |
| E-B-00712 | EMS Component |
| SDR-240-24 | EMS Component |
| 1587T11A1S | EMS Component |
| E-B-00746 | EMS Component |
| E-B-00706 | EMS Component |
| E-B-00741 | EMS Component |
| 1504SC | EMS Component |
| E-B-00744 | EMS Component |
| CAGKIT1032-100 | EMS Component |
| HM25030-3SR | EMS Component |
| 1506STD | EMS Component |
| 2002-1601 | EMS Component |
| NON-6 | EMS Component |
| E-B-00709 | EMS Component |
| E-B-00710 | EMS Component |
| P10800-01083-044 | Enclosure |
| M9U21202 | Enclosure Component |
| GRAINGER 2WJ19 | Enclosure Component |
| P10906-02000-020 | Enclosure Component |
| E-B-00104 | Enclosure Component |
| FW200B-10 | Enclosure Component |
| EDS-316 | Enclosure Component |

19

| | |
|---|---|
| 277-12010-ND | Enclosure Component |
| RB-HFMD1 | Enclosure Component |
| SRT1500RMXLA-NC | Enclosure Component |
| Duralink 50 | Enclosure Component |
| 142186 (B30-25-595-ANSIWA) | Enclosure Component |
| M70107-00011-082 R1.0 | Enclosure Component |
| M00106-02003-003 | Enclosure Component |
| 1750100 - OBSOLETE | Enclosure Component |
| M20106-08009-008 | Enclosure Component |
| M20106-08009-007 | Enclosure Component |
| M30102-65501-028 | Enclosure Component |
| 118084 (B30-R10000) | Enclosure Component |
| M90101-00003-001 | Enclosure Component |
| QO330MQ200 | Enclosure Component |
| P10906-02000-018 | Enclosure Component |
| 60409 | Enclosure Component |
| E21703-00012-309 | Enclosure Component |
| M30112-04008-004 | Enclosure Component |
| EDS-308 | Enclosure Component |
| M20106-06044-035 | Enclosure Component |
| M20106-06044-034_DO NOT USE, NOT A FG | Enclosure Component |
| M00106-02003-005 | Enclosure Integration |
| M00108-00004-032 | Enclosure Integration |
| M70107-00012-062 | Enclosure Integration |
| E21703-00007-003 | Enclosure Integration |
| M00108-00004-025 | Enclosure Integration |
| M70107-00011-104 | Enclosure Integration |
| E21703-00008-013 | Enclosure Integration |
| M30106-02004-001 | Energy Segment Component |
| HOFFMAN CSD16126 | Energy Segment Component |
| A11501-01005-003 | Energy Segment Component |
| E21703-00031-403 | Energy Segment Component |
| MOXA UC-2101-LX | Energy Segment Component |
| M30107-00008-006 | Energy Segment Component |

20

| | |
|---|---|
| M30108-01106-042 | Energy Segment Component |
| HOFFMAN CP1612 | Energy Segment Component |
| M20106-06044-064 | Energy Segment Component |
| M70107-00012-255 | Energy Segment Component |
| E21703-00017-462 | Energy Segment Component |
| A11501-01002-005 | Energy Segment Component |
| M20106-06044-061 | Energy Segment Component |
| M30103-00018-015 | Energy Segment Component |
| E21703-00030-454 | Energy Segment Component |
| P10900-07001-100 | Energy Segment Component |
| A10400-00009-933 | Energy Segment Component |
| A10400-00006-069 | Energy Segment Component |
| E21703-00017-459 | Energy Segment Component |
| A-M-00104 | Energy Segment Component |
| M70107-00011-150 | Energy Segment Component |
| M30104-12007-022 | Energy Segment Component |
| A10400-00005-905 | Energy Segment Component |
| M70104-00010-082 | Energy Segment Component |
| A-M-00203 | Energy Segment Component |
| P10900-07500-136 | Energy Segment Component |
| A-M-00276 | Energy Segment Component |
| A-M-00221 | Energy Segment Component |
| A-M-00204 | Energy Segment Component |
| M60102-30308-030 | Energy Segment Component |
| A10400-00005-907 | Energy Segment Component |
| P10900-07500-137 | Energy Segment Component |
| A10400-00005-760 | Energy Segment Component |
| M60102-30105-030 | Energy Segment Component |
| P10900-07001-110 | Energy Segment Component |
| A10400-00006-047 | Energy Segment Component |
| M60102-30504-045 | Energy Segment Component |
| M60102-10612-335 | Energy Segment Component |
| M30106-00016-002 | Energy Segment Component |
| M60102-30505-008 | Energy Segment Component |

US-DOCS\161434707.6

| | |
|---|---|
| M60102-30505-020 | Energy Segment Component |
| M60102-30505-010 | Fasteners |
| M60103-10110-000 | Fasteners |
| M60102-30308-020 | Fasteners |
| M60101-11105-000 | Fasteners |
| E-B-00289 | Fasteners |
| M60102-30606-020 | Fasteners |
| M60102-40308-025 | Fasteners |
| M60102-40310-025 | Fasteners |
| M60102-11804-808 | Fasteners |
| P10900-07001-206 | Fasteners |
| M60102-40306-025 | Fasteners |
| M60102-40310-030 | Fasteners |
| M60102-10607-515 | Fasteners |
| E-B-00806 | Fasteners |
| E-B-00805 | Fasteners |
| M60102-40308-020 | Fasteners |
| M70107-00012-283 | Fasteners |
| M60102-10310-020 | Fasteners |
| M60103-10306-000 | Fasteners |
| M60101-10210-000 | Fasteners |
| P10900-07001-453 | Fasteners |
| M60102-40306-016 | Fasteners |
| M-B-00108 | Fasteners |
| E-B-00803 | Fasteners |
| M60102-30505-014 | Fasteners |
| M60102-30504-050 | Fasteners |
| M60102-10306-014 | Fasteners |
| M60102-40505-010 | Fasteners |
| M60103-10106-000 | Fasteners |
| E-B-00804 | Fasteners |
| P10900-07001-334 | Fasteners |
| M70105-00013-000 | Fasteners |
| M60102-40306-055 | Fasteners |

22

| | |
|---|---|
| P10900-07200-021 | Fasteners |
| M60102-10504-060 | Fasteners |
| M60102-30504-008 | Fasteners |
| M60102-30504-010 | Fasteners |
| A10400-00005-775 | Fasteners |
| RIVET NUT, M6 X 1mm Internal Thread, .5-3.0mm Material Thickness, 18-8 Stainless Steel | Fasteners |
| RIVET NUT, M4 X .7mm Internal Thread, .5-2.5mm Material Thickness, 18-8 Stainless Steel | Fasteners |
| M60102-30505-012 | Fasteners |
| M60103-10304-000 | Fasteners |
| M60102-10613-522 | Fasteners |
| P10900-07001-050 | Fasteners |
| M-B-00055 | Fasteners |
| M60103-10210-000 | Fasteners |
| M60102-30308-018 | Fasteners |
| M60103-10100-003 | Fasteners |
| P10900-07001-070 | Fasteners |
| M60102-30504-016 | Fasteners |
| M60103-10100-002 | Fasteners |
| M60101-10104-000 | Fasteners |
| M60102-30310-025 | Fasteners |
| M60102-40308-030 | Fasteners |
| M60103-10310-000 | Fasteners |
| M60101-10210-010 | Fasteners |
| P10900-07001-469 | Fasteners |
| P10900-07001-348 | Fasteners |
| P10900-07001-379 | Fasteners |
| M60102-30306-020 | Fasteners |
| M60102-10304-010 | Fasteners |
| M70111-00050-178 | Fasteners |
| M60102-30305-016 | Fasteners |
| M60102-30306-016 | Fasteners |
| M60102-10703-008 | Fasteners |
| E-B-00473 | Fasteners |
| M60102-30306-012 | Fasteners |

US-DOCS\161434707.6

| | |
|---|---|
| M60103-10310-104 | Fasteners |
| M60102-30308-016 | Fasteners |
| P10900-07001-432 | Fasteners |
| M60102-10503-010 | Fasteners |
| M60102-30306-025 | Fasteners |
| M60102-30505-016 | Fasteners |
| M60101-10208-000 | Fasteners |
| M60103-10308-104 | Fasteners |
| M60102-30503-012 | Fasteners |
| M60101-10206-000 | Fasteners |
| M70107-00012-251 | Fasteners |
| M60102-11501-002 | Fasteners |
| M60103-10510-000 | Fasteners |
| M60101-10204-000 | Fasteners |
| M20103-01022-009 | FSS Component |
| M00108-00004-008 | FSS Component |
| A-M-00286 | FSS Component |
| M00108-00002-007 | FSS Component |
| P10900-07001-026 | FSS Component |
| E21703-00017-583 | FSS Component |
| M00108-00004-009 | FSS Component |
| M00108-00004-014 | FSS Component |
| A-M-00285 | FSS Component |
| M00108-00002-082 | FSS Component |
| M00108-00004-013 | FSS Component |
| A11501-01004-042 | FSS Component |
| M00108-00004-012 | FSS Component |
| M00108-00002-003 | FSS Component |
| M00108-00002-084 | FSS Component |
| M00108-00002-040 | FSS Component |
| M00108-00002-083 | FSS Component |
| M00108-00002-020 | FSS Component |
| M00108-00002-021 | FSS Component |
| M30104-12007-035 | FSS Component |

US-DOCS\161434707.6

| | |
|---|---|
| M30104-07013-000 | FSS Component |
| M-B-00053 | FSS Component |
| M30103-00014-005 | FSS Component |
| M30104-12007-037 | FSS Component |
| M00108-00002-008 | FSS Component |
| M00108-00002-009 | FSS Component |
| M70107-00011-162 | FSS Component |
| M00108-00004-031 | FSS Component |
| M00108-00002-010 | FSS Component |
| A11501-01004-042_DO NOT USE, NOT A FG | FSS Component |
| M30104-12007-036 | FSS Component |
| 3005013 | FSS Component |
| M00108-00004-002 | FSS Integration |
| E-B-00666 | FSS Integration |
| M00108-00002-012 | FSS Integration |
| M00108-00002-004 | FSS Integration |
| M00108-00004-026 | FSS Integration |
| M00108-00002-017 | FSS Integration |
| M00108-00004-022 | FSS Integration |
| M00108-00004-003 | FSS Integration |
| M00108-00002-013 | FSS Integration |
| M00108-00002-002 | FSS Integration |
| M00108-00004-015 | FSS Integration |
| M00108-00002-014 | FSS Integration |
| M00108-00002-018 | FSS Integration |
| M00108-00002-019 | FSS Integration |
| M00108-00002-001 | FSS Integration |
| M00108-00002-006 | FSS Integration |
| M00108-00002-015 | FSS Integration |
| M00108-00002-005 | FSS Integration |
| M00108-00002-011 | FSS Integration |
| M00108-00002-016 - OBSOLETE | FSS Integration |
| M00108-00004-006 | FSS Integration |
| E-B-00285 | Fuses |

25

| | |
|---|---|
| M30108-01106-059 | Fuses |
| E-B-00284 | Fuses |
| M30108-01106-020 | Fuses |
| M30108-01205-020 | Fuses |
| M30108-01205-026 | Fuses |
| M30108-01205-004 | Fuses |
| M30108-01205-025 | Fuses |
| M-B-00047 | Gaskets |
| M-B-00073 | Gaskets |
| P10900-07500-130 | Gaskets |
| M30116-01016-030 | Glands |
| M30116-13215-033 | Glands |
| M30106-00008-012 | Glands |
| M30106-00008-011 | Glands |
| E21703-00030-947 | Harnesses |
| E21703-00030-949 | Harnesses |
| E21703-00017-301 | Harnesses |
| E21703-00017-298 | Harnesses |
| E21703-00017-300 | Harnesses |
| E21703-00035-017 | Harnesses |
| E21703-00017-299 | Harnesses |
| M30116-13215-031 | HDC |
| M30116-13215-036 | HDC |
| M30116-13215-037 | HDC |
| HDC 04A ALU | HDC |
| M30116-13215-038 | HDC |
| M20106-11002-016 | HDC |
| M30116-13215-032 | HDC |
| M70112-00001-011 | HDC |
| M70112-00001-012 | HDC |
| M00106-02002-001 | HVAC |
| M00106-02004-000 | HVAC |
| MGA1072AE090CR+1+1CA+A24++++++ - OBSOLETE | HVAC |
| M00106-02002-003 | HVAC |

26

| M90101-00002-002 | HVAC Component |
| M70110-00018-004 | HVAC Integration |
| M00106-02003-001 | HVAC Integration |
| P10906-01000-003 | HVAC Integration |
| M00106-02003-002 | HVAC Integration |
| M30106-00013-003 | HVAC Integration |
| APC Replacement battery cartridge #152 | HVAC Spare |
| 10382 | HVAC Spare |
| 40181 | HVAC Spare |
| 40193A-SP | HVAC Spare |
| 40046A-SP | HVAC Spare |
| 92219-2 | HVAC Spare |
| 70571 | HVAC Spare |
| 30180 | HVAC Spare |
| 70281 | HVAC Spare |
| 50141 | HVAC Spare |
| 70688 | HVAC Spare |
| 70006 | HVAC Spare |
| 70646 | HVAC Spare |
| 70656 | HVAC Spare |
| 70546 | HVAC Spare |
| 70342 | HVAC Spare |
| 2903308 | HVAC Spare |
| P/50182 | HVAC Spare |
| 70425 | HVAC Spare |
| 50040 | HVAC Spare |
| 80428 | HVAC Spare |
| 50360 | HVAC Spare |
| 70005 | HVAC Spare |
| M70104-00010-102 | Labels |
| M70104-00010-099 | Labels |
| M-M-00077 | Labels |
| M70104-00010-108 | Labels |
| M70104-00010-111 | Labels |

US-DOCS\161434707.6

| | |
|---|---|
| ETO Labels | Labels |
| P00100-01001-031 | Labels |
| M70104-00010-110 | Labels |
| M70104-00010-103 | Labels |
| M70104-00010-112 | Labels |
| M70104-00010-107 | Labels |
| M70104-00010-158 | Labels |
| M70104-00010-113 | Labels |
| M-M-00292 | Labels |
| M70104-00010-137 | Labels |
| M70104-00010-136 | Labels |
| M70104-00010-109 | Labels |
| M70104-00010-119 | Labels |
| M70104-00010-118 | Labels |
| M-B-00263 | Labels |
| P00100-01001-035 | Labels |
| M70104-00010-124 | Labels |
| M70104-00010-125 | Labels |
| M70104-00010-120 | Labels |
| M70104-00010-164 | Labels |
| M-M-00406 | Labels |
| M70104-00010-168 | Labels |
| P00100-01001-029 | Labels |
| P00100-01001-023 | Labels |
| P00100-01001-019 | Labels |
| P00100-01001-030 | Labels |
| P00100-01001-022 | Labels |
| P00100-01001-024 | Labels |
| M70104-00010-153 | Labels |
| P00100-01001-026 | Labels |
| M70104-00010-167 | Labels |
| P00100-01001-028 | Labels |
| M-M-00296 | Labels |
| M70104-00010-157 | Labels |

US-DOCS\161434707.6

| | |
|---|---|
| P00100-01001-037 | Labels |
| P10800-01083-043 | Labels |
| P10800-01083-039 | Labels |
| P10900-07000-204 | Metal Comp. |
| M70112-00000-236 | Metal Comp. |
| A10400-00005-862 | Metal Comp. |
| P10900-07000-326 | Metal Comp. |
| P10900-07000-350 | Metal Comp. |
| M70112-00000-002 | Metal Comp. |
| P10900-07000-327 | Metal Comp. |
| P10900-07000-325 | Metal Comp. |
| P10900-07000-324 | Metal Comp. |
| P10900-07000-203 | Metal Comp. |
| P10900-07000-210 | Metal Comp. |
| A-M-00521 | Metal Fabrication |
| A10400-00005-757 | Metal Fabrication |
| A-M-00288 | Metal Fabrication |
| A-M-00305 | Metal Fabrication |
| P10900-07000-400 | Metal Fabrication |
| P10900-07000-407 | Metal Fabrication |
| M-M-00287 | Metal Fabrication |
| M-M-00288 | Metal Fabrication |
| A-M-00105 | Metal Fabrication |
| M70107-00012-280 | Metal Fabrication |
| A-M-00353 | Metal Fabrication |
| A-M-00352 | Metal Fabrication |
| P10900-07000-323 | Metal Fabrication |
| M-M-00289 | Metal Fabrication |
| A10400-00009-815 | Metal Fabrication |
| A10400-00009-812 | Metal Fabrication |
| A10400-00009-814 | Metal Fabrication |
| A10400-00009-818 | Metal Fabrication |
| A10400-00009-816 | Metal Fabrication |
| A10400-00009-817 | Metal Fabrication |

29

| | |
|---|---|
| A10400-00009-813 | Metal Fabrication |
| A10400-00005-845 | Metal Fabrication |
| M70112-00000-026 | Metal Fabrication |
| A10400-00005-820 | Metal Fabrication |
| M70112-00000-256 | Metal Fabrication |
| M-B-00012 | Misc Items |
| M-B-00235 | Misc Items |
| E-B-00412 | Misc Items |
| M70111-00050-164 | Misc Items |
| M-B-00009 | Misc Items |
| M-B-00197 | Misc Items |
| P10900-07009-218 | Misc Items |
| Server, Dell PowerEdge R260 | Misc Items |
| M-B-00142 | Misc Items |
| Poly Performance, PPI-LS-55 | Misc Items |
| Poly Performance, PPI-LS-32 | Misc Items |
| Poly Performance, PPI-LS-38 | Misc Items |
| Poly Performance, PPI-LS-40 | Misc Items |
| M70107-00012-027 | Misc Items |
| M70111-00050-170 | Misc Items |
| E-B-00422 | Misc Items |
| M70111-00050-179 | Misc Items |
| C774B430G20 | Misc Items |
| M-B-00011 | Misc Items |
| E-B-00418 | Misc Items |
| CABLE TIE, 6in, 40lbs, Nylon, Black, UV resistant (100/bag) | Misc Items |
| E-B-00421 | Misc Items |
| P10900-07009-216 | Misc Items |
| M-B-00082 | Misc Items |
| EJ14166 - OBSOLETE | Misc Items |
| NBF-32232 | Misc Items |
| P10900-07500-156 | Misc Items |
| CHCC3DU | Misc Items |
| FNQ-R-6 | Misc Items |

30

US-DOCS\161434707.6

| | |
|---|---|
| M-B-00226 | Misc Items |
| NBF-32032 | Misc Items |
| M-B-00221 | Misc Items |
| M-B-00228 | Misc Items |
| E-B-00372 | Misc Items |
| SPRAY BOTTLE, 16oz, PLASTIC | Misc Items |
| E-B-00755 | Misc Items |
| TechSpray Isopropyl Alcohol Wipes | Misc Items |
| P10900-07008-140 | Misc Items |
| 3M Super 77 CA - Spray Adhesive | Misc Items |
| PAINTERS MASKING TAPE, BLUE, 1in X 60yds ROLL | Misc Items |
| MEAN WELL MDR-20-24 | Misc Items |
| ZOLLER V30AE000056 | Misc Items |
| P10900-07001-030 | Misc Items |
| M30103-00014-004 | Misc Items |
| SHOP TOWEL, SCOTT, 9 X 11in, 55 PER ROLL | Misc Items |
| E-B-00756 | Misc Items |
| E40101-10804-011 | Module |
| E40101-10804-012 | Module |
| E40101-10403-022 | Module |
| E40101-10804-002 | Module |
| E50100-07002-000 | PCBA |
| E50100-09000-000 | PCBA |
| E50200-08000-000 | PCBA Components |
| E58200-01000-000 | PCBA Components |
| CAB1000/AC_DO NOT USE, NOT A FG | PCS |
| M30122-01001-003 | PCS Add On |
| M30122-01001-002 | PCS Add On |
| M411Z00143AA | PCS Component |
| 6AA-570-000-001 | PCS Component |
| 102025-00.01 | PCS Component |
| L5453 | PCS Component |
| E977BE | PCS Component |
| 104789-00.01 | PCS Component |

31

| | |
|---|---|
| 30-102700.01 | PCS Component |
| SMA 122430-00.02 | PCS Component |
| 108985-00.01 | PCS Component |
| 6UP-450-002-001 | PCS Component |
| SC30RIO.GR2 | PCS Component |
| SC30ACC.GR5 | PCS Component |
| L5419D | PCS Component |
| 46-107000.02 | PCS Component |
| SMA 105083-00.01 | PCS Component |
| 60-090100.01 | PCS Component |
| SMA 95-128500.03 | PCS Component |
| L5679 | PCS Component |
| L5554-1 | PCS Component |
| 60-090000.01 | PCS Component |
| SMA 65-05150 | PCS Component |
| 103135-00.01 | PCS Component |
| SMA 61-1263100.01 | PCS Component |
| SMA 61-0159452 | PCS Component |
| SMA 26-096004001 | PCS Component |
| SMA 124133-00.01 | PCS Component |
| L1874-1 | PCS Component |
| SMA 124843-00.01 | PCS Component |
| SMA 60-00562 | PCS Component |
| SMA 124841-00.01 | PCS Component |
| SMA 124840-00.01 | PCS Component |
| SMA 104460-00.02 | PCS Component |
| SMA 62-103700.02 | PCS Component |
| SMA 117962-00.01 | PCS Component |
| SMA 43-107100.01 | PCS Component |
| SMA 43-107000.01 | PCS Component |
| SMA 117728-00.01 | PCS Component |
| SMA 43-107300.01 | PCS Component |
| SMA 113930-00.01 | PCS Component |
| SMA 20-1410 | PCS Component |

| SMA 61-117117 | PCS Component |
| SMA 117303-00.01 | PCS Component |
| SMA 61-117118 | PCS Component |
| SMA 43-107200.01 | PCS Component |
| SMA 42-62120014 | PCS Component |
| SMA 124109-00.01 | PCS Component |
| SMA 43-104000.01 | PCS Component |
| SMA 86-00892 | PCS Component |
| M-M-00391 | Plastics |
| M-M-00394 | Plastics |
| P10900-07000-211 | Plastics |
| M00110-00002-004 | PLC Integration |
| M00110-00001-001 | PLC Integration |
| M00110-00002-002 | PLC Integration |
| M20103-03030-010 | PLC Integration |
| M00110-00002-001 | PLC Integration |
| M00110-00001-004 | PLC Integration |
| E21703-00007-300 | PLC Integration |
| M00110-00002-003 | PLC Integration |
| C-LBT222-ADM4055-1 | PLC Integration |
| M-B-00095 | Rubber |
| M30103-00018-013 | Stack |
| A10400-00005-701 | Stack Component |
| M30108-01106-019 | Stack Component |
| M30108-01106-016 | Stack Component |
| M30104-12007-031_DO NOT USE, NOT A FG | Stack Component |
| E50101-06000-002 | Stack Component |
| M30108-01106-008 | Stack Component |
| M30108-01106-017 | Stack Component |
| E50101-06000-001 | Stack Component |
| M30108-01106-013 | Stack Component |
| M30104-12007-019_DO NOT USE, NOT A FG | Stack Component |
| A10400-00003-300 | Stack Component |
| E50200-04000-000 | Stack Component |

33

| | |
|---|---|
| SC20-200-1000 | Stack Component |
| SC11-120-1000 | Stack Component |
| M30108-01106-002 | Stack Component |
| A70400-01000-001 | Stack Component |
| M30108-01106-050 | Stack Component |
| M30108-01106-053 | Stack Component |
| M30104-12007-019 | Stack Component |
| M30108-01106-009 | Stack Component |
| M30104-12007-020 | Stack Component |
| M30104-12007-031 | Stack Component |
| A11501-01001-600 | Stack Component |
| A00900-01000-001 | Stack Component |
| A10400-00003-701 | Stack Component |
| E50101-06200-002 | Stack Component |
| E21701-10000-016 | Stack Component |
| E21703-00001-015 V2.0 | Stack Component |
| SC20-120-1000 | Stack Component |
| E50101-06200-001 | Stack Component |
| E21703-00124-000 V1.1 | Stack Component |
| A10200-04010-009 | Stack Component |
| E50200-03000-000 | Stack Component |
| E21703-00125-000 V1.1 | Stack Component |
| E21703-00011-264 | Stack Component |
| E21703-00011-285 | Stack Component |
| Amphenol RJ-00BMMA-LL7001_DO NOT USE, NOT A FG | Stack Component |
| E21703-00000-129 V2.0 | Stack Component |
| E21703-00011-207 | Stack Component |
| E21703-00011-205 | Stack Component |
| E21703-00011-201 | Stack Component |
| E21703-00011-206 | Stack Component |
| E21703-00000-127 V2.0 | Stack Component |
| E21703-00000-113 V2.0 | Stack Component |
| E21703-00000-135 V2.0 | Stack Component |
| M30108-01106-001 | Stack Component |

US-DOCS\161434707.6

| | |
|---|---|
| SC11-200-1000 | Stack Component |
| M30112-04003-001 | Stack Component |
| E21703-00010-111 | Stack Component |
| A11501-01003-012 | Stack Component |
| E21703-00011-204 | Stack Component |
| E21703-00011-200 | Stack Component |
| E21703-00011-202 | Stack Component |
| E21703-00011-203 | Stack Component |
| E21703-00140-000 V1.1 | Stack Component |
| E21703-00000-103 | Stack Component |
| E21703-00000-137 V2.0 | Stack Component |
| E21703-00000-128 V2.0 | Stack Component |
| E21703-00011-300 | Stack Component |
| SLPPC70BNB1 | Stack Component |
| M30106-00009-001 | Stack Component |
| M20106-08009-022 | Stack Component |
| E21703-00011-263 | Stack Component |
| E21703-00011-286 | Stack Component |
| M20106-08009-021 | Stack Component |
| E21703-00010-214 | Stack Component |
| A00702-01000-000 | Stack Component |
| E21703-00001-008 | Stack Component |
| E21703-00011-294 | Stack Component |
| E21703-00000-136 V2.0 | Stack Component |
| M30118-01006-000 | Stack Component |
| M30108-01106-018 | Stack Component |
| SC20-160-1000 | Stack Component |
| SLPPC70BNO1 | Stack Component |
| M00101-00002-007 | Stack Component |
| M20106-06044-002_DO NOT USE, NOT A FG | Stack Component |
| E21703-00000-106 | Stack Component |
| E21703-00010-218 V2.1 | Stack Component |
| E21701-10000-010 | Stack Component |
| E50200-09000-000 | Stack Component |

US-DOCS\161434707.6

| | |
|---|---|
| E21703-00011-301 | Stack Component |
| M30115-04002-002 | Stack Component |
| E21703-00011-111 | Stack Component |
| E21703-00011-260 | Stack Component |
| E21703-00011-208 | Stack Component |
| E21703-00011-283 | Stack Component |
| E21701-05000-007 | Stack Component |
| E21703-00011-209 | Stack Component |
| E21703-00010-216 V2.0 | Stack Component |
| M20106-08009-022_DO NOT USE, NOT A FG | Stack Component |
| M30106-00008-002 | Stack Component |
| E21703-00001-003 | Stack Component |
| A11401-01010-000 | Stack Component |
| E50900-01000-000 | Stack Component |
| E21703-00000-105 | Stack Component |
| E21703-00011-265 | Stack Component |
| P10902-01000-001 | Stack Component |
| E21701-05000-008 | Stack Component |
| E21703-00011-277 | Stack Component |
| E21703-00011-299 | Stack Component |
| E21703-00011-278 | Stack Component |
| E21703-00011-262 | Stack Component |
| E21703-00000-104 | Stack Component |
| M20106-08009-021_DO NOT USE, NOT A FG | Stack Component |
| E21703-00000-132 | Stack Component |
| E21703-00011-271 | Stack Component |
| E21703-00011-272 | Stack Component |
| M60101-10805-001 | Stack Component |
| E21703-00011-275 | Stack Component |
| M60102-30308-040 | Stack Component |
| M30112-04004-002 | Stack Component |
| P10904-01000-107 | Stack Component |
| E21703-00000-133 | Stack Component |
| E21703-00010-200 V1.0 | Stack Component |

36

| | |
|---|---|
| E21703-00000-134 | Stack Component |
| E21703-00011-270 | Stack Component |
| E21703-00011-261 | Stack Component |
| E21703-00000-131 | Stack Component |
| M30119-04002-000 | Stack Component |
| E21703-00011-276 | Stack Component |
| E21703-00000-108 | Stack Component |
| M30104-12007-020_DO NOT USE, NOT A FG | Stack Component |
| E21703-00000-107 | Stack Component |
| E21701-05000-011 | Stack Component |
| E21701-05000-012 | Stack Component |
| M70111-00050-106 | Stack Component |
| E21603-02001-000 | Stack Component |
| E21703-00011-274 | Stack Component |
| E21703-00011-273 | Stack Component |
| E50101-04000-003/004 | Stack Component |
| E21703-00011-280 | Stack Component |
| E21703-00011-279 | Stack Component |
| E50101-04000-001/002 | Stack Component |
| E21701-05000-009 | Stack Component |
| A11501-01003-009 | Stack Component |
| E50201-06000-000 | Stack Component |
| E21703-00011-295 | Stack Component |
| M20105-07015-002 | Stack Component |
| E21703-00011-266 | Stack Component |
| E21703-00011-269 | Stack Component |
| E21703-00011-268 | Stack Component |
| M10302-03001-000 | Stack Component |
| E21703-00011-267 | Stack Component |
| M30117-03005-010 | Stack Component |
| E21703-00010-219 V2.1 | Stack Component |
| E21602-01000-000 | Stack Component |
| E21603-02002-000 | Stack Component |
| E21703-00000-138 | Stack Component |

37

| M60102-30308-055 | Stack Component |
| E21602-01001-000 | Stack Component |
| E21603-03001-000 | Stack Component |
| M60101-10205-000 | Stack Component |
| M70111-00050-107 | Stack Component |
| E21603-02003-000 | Stack Component |
| E21603-03003-000 | Stack Component |
| E50200-07000-000 | String Controller |
| SC24-105-1500 | String Controller |
| SC24-155-1500 | String Controller |
| E50200-11000-000 | String Controller |
| M30104-12007-040 | String Controller |
| M30104-12007-039 | String Controller |
| M00101-00002-023 | Switch |
| M00101-00002-017 | Switch |
| M00101-00002-020 | Switch |
| M80101-00009-001 | Switch |
| M20103-03030-003_DO NOT USE, NOT A FG | Terminals |
| M20106-06044-063 | Terminals |
| M20106-06044-060 | Terminals |
| M20103-03030-002_DO NOT USE, NOT A FG | Terminals |
| M30103-00014-014 | Terminals |
| M20103-03030-014 | Terminals |
| M30103-00014-012 | Terminals |
| M30117-10001-004 | Terminals |
| E-B-00437 | Terminals |
| M30117-10001-005 | Terminals |
| M20103-03029-003 | Terminals |
| M30117-10001-013 | Terminals |
| E-B-00037 | Terminals |
| M30117-04002-810 | Terminals |
| M30117-08004-000 | Terminals |
| M30101-00006-005 | Transformer |
| M30101-00006-005_DO NOT USE, NOT A FG | Transformer |

38

| Item | Category |
|------|----------|
| M30101-00006-008_DO NOT USE, NOT A FG | Transformer |
| M30101-00006-013 | Transformer |
| GN49 | Transformer |
| M00103-00008-000 | UPS |
| M00103-00008-007 | UPS |
| M00103-00005-000 | UPS |
| M00103-00008-017 | UPS |
| M00103-00006-000 | UPS |
| M00103-00008-006 | UPS |
| M00103-00008-016 | UPS |
| M00103-00008-022 | UPS |
| M00103-00008-015 | UPS |
| E-B-00409 | UPS |
| AP9641 | UPS |

**Mesa WHSE (Orion) Inventory**

| Item | Category |
|------|----------|
| M00101-00002-004 | Electronics |
| M00103-00008-015 | UPS |

**Mesa WHSE (GTI) Inventory**

| Item | Category |
|------|----------|
| M70112-00000-026 | Metal Fabrication |
| A10400-00005-795 | Metal Fabrication |
| M70112-00000-034 | Metal Fabrication |

**8 Loop, Houston TX (3PL) Inventory**

| Item | Category |
|------|----------|
| SMA SCS-3-3950-1500-2_FG | **PCS** |
| FP4200K CAR0040 QUOTE OPP-21-6671433 Rev 1 | **Transformer** |
| CS30-EE0-FF0-511-D11-320-0000000 | **Collection Segment Component** |
| M70107-00012-255 | **Energy Segment Component** |

39

| M70107-00012-283 | Fasteners |
| M60103-10100-001 | Fasteners |
| M60103-10100-002 | Fasteners |
| M60103-10100-003 | Fasteners |
| M60102-10613-522 | Fasteners |
| M60101-10210-010 | Fasteners |
| M60103-10210-000 | Fasteners |
| M60103-10100-004 | Fasteners |
| M60102-11501-002 | Fasteners |
| M60103-10310-000 | Fasteners |
| M70107-00012-251 | Fasteners |
| M70107-00012-280 | Metal Fabrication |
| CS30-H00-F00-411-A11-310-0000000 | Collection Segment Component |

## Trivergix (3PL) Inventory

| Item | Category |
| --- | --- |
| E40101-10806-042 | Module |
| E40101-10704-001 | Module |
| E40101-10704-002 | Module |
| E40101-10806-042 | Module |
| E40101-10704-002 | Module |
| E40101-10704-001 | Module |
| E40101-10806-102 | Module |
| E40101-10804-012 | Module |
| E40101-10804-011 | Module |
| E40101-10805-004 | Module |
| E40101-10403-021 | Module |
| E40101-10403-022 | Module |
| E40101-10805-003 | Module |
| E40101-10804-001 | Module |
| E40101-10403-024 | Module |
| E40101-10403-023 | Module |
| E40101-10804-002 | Module |
| S23-360-100-1500-C280-UNI | Stack |

40

| | |
|---|---|
| S22-230-280-1000-C280P-UNI 670-950 VDC_DO NOT USE, NOT A FG | **Stack** |
| S23-360-100-1500-E280K-UNI | **Stack** |
| S22-230-280-1000-C280P-UNI_DO NOT USE, NOT A FG | **Stack** |
| E40101-10806-022 | **Module** |
| E40101-10804-002 | **Module** |
| E40101-10806-022 | **Module** |
| E40101-10806-102 | **Module** |
| S22-230-140-1000-C280-110_DO NOT USE, NOT A FG | **Stack** |
| S22-230-140-1000-C280-110_DO NOT USE, NOT A FG | **Stack** |
| E40101-10806-022 | **Module** |
| E40101-10806-042 | **Module** |
| E40101-10806-022 | **Module** |

## OneSource (3PL) Inventory

| Item | Category |
|---|---|
| M00108-00002-007 | **FSS Component** |
| M00108-00002-021 | **FSS Component** |
| M00108-00002-020 | **FSS Component** |
| M00108-00002-008 | **FSS Component** |
| M00108-00002-010 | **FSS Component** |
| M00108-00002-009 | **FSS Component** |
| M00108-00002-012 | **FSS Integration** |
| M00108-00002-005 | **FSS Integration** |
| MGA1072AC090CR+1+1CA+C24++++++ | **HVAC** |
| S22-230-140-1000-C280-110_DO NOT USE, NOT A FG | **Stack** |
| E21703-00123-000 V1.1 | **Stack Component** |
| E21703-00139-000 V1.1 | **Stack Component** |
| E21703-00138-000 V1.1 | **Stack Component** |
| S22-230-140-1000-C280-110_DO NOT USE, NOT A FG | **Stack** |
| P10900-02000-102 V2.0 | **Busbars** |
| M50116-01116-000 | **Electronics** |
| M60102-40308-020 | **Fasteners** |
| M60102-30308-020 | **Fasteners** |

41

| | |
|---|---|
| E40101-10804-001 | **Module** |
| E40101-10804-002 | **Module** |
| S22-230-140-1000-C280-110 | **Stack** |
| S22-230-180-1000-C280-110_DO NOT USE, NOT A FG | **Stack** |
| A10400-00003-300 | **Stack Component** |
| A11501-01001-600 | **Stack Component** |
| E21703-00001-008 | **Stack Component** |
| E21703-00000-127 V2.0 | **Stack Component** |
| E21703-00000-129 V2.0 | **Stack Component** |
| E21703-00000-128 V2.0 | **Stack Component** |
| E21703-00000-135 V2.0 | **Stack Component** |
| E21703-00000-137 V2.0 | **Stack Component** |
| E21703-00000-136 V2.0 | **Stack Component** |
| E21703-00125-000 V1.1 | **Stack Component** |
| E21703-00124-000 V1.1 | **Stack Component** |
| E21703-00140-000 V1.1 | **Stack Component** |
| E21703-00000-113 V2.0 | **Stack Component** |
| E21703-00001-015 V2.0 | **Stack Component** |
| E21703-00000-103 | **Stack Component** |
| E21703-00000-106 | **Stack Component** |
| E21703-00000-105 | **Stack Component** |
| E21703-00000-104 | **Stack Component** |
| E21703-00000-108 | **Stack Component** |
| E21703-00000-132 | **Stack Component** |
| E21703-00000-131 | **Stack Component** |
| E21703-00000-133 | **Stack Component** |
| E21703-00000-134 | **Stack Component** |
| M60102-30308-040 | **Stack Component** |
| E21703-00000-107 | **Stack Component** |
| A-M-00521 | **Metal Fabrication** |

## Welldex (3PL) Inventory

| Item | Category |
|---|---|
| M00106-02002-003 | **HVAC** |

US-DOCS\161434707.6

| | |
|---|---|
| M00106-02002-003 | **HVAC** |
| A10400-00005-750 | **Metal Fabrication** |
| A10400-00005-758 | **Metal Fabrication** |
| E40101-10806-022 | **Module** |
| E40101-10806-042 | **Module** |

## RH  (3PL) Inventory

| Item | Category |
|---|---|
| P10900-07000-204 | **Metal Comp.** |
| A-M-00487A TDN-000257 | **Energy Segment Component** |
| A10400-00011-836B TDN-000257 | **Energy Segment Component** |
| A-M-00080F | **Module** |
| ES30-302-121-100-0000000 | **Energy Segment Component** |
| A-M-00487A TDN-000257 | **Energy Segment Component** |
| M70112-00000-306 | **Breakers** |
| M70112-00000-304 | **Breakers** |
| M30102-20420-017 | **Breakers** |
| M70112-00000-303 | **Breakers** |
| M30102-20420-009 | **Breakers** |
| M70112-00000-305 | **Breakers** |
| E31703-00003-003 | **Cables** |
| E31703-00003-005 | **Cables** |
| E31703-00003-009 | **Cables** |
| E21703-00030-298 | **Cables** |
| E21703-00030-296 | **Cables** |
| E21703-00030-299 | **Cables** |
| E21703-00030-297 | **Cables** |
| E21703-00030-140 | **Cables** |
| E31703-00003-004 | **Cables** |
| E31703-00003-002 | **Cables** |
| E21703-00035-021 | **Cables** |
| E31703-00003-006 | **Cables** |
| E21703-00035-023 | **Cables** |

43

| | |
|---|---|
| E21703-00030-550 | **Cables** |
| E21703-00035-024 | **Cables** |
| E21703-00030-316 | **Cables** |
| E21703-00030-317 | **Cables** |
| E21703-00030-557 | **Cables** |
| E21703-00030-164 | **Cables** |
| E21703-00130-503 | **Cables** |
| E21703-00030-556 | **Cables** |
| E21703-00030-167 | **Cables** |
| E21703-00130-500 | **Cables** |
| E21703-00130-501 | **Cables** |
| E21703-00130-502 | **Cables** |
| E21703-00130-504 | **Cables** |
| E21703-00030-561 | **Cables** |
| E21703-00030-147 | **Cables** |
| E21703-00030-560 | **Cables** |
| E21703-00033-002 | **Cables** |
| E21703-00033-004 | **Cables** |
| E21703-00033-001 | **Cables** |
| E21703-00030-558 | **Cables** |
| E21703-00030-145 | **Cables** |
| E21703-00030-148 | **Cables** |
| E21703-00033-003 | **Cables** |
| E21703-00030-144 | **Cables** |
| E21703-00030-559 | **Cables** |
| P10900-07001-283 | **Dampers** |
| P10900-07001-282 | **Dampers** |
| M70101-02004-000 | **DC Cabinet Component** |
| M70101-01016-000 | **DC Cabinet Component** |
| A10200-04010-049 | **Electrical Assy.** |
| E21703-00030-241 | **Electronics** |
| E31703-00003-001 | **Electronics** |
| M00108-00004-007 | **Electronics** |
| A10400-00011-836B TDN-000257 | **Energy Segment Component** |

44

US-DOCS\161434707.6

| | |
|---|---|
| E21703-00031-403 | **Energy Segment Component** |
| M20103-04001-008 | **Energy Segment Component** |
| P10900-07500-141 | **Energy Segment Component** |
| M70112-00000-758 | **Energy Segment Component** |
| P10900-07500-136 | **Energy Segment Component** |
| M30117-10001-006 | **Energy Segment Component** |
| P10900-07500-140 | **Energy Segment Component** |
| P10900-07500-139 | **Energy Segment Component** |
| M30117-10001-007 | **Energy Segment Component** |
| M70112-00000-076 | **Energy Segment Component** |
| M30117-10001-010 | **Energy Segment Component** |
| P10900-07500-137 | **Energy Segment Component** |
| M70112-00000-075 | **Energy Segment Component** |
| M20106-06044-064 | **Energy Segment Component** |
| M60102-30505-008 | **Energy Segment Component** |
| M60103-10210-000 | **Fasteners** |
| M60102-10306-014 | **Fasteners** |
| M60102-10310-020 | **Fasteners** |
| M60102-10504-060 | **Fasteners** |
| P10900-07001-334 | **Fasteners** |
| M60102-30505-012 | **Fasteners** |
| P10900-07200-021 | **Fasteners** |
| P10900-07001-432 | **Fasteners** |
| M60103-10308-104 | **Fasteners** |
| M60102-10503-010 | **Fasteners** |
| GASKET, BULK, PORON AQUAPRO 4701-41-15250-04, ADHESIVE: 3M 9495-200MP, 20mm WIDE STRIP | **Gaskets** |
| M70112-00000-080 | **Gaskets** |
| M70112-00000-264 | **Gaskets** |
| E21703-00035-017 | **Harnesses** |
| M70104-00010-133 | **Labels** |
| M70104-00010-102 | **Labels** |
| P00100-01001-018 | **Labels** |
| M70104-00010-118 | **Labels** |
| P10900-07000-204 | **Metal Comp.** |

45

| Item | Category |
|---|---|
| P10900-07000-210 | Metal Comp. |
| M70112-00000-261 | Metal Fabrication |
| P10900-07000-394 | Metal Fabrication |
| M70107-00012-290 | Misc Items |
| M70107-00004-012 | Misc Items |
| M30117-10001-005 | Terminals |
| M30117-10001-004 | Terminals |
| M30101-00006-005 | Transformer |
| ES30-102-111-100-0000000 | Energy Segment Component |
| E40101-10806-022 | Module |

## ATS (3PL) Inventory

| Item | Category |
|---|---|
| ES35-404-112-100-0000000 | Energy Segment |
| ES30-102-111-100-0000000 | Energy Segment Component |

## SourceOne, Portland OR (3PL) Inventory

| Item | Category |
|---|---|
| E21703-00031-185 | Cables |
| DC23-1-0630 | DC Cabinet |
| DC23-2-0630 | DC Cabinet |
| S22-230-140-1000-C280-110_DO NOT USE, NOT A FG | Stack |
| A10200-04006-000-110 | Stack Component |
| P10900-02000-102 V2.0 | Busbars |
| M50116-01116-000 | Electronics |
| C22-40HQ-3\|4HR-S230E-6T-CATL-110V_FG | Enclosure |
| M60102-40308-020 | Fasteners |
| M60102-30308-020 | Fasteners |
| E40101-10804-001 | Module |
| E40101-10804-002 | Module |
| S22-230-140-1000-C280-110_DO NOT USE, NOT A FG | Stack |
| A10400-00003-300 | Stack Component |

46

US-DOCS\161434707.6

| E21703-00000-106 | Stack Component |
| A11501-01001-600 | Stack Component |
| E21703-00123-000 V1.1 | Stack Component |
| E21703-00125-000 V1.1 | Stack Component |
| E21703-00124-000 V1.1 | Stack Component |
| E21703-00000-129 V2.0 | Stack Component |
| E21703-00000-127 V2.0 | Stack Component |
| E21703-00140-000 V1.1 | Stack Component |
| E21703-00139-000 V1.1 | Stack Component |
| E21703-00138-000 V1.1 | Stack Component |
| E21703-00000-128 V2.0 | Stack Component |
| E21703-00000-137 V2.0 | Stack Component |
| E21703-00000-135 V2.0 | Stack Component |
| E21703-00000-136 V2.0 | Stack Component |
| E21703-00001-015 V2.0 | Stack Component |
| E21703-00000-113 V2.0 | Stack Component |
| E21703-00000-103 | Stack Component |
| E21703-00000-107 | Stack Component |
| E21703-00000-105 | Stack Component |
| M60102-30308-040 | Stack Component |
| E21703-00000-104 | Stack Component |
| E21703-00000-131 | Stack Component |
| E21703-00000-132 | Stack Component |
| E21703-00000-108 | Stack Component |
| E21703-00000-133 | Stack Component |
| E21703-00000-134 | Stack Component |

## 8Loop, Attan CA  (3PL) Inventory

| Item | Category |
| --- | --- |
| E40101-10806-002 | Module |
| E40101-10806-022 | Module |
| S23-360-100-1500-C280-UNI_DO NOT USE, NOT A FG | Stack |

## SourceOne, Commerce CA  (3PL) Inventory

47

| Item | Category |
|------|----------|
| M30108-01106-028 | **Collection Segment Component** |
| M30108-01106-023 | **DC Cabinet Component** |
| M30108-01106-050 | **Stack Component** |
| M30108-01106-028 | **Collection Segment Component** |
| M30108-01106-023 | **DC Cabinet Component** |
| M00106-02004-000 | **HVAC** |
| S23-360-100-1500-C280-UNI_DO NOT USE, NOT A FG | **Stack** |
| M30108-01106-050 | **Stack Component** |

## 8Loop, Laredo TX  (3PL) Inventory

| Item | Category |
|------|----------|
| A10400-00005-865 | **Energy Segment Component** |
| ES30-103-121-100-0000000_FG | **Energy Segment** |

## SourceOne, Tolleson AZ  (3PL) Inventory

| Item | Category |
|------|----------|
| M90101-00001-001 | **Enclosure Component** |

## American Lamprecht, Houston TX  (3PL) Inventory

| Item | Category |
|------|----------|
| E40101-10804-011 | **Module** |
| E40101-10804-012 | **Module** |
| E40101-10403-022 | **Module** |
| E40101-10403-021 | **Module** |
| A10400-00003-300 | **Stack Component** |
| A10200-04006-000-110 | **Stack Component** |
| E21701-05000-007 | **Stack Component** |
| E21701-05000-009 | **Stack Component** |
| E21602-02000-000 | **Stack Component** |
| E40101-10403-022 | **Module** |
| E40101-10403-021 | **Module** |

48

A10200-04006-000-110     **Stack Component**
A10400-00003-300     **Stack Component**
E21701-05000-009     **Stack Component**
E21602-03000-000     **Stack Component**

## Prolift Rigging Co, Glendale AZ  (3PL) Inventory

Item     Category
CS30-A00-C00-512-A11-310-0000000     **Collection Segment Component**

## 8Loop, Wilmington CA  (3PL) Inventory

Item     Category
C23-53HQ-3HR-S360E-6T-CATL-UNI_DO NOT USE, NOT A FG     **Enclosure**

## Expeditors, Peabody MA  (3PL) Inventory

Item     Category
A10400-00006-006     **Cables**
A10400-00006-008     **Cables**
A10400-00006-005     **Cables**
A10400-00006-004     **Cables**
A10400-00006-003     **Cables**
A10400-00006-002     **Cables**
A10400-00006-001     **Cables**
A10400-00006-007     **Cables**
M70107-00012-255     **Energy Segment Component**
M70107-00012-283     **Fasteners**
M60103-10100-002     **Fasteners**
M60103-10100-001     **Fasteners**
M60103-10100-003     **Fasteners**
M60101-10210-010     **Fasteners**
M60102-10613-522     **Fasteners**
M60103-10210-000     **Fasteners**

49

| | |
|---|---|
| M60102-11501-002 | **Fasteners** |
| M70107-00012-251 | **Fasteners** |
| M60103-10310-000 | **Fasteners** |
| M70107-00012-280 | **Metal Fabrication** |

50

**Schedule 2.1(c)**

**INTELLECTUAL PROPERTY**

(i)     **PATENTS**

| KS Ref. No. | Country | Type | Title | Application No. | Filed | Publication No. | Publication Date | Patent No | Issued | Status | Next Due Date | Status Changed Date | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1008 78-01 | U.S. | Direct | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 16/101,032 | 8/10/2018 | 2020/0052502 | 2/13/2020 | 10,978,884 | 4/13/2021 | Issued | 10/13/2028 - Due, 2nd maintenance fee | 9/24/2024 | 1st maintenance fee paid 9/24/2024 |
| 9888-1008 78-02 | PCT | | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | PCT/US2019/045678 | 8/8/2019 | WO 2020/033665 | 2/13/2020 | N/A | N/A | Expired PCT | | | |
| 9888-1008 78-03 | Canada | National Stage | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 3,107,491 | 8/8/2019 | 3,107,491 | 2/13/2020 | | | Pending | | 6/3/2024 | Instructed to cease work and allow to lapse 6/3/2024; awaiting notice of abandonment |
| 9888-1008 78-04 | China | National Stage | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 201980052902.0 | 8/8/2019 | 112567586A | 3/26/2021 | 112567586B | 11/15/2024 | Issued | 8/8/2025 - Due, maintenance fee | 3/25/2025 | Instructed to pay maintenance fee |

| 9888-1008 78-05 | EPC | National Stage | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 19847972.7 | 8/8/2019 | 3834271 | 6/16/2021 | | | Pending | 8/8/2025 - Due, maintenance fee | 3/25/2025 | Instructed to pay maintenance fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1008 78-06 | Japan | National Stage | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 2021-531461 | 8/8/2019 | 2021-534719 | 12/9/2021 | 7295952 | 6/13/2023 | Issued | 6/13/2026 - Due, maintenance fee | 6/13/2023 | |
| 9888-1008 78-07 | U.S. | Continuation | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 17/213,155 | 3/25/2021 | 2021/0218250 | 7/15/2021 | 11,799,137 | 10/24/2023 | Issued | 4/24/2027 - Due 1st maintenance fee | 10/24/2023 | |
| 9888-1008 78-08 | U.S. | Continuation | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 18/491,448 | 10/20/2023 | 2024/0047769 | 2/8/2024 | | | Pending | | 2/8/2024 | Application published on 02/08/2024; awaiting action from PTO |
| 9888-1008 78-09 | China | Divisional | BALANCING CIRCUIT AND METHOD | 2024115086475.0 | 10/28/2024 | 119401598 | 2/7/2025 | | | Pending | | 10/28/2024 | Application published on 02/07/2025; awaiting action from CNIPA |
| 9888-1008 79-01 | U.S. | Direct | ENHANCED BATTERY MANAGEMENT SYSTEM | 16/101,045 | 8/10/2018 | 2020/0052503 | 2/13/2020 | 11,063,444 | 7/13/2021 | Issued | 1/13/2029 - Due, 2nd | 12/27/2024 | 1st maintenance fee paid |

52

| Ref | Country | Type | Title | Application No. | Filing Date | Pub. No. | Pub. Date | Patent No. | Issue Date | Status | Maintenance | Date | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | FOR BATTERY PACK | | | | | | | | maintenance fee | 12/27/2024 | |
| 9888-1008 79-02 | PCT | | ENHANCED BATTERY MANAGEMENT SYSTEM FOR BATTERY PACK | PCT/US2019/045696 | 8/8/2019 | WO 2020/033680 | 2/13/2020 | N/A | N/A | Expired PCT | | | |
| 9888-1008 79-03 | Canada | National Stage | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 3,107,493 | 8/8/2019 | 3,107,493 | 2/13/2020 | | | Pending | | 6/3/2023 | Instructed to cease work and allow to lapse 6/3/2024; awaiting Notice of Abandonment |
| 9888-1008 79-04 | China | National Stage | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 201980052886.5 | 8/8/2019 | 112585837 | 3/30/2021 | 1125858 37B | 11/12/2024 | Issued | 8/8/2025 - Due, maintenance fee | 3/25/2025 | Instructed to pay maintenance fee |
| 9888-1008 79-05 | EPC | National Stage | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 19848236.6 | 8/8/2019 | 3834272 | 6/16/2021 | | | Pending | 8/8/2025 - Due, maintenance fee | 3/25/2025 | Instructed to pay maintenance fee |
| 9888-1008 79-06 | Japan | National Stage | ENHANCED BATTERY MANAGEMENT SYSTEM FOR BATTERY PACK | 2021-531462 | 8/8/2019 | 2021-534720 | 12/9/2021 | 7295953 | 6/13/2023 | Issued | 6/13/2026 - Due, 4th maintenance fee | 6/13/2023 | |
| 9888-1008 80-01 | U.S. | Provisional | MODULAR BATTERY STACK AND SUPPORT SYSTEM | 62/729,852 | 9/11/2018 | N/A | N/A | N/A | N/A | Expired Provisional | | | |

US-DOCS\161434707.6

| Ref | Country | Type | Title | Application No. | Filing Date | Publication No. | Publication Date | Patent No. | Patent Date | Status | Next Due | Date | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1008 80-02 | PCT | | MODULAR BATTERY STACK AND SUPPORT SYSTEM | PCT/US2019/050328 | 9/10/2019 | WO 2020/055809 | 3/19/2020 | N/A | N/A | Expired PCT | | | |
| 9888-1008 80-03 | Canada | National Stage | MODULAR BATTERY STACK AND SUPPORT SYSTEM | 3,110,857 | 9/10/2019 | 3,110,857 | 3/19/2020 | | | Pending | | 8/12/2024 | Examination requested 8/12/2024; awaiting 1st action |
| 9888-1008 80-04 | China | National Stage | MODULAR BATTERY STACK AND SUPPORT SYSTEM | 201980059297.X | 9/10/2019 | 112673519 | 4/16/2021 | N/A | N/A | Abandoned | | 8/10/2023 | |
| 9888-1008 80-05 | EPC | National Stage | MODULAR BATTERY STACK AND SUPPORT SYSTEM | 19861075.0 | 9/10/2019 | 3850687 | 7/21/2021 | | | Pending | 6/6/2025 - Due, action response | 2/25/2025 | Preparing instructions to foreign agent to file response |
| 9888-1008 80-06 | U.S. | National Stage | MODULAR BATTERY STACK AND SUPPORT SYSTEM | 17/273,696 | 3/4/2021 | 2021/0336302 | 10/28/2021 | 11,996,531 | 5/28/2024 | Issued | 11/28/2027 - Due, 1st maintenance fee | 5/28/2024 | Patent issued 5/28/2024 |
| 9888-1062 20-01 | U.S. | Provisional | ELECTRICAL ENERGY STORAGE UNIT AND CONTROL SYSTEM AND APPLICATIONS THEREOF | 62/066,185 | 10/20/2014 | N/A | N/A | N/A | N/A | Expired Provisional | | | |
| 9888-1062 20-02 | U.S. | Direct | ELECTRICAL ENERGY STORAGE UNIT AND CONTROL | 14/678,074 | 4/3/2015 | 2016/0111900 | 4/21/2016 | 10,263,436 | 4/16/2019 | Issued | 10/16/2026 - Due, 2nd maintenance fee | 7/8/2022 | 1st maintenance fee paid 7/8/2022 |

US-DOCS\161434707.6

| 9888-1062 20-03 | China | Direct | ELECTRICAL ENERGY STORAGE UNIT AND CONTROL SYSTEM AND APPLICATIONS THEREOF | 201610208153.4 | 4/1/2016 | 105939035A | 9/14/2016 | 105939035B | 9/21/2018 | Abandoned | | 4/1/2024 | Notice of Cessation of Patent Rights issued 11/7/2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1062 21-01 | PCT | | ELECTRICAL ENERGY STORAGE UNIT | PCT/CN2011/071548 | 3/5/2011 | WO 2012/119297 | 9/13/2012 | N/A | N/A | Expired PCT | | | |
| 9888-1062 21-02 | China | Direct | ELECTRICAL ENERGY STORAGE UNIT | 201180065185.9 | 3/5/2011 | 103403993A | 7/19/2013 | 103403993B | 8/24/2016 | Issued | 3/5/2025 - Due, maintenance fee | 2/12/2024 | 2024 maintenance fee paid 2/12/2024 |
| 9888-1062 21-03 | U.S. | National Stage | ELECTRICAL ENERGY STORAGE UNIT AND CONTROL SYSTEM AND APPLICATIONS THEREOF | 13/978,689 | 8/27/2013 | 2013/0328530 | 12/12/2013 | 9,331,497 | 5/3/2016 | Issued | 11/3/2027 - Due, 3rd maintenance fee | 10/17/2023 | 2nd maintenance fee paid 10/17/2023 |
| 9888-1062 21-04 | U.S. | CIP | BATTERY ENERGY STORAGE SYSTEM AND CONTROL SYSTEM AND APPLICATIONS THEREOF | 14/962,491 | 12/8/2015 | 2016/0141894 | 5/19/2016 | 9,847,654 | 12/19/2017 | Issued | 6/19/2025 - Due, 2nd maintenance fee | 3/25/2025 | Instructed to pay 2nd maintenance fee |
| 9888-1062 21-05 | China | Direct | BATTERY ENERGY STORAGE SYSTEM AND CONTROL | 201611110795.7 | 12/6/2016 | 106849212 | 6/13/2017 | N/A | N/A | Abandoned | | | |

55

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1062 21-06 | U.S. | Provisional | SYSTEM AND APPLICATIONS THEREOF MODULAR, STACKABLE BATTERY ENERGY STORAGE SYSTEM, AND APPLICATIONS THEREOF | 62/554,881 | 9/6/2017 | N/A | N/A | N/A | N/A | Expired Provisional | | | |
| 9888-1062 21-07 | U.S. | CIP | BATTERY ENERGY STORAGE SYSTEM AND CONTROL SYSTEM AND APPLICATIONS THEREOF | 15/845,598 | 12/18/2017 | 2018/0123357 | 5/3/2018 | 10,536,007 | 1/14/2020 | Issued | 7/14/2027 - Due, 2nd maintenance fee | 6/15/2023 | 1st maintenance fee paid 6/15/2023 |
| 9888-1062 21-08 | China | Direct | BATTERY ENERGY STORAGE SYSTEM AND CONTROL SYSTEM AND APPLICATIONS THEREOF | 201810422475.8 | 5/5/2018 | 108649595A | 10/12/2018 | 108649595B | 10/22/2021 | Abandoned | | 5/5/2024 | Notice of Cessation of Patent Rights issued 12/11/2024 |
| 9888-1062 22-01 | U.S. | Direct | NON-TRACTION BATTERY CONTROLLER AND APPLICATIONS THEREOF | 14/105,952 | 12/13/2013 | 2015/0165913 | 6/18/2015 | 9,168,836 | 10/27/2015 | Issued | 4/27/2027 - Due, 2nd maintenance fee | 2/17/2023 | 2023 maintenance fee paid 2/17/2023 |
| 9888-1062 22-02 | China | Direct | NON-TRACTION BATTERY CONTROLLER AND APPLICATIONS THEREOF | 201410111983.6 | 3/24/2014 | 104009530A | 8/27/2014 | 104009530B | 11/20/2016 | Abandoned | | 3/24/2024 | Notice of Cessation of Patent Rights issued 10/30/2024 |

56

| 9888-1062 23-01 | U.S. | Direct | BATTERY PACK WITH INTEGRATED BATTERY MANAGEMENT SYSTEM | 14/851,482 | 9/11/2015 | 2017/0077559 | 3/16/2017 | 9,923,247 | 3/20/2018 | Issued | 9/20/2025 - Due, 2nd maintenance fee | 9/9/2021 | 1st maintenance fee paid 9/9/2021 |
| 9888-1062 23-02 | China | Direct | BATTERY PACK WITH INTEGRATED BATTERY MANAGEMENT SYSTEM | 2016108162770 | 9/10/2016 | 107123834 | 9/1/2017 | N/A | N/A | Abandoned | | 6/25/2021 | |
| 9888-1062 24-01 | U.S. | Direct | BATTERY MANAGEMENT SYSTEM (BMS) HAVING ISOLATED, DISTRIBUTED, DAISY-CHAINED BATTERY MODULE CONTROLLERS. | 14/851,460 | 9/11/2015 | 2017/0077558 | 3/16/2017 | 10,122,186 | 11/6/2018 | Issued | 5/6/2026 - Due, 2nd maintenance fee | 3/1/2022 | 1st maintenance fee paid 3/1/2022 |
| 9888-1062 24-02 | China | Direct | BATTERY MANAGEMENT SYSTEM (BMS) HAVING ISOLATED, DISTRIBUTED, DAISY-CHAINED BATTERY MODULE CONTROLLERS. | 2016108162766 | 9/10/2016 | 106899052 | 6/27/2017 | N/A | N/A | Abandoned | | 5/28/2021 | |
| 9888-1062 25-01 | U.S. | Direct | WARRANTY TRACKER FOR | 14/819,779 | 8/6/2015 | 2017/0038433 | 2/9/2017 | 10,254,350 | 4/9/2019 | Issued | 10/9/2026 - Due, 2nd maintenance fee | 7/8/2022 | 1st maintenance fee |

US-DOCS\161434707.6

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | A BATTERY PACK | | | | | | | | maintenance fee | | paid 7/8/2022 |
| 9888-1062 25-02 | China | Direct | WARRANTY TRACKER FOR A BATTERY PACK | 201610569996.7 | 7/19/2016 | 106199447A | 12/7/2016 | 106519944 7B | 3/16/2021 | Issued | 7/19/2025 - Due, maintenance fee | 3/25/2025 | Instructed to pay maintenance fee |
| 9888-1062 26-01 | U.S. | Direct | BATTERY ENERGY STORAGE SYSTEM | 14/932,688 | 11/4/2015 | 2017/0126032 | 5/4/2017 | 9,882,401 | 1/30/2018 | Issued | 7/30/2025 - Due, 2nd maintenance fee | 3/25/2025 | Instructed to pay 1st maintenance fee |
| 9888-1062 26-02 | China | Direct | BATTERY ENERGY STORAGE SYSTEM | 201610969153.6 | 11/4/2016 | 106961114A | 7/18/2017 | 106961114B | 7/19/2019 | Issued | 11/4/2025 - Due, maintenance fee | 9/30/2024 | 2024 maintenance fee paid 9/30/2024 |
| 9888-1062 26-03 | U.S. | Continuation | BATTERY ENERGY STORAGE SYSTEM | 15/882,713 | 1/29/2018 | 2018/0233931 | 8/16/2018 | 10,270,266 | 4/23/2019 | Issued | 10/23/2026 - Due, 2nd maintenance fee | 7/8/2022 | 1st maintenance fee paid 7/8/2022 |
| 9888-1062 27-01 | U.S. | Direct | SYSTEMS AND METHODS FOR DETECTING A BATTERY PACK HAVING AN OPERATING ISSUE OR DEFECT | 14/819,774 | 8/6/2015 | 2017/0040646 | 2/9/2017 | 10,153,521 | 12/11/2018 | Issued | 6/11/2026 - Due, 2nd maintenance fee | 3/1/2022 | 1st maintenance fee paid 3/1/2022 |
| 9888-1062 27-02 | China | Direct | SYSTEMS AND METHODS FOR DETECTING A BATTERY PACK HAVING AN OPERATING | 201610569997.1 | 7/19/2016 | 106154178A | 11/23/2016 | 106154178B | 5/12/2020 | Issued | 7/19/2025 - Due, maintenance fee | 3/25/2025 | Instructed to pay maintenance fee |

58

| | | | ISSUE OR DEFECT | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1062 28-01 | U.S. | Direct | BATTERY-ASSISTED ELECTRIC VEHICLE CHARGING SYSTEM AND METHOD | 14/884,463 | 10/15/2015 | 2017/0106764 | 4/20/2017 | 10,040,363 | 8/7/2018 | Issued | 2/9/2026 - Due, 2nd maintenance fee | 12/27/2021 | 1st maintenance fee paid 12/27/2021 |
| 9888-1062 28-02 | China | Direct | BATTERY-ASSISTED ELECTRIC VEHICLE CHARGING SYSTEM AND METHOD | 201610893636.2 | 10/13/2016 | 106816917 | 6/9/2017 | N/A | N/A | Abandoned | | | File Not Opened Handled directly by Powin / Virgil until abandonment |
| 9888-1062 29-01 | U.S. | Provisional | WORLD-WIDE WEB OF NETWORKED, SMART, SCALABLE, PLUG & PLAY BATTERY PACKS HAVING A BATTERY PACK OPERATING SYSTEM, AND APPLICATIONS THEREOF | 62/340,647 | 5/24/2016 | N/A | N/A | N/A | N/A | Expired Provisional | | | File Not Opened Handled by Sterne Kessler until expiration |
| 9888-1062 29-02 | U.S. | Direct | WORLD-WIDE WEB OF NETWORKED, SMART, SCALABLE, PLUG & PLAY BATTERY PACKS | 15/604,329 | 5/24/2017 | N/A | N/A | N/A | N/A | Abandoned | | | File Not Opened Handled by Sterne Kessler until abandonment |

US-DOCS\161434707.6

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | HAVING A BATTERY PACK OPERATING SYSTEM, AND APPLICATIONS THEREOF | | | | | | | | | | |
| 9888-1062 30-01 | U.S. | Direct | BATTERY PACK MONITORING AND WARRANTY TRACKING SYSTEM | 15/389,188 | 12/22/2016 | 2018/0181967 | 6/28/2018 | 10,699,278 | 6/30/2020 | Issued | 12/30/2027 - Due, 2nd maintenance fee | 12/12/2023 | 1st maintenance fee paid 12/12/2023 |
| 9888-1062 31-01 | U.S. | Provisional | MONITORING BATTERY PACKS WITHIN A BATTERY ENERGY STORAGE SYSTEM | 62/645,623 | 3/20/2018 | N/A | N/A | N/A | N/A | Expired Provisional | | | |
| 9888-1062 31-02 | PCT | | MONITORING BATTERY PACKS WITHIN A BATTERY ENERGY STORAGE SYSTEM | PCT/US19/22992 | 3/19/2019 | WO 2019/183111 | 9/26/2019 | N/A | N/A | Expired PCT | | | |
| 9888-1062 31-03 | U.S. | National Stage | MONITORING BATTERY PACKS WITHIN A BATTERY ENERGY STORAGE SYSTEM | 16/982,449 | 9/18/2020 | 2021/0083329 | 3/18/2021 | | | Allowed | | 2/25/2025 | Issue Fee paid 2/25/2025; awaiting issued patent certificate |
| 9888-1062 31-04 | U.S. | Continuation | SYSTEMS FOR MONITORING BATTERY | 19/075,032 | 3/10/2025 | | | | | Pending | | 3/10/2025 | Awaiting action from PTO |

US-DOCS\161434707.6

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | PACKS WITHIN A BATTERY ENERGY STORAGE SYSTEM | | | | | | | | | |
| 9888-1062 32-01 | U.S. | Provisional | NOISE-IMMUNE BATTERY PACK COMMUNICATION SYSTEM AND APPLICATIONS THEREOF | 62/682,453 | 6/8/2018 | N/A | N/A | N/A | N/A | Expired Provisional | | |
| 9888-1062 32-02 | PCT | | NOISE-IMMUNE BATTERY PACK COMMUNICATION SYSTEM AND APPLICATIONS THEREOF | PCT/US19/35822 | 6/6/2019 | [WO 2019/236869](#) | 12/12/2019 | N/A | N/A | Expired PCT | | |
| 9888-1062 33-01 | U.S. | Provisional | MICROGRID POWER SYSTEM | 62/682,527 | 6/8/2018 | N/A | N/A | N/A | N/A | Expired Provisional | | |
| 9888-1062 33-02 | PCT | | MICROGRID POWER SYSTEM | PCT/US19/35838 | 6/6/2019 | [WO 2019/236883](#) | 12/12/2019 | N/A | N/A | Expired PCT | | |
| 9888-1062 33-03 | U.S. | National Stage | MICROGRID POWER SYSTEM | 16/982,454 | 9/18/2020 | [2021/0083505](#) | 3/18/2021 | [11,336,111](#) | 5/17/2022 | Issued | 11/17/2025 - Due, 1st maintenance fee | 5/17/2022 |
| 9888-1062 33-04 | U.S. | Continuation | MICROGRID POWER SYSTEM | 17/743,134 | 5/12/2022 | [2022/0360105](#) | 11/10/2022 | [11,843,278](#) | 12/12/2023 | Issued | 6/18/2027 - Due, 1st maintenance fee | 12/12/2023 |

| 9888-1062 33-05 | U.S. | Divisional | MICROGRID POWER SYSTEM | 18/525,742 | 11/30/2023 | 2024/0258826 | 8/1/2024 | 12,212,181 | 1/28/2025 | Issued | 7/28/2028 - Due, 1st maintenance fee | 1/28/2025 | |
| 9888-1067 66-01 | U.S. | Provisional | MODULAR BATTERY STACK AND SUPPORT SYSTEM | 63/295,721 | 12/31/2021 | N/A | N/A | N/A | N/A | Expired Provisional | | 12/31/2022 | Filed PCT 12/30/2022 |
| 9888-1067 66-02 | PCT | | ENERGY STORAGE SYSTEMS AND ASSOCIATED METHODS | PCT/US22/54375 | 12/30/2022 | WO2023129735 | 7/6/2023 | N/A | N/A | Pending | | 7/6/2023 | National Phase applications filed in CN and US 6/28/2023 |
| 9888-1067 66-03 | China | Utility Model | ENERGY STORAGE SYSTEMS AND ASSOCIATED METHODS | 2022800870407 | 6/28/2024 | 118476104A | 8/9/2024 | | | Pending | | 2/21/2025 | Notification of Entry into Substantive Exam issued 2/21/2025; awaiting 1st OA |
| 9888-1067 66-04 | U.S. | National Stage | ENERGY STORAGE SYSTEMS AND ASSOCIATED METHODS | 18/725,710 | 6/28/2024 | | | | | Pending | | 2/26/2025 | Awaiting action from PTO; Acceptance of National Stage Application received 2/26/2025; awaiting 1st OA |
| 9888-1083 64-01 | U.S. | Provisional | HVAC SERVICING CARRIER | 63/419,262 | 10/25/2022 | N/A | N/A | N/A | N/A | Expired Provisional | | 10/25/2023 | No non-provisional applicatio |

62

| 9888-1083 65-01 | U.S. | Provisional | UNIFORM TEMPERATURE TUNED SINGLE HEATSINK FOR AIR-COOLED BATTERY APPLICATIONS | 63/405,266 | 9/9/2022 | N/A | N/A | N/A | N/A | Expired Provisional | 9/9/2023 | No non-provisional application is to be filed |
| 9888-1083 66-01 | U.S. | Provisional | BATTERY CELLS WITH VENTING INDICATORS | 63/430,211 | 12/5/2022 | N/A | N/A | N/A | N/A | Expired Provisional | 12/5/2023 | No non-provisional application is to be filed |
| 9888-1086 49-01 | U.S. | Provisional | AUXILLIARY LOAD OPTIMIZATION | | | N/A | N/A | N/A | N/A | Unfiled - In Progress | | |
| 9888-1086 51-01 | U.S. | Provisional | CONTROL SYSTEM FOR AIR-COOLED ENCLOSURE-BASED BATTERY ENERGY STORAGE SYSTEMS | 63/431,629 | 12/9/2022 | N/A | N/A | N/A | N/A | Expired Provisional | 12/9/2023 | Filed non-provisional 12/14/2022 |
| 9888-1086 51-02 | U.S. | Utility | ACTIVE FAN BALANCING | 18/081,524 | 12/14/2022 | 2024/0194968 | 6/13/2024 | | Pending | 6/13/2024 | Awaiting action from the PTO |
| 9888-1086 52-01 | U.S. | Provisional | BATTERY OPTIMIZATION PLATFORM | | | N/A | N/A | N/A | N/A | Unfiled - Not Proceeding | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1086 53-01 | U.S. | Provisional | BATTERY STATE OF CHARGE ESTIMATION | 63/451,512 | 3/10/2023 | N/A | N/A | N/A | N/A | Expired Provisional | 3/10/2024 | Non-provisional application filed 4/21/2023 |
| 9888-1086 53-02 | U.S. | Utility | BATTERY STATE OF CHARGE ESTIMATION | 18/137,362 | 4/20/2023 | 2024/0302439 | 9/12/2024 | | | Pending | 9/12/2024 | Awaiting action from the PTO |
| 9888-1087 36-01 | U.S. | Provisional | STACKABLE LADDER TRAY | 63/417,981 | 10/20/2022 | N/A | N/A | N/A | N/A | Expired Provisional | 10/20/2023 | Instructed not to file a non-provisional application |
| 9888-1105 81-02 | PCT | | | | | | | | | | | |
| 9888-1106 62-01 | China | Utility Model | DETATCHABLE ENERGY STORAGE DEVICE | 2.01521E+11 | 9/2/2015 | | 205039186 | 2/17/2016 | | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 63-01 | China | Utility Model | OUTDOOR CHARGING PILE | 2.01521E+11 | 9/2/2015 | | 204967341 | 1/13/2016 | | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 64-01 | China | Utility Model | NOVEL BATTERY MODULE | 2.01521E+11 | 10/19/2015 | | 205039192 | 2/17/2016 | | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |
| 9888-1106 65-01 | China | Utility Model | LONG DISTANCE TRANSMISSION I2C BUS COMMUNICATION INTERFACE CIRCUIT | 2.01521E+11 | 10/19/2015 | | 205427840 | 8/3/2016 | | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1106 66-01 | China | Utility Model | BATTERY PACK INTEGRATED SYSTEM | 2.01521E+11 | 10/19/2015 | | 205039193 | 2/17/2016 | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |
| 9888-1106 67-01 | China | Utility Model | AIR-COOLED BATTERY MODULE STRUCTURE | 2.01521E+11 | 10/19/2015 | | 205039221 | 2/17/2016 | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |
| 9888-1106 68-01 | China | Utility Model | COMBINED BATTERY CONNECTION STRUCTURE | 2.01521E+11 | 11/6/2015 | | 205159415 | 4/13/2016 | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |
| 9888-1106 69-01 | China | Utility Model | BATTERY CONNECTION STRUCTURE | 2.01521E+11 | 11/6/2015 | | 205092284 | 3/16/2016 | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |
| 9888-1106 70-01 | China | Utility Model | FIRE FIGHTING SYSTEM FOR ELECTRICITY STORAGE CONTAINER | 2015211324080 | 12/30/2015 | | 205434759 | 8/10/2016 | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |
| 9888-1106 71-01 | China | Utility Model | MONITORING DEVICE FOR ELECTRICITY STORAGE CONTAINER | 2015211329008 | 12/30/2015 | | 205428090 | 8/3/2016 | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |
| 9888-1106 72-01 | China | Utility Model | COOLING SYSTEM FOR ELECTRICITY STORAGE CONTAINER | 201521135094 | 12/30/2015 | | 205454348 | 8/10/2016 | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |
| 9888-1106 73-01 | China | Utility Model | NOVEL INTEGRATED HIGH-VOLTAGE ENERGY STORAGE CABINET SYSTEM | 2020212847039 | 7/3/2020 | | 212435439 | 1/29/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |

US-DOCS\161434707.6

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1106 74-01 | China | Utility Model | QUICK GRADING SYSTEM FOR ECHELON BATTERY | 2020212936916 | 7/3/2020 | | 212810381 | 3/26/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 75-01 | China | Utility Model | LITHIUM BATTERY PACK PROTECTION DEVICE | 2020214170066 | 7/17/2020 | | 212342721 | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 76-01 | China | Utility Model | AIR COOLING STRUCTURE OF LITHIUM BATTERY PACK | 2020214170070 | 7/17/2020 | | 212342694 | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 77-01 | China | Utility Model | LITHIUM BATTERY PACK ISOLATION STRUCTURE | 2020214182152 | 7/17/2020 | | 212342716 | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 78-01 | China | Utility Model | ANTI-FALLING LITHIUM BATTERY PACK SHELL | 2020214182402 | 7/17/2020 | | 212342740 | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 79-01 | China | Utility Model | HEAT PRESERVATION DEVICE FOR LITHIUM BATTERY PACK | 2020214300619 | 7/20/2020 | | 212342695 | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 80-01 | China | Utility Model | BOX BODY SEALING STRUCTURE OF LITHIUM BATTERY PACK | 2020214300623 | 7/20/2020 | | 212342756 | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 81-01 | China | Utility Model | EXTERNAL DUSTPROOF STRUCTURE OF LITHIUM | 2020214301039 | 7/20/2020 | | 212342722 | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |

US-DOCS\161434707.6

| 9888-1106 82-01 | China | Utility Model | BATTERY PACK LITHIUM BATTERY PACK CONNECTING SHEET STRUCTURE | 2020214301433 | 7/20/2020 | 212342768 | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1106 83-01 | China | Utility Model | SOFT PACKET OF LITHIUM CELL GROUP PACKAGE ASSEMBLY | 2020214320186 | 7/20/2020 | 212342718 | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 84-01 | China | Utility Model | POWER LITHIUM BATTERY PACK CONNECTING STRUCTURE | 202021418228 | 7/17/2020 | 212342717 | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 85-01 | China | Utility Model | VENTILATION DEVICE FOR LITHIUM BATTERY PACK | 202021430140 | 7/20/2020 | 212342662 | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1108 32-01 | China | Utility Model | ACTIVE-BALANCING BATTERY MANAGEMENT SYSTEM FOR SMART PHOTOVOLTAIC LOW-SPEED ELECTRIC VEHICLES | 2018209306393 | 6/11/2018 | 208353021 | 1/8/2019 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1108 33-01 | China | Utility Model | ELECTRIC ENERGY STORAGE LITHIUM BATTERY PACK WITH | 2019216036675 | 9/25/2019 | 210200916 | 3/27/2020 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |

67

EFFICIENT
HEAT
DISSIPATION

| 9888-<br>1113<br>59-01 | China | Utility<br>Model | LONG-<br>DISTANCE<br>TRANSMISSIO<br>N 12C BUS<br>COMMUNICA<br>TION<br>INTERFACE<br>CIRCUIT | 201510712605<br>8 | 10/19/2<br>015 | 105243045<br>A | 1/13/20<br>16 | | Abando<br>ned | 12/10/2<br>024 | Instructed<br>not to file<br>a<br>response |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 9888-<br>1114<br>63-01 | China | Utility<br>Model | SAFETY<br>EXPLOSION-<br>PROOF<br>STRUCTURE<br>OF STORAGE<br>BATTERY | 202223477461<br>7 | 12/26/2<br>022 | | 21897564<br>0U | 5/5/202<br>3 | Abando<br>ned | 12/10/2<br>024 | Instructed<br>not to pay<br>maintena<br>nce fee |
| 9888-<br>1114<br>64-01 | China | Utility<br>Model | THERMAL<br>RUNAWAY<br>PROTECTION<br>STRUCTURE<br>FOR<br>STORAGE<br>BATTERY | 202223485871<br>6 | 12/27/2<br>022 | | 21893982<br>1U | 4/28/20<br>23 | Abando<br>ned | 12/10/2<br>024 | Instructed<br>not to pay<br>maintena<br>nce fee |
| 9888-<br>1114<br>65-01 | China | Utility<br>Model | UNIFORM<br>HEAT<br>DISSIPATION<br>STRUCTURE<br>FOR ENERGY<br>STORAGE<br>PRODUCT<br>MODULE | 202223511639<br>5 | 12/28/2<br>022 | | 21895785<br>4U | 5/2/202<br>3 | Abando<br>ned | 12/10/2<br>024 | Instructed<br>not to pay<br>maintena<br>nce fee |
| 9888-<br>1114<br>66-01 | China | Utility<br>Model | AN<br>OUTDOOR<br>MULTI-<br>FUNCTIONAL<br>POWER<br>SUPPLY | 202223444376<br>0 | 12/22/2<br>022 | N/A | N/A | N/A | N/A | Abando<br>ned | 8/1/202<br>3 | Assignme<br>nt to<br>Powin, LLC<br>was not<br>recorded<br>as<br>applicatio<br>n lapsed<br>after |

US-DOCS\161434707.6

| 9888-111467-01 | China | Utility Model | AN OUTDOOR POWER STATION WITH GOOD HEAT DISSIPATION PERFORMANCE | 2022234586957 | 12/23/2022 | | Abandoned | 5/23/2024 | Instructed not to file a response |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | rejection in Aug. 2023 |
| 9888-113331-01 | China | Utility Model | COOLING PLATES FOR BATTERIES | 2025202486747 | 2/14/2025 | | Pending | 2/14/2025 | Awaiting 1st action from CNIPA |
| 9888-113331-02 | U.S. | Provisional | COOLING PLATES FOR BATTERIES | | | | Not Yet Filed | | Awaiting confirmation of named Applicants |
| 9888-113514-01 | U.S. | Provisional | SYSTEMS AND METHODS FOR PASSIVE BALANCING OF BATTERY PACKS | | | | Not yet filed | 3/31/2025 | Draft application sent for review 3/31/2025 |

69

**(ii)**   **TRADEMARKS**

| KS Ref. No. | Country | Mark Name | Class | Goods/Services | Applicatio n No. | Filing Date | Reg. No. | Reg. Date | Sec. 8&15 Dec. (US only) | Renewal | Status | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10493-109105-01 | USA | EnergyReserve ▉▉▉ | 9 | Electric control devices for energy storage; electric power converters; electrical storage batteries | 97/612,451 | 9/29/2022 | | | | | Abandoned | owned by GPTECH, Inc. |
| 10493-109964-01 | USA | EnergyReserve ▉▉▉ | 9 | Electric control devices for energy storage; electric power converters; electrical storage batteries | 86/410,268 | 10/1/2014 | 4,819,603 | 9/22/2015 | | 9/22/2025 | Registered (owned by GPTECH USA, Inc.) | Section 7 Request to Amend owner to reflect GPTECH, Inc. granted by USPTO |
| 9888-100566-01 | USA | STACK | 9 | Modular Energy Storage System For Providing Electrical Power | 87/873,439 | 4/11/2018 | | | | | Abandoned | |

70

| 9888-100567-01 | USA | | 9, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | 87/873,442 | 4/11/2018 | 5,712,492 | 3/2/2019 | 4/2/2025 (filed) | 4/2/2029 | Registered |

| 9888-100567-02 | Canada | | 9, 37, 42 | Class 9: Electric storage batteries; general purpose batteries; grids for batteries; charging stations for electric vehicles

Class 37: Installation of battery systems

Class 42: Design, planning and engineering of electrical storage batteries; electrical engineering; mechanical engineering; electrical systems design services; design and development | 1,897,913 | 5/7/2018 | TMA1,106,334 | 8/9/2021 | | 8/9/2031 | Registered |

72

of battery systems

| 9888-100567-03 | China | | 9, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power- | A0075614 | 5/4/2018 | 1414675 | 5/4/2018 | | 5/4/2028 | Registered via International Registration No. 1414675. | Request to Cancel Registration filed by third party. No further action to be taken in matter. Registration should eventually be |



charging
stations

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-100567-66 | Madrid (covering China) | | 9, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0075614 | 5/4/2018 | 1414675 | 5/4/2018 | 5/4/2028 | Registered via International Registration No. 1414675. |

Class 42:

74

| | | | | | |
|---|---|---|---|---|---|
| | | Engineering services; electrical systems design services; design and integration of battery systems | | | |
| 9888-105002-01 | USA | STACKOS | | Unfiled - In Progress | Draft recitation of goods sent to client for approval |
| 9888-105003-01 | USA | STACKOS+ | | Unfiled - In Progress | Draft recitation of goods sent to client for approval |
| 9888-105004-01 | USA | MAKING STORAGE SIMPLE | | Unfiled - In Progress | Awaiting instructions to file. |

US-DOCS\161434707.6

| 9888-111969-01 | USA | POWIN POD | 9 | Battery energy storage system comprised primarily of batteries, battery cells and electric controllers | 98/635,099 | 7/5/2024 | | Pending | Suspended pending outcome of US App. No. 98329935 for POWIN filed by Powin Information Technology Inc.; KMH to call Examiner re same |
| 9888-111970-01 | USA | AEGIS | | | | | | Unfiled - Not Proceeding | |
| 9888-111971-01 | USA | ATLAS | | | | | | Unfiled - Not Proceeding | |
| 9888-112030-01 | USA | NEXUS | | | | | | Unfiled - Not Proceeding | |
| 9888-112031-01 | USA | CONNECT | | | | | | Unfiled - Not Proceeding | |

76

| 9888-105656-01 | USA | CENTIPEDE | 9 | Modular battery storage systems consisting primarily of utility-scale batteries in enclosures for providing electrical power for electricity grid applications | 88/164,245 | 10/22/2018 | 6,639,559 | 2/82022 | 2/8/2028 | 2/8/2032 | Registered |
| 9888-105689-01 | USA | POWIN ENERGY | 11, 42 | Class 11: Lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | 86/521,596 | 2/2/2015 | 4,865,706 | 12/8/2015 | 12/8/2021 (filed) | 12/8/2025 | Registered |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9888-105805-01 | USA | POWIN ENERGY | 9 | Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | 86/299,545 | 1/5/2016 | 4,882,384 | 1/5/2016 | 1/5/2022 (filed) | 1/5/2026 | Registered |
| 9888-105848-01 | USA | BUILDING THE WORLD'S BEST BATTERIES | 9, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power- | 90/531,355 | 2/16/2021 | | | | | Abandoned |

charging
stations

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-106715-01 | USA | POWIN STACK | 9 | Modular energy storage system for managing electrical power comprised of battery cells and an electronic regulator that monitors and controls the charging and discharging of rechargeable batteries | 90/804,882 | 6/30/2021 | | | Abandoned | Application was allowed; instructed to take no further action |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108632-01 | USA | LEADING THE CHARGE | | | | | | | Unfiled - Not Proceeding | |

| 9888-108633-01 | USA | ENERGY STORAGE MADE SIMPLE | 9, 42 | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | 97/482,368 | 6/29/2022 | 7,559,905 | 11/5/2024 | 11/5/2030 | 11/5/2034 | Registered |
| 9888-108634-01 | USA | BUILDING THE FUTURE OF ENERGY | | | | | | | | | Unfiled - Not Proceeding |
| 9888-108890-01 | USA | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: | 97/559,144 | 8/22/2022 | 7,222,099 | 11/21/2023 | 11/21/2029 | 11/21/2033 | Registered |

80

lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-66 | International Registration | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered |

81

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-02 | Afghanistan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

82

|  |  |  |  | Class 11: lighting fixtures |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  | Class 42: Engineering services; electrical systems design services; design and integration of battery systems |  |  |  |  |  |  |
| 9888-108890-03 | OAPI (via Madrid) **OAPI includes Benin, Burkina Faso, Cameroon, the Central African Republic, Chad, the Comoros, the Congo, Côte d'Ivoire, Equatorial Guinea, | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240 |

83

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Gabon, Guinea, Guinea-Bissau, Mali, Mauritania, the Niger, Senegal, and Togo | | | Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
| 9888-108890-04 | Albania (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

84

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-05 | Algeria (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

US-DOCS\161434707.6

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-06 | Antigua and Barbuda (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | Registered via International Registration No. 1687240. |

86

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-07 | Armenia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | Registered via International Registration No. 1687240. |

87

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-08 | Australia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | | Pending: Provisional Refusal issued; response due 11/18/25 |

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-09 | Austria (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

89

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-10 | Azerbaijan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

90

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-11 | Bahrain (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

91

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-12 | Belarus (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

92

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-13 | Belgium (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. Included in Benelux. |

93

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-14 | Bhutan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

94

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-15 | Bosnia and Herzegovi (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

US-DOCS\161434707.6

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-16 | Botswana (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

US-DOCS\161434707.6

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-17 | Brazil (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/19 32 | Registere d via Internati onal Registrati on No. 1687240 |

97

US-DOCS\161434707.6

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-18 | Brunei Darussalam (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/1932 | Registered via International Registration No. 1687240 |

98

|  |  |  |  | Class 11: lighting fixtures |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  | Class 42: Engineering services; electrical systems design services; design and integration of battery systems |  |  |  |  |  |  |
| 9888-108890-19 | Bulgaria (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

99

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-20 | Cape Verde (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2022 | 8/31/1932 | Registered via International Registration No. 1687240 |

US-DOCS\161434707.6

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-21 | Cambodia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

101

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-22 | Canada (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | | Pending; Office Action issued; Response due 7/15/202 5 |

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-23 | Chile (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240 |

103

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-24 | China (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 20 | Abandon ed |

104

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-25 | Colombia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

105

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-26 | Croatia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

106

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-27 | Cuba (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

107

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-28 | Cyprus (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

US-DOCS\161434707.6

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-29 | Czech Republic (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-30 | North Korea (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

110

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-31 | Denmark (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-32 | Egypt (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

112

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-33 | Estonia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

113

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-34 | Eswatini/Swaziland (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

114

| 9888-108890-35 | European Union (via Madrid) **European Union includes Austria, Belgium, Bulgaria, Croatia, Republic of Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | | 8/31/2032 | Registered via International Registration No. 1687240. |

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

115

| | Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain and Sweden | | | Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | |
|---|---|---|---|---|---|---|---|
| 9888-108890-36 | Finland (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power- | A012 6879 | 8/31/2022 | Abandoned |

116

| 9888-108890-37 | France (via Madrid) | POWIN | 9, 11, 42 | charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

117

stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-38 | Gambia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

118

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-39 | Georgia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

US-DOCS\161434707.6

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-40 | Germany (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

120

| | | | | Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-41 | Ghana (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

121

US-DOCS\161434707.6

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-42 | Greece (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

122

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-43 | Hungary (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

123

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | | |
| 9888-108890-44 | Iceland (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

124

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-45 | India (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | | Pending |

125

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-46 | Indonesia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

126

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-47 | Iran (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

US-DOCS\161434707.6

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-48 | Ireland (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

128

|  |  |  |  | Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-49 | Israel (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

129

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-50 | Italy (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240 |

130

| | | | | Class 11: lighting fixtures | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
| 9888-108890-51 | Jamaica (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240 |

131

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-52 | Japan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

132

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-53 | Kazakhstan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

133

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-54 | Kenya (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

134

US-DOCS\161434707.6

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-55 | Kyrgizstan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240 |

135

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-56 | Laos (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

136

| | | | | Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-57 | Latvia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

137

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-58 | Lesotho (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

138

|  |  |  |  | Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-59 | Liberia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

US-DOCS\161434707.6

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-60 | Liechtenstein (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

140

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-61 | Lithuania (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

141

| | | | | Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-62 | Luxembourg (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. Included in Benelux. |

142

| | | | | Class 11: lighting fixtures | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
| 9888-108890-63 | Madagascar (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

143

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-64 | Malawi (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240 |

144

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-65 | Malaysia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

145

Case 25-10308-TMH   Doc 691-1   Filed 08/01/25   Entered 08/01/25 23:32:00   Desc Main
Exhibit B - FlexGen Asset Purchase Agreement   Page 214 of 523

Case 25-10308-TMH   Doc 591-1   Filed 07/25/25   Entered 07/25/25 19:20:00   Desc Main
Document   Page 444 of 851

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-67 | Mexico (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

146

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-68 | Monaco (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

147

|  |  |  |  | Class 11: lighting fixtures |  |  |  |  |  |  |
|  |  |  |  | Class 42: Engineering services; electrical systems design services; design and integration of battery systems |  |  |  |  |  |  |
| 9888-108890-69 | Mongolia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

148

|  |  |  |  | Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-70 | Montenegro (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

149

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-71 | Morocco (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

150

US-DOCS\161434707.6

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-72 | Mozambique (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

151

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-73 | Namibia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

152

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-74 | Netherlands (via Madrid) **Netherlands includes Netherlands, Aruba, Curaçao and St Maarten | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. Included in Benelux. |

153

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-75 | New Zealand (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

154

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-76 | Macedonia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

US-DOCS\161434707.6

|  |  |  |  | Class 11: lighting fixtures |  |  |  |  |  |  |
|  |  |  |  | Class 42: Engineering services; electrical systems design services; design and integration of battery systems |  |  |  |  |  |  |
| 9888-108890-77 | Norway (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

156

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-78 | Oman (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

157

|  |  |  |  | Class 11: lighting fixtures |  |  |  |  |  |  |
|--|--|--|--|--|--|--|--|--|--|--|
|  |  |  |  | Class 42: Engineering services; electrical systems design services; design and integration of battery systems |  |  |  |  |  |  |
| 9888-108890-79 | Pakistan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

158

| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
| 9888-108890-80 | Philippines (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

159

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-81 | Poland (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

160

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 9888-108890-82 | Portugal (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | | Abandoned |

161

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

162

| 9888-108890-83 | Korea (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Electrical Engineering services; engineering services relating to the design of electronic systems; engineering services for | | | | | | |

163

others;
engineering
services in the
field of
electrical
power;
engineering
services
relating to
computer
programmin;
engeneering
services
related to the
disign of
energy
storage
systems;
electrical
systems
design
services;
design and
integration of
battery
systems

164

| 9888-108890-84 | Moldova (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

165

| 9888-108890-85 | Romania (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

| 9888-108890-86 | Russia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

167

| 9888-108890-87 | Rwanda (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

168

| 9888-108890-88 | Samoa (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240 |

169

| 9888-108890-89 | San Marino (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

170

| 9888-108890-90 | Sao Tome & Princepe (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |
| | | | | | | | | | | |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

171

| 9888-108890-91 | Serbia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations<br><br>Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

172

| 9888-108890-92 | Sierra Leone (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240 |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

| 9888-108890-93 | Singapore (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240 |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

174

| 9888-108890-94 | Slovakia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

175

| 9888-108890-95 | Slovenia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | | 8/31/2032 | Registered via International Registration No. 1687240. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Class 11: lighting fixtures | | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | | |

176

| 9888-108890-96 | Spain (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations<br><br>Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | | Abandon ed |

177

| 9888-108890-97 | Sudan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

178

| 9888-108890-98 | Sweden (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. (Classes 9 & 42 refused) |

179

| 9888-108890-99 | Switzerland (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

180

| 9888-108914-01 | Syria (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | | 8/31/20 32 | Registered via International Registration No. 1687240. |

181

| 9888-108914-02 | Tajikstan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

182

US-DOCS\161434707.6

| 9888-108914-03 | Thailand (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | | Pending |

| 9888-108914-04 | Trinidad and Tobago (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

184

US-DOCS\161434707.6

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108914-05 | Tunisia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations<br><br>Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

185

| 9888-108914-06 | Turkey (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

186

| 9888-108914-07 | Turkmenis tan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

US-DOCS\161434707.6

| 9888-108914-08 | Ukraine (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

188

| 9888-108914-09 | United Arab Emirates (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

189

US-DOCS\161434707.6

| 9888-108914-10 | United Kingdom (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

190

| 9888-108914-12 | Uzbekistan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240 |

191

| 9888-108914-13 | Vietnam (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

192

| 9888-108914-14 | Zambia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

193

Exhibit B - FlexGen Asset Purchase Agreement Page 492 of 851

| 9888-108914-15 | Zimbabwe (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

194

| 9888-108914-16 | South Korea (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations;<br><br>Class 11: lighting fixtures;<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

195

| 9888-108914-17 | Benelux (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations;<br><br>Class 11: lighting fixtures;<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. Includes Belgium, the Netherla nds and Luxembo urg |

196

| 9888-111969-66 | International Registration | POWIN POD | 9 | Battery energy storage system comprised primarily of batteries, battery cells and electric controllers | A015 4584 | 12/30/2024 | 1837077 | 12/30/2024 | 12/30/2034 | Registered |
| 9888-111969-02 | Australia (via Madrid) | POWIN POD | 9 | Battery energy storage system comprised primarily of batteries, battery cells and electric controllers | A015 4584 | 12/30/2024 | | | | Pending: Provisional Refusal issued; response due 5/25/26 |
| 9888-111969-03 | European Union (via Madrid) **European Union includes Austria, Belgium, Bulgaria, Croatia, Republic of Cyprus, Czech Republic, Denmark, Estonia, Finland, | POWIN POD | 9 | Battery energy storage system comprised primarily of batteries, battery cells and electric controllers | A015 4584 | 12/30/2024 | | | | Pending Published for opposition (ends 6/10/2025) |

France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembou rg, Malta, Netherlan ds,

| 9888-111969-04 | United Kingdom (via Madrid) | POWIN POD | 9 | Battery energy storage system comprised primarily of batteries, battery cells and electric controllers | A015 4584 | 12/30/2 024 | | Pending; approved for publicati on |

198

(iii)    **DOMAIN NAMES**

| Domain Name | Owner | Registar | Renewal Date |
|---|---|---|---|
| p0vv1n.com | Powin LLC | GoDaddy | 4/16/2026 |
| p0vvin.com | Powin LLC | GoDaddy | 4/16/2026 |
| p0vvln.com | Powin LLC | GoDaddy | 4/16/2026 |
| p0w1n.com | Powin LLC | GoDaddy | 4/16/2026 |
| p0win.com | Powin LLC | GoDaddy | 4/16/2026 |
| p0wln.com | Powin LLC | GoDaddy | 4/16/2026 |
| povv1n.com | Powin LLC | GoDaddy | 4/16/2026 |
| povvin.com | Powin LLC | GoDaddy | 4/16/2026 |
| povvln.com | Powin LLC | GoDaddy | 4/16/2026 |
| pow1n.com | Powin LLC | GoDaddy | 4/16/2026 |
| powin.au | Powin LLC | GoDaddy | 3/29/2028 |
| powin.biz | Powin LLC | GoDaddy | 1/9/2026 |
| Powin.com | Powin LLC | GoDaddy | 11/30/2025 |
| powinchina.com | Powin LLC | GoDaddy | 11/8/2027 |
| powinenergy.com | Powin LLC | GoDaddy | 4/11/2026 |
| powinrr.com | Powin LLC | GoDaddy | 4/16/2026 |
| powintest.com | Powin LLC | GoDaddy | 3/18/2026 |

(iv)    All other Intellectual Property owned by the Sellers, including:

a.   Source code and related documentation for:
   i.    Stack OS = EMS = Dragon = Site Controller
   ii.   BMS = Local Controller = Phoenix
   iii.  String Controller = Rack BMS
   iv.   Pack Controller = Module BMS
   v.    Thermal management = Feather
   vi.   Kobold
   vii.  CCUI
   viii. Product Configurator (v1 and v2)

199

    ix.  Cell Group Controller - CGC Firmware
    x.  Battery Pack Controller - BPC hardware and firmware
    xi.  Long PLC - for HVAC control
    xii.  Powin Cloud Infrastructure
    xiii.  Powin Optimization Platform - POP
    xiv.  System Ops Dashboard (built on Databricks)
    xv.  Issue Navigator
    xvi.  Battery Diagnostics
    xvii.  Gatekeeper
    xviii.  SC Debug Utility
    xix.  BPC Debug Utility

b.  Software-related assets (including Intellectual Property), including:
    i.  Git actions
    ii.  Ansible, Terraform and CDK playbooks
    iii.  CI/CD configurations
    iv.  Test pipeline automation
    v.  All domain names owned by Powin, including all content thereon and all necessary access and transfer credentials therefor
    vi.  Assumption of the following IT systems, including related credentials:
        1.  Amazon Web Services org
        2.  Slack
        3.  Sharepoint
        4.  Atlassian (Confluence, Jira, Bitbucket)
        5.  Arena PLM
        6.  DataBricks
        7.  Zuper
        8.  Kobold
        9.  HighQ
        10. ZenDesk
        11. PowerBi
        12. SalesForce

c.  Hardware-related assets (including Intellectual Property), including:
    i.  Products (including any subcomponents)
        1.  Powin Container
        2.  Powin Centipede
        3.  Powin Pod
    ii.  Related Documentation

1. Mechanical drawings
2. 3D CAD models
3. Bills of material (BOMs)
4. Manufacturing SOPs
5. Revision history
6. Contract manufacturing partner agreements
7. Container designs

   iii. Firmware related to the foregoing

d. All documentation and Records related to Powin's operations, including:

   i. ROC / Performance

1. All Root Cause Analyses (RCAs) / quality reports and supporting documentation
2. Full remote site connection catalogue (BeyondTrust + customer specific connections)
3. All historical performance documentation (analytics reports, availability, SOH)

   ii. All project documentation (drawings, POs, network designs, control narratives)
   iii. All network documentation
   iv. All supplier details and information
   v. All SOPs
   vi. ASP Portfolio bids
   vii. Services playbook with all relative links
   viii. Services Confluence page with all relative links
   ix. Balancing procedure
   x. Commissioning Procedure
   xi. PM Checklists per site
   xii. Technical Training curriculum and documentation
   xiii. Technical Training offerings
   xiv. Customer / cleint spreadsheet, including all related information (e.g., PCS, length of time in service, etc.)
   xv. Pricing and cost worksheet
   xvi. All data contained in Powin's Slack channels

e. Others:

   i. Cell Group Controller - CGC Firmware
   ii. Battery Pack Controller - BPC hardware and firmware
   iii. Long PLC - for HVAC control
   iv. Powin Cloud Infrastructure
   v. Redis
   vi. Apache Airflow
   vii. Powin Optimization Platform – POP

US-DOCS\161434707.6

   viii.   System Ops Dashboard (built on Databricks)

     ix.   Issue Navigator

      x.   Battery Diagnostics

     xi.   Rodbus and JlibModbus

   xii.   Gatekeeper

  xiii.   Proxmox

  xiv.   Syslogd

   xv.   Google Protobuf

  xvi.   SC Debug Utility

 xvii.   BPC Debug Utility

202

## Schedule 2.1(d)

## EQUIPMENT, LEASEHOLD IMPROVEMENTS; MACHINERY

| Included Warehouses & 3PLs | Classification |
|---|---|
| Hub @ 202 Ownco (Mesa), Incl Fixed Assets | Powin Warehouse |
| Lu Pacific Properties, LLC (Tualatin), Incl Fixed Assets | Powin Warehouse |
| RH | 3PL |
| 8 Loop | 3PL |
| Trivergix | 3PL |
| OneSource | 3PL |
| Welldex | 3PL |
| SourceOne | 3PL |
| ATS | 3PL |
| American Lamprecht | 3PL |
| Prolift | 3PL |
| Expeditors | 3PL |

| Mesa Fixed Assets | |
|---|---|
| Matrix Networks - Wireless Survey | Mesa, AZ |
| Matrix Networks - Quote 7770 Arizona Warehouse | Mesa, AZ |
| Signtastic - Non-illuminated signage P = 5' tall, Powin = 16" tall | Mesa, AZ |
| Integrity Electrical Services Company - Electrical work for Mesa Warehouse. Adding outlets in office and warehouse | Mesa, AZ |
| Copytronix - MFC CDW Printer - L9570 | Mesa, AZ |
| Copytronix - MFC CDW Printer - L9570 | Mesa, AZ |
| Copytronix - MFC CDW Printer - L9570 | Mesa, AZ |
| Southwest Mobile Storage (SMS) - 40' Custom Container | Mesa, AZ |
| Arnold Machinery Company - Ride on Scrubber | Mesa, AZ |
| Installation of Mesa Brivo Access Control System | Mesa, AZ |
| BPA Services, intall door access control to mesa warehouse | Mesa, AZ |
| Signtastic - Non-illuminated signage P = 5' tall, Powin = 16" tall (Second Payment PPE-317) | Mesa, AZ |
| Arnold Machinery Company - Pallet Racking 25' Selective Rack | Mesa, AZ |
| Southwest Mobile Storage Inc. - 40' Mobile Storage Container | Mesa, AZ |
| Solar Art - Warehouse Window Tinting | Mesa, AZ |
| Integrity Electrical Services Company - Warehouse Electrical Panel, Transformer Circuits (Mesa) | Mesa, AZ |

| | |
|---|---|
| Southwest Mobile Storage Inc. - 40' Mobile Storage Container | Mesa, AZ |
| Southwest Mobile Storage Inc. - 40' Mobile Storage Container | Mesa, AZ |
| Southwest Mobile Storage Inc. - 40' Mobile Storage Container | Mesa, AZ |
| **Tualatin Fixed Assets** | |
| 750kVa Dry-Type Transformer | Tualatin, OR |
| Expedited Shipping | Tualatin, OR |
| VAVE Implementation | Tualatin, OR |
| Powin - Construction - Powin LLC FINAL | Tualatin, OR |
| Reclass Metro Access Control Invoice 226847 | Tualatin, OR |
| Reclass Metro Access Control Invoice 227349 | Tualatin, OR |
| Reclass Metro Access Control Invoice 226991 | Tualatin, OR |
| 6th Fl Double Storefront Herculite Glass Doors w/ Dual Maglocks | Tualatin, OR |
| 4ea ($10,000) Expedited Fee for delivery in less than 6 months | Tualatin, OR |
| 4ea ($65,000.00) CAB1000/AC Outdoor Rated 630/690V, 3L.2 Options: +GND FAULT, +GFD RES | Tualatin, OR |
| 4ea ($2000) Handling & Crating | Tualatin, OR |
| INV# 180731-07 | Tualatin, OR |
| INV# 180731-07 | Tualatin, OR |
| PO-2868 (April Progress Billing) | Tualatin, OR |
| PO-2868 (May Progress Billing) | Tualatin, OR |
| PO-2868 (June Progress Billing) | Tualatin, OR |
| Project 180731 CCN#2 (see attached) | Tualatin, OR |
| 1119057-00 TestEquity LLC Line Item 1 on Quote: FLUKE-NORMA 6004 POWER QUALITY PORTABLE POWER ANALYZER WITHOUT SPEED & TORQUE,FOURCHANNEL MFG Prod: FLUKE-NORMA 6004 | Tualatin, OR |
| Sheldon Manufacturing, Inc - 120V INCUBATOR - SMI31-ZZMFG | Tualatin, OR |
| Furniture & Fixtures (35) Vex Chairs | Tualatin, OR |
| 1980004-001 Design + Build Design + Build | Tualatin, OR |
| 1980004-002 Design + Build RE: Powin - Construction - Powin LLC. Powin Construction project #1980004, Application 002. | Tualatin, OR |
| 1980004-003 Design + Build RE: Powin - Construction - Powin LLC | Tualatin, OR |
| 9714035095 Celestica Oregon LLC Top-Cap HVAC Enclosure Design | Tualatin, OR |
| 1980004-005 Design + Build RE: Powin - Construction - Powin LLC | Tualatin, OR |
| 146172 Encompass Technologies Encompass Technologies | Tualatin, OR |
| 0220367 Rose City Moving & Storage Rose City Moving & Storage | Tualatin, OR |
| C220414-PWI Bergstrom China Shipping | Tualatin, OR |
| C220414-PWI Bergstrom China This is for 4 prototype HVAC units | Tualatin, OR |

US-DOCS\161434707.6

| | |
|---|---|
| C2280066-PWI Bergstrom China Tooling for Case Upper& Bottom | Tualatin, OR |
| 1980004-004 Design + Build RE: Powin - Construction - Powin LLC | Tualatin, OR |
| JPMCC - ESCHENBRENNER JASON - WALMART.COM AA | Tualatin, OR |
| MARCH PROGRESS BILLING | Tualatin, OR |
| Jaunuary Progress billing PO-2868 | Tualatin, OR |
| Moxa SFP-1FESLC-T Network Transceivers | Tualatin, OR |
| CPS-1500 Energy Storage Inverter (including all tariffs | Tualatin, OR |
| Conference Table | Tualatin, OR |
| Conference Table | Tualatin, OR |
| Moxa SFP-1FESLC-T Network Transceivers | Tualatin, OR |
| Moxa SFP-1FESLC-T Network Transceivers | Tualatin, OR |
| Moxa SFP-1FESLC-T Network Transceivers | Tualatin, OR |
| Moxa SFP-1FESLC-T Network Transceivers | Tualatin, OR |
| Moxa SFP-1FESLC-T Network Transceivers | Tualatin, OR |
| Moxa SFP-1FESLC-T Network Transceivers | Tualatin, OR |
| Moxa SFP-1FESLC-T Network Transceivers | Tualatin, OR |
| Moxa SFP-1FESLC-T Network Transceivers | Tualatin, OR |
| Moxa SFP-1FESLC-T Network Transceivers | Tualatin, OR |
| Moxa SFP-1FESLC-T Network Transceivers | Tualatin, OR |
| Moxa SFP-1FESLC-T Network Transceivers | Tualatin, OR |
| Moxa SFP-1FESLC-T Network Transceivers | Tualatin, OR |
| Moxa SFP-1FESLC-T Network Transceivers | Tualatin, OR |
| Moxa SFP-1FESLC-T Network Transceivers | Tualatin, OR |
| Crimper tool for the Lab to use for Crimping cables, etc. | Tualatin, OR |
| Crimper tool for the Lab to use for Crimping cables, etc. | Tualatin, OR |
| Furniture & Fixtures Tualatin Office | Tualatin, OR |
| Dynapower Company - Compact Power System Inverter - INV-CPS | Tualatin, OR |
| Make: Instek Model: ASR-2100R https://www.tequipment.net/Instek/ASR-2100R/AC/DC-Power-Supplies/?Source=googleshopping&msclkid=8928a126524b11ec8ecbd60666e19a6a | Tualatin, OR |
| Inverter, Compact Power System | Tualatin, OR |
| Dynapower Company - Compact Power System Inverter - INV-CPS | Tualatin, OR |
| CPS-1500, outdoor rated,  for Finway lab | Tualatin, OR |
| Stack 360 FAT stations (Finway office) | Tualatin, OR |
| Auxilliary voltage inputs | Tualatin, OR |

US-DOCS\161434707.6

| | |
|---|---|
| Design & Planning Services for Tualatin Office Remodel by Design+Build | Tualatin, OR |
| Stack 750E Test Equipment from Finway w/Freight | Tualatin, OR |
| Sunbelt Soloman 275KVA Dry Type Transformer for R&D | Tualatin, OR |
| EA-PSB 10200-420 30,000W Bidirectional Power Supply | Tualatin, OR |
| 2 x SMI31-ZZMFG SMI31 INCUBATOR, 120V CUSTOM | Tualatin, OR |
| 2 x SMI31-ZZMFG SMI31 INCUBATOR, 120V CUSTOM | Tualatin, OR |
| Mouser 372-DSOX3014T-USWW Oscilloscope w/Mouser 372-EDU36311A-USWW Power Supply | Tualatin, OR |
| ULINE H-1675 Semi-Automatic Stretch Wrap Machine w/ULINE H-1071 Optional Ramp | Tualatin, OR |
| ETAP License for SA 300 BUS Upgrade | Tualatin, OR |
| Weiss Technik- Test chamber | Tualatin, OR |
| Dell OptiPlex 7090 Desktop i5/16GB | Tualatin, OR |
| 2019 Nissan Leaf SL (Blake Frye) | Tualatin, OR |
| Transcat Battery HI tester | Tualatin, OR |
| Alled Electronic Oscilloscope Probe 1.5GHz | Tualatin, OR |
| 16in Macbook- Adam Ducharme | Tualatin, OR |
| Sheldon Manufacturing- Incubators | Tualatin, OR |
| Elektro Automatik EA-PSI | Tualatin, OR |
| ETAP License for SA 300 BUS | Tualatin, OR |
| Arbin Instruments- LBT 5V-150A, 24ch | Tualatin, OR |
| Arbin Instruments- LBT 5V-150A, 24ch | Tualatin, OR |
| Arbin Instruments- LBT 5V-150A, 24ch | Tualatin, OR |
| Arbin Instruments- LBT 5V-150A, 24ch | Tualatin, OR |
| Arbin Instruments- RBT 60V-300A, 8ch | Tualatin, OR |
| Arbin Instruments- RBT 60V-300A, 8ch | Tualatin, OR |
| Fluke- 3540 | Tualatin, OR |
| EMS Panel | Tualatin, OR |
| Powin Energy HVAC Control | Tualatin, OR |
| Stack 230 G2.2, 180A/180A current, 528V~ 964VDC, AC 220V | Tualatin, OR |
| Stack 225 G2.2, 180A/180A current, 528V~ 964VDC, CATL 271Ah cell, AC 110V | Tualatin, OR |
| Solidworks Professional Subscriptions | Tualatin, OR |
| ARM- MDK Professional Edition Perpetual license | Tualatin, OR |
| Lenovo ThinkPad P59 Mobile Workstation | Tualatin, OR |
| HP Z4 G4 Workstation | Tualatin, OR |
| Lenovo ThinkPad P73 Mobile Workstation | Tualatin, OR |

US-DOCS\161434707.6

| | |
|---|---|
| Stack 230 | Tualatin, OR |
| Eaton Cutler Hammer | Tualatin, OR |
| ARK Computer | Tualatin, OR |
| Lenovo ThinkPad P73 Mobile Workstation | Tualatin, OR |
| Apple Computer | Tualatin, OR |
| PE Website design | Tualatin, OR |
| Arbin Battery Charger | Tualatin, OR |
| Arbin Battery Charger | Tualatin, OR |
| Stack 225 | Tualatin, OR |
| PE Website design | Tualatin, OR |
| Gen 2. 0 Stack 140 | Tualatin, OR |
| Christenson Electric, Inc. | Tualatin, OR |
| PE Website design | Tualatin, OR |
| BT-5HC-5V-100A-4; TOTAL CH:4 + CABLE/AUX | Tualatin, OR |
| Test Equipment- Oscilliscope | Tualatin, OR |
| PO-5603 - Lab Renovation Phase 1A - Fiber Data | Tualatin, OR |
| PO-5603 - Lab Renovation Phase 1A - Fiber Data | Tualatin, OR |
| PO-6849 - Lab Renovations Phase 1A - Provide and install 1 Fiber Termination box, provide 1 single strand FO to existing lab. | Tualatin, OR |
| Architectural consulting services for lab budget and code analysis. Preparation for AHJ engagement. Part of the cost has already been billed out and paid. Our remaining due is 6,137.71 | Tualatin, OR |
| Arbin Instruments - Test Bench - SYS-LBT21024HC-0 | Tualatin, OR |
| Arbin Instruments - Test Bench - SYS-LBT21024HC-0 | Tualatin, OR |
| Arbin Instruments - Test Bench - SYS-LBT21024HC-0 | Tualatin, OR |
| Speedrack West - 9 Rows of Pallet Rack | Tualatin, OR |
| On Logic - Mitac 21.5" Thin Industrial Panel PC - D210-11KS | Tualatin, OR |
| Sizing Tool V1 | Tualatin, OR |
| Cornerstone Web Studio - Website design | Tualatin, OR |
| Six Feet Up - Sizing Tool v2.0 Implementation | Tualatin, OR |
| PO-5603 - Lab Renovation Phase 1A - 2 Stack 360 Test Bed | Tualatin, OR |
| PO-5603 - Lab Renovation Phase 1A - Auxilary Power Panel | Tualatin, OR |
| PO-5603 - Lab Renovation Phase 1A - Design / Permits | Tualatin, OR |
| Lab Centipede A/C Units. Added(4) 30A 120v circuits add NEMA L5-30 twist lock receptacles for Centipede A/C units. | Tualatin, OR |
| Relocate water main and backflow device in lab | Tualatin, OR |
| Capitol Electric - Tualatin Lab Data Drop (Boxes/Conduit/Cabling/Patch Panel/) 39 Data Locations | Tualatin, OR |
| EKS buss bar connections for lab expansion phase 1A | Tualatin, OR |

US-DOCS\161434707.6

| | |
|---|---|
| Capitol Electric - Tualatin Lab Data Drop RMA Work Stations | Tualatin, OR |
| Asset - Buildings & Improvements. PO-6657. Added work per Jeff Lerno - Move 2 centipedes from old lab to new lab on 3/6. Added work per Jeff Lerno - move SMA Inverter from existing lab to new lab on 3/13 | Tualatin, OR |
| Keysight Technologies - Oscilloscope, 4-channel 100MHz - DSOX3014T | Tualatin, OR |
| Speedrack West - 3 Rows of Pallet Rack | Tualatin, OR |
| Speedrack West - Replace wood decking with wire decking | Tualatin, OR |
| PO-5603 - Lab Renovation Phase 1A - Centipede Stack 750 Test Bed | Tualatin, OR |
| PO-5603 - Lab Renovation Phase 1A - Centipede Stack 750 Test Bed | Tualatin, OR |
| Arbin Instruments - 80 Auxiliary Voltage Inputs +/-5V | Tualatin, OR |
| EPC Power Corp - DC Precharge Bracket - CAB1000 | Tualatin, OR |
| EPC Power Corp - DC Precharge Bracket - CAB1000 | Tualatin, OR |
| EPC Power Corp - DC Precharge Bracket - CAB1000 | Tualatin, OR |
| Tech Heads - Outdoor Fisheye Camera - CF81-E | Tualatin, OR |
| PO-4213 - 2000A 480V Manual Transfer Switch | Tualatin, OR |
| PO-4213 - General Purpose Dry-Type Transformer - 450kVA | Tualatin, OR |
| PO-4213 - General Purpose Dry-Type Transformer - 450 kVA | Tualatin, OR |
| Tualatin Remodel - Tualatin Remodel | Tualatin, OR |
| PO-5647 - Securty fence for RMA stored goods | Tualatin, OR |
| An extra injection point needs to be added to have a good mold flow for a plastic tool P10900-07000-213 | Tualatin, OR |
| Tech Heads - Outdoor Fisheye Camera - CF81-E | Tualatin, OR |
| Tech Heads - Outdoor Fisheye Camera - CF81-E | Tualatin, OR |
| Tech Heads - Outdoor Fisheye Camera - CF81-E | Tualatin, OR |
| Tech Heads - Outdoor Fisheye Camera - CF81-E | Tualatin, OR |
| Tech Heads - Outdoor Fisheye Camera - CF81-E | Tualatin, OR |
| Tech Heads - Outdoor Fisheye Camera - CF81-E | Tualatin, OR |
| Tech Heads - Outdoor Fisheye Camera - CF81-E | Tualatin, OR |
| Tech Heads - Outdoor Fisheye Camera - CF81-E | Tualatin, OR |
| Tech Heads - Outdoor Fisheye Camera - CF81-E | Tualatin, OR |
| Tech Heads - Outdoor Fisheye Camera - CF81-E | Tualatin, OR |
| Tech Heads - Fortinet FortiGate 90G - FG-90G-BDL-950-3 | Tualatin, OR |
| Tech Heads - Fortinet FortiGate 90G - FG-90G-BDL-950-3 | Tualatin, OR |
| Indoor and Outdoor Cameras, Mounts, Viewing Stations and Licenses | Tualatin, OR |
| Capital Electric - AC/DC Wiring Connections Centipede 1&2 | Tualatin, OR |
| Arbin Instruments - Test Bench - SYS-LBT21024HC-0 | Tualatin, OR |

| | |
|---|---|
| Experience Knowledge Strategy (EKS) - PPC for Waratah Test Bench | Tualatin, OR |
| Grainger - Hand Wheel Stand 250LB - FGS-250W | Tualatin, OR |
| Capitol Electric - 500kva Solar Duty Transformers/Disconnects | Tualatin, OR |
| Capitol Electric - 500kva Solar Duty Transformers/Disconnects | Tualatin, OR |
| Capitol Electric - 500kva Solar Duty Transformers/Disconnects | Tualatin, OR |
| Capitol Electric - 1000kva Transformer/Disconnect | Tualatin, OR |
| Finway - Hardware Test Kit for 750 String Controller | Tualatin, OR |
| Rack Lift Offroad Wheels | Tualatin, OR |
| Rack Lift Offroad Wheels | Tualatin, OR |
| Arbin Instruments - Test Bench - SYS-LBT21024HC-0 | Tualatin, OR |
| 2X-INV-CPS Inverter. Compact Power System | Tualatin, OR |
| Experience Knowledge Strategy (EKS) - Redundancy PPC | Tualatin, OR |
| Bull Mountain Heating and Cooling - Mitsubisih Electric Air Conditioner - PUY-A18NKA7 | Tualatin, OR |
| Bull Mountain Heating and Cooling - Mitsubisih Electric Air Conditioner - PUY-A18NKA7 | Tualatin, OR |
| Asset - Machinery, Tooling & Equipment | Tualatin, OR |
| Weiss Technik - Test Chamber - ZPS-32-6-SCT/AC | Tualatin, OR |
| Tequipment - FED Drying/Heating Chambers Avantgarde 743 L, 208 V 3 ph 60Hz - FED720UL-208V | Tualatin, OR |
| 12 Grey conference room chairs for field office | Tualatin, OR |
| Office and Commerical Furniture | Tualatin, OR |
| Capitol Electric - Testbed 4 Installation | Tualatin, OR |
| Capitol Electric - Testbed 5 Installation | Tualatin, OR |
| Capitol Electric - Testbed 7 Installation | Tualatin, OR |
| Capitol Electric - Testbed 8 Installation | Tualatin, OR |
| Capitol Electric - Collection Segment Feeder | Tualatin, OR |
| Tequipment - FED Drying/Heating Chambers Avantgarde 743 L, 208 V 3 ph 60Hz - FED720UL-208V | Tualatin, OR |
| Tequipment - FED Drying/Heating Chambers Avantgarde 743 L, 208 V 3 ph 60Hz - FED720UL-208V | Tualatin, OR |
| Tequipment - FED Drying/Heating Chambers Avantgarde 743 L, 208 V 3 ph 60Hz - FED720UL-208V | Tualatin, OR |
| Tualatin Remodel - Tualatin Remodel | Tualatin, OR |
| Curcuits Added to Building_Tualian Warehouse_Invoices=90381_90600_90601 | Tualatin, OR |
| MCPc - Dell PowerEdge R550 Server - E-B-00412 | Tualatin, OR |
| Capitol Electric - Switchgear Breakers | Tualatin, OR |
| Weiss Technik North America - Test Chamber - ZP2421461 | Tualatin, OR |
| EMC Shop - Surge4-5 Combo Wave Generator for IEC - 61000-4-5 | Tualatin, OR |
| EPC Inverter | Tualatin, OR |

US-DOCS\161434707.6

EPC Inverter

Tualatin, OR

210

**Schedule 2.2(j)**

**EXCLUDED ASSETS OF POWIN EKS SELLCO LLC**

Minority equity interests (20%) of EKS Holdco, LLC held by Powin EKS SellCo LLC.

**Schedule 2.6**

**ASSUMED CONTRACT LIST**

None.

**Schedule 5.3**

**CONDUCT OF BUSINESS**

1. Matters not impacting the Business (i.e., rejection of contracts and abandonment of property for other Powin historical business lines that are unrelated to the Business).

2. Implementation of the LTSA Program, as defined in that certain Order Granting Motion of The Debtors for Entry of an Order (I) Authorizing the Debtors to Enter into New Customer Program with Existing Customers and (II) Granting Related Relief approved by the Bankruptcy Court on June 13, 2025 under Docket number 62; provided, however, that the Sellers may not enter into any Contract in connection with the LTSA Program without obtaining Buyer's consent in accordance with Section 5.3 of the Agreement.

213

**DISCLOSURE SCHEDULE**

**to the**

**ASSET PURCHASE AGREEMENT**

**by and among**

**FLEXGEN POWER SYSTEMS, LLC**

**and**

**POWIN, LLC**

**and**

**its direct and indirect subsidiaries signatory thereto**

**July 6, 2025**

**Schedule 3.3(b)**

**NONCONTRAVENTION; CONSENTS AND APPROVALS**

None.

**Schedule 3.4(a)**

**COMPLIANCE WITH LAWS**

The Environment Agency Enforcement Notice described in Schedule 3.8 below.

3

<u>**Schedule 3.6**</u>

<u>**CONTRACTS**</u>

1. Confidentiality Agreements with the US Employees listed attached.
2. Equipment Lease Agreement by and between BMO Harris Bank N.A. and Powin, LLC, dated October 12, 2023.
3. Equipment Lease Agreement by and between BMO Harris Bank N.A. and Powin, LLC, dated December 28, 2023.
4. Master Lease Agreement by and between Toyotalift of Arizona, Inc. and Powin, LLC, dated March 3, 2024.
5. Limited Third-Party Logistics Storage Agreement by and between Prolift Rigging Company, LLC and Powin, LLC, dated as of July 23, 2024.
6. Limited Third-Party Logistics Storage Agreement by and between Mesa Logistics Group, LLC and Powin, LLC, dated as of October 14, 2024.
7. See attached.

4

| Employee Number | Employee Email | Last Name | First Name | Confidentiality & IP Agreement on File? | Date Signed |
|---|---|---|---|---|---|
| 100020 | sanjanar@powin.com | Ramakrishnan | Sanjana | Yes | 1/9/19 |
| 100023 | lauraa@powin.com | Adams | Laura | Yes | 4/16/19 |
| 100026 | jack.hsu@powin.com | Hsu | Kuo Chun | Yes | 5/20/19 |
| 100028 | benoitl@powin.com | Lombard | Benoit | Yes | 7/29/19 |
| 100044 | conwayt@powin.com | Tang | Conway | Yes | 3/24/20 |
| 100050 | alenam@powin.com | Mitchell | Alena | Yes | 5/13/20 |
| 100086 | kiand@powin.com | Dashti | Kian | Yes | 10/17/20 |
| 100092 | scottm@powin.com | Mcgregor | Scott | Yes | 11/2/20 |
| 100101 | chrisboscawen@powin.com | Boscawen | Christopher | Yes | 12/21/20 |
| 100122 | mike.engle@powin.com | Engle | Michael | No | |
| 100154 | vytha.vadlamani@powin.com | Vadlamani | Vythahavya | Yes | 5/17/24 |
| 100156 | mark.french@powin.com | French | Mark | No | |
| 100161 | norman.farquhar@powin.com | Farquhar | Norman | No | |
| 100163 | gary.kuper@powin.com | Kuper | Gary | No | |
| 100172 | brian.kane@powin.com | Kane | Brian | No | |
| 100185 | tyson.silva@powin.com | Silva | Tyson | No | |
| 100204 | matthew.eide@powin.com | Eide | Matthew | No | |
| 100206 | james.harris@powin.com | Harris | James | No | |
| 100221 | linsey.raterink@powin.com | Raterink | Linsey | No | |
| 100239 | reuben.goldstein@powin.com | Goldstein | Reuben | No | |
| 100248 | blake.carpenter@powin.com | Carpenter | Blake | No | |
| 100253 | scott.benedetti@powin.com | Benedetti | Scott | No | |
| 100254 | antonya.johnston@powin.com | Johnston | Antonya | No | |
| 100258 | lindsey.winner@powin.com | Winner | Lindsey | No | |
| 100268 | casey.verica@powin.com | Verica | Casey | No | |
| 100291 | brittney.malhoit@powin.com | Malhoit | Brittney | Yes | 5/19/22 |
| 100301 | joshua.rayborn@powin.com | Rayborn | Joshua | Yes | 5/31/22 |
| 100306 | lisa.veber@powin.com | Veber | Lisa | Yes | 5/26/22 |
| 100314 | christopher.broeke@powin.com | Broeke | Christopher | Yes | 6/10/22 |
| 100317 | justin.mingus@powin.com | Mingus | Justin | Yes | 9/15/22 |

| 100383 | chad.paulson@powin.com | Paulson | Chad | Yes | 8/21/22 |
|---|---|---|---|---|---|
| 100388 | joshua.lacy@powin.com | Lacy | Joshua | Yes | 8/23/22 |
| 100398 | thomas.richards@powin.com | Richards | Thomas | Yes | 9/5/22 |
| 100407 | edward.fisher@powin.com | Fisher | Edward James | Yes | 9/9/22 |
| 100426 | cory.dinkle@powin.com | Dinkle | Cory | Yes | 9/23/22 |
| 100481 | chris.baker@powin.com | Baker | Christopher | Yes | 10/24/22 |
| 100488 | mahesh.sathe@powin.com | Sathe | Mahesh | Yes | 11/8/22 |
| 100491 | william.mcdonnell@powin.com | McDonnell | William | Yes | 11/22/22 |
| 100501 | samuel.donohue@powin.com | Donohue | Samuel | Yes | 12/14/22 |
| 100503 | braden.harwood@powin.com | Harwood | Braden | Yes | 12/20/22 |
| 100512 | adam.cordova@powin.com | Cordova | Adam | Yes | 1/4/23 |
| 100517 | ben.adams@powin.com | Adams | Benjamin | Yes | 1/9/23 |
| 100522 | kristine.mushkevych@powin.com | Mushkevych | Khrystyna | Yes | 1/17/23 |
| 100535 | lauren.smiley@powin.com | Smiley | Lauren | Yes | 2/13/23 |
| 100594 | jay.schwartz@powin.com | Schwartz | Jay | Yes | 4/10/23 |
| 100598 | sergey.makarenko@powin.com | Makarenko | Sergey | Yes | 4/17/23 |
| 100599 | chris.howard@powin.com | Howard | Christopher | Yes | 3/31/23 |
| 100651 | antonio.brunson@powin.com | Brunson | Antonio | Yes | 6/5/23 |
| 100675 | janice.mahn@powin.com | Mahn | Janice | Yes | 6/21/23 |
| 100680 | richard.romano@powin.com | Romano | Richard | Yes | 7/11/23 |
| 100697 | kevin.jenkins@powin.com | Jenkins | Kevin | Yes | 7/21/23 |
| 100706 | christian.ovchinikov@powin.com | Ovchinikov | Christian | Yes | 8/5/23 |
| 100718 | dean.beckley@powin.com | Beckley | Dean | Yes | 8/16/23 |
| 100729 | dustin.rogers@powin.com | Rogers | Dustin | Yes | 7/26/23 |
| 100735 | natalie.kau@powin.com | Kau | Natalie | Yes | 8/25/23 |
| 100774 | Connor.Mueth@powin.com | Mueth | Connor | Yes | 10/26/23 |
| 100808 | jenna.rutherdale@powin.com | Rutherdale Fisher | Jenna | Yes | 12/14/23 |
| 100817 | james.shiou@powin.com | Shiou | James | Yes | 12/8/23 |
| 100831 | arielle.pacheco@powin.com | Pacheco | Arielle | Yes | 1/10/24 |
| 100853 | mark.walters@powin.com | Walters | Mark | Yes | 1/19/24 |
| 100864 | kyle.adams@powin.com | Adams | Kyle | Yes | 2/6/24 |
| 100917 | colin.hutchinson@powin.com | Hutchinson | Colin | Yes | 4/24/24 |

| 100920 | kirk.fleischhauer@powin.com | Fleischhauer | Kirk | Yes | 4/26/24 |
| 100993 | angela.kendall@powin.com | Sprecher | Angela | Yes | 6/25/24 |
| 100997 | luke.wilson@powin.com | Wilson | Luke | No | |
| 101013 | dylan.kenny@powin.com | Kenny | Dylan | No | |
| 101014 | Tyler.speas@powin.com | Speas | Tyler | No | |
| 101051 | freddy.banks@powin.com | Banks | Freddy | No | |
| 101056 | waylen.rinderer@powin.com | Rinderer | Waylen | No | |
| 101063 | moriah.milan@powin.com | Milan | Moriah | No | |
| 101075 | zack.qi@powin.com | Qi | Zhao | No | |
| 101097 | beth.hale@powin.com | Hale | Beth | No | |
| 101147 | tyler.schuetze@powin.com | Schuetze | Tyler | No | |
| 101157 | mary.kahl@powin.com | Kahl | Mary | No | |
| 101161 | kevin.paprzycki@powin.com | Paprzycki | Kevin | No | |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Contract/Document Expiry Date* | Department* | Folder | Contract/Document Status |
|------|----------------|---------------------|-----------------------------------|--------------------------------|-------------|--------|--------------------------|
| BMO Harris Bank N.A.- Powin - Equipment Lease Agreement - 10.12.2023 | Equipment Lease Agreement | BMO Harris Bank N.A. | 10/12/2023 | | ISC - Manufacturing | /Supplier Contracts/ISC/Manufacturing/Executed | Executed |
| BMO Harris Bank N.A.- Powin - Large forklift Lease Agreement - 10.12.2023 | Equipment Lease Agreement | BMO Harris Bank N.A. | 12/28/2023 | | ISC - Manufacturing | /Supplier Contracts/ISC/Manufacturing/Executed | Executed |
| Toyotalift of Arizona, Inc. - Powin, LLC - Master Lease Agreement - 03.04.2024 | Equipment Lease Agreement | Toyotalift of Arizona, Inc. | 03/04/2024 | 03/04/2030 | ISC - Manufacturing | /Supplier Contracts/ISC/Manufacturing/Executed | Executed |
| 3U Millikan LLC - Powin - Lease agreement California - 2016 | Lease Agreement | 3U Millikan LLC | 10/12/2016 | | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| ACRE Management - Powin Energy Operating LLC Commercial Sublease Agreement - 05.16.2025 | Lease Agreement | ACRE Management | 05/16/2025 | 10/31/2027 | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Ampere Company, LLC - Powin, LLC - Sublease Field Office - 11.01.2021 | Lease Agreement | Ampere Computing LLC | 11/01/2021 | | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Field Office Property LLC - Powin, LLC - Office Lease - 01.01.2024 | Lease Agreement | Field Office Property, LLC | 01/01/2024 | | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Fora - Powin UK Ltd - Virtual Office - 1.18.2024 | Lease Agreement | Esselco Services LLP (Fora) | 01/18/2024 | | Legal | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Joseph Lu - Powin LLC Qingdao Office - Qingdao Office Lease Contract- 10.01.2023 | Lease Agreement | Joseph Lu | 10/01/2023 | 09/30/2026 | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Madrid Office_Networkia - Powin - ANNEX to the Service Agreement - change of party - 04.01.2024 | Lease Agreement | Networkia Cuzko, S.L. | 04/01/2024 | | Human Resources | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Madrid Office_Networkia - Powin LLC - Annex to Office Agreement Cuzco Spain - 02.15.2024 | Lease Agreement | Networkia Cuzko, S.L. | 02/15/2024 | | Human Resources | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Madrid Office_Networkia - Powin LLC - Office Agreement Cuzco Spain - 03.24.2023 | Lease Agreement | Networkia Cuzko, S.L. | 03/24/2023 | | Human Resources | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Melbourne Office_Collective 100 - Powin Australia Pty Ltd - Membership Agreement - 07.27.2023 | Lease Agreement | Collective 100 | 07/27/2023 | | Human Resources | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Melbourne Office_Collective_100 - Powin Australia Pty Ltd - Membership Agreement - 2025 | Lease Agreement | Collective 100 Pty Ltd. | 04/04/2025 | | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Melbourne Office_Collective_100 Membership Agreement - Powin - 05.14.2024 | Lease Agreement | Collective_100 | 06/03/2024 | 06/02/2025 | Human Resources | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Mesa Warehouse_HUB@202 OWNCO LLC - POWIN LLC - Arizona warehouse INDUSTRIAL LEASE - 08.02.2023 | Lease Agreement | HUB @ 202 OWNCO, LLC | 08/02/2023 | | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Miami Office_2022.12.02 Commencement Date Memo - Powin Energy | Lease Agreement | MADISON-OFC BRICKELL FL LLC | 12/02/2022 | | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Miami Office_Brickell City Tower - Powin Energy Operating, LLC - Lease - 04.08.22 | Lease Agreement | Madison-OFC Brickell FL LLC | 11/08/2022 | 12/01/2027 | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Portland Office_NP MachineWorks LLC - Powin, LLC - Multi-Tenant Office Lease - 04.08.2024 | Lease Agreement | NP MachineWorks LLC | 06/01/2024 | 08/31/2027 | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Powin (Qingdao) New Energy Co., Ltd - Facility Lease Amendment Agreement - 2023.08.28 | Lease Agreement | Powin Qingdao New Energy Co., Ltd. | 08/28/2023 | | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Powin (Qingdao) New Energy Co., Ltd - Facility Lease Contract-PTC - 2023.08.28 | Lease Agreement | Powin Qingdao New Energy Co., Ltd. | 08/01/2023 | | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Powin Taiwan Lease Agreement | Lease Agreement | Pepsi International Business Co. | 01/09/2024 | 01/09/2025 | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Qingdao Office Lease Contract - 1 | Lease Agreement | Wangjiao Plaza | 10/01/2023 | 09/30/2026 | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Qingdao Office Lease Contract-2 | Lease Agreement | Wangjiao Plaza | 10/01/2023 | 09/30/2026 | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Qingdao Office_Cheng Yu New Materials - Powin (Qingdao) - Pwin LLC - Termination agreement - 05.07.2024 | Lease Agreement | Qingdao Cheng Yu New Materials Co. Ltd. | 05/07/2024 | | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Qingdao Shunneng Machinery Co., Ltd. - Powin (Qingdao) New Energy Co., Ltd. - Lease Contract - 08.07.2024 | Lease Agreement | Qingdao Shunneng Machinery Co., Ltd. | 08/07/2024 | 08/08/2029 | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Tualatin Office_Lu Pacific Properties - Powin Energy Corporation - Tualatin Lease Agreement 2021 | Lease Agreement | LU PACIFIC PROPERIES, LLC | 12/14/2020 | | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Executed | Executed |
| Powin RISE Realty 80 SW 8th St oct 15 2024 Signed Copy | Exclusive Right Agreement | KAD Equity Inc. d/b/a Rise Realt | | | ISC - Facilities | /Supplier Contracts/ISC/Facilities/Drafts | Draft |
| 20180830 -First Amendment to Sublease Agreement | Lease Agreement | PPA Grand Johanna  LLC | 08/31/2018 | | | /Customer Contracts (EXECUTED)/Southern California Edison Company/PPA Grand Johanna LLC | Executed |
| 20190921 - Second Amendment to Millikan Sublease executed | Lease Agreement | PPA Grand Johanna  LLC | 09/21/2018 | | | /Customer Contracts (EXECUTED)/PPA Grand Johanna LLC/ESV1000 - Millikan | Executed |
| Milikan Lease | Lease Agreement | 3U Millikan LLC | 10/12/2016 | 01/09/2027 | | /Customer Contracts (EXECUTED)/PPA Grand Johanna LLC/ESV1000 - Millikan | Executed |
| Sublease (Fully Compiled) | Lease Agreement | PPA Grand Johanna  LLC | 01/01/2017 | | | /Customer Contracts (EXECUTED)/PPA Grand Johanna LLC/ESV1000 - Millikan | Executed |
| Third Amendment to the Sublease | Lease Agreement | PPA Grand Johanna LLC | 01/15/2019 | | | /Customer Contracts (EXECUTED)/PPA Grand Johanna LLC/ESV1000 - Millikan | Executed |



| Contract Management - Contract information - ESA, Framw, LNTP, LTSA, MSA, MOU, PO, Purch, TEA | | | | |
|---|---|---|---|---|
| **File** | **Contract Type*** | **Counterparty Name*** | **Contract/Document Effective Date*** | **Division*** |
| Acelliant-Powin-Microsoft 365 Order Form-03052025 | Purchase Order | Axelliant | 03/04/2025 | Technology |
| TechHeads-Powin-THInc Ops MSA-03182022 | Master Service Agreement | TechHeads | 03/18/2022 | Technology |
| Logicalis-Powin-Internet Access-04112024 | Purchase Order | Logicalis | 04/18/2024 | Technology |
| TechHeads-Powin-2024 CSP Annual Agreement-03062024 | Purchase Order | TechHeads | 03/06/2024 | Technology |
| OfficeSpace-Powin-OrderForm-12152024 | Purchase Order | OfficeSpace Software, Inc. | 12/15/2024 | Technology |
| OfficeSpace-Powin-OrderForm-12152023 | Purchase Order | OfficeSpace Software, Inc. | 12/15/2023 | Technology |
| OnlineBusinessSystems-Powin-MSA-02262021 | Master Service Agreement | Online Enterprises, Inc. | 02/26/2021 | Technology |
| Procore-Powin-OrderForm-12212024 | Purchase Order | Procore Technologies, Inc. | 12/27/2024 | Technology |
| RFPIO-Powin-OrderForm05032022 | Purchase Order | RFPIO, Inc. | 05/03/2022 | Technology |
| TravelIncorporated-Powin-MSA-06292023 | Master Service Agreement | Travel Incorporated | 06/29/2023 | Human Resources |
| LucidSoftwareInc.-Powin-Order Form-1.27.2025 | Purchase Order | Lucid Software, Inc. | 01/27/2025 | Technology |
| Techheads-Powin-Order Form-KnowBe4-6.11.2024 | Purchase Order | TechHeads, LLC | 06/11/2024 | Technology |
| InternationalSOS-Powin-MSA-06/30/2023 | Master Service Agreement | International SOS Assistance, Inc. | 06/30/2023 | Technology |
| JAMF-Powin-Order Form-3.2.2025 | Purchase Order | Jamf Software, LLC | 03/02/2025 | Technology |
| Concur-Powin-OrderForm-06-12-2023 | Purchase Order | Concur Technologies, Inc. | 06/12/2023 | Technology |
| ConcurTechnologiesInc-Powin-OrderForm-02-20-2024 | Purchase Order | Concur Technologies, Inc. | 02/20/2024 | Technology |
| GoFireFlyInc-Powin-Order Form-1.31.2025 | Purchase Order | Go Fire Fly, Inc. | 01/31/2025 | Technology |
| Salesforce-Slack-Powin-11/24/2025 | Master Service Agreement | Salesforce, Inc | 12/15/2024 | Technology |
| Resilience360Inc-Powin-OrderForm-10.31.2023 | Purchase Order | Resilience360, INC. | 10/31/2023 | Technology |
| SmartSheet-Powin-OrderForm-12/31/2024 | Purchase Order | Smartsheet | 12/31/2024 | Technology |
| Smartsheet-Powin-OrderForm-07-37-2024 | Purchase Order | Smartsheet | 07/31/2024 | Technology |
| Smartsheet-Powin-OrderForm-1-13-2025 | Purchase Order | Smartsheet | 01/10/2025 | Technology |
| DassaultSystemesSolidworksCorporation-Powin-MSA-10-23-2023 | Master Service Agreement | Dassault Systemes SolidWorks Corporation | 10/25/2023 | Technology |
| GoEngineer-Powin-Order Form Dymola-4.4.2025 | Purchasing Agreement | GoEngineer | 04/04/2025 | Technology |
| Solution7-Powin-OrderForm-11-27-2024 | Purchase Order | Solution 7 Limited | 11/27/2024 | Technology |
| Docusign-Powin-Order Form-1.31.2025 | Purchase Order | Docusign, Inc. | 01/31/2025 | Technology |
| TechHeads-Verkada-Powin-OrderForm-04-24-2024 | Purchase Order | TechHeads | 04/24/2024 | Technology |
| Deel, Inc.-Powin- Order Form-12.27.2024 | Purchasing Agreement | Deel, Inc. | 12/27/2024 | Technology |
| TechHeads-Verkada-Powin-OrderForm-05-23-2023 | Purchase Order | TechHeads | 05/23/2023 | Technology |
| Astound-Powin-ServiceOrder05-26-2023 | Purchase Order | Astound Business Solutions, LLC | 05/26/2023 | Technology |
| CTX-Powin-Order Form-ZebraOne Care-1.16.2024 | Purchasing Agreement | CTX | 01/16/2024 | Technology |
| Comcast-Powin-PDX Move Order Form-10_2_2024 | Purchase Order | Comcast Cable Communications Management, LLC | 10/02/2024 | Technology |
| Crowe LLP-Powin-MSA-YHireProgram-1.3.2024 | Master Service Agreement | Crowe, LLP | 01/03/2024 | Technology |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|---|---|---|---|---|
| ConductorOne-Powin-Order Form-12.21.2023 | Purchase Order | ConductorOne, Inc. | 12/21/2023 | Technology |
| Zoom-Powin-Amendment-01292024 | Purchase Order | Zoom | 01/30/2024 | Technology |
| Comcast-Powin-PDX Order Form-11.2.2021 | Purchase Order | Comcast Cable Communications Management, LLC | 11/02/2021 | Technology |
| TechHeadsArcticWolf-Powin-OrderForm03012025 | Purchase Order | TechHeads | 03/01/2025 | Technology |
| Comcast-Powin-HQ Order Form-11.2.2021 | Purchase Order | Comcast Cable Communications Management, LLC | 11/02/2021 | Technology |
| Celigo Inc-Powin-Order Form-04.17.2025 | Purchase Order | Celigo, Inc. | 04/17/2025 | Technology |
| PTCInc-Powin-MSAAmendment-03-31-2025 | Master Service Agreement | PTC, Inc. | 03/31/2025 | Technology |
| AgileBits-Powin-MSA02-27-2025.docx | Master Service Agreement | AgileBits | 02/27/2025 | Technology |
| powin-Alliant - Consulting Services Agreement amendment 1 -05.19.2025 | Master Service Agreement | Alliant Insurance Services, Inc. | 05/19/2025 | Human Resources |
| Beneficiary Enrollment (Rider C) - Santa Paula Energy Storage - Powin Energy 180612 | Technology Escrow Agreement | Santa Paula Energy Storage, LLC | | Technology |
| Rider C - KCE-Powin PEC (Construction Projects)(NRF 12.31).DOCX | Technology Escrow Agreement | KCE Texas Holdings 2020, LLC | 01/13/2021 | |
| GreEnergy - POWIN - ASP MSA - 05.21.2025.docx | Master Service Agreement - ASP | GreEnergy Resources, LLC | 05/21/2025 | Projects |
| Intuitive Safety Solutions, Inc. (ISS) - Powin, LLC - Master Services Agreement - 05.12.2025 | Master Service Agreement | Intuitive Safety Solutions, Inc. (ISS) | 05/12/2025 | ISC |
| Metro-Fire – Powin – ASP MSA – 05.01.2025 | Master Service Agreement - ASP | Metro Fire Equipment Inc | 04/18/2025 | Projects |
| Capgemini America, Inc. - Powin, LLC - Statement of Work - 01.27.25 | Master Service Agreement | Capgemini America, Inc. | 01/27/2025 | Technology |
| Arrow Canyon - Powin Addendum and Amendmentto ESA-04.10.25 | ESA (Energy Storage Agreement) | Arrow Canyon Solar, LLC | 04/10/2025 | Projects |
| RES-Powin-GAL0020 -_Alcoutim_-_Statement_of_Work_-_LTSA_04.03.2025 | Master Service Agreement - ASP | RES Energy Global Services, S.L.U. | 04/03/2025 | Projects |
| Pike Purchase Order - 3.7.2025 | Purchase Order | Pike Telecom and Renewables, LLC | 03/07/2025 | Projects |
| Databricks Contract For AWS Marketplace Commit_Q-54357_2025-01-30 | Purchase Order | Databricks, Inc. | 01/30/2025 | Office of Transformation |
| Activpayroll_Powin_Master_Services_Agreement_-04.17.2023 | Master Service Agreement | activpayroll Ltd. | 04/17/2023 | Human Resources |
| Powin - KMC - LTSA - Brandywine (Executed 1APR2025) | LTSA (Long Term Service Agreement) | KMC Thermo, LLC | 04/01/2025 | Revenue |
| PRAXIS Powin Two Party Master Escrow Agreement - 03.22.2024 (2) | Technology Escrow Agreement | Praxis Technology Escrow | 03/22/2024 | Technology |
| DNV GL - Powin Energy Corporation - Framework Agreement - 10.28.2020 | Framework Agreement | DNV Energy Insights USA Inc. | 10/28/2020 | Projects |
| DNV GL - Powin LLC - Amendment 1 to Frame Agreement - 11.27.2023 | Framework Agreement | DNV Energy Insights USA Inc. | 11/27/2023 | Projects |
| Deel_-_Powin_-_Q-79364-2-5-Feb-2025-07-12-41-signed | Purchase Order | Deel | 06/01/2025 | Human Resources |
| Deel- Powin - HR_Consulting_Services_Agreement - 03.06.2025 | Master Service Agreement | Deel Inc. | 03/06/2025 | Human Resources |
| Apex - APE0060 - Angelo - LTSA Amendment #2 - 3.7.2025 | LTSA (Long Term Service Agreement) | Angelo Storage, LLC. | 03/07/2025 | Projects |
| Capgemini America, Inc. - Powin, LLC - SOW Change Request - 03.15.2025 | Purchase Order | Capgemini America, Inc. | 03/15/2025 | Technology |
| Great Kiskadee ESA - PWA Amendment No. 2 Executed - 02.21.2025 | ESA (Energy Storage Agreement) | Great Kiskadee Storage, LLC | 02/21/2025 | Projects |
| Desert Quartzite PA Amendment 003_-02.28.2025 | ESA (Energy Storage Agreement) | Desert Quartzite, LLC | 02/28/2025 | Revenue |
| Powerflex - Powin - ESA PFX0050 USCS Fresno - 02.21.2025 | ESA (Energy Storage Agreement) | PowerFlex Solar, LLC | 02/21/2025 | Revenue |
| TUV-R - Powin, LLC - Assurance Framework MOU - 02.21.2025 | Memorandum of Understanding | TUV-R | 02/21/2025 | Technology |
| Circulor - Powin - MSSA - 02.18.2025 | Master Service Agreement | Circulor Inc | 02/18/2025 | Projects |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|------|---------------|--------------------|-----------------------------------|-----------|
| Davinci Technology, L.L.C. d/b/a CORE Health Networks - Powin, LLC - Master Service Agreement - 02.14.2025 | Master Service Agreement | Davinci Technology, L.L.C. d/b/a CORE Health Networks | 02/14/2025 | ISC |
| WSB - ESA Deed of amendment No. 4 - updated Project Schedule - 01.30.2025 | ESA (Energy Storage Agreement) | Munmorah Battery ProjectCo Pty Ltd | 01/30/2025 | Projects |
| LTSA - SOL0020 - Croton Harmon - BESS LTSA (compiled, dated, fully executed) | LTSA (Long Term Service Agreement) | SCS VAN WYCK 012823 CROTON ON HUDSON, LLC | 02/10/2025 | Revenue |
| Powin Energy, IG & SS '21 | Master Service Agreement | Mergermarket (US) limited Acuris | 12/17/2021 | Revenue |
| Capgemini America, Inc. - Powin, LLC - Master Services Agreement - 01.27.2025 | Master Service Agreement | Capgemini America, Inc. | 01/27/2025 | Technology |
| Thomson Reuter - Powin LLC HighQ Renewal_NEW__HighQ Order Form._01.16.2025 | Purchase Order | Thomson Reuters West Publishing Corporation | 01/16/2025 | Legal |
| Thomson Reuters - Powin - ProFlex Addendum HighQ - fully executed 1.22.2025 | Purchase Order | Thomson Reuters West Publishing Corporation | 01/22/2025 | Legal |
| JV Powin UCB revUCB 101224 PDF | Memorandum of Understanding | UCB S.A. | 01/20/2025 | |
| Intura pty Ltd - Powin AU - ASP MSA - 01.17.2025 | Master Service Agreement - ASP | Intura PTY LTD | 01/17/2025 | Projects |
| Amendment #1 to Ravenswood Group 3 ESA__BHER_(fully executed) | ESA (Energy Storage Agreement) | BHER Ravenswood Solar 1, LLC | 01/06/2025 | Revenue |
| Amendment #1 to Ravenswood Group 2 ESA__BHER_(fully executed) | ESA (Energy Storage Agreement) | BHER Ravenswood Solar 1, LLC | 01/06/2025 | Revenue |
| Amendment #1 to Ravenswood Group 1 ESA__BHER_(fully executed) | ESA (Energy Storage Agreement) | BHER Ravenswood Solar 1, LLC | 01/06/2025 | Revenue |
| NoBlue2 - Powin, LLC - Master Service Agreement - 01.10.2025 | Master Service Agreement | NoBlue2 | 01/10/2025 | Revenue |
| ESA_Second_Deed_of_Amendment_-_Ulinda_Park - 12.23.2024 | ESA (Energy Storage Agreement) | Ulinda Park ProjectCo Pty Ltd | 12/23/2024 | Projects |
| Circulor - Powin - Order Form 1.2.2025 | Purchase Order | | 01/02/2025 | ISC |
| Powin_Deel_Final_MSA - 01.03.2023 | Master Service Agreement | Deel Inc. | 01/03/2023 | Human Resources |
| SOW of Powin B2B implementation_Dec20.2024-双章 | Master Service Agreement | Logicalis Shanghai limited | 12/20/2024 | Technology |
| Powin Form LTSA DTE0010 Slocum (Fully compiled, dated, executed) | LTSA (Long Term Service Agreement) | DTE Electric Company | 12/20/2024 | Revenue |
| INV0031 La Toba ESSSA Executed (Final) | ESA (Energy Storage Agreement) | MG HR S de R.L de C.V. | 12/13/2024 | Revenue |
| La_Toba_LNTP_Letter_Agreement_-_Amendment_No._2_INV_Dec_13_24_Executed | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | MG HR S de R.L de C.V. | 11/07/2024 | Revenue |
| Logicalis Shanghai Limited - Powin Qingdao Representative Office - Sales Contract for 75 licenses - 11.14.2024 | Master Service Agreement | Logicalis Shanghai Limited | 11/14/2024 | Technology |
| ThrivePass, Inc. - Powin Energy Operating, LLC - MSA - 10.21.2022 | Master Service Agreement | ThrivePass, Inc. | 01/01/2023 | Human Resources |
| GALP - Powin - LTSA Alcoutim - 10.01.2024 | LTSA (Long Term Service Agreement) | Galp Parques Fotovoltaicos de Alcoutim, LDA | 10/01/2024 | Projects |
| Powin LLC - Trail B Technologies - Software Subscription Agreement and DPA - 12.06.2024 | Master Service Agreement | TrailB Technologies LLC | 12/06/2024 | Projects |
| Gotion Inc - Powin LLC - MSA - 10.08.2024 | Master Supply Agreement | Gotion, Inc. | 10/08/2024 | ISC |
| Logicalis Shanghai Limited - Powin Qingdao Representative Office - Cloud Service Contract - 09.08.2024 | Master Service Agreement | Logicalis Shanghai Limited | 09/08/2024 | Technology |
| Powin BHER ESA - BHE0020 Solar Star 3 (fully executed)_recompiled 12.05.2024 | ESA (Energy Storage Agreement) | Solar Star 3, LLC | 08/31/2023 | Projects |
| Stem, Inc. - Powin, LLC - STM0651 - Dark and Stormy I - 03.08.2024 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2024 | Projects |
| Stem - Powin - STM0578 Velvet Mite SD DC - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 | |
| Stem, Inc. - Powin, LLC - STM0652 - Dark and Stormy II - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 | Projects |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|---|---|---|---|---|
| Stem - Powin - STM0577 Velvet Mite ML DC - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 | |
| Stem - Powin - STM0576 Velvet Mite MR AC - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 | |
| Stem, Inc. - Powin, LLC - STM0911 - Dighton Tremont - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 | Projects |
| Stem - Powin - STM0574 Velvet Mite BR DC - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 | |
| Stem - Powin - STM0573 Velvet Mite QR DC - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 | |
| Stem - Powin - STM0572 Velvet Mite CPR - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 | |
| Stem - Powin - STM0571-Velvet Mite TR - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 | |
| Stem Inc - Powin - STM0493 Mosquito 3 - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 | |
| Stem Inc - Powin - LLC - STM0492 Mosquito 2 - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 | |
| Stem Inc - Powin LLC - STM0491 - Mosquito 1 LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem Inc. | 03/08/2023 | |
| Stem, Inc. - Powin, LLC - STM0912 - Douglas Oak - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 | Projects |
| Stem - Powin, LLC - STM0913 - Palmer Sykes - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 | Projects |
| Stem, Inc. - Powin, LLC - STM0100 - Viper - LTSA - 02.28.2021 | LTSA (Long Term Service Agreement) | Stem, Inc. | 02/28/2021 | Projects |
| RES - Powin - Statement of Work under MSA for GAL0020 - Alcoutim - 10.07.2024 | Master Service Agreement - ASP | RES ENERGY GLOBAL SERVICES S.L.U. | 10/07/2024 | Projects |
| RES - Powin - Statement of Work under ASP MSA for PCE0020 - Overhill - 11.07.2024 | Master Service Agreement - ASP | RES ENERGY GLOBAL SERVICES S.L.U. | 11/07/2024 | Projects |
| Serrano - First Amendment to ESA (compiled Execution Version 11-6-24) | ESA (Energy Storage Agreement) | Serrano Solar, LLC | 11/06/2024 | Revenue |
| Logicalis Shanghai Limited - Powin, LLC - Printing Management Service Contract - 11.07.2024 | Master Service Agreement | Logicalis Shanghai Limited | 11/07/2024 | Technology |
| Desert Quartzite - EDF0480 - ESA Amendment 002 - 10.18.2024 | ESA (Energy Storage Agreement) | Desert Quartzite, LLC | 10/18/2024 | Revenue |
| La Toba LTNP Amendment 1 (Oct 29, 2024) Executed | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | MG HR S de R.L de C.V. | 10/25/2024 | Revenue |
| Ulinda Park - Powin - Termination of Rider C under 191112 - 10.29.2024 | Technology Escrow Agreement | Praxis Technology Escrow | 10/29/2024 | Legal |
| Logicalis Shanghai Limited - Powin Qingdao - Sales Contract - 09.08.2024 | Purchasing Agreement | Logicalis Shanghai Limited | 09/08/2024 | Technology |
| SS3 - First Amendment to ESA 2024.10.11 | ESA (Energy Storage Agreement) | Longroad | 10/11/2024 | Projects |
| Cogent-Powin_Arrow Canyon-MSA_Approved Service Provider - 12.02._2331_2 | Master Service Agreement - ASP | Cogent Renewables, Inc. | 12/02/2022 | Projects |
| Logicalis - Powin Cloud Service Contract 2024 FINAL | Master Service Agreement | Logicalis Shanghai Limited | 08/09/2024 | Technology |
| Logicalis - Powin Sales Contract 2024 FINAL | Purchasing Agreement | Logicalis Shanghai limited | 08/09/2024 | Technology |
| Antidot - Powin- Fluid Topics Order form, T&C and DPA_09.30.2024 | Purchase Order | Fluid Topics | 10/01/2024 | Office of Transformation |
| Slalom Inc - Powin - Knowledge Management Discovery SOW - 09.11.2024 | Master Service Agreement | Slalom, Inc | 09/11/2024 | Projects |
| Great Kiskadee - Amendment No. 1 to LTSA - 09.30.2024 | LTSA (Long Term Service Agreement) | Great Kiskadee Storage, LLC | 09/30/2024 | Revenue |
| Great Kiskadee - Amendment No. 1 to ESA - 09.30.2024 | ESA (Energy Storage Agreement) | Great Kiskadee Storage, LLC | 09/30/2024 | Revenue |
| Apex - Angelo - Amendment No. 1 to ESA - 09.30.2024 | ESA (Energy Storage Agreement) | Angelo Storage, LLC. | 09/30/2024 | Revenue |
| Apex - Angelo - Amendment No. 1 to LTSA - 09.30.2024 | LTSA (Long Term Service Agreement) | Angelo Storage, LLC. | 09/30/2024 | Revenue |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|------|----------------|--------------------|------------------------------------|-----------|
| Form Blanket Purchase Order 20210218 FINAL Signed 20210219 - PEC | Purchase Order | Stem, Inc. | 02/22/2021 | Projects |
| West Warwick III - Powin LTSA (Executed) | LTSA (Long Term Service Agreement) | West Warwick Energy Storage 3 LLC | 09/26/2024 | Revenue |
| West Warwick II - Powin LTSA (Executed) | LTSA (Long Term Service Agreement) | West Warwick Energy Storage 2 LLC | 09/26/2024 | Revenue |
| CA Financial Services service Agreement Powin Australia Broker | Master Service Agreement | CA Financial Services | 08/22/2024 | Human Resources |
| Powin, LLC - Consulting Agreement with Slalom, Inc. (clean) - signed | Master Service Agreement | Slalom, Inc. | 09/11/2024 | |
| Transperfect - Powin - SOW - Portuguese Program (part 1) - 08.21.2024 | Master Service Agreement | TransPerfect International LLC | 08/21/2024 | Office of Transformation |
| Ulinda Park - Powin - Praxis - Tech Escrow Agreement - 09.10.2024 | Technology Escrow Agreement | Ulinda Park Project Co Pty Ltd | 09/10/2024 | Legal |
| Fedex - Powin LLC - Pricing Agreement - 9.6.2024 | Master Service Agreement | Federal Express Corporation (FedEx) | 09/06/2024 | ISC |
| Ulinda Park_ESA_Deed_of_Amendment (Fully Executed Dated 29 August 2024) | ESA (Energy Storage Agreement) | Ulinda Park Project Co Pty Ltd | 08/29/2024 | Projects |
| Lone Star AR ESA - Second Amendment with Ex. CC - Fully Executed | ESA (Energy Storage Agreement) | Lone Star Solar, LLC | 08/21/2024 | Revenue |
| Acorn-I-First-Amendment-to-Powin-Acorn-I-Energy-Two-Party-Master-Escrow-Agreement-HL-2-21-2022.d | Technology Escrow Agreement | Praxis Technology Escrow | 02/21/2022 | |
| esVolta - Powin Energy Corp - Master Supply Agreement - 12.4.2017 | Master Supply Agreement | esVolta LP | 12/04/2017 | Legal |
| Lone Star - Powin - First Amendment to A&R ESA (Fully Executed and Compiled) | ESA (Energy Storage Agreement) | Lone Star Solar, LLC | 01/19/2024 | Revenue |
| RES Global Energy Services S.L.U. - Powin LLC - ASP MSA 8.12.2024 | Master Service Agreement - ASP | RES Energy Global Services, S.L.U. | 08/12/2024 | Projects |
| STR0400 - NovaSource - Powin - Limited Services Agreement - 07.03.2024 | LTSA (Long Term Service Agreement) | Northstar Energy Management, LLC | 07/03/2024 | Revenue |
| Phillip Riley Projects - Powin AU - ASP MSA - 2024.docx | Master Service Agreement - ASP | Phillip Riley Projects Pty Ltd. | 08/02/2024 | Projects |
| Amendment to LTSA - Ameresco Viper (Fully Executed) - 08.02.2024 | LTSA (Long Term Service Agreement) | Ameresco, Inc. | 08/02/2024 | Revenue |
| Santa Paula-Powin O&M First Amendment_07.13.2023 | LTSA (Long Term Service Agreement) | Santa Paula Energy Storage, LLC | 07/13/2023 | Projects |
| Waratah ESA Deed of Amendment No 3 - Fully Executed dated 26 July 2024 | ESA (Energy Storage Agreement) | Munmorah Battery ProjectCo Pty Ltd | 07/26/2024 | Projects |
| IANS - Powin - MSA - 06.21.2024 | Master Service Agreement | The Institute for Applied Network Security, LLC | 06/21/2024 | Human Resources |
| Hummingbird_Powin_LTSA Amendment - 07.18.2024 | LTSA (Long Term Service Agreement) | Hummingbird Energy Storage, LLC | 07/18/2024 | Projects |
| West Warwick I - Powin LTSA (Executed) | LTSA (Long Term Service Agreement) | West Warwick Energy Storage 1 LLC | 07/12/2024 | Revenue |
| Powin BHER - ESA - BHE0032 - Ravenswood Group 3 (executed, fully compiled) | ESA (Energy Storage Agreement) | BHER Ravenswood Solar 1, LLC | 07/12/2024 | Revenue |
| BHER Ravenswood and Powin MSA - BHE0030 (executed, fully compiled) | Master Supply Agreement | BHER Ravenswood Solar 1, LLC | 07/12/2024 | Revenue |
| Powin BHER - ESA - BHE0031 - Ravenswood Group 2 (executed, fully compiled) | ESA (Energy Storage Agreement) | BHER Ravenswood Solar 1, LLC | 07/12/2024 | Revenue |
| Powin BHER - ESA - BHE0030 - Ravenswood Group 1 (executed, fully compiled) | ESA (Energy Storage Agreement) | BHER Ravenswood Solar 1, LLC | 07/12/2024 | Revenue |
| Databricks - Powin - MSA - 07.15.2024 | Master Service Agreement | Databricks, Inc. | 07/18/2024 | Office of Transformation |
| Re:Build AppliedLogix, LLC - Powin LLC - MSA - 06.05.2024 | Master Service Agreement | Re:Build AppliedLogix, LLC | 06/05/2024 | Technology |
| 3Drivers - Powin - Power of Attorney to 3Drivers Agreement for GAL0020 - Alcoutim - 06.14.2024 | Framework Agreement | 3drivers – Engenharia, Inovação e Ambiente, SA. | 06/14/2024 | Projects |
| Weifang Genius Electronics Co., Ltd - Powin, LLC - MSA - 03.20.2024 | Master Supply Agreement | Weifang Genius Electronics Co., Ltd. | 03/20/2024 | ISC |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|------|----------------|--------------------|-----------------------------------|-----------|
| Clean Peak Energy BESS MSA - 20210217 Execution Version (Powin LLC CLEAN 032321) (005) | Master Supply Agreement | Clean Peak Energy (CPE) | 02/17/2021 | |
| Ormat - Powin - OTI040 Bottlenck - ESA Amendment #1 - 03.30.2023 | ESA (Energy Storage Agreement) | Ormat Nevada, Inc. | 03/30/2023 | Projects |
| Service Stream - SOW_for_QA_Inspection - 05.31.2024 | Master Service Agreement - ASP | Service Stream Energy and Water Pty Ltd | 05/31/2024 | Projects |
| Sunstreams 4 - Powin, LLC - LRD0082 - Second Amendment to ESA - 05.29.2024 | ESA (Energy Storage Agreement) | Sun Streams Expansion, LLC | 05/29/2024 | Projects |
| Thomson Reuters - Powin - HighQ - Agreement - 06.15.2023 | Master Supply Agreement | Thompson Reuters West Publishing Corporation | 06/15/2023 | Legal |
| Thomson Reuters - Powin - Document Intelligence Order Form- 06.15.2023 | Purchase Order | Thompson Reuters West Publishing Corporation | 06/15/2023 | Legal |
| Hummingbird - ESV0220 - Powin - ESA Amendment No.1 - 06.03.2024 | ESA (Energy Storage Agreement) | Hummingbird Energy Storage, LLC | 06/03/2024 | Projects |
| 3Drivers – Powin - Agreement for the Appointment of Authorized Representative - 06.03.2024 | Framework Agreement | 3drivers – Engenharia, Inovação e Ambiente, SA. | 06/03/2024 | Projects |
| Yuma Solar LTSA - INV0490 (Executed May 15, 2024) | LTSA (Long Term Service Agreement) | Yuma Solar energy LLC | 05/15/2024 | Projects |
| REPT BATTERO Energy Co., Ltd. - Powin, LLC - DC Blocks MSA - 05.20.2024 | Master Supply Agreement | REPT BATTERO Energy Co., Ltd. | 05/20/2024 | ISC |
| INV0031 - La Toba LNTP Letter Agreement (Compiled)(Executed)(May 20, 2024) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | MG HR S de R.L de CV | 05/17/2024 | Revenue |
| Spark Power Renewables USA - Powin - ASP MSA - 05.20.2024 | Master Service Agreement - ASP | Spark Power Renewables USA Inc | 05/20/2024 | Projects |
| ACCURE - Powin - MOU - 05.01.2024 | Memorandum of Understanding | Accure Battery Intelligence GmnH | 05/14/2024 | Technology |
| Service Stream Energy & Water Pty Ltd - Powin AU - Short-Form-Novation-Deed-ASP-MSA-05.13.2024 | Master Service Agreement - ASP | Service Stream Energy & Water Pty Ltd | 05/08/2024 | Projects |
| Powin - UKG PRO MSA 12.3.21.docx | Master Service Agreement | UKG Inc. | 12/19/2021 | Human Resources |
| Powin - UKG PRO ORDER 12.3.21 Powin Executed | Purchase Order | UKG Inc. | 12/03/2021 | Human Resources |
| UKG-Powin Energy Corporation - Order; Document Manager - 10.7.22.docx | Purchase Order | UKG Inc. | 10/12/2022 | Human Resources |
| Cameron Wind 1, LLC - Powin - Augmentation ESA - Omnibus - 05.03.2024 | ESA (Energy Storage Agreement) | Cameron Wind 1, LLC | 05/03/2024 | Revenue |
| Cameron Wind 1 - Powin - Amendment # 1 ESA - Omnibus - 05.03.2024 | ESA (Energy Storage Agreement) | Cameron Wind 1, LLC | 05/03/2024 | Revenue |
| REPT Battero - Powin - Cell MSA - 05.01.2024 | Master Supply Agreement | REPT Battero Energy Co., Ltd. | 05/01/2024 | ISC |
| Stowe Australia Pty Ltd - Powin AU - ASP MSA - 02.27.2024 | Master Service Agreement - ASP | Stowe Australia Pty Ltd | 02/27/2024 | Projects |
| Cameron Wind 1, LLC-PRAXIS-Powin-Rider C-05.01.2024 | Technology Escrow Agreement | Cameron Wind 1,, LLC | 05/01/2024 | Projects |
| Powin & EVE MSA for 2024-2026 - Effective 04.28.2024 | Master Supply Agreement | EVE Power Co. Ltd. | 04/28/2024 | ISC |
| SunStreams4 - LRD0082 - First Amendment to ESA - 04.17.2024 | ESA (Energy Storage Agreement) | Sun Streams Expansion, LLC | 04/17/2024 | Revenue |
| Powin Specified Technologies MSA - Fully Executed | Master Supply Agreement | Specified Technology Inc. (STI) | 04/01/2024 | ISC |
| Orr Protection - Powin LLC - ASP MSA - 03.14.2024 | Master Service Agreement - ASP | Orr Protection Systems, Inc. | 03/14/2024 | Projects |
| DTE - DTE0021 Trenton Channel - Powin Notice to Proceed 4-3-2024 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | DTE Electric Company | 04/03/2024 | Projects |
| Powin - GTI - MOU signed 04.03.2024 | Memorandum of Understanding | GTI Fabrication | 02/22/2022 | ISC |
| Apex - Cameron Wind - APE0010 Sabal Ingka - LTSA - 04.01.2024 | LTSA (Long Term Service Agreement) | Cameron Wind 1, LLC | 04/01/2024 | Projects |
| Apex - Great Kiskadee - Powin - LTSA - 03.27.2024 | LTSA (Long Term Service Agreement) | Great Kiskadee Storage, LLC | 03/27/2024 | Revenue |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|---|---|---|---|---|
| Ebara - Powin - Manufacturing Services Agreement - 03.01.2024 | Master Service Agreement | EBARA DENSAN (QINGDAO) TECHNOLOGY CO., LTD. | 03/01/2024 | ISC |
| Desert Quartzite - Powin - LTSA First Amendment - 3.20.2024 | LTSA (Long Term Service Agreement) | Desert Quartzite, LLC | 03/20/2024 | Revenue |
| Desert Quartzite - Powin - ESA Amendment 001 and CO#4 - 03.20.2024 | ESA (Energy Storage Agreement) | Desert Quartzite, LLC | 03/20/2024 | Revenue |
| Powin & EVE MSA Amendment No. 3 - signed 03.21.2024 | Master Supply Agreement | EVE Asia Co., Limited; EVE Power Co., Ltd | 03/21/2024 | ISC |
| EBARA Densan - Powin - Free Issue Parts Agreement - 03.08.2024 | Master Service Agreement | EBARA DENSAN (QINGDAO) TECHNOLOGY CO., LTD. | 03/01/2024 | ISC |
| Powin Energy Operating, LLC (PEO) - Powin, LLC - Intercompany Administrative Services Agreement - 03.21.2021 | Master Service Agreement | Powin Energy Operating, LLC (PEO) | 03/21/2021 | Finance & Accounting |
| Powin UK Ltd - Powin, LLC - Intercompany Services Agreement - 05.15.2023 | Master Service Agreement | Powin UK Ltd | 05/15/2023 | Finance & Accounting |
| Powin Energy Spain, SL - Powin, LLC - Intercompany Services Agreement - 04.13.2023 | Master Service Agreement | Powin Energy Spain, SL | 04/13/2023 | Finance & Accounting |
| Powin Australia Pty Ltd - Powin, LLC - Intercompany Services Agreement - 02.13.2023 | Master Service Agreement | Powin Australia Pty Ltd | 02/13/2023 | Finance & Accounting |
| Service Stream Utilities Pty Ltd - Powin Australia Pty Ltd - MSA - 3.4.2024 | Master Service Agreement - ASP | Service Stream Utilities Pty Ltd | 03/04/2024 | Projects |
| SAFE Laboratories and Engineering Corp. - Powin, LLC - MSA - 10.26.2023 | Master Service Agreement | SAFE Laboratories and Engineering Corp. | 10/26/2023 | Technology |
| Invenergy Powin - Amendment#1 LTSA - 02.21.2024 | LTSA (Long Term Service Agreement) | Invenergy Services LLC | 02/21/2024 | Revenue |
| Crowe LLP - Powin, LLC - MSA for Clients - 06.23.2023 | Master Service Agreement | Crowe LLP | 06/23/2023 | Human Resources |
| Powin CIMC-JV Supplemental Agreement for MSA - signed 02.29.2024 | Master Service Agreement | Qingdao CIMC-Powin New Energy Technology Co., Ltd (CIMC - Powin) | 01/10/2024 | ISC |
| DTE - Trenton DTE0021 - Powin Tech Escrow Invoicing Agreement_02.23.2024 | Technology Escrow Agreement | DTE Electric Company | 02/23/2024 | Projects |
| DTE - Trenton DTE0021 - Powin Rider C - 02.23.2023 | Technology Escrow Agreement | DTE Electric Company | 02/23/2024 | Projects |
| PRAXIS-Powin-Munmorah Three Party Master Escrow Agreement - 02.22.2024 | Technology Escrow Agreement | Munmorah Battery ProjectCo Pty Ltd | 02/22/2024 | Projects |
| Australia_Powin_and_CES_Services_Agreement_ Fully executed - 2.21.2024 | Master Service Agreement | Clean Energy Services CES LLC (CES) | 02/21/2024 | Projects |
| Ayna AI LLC - Powin, LLC - MSA - 02.14.2024 | Master Service Agreement | Anya AI LLC | 02/14/2024 | Human Resources |
| SMM Consulting Service Contract for Powin - signed 02.20.2024 | Purchasing Agreement | SMM Information & Technology Co., Ltd. | 02/20/2024 | ISC |
| Waratah_ESA_Deed_of_Amendment_02.17.2024 | ESA (Energy Storage Agreement) | Munmorah Battery ProjectCo Pty Ltd | 02/17/2024 | Projects |
| EKS - Powin - Global Master Products Supply Agreement - Oct. 23, 2023 Redacted Pow | Master Supply Agreement | EKS (Experience Knowledge, Strategy, S.L.) | 10/23/2023 | ISC |
| Powin & SMM Information Service Agreement - 02.06.2024 | Master Service Agreement | Shanghai Metal Market | 02/06/2024 | ISC |
| Waratah ESA - Exhibit X 30March2023rev1 (AKE0060) | ESA (Energy Storage Agreement) | Munmorah Battery ProjectCo Pty Ltd | 05/03/2023 | Projects |
| Akaysha WSB - Record of agreement under Powin ESA and Exhibit X.3.30.2023v.1.docx | ESA (Energy Storage Agreement) | Munmorah Battery ProjectCo Pty Ltd | 05/03/2023 | Projects |
| Trenton ESA (fully executed, compiled with exhibits) | ESA (Energy Storage Agreement) | DTE Electric Company | 01/24/2024 | Revenue |
| Powin - TUV Rheinland (Shanghai) Co., Ltd. - MSA - 1.2.2024 | Master Service Agreement | TUV Rheinland (Shanghai) Co., Ltd. | 01/02/2024 | ISC |
| Lonestar Amended and Restated ESA (fully executed, compiled) 9.15.2023 | ESA (Energy Storage Agreement) | Lone Star Solar, LLC | 09/15/2023 | Revenue |
| STM0380_Watersprout - Powin - Limited Services Agreement _ Stem PO - 01.09.2024 | LTSA (Long Term Service Agreement) | STEM / Mohave Power LLC | 01/09/2024 | Revenue |
| Socomec - Powin - Master Supply Agreement - 01.01.2024 | Master Supply Agreement | Socomec Inc. | 01/01/2024 | ISC |
| Sunny Central Storage Data Sheet (2475-US) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|------|---------------|-------------------|----------------------------------|-----------|
| Sunbelt_150kVA Aux_434Vprimary | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| Powin Stacks Product Line Datasheet (DP-S 2021) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| Powin Enclosure Product Line Datasheet (DP-E-2021) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| MP-S230P-01 Stack230P Product Manual Rev 2 | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| Sunny Central Storage Operating Manual | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| Inverter Transformer Technical Requirements Rev 0 | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| BESS Technical Requirements_Rev. C | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| Exhibit C - FSI0050 Rabbitbrush 2 7-20-2021 | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| Powin Enclosure Product Manual (MP-ENCL-01) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| MP-SOS-MB StackOS-Modbus Product Manual Rev 0 | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| Sunny Central Storage Data Sheet (2475-US) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| MP-S230P-01 Stack230P Product Manual Rev 2 | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| Exhibit C - FSI0040 Rabbitbrush 1 7-20-2021 | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| Powin Enclosure Product Line Datasheet (DP-E-2021) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| Powin Stacks Product Line Datasheet (DP-S 2021) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| Sunny Central Storage Operating Manual | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| Sunbelt_150kVA Aux_434Vprimary | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| Powin Enclosure Product Manual (MP-ENCL-01) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| MP-SOS-MB StackOS-Modbus Product Manual Rev 0 | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| Inverter Transformer Technical Requirements Rev 0 | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| BESS Technical Requirements_Rev. C | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | Revenue |
| Pulse - PCE0020_Overhill_ LTSA (fully executed)_12.23.2023 | LTSA (Long Term Service Agreement) | PULSE CLEAN ENERGY SPV WATT LIMITED | 12/22/2023 | Revenue |
| Northern Reliability - PEC - Kia consulting agreement - 2018.07.10 | Master Service Agreement | Northern Reliability | 06/25/2018 | Projects |
| Luminate - PEC - Prof.Services Agreement - 12.30.2020 | Master Service Agreement | Luminate LLC | 12/30/2020 | Revenue |
| Libess - PEC - Services Agreement - 06.03.2019 | Master Service Agreement | Libess Service | 06/03/2019 | Revenue |
| JS Renewable Energy - Powin - Professional Services Agreem - 10.11.2022 | Master Service Agreement | JS Renewable Energy | 10/11/2022 | Technology |
| Intertek -Powin - MSA 7.21.2021 | Master Service Agreement - ASP | Intertek Testing Services NA Inc. | 07/21/2021 | Revenue |
| iBase - Powin - PurchasingAgreement - 07.01.2020 | Purchasing Agreement | iBase Gaming Inc. | 07/01/2020 | ISC |
| EKS - Powin - Global Master Products Supply Agreement - Oct. 23, 2023 | Master Supply Agreement | Experience Knowledge Strategy, S.L. (EKS) | 10/23/2023 | Legal |
| Pulse _Overhill_PCE0020_ESA - Powin (fully executed)_12.22.2023 | ESA (Energy Storage Agreement) | Pulse | 12/22/2023 | Revenue |
| Bergstrom, Inc. - Powin, LLC - MSA - 12.01.2023 | Master Supply Agreement | Bergstrom Inc. | 12/01/2023 | ISC |
| DesertQuartzite_Powin_LTSA_12.12.2023-FullyExecuted | LTSA (Long Term Service Agreement) | Desert Quartzite | 12/12/2023 | Revenue |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|---|---|---|---|---|
| Pulse Clean Energy SPV Watt Limited - Powin, LLC - LNTP Amendment No. 2 - 12.01.2023 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Pulse Clean Energy SPV Watt Limited | 12/01/2023 | Projects |
| Xiamen Hithium Energy Storage Technology Co, Ltd. - Powin - MSA - 12.15.2023 | Master Supply Agreement | Xiamen Hithium Energy Storage Technology Co., Ltd. | 01/01/2024 | ISC |
| Strativ Group - Powin, LLC - MSA ASP Installation Work - 12.01.2023 | Master Service Agreement - ASP | Strativ Group | 12/01/2022 | Projects |
| Sonic Systems International, LLC dba Amperion - Powin, LLC - MSA ASP - 04.17.2023 | Master Service Agreement - ASP | Sonic Systems International, LLC dba Amperion | 04/17/2023 | Projects |
| GreEnergy Resources, LLC - Powin, LLC - ASP Site Manager Services - 01.05.2023 | Master Service Agreement - ASP | GreEnergy Resources, LLC | 01/05/2023 | Projects |
| Clean Energy Services CES LLC - Powin, LLC - ASP Site Manager Services - 12.13.2022 | Master Service Agreement - ASP | Clean Energy Services CES LLC (CES) | 12/13/2022 | Projects |
| PRAXIS - Powin - El Sol Energy Storage Rider C Final.docx | Technology Escrow Agreement | El Sol Energy Storage LLC | 12/05/2023 | Projects |
| PRAXIS - Powin - Yuma Solar Energy Rider C Final.docx | Technology Escrow Agreement | Yuma Solar Energy LLC | 12/05/2023 | Projects |
| INV0111- El Sol - Powin - Technology Escrow Invoicing Agreement - 12.05.2023 (fully executed) | Technology Escrow Agreement | El Sol Energy Storage LLC | 12/05/2023 | Projects |
| INV0490 - Yuma - Powin Tech Escrow Invoicing Agreement - 12.5.2023 (fully executed) | Technology Escrow Agreement | Yuma Solar Energy LLC | 12/05/2023 | Projects |
| JMS Wind Energy, Inc. - Powin, LLC - ASP Master Service Agreement - 01.19.2023 | Master Service Agreement - ASP | JMS Wind Energy, Inc. | 01/19/2023 | Projects |
| Logicalis - Powin, LLC - Service Agreement - 12.08.2023 | Master Service Agreement | Logicalis | 12/08/2023 | Human Resources |
| GAL0020_Alcoutim ESA 12.4.2023 (Fully executed, compiled) | ESA (Energy Storage | GALP PARQUES FOTOVOLTAICOS DE ALCOUTIM | 12/04/2023 | |
| IOActive Inc. - Powin, LLC - MSA 11.22.2023 | Master Supply Agreement | IOActive, Inc | 11/22/2023 | Human Resources |
| Apex - Angelo-Powin - Long Term Services Agreement (11_17_2023) | LTSA (Long Term Service Agreement) | Angelo Storage LLC | 11/17/2023 | |
| Amended and Restated LNTP - Hemingway Expansion (Executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Idaho Power Comapny | 05/19/2023 | Revenue |
| SUN0050_SunGrid_Kruger HMLP_Order Letter_12JUN2020 - R2 - 2020.06.16 - signed SG | Purchase Order | | | |
| Powin_LTSA Proposal_Solvida_Putah Creek_SDA0000_08DEC2022_Signed | LTSA (Long Term Service Agreement) | Putah Creek Solar Farms, LLC | 12/08/2022 | |
| Bottleneck LTSA (fully executed) | LTSA (Long Term Service Agreement) | Ormat Nevada, inc. | 11/03/2023 | Projects |
| MPI0090 - Wilson - Services Agreement 20190620 | LTSA (Long Term Service Agreement) | Strata Solar Services, LLC | 08/22/2019 | |
| Termination Agreement - Framework Agreement (fully executed, compiled w_ appendices) | Framework Agreement | Longroad BESS Procurement, LLC | 12/09/2022 | |
| CPE - Powin LNTP 070720 (2) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | CPE Funding Pty Ltd | 07/07/2020 | Revenue |
| JMA0030 - Jema - Flexitranstore - PO - 12.20.2018 | Purchase Order | Jema Energy S.A | | |
| LNTP Letter Agreement Fully Assembled-AMP0194, AMP0195, AMP0196 (3-21-22) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | AMP Solar Development Inc. | 03/21/2022 | Revenue |
| Poblano -Escrow_Invoicing_Agreement (Poblano) - 11.3.2023 | Technology Escrow Agreement | Poblano Energy Storage, LLC | 11/03/2023 | Legal |
| Exhibit U STR0040 Escrow_Agreement PRAXIS Rider C Poblano 11.3.2023 | Technology Escrow Agreement | Poblano Energy Storage, LLC | 11/03/2023 | Legal |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|------|----------------|--------------------|-----------------------------------|-----------|
| Waratah - Energy Supply Agreement (ESA) - Deed of amendment -11.3.2023 | ESA (Energy Storage Agreement) | Munmorah Battery ProjectCo Pty Ltd | 11/03/2023 | Projects |
| Exhibit U STR0040 Escrow_Agreement PRAXIS Rider C EPC Services Company 11.3.2023 | Technology Escrow Agreement | EPC Services Company | 11/03/2023 | Projects |
| Poblano -Escrow_Invoicing_Agreement (EPC Contractor) - 11.3.2023 | Technology Escrow Agreement | EPC Services Company | 11/03/2023 | Projects |
| Hummingbird - Exhibit Y - ESV0220 - IP Escrow Agreement - PRAXIS Rider C.docx | Technology Escrow Agreement | Hummingbird Energy Storage, LLC | 10/01/2022 | Projects |
| PCE0020 - Overhill - Pulse - Amendment to LNTP | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | PULSE CLEAN ENERGY SPV WATT LIMITED | 10/30/2023 | Revenue |
| STM0576 - Sharon - Negroni 2 - Purchase Order (compiled, fully executed) | Purchase Order | Stem, Inc. | 10/13/2023 | |
| Amp LTSA Update to Form LTSA 4.3 - 3R (fully executed, compiled) | LTSA (Long Term Service Agreement) | ASD THREE RIVERS MA SOLAR LLC | 09/18/2023 | |
| Amp LTSA Update to Form LTSA 4.3 FRS (fully executed, compiled) | LTSA (Long Term Service Agreement) | FORT RIVER SOLAR 2 LLC | 09/18/2023 | |
| Amp LTSA Update to Form LTSA 4.3 Cotuit (fully executed, compiled) | LTSA (Long Term Service Agreement) | ASD COTUIT MA SOLAR LLC | 09/18/2023 | |
| Powin BHER ESA - BHE0021 Solar Star 4 (fully executed) | ESA (Energy Storage Agreement) | Solar Star 4, LLC | 08/31/2023 | |
| Powin BHER ESA - BHE0020 Solar Star 3 (fully executed) (1) | ESA (Energy Storage Agreement) | Solar Star 3, LLC | 08/31/2023 | |
| LTSA - Ameresco - Hampden (fully compiled, fully executed) | LTSA (Long Term Service Agreement) | Hampden Landfill Solar LLC | 07/31/2023 | Projects |
| PCE0020 - Overhill - LNTP (executed, compiled) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | PULSE CLEAN ENERGY SPV WATT LIMITED | 08/04/2023 | Revenue |
| (EDF0570 - EDF Test Cell PO) 4500138514 | Purchase Order | EDF Renewables | | |
| IPC - Powin Black Mesa et al Omnibus LTSA (executed, compiled) | LTSA (Long Term Service Agreement) | Idaho Power Comapny | 08/21/2023 | Projects |
| 20210714_AESC_Battery Cell Master Supply Agreement_EXECUTED | Master Supply Agreement | Envision Ruitai Dynamics Technology (Shanghai) Co., Ltd. | 07/07/2021 | ISC |
| DocuSign Purchase Order_PO-2544_1625027641312 | Purchase Order | DocuSign Inc. | 06/30/2021 | Legal |
| DocuSign Inc - Powin LLC - Order Form - 03.31.2023 | Purchase Order | DocuSign Inc | 03/30/2021 | Legal |
| DocuSign Inc - Powin LLC - Order Form - 2021 | Purchase Order | DocuSign Inc. | 06/21/2021 | Legal |
| Descartes - Powin, LLC - GLN Services Agreement (ISF) - 2022 | Master Service Agreement | Descartes Systems (USA) LLC | 02/03/2022 | ISC |
| CT Corp - PEC - CT Assurance Agreement 2022 - COUNTERSIGNED | Master Service Agreement | CT Corporation System | 10/07/2022 | Legal |
| Powin & AESC MSA - Effective 10.01.2023 | Master Supply Agreement | AESC US, LLC. | 10/01/2023 | ISC |
| Powin PEC 3P Escrow Agreement 180303 | Technology Escrow Agreement | PPA Grand Johanna | 03/15/2018 | |
| Reliance - Powin - MOU - 09062023 | Memorandum of Understanding | Reliance Industries Limited | 09/06/2023 | ISC |
| QPO - Powin - Agreement 8.8.2023 | Purchasing Agreement | QPO Energy, LLC | 08/08/2023 | ISC |
| PO Box Services Proposal - POWIN ENERGY SPAIN SLU - Gestiona T - 20230403 | Master Service Agreement | Grupo Gestiona T | 01/03/2023 | Human Resources |
| AT&T - Powin Professional Consulting Agreement October 2023 | Master Service Agreement | AT&T Corp | 10/05/2023 | Human Resources |
| PRAXIS Rider C Great Kiskadee Storage, LLC | Technology Escrow Agreement | Great Kiskadee Storage, LLC | 12/20/2022 | |
| PRAXIS Rider C - Chaparral Springs - Powin.docx | Technology Escrow Agreement | Chaparral Springs, LLC | 12/20/2022 | |
| PRAXIS Rider C (Angelo Storage, LLC | Technology Escrow Agreement | Angelo Storage LLC | 12/20/2022 | |
| PRAXIS-Powin-Desert-Quartzite-signed-Rider-C | Technology Escrow Agreement | Desert Quartzite, LLC | 12/06/2022 | |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|------|---------------|--------------------|-----------------------------------|-----------|
| PRAXIS Rider C - Rabbitbrush Solar, LLC | Technology Escrow Agreement | Rabbitbrush Solar, LLC | | |
| PRAXIS Rider C - Arrow Canyon Solar | Technology Escrow Agreement | Arrow Canyon Solar, LLC | | |
| Powin-Rider-C-Tranquility-Project.docx | Technology Escrow Agreement | SP Tranquility Solar Storage LLC | | |
| Powin-Rider-C-Garland-Project.docx | Technology Escrow Agreement | SP Garland Solar Storage LLC | | |
| Arizona Mechanics Lien Waiver Forms (Statutory) Powin FINAL - Exh.Q-1 | ESA (Energy Storage Agreement) | Sun Streams Expansion, LLC | | Projects |
| Powin-Energy-Ontario-Storage-First-Amendment-to-Powin-Energy-Ontario-Storage-Two-Party-Master-Escr-signed | Technology Escrow Agreement | Powin Energy Ontario Storage II, LP | 05/17/2022 | |
| 12.26.21 Powin Rider C - Triple Butte LLC (Jupiter cmts) - FINAL (1) | Technology Escrow Agreement | Triple Butte LLC | | |
| 12.26.21 Powin Rider C - Swoose LLC (Jupiter cmts) - FINAL (1) | Technology Escrow Agreement | Swoose LLC | | |
| 12.26.21 Powin Rider C - Flower Valley LLC (Jupiter cmts) - FINAL (1) | Technology Escrow Agreement | Flower Valley LLC | | |
| Exhibit U - AKE0060 - PRAXIS Rider C - (Final) (1) (1).docx | Technology Escrow Agreement | MUNMORAH BATTERY PROJECTCO PTY LTD; | 12/12/2022 | |
| Exhibit X2 - IDP0061 - Powin Tech Escrow Invoicing Agreement_execution_v | Technology Escrow Agreement | Idaho Power Comapny | 09/14/2023 | Projects |
| PRAXIS - PEC - Charger-Two-Party-Master-Escrow - 6.21.2018 (Powin Energy Ontario Storage II Rider C) | Technology Escrow Agreement | Praxis Technology Escrow | 06/21/2018 | Legal |
| PRAXIS - Powin Idaho Power Company Rider C Final.docx | Technology Escrow Agreement | Idaho Power Comapny | 09/14/2023 | |
| 20191113 Praxis Rider C Acorn (esVolta PEC Executed) | Technology Escrow Agreement | Acorn I Energy Storage LLC | 10/01/2019 | |
| PRAXIS Rider C Wildcat - FINAL.docx | Technology Escrow Agreement | Wildcat I Energy Storage LLC | 11/25/2019 | |
| Serrano - Invoicing Agreement (IP Escrow) _8.8.2023 execution version | Technology Escrow Agreement | Serrano Solar, LLC | 08/23/2023 | |
| Coffman_Powin_Full MSA_2021_Clean CEI sig.pdf_signed_2021.12.17.23.39.32 | Master Service Agreement | Coffman Engineers Incorporated | 12/01/2021 | ISC |
| Powin PO 5326 - Code Unlimited_Final Revision | Purchase Order | Code Unlimited LLC | 11/15/2022 | ISC |
| Professional Services Agreement -Powin and Billion | Master Service Agreement | Billion Electric Co., Ltd. | 09/27/2022 | ISC |
| MSA - Ameresco - POWIN CONTRACT - FINAL 9-8-2022.pdf_signed_2022.09.11.10.49.03 | Master Service Agreement - ASP | Ameresco Inc | 09/02/2022 | |
| 2017.04.21 - KSAndCo_MSA_Addendum_Q1_2017 | Master Service Agreement | Kieckhafer, Schiffer & Company LLP | 04/21/2017 | |
| Powin - ACE Battery PFA - FINAL CLEAN - 03.14.2023 | Framework Agreement | Shenzhen ACE Battery Co., Ltd. | 03/14/2023 | ISC |
| Q221028-1_MSA_ ACCURE Inc_Powin_final.docx (1) | Master Service Agreement | Accure | 10/28/2022 | |
| Clean Peak Energy BESS MSA - 20210217 Execution Version - CPE signed | Master Supply Agreement | CPE Funding Pty Ltd | 02/17/2021 | |
| AMR Framework | Framework Agreement | Ameresco Inc | 04/29/2022 | |
| Akaysha Framework Agreement_Term Sheet - Executed_2022.03.04 | Framework Agreement | Akaysha Energy Pty Ltd | 03/01/2022 | |
| SUN0030-3 Order Letter- Kruger 072319 (executed) | Purchase Order | SunGrid Solutions Inc. | 07/24/2019 | |
| MSA Stem - Powin (EXECUTED w PGs and LTSA v2) | Master Supply Agreement | Stem, Inc. | 09/02/2020 | |
| SS4 - Invoicing Agreement (IP Escrow) 2023.08.23 | Technology Escrow Agreement | Sun Streams Expansion LLC | 08/23/2023 | |
| PRAXIS - Powin Serrano Solar Rider C Final.docx | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | 08/23/2023 | |
| PRAXIS - Sun Streams PVS 4 - Rider C Final.docx | Technology Escrow Agreement | Sun Streams Expansion, LLC | 08/23/2023 | |
| 2017.03.30 - Tolling Agreement Fully Executed | Purchasing Agreement | San Diego Gas & Electric Company | 03/30/2017 | |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|------|---------------|--------------------|----------------------------------|-----------|
| 2017-09-01 SCE-POWIN Goleta ESS1 FINAL EXECUTED | ESA (Energy Storage Agreement) | Southern California Edison Company | 09/01/2017 | |
| Termination of LNTP_Angiola SBE0010.docx_signed_2022.06.21.20.39.07 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Angiola East, LLC | 06/21/2022 | |
| Termination of LNTP_Angiola SBE0010.docx_signed_2022.06.08.15.28.08 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Angiola East, LLC | 06/08/2022 | |
| PO# 192 - Powin Energy - Schaeffler | Purchase Order | Saturn Power Inc. | 04/06/2018 | |
| 20191209 - Prisma - Powin MSA_Fully Executed | Master Service Agreement | Prisma Energy Solutions LLC | | |
| 3.4.5 Charger - Amended and Restated BESA (PPA Grand Johanna) [EXECUTED] | ESA (Energy Storage Agreement) | PPA Grand Johanna LLC | 12/04/2017 | |
| PPA_Energy Storage_RA Only (After Online Date)_2016-08-05_EXECUTED | Purchasing Agreement | Southern California Edison Company | 08/05/2016 | |
| Grissom_1st Amendment to PPA_Fully Executed_1.9.2020 | Purchasing Agreement | Grissom Solar, LLC | 01/09/2020 | |
| Grissom_2nd Amendment to PPA_Fully Executed_5.20.2020 | Purchasing Agreement | Grissom Solar, LLC | 05/20/2020 | |
| Grissom_Power Purchase Agreement_09.06.2018 | Purchasing Agreement | North Carolina Electric Membership Corporation | 09/06/2018 | |
| Ormat - Powin - OTI0040 - Bottleneck - ESA Amendment #1 - 05.10.2022 | ESA (Energy Storage Agreement) | Ormat Nevada Inc | 03/15/2022 | |
| 20201026 - RTC0020 Garland Executed Supply Agreement | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. | 10/26/2020 | |
| Tranquility LTSA Powin Amendment 3 - Availability Calculations (Execution Version 12.8.22).pdf_signed_2022.12.22.09.23.39 | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas Inc | 12/08/2022 | |
| Garland LTSA Powin Amendment 3 - Availability Calculations - 12.08.2022 | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas Inc | 12/08/2022 | |
| LNTP 1-2 Payment Release Lien Waivers - Hecate Johanna - Signed 6-22-2020 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Mitsubishi Hitachi Power Systems Americas, Inc. | 06/22/2020 | |
| Hecate - LNTP2 Amendment #1 - PECexec | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Mitsubishi Hitachi Power Systems Americas, Inc. | 07/02/2020 | |
| PO Windsor PS00010871 | Purchase Order | MITSUBISHI ELECTRIC POWER PRODUCTS, INC (MEPPI) | 12/19/2018 | |
| PO Sarnia PS00010872 | Purchase Order | MITSUBISHI ELECTRIC POWER PRODUCTS, INC (MEPPI) | 12/19/2018 | |
| PRAXIS-Powin Two Party Master Escrow Agreement - Final 12-17-19.docx | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | 12/17/2019 | Technology |
| Powin - REPT - MOU for Indonesia Opportunity - signed 08.14.2023 | Memorandum of Understanding | REPT BATTERO Energy Co., Ltd | 08/01/2023 | ISC |
| W. Columbia - Praxis - POWIN - Three Party Technology Escrow Agreement wEX B FINAL | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | 09/26/2019 | |
| SP_Powin_Praxis_Escrow Agreement Amendment202203_FE (1) | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | 03/01/2022 | |
| Amendment 2 for MAV6 Subcontract _.pdf_signed_2022.03.01.21.48.30 | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. | 02/08/2022 | |
| Powin - Desay Battery PFA - FINAL CLEAN - 03.15.2023 | Framework Agreement | Huizhou Desay Battery Co., Ltd. | 03/15/2023 | ISC |
| APE0070 - Powin Tech Escrow Invoicing Agreement_Executable.docx.pdf_signed_2022.12.21.07.32.07 | Technology Escrow Agreement | Great Kiskadee  LLC | 12/20/2022 | |
| APE0060 - Powin Tech Escrow Invoicing Agreement_Executable.docx.pdf_signed_2022.12.21.07.29.30 | Technology Escrow Agreement | Angelo Storage LLC | 12/20/2022 | |
| PO - Powin - Wallum - final (corrected) | Purchase Order | Amp Solar US Services LLC | 08/28/2020 | |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|------|----------------|--------------------|-----------------------------------|-----------|
| Oak_Hill_2-Assignment_of_Rights_under_Purchase_Order_(amp_9-3-21)-Execution | Purchase Order | Oak Hill Solar 2 LLC | 09/03/2021 | |
| Oak_Hill_1-Assignment_of_Rights_under_Purchase_Order_(amp_9-3-21)-Execution | Purchase Order | Oak Hill Solar 1 LLC | 09/03/2021 | |
| AKA0010 - Amendment 1 - 4 March 22_AKA Fully Executed | ESA (Energy Storage Agreement) | Aspin Kemp & Associates Inc | 12/23/2021 | |
| Powin 20191028 - PEC BESA - Base v.9 (PEC Executed 06.11.21) - Ventura | ESA (Energy Storage Agreement) | Powerflex Systems, Inc. | 06/11/2021 | |
| KIA0000 - Purchase Agreement - MEPPI and Powin | Purchasing Agreement | Mitsubishi Electric Power Products, Inc. (MEPPI) | 08/29/2018 | |
| Rider-C-Powin-KCE-TX-Holdings-2020-Operating-Projects-NRF-12.31.DOCX | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | 01/13/2021 | |
| Rider-C-KCE-Powin-PEC-Construction-ProjectsNRF-12.31.DOCX | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | | |
| Rider-C-KCE-Powin.docx | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | | |
| PRAXIS - Powin - Sun Streams PVS Rider C executed | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | 07/24/2023 | |
| PRAXIS - Ulinda Park - Exhibit U - AKE0010 Rider C -executed | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | 07/25/2023 | |
| Powin & BQC MSA - signed 08.01.2023 | Master Supply Agreement | Shenzhen Baiqiancheng Electronic Co.,Ltd | | ISC |
| TPE0010 - Purchase Order | Purchase Order | TPE Energy, Inc. | 10/27/2020 | |
| TPE 0080_Powin_Form_BESA_TPE_225_TPE0 | ESA (Energy Storage Agreement) | TPE Energy, Inc. | 11/18/2021 | |
| TPE 0070_Powin_Form_BESA_TPE_230P_TPE | ESA (Energy Storage Agreement) | TPE Energy, Inc. | 11/18/2021 | |
| Three Rivers - AMP0196 - BESA (fully executed) | ESA (Energy Storage Agreement) | AMP Solar US Services LLC | 07/28/2022 | |
| Sunstreams 3 - Limited Notice to Proceed (Executed fully assembled) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Sun Streams PVS, LLC | 09/12/2022 | |
| SUN0040 - SunGrid - Small Fry - OL | Purchase Order | Sungrid Solutions | 08/08/2019 | |
| Strata-Powin MSA Term Sheet 07-07-22 Fully Executed | Master Supply Agreement | Strata Solar, LLC | 07/07/2022 | |
| Strata Poblano LNTP (executed, compiled) (2)_small | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Poblano, Energy Storage, LLC | 12/19/2022 | |
| Strata Poblano ESA (fully executed and compiled) | ESA (Energy Storage Agreement) | Poblano Energy Storage, LLC | 04/17/2023 | |
| STR0010 - GUC Evans Substation - Services Agreement | LTSA (Long Term Service Agreement) | Strata Solar, LLC | 10/27/2020 | |
| STR0010 - GUC Evans Substation - BESA | ESA (Energy Storage Agreement) | Strata Solar, LLC | 03/27/2020 | |
| STM0913-BWV_Palmer_Sykes_Purchase_Order_11953_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 | |
| STM0912-BWV_Douglas_Oak_Purchase_Order_11958_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 | |
| STM0911-BWV_Dighton_Tremont_Purchase_Order_11957_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 | |
| Yuma Supply Agreement (executed, compiled with exhibits) | ESA (Energy Storage Agreement) | Yuma Solar Energy LLC | 05/19/2023 | |
| YUMA PCS LNTP Letter Agreement (fully executed 3.13.23) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Yuma Solar Energy LLC | 03/13/2023 | |
| Ysolar_PO_Leader_20210824 | Purchase Order | Leader Energy Storage Technology Co., Ltd | 08/24/2021 | |
| Willow Springs - ESSA - FULLY COMPILED AND EXECUTED - 7-27-2022_small | ESA (Energy Storage Agreement) | Chaparral Springs, LLC | 07/27/2022 | |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|---|---|---|---|---|
| WEG0020 - Demo Stack225 - Purchase Order | Purchase Order | WEG Electric Corp | 02/24/2020 | |
| WEG0020 - Demo Stack225 - PO | Purchase Order | WEG Electric Corp | 01/28/2020 | |
| TX11 CSA Amendment 1 dually signed | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 06/14/2022 | |
| STM0652-Dark_N_Stormy_II_Purchase_Order_11633_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 | |
| STM0651-Dark_N_Stormy_I_Purchase_Order_11634_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 | |
| STM0572-Velvet_Mite_CPR_Purchase_Order_12288_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 | |
| STM0571-Velvet_Mite_TR_Purchase_Order_12285_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 | |
| STM0578-Velvet_Mite_SD_Purchase_Order_12283_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 | |
| STM0577-Velvet Mite ML Purchase Order 12282 (assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 | |
| STM0576-Velvet_Mite_MR_Purchase_Order_12287_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 | |
| STM0574-Velvet_Mite_BR_Purchase_Order_12284_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 | |
| STM0573-Velvet_Mite_QR_Purchase_Order_12286_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 | |
| STM0493-Mosquito_III_Purchase_Order_11635_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 | |
| STM0492-Mosquito_II_Purchase_Order_11637_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 | |
| STM0491-Mosquito_I_Purchase_Order_11636_(assembled)(1)_small | Purchase Order | Stem, Inc. | 03/08/2023 | |
| Southern TQ_MPA LTSA - Powin Subcontract - 6-30 - Fully Executed | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 06/28/2021 | |
| Southern Garland_MPA LTSA Powin Subcontract 6-30 - Fully Executed | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 06/28/2021 | |
| Sol System - BESS Supply Agreement (Fully executed) | ESA (Energy Storage Agreement) | SCS Van Wyck 012823 Croton On Hudson, LLC | 11/23/2021 | |
| Slocum ESA (fully executed, compiled) | ESA (Energy Storage Agreement) | DTE Electric Company | 12/15/2022 | |
| Signed LES0010 BESA | ESA (Energy Storage Agreement) | Leader Energy Storage Technology Co., Ltd | 09/30/2022 | |
| SBE0010 Angiola LNTP (executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Angiola East, LLC | 03/17/2022 | |
| Santa Paula OMA (Executed) | LTSA (Long Term Service Agreement) | Santa Paula Energy Storage, LLC | 10/21/2021 | |
| Santa Paula BESA Powin - esVolta (Executed) | ESA (Energy Storage Agreement) | Santa Paula Energy Storage, LLC | 10/21/2021 | |
| RCT0030 - Tranquillity - BESSA - 20201123 | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 11/23/2020 | |
| Rabbitbrush 2 - Leeward - Powin BESA SA (executed)[71635] | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | |
| Rabbitbrush 1 - Leeward - Powin BESA SA (executed) (1) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 | |
| Quote - QPO0030 (Richard Signed) | Purchase Order | QPO Energy, LLC | 10/14/2021 | |
| Quote - QPO0010-QPO Taiwan (Richard Signed) | Purchase Order | QPO Energy, LLC | 10/01/2021 | |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|---|---|---|---|---|
| Purchase Order 10711 Powin 20210603 V3 (002) - signed | Purchase Order | Stem, Inc. | 06/08/2021 | |
| Purchase Order 10459 20210210 Stem - Fully Assembled - Fully Executed 20210308 | Purchase Order | Stem, Inc. | 02/28/2021 | |
| Purchase Order 10425 20210114 Stem Signed | Purchase Order | Stem, Inc. | 01/14/2021 | |
| PRAXIS Rider C - Powin 191112 - West Warwick Energy Storage III, LLC.docx | Technology Escrow Agreement | Convergent Energy and Power LP | | |
| PRAXIS Rider C - Powin 191112 - West Warwick Energy Storage II, LLC.docx | Technology Escrow Agreement | Convergent Energy and Power LP | | |
| PRAXIS Rider C - Powin 191112 - West Warwick Energy Storage I, LLC.docx | Technology Escrow Agreement | Convergent Energy and Power LP | | |
| PPS0000 - Silver Oak - PO | Purchase Order | Pure Power Solutions, Inc. | 02/27/2018 | |
| Powin-LRE Sunstreams ESA (fully executed, compiled w exhibits) | ESA (Energy Storage Agreement) | Sun Streams PVS, LLC | 12/09/2021 | |
| Powin_LTSA_Az_Sun_El_Sol_Orangeville_FINAL | LTSA (Long Term Service Agreement) | Invenergy Services LLC | 03/01/2022 | |
| Powin_Akaysha_Waratah_LTSA_(compiled_fully_executed) | LTSA (Long Term Service Agreement) | Munmorah Battery ProjectCo Pty Ltd | 12/16/2022 | |
| Powin Project Addendum Hannover (FINAL PROJECT ADDENDUM 05.25.21) - CLEAN Fully Executed | Master Supply Agreement | Mitsubishi Electric Power Equipment, Inc. (MEPPI) | 05/25/2021 | |
| Powin Master Agreement 5-25-21 (FINAL MAIN BODY 05.25.21) - CLEAN Fully Executed | Master Supply Agreement | Mitsubishi Electric Power Products, Inc. (MEPPI) | 05/25/2021 | |
| Town of La Grange - Powin - LTSA - 06.30.2021 | LTSA (Long Term Service Agreement) | La Grange, an Incorporated North Carolina Town | 06/30/2021 | |
| Powin LTSA - Bruce Power -  20230501 fully executed | LTSA (Long Term Service Agreement) | Saturn Battery I LP | 05/01/2023 | |
| Powin LNTP - NY ESRT Equipment and Schedule Form (executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Powerflex Systems, Inc. | 02/25/2022 | |
| Powin LNTP - CSU Fullerton Equipment and Schedule Form (executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Powerflex Systems, Inc. | 02/25/2022 | |
| Powin Executed MSA Stem - Powin 1st Restated - 20220914 Execution Version - FE | Master Supply Agreement | Stem, Inc. | 09/14/2022 | |
| Powin APS - Project Contract (Paloma & Cotton Center) (executed) | ESA (Energy Storage Agreement) | Arizona Storage Development LLC | 03/05/2021 | |
| Powin APS - Project Contract (Hyder 1 & Hyder 2) (executed) | ESA (Energy Storage Agreement) | Arizona Storage Development LLC | 03/05/2021 | |
| Powin APS - Project Contract (Gila Bend 1 & Gila Bend) (executed) | ESA (Energy Storage Agreement) | Arizona Storage Development LLC | 03/05/2021 | |
| Powin APS - Project Contract (Foothills 1 & Foothills 2) (executed) | ESA (Energy Storage Agreement) | Arizona Storage Development LLC | 03/05/2021 | |
| Powin APS - Project Contract (Desert Star) (executed) | ESA (Energy Storage Agreement) | Arizona Storage Development LLC | 03/05/2021 | |
| Powin 20191028 - PEC BESA - Base v.9 (PEC Executed 06.11.21) - Thousand Oaks | ESA (Energy Storage Agreement) | Powerflex Systems, Inc. | 06/11/2021 | |
| Powin - LRD Serrano ESA (fully executed assembled with exhibits) | ESA (Energy Storage Agreement) | Serrano Solar, LLC | 05/05/2023 | |
| Powin - IPC BESA - IDP0070 (Melba) (executed) | ESA (Energy Storage Agreement) | Idaho Power Company | 12/28/2021 | |
| Powin - IPC BESA - IDP0050 (Elmore) (executed) | ESA (Energy Storage Agreement) | Idaho Power Company | 12/28/2021 | |
| Powin - IPC BESA - IDP0030 (Filer) (executed) | ESA (Energy Storage Agreement) | Idaho Power Company | 12/28/2021 | |
| Powin - IPC BESA - IDP0010 (Weiser) (executed) | ESA (Energy Storage Agreement) | Idaho Power Company | 12/28/2021 | |
| Powin - CEP BESA - WWIII [Executed][94637]_small | ESA (Energy Storage Agreement) | Convergent Energy and Power LP | 02/16/2022 | |
| Powin - CEP BESA - WWII [Executed][94638]_small2 | ESA (Energy Storage Agreement) | Convergent Energy and Power LP | 02/16/2022 | |
| Powin - CEP BESA - WWI [Executed][94575]_small | ESA (Energy Storage Agreement) | Convergent Energy and Power LP | 02/16/2022 | |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|------|---------------|--------------------|----------------------------------|-----------|
| Powin - AKA0010 BESA (EXECUTED) | ESA (Energy Storage Agreement) | AKA Group | 12/23/2021 | |
| PO2022-001-Powin | Purchase Order | Leader Energy Storage Technology Co., Ltd | 03/03/2022 | |
| PO003 - Quilhurst | Purchase Order | QPO Energy, LLC | 10/14/2021 | |
| PO001 - Taiwan | Purchase Order | QPO Energy, LLC | 10/14/2021 | |
| PO 4415070665 R5 | Purchase Order | Honeywell Limited - HPS CA | 12/01/2020 | |
| PNM Rio Del Oro - LNTP(Fully Executed) (1) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Public Service Company of New Mexico | 03/09/2023 | |
| PNM Powin - South Valley EPA (fully executed, compiled with exhibits)[203748] | ESA (Energy Storage Agreement) | Public Service Company of New Mexico | 05/01/2023 | |
| PGR0020 - Rochester - LNTP | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Pine Gate Renewables, LLC | 10/06/2020 | |
| PGR0010 - Tremont - LNTP | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Pine Gate Renewables, LLC | 10/06/2020 | |
| PGE0010 - PGE- BPSC - PO | Purchase Order | Portland General Electric (PGE) | 10/07/2019 | |
| PEC to PEOS II Battery Equipment supply Agreement | ESA (Energy Storage Agreement) | Powin Energy Ontario Storage, LLC | 07/01/2017 | |
| PAC0010 - Klamath Falls -Materiasl Supply and Installation Contract - EC | ESA (Energy Storage Agreement) | Pacificorp | 10/06/2021 | |
| PAC0010 - Klamath Falls - NTP | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Pacificorp | 10/07/2021 | |
| Ormat Equipment Supply Agreement (executed)_small | ESA (Energy Storage Agreement) | Ormat Nevada Inc. | 03/15/2022 | |
| BESA Or Haner | ESA (Energy Storage Agreement) | Auto-Chen Ltd | 06/09/2021 | |
| OPL0010 - EPC Integration for Opalco by SunGrid | Purchase Order | Orcas Power & Light Cooperative (OPALCO) | 12/04/2019 | |
| OPL0010 - Decatur EPC Agreement - 20190712 | ESA (Energy Storage Agreement) | Orcas Power & Light Cooperative (OPALCO) | 07/12/2019 | |
| Oak Hill 2 Powin PO | Purchase Order | Amp Solar US Services LP | 01/25/2021 | |
| Oak Hill 1 Powin PO | Purchase Order | Amp Solar US Services LP | 01/25/2021 | |
| Novasource - Powin Limited Services Agreement.docx | LTSA (Long Term Service Agreement) | Northstar Energy Management, LLC | 02/27/2023 | Projects |
| NIS0040 - NIDEC - Disney Bahamas - PO | Purchase Order | Nidec ASI S.p.A. | 05/29/2019 | |
| BESA Nir Yitzac 3 | ESA (Energy Storage Agreement) | Auto-Chen Ltd | 06/09/2021 | |
| BESA Nir Yitsac 2 | ESA (Energy Storage Agreement) | Auto-Chen Ltd | 06/09/2021 | |
| Neat Mordechai - ESA - 6.9.2021 | ESA (Energy Storage Agreement) | Auto-Chen Ltd | 06/09/2021 | |
| MTA-45002234641 | Purchase Order | Mesa Technical Associates, Inc. | 10/01/2019 | |
| Millikan - PPA Grand Johanna - O&M Agreement | LTSA (Long Term Service Agreement) | PPA Grand Johanna LLC | 12/04/2017 | |
| MidAm ESS Supply Agreement FINAL 10.3.18_Fully Executed | ESA (Energy Storage Agreement) | Invenergy Storage Development LLC | 10/02/2018 | |
| MHP0230 - KCE TX23 - LNTP | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Mitsubishi Hitachi Power Systems Americas, Inc. (MHPS) | 07/16/2020 | |
| MHP0230 - KCE TX 23 - BESSA - MPA | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 10/16/2020 | |
| MHP0120 - KCE TX12 - LNTP | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Mitsubishi Hitachi Power Systems Americas, Inc. (MHPS) | 07/16/2020 | |
| MHP0120 - KCE TX 12 - BESSSA - MPA | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 10/16/2020 | |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|------|----------------|--------------------|-----------------------------------|-----------|
| MHP0110 - KCE TX11 - LNTP | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Mitsubishi Hitachi Power Systems Americas, Inc. (MHPS) | 07/16/2020 | |
| MHP0110 - KCE TX 11 - Service Agreement | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 05/19/2021 | |
| MHP0110 - KCE TX 11 - BESSA - MPA | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 10/15/2020 | |
| MHP0010 - Fredonia - PO | Purchase Order | Mitsubishi Hitachi Power Systems Americas, Inc. (MHPS) | 03/25/2020 | |
| MHP0010 - Fredonia - Order Letter | Purchase Order | Mitsubishi Hitachi Power Systems Americas, Inc. (MHPS) | 03/05/2020 | |
| MEP0020 - ITC Test Bed - MSA | Master Supply Agreement | Mitsubishi Electric Power Products, Inc. (MEPPI) | 02/27/2019 | |
| Mav6 Powin LTSA - 20210719 Fully Executed | LTSA (Long Term Service Agreement) | Maverick Solar 6, LLC | 07/19/2021 | |
| LTSA_-_GOElectric_-_Confederation_College_(Powin_2023-01-17_-_Fully_Compiled) | LTSA (Long Term Service Agreement) | Go Electric, Inc | 02/02/2023 | |
| LRE (Longroad)-Powin Definitive Framework Agreement (Executed) | Framework Agreement | Longroad BESS Procurement LLC | 01/07/2022 | |
| LRE - Powin - Rabbitbrush 2 Battery LTSA - 03.18.2022 | LTSA (Long Term Service Agreement) | Rabbitbrush Solar, LLC | 03/18/2022 | |
| LRE - Powin - Rabbitbrush 1 Battery LTSA - 03.18.2022 | LTSA (Long Term Service Agreement) | Rabbitbrush Solar, LLC | 03/18/2022 | |
| Longroad SS4 ESA (assembled, fully executed)_small | ESA (Energy Storage Agreement) | Sun Streams Expansion, LLC | 03/10/2023 | |
| Long Term Services Agreement for ESS between Chaparral Springs, LLC and Powin, LLC for the Willow Springs Solar 3 project (fully | LTSA (Long Term Service Agreement) | Chaparral Springs, LLC | 08/08/2022 | |
| Long Term Services Agreement for ESS between Chaparral Springs, LLC and Powin, LLC for the Chaparral Solar project (fully execut | LTSA (Long Term Service Agreement) | Chaparral Springs, LLC | 08/08/2022 | |
| Lonestar ESA - SCL0020 (fully executed, compiled with all exhibits) | ESA (Energy Storage Agreement) | Lone Star Solar, LLC | 05/01/2023 | |
| LNTP_DYN0108_POWIN (051022) CLEAN - fully executed | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Dynapower Company, LLC | 05/10/2022 | |
| LNTP_DYN0107_Powin_05.092022 Clean Final - fully executed | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Dynapower Company, LLC | 05/10/2022 | |
| LNTP Side Letter DYN0108 Powin 05.24.2022 Executable | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Dynapower Company, LLC | 05/24/2022 | |
| LNTP Side Letter DYN0107 Powin 05.24.2022 Executable | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Dynapower Company, LLC | 05/24/2022 | |
| LES0010-Leader Energy Storage_210806-signed | Purchase Order | Leader Energy Storage Technology Co., Ltd | 08/06/2021 | |
| Leader PO2022-001 Fully Executed | Purchase Order | Leader Energy Storage Technology Co., Ltd | 03/03/2022 | |
| LaGrange Strata - Powin BESA (EXECUTED) | ESA (Energy Storage Agreement) | Strata Solar, LLC | 08/12/2021 | |
| La Grange Powin LNTP - Strata_2021.07.07_EXECUTED | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Strata Storage, LLC | 07/02/2021 | |
| KMC0010 LNTP Letter Agreement - Brandywine (fully executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | KMC Thermo, LLC | 03/15/2022 | |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|------|----------------|--------------------|-----------------------------------|-----------|
| STM0000 - Stem - Master Service Agreement (3) | Master Supply Agreement | Stem, Inc. | 09/02/2020 | |
| Stem Portfolio LNTP Letter Agreement 20220303 - Execution Version FE | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Stem, Inc. | 03/03/2022 | |
| SPI0040 - HoneywellSaturn - Bruce - Subcontract Agreement - A1 | ESA (Energy Storage Agreement) | Honeywell International Inc. / Honeywell Process Solutions | 01/11/2019 | |
| SPI0040 - HoneywellSaturn - Bruce - PO | Purchase Order | Honeywell Limited - HPS CA | 03/01/2019 | |
| SPI0040 - Honeywell Saturn - Bruce - Goods and Services Agreement | ESA (Energy Storage Agreement) | Honeywell International Inc. / Honeywell Process Solutions | 01/18/2019 | |
| SPC0030 - Southern CO - PowerSecure - PO and Terms | Purchase Order | Southern Power Company (SPC) | 02/20/2019 | |
| SPC0030 - Southern Co - PowerSecure - OL | Purchase Order | Southern Power Company (SPC) | 11/19/2019 | |
| KCE0080 - PO #3 - KCE - Worsham | Purchase Order | KCE TX 8, LLC | 05/22/2020 | |
| KCE0070 - KCE TX7 - Services Agreement_EXECUTED | LTSA (Long Term Service Agreement) | KCE TX 7, LLC | 06/01/2020 | |
| KCE0070 - PO - KCE - Flat Top | Purchase Order | KCE TX 7, LLC | 05/22/2020 | |
| KCE0060 - NY3 - Service Agreement | LTSA (Long Term Service Agreement) | Key Capture Energy, LLC (KCE) | 06/01/2020 | |
| KCE0060 - PO - KCE - NY3 | Purchase Order | Key Capture Energy, LLC (KCE) | 02/20/2020 | |
| KCE_TX-12_Powin-MPA_CSA - Executed Version | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 05/19/2021 | |
| KCE TX-23_Powin-MPA_CSA_Executed Version | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 05/19/2021 | |
| KCE TX1TX2TX3 - LNTP 2 - 20190201 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Key Capture Energy, LLC (KCE) | 01/31/2019 | |
| KCE TX1TX2TX3 - LNTP - 20190115 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Key Capture Energy, LLC (KCE) | 01/15/2019 | |
| KCE - Master Equipment Supply Agreement TX NY | Master Supply Agreement | Key Capture Energy, LLC (KCE) | 01/15/2019 | |
| JPR0030 - Triple Butte - Services Agreement | LTSA (Long Term Service Agreement) | Triple Butte, LLC | 08/21/2020 | |
| JPR0030 - Triple Butte - PO 003 | Purchase Order | Triple Butte, LLC | 08/21/2020 | |
| JPR0020 - Flower Valley - Service Agreement | LTSA (Long Term Service Agreement) | Flower Valley, LLC | 05/15/2020 | |
| JPR0020 - Flower Valley - PO 001 | Purchase Order | Flower Valley, LLC | 05/15/2020 | |
| JPR0010 - Swoose - Services Agreement | LTSA (Long Term Service Agreement) | Swoose, LLC | 05/15/2020 | |
| JPR0010 - Swoose - PO 002 | Purchase Order | Swoose, LLC | 05/15/2020 | |
| JPR0000 - Jupiter Power - Master Supply Agreement | Master Supply Agreement | Jupiter Power, LLC | 05/15/2020 | |
| JMA0030 - Jema - Flexitranstore - PO | Purchase Order | Jema Energy S.A. | 12/20/2018 | |
| INV0030 - Insurgentes - Supply Agreement | ESA (Energy Storage Agreement) | MG HR, S. de R.L. de C.V. | 12/20/2019 | |
| INV0030 - Insurgentes - Amendment 1 | ESA (Energy Storage Agreement) | MG HR, S. de R.L. de C.V. | 01/31/2020 | |
| INV0020 - Orangeville - PO ORS111127 | Purchase Order | Orangeville Energy Storage LLC | 11/02/2020 | |
| INV0020 - Orangeville - BESSSA | ESA (Energy Storage Agreement) | Orangeville Energy Storage LLC | 11/02/2020 | |
| INV0000 - Invenergy - Master Supply Agreement | ESA (Energy Storage Agreement) | Invenergy Storage Development LLC | 12/20/2019 | |
| Hummingbird Powin LTSA (assembled, executed) | LTSA (Long Term Service Agreement) | Hummingbird Energy Storage, LLC | 02/10/2023 | Revenue |
| Hummingbird Limited Notice to Proceed (compiled executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | esVolta Development, LLC | 12/29/2022 | |
| Hummingbird - ESV0220 - ESA (assembled, fully executed) | ESA (Energy Storage Agreement) | Hummingbird Energy Storage, LLC | 02/03/2023 | |
| Honeywell_Powin_LTSA_EXECUTED_2021.08.18 | LTSA (Long Term Service Agreement) | Honeywell International | 08/18/2021 | |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|---|---|---|---|---|
| HNL0077 - Hydro Extrusions - PO 4415658515 R1 | Purchase Order | Honeywell Limited - HPS CA | 09/23/2020 | |
| HNL0072 - Honeywell - Malpack 1.1 - PO - A1 | Purchase Order | Honeywell Limited - HPS CA | 05/01/2020 | |
| HNL0071 - Malpack 1.2 - PO 4415000886 R8 | Purchase Order | Honeywell Limited - HPS CA | 05/01/2020 | |
| HNL0070 - Canopy Growth - PO 4415070665 | Purchase Order | Honeywell Limited - HPS CA | 03/24/2020 | |
| HNL0069 - Toyota Boshoku - PO 4415001119 R6 | Purchase Order | Honeywell Limited - HPS CA | 05/01/2020 | |
| HNL0068 - Pillers Waterloo - PO 4414731331 R9 | Purchase Order | Honeywell Limited - HPS CA | 04/18/2020 | |
| HNL0068 - Pillers Waterloo - PO 4414731331 R7 | Purchase Order | Honeywell Limited - HPS CA | 04/02/2020 | |
| HNL0067 - Pillers Brantford - PO 4414731269 R8 | Purchase Order | Honeywell Limited - HPS CA | 04/02/2020 | |
| HNL0066 - Rich Foods - PO 4414731328 R8 | Purchase Order | Honeywell Limited - HPS CA | 04/02/2020 | |
| HNL0065 - Honeywell - Molson Coors - PO - A1 | Purchase Order | Honeywell Limited - HPS CA | 05/01/2020 | |
| HNL0064 - Decast - PO 4414731297 R9 | Purchase Order | Honeywell Limited - HPS CA | 04/02/2020 | |
| HNL0062 - Kelloggs - PO 4414731277 R8 | Purchase Order | Honeywell Limited - HPS CA | 04/02/2020 | |
| HNL0061 - Enbridge - PO 4415000441 R6 | Purchase Order | Honeywell International, Inc. | 05/01/2020 | |
| HNL0000 - Honeywell - MSA - EC | Purchasing Agreement | Honeywell International, Inc. | 03/21/2019 | |
| HNL0000 - Honeywell - Addendum - EC | ESA (Energy Storage Agreement) | Honeywell International, Inc. | 12/20/2019 | |
| HES0010 - Hunt - Demo - Order Letter | Purchase Order | Hunt Energy Solutions | 06/11/2019 | |
| Hemingway IPC BESA 80MW (executed & assembled)_small | ESA (Energy Storage Agreement) | Idaho Power Company | 02/28/2022 | |
| Hemingway Expansion ESA (executed, compiled) | ESA (Energy Storage Agreement) | Idaho Power Company | 06/08/2023 | |
| HEM0070 - Ukraine - PO and Order Letter | Purchase Order | Sungrid Solutions | 09/04/2020 | |
| HEC0070 - Kitchener II - OM Agreement - 20181030 | LTSA (Long Term Service Agreement) | Hecate Energy Ontario Storage VII, LP | 10/30/2018 | |
| HEC0070 - Kitchener II - BESA | ESA (Energy Storage Agreement) | Hecate Energy Ontario Storage VII, LP | 03/01/2018 | |
| HEC0050 - Johanna - Supply Agreement LNTP | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Mitsubishi Hitachi Power Systems Americas, Inc. (MHPS) | 05/28/2020 | |
| HEC0050 - Johanna - Supply Agreement - LNTP2 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Mitsubishi Hitachi Power Systems Americas, Inc. (MHPS) | 06/11/2020 | |
| HEC0050 - Johanna - Subcontract | ESA (Energy Storage Agreement) | Mitsubishi Hitachi Power Systems Americas, Inc. (MHPS) | 08/31/2020 | |
| HEC0050 - Johanna - Long Term Service Agreement | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 01/25/2021 | |
| Great Kiskadee ESA (Executed) | ESA (Energy Storage Agreement) | Great Kiskadee Storage, LLC | 08/26/2022 | |
| GOE0060 - Thunder Bay - BESA - 20180831 | ESA (Energy Storage Agreement) | Go Electric Inc | 08/31/2018 | |
| GLP0020 - West Columbia - Services Agreement | LTSA (Long Term Service Agreement) | West Columbia Storage, LLC | 09/09/2019 | |
| GLP0020 - West Columbia - BESSSA | ESA (Energy Storage Agreement) | West Columbia Storage, LLC | 02/26/2019 | |
| GLP0020 - Glidepath - W. Columbia - Second Amendment to ESSSA (EXECUTED) | ESA (Energy Storage Agreement) | West Columbia Storage, LLC | 10/04/2019 | |
| GLP0020 - Glidepath - W. Columbia - First Amendment to ESSSA (EXECUTED) | ESA (Energy Storage Agreement) | West Columbia Storage, LLC | 09/09/2019 | |
| GDS0010 - Gridspan - Pilot Order | Purchase Order | Gridspan Energy | 10/29/2018 | |
| FRS - AMP0195 - BESA (fully executed) | ESA (Energy Storage Agreement) | AMP Solar US Services LLC | 07/28/2022 | |
| Framework Agreement - Akaysha_Powin_EXECUTED_2022.04.18 | Framework Agreement | Akaysha Energy Pty Ltd | 04/18/2022 | |
| Form Blanket Purchase Order 20210218 FINAL Signed 20210219 - PEC | Purchase Order | Stem, Inc. | 02/22/2021 | |
| First_LTSA_Amendment_-_Tranquillity_rev_BJ_7-21-2021_-_clean | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 07/21/2021 | |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|---|---|---|---|---|
| First_LTSA_Amendment_-_Garland_rev_BJ_7-21-2021_-_clean | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 07/21/2021 | |
| First_BESA_Subcontract_Amendment__-_Tranquility_rev_BJ_7-21-2021 | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 11/23/2020 | |
| First_BESA_Subcontract_Amendment__-_Garland_rev_BJ_7-21-2021 | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 10/26/2020 | |
| First_Amendment_TX23_2021.05.19_EXECUTED | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 10/16/2020 | |
| First_Amendment_TX12_2021.05.19_EXECUTED | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 10/16/2020 | |
| First_Amendment_TX11_2021.05.19_EXECUTED | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 10/16/2020 | |
| First Amendment to Powin - Rabbitbrush 2 Supply Agreement (9-16-21) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 09/17/2021 | |
| First Amendment to Powin - Rabbitbrush 1 Supply Agreement (9-16-21) | ESA (Energy Storage Agreement) | Rabbitbrush Solar  LLC | 09/17/2021 | |
| Final_Dry_Bridge__LNTP_-_Powin_Signed_11-11-2021 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Strata Solar, LLC | 11/11/2021 | |
| KCE0090 - TX2 - Port Lavaca - Services Agreement | LTSA (Long Term Service Agreement) | KCE TX 2, LLC | 06/01/2020 | |
| KCE0090 - Port Lavaca - PO - 20200522 | Purchase Order | KCE TX 2, LLC | 05/22/2020 | |
| KCE0080 Powin Services Agreement - TX 8 - EXECUTED | LTSA (Long Term Service Agreement) | KCE TX 8, LLC | 06/01/2020 | |
| EVE LF280K PO | Purchase Order | PuYuan Green Energy Inc. | | |
| ESRT Powin ESA-Centipede (executed w_ exhibits)[142956] | ESA (Energy Storage Agreement) | PowerFlex Systems, LLC | 12/09/2022 | |
| Elmbrook Powin PO | Purchase Order | Amp Solar US Services LP | 01/19/2021 | |
| El Sol AR Supply Agreement (executed, compiled) | ESA (Energy Storage Agreement) | El Sol Energy Storage LLC | 05/19/2023 | |
| El Sol - Energy Storage System Supply Agreement 04.09.21 (executed) | ESA (Energy Storage Agreement) | El Sol Storage Energy LLC | 04/09/2021 | |
| EDF-Powin BESS MSA (Executed - September 9, 2022)_small | ESA (Energy Storage Agreement) | EDF Renewables Development, Inc. | 09/09/2022 | |
| EDF0070 - Mav 6 - BESS Subcontract Agreement | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 12/22/2020 | |
| EDF0070 - Amendment 1 to BESS Subcontract - final - PEC exec | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 02/26/2021 | |
| EDF0050 - Big Beau 2 - Subcontract Agreement | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 02/01/2021 | |
| EDF0050 - Big Beau 2 - BESSSA | ESA (Energy Storage Agreement) | BigBeau Solar, LLC | 02/01/2021 | |
| EDF0040 - Big Beau 1 - Subcontract Agreement | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 02/01/2021 | |
| ESV0290 - Third Powin Letter Agreement - Acorn-FINAL - signed (1) | ESA (Energy Storage Agreement) | Acorn I Energy Storage LLC | 06/08/2021 | |
| ESV0290 - esVolta - Operation & Maintenance Agreement | LTSA (Long Term Service Agreement) | Acorn I Energy Storage LLC | 11/06/2019 | |
| ESV0290 - esVolta - Acorn BESA | ESA (Energy Storage Agreement) | Acorn I Energy Storage LLC | 11/06/2019 | |
| ESV0090 - esVolta - Wildcat BESA | ESA (Energy Storage Agreement) | Wildcat I Energy Storage, LLC | 11/06/2019 | |
| ESV0090 - esVolta - Operations & Maintenance Agreement | LTSA (Long Term Service Agreement) | Wildcat I Energy Storage, LLC | 11/06/2019 | |
| ESV0000 - Stratford - OM Agreement | LTSA (Long Term Service Agreement) | Powin Energy Ontario Storage, LLC | 03/29/2018 | |
| CSU Powin ESA-Centipede (executed w_exhibits)[143046] | ESA (Energy Storage Agreement) | PowerFlex Systems, LLC | 12/09/2022 | |
| CSE0010 - Countryside - Purchase Order | Purchase Order | CS Energy, LLC | 09/29/2020 | |
| CPE0070 - CPE - Waneroo - BESA | ESA (Energy Storage Agreement) | Clean Peak Energy (CPE) | 09/09/2019 | |
| CPE0040 - CPE - Lansell Square - BESA | ESA (Energy Storage Agreement) | Clean Peak Energy (CPE) | 09/09/2019 | |
| CPE0030 - CPE - Bateau -BESA | ESA (Energy Storage Agreement) | Clean Peak Energy (CPE) | 09/09/2019 | |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|---|---|---|---|---|
| CPE0020 - CPE - Salamander Bay - BESA | ESA (Energy Storage Agreement) | Clean Peak Energy (CPE) | 09/09/2019 | |
| Cotuit - AMP0194 - BESA (fully executed) | ESA (Energy Storage Agreement) | AMP Solar US Services LLC | 07/28/2022 | |
| Waratah_Energy_Supply_Agreement (fully executed, compiled) | ESA (Energy Storage Agreement) | Munmorah Battery ProjectCo Pty Ltd | 11/04/2022 | |
| CleanPeak Energy MSA PO form 20210602 Final Executed | Purchase Order | Clean Peak Energy (CPE) | 05/20/2021 | |
| CLEAN Powin - 20191028 - PEC BESA - PEC v.11 Final Tremont - 02192021 - Fully Executed | ESA (Energy Storage Agreement) | Pine Gate Renewables, LLC | 02/19/2021 | |
| CLEAN Powin - 20191028 - PEC BESA - PEC v.10 Final Rochester - 02192021 - Fully Executed (1) | ESA (Energy Storage Agreement) | Pine Gate Renewables, LLC | 02/19/2021 | |
| Chaparral Springs ESSA - FULLY COMPILED AND EXECUTED - 7-27-2022_small | ESA (Energy Storage Agreement) | Chaparral Springs, LLC | 07/27/2022 | |
| Chap Solar & Willow Springs LNTP - Fully Compiled and Executed | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Chaparral Springs, LLC | 05/27/2022 | |
| CEP0180 - Master Supply Agreement - MEPPI - Sarnia | Master Supply Agreement | Mitsubishi Electric Power Products, Inc. (MEPPI) | 02/27/2019 | |
| CEP0100 - Master Supply Agreement - MEPPI - Windsor | Master Supply Agreement | Mitsubishi Electric Power Products, Inc. (MEPPI) | 02/27/2019 | |
| CAR0040 - Candela Transoceanic shipping - Exhibit E | ESA (Energy Storage Agreement) | Front Range-Midway Solar Project, LLC | 11/17/2021 | |
| Candela - Powin - BESA (Executed 11.17.2021) (1) | ESA (Energy Storage Agreement) | Front Range-Midway Solar Project, LLC | 11/17/2021 | |
| Brandywine LNTP Amendment and Assignment [EXECUTED] | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | KMC Thermo, LLC/ESI, Inc. | | |
| Brandywine ESA [Execution Version + exhibits] (EXECUTED) (1) | ESA (Energy Storage Agreement) | ESI Inc. | 12/05/2022 | |
| Black Mesa IPC BESA (executed & assembled)_small | ESA (Energy Storage Agreement) | Idaho Power Company | 02/28/2022 | |
| BESA - Adon & Powin | ESA (Energy Storage Agreement) | Adon Renewables | 01/26/2017 | |
| BB2 Powin LTSA - 20210719 Fully Executed | LTSA (Long Term Service Agreement) | BigBeau Solar, LLC | 07/19/2021 | |
| BB1 Powin LTSA - 20210719 Fully Executed | LTSA (Long Term Service Agreement) | BigBeau Solar, LLC | 07/19/2021 | |
| AVEP LTSA - Fully Compiled (Executed) | LTSA (Long Term Service Agreement) | AVEP BESS, LLC | 12/15/2022 | |
| AVEP LNTP - Fully Executed and Compiled | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | AVEP BESS, LLC | 05/27/2022 | |
| AVEP Fifth Amendment to LNTP (Fully Executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | AVEP BESS, LLC | 08/05/2022 | |
| AVEP ESSA - EXECUTION VERSION (Fully Compiled, EXECUTED) - 12-21-2022_small | ESA (Energy Storage Agreement) | AVEP BESS, LLC | 12/21/2022 | |
| Auto-Chen_Ltd_(Nir_David)_BESA_2021.05.12_EXECUTED (Commissioning LDs Weekly Edit) LD initialized 17.6.21 | ESA (Energy Storage Agreement) | Auto-Chen Ltd | 05/12/2021 | |
| Auto-Chen_Ltd_(Gevim)_BESA_2021.05.12_EXECUTED (w. Exhibit B) small | ESA (Energy Storage Agreement) | Auto-Chen Ltd | 05/12/2021 | |
| Auto-Chen_Ltd_(Gevim)_BESA_2021.05.12_EXECUTED (w. Exhibit B and Commissioning LDs Weekly Edit)17.6.21 | ESA (Energy Storage Agreement) | Auto-Chen Ltd | 05/12/2021 | |
| Arrow Canyon Powin LTSA_Singed_wExhibit | LTSA (Long Term Service Agreement) | Arrow Canyon Solar, LLC | 12/10/2021 | |

Case 25-01673-MBK Doc 6591-1 Filed 08/01/25 Entered 08/01/25 23:29:20 Desc Main
Exhibit B - FlexGen Asset Purchase Agreement Page 312 of 523

Case 25-01673-MBK Doc 6591-1 Filed 08/01/25 Entered 08/01/25 23:29:20 Desc Main
Document Page 312 of 523

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|------|----------------|--------------------|-----------------------------------|-----------|
| Arrow Canyon - BESS Agreement (Fully Executed 06042021) | ESA (Energy Storage Agreement) | Arrow Canyon Solar, LLC | 06/03/2021 | |
| AMR0170 Hampden Landfill Powin BESA (fully executed) | ESA (Energy Storage Agreement) | Hampden Landfill Solar LLC | 05/11/2022 | |
| APE0010 Apex Sabal BESA-Centipede (Fully Executed) | ESA (Energy Storage Agreement) | II Battery Storage US LLC (CAMERON WIND I, LLC) | 05/13/2022 | |
| Angelo ESA (fully assembled and executed)_small | ESA (Energy Storage Agreement) | Angelo Storage, LLC | 08/10/2022 | |
| AMRC OUC ESA (Fully Executed, Compiled)_small | ESA (Energy Storage Agreement) | Ameresco Inc. | 11/23/2022 | |
| AMR0190-Kupono LNTP (Powin 04.22.22) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Kupono Solar, LLC | 04/22/2022 | |
| AMP0070 - Cronin - PO | Purchase Order | Amp Solar US Services LP | 08/04/2020 | |
| AMP0070 - Cronin - LTSA - FINAL (09-09-20) | LTSA (Long Term Service Agreement) | Amp Solar US Services LP | 09/09/2020 | |
| AMP0060 - Wallum - PO | Purchase Order | Amp Solar US Services LP | 08/04/2020 | |
| AMP0060 - Wallum - LTSA - FINAL (09-09-20) | LTSA (Long Term Service Agreement) | Amp Solar US Services LP | 09/09/2020 | |
| AMP0050 -Palmer - LTSA - FINAL (09-09-20) | LTSA (Long Term Service Agreement) | Ware Palmer Road Solar, LLC | 09/09/2020 | |
| AMP0050 - Ware Palmer - PO | Purchase Order | Amp Solar US Services LP | 08/28/2020 | |
| AMP0020 - PO - Powin - Adams Road | Purchase Order | Amp Solar US Services LP | 08/28/2020 | |
| AMP0020 - Adams Road - LTSA - FINAL (09-09-20) | LTSA (Long Term Service Agreement) | East Brookfield Adams Road Solar LLC | 09/09/2020 | |
| AMP0000 - Amp - Master Service Agreement - 20200710 | Master Supply Agreement | esVolta, LP | 07/09/2020 | |
| Amendment_2_SPC_Garland_Prime_Contract_-_Final | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 04/25/2022 | |
| Leader - Powin - PO 20211213_approved__powin (LD Date Change 6.15.22) | Purchase Order | Leader Energy Storage Technology Co., Ltd | 12/13/2021 | |
| 20210811 - LNTP for TPE21001 (Powin 8.4.21)_TPE signed | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | TPE Energy, Inc. | 08/04/2021 | |
| 20210811 - LNTP for TPE20032 (Powin 8.4.21)_TPE signed | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | TPE Energy, Inc. | 08/02/2021 | |
| 20201231_Westar_-_Project_Contract_(final_exhibits_executed) | ESA (Energy Storage Agreement) | Invenergy Storage Development LLC | 02/05/2021 | |
| 20191028 - PEC BESA - Base v.9 Putah Creek Execution Copy 042221_fully signed | ESA (Energy Storage Agreement) | Putah Creek Solar Farms, LLC | 04/22/2021 | |
| 20190715 - Annex - Agreement for the Supply and Commissioning of Batteries - Fully Executed | ESA (Energy Storage Agreement) | Nidec ASI S.p.A. | 07/15/2019 | |
| 20190715 - Agreement for the Supply and Commissioning of Batteries - Fully Executed | ESA (Energy Storage Agreement) | Nidec ASI S.p.A. | 07/15/2019 | |
| 2021.12.30 Powin-Borrego MSA wForm BESA (Fully Executed) | Master Supply Agreement | Borrego Solar Systems Inc | 12/30/2021 | |
| 2021.11.09_LTSA_FINAL_Oak Hill 2_EXECUTED | LTSA (Long Term Service Agreement) | Amp Solar US Services LP | 11/09/2021 | |
| 2021.11.09_LTSA_FINAL_Oak Hill 1_EXECUTED | LTSA (Long Term Service Agreement) | Amp Solar US Services LP | 11/09/2021 | |
| 2021.11.09_LTSA_FINAL_Elmbrook_EXECUTED | LTSA (Long Term Service Agreement) | Amp Solar US Services LP | 11/09/2021 | |
| 2018.08.22 Stillwater -v13.3 - PEC Final (fully executed) (003) | Purchase Order | Stillwater Energy Storage, LLC | 08/22/2018 | |
| 2017.02.03 - Adon Powin - Battery Equipment Supply Agreement - EXECUTED | ESA (Energy Storage Agreement) | Adon Renewables | 01/26/2017 | Revenue |
| EDF0040 - Big Beau 1 - BESSSA | ESA (Energy Storage Agreement) | BigBeau Solar, LLC | 02/01/2021 | |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|------|----------------|--------------------|-----------------------------------|-----------|
| DTE Powin LNTP Letter Agreement - Engineer (compiled, fully executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | DTE Electric Company | 07/18/2023 | |
| Dry Bridge Strata-Powin BESA (compiled, fully executed) | ESA (Energy Storage Agreement) | Strata Solar, LLC | 02/02/2022 | |
| Desert Quartzite - Project Agreement (Executed) | ESA (Energy Storage Agreement) | Desert Quartzite, LLC | 12/06/2022 | |
| Desert Quartzite - NTP (Executed)-1 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Desert Quartzite, LLC | 12/06/2022 | |
| MSA - Powin & TopBand - signed 07.21.2023 | Master Service Agreement | Huizhou Topband Electrical Technology Co., LTD | | ISC |
| MSA - Powin & Ultra - signed 07.22.2023 | Master Supply Agreement | Ultra Corpotech PVT Ltd. Chakan, Pune 410501 India | | ISC |
| Exhibit_U_-_AKE0010_-_Ulinda Park_Tech_Escrow_Invoicing_Agreement_(Final) - executed | Technology Escrow Agreement | Ulinda Park ProjectCo Pty Ltd | 07/21/2023 | |
| Sun Streams 3_-_Invoicing_Agreement_(IP_Escrow)__7.20.2023_clean_executed | Technology Escrow Agreement | Sun Streams PVS, LLC | 07/20/2023 | |
| PNM Powin Rio Del Oro EPA (fully executed, compiled with exhibits)[203747] | ESA (Energy Storage Agreement) | Public Service Company of New Mexico | 05/01/2023 | |
| PNM South Valley - LNTP (Fully Executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Public Service Company of New Mexico | 03/09/2023 | |
| 20220814 - LNTP Letter Agreement - Lonestar (Powin CLEAN 12.21.22)(Fully Executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Lone Star Solar, LLC | 12/21/2022 | |
| Lonestar LTSA (fully executed, compiled with exhibits) | LTSA (Long Term Service Agreement) | Lone Star Solar, LLC | 05/01/2023 | |
| Hemingway Expansion LNTP (fully executed, fully compiled) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Idaho Power Company | 05/05/2023 | |
| Second Amended and Restated LNTP - Hemingway Expansion (fully executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Idaho Power Company | 05/25/2023 | |
| Akaysha - Ulinda Park - Powin - Energy Supply Agreement (fully executed, compiled) | ESA (Energy Storage Agreement) | Ulinda Park ProjectCo Pty Ltd | 06/26/2023 | |
| Akaysha - Ulinda Park - LTSA (fully executed, compiled) | LTSA (Long Term Service Agreement) | Ulinda Park ProjectCo Pty Ltd | 06/28/2023 | Revenue |
| Li-Cycle Inc. - Services Agreement & Quote - signed 10.20.2022 | Master Service Agreement | Li-Cycle Holdings Corp. | 10/20/2022 | ISC |
| 06.10.2022 EVE - Powin MSA Amendment #2 - signed | Master Supply Agreement | EVE Asia Co. Limited | 06/01/2022 | ISC |
| Powin_CNTE_Purchase Framework Agreement-Fully Executed - 02.28.2022 | Framework Agreement | Contemporary Nebubula Technology Energy Co., Ltd. (CNTE) | 02/28/2022 | ISC |
| MSA - Powin & Ultra - signed 07.22.2023 | Master Supply Agreement | Ultra Corpotech PVT Ltd. Chakan, Pune 410501 India | | ISC |
| Amendment to MSA - Powin Energy (2)_Final | Master Service Agreement | RRC Power and Energy, LLC | 01/26/2022 | ISC |
| Powin & Heilind MSA - signed 08.29.2022 (Supplier of Amphenol Materials) | Master Supply Agreement | Heilind Asia Pacific (HK) Ltd. | 08/29/2022 | ISC |
| Formosa Supply Agreement redv4 20201029 | Master Supply Agreement | Formosa Electronic Industries, Inc. | | ISC |
| Energy Storage Response Group, LLC_Powin_MSA (SOW 1 & 2)_2021.06.21_Executed | Master Service Agreement | Energy Storage Response Group LLC | 06/21/2021 | ISC |
| Powin & Envision AESC US MSA - signed 07.28.2022 | Master Supply Agreement | Envision AESC US LLC | 07/18/2022 | ISC |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|------|----------------|--------------------|-----------------------------------|-----------|
| Powin - REPT - MOU - Fully Executed 04.21.2022 | Memorandum of Understanding | REPT BATTERO Energy Co., LTD | 06/01/2024 | ISC |
| Powin - ACE Battery PFA - signed 03.15.2023 | Framework Agreement | Shenzhen ACE Battery Co., Ltd. | 03/15/2023 | ISC |
| Powin - iBase Solutions PFA - signed 05.16.2023 | Framework Agreement | iBase Solution Co., Ltd. | 05/16/2023 | ISC |
| 20191031 - iBase fully executed | Master Supply Agreement | iBase Gaming Inc. | 10/31/2019 | ISC |
| Powin & CIMC MSA - signed 03.07.2023 | Master Service Agreement | Qingdao CIMC container manufacture CO. LTD | 03/01/2023 | ISC |
| REPT Battery Cell MSA Fully Executed 210714 | Master Supply Agreement | Ruipu Energy Co., LTD (REPT) | 06/29/2021 | ISC |
| Powin - Myst AI Form Agreement and Order Form_FINAL_2022.10.07.docx | Purchase Order | Myst AI, Inc. | 10/07/2022 | ISC |
| Powin_Bluewater Battery Solutions_Services Agreement - FINAL - signed 12.09.2022 | Master Service Agreement | Bluewater Battery Logistic, LLC | 12/09/2022 | ISC |
| EVE-Powin-iBase 3-Party MSA 03.17.2021 | Master Supply Agreement | EVE Asia Co. Limited | 09/30/2021 | ISC |
| Huizhou Topband Electrical Technology Purchase Framework Agreement | Framework Agreement | Huizhou Topband Electrical Technology Co., Ltd. | 12/29/2021 | ISC |
| Powin & J-Tech MSA - signed 12.30.2022 | Master Supply Agreement | China J-Tech Prescision Machinery Group Limited | | ISC |
| AESC Battery Cell MSA Fully Executed 210714 | Master Supply Agreement | Envision Ruitai Dynamics Technology (Shanghai) Co. Ltd. | 07/07/2021 | ISC |
| Amendment to EVE-Powin-Finway 3-Party MSA - Performance Only - 12.16.2021 (1) | Master Supply Agreement | EVE Asia Co. Limited | 11/22/2021 | ISC |
| Powin - SMA 2022.08.22 clean Final with Exhibits part excec 08.23.22 | Master Supply Agreement | SMA Solar Technology America LLC | 08/19/2022 | ISC |
| Powin - Hithium PFA - signed- 05.18.2023 | Framework Agreement | Hithium (Xiamen Hithium Energy Storage Technology Co., Ltd.) | 05/18/2023 | ISC |
| Powin - REPT MSA - FINAL with Exhibits - signed 12.13.2022 | Master Supply Agreement | REPT BATTERO Energy Co., LTD | 12/06/2022 | ISC |
| Amendment 3 to MSA between Powin and EVE - signed 11.21.2022 | Master Supply Agreement | EVE Power Hong Kong Co., Limited | 10/31/2022 | ISC |
| Formosa MOU | Memorandum of Understanding | Formosa Electronic Industries, Inc. | | ISC |
| Powin G Battery PFA FINAL - signed 04.24.2023 | Framework Agreement | Xuzhou G Battery International Trade Co., Ltd. | 04/24/2023 | ISC |
| CATL & Powin Cell MSA - 01.23.2019 | Master Supply Agreement | Contemporary Amperex Technology Co. Limited (CATL) | 06/30/2022 | ISC |
| Intertek_Powin MSA 7.21.21_EXECUTED (4) | Master Service Agreement | Intertek Testing Services NA, Inc. | 07/21/2021 | ISC |
| Powin - Formosa Electric Industries PFA - Executed 03.23.2023 | Framework Agreement | Formosa Electronic Industries, Inc. | 03/22/2023 | ISC |
| Powin EPSoft Service Agreement - signed 06.03.2022 | Master Service Agreement | EPSoft | 06/03/2022 | ISC |
| Powin & Ace Engineering MSA - EXECUTED - 12.12.2022 | Master Supply Agreement | ACE Engineering & Co Ltd | 12/12/2022 | ISC |
| Powin - SMA MSA - clean FINAL EXECUTED v2 12232020 | Master Supply Agreement | SMA Solar Technology America LLC | 01/01/2021 | ISC |
| 2022-2023 Annual Purchase Agreement_2021.05.17_EXECUTED (3) | Purchasing Agreement | Contemporary Amperex Technology Co. Limited (CATL) | | ISC |
| EVE Cell PG and Warranty Term Amendment - 01.05.2023 | Master Supply Agreement | EVE Asia Co. Limited | | ISC |
| Powin-CATL-MSA Amendment #1 - signed 20220214 | Master Supply Agreement | Contemporary Amperex Technology Co. Limited (CATL) | | ISC |
| Master Supply Agreement_GTI_9-6-2022 Executed | Master Supply Agreement | GTI Fabrication | 09/05/2022 | ISC |
| MSA - Powin & C3Controls - signed 04.03.2023 | Master Supply Agreement | Control Concepts Corporation dba c3controls | 04/01/2023 | ISC |
| Dynapower - Powin - MSA - 12-15-2020 - Countersigned | Master Supply Agreement | Dynapower Company, LLC | 10/01/2020 | ISC |
| Powin - Envision AESC - MOU FINAL - Fully Executed - 02.17.2022 | Memorandum of Understanding | Envision Ruitai Dynamics Technology (Shanghai) Co. Ltd. | | ISC |
| Powin & CIMC-Powin JV MSA - 04.27.2023 | Master Service Agreement | Qingdao CIMC-Powin New Energy Technology Co., LTD | 04/23/2023 | ISC |

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* | Division* |
|---|---|---|---|---|
| Jabil Powin - MSA Amendment 1 - signed 04.10.2023 | Master Supply Agreement | Jabil Inc. | 02/13/2023 | ISC |
| Powin & Celestica MSA - EXECUTED - 04.26.2023 | Master Supply Agreement | Celestica LLC | 03/06/2023 | ISC |
| Powin - Desay Battery PFA - signed 03.26.2023 | Framework Agreement | Huizhou Desay Battery Co., Ltd. | | ISC |
| Powin & CNTE MSA -Fully Executed - 04.20.2022 | Master Supply Agreement | Contemporary Nebubula Technology Energy Co., Ltd. (CNTE) | | ISC |
| Powin & SGS Service Agreement_FINAL - 03.14.2022 | Master Service Agreement | SGS North America Inc. | 03/14/2022 | ISC |
| Powin & SIBA Fuse MSA - signed 10.10.2022 | Master Supply Agreement | SIBA, LLC | 10/10/2022 | ISC |
| EVE-Powin-Finway 3-Party MSA 12.16.2020 | Master Supply Agreement | EVE Asia Co. Limited | | ISC |
| Li-Cycle Inc. - Services Agreement Quote 12022022 - 2nd pickup - signed 12.07.2022 | Master Service Agreement | Li-Cycle Holdings Corp. | 12/07/2022 | ISC |
| Powin - Jabil MSA - FINAL - 06.20.2022 | Master Supply Agreement | Jabil Inc. | 06/07/2022 | ISC |

| Content type | Title | Counterparty | Effective Date |
|---|---|---|---|
| Document | TPE Energy - Powin - JV Agreement - 05.20.2020 | TPE Energy; iBase Gaming Inc. CMIC Technology Co., Ltd Qingdao CIMC Container Manufacture Co. LTD. | 05.20.2020 |
| Document | Powin_CIMC JV Agreement Bilingual | Powin China Holdings 2, LLC | Unknown, effective Date is blank |
| Document | JV Powin UCB revUCB 101224 PDF | UCB S.A. | 01.10.2025 |
| Document | CIMC-Powin Term Sheet 28July_Final | CMIC Technology Co., Ltd | 07.21.2022 |

Contract Management - Contract information - Technology Escrow Agreements

| File | Contract Type* | Counterparty Name* | Second Counterparty Name | Contract/Document Effective Date* | Project ID | Project Name | Folder |
|---|---|---|---|---|---|---|---|
| Ulinda Park - Powin - Praxis - Tech Escrow Agreement - 09.10.2024 | Technology Escrow Agreement | Ulinda Park Project Co Pty Ltd | PRAXIS Technology Escrow, LLC | 09/10/2024 | AKE0010 | Ulinda Park | /Customer Contracts (EXECUTED)/Akaysha Energy Pty Ltd/AKE0010 - Ulinda Park |
| Cameron Wind 1, LLC-PRAXIS-Powin-Rider C-05.01.2024 | Rider C | Cameron Wind 1,, LLC | PRAXIS Technology Escrow, LLC | 05/01/2024 | APE0010 | Sabal | /Customer Contracts (EXECUTED)/Apex Clean Energy/APE0010 - Sabal |
| PRAXIS Powin Two Party Master Escrow Agreement - 03.22.2024 (2) | Technology Escrow Agreement | Praxis Technology Escrow | | 03/22/2024 | | | /Supplier Contracts/Technology |
| DTE - Trenton DTE0021 - Powin Rider C - 02.23.2023 | Rider C | DTE Electric Company | | 02/23/2024 | DTE0021 | Trenton | /Customer Contracts (EXECUTED)/DTE Electric Company/DTE0021 - Trenton Channel |
| DTE - Trenton DTE0021 - Powin Tech Escrow Invoicing Agreement_02.23.2024 | Invoicing Agreement | DTE Electric Company | | 02/23/2024 | DTE0021 | Trenton | /Customer Contracts (EXECUTED)/DTE Electric Company/DTE0021 - Trenton Channel |
| PRAXIS-Powin-Munmorah Three Party Master Escrow Agreement - 02.22.2024 | Technology Escrow Agreement | Munmorah Battery ProjectCo Pty Ltd | PRAXIS Technology Escrow, LLC | 02/22/2024 | AKE0060 | Waratah | /Customer Contracts (EXECUTED)/Akaysha Energy Pty Ltd/AKE0060 - Waratah Super Battery |
| INV0490 - Yuma - Powin Tech Escrow Invoicing Agreement - 12.5.2023 (fully executed) | Invoicing Agreement | Yuma Solar Energy LLC | | 12/05/2023 | INV0490 | Yuma | /Customer Contracts (EXECUTED)/Invenergy Storage Development LLC/INV0490 - YUMA |
| INV0111- El Sol - Powin - Technology Escrow Invoicing Agreement - 12.05.2023 (fully executed) | Invoicing Agreement | El Sol Energy Storage LLC | | 12/05/2023 | INV0111 | El Sol | /Customer Contracts (EXECUTED)/Invenergy Storage Development LLC/INV0111 - El Sol A&R |
| PRAXIS - Powin - Yuma Solar Energy Rider C Final.docx | Rider C | Yuma Solar Energy LLC | | 12/05/2023 | INV0490 | Yuma | /Customer Contracts (EXECUTED)/Invenergy Storage Development LLC/INV0490 - YUMA |
| PRAXIS - Powin - El Sol Energy Storage Rider C Final.docx | Rider C | El Sol Energy Storage LLC | | 12/05/2023 | INV0111 | El Sol | /Customer Contracts (EXECUTED)/Invenergy Storage Development LLC/INV0111 - El Sol A&R |
| Poblano -Escrow_Invoicing_Agreement (EPC Contractor) - 11.3.2023 | Invoicing Agreement | EPC Services Company | | 11/03/2023 | STR0400 | Poblano | /Customer Contracts (EXECUTED)/Strata Solar, LLC/STR0400 - Poblano |
| Exhibit U STR0040 Escrow_Agreement PRAXIS Rider C EPC Services Company 11.3.2023 | Rider C | EPC Services Company | PRAXIS Technology Escrow, LLC | 11/03/2023 | STR0400 | Poblano | /Customer Contracts (EXECUTED)/Strata Solar, LLC/STR0400 - Poblano |
| Exhibit U STR0040 Escrow_Agreement PRAXIS Rider C Poblano 11.3.2023 | Rider C | Poblano Energy Storage, LLC | PRAXIS Technology Escrow, LLC | 11/03/2023 | STR0040 | Poblano | /Customer Contracts (EXECUTED)/Strata Solar, LLC/STR0400 - Poblano |
| Poblano -Escrow_Invoicing_Agreement (Poblano) - 11.3.2023 | Invoicing Agreement | Poblano Energy Storage, LLC | | 11/03/2023 | STR0400 | Poblano | /Customer Contracts (EXECUTED)/Strata Solar, LLC/STR0400 - Poblano |
| PRAXIS - Powin Idaho Power Company Rider C Final.docx | Rider C | Idaho Power Comapny | | 09/14/2023 | IDP0061 | Hemingway Expansion | /Customer Contracts (EXECUTED)/Idaho Power Company/IDP0061 - Hemingway Expansion |
| Exhibit X2 - IDP0061 - Powin Tech Escrow Invoicing Agreement_execution_v | Invoicing Agreement | Idaho Power Comapny | | 09/14/2023 | IDP0061 | Hemingway Expansion | /Customer Contracts (EXECUTED)/Idaho Power Company/IDP0061 - Hemingway Expansion |
| PRAXIS - Sun Streams PVS 4 - Rider C Final.docx | Rider C | Sun Streams Expansion, LLC | | 08/23/2023 | LRD0082 | Sunstreams 4 | /Customer Contracts (EXECUTED)/Longroad BESS Procurement, LLC (Main)/LRD0082 - Sunstreams 4 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PRAXIS - Powin Serrano Solar Rider C Final.docx | Rider C | Serrano Solar, LLC | PRAXIS Technology Escrow, LLC | 08/23/2023 | LRD0100 | Serrano | /Customer Contracts (EXECUTED)/Longroad BESS Procurement, LLC (Main)/LRD0100 - Serrano |
| SS4 - Invoicing Agreement (IP Escrow) 2023.08.23 | Invoicing Agreement | Sun Streams Expansion LLC | | 08/23/2023 | LRD0082 | Sunstreams 4 | /Customer Contracts (EXECUTED)/Longroad BESS Procurement, LLC (Main)/LRD0082 - Sunstreams 4 |
| Serrano - Invoicing Agreement (IP Escrow) _8.8.2023 execution version | Invoicing Agreement | Serrano Solar, LLC | | 08/23/2023 | LRD0100 | Serrano | /Customer Contracts (EXECUTED)/Longroad BESS Procurement, LLC (Main)/LRD0100 - Serrano |
| PRAXIS - Powin - Sun Streams PVS Rider C executed | Rider C | Sun Streams PVS, LLC | PRAXIS Technology Escrow, LLC | 07/24/2023 | LRD0081 | Sunstreams3 | /Customer Contracts (EXECUTED)/Longroad BESS Procurement, LLC (Main)/LRD0081 - Sunstreams 3 |
| Sun Streams 3_-_Invoicing_Agreement_(IP_Escrow)__7.20.2023_clean_executed | Invoicing Agreement | Sun Streams PVS, LLC | | 07/20/2023 | LRD0081 | Sun Streams 3 | /Customer Contracts (EXECUTED)/Longroad BESS Procurement, LLC (Main)/LRD0081 - Sunstreams 3 |
| APE0060 - Powin Tech Escrow Invoicing Agreement_Executable.docx.pdf_signed_2022.12.21.07.29.30 | Invoicing Agreement | Angelo Storage LLC | | 12/20/2022 | APE0060 | Angelo Storage | /Customer Contracts (EXECUTED)/Apex Clean Energy/APE0060 - Angelo Storage |
| APE0070 - Powin Tech Escrow Invoicing Agreement_Executable.docx.pdf_signed_2022.12.21.07.32.07 | Invoicing Agreement | Great Kiskadee LLC | | 12/20/2022 | APE0070 | Kiskadee Storage | /Customer Contracts (EXECUTED)/Apex Clean Energy/APE0070 - Great Kiskadee Storage |
| PRAXIS Rider C (Angelo Storage, LLC | Rider C | Angelo Storage LLC | | 12/20/2022 | APE0060 | Angelo Storage | /Customer Contracts (EXECUTED)/Apex Clean Energy/APE0060 - Angelo Storage |
| PRAXIS Rider C Great Kiskadee Storage, LLC | Rider C | Great Kiskadee Storage, LLC | | 12/20/2022 | APE0070 | Kiskadee Storage | /Customer Contracts (EXECUTED)/Apex Clean Energy/APE0070 - Great Kiskadee Storage |
| PRAXIS-Powin-Desert-Quartzite-signed-Rider-C | Rider C | Desert Quartzite, LLC | | 12/06/2022 | EDF0480 | Desert Quartzite | /Customer Contracts (EXECUTED)/EDF Renewables Development, Inc/EDF0480 - Desert Quartzite |
| Hummingbird - Exhibit Y - ESV0220 - IP Escrow Agreement - PRAXIS Rider C.docx | Rider C | Hummingbird Energy Storage, LLC | | 10/01/2022 | ESV0220 | Hummingbird | /Customer Contracts (EXECUTED)/esVolta, LP/ESV0220 - Hummingbird |
| Powin-Energy-Ontario-Storage-First-Amendment-to-Powin-Energy-Storage-Two-Party-Master-Escr-signed | Technology Escrow Agreement | Powin Energy Ontario Storage II, LP | PRAXIS Technology Escrow, LLC | 05/17/2022 | ESV0000 | Stratford | /Customer Contracts (EXECUTED)/esVolta, LP/ESV0000 - Stratford |
| SP_Powin_Praxis_Escrow Agreement Amendment202203_FE (1) | Technology Escrow Agreement | Santa Paula Energy Storage | PRAXIS Technology Escrow, LLC | 03/01/2022 | ESV0230 | Santa Paula | /Customer Contracts (EXECUTED)/esVolta, LP/ESV0230 - Santa Paula |
| Acorn-I-First-Amendment-to-Powin-Acorn-I-Energy-Two-Party-Master-Escrow-Agreement-HL-2-21-2022.d | Technology Escrow Agreement | Acorn I Energy Storage LLC | PRAXIS Technology Escrow, LLC | 02/21/2022 | ESV0290 | Acorn I | /Customer Contracts (EXECUTED)/esVolta, LP/ESV0290 - Acorn |
| Rider-C-Powin-KCE-TX-Holdings-2020-Operating-Projects-NRF-12.31.DOCX | Rider C | KCE Texas Holdings 2020, LLC | PRAXIS Technology Escrow, LLC | 01/13/2021 | MHP0110, MHP0120, MHP230 | TX 11, TX 12, Roughneck | /Customer Contracts (EXECUTED)/Key Capture Energy, LLC (KCE) |
| Rider C - KCE-Powin PEC (Construction Projects)(NRF 12.31).DOCX | Rider C | KCE Texas Holdings 2020, LLC | | 01/13/2021 | | TX 2, TX7, TX8 | /Customer Contracts (EXECUTED)/Key Capture Energy, LLC (KCE) |
| PRAXIS-Powin Two Party Master Escrow Agreement - Final 12-17-19.docx | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | | 12/17/2019 | | | /Supplier Contracts/Technology |

| Document | Type | Company | Escrow | Date | Code | Project | Path |
|---|---|---|---|---|---|---|---|
| PRAXIS Rider C Wildcat - FINAL.docx | Rider C | Wildcat I Energy Storage LLC | | 11/25/2019 | ESV0090 | Wildcat | /Customer Contracts (EXECUTED)/esVolta, LP/ESV0090 - Wildcat Project |
| 20191113 Praxis Rider C Acorn (esVolta PEC Executed) | Rider C | Acorn I Energy Storage LLC | | 10/01/2019 | ESV0290 | Acorn | /Customer Contracts (EXECUTED)/esVolta, LP/ESV0290 - Acorn |
| W. Columbia - Praxis - POWIN - Three Party Technology Escrow Agreement wEX B FINAL | Technology Escrow Agreement | West Columbia Storage LLC | PRAXIS Technology Escrow, LLC | 09/26/2019 | GLP0020 | Glidepath West Columbia | /Customer Contracts (EXECUTED)/West Columbia Storage, LLC/GLP0020 - Glidepath West Columbia |
| PRAXIS - PEC - Charger-Two-Party-Master-Escrow - 6.21.2018 (Powin Energy Ontario Storage II Rider C) | Rider C | Praxis Technology Escrow | | 06/21/2018 | ESV0000 | Stratford | /Customer Contracts (EXECUTED)/esVolta, LP |
| Powin PEC 3P Escrow Agreement 180303 | Technology Escrow Agreement | PPA Grand Johanna | PRAXIS Technology Escrow, LLC | 03/15/2018 | ESV1000 | Millikan | /Customer Contracts (EXECUTED)/PPA Grand Johanna LLC/ESV1000 - Millikan |
| PRAXIS Rider C - Powin 191112 - West Warwick Energy Storage I, LLC.docx | Rider C | Convergent Energy and Power LP | | | CEP0201 | West Warwick I | /Customer Contracts (EXECUTED)/Convergent Energy/CEP0201 - West Warwick I |
| PRAXIS Rider C - Powin 191112 - West Warwick Energy Storage II, LLC.docx | Rider C | Convergent Energy and Power LP | | | CEP0201 | West Warwick I | /Customer Contracts (EXECUTED)/Convergent Energy/CEP0202 - West Warwick II |
| PRAXIS Rider C - Powin 191112 - West Warwick Energy Storage III, LLC.docx | Rider C | Convergent Energy and Power LP | | | CEP0203 | West Warwick III | /Customer Contracts (EXECUTED)/Convergent Energy/CEP0203 - West Warwick III |
| Rider-C-KCE-Powin.docx | Rider C | Key Capture Energy | PRAXIS Technology Escrow, LLC | | | | /Customer Contracts (EXECUTED)/Key Capture Energy, LLC (KCE) |
| Rider-C-KCE-Powin-PEC-Construction-ProjectsNRF-12.31.DOCX | Rider C | KCE Texas Holdings 2020, LLC | PRAXIS Technology Escrow, LLC | | KCE0090, KCE0070, KCE0080 | TX 2, TX 7, TX 8 | /Customer Contracts (EXECUTED)/Mitsubishi Power Americas, Inc. (MPA)/Prevalon |
| 12.26.21 Powin Rider C - Flower Valley LLC (Jupiter cmts) - FINAL (1) | Rider C | Flower Valley LLC | PRAXIS Technology Escrow, LLC | | JPR0020 | Flower Valley | /Customer Contracts (EXECUTED)/Jupiter Power, LLC/JPR0020 - Flower Valley |
| 12.26.21 Powin Rider C - Swoose LLC (Jupiter cmts) - FINAL (1) | Rider C | Swoose LLC | PRAXIS Technology Escrow, LLC | | JPR0010 | Swoose | /Customer Contracts (EXECUTED)/Jupiter Power, LLC/JPR0010 - Swoose |
| 12.26.21 Powin Rider C - Triple Butte LLC (Jupiter cmts) - FINAL (1) | Rider C | Triple Butte LLC | PRAXIS Technology Escrow, LLC | | JPR0030 | Triple Butte | /Customer Contracts (EXECUTED)/Jupiter Power, LLC/JPR0030 - Triple Butte |
| Powin-Rider-C-Garland-Project.docx | Rider C | SP Garland Solar Storage LLC Mitsubishi Power Americas | PRAXIS Technology Escrow, LLC | | RCT0020 | Garland | /Customer Contracts (EXECUTED)/Mitsubishi Power Americas, Inc. (MPA)/Prevalon/RCT0020 - Garland |
| Powin-Rider-C-Tranquility-Project.docx | Rider C | SP Tranquility Solar Storage LLC Mitsubishi Power Americas | PRAXIS Technology Escrow, LLC | | RCT0030 | Trannquility | /Customer Contracts (EXECUTED)/Mitsubishi Power Americas, Inc. (MPA)/Prevalon/RCT0030 - Tranquility |
| PRAXIS Rider C - Arrow Canyon Solar | Rider C | Arrow Canyon Solar, LLC | | | EDF0170 | Arrown Canyon | /Customer Contracts (EXECUTED)/EDF Renewables Development, Inc/EDF0170 - Arrow Canyon |
| PRAXIS Rider C - Rabbitbrush Solar, LLC | Rider C | Rabbitbrush Solar, LLC | | | FSI0040 | Rabbitbrush 1 | /Customer Contracts (EXECUTED)/Leeward/FSI0040 - Rabbitbrush 1 |
| PRAXIS Rider C - Chaparral Springs - Powin.docx | Rider C | Chaparral Springs, LLC | | | LWD0020 | Chapparral Springs | /Customer Contracts (EXECUTED)/Leeward/LWD0020 - Chaparral Springs |

| Beneficiary Enrollment (Rider C) - Santa Paula Energy Storage - Powin Energy 180612 | Rider C | Santa Paula Energy Storage | | | ESV0230 | Santa Paula | /Customer Contracts (EXECUTED)/esVolta, LP/ESV0230 - Santa Paula |
|---|---|---|---|---|---|---|---|

**Schedule 3.7**

**INTELLECTUAL PROPERTY**

(a)

   (i)   Registered Intellectual Property

  **a.  PATENTS**

| KS Ref. No. | Country | Type | Title | Application No. | Filed | Publication No. | Publication Date | Patent No | Issued | Status | Next Due Date | Status Changed Date | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9888-100878-01 | U.S. | Direct | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 16/101,032 | 8/10/2018 | 2020/0052502 | 2/13/2020 | 10,978,884 | 4/13/2021 | Issued | 10/13/2028 - Due, 2nd maintenance fee | 9/24/2024 | 1st maintenance fee paid 9/24/2024 |
| 9888-100878-02 | PCT | | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | PCT/US2019/045678 | 8/8/2019 | WO 2020/033665 | 2/13/2020 | N/A | N/A | Expired PCT | | | |
| 9888-100878-03 | Canada | National Stage | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 3,107,491 | 8/8/2019 | 3,107,491 | 2/13/2020 | | | Pending | | 6/3/2024 | Instructed to cease work and allow to lapse 6/3/2024; awaiting notice of abandonment |
| 9888-100878-04 | China | National Stage | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 201980052902.0 | 8/8/2019 | 112567586A | 3/26/2021 | 112567586B | 11/15/2024 | Issued | 8/8/2025 - Due, maintenance fee | 3/25/2025 | Instructed to pay maintenance fee |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1008 78-05 | EPC | National Stage | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 19847972.7 | 8/8/2019 | 3834271 | 6/16/2021 | | | Pending | 8/8/2025 - Due, maintenance fee | 3/25/2025 | Instructed to pay maintenance fee |
| 9888-1008 78-06 | Japan | National Stage | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 2021-531461 | 8/8/2019 | 2021-534719 | 12/9/2021 | 7295952 | 6/13/2023 | Issued | 6/13/2026 - Due, maintenance fee | 6/13/2023 | |
| 9888-1008 78-07 | U.S. | Continuation | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 17/213,155 | 3/25/2021 | 2021/0218250 | 7/15/2021 | 11,799,137 | 10/24/2023 | Issued | 4/24/2027 - Due 1st maintenance fee | 10/24/2023 | |
| 9888-1008 78-08 | U.S. | Continuation | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 18/491,448 | 10/20/2023 | 2024/0047769 | 2/8/2024 | | | Pending | | 2/8/2024 | Application published on 02/08/2024; awaiting action from PTO |
| 9888-1008 78-09 | China | Divisional | BALANCING CIRCUIT AND METHOD | 202411508647 5.0 | 10/28/2024 | 119401598 | 2/7/2025 | | | Pending | | 10/28/2024 | Application published on 02/07/2025; awaiting action from CNIPA |
| 9888-1008 79-01 | U.S. | Direct | ENHANCED BATTERY MANAGEME | 16/101,045 | 8/10/2018 | 2020/0052503 | 2/13/2020 | 11,063,444 | 7/13/2021 | Issued | 1/13/2029 - Due, 2nd | 12/27/2024 | 1st maintenance fee |

Exhibit B - FlexGen Asset Purchase Agreement

| Ref | Country | Type | Title | Application No. | Filing Date | Pub. No. | Pub. Date | Patent No. | Issue Date | Status | Col1 | Col2 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | NT SYSTEM FOR BATTERY PACK | | | | | | | | maintenance fee | | paid 12/27/2024 |
| 9888-1008 79-02 | PCT | | ENHANCED BATTERY MANAGEMENT SYSTEM FOR BATTERY PACK | PCT/US2019/045696 | 8/8/2019 | WO 2020/033680 | 2/13/2020 | N/A | N/A | Expired PCT | | | |
| 9888-1008 79-03 | Canada | National Stage | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 3,107,493 | 8/8/2019 | 3,107,493 | 2/13/2020 | | | Pending | | 6/3/2023 | Instructed to cease work and allow to lapse 6/3/2024; awaiting Notice of Abandonment |
| 9888-1008 79-04 | China | National Stage | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 201980052886.5 | 8/8/2019 | 112585837 | 3/30/2021 | 1125858 37B | 11/12/2024 | Issued | 8/8/2025 - Due, maintenance fee | 3/25/2025 | Instructed to pay maintenance fee |
| 9888-1008 79-05 | EPC | National Stage | ENHANCED SWITCHED BALANCING NETWORK FOR BATTERY PACK | 19848236.6 | 8/8/2019 | 3834272 | 6/16/2021 | | | Pending | 8/8/2025 - Due, maintenance fee | 3/25/2025 | Instructed to pay maintenance fee |
| 9888-1008 79-06 | Japan | National Stage | ENHANCED BATTERY MANAGEMENT SYSTEM FOR BATTERY PACK | 2021-531462 | 8/8/2019 | 2021-534720 | 12/9/2021 | 7295953 | 6/13/2023 | Issued | 6/13/2026 - Due, 4th maintenance fee | 6/13/2023 | |
| 9888-1008 80-01 | U.S. | Provisional | MODULAR BATTERY STACK AND | 62/729,852 | 9/11/2018 | N/A | N/A | N/A | N/A | Expired Provisional | | | |

7

US-DOCS\161435194.2
130703294\V-4

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1008 80-02 | PCT | SUPPORT SYSTEM MODULAR BATTERY STACK AND SUPPORT SYSTEM | PCT/US2019/050328 | 9/10/2019 | WO 2020/055809 | 3/19/2020 | N/A | N/A | Expired PCT | | |
| 9888-1008 80-03 | Canada | National Stage | MODULAR BATTERY STACK AND SUPPORT SYSTEM | 3,110,857 | 9/10/2019 | 3,110,857 | 3/19/2020 | | | Pending | 8/12/2024 | Examination requested 8/12/2024; awaiting 1st action |
| 9888-1008 80-04 | China | National Stage | MODULAR BATTERY STACK AND SUPPORT SYSTEM | 201980059297.X | 9/10/2019 | 112673519 | 4/16/2021 | N/A | N/A | Abandoned | 8/10/2023 | |
| 9888-1008 80-05 | EPC | National Stage | MODULAR BATTERY STACK AND SUPPORT SYSTEM | 19861075.0 | 9/10/2019 | 3850687 | 7/21/2021 | | | Pending | 6/6/2025 - Due, action response | 2/25/2025 | Preparing instructions to foreign agent to file response |
| 9888-1008 80-06 | U.S. | National Stage | MODULAR BATTERY STACK AND SUPPORT SYSTEM | 17/273,696 | 3/4/2021 | 2021/0336302 | 10/28/2021 | 11,996,531 | 5/28/2024 | Issued | 11/28/2027 - Due, 1st maintenance fee | 5/28/2024 | Patent issued 5/28/2024 |
| 9888-1062 20-01 | U.S. | Provisional | ELECTRICAL ENERGY STORAGE UNIT AND CONTROL SYSTEM AND APPLICATIONS THEREOF | 62/066,185 | 10/20/2014 | N/A | N/A | N/A | N/A | Expired Provisional | | |

8

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1062 20-02 | U.S. | Direct | ELECTRICAL ENERGY STORAGE UNIT AND CONTROL SYSTEM AND APPLICATIONS THEREOF | 14/678,074 | 4/3/2015 | 2016/0111900 | 4/21/2016 | 10,263,436 | 4/16/2019 | Issued | 10/16/2026 - Due, 2nd maintenance fee | 7/8/2022 | 1st maintenance fee paid 7/8/2022 |
| 9888-1062 20-03 | China | Direct | ELECTRICAL ENERGY STORAGE UNIT AND CONTROL SYSTEM AND APPLICATIONS THEREOF | 201610208153.4 | 4/1/2016 | 105939035A | 9/14/2016 | 105939035B | 9/21/2018 | Abandoned | | 4/1/2024 | Notice of Cessation of Patent Rights issued 11/7/2024 |
| 9888-1062 21-01 | PCT | | ELECTRICAL ENERGY STORAGE UNIT | PCT/CN2011/071548 | 3/5/2011 | WO 2012/119297 | 9/13/2012 | N/A | N/A | Expired PCT | | | |
| 9888-1062 21-02 | China | Direct | ELECTRICAL ENERGY STORAGE UNIT | 201180065185.9 | 3/5/2011 | 103403993A | 7/19/2013 | 103403993B | 8/24/2016 | Issued | 3/5/2025 - Due, maintenance fee | 2/12/2024 | 2024 maintenance fee paid 2/12/2024 |
| 9888-1062 21-03 | U.S. | National Stage | ELECTRICAL ENERGY STORAGE UNIT AND CONTROL SYSTEM AND APPLICATIONS THEREOF | 13/978,689 | 8/27/2013 | 2013/0328530 | 12/12/2013 | 9,331,497 | 5/3/2016 | Issued | 11/3/2027 - Due, 3rd maintenance fee | 10/17/2023 | 2nd maintenance fee paid 10/17/2023 |
| 9888-1062 21-04 | U.S. | CIP | BATTERY ENERGY STORAGE SYSTEM AND CONTROL SYSTEM AND | 14/962,491 | 12/8/2015 | 2016/0141894 | 5/19/2016 | 9,847,654 | 12/19/2017 | Issued | 6/19/2025 - Due, 2nd maintenance fee | 3/25/2025 | Instructed to pay 2nd maintenance fee |

9

| | | | APPLICATION S THEREOF | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1062 21-05 | China | Direct | BATTERY ENERGY STORAGE SYSTEM AND CONTROL SYSTEM AND APPLICATION S THEREOF | 201611110795.7 | 12/6/2016 | [106849212](#) | 6/13/2017 | N/A | N/A | Abando ned | | | |
| 9888-1062 21-06 | U.S. | Provision al | MODULAR, STACKABLE BATTERY ENERGY STORAGE SYSTEM, AND APPLICATION S THEREOF | 62/554,881 | 9/6/2017 | N/A | N/A | N/A | N/A | Expired Provisio nal | | | |
| 9888-1062 21-07 | U.S. | CIP | BATTERY ENERGY STORAGE SYSTEM AND CONTROL SYSTEM AND APPLICATION S THEREOF | 15/845,598 | 12/18/2017 | [2018/0123357](#) | 5/3/2018 | [10,536,007](#) | 1/14/2020 | Issued | 7/14/2027 - Due, 2nd maintena nce fee | 6/15/2023 | 1st maintena nce fee paid 6/15/2023 |
| 9888-1062 21-08 | China | Direct | BATTERY ENERGY STORAGE SYSTEM AND CONTROL SYSTEM AND APPLICATION S THEREOF | 201810422475.8 | 5/5/2018 | [108649595A](#) | 10/12/2018 | [108649595B](#) | 10/22/2021 | Abando ned | | 5/5/2024 | Notice of Cessation of Patent Rights issued 12/11/2024 |
| 9888-1062 22-01 | U.S. | Direct | NON-TRACTION BATTERY CONTROLLER AND | 14/105,952 | 12/13/2013 | [2015/0165913](#) | 6/18/2015 | [9,168,836](#) | 10/27/2015 | Issued | 4/27/2027 - Due, 2nd maintena nce fee | 2/17/2023 | 2023 maintena nce fee paid 2/17/2023 |

US-DOCS\161435194.2
130703294\V-4

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | APPLICATION S THEREOF | | | | | | | | | |
| 9888-1062 22-02 | China | Direct | NON-TRACTION BATTERY CONTROLLER AND APPLICATION S THEREOF | 201410111983.6 | 3/24/2014 | 104009530A | 8/27/2014 | 104009530B | 11/20/2016 | Abando ned | 3/24/2024 | Notice of Cessation of Patent Rights issued 10/30/2024 |
| 9888-1062 23-01 | U.S. | Direct | BATTERY PACK WITH INTEGRATED BATTERY MANAGEME NT SYSTEM | 14/851,482 | 9/11/2015 | 2017/0077559 | 3/16/2017 | 9,923,247 | 3/20/2018 | Issued | 9/20/2025 - Due, 2nd maintena nce fee | 1st maintena nce fee paid 9/9/2021 |
| 9888-1062 23-02 | China | Direct | BATTERY PACK WITH INTEGRATED BATTERY MANAGEME NT SYSTEM | 201610816277.0 | 9/10/2016 | 107123834 | 9/1/2017 | N/A | N/A | Abando ned | 6/25/2021 | |
| 9888-1062 24-01 | U.S. | Direct | BATTERY MANAGEME NT SYSTEM (BMS) HAVING ISOLATED, DISTRIBUTED, DAISY-CHAINED BATTERY MODULE CONTROLLER S. | 14/851,460 | 9/11/2015 | 2017/0077558 | 3/16/2017 | 10,122,186 | 11/6/2018 | Issued | 5/6/2026 - Due, 2nd maintena nce fee | 1st maintena nce fee paid 3/1/2022 |
| 9888-1062 24-02 | China | Direct | BATTERY MANAGEME NT SYSTEM (BMS) HAVING | 201610816276.6 | 9/10/2016 | 106899052 | 6/27/2017 | N/A | N/A | Abando ned | 5/28/2021 | |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | ISOLATED, DISTRIBUTED, DAISY-CHAINED BATTERY MODULE CONTROLLERS. | | | | | | | | | | |
| 9888-1062 25-01 | U.S. | Direct | WARRANTY TRACKER FOR A BATTERY PACK | 14/819,779 | 8/6/2015 | 2017/0038433 | 2/9/2017 | 10,254,350 | 4/9/2019 | Issued | 10/9/2026 - Due, 2nd maintenance fee | 7/8/2022 | 1st maintenance fee paid 7/8/2022 |
| 9888-1062 25-02 | China | Direct | WARRANTY TRACKER FOR A BATTERY PACK | 201610569996.7 | 7/19/2016 | 106199447A | 12/7/2016 | 10651994 47B | 3/16/2021 | Issued | 7/19/2025 - Due, maintenance fee | 3/25/2025 | Instructed to pay maintenance fee |
| 9888-1062 26-01 | U.S. | Direct | BATTERY ENERGY STORAGE SYSTEM | 14/932,688 | 11/4/2015 | 2017/0126032 | 5/4/2017 | 9,882,401 | 1/30/2018 | Issued | 7/30/2025 - Due, 2nd maintenance fee | 3/25/2025 | Instructed to pay 1st maintenance fee |
| 9888-1062 26-02 | China | Direct | BATTERY ENERGY STORAGE SYSTEM | 201610969153.6 | 11/4/2016 | 106961114A | 7/18/2017 | 106961114B | 7/19/2019 | Issued | 11/4/2025 - Due, maintenance fee | 9/30/2024 | 2024 maintenance fee paid 9/30/2024 |
| 9888-1062 26-03 | U.S. | Continuation | BATTERY ENERGY STORAGE SYSTEM | 15/882,713 | 1/29/2018 | 2018/0233931 | 8/16/2018 | 10,270,266 | 4/23/2019 | Issued | 10/23/2026 - Due, 2nd maintenance fee | 7/8/2022 | 1st maintenance fee paid 7/8/2022 |
| 9888-1062 27-01 | U.S. | Direct | SYSTEMS AND METHODS FOR DETECTING A BATTERY PACK HAVING AN | 14/819,774 | 8/6/2015 | 2017/0040646 | 2/9/2017 | 10,153,521 | 12/11/2018 | Issued | 6/11/2026 - Due, 2nd maintenance fee | 3/1/2022 | 1st maintenance fee paid 3/1/2022 |

US-DOCS\161435194.2
130703294\V-4

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1062 27-02 | China | Direct | OPERATING ISSUE OR DEFECT SYSTEMS AND METHODS FOR DETECTING A BATTERY PACK HAVING AN OPERATING ISSUE OR DEFECT | 201610569997.1 | 7/19/2016 | 106154178A | 11/23/2016 | 106154178B | 5/12/2020 | Issued | 7/19/2025 - Due, maintenance fee | 3/25/2025 | Instructed to pay maintenance fee |
| 9888-1062 28-01 | U.S. | Direct | BATTERY-ASSISTED ELECTRIC VEHICLE CHARGING SYSTEM AND METHOD | 14/884,463 | 10/15/2015 | 2017/0106764 | 4/20/2017 | 10,040,363 | 8/7/2018 | Issued | 2/9/2026 - Due, 2nd maintenance fee | 12/27/2021 | 1st maintenance fee paid 12/27/2021 |
| 9888-1062 28-02 | China | Direct | BATTERY-ASSISTED ELECTRIC VEHICLE CHARGING SYSTEM AND METHOD | 201610893636.2 | 10/13/2016 | 106816917 | 6/9/2017 | N/A | N/A | Abandoned | | | File Not Opened Handled directly by Powin / Virgil until abandonment |
| 9888-1062 29-01 | U.S. | Provisional | WORLD-WIDE WEB OF NETWORKED, SMART, SCALABLE, PLUG & PLAY BATTERY PACKS HAVING A BATTERY PACK | 62/340,647 | 5/24/2016 | N/A | N/A | N/A | N/A | Expired Provisional | | | File Not Opened Handled by Sterne Kessler until expiration |

13

OPERATING
SYSTEM, AND
APPLICATION
S THEREOF

| 9888-1062 29-02 | U.S. | Direct | WORLD-WIDE WEB OF NETWORKED, SMART, SCALABLE, PLUG & PLAY BATTERY PACKS HAVING A BATTERY PACK OPERATING SYSTEM, AND APPLICATION S THEREOF | 15/604,329 | 5/24/2017 | N/A | N/A | N/A | N/A | Abando ned | | | File Not Opened Handled by Sterne Kessler until abandonm ent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1062 30-01 | U.S. | Direct | BATTERY PACK MONITORING AND WARRANTY TRACKING SYSTEM | 15/389,188 | 12/22/2016 | 2018/0181967 | 6/28/2018 | 10,699,278 | 6/30/2020 | Issued | 12/30/2027 - Due, 2nd maintena nce fee | 12/12/2023 | 1st maintena nce fee paid 12/12/2023 |
| 9888-1062 31-01 | U.S. | Provision al | MONITORING BATTERY PACKS WITHIN A BATTERY ENERGY STORAGE SYSTEM | 62/645,623 | 3/20/2018 | N/A | N/A | N/A | N/A | Expired Provisio nal | | | |
| 9888-1062 31-02 | PCT | | MONITORING BATTERY PACKS WITHIN A BATTERY | PCT/US19/22992 | 3/19/2019 | WO 2019/183111 | 9/26/2019 | N/A | N/A | Expired PCT | | | |

14

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | ENERGY STORAGE SYSTEM | | | | | | | |
| 9888-1062 31-03 | U.S. | National Stage | MONITORING BATTERY PACKS WITHIN A BATTERY ENERGY STORAGE SYSTEM | 16/982,449 | 9/18/2020 | [2021/0083329](#) | 3/18/2021 | | Allowed | 2/25/2025 | Issue Fee paid 2/25/2025; awaiting issued patent certificate |
| 9888-1062 31-04 | U.S. | Continuation | SYSTEMS FOR MONITORING BATTERY PACKS WITHIN A BATTERY ENERGY STORAGE SYSTEM | 19/075,032 | 3/10/2025 | | | | Pending | 3/10/2025 | Awaiting action from PTO |
| 9888-1062 32-01 | U.S. | Provisional | NOISE-IMMUNE BATTERY PACK COMMUNICATION SYSTEM AND APPLICATIONS THEREOF | 62/682,453 | 6/8/2018 | N/A | N/A | N/A | N/A | Expired Provisional | |
| 9888-1062 32-02 | PCT | | NOISE-IMMUNE BATTERY PACK COMMUNICATION SYSTEM AND APPLICATIONS THEREOF | PCT/US19/35822 | 6/6/2019 | [WO 2019/236869](#) | 12/12/2019 | N/A | N/A | Expired PCT | |

15

US-DOCS\161435194.2
130703294\V-4

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1062 33-01 | U.S. | Provisional | MICROGRID POWER SYSTEM | 62/682,527 | 6/8/2018 | N/A | N/A | N/A | N/A | Expired Provisional | | |
| 9888-1062 33-02 | PCT | | MICROGRID POWER SYSTEM | PCT/US19/35838 | 6/6/2019 | WO 2019/236883 | 12/12/2019 | N/A | N/A | Expired PCT | | |
| 9888-1062 33-03 | U.S. | National Stage | MICROGRID POWER SYSTEM | 16/982,454 | 9/18/2020 | 2021/0083505 | 3/18/2021 | 11,336,111 | 5/17/2022 | Issued | 11/17/2025 - Due, 1st maintenance fee | 5/17/2022 |
| 9888-1062 33-04 | U.S. | Continuation | MICROGRID POWER SYSTEM | 17/743,134 | 5/12/2022 | 2022/0360105 | 11/10/2022 | 11,843,278 | 12/12/2023 | Issued | 6/18/2027 - Due, 1st maintenance fee | 12/12/2023 |
| 9888-1062 33-05 | U.S. | Divisional | MICROGRID POWER SYSTEM | 18/525,742 | 11/30/2023 | 2024/0258826 | 8/1/2024 | 12,212,181 | 1/28/2025 | Issued | 7/28/2028 - Due, 1st maintenance fee | 1/28/2025 |
| 9888-1067 66-01 | U.S. | Provisional | MODULAR BATTERY STACK AND SUPPORT SYSTEM | 63/295,721 | 12/31/2021 | N/A | N/A | N/A | N/A | Expired Provisional | 12/31/2022 | Filed PCT 12/30/2022 |
| 9888-1067 66-02 | PCT | | ENERGY STORAGE SYSTEMS AND ASSOCIATED METHODS | PCT/US22/54375 | 12/30/2022 | WO2023129735 | 7/6/2023 | N/A | N/A | Pending | 7/6/2023 | National Phase applications filed in CN and US 6/28/2024 |
| 9888-1067 66-03 | China | Utility Model | ENERGY STORAGE SYSTEMS AND ASSOCIATED METHODS | 2022800870407 | 6/28/2024 | 118476104A | 8/9/2024 | | | Pending | 2/21/2025 | Notification of Entry into Substantive Exam issued 2/21/2025 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | ; awaiting 1st OA |
| 9888-1067 66-04 | U.S. | National Stage | ENERGY STORAGE SYSTEMS AND ASSOCIATED METHODS | 18/725,710 | 6/28/2024 | | | | | Pending | 2/26/2025 | Awaiting action from PTO; Acceptance of National Stage Application received 2/26/2025; awaiting 1st OA |
| 9888-1083 64-01 | U.S. | Provisional | HVAC SERVICING CARRIER | 63/419,262 | 10/25/2022 | N/A | N/A | N/A | N/A | Expired Provisional | 10/25/2023 | No non-provisional application is to filed |
| 9888-1083 65-01 | U.S. | Provisional | UNIFORM TEMPERATURE TUNED SINGLE HEATSINK FOR AIR-COOLED BATTERY APPLICATIONS | 63/405,266 | 9/9/2022 | N/A | N/A | N/A | N/A | Expired Provisional | 9/9/2023 | No non-provisional application is to be filed |
| 9888-1083 66-01 | U.S. | Provisional | BATTERY CELLS WITH VENTING INDICATORS | 63/430,211 | 12/5/2022 | N/A | N/A | N/A | N/A | Expired Provisional | 12/5/2023 | No non-provisional application is to be filed |
| 9888-1086 49-01 | U.S. | Provisional | AUXILLIARY LOAD | | | N/A | N/A | N/A | N/A | Unfiled - In Progress | | |

17

OPTIMIZATION

| 9888-1086 51-01 | U.S. | Provisional | CONTROL SYSTEM FOR AIR-COOLED ENCLOSURE-BASED BATTERY ENERGY STORAGE SYSTEMS | 63/431,629 | 12/9/2022 | N/A | N/A | N/A | N/A | Expired Provisional | 12/9/2023 | Filed non-provisional 12/14/2022 |
| 9888-1086 51-02 | U.S. | Utility | ACTIVE FAN BALANCING | 18/081,524 | 12/14/2022 | 2024/0194968 | 6/13/2024 | | | Pending | 6/13/2024 | Awaiting action from the PTO |
| 9888-1086 52-01 | U.S. | Provisional | BATTERY OPTIMIZATION PLATFORM | | | N/A | N/A | N/A | N/A | Unfiled - Not Proceeding | | |
| 9888-1086 53-01 | U.S. | Provisional | BATTERY STATE OF CHARGE ESTIMATION | 63/451,512 | 3/10/2023 | N/A | N/A | N/A | N/A | Expired Provisional | 3/10/2024 | Non-provisional application filed 4/21/2023 |
| 9888-1086 53-02 | U.S. | Utility | BATTERY STATE OF CHARGE ESTIMATION | 18/137,362 | 4/20/2023 | 2024/0302439 | 9/12/2024 | | | Pending | 9/12/2024 | Awaiting action from the PTO |
| 9888-1087 36-01 | U.S. | Provisional | STACKABLE LADDER TRAY | 63/417,981 | 10/20/2022 | N/A | N/A | N/A | N/A | Expired Provisional | 10/20/2023 | Instructed not to file a non-provisional application |
| 9888-1105 81-02 | PCT | | | | | | | | | | | |

US-DOCS\161435194.2
130703294\V-4

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1106 62-01 | China | Utility Model | DETATCHABLE ENERGY STORAGE DEVICE | 2.01521E+11 | 9/2/2015 | | 205039186 | 2/17/2016 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 63-01 | China | Utility Model | OUTDOOR CHARGING PILE | 2.01521E+11 | 9/2/2015 | | 204967341 | 1/13/2016 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 64-01 | China | Utility Model | NOVEL BATTERY MODULE | 2.01521E+11 | 10/19/2015 | | 205039192 | 2/17/2016 | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |
| 9888-1106 65-01 | China | Utility Model | LONG DISTANCE TRANSMISSION I2C BUS COMMUNICATION INTERFACE CIRCUIT | 2.01521E+11 | 10/19/2015 | | 205427840 | 8/3/2016 | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |
| 9888-1106 66-01 | China | Utility Model | BATTERY PACK INTEGRATED SYSTEM | 2.01521E+11 | 10/19/2015 | | 205039193 | 2/17/2016 | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |
| 9888-1106 67-01 | China | Utility Model | AIR-COOLED BATTERY MODULE STRUCTURE | 2.01521E+11 | 10/19/2015 | | 205039221 | 2/17/2016 | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |
| 9888-1106 68-01 | China | Utility Model | COMBINED BATTERY CONNECTION STRUCTURE | 2.01521E+11 | 11/6/2015 | | 205159415 | 4/13/2016 | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |
| 9888-1106 69-01 | China | Utility Model | BATTERY CONNECTION STRUCTURE | 2.01521E+11 | 11/6/2015 | | 205092284 | 3/16/2016 | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |
| 9888-1106 70-01 | China | Utility Model | FIRE FIGHTING SYSTEM FOR ELECTRICITY | 2015211324080 | 12/30/2015 | | 205434759 | 8/10/2016 | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |

19

| | | | STORAGE CONTAINER | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1106 71-01 | China | Utility Model | MONITORING DEVICE FOR ELECTRICITY STORAGE CONTAINER | 2015211329008 | 12/30/2015 | | 205428090 | 8/3/2016 | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |
| 9888-1106 72-01 | China | Utility Model | COOLING SYSTEM FOR ELECTRICITY STORAGE CONTAINER | 201521135094 | 12/30/2015 | | 205454348 | 8/10/2016 | Abandoned | 9/23/2024 | Instructed not to pay maintenance fee |
| 9888-1106 73-01 | China | Utility Model | NOVEL INTEGRATED HIGH-VOLTAGE ENERGY STORAGE CABINET SYSTEM | 2020212847039 | 7/3/2020 | | 212435439 | 1/29/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 74-01 | China | Utility Model | QUICK GRADING SYSTEM FOR ECHELON BATTERY | 2020212936916 | 7/3/2020 | | 212810381 | 3/26/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 75-01 | China | Utility Model | LITHIUM BATTERY PACK PROTECTION DEVICE | 2020214170066 | 7/17/2020 | | 212342721 | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 76-01 | China | Utility Model | AIR COOLING STRUCTURE OF LITHIUM BATTERY PACK | 2020214170070 | 7/17/2020 | | 212342694 | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 77-01 | China | Utility Model | LITHIUM BATTERY PACK | 2020214182152 | 7/17/2020 | | 212342716 | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |

US-DOCS\161435194.2
130703294\V-4

| | | | ISOLATION STRUCTURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-1106 78-01 | China | Utility Model | ANTI-FALLING LITHIUM BATTERY PACK SHELL | 202021418240 | 7/17/2020 | | [212342740](#) | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 79-01 | China | Utility Model | HEAT PRESERVATION DEVICE FOR LITHIUM BATTERY PACK | 202021430061 9 | 7/20/2020 | | [212342695](#) | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 80-01 | China | Utility Model | BOX BODY SEALING STRUCTURE OF LITHIUM BATTERY PACK | 202021430062 3 | 7/20/2020 | | [212342756](#) | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 81-01 | China | Utility Model | EXTERNAL DUSTPROOF STRUCTURE OF LITHIUM BATTERY PACK | 202021430103 9 | 7/20/2020 | | [212342722](#) | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 82-01 | China | Utility Model | LITHIUM BATTERY PACK CONNECTING SHEET STRUCTURE | 202021430143 3 | 7/20/2020 | | [212342768](#) | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 83-01 | China | Utility Model | SOFT PACKET OF LITHIUM CELL GROUP PACKAGE ASSEMBLY | 202021432018 6 | 7/20/2020 | | [212342718](#) | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1106 84-01 | China | Utility Model | POWER LITHIUM BATTERY PACK | 202021418228 | 7/17/2020 | | [212342717](#) | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |

21

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | CONNECTING STRUCTURE | | | | | | | | |
| 9888-1106 85-01 | China | Utility Model | VENTILATION DEVICE FOR LITHIUM BATTERY PACK | 202021430140 | 7/20/2020 | | 212342662 | 1/12/2021 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1108 32-01 | China | Utility Model | ACTIVE-BALANCING BATTERY MANAGEMENT SYSTEM FOR SMART PHOTOVOLTAIC LOW-SPEED ELECTRIC VEHICLES | 201820930639 3 | 6/11/2018 | | 208353021 | 1/8/2019 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1108 33-01 | China | Utility Model | ELECTRIC ENERGY STORAGE LITHIUM BATTERY PACK WITH EFFICIENT HEAT DISSIPATION | 201921603667 5 | 9/25/2019 | | 210200916 | 3/27/2020 | Abandoned | 4/1/2024 | Instructed not to pay maintenance fee |
| 9888-1113 59-01 | China | Utility Model | LONG-DISTANCE TRANSMISSION 12C BUS COMMUNICATION INTERFACE CIRCUIT | 201510712605 8 | 10/19/2015 | 105243045A | 1/13/2016 | | | Abandoned | 12/10/2024 | Instructed not to file a response |
| 9888-1114 63-01 | China | Utility Model | SAFETY EXPLOSION-PROOF STRUCTURE | 202223477461 7 | 12/26/2022 | | 218975640U | 5/5/2023 | Abandoned | 12/10/2024 | Instructed not to pay maintenance fee |

US-DOCS\161435194.2
130703294\V-4

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | OF STORAGE BATTERY | | | | | | | | |
| 9888-1114 64-01 | China | Utility Model | THERMAL RUNAWAY PROTECTION STRUCTURE FOR STORAGE BATTERY | 2022234858716 | 12/27/2022 | | | 218939821U | 4/28/2023 | Abandoned | 12/10/2024 | Instructed not to pay maintenance fee |
| 9888-1114 65-01 | China | Utility Model | UNIFORM HEAT DISSIPATION STRUCTURE FOR ENERGY STORAGE PRODUCT MODULE | 2022235116395 | 12/28/2022 | | | 218957854U | 5/2/2023 | Abandoned | 12/10/2024 | Instructed not to pay maintenance fee |
| 9888-1114 66-01 | China | Utility Model | AN OUTDOOR MULTI-FUNCTIONAL POWER SUPPLY | 2022234443760 | 12/22/2022 | N/A | N/A | N/A | N/A | Abandoned | 8/1/2023 | Assignment to Powin, LLC was not recorded as application lapsed after rejection in Aug. 2023 |
| 9888-1114 67-01 | China | Utility Model | AN OUTDOOR POWER STATION WITH GOOD HEAT DISSIPATION PERFORMANCE | 2022234586957 | 12/23/2022 | | | | | Abandoned | 5/23/2024 | Instructed not to file a response |

23

| 9888-1133 31-01 | China | Utility Model | COOLING PLATES FOR BATTERIES | 2025202486747 | 2/14/2025 | | | Pending | 2/14/2025 | Awaiting 1st action from CNIPA |
| 9888-1133 31-02 | U.S. | Provisional | COOLING PLATES FOR BATTERIES | | | | | Not Yet Filed | | Awaiting confirmation of named Applicants |
| 9888-1135 14-01 | U.S. | Provisional | SYSTEMS AND METHODS FOR PASSIVE BALANCING OF BATTERY PACKS | | | | | Not yet filed | 3/31/2025 | Draft application sent for review 3/31/2025 |

US-DOCS\161435194.2
130703294\V-4

b. **TRADEMARKS**

| KS Ref. No. | Country | Mark Name | Class | Goods/Services | Application No. | Filing Date | Reg. No. | Reg. Date | Sec. 8&15 Dec. (US only) | Renewal | Status | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10493-109105-01 | USA |  | 9 | Electric control devices for energy storage; electric power converters; electrical storage batteries | 97/612,451 | 9/29/2022 | | | | | Abandoned | owned by GPTECH, Inc. |
| 10493-109964-01 | USA |  | 9 | Electric control devices for energy storage; electric power converters; electrical storage batteries | 86/410,268 | 10/1/2014 | 4,819,603 | 9/22/2015 | | 9/22/2025 | Registered (owned by GPTECH USA, Inc.) | Section 7 Request to Amend owner to reflect GPTECH, Inc. granted by USPTO |
| 9888-100566-01 | USA | STACK | 9 | Modular Energy Storage System For Providing Electrical Power | 87/873,439 | 4/11/2018 | | | | | Abandoned | |

25

| 9888-100567-01 | USA | | 9, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | 87/873,442 | 4/11/2018 | 5,712,492 | 3/2/2019 | 4/2/2025 (filed) | 4/2/2029 | Registered |



US-DOCS\161435194.2
130703294.\V-4

| 9888-100567-02 | Canada | | 9, 37, 42 | Class 9: Electric storage batteries; general purpose batteries; grids for batteries; charging stations for electric vehicles

Class 37: Installation of battery systems

Class 42: Design, planning and engineering of electrical storage batteries; electrical engineering; mechanical engineering; electrical systems design services; design and development | 1,897,913 | 5/7/2018 | TMA1,106,334 | 8/9/2021 | | 8/9/2031 | Registered |

US-DOCS\161435194.2
130703294\V-4

of battery
systems

| 9888-100567-03 | China | | 9, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile | A0075614 | 5/4/2018 | 1414675 | 5/4/2018 | 5/4/2028 | Registered via International Registration No. 1414675. | Request to Cancel Registration filed by third party. No further action to be taken in matter. Registration should eventual |



US-DOCS\161435194.2
130703294\V-4

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | power-charging stations<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | | ly be cancelle d. |
| 9888-100567-66 | Madrid (covering China) | | 9, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations<br><br>Class 42: | A007 5614 | 5/4/201 8 | 1414675 | 5/4/201 8 | | 5/4/202 8 | Registere d via Internati onal Registrati on No. 1414675. |

US-DOCS\161435194.2
130703294\V-4

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | Engineering services; electrical systems design services; design and integration of battery systems |  |  |
| 9888-105002-01 | USA | STACKOS | Unfiled - In Progress | Draft recitation of goods sent to client for approval |
| 9888-105003-01 | USA | STACKOS+ | Unfiled - In Progress | Draft recitation of goods sent to client for approval |
| 9888-105004-01 | USA | MAKING STORAGE SIMPLE | Unfiled - In Progress | Awaiting instructions to file. |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 9888-111969-01 | USA | POWIN POD | 9 | Battery energy storage system comprised primarily of batteries, battery cells and electric controllers | 98/635,099 | 7/5/2024 | | Pending | Suspended pending outcome of US App. No. 98329935 for POWIN filed by Powin Information Technology Inc.; KMH to call Examiner re same |
| 9888-111970-01 | USA | AEGIS | | | | | | | Unfiled - Not Proceeding |
| 9888-111971-01 | USA | ATLAS | | | | | | | Unfiled - Not Proceeding |
| 9888-112030-01 | USA | NEXUS | | | | | | | Unfiled - Not Proceeding |
| 9888-112031-01 | USA | CONNECT | | | | | | | Unfiled - Not Proceeding |

31

| 9888-105656-01 | USA | CENTIPEDE | 9 | Modular battery storage systems consisting primarily of utility-scale batteries in enclosures for providing electrical power for electricity grid applications | 88/164,245 | 10/22/2018 | 6,639,559 | 2/82022 | 2/8/2028 | 2/8/2032 | Registered |
| 9888-105689-01 | USA | POWIN ENERGY | 11, 42 | Class 11: Lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | 86/521,596 | 2/2/2015 | 4,865,706 | 12/8/2015 | 12/8/2021 (filed) | 12/8/2025 | Registered |

| 9888-105805-01 | USA | POWIN ENERGY | 9 | Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | 86/299,545 | 1/5/2016 | 4,882,384 | 1/5/2016 | 1/5/2022 (filed) | 1/5/2026 | Registered |
| 9888-105848-01 | USA | BUILDING THE WORLD'S BEST BATTERIES | 9, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power- | 90/531,355 | 2/16/2021 | | | | | Abandoned |

33

charging stations

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 9888-106715-01 | USA | POWIN STACK | 9 | Modular energy storage system for managing electrical power comprised of battery cells and an electronic regulator that monitors and controls the charging and discharging of rechargeable batteries | 90/80 4,882 | 6/30/2021 | | Abandoned | Application was allowed; instructed to take no further action |
| 9888-108632-01 | USA | LEADING THE CHARGE | | | | | | Unfiled - Not Proceeding | |

US-DOCS\161435194.2
130703294\V-4

| 9888-108633-01 | USA | ENERGY STORAGE MADE SIMPLE | 9, 42 | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | 97/482,368 | 6/29/2022 | 7,559,905 | 11/5/2024 | 11/5/2030 | 11/5/2034 | Registered |
| 9888-108634-01 | USA | BUILDING THE FUTURE OF ENERGY | | | | | | | | | Unfiled - Not Proceeding |
| 9888-108890-01 | USA | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: | 97/559,144 | 8/22/2022 | 7,222,099 | 11/21/2023 | 11/21/2029 | 11/21/2033 | Registered |

35

lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-66 | International Registration | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered |

36

stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-02 | Afghanistan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

37

| | | | | stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-03 | OAPI (via Madrid) **OAPI includes Benin, Burkina Faso, Cameroon, the Central African Republic, Chad, the Comoros, the Congo, Côte d'Ivoire, Equatorial | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240 |

38

| | Guinea, Gabon, Guinea, Guinea-Bissau, Mali, Mauritania, the Niger, Senegal, and Togo | | | stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-04 | Albania (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

39

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-05 | Algeria (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

40

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | stations | | | | | |
| | | | | Class 11: lighting fixtures | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | |
| 9888-108890-06 | Antigua and Barbuda (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | Registered via International Registration No. 1687240. |

41

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-07 | Armenia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | Registere d via Internati onal Registrati on No. 1687240. |

US-DOCS\161435194.2
130703294\V-4

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | stations | | | | |
| | | | | Class 11: lighting fixtures | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | |
| 9888-108890-08 | Australia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | | Pending: Provision al Refusal issued; response due 11/18/25 |

43

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-09 | Austria (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

44

stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-10 | Azerbaijan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

45

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | stations | | | | | | |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
| 9888-108890-11 | Bahrain (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

46

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-12 | Belarus (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

47

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-13 | Belgium (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. Included in Benelux. |

48

stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-14 | Bhutan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

49

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-15 | Bosnia and Herzegovi (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

50

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-16 | Botswana (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

51

| | | | | stations |
|---|---|---|---|---|

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-17 | Brazil (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/1932 | Registered via International Registration No. 1687240 |

52

stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-18 | Brunei Darussalam (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/1932 | Registered via International Registration No. 1687240 |

53

| | | | | stations | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
| 9888-108890-19 | Bulgaria (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

54

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-20 | Cape Verde (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/19 32 | Registered via International Registration No. 1687240 |

55

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-21 | Cambodia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

56

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-22 | Canada (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | | Pending; Office Action issued; Response due 7/15/202 5 |

57

stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-23 | Chile (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-24 | China (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2020 | Abandoned |

59

US-DOCS\161435194.2
130703294\V-4

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-25 | Colombia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

60

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-26 | Croatia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240 |

| Docket No. | Country | Mark | Class | Goods/Services | App. No. | Filing Date | Reg. No. | Reg. Date | Expiration Date | Status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | stations<br><br>Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
| 9888-108890-27 | Cuba (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

62

stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-28 | Cyprus (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

63

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-29 | Czech Republic (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

64

stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-30 | North Korea (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-31 | Denmark (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

66

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-32 | Egypt (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

US-DOCS\161435194.2
130703294\V-4

| | | | | stations | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
| 9888-108890-33 | Estonia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

68

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | stations | | | | | | |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
| 9888-108890-34 | Eswatini/Swaziland (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

69

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | stations<br><br>Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
| 9888-108890-35 | European Union (via Madrid) **European Union includes Austria, Belgium, Bulgaria, Croatia, Republic of Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Germany, | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

70

| | Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembou rg, Malta, Netherlan ds, Poland, Portugal, Romania, Slovakia, Slovenia, Spain and Sweden | | | stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | |
|---|---|---|---|---|---|---|---|
| 9888-108890-36 | Finland (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile | A012 6879 | 8/31/20 22 | Abandon ed |

power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-37 | France (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power- | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

72

charging
stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-38 | Gambia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

73

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-39 | Georgia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

74

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-40 | Germany (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

75

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | stations | | | | | | |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
| 9888-108890-41 | Ghana (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

US-DOCS\161435194.2
130703294\V-4

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | stations | | | | | | |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
| 9888-108890-42 | Greece (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

77

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-43 | Hungary (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

78

stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-44 | Iceland (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

79

stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-45 | India (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | | Pending |

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-46 | Indonesia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

81

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-47 | Iran (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

82

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | stations | | | | | | |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
| 9888-108890-48 | Ireland (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

83

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-49 | Israel (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

US-DOCS\161435194.2
130703294\V-4

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | stations<br><br>Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | | |
| 9888-108890-50 | Italy (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240 |

85

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | stations | | | | | | |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
| 9888-108890-51 | Jamaica (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240 |

86

stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-52 | Japan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

US-DOCS\161435194.2
130703294\V-4

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-53 | Kazakhstan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

88

US-DOCS\161435194.2
130703294\V-4

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-54 | Kenya (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

89

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | stations | | | | | | |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |
| 9888-108890-55 | Kyrgizstan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240 |

90

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-56 | Laos (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

US-DOCS\161435194.2
130703294\V-4

stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-57 | Latvia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

US-DOCS\161435194.2
130703294\V-4

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-58 | Lesotho (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

93

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-59 | Liberia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

94

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-60 | Liechtenstein (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240 |

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-61 | Lithuania (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

96

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-62 | Luxembourg (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. Included in Benelux. |

US-DOCS\161435194.2
130703294\V-4

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-63 | Madagascar (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

98

stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-64 | Malawi (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

99

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-65 | Malaysia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240 |

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-67 | Mexico (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

US-DOCS\161435194.2
130703294\V-4

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | stations |  |  |  |  |  |  |
| | | | | Class 11: lighting fixtures |  |  |  |  |  |  |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems |  |  |  |  |  |  |
| 9888-108890-68 | Monaco (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

102

|  |  |  |  | stations |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  | Class 11: lighting fixtures |  |  |  |  |  |  |
|  |  |  |  | Class 42: Engineering services; electrical systems design services; design and integration of battery systems |  |  |  |  |  |  |
| 9888-108890-69 | Mongolia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

US-DOCS\161435194.2
130703294\V-4

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | stations | | | | | | | |
| | | | | Class 11: lighting fixtures | | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | | |
| 9888-108890-70 | Montenegro (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

104

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-71 | Morocco (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

105

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-72 | Mozambique (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

106

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-73 | Namibia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

107

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-74 | Netherlands (via Madrid) **Netherlands includes Netherlands, Aruba, Curaçao and St Maarten | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. Included in Benelux. |

US-DOCS\161435194.2
130703294\V-4

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-75 | New Zealand (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

109

stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-76 | Macedonia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

US-DOCS\161435194.2
130703294\V-4

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-77 | Norway (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

US-DOCS\161435194.2
130703294\V-4

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9888-108890-78 | Oman (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

112

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-79 | Pakistan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-80 | Philippines (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

114

stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems

| 9888-108890-81 | Poland (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

US-DOCS\161435194.2
130703294\V-4

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-82 | Portugal (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging | A012 6879 | 8/31/20 22 | | Abandon ed |

116

stations

Class 11:
lighting
fixtures

Class 42:
Engineering
services;
electrical
systems
design
services;
design and
integration of
battery
systems

US-DOCS\161435194.2
130703294\V-4

| 9888-108890-83 | Korea (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Electrical Engineering services; engineering services relating to the design of electronic systems; engineering services for | | | | | | |

118

others;
engineering
services in the
field of
electrical
power;
engineering
services
relating to
computer
programmin;
engeneering
services
related to the
disign of
energy
storage
systems;
electrical
systems
design
services;
design and
integration of
battery
systems

| 9888-108890-84 | Moldova (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

120

| 9888-108890-85 | Romania (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

121

| 9888-108890-86 | Russia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

| 9888-108890-87 | Rwanda (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

123

| 9888-108890-88 | Samoa (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

US-DOCS\161435194.2
130703294\V-4

| 9888-108890-89 | San Marino (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

US-DOCS\161435194.2
130703294\V-4

| 9888-108890-90 | Sao Tome & Princepe (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

| 9888-108890-91 | Serbia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations<br><br>Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

US-DOCS\161435194.2
130703294\V-4

| 9888-108890-92 | Sierra Leone (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations  Class 11: lighting fixtures  Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

US-DOCS\161435194.2
130703294\V-4

| 9888-108890-93 | Singapore (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

| 9888-108890-94 | Slovakia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

US-DOCS\161435194.2
130703294\V-4

| 9888-108890-95 | Slovenia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

131

| 9888-108890-96 | Spain (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | | Abandon ed |
|---|---|---|---|---|---|---|---|---|
| | | | | Class 11: lighting fixtures | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | |

132

| 9888-108890-97 | Sudan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

US-DOCS\161435194.2
130703294\V-4

| 9888-108890-98 | Sweden (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations<br><br>Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. (Classes 9 & 42 refused) |

US-DOCS\161435194.2
130703294\V-4

| 9888-108890-99 | Switzerland (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

| 9888-108914-01 | Syria (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations<br><br>Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

136

| 9888-108914-02 | Tajikstan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations<br><br>Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

US-DOCS\161435194.2
130703294\V-4

| 9888-108914-03 | Thailand (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/2022 | | Pending |

US-DOCS\161435194.2
130703294\V-4

| 9888-108914-04 | Trinidad and Tobago (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240 |

US-DOCS\161435194.2
130703294\V-4

| 9888-108914-05 | Tunisia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations<br><br>Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

| 9888-108914-06 | Turkey (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

| 9888-108914-07 | Turkmenis tan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations<br><br>Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

US-DOCS\161435194.2
130703294\V-4

| 9888-108914-08 | Ukraine (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

US-DOCS\161435194.2
130703294\V-4

| 9888-108914-09 | United Arab Emirates (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations<br><br>Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

US-DOCS\161435194.2
130703294\V-4

| 9888-108914-10 | United Kingdom (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registered via International Registration No. 1687240. |

US-DOCS\161435194.2
130703294\V-4

| 9888-108914-12 | Uzbekistan (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |
| | | | | Class 11: lighting fixtures | | | | | | |
| | | | | Class 42: Engineering services; electrical systems design services; design and integration of battery systems | | | | | | |

146

| 9888-108914-13 | Vietnam (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations  Class 11: lighting fixtures  Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240 |

US-DOCS\161435194.2
130703294\V-4

| 9888-108914-14 | Zambia (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations<br><br>Class 11: lighting fixtures<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

148

| 9888-108914-15 | Zimbabwe (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations

Class 11: lighting fixtures

Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. |

149

| 9888-108914-16 | South Korea (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations;<br><br>Class 11: lighting fixtures;<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A0126879 | 8/31/2022 | 1687240 | 8/31/2022 | 8/31/2032 | Registered via International Registration No. 1687240. |

| 9888-108914-17 | Benelux (via Madrid) | POWIN | 9, 11, 42 | Class 9: Energy storage systems comprised of electrical storage batteries for commercial, residential and vehicle-power charging station purposes, including automobile power-charging stations;<br><br>Class 11: lighting fixtures;<br><br>Class 42: Engineering services; electrical systems design services; design and integration of battery systems | A012 6879 | 8/31/20 22 | 1687240 | 8/31/20 22 | 8/31/20 32 | Registere d via Internati onal Registrati on No. 1687240. Includes Belgium, the Netherla nds and Luxembo urg |

US-DOCS\161435194.2
130703294\V-4

| 9888-111969-66 | International Registration | POWIN POD | 9 | Battery energy storage system comprised primarily of batteries, battery cells and electric controllers | A015 4584 | 12/30/2024 | 1837077 | 12/30/2024 | 12/30/2024 | 12/30/2034 | Registered |
| 9888-111969-02 | Australia (via Madrid) | POWIN POD | 9 | Battery energy storage system comprised primarily of batteries, battery cells and electric controllers | A015 4584 | 12/30/2024 | | | | | Pending: Provisional Refusal issued; response due 5/25/26 |
| 9888-111969-03 | European Union (via Madrid) **European Union includes Austria, Belgium, Bulgaria, Croatia, Republic of Cyprus, Czech Republic, Denmark, Estonia, Finland, | POWIN POD | 9 | Battery energy storage system comprised primarily of batteries, battery cells and electric controllers | A015 4584 | 12/30/2024 | | | | | Pending Published for opposition (ends 6/10/2025) |

US-DOCS\161435194.2
130703294\V-4

France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, Netherlands,

| 9888-111969-04 | United Kingdom (via Madrid) | POWIN POD | 9 | Battery energy storage system comprised primarily of batteries, battery cells and electric controllers | A015 4584 | 12/30/2024 | | Pending; approved for publication |
|---|---|---|---|---|---|---|---|---|

**c. DOMAIN NAMES**

| Domain Name | Owner | Registar | Renewal Date |
|---|---|---|---|
| p0vv1n.com | Powin LLC | GoDaddy | 4/16/2026 |
| p0vvin.com | Powin LLC | GoDaddy | 4/16/2026 |
| p0vvln.com | Powin LLC | GoDaddy | 4/16/2026 |
| p0w1n.com | Powin LLC | GoDaddy | 4/16/2026 |
| p0win.com | Powin LLC | GoDaddy | 4/16/2026 |

| p0wln.com | Powin LLC | GoDaddy | 4/16/2026 |
| povv1n.com | Powin LLC | GoDaddy | 4/16/2026 |
| povvin.com | Powin LLC | GoDaddy | 4/16/2026 |
| povvln.com | Powin LLC | GoDaddy | 4/16/2026 |
| pow1n.com | Powin LLC | GoDaddy | 4/16/2026 |
| powin.au | Powin LLC | GoDaddy | 3/29/2028 |
| powin.biz | Powin LLC | GoDaddy | 1/9/2026 |
| Powin.com | Powin LLC | GoDaddy | 11/30/2025 |
| powinchina.com | Powin LLC | GoDaddy | 11/8/2027 |
| powinenergy.com | Powin LLC | GoDaddy | 4/11/2026 |
| powinrr.com | Powin LLC | GoDaddy | 4/16/2026 |
| powintest.com | Powin LLC | GoDaddy | 3/18/2026 |

(ii)    None.

(iii)

    a. The contracts identified as "Framework Agreement" under the "Contract Type" column in the attached Customer and Vendor Schedule.

    b. The contracts identified as "Energy Supply Agreement" or "ESA" under the "Contract Type" column in the attached Customer and Vendor Schedule.

    c. The contracts identified as "Technology Escrow Agreement" under the "Contract Type" column in the attached Customer and Vendor Schedule.

    d. Software License and Data Security Agreement, by and between Powin, LLC and Strata Solar, LLC (and Virginia Electric and Power Company for certain purposes), dated as of October 13, 2023.

    e. Gatekeeper Intellectual Property and Software License Agreement, by and between Powin, LLC and Idaho Power Company, dated as of May 11, 2023.

    f. Gatekeeper Intellectual Property and Software License Agreement, by and between Powin, LLC and DTE Electric Company, dated as of September 25, 2024.

    g. Term Sheet, by and between  Powin, LLC and CIMC Technology Co., Ltd., dated as of July 28, 2022.

    h. Joint Venture Agreement for Energy Storage Manufacturing, by and between CIMC Technology Co., Ltd, Qingdao CIMC Container Manufacture Co. Ltd., and Powin China Holdings 2, LLC.

i.   Joint Venture Agreement for Energy Market in Taiwan (TPE Energy Inc), by and between Powin Energy Corporation and IBASE Gaming Inc, dated as of May 20, 2020.

j.   Memorandum of Understanding for UCB and Powin JV, by and between UCB S.A. and Powin LLC, dated as of January 10, 2025 (Note: This is a non-binding MOU; a definitive agreement, once executed, would be material).

US-DOCS\161435194.2
130703294\V-4

**Customer and Vendor Schedule**

Contract Management - Contract information - ESA, Framw, LNTP, LTSA, MSA, MOU, PO, Purch, TEA

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* |
|------|----------------|--------------------|-----------------------------------|
| Acelliant-Powin-Microsoft 365 Order Form-03052025 | Purchase Order | Axelliant | 03/04/2025 |
| TechHeads-Powin-THInc Ops MSA-03182022 | Master Service Agreement | TechHeads | 03/18/2022 |
| Logicalis-Powin-Internet Access-04112024 | Purchase Order | Logicalis | 04/18/2024 |
| TechHeads-Powin-2024 CSP Annual Agreement-03062024 | Purchase Order | TechHeads | 03/06/2024 |
| OfficeSpace-Powin-OrderForm-12152024 | Purchase Order | OfficeSpace Software, Inc. | 12/15/2024 |
| OfficeSpace-Powin-OrderForm-12152023 | Purchase Order | OfficeSpace Software, Inc. | 12/15/2023 |
| OnlineBusinessSystems-Powin-MSA-02262021 | Master Service Agreement | Online Enterprises, Inc. | 02/26/2021 |
| Procore-Powin-OrderForm-12212024 | Purchase Order | Procore Technologies, Inc. | 12/27/2024 |
| RFPIO-Powin-OrderForm05032022 | Purchase Order | RFPIO, Inc. | 05/03/2022 |
| TravelIncorporated-Powin-MSA-06292023 | Master Service Agreement | Travel Incorporated | 06/29/2023 |
| LucidSoftwareInc.-Powin-Order Form-1.27.2025 | Purchase Order | Lucid Software, Inc. | 01/27/2025 |
| Techheads-Powin-Order Form-KnowBe4-6.11.2024 | Purchase Order | TechHeads, LLC | 06/11/2024 |
| InternationalSOS-Powin-MSA-06/30/2023 | Master Service Agreement | International SOS Assistance, Inc. | 06/30/2023 |
| JAMF-Powin-Order Form-3.2.2025 | Purchase Order | Jamf Software, LLC | 03/02/2025 |
| Concur-Powin-OrderForm-06-12-2023 | Purchase Order | Concur Technologies, Inc. | 06/12/2023 |
| ConcurTechnologiesInc-Powin-OrderForm-02-20-2024 | Purchase Order | Concur Technologies, Inc. | 02/20/2024 |
| GoFireFlyInc-Powin-OrderForm-1.31.2025 | Purchase Order | Go Fire Fly, Inc. | 01/31/2025 |
| Salesforce-Slack-Powin-11/24/2025 | Master Service Agreement | Salesforce, Inc | 12/15/2024 |
| Resilience360Inc-Powin-OrderForm-10.31.2023 | Purchase Order | Resilience360, INC. | 10/31/2023 |
| SmartSheet-Powin-OrderForm-12/31/2024 | Purchase Order | Smartsheet | 12/31/2024 |
| Smartsheet-Powin-OrderForm-07-37-2024 | Purchase Order | Smartsheet | 07/31/2024 |
| Smartsheet-Powin-OrderForm-1-13-2025 | Purchase Order | Smartsheet | 01/10/2025 |
| DassaultSystemesSolidworksCorporation-Powin-MSA-10-23-2023 | Master Service Agreement | Dassault Systemes SolidWorks Corporation | 10/25/2023 |
| GoEngineer-Powin-Order Form Dymola-4.4.2025 | Purchasing Agreement | GoEngineer | 04/04/2025 |
| Solution7-Powin-OrderForm-11-27-2024 | Purchase Order | Solution 7 Limited | 11/27/2024 |
| Docusign-Powin-Order Form-1.31.2025 | Purchase Order | Docusign, Inc. | 01/31/2025 |
| TechHeads-Verkada-Powin-OrderForm-04-24-2024 | Purchase Order | TechHeads | 04/24/2024 |
| Deel, Inc.-Powin- Order Form-12.27.2024 | Purchasing Agreement | Deel, Inc. | 12/27/2024 |
| TechHeads-Verkada-Powin-OrderForm-05-23-2023 | Purchase Order | TechHeads | 05/23/2023 |
| Astound-Powin-ServiceOrder05-26-2023 | Purchase Order | Astound Business Solutions, LLC | 05/26/2023 |
| CTX-Powin-Order Form-ZebraOne Care-1.16.2024 | Purchasing Agreement | CTX | 01/16/2024 |
| Comcast-Powin-PDX Move Order Form-10_2_2024 | Purchase Order | Comcast Cable Communications Management, LLC | 10/02/2024 |
| Crowe LLP-Powin-MSA-YHireProgram-1.3.2024 | Master Service Agreement | Crowe, LLP | 01/03/2024 |
| ConductorOne-Powin-Order Form-12.21.2023 | Purchase Order | ConductorOne, Inc. | 12/21/2023 |
| Zoom-Powin-Amendment-01292024 | Purchase Order | Zoom | 01/30/2024 |

| Comcast-Powin-PDX Order Form-11.2.2021 | Purchase Order | Comcast Cable Communications Management, LLC | 11/02/2021 |
|---|---|---|---|
| TechHeadsArcticWolf-Powin-OrderForm03012025 | Purchase Order | TechHeads | 03/01/2025 |
| Comcast-Powin-HQ Order Form-11.2.2021 | Purchase Order | Comcast Cable Communications Management, LLC | 11/02/2021 |
| Celigo Inc-Powin-Order Form-04.17.2025 | Purchase Order | Celigo, Inc. | 04/17/2025 |
| PTCInc-Powin-MSAAmendment-03-31-2025 | Master Service Agreement | PTC, Inc. | 03/31/2025 |
| AgileBits-Powin-MSA02-27-2025.docx | Master Service Agreement | AgileBits | 02/27/2025 |
| powin-Alliant - Consulting Services Agreement amendment 1 -05.19.2025 | Master Service Agreement | Alliant Insurance Services, Inc. | 05/19/2025 |
| Beneficiary Enrollment (Rider C) - Santa Paula Energy Storage - Powin Energy 180612 | Technology Escrow Agreement | Santa Paula Energy Storage, LLC | |
| Rider C - KCE-Powin PEC (Construction Projects)(NRF 12.31).DOCX | Technology Escrow Agreement | KCE Texas Holdings 2020, LLC | 01/13/2021 |
| GreEnergy - POWIN - ASP MSA - 05.21.2025.docx | Master Service Agreement - ASP | GreEnergy Resources, LLC | 05/21/2025 |
| Intuitive Safety Solutions, Inc. (ISS) - Powin, LLC - Master Services Agreement - 05.12.2025 | Master Service Agreement | Intuitive Safety Solutions, Inc. (ISS) | 05/12/2025 |
| Metro-Fire – Powin – ASP MSA – 05.01.2025 | Master Service Agreement - ASP | Metro Fire Equipment Inc | 04/18/2025 |
| Capgemini America, Inc. - Powin, LLC - Statement of Work - 01.27.25 | Master Service Agreement | Capgemini America, Inc. | 01/27/2025 |
| Arrow Canyon - Powin Addendum and Amendmentto ESA-04.10.25 | ESA (Energy Storage Agreement) | Arrow Canyon Solar, LLC | 04/10/2025 |
| RES-Powin-GAL0020 -_Alcoutim_-_Statement_of_Work_-_LTSA_04.03.2025 | Master Service Agreement - ASP | RES Energy Global Services, S.L.U. | 04/03/2025 |
| Pike Purchase Order - 3.7.2025 | Purchase Order | Pike Telecom and Renewables, LLC | 03/07/2025 |
| Databricks Contract For AWS Marketplace Commit_Q-54357_2025-01-30 | Purchase Order | Databricks, Inc. | 01/30/2025 |
| Activpayroll_Powin_Master_Services_Agreement_-04.17.2023 | Master Service Agreement | activpayroll Ltd. | 04/17/2023 |
| Powin - KMC - LTSA - Brandywine (Executed 1APR2025) | LTSA (Long Term Service Agreement) | KMC Thermo, LLC | 04/01/2025 |
| PRAXIS Powin Two Party Master Escrow Agreement - 03.22.2024 (2) | Technology Escrow Agreement | Praxis Technology Escrow | 03/22/2024 |
| DNV GL - Powin Energy Corporation - Framework Agreement - 10.28.2020 | Framework Agreement | DNV Energy Insights USA Inc. | 10/28/2020 |
| DNV GL - Powin LLC - Amendment 1 to Frame Agreement - 11.27.2023 | Framework Agreement | DNV Energy Insights USA Inc. | 11/27/2023 |
| Deel_-_Powin_-_Q-79364-2-5-Feb-2025-07-12-41-signed | Purchase Order | Deel | 06/01/2025 |
| Deel- Powin - HR_Consulting_Services_Agreement - 03.06.2025 | Master Service Agreement | Deel Inc. | 03/06/2025 |
| Apex - APE0060 - Angelo - LTSA Amendment #2 - 3.7.2025 | LTSA (Long Term Service Agreement) | Angelo Storage, LLC. | 03/07/2025 |
| Capgemini America, Inc. - Powin, LLC - SOW Change Request - 03.15.2025 | Purchase Order | Capgemini America, Inc. | 03/15/2025 |
| Great Kiskadee ESA - PWA Amendment No. 2 Executed - 02.21.2025 | ESA (Energy Storage Agreement) | Great Kiskadee Storage, LLC | 02/21/2025 |

| Desert Quartzite PA Amendment 003_-02.28.2025 | ESA (Energy Storage Agreement) | Desert Quartzite, LLC | 02/28/2025 |
|---|---|---|---|
| Powerflex - Powin - ESA PFX0050 USCS Fresno - 02.21.2025 | ESA (Energy Storage Agreement) | PowerFlex Solar, LLC | 02/21/2025 |
| TUV-R - Powin, LLC - Assurance Framework MOU - 02.21.2025 | Memorandum of Understanding | TUV-R | 02/21/2025 |
| Circulor - Powin - MSSA - 02.18.2025 | Master Service Agreement | Circulor Inc | 02/18/2025 |
| Davinci Technology, L.L.C. d/b/a CORE Health Networks - Powin, LLC - Master Service Agreement - 02.14.2025 | Master Service Agreement | Davinci Technology, L.L.C. d/b/a CORE Health Networks | 02/14/2025 |
| WSB - ESA Deed of amendment No. 4 - updated Project Schedule - 01.30.2025 | ESA (Energy Storage Agreement) | Munmorah Battery ProjectCo Pty Ltd | 01/30/2025 |
| LTSA - SOL0020 - Croton Harmon - BESS LTSA (compiled, dated, fully executed) | LTSA (Long Term Service Agreement) | SCS VAN WYCK 012823 CROTON ON HUDSON, LLC | 02/10/2025 |
| Powin Energy, IG & SS '21 | Master Service Agreement | Mergermarket (US) limited Acuris | 12/17/2021 |
| Capgemini America, Inc. - Powin, LLC - Master Services Agreement - 01.27.2025 | Master Service Agreement | Capgemini America, Inc. | 01/27/2025 |
| Thomson Reuter - Powin LLC HighQ Renewal_NEW__HighQ Order Form._01.16.2025 | Purchase Order | Thomson Reuters West Publishing Corporation | 01/16/2025 |
| Thomson Reuters - Powin - ProFlex Addendum HighQ - fully executed 1.22.2025 | Purchase Order | Thomson Reuters West Publishing Corporation | 01/22/2025 |
| JV Powin UCB revUCB 101224 PDF | Memorandum of Understanding | UCB S.A. | 01/20/2025 |
| Intura pty Ltd - Powin AU - ASP MSA - 01.17.2025 | Master Service Agreement - ASP | Intura PTY LTD | 01/17/2025 |
| Amendment #1 to Ravenswood Group 3 ESA__BHER_(fully executed) | ESA (Energy Storage Agreement) | BHER Ravenswood Solar 1, LLC | 01/06/2025 |
| Amendment #1 to Ravenswood Group 2 ESA__BHER_(fully executed) | ESA (Energy Storage Agreement) | BHER Ravenswood Solar 1, LLC | 01/06/2025 |
| Amendment #1 to Ravenswood Group 1 ESA__BHER_(fully executed) | ESA (Energy Storage Agreement) | BHER Ravenswood Solar 1, LLC | 01/06/2025 |
| NoBlue2 - Powin, LLC - Master Service Agreement - 01.10.2025 | Master Service Agreement | NoBlue2 | 01/10/2025 |
| ESA_Second_Deed_of_Amendment_-_Ulinda_Park - 12.23.2024 | ESA (Energy Storage Agreement) | Ulinda Park ProjectCo Pty Ltd | 12/23/2024 |
| Circulor - Powin - Order Form 1.2.2025 | Purchase Order | | 01/02/2025 |
| Powin_Deel_Final_MSA - 01.03.2023 | Master Service Agreement | Deel Inc. | 01/03/2023 |
| SOW of Powin B2B implementation_Dec20.2024-双章 | Master Service Agreement | Logicalis Shanghai limited | 12/20/2024 |
| Powin Form LTSA DTE0010 Slocum (Fully compiled, dated, executed) | LTSA (Long Term Service Agreement) | DTE Electric Company | 12/20/2024 |
| INV0031 La Toba ESSSA Executed (Final) | ESA (Energy Storage Agreement) | MG HR S de R.L de C.V. | 12/13/2024 |

| | | | |
|---|---|---|---|
| La_Toba_LNTP_Letter_Agreement_-_Amendment_No._2_INV_Dec_13_24_Executed | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | MG HR S de R.L de C.V. | 11/07/2024 |
| Logicalis Shanghai Limited - Powin Qingdao Representative Office - Sales Contract for 75 licenses - 11.14.2024 | Master Service Agreement | Logicalis Shanghai Limited | 11/14/2024 |
| ThrivePass, Inc. - Powin Energy Operating, LLC - MSA - 10.21.2022 | Master Service Agreement | ThrivePass, Inc. | 01/01/2023 |
| GALP - Powin - LTSA Alcoutim - 10.01.2024 | LTSA (Long Term Service Agreement) | Galp Parques Fotovoltaicos de Alcoutim, LDA | 10/01/2024 |
| Powin LLC - Trail B Technologies - Software Subscription Agreement and DPA - 12.06.2024 | Master Service Agreement | TrailB Technologies LLC | 12/06/2024 |
| Gotion Inc - Powin LLC - MSA - 10.08.2024 | Master Supply Agreement | Gotion, Inc. | 10/08/2024 |
| Logicalis Shanghai Limited - Powin Qingdao Representative Office - Cloud Service Contract - 09.08.2024 | Master Service Agreement | Logicalis Shanghai Limited | 09/08/2024 |
| Powin BHER ESA - BHE0020 Solar Star 3 (fully executed)_recompiled 12.05.2024 | ESA (Energy Storage Agreement) | Solar Star 3, LLC | 08/31/2023 |
| Stem, Inc. - Powin, LLC - STM0651 - Dark and Stormy I - 03.08.2024 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2024 |
| Stem - Powin - STM0578 Velvet Mite SD DC - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 |
| Stem, Inc. - Powin, LLC - STM0652 - Dark and Stormy II - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 |
| Stem - Powin - STM0577 Velvet Mite ML DC - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 |
| Stem - Powin - STM0576 Velvet Mite MR AC - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 |
| Stem, Inc. - Powin, LLC - STM0911 - Dighton Tremont - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 |
| Stem - Powin - STM0574 Velvet Mite BR DC - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 |
| Stem - Powin - STM0573 Velvet Mite QR DC - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 |
| Stem - Powin - STM0572 Velvet Mite CPR - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 |
| Stem - Powin - STM0571-Velvet Mite TR - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 |
| Stem Inc - Powin - STM0493 Mosquito 3 - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 |
| Stem Inc - Powin - LLC - STM0492 Mosquito 2 - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 |
| Stem Inc - Powin LLC - STM0491 - Mosquito 1 LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem Inc. | 03/08/2023 |
| Stem, Inc. - Powin, LLC - STM0912 - Douglas Oak - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 |
| Stem - Powin, LLC - STM0913 - Palmer Sykes - LTSA - 03.08.2023 | LTSA (Long Term Service Agreement) | Stem, Inc. | 03/08/2023 |
| Stem, Inc. - Powin, LLC - STM0100 - Viper - LTSA - 02.28.2021 | LTSA (Long Term Service Agreement) | Stem, Inc. | 02/28/2021 |
| RES - Powin - Statement of Work under MSA for GAL0020 - Alcoutim - 10.07.2024 | Master Service Agreement - ASP | RES ENERGY GLOBAL SERVICES S.L.U. | 10/07/2024 |
| RES - Powin - Statement of Work under ASP MSA for PCE0020 - Overhill - 11.07.2024 | Master Service Agreement - ASP | RES ENERGY GLOBAL SERVICES S.L.U. | 11/07/2024 |

| Serrano - First Amendment to ESA (compiled Execution Version 11-6-24) | ESA (Energy Storage Agreement) | Serrano Solar, LLC | 11/06/2024 |
|---|---|---|---|
| Logicalis Shanghai Limited - Powin, LLC - Printing Management Service Contract - 11.07.2024 | Master Service Agreement | Logicalis Shanghai Limited | 11/07/2024 |
| Desert Quartzite - EDF0480 - ESA Amendment 002 - 10.18.2024 | ESA (Energy Storage Agreement) | Desert Quartzite, LLC | 10/18/2024 |
| La Toba LTNP Amendment 1 (Oct 29, 2024) Executed | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | MG HR S de R.L de C.V. | 10/25/2024 |
| Ulinda Park - Powin - Termination of Rider C under 191112 - 10.29.2024 | Technology Escrow Agreement | Praxis Technology Escrow | 10/29/2024 |
| Logicalis Shanghai Limited - Powin Qingdao - Sales Contract - 09.08.2024 | Purchasing Agreement | Logicalis Shanghai Limited | 09/08/2024 |
| SS3 - First Amendment to ESA 2024.10.11 | ESA (Energy Storage Agreement) | Longroad | 10/11/2024 |
| Cogent-Powin_Arrow Canyon-MSA_Approved Service Provider - 12.02._2331_2 | Master Service Agreement - ASP | Cogent Renewables, Inc. | 12/02/2022 |
| Logicalis - Powin Cloud Service Contract 2024 FINAL | Master Service Agreement | Logicalis Shanghai Limited | 08/09/2024 |
| Logicalis - Powin Sales Contract 2024 FINAL | Purchasing Agreement | Logicalis Shanghai limited | 08/09/2024 |
| Antidot - Powin- Fluid Topics Order form, T&C and DPA_09.30.2024 | Purchase Order | Fluid Topics | 10/01/2024 |
| Slalom Inc - Powin - Knowledge Management Discovery SOW - 09.11.2024 | Master Service Agreement | Slalom, Inc | 09/11/2024 |
| Great Kiskadee - Amendment No. 1 to LTSA - 09.30.2024 | LTSA (Long Term Service Agreement) | Great Kiskadee Storage, LLC | 09/30/2024 |
| Great Kiskadee - Amendment No. 1 to ESA - 09.30.2024 | ESA (Energy Storage Agreement) | Great Kiskadee Storage, LLC | 09/30/2024 |
| Apex - Angelo - Amendment No. 1 to ESA - 09.30.2024 | ESA (Energy Storage Agreement) | Angelo Storage, LLC. | 09/30/2024 |
| Apex - Angelo - Amendment No. 1 to LTSA - 09.30.2024 | LTSA (Long Term Service Agreement) | Angelo Storage, LLC. | 09/30/2024 |
| Form Blanket Purchase Order 20210218 FINAL Signed 20210219 - PEC | Purchase Order | Stem, Inc. | 02/22/2021 |
| West Warwick III - Powin LTSA (Executed) | LTSA (Long Term Service Agreement) | West Warwick Energy Storage 3 LLC | 09/26/2024 |
| West Warwick II - Powin LTSA (Executed) | LTSA (Long Term Service Agreement) | West Warwick Energy Storage 2 LLC | 09/26/2024 |
| CA Financial Services service Agreement Powin Australia Broker | Master Service Agreement | CA Financial Services | 08/22/2024 |
| Powin, LLC - Consulting Agreement with Slalom, Inc. (clean) - signed | Master Service Agreement | Slalom, Inc. | 09/11/2024 |
| Transperfect - Powin - SOW - Portuguese Program (part 1) - 08.21.2024 | Master Service Agreement | TransPerfect International LLC | 08/21/2024 |
| Ulinda Park - Powin - Praxis - Tech Escrow Agreement - 09.10.2024 | Technology Escrow Agreement | Ulinda Park Project Co Pty Ltd | 09/10/2024 |
| Fedex - Powin LLC - Pricing Agreement - 9.6.2024 | Master Service Agreement | Federal Express Corporation (FedEx) | 09/06/2024 |
| Ulinda Park_ESA_Deed_of_Amendment (Fully Executed Dated 29 August 2024) | ESA (Energy Storage Agreement) | Ulinda Park Project Co Pty Ltd | 08/29/2024 |
| Lone Star AR ESA - Second Amendment with Ex. CC - Fully Executed | ESA (Energy Storage Agreement) | Lone Star Solar, LLC | 08/21/2024 |

| Acorn-I-First-Amendment-to-Powin-Acorn-I-Energy-Two-Party-Master-Escrow-Agreement-HL-2-21-2022.d | Technology Escrow Agreement | Praxis Technology Escrow | 02/21/2022 |
|---|---|---|---|
| esVolta - Powin Energy Corp - Master Supply Agreement - 12.4.2017 | Master Supply Agreement | esVolta LP | 12/04/2017 |
| Lone Star - Powin - First Amendment to A&R ESA (Fully Executed and Compiled) | ESA (Energy Storage Agreement) | Lone Star Solar, LLC | 01/19/2024 |
| RES Global Energy Services S.L.U. - Powin LLC - ASP MSA 8.12.2024 | Master Service Agreement - ASP | RES Energy Global Services, S.L.U. | 08/12/2024 |
| STR0400 - NovaSource - Powin - Limited Services Agreement - 07.03.2024 | LTSA (Long Term Service Agreement) | Northstar Energy Management, LLC | 07/03/2024 |
| Phillip Riley Projects - Powin AU - ASP MSA - 2024.docx | Master Service Agreement - ASP | Phillip Riley Projects Pty Ltd. | 08/02/2024 |
| Amendment to LTSA - Ameresco Viper (Fully Executed) - 08.02.2024 | LTSA (Long Term Service Agreement) | Ameresco, Inc. | 08/02/2024 |
| Santa Paula-Powin O&M First Amendment_07.13.2023 | LTSA (Long Term Service Agreement) | Santa Paula Energy Storage, LLC | 07/13/2023 |
| Waratah ESA Deed of Amendment No 3 - Fully Executed dated 26 July 2024 | ESA (Energy Storage Agreement) | Munmorah Battery ProjectCo Pty Ltd | 07/26/2024 |
| IANS - Powin - MSA - 06.21.2024 | Master Service Agreement | The Institute for Applied Network Security, LLC | 06/21/2024 |
| Hummingbird_Powin_LTSA Amendment - 07.18.2024 | LTSA (Long Term Service Agreement) | Hummingbird Energy Storage, LLC | 07/18/2024 |
| West Warwick I - Powin LTSA (Executed) | LTSA (Long Term Service Agreement) | West Warwick Energy Storage 1 LLC | 07/12/2024 |
| Powin BHER - ESA - BHE0032 - Ravenswood Group 3 (executed, fully compiled) | ESA (Energy Storage Agreement) | BHER Ravenswood Solar 1, LLC | 07/12/2024 |
| BHER Ravenswood and Powin MSA - BHE0030 (executed, fully compiled) | Master Supply Agreement | BHER Ravenswood Solar 1, LLC | 07/12/2024 |
| Powin BHER - ESA - BHE0031 - Ravenswood Group 2 (executed, fully compiled) | ESA (Energy Storage Agreement) | BHER Ravenswood Solar 1, LLC | 07/12/2024 |
| Powin BHER - ESA - BHE0030 - Ravenswood Group 1 (executed, fully compiled) | ESA (Energy Storage Agreement) | BHER Ravenswood Solar 1, LLC | 07/12/2024 |
| Databricks - Powin - MSA - 07.15.2024 | Master Service Agreement | Databricks, Inc. | 07/18/2024 |
| Re:Build AppliedLogix, LLC - Powin LLC - MSA - 06.05.2024 | Master Service Agreement | Re:Build AppliedLogix, LLC | 06/05/2024 |
| 3Drivers - Powin - Power of Attorney to 3Drivers Agreement for GAL0020 - Alcoutim - 06.14.2024 | Framework Agreement | 3drivers – Engenharia, Inovação e Ambiente, SA. | 06/14/2024 |
| Weifang Genius Electronics Co., Ltd - Powin, LLC - MSA - 03.20.2024 | Master Supply Agreement | Weifang Genius Electronics Co., Ltd. | 03/20/2024 |
| Clean Peak Energy BESS MSA - 20210217 Execution Version (Powin LLC CLEAN 032321) (005) | Master Supply Agreement | Clean Peak Energy (CPE) | 02/17/2021 |
| Ormat - Powin - OTI040 Bottlenck - ESA Amendment #1 - 03.30.2023 | ESA (Energy Storage Agreement) | Ormat Nevada, Inc. | 03/30/2023 |
| Service Stream - SOW_for_QA_Inspection - 05.31.2024 | Master Service Agreement - ASP | Service Stream Energy and Water Pty Ltd | 05/31/2024 |

| | | | |
|---|---|---|---|
| Sunstreams 4 - Powin, LLC - LRD0082 - Second Amendment to ESA - 05.29.2024 | ESA (Energy Storage Agreement) | Sun Streams Expansion, LLC | 05/29/2024 |
| Thomson Reuters - Powin - HighQ - Agreement - 06.15.2023 | Master Supply Agreement | Thompson Reuters West Publishing Corporation | 06/15/2023 |
| Thomson Reuters - Powin - Document Intelligence Order Form- 06.15.2023 | Purchase Order | Thompson Reuters West Publishing Corporation | 06/15/2023 |
| Hummingbird - ESV0220 - Powin - ESA Amendment No.1 - 06.03.2024 | ESA (Energy Storage Agreement) | Hummingbird Energy Storage, LLC | 06/03/2024 |
| 3Drivers – Powin - Agreement for the Appointment of Authorized Representative - 06.03.2024 | Framework Agreement | 3drivers – Engenharia, Inovação e Ambiente, SA. | 06/03/2024 |
| Yuma Solar LTSA - INV0490 (Executed May 15, 2024) | LTSA (Long Term Service Agreement) | Yuma Solar energy LLC | 05/15/2024 |
| REPT BATTERO Energy Co., Ltd. - Powin, LLC - DC Blocks MSA - 05.20.2024 | Master Supply Agreement | REPT BATTERO Energy Co., Ltd. | 05/20/2024 |
| INV0031 - La Toba LNTP Letter Agreement (Compiled)(Executed)(May 20, 2024) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | MG HR S de R.L de CV | 05/17/2024 |
| Spark Power Renewables USA - Powin - ASP MSA - 05.20.2024 | Master Service Agreement - ASP | Spark Power Renewables USA Inc | 05/20/2024 |
| ACCURE - Powin - MOU - 05.01.2024 | Memorandum of Understanding | Accure Battery Intelligence GmnH | 05/14/2024 |
| Service Stream Energy & Water Pty Ltd - Powin AU - Short-Form-Novation-Deed-ASP-MSA-05.13.2024 | Master Service Agreement - ASP | Service Stream Energy & Water Pty Ltd | 05/08/2024 |
| Powin - UKG PRO MSA 12.3.21.docx | Master Service Agreement | UKG Inc. | 12/19/2021 |
| Powin - UKG PRO ORDER 12.3.21 Powin Executed | Purchase Order | UKG Inc. | 12/03/2021 |
| UKG-Powin Energy Corporation - Order; Document Manager - 10.7.22.docx | Purchase Order | UKG Inc. | 10/12/2022 |
| Cameron Wind 1, LLC - Powin - Augmentation ESA - Omnibus - 05.03.2024 | ESA (Energy Storage Agreement) | Cameron Wind 1, LLC | 05/03/2024 |
| Cameron Wind 1 - Powin - Amendment # 1 ESA - Omnibus - 05.03.2024 | ESA (Energy Storage Agreement) | Cameron Wind 1, LLC | 05/03/2024 |
| REPT Battero - Powin - Cell MSA - 05.01.2024 | Master Supply Agreement | REPT Battero Energy Co., Ltd. | 05/01/2024 |
| Stowe Australia Pty Ltd - Powin AU  - ASP MSA - 02.27.2024 | Master Service Agreement - ASP | Stowe Australia Pty Ltd | 02/27/2024 |
| Cameron Wind 1, LLC-PRAXIS-Powin-Rider C-05.01.2024 | Technology Escrow Agreement | Cameron Wind 1,, LLC | 05/01/2024 |
| Powin & EVE MSA for 2024-2026 - Effective 04.28.2024 | Master Supply Agreement | EVE Power Co. Ltd. | 04/28/2024 |
| SunStreams4 - LRD0082 - First Amendment to ESA - 04.17.2024 | ESA (Energy Storage Agreement) | Sun Streams Expansion, LLC | 04/17/2024 |
| Powin Specified Technologies MSA - Fully Executed | Master Supply Agreement | Specified Technology Inc. (STI) | 04/01/2024 |
| Orr Protection - Powin LLC - ASP MSA - 03.14.2024 | Master Service Agreement - ASP | Orr Protection Systems, Inc. | 03/14/2024 |
| DTE - DTE0021 Trenton Channel - Powin Notice to Proceed 4-3-2024 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | DTE Electric Company | 04/03/2024 |
| Powin - GTI - MOU signed 04.03.2024 | Memorandum of Understanding | GTI Fabrication | 02/22/2022 |
| Apex - Cameron Wind - APE0010 Sabal Ingka - LTSA - 04.01.2024 | LTSA (Long Term Service Agreement) | Cameron Wind 1, LLC | 04/01/2024 |

| Apex - Great Kiskadee - Powin - LTSA - 03.27.2024 | LTSA (Long Term Service Agreement) | Great Kiskadee Storage, LLC | 03/27/2024 |
|---|---|---|---|
| Ebara - Powin - Manufacturing Services Agreement - 03.01.2024 | Master Service Agreement | EBARA DENSAN (QINGDAO) TECHNOLOGY CO., LTD. | 03/01/2024 |
| Desert Quartzite - Powin - LTSA First Amendment - 3.20.2024 | LTSA (Long Term Service Agreement) | Desert Quartzite, LLC | 03/20/2024 |
| Desert Quartzite - Powin - ESA Amendment 001 and CO#4 - 03.20.2024 | ESA (Energy Storage Agreement) | Desert Quartzite, LLC | 03/20/2024 |
| Powin & EVE MSA Amendment No. 3 - signed 03.21.2024 | Master Supply Agreement | EVE Asia Co., Limited; EVE Power Co., Ltd | 03/21/2024 |
| EBARA Densan - Powin - Free Issue Parts Agreement - 03.08.2024 | Master Service Agreement | EBARA DENSAN (QINGDAO) TECHNOLOGY CO., LTD. | 03/01/2024 |
| Powin Energy Operating, LLC (PEO) - Powin, LLC - Intercompany Administrative Services Agreement - 03.21.2021 | Master Service Agreement | Powin Energy Operating, LLC (PEO) | 03/21/2021 |
| Powin UK Ltd - Powin, LLC - Intercompany Services Agreement - 05.15.2023 | Master Service Agreement | Powin UK Ltd | 05/15/2023 |
| Powin Energy Spain, SL - Powin, LLC - Intercompany Services Agreement - 04.13.2023 | Master Service Agreement | Powin Energy Spain, SL | 04/13/2023 |
| Powin Australia Pty Ltd - Powin, LLC - Intercompany Services Agreement - 02.13.2023 | Master Service Agreement | Powin Australia Pty Ltd | 02/13/2023 |
| Service Stream Utilities Pty Ltd - Powin Australia Pty Ltd - MSA - 3.4.2024 | Master Service Agreement - ASP | Service Stream Utilities Pty Ltd | 03/04/2024 |
| SAFE Laboratories and Engineering Corp. - Powin, LLC - MSA - 10.26.2023 | Master Service Agreement | SAFE Laboratories and Engineering Corp. | 10/26/2023 |
| Invenergy Powin - Amendment#1 LTSA - 02.21.2024 | LTSA (Long Term Service Agreement) | Invenergy Services LLC | 02/21/2024 |
| Crowe LLP - Powin, LLC - MSA for Clients - 06.23.2023 | Master Service Agreement | Crowe LLP | 06/23/2023 |
| Powin CIMC-JV Supplemental Agreement for MSA - signed 02.29.2024 | Master Service Agreement | Qingdao CIMC-Powin New Energy Technology Co., Ltd (CIMC - Powin) | 01/10/2024 |
| DTE - Trenton DTE0021 - Powin Tech Escrow Invoicing Agreement_02.23.2024 | Technology Escrow Agreement | DTE Electric Company | 02/23/2024 |
| DTE - Trenton DTE0021 - Powin Rider C - 02.23.2023 | Technology Escrow Agreement | DTE Electric Company | 02/23/2024 |
| PRAXIS-Powin-Munmorah Three Party Master Escrow Agreement - 02.22.2024 | Technology Escrow Agreement | Munmorah Battery ProjectCo Pty Ltd | 02/22/2024 |
| Australia_Powin_and_CES_Services_Agreement_Fully executed - 2.21.2024 | Master Service Agreement | Clean Energy Services CES LLC (CES) | 02/21/2024 |
| Ayna AI LLC - Powin, LLC - MSA - 02.14.2024 | Master Service Agreement | Anya AI LLC | 02/14/2024 |
| SMM Consulting Service Contract for Powin - signed 02.20.2024 | Purchasing Agreement | SMM Information & Technology Co., Ltd. | 02/20/2024 |
| Waratah_ESA_Deed_of_Amendment_02.17.2024 | ESA (Energy Storage Agreement) | Munmorah Battery ProjectCo Pty Ltd | 02/17/2024 |
| EKS - Powin - Global Master Products Supply Agreement - Oct. 23, 2023 Redacted Pow | Master Supply Agreement | EKS (Experience Knowledge, Strategy, S.L.) | 10/23/2023 |
| Powin & SMM Information Service Agreement - 02.06.2024 | Master Service Agreement | Shanghai Metal Market | 02/06/2024 |

| Waratah ESA - Exhibit X 30March2023rev1 (AKE0060) | ESA (Energy Storage Agreement) | Munmorah Battery ProjectCo Pty Ltd | 05/03/2023 |
|---|---|---|---|
| Akaysha WSB - Record of agreement under Powin ESA and Exhibit X.3.30.2023v.1.docx | ESA (Energy Storage Agreement) | Munmorah Battery ProjectCo Pty Ltd | 05/03/2023 |
| Trenton ESA (fully executed, compiled with exhibits) | ESA (Energy Storage Agreement) | DTE Electric Company | 01/24/2024 |
| Powin - TUV Rheinland (Shanghai) Co., Ltd. - MSA - 1.2.2024 | Master Service Agreement | TUV Rheinland (Shanghai) Co., Ltd. | 01/02/2024 |
| Lonestar Amended and Restated ESA (fully executed, compiled) 9.15.2023 | ESA (Energy Storage Agreement) | Lone Star Solar, LLC | 09/15/2023 |
| STM0380_Watersprout - Powin - Limited Services Agreement _ Stem PO - 01.09.2024 | LTSA (Long Term Service Agreement) | STEM / Mohave Power LLC | 01/09/2024 |
| Socomec - Powin - Master Supply Agreement - 01.01.2024 | Master Supply Agreement | Socomec Inc. | 01/01/2024 |
| Sunny Central Storage Data Sheet (2475-US) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| Sunbelt_150kVA Aux_434Vprimary | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| Powin Stacks Product Line Datasheet (DP-S 2021) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| Powin Enclosure Product Line Datasheet (DP-E-2021) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| MP-S230P-01 Stack230P Product Manual Rev 2 | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| Sunny Central Storage Operating Manual | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| Inverter Transformer Technical Requirements Rev 0 | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| BESS Technical Requirements_Rev. C | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| Exhibit C - FSI0050 Rabbitbrush 2 7-20-2021 | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| Powin Enclosure Product Manual (MP-ENCL-01) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| MP-SOS-MB StackOS-Modbus Product Manual Rev 0 | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| Sunny Central Storage Data Sheet (2475-US) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| MP-S230P-01 Stack230P Product Manual Rev 2 | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |

| | | | |
|---|---|---|---|
| Exhibit C - FSI0040 Rabbitbrush 1 7-20-2021 | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| Powin Enclosure Product Line Datasheet (DP-E-2021) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| Powin Stacks Product Line Datasheet (DP-S 2021) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| Sunny Central Storage Operating Manual | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| Sunbelt_150kVA Aux_434Vprimary | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| Powin Enclosure Product Manual (MP-ENCL-01) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| MP-SOS-MB StackOS-Modbus Product Manual Rev 0 | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| Inverter Transformer Technical Requirements Rev 0 | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| BESS Technical Requirements_Rev. C | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| Pulse - PCE0020_Overhill_ LTSA (fully executed)_12.23.2023 | LTSA (Long Term Service Agreement) | PULSE CLEAN ENERGY SPV WATT LIMITED | 12/22/2023 |
| Northern Reliability - PEC - Kia consulting agreement - 2018.07.10 | Master Service Agreement | Northern Reliability | 06/25/2018 |
| Luminate - PEC - Prof.Services Agreement - 12.30.2020 | Master Service Agreement | Luminate LLC | 12/30/2020 |
| Libess - PEC - Services Agreement - 06.03.2019 | Master Service Agreement | Libess Service | 06/03/2019 |
| JS Renewable Energy - Powin - Professional Services Agreem - 10.11.2022 | Master Service Agreement | JS Renewable Energy | 10/11/2022 |
| Intertek -Powin - MSA 7.21.2021 | Master Service Agreement - ASP | Intertek Testing Services NA Inc. | 07/21/2021 |
| iBase - Powin - PurchasingAgreement - 07.01.2020 | Purchasing Agreement | iBase Gaming Inc. | 07/01/2020 |
| EKS - Powin - Global Master Products Supply Agreement - Oct. 23, 2023 | Master Supply Agreement | Experience Knowledge Strategy, S.L. (EKS) | 10/23/2023 |
| Pulse _Overhill_PCE0020_ESA - Powin (fully executed)_12.22.2023 | ESA (Energy Storage Agreement) | Pulse | 12/22/2023 |
| Bergstrom, Inc. - Powin, LLC - MSA - 12.01.2023 | Master Supply Agreement | Bergstrom Inc. | 12/01/2023 |
| DesertQuartzite_Powin_LTSA_12.12.2023-FullyExecuted | LTSA (Long Term Service Agreement) | Desert Quartzite | 12/12/2023 |
| Pulse Clean Energy SPV Watt Limited - Powin, LLC - LNTP Amendment No. 2 - 12.01.2023 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Pulse Clean Energy SPV Watt Limited | 12/01/2023 |
| Xiamen Hithium Energy Storage Technology Co, Ltd. - Powin - MSA - 12.15.2023 | Master Supply Agreement | Xiamen Hithium Energy Storage Technology Co., Ltd. | 01/01/2024 |

| Strativ Group - Powin, LLC - MSA ASP Installation Work - 12.01.2023 | Master Service Agreement - ASP | Strativ Group | 12/01/2022 |
|---|---|---|---|
| Sonic Systems International, LLC dba Amperion - Powin, LLC - MSA ASP - 04.17.2023 | Master Service Agreement - ASP | Sonic Systems International, LLC dba Amperion | 04/17/2023 |
| GreEnergy Resources, LLC - Powin, LLC - ASP Site Manager Services - 01.05.2023 | Master Service Agreement - ASP | GreEnergy Resources, LLC | 01/05/2023 |
| Clean Energy Services CES LLC - Powin, LLC - ASP Site Manager Services - 12.13.2022 | Master Service Agreement - ASP | Clean Energy Services CES LLC (CES) | 12/13/2022 |
| PRAXIS - Powin - El Sol Energy Storage Rider C Final.docx | Technology Escrow Agreement | El Sol Energy Storage LLC | 12/05/2023 |
| PRAXIS - Powin - Yuma Solar Energy Rider C Final.docx | Technology Escrow Agreement | Yuma Solar Energy LLC | 12/05/2023 |
| INV0111- El Sol - Powin - Technology Escrow Invoicing Agreement - 12.05.2023 (fully executed) | Technology Escrow Agreement | El Sol Energy Storage LLC | 12/05/2023 |
| INV0490 - Yuma - Powin Tech Escrow Invoicing Agreement - 12.5.2023 (fully executed) | Technology Escrow Agreement | Yuma Solar Energy LLC | 12/05/2023 |
| JMS Wind Energy, Inc. - Powin, LLC - ASP Master Service Agreement - 01.19.2023 | Master Service Agreement - ASP | JMS Wind Energy, Inc. | 01/19/2023 |
| Logicalis - Powin, LLC - Service Agreement - 12.08.2023 | Master Service Agreement | Logicalis | 12/08/2023 |
| GAL0020_Alcoutim ESA 12.4.2023 (Fully executed, compiled) | ESA (Energy Storage Agreement) | GALP PARQUES FOTOVOLTAICOS DE ALCOUTIM | 12/04/2023 |
| IOActive Inc. - Powin, LLC - MSA 11.22.2023 | Master Supply Agreement | IOActive, Inc | 11/22/2023 |
| Apex - Angelo-Powin - Long Term Services Agreement (11_17_2023) | LTSA (Long Term Service Agreement) | Angelo Storage LLC | 11/17/2023 |
| Amended and Restated LNTP - Hemingway Expansion (Executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Idaho Power Comapny | 05/19/2023 |
| SUN0050_SunGrid_Kruger HMLP_Order Letter_12JUN2020 - R2 - 2020.06.16 - signed SG | Purchase Order | | |
| Powin_LTSA Proposal_Solvida_Putah Creek_SDA0000_08DEC2022_Signed | LTSA (Long Term Service Agreement) | Putah Creek Solar Farms, LLC | 12/08/2022 |
| Bottleneck LTSA (fully executed) | LTSA (Long Term Service Agreement) | Ormat Nevada, inc. | 11/03/2023 |
| MPI0090 - Wilson - Services Agreement 20190620 | LTSA (Long Term Service Agreement) | Strata Solar Services, LLC | 08/22/2019 |
| Termination Agreement - Framework Agreement (fully executed, compiled w_ appendices) | Framework Agreement | Longroad BESS Procurement, LLC | 12/09/2022 |
| CPE - Powin LNTP 070720 (2) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | CPE Funding Pty Ltd | 07/07/2020 |
| JMA0030 - Jema - Flexitranstore - PO - 12.20.2018 | Purchase Order | Jema Energy S.A | |
| LNTP Letter Agreement Fully Assembled- AMP0194, AMP0195, AMP0196 (3-21-22) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | AMP Solar Development Inc. | 03/21/2022 |
| Poblano -Escrow_Invoicing_Agreement (Poblano) - 11.3.2023 | Technology Escrow Agreement | Poblano Energy Storage, LLC | 11/03/2023 |
| Exhibit U STR0040 Escrow_Agreement PRAXIS Rider C Poblano 11.3.2023 | Technology Escrow Agreement | Poblano Energy Storage, LLC | 11/03/2023 |

| Waratah - Energy Supply Agreement (ESA) - Deed of amendment -11.3.2023 | ESA (Energy Storage Agreement) | Munmorah Battery ProjectCo Pty Ltd | 11/03/2023 |
|---|---|---|---|
| Exhibit U STR0040 Escrow_Agreement PRAXIS Rider C EPC Services Company 11.3.2023 | Technology Escrow Agreement | EPC Services Company | 11/03/2023 |
| Poblano -Escrow_Invoicing_Agreement (EPC Contractor) - 11.3.2023 | Technology Escrow Agreement | EPC Services Company | 11/03/2023 |
| Hummingbird - Exhibit Y - ESV0220 - IP Escrow Agreement - PRAXIS Rider C.docx | Technology Escrow Agreement | Hummingbird Energy Storage, LLC | 10/01/2022 |
| PCE0020 - Overhill - Pulse - Amendment to LNTP | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | PULSE CLEAN ENERGY SPV WATT LIMITED | 10/30/2023 |
| STM0576 - Sharon - Negroni 2 - Purchase Order (compiled, fully executed) | Purchase Order | Stem, Inc. | 10/13/2023 |
| Amp LTSA Update to Form LTSA 4.3 - 3R (fully executed, compiled) | LTSA (Long Term Service Agreement) | ASD THREE RIVERS MA SOLAR LLC | 09/18/2023 |
| Amp LTSA Update to Form LTSA 4.3 FRS (fully executed, compiled) | LTSA (Long Term Service Agreement) | FORT RIVER SOLAR 2 LLC | 09/18/2023 |
| Amp LTSA Update to Form LTSA 4.3 Cotuit (fully executed, compiled) | LTSA (Long Term Service Agreement) | ASD COTUIT MA SOLAR LLC | 09/18/2023 |
| Powin BHER ESA - BHE0021 Solar Star 4 (fully executed) | ESA (Energy Storage Agreement) | Solar Star 4, LLC | 08/31/2023 |
| Powin BHER ESA - BHE0020 Solar Star 3 (fully executed) (1) | ESA (Energy Storage Agreement) | Solar Star 3, LLC | 08/31/2023 |
| LTSA - Ameresco - Hampden (fully compiled, fully executed) | LTSA (Long Term Service Agreement) | Hampden Landfill Solar LLC | 07/31/2023 |
| PCE0020 - Overhill - LNTP (executed, compiled) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | PULSE CLEAN ENERGY SPV WATT LIMITED | 08/04/2023 |
| (EDF0570 - EDF Test Cell PO) 4500138514 | Purchase Order | EDF Renewables | |
| IPC - Powin Black Mesa et al Omnibus LTSA (executed, compiled) | LTSA (Long Term Service Agreement) | Idaho Power Comapny | 08/21/2023 |
| 20210714_AESC_Battery Cell Master Supply Agreement_EXECUTED | Master Supply Agreement | Envision Ruitai Dynamics Technology (Shanghai) Co., Ltd. | 07/07/2021 |
| DocuSign Purchase Order_PO-2544_1625027641312 | Purchase Order | DocuSign Inc. | 06/30/2021 |
| DocuSign Inc - Powin LLC - Order Form - 03.31.2023 | Purchase Order | DocuSign Inc | 03/30/2023 |
| DocuSign Inc - Powin LLC - Order Form - 2021 | Purchase Order | DocuSign Inc. | 06/21/2021 |
| Descartes - Powin, LLC - GLN Services Agreement (ISF) - 2022 | Master Service Agreement | Descartes Systems (USA) LLC | 02/03/2022 |
| CT Corp - PEC - CT Assurance Agreement 2022 - COUNTERSIGNED | Master Service Agreement | CT Corporation System | 10/07/2022 |
| Powin & AESC MSA - Effective 10.01.2023 | Master Supply Agreement | AESC US, LLC. | 10/01/2023 |
| Powin PEC 3P Escrow Agreement 180303 | Technology Escrow Agreement | PPA Grand Johanna | 03/15/2018 |
| Reliance - Powin - MOU - 09062023 | Memorandum of Understanding | Reliance Industries Limited | 09/06/2023 |
| QPO - Powin - Agreement 8.8.2023 | Purchasing Agreement | QPO Energy, LLC | 08/08/2023 |
| PO Box Services Proposal - POWIN ENERGY SPAIN SLU - Gestiona T - 20230403 | Master Service Agreement | Grupo Gestiona T | 01/03/2023 |

| AT&T - Powin Professional Consulting Agreement October 2023 | Master Service Agreement | AT&T Corp | 10/05/2023 |
|---|---|---|---|
| PRAXIS Rider C Great Kiskadee Storage, LLC | Technology Escrow Agreement | Great Kiskadee Storage, LLC | 12/20/2022 |
| PRAXIS Rider C - Chaparral Springs - Powin.docx | Technology Escrow Agreement | Chaparral Springs, LLC | |
| PRAXIS Rider C (Angelo Storage, LLC | Technology Escrow Agreement | Angelo Storage LLC | 12/20/2022 |
| PRAXIS-Powin-Desert-Quartzite-signed-Rider-C | Technology Escrow Agreement | Desert Quartzite, LLC | 12/06/2022 |
| PRAXIS Rider C - Rabbitbrush Solar, LLC | Technology Escrow Agreement | Rabbitbrush Solar, LLC | |
| PRAXIS Rider C - Arrow Canyon Solar | Technology Escrow Agreement | Arrow Canyon Solar, LLC | |
| Powin-Rider-C-Tranquility-Project.docx | Technology Escrow Agreement | SP Tranquility Solar Storage LLC | |
| Powin-Rider-C-Garland-Project.docx | Technology Escrow Agreement | SP Garland Solar Storage LLC | |
| Arizona Mechanics Lien Waiver Forms (Statutory) Powin FINAL - Exh.Q-1 | ESA (Energy Storage Agreement) | Sun Streams Expansion, LLC | |
| Powin-Energy-Ontario-Storage-First-Amendment-to-Powin-Energy-Ontario-Storage-Two-Party-Master-Escr-signed | Technology Escrow Agreement | Powin Energy Ontario Storage II, LP | 05/17/2022 |
| 12.26.21 Powin Rider C - Triple Butte LLC (Jupiter cmts) - FINAL (1) | Technology Escrow Agreement | Triple Butte LLC | |
| 12.26.21 Powin Rider C - Swoose LLC (Jupiter cmts) - FINAL (1) | Technology Escrow Agreement | Swoose LLC | |
| 12.26.21 Powin Rider C - Flower Valley LLC (Jupiter cmts) - FINAL (1) | Technology Escrow Agreement | Flower Valley LLC | |
| Exhibit U - AKE0060 - PRAXIS Rider C - (Final) (1) (1).docx | Technology Escrow Agreement | MUNMORAH BATTERY PROJECTCO PTY LTD; | 12/12/2022 |
| Exhibit X2 - IDP0061 - Powin Tech Escrow Invoicing Agreement_execution_v | Technology Escrow Agreement | Idaho Power Comapny | 09/14/2023 |
| PRAXIS - PEC - Charger-Two-Party-Master-Escrow - 6.21.2018 (Powin Energy Ontario Storage II Rider C) | Technology Escrow Agreement | Praxis Technology Escrow | 06/21/2018 |
| PRAXIS - Powin Idaho Power Company Rider C Final.docx | Technology Escrow Agreement | Idaho Power Comapny | 09/14/2023 |
| 20191113 Praxis Rider C Acorn (esVolta PEC Executed) | Technology Escrow Agreement | Acorn I Energy Storage LLC | 10/01/2019 |
| PRAXIS Rider C Wildcat - FINAL.docx | Technology Escrow Agreement | Wildcat I Energy Storage LLC | 11/25/2019 |
| Serrano - Invoicing Agreement (IP Escrow) _8.8.2023 execution version | Technology Escrow Agreement | Serrano Solar, LLC | 08/23/2023 |
| Coffman_Powin_Full MSA_2021_Clean CEI sig.pdf_signed_2021.12.17.23.39.32 | Master Service Agreement | Coffman Engineers Incorporated | 12/01/2021 |
| Powin PO 5326 - Code Unlimited_Final Revision | Purchase Order | Code Unlimited LLC | 11/15/2022 |

Case 25-16313-MBK   Doc 6591-1   Filed 08/07/25   Entered 08/07/25 23:29:20   Desc Main
Exhibit B - FlexGen Asset Purchase Agreement   Page 485 of 523

Page 485 of 523

| Professional Services Agreement -Powin and Billion | Master Service Agreement | Billion Electric Co., Ltd. | 09/27/2022 |
|---|---|---|---|
| MSA - Ameresco - POWIN CONTRACT - FINAL 9-8-2022.pdf_signed_2022.09.11.10.49.03 | Master Service Agreement - ASP | Ameresco Inc | 09/02/2022 |
| 2017.04.21 - KSAndCo_MSA_Addendum_Q1_2017 | Master Service Agreement | Kieckhafer, Schiffer & Company LLP | 04/21/2017 |
| Powin - ACE Battery PFA - FINAL CLEAN - 03.14.2023 | Framework Agreement | Shenzhen ACE Battery Co., Ltd. | 03/14/2023 |
| Q221028-1_MSA_ACCURE Inc_Powin_final.docx (1) | Master Service Agreement | Accure | 10/28/2022 |
| Clean Peak Energy BESS MSA - 20210217 Execution Version - CPE signed | Master Supply Agreement | CPE Funding Pty Ltd | 02/17/2021 |
| AMR Framework | Framework Agreement | Ameresco Inc | 04/29/2022 |
| Akaysha Framework Agreement_Term Sheet - Executed_2022.03.04 | Framework Agreement | Akaysha Energy Pty Ltd | 03/01/2022 |
| SUN0030-3 Order Letter- Kruger 072319 (executed) | Purchase Order | SunGrid Solutions Inc. | 07/24/2019 |
| MSA Stem - Powin (EXECUTED w PGs and LTSA v2) | Master Supply Agreement | Stem, Inc. | 09/02/2020 |
| SS4 - Invoicing Agreement (IP Escrow) 2023.08.23 | Technology Escrow Agreement | Sun Streams Expansion LLC | 08/23/2023 |
| PRAXIS - Powin Serrano Solar Rider C Final.docx | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | 08/23/2023 |
| PRAXIS - Sun Streams PVS 4 - Rider C Final.docx | Technology Escrow Agreement | Sun Streams Expansion, LLC | 08/23/2023 |
| 2017.03.30 - Tolling Agreement Fully Executed | Purchasing Agreement | San Diego Gas & Electric Company | 03/30/2017 |
| 2017-09-01 SCE-POWIN Goleta ESS1 FINAL EXECUTED | ESA (Energy Storage Agreement) | Southern California Edison Company | 09/01/2017 |
| Termination of LNTP_Angiola SBE0010.docx_signed_2022.06.21.20.39.07 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Angiola East, LLC | 06/21/2022 |
| Termination of LNTP_Angiola SBE0010.docx_signed_2022.06.08.15.28.08 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Angiola East, LLC | 06/08/2022 |
| PO# 192 - Powin Energy - Schaeffler | Purchase Order | Saturn Power Inc. | 04/06/2018 |
| 20191209 - Prisma - Powin MSA_Fully Executed | Master Service Agreement | Prisma Energy Solutions LLC | |
| 3.4.5 Charger - Amended and Restated BESA (PPA Grand Johanna) [EXECUTED] | ESA (Energy Storage Agreement) | PPA Grand Johanna LLC | 12/04/2017 |
| PPA_Energy Storage_RA Only (After Online Date)_2016-08-05_EXECUTED | Purchasing Agreement | Southern California Edison Company | 08/05/2016 |
| Grissom_1st Amendment to PPA_Fully Executed_1.9.2020 | Purchasing Agreement | Grissom Solar, LLC | 01/09/2020 |
| Grissom_2nd Amendment to PPA_Fully Executed_ 5.20.2020 | Purchasing Agreement | Grissom Solar, LLC | 05/20/2020 |
| Grissom_Power Purchase Agreement_09.06.2018 | Purchasing Agreement | North Carolina Electric Membership Corporation | 09/06/2018 |
| Ormat - Powin - OTI0040 - Bottleneck - ESA Amendment #1 - 05.10.2022 | ESA (Energy Storage Agreement) | Ormat Nevada Inc | 03/15/2022 |
| 20201026 - RTC0020 Garland Executed Supply Agreement | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. | 10/26/2020 |

| Tranquillity LTSA Powin Amendment 3 - Availability Calculations (Execution Version 12.8.22).pdf_signed_2022.12.22.09.23.39 | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas Inc | 12/08/2022 |
|---|---|---|---|
| Garland LTSA Powin Amendment 3 - Availability Calculations - 12.08.2022 | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas Inc | 12/08/2022 |
| LNTP 1-2 Payment Release Lien Waivers - Hecate Johanna - Signed 6-22-2020 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Mitsubishi Hitachi Power Systems Americas, Inc. | 06/22/2020 |
| Hecate - LNTP2 Amendment #1 - PECexec | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Mitsubishi Hitachi Power Systems Americas, Inc. | 07/02/2020 |
| PO Windsor PS00010871 | Purchase Order | MITSUBISHI ELECTRIC POWER PRODUCTS, INC (MEPPI) | 12/19/2018 |
| PO Sarnia PS00010872 | Purchase Order | MITSUBISHI ELECTRIC POWER PRODUCTS, INC (MEPPI) | 12/19/2018 |
| PRAXIS-Powin Two Party Master Escrow Agreement - Final 12-17-19.docx | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | 12/17/2019 |
| Powin - REPT - MOU for Indonesia Opportunity - signed 08.14.2023 | Memorandum of Understanding | REPT BATTERO Energy Co., Ltd | 08/01/2023 |
| W. Columbia - Praxis - POWIN - Three Party Technology Escrow Agreement wEX B FINAL | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | 09/26/2019 |
| SP_Powin_Praxis_Escrow Agreement Amendment202203_FE (1) | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | 03/01/2022 |
| Amendment 2 for MAV6 Subcontract .pdf_signed_2022.03.01.21.48.30 | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. | 02/08/2022 |
| Powin - Desay Battery PFA - FINAL CLEAN - 03.15.2023 | Framework Agreement | Huizhou Desay Battery Co., Ltd. | 03/15/2023 |
| APE0070 - Powin Tech Escrow Invoicing Agreement_Executable.docx.pdf_signed_2022.12. 21.07.32.07 | Technology Escrow Agreement | Great Kiskadee LLC | 12/20/2022 |
| APE0060 - Powin Tech Escrow Invoicing Agreement_Executable.docx.pdf_signed_2022.12. 21.07.29.30 | Technology Escrow Agreement | Angelo Storage LLC | 12/20/2022 |
| PO - Powin - Wallum - final (corrected) | Purchase Order | Amp Solar US Services LLC | 08/28/2020 |
| Oak_Hill_2-Assignment_of_Rights_under_Purchase_Order_(a mp_9-3-21)-Execution | Purchase Order | Oak Hill Solar 2 LLC | 09/03/2021 |
| Oak_Hill_1-Assignment_of_Rights_under_Purchase_Order_(a mp_9-3-21)-Execution | Purchase Order | Oak Hill Solar 1 LLC | 09/03/2021 |
| AKA0010 - Amendment 1 - 4 March 22_AKA Fully Executed | ESA (Energy Storage Agreement) | Aspin Kemp & Associates Inc | 12/23/2021 |
| Powin 20191028 - PEC BESA - Base v.9 (PEC Executed 06.11.21) - Ventura | ESA (Energy Storage Agreement) | Powerflex Systems, Inc. | 06/11/2021 |
| KIA0000 - Purchase Agreement - MEPPI and Powin | Purchasing Agreement | Mitsubishi Electric Power Products, Inc. (MEPPI) | 08/29/2018 |
| Rider-C-Powin-KCE-TX-Holdings-2020-Operating-Projects-NRF-12.31.DOCX | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | 01/13/2021 |
| Rider-C-KCE-Powin-PEC-Construction-ProjectsNRF-12.31.DOCX | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | |

| Rider-C-KCE-Powin.docx | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | |
| PRAXIS - Powin - Sun Streams PVS Rider C executed | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | 07/24/2023 |
| PRAXIS - Ulinda Park - Exhibit U - AKE0010 Rider C -executed | Technology Escrow Agreement | PRAXIS Technology Escrow, LLC | 07/25/2023 |
| Powin & BQC MSA - signed 08.01.2023 | Master Supply Agreement | Shenzhen Baiqiancheng Electronic Co.,Ltd | |
| TPE0010 - Purchase Order | Purchase Order | TPE Energy, Inc. | 10/27/2020 |
| TPE 0080_Powin_Form_BESA_TPE_225_TPE0 | ESA (Energy Storage Agreement) | TPE Energy, Inc. | 11/18/2021 |
| TPE 0070_Powin_Form_BESA_TPE_230P_TPE | ESA (Energy Storage Agreement) | TPE Energy, Inc. | 11/18/2021 |
| Three Rivers - AMP0196 - BESA (fully executed) | ESA (Energy Storage Agreement) | AMP Solar US Services LLC | 07/28/2022 |
| Sunstreams 3 - Limited Notice to Proceed (Executed fully assembled) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Sun Streams PVS, LLC | 09/12/2022 |
| SUN0040 - SunGrid - Small Fry - OL | Purchase Order | Sungrid Solutions | 08/08/2019 |
| Strata-Powin MSA Term Sheet 07-07-22 Fully Executed | Master Supply Agreement | Strata Solar, LLC | 07/07/2022 |
| Strata Poblano LNTP (executed, compiled) (2)_small | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Poblano, Energy Storage, LLC | 12/19/2022 |
| Strata Poblano ESA (fully executed and compiled) | ESA (Energy Storage Agreement) | Poblano Energy Storage, LLC | 04/17/2023 |
| STR0010 - GUC Evans Substation - Services Agreement | LTSA (Long Term Service Agreement) | Strata Solar, LLC | 10/27/2020 |
| STR0010 - GUC Evans Substation - BESA | ESA (Energy Storage Agreement) | Strata Solar, LLC | 03/27/2020 |
| STM0913-BWV_Palmer_Sykes_Purchase_Order_11953_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 |
| STM0912-BWV_Douglas_Oak_Purchase_Order_11958_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 |
| STM0911-BWV_Dighton_Tremont_Purchase_Order_11957_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 |
| Yuma Supply Agreement (executed, compiled with exhibits) | ESA (Energy Storage Agreement) | Yuma Solar Energy LLC | 05/19/2023 |
| YUMA PCS LNTP Letter Agreement (fully executed 3.13.23) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Yuma Solar Energy LLC | 03/13/2023 |
| Ysolar_PO_Leader_20210824 | Purchase Order | Leader Energy Storage Technology Co., Ltd | 08/24/2021 |
| Willow Springs - ESSA - FULLY COMPILED AND EXECUTED - 7-27-2022_small | ESA (Energy Storage Agreement) | Chaparral Springs, LLC | 07/27/2022 |
| WEG0020 - Demo Stack225 - Purchase Order | Purchase Order | WEG Electric Corp | 02/24/2020 |
| WEG0020 - Demo Stack225 - PO | Purchase Order | WEG Electric Corp | 01/28/2020 |

| TX11 CSA Amendment 1 dually signed | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 06/14/2022 |
|---|---|---|---|
| STM0652-Dark_N_Stormy_II_Purchase_Order_11633_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 |
| STM0651-Dark_N_Stormy_I_Purchase_Order_11634_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 |
| STM0572-Velvet_Mite_CPR_Purchase_Order_12288_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 |
| STM0571-Velvet_Mite_TR_Purchase_Order_12285_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 |
| STM0578-Velvet_Mite_SD_Purchase_Order_12283_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 |
| STM0577-Velvet Mite ML Purchase Order 12282 (assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 |
| STM0576-Velvet_Mite_MR_Purchase_Order_12287_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 |
| STM0574-Velvet_Mite_BR_Purchase_Order_12284_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 |
| STM0573-Velvet_Mite_QR_Purchase_Order_12286_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 |
| STM0493-Mosquito_III_Purchase_Order_11635_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 |
| STM0492-Mosquito_II_Purchase_Order_11637_(assembled)_small | Purchase Order | Stem, Inc. | 03/08/2023 |
| STM0491-Mosquito_I_Purchase_Order_11636_(assembled)(1)_small | Purchase Order | Stem, Inc. | 03/08/2023 |
| Southern TQ_MPA LTSA - Powin Subcontract - 6-30 - Fully Executed | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 06/28/2021 |
| Southern Garland_MPA LTSA Powin Subcontract 6-30 - Fully Executed | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 06/28/2021 |
| Sol System - BESS Supply Agreement (Fully executed) | ESA (Energy Storage Agreement) | SCS Van Wyck 012823 Croton On Hudson, LLC | 11/23/2021 |
| Slocum ESA (fully executed, compiled) | ESA (Energy Storage Agreement) | DTE Electric Company | 12/15/2022 |
| Signed LES0010 BESA | ESA (Energy Storage Agreement) | Leader Energy Storage Technology Co., Ltd | 09/30/2022 |
| SBE0010 Angiola LNTP (executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Angiola East, LLC | 03/17/2022 |
| Santa Paula OMA (Executed) | LTSA (Long Term Service Agreement) | Santa Paula Energy Storage, LLC | 10/21/2021 |

| Santa Paula BESA Powin - esVolta (Executed) | ESA (Energy Storage Agreement) | Santa Paula Energy Storage, LLC | 10/21/2021 |
|---|---|---|---|
| RCT0030 - Tranquillity - BESSA - 20201123 | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 11/23/2020 |
| Rabbitbrush 2 - Leeward - Powin BESA SA (executed)[71635] | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| Rabbitbrush 1 - Leeward - Powin BESA SA (executed) (1) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 07/09/2021 |
| Quote - QPO0030 (Richard Signed) | Purchase Order | QPO Energy, LLC | 10/14/2021 |
| Quote - QPO0010-QPO Taiwan (Richard Signed) | Purchase Order | QPO Energy, LLC | 10/01/2021 |
| Purchase Order 10711 Powin 20210603 V3 (002) - signed | Purchase Order | Stem, Inc. | 06/08/2021 |
| Purchase Order 10459 20210210 Stem - Fully Assembled - Fully Executed 20210308 | Purchase Order | Stem, Inc. | 02/28/2021 |
| Purchase Order 10425 20210114 Stem Signed | Purchase Order | Stem, Inc. | 01/14/2021 |
| PRAXIS Rider C - Powin 191112 - West Warwick Energy Storage III, LLC.docx | Technology Escrow Agreement | Convergent Energy and Power LP | |
| PRAXIS Rider C - Powin 191112 - West Warwick Energy Storage II, LLC.docx | Technology Escrow Agreement | Convergent Energy and Power LP | |
| PRAXIS Rider C - Powin 191112 - West Warwick Energy Storage I, LLC.docx | Technology Escrow Agreement | Convergent Energy and Power LP | |
| PPS0000 - Silver Oak - PO | Purchase Order | Pure Power Solutions, Inc. | 02/27/2018 |
| Powin-LRE Sunstreams ESA (fully executed, compiled w exhibits) | ESA (Energy Storage Agreement) | Sun Streams PVS, LLC | 12/09/2022 |
| Powin_LTSA_Az_Sun_El_Sol_Orangeville_FINAL | LTSA (Long Term Service Agreement) | Invenergy Services LLC | 03/01/2022 |
| Powin_Akaysha_Waratah_LTSA_(compiled_fully_executed) | LTSA (Long Term Service Agreement) | Munmorah Battery ProjectCo Pty Ltd | 12/16/2022 |
| Powin Project Addendum Hannover (FINAL PROJECT ADDENDUM 05.25.21) - CLEAN Fully Executed | Master Supply Agreement | Mitsubishi Electric Power Equipment, Inc. (MEPPI) | 05/25/2021 |
| Powin Master Agreement 5-25-21 (FINAL MAIN BODY 05.25.21) - CLEAN Fully Executed | Master Supply Agreement | Mitsubishi Electric Power Products, Inc. (MEPPI) | 05/25/2021 |
| Town of La Grange - Powin - LTSA - 06.30.2021 | LTSA (Long Term Service Agreement) | La Grange, an Incorporated North Carolina Town | 06/30/2021 |
| Powin LTSA - Bruce Power - 20230501 fully executed | LTSA (Long Term Service Agreement) | Saturn Battery I LP | 05/01/2023 |
| Powin LNTP - NY ESRT Equipment and Schedule Form (executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Powerflex Systems, Inc. | 02/25/2022 |
| Powin LNTP - CSU Fullerton Equipment and Schedule Form (executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Powerflex Systems, Inc. | 02/25/2022 |
| Powin Executed MSA Stem - Powin 1st Restated - 20220914 Execution Version - FE | Master Supply Agreement | Stem, Inc. | 09/14/2022 |

| | | | |
|---|---|---|---|
| Powin APS - Project Contract (Paloma & Cotton Center) (executed) | ESA (Energy Storage Agreement) | Arizona Storage Development LLC | 03/05/2021 |
| Powin APS - Project Contract (Hyder 1 & Hyder 2) (executed) | ESA (Energy Storage Agreement) | Arizona Storage Development LLC | 03/05/2021 |
| Powin APS - Project Contract (Gila Bend 1 & Gila Bend (executed) | ESA (Energy Storage Agreement) | Arizona Storage Development LLC | 03/05/2021 |
| Powin APS - Project Contract (Foothills 1 & Foothills 2) (executed) | ESA (Energy Storage Agreement) | Arizona Storage Development LLC | 03/05/2021 |
| Powin APS - Project Contract (Desert Star) (executed) | ESA (Energy Storage Agreement) | Arizona Storage Development LLC | 03/05/2021 |
| Powin 20191028 - PEC BESA - Base v.9 (PEC Executed 06.11.21) - Thousand Oaks | ESA (Energy Storage Agreement) | Powerflex Systems, Inc. | 06/11/2021 |
| Powin - LRD Serrano ESA (fully executed assembled with exhibits) | ESA (Energy Storage Agreement) | Serrano Solar, LLC | 05/05/2023 |
| Powin - IPC BESA - IDP0070 (Melba) (executed) | ESA (Energy Storage Agreement) | Idaho Power Company | 12/28/2021 |
| Powin - IPC BESA - IDP0050 (Elmore) (executed) | ESA (Energy Storage Agreement) | Idaho Power Company | 12/28/2021 |
| Powin - IPC BESA - IDP0030 (Filer) (executed) | ESA (Energy Storage Agreement) | Idaho Power Company | 12/28/2021 |
| Powin - IPC BESA - IDP0010 (Weiser) (executed) | ESA (Energy Storage Agreement) | Idaho Power Company | 12/28/2021 |
| Powin - CEP BESA - WWIII (Executed)[94637]_small | ESA (Energy Storage Agreement) | Convergent Energy and Power LP | 02/16/2022 |
| Powin - CEP BESA - WWII (Executed)[94638]_small2 | ESA (Energy Storage Agreement) | Convergent Energy and Power LP | 02/16/2022 |
| Powin - CEP BESA - WWI (Executed)[94575]_small | ESA (Energy Storage Agreement) | Convergent Energy and Power LP | 02/16/2022 |
| Powin - AKA0010 BESA (EXECUTED) | ESA (Energy Storage Agreement) | AKA Group | 12/23/2021 |
| PO2022-001-Powin | Purchase Order | Leader Energy Storage Technology Co., Ltd | 03/03/2022 |
| PO003 - Quilhurst | Purchase Order | QPO Energy, LLC | 10/14/2021 |
| PO001 - Taiwan | Purchase Order | QPO Energy, LLC | 10/14/2021 |
| PO 4415070665 R5 | Purchase Order | Honeywell Limited - HPS CA | 12/01/2020 |
| PNM Rio Del Oro - LNTP(Fully Executed) (1) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Public Service Company of New Mexico | 03/09/2023 |
| PNM Powin - South Valley EPA (fully executed, compiled with exhibits)[203748] | ESA (Energy Storage Agreement) | Public Service Company of New Mexico | 05/01/2023 |

| PGR0020 - Rochester - LNTP | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Pine Gate Renewables, LLC | 10/06/2020 |
|---|---|---|---|
| PGR0010 - Tremont - LNTP | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Pine Gate Renewables, LLC | 10/06/2020 |
| PGE0010 - PGE- BPSC - PO | Purchase Order | Portland General Electric (PGE) | 10/07/2019 |
| PEC to PEOS II Battery Equipment supply Agreement | ESA (Energy Storage Agreement) | Powin Energy Ontario Storage, LLC | 07/01/2017 |
| PAC0010 - Klamath Falls -Materiasl Supply and Installation Contract - EC | ESA (Energy Storage Agreement) | Pacificorp | 10/06/2021 |
| PAC0010 - Klamath Falls - NTP | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Pacificorp | 10/07/2021 |
| Ormat Equipment Supply Agreement (executed)_small | ESA (Energy Storage Agreement) | Ormat Nevada Inc. | 03/15/2022 |
| BESA Or Haner | ESA (Energy Storage Agreement) | Auto-Chen Ltd | 06/09/2021 |
| OPL0010 - EPC Integration for Opalco by SunGrid | Purchase Order | Orcas Power & Light Cooperative (OPALCO) | 12/04/2019 |
| OPL0010 - Decatur EPC Agreement - 20190712 | ESA (Energy Storage Agreement) | Orcas Power & Light Cooperative (OPALCO) | 07/12/2019 |
| Oak Hill 2 Powin PO | Purchase Order | Amp Solar US Services LP | 01/25/2021 |
| Oak Hill 1 Powin PO | Purchase Order | Amp Solar US Services LP | 01/25/2021 |
| Novasource - Powin Limited Services Agreement.docx | LTSA (Long Term Service Agreement) | Northstar Energy Management, LLC | 02/27/2023 |
| NIS0040 - NIDEC - Disney Bahamas - PO | Purchase Order | Nidec ASI S.p.A. | 05/29/2019 |
| BESA Nir Yitzac 3 | ESA (Energy Storage Agreement) | Auto-Chen Ltd | 06/09/2021 |
| BESA Nir Yitsac 2 | ESA (Energy Storage Agreement) | Auto-Chen Ltd | 06/09/2021 |
| Neat Mordechai - ESA - 6.9.2021 | ESA (Energy Storage Agreement) | Auto-Chen Ltd | 06/09/2021 |
| MTA-45002234641 | Purchase Order | Mesa Technical Associates, Inc. | 10/01/2019 |
| Millikan - PPA Grand Johanna - O&M Agreement | LTSA (Long Term Service Agreement) | PPA Grand Johanna LLC | 12/04/2017 |
| MidAm ESS Supply Agreement FINAL 10.3.18_Fully Executed | ESA (Energy Storage Agreement) | Invenergy Storage Development LLC | 10/02/2018 |
| MHP0230 - KCE TX23 - LNTP | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Mitsubishi Hitachi Power Systems Americas, Inc. (MHPS) | 07/16/2020 |
| MHP0230 - KCE TX 23 - BESSA - MPA | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 10/16/2020 |
| MHP0120 - KCE TX12 - LNTP | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Mitsubishi Hitachi Power Systems Americas, Inc. (MHPS) | 07/16/2020 |

| MHP0120 - KCE TX 12 - BESSSA - MPA | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 10/16/2020 |
|---|---|---|---|
| MHP0110 - KCE TX11 - LNTP | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Mitsubishi Hitachi Power Systems Americas, Inc. (MHPS) | 07/16/2020 |
| MHP0110 - KCE TX 11 - Service Agreement | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 05/19/2021 |
| MHP0110 - KCE TX 11 - BESSA - MPA | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 10/15/2020 |
| MHP0010 - Fredonia - PO | Purchase Order | Mitsubishi Hitachi Power Systems Americas, Inc. (MHPS) | 03/25/2020 |
| MHP0010 - Fredonia - Order Letter | Purchase Order | Mitsubishi Hitachi Power Systems Americas, Inc. (MHPS) | 03/05/2020 |
| MEP0020 - ITC Test Bed - MSA | Master Supply Agreement | Mitsubishi Electric Power Products, Inc. (MEPPI) | 02/27/2019 |
| Mav6 Powin LTSA - 20210719 Fully Executed | LTSA (Long Term Service Agreement) | Maverick Solar 6, LLC | 07/19/2021 |
| LTSA_-_GOElectric_-_Confederation_College_(Powin_2023-01-17_-_Fully_Compiled) | LTSA (Long Term Service Agreement) | Go Electric, Inc | 02/02/2023 |
| LRE (Longroad)-Powin Definitive Framework Agreement (Executed) | Framework Agreement | Longroad BESS Procurement LLC | 01/07/2022 |
| LRE - Powin - Rabbitbrush 2 Battery LTSA - 03.18.2022 | LTSA (Long Term Service Agreement) | Rabbitbrush Solar, LLC | 03/18/2022 |
| LRE - Powin - Rabbitbrush 1 Battery LTSA - 03.18.2022 | LTSA (Long Term Service Agreement) | Rabbitbrush Solar, LLC | 03/18/2022 |
| Longroad SS4 ESA (assembled, fully executed)_small | ESA (Energy Storage Agreement) | Sun Streams Expansion, LLC | 03/10/2023 |
| Long Term Services Agreement for ESS between Chaparral Springs, LLC and Powin, LLC for the Willow Springs Solar 3 project (fully | LTSA (Long Term Service Agreement) | Chaparral Springs, LLC | 08/08/2022 |
| Long Term Services Agreement for ESS between Chaparral Springs, LLC and Powin, LLC for the Chaparral Solar project (fully execut | LTSA (Long Term Service Agreement) | Chaparral Springs, LLC | 08/08/2022 |
| Lonestar ESA - SCL0020 (fully executed, compiled with all exhibits) | ESA (Energy Storage Agreement) | Lone Star Solar, LLC | 05/01/2023 |
| LNTP_DYN0108_POWIN (051022) CLEAN - fully executed | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Dynapower Company, LLC | 05/10/2022 |
| LNTP_DYN0107_Powin_05.092022 Clean Final - fully executed | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Dynapower Company, LLC | 05/10/2022 |
| LNTP Side Letter DYN0108 Powin 05.24.2022 Executable | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Dynapower Company, LLC | 05/24/2022 |
| LNTP Side Letter DYN0107 Powin 05.24.2022 Executable | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Dynapower Company, LLC | 05/24/2022 |

| LES0010-Leader Energy Storage_210806-signed | Purchase Order | Leader Energy Storage Technology Co., Ltd | 08/06/2021 |
|---|---|---|---|
| Leader PO2022-001 Fully Executed | Purchase Order | Leader Energy Storage Technology Co., Ltd | 03/03/2022 |
| LaGrange Strata - Powin BESA (EXECUTED) | ESA (Energy Storage Agreement) | Strata Solar, LLC | 08/12/2021 |
| La Grange Powin LNTP - Strata_2021.07.07_EXECUTED | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Strata Storage, LLC | 07/02/2021 |
| KMC0010 LNTP Letter Agreement - Brandywine (fully executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | KMC Thermo, LLC | 03/15/2022 |
| STM0000 - Stem - Master Service Agreement (3) | Master Supply Agreement | Stem, Inc. | 09/02/2020 |
| Stem Portfolio LNTP Letter Agreement 20220303 - Execution Version FE | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Stem, Inc. | 03/03/2022 |
| SPI0040 - HoneywellSaturn - Bruce - Subcontract Agreement - A1 | ESA (Energy Storage Agreement) | Honeywell International Inc. / Honeywell Process Solutions | 01/11/2019 |
| SPI0040 - HoneywellSaturn - Bruce - PO | Purchase Order | Honeywell Limited - HPS CA | 03/01/2019 |
| SPI0040 - Honeywell Saturn - Bruce - Goods and Services Agreement | ESA (Energy Storage Agreement) | Honeywell International Inc. / Honeywell Process Solutions | 01/18/2019 |
| SPC0030 - Southern CO - PowerSecure - PO and Terms | Purchase Order | Southern Power Company (SPC) | 02/20/2019 |
| SPC0030 - Southern Co - PowerSecure - OL | Purchase Order | Southern Power Company (SPC) | 11/19/2019 |
| KCE0080 - PO #3 - KCE - Worsham | Purchase Order | KCE TX 8, LLC | 05/22/2020 |
| KCE0070 - KCE TX7 - Services Agreement_EXECUTED | LTSA (Long Term Service Agreement) | KCE TX 7, LLC | 06/01/2020 |
| KCE0070 - PO - KCE - Flat Top | Purchase Order | KCE TX 7, LLC | 05/22/2020 |
| KCE0060 - NY3 - Service Agreement | LTSA (Long Term Service Agreement) | Key Capture Energy, LLC (KCE) | 06/01/2020 |
| KCE0060 - PO - KCE - NY3 | Purchase Order | Key Capture Energy, LLC (KCE) | 02/20/2020 |
| KCE_TX-12_Powin-MPA_CSA - Executed Version | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 05/19/2021 |
| KCE TX-23_Powin-MPA_CSA_Executed Version | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 05/19/2021 |
| KCE TX1TX2TX3 - LNTP 2 - 20190201 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Key Capture Energy, LLC (KCE) | 01/31/2019 |
| KCE TX1TX2TX3 - LNTP - 20190115 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Key Capture Energy, LLC (KCE) | 01/15/2019 |

| KCE - Master Equipment Supply Agreement TX NY | Master Supply Agreement | Key Capture Energy, LLC (KCE) | 01/15/2019 |
| JPR0030 - Triple Butte - Services Agreement | LTSA (Long Term Service Agreement) | Triple Butte, LLC | 08/21/2020 |
| JPR0030 - Triple Butte - PO 003 | Purchase Order | Triple Butte, LLC | 08/21/2020 |
| JPR0020 - Flower Valley - Service Agreement | LTSA (Long Term Service Agreement) | Flower Valley, LLC | 05/15/2020 |
| JPR0020 - Flower Valley - PO 001 | Purchase Order | Flower Valley, LLC | 05/15/2020 |
| JPR0010 - Swoose - Services Agreement | LTSA (Long Term Service Agreement) | Swoose, LLC | 05/15/2020 |
| JPR0010 - Swoose - PO 002 | Purchase Order | Swoose, LLC | 05/15/2020 |
| JPR0000 - Jupiter Power - Master Supply Agreement | Master Supply Agreement | Jupiter Power, LLC | 05/15/2020 |
| JMA0030 - Jema - Flexitranstore - PO | Purchase Order | Jema Energy S.A. | 12/20/2018 |
| INV0030 - Insurgentes - Supply Agreement | ESA (Energy Storage Agreement) | MG HR, S. de R.L. de C.V. | 12/20/2019 |
| INV0030 - Insurgentes - Amendment 1 | ESA (Energy Storage Agreement) | MG HR, S. de R.L. de C.V. | 01/31/2020 |
| INV0020 - Orangeville - PO ORS111127 | Purchase Order | Orangeville Energy Storage LLC | 11/02/2020 |
| INV0020 - Orangeville - BESSSA | ESA (Energy Storage Agreement) | Orangeville Energy Storage LLC | 11/02/2020 |
| INV0000 - Invenergy - Master Supply Agreement | ESA (Energy Storage Agreement) | Invenergy Storage Development LLC | 12/20/2019 |
| Hummingbird Powin LTSA (assembled, executed) | LTSA (Long Term Service Agreement) | Hummingbird Energy Storage, LLC | 02/10/2023 |
| Hummingbird Limited Notice to Proceed (compiled executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | esVolta Development, LLC | 12/29/2022 |
| Hummingbird - ESV0220 - ESA (assembled, fully executed) | ESA (Energy Storage Agreement) | Hummingbird Energy Storage, LLC | 02/03/2023 |
| Honeywell_Powin_LTSA_EXECUTED_2021.08.18 | LTSA (Long Term Service Agreement) | Honeywell International | 08/18/2021 |
| HNL0077 - Hydro Extrusions - PO 4415658515 R1 | Purchase Order | Honeywell Limited - HPS CA | 09/23/2020 |
| HNL0072 - Honeywell - Malpack 1.1 - PO - A1 | Purchase Order | Honeywell Limited - HPS CA | 05/01/2020 |
| HNL0071 - Malpack 1.2 - PO 4415000886 R8 | Purchase Order | Honeywell Limited - HPS CA | 05/01/2020 |
| HNL0070 - Canopy Growth - PO 4415070665 | Purchase Order | Honeywell Limited - HPS CA | 03/24/2020 |
| HNL0069 - Toyota Boshoku - PO 4415001119 R6 | Purchase Order | Honeywell Limited - HPS CA | 05/01/2020 |
| HNL0068 - Pillers Waterloo - PO 4414731331 R9 | Purchase Order | Honeywell Limited - HPS CA | 04/18/2020 |

| | | | |
|---|---|---|---|
| HNL0068 - Pillers Waterloo - PO 4414731331 R7 | Purchase Order | Honeywell Limited - HPS CA | 04/02/2020 |
| HNL0067 - Pillers Brantford - PO 4414731269 R8 | Purchase Order | Honeywell Limited - HPS CA | 04/02/2020 |
| HNL0066 - Rich Foods - PO 4414731328 R8 | Purchase Order | Honeywell Limited - HPS CA | 04/02/2020 |
| HNL0065 - Honeywell - Molson Coors - PO - A1 | Purchase Order | Honeywell Limited - HPS CA | 05/01/2020 |
| HNL0064 - Decast - PO 4414731297 R9 | Purchase Order | Honeywell Limited - HPS CA | 04/02/2020 |
| HNL0062 - Kelloggs - PO 4414731277 R8 | Purchase Order | Honeywell Limited - HPS CA | 04/02/2020 |
| HNL0061 - Enbridge - PO 4415000441 R6 | Purchase Order | Honeywell International, Inc. | 05/01/2020 |
| HNL0000 - Honeywell - MSA - EC | Purchasing Agreement | Honeywell International, Inc. | 03/21/2019 |
| HNL0000 - Honeywell - Addendum - EC | ESA (Energy Storage Agreement) | Honeywell International, Inc. | 12/20/2019 |
| HES0010 - Hunt - Demo - Order Letter | Purchase Order | Hunt Energy Solutions | 06/11/2019 |
| Hemingway IPC BESA 80MW (executed & assembled)_small | ESA (Energy Storage Agreement) | Idaho Power Company | 02/28/2022 |
| Hemingway Expansion ESA (executed, compiled) | ESA (Energy Storage Agreement) | Idaho Power Company | 06/08/2023 |
| HEM0070 - Ukraine - PO and Order Letter | Purchase Order | Sungrid Solutions | 09/04/2020 |
| HEC0070 - Kitchener II - OM Agreement - 20181030 | LTSA (Long Term Service Agreement) | Hecate Energy Ontario Storage VII, LP | 10/30/2018 |
| HEC0070 - Kitchener II - BESA | ESA (Energy Storage Agreement) | Hecate Energy Ontario Storage VII, LP | 03/01/2018 |
| HEC0050 - Johanna - Supply Agreement LNTP | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Mitsubishi Hitachi Power Systems Americas, Inc. (MHPS) | 05/28/2020 |
| HEC0050 - Johanna - Supply Agreement - LNTP2 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Mitsubishi Hitachi Power Systems Americas, Inc. (MHPS) | 06/11/2020 |
| HEC0050 - Johanna - Subcontract | ESA (Energy Storage Agreement) | Mitsubishi Hitachi Power Systems Americas, Inc. (MHPS) | 08/31/2020 |
| HEC0050 - Johanna - Long Term Service Agreement | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 01/25/2021 |
| Great Kiskadee ESA (Executed) | ESA (Energy Storage Agreement) | Great Kiskadee Storage, LLC | 08/26/2022 |
| GOE0060 - Thunder Bay - BESA - 20180831 | ESA (Energy Storage Agreement) | Go Electric Inc | 08/31/2018 |
| GLP0020 - West Columbia - Services Agreement | LTSA (Long Term Service Agreement) | West Columbia Storage, LLC | 09/09/2019 |
| GLP0020 - West Columbia - BESSSA | ESA (Energy Storage Agreement) | West Columbia Storage, LLC | 02/26/2019 |
| GLP0020 - Glidepath - W. Columbia - Second Amendment to ESSSA (EXECUTED) | ESA (Energy Storage Agreement) | West Columbia Storage, LLC | 10/04/2019 |

| | | | |
|---|---|---|---|
| GLP0020 - Glidepath - W. Columbia - First Amendment to ESSSA (EXECUTED) | ESA (Energy Storage Agreement) | West Columbia Storage, LLC | 09/09/2019 |
| GDS0010 - Gridspan - Pilot Order | Purchase Order | Gridspan Energy | 10/29/2018 |
| FRS - AMP0195 - BESA (fully executed) | ESA (Energy Storage Agreement) | AMP Solar US Services LLC | 07/28/2022 |
| Framework Agreement - Akaysha_Powin_EXECUTED_2022.04.18 | Framework Agreement | Akaysha Energy Pty Ltd | 04/18/2022 |
| Form Blanket Purchase Order 20210218 FINAL Signed 20210219 - PEC | Purchase Order | Stem, Inc. | 02/22/2021 |
| First_LTSA_Amendment_-_Tranquillity_rev_BJ_7-21-2021_-_clean | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 07/21/2021 |
| First_LTSA_Amendment_-_Garland_rev_BJ_7-21-2021_-_clean | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 07/21/2021 |
| First_BESA_Subcontract_Amendment__-_Tranquillity_rev_BJ_7-21-2021 | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 11/23/2020 |
| First_BESA_Subcontract_Amendment__-_Garland_rev_BJ_7-21-2021 | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 10/26/2020 |
| First_Amendment_TX23_2021.05.19_EXECUTED | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 10/16/2020 |
| First_Amendment_TX12_2021.05.19_EXECUTED | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 10/16/2020 |
| First_Amendment_TX11_2021.05.19_EXECUTED | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 10/16/2020 |
| First Amendment to Powin - Rabbitbrush 2 Supply Agreement (9-16-21) | ESA (Energy Storage Agreement) | Rabbitbrush Solar, LLC | 09/17/2021 |
| First Amendment to Powin - Rabbitbrush 1 Supply Agreement (9-16-21) | ESA (Energy Storage Agreement) | Rabbitbrush Solar LLC | 09/17/2021 |
| Final_Dry_Bridge__LNTP_-_Powin_Signed_11-11-2021 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Strata Solar, LLC | 11/11/2021 |
| KCE0090 - TX2 - Port Lavaca - Services Agreement | LTSA (Long Term Service Agreement) | KCE TX 2, LLC | 06/01/2020 |
| KCE0090 - Port Lavaca - PO - 20200522 | Purchase Order | KCE TX 2, LLC | 05/22/2020 |
| KCE0080 Powin Services Agreement - TX 8 - EXECUTED | LTSA (Long Term Service Agreement) | KCE TX 8, LLC | 06/01/2020 |
| EVE LF280K PO | Purchase Order | PuYuan Green Energy Inc. | |
| ESRT Powin ESA-Centipede (executed w_ exhibits)[142956] | ESA (Energy Storage Agreement) | PowerFlex Systems, LLC | 12/09/2022 |
| Elmbrook Powin PO | Purchase Order | Amp Solar US Services LP | 01/19/2021 |
| El Sol AR Supply Agreement (executed, compiled) | ESA (Energy Storage Agreement) | El Sol Energy Storage LLC | 05/19/2023 |

| El Sol - Energy Storage System Supply Agreement 04.09.21 (executed) | ESA (Energy Storage Agreement) | El Sol Storage Energy LLC | 04/09/2021 |
|---|---|---|---|
| EDF-Powin BESS MSA (Executed - September 9, 2022)_small | ESA (Energy Storage Agreement) | EDF Renewables Development, Inc. | 09/09/2022 |
| EDF0070 - Mav 6 - BESS Subcontract Agreement | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 12/22/2020 |
| EDF0070 - Amendment 1 to BESS Subcontract - final - PEC exec | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 02/26/2021 |
| EDF0050 - Big Beau 2 - Subcontract Agreement | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 02/01/2021 |
| EDF0050 - Big Beau 2 - BESSSA | ESA (Energy Storage Agreement) | BigBeau Solar, LLC | 02/01/2021 |
| EDF0040 - Big Beau 1 - Subcontract Agreement | ESA (Energy Storage Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 02/01/2021 |
| ESV0290 - Third Powin Letter Agreement - Acorn-FINAL - signed (1) | ESA (Energy Storage Agreement) | Acorn I Energy Storage LLC | 06/08/2021 |
| ESV0290 - esVolta - Operation & Maintenance Agreement | LTSA (Long Term Service Agreement) | Acorn I Energy Storage LLC | 11/06/2019 |
| ESV0290 - esVolta - Acorn BESA | ESA (Energy Storage Agreement) | Acorn I Energy Storage LLC | 11/06/2019 |
| ESV0090 - esVolta - Wildcat BESA | ESA (Energy Storage Agreement) | Wildcat I Energy Storage, LLC | 11/06/2019 |
| ESV0090 - esVolta - Operations & Maintenance Agreement | LTSA (Long Term Service Agreement) | Wildcat I Energy Storage, LLC | 11/06/2019 |
| ESV0000 - Stratford - OM Agreement | LTSA (Long Term Service Agreement) | Powin Energy Ontario Storage, LLC | 03/29/2018 |
| CSU Powin ESA-Centipede (executed w_exhibits)[143046] | ESA (Energy Storage Agreement) | PowerFlex Systems, LLC | 12/09/2022 |
| CSE0010 - Countryside - Purchase Order | Purchase Order | CS Energy, LLC | 09/29/2020 |
| CPE0070 - CPE - Waneroo - BESA | ESA (Energy Storage Agreement) | Clean Peak Energy (CPE) | 09/09/2019 |
| CPE0040 - CPE - Lansell Square - BESA | ESA (Energy Storage Agreement) | Clean Peak Energy (CPE) | 09/09/2019 |
| CPE0030 - CPE - Bateau -BESA | ESA (Energy Storage Agreement) | Clean Peak Energy (CPE) | 09/09/2019 |
| CPE0020 - CPE - Salamander Bay - BESA | ESA (Energy Storage Agreement) | Clean Peak Energy (CPE) | 09/09/2019 |
| Cotuit - AMP0194 - BESA (fully executed) | ESA (Energy Storage Agreement) | AMP Solar US Services LLC | 07/28/2022 |
| Waratah_Energy_Supply_Agreement (fully executed, compiled) | ESA (Energy Storage Agreement) | Munmorah Battery ProjectCo Pty Ltd | 11/04/2022 |
| CleanPeak Energy MSA PO form 20210602 Final Executed | Purchase Order | Clean Peak Energy (CPE) | 05/20/2021 |
| CLEAN Powin - 20191028 - PEC BESA - PEC v.11 Final Tremont - 02192021 - Fully Executed | ESA (Energy Storage Agreement) | Pine Gate Renewables, LLC | 02/19/2021 |

| | | | |
|---|---|---|---|
| CLEAN Powin - 20191028 - PEC BESA - PEC v.10 Final Rochester - 02192021 - Fully Executed (1) | ESA (Energy Storage Agreement) | Pine Gate Renewables, LLC | 02/19/2021 |
| Chaparral Springs ESSA - FULLY COMPILED AND EXECUTED - 7-27-2022_small | ESA (Energy Storage Agreement) | Chaparral Springs, LLC | 07/27/2022 |
| Chap Solar & Willow Springs LNTP - Fully Compiled and Executed | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Chaparral Springs, LLC | 05/27/2022 |
| CEP0180 - Master Supply Agreement - MEPPI - Sarnia | Master Supply Agreement | Mitsubishi Electric Power Products, Inc. (MEPPI) | 02/27/2019 |
| CEP0100 - Master Supply Agreement - MEPPI - Windsor | Master Supply Agreement | Mitsubishi Electric Power Products, Inc. (MEPPI) | 02/27/2019 |
| CAR0040 - Candela Transoceanic shipping - Exhibit E | ESA (Energy Storage Agreement) | Front Range-Midway Solar Project, LLC | 11/17/2021 |
| Candela - Powin - BESA (Executed 11.17.2021) (1) | ESA (Energy Storage Agreement) | Front Range-Midway Solar Project, LLC | 11/17/2021 |
| Brandywine LNTP Amendment and Assignment [EXECUTED] | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | KMC Thermo, LLC/ESI, Inc. | |
| Brandywine ESA [Execution Version + exhibits] (EXECUTED) (1) | ESA (Energy Storage Agreement) | ESI Inc. | 12/05/2022 |
| Black Mesa IPC BESA (executed & assembled)_small | ESA (Energy Storage Agreement) | Idaho Power Company | 02/28/2022 |
| BESA - Adon & Powin | ESA (Energy Storage Agreement) | Adon Renewables | 01/26/2017 |
| BB2 Powin LTSA - 20210719 Fully Executed | LTSA (Long Term Service Agreement) | BigBeau Solar, LLC | 07/19/2021 |
| BB1 Powin LTSA - 20210719 Fully Executed | LTSA (Long Term Service Agreement) | BigBeau Solar, LLC | 07/19/2021 |
| AVEP LTSA - Fully Compiled (Executed) | LTSA (Long Term Service Agreement) | AVEP BESS, LLC | 12/15/2022 |
| AVEP LNTP - Fully Executed and Compiled | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | AVEP BESS, LLC | 05/27/2022 |
| AVEP Fifth Amendment to LNTP (Fully Executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | AVEP BESS, LLC | 08/05/2022 |
| AVEP ESSA - EXECUTION VERSION (Fully Compiled, EXECUTED) - 12-21-2022_small | ESA (Energy Storage Agreement) | AVEP BESS, LLC | 12/21/2022 |
| Auto-Chen_Ltd_(Nir_David)_BESA_2021.05.12_EXECUTED (Commissioning LDs Weekly Edit) LD initialized 17.6.21 | ESA (Energy Storage Agreement) | Auto-Chen Ltd | 05/12/2021 |
| Auto-Chen_Ltd_(Gevim)_BESA_2021.05.12_EXECUTED (w. Exhibit B) small | ESA (Energy Storage Agreement) | Auto-Chen Ltd | 05/12/2021 |
| Auto-Chen_Ltd_(Gevim)_BESA_2021.05.12_EXECUTED (w. Exhibit B and Commissioning LDs Weekly Edit)17.6.21 | ESA (Energy Storage Agreement) | Auto-Chen Ltd | 05/12/2021 |

| Arrow Canyon Powin LTSA_Singed_wExhibit | LTSA (Long Term Service Agreement) | Arrow Canyon Solar, LLC | 12/10/2021 |
|---|---|---|---|
| Arrow Canyon - BESS Agreement (Fully Executed 06042021) | ESA (Energy Storage Agreement) | Arrow Canyon Solar, LLC | 06/03/2021 |
| AMR0170 Hampden Landfill Powin BESA (fully executed) | ESA (Energy Storage Agreement) | Hampden Landfill Solar LLC | 05/11/2022 |
| APE0010 Apex Sabal BESA-Centipede (Fully Executed) | ESA (Energy Storage Agreement) | II Battery Storage US LLC (CAMERON WIND I, LLC) | 05/13/2022 |
| Angelo ESA (fully assembled and executed)_small | ESA (Energy Storage Agreement) | Angelo Storage, LLC | 08/10/2022 |
| AMRC OUC ESA (Fully Executed, Compiled)_small | ESA (Energy Storage Agreement) | Ameresco Inc. | 11/23/2022 |
| AMR0190-Kupono LNTP (Powin 04.22.22) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Kupono Solar, LLC | 04/22/2022 |
| AMP0070 - Cronin - PO | Purchase Order | Amp Solar US Services LP | 08/04/2020 |
| AMP0070 - Cronin - LTSA - FINAL (09-09-20) | LTSA (Long Term Service Agreement) | Amp Solar US Services LP | 09/09/2020 |
| AMP0060 - Wallum - PO | Purchase Order | Amp Solar US Services LP | 08/04/2020 |
| AMP0060 - Wallum - LTSA - FINAL (09-09-20) | LTSA (Long Term Service Agreement) | Amp Solar US Services LP | 09/09/2020 |
| AMP0050 -Palmer - LTSA - FINAL (09-09-20) | LTSA (Long Term Service Agreement) | Ware Palmer Road Solar, LLC | 09/09/2020 |
| AMP0050 - Ware Palmer - PO | Purchase Order | Amp Solar US Services LP | 08/28/2020 |
| AMP0020 - PO - Powin - Adams Road | Purchase Order | Amp Solar US Services LP | 08/28/2020 |
| AMP0020 - Adams Road - LTSA - FINAL (09-09-20) | LTSA (Long Term Service Agreement) | East Brookfield Adams Road Solar LLC | 09/09/2020 |
| AMP0000 - Amp - Master Service Agreement - 20200710 | Master Supply Agreement | esVolta, LP | 07/09/2020 |
| Amendment_2_SPC_Garland_Prime_Contract_-_Final | LTSA (Long Term Service Agreement) | Mitsubishi Power Americas, Inc. (MPA) | 04/25/2022 |
| Leader - Powin - PO 20211213_approved__powin (LD Date Change 6.15.22) | Purchase Order | Leader Energy Storage Technology Co., Ltd | 12/13/2021 |
| 20210811 - LNTP for TPE21001 (Powin 8.4.21)_TPE signed | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | TPE Energy, Inc. | 08/04/2021 |
| 20210811 - LNTP for TPE20032 (Powin 8.4.21)_TPE signed | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | TPE Energy, Inc. | 08/02/2021 |
| 20201231_Westar_-_Project_Contract_(final_exhibits_executed) | ESA (Energy Storage Agreement) | Invenergy Storage Development LLC | 02/05/2021 |
| 20191028 - PEC BESA - Base v.9 Putah Creek Execution Copy 042221_fully signed | ESA (Energy Storage Agreement) | Putah Creek Solar Farms, LLC | 04/22/2021 |
| 20190715 - Annex - Agreement for the Supply and Commissioning of Batteries - Fully Executed | ESA (Energy Storage Agreement) | Nidec ASI S.p.A. | 07/15/2019 |
| 20190715 - Agreement for the Supply and Commissioning of Batteries - Fully Executed | ESA (Energy Storage Agreement) | Nidec ASI S.p.A. | 07/15/2019 |

| | | | |
|---|---|---|---|
| 2021.12.30 Powin-Borrego MSA wForm BESA (Fully Executed) | Master Supply Agreement | Borrego Solar Systems Inc | 12/30/2021 |
| 2021.11.09_LTSA_FINAL_Oak Hill 2_EXECUTED | LTSA (Long Term Service Agreement) | Amp Solar US Services LP | 11/09/2021 |
| 2021.11.09_LTSA_FINAL_Oak Hill 1_EXECUTED | LTSA (Long Term Service Agreement) | Amp Solar US Services LP | 11/09/2021 |
| 2021.11.09_LTSA_FINAL_Elmbrook_EXECUTED | LTSA (Long Term Service Agreement) | Amp Solar US Services LP | 11/09/2021 |
| 2018.08.22 Stillwater- v13.3 - PEC Final (fully executed) (003) | Purchase Order | Stillwater Energy Storage, LLC | 08/22/2018 |
| 2017.02.03 - Adon Powin - Battery Equipment Supply Agreement - EXECUTED | ESA (Energy Storage Agreement) | Adon Renewables | 01/26/2017 |
| EDF0040 - Big Beau 1 - BESSSA | ESA (Energy Storage Agreement) | BigBeau Solar, LLC | 02/01/2021 |
| DTE Powin LNTP Letter Agreement - Engineer (compiled, fully executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | DTE Electric Company | 07/18/2023 |
| Dry Bridge Strata-Powin BESA (compiled, fully executed) | ESA (Energy Storage Agreement) | Strata Solar, LLC | 02/02/2022 |
| Desert Quartzite - Project Agreement (Executed) | ESA (Energy Storage Agreement) | Desert Quartzite, LLC | 12/06/2022 |
| Desert Quartzite - NTP (Executed)-1 | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Desert Quartzite, LLC | 12/06/2022 |
| MSA - Powin & TopBand - signed 07.21.2023 | Master Service Agreement | Huizhou Topband Electrical Technology Co., LTD | |
| MSA - Powin & Ultra - signed 07.22.2023 | Master Supply Agreement | Ultra Corpotech PVT Ltd. Chakan, Pune 410501 India | |
| Exhibit_U_-_AKE0010_-_Ulinda Park_Tech_Escrow_Invoicing_Agreement_(Final) - executed | Technology Escrow Agreement | Ulinda Park ProjectCo Pty Ltd | 07/21/2023 |
| Sun Streams 3_-_Invoicing_Agreement_(IP_Escrow)__7.20.2023_clean_executed | Technology Escrow Agreement | Sun Streams PVS, LLC | 07/20/2023 |
| PNM Powin Rio Del Oro EPA (fully executed, compiled with exhibits)[203747] | ESA (Energy Storage Agreement) | Public Service Company of New Mexico | 05/01/2023 |
| PNM South Valley - LNTP (Fully Executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Public Service Company of New Mexico | 03/09/2023 |
| 20220814 - LNTP Letter Agreement - Lonestar (Powin CLEAN 12.21.22)(Fully Executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Lone Star Solar, LLC | 12/21/2022 |
| Lonestar LTSA (fully executed, compiled with exhibits) | LTSA (Long Term Service Agreement) | Lone Star Solar, LLC | 05/01/2023 |
| Hemingway Expansion LNTP (fully executed, fully compiled) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Idaho Power Company | 05/05/2023 |
| Second Amended and Restated LNTP - Hemingway Expansion (fully executed) | LNTP (Limited Notice to Proceed) or NTP (Notice to Proceed) | Idaho Power Company | 05/25/2023 |
| Akaysha - Ulinda Park - Powin - Energy Supply Agreement (fully executed, compiled) | ESA (Energy Storage Agreement) | Ulinda Park ProjectCo Pty Ltd | 06/26/2023 |
| Akaysha - Ulinda Park - LTSA (fully executed, compiled) | LTSA (Long Term Service Agreement) | Ulinda Park ProjectCo Pty Ltd | 06/28/2023 |

| Li-Cycle Inc. - Services Agreement & Quote - signed 10.20.2022 | Master Service Agreement | Li-Cycle Holdings Corp. | 10/20/2022 |
|---|---|---|---|
| 06.10.2022 EVE - Powin MSA Amendment #2 - signed | Master Supply Agreement | EVE Asia Co. Limited | 06/01/2022 |
| Powin_CNTE_Purchase Framework Agreement-Fully Executed - 02.28.2022 | Framework Agreement | Contemporary Nebubula Technology Energy Co., Ltd. (CNTE) | 02/28/2022 |
| MSA - Powin & Ultra - signed 07.22.2023 | Master Supply Agreement | Ultra Corpotech PVT Ltd. Chakan, Pune 410501 India | |
| Amendment to MSA - Powin Energy (2)_Final | Master Service Agreement | RRC Power and Energy, LLC | 01/26/2022 |
| Powin & Heilind MSA - signed 08.29.2022 (Supplier of Amphenol Materials) | Master Supply Agreement | Heilind Asia Pacific (HK) Ltd. | 08/29/2022 |
| Formosa Supply Agreement redv4 20201029 | Master Supply Agreement | Formosa Electronic Industries, Inc. | |
| Energy Storage Response Group, LLC_Powin_MSA (SOW 1 & 2)_2021.06.21_Executed | Master Service Agreement | Energy Storage Response Group LLC | 06/21/2021 |
| Powin & Envision AESC US MSA - signed 07.28.2022 | Master Supply Agreement | Envision AESC US LLC | 07/18/2022 |
| Powin - REPT - MOU - Fully Executed 04.21.2022 | Memorandum of Understanding | REPT BATTERO Energy Co., LTD | 06/01/2024 |
| Powin - ACE Battery PFA - signed 03.15.2023 | Framework Agreement | Shenzhen ACE Battery Co., Ltd. | 03/15/2023 |
| Powin - iBase Solutions PFA - signed 05.16.2023 | Framework Agreement | iBase Solution Co., Ltd. | 05/16/2023 |
| 20191031 - iBase fully executed | Master Supply Agreement | iBase Gaming Inc. | 10/31/2019 |
| Powin & CIMC MSA - signed 03.07.2023 | Master Service Agreement | Qingdao CIMC container manufacture CO. LTD | 03/01/2023 |
| REPT Battery Cell MSA Fully Executed 210714 | Master Supply Agreement | Ruipu Energy Co., LTD (REPT) | 06/29/2021 |
| Powin - Myst AI Form Agreement and Order Form_FINAL_2022.10.07.docx | Purchase Order | Myst AI, Inc. | 10/07/2022 |
| Powin_Bluewater Battery Solutions_Services Agreement - FINAL - signed 12.09.2022 | Master Service Agreement | Bluewater Battery Logistic, LLC | 12/09/2022 |
| EVE-Powin-iBase 3-Party MSA 03.17.2021 | Master Supply Agreement | EVE Asia Co. Limited | 09/30/2021 |
| Huizhou Topband Electrical Technology Purchase Framework Agreement | Framework Agreement | Huizhou Topband Electrical Technology Co., Ltd. | 12/29/2021 |
| Powin & J-Tech MSA - signed 12.30.2022 | Master Supply Agreement | China J-Tech Prescision Machinery Group Limited | |
| AESC Battery Cell MSA Fully Executed 210714 | Master Supply Agreement | Envision Ruitai Dynamics Technology (Shanghai) Co. Ltd. | 07/07/2021 |
| Amendment to EVE-Powin-Finway 3-Party MSA - Performance Only - 12.16.2021 (1) | Master Supply Agreement | EVE Asia Co. Limited | 11/22/2021 |
| Powin - SMA MSA 2022.08.22 clean Final with Exhibits part excec 08.23.22 | Master Supply Agreement | SMA Solar Technology America LLC | 08/19/2022 |
| Powin - Hithium PFA - signed- 05.18.2023 | Framework Agreement | Hithium (Xiamen Hithium Energy Storage Technology Co., Ltd.) | 05/18/2023 |
| Powin - REPT MSA - FINAL with Exhibits - signed 12.13.2022 | Master Supply Agreement | REPT BATTERO Energy Co., LTD | 12/06/2022 |
| Amendment 3 to MSA between Powin and EVE - signed 11.21.2022 | Master Supply Agreement | EVE Power Hong Kong Co., Limited | 10/31/2022 |
| Formosa MOU | Memorandum of Understanding | Formosa Electronic Industries, Inc. | |
| Powin  G Battery PFA FINAL - signed 04.24.2023 | Framework Agreement | Xuzhou G Battery International Trade Co., Ltd. | 04/24/2023 |

| CATL & Powin Cell MSA - 01.23.2019 | Master Supply Agreement | Contemporary Amperex Technology Co. Limited (CATL) | 06/30/2022 |
|---|---|---|---|
| Intertek_Powin MSA 7.21.21_EXECUTED (4) | Master Service Agreement | Intertek Testing Services NA, Inc. | 07/21/2021 |
| Powin - Formosa Electric Industries PFA - Executed 03.23.2023 | Framework Agreement | Formosa Electronic Industries, Inc. | 03/22/2023 |
| Powin EPSoft Service Agreement - signed 06.03.2022 | Master Service Agreement | EPSoft | 06/03/2022 |
| Powin & Ace Engineering MSA - EXECUTED - 12.12.2022 | Master Supply Agreement | ACE Engineering & Co Ltd | 12/12/2022 |
| Powin - SMA MSA - clean FINAL EXECUTED v2 12232020 | Master Supply Agreement | SMA Solar Technology America LLC | 01/01/2021 |
| 2022-2023 Annual Purchase Agreement_2021.05.17_EXECUTED (3) | Purchasing Agreement | Contemporary Amperex Technology Co. Limited (CATL) | |
| EVE Cell PG and Warranty Term Amendment - 01.05.2023 | Master Supply Agreement | EVE Asia Co. Limited | |
| Powin-CATL-MSA Amendment #1 - signed 20220214 | Master Supply Agreement | Contemporary Amperex Technology Co. Limited (CATL) | |
| Master Supply Agreement_GTI_9-6-2022 Executed | Master Supply Agreement | GTI Fabrication | 09/05/2022 |
| MSA - Powin & C3Controls - signed 04.03.2023 | Master Supply Agreement | Control Concepts Corporation dba c3controls | 04/01/2023 |
| Dynapower - Powin - MSA - 12-15-2020 - Countersigned | Master Supply Agreement | Dynapower Company, LLC | 10/01/2020 |
| Powin - Envision AESC - MOU FINAL - Fully Executed - 02.17.2022 | Memorandum of Understanding | Envision Ruitai Dynamics Technology (Shanghai) Co. Ltd. | |
| Powin & CIMC-Powin JV MSA - 04.27.2023 | Master Service Agreement | Qingdao CIMC-Powin New Energy Technology Co., LTD | 04/23/2023 |
| Jabil Powin - MSA Amendment 1 - signed 04.10.2023 | Master Supply Agreement | Jabil Inc. | 02/13/2023 |
| Powin & Celestica MSA - EXECUTED - 04.26.2023 | Master Supply Agreement | Celestica LLC | 03/06/2023 |
| Powin - Desay Battery PFA - signed 03.26.2023 | Framework Agreement | Huizhou Desay Battery Co., Ltd. | |
| Powin & CNTE MSA -Fully Executed - 04.20.2022 | Master Supply Agreement | Contemporary Nebubula Technology Energy Co., Ltd. (CNTE) | |
| Powin & SGS Service Agreement_FINAL - 03.14.2022 | Master Service Agreement | SGS North America Inc. | 03/14/2022 |
| Powin & SIBA Fuse MSA - signed 10.10.2022 | Master Supply Agreement | SIBA, LLC | 10/10/2022 |
| EVE-Powin-Finway 3-Party MSA 12.16.2020 | Master Supply Agreement | EVE Asia Co. Limited | |
| Li-Cycle Inc. - Services Agreement Quote 12022022 - 2nd pickup - signed 12.07.2022 | Master Service Agreement | Li-Cycle Holdings Corp. | 12/07/2022 |
| Powin - Jabil MSA - FINAL - 06.20.2022 | Master Supply Agreement | Jabil Inc. | 06/07/2022 |

(d)  The following Intellectual Property that was deposited into escrow:

| Repository | Where is it used? | Definition | Notes |
|---|---|---|---|
| ansible-cloud-deploy | DevOps | The tool used to deploy cloud servers to AWS. | |
| argocd-app-of-apps | Cloud | Used by the war and deployed to the cloud | |
| bergstrom-fw-updater | OnPremises | Updates the firmware on Bergstrom hvacs | |
| ccui-regression | QA | Automated regression test suite for CommandCenter | |
| cloud-regression | QA | Automated regression test suite for cloud components | |
| cloud-shared | Cloud | A grouping of libraries (parent-pom) used by different cloud applications. | Includes projects: goblin, powinaws, powinredis, powinwebappbase |
| coblynau | Cloud | Coblynau is the single point of contact for sites to register, report their data and retrieve commands and firmware updates. Requests to Coblynau are routed to other destinations for processing and/or storage. | |
| coblynau1 | Cloud | Gen1 version of Coblynau. | Mostly Archived. Gen1 stations only. |
| coblynaudb | Cloud | Used by the war and deployed to the cloud | |
| commandcenter | Cloud | The React presentation and control layer in the cloud designed to replace Kobold. | |
| commandpusher | Developer Tools | A tool to simulate a command being sent from the cloud to on-premises system. It is used to test the on-premises system in place of running a cloud environment. | |
| data-api | Cloud | An attempt to replace Kobold with a single responsibility DataApi. (incomplete) | |
| devops-tools | DevOps Tools | A collection of scripts and configuration files used by DevOps | |
| devtools-git | Developer Tools | A collection of scripts used to manage local git pointers. | |
| dockerfiles-devops | DevOps Tools | Repo for building containerized environments | |
| dockerstack | Archived | Old version of site compose | |
| dragon | OnPremises | The EMS library that turtle uses. | |
| ekssim | Developer Tools | Simulator for the EKS PCS | |
| em | OnPremises | Environmental Manager (also referred to as Feather) is for Centipede and newer systems only. It is the software that controls the HVAC and sensor systems on individual stacks. Communicates with the LocalManager or Turtle. | |

156

| | | | |
|---|---|---|---|
| enclosure-controller-simulator | Pod | Java app to emulate the Pod interface | |
| environmentmanager-test | QA | Service level tests for environment manager (feather) | |
| everestmocksdriver | Pod | Drives momotaro based mocks | |
| featherconfigurator | Developer Tools | Part of the *Configurator series. It contains configuration files for the EM (or Feather) | |
| feature-flow-client | Incomplete | Java app installed by pipelines-shared repo to perform certain logic | |
| fey | OnPremises & Cloud | A library used by most systems. It contains standardized device identification keys. | |
| firstresponderui | OnPremises | Deployed on an HMI on the site. It's sole purpose is to give emergency first responders an idea of what's going wrong, as well as physically where. | |
| fw_sys_bin_arena | Firmware | Firmware build scripts, including scripts to add footer for cloud deployment | |
| fw_sys_bin_stack140g2 | Firmware | | |
| fw_sys_bin_stack225_230_360 | Firmware | | |
| fw_sys_bin_stack750_800 | Firmware | | |
| fw_sys_bin_with_footer | Firmware | | |
| fw_sys_common_lcd_f030 | Firmware | Source code for LCD used in Stack230P, Stack 360, Stack 750, and Stack 800 | |
| fw_sys_common_lcd_f030_bootloader | Firmware | | |
| fw_sys_common_lcd_f303 | Firmware | | |
| fw_sys_common_lcd_f303_bootloader | Firmware | | |
| fw_sys_docs | Firmware | Firmware documentation about recertification, build instructions, and embedded software team design conventions and rules. | |
| fw_sys_gen1p0_bmc | Firmware | Firmware source code for gen1 (Stack 140gen1) battery monitor controller | |
| fw_sys_gen1p0_bmc_burner | Firmware | | |
| fw_sys_gen1p0_bpc | Firmware | Firmware source code for gen1 (Stack 140gen1) battery pack controller (including bootloader) | |
| fw_sys_gen1p0_bpc_bootloader | Firmware | | |
| fw_sys_gen1p0_relay_and_bootloader | Firmware | Firmware source code for gen1 (Stack 140gen1) string relay board (including bootloader) | |
| fw_sys_gen1p0_sc_and_bootloader | Firmware | Firmware source code for gen1 (Stack 140gen1) string controller (including bootloader) | |
| fw_sys_gen2p0_bpc | Firmware | | |

| | | | |
|---|---|---|---|
| fw_sys_gen2p0_bpc_bootloader | Firmware | Firmware source code for gen2.0 (Stack 140gen2) battery pack controller (including bootloader) | |
| fw_sys_gen2p0_cgc | Firmware | Firmware source code for gen2.0 (Stack 140gen2) cell group controller (including bootloader) | |
| fw_sys_gen2p0_cgc_bootloader | Firmware | | |
| fw_sys_gen2p0_sc | Firmware | Firmware source code for gen2.0 (Stack 140gen2) string controller (including bootloader) | |
| fw_sys_gen2p0_sc_bootloader | Firmware | | |
| fw_sys_gen2p2_bpc | Firmware | Firmware source code for gen2.2 (Stack 225, Stack 230E, Stack 230P) battery pack controller (including bootloader, bootloader is also for gen2.3 Stack 360 battery pack controller) | |
| fw_sys_gen2p2_bpc_bootloader | Firmware | | |
| fw_sys_gen2p2_sc | Firmware | Firmware source code for gen2.2 (Stack 225, Stack 230E, Stack 230P) string controller (including bootloader) | |
| fw_sys_gen2p2_sc_bootloader | Firmware | | |
| fw_sys_gen2p3_bpc | Firmware | Firmware source code for gen2.3 (Stack 360) battery pack controller (bootloader uses fw_sys_gen2p2_bpc_bootloader) | |
| fw_sys_gen2p3_sc | Firmware | Firmware source code for gen2.3 (Stack 360) string controller (including bootloader), points to gen2.2 project files | |
| fw_sys_gen2p3_sc_bootloader | Firmware | | |
| fw_sys_gen3_bpc | Firmware | Firmware source code for gen3.0 (Stack 750, Stack 800) battery pack controller (including bootloader) | |
| fw_sys_gen3_bpc_bootloader | Firmware | | |
| fw_sys_gen3_sc | Firmware | Firmware source code for gen3.0 (Stack 750, Stack 800) string controller (including bootloader) | |
| fw_sys_gen3_sc_bootloader | Firmware | | |
| fwt_factorytester_pcsoftware | Firmware | Source code for Field Service and Factory "FactoryTester" CAN tool, written in C# with Visual Studio | |
| fwt_build_tools | Firmware | Installers and executables for firmware IDEs and srecord tool used when developing and building firmware. | |
| gatekeeper | OnPremises & Cloud | Cloud endpoint deployed onprem | |
| goblin | Cloud | A Library used by cloud-services to enque and deque messages. Moved to the `cloud-shared` repository. | |
| hatchery | OnPremises | A service to expediate the commissioning of a site. It sets up the network, designating the proper addresses to devices. Configure Moa IKS switches and set IP addresses of Environment Controllers | |
| hatcherycli | OnPremises | Specific to the Waratah Super Battery - A service to expediate the commissioning of a site. It sets up the network, designating the proper addresses to devices. | |
| hector | Developer Tools | A Skeleton project for anything with a web interface | |

158

| | | | |
|---|---|---|---|
| jinmao | Developer Tools | End of line testing code | |
| kafkamanager | Cloud | Used by the war and deployed to the cloud | |
| knocker | Cloud | ETL that takes standard reports (aka site reports or block reports) from Redis and loads them into Redshift. | |
| knocker1 | Cloud | Gen1 version of Knocker. | Mostly Archived. Gen1 stations only. |
| kobold | Cloud | The original Presentation, and Control layer. It also took on the role of DataApi to serve Command Center (and any customer "programmatic users"). | |
| kobold1 | Cloud | Gen1 version of Kobold. | Mostly Archived. Gen1 stations only. |
| Lab-Tools | QA | Scripts for running/deploying dockerized apps in the lab | |
| lishu | OnPremises & Cloud | A service to produce reports that are saved in S3 (archived?) | |
| lishutongue | OnPremises & Cloud | The protobuf conversion files for compressing/decompressing lishu reports | |
| lishutonguejava | OnPremises & Cloud | The java code generated from the LishuTongue protobuf files. | |
| lmconfigurator | Developer Tools | Part of the *Configurator series. It contains the different configuration files for LocalManager. | |
| localmanager | OnPremises | Local manager source code (StackOS3 equivalent of Turtle) | |
| localmanager-test | QA | Service level tests for localmanager | |
| modbusecho | Developer Tools | The Modbus Echo is a project to scan holding and input registers from a TCP Modbus server and save the results to a .json file | |
| modbusechoui | Developer Tools | A React interface to interact with the modbus echo project. | |
| modbusforfourba | OnPremises | Modbus for dragon, phoenix, quilin, turtle | |
| modbusregistercalculator | Developer Tools | Tool to convert complex data types stored in modbus | |
| momotaro | Developer Tools | The purpose of this simulation tool is to provide both developers and QA with tools for mocking data on modbus servers in order to supply a flexible and customizable "device simulation tool". This tool will not contain any device-logic but allow users to implement through small scripts, or simple endpoint commands the behavior they would like to test or emulate. | |
| momotaro-dev-client | Incomplete | Not needed | An Empty Repo. This was going to be a prototype. |
| moth | Cloud | Bidding service for CAISO energy market | |

| okiku | OnPremises | The "SOX" library. Covers State Of Health, State Of Charge, State of HeadRoom | |
| onprem2 | OnPremises | A attempt to consolidate all of the StackOS2 libraries into one parent-pom style project. Replacement for Turtle (StackOS2). | Still has some questionable functionality. |
| onprem2-development | Incomplete | Not needed | |
| onpremenvautomation | Incomplete | Not needed | |
| phoenix | OnPremises | The BMS library that Turtle uses. | |
| phoenixtongue | OnPremises | The protobuf conversion files for compressing/decompressing all on premises reports. | |
| phoenixtonguecsharp | Archived | The C# code generated from the PhoenixTongue Protobuf files. | |
| phoenixtonguejava | OnPremises | The java code generated from the PhoenixTongue protobuf files. | |
| pipelines-shared | Incomplete | Used to build new artifacts for onprem as part of the new branch strategy | |
| pop | Cloud | POP's core is an optimization that takes inputs (forecasts) and maps them to a plan about how to operate a BESS system. This optimization is run in a feedback look called Model Predictive Control which allows the system to respond in real-time to changes in forecasts. | |
| powin-core | OnPremises | A grouping of libraries (parent-pom) used by different OnPrem applications. | Includes projects: fey, goblin, lishu, lishutonguejava, modbusforfourba, okiku, phoenixtongue, phoenixtonguejava, powinaws, powinredis, powintestsupport, powinwebappbase, sunspecdefinitionsjava, toolsurlbuilder, wu |
| powin-shared | OnPremises & Cloud | A grouping of libraries (parent-pom) used by different OnPrem and cloud applications. | Includes projects: fey, phoenixtongue, phoenixtonguejava, powintestsupport, wu |
| powinaws | Cloud | Used by the war and deployed to the cloud | |
| powinredis | OnPremises | Helper code to talk to redis | |
| powintestsupport | Archived | Archived | |
| powinwebappbase | Cloud | Used by the war and deployed to the cloud | |
| primrose | Cloud | The in-house authentication and authorization application. | |
| primrose1 | Cloud | Gen1 version of Primrose | Mostly Archived. Gen1 stations only. |
| primroseclient | Cloud | Authorization library used by primrose | |

US-DOCS\161435194.2
130703294\V-4

| | | | |
|---|---|---|---|
| primrosetongue | Cloud | Login authentication Protobuf | |
| primrosetonguejava | Cloud | Java generated code from PrimroseTongue | |
| primrosewebclient | Cloud | Used by the war and deployed to the cloud | |
| product-documentation | Documentation | Documentation of some Features, architecture, devops and simulator.  It is incomplete | |
| puck | Cloud | AWE Messaging and routing, Gen1 | |
| puckapi | Cloud | AWE Messaging and routing, Gen1 | |
| puckui | Cloud | AWE Messaging and routing, Gen1 | |
| qa-automated-regression | QA | Automated tests for 2.x deployments | |
| qa-test-cases | QA | Contains exported manual test cases from Test Rail | |
| qilin | OnPremises | Library for interacting with the file system, also provides wrapper layers. | |
| repo-llama-docmaker | Developer Tools | AI document generator for the repos | |
| report-consumer-service | Cloud | Pulls reports from Kafka to influx db | |
| reportpusher | Developer Tools | Emulates the reporting functionality of a tortuga-style local controller. | Tortuga was the original split from StackOS2 -> StackOS3. It became LocalManager. Possibly archived? |
| samljaxb | Developer Tools | Oauth connector that is not used | |
| servicetools | OnPremises & Cloud | Utility functions for commissioning/operations | |
| sim-site-config | Developer Tools | The configuration of the docker files for site-compose. | |
| simstationgenerator | Pod | Generate dynamic Pod config/compose files | |
| site-compose | QA | This repository contains Docker configurations for simulating complete energy storage sites and cloud services locally | |
| site-init | Developer Tools | Scrips for initiatializing some devices | |
| site-report-pusher | Developer Tools | This tool is for developers, QA, QA Automation, other types of nerds and/or protobuf enthusiasts. It can be used to simulate sending standard block reports and standard notification reports to any coblynau service (locally or in the cloud). | |
| sitecontroller | OnPremises | Site controller source code | |
| sitemanager | OnPremises | As of 10/31/2024 it can be used to simulate sending standard block reports and standard notification reports to any coblynau service (locally or in the cloud). | |

161

| | | | |
|---|---|---|---|
| sitemanager-test | QA | Service level tests for SiteManager | |
| sitereportecho | Developer Tools | Captures sitelevel reports and allows for reply | |
| spark-hudi | Archived | Depricated | |
| stack-sim-regression | QA | Automation framework for running regression against StackOS2 and 3 | |
| stackos2configurator | Developer Tools | Part of the *Configurator series. It contains configuration for the Turtle (StackOS2). | There was an intended name switch from Turtle to StackOS2, there maybe some updates to turtleconfigurator that didn't happen here. We only need one of the two. |
| stacksimulator | Developer Tools | Java app emulates string controller interface and PCS interface | |
| stringprotocol | Developer Tools | Data format between string controller and other hardware | |
| stringpusher | Developer Tools | Push arbitrary data to local manager as if it was coming from the string controller | |
| sunspec-model134-simulator | Developer Tools | Susnpec simulator | |
| sunspecdefinitions | Developer Tools | Modbus map definitions | Should compare with stackos2configurator/turtleconfigurator projects to ensure parity |
| sunspecdefinitionsjava | Developer Tools | Java generated code for modbus map definitions | |
| sunspectests | Developer Tools | Susnpec automation | |
| swtools | Developer Tools | Scripts to support release management in Jira | |
| terraform-aws-infra | DevOps | Cloud infrastructure as code | |
| terraform-aws-infra-modules | DevOps | Cloud infrastructure as code modules | |
| toolsurlbuilder | Developer Tools | A library inside of Turtle (StackOS2) that helps build urls to tools endpoints to simulate/test. | |
| turtle | OnPremises | This is the heart of StackOS2. Turtle is a shell that is constituted of either a Dragon, a Phoenix, or Both. It serves as a communication gateway between various components of the Powin Energy Storage System. It facilitates message routing between Dragon (EMS), Phoenix (BMS), Feather (environmental controller), and Coblynau (cloud service). Turtle also provides diagnostic tools, firmware management, and failover capabilities to ensure reliable system operation. | |

US-DOCS\161435194.2
130703294\V-4

| | | | |
|---|---|---|---|
| turtleconfigurator | Developer Tools | Part of the *Configurator series. It contains configuration for the Turtle (StackOS2). | There was an intended name switch from Turtle to StackOS2, there maybe some updates to stackos2configurator that didn't happen here. We only need one of the two. |
| wu | OnPremises | A toggle service library to be able to choose paths in the code. | |

US-DOCS\161435194.2
130703294\V-4

**Schedule 3.8**

**LITIGATION**

| PARTIES | JURISDICTION | CLAIM | STATUS |
|---|---|---|---|
| 301 Tariff Protest | Court of International Trade | Customs Designation/Import Designation | Powin is contesting the HTS Code designation by U.S. Customs and Border Protection ("CBP") of the country of origin of the Section 301 duties applied to Stacks imported by Powin designated as China because allegedly no substantial transformation occurred in Taiwanfor 2020 and 2021 imports. In addition, Powin is seeking a ruling that substantial transformation of its Centipede occurred, changing its Section 301 duties.<br><br>In addition, Powin still has potential exposure for five years from the import date under theories of fraud, gross negligence (40% penalty) or negligence (20% penalty) in addition to the current per entry penalty (currently $28k on 209 entries).<br><br>The total importation amount/value is $86.5M. |
| Airways Services, LLC (Takkion) vs. Powin, LLC and Brian Kane | Texas (239th District Court) Cause No. 129700-CV | Contract Dispute | Powin received a Citation for a case filed on 7/30/2024. The dispute arises from a 1/20/22 agreement under the KCE TX 23 Project in Texas. Airway was to provide technical, maintenance and installation services for the project. Airways seeks $349,431.25 for work performed from April to September 2022.<br>Blank Rome, Houston (Mike Bell and Greg Moore) have been assigned 8/26/24. They have instructions to file timely response. 04/25/25: Settlement negotiations are ongoing.<br><br>Parties entered into a walk-away, no cost settlement on 6/9/25. RESOLVED |
| Ameresco, Inc. and Kupono Solar, LLC | Superior Court of the State of Delaware Case No. N24C-04-012 VLM | | Complaint was filed on 4/3/2024 where Kupono seeks the return of a $16,683,457.35 deposit that was paid pursuance to an LNTP dated 4/22/2022, as well as a $10M dollar deposit under a Framework Term Sheet dated 4/29/2022. Ameresco seeks to recover the deposit under the LNTP dated 4/22/2022 ($11,385,695.50 or the original $16,683,457.35). Ameresco also seeks to terminate the Term Sheet, dated 4/29/2022 and recover the $10M deposit paid thereunder. The LNTP was non-refundable, subject only to Powin's bad faith and the Term Sheet provides that Powin retains any uncredited amounts. Both parties are subject to LD's under the Term Sheet for volume failures, unless unable to agree to BESA terms after good faith negotiations. |

| C3 Controls | American Arbitration Association | Contract Dispute | Demand Letter dated 3/27/2025 demanding $3,993,456.80 by 4/10/2025. Claim arises from Minimum Volume commitment, for which Powin purchased approximately 18%. Powin negotiated a settlement for $500k, but did not pay as per the schedule. **04/25/25:** Request for extension granted, and response is due June 6, 2025 |
|---|---|---|---|
| CATL | Hong Kong International Arbitration Center | | CATL Issued a notice letter of demand for payment dated 12/9/23 (from Baker McKenzie Hong Kong). 8/2/2024 Notice of Arbitration was filed against Powin, LLC and Yangzhou Finway Energy Tech CO., LTD. CATL is seeking RMB37,664,256 (USD$5.29M)from Powin and Finway and RMB1,497,690.88 (USD$211k), RMB20,256,687.36 (USD$2.847M) and RMB31,418,266.88 (USD$4.42M) from Powin Only. In addition CATL seeks RMB216,877,243.64 (USD$29.6M for a June 6, 2023 Order) along with RMB2,953,119.16 (USD$402.7K in LDS for late payment). Total USD$44M. Powin initial advance pay/deposit (USD$6.7M)<br><br>12.17.24 CATL filed Petition for Provisional Measures in Aid of Arbitration in Washington County Circuit Court, requests that the court enter an order for issuance of provisional process and a writ of attachment against Powin's Oregon-based assets, including, but not limited to, the battery cells supplied by CATL and Powin's other tangible property and real property located at 20550 SW 115th Ave., Tualatin, Oregon and 2035 NW Front Ave, Ste #600, Portland, OR 97209, as may be necessary and sufficient to satisfy Petitioner's demand in the sum of not less than $44,306,992.38, and grant such other and further relief as the Court deems just and proper. Powin physical inventory in Oregon is approximately $2M. Hearing is scheduled for January 27, 2025. |
| Enel Produzione S.p.A | COURT OF ROME Sec. X - Dr Gaetano RG n. 35416/2022 | Breach of Supply and Services Contract | Action brought in the Court of Rome Italy 4/7/2022. Powin claims Enel owes €784,456.82 under the contract. Enel counters that Powin owed damages for Lost Profit, Loss of Value, Extra Costs and LDs (approximately €2M total). 8/2/2022 Powin proposed settlement, whereby Enel would pay the amounts outstanding in exchange for the lesser of $1M or 5% credit on another project. Enel declined to submit a counter proposal (12/30/2022). Court of Rome has set hearing for continuation and joining the two pending judgments on 6/21/2023. Hearing on 6/21/2023, court joined two proceedings. Brief due 10/10/2023 and evidentiary requests due 11/11/2023 and reply briefs due 12/2/2023. The next hearing is scheduled for 4/3/2024.<br>Powin and Enel filed briefs. Due by 11/3/2023: response to the reconstruction of facts; list of |

US-DOCS\161435194.2
130703294\V-4

| | | | |
|---|---|---|---|
| | | | witnesses from Powin; technical questions we want the court-appointed consultant to answer to confirm our defense strategy. |
| Honeywell/Saturn Power | American Arbitration Association | | Notice of Arbitration issued by Honeywell to Powin dated April 2, 2024. On September 29, 2023, Saturn Power filed a statement of claim in arbitration with the American Arbitration Association ("AAA") in New York, New York against Honeywell and Powin. That arbitration was assigned Case Number 01-23-0004-3145. Saturn Power seeks recovery arising from two alleged incidents occurred in which the fire suppression system ("FSS") was triggered. The first incident allegedly occurred on September 30, 2021, when a raccoon gained entry to Container 1 of the BESS. The second incident allegedly occurred on August 18, 2022, when a fire in Container 2 of the BESS triggered the FSS. This allegedly caused damage to other various Saturn property as well. Saturn Power asserts that it is entitled to damages from Honeywell and Powin totaling at least $2,514,100. Honeywell is filing an arbitration against Powin in an effort to join the two abirritations.<br><br>4.30.2025 Settlement between the parties, agreed in principle at $425k. Powin Insurer $400k and Powin's contribution $25k, payment due within 60 days.<br>6.10.2025: Settlement Agreement between Saturn Power, Powin and Honeywell signed with effective Date - 05.23.2025 |
| Jan Jacobson | Circuit Court of the State of Oregon for the County of Multnomah | Breach of Contract | On 5/3/2024 Mr. Jacobson filed a complaint alleging breach of contract by Powin Energy Corporation for failing to value his equity shares at the same value as a Moss Adams report ($1.93M) and another claim against Powin, LLC for failing to pay him Commissions under certain Framework Agreements under the 2019 Commission Plan ($5.04M). |
| Lucas Lennick | Oregon Circuit Court Multnomah County (23CV32677) | Wrongful Termination/Harassment/Discrimination | Complaint dated 8/11/23 alleging (1) gender-based claims: harassment/hostile work environment, discrimination, retaliation for opposing/reporting the same, and various defendants aiding & abetting the same; (2) Oregon sick leave violations; (3) wrongful termination. Damages pleaded are "no more than $1.75 million" ($500k emotional distress/noneconomic damages, and $750k lost wages/economic damages, offset for taxes, attorney fees and costs, prejudgment interest). Trial, |

| | | | date certain has been set for 3/3/2025 and MSJ deadline is 1/2/2025.<br><br>This matter was resolved through settlement and dismissed with prejudice on 4/15/2025.<br>**RESOLVED** |
|---|---|---|---|
| Mitsubishi | Arbitration (Notice Only) | Dispute over Liquidated Damages | On 9/28/2023, Powin issued notice to initiate dispute resolution under the Supply Agreements for Texas 11, 12 and 23 against Mitsubishi Power Americas Inc. Mitsubishi is also withholding payments related to the Big Beau project ($4,679,285 + ~$700,000 in interest). With regards to TX 11, 12, & 23, Mitsubishi is seeking $14M in Liquidated Damages and Powin is seeking $9M payments. |
| Prevalon/Hecate Energy Johanna Facility/Mistubishi vs. Powin | Arbitration Case Number 01-24-0008-1077 | Breach of LTSA | Notice of Arbitration issued on 10/7/24 with the American Arbitration Association, alleging that Powin failed and refused to provide all planned and unplanned maintenance to all Facility systems and components. That the Facility has not achieved all availability and capacity performance guarantees set forth in the Powin LTSA. Demand at the time of filing alleges $1.4M in damages. Arbitration currently stayed while the parties work on a commercial solution. |
| STEM | Arbitration (Demand) | Breach of various agreements, including LNTP, MSA, LTSA and certain purchase orders | Notice of Dispute Resolution issued on 12/23/2024, under First Amended and Restate Master Supply Agreement for Purchase and Sale of Energy Storage Equipment between Powin, LLC ("Powin") and Stem, Inc. ("Stem," together with Powin, the "Parties"), dated September 14, 2022 ("MSA").<br><br>In all, STEM seeks approximately $23.5M ($5.3M LDs; Late Cancellation refund ($4.8M; Deposit return ($3.4M) and Pricing Clawback ($10.1M)), alleging that Powin failed to pay Delivery Delay Damages and Commissioning Delay Damages, perform Section 13.1 obligations (ongoing maintenance and support under LCW and LTSA), failure to reallocate Tangerine deposit, failure to refund PO 12282; 12283; 112284; 12285 and 12286; breach obligation to accept purchase orders and deliver products at quoted LNTP prices (March 3, 2022) |
| The Sleeper Group | Small Claims Maine Judicial Branch | Breach of Contract | Alleges unpaid invoices for onboarding videos and seeks amount of $4,982.98. |

167

| | | | |
|---|---|---|---|
| UQI Storage | Qingdao Maritime Court (2023) 72 Litigation Qianqian No. 417 | Claim for Demurrage Charges | 5/10/2023, action brought in China. Enclosures for APS Foothills contracted by Bill of Ladings for delivery from Port of Loading in Qingdao, China to a specific address in the US. First arriving in Vancouver, Canada in December 2021 through February 27, 2022. UQI claims unspecified ancillary charges ("detention" charges in Canada where cargo was being held due to lack of action by UQI), estimated at $641k in demurrage charges.<br>Hearing scheduled for 9/13/2023. Defense to be submitted on or before the hearing.<br>Dajinhui applied (5.22.24) to freeze RMB 4.4M of Powin Qingdao arising from relief order dated 7.13.23<br>12.18.24, Judge informed counsel that she confirmed that a contractual relationship existed between Dajinhui and Powin, but rejected the claims made by Dajinhui against Powin because they failed to prove the amount of the additional costs incurred by Danjinhui. Civil Judgment delivered on 12.19.24 in favor of Powin.<br>UQI's appeal was received on 1.13.25. Powin's response is due by 2.21.25. Trial scheduled for 4.15.25. During the appeal hearing, Dajinhui did not raise any new points. Post-hearing opinions were submitted on 4.22.25. |
| Wilson Fire Equipment & Service Co., Inc. | District Court of Hidalgo County, Texas (C-2198-25-I) | Breach of Contract - Unpaid Invoices | 5/14/25: Served with complaint for damages for $130,786.89 plus interest and attorney's fees.<br>5/15/25: Blank Rome contacted to assist. They will seek an extension for filing answer and run conflicts if needed. Current deadline is 06/09/25.<br>5/16/25: Email from BR - Request to plaintiff counsel sent. This would extend to 6/30/25. Waiting to hear back. In the meantime, need to develop strategy (i.e. whether to defend or pay). If we're going to defend, need to retain BR so they can run conflicts. |
| The Environment Agency (UK) | United Kingdom | Enforcement notice for failure to submit 2024 F-Gas verification document as required under the Fluorinated Greenhouse Gases Regulations 2015 (SI 2015 No.310) and EU Regulation No 517/2014, Articles 14(2) and 19(5). (the "Environment Agency Enforcement Notice") | Enforcement notice issued to Powin LLC July 4, 2025; corrective action required by August 1, 2025; failure to comply with the requirements of the Enforcement Notice may result in a civil penalty up to £200,000.No penalty was assessed as of disclosure date. The Environmental Agency listed the following as the next steps to be taken:<br><br>"Ensure that the 2024 Activity Report submitted by Powin LLC is verified by an independent auditor who is duly accredited to verify financial statements in accordane with Article 14(2) EU Reg 2014/517 as amended. Submit such verification document to the EA by means of the following email address: f-gassupport@environment-agency.gov.uk." |

US-DOCS\161435194.2
130703294\V-4

Class action adversary proceeding complaint for violation of WARN Act 29, U.S.C. § 2101, ET SEQ., filed on June 12, 2025, styled B. Palomino v. Powin, LLC, et al., Adversary Proceeding No.  25-01249-MBK, pending in the United States Bankruptcy Court, District of New Jersey (Trenton).

US-DOCS\161435194.2
130703294\V-4

## Schedule 3.10(b)

## LEASED REAL PROPERTY AND LEASES

(i)     **LEASED REAL PROPERTY**

    a.  Ampere Company, LLC - Powin, LLC - Sublease Field Office West

        i.  2035 Front Ave., Portland, Oregon 97209

    b.  3U Millikan LLC – Powin Energy – PPA Grand Johanna

        i.  16902 Millikan Avenue, Irvine, CA 92606

    c.  Madison-OFC Brickell FL LLC – Powin Energy Operating LLC - ACRE Management -

        i.  Brickell City Tower, Miami, FL: 80 SW 8th Street, Suite 2600, Miami, Florida 33130

    d.  Field Office Property LLC - Powin, LLC - Office Lease

        i.  2035 NW Front Avenue, Portland, Oregon (19,807 rentable sq. ft. in the building)

    e.  Madrid Office - Networkia - Powin LLC - Cuzco Spain

        i.  Poeta Joan Maragall 23, 28020 Madrid, Spain (Offices No. 17, 18, 19 in the Center of Cuzco)

    f.  Melbourne Office – Collective 100 - Powin Australia Pty Ltd - Membership Agreement

        i.  Level 2, 100 Cubitt Street, Cremorne VIC 3121, Australia

    g.  Fora - Powin UK Ltd - Virtual Office

        i.  3 Lloyd's Avenue, London, EC3N 3DS, United Kingdom

    h.  Portland Office - NP MachineWorks LLC - Powin, LLC - Multi-Tenant Office Lease

        i.  The Machine Works Building: 1414 NW Northrup Street, Portland, Oregon 97209

    i.  Mesa Warehouse - HUB@202 OWNCO LLC - POWIN LLC - Arizona warehouse

        i.  7524 East Warner Road, Mesa, Arizona 85212

    j.  Tualatin Office - Lu Pacific Properties - Powin Energy Corporation

        i.  20550 SW 115th Ave., Tualatin, Oregon 97062, USA

    k.  Qingdao Shunneng Machinery Co., Ltd. - Powin (Qingdao) New Energy

    l.  No. 6 Shanhe Road, Provincial High-tech Industrial Development Zone, Jimo City, Qingdao, China

    m.  Qingdao Office Lease Contract - 1

        i.  Room D, E, I, F, G, H, Floor 18, Mong Kok Building, No. 73 Hong Kong Middle Road, Shinan District, Qingdao City, Shandong Province, China

    n.  Qingdao Office Lease Contract-2.pdf

        i.  Room A, B, C, J, K, L, Floor 18, Mong Kok Building, No. 73 Hong Kong Middle Road, Shinan District, Qingdao City, Shandong Province, China

    o.  Powin Taiwan Lease Agreement.pdf

        i.  Room 2D, Floor 10, No. 500, Yanping Road, Zhongli District, Taoyuan City, Taiwan

(ii)     **REAL PROPERTY LEASES**

| File | Contract Type | Counterparty Name | Contract/Document Effective Date |
|---|---|---|---|
| 3U Millikan LLC - Powin - Lease agreement California - 2016 | Lease Agreement | 3U Millikan LLC | 10/12/2016 |
| ACRE Management - Powin Energy Operating LLC - Commercial Sublease Agreement  - 05.16.2025 | Lease Agreement | ACRE Management | 05/16/2025 |
| Ampere Company, LLC - Powin, LLC - Sublease Field Office - 11.01.2021 | Lease Agreement | Ampere Computing LLC | 11/01/2021 |
| Field Office Property LLC - Powin, LLC - Office Lease - 01.01.2024 | Lease Agreement | Field Office Property, LLC | 01/01/2024 |
| Fora - Powin UK Ltd - Virtual Office - 1.18.2024 | Lease Agreement | Esselco Services LLP (Fora) | 01/18/2024 |
| Joseph Lu - Powin LLC Qingdao Office - Qingdao Office Lease Contract- 10.01.2023 | Lease Agreement | Joseph Lu | 10/01/2023 |
| Madrid Office_Networkia - Powin - ANNEX to the Service Agreement - change of party - 04.01.2024 | Lease Agreement | Networkia Cuzko, S.L. | 04/01/2024 |
| Madrid Office_Networkia - Powin LLC - Annex to Office Agreement Cuzco Spain - 02.15.2024 | Lease Agreement | Networkia Cuzko, S.L. | 02/15/2024 |
| Madrid Office_Networkia - Powin LLC - Office Agreement Cuzco Spain - 03.24.2023 | Lease Agreement | Networkia Cuzko, S.L. | 03/24/2023 |
| Melbourne Office_Collective 100 - Powin Australia Pty Ltd - Membership Agreement - 07.27.2023 | Lease Agreement | Collective 100 | 07/27/2023 |
| Melbourne Office_Collective_100 - Powin Australia Pty Ltd - Membership Agreement - 2025 | Lease Agreement | Collective 100 Pty Ltd. | 04/04/2025 |
| Melbourne Office_Collective_100 Membership Agreement - Powin - 05.14.2024 | Lease Agreement | Collective_100 | 06/03/2024 |
| Mesa Warehouse_HUB@202 OWNCO LLC - POWIN LLC - Arizona warehouse INDUSTRIAL LEASE - 08.02.2023 | Lease Agreement | HUB @ 202 OWNCO, LLC | 08/02/2023 |
| Miami Office_2022.12.02 Commencement Date Memo - Powin Energy | Lease Agreement | MADISON-OFC BRICKELL FL LLC | 12/02/2022 |
| Miami Office_Brickell City Tower - Powin Energy Operating, LLC - Lease - 04.08.22 | Lease Agreement | Madison-OFC Brickell FL LLC | 11/08/2022 |

US-DOCS\161435194.2
130703294\V-4

| Portland Office_NP MachineWorks LLC - Powin, LLC - Multi-Tenant Office Lease - 04.08.2024 | Lease Agreement | NP MachineWorks LLC | 06/01/2024 |
|---|---|---|---|
| Powin (Qingdao) New Energy Co., Ltd - Facility Lease Amendment Agreement - 2023.08.28 | Lease Agreement | Powin Qingdao New Energy Co., Ltd. | 08/28/2023 |
| Powin (Qingdao) New Energy Co., Ltd - Facility Lease Contract-PTC - 2023.08.28 | Lease Agreement | Powin Qingdao New Energy Co., Ltd. | 08/01/2023 |
| Powin Taiwan Lease Agreement | Lease Agreement | Pepsi International Business Co. | 01/09/2024 |
| Qingdao Office Lease Contract - 1 | Lease Agreement | Wangjiao Plaza | 10/01/2023 |
| Qingdao Office Lease Contract-2 | Lease Agreement | Wangjiao Plaza | 10/01/2023 |
| Qingdao Office_Cheng Yu New Materials - Powin (Qingdao) - Pwin LLC - Termination agreement - 05.07.2024 | Lease Agreement | Qingdao Cheng Yu New Materials Co. Ltd. | 05/07/2024 |
| Qingdao Shunneng Machinery Co., Ltd. - Powin (Qingdao) New Energy Co., Ltd. - Lease Contract - 08.07.2024 | Lease Agreement | Qingdao Shunneng Machinery Co., Ltd. | 08/07/2024 |
| Tualatin Office_Lu Pacific Properties - Powin Energy Corporation - Tualatin Lease Agreement 2021 | Lease Agreement | LU PACIFIC PROPERIES, LLC | 12/14/2020 |
| Powin RISE Realty 80 SW 8th St oct 15 2024 Signed Copy[1] | Exclusive Right Agreement | KAD Equity Inc. d/b/a Rise Realt | |
| 20180830 -First Amendment to Sublease Agreement | Lease Agreement | PPA Grand Johanna LLC | 08/31/2018 |
| 20190921 - Second Amendment to Millikan Sublease executed | Lease Agreement | PPA Grand Johanna LLC | 09/21/2018 |
| Milikan Lease | Lease Agreement | 3U Millikan LLC | 10/12/2016 |
| Sublease (Fully Compiled) | Lease Agreement | PPA Grand Johanna LLC | 01/01/2017 |
| Third Amendment to the Sublease | Lease Agreement | PPA Grand Johanna LLC | 01/15/2019 |

[1] Signed by Powin Only.

172

**Schedule 3.10(c)**

**LEASEHOLD IMPROVEMENTS**

Other than the testing lab, only ordinary furniture, fixtures, and equipment.

173

**Schedule 3.11**

**PERSONAL PROPERTY LEASES**

| File | Contract Type* | Counterparty Name* | Contract/Document Effective Date* |
|------|----------------|--------------------|-----------------------------------|
| BMO Harris Bank N.A.- Powin - Equipment Lease Agreement - 10.12.2023 | Equipment Lease Agreement | BMO Harris Bank N.A. | 10/12/2023 |
| BMO Harris Bank N.A.- Powin - Large forklift Lease Agreement - 10.12.2023 | Equipment Lease Agreement | BMO Harris Bank N.A. | 12/28/2023 |
| Toyotalift of Arizona, Inc. - Powin, LLC - Master Lease Agreement - 03.04.2024 | Equipment Lease Agreement | Toyotalift of Arizona, Inc. | 03/04/2024 |

US-DOCS\161435194.2
130703294\V-4

**Schedule 3.12**

**PERMITS**

Tualatin stormwater permit for the Tualatin warehouse.

**Schedule 3.14**

**ENVIRONMENTAL MATTERS**

a)
    1.   That certain Tualatin Facility Stormwater Permit.
    2.   The Environment Agency Enforcement Notice.

b)   The Environment Agency Enforcement Notice.

d)   Sellers conduct routine analyses in response to issues at sites involving fire or other thermal events, which have not been provided, and confirm that there have been no claims to date.

US-DOCS\161435194.2
130703294\V-4

## Exhibit C

**(EKS Term Sheet)**

**TERM SHEET FOR POWIN AND HITACHI TRANSACTION**

| Parties | • Hitachi Energy Ltd, Brown-Boveri-Strasse 5, 8050 Zurich, Switzerland ("**Hitachi Energy**" or the "**Buyer**") |
|---|---|
| | • Hitachi Energy Power Conversion Solutions, S.L.U., Avenida de Camas, 28 Polígono Industrial PIBO, 41110, Bollullos de la Mitación, Seville, Spain ("**EKS**" and together with the Buyer, "**Hitachi**") |
| | • Powin LLC, 20550 SW 115th Ave, Tualatin, OR 97062 ("**Powin**" or the "**Guarantor**") |
| | • Powin EKS SellCo LLC, 20550 SW 115th Ave, Tualatin, OR 97062 (the "**Seller**" and together with Powin, the "**Powin Parties**" and together with Hitachi, the Parties and each a "**Party**") |
| **Background** | • On October 23, 2023, the Buyer, the Seller and the Guarantor entered into: |
| |     o a membership interest purchase agreement (as amended, the "**MIPA**"), pursuant to which the Buyer purchased 80% of the units of EKS HoldCo LLC (f/k/a Powin EKS Holdings LLC, "**HoldCo**") from Seller and Seller retained 20% of the units (the "**Remaining Units**") of HoldCo (the "**Acquisition**"); and |
| |     o an amended and restated limited liability agreement, regarding, among other things, the governance of HoldCo (as amended, the "**LLCA**"). |
| | • On October 23, 2023, EKS and certain former executives entered into separation agreements, as provided for in the MIPA, under which separation payments were made (the "**Separation Agreements**"). |
| | • On October 23, 2023, HoldCo, the Seller and Powin entered into a transition services agreement, pursuant to which Powin rendered services to HoldCo (the "**TSA**"). |
| | • On October 23, 2023, Powin and Mr. Javier Landero Cruz entered into a consultancy services agreement, pursuant to which Mr. Javier Landero Cruz agreed to provide services to Powin (the "**First Service Agreement**"). |
| | • On October 23, 2023, Powin and Mr. Sergio Hurtado Cuerva entered into a consultancy services agreement, pursuant to which Mr. Sergio Hurtado Cuerva agreed to provide services to Powin (the "**Second Service Agreement**" and, together with the First Service Agreement, the "**Service Agreements**"). |
| | • On October 23, 2023, EKS and Powin entered into a master product supply agreement for the provision by EKS of products to Powin (as amended, the "**MSA**"). |
| | • Separate and apart from the MSA, EKS has also supplied goods and services to Powin pursuant to certain purchase orders ("**Purchase Orders**"). |
| | • On June 10, 2025 (the "**Petition Date**"), Powin and certain of its affiliates, excluding the Seller (the "**Powin Debtors**"), filed petitions in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**") for relief under chapter 11 of title 11 of the United States Code (the "**Chapter 11 Cases**"). |
| | • As of the Petition Date, Hitachi asserts the following claims against the Powin Parties: |

|  | o | Indemnity claims of Buyer and EKS under the MIPA against the Seller and Powin (as Guarantor) in an amount no less than USD 2,276,963, relating to separation payments pursuant to the Separation Agreements and bonus payments made by EKS in connection with the Acquisition (the "**Indemnity Claims**"). |
|  | o | Commercial claims under the Purchase Orders for issued and unpaid invoices for goods and services EKS supplied to Powin, in an amount equal to the sum of (i) EUR 4,510,905.73 (of which EUR 2,700,809.21 is for overdue invoices and EUR 1,810,096.52 is for goods and services supplied but not yet invoiced) and (ii) USD 3,447,597.34 (of which USD 2,428,077.05 is for overdue invoices and USD 1,019,520.29is for goods and services supplied but not yet invoiced) (all such claims, the "**Commercial Claims**"), in each case, plus interest. The Commercial Claims include EUR 34,968.77 in connection with goods delivered on June 9, 2025 and EUR 1,520.52 in connection with goods shipped by EKS whose scheduled delivery date is June 22, 2025, which are entitled to treatment as an administrative expense. |
|  | o | Under the MIPA, potential indemnification claims against Seller in relation to certain tracking units (or other phantom equity interests) granted to certain employees of EKS equivalent in the aggregate to 1.5% of Seller's remaining interest in HoldCo, but which have not been granted or issued to such employees (the "**Tracking Units Claims**"). |

| Proposed Transaction | The Parties desire to consummate a comprehensive transaction (the "**Proposed Transaction**") as follows. |
|---|---|
| | • The Buyer would acquire the Remaining Units from the Seller (the "**20% Acquisition**"). |
| | • As partial consideration for the 20% Acquisition, Hitachi would release and waive its claims against the respective Powin Parties and their respective related parties (collectively, the "**Hitachi Releases**"), including: |
| |    o   The Indemnity Claims |
| |    o   The Commercial Claims |
| |    o   The Tracking Units Claims |
| |    o   Rejection damages claims under the MSA, including in relation to Powin's failure to satisfy the MVC obligations |
| | provided, however, the Hitachi Releases will not encompass, extend to or otherwise comprise any rights and claims Hitachi or its affiliates may have against Akaysha and its affiliates. |
| | • The Seller, Powin, their affiliates and related parties, and the bankruptcy estates of the Powin Debtors, expressly waive and release any and all claims, offsets, defenses, whether known or unknown they may or may have against the Buyer, EKS, HoldCo or any of their affiliates, or their respective agents, attorneys, shareholders, managers, members, advisors, officers, directors, employees, affiliates, partners, predecessors, successors, and assigns, or other related parties under any ground, including but not limited under law, equity or relating in any way to the MIPA, the LLCA (including the put option rights of Seller thereunder), the Separation Agreements, the TSA, the Service Agreements, the Acquisition, the MSA, the Purchase Orders, any dealings of Hitachi with or concerning the end customers of Powin under the Purchase Orders, or otherwise, including any claims or causes of actions under chapter 5 of the Bankruptcy Code (the "**Powin Releases**"). |
| | • The transactions contemplated by this term sheet are expected to be documented in an agreement, to which the membership interest purchase agreement substantially in the form attached as Exhibit D to the LLCA will be an exhibit (the "**Agreement**").  The Powin Debtors will file a motion or such appropriate supplements to their existing sale motion such that approval of the transactions contemplated by this term sheet will be sought from the Bankruptcy Court on August 6, 2025. |
| Purchase Price and Settlement Payment | In addition to the Hitachi Releases, as full and final consideration of the proposed transaction, including the 20% Acquisition and the Powin Releases, the Buyer will pay, or cause to be paid, to the Seller a fixed sum of **USD 15,000,000**, not subject to any price adjustment or earn-out (the "**Purchase Price**"). |
| Conditions Precedent | Consummation of the proposed transactions are subject to: |
| | • Entry of an order of the Bankruptcy Court approving and authorizing the Proposed Transaction pursuant to Bankruptcy Rule 9019 and the applicable provisions of the Bankruptcy Code, including sections 363 and 365 thereof (the "**Court Approval**"), which order has not been stayed and has become final. |
| | • Voluntary release of any security interests or liens on the Remaining Interests, in form and substance acceptable to Buyer. |
| | • Satisfaction or waiver of all conditions precedent in the Agreement, including any conditions precedent in the form MIPA incorporated into the Agreement. |

| | |
|---|---|
| **Closing of the Proposed Transaction** | Closing of the Proposed Transaction will take place on the date which is 10 Business Days following satisfaction of the last of the Conditions Precedent (such date, the "**Closing Date**").<br><br>At Closing:<br><br>• The Buyer will pay to the Seller in immediately available funds the Purchase Price to the bank account designated in writing by the Seller no later than 5 Business Days prior to the Closing Date.<br><br>• The Buyer and the Seller will enter into and close on the membership interest purchase agreement substantially in the form attached as Exhibit D to the LLCA, assigning the Remaining Units to Buyer.<br><br>• Releases of any liens or security interests (including without limitation any adequate protection liens or other liens under any order approving DIP financing or the use of cash collateral in the Chapter 11 Cases) will be executed and delivered.<br><br>• The Agreement will be executed and the Hitachi Releases and the Powin Releases will each become effective.<br><br>• To the extent applicable, the Seller will cause the Powin Directors (as defined in the LLCA) to resign as of the Effective Date. |
| **Costs and expenses** | Each Party shall bear its own costs and expenses in connection with this terms sheet and the Proposed Transaction. |
| **Confidentiality** | No Party shall make any public announcements in respect of this term sheet or the transactions contemplated by this term sheet without the prior written consent of the other Party (which consent shall not be unreasonably withheld, conditioned or delayed), and the Parties shall cooperate as to the timing and contents of any such announcement or disclosure; provided, however, nothing in this paragraph will prevent any of the following at any time:<br><br>• the Parties filing any document or providing any information to the Bankruptcy Court to obtain Court Approval;<br><br>• a Party disclosing any information to the extent required under applicable law, in which case the Party required to make such release or announcement will allow the other Party reasonable time to comment on such release or announcement in advance of such issuance;<br><br>• a Party making a statement or disclosure to (i) such Party's (or any of its affiliate's) paid legal, accounting and financial advisers to the extent reasonably necessary for any such adviser to perform its paid legal, accounting and financial services, respectively, for such Party (or such affiliate), or (ii) any of its affiliates or any of their representatives in the ordinary course of its business; provided, that such persons are bound by confidentiality restrictions regarding the information disclosed. |
| **Governing law** | This term sheet shall be governed by and construed in accordance with the internal Laws of the State of Delaware without regard to the conflicts of law provision or rule (whether of the State of Delaware or any other jurisdiction). |
| **Jurisdiction** | Each Party to submit to the jurisdiction of the Bankruptcy Court and, for matters arising following the conclusion of the Chapter 11 Cases, the United States District Court for the District of Delaware, for the purposes of any proceeding relating to the transaction contemplated by the definitive documents. |
| **Waiver of Jury Trial Rights** | Agreement and related definitive documentation will provide, to the fullest extent permitted by applicable law, for the waiver by each Party of any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this term sheet, or any transaction contemplated hereby or thereby. |

4

**Exhibit 8**

(KEIP Orders)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| AGWAY FARM & HOME SUPPLY, LLC, | Case No. 22-10602 (JKS) |
| Debtor.[1] | **Re D.I. No. 70** |

## AMENDED ORDER GRANTING DEBTOR'S MOTION FOR AN ORDER APPROVING (1) KEY EMPLOYEE INCENTIVE PLAN; (2) KEY EMPLOYEE RETENTION PLAN, AND (3) GRANTING RELATED RELIEF

Upon the Motion of the Agway Farm & Home Supply, LLC, the debtor and debtor in possession in the above captioned case (the "Debtor"), for an Order Approving (1) Key Employee Incentive Plan; (2) Key Employee Retention Plan; and (3) Granting Related Relief to (A) Assume Existing Insurance Policies; and (B) Pay all Obligations in Respect Thereof (the "Motion");[2] and it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and that this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having reviewed and considered the Preliminary Objection of the Official Committee of Unsecured Creditors to the Motion (Docket No. 88) and the Objection of the United States Trustee to the Motion (Docket No. 92; and the Court having determined that the relief requested in the Motion is necessary to the ongoing orderly operation of the Debtor's business and is in the best interests of the Debtor, its estate, and its creditors; and it appearing that the notice of the Motion having been given as set forth herein was appropriate and that no other or further notice need by given; and after

---

[1] The last four digits of the Debtor's federal tax identification number are 1247. The Debtor's address is 6606 W. Broad Street, Richmond, VA 23230.

[2] Capitalized terms not otherwise defined herein shall have the meaning set forth in the Motion.

due deliberation and good and sufficient cause appearing therefor; and since the entry of the Order Approving (1) Key Employee Incentive Plan; (2) Key Employee Retention Plan; and (3) Granting Related Relief [Docket No. 134];

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED.

2.    Except as provided to the contrary herein, all objections to the Motion or the relief provided herein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled and denied.

3.    The KEIP and the KERP are each approved on the terms described in the Motion with the following modifications: (1) The amount of the KEIP will be calculated based on the sale proceeds from the Sale Process other than any sale proceeds that result from the Debtor's de minimis asset sales of inventory at discounted rates ("De Minimis Asset Sales"). In other words, any sale proceeds from De Minimis Asset Sales will not count toward the calculation of the KEIP amount to be paid; and (2) The total paid to the KERP Employees under the KERP shall not exceed $330,000.00.

4.    The Debtor is authorized to take all actions necessary to implement the KEIP and the KERP, and to make all payments provided under such plans.

5.    All amounts earned and payable under the KEIP and the KERP shall have administrative expense priority under sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code for all purposes in this Case and in any other case under the Bankruptcy Code to which this Case may be converted.

6.    This Order shall be effective and enforceable immediately upon entry, and any

13910292.v1

stay applicable under the Bankruptcy Rules or the Local Rules is hereby expressly waived and shall not apply.

7.    The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

8.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**Dated: November 21st, 2022
Wilmington, Delaware**

**J. KATE STICKLES
UNITED STATES BANKRUPTCY JUDGE**

3

13910292.v1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-2(c)

**CURTIS, MALLET-PREVOST,**
    **COLT & MOSLE LLP**
101 Park Avenue
New York, NY 10178-0061
Telephone: (212) 696-6000
Facsimile: (212) 697-1559
Steven J. Reisman
Cindi M. Giglio
Bryan M. Kotliar

*Counsel to the Debtors*
    *and Debtors-in-Possession*

**COLE, SCHOTZ, MEISEL,**
    **FORMAN & LEONARD, P.A.**
Court Plaza North
25 Main Street
Hackensack, New Jersey 07602-0800
Telephone: (201) 489-3000
Facsimile: (201) 489-1536
Michael D. Sirota
Ilana Volkov

*Co-Counsel to the Debtors*
    *and Debtors-in-Possession*

In re:

ASHLEY STEWART HOLDINGS, INC., *et al.*,[1]

                    Debtors-in-Possession.

Case No. 14-14383 (MBK)

Judge:  Honorable Michael B. Kaplan

Chapter 11

(Jointly Administered)

**ORDER PURSUANT TO SECTIONS 105(A), 363(B) AND 503(C)(3) OF THE**
**BANKRUPTCY CODE APPROVING DEBTORS' KEY EMPLOYEE**
**INCENTIVE PROGRAM**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

**DATED: 4/23/2014**

Order Filed on
**4/23/2014**
by Clerk U.S. Bankruptcy
Court District of New Jersey

(Page 1)

Debtor:        ASHLEY STEWART HOLDINGS, INC., et al.

Case No.:      14-14383 (MBK) (Jointly Administered)

Caption:       ORDER PURSUANT TO SECTIONS 105(a), 363(b) AND 503(C)(3) OF THE
               BANKRUPTCY CODE APPROVING DEBTORS' KEY EMPLOYEE
               INCENTIVE PROGRAM

---

        The relief set forth on the following pages, numbered two (2) through four (4) is

hereby ORDERED.

18007299

*Approved by Judge Michael Kaplan  April 23, 2014*

(Page 2)
Debtor:       ASHLEY STEWART HOLDINGS, INC., et al.
Case No.:     14-14383 (MBK) (Jointly Administered)
Caption:      ORDER PURSUANT TO SECTIONS 105(a), 363(b) AND 503(C)(3) OF THE
              BANKRUPTCY CODE APPROVING DEBTORS' KEY EMPLOYEE
              INCENTIVE PROGRAM

---

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for entry of an order (this "Order") pursuant to sections 105(a), 363(b), and 503(c)(3) of the Bankruptcy Code approving Debtors' key employee incentive program (the "KEIP"); and upon the Debtors' Supplemental Statement in support thereof; and upon the Declaration of Perry M. Mandarino submitted in support thereof; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors and other parties in interest; and the Court having found that the Debtors' implementation of the KEIP is justified by the facts and circumstances of these Chapter 11 Cases and is a sound exercise of the Debtors' business judgment; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* dated as of September 18, 2012; and it appearing that the Motion is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2); and it appearing that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and it appearing that no other or further notice need be provided; and appearing that no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.       Subject to the conditions specified herein, the Debtors are authorized, but not required, to adopt and implement the KEIP as set forth on **Exhibit A** hereto and to make the payments contemplated by the KEIP; provided, however, that each Participating Employee, and

---

[2] Capitalized terms used herein but not otherwise defined have the meanings ascribed to them in the Motion.

18007299

*Approved by Judge Michael Kaplan  April 23, 2014*

(Page 3)
Debtor:        ASHLEY STEWART HOLDINGS, INC., et al.
Case No.:      14-14383 (MBK) (Jointly Administered)
Caption:       ORDER PURSUANT TO SECTIONS 105(a), 363(b) AND 503(C)(3) OF THE
               BANKRUPTCY CODE APPROVING DEBTORS' KEY EMPLOYEE
               INCENTIVE PROGRAM

any other employee who may become entitled to a payment under the KEIP, is entitled to receive an Incentive Bonus under the KEIP if the Debtors meet the gross sale proceeds thresholds set forth in the Motion and the Participating Employee is employed by the Debtors until such time as his or her services are no longer needed.

2.    Subject to the Court's approval of the Settlement Agreement, dated as of April 14, 2014 [Docket No. 292, Ex. A] (the "Global Settlement"), the Debtors are authorized to make payments pursuant to the KEIP to the Participating Employees as part of the Tier 2 Claims and Tier 3 Claims (each as defined in the Global Settlement).  This Order shall be without prejudice to the Debtors submitting an additional proposed form of order for approval authorizing the Debtors to make payments pursuant to the KEIP to the Participating Employees or any other of the Debtors' employees that the Debtors determine in their business judgment are entitled to such payments as part of the Tier 4 Claims (as defined in the Global Settlement).

3.    The terms of this Order are conditioned upon the Court's approval of the Global Settlement.  In the event that the Global Settlement is denied, the terms of this Order shall be immediately vacated and shall be without prejudice to the Debtors' rights to renew the Motion.  For the avoidance of doubt, no payment shall be made pursuant to the KEIP until the Global Settlement is approved, or if denied, until after the Debtors renew their Motion and such renewed Motion is approved.

4.    The authorization granted herein to make payments to the Participating Employees under the KEIP shall not create any obligation or liability on the part of the Debtors, their officers, directors, employees or agents to make such payments.

18007299

*Approved by Judge Michael Kaplan  April 23, 2014*

(Page 4)
Debtor:      ASHLEY STEWART HOLDINGS, INC., et al.
Case No.:    14-14383 (MBK) (Jointly Administered)
Caption:     ORDER PURSUANT TO SECTIONS 105(a), 363(b) AND 503(C)(3) OF THE
             BANKRUPTCY CODE APPROVING DEBTORS' KEY EMPLOYEE
             INCENTIVE PROGRAM

---

5.      All Incentive Bonuses paid to the Participating Employees under the KEIP as authorized herein shall constitute administrative expenses of the Debtors' estates pursuant to section 503(b) of the Bankruptcy Code.

6.      The Debtors, their officers, employees and agents are authorized to take and refrain from taking such acts as are necessary and appropriate to implement and effectuate the relief granted herein.

7.      Notwithstanding Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

8.      To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Order shall govern.

9.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

10.     A true copy of this Order shall be served on all parties-in-interest by regular mail within seven (7) days hereof.

18007299

*Approved by Judge Michael Kaplan  April  23, 2014*

## Exhibit A

**Key Employee Incentive Plan**

*Approved by Judge Michael Kaplan  April  23, 2014*

Business Recovery Services

# New Ashley Stewart, Inc.
## Key Employee Incentive Plan

*Strictly Private
and Confidential*

*4 April 2014*



*Approved by Judge Michael Kaplan  April  23, 2014*



# pwc

New Ashley Stewart, Inc.
100 Metro Way
Secaucus, NJ 07094

April 4, 2014

Dear Board of Directors:

PricewaterhouseCoopers LLP ("PwC") has performed certain advisory services for New Ashley Stewart, Inc. ("Client") in connection with certain restructuring advisory services pursuant to the engagement letter dated January 25, 2014.

This report and PwC's services are confidential and access, use and distribution are restricted. The services were performed, and this report prepared, at Client's direction and exclusively for Client's sole benefit and use. The services and report may not be relied upon by any person or entity other than Client. PwC makes no representations or warranties regarding the services or this report and expressly disclaims any contractual or other duty, responsibility or liability to any person or entity other than Client. If you are not Client, or otherwise authorized by Client and PwC, you may not access or use the services or this report.

The services were performed in accordance with the Standards for Consulting Services of the American Institute of Certified Public Accountants ("AICPA") and, where applicable, the AICPA Standards for Reports on the Application of Accounting Principles or the AICPA Statements on Standards for Tax Services. The services do not constitute legal or investment advice, broker dealer services, a fairness or solvency opinion, an estimate of value, an audit, an examination of any type, an accounting or tax opinion, or other attestation or review services in accordance with the standards of the AICPA, the Public Company Accounting Oversight Board or any other professional or regulatory body. PwC provides no opinion or other form of assurance with respect to the services, report or underlying information. Client, in consultation with its independent accountants, is responsible for the presentation and preparation of its financial statements and related disclosures.

The services and this report shall be maintained in strict confidence and may not be discussed with, distributed or otherwise disclosed to any third party, in whole or in part, without PwC's prior written consent, nor may the services or this report (or contents thereof) be associated with, referred to or quoted in any way in any offering memorandum, prospectus, registration statement, public filing, loan or other agreement.

Any underlying prospective financial information ("PFI") referred to in this report was not prepared or developed by PwC and PwC has not restated any PFI or made assumptions or projections relating to PFI. While PwC may have performed sensitivity analyses on PFI and underlying assumptions, any tables aggregating PwC's comments or observations of vulnerabilities and sensitivities do not represent restatements of or revisions to PFI; they are only a summary of PwC's analyses to assist Client with its evaluation of PFI. It is Client's responsibility to make its own decisions regarding PFI. As events and circumstances frequently do not occur as expected, there may be material differences between PFI and actual results. PwC disclaims responsibility and liability for PFI and any results achieved.

This report was not intended or written to be used, and it may not be used for the purpose of avoiding U.S. Federal, state or local tax penalties, or supporting the promotion or marketing of any transactions or matters addressed in this report. Client has no obligation of confidentiality with respect to any information related to the tax structure or tax treatment of any transaction.

Very truly yours,

PricewaterhouseCoopers LLP
By **Perry Mandarino, Partner**
T: (646) 471-7589
M: (201)522-5497
perry.mandarino@us.pwc.com

**PricewaterhouseCoopers LLP**
300 Madison Ave
New York, NY 10017
T:    +1 (646) 471-4000
F:    +1 (813) 286 6000

New Ashley Stewart, Inc.
PwC

Confidential Information for the sole benefit and use of PwC's Client.

4 April 2014
2

*Approved by Judge Michael Kaplan  April  23, 2014*

# *Contents*

| | Transmittal Letter | 2 |
|---|---|---|
| 1 | Background | 4 |
| 2 | Approach | 6 |

New Ashley Stewart, Inc.
PwC

Confidential Information for the sole benefit and use of PwC's Client.

4 April 2014
3

*Approved by Judge Michael Kaplan  April  23, 2014*

# Background

## Introduction

- New Ashley Stewart, Inc. ("NAS" or the "Company"), a plus size women's iconic fashion brand and specialty retailer with 168 stores in 24 states as of March 1, 2014, Washington DC and the US Virgin Islands, was founded in 1991 and has its corporate office and distribution facility in Secaucus, New Jersey.

- Revenue began to decline in FY'12, resulting in a glut of clearance, seven months of negative comparable stores sales, and a significant erosion of cash. To combat the weak macro-economic conditions and declining sales, NAS implemented over $3M in cost cutting initiatives and hired a restructuring advisor.

- In August 2013, after another disappointing spring, the Company completed a refinancing and appointed a new interim president and interim CFO; new management immediately focused on digital and supply chain improvements, as well as additional cost cuts – including a systematic reduction in headcount in order to increase productivity and preserve cash.

- Financial results dramatically improved in September/October, capped off with a record-breaking Black Friday week; however, the Company suffered from difficult December results due to poor weather and a weak retail environment, which resulted in a significant strain on NAS's liquidity.

- As a result of the liquidity constraints, the Company filed for Chapter 11 bankruptcy on March 10, 2014.

- The NAS Board and Management conducted extensive due diligence with respect to the need for an incentive compensation plan and the team most critical to a successful restructuring and sale.

## The Company sought independent counsel to perform diligence and to create and authorize the incentive compensation

- PwC has been retained as the Financial Advisor to NAS to advise on the financial restructuring, bankruptcy and 363 sale process.

- As such, the Company has requested our recommendation with respect to the design of a Key Employee Incentive Plan ("KEIP") for employees that are both necessary to successfully executing a 363 sale and will have the most impact in the value achieved during the sale process.

- NAS employs approximately 1,700 employees, of which 400 are full time.

- Management requested that we consider the following with respect to the KEIP design:

  - Achieving the greatest value for all constituents is directly correlated to the value achieved through the sale process;

  - Value is likely to be maximized through the sale of NAS as a going concern, which will preserve many of the 1,700 jobs.

- Accordingly, management has requested that we outline a KEIP plan for key employees of the Company that is linked to the 363 sale process and incentivizes the participants relative to their contribution to a successful outcome.

- The range of potentially achievable values is from $350,000 if the assets are sold for at least $23m and up to a maximum of $1.4m if the assets are sold for more than $37m.

New Ashley Stewart, Inc.
PwC

Confidential Information for the sole benefit and use of PwC's Client.

4 April 2014
4

*Approved by Judge Michael Kaplan  April  23, 2014*

# KERP vs KEIP

Since the Bankruptcy Code was amended in 2005, the bar has been raised with respect to providing "pay to stay" incentives for a debtor's management and other key employees. Sections 503(c)(1) and (c)(2) of the Bankruptcy Code provide strict limitations on key employee retention plans ("KERPs") and severance programs for insiders. In addition, section 503(c)(3) mandates that transfers and obligations outside of the ordinary course of business to any person or entity, including officers, managers, or consultants hired postpetition, be "justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). Section 503(c)(3) applies to key employee incentive programs ("KEIPs").

Because KERPs and KEIPs are evaluated under different provisions of the Bankruptcy Code, the threshold inquiry for a court is whether the program being proposed by the debtor is a KERP or a KEIP. This inquiry focuses on whether the KEIP is a true incentive plan rather than a disguised retention plan. *See In re Hawker Beechcraft, Inc.,* 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012).  In other words, "the Court must examine a proposed KEIP mindful of the practice that Congress sought to eradicate and, at the risk of oversimplification, determine whether the proposed targets are designed to motivate insiders to rise to a challenge or merely report to work." *Id.*  Courts look for high hurdles and challenging standards before a retention bonus can be paid.  *Id.*  Importantly, the proponent of the KEIP bears the burden of proving that the plan is not a retention plan governed by section 503(c)(1).  *Id.*

> *In keeping with § 503(c)(3), the goal is to create a fair and reasonable KEIP for NAS*

New Ashley Stewart, Inc.
PwC

Confidential Information for the sole benefit and use of PwC's Client.

4 April 2014
5

*Approved by Judge Michael Kaplan  April  23, 2014*

# PwC's Approach

## Factors relevant to good KEIP design

KEIPs have generally been found to be primarily incentivizing if they are designed to incentivize management to produce and enhance the value of the estate or motivate employees to achieve performance goals.

Considerations include whether:

- the plan is calculated to achieve the desired performance;

- the cost of the plan is reasonable within the context of the debtor's assets, liabilities, and earning potential;

- the scope of the plan is fair and reasonable;

- the plan is consistent with industry standards;

- the debtor engaged in due diligence related to the need for the plan, the employees that needed to be incentivized, and what types of plans are generally applicable in a particular industry; and

- the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation.

See In re Dana Corp., 358 B.R. at 576-77 (identifying factors to determine whether business judgment standard has been satisfied)

## PwC's objectives with respect to New Ashley Stewart's KEIP design

- Consistent with management's direction we sought to design a KEIP which:

  - appropriately incentivizes all participants to enhance value achieved through the sale process;

  - continues the current operational improvements;

  - preserves jobs.

- In order to establish a reasonable range of award values we looked at recent KEIPs in similar cases. (Similar cases include companies that had Section 363 KEIPS and the entity was ultimately sold for $75M or under in sale proceeds).

  - We utilized the data and other attributes of these plans to design a plan that satisfies the business judgment standard of Section 503(c)(3).

- Upon review of the KEIP plans of the comparable companies, we believe the structure that best aligns incentives is one that is based on incremental value thresholds and provides modest awards for good results but significantly larger rewards for exceptional results (similar to Movie Gallery).

---

**The NAS KEIP is designed to incentivize management and other employees to achieve a successful outcome:**
- The plan includes various thresholds based on the value of contemplated sale proceeds;
- Sale proceeds are defined as aggregate consideration received from an acquiring party in the event of a transaction / sale as a going concern;
- Aggregate consideration includes all cash consideration, plus the principal amount of any assumed debt, plus the value of any assumed liabilities.

---

New Ashley Stewart, Inc.
PwC

Confidential Information for the sole benefit and use of PwC's Client.

4 April 2014

6

*Approved by Judge Michael Kaplan  April  23, 2014*

# KEIP Plan Design – New Ashley Stewart Plan is designed to achieve desired performance

| Issue | KEIP Design | Commentary |
|---|---|---|
| **Eligibility** | 10 employees are eligible for the plan<br>• 4 top executives<br>• 6 management team members | The 10 participants have been identified based on their likely impact on the execution of the turnaround and or sale outcome. The participant pool represents approximately less than 3% of full time employees and less than 1% of total employees. As discussed in greater detail on the next slide, the awards are weighted by impact. |
| **Total Cost Range** | The total plan cost ranges from $0 if the threshold is not achieved to a maximum of $1.4M at a value that reflects continued execution on the turnaround plan and going concern that preserves jobs. | The cost is in line with KEIPs for comparable sales transactions and is more than offset by the increased recoveries available to creditors at each payout level. |
| **Payout Metric (Base Case)** | | The size of the KEIP award is calculated based on the size of the sale proceeds and the award by individual ranges from 2.0% – 32.25% of the total KEIP. The award increases progressively by dollar value and percentage of base compensation as sale value increases; in no case is the total cost of the maximum award above 4% of the sale proceeds.<br><br>***The cost of the plan is reasonable within the context of the Debtors' assets, liabilities and earning potential.*** |
| **Payout Timing** | Upon sale close. | Incentivizes an expeditious sale closing that maximizes value for the creditors. |

**Total Cost Per Employee**

| Outcome Range | Award Level | Total Cost | % of Value | Avg per Employee |
|---|---|---|---|---|
| Below $23M | 0% | $0 | 0.0% | - |
| $23M - $28.9M | 25% | 350,000 | 1.8% | 35,000 |
| $29M - $34.9M | 50% | 700,000 | 2.8% | 70,000 |
| $35M - $36.9M | 75% | 1,050,000 | 3.5% | 105,000 |
| Above $37M | 100% | 1,400,000 | 4.0% | 140,000 |
| **Total Maximum Cost** | | $1,400,000 | | |

*Approved by Judge Michael Kaplan April 23, 2014*

# KEIP award is designed to be heavily weighted to results and impact - Plan is designed to achieve desired performance

## KEIP Award as a % of Total KEIP Award

| Aggregate Consideration | | $23M | $28m | $33m | $37m+ |
|---|---|---|---|---|---|
| Ct | Job Title | T-hold | Target | Target+ | Super |
| 1 | Employee 1 | 32.25% | 32.25% | 32.25% | 32.25% |
| 2 | Employee 2 | 12.25% | 12.25% | 12.25% | 12.25% |
| 3 | Employee 3 | 12.25% | 12.25% | 12.25% | 12.25% |
| 4 | Employee 4 | 12.25% | 12.25% | 12.25% | 12.25% |
| 5 | Employee 5 | 10.00% | 10.00% | 10.00% | 10.00% |
| 6 | Employee 6 | 7.00% | 7.00% | 7.00% | 7.00% |
| 7 | Employee 7 | 5.00% | 5.00% | 5.00% | 5.00% |
| 8 | Employee 8 | 5.00% | 5.00% | 5.00% | 5.00% |
| 9 | Employee 9 | 2.00% | 2.00% | 2.00% | 2.00% |
| 10 | Employee 10 | 2.00% | 2.00% | 2.00% | 2.00% |
| % of Maximum Award | | 25.0% | 50.0% | 75.0% | 100.0% |
| Total Award (10 employees) | | $350,000 | $700,000 | $1,050,000 | 1,400,000 |
| Average per Employee | | $35,000 | $70,000 | $105,000 | $140,000 |
| Total Max Award | | $350,000 | $700,000 | $1,050,000 | $1,400,000 |

Source: PwC Analysis, Discussions with the NAS Board and its legal advisors

> **The maximum KEIP award is $1.4M, which is an average of $140,000 per employee, if aggregate consideration of over $37M is achieved.**

## Eligible Employees

The aggregate award becomes progressively larger as exceptional outcomes are achieved:

- Initial threshold of $23M is well above the liquidation value.

- Each award level above the initial threshold increases by an incremental $1M of value (see following page)

- The final award level (Super) is set at 100% of the maximum award.

- Individual awards as a % of the total KEIP award remains constant at the various outcome levels, while the dollar value increases progressively:

- The top-level executives (12.5% - 32.25% of total KEIP award) are expected to have the largest and most significant impact on achieving the desired sale outcome.

- The management-level employees (2.00% - 10.00% of total KEIP award) are expected to have a significant impact and influence on the desired outcome.

*Approved by Judge Michael Kaplan  April  23, 2014*

# The KEIP compensation pool is a derivative of Aggregate Consideration [1] and increases 5% for each additional $1.0 million of sale proceeds.

## KEIP Compensation

| Aggregate Consideration ($ M) | 23.0 | 24.0 | 25.0 | 26.0 | 27.0 | 28.0 | 29.0 | 30.0 | 31.0 | 32.0 |
|---|---|---|---|---|---|---|---|---|---|---|
| | T-hold | T-hold | T-hold | T-hold | T-hold | Target | Target | Target | Target | Target |
| Employee 1 | 112,875.0 | 135,450.0 | 158,025.0 | 180,600.0 | 203,175.0 | 225,750.0 | 248,325.0 | 270,900.0 | 293,475.0 | 316,050.0 |
| Employee 2 | 42,875.0 | 51,450.0 | 60,025.0 | 68,600.0 | 77,175.0 | 85,750.0 | 94,325.0 | 102,900.0 | 111,475.0 | 120,050.0 |
| Employee 3 | 42,875.0 | 51,450.0 | 60,025.0 | 68,600.0 | 77,175.0 | 85,750.0 | 94,325.0 | 102,900.0 | 111,475.0 | 120,050.0 |
| Employee 4 | 42,875.0 | 51,450.0 | 60,025.0 | 68,600.0 | 77,175.0 | 85,750.0 | 94,325.0 | 102,900.0 | 111,475.0 | 120,050.0 |
| Employee 5 | 35,000.0 | 42,000.0 | 49,000.0 | 56,000.0 | 63,000.0 | 70,000.0 | 77,000.0 | 84,000.0 | 91,000.0 | 98,000.0 |
| Employee 6 | 24,500.0 | 29,400.0 | 34,300.0 | 39,200.0 | 44,100.0 | 49,000.0 | 53,900.0 | 58,800.0 | 63,700.0 | 68,600.0 |
| Employee 7 | 17,500.0 | 21,000.0 | 24,500.0 | 28,000.0 | 31,500.0 | 35,000.0 | 38,500.0 | 42,000.0 | 45,500.0 | 49,000.0 |
| Employee 8 | 17,500.0 | 21,000.0 | 24,500.0 | 28,000.0 | 31,500.0 | 35,000.0 | 38,500.0 | 42,000.0 | 45,500.0 | 49,000.0 |
| Employee 9 | 7,000.0 | 8,400.0 | 9,800.0 | 11,200.0 | 12,600.0 | 14,000.0 | 15,400.0 | 16,800.0 | 18,200.0 | 19,600.0 |
| Employee 10 | 7,000.0 | 8,400.0 | 9,800.0 | 11,200.0 | 12,600.0 | 14,000.0 | 15,400.0 | 16,800.0 | 18,200.0 | 19,600.0 |
| **Total Award** | $350,000.0 | $420,000.0 | $490,000.0 | $560,000.0 | $630,000.0 | $700,000.0 | $770,000.0 | $840,000.0 | $910,000.0 | $980,000.0 |
| % of Maximum Award | 25% | 30% | 35% | 40% | 45% | 50% | 55% | 60% | 65% | 70% |
| Average per Employee | $35,000.0 | $42,000.0 | $49,000.0 | $56,000.0 | $63,000.0 | $70,000.0 | $77,000.0 | $84,000.0 | $91,000.0 | $98,000.0 |

## KEIP Compensation, cont.

| Aggregate Consideration ($ M) | 33.0 | 34.0 | 35.0 | 36.0 | 37.0 | 37.0 + |
|---|---|---|---|---|---|---|
| | Target+ | Target+ | Target+ | Target+ | Target+ | Super |
| Employee 1 | 338,625.0 | 361,200.0 | 383,775.0 | 406,350.0 | 428,925.0 | 451,500.0 |
| Employee 2 | 128,625.0 | 137,200.0 | 145,775.0 | 154,350.0 | 162,925.0 | 171,500.0 |
| Employee 3 | 128,625.0 | 137,200.0 | 145,775.0 | 154,350.0 | 162,925.0 | 171,500.0 |
| Employee 4 | 128,625.0 | 137,200.0 | 145,775.0 | 154,350.0 | 162,925.0 | 171,500.0 |
| Employee 5 | 105,000.0 | 112,000.0 | 119,000.0 | 126,000.0 | 133,000.0 | 140,000.0 |
| Employee 6 | 73,500.0 | 78,400.0 | 83,300.0 | 88,200.0 | 93,100.0 | 98,000.0 |
| Employee 7 | 52,500.0 | 56,000.0 | 59,500.0 | 63,000.0 | 66,500.0 | 70,000.0 |
| Employee 8 | 52,500.0 | 56,000.0 | 59,500.0 | 63,000.0 | 66,500.0 | 70,000.0 |
| Employee 9 | 21,000.0 | 22,400.0 | 23,800.0 | 25,200.0 | 26,600.0 | 28,000.0 |
| Employee 10 | 21,000.0 | 22,400.0 | 23,800.0 | 25,200.0 | 26,600.0 | 28,000.0 |
| **Total Award** | $1,050,000.0 | $1,120,000.0 | $1,190,000.0 | $1,260,000.0 | $1,330,000.0 | $1,400,000.0 |
| % of Maximum Award | 75% | 80% | 85% | 90% | 95% | 100% |
| Average per Employee | $105,000.0 | $112,000.0 | $119,000.0 | $126,000.0 | $133,000.0 | $140,000.0 |

(1) Aggregate consideration includes all cash consideration, plus the principal amount of any assumed debt, plus the value of any assumed liabilities.

Source: PwC Analysis, Discussions with NAS Board and its legal advisors

New Ashley Stewart, Inc.
PwC

Confidential Information for the sole benefit and use of PwC's Client.

4 April 2014
9

*Approved by Judge Michael Kaplan  April 23, 2014*

# *New Ashley Stewart KEIP costs as compared to similar companies*

| Company Name | Filing Date | Estimated / Actual Sale Proceeds | KEIP Max Award (Aggregate) | Total # of Employees Covered | Average Award / Eligible Employee |
|---|---|---|---|---|---|
| Claim Jumper | Sep-10 | $55,300,000 | $450,000 | 15 | $30,000 |
| Nanogen, Inc. | May-09 | 25,685,000 | 385,000 | 6 | 64,167 |
| Evergreen Solar, Inc. | Aug-11 | 34,000,000 | 2,000,000 | 7 | 285,714 |
| Magic Brands, LLC | Apr-10 | 63,500,000 | 1,659,375 | 11 | 150,852 |
| Metro Affiliates (Atlantic Express)** | Nov-13 | 12,000,000 | 605,000 | 2 | 302,500 |
| Movie Gallery, Inc. | Feb-10 | 74,200,000 | 2,860,000 | 5 | 572,000 |
| Point Blank Solutions, Inc. | Apr-10 | 36,600,000 | 381,450 | 20 | 19,073 |
| Proliance International, Inc. | Jul-09 | 34,420,000 | 910,000 | 5 | 182,000 |
| RIH Acquisitions NJ LLC (Atlantic Club Casino Hotel) | Nov-13 | 60,000,000 | 2,100,000 | 7 | 300,000 |
| Sharper Image | Feb-08 | 49,000,000 | 1,130,000 | 5 | 226,000 |
| | | **Total KEIP** | **$12,480,825** | **83** | **$150,371.39** |
| | | **Avg KEIP** | **$1,248,083** | **8** | **$213,231** |

**Metro Affiliates (Atlantic Express) KEIP is driven by collection of $12M in receivables and not a 363 sale.*

Source: PwC Analysis, Public Information

| Total Cost Per Employee | | | | |
|---|---|---|---|---|
| Outcome Range | Award Level | Total Cost | % of Value | Avg per Employee |
| Below $23M | 0% | $0 | 0.0% | – |
| $23M - $28.9M | 25% | 350,000 | 1.8% | 35,000 |
| $29M - $34.9M | 50% | 700,000 | 2.8% | 70,000 |
| $35M - $36.9M | 75% | 1,050,000 | 3.5% | 105,000 |
| Above $37M | 100% | 1,400,000 | 4.0% | 140,000 |
| **Total Maximum Cost** | | **$1,400,000** | | |

Source: PwC Analysis, Public Information

The comparable company KEIP dataset includes those with a planned 363 sale** with anticipated or actual proceeds less than $75M and a filing date within the past five years.

In comparison to other recent approved KEIPs, the NAS KEIP is fair and reasonable:

- NAS KEIP covers 10 executives and managers as compared to the average KEIP plan which covers 8 people.

- The NAS KEIP provides a progressively higher award for employees based on positive outcome for the estate.

- The NAS KEIP has a maximum cost of $1.4M, which is just above the average KEIP.

- NAS KEIP has an average incentive award per employee of approximately $140,000 (based on the maximum award) vs the average award of $150,000 for the comparable companies set.

New Ashley Stewart, Inc.
PwC

Confidential Information for the sole benefit and use of PwC's Client.

4 April 2014
10

*Approved by Judge Michael Kaplan April 23, 2014*

# *Based on the analysis of comparable KEIPs, the New Ashley Stewart KEIP is consistent with industry standards*

- The chart below displays the relationship between sale proceeds and maximum KEIP costs of the comparable companies set (identified on the previous page) and the range of values that can be achieved in the NAS KEIP.
- Comparable company data was plotted using actual and potential sale proceeds and the maximum cost of the KEIP.
- The proposed NAS KEIP is overlaid using the curved red line to connect each payout bracket.
- The NAS proposed KEIP falls within the bound of reasonable ranges based upon the comparable KEIPs summarized on the prior page.

**Sale Contingent KEIPs**



Source: PwC Analysis, Public Information

*NAS potential sale proceeds are presented based on the possible transaction sale proceeds*

New Ashley Stewart, Inc.
PwC

Confidential Information for the sole benefit and use of PwC's Client.

4 April 2014
11

*Approved by Judge Michael Kaplan  April  23, 2014*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>MOBITV, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 21-10457 (LSS)<br><br>Jointly Administered<br><br>**Related Docket Nos. 85, 144, 145, 146, and 172** |

## ORDER APPROVING KEY EMPLOYEE
## INCENTIVE PLAN FOR SENIOR LEADERSHIP EMPLOYEES

The Court has considered the *Debtors' Motion for an Order (I) Approving Key Employee Incentive Plan for Senior Leadership Employees and (II) Approving Key Employee Retention Plan for Non-Insider Employees* [Docket No. 85] (the "Motion"),[2] the *Second Amended Key Employee Incentive Plan* [Docket No. 172-1] (the "Amended KEIP"), and the declarations in support thereof at Docket Nos. 85-3, 144, 145, and 146. The Court has reviewed the Motion and has found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012, and that this Court may enter a final order consistent with Article III of the United States Constitution; (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); and (iv) notice of the Motion and the opportunity for a hearing was sufficient under the circumstances. After due deliberation, the Court has determined that the relief requested in the Motion as it relates to the Amended KEIP, as amended by the Notice, is in

---

[1]  The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: MobiTV, Inc. (2422) and MobiTV Service Corporation (8357). The Debtors' mailing address is 1900 Powell Street, 9th Floor, Emeryville, CA 94608.

[2]  A capitalized term used but not defined herein shall have the meaning ascribed to it in the Motion.

the best interests of the Debtors, their estates, and their creditors and good and sufficient cause
having been shown, therefor;

## IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED to the extent set forth herein.

2.      The terms of the Amended KEIP are hereby approved.

3.      The Debtors are authorized, but not directed, to make any and all
payments to Senior Leadership Employees under the Amended KEIP if the applicable
condition(s) for any such respective payments are met, as described therein.

4.      This Order shall be binding upon any successors and assigns of the
Debtors, including any trustee appointed in these Chapter 11 Cases or in any superseding
proceeding under chapter 7 of the Bankruptcy Code.

5.      This Court shall retain exclusive jurisdiction to hear and determine all
matters arising from or related to the interpretation, implementation, or enforcement of this
Order.

**Dated: April 14th, 2021**
**Wilmington, Delaware**

LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| OneWeb Global Limited, *et al.* | Case No. 20-22437 (RDD) |
| Debtors.[1] | (Jointly Administered) |

### ORDER (I) APPROVING KEY EMPLOYEE INCENTIVE PROGRAM AND KEY EMPLOYEE RETENTION PROGRAM; (II) AUTHORIZING PAYMENTS THEREUNDER; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (the "Debtors"), pursuant to sections 363(b), 503(c)(3), and 507(a)(2) of the Bankruptcy Code, for an order approving the Debtors' key employee retention program ("KERP" and key employee incentive program ("KEIP"), authorizing the payments thereunder, and granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b), and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been provided in accordance with the *Order Implementing Certain Notice and Case*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: OneWeb Global Limited (N/A); OneWeb Holdings LLC (5429); OneWeb Communications Limited (9487); WorldVu Satellites Limited (7802); WorldVu Development LLC (9067); WorldVu JV Holdings LLC (N/A); 1021823 B.C. LTD (8609); Network Access Associates Limited (8566); OneWeb Limited (8662); WorldVu South Africa (Pty) Ltd. (1867); OneWeb Chile SpA (2336); WorldVu Australia Pty Ltd. (5436); WorldVu Unipessoal Lda. (2455); OneWeb Norway AS (0209); OneWeb ApS (9191); OneWeb Network Access Holdings Limited (8580); OneWeb G.K. (1396); OneWeb Ltd (8661); WorldVu Mexico S. DE R. L. DE C.V. (1234). The Debtors' headquarters is located at 195 Wood Lane, West Works Building, 3rd Floor, London, W12 7FQ, UK.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

*Management Procedures* [Docket No. 44], such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and upon the only remaining objection to the Motion, filed by the United States Trustee, all other opposition to the Motion having been resolved by the terms of this Order and withdrawn; and upon the Debtors' reply to the United States Trustee's objection; and the Court having reviewed the Motion and the declarations and supplemental declarations submitted in support of the Motion; and the Court having held a hearing to consider the relief requested in the Motion (the "Hearing"); and upon the record of the Hearing and all of the proceedings herein; and, after due deliberation and for the reasons stated in its bench ruling at the Hearing, the Court having determined that the legal and factual bases set forth in the Motion establish good and sufficient cause for the relief granted herein and satisfy the applicable standards under 11 U.S.C. §§ 363(b) and 503(c); and it appearing that the relief granted herein is in the best interests of the Debtors, their estates, creditors, and all parties in interest; now, therefore,

**IT IS HEREBY ORDERED THAT:**

1. The Motion is granted to the extent set forth herein.

2. The KERP is approved, subject to paragraph 5 hereof. The Debtors are authorized (but not directed) to make payments to the Long-Term Employees and the Short-Term Employees pursuant to the terms of the KERP in the aggregate amount of $3,000,000, without further application or order of this Court.

3. The KEIP, as set forth substantially in the form attached to the Motion as **Exhibit A**, is hereby approved, subject to paragraph 5 hereof.

4.      The Debtors are authorized, but not directed, to take all actions necessary to implement the KEIP, including making any payments that become due pursuant to the terms of the KEIP, without further application or order of this Court.

5.      All amounts earned and payable under the KERP and KEIP shall have administrative expense priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code for all purposes in these chapter 11 cases and in any successor case.  For the avoidance of doubt, the Court is not approving (whether directly or indirectly) any prepetition payments made to the Debtors' Executives.  The Debtors' Executives waive any rights they may have against the Debtors based on any severance claims.  Notwithstanding the waiver of any severance claims in the preceding sentence, such waiver shall not be effective with respect to any assumption and assignment to a third party purchaser of any employment agreements governing the Executives, which assumption and assignment shall include any severance provisions of such agreements, provided that such assumption and assignment shall not require a cure payment by the Debtors or their estates.

6.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of the Motion and the relied granted hereby, and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

7.      Notwithstanding anything to the contrary, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

8.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: May 29, 2020
       White Plains, New York

                          */s/Robert D. Drain*
                          _____
                          THE HONORABLE ROBERT D. DRAIN
                          UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-2(c)**

**FOX ROTHSCHILD LLP**
(Formed in the Commonwealth of Pennsylvania)
Michael J. Viscount, Jr., Esq.
Raymond M. Patella, Esq.
1301 Atlantic Avenue, Suite 400
Atlantic City, NJ 08401
(609) 348-4515/fax (609) 348-6834

**WHITE & CASE LLP**
John K. Cunningham, Esq. (admitted *pro hac vice*)
Richard S. Kebrdle, Esq. (admitted *pro hac vice*)
Kevin M. McGill, Esq. (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
(305) 371-2700/fax (305) 358-5744

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

In re:

REVEL AC, INC., et al.,

Debtors.[1]

Chapter 11

Case No. 14-22654 (GMB)

Jointly Administered

**Re: Docket Nos. 92, 333 & 354**

Order Filed on 7/30/2014 by Clerk U.S. Bankruptcy Court District of New Jersey

**CORRECTED ORDER AUTHORIZING AND APPROVING
KEY EMPLOYEE INCENTIVE PLAN**

The relief set forth on the following pages two (2) through three (3) is hereby ORDERED:

**DATED: 7/30/2014**

Gloria M. Burns, Chief Judge
United States Bankruptcy Court Judge

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Revel AC, Inc. (3856), Revel AC, LLC (4456), Revel Atlantic City, LLC (9513), Revel Entertainment Group, LLC (2321), NB Acquisition, LLC (9387) and SI LLC (3856). The location of the Debtors' corporate headquarters is 500 Boardwalk, Atlantic City, New Jersey 08401.

MIAMI 1021555

(Page 2)

| | |
|---|---|
| Debtors: | Revel AC, Inc., et al. |
| Case No.: | 14-22654 (GMB) |
| Caption of Order: | ORDER AUTHORIZING AND APPROVING KEY EMPLOYEE INCENTIVE PLAN |

Upon the motion (the "Motion")[2] of Revel AC, Inc. and its affiliated debtors and

debtors in possession (collectively, the "Debtors") pursuant to sections 105(a), 363(b)(1) and 503

of the Bankruptcy Code, for entry of an order authorizing and approving a key employee

incentive plan; and it appearing that the Court has jurisdiction over this matter; and it appearing

that due notice of the Motion as set forth therein is sufficient under the circumstances, and that

no other or further notice need be provided; and it further appearing that the relief requested in

the Motion is in the best interests of the Debtors and their estates and creditors; and upon all of

the proceedings had before the Court; and after due deliberation and sufficient cause appearing

therefor, it is hereby

ORDERED that the Motion is GRANTED; and it is further

ORDERED that the key employee incentive plan, in the form attached to hereto as

Exhibit "1" (the "KEIP"), is hereby approved, and that the Debtors are authorized, but not

directed, to make payments to the KEIP Participants pursuant to the KEIP; and it is further

ORDERED that each KEIP Participant must, prior to receiving any KEIP

Payment, execute and deliver to the Debtors (without revocation within any statutorily-

authorized period) a general release of known and unknown claims in favor of the Debtors and

the Debtors' affiliated persons and entities in a form consistent with the terms of the KEIP and

satisfactory to the Debtors; and it is further

ORDERED that all amounts payable under the KEIP pursuant to this Order shall

be deemed allowed administrative expenses of the Debtors' estates under section 503(b) of the

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

MIAMI 1021555

*Approved by Judge Gloria M. Burns July  30, 2014*

(Page 3)

| | |
|---|---|
| Debtors: | Revel AC, Inc., et al. |
| Case No.: | 14-22654 (GMB) |
| Caption of Order: | ORDER AUTHORIZING AND APPROVING KEY EMPLOYEE INCENTIVE PLAN |

Bankruptcy Code from and after the Closing Date (as defined in the KEIP); provided, however, that all such amounts shall be payable pursuant to the terms of the KEIP; and it is further

ORDERED that the Debtors are authorized to take all actions necessary to implement the relief granted in this Order; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to implementation of this Order; and it is further

ORDERED that the Debtors shall file the unredacted version of the KEIP disclosing the sale consideration milestones promptly upon the announcement of the Successful Bidder at the conclusion of the Auction.

3

Approved by Judge Gloria M. Burns July  30, 2014

# **Exhibit 1**

(KEIP)

MIAMI 1021555

*Approved by Judge Gloria M. Burns July  30, 2014*

**REVEL AC, INC. AND ITS AFFILIATED DEBTORS**

**KEY EMPLOYEE INCENTIVE PLAN (the "KEIP")**

1.    Purpose

The Plan is intended to provide incentives and rewards to key managers of the Debtors to effectuate the sale of the Debtors' assets in order to maximize recovery for the benefit of the Debtors' estates and creditor consistencies.

2.    Definitions

(a)    "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

(b)    "Bankruptcy Court" means the United States Bankruptcy Court for the District of New Jersey.

(c)    "Board" means the Board of Directors of Revel AC, Inc.

(d)    "Cause" shall mean (i) a KEIP Participant's failure to materially perform the duties for which he or she is employed, (ii) a KEIP Participant's willful violation of a material Debtors' policy, (iii) a KEIP Participant's commission of any act or acts of fraud, embezzlement, dishonesty or other willful misconduct, (iv) a KEIP Participant's material breach of any of his or her obligations under any written agreement or covenant with the Debtors, or (v) an act of dishonesty on the part of the KEIP Participant resulting or intended to result, directly or indirectly, in his or her gain for personal enrichment at the expense of the Debtors.

(e)    "Chapter 11 Cases" means those certain cases under chapter 11 of the Bankruptcy Code currently pending in the Bankruptcy Court and being jointly administered under Case No. 14-22654 (GMB).

(f)    "Closing Date" shall mean the date on which the Sale closes.

(g)    "Code" means the Internal Revenue Code of 1986, as it may be amended from time to time, including regulations and rules thereunder and successor provisions and regulations and rules thereto.

(h)    "Debtors" means the debtors and debtors in possession in the Chapter 11 Cases.

(i)    "Disability" means "disabled" within the meaning of Section 409A of the Code and the regulations issued thereunder.

(j)    "KEIP Incentive Pool" shall be as defined in Section 5 hereof.

(k)    "KEIP Participants" means the individuals identified as participating in this Plan on Schedule 1 attached hereto.

*Approved by Judge Gloria M. Burns July  30, 2014*

(l)    "Petition Date" means June 19, 2014.

(m)    "Plan" means this Key Employee Incentive Plan.

(n)    "Sale" means the sale of all or substantially all of the Debtors' assets.

3.    <u>Administration</u>

The Board shall have exclusive authority to interpret, operate, manage and administer the Plan in accordance with its terms and conditions.  The Board shall have full discretionary authority in all matters related to the discharge of their respective responsibilities and the exercise of their respective authority under the Plan.  All determinations, decisions, actions and interpretations made or taken by the Board with respect to the Plan shall be final, conclusive and binding on all KEIP Participants and all other persons having or claiming to have any right or interest in or under the Plan, provided that the Board shall not be entitled to modify the conditions for eligibility for, or increase the amount of, the KEIP Incentive Pool.  The Board may consider such factors as it deems relevant to making or taking such decisions, determinations, actions and interpretations, including the recommendations or advice of any director, officer or employee of the Debtors or an affiliate and such attorneys, consultants and accountants as the Board may select.  A KEIP Participant may contest a decision or action by the Board with respect to such KEIP Participant only on the grounds that such decision or action was arbitrary or capricious or was unlawful, and any review of such decision or action shall be limited to determining whether the Board's decision or action was arbitrary or capricious or was unlawful.

4.    <u>Bonus Opportunities</u>

Each KEIP Participant will be eligible to be paid a bonus from the KEIP Incentive Pool described in Section 5.

5.    <u>KEIP Incentive Pools</u>

Following the closing of a Sale, the Debtors shall make payments to the KEIP Participants in the collective aggregate amount (the "KEIP Incentive Pool") of:

(i)    $250,000, contingent upon the aggregate amount of cash and credit bid consideration (excluding assumed liabilities) received in the Sale equaling or exceeding ███████; <u>plus</u>

(ii)    an additional $250,000, contingent upon the aggregate amount of cash and credit bid consideration (excluding assumed liabilities) received in the Sale equaling or exceeding ███████; <u>plus</u>

(iii)    an additional $200,000, contingent upon the aggregate amount of cash and credit bid consideration (excluding assumed liabilities) received in the Sale equaling or exceeding ███████; <u>plus</u>

2

MIAMI 1021041

*Approved by Judge Gloria M. Burns July  30, 2014*

(iv)    an additional $200,000, contingent upon the aggregate amount of cash and credit bid consideration (excluding assumed liabilities) received in the Sale equaling or exceeding ██████████; *plus*

(v)    an additional $200,000, contingent upon the aggregate amount of cash and credit bid consideration (excluding assumed liabilities) received in the Sale equaling or exceeding ██████████; *plus*

(vi)    an additional $200,000, contingent upon the aggregate amount of cash and credit bid consideration (excluding assumed liabilities) received in the Sale equaling or exceeding ██████████; *plus*

(vii)    an additional $200,000, contingent upon the aggregate amount of cash and credit bid consideration (excluding assumed liabilities) received in the Sale equaling or exceeding ██████████; *plus*

(viii)    an additional $250,000, contingent upon the aggregate amount of cash and credit bid consideration (excluding assumed liabilities) received in the Sale equaling or exceeding ██████████.

The amount of any KEIP Payments awarded to each KEIP Participant shall be determined by the Board in its discretion; *provided*, *however*, that the aggregate amount of all KEIP Payments made under this paragraph shall not exceed the aggregate amount set forth above.

6.    Timing of Payments. Subject to Section 8, all payments of bonuses under the Plan (including payment to KEIP Participants who become entitled to payments pursuant to Section 7(b) hereof) shall be made in a lump-sum no earlier than fifteen (15) days following the closing of a Sale; *provided*, *however*, that with respect to each KEIP Participant, no more than 60% of the amounts payable to such KEIP Participant under the Plan shall be paid prior to the effective date of a confirmed chapter 11 plan in these Chapter 11 Cases.

7.    Termination of Employment

(a)    Subject to Section 7(b), any amount otherwise payable under the Plan will be forfeited in the event a KEIP Participant's employment with the Debtors is terminated for any reason prior to the closing of a Sale.

(b)    If a KEIP Participant's employment with the Debtors is terminated without Cause, or due to death or Disability (as determined by the Debtors), prior to the Closing Date, then such KEIP Participant shall be entitled to receive, subject to such KEIP Participant's execution of the release set forth in Section 8 below, (i) any KEIP Payments that would have been earned under the KEIP had the KEIP Participant been employed through the Closing Date, divided by (ii) the number of days from the Petition Date through the Closing Date, multiplied by (iii) the number of days from the Petition Date through the Closing Date during which such KEIP Participant was employed by the Debtors.  Notwithstanding the foregoing, no payment will be made to any such KEIP Participant after the date that is two and one half months following the end of the calendar year in which such termination occurs.

3

*Approved by Judge Gloria M. Burns July 30, 2014*

8.      <u>Release</u>

All payments under the Plan shall be contingent upon a KEIP Participant executing and not revoking a full release of known and unknown claims such KEIP Participant may have against the Debtors in a form determined appropriate by the Debtors.  Such release will include, but not be limited to, (i) any claim against the Debtors with respect to such employee's employment with the Debtors (other than accrued and unpaid salary, benefits, expense reimbursement, vacation and any indemnification) and (ii) if applicable, any claim, right, or interest to any previously unpaid amounts earned or accrued with respect to any previous plans, agreements, or policies related to retention, severance, bonuses, or incentives.  Such release must be executed and is non-revocable prior to the date that is fifteen (15) days following the closing of a Sale (the "Release Date").  In the event that such release is not executed by the KEIP Participant or is revoked by the KEIP Participant prior to the Release Date, any payments under this Plan will be forfeited.

9.      <u>Section 409A</u>

The Plan is intended to comply with, or satisfy an applicable exemption from, Section 409A of the Internal Revenue Code of 1986, as amended, and the Plan shall be administered and interpreted in accordance with such intention.

10.     <u>Miscellaneous</u>

(a)     The Plan shall constitute an unfunded, unsecured liability of the Debtors to make payments in accordance with the provisions of the Plan, and no individual shall have any security interest, ownership interest, or other interest in any assets of the Debtors in connection with the Plan.  Neither the establishment of the Plan nor any obligation of the Debtors to make payments under the Plan shall be deemed to create a trust or a principal-agent relationship.  This Plan does not constitute a term or condition of employment and no KEIP Participant shall have any right to receive payments hereunder, except to the extent all conditions relating to the receipt of such payments have been satisfied.

(b)     Nothing in the Plan shall be construed or interpreted as giving any KEIP Participant the right to be employed or retained by the Debtors for any period or otherwise or impair the right of the Debtors to control their employees or to terminate the services of any employee at any time.

(c)     Amounts payable under the Plan shall not be considered wages, salaries, or compensation under any employee benefit plan, except pursuant to the written terms of the Plan.

(d)     The Debtors shall be entitled to withhold from any amount due and payable by the Debtors to any KEIP Participant (or secure payment from such KEIP Participant in lieu of withholding) the amount of any withholding or other tax due from the Debtors with respect to any amount payable to such KEIP Participant under this Plan.

(e)     If a KEIP Participant becomes entitled to any payments under the Plan, and if at such time such KEIP Participant has outstanding any debt, obligation, or other liability representing an amount owing to the Debtors (whether or not such liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, or equitable),

4

*Approved by Judge Gloria M. Burns July  30, 2014*

then the Debtors may offset such amount against the amount otherwise distributable to such KEIP Participant to the extent permitted by applicable law.

(f)        No person otherwise eligible to receive any payment under the Plan shall have any rights to pledge, assign, transfer, sell, or otherwise dispose of all or any portion of such payments, either directly or by operation of law, including, without limitation, by execution, levy, garnishment, attachment, pledge, or bankruptcy.  If a KEIP Participant is not living at the time any payments are otherwise payable to him or her in accordance with the Plan, such payments shall be paid as designated by the KEIP Participant by will or by the laws of descent and distribution.

(g)        The Plan made and actions taken thereunder shall be governed by and construed in accordance with the laws of the State of New Jersey, without reference to the principles of conflict of laws, except as superseded by applicable federal law.

5

*Approved by Judge Gloria M. Burns July  30, 2014*

## <u>Schedule 1</u>

(List of KEIP Participants)

[Filed Under Seal]

*Approved by Judge Gloria M. Burns July  30, 2014*

Order Filed on
7/30/2014
by Clerk U.S. Bankruptcy
Court District of New Jersey

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-2(c)**

**FOX ROTHSCHILD LLP**
(Formed in the Commonwealth of Pennsylvania)
Michael J. Viscount, Jr., Esq.
Raymond M. Patella, Esq.
1301 Atlantic Avenue, Suite 400
Atlantic City, NJ 08401
(609) 348-4515/fax (609) 348-6834

**WHITE & CASE LLP**
John K. Cunningham, Esq. (admitted *pro hac vice*)
Richard S. Kebrdle, Esq. (admitted *pro hac vice*)
Kevin M. McGill, Esq. (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
(305) 371-2700/fax (305) 358-5744

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

---

In re:

REVEL AC, INC., <u>et al.</u>,

                                    Debtors.[1]

Chapter 11

Case No. 14-22654 (GMB)

Jointly Administered

Re: Docket Nos. 92 & ___

## ORDER AUTHORIZING AND APPROVING
## KEY EMPLOYEE INCENTIVE PLAN

The relief set forth on the following pages two (2) through three (3) is hereby ORDERED:

**DATED: 7/30/2014**

7/30/14

C. U.S.B.J.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Revel AC, Inc. (3856), Revel AC, LLC (4456), Revel Atlantic City, LLC (9513), Revel Entertainment Group, LLC (2321), NB Acquisition, LLC (9387) and SI LLC (3856). The location of the Debtors' corporate headquarters is 500 Boardwalk, Atlantic City, New Jersey 08401.

MIAMI 1021555

(Page 2)
Debtors:              Revel AC, Inc., et al.
Case No.:            14-22654 (GMB)
Caption of Order:     ORDER AUTHORIZING AND APPROVING KEY EMPLOYEE
                      INCENTIVE PLAN

Upon the motion (the "Motion")[2] of Revel AC, Inc. and its affiliated debtors and

debtors in possession (collectively, the "Debtors") pursuant to sections 105(a), 363(b)(1) and 503

of the Bankruptcy Code, for entry of an order authorizing and approving a key employee

incentive plan; and it appearing that the Court has jurisdiction over this matter; and it appearing

that due notice of the Motion as set forth therein is sufficient under the circumstances, and that

no other or further notice need be provided; and it further appearing that the relief requested in

the Motion is in the best interests of the Debtors and their estates and creditors; and upon all of

the proceedings had before the Court; and after due deliberation and sufficient cause appearing

therefor, it is hereby

ORDERED that the Motion is GRANTED; and it is further

ORDERED that the key employee incentive plan, in the form attached to hereto as

Exhibit "1" (the "KEIP"), is hereby approved, and that the Debtors are authorized, but not

directed, to make payments to the KEIP Participants pursuant to the KEIP; and it is further

ORDERED that each KEIP Participant must, prior to receiving any KEIP

Payment, execute and deliver to the Debtors (without revocation within any statutorily-

authorized period) a general release of known and unknown claims in favor of the Debtors and

the Debtors' affiliated persons and entities in a form consistent with the terms of the KEIP and

satisfactory to the Debtors; and it is further

ORDERED that all amounts payable under the KEIP pursuant to this Order shall

be deemed allowed administrative expenses of the Debtors' estates under section 503(b) of the

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
Motion.

2

*Approved by Judge Gloria M. Burns July 30, 2014*

(Page 3)
Debtors:            Revel AC, Inc., et al.
Case No.:           14-22654 (GMB)
Caption of Order:   ORDER AUTHORIZING AND APPROVING KEY EMPLOYEE
                    INCENTIVE PLAN

Bankruptcy Code from and after the Closing Date (as defined in the KEIP); provided, however,

that all such amounts shall be payable pursuant to the terms of the KEIP; and it is further

ORDERED that the Debtors are authorized to take all actions necessary to

implement the relief granted in this Order; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to implementation of this Order; and it is further

ORDERED That the Debtor shall file the unredacted version of the KEIP disclosing the Sale consideration milestones promptly upon the announcement of the Successful Bidder at the conclusion of the Auction.

3

MIAMI 1021555

*Approved by Judge Gloria M. Burns July 30, 2014*

**Exhibit 1**

(KEIP)

MIAMI 1021555

*Approved by Judge Gloria M. Burns July  30, 2014*

# REVEL AC, INC. AND ITS AFFILIATED DEBTORS

# KEY EMPLOYEE INCENTIVE PLAN (the "KEIP")

1.    <u>Purpose</u>

The Plan is intended to provide incentives and rewards to key managers of the Debtors to effectuate the sale of the Debtors' assets in order to maximize recovery for the benefit of the Debtors' estates and creditor consistencies.

2.    <u>Definitions</u>

(a)    "Actual Operating Cash Flow" means, for any given period, the Debtors' actual operating cash flow as calculated by the Board in a manner that (i) is consistent with the income and expense categories included in Budgeted Operating Cash Flow and (ii) excludes, at the Board's discretion, any non-ordinary, one-time income or expenses.

(b)    "Approved Budget" means that certain budget attached to the Interim DIP Order as Exhibit "B", subject to adjustment for any waivers granted, and as may be amended from time to time, in each case with the consent of the DIP Agent and the Required Lenders.

(c)    "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

(d)    "Bankruptcy Court" means the United States Bankruptcy Court for the District of New Jersey.

(e)    "Board" means the Board of Directors of Revel AC, Inc.

(f)    "Budgeted Operating Cash Flow" means, for any given period, the cumulative amount of operating cash flow budgeted for such period in the Approved Budget.

(g)    "Cause" shall mean (i) a KEIP Participant's failure to materially perform the duties for which he or she is employed, (ii) a KEIP Participant's willful violation of a material Debtors' policy, (iii) a KEIP Participant's commission of any act or acts of fraud, embezzlement, dishonesty or other willful misconduct, (iv) a KEIP Participant's material breach of any of his or her obligations under any written agreement or covenant with the Debtors, or (v) an act of dishonesty on the part of the KEIP Participant resulting or intended to result, directly or indirectly, in his or her gain for personal enrichment at the expense of the Debtors.

(h)    "Chapter 11 Cases" means those certain cases under chapter 11 of the Bankruptcy Code currently pending in the Bankruptcy Court and being jointly administered under Case No. 14-22654 (GMB).

(i)    "Closing Date" shall mean the date on which the Sale closes.

*Approved by Judge Gloria M. Burns July 30, 2014*

(j)      "Code" means the Internal Revenue Code of 1986, as it may be amended from time to time, including regulations and rules thereunder and successor provisions and regulations and rules thereto.

(k)      "Debtors" means the debtors and debtors in possession in the Chapter 11 Cases.

(l)      "DIP Agent" shall be as defined in the Interim DIP Order.

(m)      "DIP Credit Agreement" means that certain debtor in possession credit agreement attached to the Interim DIP Order as Exhibit "A".

(n)      "DIP Loan" means the Debtors' debtor in possession financing approved by the Bankruptcy Court on an interim basis pursuant to the Interim DIP Order.

(o)      "Disability" means "disabled" within the meaning of Section 409A of the Code and the regulations issued thereunder.

(p)      "Interim DIP Order" means that certain order entered by the Bankruptcy Court on June 20, 2014 and listed on the Bankruptcy Court's docket for the Chapter 11 Cases as Docket No. 49.

(q)      "KEIP Incentive Pool" shall be as defined in Section 5 hereof.

(r)      "KEIP Participants" means the individuals identified as participating in this Plan on Schedule 1 attached hereto.

(s)      "Petition Date" means June 19, 2014.

(t)      "Plan" means this Events Rentals, Inc. Key Employee Incentive Plan.

(u)      "Required Lenders" shall be as defined in the DIP Credit Agreement.

(v)      "Sale" means the sale of all or substantially all of the Debtors' assets.

3.      <u>Administration</u>

The Board shall have exclusive authority to interpret, operate, manage and administer the Plan in accordance with its terms and conditions.  The Board shall have full discretionary authority in all matters related to the discharge of their respective responsibilities and the exercise of their respective authority under the Plan.  All determinations, decisions, actions and interpretations made or taken by the Board with respect to the Plan shall be final, conclusive and binding on all KEIP Participants and all other persons having or claiming to have any right or interest in or under the Plan, provided that the Board shall not be entitled to modify the conditions for eligibility for, or increase the amount of, the KEIP Incentive Pool.  The Board may consider such factors as it deems relevant to making or taking such decisions, determinations, actions and interpretations, including the recommendations or advice of any director, officer or employee of the Debtors or an affiliate and such attorneys, consultants and accountants as the Board may select.  A KEIP Participant may contest a decision or action by the Board with respect to such KEIP Participant only on the grounds that such decision or action was arbitrary or capricious or

2

*Approved by Judge Gloria M. Burns July  30, 2014*

was unlawful, and any review of such decision or action shall be limited to determining whether the Board's decision or action was arbitrary or capricious or was unlawful.

4.      Bonus Opportunities

Each KEIP Participant will be eligible to be paid a bonus from the KEIP Incentive Pool described in Section 5.

5.      KEIP Incentive Pools

Following the closing of a Sale, the Debtors shall make payments to the KEIP Participants in the collective aggregate amount (the "KEIP Incentive Pool") of:

(i).    $175,000, contingent upon achieving Actual Operating Cash Flow equaling or exceeding Budgeted Operating Cash Flow for the period from the Petition Date through and including the Closing Date; plus

(ii).   an additional $250,000, contingent upon achieving Actual Operating Cash Flow that is at least 2.5% better than Budgeted Operating Cash Flow for the period from the Petition Date through and including the Closing Date; plus

(iii).  an additional $250,000, contingent upon achieving Actual Operating Cash Flow that is at least 5% better than Budgeted Operating Cash Flow for the period from the Petition Date through and including the Closing Date; plus

(iv).   an additional $275,000, contingent upon achieving Actual Operating Cash Flow that is at least 7.5% better than Budgeted Operating Cash Flow for the period from the Petition Date through and including the Closing Date; plus

(v).    an additional $275,000, contingent upon achieving Actual Operating Cash Flow that is at least 10% better than Budgeted Operating Cash Flow for the period from the Petition Date through and including the Closing Date; plus

(vi).   an additional $300,000, contingent upon achieving Actual Operating Cash Flow that is at least 12.5% better than Budgeted Operating Cash Flow for the period from the Petition Date through and including the Closing Date; plus

(vii).  an additional $225,000, contingent upon the aggregate amount of cash and credit bid consideration (excluding assumed liabilities) received in the Sale equaling or exceeding $150 million.

The amount of any KEIP Payments awarded to each KEIP Participant shall be determined by the Board in its discretion; provided, however, that the aggregate amount of all KEIP Payments made under this paragraph shall not exceed the aggregate amount set forth above.

6.      Timing of Payments. Subject to Section 8, all payments of bonuses under the Plan (including payment to KEIP Participants who become entitled to payments pursuant to Section

3

*Approved by Judge Gloria M. Burns July  30, 2014*

7(b) hereof) shall be made in a lump-sum no earlier than fifteen (15) days following the closing of a Sale.

7.     Termination of Employment

(a)     Subject to Section 7(b), any amount otherwise payable under the Plan will be forfeited in the event a KEIP Participant's employment with the Debtors is terminated for any reason prior to the closing of a Sale.

(b)     If a KEIP Participant's employment with the Debtors is terminated without Cause, or due to death or Disability (as determined by the Debtors), prior to the Closing Date, then such KEIP Participant shall be entitled to receive, subject to such KEIP Participant's execution of the release set forth in Section 8 below, (i) any KEIP Payments that would have been earned under the KEIP had the KEIP Participant been employed through the Closing Date, divided by (ii) the number of days from the Petition Date through the Closing Date, multiplied by (iii) the number of days from the Petition Date through the Closing Date during which such KEIP Participant was employed by the Debtors.  Notwithstanding the foregoing, no payment will be made to any such KEIP Participant after the date that is two and one half months following the end of the calendar year in which such termination occurs.

8.     Release

All payments under the Plan shall be contingent upon a KEIP Participant executing and not revoking a full release of known and unknown claims such KEIP Participant may have against the Debtors in a form determined appropriate by the Debtors.  Such release will include, but not be limited to, (i) any claim against the Debtors with respect to such employee's employment with the Debtors (other than accrued and unpaid salary, benefits, expense reimbursement, vacation and any indemnification) and (ii) if applicable, any claim, right, or interest to any previously unpaid amounts earned or accrued with respect to any previous plans, agreements, or policies related to retention, severance, bonuses, or incentives.  Such release must be executed and be non-revocable prior to the date that is fifteen (15) days following the closing of a Sale (the "Release Date").  In the event that such release is not executed by the KEIP Participant or is revoked by the KEIP Participant prior to the Release Date, any payments under this Plan will be forfeited.

9.     Section 409A

The Plan is intended to comply with, or satisfy an applicable exemption from, Section 409A of the Internal Revenue Code of 1986, as amended, and the Plan shall be administered and interpreted in accordance with such intention.

10.     Miscellaneous

(a)     The Plan shall constitute an unfunded, unsecured liability of the Debtors to make payments in accordance with the provisions of the Plan, and no individual shall have any security interest, ownership interest, or other interest in any assets of the Debtors in connection with the Plan.  Neither the establishment of the Plan nor any obligation of the Debtors to make payments

4

*Approved by Judge Gloria M. Burns July  30, 2014*

under the Plan shall be deemed to create a trust or a principal-agent relationship.  This Plan does not constitute a term or condition of employment and no KEIP Participant shall have any right to receive payments hereunder, except to the extent all conditions relating to the receipt of such payments have been satisfied.

(b)      Nothing in the Plan shall be construed or interpreted as giving any KEIP Participant the right to be employed or retained by the Debtors for any period or otherwise or impair the right of the Debtors to control their employees or to terminate the services of any employee at any time.

(c)      Amounts payable under the Plan shall not be considered wages, salaries, or compensation under any employee benefit plan, except pursuant to the written terms of the Plan.

(d)      The Debtors shall be entitled to withhold from any amount due and payable by the Debtors to any KEIP Participant (or secure payment from such KEIP Participant in lieu of withholding) the amount of any withholding or other tax due from the Debtors with respect to any amount payable to such KEIP Participant under this Plan.

(e)      If a KEIP Participant becomes entitled to any payments under the Plan, and if at such time such KEIP Participant has outstanding any debt, obligation, or other liability representing an amount owing to the Debtors (whether or not such liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, or equitable), then the Debtors may offset such amount against the amount otherwise distributable to such KEIP Participant to the extent permitted by applicable law.

(f)      No person otherwise eligible to receive any payment under the Plan shall have any rights to pledge, assign, transfer, sell, or otherwise dispose of all or any portion of such payments, either directly or by operation of law, including, without limitation, by execution, levy, garnishment, attachment, pledge, or bankruptcy.  If a KEIP Participant is not living at the time any payments are otherwise payable to him or her in accordance with the Plan, such payments shall be paid as designated by the KEIP Participant by will or by the laws of descent and distribution.

(g)      The Plan made and actions taken thereunder shall be governed by and construed in accordance with the laws of the State of New Jersey, without reference to the principles of conflict of laws, except as superseded by applicable federal law.

MIAMI 1012164

*Approved by Judge Gloria M. Burns July  30, 2014*

# **Schedule 1**

(List of KEIP Participants)

[Filed Under Seal]

*Approved by Judge Gloria M. Burns July  30, 2014*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-1(b)
**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
msirota@coleschotz.com
Ryan T. Jareck, Esq.
rjareck@coleschotz.com
Matteo Percontino, Esq.
mpercontino@coleschotz.com
*Proposed Counsel to Debtors and Debtors in Possession*

Order Filed on June 13, 2024
by Clerk,
U.S. Bankruptcy Court
District of New Jersey

In re:

SAM ASH MUSIC CORPORATION, *et al.*

Debtors.[1]

Chapter 11

Case No. 24-14727 (SLM)

Judge: Stacey L. Meisel

(Jointly Administered)

## ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN, AND (II) GRANTING RELATED RELIEF

The relief set forth on the following pages, numbered two (2) through six (6), is hereby **ORDERED**.

**DATED: June 13, 2024**

Honorable Stacey L. Meisel
United States Bankruptcy Judge

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Sam Ash Music Corporation (3915); Samson Technologies Corp. (4062); Sam Ash Megastores, LLC (9955); Sam Ash California Megastores, LLC (3598); Sam Ash Florida Megastores, LLC (7276); Sam Ash Illinois Megastores, LLC (8966); Sam Ash Nevada Megastores, LLC (6399); Sam Ash New York Megastores, LLC (7753); Sam Ash New Jersey Megastores, LLC (8788); Sam Ash CT, LLC (5932); Sam Ash Music Marketing, LLC (2024); and Sam Ash Quikship Corp. (7410). The location of debtor Sam Ash Music Corporation's principal place of business is 278 Duffy Avenue, P.O. Box 9047, Hicksville, NY 11802.

(Page 2)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE
                    PLAN AND KEY EMPLOYEE RETENTION PLAN, AND (II)
                    GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections 105(a), 363(b), 503(b), 503(c) and 507(a)(2) of title 11 of the United States Code (the "Bankruptcy Code") for entry of an Order (a) authorizing, but not directing, the Debtors to implement the proposed key employee incentive plan (the "KEIP") and key employee retention plan (the "KERP"), (b) granting administrative expense priority status to the incentive and retention payments, and (c) granting such other relief as the Court deems appropriate; and the Court having jurisdiction to decide the Motion and the relief requested therein in accordance with 28. U.S.C. §§ 157(a)-(b) and 1334(b) and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, dated September 18, 2012 (Simandle, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been given as provided in the Motion, and such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice of the Motion need be provided; and the Court having held a hearing to consider the relief requested in the Motion (the "Hearing"); and upon the *Declaration of Jordan Meyers in Support of Debtors' Motion for Entry of an Order Approving Debtors' Key Employee Incentive Plan and Key Employee Retention Plan,* the record of the Hearing, and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

(Page 3)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN, AND (II) GRANTING RELATED RELIEF |

the Debtors, their respective estates and creditors, and all parties-in-interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is **GRANTED** as set forth herein.

2.      The KERP and KEIP Plan attached hereto as Exhibit 1 is approved as modified herein.

3.      The Debtors are authorized, but not directed, to take all actions necessary to implement the KERP and KEIP Plan and to make all payments provided under such plans to or on behalf of the Participants in accordance with the terms of this Order.

4.      All amounts earned and payable under the KERP and KEIP Plan shall have administrative expense priority under sections 503(a) and 507(a)(2) of the Bankruptcy Code to the extent earned and payable as set forth in the KERP and KEIP Plan and this Order.

5.      All amounts earned and payable under the KERP and KEIP Plan shall be paid within 10 days following the effective date of a chapter 11 plan.

6.      The Debtors shall provide counsel to the Official Committee of Unsecured Creditors (the "Committee") with reasonably practicable notice of the termination or resignation of any KERP Participant or KEIP Participant.  In the event a KERP Participant or KEIP Participant is not employed by the Debtors on or during the KERP Effective Date or KEIP Effective Date, respectively, the Debtors (i) are authorized to make payments to such Participants, if any, but only

| (Page 4) | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN, AND (II) GRANTING RELATED RELIEF |

in accordance with the KERP and KEIP Plan, and (ii) are not authorized to allocate any unused dollars under the KERP or KEIP to other KERP Participants or KEIP Participants, respectively.

7.      The KERP and KEIP Plan is hereby modified such that (a) any eligible KEIP Participant will be entitled to (i) 50% of the KEIP Bonus in the event the Debtors sell their Samson business for in excess of $7.5 million; and (ii) 50% of the KEIP Bonus in the event the Debtors sell all of their assets for an aggregate amount in excess of $10 million (in both instances, including the sale of the Samson business, but excluding the store closing sales and existing credit bid stalking horse asset purchase agreement with Tiger Finance, LLC), and (b) in order to receive a KEIP Bonus or KERP Bonus, each KEIP Participant and KERP Participant shall be required to waive any claims against the Debtors, including any right to any other performance bonus, retention, or severance compensation otherwise payable to them by the Debtors pursuant to any prepetition bonus plan or employment agreement, but excluding any claims for unpaid paid time off and wages authorized by any *Final Order (I) Authorizing The Debtors To (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, And Reimbursable Employee Expenses And (B) Continue Employee Benefits Programs And (II) Granting Related Relief.*

8.      Schedules I and II to the KERP and KEIP Plan may be modified by the Debtors, in consultation with the Committee, provided that such modification: (i) is on five (5) days prior written notice to the notice parties set forth in the Motion and the Committee; (ii) is consistent with the Motion; and (iii) does not increase the total amounts payable under the KEIP or KERP as authorized by this Order or is otherwise inconsistent with the *Order (I) Authorizing the Debtors to*

| | |
|---|---|
| (Page 5) | |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN, AND (II) GRANTING RELATED RELIEF |

*Obtain Postpetition Financing, (II) Authorizing Use of Cash Collateral and Affording Adequate Protection; (III) Granting Liens and Providing Superpriority Administrative Expense Status; (IV) Modifying Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 49].

9.      Nothing in this Order shall be deemed to authorize the payment of any severance payments to insiders of the Debtors or that are otherwise subject to sections 503(c)(1) or 503(c)(2) of the Bankruptcy Code.

10.      Nothing in the Motion or this Order: (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates or (ii) shall impair, prejudice, waive or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority or amount of any claim against the Debtors and their estates.

11.      Notwithstanding anything to the contrary in the Motion or this Order, any payment made by the Debtors pursuant to the authority granted in this Order must be in compliance with and any authorization of the Debtors contained herein is subject to: (a) any interim or final orders entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility and/or authorizing the use of cash collateral; (b) the documentation in respect of any such debtor-in-possession financing or use of cash collateral; and (c) any budget or cash flow forecasts in connection therewith.

12.      Notwithstanding the relief granted herein or any action taken hereunder, nothing contained in this Order shall itself create any right to future employment or entitlements to any

(Page 6)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN, AND (II) GRANTING RELATED RELIEF |

Participant.

13.    Notice of the Motion as provided herein shall be deemed good and sufficient notice of such Motion and the requirements of Rule 6004(a) of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

14.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

15.    The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

16.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

17.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

## Exhibit 1

**KERP AND KEIP PLAN**

## SAM ASH MUSIC CORPORATION AND ITS AFFILIATED DEBTORS
## KEY EMPLOYEE INCENTIVE AND KEY EMPLOYEE RETENTION PLANS

**KERP AND KEIP OBJECTIVES**

The Key Employee Retention Plan (the "KERP") and Key Employee Incentive Plan (the "KEIP") of Sam Ash Music Corporation and its debtor affiliates (collectively, the "Company" or the "Debtors") described herein are designed to encourage the retention of certain valuable, hard-to-replace, non-senior management employees (collectively, the "KERP Participants"), and to provide performance incentives to certain senior management (collectively, the "KEIP Participants") who are essential to the Company's restructuring and will aid in maximizing the value of the Company for the benefits of its stakeholders.

**THE KERP**

The KERP is designed to help ensure that valuable, hard-to-replace, non-insider, non-senior management employees who are important to the Debtors' restructuring are retained and properly motivated to preserve and maximize the value of the Debtors' business for the benefit of the Debtors' stakeholders in the Company's chapter 11 cases (the "Chapter 11 Cases"). The Debtors wish to provide a bonus to the KERP Participants so that they are committed to this goal. The Debtors have identified the KERP Participants as important to the success of their restructuring efforts. The KERP will encourage these non-insider employees to remain with the Debtors as they pursue their restructuring efforts, as well as to help manage the Company's ongoing operations and the administration of the Debtors' estates during the Chapter 11 Cases.

**KERP PARTICIPANTS AND KERP BONUSES**

The Debtors have identified the employees listed on Schedule I attached hereto to participate in the KERP. Each KERP Participant was carefully selected by management and deemed critical to the Company's ability to maximize value for the benefit of all interested parties. Without payments under the proposed KERP, the Company believes that the KERP Participants are likely to pursue alternative employment, harming the value of the estates and negatively affecting the Debtors' restructuring efforts.

"KERP Bonuses" will be payable to each KERP Participant in the respective amounts identified on Schedule I (the "KERP Bonuses"). The KERP Bonuses represent fixed cash amounts payable in one installment based on continued employment of the KERP Participant through the sale process *and* confirmation of a plan of liquidation. The KERP Bonuses shall be paid within 10 days following the effective date of a chapter 11 plan (the "KERP Effective Date").

There are currently twenty-one (21) KERP Participants, and the total potential aggregate payout under the KERP is approximately $234,400.00. The KERP Bonuses on average equal 10% of the KERP Participants' annual salary.

**THE KEIP**

The KEIP is designed to incentivize the KEIP Participants, who hold critical operational leadership or corporate management positions, to preserve and maximize the value of the

Company's business for the benefit of its stakeholders in the Chapter 11 Cases. The Debtors rely on the KEIP Participants' expertise to make decisions that support the operations and drive the financial performance of the Company's business. The KEIP Participants are responsible for, among other things, essential day-to-day business functions, executing the Debtors' business plan, implementing the operational goals of the Debtors' restructuring, participating in the Debtors' efforts to successfully effectuate a sale of the eCommerce business, participating in the Debtors' efforts related to the store closing sales, assisting counsel in the preparation of essential reporting and bankruptcy-related documents, and responding to requests for diligence by non-debtor parties in connection with the restructuring process. Given their essential role in the Debtors' enterprise as officers, these individuals are best-positioned to drive performance and results with respect to the Debtors' restructuring goals and have taken on substantial tasks and responsibilities to help effectuate and further the Debtors' proposed restructuring, in addition to their existing responsibilities.

**KEIP PARTICIPANTS, METRIC AND PAYMENT AMOUNTS**

Each KEIP Participant, with his or her title and potential "KEIP Bonus," is set forth on Schedule II attached hereto. There are four (4) KEIP Participants, which were identified by the Debtors. The KEIP Participants may earn in the aggregate $107,000 in incentive awards (the "KEIP Bonus") which will be payable, if at all, as follows: (i) 75% of the KEIP Bonus in the event the Debtors sell their Samson business for in excess of $7.5 million; and (ii) 25% of the KEIP Bonus in the event the Debtors sell all of their assets for an aggregate amount in excess of $10 million (*including* the sale of the Samson business, but *excluding* the store closing sales and existing credit bid stalking horse asset purchase agreement with Tiger Finance, LLC).

The KEIP Bonuses shall be paid within 10 days following the effective date of a chapter 11 plan (the "KEIP Effective Date").

**CONDITIONS AND TIMING OF PAYMENT OF BONUSES**

The KERP and KEIP are subject to authorization and approval by the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").

In addition to the KEIP requirements above, in order to earn a KEIP Bonus, the KEIP Participant must be employed by the Debtors on the KEIP Effective Date unless, prior to such date, the KEIP Participant (i) is involuntarily terminated by the Debtors for any reason other than "for Cause," (ii) is placed on disability, or (iii) dies. The KEIP Bonuses shall vest on the KEIP Effective Date.

In addition to the KERP requirements above, in order to earn a KERP Bonus, the KERP Participant must be employed by the Debtors on the KERP Effective Date unless, prior to such date, the KERP Participant (i) is involuntarily terminated by the Debtors for any reason other than "for Cause," (ii) is placed on disability, or (iii) dies. The KERP Bonuses shall vest on the KERP Effective Date.

## "CAUSE" DEFINED

For purposes of the KERP and KEIP, the term "for Cause" means, either before or after adoption of the KEIP or KERP:

- Refusal to follow the lawful instructions of a direct supervisor;

- A finding by a legal or administrative court or tribunal that the KEIP Participant or KERP Participant engaged in fraud or willful misconduct, or was grossly negligent, in the performance of his or her duties;

- A material and direct conflict of interest, not specifically waived in advance by the Company;

- Unauthorized use or disclosure of confidential information that belongs to the Company or its customers, employees or vendors;

- Repeated absences from work that the Company reasonably determines to be materially adverse to the best interests of the Company; or

- Other material misconduct including, but not limited to: falsification of the Company's records, theft, sexual harassment, or possession of firearms, controlled substances or illegal drugs on the Company's premises or while performing the Company's business.

## FURTHER ACTIONS

As a condition to each KEIP Participant's or KERP Participant's eligibility to participate in the KEIP or KERP, as applicable, such participant shall agree to take such further actions as are reasonably requested by the Company, including such actions as the Company may reasonably request subsequent to the termination or resignation of such participant's employment with the Company to assist the Company as needed, including in the conduct of the Chapter 11 Cases and to resolve any matters in which such participant was involved during his or her tenure at the Company.

## CHANGE OF ADDRESS

The KEIP Participants and KERP Participants shall be responsible for notifying the Company of any change of address before payment is made by email notification to the Company's counsel, Cole Schotz P.C., Attn: Ryan T. Jareck, Esq. (rjareck@coleschotz.com) and Matteo Percontino (mpercontino@coleschotz.com).

## PROMISE OF CONTINUED EMPLOYMENT

The KERP and KEIP, and any KEIP Participant's or KERP Participant's selection as a participant in the KEIP or KERP, respectively, does not, and is in no manner intended to constitute, a promise of employment for any period of time or to change a KEIP Participant's or KERP Participant's status, if applicable, as an at will employee subject to termination at any time for any reason.

**TAXES**

All payments made pursuant to the KEIP or KERP shall be subject to standard withholding and deductions on wages.  Neither the Company nor its officers or agents make or has made any representation about the tax consequences of any payments or benefits offered by the Company to any KEIP Participant or KERP Participant.

**SEVERABILITY**

If any provision of the KEIP or KERP is determined to be invalid or unenforceable, in whole or in part, this determination shall not affect any other provision of the KEIP or KERP and the provision in question shall be modified as to be rendered enforceable in a manner consistent with the intent of the parties insofar as possible.  Any waiver of or breach of any of the terms of the KEIP or KERP shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision

**CHOICE OF LAW AND VENUE**

The KEIP and KERP shall both be governed by the laws of the State of New York, notwithstanding that State's conflict of law provisions.  The Company and each KEIP Participant and KERP Participant shall: (i) irrevocably and unconditionally consent to the exclusive jurisdiction of the Bankruptcy Court; (ii) irrevocably and unconditionally waive any objection to the laying of venue of any action, suit, or proceeding arising out of or related to the KEIP or KERP in the Bankruptcy Court; and (iii) irrevocably and unconditionally waive and agree not to plead or claim that any such action, suit, or proceeding brought in the Bankruptcy Court has been brought in an inconvenient forum.

**ENTIRE AGREEMENT AND AMENDMENT**

This document constitutes the complete, final and exclusive embodiment of the terms and conditions of the KERP and KEIP and may only be modified in writing signed by an authorized officer of the Company.  Any agreement between any KEIP Participant or KERP Participant and the Company with regard to the KEIP or KERP, as applicable, and its subject matter is superseded in its entirety by this document.

**NO ASSIGNMENT**

The rights of a KEIP Participant or KERP Participant or any other person to any payment or other benefits under the KEIP or KERP, as applicable, may not be assigned, transferred, pledged, or encumbered except by will or the laws of descent and distribution.

## Schedule I – KERP Participants and Payment Amounts

**[FILED UNDER SEAL]**

## Schedule II – KEIP Participants and KEIP Bonus Information

## [FILED UNDER SEAL]

**<u>Exhibit 9</u>**

(KERP Orders)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| AGWAY FARM & HOME SUPPLY, LLC, | Case No. 22-10602 (JKS) |
| Debtor.[1] | **Re D.I. No. 70** |

### AMENDED ORDER GRANTING DEBTOR'S MOTION FOR AN ORDER APPROVING (1) KEY EMPLOYEE INCENTIVE PLAN; (2) KEY EMPLOYEE RETENTION PLAN, AND (3) GRANTING RELATED RELIEF

Upon the Motion of the Agway Farm & Home Supply, LLC, the debtor and debtor in possession in the above captioned case (the "<u>Debtor</u>"), for an Order Approving (1) Key Employee Incentive Plan; (2) Key Employee Retention Plan; and (3) Granting Related Relief to (A) Assume Existing Insurance Policies; and (B) Pay all Obligations in Respect Thereof (the "<u>Motion</u>");[2] and it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and that this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having reviewed and considered the Preliminary Objection of the Official Committee of Unsecured Creditors to the Motion (Docket No. 88) and the Objection of the United States Trustee to the Motion (Docket No. 92; and the Court having determined that the relief requested in the Motion is necessary to the ongoing orderly operation of the Debtor's business and is in the best interests of the Debtor, its estate, and its creditors; and it appearing that the notice of the Motion having been given as set forth herein was appropriate and that no other or further notice need by given; and after

---

[1] The last four digits of the Debtor's federal tax identification number are 1247. The Debtor's address is 6606 W. Broad Street, Richmond, VA 23230.

[2] Capitalized terms not otherwise defined herein shall have the meaning set forth in the Motion.

due deliberation and good and sufficient cause appearing therefor; and since the entry of the

Order Approving (1) Key Employee Incentive Plan; (2) Key Employee Retention Plan; and

(3) Granting Related Relief [Docket No. 134]:

IT IS HEREBY ORDERED THAT:

1.     The Motion is GRANTED.

2.     Except as provided to the contrary herein, all objections to the Motion or the

relief provided herein that have not been withdrawn, waived, or settled, and all reservations

of rights included therein, are overruled and denied.

3.     The KEIP and the KERP are each approved on the terms described in the

Motion with the following modifications: (1) The amount of the KEIP will be calculated based

on the sale proceeds from the Sale Process other than any sale proceeds that result from the

Debtor's de minimis asset sales of inventory at discounted rates ("De Minimis Asset Sales").

In other words, any sale proceeds from De Minimis Asset Sales will not count toward the

calculation of the KEIP amount to be paid; and (2) The total paid to the KERP Employees

under the KERP shall not exceed $330,000.00.

4.     The Debtor is authorized to take all actions necessary to implement the KEIP

and the KERP, and to make all payments provided under such plans.

5.     All amounts earned and payable under the KEIP and the KERP shall have

administrative expense priority under sections 105(a), 503(b), and 507(a)(2) of the

Bankruptcy Code for all purposes in this Case and in any other case under the Bankruptcy

Code to which this Case may be converted.

6.     This Order shall be effective and enforceable immediately upon entry, and any

13910292.v1

stay applicable under the Bankruptcy Rules or the Local Rules is hereby expressly waived and shall not apply.

7.     The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

8.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**Dated: November 21st, 2022**
**Wilmington, Delaware**

**J. KATE STICKLES**
**UNITED STATES BANKRUPTCY JUDGE**

13910292.v1

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------ x
In re:                                           :   Chapter 11
                                                 :
KB TOYS, INC.                                    :   Case No. 08-13269 (KJC)
a Delaware corporation, et al.,                  :
                                                 :   Jointly Administered
Debtors.                                         :
------------------------------------------------ x   Ref. Docket No.: 70
```

### ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363(b) AND 503(c) APPROVING THE DEBTORS' NON-INSIDER HEADQUARTERS AND FIELD STAFF EMPLOYEE RETENTION PLAN AND CERTAIN OTHER RELATED RELIEF

Upon consideration of the motion (the "Motion")[1] of KB Toys Inc., a Delaware corporation, and certain of its direct and indirect subsidiaries, the debtors and debtors in possession in the above cases (collectively, the "Debtors"),[2] for entry of an order, pursuant to sections 105(a), 363(b) and 503(c) of the Bankruptcy Code, approving the Debtors' Retention Plan and certain other related relief; the Court having reviewed the Motion; the Court finding that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (iii) notice of the Motion was sufficient under the circumstances and no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the Court having determined that the relief sought in the Motion is

---

[1]       Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

[2]       The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: KB Toys, Inc. (0658), KB Toy of Massachusetts, Inc. (6093), KB Toys Retail, Inc. (3156), KB Toys Gift Cards, Inc. (9425), KB Toys Puerto Rico, Inc. (2716), KB Toys Merchandising, Inc. (4697), Creative Innovations & Sourcing HK, Inc. (6974), Creative Innovations & Sourcing, LLC (9936), and KB Holdings, LLC (7797). The Debtors' executive headquarters' address is 100 West Street Pittsfield, MA 01201.

in the best interests of the Debtors and their estates; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED, that the Motion is GRANTED; and it is further

ORDERED, that the Debtors are authorized in the exercise of their discretion and consistent with the budget governing the Debtors' use of cash collateral, to make the Payments as set forth in the Motion and in accordance with the terms of the Retention Plan; and it is further

ORDERED, that, the authorization granted hereby to make the Payments under the Retention Plan shall not create any obligation on the part of the Debtors or their officers, directors, attorneys or agents to make Payments under the Retention Plan and none of the foregoing persons shall have any liability on account of any decision by the Debtors not to honor the Retention Plan; and it is further

ORDERED, that entry of this Order is without prejudice to the right of the Debtors and their estates to apply to the Court for additional payments or consideration to be made to any employee, whether subject to section 503(c) of the Bankruptcy Code or otherwise. All parties in interest reserve all rights to object to any such payment or consideration; and it is further

ORDERED, that, neither this Order nor any payment or performance by the Debtors authorized hereunder shall be deemed an assumption of any executory contract or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contracts; and it is further

ORDERED, that notwithstanding anything to the contrary in the Court's Interim Order (i) Authorizing Use of Cash Collateral, (ii) Granting Adequate Protection, (iii) Modifying the Automatic Stay, and (iv) Scheduling a Final Hearing [Docket No. 47], and any final order entered with respect thereto (collectively, the "Cash Collateral Order"), and the Second Lien

Agent (on behalf of itself and the Second Lien Lenders, as those terms are defined in the Cash Collateral Order) having consented on the record to the provisions of this paragraph, any and all obligations of the Debtors and their estates, for payments required to be made under the Retention Plan, shall be and hereby are, but only as and to the extent not previously made by the Debtors, (a) entitled to allowance as administrative expenses in these cases, and (b) entitled to payment prior to, and made senior in all respects to (i) the Pre-Petition Second Lien Obligations (as defined in the Cash Collateral Order) and all liens and claims (including, without limitation, claims arising under section 507(b) of the Bankruptcy Code) securing, arising from or relating to the same, (ii) the Junior Adequate Protection Liens (as defined in the Cash Collateral Order) and all claims (including, without limitation, claims arising under section 507(b) of the Bankruptcy Code) arising from or relating to the same, and (iii) the Junior Adequate Protection Superpriority Claim (as defined in the Cash Collateral Order).

ORDERED, that notwithstanding any applicability of Federal Rule of Bankruptcy Procedure 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED, that this Court shall retain jurisdiction over any matters arising from or

related to the implementation or interpretation of this Order.

Dated:   January 6 , 2009
         Wilmington, Delaware

Kevin J. Carey
Chief United States Bankruptcy Judge

ORIGINAL

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MERVYN'S HOLDINGS, LLC. et al.,[1] | ) | Case No. 08-11586 (KG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | Re: Docket No. 651 |

### ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363(b) AND 503(c) APPROVING THE DEBTORS' EMPLOYEE RETENTION PLAN, SENIOR MANAGEMENT INCENTIVE PLAN AND CERTAIN OTHER RELATED RELIEF

The matter coming before the Court on the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 503(c) For Entry of an Order Approving the Debtors' Employee Retention Plan, Senior Management Incentive Plan and Certain Other Related Relief* (the "Motion"), filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors"); the Court having reviewed the Motion; the Court finding that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (iii) notice of the Motion was sufficient under the circumstances and no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the Court having determined that the relief sought in the Motion is in the best interests of the Debtors and their estates; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED, that the Motion as modified is GRANTED; and it is further

ORDERED, that the Retention Plan[2] and the Incentive Plan are hereby approved, pursuant to Sections 363(b) and 503(c) of the Bankruptcy Code, as justified by the facts and

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers, are Mervyn's Holdings, LLC (3405), Mervyn's LLC (4456) and Mervyn's Brands, LLC (8850).

circumstances of the cases and as a necessary cost and expense of preserving the estates; and it is further

ORDERED, that, pursuant to Sections 105(a), 363(b) and 503(c) of the Bankruptcy Code, the Debtors are authorized to take any and all actions that are necessary or appropriate in the exercise of their business judgment to make payments under the Retention Plan and the Incentive Plan; and it is further

ORDERED, that the provision of postpetition payments to the participants under the Retention Plan and Incentive Plan as authorized herein shall be administrative expenses of the estates pursuant to Section 503(b) of the Bankruptcy Code; and it is further

ORDERED, that entry of this Order is without prejudice to the right of the Debtors and their estates to apply to the Court for additional payments or consideration to be made to any employee, whether subject to Section 503(c) of the Bankruptcy Code or otherwise. All parties in interest reserve all rights to object to any such payment or consideration; and it is further

ORDERED, that the Debtors shall not be required to comply with any state "fast pay" laws and regulations when terminating employees; and it is further

ORDERED, that the terms and provisions of this Order shall be binding in all respects, and shall inure to the benefit of, the Debtors, their estates, creditors and interest holders and their respective affiliates, successors and assigns; and it is further

ORDERED, that, neither this Order nor any payment or performance by the Debtors

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

authorized hereunder shall be deemed an assumption of any executory contract or otherwise affect the Debtors' rights under Section 365 of the Bankruptcy Code to assume or reject any executory contracts; and it is further

ORDERED, that notwithstanding any applicability of Federal Rule of Bankruptcy Procedure 6004(g), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED, that this Court shall retain jurisdiction over any matters arising from or related to the implementation or interpretation of this Order.

Dated:    October 30, 2008
          Wilmington, Delaware

THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| MOBITV, INC., *et al.*, | Case No. 21-10457 (LSS) |
| Debtors.[1] | Jointly Administered |
|  | **Related Docket No. 85** |

## ORDER APPROVING KEY EMPLOYEE
## RETENTION PLAN FOR NON-INSIDER EMPLOYEES

The Court has considered the *Debtors' Motion for an Order (I) Approving Key Employee Incentive Plan for Senior Leadership Employees and (II) Approving Key Employee Retention Plan for Non-Insider Employees* [Docket No. 85] (the "Motion")[2] and the *Declaration of Terri Stevens in Support of Debtors' Motion for an Order (I) Approving Key Employee Incentive Plan for Senior Leadership Employees and (II) Approving Key Employee Retention Plan for Non-Insider Employees* [Docket No. 85-3]. The Court has reviewed the Motion and has found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012, and that this Court may enter a final order consistent with Article III of the United States Constitution; (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); and (iv) notice of the Motion and the opportunity for a hearing was sufficient under the circumstances. After due deliberation, the Court has determined that the relief requested in the

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: MobiTV, Inc. (2422) and MobiTV Service Corporation (8357). The Debtors' mailing address is 1900 Powell Street, 9th Floor, Emeryville, CA 94608.

[2] A capitalized term used but not defined herein shall have the meaning ascribed to it in the Motion.

Motion as it relates to the KERP is in the best interests of the Debtors, their estates, and their

creditors and good and sufficient cause having been shown, therefor;

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED to the extent set forth herein.

2.      The terms of the Debtors' proposed KERP, attached hereto as <u>Exhibit 1</u>, is

hereby approved.

3.      The Debtors are authorized, but not directed, to make any and all

payments to Non-Insider Employees under the KERP if the applicable condition(s) for any such

respective payments are met, as described herein.

4.      <u>Amended KEIP Hearing</u>.  The hearing on the Debtors' amended KEIP

[Docket No. 143] shall be held before the Honorable Laurie Selber Silverstein, United States

Bankruptcy Court Judge, in the United States Bankruptcy Court for the District of Delaware, 824

North Market Street, 5th Floor, Courtroom 2, Wilmington, Delaware 19801, on **April 16, 2021**

**at 10:00 a.m. (Eastern Time)**.

5.      <u>Amended KEIP Objection Deadline</u>.  Any response or objection to the

entry of an order approving the Amended KEIP must be filed with the Bankruptcy Court on or

before **April 12, 2021 at 4:00 p.m. (Eastern Time)**.

6.      This Order shall be binding upon any successors and assigns of the

Debtors, including any trustee appointed in these Chapter 11 Cases or in any superseding

proceeding under chapter 7 of the Bankruptcy Code.

7.      This Court shall retain exclusive jurisdiction to hear and determine all

matters arising from or related to the interpretation, implementation, or enforcement of this

Order.

**Dated: April 7th, 2021**
**Wilmington, Delaware**

**LAURIE SELBER SILVERSTEIN**
**UNITED STATES BANKRUPTCY JUDGE**

2

Case 25-16137 Case 21-10457-LSS   Doc 862-1 Doc 1125   Filed 04/08/21 Entered 07/01/25 22:33:20   Desc Main
Document        Page 831 of 851

### Exhibit 1 to Order

### Key Employee Retention Plan Term Sheet

| Term | Description |
|------|-------------|
| **KERP Objective** | The MobiTV, Inc. Key Employee Retention Plan (the "<u>KERP</u>") is designed to retain key employees ("<u>KERP Participants</u>") of MobiTV, Inc. (the "<u>Debtor</u>") in their current roles over the near term while providing them with financial stability. |
| **Participating Employees** | KERP Participants will include all employees of the Debtor other than the KEIP Participants. |
| **Timing of Payments** | Payments under the KERP (the "<u>KERP Payments</u>") will be distributed to KERP Participants upon the earlier of (1) the consummation of the sale of substantially all assets of the Debtor pursuant to section 363 of the Bankruptcy Code, (2) confirmation of a plan of reorganization, and (3) conversion of the Debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code (collectively, the "<u>KERP Trigger Date</u>"). |
| **KERP Payments** | The KERP awards non-insider personnel with payments equal to 5.0% to 25.1% of their base salary not to exceed $1,229,541 in the aggregate. |
| **Structure of KERP Payments** | The amount of payment received by each of the KERP Participants will be based on their 2019 annual and 2020 retention bonuses (with appropriate floors) and continued employment with the Debtor through the earlier of (1) their involuntary termination other than for cause (*i.e.*, a layoff) or (2) the KERP Trigger Date.  No other performance metrics will be included. |
| **Effect of Termination of Employment** | In the event a KERP Participant voluntarily resigns or is terminated by the Debtor for cause prior to the KERP Trigger Date, the KERP Participant will forfeit any right to a KERP Payment. |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| OneWeb Global Limited, *et al.* | Case No. 20-22437 (RDD) |
| Debtors.[1] | (Jointly Administered) |

### ORDER (I) APPROVING KEY EMPLOYEE INCENTIVE PROGRAM AND KEY EMPLOYEE RETENTION PROGRAM; (II) AUTHORIZING PAYMENTS THEREUNDER; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession (the "<u>Debtors</u>"), pursuant to sections 363(b), 503(c)(3), and 507(a)(2) of the Bankruptcy Code, for an order approving the Debtors' key employee retention program ("KERP" and key employee incentive program ("KEIP"), authorizing the payments thereunder, and granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b), and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been provided in accordance with the *Order Implementing Certain Notice and Case*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: OneWeb Global Limited (N/A); OneWeb Holdings LLC (5429); OneWeb Communications Limited (9487); WorldVu Satellites Limited (7802); WorldVu Development LLC (9067); WorldVu JV Holdings LLC (N/A); 1021823 B.C. LTD (8609); Network Access Associates Limited (8566); OneWeb Limited (8662); WorldVu South Africa (Pty) Ltd. (1867); OneWeb Chile SpA (2336); WorldVu Australia Pty Ltd. (5436); WorldVu Unipessoal Lda. (2455); OneWeb Norway AS (0209); OneWeb ApS (9191); OneWeb Network Access Holdings Limited (8580); OneWeb G.K. (1396); OneWeb Ltd (8661); WorldVu Mexico S. DE R. L. DE C.V. (1234). The Debtors' headquarters is located at 195 Wood Lane, West Works Building, 3rd Floor, London, W12 7FQ, UK.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

*Management Procedures* [Docket No. 44], such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and upon the only remaining objection to the Motion, filed by the United States Trustee, all other opposition to the Motion having been resolved by the terms of this Order and withdrawn; and upon the Debtors' reply to the United States Trustee's objection; and the Court having reviewed the Motion and the declarations and supplemental declarations submitted in support of the Motion; and the Court having held a hearing to consider the relief requested in the Motion (the "Hearing"); and upon the record of the Hearing and all of the proceedings herein; and, after due deliberation and for the reasons stated in its bench ruling at the Hearing, the Court having determined that the legal and factual bases set forth in the Motion establish good and sufficient cause for the relief granted herein and satisfy the applicable standards under 11 U.S.C. §§ 363(b) and 503(c); and it appearing that the relief granted herein is in the best interests of the Debtors, their estates, creditors, and all parties in interest; now, therefore,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted to the extent set forth herein.

2.      The KERP is approved, subject to paragraph 5 hereof. The Debtors are authorized (but not directed) to make payments to the Long-Term Employees and the Short-Term Employees pursuant to the terms of the KERP in the aggregate amount of $3,000,000, without further application or order of this Court.

3.      The KEIP, as set forth substantially in the form attached to the Motion as **Exhibit A**, is hereby approved, subject to paragraph 5 hereof.

4.      The Debtors are authorized, but not directed, to take all actions necessary to implement the KEIP, including making any payments that become due pursuant to the terms of the KEIP, without further application or order of this Court.

5.      All amounts earned and payable under the KERP and KEIP shall have administrative expense priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code for all purposes in these chapter 11 cases and in any successor case.  For the avoidance of doubt, the Court is not approving (whether directly or indirectly) any prepetition payments made to the Debtors' Executives.  The Debtors' Executives waive any rights they may have against the Debtors based on any severance claims.  Notwithstanding the waiver of any severance claims in the preceding sentence, such waiver shall not be effective with respect to any assumption and assignment to a third party purchaser of any employment agreements governing the Executives, which assumption and assignment shall include any severance provisions of such agreements, provided that such assumption and assignment shall not require a cure payment by the Debtors or their estates.

6.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of the Motion and the relied granted hereby, and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

7.      Notwithstanding anything to the contrary, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

8.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: May 29, 2020
        White Plains, New York

                                        */s/Robert D. Drain*
                                        _____
                                        THE HONORABLE ROBERT D. DRAIN
                                        UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-1(b)
**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
msirota@coleschotz.com
Ryan T. Jareck, Esq.
rjareck@coleschotz.com
Matteo Percontino, Esq.
mpercontino@coleschotz.com
*Proposed Counsel to Debtors and Debtors in Possession*

Order Filed on June 13, 2024
by Clerk,
U.S. Bankruptcy Court
District of New Jersey

In re:

SAM ASH MUSIC CORPORATION, *et al.*

Debtors.[1]

Chapter 11

Case No. 24-14727 (SLM)

Judge: Stacey L. Meisel

(Jointly Administered)

**ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN, AND (II) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered two (2) through six (6), is hereby **ORDERED**.

**DATED: June 13, 2024**

Honorable Stacey L. Meisel
United States Bankruptcy Judge

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Sam Ash Music Corporation (3915); Samson Technologies Corp. (4062); Sam Ash Megastores, LLC (9955); Sam Ash California Megastores, LLC (3598); Sam Ash Florida Megastores, LLC (7276); Sam Ash Illinois Megastores, LLC (8966); Sam Ash Nevada Megastores, LLC (6399); Sam Ash New York Megastores, LLC (7753); Sam Ash New Jersey Megastores, LLC (8788); Sam Ash CT, LLC (5932); Sam Ash Music Marketing, LLC (2024); and Sam Ash Quikship Corp. (7410). The location of debtor Sam Ash Music Corporation's principal place of business is 278 Duffy Avenue, P.O. Box 9047, Hicksville, NY 11802.

(Page 2)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN, AND (II) GRANTING RELATED RELIEF |

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections 105(a), 363(b), 503(b), 503(c) and 507(a)(2) of title 11 of the United States Code (the "Bankruptcy Code") for entry of an Order (a) authorizing, but not directing, the Debtors to implement the proposed key employee incentive plan (the "KEIP") and key employee retention plan (the "KERP"), (b) granting administrative expense priority status to the incentive and retention payments, and (c) granting such other relief as the Court deems appropriate; and the Court having jurisdiction to decide the Motion and the relief requested therein in accordance with 28. U.S.C. §§ 157(a)-(b) and 1334(b) and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, dated September 18, 2012 (Simandle, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been given as provided in the Motion, and such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice of the Motion need be provided; and the Court having held a hearing to consider the relief requested in the Motion (the "Hearing"); and upon the *Declaration of Jordan Meyers in Support of Debtors' Motion for Entry of an Order Approving Debtors' Key Employee Incentive Plan and Key Employee Retention Plan,* the record of the Hearing, and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

(Page 3)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN, AND (II) GRANTING RELATED RELIEF |

the Debtors, their respective estates and creditors, and all parties-in-interest, and that the legal and

factual bases set forth in the Motion establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. The Motion is **GRANTED** as set forth herein.

2. The KERP and KEIP Plan attached hereto as <u>Exhibit 1</u> is approved as modified

herein.

3. The Debtors are authorized, but not directed, to take all actions necessary to

implement the KERP and KEIP Plan and to make all payments provided under such plans to or on

behalf of the Participants in accordance with the terms of this Order.

4. All amounts earned and payable under the KERP and KEIP Plan shall

have administrative expense priority under sections 503(a) and 507(a)(2) of the Bankruptcy Code

to the extent earned and payable as set forth in the KERP and KEIP Plan and this Order.

5. All amounts earned and payable under the KERP and KEIP Plan shall be paid

within 10 days following the effective date of a chapter 11 plan.

6. The Debtors shall provide counsel to the Official Committee of Unsecured

Creditors (the "<u>Committee</u>") with reasonably practicable notice of the termination or resignation

of any KERP Participant or KEIP Participant.  In the event a KERP Participant or KEIP Participant

is not employed by the Debtors on or during the KERP Effective Date or KEIP Effective Date,

respectively, the Debtors (i) are authorized to make payments to such Participants, if any, but only

(Page 4)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN, AND (II) GRANTING RELATED RELIEF |

in accordance with the KERP and KEIP Plan, and (ii) are not authorized to allocate any unused dollars under the KERP or KEIP to other KERP Participants or KEIP Participants, respectively.

7.     The KERP and KEIP Plan is hereby modified such that (a) any eligible KEIP Participant will be entitled to (i) 50% of the KEIP Bonus in the event the Debtors sell their Samson business for in excess of $7.5 million; and (ii) 50% of the KEIP Bonus in the event the Debtors sell all of their assets for an aggregate amount in excess of $10 million (in both instances, including the sale of the Samson business, but excluding the store closing sales and existing credit bid stalking horse asset purchase agreement with Tiger Finance, LLC), and (b) in order to receive a KEIP Bonus or KERP Bonus, each KEIP Participant and KERP Participant shall be required to waive any claims against the Debtors, including any right to any other performance bonus, retention, or severance compensation otherwise payable to them by the Debtors pursuant to any prepetition bonus plan or employment agreement, but excluding any claims for unpaid paid time off and wages authorized by any *Final Order (I) Authorizing The Debtors To (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, And Reimbursable Employee Expenses And (B) Continue Employee Benefits Programs And (II) Granting Related Relief.*

8.     Schedules I and II to the KERP and KEIP Plan may be modified by the Debtors, in consultation with the Committee, provided that such modification: (i) is on five (5) days prior written notice to the notice parties set forth in the Motion and the Committee; (ii) is consistent with the Motion; and (iii) does not increase the total amounts payable under the KEIP or KERP as authorized by this Order or is otherwise inconsistent with the *Order (I) Authorizing the Debtors to*

(Page 5)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN, AND (II) GRANTING RELATED RELIEF |

*Obtain Postpetition Financing, (II) Authorizing Use of Cash Collateral and Affording Adequate Protection; (III) Granting Liens and Providing Superpriority Administrative Expense Status; (IV) Modifying Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 49].

9.      Nothing in this Order shall be deemed to authorize the payment of any severance payments to insiders of the Debtors or that are otherwise subject to sections 503(c)(1) or 503(c)(2) of the Bankruptcy Code.

10.      Nothing in the Motion or this Order: (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates or (ii) shall impair, prejudice, waive or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority or amount of any claim against the Debtors and their estates.

11.      Notwithstanding anything to the contrary in the Motion or this Order, any payment made by the Debtors pursuant to the authority granted in this Order must be in compliance with and any authorization of the Debtors contained herein is subject to: (a) any interim or final orders entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility and/or authorizing the use of cash collateral; (b) the documentation in respect of any such debtor-in-possession financing or use of cash collateral; and (c) any budget or cash flow forecasts in connection therewith.

12.      Notwithstanding the relief granted herein or any action taken hereunder, nothing contained in this Order shall itself create any right to future employment or entitlements to any

(Page 6)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN, AND (II) GRANTING RELATED RELIEF |

Participant.

13.    Notice of the Motion as provided herein shall be deemed good and sufficient notice of such Motion and the requirements of Rule 6004(a) of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

14.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

15.    The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

16.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

17.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

## <u>Exhibit 1</u>

### KERP AND KEIP PLAN

## SAM ASH MUSIC CORPORATION AND ITS AFFILIATED DEBTORS
## KEY EMPLOYEE INCENTIVE AND KEY EMPLOYEE RETENTION PLANS

**KERP AND KEIP OBJECTIVES**

The Key Employee Retention Plan (the "KERP") and Key Employee Incentive Plan (the "KEIP") of Sam Ash Music Corporation and its debtor affiliates (collectively, the "Company" or the "Debtors") described herein are designed to encourage the retention of certain valuable, hard-to-replace, non-senior management employees (collectively, the "KERP Participants"), and to provide performance incentives to certain senior management (collectively, the "KEIP Participants") who are essential to the Company's restructuring and will aid in maximizing the value of the Company for the benefits of its stakeholders.

**THE KERP**

The KERP is designed to help ensure that valuable, hard-to-replace, non-insider, non-senior management employees who are important to the Debtors' restructuring are retained and properly motivated to preserve and maximize the value of the Debtors' business for the benefit of the Debtors' stakeholders in the Company's chapter 11 cases (the "Chapter 11 Cases"). The Debtors wish to provide a bonus to the KERP Participants so that they are committed to this goal. The Debtors have identified the KERP Participants as important to the success of their restructuring efforts. The KERP will encourage these non-insider employees to remain with the Debtors as they pursue their restructuring efforts, as well as to help manage the Company's ongoing operations and the administration of the Debtors' estates during the Chapter 11 Cases.

**KERP PARTICIPANTS AND KERP BONUSES**

The Debtors have identified the employees listed on Schedule I attached hereto to participate in the KERP. Each KERP Participant was carefully selected by management and deemed critical to the Company's ability to maximize value for the benefit of all interested parties. Without payments under the proposed KERP, the Company believes that the KERP Participants are likely to pursue alternative employment, harming the value of the estates and negatively affecting the Debtors' restructuring efforts.

"KERP Bonuses" will be payable to each KERP Participant in the respective amounts identified on Schedule I (the "KERP Bonuses"). The KERP Bonuses represent fixed cash amounts payable in one installment based on continued employment of the KERP Participant through the sale process *and* confirmation of a plan of liquidation. The KERP Bonuses shall be paid within 10 days following the effective date of a chapter 11 plan (the "KERP Effective Date").

There are currently twenty-one (21) KERP Participants, and the total potential aggregate payout under the KERP is approximately $234,400.00. The KERP Bonuses on average equal 10% of the KERP Participants' annual salary.

**THE KEIP**

The KEIP is designed to incentivize the KEIP Participants, who hold critical operational leadership or corporate management positions, to preserve and maximize the value of the

Company's business for the benefit of its stakeholders in the Chapter 11 Cases. The Debtors rely on the KEIP Participants' expertise to make decisions that support the operations and drive the financial performance of the Company's business. The KEIP Participants are responsible for, among other things, essential day-to-day business functions, executing the Debtors' business plan, implementing the operational goals of the Debtors' restructuring, participating in the Debtors' efforts to successfully effectuate a sale of the eCommerce business, participating in the Debtors' efforts related to the store closing sales, assisting counsel in the preparation of essential reporting and bankruptcy-related documents, and responding to requests for diligence by non-debtor parties in connection with the restructuring process. Given their essential role in the Debtors' enterprise as officers, these individuals are best-positioned to drive performance and results with respect to the Debtors' restructuring goals and have taken on substantial tasks and responsibilities to help effectuate and further the Debtors' proposed restructuring, in addition to their existing responsibilities.

**KEIP PARTICIPANTS, METRIC AND PAYMENT AMOUNTS**

Each KEIP Participant, with his or her title and potential "KEIP Bonus," is set forth on Schedule II attached hereto. There are four (4) KEIP Participants, which were identified by the Debtors. The KEIP Participants may earn in the aggregate $107,000 in incentive awards (the "KEIP Bonus") which will be payable, if at all, as follows: (i) 75% of the KEIP Bonus in the event the Debtors sell their Samson business for in excess of $7.5 million; and (ii) 25% of the KEIP Bonus in the event the Debtors sell all of their assets for an aggregate amount in excess of $10 million (*including* the sale of the Samson business, but *excluding* the store closing sales and existing credit bid stalking horse asset purchase agreement with Tiger Finance, LLC).

The KEIP Bonuses shall be paid within 10 days following the effective date of a chapter 11 plan (the "KEIP Effective Date").

**CONDITIONS AND TIMING OF PAYMENT OF BONUSES**

The KERP and KEIP are subject to authorization and approval by the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").

In addition to the KEIP requirements above, in order to earn a KEIP Bonus, the KEIP Participant must be employed by the Debtors on the KEIP Effective Date unless, prior to such date, the KEIP Participant (i) is involuntarily terminated by the Debtors for any reason other than "for Cause," (ii) is placed on disability, or (iii) dies. The KEIP Bonuses shall vest on the KEIP Effective Date.

In addition to the KERP requirements above, in order to earn a KERP Bonus, the KERP Participant must be employed by the Debtors on the KERP Effective Date unless, prior to such date, the KERP Participant (i) is involuntarily terminated by the Debtors for any reason other than "for Cause," (ii) is placed on disability, or (iii) dies. The KERP Bonuses shall vest on the KERP Effective Date.

**"CAUSE" DEFINED**

For purposes of the KERP and KEIP, the term "for Cause" means, either before or after adoption of the KEIP or KERP:

- Refusal to follow the lawful instructions of a direct supervisor;

- A finding by a legal or administrative court or tribunal that the KEIP Participant or KERP Participant engaged in fraud or willful misconduct, or was grossly negligent, in the performance of his or her duties;

- A material and direct conflict of interest, not specifically waived in advance by the Company;

- Unauthorized use or disclosure of confidential information that belongs to the Company or its customers, employees or vendors;

- Repeated absences from work that the Company reasonably determines to be materially adverse to the best interests of the Company; or

- Other material misconduct including, but not limited to: falsification of the Company's records, theft, sexual harassment, or possession of firearms, controlled substances or illegal drugs on the Company's premises or while performing the Company's business.

**FURTHER ACTIONS**

As a condition to each KEIP Participant's or KERP Participant's eligibility to participate in the KEIP or KERP, as applicable, such participant shall agree to take such further actions as are reasonably requested by the Company, including such actions as the Company may reasonably request subsequent to the termination or resignation of such participant's employment with the Company to assist the Company as needed, including in the conduct of the Chapter 11 Cases and to resolve any matters in which such participant was involved during his or her tenure at the Company.

**CHANGE OF ADDRESS**

The KEIP Participants and KERP Participants shall be responsible for notifying the Company of any change of address before payment is made by email notification to the Company's counsel, Cole Schotz P.C., Attn: Ryan T. Jareck, Esq. (rjareck@coleschotz.com) and Matteo Percontino (mpercontino@coleschotz.com).

**PROMISE OF CONTINUED EMPLOYMENT**

The KERP and KEIP, and any KEIP Participant's or KERP Participant's selection as a participant in the KEIP or KERP, respectively, does not, and is in no manner intended to constitute, a promise of employment for any period of time or to change a KEIP Participant's or KERP Participant's status, if applicable, as an at will employee subject to termination at any time for any reason.

**TAXES**

All payments made pursuant to the KEIP or KERP shall be subject to standard withholding and deductions on wages.  Neither the Company nor its officers or agents make or has made any representation about the tax consequences of any payments or benefits offered by the Company to any KEIP Participant or KERP Participant.

**SEVERABILITY**

If any provision of the KEIP or KERP is determined to be invalid or unenforceable, in whole or in part, this determination shall not affect any other provision of the KEIP or KERP and the provision in question shall be modified as to be rendered enforceable in a manner consistent with the intent of the parties insofar as possible.  Any waiver of or breach of any of the terms of the KEIP or KERP shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision

**CHOICE OF LAW AND VENUE**

The KEIP and KERP shall both be governed by the laws of the State of New York, notwithstanding that State's conflict of law provisions.  The Company and each KEIP Participant and KERP Participant shall: (i) irrevocably and unconditionally consent to the exclusive jurisdiction of the Bankruptcy Court; (ii) irrevocably and unconditionally waive any objection to the laying of venue of any action, suit, or proceeding arising out of or related to the KEIP or KERP in the Bankruptcy Court; and (iii) irrevocably and unconditionally waive and agree not to plead or claim that any such action, suit, or proceeding brought in the Bankruptcy Court has been brought in an inconvenient forum.

**ENTIRE AGREEMENT AND AMENDMENT**

This document constitutes the complete, final and exclusive embodiment of the terms and conditions of the KERP and KEIP and may only be modified in writing signed by an authorized officer of the Company.  Any agreement between any KEIP Participant or KERP Participant and the Company with regard to the KEIP or KERP, as applicable, and its subject matter is superseded in its entirety by this document.

**NO ASSIGNMENT**

The rights of a KEIP Participant or KERP Participant or any other person to any payment or other benefits under the KEIP or KERP, as applicable, may not be assigned, transferred, pledged, or encumbered except by will or the laws of descent and distribution.

**Schedule I – KERP Participants and Payment Amounts**

**[FILED UNDER SEAL]**

## Schedule II – KEIP Participants and KEIP Bonus Information

### [FILED UNDER SEAL]

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**
**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D.  Sirota, Esq. (msirota@coleschotz.com)
Warren A. Usatine, Esq. (wusatine@coleschotz.com)
David M.  Bass, Esq. (dbass@coleschotz.com)
Jacob S. Frumkin, Esq. (jfrumkin@coleschotz.com)

*Proposed Attorneys for Debtors and Debtors in
Possession*

**Order Filed on July 22, 2020**
**by Clerk**
**U.S. Bankruptcy Court**
**District of New Jersey**

In re:

SLT HOLDCO, INC., *et al.,*

Debtors.[1]

Chapter 11

Case No. 20-18368 (MBK)

Jointly Administered

**Hearing Date and Time:**

## ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF

The relief set forth on the following pages, numbered two (2) through four (4), is hereby

**ORDERED**.

**DATED: July 22, 2020**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: SLT Holdco, Inc. (0403) and Sur La Table, Inc. (3409).  The Debtors' corporate headquarters are located at 6100 4th Avenue South, Suite 500, Seattle, Washington 98108.

60743/0001-20880883v1

(Page 2)

| | |
|---|---|
| Debtors: | SLT HOLDCO, Inc., *et al.* |
| Case No. | 20-18368 (MBK) |
| Caption of Order: | ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF |

Upon the motion (the "**Motion**")[2] SLT Holdco, Inc. and its wholly-owned subsidiary, Sur La Table, Inc., as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" or the "**Company**"), pursuant to sections 105(a), 363(b), 503(c) and 507(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**"), for entry of an order (this "**Order**") (a) authorizing, but not directing, the Debtors to implement the proposed non-insider key employee retention plan (the "**KERP**") and (b) granting related relief; and the Court having jurisdiction to decide the Motion and the relief requested therein in accordance with 28. U.S.C. §§ 157(a)-(b) and 1334(b) and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, dated September 18, 2012 (Simandle, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been given as provided in the Motion, and such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice of the Motion need be provided; and the Court having held a hearing to consider the relief requested in the Motion (the "**Hearing**"); and upon the *Declaration of Jason Goldberger in Support of Debtors' Motion for Entry of an Order (I) Approving Debtors' Key Employee Retention Plan and (II) Granting Related Relief*, the record of the Hearing, and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their respective estates and creditors, and all parties-in-interest, and that the legal

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

(Page 3)
Debtors:            SLT HOLDCO, Inc., *et al.*
Case No.            20-18368 (MBK)
Caption of Order:   ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE RETENTION
                    PLAN AND (II) GRANTING RELATED RELIEF

and factual bases set forth in the Motion establish just cause for the relief granted herein; and

after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is **GRANTED** as set forth herein.

2.      The KERP is approved in its entirety.

3.      The Debtors are authorized, but not directed, to implement the KERP as described

in the Motion, including by making all payments to or on behalf of the Eligible Employees at the

times and in the amounts specified in the Motion.

4.      After providing notice to Debtors' prepetition and DIP lenders, counsel to the

Office of the United States Trustee and any official committee of unsecured creditors appointed

in these chapter 11 cases, the Debtors are authorized to add and pay KERP bonuses to non-

insider employees not currently identified in the Motion.

5.      All amounts earned and payable under the KERP shall have administrative

expense priority under sections 503(a) and 507(a)(2) of the Bankruptcy Code for all purposes in

these chapter 11 cases and in any other cases under the Bankruptcy Code to which these chapter

11 cases may be converted.

6.      Nothing in the Motion or this Order: (i) is intended or shall be deemed to

constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an

admission as to the validity of any claim against the Debtors and their estates or (ii) shall impair,

(Page 4)
Debtors:            SLT HOLDCO, Inc., *et al.*
Case No.            20-18368 (MBK)
Caption of Order:   ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE RETENTION
                    PLAN AND (II) GRANTING RELATED RELIEF

prejudice, waive or otherwise affect the rights of the Debtors and their estates with respect to the

validity, priority or amount of any claim against the Debtors and their estates.

      7.      Notwithstanding the applicability of any Bankruptcy Rule, this Order shall be

effective and enforceable by its terms immediately upon entry.

      8.      This Court shall retain jurisdiction with respect to all matters arising from or

related to the implementation or interpretation of this Order.