**DENTONS US LLP**

Tania M. Moyron (admitted *pro hac vice*)
Van C. Durrer, II (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: tania.moyron@dentons.com
       van.durrer@dentons.com

John D. Beck (admitted *pro hac vice*)
Sarah M. Schrag (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
Email: john.beck@dentons.com
       sarah.schrag@dentons.com

*Counsel for Debtors and
Debtors in Possession*

Order Filed on October 22, 2025
by Clerk
U.S. Bankruptcy Court
District of New Jersey

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br>Powin, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered)<br><br>**Hearing Date: October 23, 2025 at 12:30 p.m. E.T.** |

### NOTICE OF FILING OF DEBTORS' APPLICATION IN LIEU OF MOTION IN SUPPORT OF ENTRY OF JOINT STIPULATION AND AGREED ORDER AUTHORIZING THE TERMINATION OF THAT CERTAIN REAL PROPERTY LEASE FOR PROPERTY LOCATED AT 16902 MILLIKAN AVENUE

**PLEASE TAKE NOTICE** that on June 9, 2025 and June 10, 2025 (collectively, the "Petition Date"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") each

**DATED: October 22, 2025**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").

   **PLEASE TAKE FURTHER NOTICE** that on October 7, 2025, the Debtors filed an *Application in Lieu of Motion in Support of Entry of Joint Stipulation and Agreed Order Authorizing the Termination of That Certain Real Property Lease for Property Located at 16902 Millikan Avenue* (the "Application").[2]  Only, if objections are filed, a hearing will be held via Zoom to consider approval of the Application on October 23, 2025 at 12:30 p.m. E.T. (the "Hearing"), or as soon thereafter as counsel may be heard. If no objections are filed within 14 days of filing the Application, the Application will be granted without the need for a Hearing.

   **PLEASE TAKE FURTHER NOTICE** that written objections, if any, to the relief requested in the Application shall: (a) be in writing; (b) state with particularity the basis of the objection; and (c) be filed with the Clerk of the Bankruptcy Court electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the *General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002* (the "General Order") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and shall be served on such parties in accordance with the General Order and the Supplemental Commentary, so as to be actually received no later than fourteen (14) days after filing of the Application.

   **PLEASE TAKE FURTHER NOTICE** if an Objection is filed, any objecting party wishing to appear at the Hearing must register with the Court by submitting an e-mail to Chambers (chambers_of_mbk@njb.uscourts.gov) indicating the name of the person appearing, their e-mail address, their affiliation, and whom they represent/interest in this case.  If the request is approved, the participant will receive appropriate credentials and further instruction.  Telephonic information for observational purposes can be found on the page on the Court's website devoted to the *Powin, LLC, et al.*, bankruptcy case: https://www.njb.uscourts.gov/powin.

   **PLEASE TAKE FURTHER NOTICE THAT YOUR RIGHTS MAY BE AFFECTED.  You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case.  If you do not have an attorney, you may wish to consult one.**

---

[2] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Application.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Application, and any related filings, can be viewed and/or obtained by: (i) accessing the Bankruptcy Court's Website for a fee, (ii) visiting the website for the Debtors' chapter 11 cases at: https://www.veritaglobal.net/powin or (iii) by contacting the Office of the Clerk of the United States Bankruptcy Court, District of New Jersey. Please note that a PACER password is required to access documents on the Bankruptcy Court's Website.

[*Concluded on the following page*]

Dated: October 7, 2025

**TOGUT, SEGAL & SEGAL LLP**

*/s/ Frank A. Oswald*
Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  altogut@teamtogut.com
          eblander@teamtogut.com

- and -

**DENTONS US LLP**

Tania M. Moyron (admitted *pro hac vice*)
Van C. Durrer, II (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:  tania.moyron@dentons.com
          van.durrer@dentons.com

John D. Beck (admitted *pro hac vice*)
Sarah M. Schrag (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:  john.beck@dentons.com
          sarah.schrag@dentons.com

*Counsel for Debtors and*
*Debtors in Possession*

Docusign Envelope ID: D66E246B-1D0F-4CA1-86C5-6E5B983DE550

Case 25-16137-MBK    Doc 99    Filed 10/07/25    Entered 10/07/25 00:14:47    Desc
Imaged Certificate of Notice    Page 5 of 75    Page 5 of 75

**DENTONS US LLP**

Tania M. Moyron (admitted *pro hac vice*)
Van C. Durrer, II (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:   tania.moyron@dentons.com
             van.durrer@dentons.com

John D. Beck (admitted *pro hac vice*)
Sarah M. Schrag (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:   john.beck@dentons.com
             sarah.schrag@dentons.com

*Counsel for Debtors and*
*Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:   frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:   altogut@teamtogut.com
             eblander@teamtogut.com

*Counsel for Debtors and*
*Debtors in Possession*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>Powin, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504]; (iii) PEOS Holdings, LLC [5476]; (iv) Powin China Holdings 1, LLC [1422]; (v) Powin China Holdings 2, LLC [9713]; (vi) Charger Holdings, LLC [5241]; (vii) Powin Energy Ontario Storage, LLC [8348]; (viii) Powin Energy Operating Holdings, LLC [2495]; (ix) Powin Energy Operating, LLC [6487]; (x) Powin Energy Storage 2, Inc., [9926]; (xi) Powin Energy Ontario Storage II LP, [5787]; and (xii) Powin Canada B.C. Ltd. [2239]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

**DEBTORS' APPLICATION IN LIEU OF MOTION IN
SUPPORT OF ENTRY OF JOINT STIPULATION AND AGREED ORDER
AUTHORIZING THE TERMINATION OF THAT CERTAIN REAL PROPERTY
LEASE FOR PROPERTY LOCATED AT 16902 MILLIKAN AVENUE**

TO THE HONORABLE MICHAEL B. KAPLAN, UNITED STATES BANKRUPTCY JUDGE:

Powin, LLC and the above-referenced affiliated debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases (the "Chapter 11 Cases") hereby submit this Application (this "Application") pursuant to rule 9019-4(b) of the Local Bankruptcy Rules for the District of New Jersey (the "Local Rules"), seeking approval and entry of the proposed *Joint Stipulation and Agreed Order Authorizing the Termination of that Certain Real Property Lease for Property Located at 16902 Millikan Avenue* (the "Stipulation and Agreed Order"), a copy of which is attached hereto as **Exhibit A**, and respectfully state as follows:

1.      On June 9, 2025 (the "Petition Date"),[2] the Debtors each commenced a voluntary case for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On June 13, 2025, the Court entered an order [Docket No. 58] authorizing procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  On June 27, 2025 the United States Trustee for the District of New Jersey (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 174].  No request for the appointment of a trustee or examiner has been appointed in these Chapter 11 Cases.

2.      Additional information regarding the Debtors, including their business and the events leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of*

---

[2]     Lead Debtor Case No. 25-16137 (MBK) for Debtor Powin Project LLC was filed on June 9, 2025, and the remaining Debtors were filed shortly thereafter on June 10, 2025 and June 22, 2025.

2

Docusign Envelope ID: D668246B-4D0F-4C13-8EC5-8E5D9830F552

*Gerard Uzzi in Support of Emergency First Day Motions of the Debtors* [Docket No. 13] (the "First Day Declaration").

3.        This Application is submitted pursuant to Local Rule 9019-4(b) in lieu of a motion in support of the Debtors' request that the Court enter the Stipulation and Agreed Order as presented.

4.        On October 12, 2016 3U Millikan, LLC ("3U"), as lessor, and Powin Energy Corporation ("Powin Energy"), as lessee, executed that certain lease agreement (the "Lease Agreement") by which the parties agreed that 3U would lease the premises located at 16902 Millikan Avenue, Irvine, CA 92606 (the "Premises") to Powin Energy.  A copy of the Lease Agreement is attached to the Stipulation and Agreed Order as **Exhibit 1**.

5.        On January 1, 2017, Powin Energy, as sublessor, entered into a sublease agreement, attached to the Stipulation and Agreed Order as **Exhibit 2** (as amended from time to time, the "Sublease Agreement," and together with the Lease Agreement, the "Agreements"), with PPA Grand Johanna, LLC, as sublessee ("PPA Grand") whereby PPA Grand agreed to sublease the Premises from Powin Energy and assumed all of the obligations under the Lease Agreement.

6.        On March 11, 2021, pursuant to that Assignment, Assumption and Bill of Sale dated March 11, 2021, attached to the Stipulation and Agreed Order as **Exhibit 3** (the "Assumption and Assignment Agreement"), by and between Powin Energy, as Assignor, and Powin Energy Operating, LLC, Powin, LLC, and Powin Energy Holdings, LLC, as Assignees, Powin Energy transferred all of its rights, obligations, and interests under the Agreements to Assignees.  *See* Ex. 3.

7.        The Lease Agreement is set to expire on January 9, 2027.

8.     On June 24, 2025, counsel to 3U contacted Debtors' counsel seeking early termination of the Lease Agreement and possession of the Premises.

9.     The Parties have agreed that the Agreements shall be deemed rejected and terminated, effective August 31, 2025 (the "Termination Date") *provided that* 3U shall provide PPA Grand access to the Premises through September 30, 2025 at no additional cost.

10.     PPA Grand shall be solely responsible for removing all personal property located at the Premises. PPA Grand shall be responsible to pay to 3U use and occupancy charges for the period commencing October 1, 2025 to the extent the personal property has not been removed from the premises.

11.     The Parties agree that the Stipulation and Agreed Order shall be effective immediately upon its entry by the Court (the "Effective Date").

12.     The Parties intend that the Stipulation and Agreed Order will be binding upon their successors, agents, assigns, including bankruptcy trustees and estate representatives, and any parent, subsidiary, or affiliated entity of the Parties.

13.     3U and PPA Grand shall have until the later of (a) the date that is 30 days after the date the Court enters the Stipulation and Agreed Order and (b) September 30, 2025, to file a proof of claim against the Debtors for the rejection and termination of the Agreements, as applicable.

14.     Notwithstanding anything to the contrary in this Stipulation and Agreed Order, nothing herein shall be deemed to waive, release, impair, or otherwise prejudice (i) the Debtors' right to assert a claim, cause of action, or right of setoff or recoupment against 3U, PPA Grand, or any other party, or (ii) the right of 3U, PPA Grand, or any other party to file a proof of claim or assert any claim, cause of action, or right of setoff or recoupment against the Debtors or their estates.  All such rights, claims, and defenses are expressly preserved.

4

15.     The Debtors submit that the Stipulation and Agreed Order is in the best interests of the Debtors and their estates, and a sound exercise of the Debtors' business judgement.

16.     No prior request for the relief sought in this Application has been made to this Court or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter the Stipulation and Agreed Order, in substantially the form submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Docusign Envelope ID: D666246B4D0F42C13-8CC-6E5B8830F559

Case 25-16013-MBR Doc Doc 99 Filed 10/07/25/25 Entered 10/07/25/25 Doc4:37 Desc
Imaged Certificate Document Page 10 of 68 Page 10 of 75

Dated: October 6, 2025

**TOGUT, SEGAL & SEGAL LLP**

_/s/ Frank A. Oswald_

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Email: frankoswald@teamtogut.com

Albert Togut (admitted _pro hac vice_)
Eitan Blander (admitted _pro hac vice_)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Email: altogut@teamtogut.com
eblander@teamtogut.com

- and -

**DENTONS US LLP**

Tania M. Moyron (admitted _pro hac vice_)
Van C. Durrer, II (admitted _pro hac vice_)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: tania.moyron@dentons.com
van.durrer@dentons.com

John D. Beck (admitted _pro hac vice_)
Sarah M. Schrag (admitted _pro hac vice_)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
Email: john.beck@dentons.com
sarah.schrag@dentons.com

_Counsel for Debtors and_
_Debtors in Possession_

## EXHIBIT A

(Proposed Stipulation and Agreed Order)

TSS Draft 9/24/2025

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re:<br>Powin, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

## JOINT STIPULATION AND AGREED ORDER AUTHORIZING THE TERMINATION OF THAT CERTAIN REAL PROPERTY LEASE FOR PROPERTY LOCATED AT 16902 MILLIKAN AVENUE

The relief set forth on the following pages, numbered five (5) through eight (8), is **ORDERED.**

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504]; (iii) PEOS Holdings, LLC [5476]; (iv) Powin China Holdings 1, LLC [1422]; (v) Powin China Holdings 2, LLC [9713]; (vi) Charger Holdings, LLC [5241]; (vii) Powin Energy Ontario Storage, LLC [8348]; (viii) Powin Energy Operating Holdings, LLC [2495]; (ix) Powin Energy Operating, LLC [6487]; (x) Powin Energy Storage 2, Inc., [9926]; (xi) Powin Energy Ontario Storage II LP, [5787]; and (xii) Powin Canada B.C. Ltd. [2239]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062

Docusign Envelope ID: ...

(Page | 2)

| | |
|---|---|
| Debtors: | Powin, LLC, *et al.* |
| Case No. | 25-16137 (MBK) |
| Caption of Order: | Joint Stipulation and Agreed Order Authorizing the Termination of That Certain Real Property Lease for Property Located at 16902 Millikan Avenue |

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**DENTONS US LLP**

Tania M. Moyron (admitted *pro hac vice*)
Van C. Durrer, II (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:  tania.moyron@dentons.com
             van.durrer@dentons.com

John D. Beck (admitted *pro hac vice*)
Sarah M. Schrag (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:  john.beck@dentons.com
             sarah.schrag@dentons.com

*Counsel for Debtors and
Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  altogut@teamtogut.com
             eblander@teamtogut.com

*Counsel for Debtors and
Debtors in Possession*

(Page | 3)

| | |
|---|---|
| Debtors: | Powin, LLC, *et al.* |
| Case No. | 25-16137 (MBK) |
| Caption of Order: | Joint Stipulation and Agreed Order Authorizing the Termination of That Certain Real Property Lease for Property Located at 16902 Millikan Avenue |

---

This joint stipulation and agreed order (the "<u>Stipulation and Agreed Order</u>") is entered into by and among the 3U Millikan, LLC ("<u>3U</u>"), PPA Grand Johanna, LLC ("<u>PPA Grand</u>") and Debtor Powin, LLC ("<u>Powin</u>,"and together with 3U and PPA Grand, the "<u>Parties</u>"), each as signatory hereto. The Parties hereby stipulate to the following:

## RECITALS

**WHEREAS**, on June 9, 2025 (the "<u>Petition Date</u>"),[1] the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") each commenced a voluntary case for relief under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On June 13, 2025, the Court entered an order [Docket No. 58] authorizing procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). On June 27, 2025 the United States Trustee for the District of New Jersey (the "<u>U.S. Trustee</u>") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "<u>Committee</u>") [Docket No. 174]. No request for the appointment of a trustee or examiner has been appointed in these Chapter 11 Cases;

**WHEREAS**, on October 12, 2016, 3U, as lessor, and Powin Energy Corporation ("<u>Powin Energy</u>"), as lessee, executed that certain lease agreement (the "<u>Lease Agreement</u>") by which the parties agreed that 3U would lease the premises located at 16902 Millikan Avenue, Irvine,

---

[1]    Lead Debtor Case No. 25-16137 (MBK) for Debtor Powin Project LLC was filed on June 9, 2025, and the remaining Debtors were filed shortly thereafter on June 10, 2025.

Docusign Envelope ID: B066246B4D0F4C13-8CC5-8E58983DF553

Docusign Envelope ID: D666246B4D9F44C13-86C5-8F5E9830F5E9

(Page | 4)

| | |
|---|---|
| Debtors: | Powin, LLC, *et al.* |
| Case No. | 25-16137 (MBK) |
| Caption of Order: | Joint Stipulation and Agreed Order Authorizing the Termination of That Certain Real Property Lease for Property Located at 16902 Millikan Avenue |

---

California 92606 (the "<u>Premises</u>") to Powin Energy.  A copy of the Lease is attached hereto as

**<u>Exhibit 1</u>**;

    **WHEREAS**, on January 1, 2017, Powin Energy, as lessor, entered into an agreement,

attached hereto as **<u>Exhibit 2</u>** (as amended from time to time, the "<u>Sublease Agreement</u>," together

with the Lease Agreement, the "<u>Agreements</u>") with PPA Grand, as sublessee, whereby PPA Grand

agreed to sublease the Premises from Powin Energy and assumed and agreed all of the obligations

under the Lease Agreement;

    **WHEREAS**, on March 11, 2021, pursuant to that Assignment, Assumption and Bill of

Sale dated March 11, 2021, attached hereto as **<u>Exhibit 2</u>** (the "<u>Assumption and Assignment</u>

<u>Agreement</u>"), by and between Powin Energy, as assignor, and Powin Energy Operating, LLC,

Powin, LLC, and Powin Energy Holdings, LLC, (collectively, the "<u>Assignees</u>"), Powin Energy

transferred all of its rights, obligations, and interests under the Agreements to Assignees;

    **WHEREAS**, the Lease Agreement is set to expire on January 9, 2027;

    **WHEREAS**, on June 24, 2025, counsel to 3U contacted Debtors' counsel seeking early

termination of the Lease Agreement and possession of the Premises;

    **WHEREAS**, the Parties agree that the Agreements should be deemed rejected and

terminated as of August 31, 2025 (the "<u>Termination Date</u>"); and

    **WHEREAS**, the Parties agree that they each, or through respective counsel, carefully read

this Stipulation and Agreed Order, and they understand the terms and conditions hereof.

Docusign Envelope ID: D866246B-4D0F-4C13-86C5-6E5B833DF553

Case 25-16137-MBK    Doc 99    Filed 10/02/25    Entered 10/03/25 10:25:25    Desc Main
Image of Certificate of Notice    Page 16 of 68    Page 16 of 75

(Page | 5)

| | |
|---|---|
| Debtors: | Powin, LLC, *et al.* |
| Case No. | 25-16137 (MBK) |
| Caption of Order: | Joint Stipulation and Agreed Order Authorizing the Termination of That Certain Real Property Lease for Property Located at 16902 Millikan Avenue |

---

**IT IS THEREFORE STIPULATED AND AGREED, AND UPON BANKRUPTCY COURT APPROVAL HEREOF, IT SHALL BE SO ORDERED THAT:**

1.      This Stipulation and Agreed Order is approved as and to the extent set forth herein.

2.      The above recitals are incorporated by reference into this Stipulation and Agreed Order with the same force and effect as if fully set forth hereinafter.

3.      The Agreements shall be deemed rejected and terminated as of the Termination Date.

4.      3U and PPA Grand shall have until the later of (a) the date that is 30 days after the date the Court enters an order approving this Stipulation and Agreed Order and (b) September 30, 2025, to file a proof of claim against the Debtors for the rejection and termination of the Agreements, as applicable.

5.      PPA Grand shall be solely responsible for removing all personal property located at the Premises.

6.      This Stipulation and Agreed Order shall be effective immediately upon its entry by the Court (the "Effective Date").

7.      This Stipulation and Agreed Order shall be binding upon each Party's successors, agents, assigns, including bankruptcy trustees and estate representatives, and any parent, subsidiary, or affiliated entity of the Parties.

8.      Except as otherwise provided in this Stipulation and Agreed Order, no Party shall have any further liability or obligation to any other Party with respect to the Agreements after the

Docusign Envelope ID: D666246B-4D9F-4CA3-86C5-6E5B983DE559

(Page | 6)

| | |
|---|---|
| Debtors: | Powin, LLC, *et al.* |
| Case No. | 25-16137 (MBK) |
| Caption of Order: | Joint Stipulation and Agreed Order Authorizing the Termination of That Certain Real Property Lease for Property Located at 16902 Millikan Avenue |

Termination Date, including, without limitation, any costs, fees, or expenses related to the removal, decontamination, storage, or disposition of any property at the Premises or any other location.

9.      Neither this Stipulation and Agreed Order nor any negotiations and/or writings engaged in or prepared, as applicable, in connection with the Stipulation and Agreed Order will in any way be construed as or deemed to be evidence of, or an admission on behalf of any Party regarding, any claim or right that such Party may have against another Party.

10.      None of the terms in this Stipulation and Agreed Order shall be offered as evidence in any legal or administrative proceeding among or between the Parties, other than as may be necessary: (a) to obtain Court approval of and to enforce this Stipulation and Agreed Order; or (b) to seek damages or injunctive relief in connection with enforcement of the Stipulation and Agreed Order.

11.      Nothing in this Stipulation and Agreed Order or the relief sought herein shall constitute or be deemed to be or result in: (a) an allowance of administrative expense claims under section 503(b) of the Bankruptcy Code; (b) an assumption or rejection of an executory contract or unexpired lease under section 365 of the Bankruptcy Code, except as expressly provided herein; (c) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (d) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds whatsoever; (e) a promise or requirement to pay any claim; (f) an implication or admission that any particular claim is of a type specified or defined in the Stipulation and Agreed Order or a finding that any particular claim is an administrative expense claim or other priority claim; (g) an admission as to the validity,

Docusign Envelope ID: D668246B-1D9E-4C11-86C5-6E5B9830F558

(Page | 7)

| | |
|---|---|
| Debtors: | Powin, LLC, *et al.* |
| Case No. | 25-16137 (MBK) |
| Caption of Order: | Joint Stipulation and Agreed Order Authorizing the Termination of That Certain Real Property Lease for Property Located at 16902 Millikan Avenue |

priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' bankruptcy estates; (h) a waiver or limitation of the Debtors', or any insurers', rights under the Bankruptcy Code or any other applicable nonbankruptcy law; or (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to this Stipulation and Agreed Order are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

12.     Notwithstanding anything to the contrary in this Stipulation and Agreed Order, nothing herein shall be deemed to waive, release, impair, or otherwise prejudice (i) the Debtors' right to assert any claim, cause of action, or right of setoff or recoupment against 3U, PPA Grand, or any other party, or (ii) the right of 3U, PPA Grand, or any other party to assert any claim, cause of action, or right of setoff or recoupment against the Debtors or their estates prior to the Bar Date established by the Bankruptcy Court.  All such rights, claims, and defenses are expressly preserved.

13.     Each of the Parties to this Stipulation and Agreed Order represents and warrants that it is duly authorized to enter into and be bound by this Stipulation and Agreed Order.

14.     This Stipulation and Agreed Order may be executed in identical counterparts, including by facsimile and/or electronic mail, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

(Page | 8)

| | |
|---|---|
| Debtors: | Powin, LLC, *et al.* |
| Case No. | 25-16137 (MBK) |
| Caption of Order: | Joint Stipulation and Agreed Order Authorizing the Termination of That Certain Real Property Lease for Property Located at 16902 Millikan Avenue |

---

15. This Stipulation and Agreed Order represents the entire agreement by and between the Parties with respect to the subject matter hereof, and all prior understandings or agreements, if any, are merged into this Stipulation and Agreed Order.

16. The Court retains exclusive jurisdiction with respect to any disputes arising from or other actions to interpret, administer, or enforce the terms and provisions of this Stipulation and Agreed Order, and the Parties hereby consent to such jurisdiction to resolve any disputes or controversies arising from or related to the implementation of this Stipulation and Agreed Order.

[*Concluded on the Following Page*]

(Page | 9)

| | |
|---|---|
| Debtors: | Powin, LLC, *et al.* |
| Case No. | 25-16137 (MBK) |
| Caption of Order: | Joint Stipulation and Agreed Order Authorizing the Termination of That Certain Real Property Lease for Property Located at 16902 Millikan Avenue |

---

Stipulated and agreed to by:
Dated: October 6, 2025

**TOGUT, SEGAL & SEGAL LLP**
*/s/ Frank A. Oswald*
Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Email: frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Email: altogut@teamtogut.com
          eblander@teamtogut.com

*Co-Counsel to the Debtors and*
*Debtors-in-Possession*

And

**DENTONS US LLP**

Tania M. Moyron (admitted *pro hac vice*)
Van C. Durrer, II (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: tania.moyron@dentons.com
          van.durrer@dentons.com

John D. Beck (admitted *pro hac vice*)
Sarah M. Schrag (admitted *pro hac vice*)

(Page | 10)

| | |
|---|---|
| Debtors: | Powin, LLC, *et al.* |
| Case No. | 25-16137 (MBK) |
| Caption of Order: | Joint Stipulation and Agreed Order Authorizing the Termination of That Certain Real Property Lease for Property Located at 16902 Millikan Avenue |

---

1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
Email: john.beck@dentons.com
         sarah.schrag@dentons.com

*Counsel to the Debtors and*
*Debtors-in-Possession*


**ASATOURIAN LAW, A PROFESSIONAL CORPORATION**

/s/ MICHAEL ASATOURIAN
Michael R. Asatourian, Esq.
620 Newport Center Drive, Suite 1100
Newport Beach, CA 92660
Telephone: (714) 702-5100
Email: masatourian@alapc.net

*Counsel to 3U Millikan, LLC*


**ORRICK, HERRINGTON & SUTCLIFFE LLP**

/s/ Lorraine McGowen
Michael Trentin, Esq.
Lorraine McGowen, Esq. (admitted *pro hac vice*)
Jenna MacDonald Busche, Esq. (admitted *pro hac vice*)
51 West 52nd Street
New York, New York 10019-6142
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Email: mtrentin@orrick.com
lmcgowen@orrick.com
jmacdonaldbusche@orrick.com

*Counsel to PPA Grand Johanna, LLC*

# EXHIBIT 1

**Lease Agreement**

## AIR COMMERCIAL REAL ESTATE ASSOCIATION
## STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE -- NET
### (DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)

**1. Basic Provisions ("Basic Provisions").**

1.1 **Parties:** This Lease ("Lease"), dated for reference purposes only __October 12, 2016__
is made by and between __3U Millikan LLC__

("Lessor")

and __Powin Energy__

("Lessee").

(collectively the "Parties," or individually a "Party").

1.2 **Premises:** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease, and commonly known as __16902 Millikan Avenue, Irvine, CA 92606__
located in the County of __Orange__ , State of __California__
and generally described as (describe briefly the nature of the property and, if applicable, the "Project", if the property is located within a Project)
__an approximate 13,500 square foot industrial space. Exact square footage to be verified.__

("Premises"). (See also Paragraph 2)

1.3 **Term:** __10__ years and __3__ months ("Original Term") commencing __October 10, 2016__
("Commencement Date") and ending __January 9, 2027__ ("Expiration Date"). (See also Paragraph 3)

1.4 **Early Possession:** If the Premises are available Lessee may have non-exclusive possession of the Premises commencing
_____ ("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)

1.5 **Base Rent:** $17,550.00 per month ("Base Rent"), payable on the __1st__ day of
each month commencing __January 1, 2017__
. (See also Paragraph 4)

☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph __51__

1.6 **Base Rent and Other Monies Paid Upon Execution:**

(a) **Base Rent:** $17,550.00 for the period January 1, 2017 - January 31, 2017

(b) **Security Deposit:** $17,550.00 ("Security Deposit"). (See also Paragraph 5)

(c) **Association Fees:** $_____ for the period _____

(d) **Other:** $_____ for _____

(e) **Total Due Upon Execution of this Lease:** $35,100.00

1.7 **Agreed Use:** __The Premises shall be used for the operation of a Battery Energy__
__Storage System (BESS) that is contracted to serve California Edison__ . (See also Paragraph 6)

1.8 **Insuring Party:** Lessor is the "Insuring Party" unless otherwise stated herein. (See also Paragraph 8)

1.9 **Real Estate Brokers:** (See also Paragraph 15 and 25)

(a) Representation: The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check applicable boxes):

☐ _____ represents Lessor exclusively ("Lessor's Broker");

☑ Pacific Coast Commercial represents Lessee exclusively ("Lessee's Broker"); or

☐ _____ represents both Lessor and Lessee ("Dual Agency").

(b) Payment to Brokers: Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the brokerage fee agreed to in a separate written agreement (or if there is no such agreement, the sum of _____ or _____ % of the total Base Rent) for the brokerage services rendered by the Brokers.

1.10 **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by _____
("Guarantor"). (See also Paragraph 37)

1.11 **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:

☑ an Addendum consisting of Paragraphs __51__ through __57__ ;

☐ a plot plan depicting the Premises;

☐ a current set of the Rules and Regulations;

☐ a Work Letter;

☑ other (specify): Lease disclosures _____

**2. Premises.**

2.1 **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment

XZ

PAGE 1 OF 17

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-24-05/16E

should the actual size be determined to be different. **Note: Lessee is advised to verify the actual size prior to executing this Lease.**

2.2    Condition. Lessor shall deliver the Premises to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, sump pumps, if any, and all other such elements in the Premises, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of any buildings on the Premises (the "Building") shall be free of material defects, and that the Premises do not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with said warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Building. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense. Lessor also warrants, that unless otherwise specified in writing, Lessor is unaware of (i) any recorded Notices of Default affecting the Premise; (ii) any delinquent amounts due under any loan secured by the Premises; and (iii) any bankruptcy proceeding affecting the Premises.

2.3    Compliance. Lessor warrants that to the best of its knowledge the improvements on the Premises comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("Applicable Requirements") that were in effect at the time that each improvement, or portion thereof, was constructed. Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 50), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. **NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning, are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed.** If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

(a) Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and an amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b) If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date that on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with Interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not, however, have any right to terminate this Lease.

2.4    Acknowledgements. Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5    Lessee as Prior Owner/Occupant. The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.



INITIALS

**PAGE 2 OF 17**



INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-24-05/16E

3. **Term.**

    3.1    **Term.** The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

    3.2    **Early Possession.** Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date. Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises. If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession. All other terms of this Lease (including but not limited to the obligations to pay Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period. Any such Early Possession shall not affect the Expiration Date.

    3.3    **Delay In Possession.** Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, as the same may be extended under the terms of any Work Letter executed by Parties, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

    3.4    **Lessee Compliance.** Lessor shall not be required to deliver possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4. **Rent.**

    4.1.    **Rent Defined.** All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("Rent").

    4.2    **Payment.** Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent, Insurance and Real Property Taxes, and any remaining amount to any other outstanding charges or costs.

    4.3    **Association Fees.** In addition to the Base Rent, Lessee shall pay to Lessor each month an amount equal to any owner's association or condominium fees levied or assessed against the Premises. Said monies shall be paid at the same time and in the same manner as the Base Rent.

5.    **Security Deposit.** Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/ or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the Initial Security Deposit bore to the Initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. Lessor shall upon written request provide Lessee with an accounting showing how that portion of the Security Deposit that was not returned was applied. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease. THE SECURITY DEPOSIT SHALL NOT BE USED BY LESSEE IN LIEU OF PAYMENT OF THE LAST MONTH'S RENT.

6.    **Use.**

    6.1    **Use.** Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles. Lessor shall not unreasonably withhold or delay its consent to any request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the Premises or the

_XZ_
**INITIALS**

PAGE 3 OF 17

**INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-24-05/16E

mechanical or electrical systems therein, and/or is not significantly more burdensome to the Premises. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

6.2 **Hazardous Substances.**

(a) **Reportable Uses Require Consent.** The term **"Hazardous Substance"** as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "Reportable Use" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b) **Duty to Inform Lessor.** If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c) **Lessee Remediation.** Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d) **Lessee Indemnification.** Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties not caused or contributed to by Lessee). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. **No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.**

(e) **Lessor Indemnification.** Except as otherwise provided in paragraph 8.7, Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which result from Hazardous Substances which existed on the Premises prior to Lessee's occupancy or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f) **Investigations and Remediations.** Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to Lessee's occupancy, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g) **Lessor Termination Option.** If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance

<u>XZ</u>
**INITIALS**

PAGE 4 OF 17

<u>AB</u>
**INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION FORM STN-24-05/16E

Docusign Envelope ID: D98D848B4D0F4A21 8FC5 6FFB8930E5F0
Case 2:16-13-EMBR Doc 951 d 19/02/25/21/25ed E0/03/25 10/25/25 Desc Main Image Document Page 27/04 68 Page 27 of 75

thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3 **Lessee's Compliance with Applicable Requirements.** Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said Applicable Requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements. Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises. In addition, Lessee shall provide copies of all relevant material safety data sheets (MSDS) to Lessor within 10 days of the receipt of a written request therefor. In addition, Lessee shall provide Lessor with copies of its business license, certificate of occupancy and/or any similar document within 10 days of the receipt of a written request therefor.

6.4 **Inspection; Compliance.** Lessor and Lessor''s "Lender" (as defined in Paragraph 30) and consultants authorized by Lessor shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting and/or testing the condition of the Premises and/or for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see paragraph 9.1) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination. In addition, Lessee shall provide copies of all relevant material safety data sheets (MSDS) to Lessor within 10 days of the receipt of a written request therefor. Lessee acknowledges that any failure on its part to allow such inspections or testing will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, should the Lessee fail to allow such inspections and/or testing in a timely fashion the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for the remainder to the Lease. The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to allow such inspection and/or testing. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to such failure nor prevent the exercise of any of the other rights and remedies granted hereunder.

7. **Maintenance; Repairs, Utility Installations; Trade Fixtures and Alterations.**

7.1 **Lessee's Obligations.**

(a) **In General.** Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior), foundations, ceilings, roofs, roof drainage systems, floors, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, on, or adjacent to the Premises. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair. Lessee shall, during the term of this Lease, keep the exterior appearance of the Building in a first-class condition (including, e.g. graffiti removal) consistent with the exterior appearance of other similar facilities of comparable age and size in the vicinity, including, when necessary, the exterior repainting of the Building.

(b) **Service Contracts.** Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler, and pressure vessels, (iii) fire extinguishing systems, including fire alarm and/or smoke detection, (iv) landscaping and irrigation systems, (v) roof covering and drains, and (vi) clarifiers. However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c) **Failure to Perform.** If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

(d) **Replacement.** Subject to Lessee's Indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (ie. 1/144th of the cost per month). Lessee shall pay interest on the unamortized balance but may prepay its obligation at any time.

7.2 **Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 9 (Damage or Destruction) and 14 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein, all of which obligations are intended to be that of the Lessee. It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises, and they expressly waive the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.



**INITIALS**

**PAGE 5 OF 17**

**INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

Docusign Envelope ID: B6B044B9-D9E4-4DA1-8BC5-8FEF9830FEF0

### 7.3 Utility Installations; Trade Fixtures; Alterations.

(a) Definitions. The term "Utility Installations" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "Lessee Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b) Consent. Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, do not trigger the requirement for additional modifications and/or improvements to the Premises resulting from Applicable Requirements, such as compliance with Title 24, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c) Liens; Bonds. Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

### 7.4 Ownership; Removal; Surrender; and Restoration.

(a) Ownership. Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b) Removal. By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c) Surrender; Restoration. Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if the Lessee occupies the Premises for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises) to the level specified in Applicable Requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

### 8. Insurance; Indemnity.

8.1 Payment For Insurance. Lessee shall pay for all insurance required under Paragraph 8 except to the extent of the cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $3,000,000 $2,000,000 per occurrence. Premiums for policy periods commencing prior to or extending beyond the Lease term shall be prorated to correspond to the Lease term. Payment shall be made by Lessee to Lessor within 10 days following receipt of an invoice.

### 8.2 Liability Insurance.

(a) Carried by Lessee. Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $3,000,000 $2,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any intra-insured exclusions as between insured persons or

XZ
**INITIALS**

**PAGE 6 OF 17**

**INITIALS**

organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b) **Carried by Lessor.** Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3     **Property Insurance - Building, Improvements and Rental Value.**

(a) **Building and Improvements.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $5,000 per occurrence, and Lessee shall be liable for such deductible amount in the event of an Insured Loss.

(b) **Rental Value.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period. Lessee shall be liable for any deductible amount in the event of such loss.

(c) **Adjacent Premises.** If the Premises are part of a larger building, or of a group of buildings owned by Lessor which are adjacent to the Premises, the Lessee shall pay for any increase in the premiums for the property insurance of such building or buildings if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

8.4     **Lessee's Property; Business Interruption Insurance; Worker's Compensation Insurance.**

(a) **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations.

(b) **Business Interruption.** Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c) **Worker's Compensation Insurance.** Lessee shall obtain and maintain Worker's Compensation Insurance in such amount as may be required by Applicable Requirements. Such policy shall include a 'Waiver of Subrogation' endorsement. Lessee shall provide Lessor with a copy of such endorsement along with the certificate of insurance or copy of the policy required by paragraph 8.5.

(d) **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5     **Insurance Policies.** Insurance required herein shall be by companies maintaining during the policy term a "General Policyholders Rating" of at least A-, VII, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates with copies of the required endorsements evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may increase his liability insurance coverage and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6     **Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7     **Indemnity.** Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8     **Exemption of Lessor and its Agents from Liability.** Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the building of which the Premises are a part, or from other

INITIALS                                                                                                 INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                          FORM STN-24-05/16E

sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9    **Failure to Provide Insurance.** Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

9.    **Damage or Destruction.**

    9.1    **Definitions.**

        (a) **"Premises Partial Damage"** shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

        (b) **"Premises Total Destruction"** shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

        (c) **"Insured Loss"** shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

        (d) **"Replacement Cost"** shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

        (e) **"Hazardous Substance Condition"** shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance , in, on, or under the Premises which requires remediation.

    9.2    **Partial Damage - Insured Loss.** If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the insuring Party shall promptly contribute the shortage in proceeds (except as to the deductible which is Lessee's responsibility) as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

    9.3    **Partial Damage - Uninsured Loss.** If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage. Such termination shall be effective 60 days following the date of such notice. In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

    9.4    **Total Destruction.** Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction. If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

    9.5    **Damage Near End of Term.** If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage. Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or



**INITIALS**

PAGE 8 OF 17

**INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                                                                                    FORM STN-24-05/16E

adequate assurance thereof) to cover any shortage in insurance proceeds. Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6     **Abatement of Rent; Lessee's Remedies.**

(a) **Abatement.** In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b) **Remedies.** If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7     **Termination; Advance Payments.** Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

10.     **Real Property Taxes.**

10.1     **Definition.** As used herein, the term "**Real Property Taxes**" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises or the Project. Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address. Real Property Taxes shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Premises, and (ii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

10.2     **Payment of Taxes.** In addition to Base Rent, Lessee shall pay to Lessor an amount equal to the Real Property Tax installment due at least 20 days prior to the applicable delinquency date. If any such installment shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such installment shall be prorated. In the event Lessee incurs a late charge on any Rent payment, Lessor may estimate the current Real Property Taxes, and require that such taxes be paid in advance to Lessor by Lessee monthly in advance with the payment of the Base Rent. Such monthly payments shall be an amount equal to the amount of the estimated installment of taxes divided by the number of months remaining before the month in which said installment becomes delinquent. When the actual amount of the applicable tax bill is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable taxes. If the amount collected by Lessor is insufficient to pay such Real Property Taxes when due, Lessee shall pay Lessor, upon demand, such additional sum as is necessary. Advance payments may be intermingled with other moneys of Lessor and shall not bear interest. In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any such advance payments may be treated by Lessor as an additional Security Deposit.

10.3     **Joint Assessment.** If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.

10.4     **Personal Property Taxes.** Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee. When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.     **Utilities and Services.** Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. If any such services are not separately metered or billed to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor, of all charges jointly metered or billed. There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

12.     **Assignment and Subletting.**

12.1     **Lessor's Consent Required.**

(a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "**assign or assignment**") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

(b) Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "**Net Worth of Lessee**" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.



INITIALS

PAGE 9 OF 17

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-24-05/16E

(d) An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(d), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

f) Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

(g) Notwithstanding the foregoing, allowing a de minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

12.2    **Terms and Conditions Applicable to Assignment and Subletting.**

(a) Regardless of Lessor's consent, no assignment or subletting shall: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c) Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d) In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

(f) Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g) Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

12.3    **Additional Terms and Conditions Applicable to Subletting.** The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b) In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13.    **Default; Breach; Remedies.**

13.1    **Default; Breach.** A "Default" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A "Breach" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a) The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfil any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee. THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.



**INITIALS**

**INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-24-05/16E

Docusign Envelope ID: B906264B-BD0E-4CA1-85C5-6FED8830DEE0

(c) The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee. In the event that Lessee commits waste, a nuisance or an illegal activity a second time then, the Lessor may elect to treat such conduct as a non-curable Breach rather than a Default.

(d) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 42, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e) A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 40 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f) The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. §101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g) The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h) If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2   Remedies.   If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor. In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover any damages to which Lessor is otherwise entitled. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3   Inducement Recapture.   Any agreement for free or abated rent or other charges, the cost of tenant improvements for Lessee paid for or performed by Lessor, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions", shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor



XZ

**INITIALS**

JS

**INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION   FORM STN-24-05/16E

Docusign Envelope ID: ...

at the time of such acceptance.

13.4 **Late Charges.** Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5 **Interest.** Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due shall bear interest from the 31st day after it was due. The interest ("**Interest**") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6 **Breach by Lessor.**

(a) **Notice of Breach.** Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b) **Performance by Lessee on Behalf of Lessor.** In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided, however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset. Lessee shall document the cost of said cure and supply said documentation to Lessor.

14. **Condemnation.** If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "**Condemnation**"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 10% of the Building, or more than 25% of that portion of the Premises not occupied by any building, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

15. **Brokerage Fees.**

15.1 ~~Additional Commission. In addition to the payments owed pursuant to Paragraph 1.9 above, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires any rights to the Premises or other premises owned by Lessor and located within the same Project, if any, within which the Premises is located, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then Lessor shall pay Brokers a fee in accordance with the fee schedule of the Brokers in effect at the time the Lease was executed.~~

15.2 ~~Assumption of Obligations. Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.9, 15, 22 and 31. If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue Interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.~~

15.3 ~~Representations and Indemnities of Broker Relationships. Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.~~

16. **Estoppel Certificates.**

(a) Each Party (as "**Responding Party**") shall within 10 days after written notice from the other Party (the "**Requesting Party**") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "**Estoppel Certificate**" form published by the AIR Commercial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one

**XZ**

**INITIALS**                                                                                                                          **INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                        FORM STN-24-05/16E

month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate. In addition, Lessee acknowledges that any failure on its part to provide such an Estoppel Certificate will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, should the Lessee fail to execute and/or deliver a requested Estoppel Certificate in a timely fashion the monthly Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for remainder of the Lease. The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to provide the Estoppel Certificate. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to provide the Estoppel Certificate nor prevent the exercise of any of the other rights and remedies granted hereunder.

(c) If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17.     **Definition of Lessor.** The term "Lessor" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

18.     **Severability.** The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

19.     **Days.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.     **Limitation on Liability.** The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21.     **Time of Essence.** Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22.     **No Prior or Other Agreements; Broker Disclaimer.** This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

23.     **Notices.**

23.1    **Notice Requirements.** All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, or by email, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

23.2    **Date of Notice.** Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier. Notices delivered by hand, or transmitted by facsimile transmission or by email shall be deemed delivered upon actual receipt. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.     **Waivers.**

(a)     No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

(b)     The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

(c)     THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

25.     **Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

(a)     When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

(i)     **Lessor's Agent.** A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only. A Lessor's agent or subagent has the following affirmative obligations: To the Lessor: A fiduciary duty of utmost care, integrity, honesty, and

XZ

**PAGE 13 OF 17**

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-24.05/16E

loyalty in dealings with the Lessor. To the Lessee and the Lessor: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(ii)   Lessee's Agent. An agent can agree to act as agent for the Lessee only. In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor. An agent acting only for a Lessee has the following affirmative obligations. To the Lessee: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee. To the Lessee and the Lessor: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii)   Agent Representing Both Lessor and Lessee. A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee. In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee. b. Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii). In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered. The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests. Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(b)   Brokers have no responsibility with respect to any default or breach hereof by either Party. The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)   Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

26.   **No Right To Holdover.** Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination. Holdover Base Rent shall be calculated on monthly basis. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.   **Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.   **Covenants and Conditions; Construction of Agreement.** All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29.   **Binding Effect; Choice of Law.** This Lease shall be binding upon the Parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.   **Subordination; Attornment; Non-Disturbance.**

30.1   **Subordination.** This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "**Security Device**"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "**Lender**") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2   **Attornment.** In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor. (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.

30.3   **Non-Disturbance.** With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "**Non-Disturbance Agreement**") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4   **Self-Executing.** The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and


INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-24-05/16E

Docusign Envelope ID: [illegible]

Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31. **Attorneys' Fees.** If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

32. **Lessor's Access; Showing Premises; Repairs.** Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect to Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

33. **Auctions.** Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34. **Signs.** Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Except for ordinary "for sublease" signs, Lessee shall not place any sign upon the Premises without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

35. **Termination; Merger.** Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36. **Consents.** All requests for consent shall be in writing. Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

37. **Guarantor.**

37.1 **Execution.** The Guarantors, if any, shall each execute a guaranty in the form most recently published by the AIR Commercial Real Estate Association, and each such Guarantor shall have the same obligations as Lessee under this Lease.

37.2 **Default.** It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

38. **Quiet Possession.** Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39. **Options.** If Lessee is granted any Option, as defined below, then the following provisions shall apply:

39.1 **Definition.** "Option" shall mean: (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2 **Options Personal To Original Lessee.** Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessee, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

39.3 **Multiple Options.** In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4 **Effect of Default on Options.**

(a) Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c) An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30



INITIALS

PAGE 15 OF 17

INITIALS

Docusign Envelope ID: B9064B1D0C4C12BCC5EEEB030FEE2

days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

40. **Multiple Buildings.** If the Premises are a part of a group of buildings controlled by Lessor, Lessee agrees that it will abide by and conform to all reasonable rules and regulations which Lessor may make from time to time for the management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessee also agrees to pay its fair share of common expenses incurred in connection with such rules and regulations.

41. **Security Measures.** Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

42. **Reservations.** Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate any such easement rights, dedication, map or restrictions.

43. **Performance Under Protest.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" with 6 months shall be deemed to have waived its right to protest such payment.

44. **Authority; Multiple Parties; Execution.**

(a)    If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

(b)    If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.

(c)    This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

45. **Conflict.** Any conflict between the printed provisions of this Lease and typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

46. **Offer.** Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

47. **Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

48. **Waiver of Jury Trial.** THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

49. **Arbitration of Disputes.** An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☑ is not attached to this Lease.

50. **Accessibility; Americans with Disabilities Act.**

(a)    The Premises: ☑ have not undergone an inspection by a Certified Access Specialist (CASp). ☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises met all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq. ☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises did not meet all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.

(b)    Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

**ATTENTION:** NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1. SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

**WARNING:** IF THE PREMISES IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES IS LOCATED.

XZ

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-24-05/16E

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| | |
|---|---|
| Executed at: | Executed at: |
| On: | On: |

**BY LESSOR:**

3U Millikan LLC

By: _Logan Zhu_

Name Printed:

Title:

By:

Name Printed:

Title:

Address: 12 Carmel Woods

Laguna Niguel, CA 92677

Telephone:( )

Facsimile:( )

Email:

Email:

Federal ID No.

**BY LESSEE:**

Powin Energy

By: _Bedley Brown_

Name Printed: _Bedley Brown_

Title: _President_

By:

Name Printed: _Geoffrey Brown_

Title:

Address: 20550 SW 115th Avenue

Tualatin, OR 97062

Telephone:( )

Facsimile:( )

Email:

Email:

Federal ID No.

**BROKER:**

Attn:

Title:

Address:

Telephone:( )

Facsimile:( )

Email:

Federal ID No.

Broker/Agent BRE License #:

**BROKER:**

Pacific Coast Commercial

Attn: Tom Hennessy

Title: Sales & Leasing Associate

Address: 6050 Santo Rd., Suite 200

San Diego, CA 92124

Telephone:(619) 469-3600

Facsimile:(858) 560-5604

Email: tom@pacificcoastcommercial.com

Federal ID No.

Broker/Agent BRE License #:

**NOTICE:** These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 500 N Brand Blvd, Suite 900, Glendale, CA 91203.
Telephone No. (213) 687-8777. Fax No.: (213) 687-8616.

© Copyright 2001 - By AIR Commercial Real Estate Association. All rights reserved.

No part of these works may be reproduced in any form without permission in writing.



INITIALS

PAGE 17 OF 17



INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-24-05/16E



# ADDENDUM

**Date:** October 12, 2016

**By and Between (Lessor)** JU Millikan LLC
**(Lessee)** Powin Energy

**Address of Premises:** 16902 Millikan Ave, Irvine, CA 92606

Paragraph 51-57

In the event of any conflict between the provisions of this Addendum and the printed provisions of the Lease, this Addendum shall control.

51. Base Rent: Lessee shall pay Lessor a Base Rent according to following schedule:

October 10, 2016 - December 31, 2016: Base rent shall be abated.
January 1, 2017 - December 31, 2017: Base Rent shall be $17,550 per month
January 1, 2018 - December 31, 2018: Base Rent shall be $18,077 per month
January 1, 2019 - December 31, 2019: Base Rent shall be $18,619 per month
January 1, 2020 - December 31, 2020: Base Rent shall be $19,177 per month
January 1, 2021 - December 31, 2021: Base Rent shall be $19,753 per month
January 1, 2022 - December 31, 2022: Base Rent shall be $20,345 per month
January 1, 2023 - December 31, 2023: Base Rent shall be $20,956 per month
January 1, 2024 - December 31, 2024: Base Rent shall be $21,584 per month
January 1, 2025 - December 31, 2025: Base Rent shall be $22,232 per month
January 1, 2026 - December 31, 2026: Base Rent shall be $22,899 per month

52. All Tenant Improvement work done must be approved by Lessor in writing before any work commences and according to the Lease and as permitted by the City. Otherwise Tenant will take Premises in an "As-Is" condition.

53. Option To Renew: Lessee shall have one (1) Option to Extend the Initial Lease Term up to ten (10) years. Term determined by Lessee. Base Monthly Rent of extension shall increase by a factor of three (3%) percent on each twelve (12) month anniversary of the lease commencement date.

54. Signage: Lessee shall have signage rights to the exterior of the Premises per building standards and the City of Irvine regulations. All signage shall be preapproved by Lessor prior to installation.

55. Parking: Tenant shall have access to spaces located next to building.

56. Right to Sublet: Lessor shall not unreasonably withhold Lessee from subletting all or a portion of the Premises.

57. Right of First Refusal: Tenant shall have the right of first refusal to purchase Premises at the then prevailing market terms, rates and conditions or at the same terms and conditions of any bona fide written offer, whichever is less. Tenant shall have thirty (30) business days to notify Landlord of its intention to purchase the Premises. If Tenant elects not to purchase such Premises, Landlord may offer such Premises to third parties upon the same terms and conditions as contained in Landlord's prior written notification to Tenant. Prior to offering such Premises to third parties upon different terms and conditions then offered to Tenant, Landlord will first offer the Premises to Tenant upon such newly proposed terms and conditions.

XZ
**INITIALS**

PAGE 1 OF 1

**INITIALS**

## EXHIBIT 2

**Sublease Agreement**

**SUBLEASE AGREEMENT**

**Dated**: January 1, 2017

**Parties**: Powin Energy Corporation, a Nevada corporation, whose address is 20550 SW 115th Ave. Tualatin, Oregon 97062 *("Sublessor")* and  PPA Grand Johanna, LLC,  a limited liability company organized under the laws of the State of California whose address is 20550 SW 115th Ave. Tualatin, Oregon 97062 *("Sublessee")*.

**Premises**: Sublessor hereby subleases to Sublessee and Sublessee  hereby subleases from Sublessor for the term, at the rental and upon all of the conditions set forth herein, that certain real property located at 16902 Millikan Avenue, Irvine, CA 92606 located in Orange County, California, more specifically consisting of sufficient square footage to place and operate the Battery Energy Storage System as installed as of the date of this Sublease. Said real property is hereinafter referred to  the *"Premises"*. Sublessee accepts the Premises in its condition existing as of the date of this Sublease, subject to all applicable zoning, municipal, county and state laws, ordinances, rules, regulations governing the use of the Premises.

**Term**: The term of this Sublease shall be for 10 years, beginning on January 1st, 2017 *("Term")*.

**Rent**: Sublessee shall pay Sublessor as rent *("Rent")* for the Premises equal monthly payments as follows:

    January 1, 2017 – December 31, 2017: $4,000.00 per month
    January 1, 2018 – December 31, 2018: $4,120.00 per month
    January 1, 2019 – December 31, 2019: $4,243.60 per month
    January 1, 2020 – December 31, 2020: $4,370.91 per month
    January 1, 2021 – December 31, 2021: $4,502.04 per month
    January 1, 2022 – December 31, 2022: $4,637.10 per month
    January 1, 2023 – December 31, 2023: $4,776.21 per month
    January 1, 2024 – December 31, 2024: $4,919.50 per month
    January 1, 2025 – December 31, 2025: $5,067.08 per month
    January 1, 2026 – December 31, 2026: $5,219.09 per month

on the 1st day of each month during the Term. Rent for any period during the Term which is less than one month shall be a prorata portion of the monthly installment.  Rent shall be paid to Sublessor at the Sublessor's address stated herein.

**Use:**  The Premises shall be used and occupied only for the agreed use set forth in the lease between the Sublessor and 3U Millikan LLC dated October 12, 2016, hereinafter referred to in this *"Master Lease"*. Should additional battery energy storage capacity be added to the premises referred to in this Sub-Lease, Sub-Lessor will have the right to increase the base rent by an amount in proportion to the amount of added battery energy storage capacity relative to the existing battery energy storage capacity, and in addition, make necessary market-based adjustments at the time the addition commences installation. Sublessee is prohibited from expanding the Battery Energy Storage system without consent of Sublessor and upon such expansion Sublessor and Sublessee shall renegotiate the terms of this Sublease.

**Option to Renew:** The Master Lease allows one (1) Option to Extend the initial Lease Term up to ten (10) years. If the Master Lease is renewed, Lessee to this sublease will also have the option to Extend the initial Lease Term for the same period as the Master Lease is renewed.

**Master Lease:** This Sublease is and shall be at all times subject to and subordinate to the Master Lease. The terms, conditions and respective obligations of the Sublessor and Sublessee to each other under this

Sublease shall be the terms and conditions of the Master Lease. Sublesees does hereby expressly assume and agree to perform and comply with each and every obligation of Sublessor under the Master Lease.

The parties have executed this Sublease on the date specified above.

Powin Energy Corporation

By: _____
Geoffrey L. Brown, President

PPA Grand Johanna, LLC

By: _____
By: Powin Energy Corporation
Its: Managing Member
By: Geoffrey Brown
Its: President

## FIRST AMENDMENT TO SUBLEASE AGREEMENT

This FIRST AMENDMENT TO SUBLEASE AGREEMENT (the "Amendment") is entered into as of August 31, 2018 (the "Effective Date"), by and between Powin Energy Corporation, a Nevada corporation (the "Sublessor"), and PPA Grand Johanna, LLC, a California limited liability company (the "Sublessee," and, together with the Sublessor, collectively, the "Parties").

### Recitals

WHEREAS, Sublessor and Sublessee are parties to that certain Sublease Agreement dated as of January 1, 2017 (the "Sublease"), granting to Sublessee a subleasehold interest in Sublessor's leasehold under that certain AIR Commercial Real Estate Association Standard Industrial/Commercial Single-Tenant Lease by and between Sublessor and 3U Millikan LLC dated October 12, 2016; and

WHEREAS, the Parties wish to amend certain terms of the Sublease as more specifically set forth herein.

### Agreement

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Recitals. The foregoing recitals are true and correct, and are incorporated herein by reference.

2. Definitions. Capitalized terms used but not defined herein shall have the meaning set forth in the Sublease.

3. Rent. The Sublease section entitled "Rent" is hereby amended to add the following language after the last sentence of the section:

"Should the Term of this Sublease be extended pursuant to the terms hereof, Sublessee shall pay to Sublessor the following amounts during the extended Term:

January 1, 2027 -December 31, 2027: $23,586 per month
January 1, 2028 -December 31, 2028: $24,294 per month
January 1, 2029 -December 31, 2029: $25,022 per month
January 1, 2030 -December 31, 2030: $25,773 per month
January 1, 2031 -December 31, 2031: $26,546 per month
January 1, 2032 -December 31, 2032: $27,343 per month
January 1, 2033 -December 31, 2033: $28,163 per month
January 1, 2034 -December 31, 2034: $29,008 per month
January 1, 2035 -December 31, 2035: $29,878 per month
January 1, 2036 -December 31, 2036: $30,774per month
January 1, 2037 -December 31, 2037: $31,698 per month"

4. Option to Renew. The Sublease section entitled "Option to Renew" is hereby amended to read as follows:

"Paragraph 53 of the Master Lease provides Sublessor with the onetime right to extend the Master Lease term up to ten (10) years (the "Extension Option"). Sublessor and Sublessee hereby

agree that upon written notice from Sublessee to Sublessor, Sublessor shall exercise the Extension Option in accordance with the terms of the Master Lease for the full ten (10) years. Upon Sublessor's exercise of the Extension Option, the Term of this Sublease shall be extended to that date which is one (1) day prior to the expiration of the Master Lease."

[*Signature Page Follows Immediately*]

In witness whereof, the Parties have executed this Amendment as of the Effective Date.

**Sublessor:**

Powin Energy Corporation,
a Nevada corporation

By: _____
Name: _____
Its: President

**Sublessee:**

PPA Grand Johanna, LLC,
a California limited liability company

By: _____
Name: Randolph P. Mann
Its: President

## SECOND AMENDMENT TO SUBLEASE AGREEMENT

This SECOND AMENDMENT TO SUBLEASE AGREEMENT (the "Amendment") is entered into as of September 21, 2018 (the "Effective Date"), by and between Powin Energy Corporation, a Nevada corporation (the "Sublessor"), and PPA Grand Johanna, LLC, a California limited liability company (the "Sublessee," and, together with the Sublessor, collectively, the "Parties").

### Recitals

WHEREAS, Sublessor and Sublessee are parties to that certain Sublease Agreement dated as of January 1, 2017 (the "Sublease"), granting to Sublessee a subleasehold interest in Sublessor's leasehold under that certain AIR Commercial Real Estate Association Standard Industrial/Commercial Single-Tenant Lease by and between Sublessor and 3U Millikan LLC dated October 12, 2016 and the First Amendment to Sublease Agreement dated as of August 31, 2018; and

WHEREAS, the Parties wish to amend certain terms of the First Amendment to Sublease as more specifically set forth herein.

### Agreement

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Rent. The Sublease section entitled "Rent" is hereby amended to modify the rent amounts as follows:

   January 1, 2027 -December 31, 2027: $5,376 per month
   January 1, 2028 -December 31, 2028: $5,537 per month
   January 1, 2029 -December 31, 2029: $5,703 per month
   January 1, 2030 -December 31, 2030: $5,874 per month
   January 1, 2031 -December 31, 2031: $6,050 per month
   January 1, 2032 -December 31, 2032: $6,232 per month
   January 1, 2033 -December 31, 2033: $6,419 per month
   January 1, 2034 -December 31, 2034: $6,611 per month
   January 1, 2035 -December 31, 2035: $6,810 per month
   January 1, 2036 -December 31, 2036: $7,014 per month
   January 1, 2037 -December 31, 2037: $7,224 per month"

*[Signature Page Follows Immediately]*

Docusign Envelope ID: ...

Case 25-16137-MBR   Doc 99   Filed 10/20/25   Entered 10/03/25 10:25:25   Desc
Image Document   Certificate of Notice   Page 48 of 75   Page 48 of 75

In witness whereof, the Parties have executed this Second Amendment as of the Effective Date.

**Sublessor:**

Powin Energy Corporation,
a Nevada corporation

By: _____

Name: Geoff Brown

Its: Pres

**Sublessee:**

PPA Grand Johanna, LLC,
a California limited liability company

By: _____

Name: Randolph Mann

Its: President

## THIRD AMENDMENT TO SUBLEASE AGREEMENT

This THIRD AMENDMENT TO SUBLEASE AGREEMENT (the "**Amendment**") is entered into as of January 𝟷7th , 2019 (the "**Effective Date**"), by and between Powin Energy Corporation, a Nevada corporation (the "**Sublessor**"), and PPA Grand Johanna LLC, a California limited liability company which has been converted to a Delaware limited liability company (the "**Sublessee**," and together with the Sublessor, collectively, the "**Parties**").

### Recitals

WHEREAS, Sublessor and Sublessee are parties to that certain Sublease Agreement dated as of January 1, 2017 (as amended by that certain First Amendment to Sublease Agreement dated August 31, 2018 and that certain Second Amendment to Sublease Agreement dated September 21, 2018, the "**Sublease**"), granting to Sublessee a subleasehold interest in Sublessor's leasehold under that certain AIR Commercial Real Estate Association Standard Industrial/Commercial Single-Tenant Lease by and between Sublessor and 3U Millikan LLC dated October 12, 2016; and

WHEREAS, the Parties wish to amend certain terms of the Sublease as more specifically set forth herein.

### Agreement

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Recitals. The foregoing recitals are true and correct and are incorporated herein by reference.

2. Definitions. Capitalized terms used but not defined herein shall have the meaning set forth in the Sublease.

3. Use. The section of the Sublease entitled "Use" is deleted in its entirety and replaced with the following:

**Use**: The Premises shall be used and occupied only for the operation of a Battery Storage System (BESS) that is contracted to serve California Edison or any other party.

4. Depiction of Premises.

   a. The term "Premises" is defined in the Sublease to consist of "sufficient square footage to place and operate the Battery Energy Storage System as installed as of the date of this Sublease." Sublessor and Sublessee acknowledge and agree that such extent of the Premises is depicted as the hatched area on Exhibit A attached hereto, including the exterior area comprising approximately four parking spaces and designated as the "Switch Gear Pad" and related equipment.

b. Exhibit A attached hereto is incorporated into the Sublease.

5. Use of Common Areas. The following is added to the Sublease as a section entitled "Common Areas":

Common Areas: Sublessor grants to Sublessee, for the benefit of Sublessee and its employees, suppliers, shippers, contractors and invitees, during the term of this Sublease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time. The term "Common Areas" is defined as all areas and facilities outside of the Premises (as defined in this Sublease), but within the Premises (as defined in the Master Lease), including parking areas, loading and unloading areas, trash areas, electrical panels, roofs, roadways, walkways, driveways and landscaped areas, other than internal building areas designated for the exclusive use and possession of Sublessor or third-party sublessees. In addition, Sublessor grants to Sublessee, for the benefit of Sublessee and its employees, suppliers, shippers, contractors and invitees, during the term of this Sublease to use such portions of the Premises (as defined in the Master Lease) as are necessary or convenient to provide pedestrian and vehicular access between Millikan Avenue and the Premises.

In addition to the foregoing non-exclusive right to use the Common Areas and the right of access, and without limiting the generality of the foregoing, Sublessor agrees that the portion of the building which is located outside the Premises (as defined in this Sublease) but within the portion of the building designated as "Common Area 1" on Exhibit A attached hereto shall not be obstructed in any way which interferes with Sublessee's, or its contractors', access (including Sublessee's equipment) to and from the Premises through the overhead door and the pedestrian door which doors are depicted on Exhibit A. The foregoing covenant shall not be construed to prevent Landlord from storing certain of its equipment in the area closest to Millikan Drive for equipment storage purposes, as long as such use does not materially or unreasonably interfere with Sublessee's right of access described above.

6. Option to Renew. The Section entitled "Option to Renew" is hereby deleted and is replaced with the following:

"Sublessor hereby grants Sublessee the right to extend the term of this Sublease so that the term of this Sublease will expire on January 8, 2037, which right may be exercised by Sublessee providing written notice thereof to Sublessor prior to the expiration if the initial term of this Sublease. Paragraph 53 of the lease between the Sublessor and 3U Millikan LLC dated October 12, 2016, hereinafter referred to the *"Master Lease"*, provides Sublessor with the onetime right to extend the Master Lease term up to ten (10) years (the "Master Lease Extension Option"). Sublessor and Sublessee hereby agree that upon written notice from Sublessee to Sublessor and provided that Sublessee has exercised (or simultaneously exercises) the right to extend the term if this Sublease, Sublessor shall

exercise the Master Lease Extension Option in accordance with the terms of the Master Lease for the full ten (10) years (i.e., expiring January 9, 2037)."

7. Master Lease. The last two sentences of the Section entitled "Master Lease" is hereby deleted and is replaced with the following:

"Sublessee does hereby expressly assume and agree to perform and comply with each and every obligation of Sublessor under the Master Lease as it pertains to the Premises under this Sublease, specifically excluding the obligation to pay Base Rent."

8. Prime Lease Compliance. Sublessor covenants and agrees to comply with all payment and performance obligations of Sublessor as lessee under the Master Lease and shall not surrender the Master Lease, or cancel or abridge or modify the Master Lease in a manner which adversely affects Sublessee's rights under the Sublease without the prior written consent of Sublessee in each instance.

9. Sublessee Remedies Related to Sublessee Cure Rights. As contemplated by Section 12.3 of the Master Lease, if Sublessee cures any default by Sublessor under the Master Lease, Sublessor shall promptly reimburse Sublessee for the costs of such cure, including attorneys' fees and costs incurred by Sublessee in connection therewith, and if Sublessor does not reimburse Sublessee for such costs within ten (10) days after receipt of an invoice therefor, Sublessee shall have the right to offset such unpaid amounts against the amounts payable to Sublessor under this Sublease. If Sublessor fails to reimburse Sublessee within thirty (30) days after receipt of an invoice therefor, then Sublessee may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Sublessor and its agents therefrom, without liability for trespass, damages or otherwise and exclude Sublessor and its agents therefrom, and take possession of all books, records and accounts relating thereto and Sublessor agrees to surrender possession of the Property and of such books, records and accounts to Sublessee upon demand, and thereupon Sublessee may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business at the Property; (ii) make any alterations, additions, renewals, replacements and improvements to or on the Property; (iii) exercise all rights and powers of Sublessor with respect to the Property, whether in the name of Sublessor or otherwise, including, without limitation, the right to make, cancel, enforce or modify leases and subleases, obtain and evict subtenants, and demand, sue for, collect and receive all rents, subrents and other revenue payable in connection with the Property and every part thereof; (iv) require Sublessor to pay monthly in advance to Sublessee the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Sublessee, (v) apply the receipts from the Property to the payment of any amounts incurred in connection with the aforesaid operations, including rents and other sums payable to the lessor under the Master Lease, taxes, insurance and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Sublessee, its counsel, agents and employees, and (vi) require Sublessor to provide such notices and instruments to third parties (including vendors, utilities and subtenants) as Sublessee may reasonable request to carry out the intentions of this Paragraph 9.    In addition to the

foregoing remedies, at any time while such costs of cure remain outstanding, then upon the request of Sublessee, Sublessor shall assign to Sublessee the Master Lease all the rights and obligations of Sublessor under the Master Lease arising from and after the date of transfer proposed by Sublessee and shall cooperate with and assist Sublessee in obtaining the written consent of the then current lessor under the Master Lease. For purposes of this Paragraph 9, the term "Property" shall mean the entire premises leased to Sublessor under the Master Lease, to include the entire building and all parking areas, sidewalks and landscaped areas at 16902 Millikan Avenue.

10. Certain Agreements by Sublessor. Sublessor covenants and agrees as follows:

a. In no event shall Sublessor be entitled to terminate the Sublease as the consequence of, or based on, the presence of, or a contamination by, a hazardous substance in, on or under the Premises, including any such condition which may require remediation.

b. In no event shall Sublessor be entitled to terminate the Sublease as the consequence of, or based on, the total or partial destruction of the Premises.

c. In no event shall an event of default under the Sublease be deemed to occur unless and until any breach of any obligation under the Sublease occurs and such breach is not cured within ten (10) days after receipt of written notice from Sublessor; provided, however, if such curative action cannot be completed within ten (10) days after receipt of written notice from Sublessor, such failure will not constitute an event of default as long as Sublessor is pursuing such curative measures in good faith with respect to such breach.

d. In no event shall Sublessee's failure to timely provide an estoppel certificate result in an increase in rent or affect Sublessee's right to exercise its right to extend the term of the Sublease.

e. In no event shall any transfer of Sublessee's interest under the Sublease or any transfer of any equity interests of Sublessee be a default under the Lease or affect Sublessee's rights to extend the term of the Sublease. In addition, in no event shall the existence or occurrence of one or more breaches or events of default under the Sublease affect Sublessee's right to exercise its right to extend the term of the Sublease, as long as the Sublease is in full force and effect.

11. Miscellaneous. To the extent of any conflict between the Sublease and this Amendment, this Amendment shall control. Unless specifically modified hereby, all terms of the Sublease shall remain in full force and effect. This Amendment (a) shall bind and benefit the parties hereto and their respective heirs, administrators, executors, successors and assigns; (b) shall be governed by the laws of the State of California and United States federal law, as applicable, and (c) may be executed in several counterparts, and by the parties hereto on separate counterparts, and each counterpart, when executed and delivered, shall constitute an original agreement enforceable against all who signed it without production of or accounting for any other counterpart, and all separate

counterparts shall constitute the same agreement. A document signed and transmitted by facsimile machine, PDF or other electronic means shall be treated as an original document and any such signature shall be treated as an original signature.

*[Signature Page Follows Immediately]*

In Witness Whereof, the Parties have executed this Amendment as of the Effective Date.

**Sublessor:**

Powin Energy Corporation,
a Nevada corporation

By: _____
Name: Scott Gaun
Title: President

**Sublessee:**

PPA Grand Johanna LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

In Witness Whereof, the Parties have executed this Amendment as of the Effective Date.

**Sublessor:**

Powin Energy Corporation,
a Nevada corporation

By: _____
Name: _____
Title: _____

**Sublessee:**

PPA Grand Johanna LLC,
a Delaware limited liability company

By: _____
Name: _Randolph Mann_
Title: _President_

[Signature Page to the Third Amendment to the Sublease]

# EXHIBIT A TO THIRD AMENDMENT TO SUBLEASE AGREEMENT

## Depiction of Premises







Docusign Envelope ID: D86B246B4D0F4C13-8CC-6F5D833DE59

Case 25-16137-MBR Doc 95 Filed 10/07/25 Entered 10/07/25 17:52:29 Desc Main
Document Page 57 of 75

Case 25-16137-MBR Doc 99 Filed 10/24/25 Entered 10/25/25 00:14:07 Desc
Imaged Certificate of Notice Page 57 of 68 Page 57 of 75

## EXHIBIT 3

**Assumption and Assignment Agreement**

*Execution Version*

## ASSIGNMENT, ASSUMPTION AND BILL OF SALE

This Assignment, Assumption and Bill of Sale, (this "Assignment") is made as of March 11, 2021, by and among Powin Energy Corporation, a Nevada corporation ("Assignor"), Powin Energy Operating, LLC, a Delaware limited liability company ("EmployeeCo"), Powin, LLC, a Delaware limited liability company ("OpCo"), Powin Energy Holdings, LLC, a Delaware limited liability company ("Holdings" and together with OpCo and EmployeeCo, the "Assignees") and Powin Energy Intermediate, LLC, a Delaware limited liability company ("Intermediate"). Assignor, Assignees, Holdings and Intermediate may also be referred to herein as the "Parties" and each individually as a "Party."

WHEREAS, as of the Closing, each Assignee is an indirect wholly owned subsidiary of Assignor;

WHEREAS, Assignor, Powin Energy Holdings, LLC, a Delaware limited liability company, certain shareholders of Assignor and each of the Purchasers listed on Schedule 1.1 therein entered into that certain Master Transaction Agreement (the "MTA") dated as of February 2, 2021; and

WHEREAS, Assignor and each Assignee desire to enter into this Assignment to give effect to the transfer of the assets and properties listed on Schedule I hereto (the "Transferred Assets") (such transfer along with all other related transactions contemplated in or under the MTA are herein referred to as the "Transactions").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Assignment. Assignor does hereby contribute, assign, transfer and deliver (or causes its Subsidiaries that own Transferred Assets (such Subsidiaries, other than the Assignee, collectively the "PEC Group") to contribute, assign, transfer and deliver, as applicable) to the applicable Assignee all of Assignor's or such member of the PEC Group's right, title and interest in and to the Transferred Assets (which do not include the Retained Assets as set forth on Schedule II hereto), in each case free and clear of all Liens and liabilities other than Permitted Liens and Assumed Liabilities, in accordance with, and subject to, the terms of the MTA. For the avoidance of doubt, Holdings will only be an Assignee with respect to the Arroyo Note.

2. Assumption. Each Assignee hereby accepts the right, title and interest in, to and under the applicable Transferred Assets in accordance with, and subject to, the terms of the MTA.

3. Assumed Liabilities. Each Assignee hereby accepts, assumes and agrees to perform, discharge and fulfill the applicable duties, obligations, and liabilities set forth on Schedule III hereto (the "Assumed Liabilities") and, as of the Closing, such Assignee shall be responsible for all of such Assumed Liabilities. For the avoidance of doubt, Assignor shall retain and agrees to perform, discharge and fulfill any and all liabilities set forth on Schedule IV hereto.

4. Consideration. As consideration for the Transferred Assets, the receipt and sufficiency of which are hereby acknowledged, (a) each Assignee, as applicable, hereby assumes the Assumed Liabilities assigned to it and (b) Holdings shall issue to PEC the equity interests contemplated by the MTA (including Section 1.2(c) thereof) and pursuant to that certain Amended and Restated Limited Liability Company Agreement of Holdings dated as of the date hereof.

5. <u>Acknowledgement of Assignment</u>. Each of the Parties hereby acknowledges and agrees that, as a matter of administrative convenience only and to facilitate the efficient closing of the transactions contemplated by this Assignment and the MTA, and with no intent or effect of changing or altering the transactions set forth herein or in the MTA, notwithstanding the fact that the Transferred Assets will be contributed directly to OpCo or EmployeeCo, the following transactions are deemed to have occurred in the following order in accordance with this Assignment and the MTA:

   (a) the applicable member of the PEC Group transfers the applicable Transferred Assets and Assumed Liabilities to Holdings;

   (b) Holdings receives the Transferred Assets and Assumed Liabilities and transfers the Transferred Assets and Assumed Liabilities (other than with respect to the Arroyo Note) to Intermediate;

   (c) Intermediate receives the Transferred Assets and Assumed Liabilities and transfers the Transferred Assets and Assumed Liabilities to OpCo; and

   (d) OpCo receives the Transferred Assets and Assumed Liabilities and transfers the specific Transferred Assets set forth on <u>Schedule V</u> hereto and the Assumed Liabilities arising out of such Transferred Assets to EmployeeCo.

6. <u>Consents</u>.

   (a) Notwithstanding anything to the contrary in this Assignment, nothing in this Assignment constitutes an agreement to sell, assign, transfer, convey, deliver or assume any asset that would constitute a Transferred Asset if such asset was not transferable in accordance with applicable Law or with any other requisite approval, authorization, clearance, consent, ratification, permission, exemption or waiver or the expiration, lapse or termination of any waiting period (including any extension thereof) (each, a "<u>Consent</u>"). If the transfer or assignment of any asset intended to be transferred or assigned hereunder is not consummated prior to or on the Closing Date, whether as a result of a prohibition on transfer due to a violation or breach of applicable Law or any other requisite Consent, or any other reason, then the Person retaining such asset shall thereafter hold such asset for the use and benefit, insofar as legally permitted and reasonably possible, of the Person entitled thereto until the consummation of the transfer or assignment thereof (or as otherwise mutually determined by Assignor and Assignees). In addition, the Person retaining such asset shall take such other actions as may reasonably be requested by the Person to whom such asset is to be transferred in order to place such Person, insofar as legally permitted and reasonably possible, in the same position as if such asset had been transferred as contemplated hereby and so that all the benefits and burdens relating to such asset, including possession, use, risk of loss, potential for gain, and dominion, control and command over such asset, are to inure from and after the Closing Date to the Person to whom such asset is to be transferred. Notwithstanding the foregoing, any such asset shall still be considered a Transferred Asset.

   (b) The Person retaining an asset due to the deferral of the transfer and assignment of such asset shall not be obligated, in connection with the foregoing, to expend any money or personnel in connection with the maintenance of the asset unless the necessary funds or expenses or costs associated with such maintenance are advanced or promptly reimbursed by the Person to whom

such asset is to be transferred, other than reasonable out-of-pocket expenses, attorneys' fees and recording or similar fees, all of which shall be promptly reimbursed by the Person to whom such asset is to be transferred; provided, however, that the Person retaining such asset shall, as promptly as practicable, provide notice to the Person to whom such asset is to be transferred of the amount of all such expenses and fees.

(c) For the avoidance of doubt, the transfer of any assets under this Section 6 shall be effected without any additional consideration payable by any Party.

7.   General. Except to the extent modified herein, the terms and conditions of Section 1.5 and Article VIII of the MTA shall apply *mutatis mutandis* to this Assignment. The provisions of this Assignment may be amended and waived only in writing by all the Parties and shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns. This Agreement is in all respects subject to the provisions of the MTA and is not intended in any way to supersede, limit, qualify, or expand any provision of the MTA. If there is any conflict between any term or provision of this Assignment and that of the MTA, the terms and provisions of the MTA shall control. Any capitalized term used but not defined herein or in any schedule or exhibit shall have the meaning set forth in the MTA.

8.   Bulk Transfer Compliance. The Parties hereby waive compliance with the provisions of Article 6 of the Uniform Commercial Code, entitled "Uniform Commercial Code - Bulk Transfers," to the extent applicable to the transactions contemplated hereby

9.   Further Assurances. From and after the date hereof and subject to the terms and conditions of the MTA and applicable Law, each of the Parties shall use its reasonable best efforts to take or cause to be taken all actions necessary, proper or advisable to consummate and make effective the Transactions and carry out the purposes of this Assignment, the MTA and the other agreements contemplated hereby and thereby, including the execution and delivery of other assignment and conveyance documents necessary or appropriate for purposes of recording title, conveyance or otherwise.

\* \* \*

The undersigned have executed and delivered this Assignment as of the date first above written.

**POWIN ENERGY HOLDINGS, LLC**

By: _____

Name: Geoffrey L. Brown
Title: Chief Executive Officer

**POWIN ENERGY INTERMEDIATE, LLC**

By: _____

Name: Geoffrey L. Brown
Title: Chief Executive Officer

**POWIN, LLC**

By: _____

Name: Geoffrey L. Brown
Title: Chief Executive Officer

**POWIN ENERGY OPERATING, LLC**

By: _____

Name: Geoffrey L. Brown
Title: Chief Executive Officer

*[Signature Page to Assignment]*

The undersigned have executed and delivered this Assignment as of the date first above written

### POWIN ENERGY CORPORATION

By: _____

Name: Geoffrey L. Brown
Title: President

*[Signature Page to Assignment]*

## Schedule I

### Transferred Assets

"Transferred Assets" shall include all of PEC's right, title and interest in, to and under all of the rights, properties and assets of every kind, character and description, wherever located and whether tangible or intangible, real or personal or fixed or contingent, owned, held, used, conceived, developed or offered for sale or license by PEC in connection with the conduct of the Business, including the following:

1. all capital equipment, together with all other machinery, equipment, vehicles, leasehold improvements, furniture and fixtures, office equipment, supplies, inventory and other tangible personal property owned, held or used by PEC in connection with the conduct of the Business, including any of the foregoing for which PEC has made a down payment or executed a purchase order but that has not been delivered to PEC, including all raw materials, components, work-in-process, finished goods and packaging materials and supplies held or used by PEC in connection with the conduct of the Business;

2. all of the issued and outstanding Equity Interests of each Company Subsidiary that are owned, directly or indirectly, by PEC immediately prior to the Restructuring Closing and prior to giving effect to the Pre-Closing Restructuring;

3. deposits (including customer deposits and security or other deposits for rent, electricity, telephone, inventory or otherwise) and prepaid charges and expenses for services not yet performed;

4. rights to the Owned Real Property and Leased Real Property, in each case together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

5. the Arroyo Note and each of the PEC Notes;

6. the Transferred Business Contracts;

7. all Permits issued to or held by PEC in connection with PEC's ownership or use of the Transferred Assets or otherwise relating to the Business;

8. all IP Rights that are owned by, issued to, licensed to, developed by or for or licensed by PEC, along with all of PEC's interests in income, royalties, damages and payments accrued, due or payable to PEC as of the Closing or thereafter (including damages and payments for past, present or future infringements or misappropriations thereof), the right to sue and recover for past infringements or misappropriations thereof and any and all corresponding rights that, now or hereafter, may be secured throughout the world and all copies and tangible embodiments of any such IP Rights;

9. all rights of PEC under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees, independent contractors, and agents of PEC or with third parties to the extent relating to the Business or the Transferred Assets (or any portion thereof);

10. all agreements, documents, books, records and files, including all documents, instruments, papers, electronic correspondence, records and files stored on computer disks or tapes or any other storage medium, studies, reports, drawings, microfilms, photographs, letters, journals, title policies, regulatory filings, purchase orders, invoices, shipping records, operating records, operating, safety and maintenance manuals, engineering design plans, blueprints and as-built plans, user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), equipment repair, safety, maintenance or service records, technical data, business

*Schedule I to Assignment*

plans, financial and operating data, environmental records, plans and studies, Transferred Employee Records, accounting and Tax records (including Tax Returns), ledgers, filings or other documentation relating to any litigation or other Liability, internal and external correspondence and other books and records, whether in paper, e-mail, digital or other tangible form, in each case, to the extent used in or associated with the Business or the ownership or operation of the Transferred Assets;

11. all accounts or notes receivable held by PEC, and any security, claim, remedy or other right related to any of the foregoing;

12. the sponsorship of and the assets maintained pursuant to or in connection with the Assumed Benefit Plans;

13. the Insurance Policies;

14. all rights of PEC under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and other parties to the extent relating to Products sold, or services provided, to PEC in connection with the Business or to the extent affecting any Transferred Assets, other than any warranties, representations and guarantees pertaining to any Retained Assets or rights and defenses pertaining to any Retained Liabilities;

15. all claims, refunds, credits, causes of action, choices in action, rights of recovery and rights of set-off of any kind to or in respect of the Transferred Assets;

16. all proceeds paid under insurance policies with respect to the Transferred Assets with respect to claims arising with respect to the Transferred Assets or the Business after the Closing Date;

17. cash, cash equivalents, certificate of deposits and bank or savings accounts;

18. all goodwill and other intangible assets associated with the Business; and

19. all other properties, assets and rights owned by PEC as of the Closing, or in which PEC has an interest, in each case that are associated with the Business, and that are not otherwise Retained Assets.

*Schedule I to Assignment*

## Schedule II

### Retained Assets

"Retained Assets" shall include all assets of the PEC Parties that are not directly used or expected to be used in the operation of the Business as of the Closing Date shall remain the exclusive property of PEC on and after the Restructuring Closing, which Retained Assets shall include the following:

1. PEC's organizational documents and qualifications to conduct business as a corporation, arrangements with registered agents relating to foreign qualifications, income Tax Returns, seals and other documents relating to the organization, maintenance and existence of PEC as a corporation;

2. except as is explicitly a Transferred Asset, the sponsorship of and all assets maintained pursuant to or in connection with any benefit or compensation plan, program, policy, Contract, agreement or arrangement at any time maintained, sponsored, contributed or required to be contributed by PEC or any of its Affiliates or with respect to which PEC or any of its Affiliates has any Liability;

3. PEC's rights under or pursuant to this Agreement and the Transaction Documents;

4. copies of any financial, accounting and other data and books, records and information related to the Retained Assets and Retained Liabilities;

5. copies of personnel records that PEC is required by Law to retain in PEC's possession;

6. All funds on deposit in that certain escrow account established in connection with the PPP loan and in accordance with SBA Procedural Notice Control Number 5000-20057 with Umpqua Bank, plus all interest and other payments thereon;

7. All PPP Loan amounts forgiven by the SBA; and

8. the assets set forth on Section 1.3(b)(viii) of the PEC Disclosure Letter.

*Schedule II to Assignment*

## Schedule III

### Assumed Liabilities

"Assumed Liabilities" shall include (without duplication) any and all Liabilities of PEC to the extent directly relating to, arising out of or resulting from PEC's ownership or operation of the Business or the Transferred Assets (other than to the extent constituting, related to, arising out of or resulting from any Retained Assets or Retained Liabilities), including the following, but in each case, solely to the extent attributable to the period on or following January 1, 2017 or such later time specified and subject to the exceptions set forth below:

1. Liabilities under Transferred Business Contracts and Transferred Permits, but only to the extent such Transferred Business Contracts and Transferred Permits, as applicable, are assigned to the Company or the Company otherwise receives the rights and benefits of such Transferred Business Contracts and Transferred Permits pursuant to Section 1.7 of the MTA;

2. Liabilities relating to the Company's ownership or operation of the Transferred Assets, to the extent arising from events, facts or circumstances that first occur from and after January 1, 2017;

3. Liabilities for Prorated Taxes for the portion of any Straddle Period beginning after the Closing Date;

4. Liabilities related to the employment or engagement or termination of employment or engagement of any Transferred Employee or independent contractor following the Closing Date;

5. Liabilities related to the sponsorship of the Assumed Benefit Plans, but for the avoidance of doubt, no Liabilities arising in connection with a breach of any representation or warranty or covenant hereunder;

6. any other Liability that is expressly identified on <u>Section 1.4(a)(vii)</u> of the PEC Disclosure Letter, and

7. any other Liability (other than for Taxes, which are the subject of <u>Section 1.4(a)(iii)</u> of the MTA) directly related to the ongoing operation of the Company after the Closing.

## Schedule IV

### Retained Liabilities

"Retained Liabilities" shall include any and all Liabilities not expressly constituting an Assumed Liability, and whenever arising (whether prior to, on or after the Closing Date), including, but not limited to:

1. Liabilities of PEC Parties relating to the Business or the Transferred Assets to the extent arising by reason of any breach or alleged breach by PEC of any Contract, Real Property Lease, Permit, judgment, Order or decree arising out of or resulting from the transactions contemplated by this Agreement;

2. Liabilities of PEC Parties relating to, arising out of, resulting from or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby, including fees and expenses of counsel, accountants, consultants, advisers and others;

3. Liabilities of PEC Parties that are not directly related to, do not directly arise out of or do not directly result from the ownership or operation of the Transferred Assets or the Business (including (w) any matters related to the Equity Interests, incentive programs, ownership or shareholder matters of PEC Parties and any Indebtedness (even if such Indebtedness constitutes a Transferred Asset), (x) Liabilities related to any business currently or formerly conducted by PEC Parties, other than the Business, (y) Liabilities related to any assets of PEC Parties that are used in any business currently or formerly conducted by PEC Parties, other than the Business, and (z) Liabilities relating to, arising out of or resulting from PEC's ownership or operation of the Business or the Transferred Assets to the extent attributable to the period prior to January 1, 2017);

4. Except as provided in Section 4.7(c) of the MTA, Liabilities related to the employment or engagement or termination of employment or engagement of (i) any PEC Party current or former, actual or potential employee who does not become a Transferred Employee or current or former, actual or potential independent contractor of the Business but whose engagement does not continue with the Company, in all cases whether arising prior to, on or following the Closing Date or (ii) any Transferred Employee or independent contractor whose engagement continues with the Company, in all cases, arising prior to or on the Closing Date;

5. Liabilities for Taxes of PEC (or that PEC is otherwise responsible for) (except to the extent provided in Section 1.4(a)(iii) of the MTA);

6. Liabilities to the extent relating to, arising out of or resulting from any Retained Assets;

7. any Liability of PEC Parties (including its predecessors) or relating to, arising out of or resulting from its assets, operations, activity or business (including the Business) attributable to the period prior to January 1, 2017;

8. any Liability related to or arising out of any claims or rights asserted by a current or former direct or indirect holder of Equity Interests of PEC in connection with the Pre-Closing Restructuring or the Merger or other matters contemplated by Section 4.9 of the MTA; and

9. any other Liability that is expressly identified on Section 1.4(b)(ix) of the PEC Disclosure Letter

*Schedule IV to Assignment*

## Schedule V

### EmployeeCo Transferred Assets

1. Sponsorship of and the assets maintained pursuant to or in connection with the Assumed Benefit Plans, including:

    i. Powin Corporation 401k Profit Sharing Plan and Trust
    ii. Powin Energy Corporation Welfare Benefit Plan
    iii. Powin Energy Corporation Flexible Spending Account (FSA)
    iv. Powin Energy Corporation Employee Handbook, dated March 13, 2017
    v. Medical insurance through the Vigilant Group Benefits Trust
    vi. Dental insurance through Principal Life Insurance Company
    vii. Life insurance through Principal Life Insurance Company
    viii. Long-Term disability insurance through Principal Life Insurance Company

2. offer letters with active employees and confidentiality, invention assignment and similar restrictive covenant agreements with employees and individual consultants and contractors of Powin Energy Corporation

3. Furniture and those certain fixtures designated as "Work Stations for ICO team on 1st floor" (Internal Asset #20)

4. Transferred Employee Records

*Schedule V to Assignment*

United States Bankruptcy Court

District of New Jersey

In re:                                                                                    Case No. 25-16137-MBK

Powin, LLC                                                                          Chapter 11

    Debtor

# CERTIFICATE OF NOTICE

| District/off: 0312-3 | User: admin | Page 1 of 7 |
|---|---|---|
| Date Rcvd: Oct 22, 2025 | Form ID: pdf903 | Total Noticed: 1 |

The following symbols are used throughout this certificate:

**Symbol**     **Definition**

+     Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP.

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Oct 24, 2025:**

**Recip ID**          **Recipient Name and Address**
db          +  Powin, LLC, 20550 SW 115th Avenue, Tualatin, OR 97062-6857

TOTAL: 1

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI).
NONE

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, \*duplicate of an address listed above, \*P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

NONE

# NOTICE CERTIFICATION

**I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Oct 24, 2025                    Signature:          /s/Gustava Winters

---

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on October 22, 2025 at the address(es) listed below:**

| Name | Email Address |
|---|---|
| Alan J. Brody | |
| | on behalf of Interested Party Stem  Inc. brodya@gtlaw.com, alan-brody-2138@ecf.pacerpro.com |
| Anne B. Sekel | |
| | on behalf of Creditor AMP Solar US Services LLC  n/k/a PureSky US Services LLC asekel@foley.com, jnicholson@foley.com;jlee@foley.com |
| Arthur Abramowitz | |
| | on behalf of Creditor Ace Engineering aabramowitz@shermansilverstein.com  jbaugh@shermansilverstein.com |
| Barbra Rachel Parlin | |
| | on behalf of Creditor El Sol Storage Energy LLC barbra.parlin@hklaw.com elvin.ramos@hklaw.com;glenn.huzinec@hklaw.com,HAPI@HKLAW.COM;hapi@hklaw.com;jjalemany@hklaw.com |
| Barbra Rachel Parlin | |
| | on behalf of Creditor El Sol Energy Storage LLC barbra.parlin@hklaw.com elvin.ramos@hklaw.com;glenn.huzinec@hklaw.com,HAPI@HKLAW.COM;hapi@hklaw.com;jjalemany@hklaw.com |

Barbra Rachel Parlin
on behalf of Creditor Arizona Storage Development LLC barbra.parlin@hklaw.com
elvin.ramos@hklaw.com;glenn.huzinec@hklaw.com,HAPI@HKLAW.COM;hapi@hklaw.com;jjalemany@hklaw.com

Barbra Rachel Parlin
on behalf of Creditor Invenergy Storage Development LLC barbra.parlin@hklaw.com
elvin.ramos@hklaw.com;glenn.huzinec@hklaw.com,HAPI@HKLAW.COM;hapi@hklaw.com;jjalemany@hklaw.com

Barbra Rachel Parlin
on behalf of Creditor Invenergy  LLC barbra.parlin@hklaw.com,
elvin.ramos@hklaw.com;glenn.huzinec@hklaw.com,HAPI@HKLAW.COM;hapi@hklaw.com;jjalemany@hklaw.com

Barbra Rachel Parlin
on behalf of Creditor Yuma Solar Energy LLC barbra.parlin@hklaw.com
elvin.ramos@hklaw.com;glenn.huzinec@hklaw.com,HAPI@HKLAW.COM;hapi@hklaw.com;jjalemany@hklaw.com

Barbra Rachel Parlin
on behalf of Creditor Invenergy Services LLC barbra.parlin@hklaw.com
elvin.ramos@hklaw.com;glenn.huzinec@hklaw.com,HAPI@HKLAW.COM;hapi@hklaw.com;jjalemany@hklaw.com

Barbra Rachel Parlin
on behalf of Creditor MG HR S de R.L. de C.V. barbra.parlin@hklaw.com
elvin.ramos@hklaw.com;glenn.huzinec@hklaw.com,HAPI@HKLAW.COM;hapi@hklaw.com;jjalemany@hklaw.com

Blake Denton
on behalf of Creditor FlexGen Power Systems  LLC blake.denton@lw.com

Boaz Cohen
on behalf of Creditor Hitachi Energy Power Conversion Solutions  S.L.U., f/k/a Experience Knowledge Strategy, S.L.
bcohen@kramerlevin.com

Boaz Cohen
on behalf of Creditor Hitachi Energy Power Conversion Solutions Spain S.L., f/k/a Experience Knowledge Strategy, S.L.
bcohen@kramerlevin.com

Boaz Cohen
on behalf of Creditor Hitachi Energy Ltd bcohen@kramerlevin.com

Brett S. Theisen
on behalf of Creditor GLAS USA LLC btheisen@gibbonslaw.com  nmitchell@gibbonslaw.com

Brett S. Theisen
on behalf of Interested Party Galp Parques Fotovoltaicos de Alcoutim  Lda btheisen@gibbonslaw.com,
nmitchell@gibbonslaw.com

Cameron Deane
on behalf of Creditor Toyota Industries Commercial Finance  Inc. cdeane@weltman.com

Courtney Brown
on behalf of Creditor Mitsubishi Electric Power Products  Inc. cmbrown@vedderprice.com,
ecfnydocket@vedderprice.com,courtney-brown-3667@ecf.pacerpro.com

Daniel Harris
on behalf of Interested Party BHER Ravenswood Solar 1  LLC dharris@coleschotz.com, ddelehanty@coleschotz.com

Daniel Stolz
on behalf of Attorney Brown Rudnick LLP dstolz@genovaburns.com  dstolz@ecf.inforuptcy.com;msousa@genovaburns.com

Daniel Stolz
on behalf of Creditor Committee Official Committee of Unsecured Creditors dstolz@genovaburns.com
dstolz@ecf.inforuptcy.com;msousa@genovaburns.com

Daniel Stolz
on behalf of Attorney Genova Burns LLC dstolz@genovaburns.com  dstolz@ecf.inforuptcy.com;msousa@genovaburns.com

Daniel Stolz
on behalf of Other Prof. Alvarez & Marsal North America  LLC dstolz@genovaburns.com,
dstolz@ecf.inforuptcy.com;msousa@genovaburns.com

Daniel C Fleming
on behalf of Creditor ORR Protection Systems  Inc. dfleming@wongfleming.com, sshalloo@wongfleming.com

David A. Pisciotta
on behalf of Creditor GLAS USA LLC dpisciotta@reedsmith.com
david-pisciotta-4680@ecf.pacerpro.com;docketingecfnyc@reedsmith.com

David E. Sklar
on behalf of Interested Party Leeward Renewable Energy  LLC, on behalf of Rabbitbrush Solar, LLC, Chaparral Springs, LLC,
and Antelope Valley BESS, LLC dsklar@pashmanstein.com,
lsalcedo@pashmanstein.com;gkarnick@pashmanstein.com;aoden@pashmanstein.com

David E. Sklar
on behalf of Interested Party DTE Electric Company dsklar@pashmanstein.com

District/off: 0312-3

Date Rcvd: Oct 22, 2025

User: admin

Form ID: pdf903

Page 3 of 7

Total Noticed: 1

lsalcedo@pashmanstein.com;gkarnick@pashmanstein.com;aoden@pashmanstein.com

David E. Sklar

on behalf of Interested Party Poblano Energy Storage  LLC, Strata Solar Services, LLC, and Strata Storage, LLC
dsklar@pashmanstein.com, lsalcedo@pashmanstein.com;gkarnick@pashmanstein.com;aoden@pashmanstein.com

David E. Sklar

on behalf of Interested Party Longroad Development Company  LLC, on behalf of Serrano Solar, LLC, Sun Streams PVS, LLC,
and Sun Streams Expansion, LLC dsklar@pashmanstein.com,
lsalcedo@pashmanstein.com;gkarnick@pashmanstein.com;aoden@pashmanstein.com

David E. Sklar

on behalf of Interested Party Longroad Energy Partners  on behalf of Serrano Solar, LLC, Sun Streams PVS, LLC, and Sun
Streams Expansion, LLC dsklar@pashmanstein.com,
lsalcedo@pashmanstein.com;gkarnick@pashmanstein.com;aoden@pashmanstein.com

David E. Sklar

on behalf of Interested Party Poblano Energy Storage  LLC dsklar@pashmanstein.com,
lsalcedo@pashmanstein.com;gkarnick@pashmanstein.com;aoden@pashmanstein.com

David H. Pikus

on behalf of Creditor Expeditors International of Washington  INC dpikus@bressler.com

Deanna Boll

on behalf of Creditor Apex Clean Energy Holdings  LLC dboll@mwe.com, dnorthrop@mwe.com

Donald W Clarke

on behalf of Attorney Brown Rudnick LLP dclarke@genovaburns.com  dclarke@ecf.inforuptcy.com;dclarke@ecfalerts.com

Donald W Clarke

on behalf of Creditor Committee Official Committee of Unsecured Creditors dclarke@genovaburns.com
dclarke@ecf.inforuptcy.com;dclarke@ecfalerts.com

Donald W Clarke

on behalf of Other Prof. Alvarez & Marsal North America  LLC dclarke@genovaburns.com,
dclarke@ecf.inforuptcy.com;dclarke@ecfalerts.com

Douglas J. McGill

on behalf of Creditor Bergstrom Inc. dmcgill@webbermcgill.com

Evan Lazerowitz

on behalf of Creditor Enel Produzione S.p.A elazerowitz@rc.com  efiling-notice@ecf.pacerpro.com;efilingnotice@cooley.com

Felice R. Yudkin

on behalf of Interested Party BHER Ravenswood Solar 1  LLC fyudkin@coleschotz.com, fpisano@coleschotz.com

Frank A. Oswald

on behalf of Defendant Powin Energy Operating Holdings  LLC frankoswald@teamtogut.com,
seratner@teamtogut.com;dperson@teamtogut.com;altogut@teamtogut.com;jcohen@teamtogut.com;eblander@teamtogut.com;cgr
ady@teamtogut.com

Frank A. Oswald

on behalf of Debtor Powin Energy Operating  LLC frankoswald@teamtogut.com,
seratner@teamtogut.com;dperson@teamtogut.com;altogut@teamtogut.com;jcohen@teamtogut.com;eblander@teamtogut.com;cgr
ady@teamtogut.com

Frank A. Oswald

on behalf of Defendant Powin  LLC frankoswald@teamtogut.com,
seratner@teamtogut.com;dperson@teamtogut.com;altogut@teamtogut.com;jcohen@teamtogut.com;eblander@teamtogut.com;cgr
ady@teamtogut.com

Frank A. Oswald

on behalf of Debtor Powin Project LLC frankoswald@teamtogut.com
seratner@teamtogut.com;dperson@teamtogut.com;altogut@teamtogut.com;jcohen@teamtogut.com;eblander@teamtogut.com;cgr
ady@teamtogut.com

Frank A. Oswald

on behalf of Debtor Powin Energy Ontario Storage  LLC frankoswald@teamtogut.com,
seratner@teamtogut.com;dperson@teamtogut.com;altogut@teamtogut.com;jcohen@teamtogut.com;eblander@teamtogut.com;cgr
ady@teamtogut.com

Frank A. Oswald

on behalf of Debtor Powin China Holdings 1  LLC frankoswald@teamtogut.com,
seratner@teamtogut.com;dperson@teamtogut.com;altogut@teamtogut.com;jcohen@teamtogut.com;eblander@teamtogut.com;cgr
ady@teamtogut.com

Frank A. Oswald

on behalf of Debtor Powin Energy Operating Holdings  LLC frankoswald@teamtogut.com,
seratner@teamtogut.com;dperson@teamtogut.com;altogut@teamtogut.com;jcohen@teamtogut.com;eblander@teamtogut.com;cgr
ady@teamtogut.com

Frank A. Oswald

on behalf of Debtor Powin  LLC frankoswald@teamtogut.com,

District/off: 0312-3            User: admin            Page 4 of 7

Date Rcvd: Oct 22, 2025            Form ID: pdf903            Total Noticed: 1

seratner@teamtogut.com;dperson@teamtogut.com;altogut@teamtogut.com;jcohen@teamtogut.com;eblander@teamtogut.com;cgrady@teamtogut.com

Frank A. Oswald

on behalf of Debtor Powin China Holdings 2  LLC frankoswald@teamtogut.com, seratner@teamtogut.com;dperson@teamtogut.com;altogut@teamtogut.com;jcohen@teamtogut.com;eblander@teamtogut.com;cgrady@teamtogut.com

Frank A. Oswald

on behalf of Defendant Powin Energy Operating  LLC frankoswald@teamtogut.com, seratner@teamtogut.com;dperson@teamtogut.com;altogut@teamtogut.com;jcohen@teamtogut.com;eblander@teamtogut.com;cgrady@teamtogut.com

Frank A. Oswald

on behalf of Debtor PEOS Holdings  LLC frankoswald@teamtogut.com, seratner@teamtogut.com;dperson@teamtogut.com;altogut@teamtogut.com;jcohen@teamtogut.com;eblander@teamtogut.com;cgrady@teamtogut.com

Frank A. Oswald

on behalf of Debtor Charger Holdings  LLC frankoswald@teamtogut.com, seratner@teamtogut.com;dperson@teamtogut.com;altogut@teamtogut.com;jcohen@teamtogut.com;eblander@teamtogut.com;cgrady@teamtogut.com

Frank A. Oswald

on behalf of Attorney Togut  Segal & Segal LLP frankoswald@teamtogut.com, seratner@teamtogut.com;dperson@teamtogut.com;altogut@teamtogut.com;jcohen@teamtogut.com;eblander@teamtogut.com;cgrady@teamtogut.com

Franklin Barbosa, Jr

on behalf of Creditor CS Energy  LLC fb@spsk.com, clm@spsk.com

Gail C. Lin

on behalf of Plaintiff Brian Palomino gcl@raisnerroupinian.com rsr@raisnerroupinian.com;jar@raisnerroupinian.com;warnlawyers@raisnerroupinian.com;rrllp@ecf.courtdrive.com

Gregory S. Toma

on behalf of Interested Party Front Range-Midway Solar Project  LLC gtoma@riker.com

Jaclynn McDonnell

on behalf of Creditor Committee Official Committee of Unsecured Creditors jmcdonnell@genovaburns.com dmendez@genovaburns.com

James N. Lawlor

on behalf of Creditor Munmorah Battery ProjectCo Pty Ltd jlawlor@wmd-law.com

James N. Lawlor

on behalf of Creditor Ulinda Park ProjectCo Pty Ltd jlawlor@wmd-law.com

Jeffrey A. Cooper

on behalf of Interested Party Honeywell International Inc. jcooper@rltlawfirm.com cooperatty@aol.com;rgaydos@rltlawfirm.com

Jeffrey M. Sponder

on behalf of U.S. Trustee U.S. Trustee jeffrey.m.sponder@usdoj.gov  jeffrey.m.sponder@usdoj.gov

Jennifer Hoover

on behalf of Creditor EPC Services Company jhoover@beneschlaw.com  docket2@beneschlaw.com;lmolinaro@beneschlaw.com

Jennifer Hoover

on behalf of Creditor GreEnergy Resources  LLC jhoover@beneschlaw.com, docket2@beneschlaw.com;lmolinaro@beneschlaw.com

Jeremy M. Campana

on behalf of Creditor Ultra Corpotech Inc. jeremy.campana@thompsonhine.com  ECFDocket@thompsonhine.com

Jeremy M. Campana

on behalf of Creditor Ultra Corpotech Private Limited jeremy.campana@thompsonhine.com  ECFDocket@thompsonhine.com

Joanna J. Cline

on behalf of Creditor Kupono Solar  LLC joanna.cline@troutman.com, monica.molitor@troutman.com;wlbank@troutman.com

Joanna J. Cline

on behalf of Interested Party Ameresco  Inc. and Kupono Solar, LLC joanna.cline@troutman.com, monica.molitor@troutman.com;wlbank@troutman.com

John Pintarelli

on behalf of Creditor Mitsubishi Power Americas  Inc. john.pintarelli@pillsburylaw.com

John Pintarelli

on behalf of Creditor Prevalon Energy LLC john.pintarelli@pillsburylaw.com

John S. Mairo

on behalf of Creditor Certain Funds and Accounts Managed by KKR Credit Advisors (US) LLC jmairo@gibbonslaw.com

District/off: 0312-3                                 User: admin                                 Page 5 of 7
Date Rcvd: Oct 22, 2025                         Form ID: pdf903                         Total Noticed: 1

emunera@gibbonslaw.com

Joseph H. Lemkin

on behalf of Creditor THI Inc jlemkin@stark-stark.com

Joseph H. Lemkin

on behalf of Creditor Spark Power Renewables USA Inc. jlemkin@stark-stark.com

Joseph J. DiPasquale

on behalf of Interested Party Specified Technologies Inc. Jdipasquale@foxrothschild.com,
aedwards@foxrothschild.com;msteen@foxrothschild.com

Joseph L. Schwartz

on behalf of Creditor Solar Carver 1 LLC jschwartz@riker.com

Joseph L. Schwartz

on behalf of Interested Party Front Range-Midway Solar Project LLC jschwartz@riker.com

Joseph L. Schwartz

on behalf of Creditor Solar Carver 3 LLC jschwartz@riker.com

Kevin J. Mangan

on behalf of Interested Party Pennsylvania Insurance Company kevin.mangan@wbd-us.com
Heidi.sasso@wbd-us.com;cindy.giobbe@wbd-us.com;nichole.wilcher@wbd-us.com

Kevin J. Mangan

on behalf of Interested Party Applied Surety Underwriters kevin.mangan@wbd-us.com
Heidi.sasso@wbd-us.com;cindy.giobbe@wbd-us.com;nichole.wilcher@wbd-us.com

Kevin J. Mangan

on behalf of Interested Party SiriusPoint America Insurance Company kevin.mangan@wbd-us.com
Heidi.sasso@wbd-us.com;cindy.giobbe@wbd-us.com;nichole.wilcher@wbd-us.com

Kevin M. Capuzzi

on behalf of Creditor Mesa Logistics Group LLC d/b/a Trivergix Group kcapuzzi@beneschlaw.com,
docket2@beneschlaw.com;lmolinaro@beneschlaw.com

Kevin M. Capuzzi

on behalf of Creditor 8Loop Logistics LLC kcapuzzi@beneschlaw.com  docket2@beneschlaw.com;lmolinaro@beneschlaw.com

Kevin M. Capuzzi

on behalf of Creditor 8Loop Trans Inc. kcapuzzi@beneschlaw.com  docket2@beneschlaw.com;lmolinaro@beneschlaw.com

Kevin M. Capuzzi

on behalf of Creditor Mainfreight Inc. kcapuzzi@beneschlaw.com  docket2@beneschlaw.com;lmolinaro@beneschlaw.com

Kyriaki Christodoulou

on behalf of Creditor Arevon Energy Inc. kchristodoulou@cullenllp.com

Lauren Bielskie

on behalf of U.S. Trustee U.S. Trustee lauren.bielskie@usdoj.gov

Lauren M. Macksoud

on behalf of Debtor Powin Canada B.C. Ltd. lauren.macksoud@dentons.com  docket.general.lit.nyc@dentons.com

Lauren M. Macksoud

on behalf of Debtor Powin Energy Ontario Storage II LP lauren.macksoud@dentons.com  docket.general.lit.nyc@dentons.com

Lauren M. Macksoud

on behalf of Debtor Powin LLC lauren.macksoud@dentons.com, docket.general.lit.nyc@dentons.com

Lauren M. Macksoud

on behalf of Debtor Powin Energy Storage 2 Inc. lauren.macksoud@dentons.com, docket.general.lit.nyc@dentons.com

Lauren M. Macksoud

on behalf of Attorney Dentons US LLP lauren.macksoud@dentons.com  docket.general.lit.nyc@dentons.com

Leah Eisenberg

on behalf of Interested Party DTE Electric Company leisenberg@pashmanstein.com
leah-eisenberg-0344@ecf.pacerpro.com;gkarnick@pashmanstein.com

Leah Eisenberg

on behalf of Interested Party Longroad Development Company LLC, on behalf of Serrano Solar, LLC, Sun Streams PVS, LLC,
and Sun Streams Expansion, LLC leisenberg@pashmanstein.com,
leah-eisenberg-0344@ecf.pacerpro.com;gkarnick@pashmanstein.com

Leah Eisenberg

on behalf of Interested Party Poblano Energy Storage LLC leisenberg@pashmanstein.com,
leah-eisenberg-0344@ecf.pacerpro.com;gkarnick@pashmanstein.com

Leah Eisenberg

on behalf of Interested Party Longroad Energy Partners on behalf of Serrano Solar, LLC, Sun Streams PVS, LLC, and Sun
Streams Expansion, LLC leisenberg@pashmanstein.com, leah-eisenberg-0344@ecf.pacerpro.com;gkarnick@pashmanstein.com

District/off: 0312-3                          User: admin                                    Page 6 of 7
Date Rcvd: Oct 22, 2025                       Form ID: pdf903                          Total Noticed: 1

Leah Eisenberg
on behalf of Interested Party Poblano Energy Storage  LLC, Strata Solar Services, LLC, and Strata Storage, LLC
leisenberg@pashmanstein.com, leah-eisenberg-0344@ecf.pacerpro.com;gkarnick@pashmanstein

Leah Eisenberg
on behalf of Interested Party Leeward Renewable Energy  LLC, on behalf of Rabbitbrush Solar, LLC, Chaparral Springs, LLC,
and Antelope Valley BESS, LLC leisenberg@pashmanstein.com,
leah-eisenberg-0344@ecf.pacerpro.com;gkarnick@pashmanstein.com

Lee M. Cortes, Jr
on behalf of Interested Party Celestica LLC lee.cortes@arnoldporter.com

Lynne B. Xerras
on behalf of Creditor Invenergy Services LLC lynne.xerras@hklaw.com

Lynne B. Xerras
on behalf of Creditor El Sol Energy Storage LLC lynne.xerras@hklaw.com

Lynne B. Xerras
on behalf of Creditor Invenergy Storage Development LLC lynne.xerras@hklaw.com

Lynne B. Xerras
on behalf of Creditor Invenergy  LLC lynne.xerras@hklaw.com

Lynne B. Xerras
on behalf of Creditor El Sol Storage Energy LLC lynne.xerras@hklaw.com

Lynne B. Xerras
on behalf of Creditor Yuma Solar Energy LLC lynne.xerras@hklaw.com

Mark Magnozzi
on behalf of Creditor Oracle America  Inc., successor in interest to NetSuite, Inc. mmagnozzi@magnozzilaw.com

Mark S. Lichtenstein
on behalf of Creditor Sonic Systems International  LLC mark.lichtenstein@akerman.com, Reyko.delpino@akerman.com

Matthew L. Curro
on behalf of Creditor Contemporary Amperex Technology Co.  LTD mcurro@currolaw.com

Max DuVal
on behalf of Creditor Mitsubishi Electric Power Products  Inc. mduval@vedderprice.com

Michael Trentin
on behalf of Creditor EDF Power Solutions  Inc. mtrentin@orrick.com, ssallie@coleschotz.com;dcarnie@orrick.com

Michael Trentin
on behalf of Creditor PowerFlex Systems  Inc. mtrentin@orrick.com, ssallie@coleschotz.com;dcarnie@orrick.com

Michael Trentin
on behalf of Creditor EsVolta  L.P. mtrentin@orrick.com, ssallie@coleschotz.com;dcarnie@orrick.com

Michael P. Pompeo
on behalf of Creditor Keyframe Capital Partners  L.P. michael.pompeo@faegredrinker.com, cathy.greer@faegredrinker.com

Michael R. Herz
on behalf of Interested Party Zendesk  Inc. mherz@foxrothschild.com, cbrown@foxrothschild.com

Natasha M. Songonuga
on behalf of Creditor Lu Pacific Properties  LLC NSongonuga@archerlaw.com, ahuber@archerlaw.com

Nicholas Blaine Vislocky
on behalf of Creditor GLAS USA LLC nvislocky@reedsmith.com

Nicholas M. Gaunce
on behalf of Creditor Control Concepts Corporation dba c3controls ngaunce@eckertseamans.com  nicholasmgaunce@gmail.com

Paul R. DeFilippo
on behalf of Creditor Munmorah Battery ProjectCo Pty Ltd pdefilippo@wmd-law.com

Paul R. DeFilippo
on behalf of Creditor Ulinda Park ProjectCo Pty Ltd pdefilippo@wmd-law.com

Richard Solow
on behalf of Creditor GLAS USA LLC rsolow@reedsmith.com  rich-solow-3519@ecf.pacerpro.com

Richard B Harper
on behalf of Creditor Idaho Power Company richard.harper@bakerbotts.com  john.mitchell@bakerbotts.com

Rodney Nelson
on behalf of Creditor Expeditors International of Washington  INC rodneyknelson9@gmail.com, rahafalrehaili@labayenlaw.com

Ross J. Switkes
on behalf of Creditor Ace Engineering rswitkes@shermansilverstein.com

Sameer Alifarag
    on behalf of Creditor JMS Wind Energy  LLC sameeralifarag@eversheds-sutherland.com

Sameer Alifarag
    on behalf of Creditor Pulse Clean Energy SPV Watt Limited sameeralifarag@eversheds-sutherland.com

Sean J. Kirby
    on behalf of Creditor SMA Solar Technology America  LLC skirby@sheppardmullin.com

Sean M. Beach
    on behalf of Interested Party Ormat Nevada Inc. bankfilings@ycst.com  dlaskin@ycst.com

Steven Abramowitz
    on behalf of Creditor Ad Hoc Customer Group sabramowitz@velaw.com
mmoran@velaw.com;kgrissel@velaw.com;tmitsch@velaw.com;kduchesne@velaw.com

Steven Abramowitz
    on behalf of Creditor energyRe Services  LLC sabramowitz@velaw.com,
mmoran@velaw.com;kgrissel@velaw.com;tmitsch@velaw.com;kduchesne@velaw.com

Steven Abramowitz
    on behalf of Creditor Lone Star Solar  LLC sabramowitz@velaw.com,
mmoran@velaw.com;kgrissel@velaw.com;tmitsch@velaw.com;kduchesne@velaw.com

Stuart M. Brown
    on behalf of Interested Party Qingdao CIMC Container Manufacture Co. Ltd. stuart.brown@dlapiper.com
DLAPiper@ecfxmail.com;docketingbaltimore@dlapiper.com

Stuart M. Brown
    on behalf of Interested Party China International Marine Containers Group Co.  Ltd. stuart.brown@dlapiper.com,
DLAPiper@ecfxmail.com;docketingbaltimore@dlapiper.com

Stuart M. Brown
    on behalf of Interested Party CIMC Technology Co.  Ltd. stuart.brown@dlapiper.com,
DLAPiper@ecfxmail.com;docketingbaltimore@dlapiper.com

Susan Long
    on behalf of Creditor Committee Official Committee of Unsecured Creditors slong@genovaburns.com

Tara T. LeDay
    on behalf of Creditor One Source Freight Solutions Tara.LeDay@huschblackwell.com
christine.deacon@huschblackwell.com;penny.keller@huschblackwell.com

Turner Falk
    on behalf of Creditor KCE NY 3  LLC turner.falk@saul.com, catherine.santangelo@saul.com;tnfalk@recap.email

Turner Falk
    on behalf of Creditor Clean Energy Services CES  LLC turner.falk@saul.com,
catherine.santangelo@saul.com;tnfalk@recap.email

Turner Falk
    on behalf of Creditor KCE TX 7  LLC turner.falk@saul.com, catherine.santangelo@saul.com;tnfalk@recap.email

Turner Falk
    on behalf of Creditor KCE TX 2  LLC turner.falk@saul.com, catherine.santangelo@saul.com;tnfalk@recap.email

Turner Falk
    on behalf of Creditor KCE TX 8  LLC turner.falk@saul.com, catherine.santangelo@saul.com;tnfalk@recap.email

Turner Falk
    on behalf of Creditor Key Capture Energy  LLC turner.falk@saul.com, catherine.santangelo@saul.com;tnfalk@recap.email

U.S. Trustee
    USTPRegion03.NE.ECF@usdoj.gov

Warren J. Martin, Jr.
    on behalf of Creditor Formosa Electronic Industries Inc. wjmartin@pbnlaw.com
mpdermatis@pbnlaw.com;pnbalala@pbnlaw.com;raparisi@pbnlaw.com;jmoconnor@pbnlaw.com

TOTAL: 141