UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
UNITED STATES TRUSTEE, REGIONS 3 & 9
Jeffrey M. Sponder, Esq.
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Email: jeffrey.m.sponder@usdoj.gov

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 25-16137 (MBK) |
| Powin, LLC, et als.,[1] | : | |
| | : | The Honorable Michael B. Kaplan |
| Debtors. | : | |
| | : | Hearing Date: November 25, 2025 at 11:30 a.m. |
| | : | |

**UNITED STATES TRUSTEE'S OBJECTION TO THE JOINT COMBINED
DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION OF
POWIN, LLC AND AFFILIATES THEREOF AND THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS**

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S.

Trustee"), through his undersigned counsel, hereby objects to the *Joint Combined Disclosure*

*Statement and Chapter 11 Plan of Liquidation of Powin, LLC and Affiliates Thereof and the*

*Official Committee of Unsecured Creditors* [Dkt. 942] (the "Plan"),[2] and respectfully states as

follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583], (ii) Powin, LLC [0504], (iii) PEOS Holdings, LLC [5476], (iv) Powin China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [5241], (vii) Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [2495], and (ix) Powin Energy Operating, LLC [6487]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan (including exhibits), as applicable.

## PRELIMINARY STATEMENT

1.      In contravention of United States Supreme Court precedent and applicable state law, the Plan extracts non-consensual third-party releases and, to the extent that exculpation is permissible beyond the provisions of Bankruptcy Code section 1125(e), the proposed Plan's exculpation provision violates controlling Third Circuit case law by attempting to shield non-fiduciaries of the Debtors' estates.

2.      In addition, the Plan contains overbroad Debtor releases and injunctions and improperly seeks the waiver of the 14-day stay pursuant to Fed. R. Bankr. P. 3020(e).

3.      The U.S. Trustee further objects to several miscellaneous provisions of the Plan including Sections 3.1, 9.1(b), and 9.2(b) of the Plan that contain the phrases "satisfaction, compromise, settlement, release and discharge of an in exchange for such Claim", Section 3.1 and 7.2 of the Plan concerning the payment of statutory quarterly fees; and Section 19.15 of the Plan concerning Substantial Consummation of the Plan.

4.      Accordingly, and for the reasons set forth in more detail herein, the U.S. Trustee respectfully requests that the Court enter an order denying confirmation.

## JURISDICTION AND STANDING

5.      This Court has jurisdiction to hear and determine confirmation of the Plan and this Objection pursuant to: **(i)** 28 U.S.C. § 1334; **(ii)** applicable orders of the United States District Court of the District of New Jersey issued pursuant to 28 U.S.C. § 157(a); and **(iii)** 28 U.S.C. § 157(b)(2).

6.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and

interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").  Under 28 U.S.C. § 586(a)(3)(B) the U.S. Trustee has the duty to monitor and comment on plans and disclosure statements filed in chapter 11 cases.

7.    The U.S. Trustee has standing to be heard concerning confirmation of the Plan and this Objection pursuant to 11 U.S.C. § 307.  *See U.S. Tr. v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under section 307, which goes beyond mere pecuniary interest).

## Background

### A.    The Chapter 11 Cases

8.    On June 10, 2025 (the "Petition Date"), Powin Project LLC, Powin, LLC, PEOS Holdings, LLC, Powin China Holdings 1, LLC, Powin China Holdings 2, LLC, Charger Holdings, LLC, Powin Energy Ontario Storage, LLC, Powin Energy Operating Holdings, LLC, and Powin Energy Operating, LLC (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").  *See,* for example, Case No. 25-16137, at Dkt. 1.

9.    The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

10.    On June 27, 2025, the U.S. Trustee filed a Notice of Appointment of Official Committee of Unsecured Creditors.  *See* Dkt. 174.

11.    As of the date hereof, no trustee or examiner has been requested or appointed.

**B.      The Debtors and their Businesses**

12.      Prior to the Petition Date, the Debtors operated as a leading energy storage integrator, based in Portland, Oregon, and with offices around the world in Vietnam, China, Canada, Australia, and Spain.  *See* Dkt. 942 at Section 4.1(a), page 31 of 85.  The Debtors focused their business on ensuring access to clean, reliable, resilient, and affordable power through cutting-edge technology.  *See id.*

13.      According to the Debtors, their business model had two lines of business: (i) the engineering and installation of battery energy storage systems, which are governed by various energy supply agreements (each, an "ESA"); and (ii) the warranties, servicing and maintenance of battery energy storage systems, which are governed by various long term servicing agreements (each, an "LTSA").  *See id.*, page 32 of 85. To implement the Debtors' business plan, the Debtors entered into these ESAs and LTSAs with its customers, and then used suppliers and vendors to support performance under the ESAs and LTSAs.  *See id.*

**C.      The Plan.**

14.      On October 6, 2025, the Debtor and the Official Committee of Unsecured Creditors (the "Plan Proponents") filed the *Joint Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Powin, LLC and Affiliates Thereof and the Official Committee of Unsecured Creditors* (the "Original Plan").  *See* Dkt. 914.

15.      Also, on October 6, 2025, the Plan Proponents filed the *Joint Motion of the Plan Proponents for Entry of an Order Approving (i) the Adequacy of the Disclosure Statement on Conditional Basis, (ii) the Solicitation and Notice Procedures, (iii) the Forms of Ballots and Notices in Connection therewith, and (iv) Certain Dates with Respect thereto* (the "Disclosure Statement and Solicitation Motion").  *See* Dkt. 915.

4

16.     On October 10, 2025, the U.S. Trustee filed an Objection to the Disclosure Statement and Solicitation Motion.  *See* Dkt. 929.

17.     On October 14, 2025, the Court entered an Order Approving (i) the Adequacy of the Disclosure Statement on Conditional Basis, (ii) the Solicitation and Notice Procedures, (iii) the Forms of Ballots and Notices in Connection Therewith, and (iv) Certain Dates With Respect Thereto, and scheduled a confirmation hearing for November 25, 2025.  *See* Dkt. 939.

18.     On October 15, 2025, the Debtors filed the Plan that is the subject of this Objection. *See* Dkt. 942.

19.     On November 7, 2025, the Debtors filed a Notice of Filing of Plan Supplement. *See* Dkt. 1036.

20.     On November 8, 2025, the Debtors filed a Notice of filing of Amended Plan Supplement.  *See* Dkt. 1038.

21.     On November 13, 2025, the Debtors filed a Notice of Amended Exhibits to Amended Plan Supplement.  *See* Dkt. 1055.

**D.     Specific Provisions of the Plan**

22.     The Plan includes the following provisions relevant to this Objection.

####    i.    Third-Party Release Provision

23.    Section 15.2(b) of the Plan broadly provides that the Releasing Parties[3] shall release

each of the Released Parties[4] "from, any and all claims, interests, obligations, rights, suits,

damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims

asserted or assertable on behalf of any of the Debtors or the Estates, as applicable, whether known

or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or

unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due

or to become due, existing or hereinafter arising, in law, equity, or otherwise."[5]  *See* Dkt. 942 at

Section 15.2(b), pages 67 and 68 of 85.

---

[3] The Plan defines "Releasing Parties" as follows:

> "Releasing Parties" means, individually and collectively: (i) each holder of a Claim or Interest that does not opt out of the Third Party Release; (ii) the Committee and each of its members in such capacity; and (iii) with respect to each of the foregoing Entities in clauses (i) and (ii), such Entities' or Persons' successors, assigns, transferees, and such Entities' or Persons' officers and directors, agents, members, financial and other advisors, attorneys, employees, partners, affiliates, and representatives (in each case in their capacity as such), and any and all other entities who may purport to assert any cause of action, by, through, for, or because of such Entities or Persons.

*See* Dkt. 942 at Section 2, page 25 of 85.

[4] The Plan defines "Released Parties" as follows:

> "Released Parties" means collectively (a) the Debtors, (b) the Debtors' respective current officers and managers, including John Brecker, in any capacity, including, without limitation, his capacity as Independent Manager of Powin LLC, (c) Gerard Uzzi, in any capacity, including, without limitation, his capacity as Chief Restructuring Officer of Powin, LLC and former Independent Manager of Powin, LLC, (d) Brian Kane, Chad Paulson, any others agreed to between the Committee and the Debtors, in any capacity, subject to approval by the Committee based on the results of its investigation and (if required by the Committee) execution of an agreement satisfactory to the Committee to cooperate with the Liquidating Trust and the Direct Claims Trust in their investigation and prosecution of claims, (e) members of the Committee (solely in their capacities as Committee members), (f) Bankruptcy Court-approved Estate and Committee professionals, and (g) any other party, subject to approval by the Committee, which may be withheld for any reason or conditioned on execution of any appropriate agreement to cooperate with the Liquidating Trust and the Direct Claims Trust in their investigation and prosecution of claims, for whom the Debtors determine a release is appropriate.

*See* Dkt. 942 at Section 2, pages 24 and 25 of 85.

[5] The Plan provides for a Third Party Release as follows:

24.    Holders of Claims in Classes 1 and 2 and Holders of Intercompany Claims and Interests in Classes 6 and 7 are either unimpaired or are insiders or Affiliates of the Debtor; as a result, they are either presumed to have accepted the Plan or deemed to have rejected it, and so are not entitled to vote on the Plan. *See id*. at Section 8.1, page 48 of 85. Instead, pursuant to the Solicitation and Voting Procedures, the holders of claims in these classes received a Non-Voting Status Notice, which contained a Release Opt-Out Election Form. *See* Dkt. 939 at Exhibit 7, pages 162-177 of 192.

25.    The Notice of Non-Voting Status and Release Opt-Out Election Forms that were sent to members of Classes 1, 2, 6 and 7 specifies that a recipient who fails to timely and properly

---

Notwithstanding anything in the Plan to the contrary, on and after and subject to the occurrence of the Effective Date, each of the Releasing Parties shall release (the "Third Party Release") each Released Party, and each of the Debtors, the Estates, and the Released Parties shall be deemed released from, any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of any of the Debtors or the Estates, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Debtors' liquidation, the Chapter 11 Cases, the purchase, sale, transfer of any security, asset, right, or interest of the Debtors and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Combined Plan and Disclosure Statement, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of, or solicitation of votes on, the Combined Plan and Disclosure Statement or related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, actual fraud, bad faith, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction) but in all respects such Released Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Combined Plan and Disclosure Statement. Notwithstanding anything to the contrary in the foregoing, the Third Party Release shall not release any obligations of any party under the Combined Plan and Disclosure Statement or any other document, instrument, or agreement executed to implement the Combined Plan and Disclosure Statement. For the avoidance of doubt, the Third Party Release shall not be effective upon any party that executes and returns a Release Opt-Out Election Form in accordance with the terms of this Combined Plan and Disclosure Statement.

*See* Dkt. 942 at Section 15.2(b), pages 67 and 68 of 85.

submit a Release Opt-Out Election Form to the Balloting Agent by the Opt-Out Deadline with the opt-out box checked will be deemed to have consented to the Section 15.2 third-party releases.[6]  *See id.*

26.    Holders of Claims in Classes 3, 4 and 5 are entitled to vote under the Plan.  *See* Dkt. 942 at page 48 of 85.  The ballots provided to the voting classes included an opt-out election.  *See* Dkt. 939 at Exhibits 4A, 4B and 4C, pages 122-154 of 192.  The opt-out election provides that a claimant will be deemed to provide the releases contained in Section 15.2(b) of the Plan unless the box is checked and the ballot submitted to the Balloting Agent prior to the Voting Deadline.  *See id.*

## ii.    Debtor Release Provision

27.    Section 15.2(a) of the Plan broadly provides that each of the Released Parties are deemed released by the Debtor/Estate Releasors.[7]  The Clams being released include "any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor/Estate Releasors, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or

---

[6] It is unclear whether a member of the non-voting classes could file an objection in lieu of a Release Opt-Out Election Form if it does not consent to granting the third-party releases.

[7] The Plan defines "Debtor/Estate Releasors" as follows:

> "…the Debtors and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any cause of action, by, through, for, or because of the foregoing entities...".

*See* Dkt. 942 at Section 15.2(a), page 66 of 85.

undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in

law, equity, or otherwise."[8]   *See* Dkt. 942 at Section 15.2(a), page 66 of 85.

---

[8] The Plan provides for Debtor Releases as follows:

> Pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each of the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtor, its Estate, and, if applicable, the Post-Effective Date Debtor, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action directly or derivatively, by, through, for, or because of the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims asserted or assertable on behalf of the Debtor, its Estate, or the Post-Effective Date Debtor), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtor, its Estate, the Post-Effective Date Debtor, if applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons, including Related Parties, claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim, Interest, or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor or the Estate, the Chapter 11 Case, the Global Resolution, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim, or Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among the Debtor and any Released Party, the Receivables Facilities, the distribution of any Cash or other property of the Debtor to any Released Party, the assertion or enforcement of rights or remedies against the Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the Debtor's in- or out-of-court restructuring efforts, the decision to File the Chapter 11 Case, any intercompany transactions, the negotiation and consummation of the any sale of the Debtor's assets, the negotiation, formulation, or preparation of the Plan, Disclosure Statement, Plan Supplement, or related agreements, instruments or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the solicitation of votes with respect to the Plan, the DIP Facility, the DIP Loan Documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that the foregoing releases shall have no effect on the liability of any person or Entity that results from any act or omission based on or arising out of gross negligence, fraud or willful misconduct.

> Notwithstanding anything to the contrary in the foregoing, the Debtor does not, pursuant to the releases set forth above, release (i) any Retained Causes of Action, including, but not limited to, Avoidance Actions and Commercial Tort Claims; (ii) any post-Effective Date obligations of any party of Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (iii) the Excluded Parties. The foregoing does not affect the Debtor's Stipulations and Releases contained in Paragraph 2 of the Final DIP Order, which shall remain in full force and effect.

### iii.    Exculpation Provision

28.    Section 15.1 of the Plan is an overbroad exculpation provision[9] for Exculpated Parties.[10]  *See* Dkt. 942 at Section 15.1, page 66 of 85.

---

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtor and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtor, the Debtor's Estate, or, if applicable, the Post-Effective Date Debtor, asserting any claim or Cause of Action released pursuant to the Debtor Release.

*See* Dkt. 942 at Section 15.2(a), pages 66 and 67 of 85.

[9] The Plan's exculpation provision states as follows:

The Exculpated Parties will neither have nor incur any liability to any entity for any action in good faith taken or omitted to be taken between the Petition Date and Effective Date in connection with or related to the Chapter 11 Cases, the sale or other disposition of the Debtors' assets or the formulation, preparation, dissemination, implementation, Confirmation, or Consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan; *provided, however*, that this limitation will not affect or modify the obligations created under the Plan, or the rights of any holder of an Allowed Claim to enforce its rights under the Plan, and shall not release any action (or inaction) constituting willful misconduct, fraud, bad faith, or gross negligence (in each case subject to determination by final order of the Bankruptcy Court); *provided that* any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan, and such reasonable reliance shall form a defense to any such claim, Cause of Action, or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of section 1125(e) of the Bankruptcy Code.

*See* Dkt. 942 at Section 15.1, page 66 of 85.

[10] The Plan defines "Exculpated Parties" as follows:

"Exculpated Parties" means collectively (a) the Debtors, (b) John Brecker in any capacity, including, without limitation, his capacity as Independent Manager of Powin LLC, (c) Gerard Uzzi in any capacity, including, without limitation, in his capacity as Chief Restructuring Officer of Powin, LLC and as former Independent Manager of Powin, LLC, (d) Brian Kane, Chad Paulson, any others agreed to between the Committee and the Debtors, in any capacity, subject to approval by the Committee based on the results of its investigation and (if required by the Committee) execution of an agreement satisfactory to the Committee to cooperate with the Liquidating Trust and the Direct Claims Trust in their investigation and prosecution of claims, (e) members of the Committee (solely in their capacities as Committee members), (f) Bankruptcy Court-approved Estate and Committee professionals, and (g) any other party, subject to approval by the Committee, which may be withheld for any reason or conditioned on execution of any appropriate agreement to cooperate with the Liquidating Trust and the Direct Claims Trust in their investigation and prosecution of claims, for whom the Debtors determine exculpation is appropriate.

### iv.    Injunction Provision

29.    Despite the Plan being a liquidating plan, Section 15.3 of the Plan broadly provides a permanent injunction against "all entities who have held, hold or may hold Claims against or Interests in the Debtors, the Liquidating Trust, the Direct Claims Trust, or the Estates that arose prior to the Effective Date."[11]  *See* Dkt. 942 at Section 15.3, page 68 of 85.

### v.    Rule 3020(e) Waiver

30.    The Debtors seek a waiver of the 14-day stay under Fed R. Bankr. P. 3020(e).[12] *See* Dkt. 942 at Section 19.16, at page 84 of 85.

---

*See* Dkt. 942 at Section 2, page 19 of 85.

[11] The Plan's injunction provision states as follows:

> In implementation of the Plan, except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtors, the Liquidating Trust, the Direct Claims Trust, or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, the Estates, the Liquidating Trust, the Direct Claims Trust, or any of such Trusts' Assets with respect to any such Claim or Interest; (b) the enforcement, attachment, collection, or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtors, the Estates, the Liquidating Trust, the Direct Claims Trust, or any of Such Trusts' Assets with respect to any such Claim or Interest; (c) creating, perfecting, or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtors, the Estates, the Liquidating Trust, the Direct Claims Trust, or any of such Trusts' Assets with respect to any such Claim or Interest; and (d) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest. Nothing contained in this Section shall prohibit the holder of a timely filed Proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtors or any Trust under the Plan. Notwithstanding any other provision of this Plan, the Debtors shall not receive a discharge pursuant to Bankruptcy Code section 1141(d)(3).

*See* Dkt. 942 at Section 15.3, page 68 of 85.

[12] The Plan provides for the waiver of the 14-day stay as follows:

> "The Debtors and Committee request as part of the Confirmation Order a waiver from the Bankruptcy Court of the 14-day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the 14-day stay of Bankruptcy Rule 6004(g)."

*See* Dkt. 942 at Section 19.16, at page 84 of 85.

### vi.    Other Provisions

31.    Sections 9.1(b),[13] 9.2(b),[14] and 3.1 of the Plan, provide that in exchange for the treatment in the Plan, Holders of an Allowed Other Secured Claim and Holders of an Allowed Priority Non-Tax Claim will receive payment in full in Cash in an amount equal to the Allowed amount of such Claim "in full and final satisfaction, compromise, settlement, release and discharge of or in exchange for such Claim."  *See* Dkt. 942 at Section 3.1, pages 28 and 29 of 85 and Sections 9.1(b) and 9.1(c) at pages 48 and 49 of 85.

---

[13] Section 9.1(b) of the Plan states as follows:

> Treatment. Except to the extent a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, on the later of (i) the Effective Date or (ii) the date such Priority Non-Tax Claim becomes Allowed, or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, payment in full in Cash in an amount equal to the Allowed amount of such Claim.

*See* Dkt. 942 at Section 9.1(b), pages 48 and 49 of 85.

[14] Section 9.2(b) of the Plan states as follows:

> Treatment. Except to the extent a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the later of (i) the Effective Date or (ii) the date such Other Secured Claim becomes Allowed, or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, at the discretion of the Distribution Agent (x) payment in full in Cash in an amount equal to the Allowed amount of such Claim; (y) such other treatment sufficient to render such Other Secured Claim Unimpaired;  or (z) return of the applicable collateral or authorization of a setoff in satisfaction of the Allowed amount of such Other Secured Claim.

*See* Dkt. 942 at Section 9.2(b), page 49 of 85.

32.      Section 7.2(a)[15] and 7.2(c)[16] of the Plan contain language concerning the payment

of statutory quarterly fees pursuant to 11 U.S.C. § 1930(a)(6).  *See* Dkt. 942 at Section 7.2(a) and

7.2(c), page 46 of 85.  In addition, section 3.1 contains similar language concerning the payment

of statutory fees.  *See id.* at Section 3.1, page 28 of 85.

33.      Section 19.15[17] of the Plan provides that Substantial Consummation will be deemed

to occur on the Effective Date pursuant to sections 1101 and 1127(b) of the Bankruptcy Code.  *See*

*id.* at Section 19.15, page 83 of 85.

---

[15] Section 7.2(a) of the Plan states as follows:

> Except to the extent that a holder of an Allowed Administrative Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive from Available Cash, without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the holder of such Claim and the Debtors or the Liquidating Trustee, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law.

*See* Dkt. 942 at Section 7.2(a), page 46 of 85.

[16] Section 7.2(c) of the Plan states as follows:

> All Quarterly Fees due prior to the Effective Date shall be paid by the Debtor on the Effective Date. All fees due and payable under 28 U.S.C. § 1930 that have not been paid.

*See* Dkt. 942 at Section 7.2(c), page 46 of 85.

[17] Section 19.15 of the Plan states as follows:

> On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

*See* Dkt. 942 at Section 19.15, page 83 of 85.

**OBJECTION**

## I. Confirmation Standard

34. A chapter 11 plan cannot be confirmed unless this Court finds the plan complies with the provisions of 11 U.S.C. § 1129(a). *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 220-21 (Bankr. D.N.J. 2000). A plan proponent bears the burden of proof with respect to each element of section 1129(a). *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001).

35. For the following reasons, the Plan cannot be confirmed in its present form.

## II. The Plan is Not Confirmable Because it Proposes Non-Consensual Third-Party Releases That Are Not Authorized Under the Bankruptcy Code.

### A. Introduction

36. The Supreme Court held in *Harrington v. Purdue Pharma L.P.* that bankruptcy courts cannot involuntarily alter relationships between non-debtors by imposing nonconsensual releases of, or injunctions barring, claims between them. *See* 603 U.S. 204, 209, 227 (2024). The Court did not prohibit chapter 11 plans from memorializing consensual third-party releases, and it did not "express a view on what qualifies as a consensual release." *See id.* at 226.

37. A consensual third-party release is a separate agreement between non-debtors governed by nonbankruptcy law. As the Supreme Court recognized in *Purdue*, a release is a type of settlement agreement. *See Purdue*, 603 U.S. at 223 (explaining that what the Sacklers sought was not "a traditional release" because "settlements are, by definition, consensual") (cleaned up). A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for a consensual release is the agreement itself, not the Bankruptcy Code. If a claim has been extinguished by virtue of the agreement of the parties, then the court is not using the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish the property right.

38.     Here, there is no existing release agreement between non-debtors.  Debtors instead seek a confirmation order that would use the power of the court to impose a third-party release on claimants without their affirmative and voluntary consent.  Such a confirmation order would impermissibly alter the relations between non-debtors because a valid release does not exist under nonbankruptcy law.

39.     State law governs whether non-debtors have agreed to release each other.  *See infra* Part B.  Nothing in the Bankruptcy Code allows parties to disregard state law when debtors seek to impose third-party releases in their plans.  Under New Jersey law, which appears to be the law governing the Plan, as in other states, silence is not acceptance of an offer other than in limited circumstances inapplicable here.  The Debtors thus cannot deem those who fail to opt out to have released claims because those claimants have not agreed to the third-party release under state law.

### B.     State Contract Law Applies

40.     "[T]he basic federal rule in bankruptcy is that state law governs the substance of claims."  *See Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (cleaned up); *accord Butner v. United States*, 440 U.S. 48 (1979).  Thus, courts apply state law when the question is whether a debtor has entered a valid settlement agreement.  *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").

41.     The rule is no different for third-party releases.  They are separate agreements between non-debtors governed by state law.  Unlike a bankruptcy discharge, which "is an

involuntary release by operation of law," "[i]n the case of voluntary releases, the nondebtor is

released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the *creditor agrees to do

so*." *See In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997) (emphasis in

original). *See also Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental

Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions

"unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source

of the bankruptcy court's authority").  Thus, "the Bankruptcy Code has not altered the contractual

obligations of third parties, the parties themselves have so agreed."  *See Arrowmill*, 211 B.R. at

507.

42.    Because the Bankruptcy Code does not authorize the imposition of an involuntary

release, *Purdue*, 603 U.S. at 209, 227, the release must be consensual under non-bankruptcy law.

There is no Bankruptcy Code provision that preempts otherwise applicable state contract law

governing releases between non-debtors.  *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate

Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a

statute provides the rule of decision or authorizes a federal court to supply one, 'state law must

govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72

(1965)); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the

Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the

state.").  Section 105(a), for example, "serves only to carry out authorities expressly conferred

elsewhere in the code."  *See Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted).  But the Code

does not confer any authority to impose a release of claims between non-debtors that would not be

valid under state law.  The Bankruptcy Code does not define a "consensual release."  *See* 11 U.S.C.

§ 101.  "There is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism"

16

for third-party releases in chapter 11 plans. *See In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015). And no Code provision authorizes bankruptcy courts to deem a non-debtor to have consented to release claims against other non-debtors where such consent would not exist as a matter of state law.

43. Some courts have held that federal rather than state law applies to determine whether a third-party release is consensual. But because there is no applicable Code provision, whether a non-debtor has consented to release another non-debtor is not, as one court concluded, a "matter of federal bankruptcy law." *See In re Spirit Airlines, Inc.*, 666 B.R. 689, 716 (Bankr. S.D.N.Y 2025); *see also In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (relying on caselaw in the district rather than any provision of the Bankruptcy Code). Absent express authority in the Code, federal courts cannot simply make up their own rules for when parties have given up property rights by releasing claims. Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *See In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Indeed, nearly a hundred years ago, the Supreme Court rejected the notion that federal courts can displace state law as "an unconstitutional assumption of powers by the Courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct." *See Erie*, 304 U.S. at 79 (cleaned up); *accord Rodriquez v. FDIC*, 589 U.S. 132, 133 (2020) (holding state law applies to determine allocation of federal tax refund resulting from consolidated tax return). Courts thus may not invent their own rule for when parties may be "deemed" to have given up property rights by releasing claims.

44. Accordingly, state-law contract principles govern whether a third-party release is consensual. *See, e.g.*, *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 684-85 (E.D.

Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, 665 B.R. 704, 720 (Bankr. D. Del. 2024) (recognizing that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *Arrowmill*, 211 B.R. at 506, 507 (explaining that a third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original). Because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *See In re Tonawanda Coke Corp*., 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 603 U.S. at 223). And "any such consensual agreement would be governed by state law." *See id.*

45.    Even if federal law applied, however, it would not lead to a different result. That is because "federal contract law is largely indistinguishable from general contract principles under state common law." *See Young v. BP Expl. & Prod., Inc. (In re Deepwater Horizon)*, 786 F.3d 344, 354 (5th Cir 2015) (cleaned up). *See also Deville v. United States*, 202 F. App'x 761, 763 n.3 (5th Cir. 2006) ("The federal law that governs whether a contract exists 'uses the core principles of the common law of contracts that are in force in most states.' . . . These core principles can be derived from the Restatements.") (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003)).

### C.      Under State Law, Silence is Not Acceptance

46.      The Debtors bear the burden to prove that their Plan is confirmable. *See In re American Cap. Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012). The Debtors have not met this burden because they have failed to establish that the third-party release is consensual under applicable state law, nor have they even contended that consent exists under state law.

47.      Here, the Plan provides that the governing law is the State of New Jersey. *See* Dkt. 942 at Section 19.17, page 84 of 85. Under New Jersey law, like in other states, an agreement to release claims—like any other contract—requires a manifestation of assent to that agreement.[18] *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration."); In re Hertz Corp., 120 F.4th 1181, 1192 (3d Cir. 2024) ("Contract law does not bind parties to promises they did not make."); *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 284 (N.J. 1992) (emphasis added) (internal quotation marks omitted) ("[i]t is requisite that there be an *unqualified acceptance* to conclude the manifestation of assent").

48.      Thus, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance."[19] *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). *See also Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he

---

[18] The Court may apply New Jersey law because no party has suggested that any other state's law applies. *See, e.g., Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits."). Nor has anyone suggested there would be a different outcome under the law of any other jurisdiction, so no choice of law is required. *See, e.g., In re Syntax-Brillian Corp.*, 573 F. App'x 154, 162 (3d Cir. 2014). Thus, the statement of one bankruptcy court that there is "no answer" to the choice of law question, *In re LaVie Care Cntrs., LLC*, No. 24-55507, 2024 WL 4988600, at *14 (Bankr. N.D. Ga. Dec. 5, 2024), is not true. Even if a choice of law had to be made, if such a choice is made difficult by the breadth of the third-party release that may be a reason not to approve the plan, but it is not an excuse to flout the court's obligation to make a choice of law if there is an actual conflict of laws. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985); *Cf. Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 669 (E.D. Va. 2022).

[19] New Jersey, like many states, follows the Restatement (Second) of Contracts § 69. *See, e.g. Weichert Co. Realtors*, 608 A.2d at 436; *James v. Global Tel*Link Corp.*, 852 F.3d 262, 266 (3d. Cir. 2017).

offeror cannot prescribe conditions so as to turn silence into acceptance."); *Jacques v. Solomon & Solomon P.C.*, 886 F. Supp. 2d 429, 433 n.3 (D. Del. 2012) ("Merely sending an unsolicited offer does not impose upon the party receiving it any duty to speak or deprive the party of its privilege of remaining silent without accepting."); *Elfar v. Wilmington Trust, N.A.*, No. 20-0273, 2020 WL 7074609, at *2 n.3 (E.D. Cal. Dec. 3, 2020) ("The court is aware of no jurisdiction whose contract law construes silence as acceptance of an offer, as the general rule."), *adopted by* 2020 WL 1700778, at *1 (E.D. Cal. Feb. 11, 2021); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.).

49.    There are only very limited exceptions to the "general rule of contracts . . . that silence cannot manifest consent." *See Patterson*, 636 B.R. at 686; *see also, e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer"). "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance.  Even in those cases the contract may be unenforceable under the Statute of Frauds." *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

50.    But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." *See id.*  And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *See id.* § 69, cmt. c; *see also Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out); *Jacques*, 886 F. Supp. 2d at 433 n.3.

20

### D.      Failing to Opt Out Does Not Provide the Required Affirmative Consent

51.     The Plan imposes a third-party release on anyone who is provided a ballot and does not return it with the opt-out box checked and anyone who is provided the Non-Voting Status Notice, which contains a Release Opt-Out Election Form, and does not return the Release Opt-Out Election Form.    In other words, the Debtor purports to impose an otherwise non-existent duty to speak on claimants regarding the offer to release non-debtors, and their silence—the failure to opt out—is "deemed" consent.  But under black-letter law, silence is not acceptance of the offer to release non-debtors.  *See, e.g.*, *Patterson*, 636 B.R. at 688 ("Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent.").

52.     A case from the Ninth Circuit illustrates the point.  In *Norcia v. Samsung Telecom. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017), and the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), the court held that a failure to opt out did not constitute consent to an arbitration agreement.  A consumer bought a Samsung phone and signed the Verizon Wireless Customer Agreement.  *See Norcia*, 845 F.3d at 1282.  The phone came with a Samsung warranty brochure that contained an arbitration provision but gave purchasers the ability to opt out of it without affecting the warranty coverage.  *See id*. The customer did not opt out.  *See id*.  When the customer later sued Samsung, Samsung argued that the arbitration provision applied.  *See id*. at 1282-83.

53.     The Ninth Circuit in *Norcia* held that the customer's failure to opt out did not constitute consent to arbitrate.  The court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer."  *See Norcia*, 845 F.3d at

1284 (quotation marks omitted).  *See also, Weichert Co. Realtors v. Ryan*, 128 N.J. at 436 ([s]ilence does not ordinarily manifest assent, but the relationships between the parties or other circumstances may justify the offeror's expecting a reply and, therefore, assuming that silence indicates assent to the proposal).  The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *See Norcia*, 845 F.3d at 1285 (quotation marks omitted).  This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless.  "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *See id*. at 1286 (quotation marks and citation omitted).

54.     The Ninth Circuit held that none of the exceptions to this rule applied.  *See Norcia*, 845 F.3d at 1284-85.  There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision.  *See id*. at 1286.

55.     Here, too, Debtors' creditors have not signed an agreement to release the non-debtors nor acted in any other manner to suggest that their silence manifests an intention to accept an offer to release the non-debtors.

### i.     Not voting and not opting out is not consent to release non-debtors

56.     Third-party releases cannot be imposed on those who do not vote and do not opt out.  *See Smallhold,* 665 B.R. at 709; *SunEdison*, 576 B.R. at 458–61; *Chassix*, 533 B.R. at 81–82; *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011).  442 B.R. 314, 355 (Bankr.

D. Del. 2011). This applies to both those creditors who simply abstain from voting and those creditors who are not entitled to vote on the Plan because they are deemed to accept or reject. There is no basis to infer consent by those who do not vote and are taking no action with respect to the Plan.

57. Even where there are conspicuous warnings that a party will be bound if they remain silent, that is not sufficient to recast a party's silence as consent to a third-party release. *See SunEdison*, 576 B.R. at 458–61. Creditors have no legal duty to vote on a plan, much less to respond to an offer to release non-debtors included in a plan solicitation. *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison,* 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence). Consent thus cannot be inferred from their silence because "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. c (1981). Nor can it "impose on him any duty to speak." *Id.* § 69 cmt. a.

58. Further, "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016). Consent thus cannot be inferred here because parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases. *See SunEdison*, 576 B.R. at 461. This is especially true for those whose votes are not solicited at all—but who are instead sent a notice informing them they cannot vote, along with a form to opt-out that they must return to avoid being bound by the third-party release.

23

59.    "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *See Chassix*, 533 B.R. at 81. "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor. But as to the creditor's rights against third parties—which belong to the creditor and not the bankruptcy estate—a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." *See Smallhold*, 665 B.R. at 721; *see also id.* at 719-20 (discussing *Chassix*). "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent. *See Emerge Energy Services, LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *See id.*

60.    Simply put, an "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *See In re Washington Mut., Inc.*, 442 at 355; *see also Chassix*, 533 B.R. at 81–82.

### ii.    Voting on a plan plus a failure to opt out does not manifest consent to a non-debtor release

61.    Voting to accept a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* Restatement (Second) of Contracts § 69 cmt. a (1981). Voting to approve a plan plus a failure to opt out of a third-party release is nothing more than silence with respect to

24

the offer to release claims against non-debtors.  The act of voting on a chapter 11 plan without

opting out is not conduct that "manifest[s] [an] intention that silence may operate as acceptance"

of a proposal that the creditor release claims against non-debtors.  *See* Restatement (Second) of

Contracts § 69 cmt. a.  Impaired creditors have a federal right under the Bankruptcy Code to vote

on a chapter 11 plan.  *See* 11 U.S.C. § 1126(a).  Merely exercising that right does not manifest

consent to release claims against non-debtors.

62.      Even more obviously, those who vote to reject the plan are not consenting to third-

party releases by failing to mark an opt-out box.  Not only is there no "mutual agreement" as to

the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan.

As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject a plan

should also be presumed to have rejected the proposed third-party releases that are set forth in the

plan. *The additional 'opt out' requirement, in the context of this case, would have been little more*

*than a Court-endorsed trap for the careless or inattentive creditor.*"  *See* 533 B.R. at 79 (emphasis

added).

### iii.      Smallhold's conclusion that voting plus a failure to opt out equals consent to a non-debtor release is incorrect

63.      One bankruptcy court has found that, in at least some circumstances, a failure to

opt out constitutes consent when a claimant votes—either to accept or reject a plan—but not if

they do not vote.  *See Smallhold*, 665 B.R. at 723.  The *Smallhold* court incorrectly reasoned that

because the act of voting on a debtor's plan is an "affirmative step" taken after notice of the third-

party release, failing to opt out binds the voter to the release.  *See id.*  But while voting is an

"affirmative step" with respect to the debtor's plan, it is not a "manifestation of intention that

silence may operate as acceptance" of a third-party release. RESTATEMENT (SECOND) OF

CONTRACTS § 69 cmt. a (1981) (emphasis added).  That is because "[t]he mere receipt of an

25

unsolicited offer does not impair the offeree's freedom of action or inaction," id.—in this case, the federal right to vote on a chapter 11 plan. 11 U.S.C. § 1126(a).  Nor does it "impose on him any duty to speak," RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a, such as by checking an opt out box.[20]    Thus, consent to release third-party claims (which are governed by nonbankruptcy law) cannot properly be inferred from a party's failure to check an opt-out box on a ballot to vote on the proposed treatment of claims against the debtor (governed by bankruptcy law).  *See supra*.

### E.    Opt Outs Cannot Be Imposed Based on a Procedural Default Theory

64.    Applicable state contract law cannot be disregarded on a procedural default theory, applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors if they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so.[21]  *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592, at *5-*6 (Bankr. D. Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at 716; *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022); *In re DBSD North America, Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011).  These courts reasoned that so long as the creditors received notice of a proposed non-debtor release and were informed of the

---

[20] The *Spirit* court concluded that "creditors entitled to vote who returned a ballot but did not check the opt-out box on that ballot also clearly manifested their consent to the Third-Party Releases."  *See In re Spirit Airlines, Inc.*, No. 24-11998, 2025 WL 737068, at *21 (Bankr. S.D.N.Y Mar. 7, 2025). That is wrong because an unsolicited offer of a third-party release cannot impose a duty to speak or impair the freedom to vote on a plan.  Further, the *Spirit* court erred in assuming that the failure to check an opt-out box on a ballot necessarily shows that a creditor "affirmatively chose" not to check the box. *See id.* at *21. " When the circumstances are equally consistent with either of two facts, neither fact may be inferred."  *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016).  And a failure to check an opt-out box is equally consistent with inadvertence or lack of understanding.

[21] Although the court in *Spirit* disclaimed relying on a default theory, *Spirit Airlines,* 666 B.R. at 715, it based its holding on the same rationale: that a party may be deemed to consent based on notice and a failure to respond.

consequences if they did not opt out or object to that release, there is no unfairness or deprivation

of due process from binding them to the release.  *Cf. Smallhold*, 665 B.R. at 708 (describing this

reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party

release to be entered by default").

65.      A fuller explanation of this theory was articulated prior to the *Purdue* ruling in *In

re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022).  The *Mallinckrodt* court stated

that "the notion that an individual or entity is in some instances deemed to consent to something

by their failure to act is one that is utilized throughout the judicial system."  *See id*.  "When a party

to a lawsuit is served with a complaint or a motion, they need to file an answer or otherwise

respond, or a judgment is automatically entered against them."  *See id*. at 879.  The court reasoned

that "[t]here is no reason why this principle should not be applied in the same manner to properly

noticed releases within a plan of reorganization."  *See id*.

66.      This is wrong.  First, when a party in litigation is bound to a result based on a failure

to timely respond, it is not because the defaulting party has *consented* to an adverse ruling.  Rather,

"failure to make timely assertion of [a] right before a tribunal having jurisdiction to determine it"

results in *forfeiture* of the right.  *See United States v. Olano*, 507 U.S. 725, 731 (1993).  Forfeiture,

unlike waiver, is not an intentional relinquishment of a known right.  *See id*. at 733.  *Cf. Smallhold*,

665 B.R. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat

imprecise, way.  It may be more accurate to say that the counterparty forfeits its objection on

account of its default.").  Forfeiture principles thus do not show consent.

67.      Second, there is no basis to hold that parties have forfeited claims against non-

debtor third parties based on their silence in response to a debtor's chapter 11 plan.  No one has

submitted the released claims for adjudication by the bankruptcy court.  *See Olano*, 507 U.S. at

731.

68.    And under *Purdue*, imposition of a nonconsensual non-debtor release is not

available relief through a debtor's chapter 11 plan.  *See Purdue,* 603 U.S. at 215-227 & n.1; *see

also Smallhold*, 2665 B.R. at 709 ("After *Purdue Pharma*, a third-party release is no longer an

ordinary plan provision that can properly be entered by 'default' in the absence of an objection.").

It is therefore "no longer appropriate to require creditors to object or else be subject to (or be

deemed to 'consent' to) such a third-party release."  *See Smallhold*, 665 B.R. at 719.

69.    The Supreme Court's *Purdue* decision rejected a fundamental premise of the

procedural default theory—that a bankruptcy proceeding legally could lead to the destruction of

creditors' rights against non-debtors, so they had best pay attention lest they risk losing those

rights.  *See Smallhold*, 665 B.R. at 708-09; *see also id*. at 708 ("The possibility that a plan might

be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the

duty to speak up if it objected to what the debtor was proposing.").  The courts that relied on this

procedural-default theory had reasoned that non-debtor releases were no different from any other

plan provision to which creditors had to object or risk forfeiture of their rights, because pre-*Purdue*

a chapter 11 plan could permissibly include nonconsensual, non-debtor releases under certain

circumstances.  *See id*. at 717-18.  As the *Smallhold* court explained, however, under the default

theory, a plan's opt-out provision functions not as a method to secure consent, but rather serves as

"an administrative shortcut to relieve those creditors of the burden of having to file a formal plan

objection."  *See id*. at 709; *see also id*. at 718 ("In this context, the word 'consent' is used in a

shorthand, and somewhat imprecise, way.  It may be more accurate to say that the counterparty

forfeits its objection on account of its default.").

28

70.    But "[u]nder established principles," courts may enter relief against a party who procedurally defaults by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff" in contested litigation. *See id*. at *2; *see also id*. at *13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so."); *see also Thomson v. Wooster*, 114 U.S. 104, 113 (1885) (holding a decree *pro confesso* may only be entered if it "is proper to be decreed"); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered.") (cleaned up).

71.    "[After *Purdue*], that is no longer the case in the context of a third-party release." *See Smallhold*, 665 B.R. at 722.  A third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."  *See id*.  "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *See id*.  That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties.  Because imposition of a nonconsensual non-debtor release is not relief available through a debtor's chapter 11 plan, it is not "appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release."  *See id*. at 719-20.

72.    Because *Purdue* establishes that a *non*consensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default."  *See id*. at 709.  And besides the now-

discredited default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny." *See id*. Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-debtor release.[22] Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required. *See id*. at 720 (emphasis added).

73.    In sum, the failure to opt out does not constitute the affirmative consent necessary to reflect unqualified acceptance by holders of Claims or Interests to the third-party releases the Plan seeks to provide to the many so-called "Released Parties." As a result, the Debtor does not meet its state-law burden of establishing that the members of the Classes in the Plan have agreed to release their property rights and have that release memorialized in the Plan. *See Weichert*, 608 A.2d at 284. Nothing in the Bankruptcy Code authorizes bankruptcy courts to extinguish claims by inferring consent outside the bounds of state law. It is especially egregious to do so here to parties that are not entitled to vote on the Plan. The Plan's third-party releases are therefore non-consensual, and so are prohibited by *Purdue*.

## III.    The Debtor Releases in the Plan Are Overbroad

74.    The Plan provides for a release by the Debtors to the Released Parties. *See* Dkt. 942 at Section 15.2(a).

75.    The Plan does not establish that each of the proposed Released Parties are providing adequate consideration in exchange for receiving such releases. In addition, certain persons included in the definition of Released Parties do not appear to be entitled to such releases under

---

[22] For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory. *See id*. at 716 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

applicable case law.  Many individuals and entities are also included in the definition of Released

Parties that are unknown parties.[23]  Further, estate fiduciaries are not only receiving an exculpation

under the Plan but are also receiving a release from the Debtors.

76.     In *In re Zenith Elecs. Corp.*, the Court identified five factors that are relevant to

determine whether a debtor's release of a non-debtor is appropriate:

> (1)     an identity of interest between the debtor and non-debtor such that a suit
> against the non-debtor will deplete the estate's resources;
>
> (2)     a substantial contribution to the plan by the non-debtor;
>
> (3)     the necessity of the release to the reorganization;
>
> (3)     the overwhelming acceptance of the plan and release by creditors and
> interest holders; and
>
> (4)     the payment of all or substantially all of the claims of the creditors and
> interest holders under the plan.

*See Zenith*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (*citing Master Mortgage Inv. Fund, Inc.*, 168

B.R. 930, 937 (Bankr. W.D. Mo. 1994). These factors are neither exclusive nor conjunctive

requirements but provide guidance in the court's determination of fairness. *See Master Mortgage*,

168 B.R. at 935 (finding there is no "rigid test" to be applied in every circumstance and that the

five factors are neither exclusive, nor conjunctive).

77.     The first *Zenith* factor requires an "identity of interest between the debtor and the

third-party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will

deplete the assets of the estate."  *See In re Spansion, Inc.*, 426 B.R. 114, n. 47 (Bankr. D. Del.

---

[23] Included in the definition of Released Parties are "any others agreed to between the Committee and the Debtors, in
any capacity, subject to approval by the Committee based on the results of its investigation and (if required by the
Committee) execution of an agreement satisfactory to the Committee to cooperate with the Liquidating Trust and the
Direct Claims Trust in their investigation and prosecution of claims" and "any other party, subject to approval by the
Committee, which may be withheld for any reason or conditioned on execution of any appropriate agreement to
cooperate with the Liquidating Trust and the Direct Claims Trust in their investigation and prosecution of claims, for
whom the Debtors determine a release is appropriate."  *See* Dkt. 942 at Section 15.2(a), pages 24 and 25 of 85.

2010), *citing Zenith*, 241 B.R. at 110.  An identity of interest exists when, among other things, the debtor has a duty to indemnify the non-debtor receiving the release.  *See Wash. Mut.*, 442 B.R. at 347 (recognizing that indemnification may create an identity of interest thereby satisfying the first factor of *Zenith*).  Here, it is unclear whether an identity of interest exists between the Debtors and each of the Released Parties.

78.    The second *Zenith* factor involves whether the non-debtor party benefiting from the release made a substantial contribution of assets to the debtor's reorganization.  *See In re Congoleum Corp.*, 362 B.R. 167, 193 (Bankr. D.N.J. 2007).  In considering releases, substantial contribution does not include contributions to the reorganization related to operational restructuring or negotiating for the financial restructuring.  *See In re Genesis Health*, 266 B.R. at 606-7 ("the officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' to the reorganization.").  There is scant evidence that each of the Released Parties provided a substantial contribution of assets.

79.    As to the third *Zenith* factor, no information is provided to support the contention that all of the releases are necessary to a reorganization as this is in fact a liquidation.

80.    The fourth *Zenith* factor concerning acceptance of the plan is premature and cannot be assessed at this time as the Debtors have not filed a certification of ballots.

81.    The fifth *Zenith* factor is not satisfied as it does not appear that unsecured creditors will receive all or substantially all of their claims.  Accordingly, these factors do not support the Debtor Releases.

82.    Additionally, estate fiduciaries receive an exculpation for their actions or inactions between the Petition Date and the Effective Date under the Plan.  *See* Dkt. 942 at Section 15.1,

page 66 of 85. The estate fiduciaries do not satisfy the *Zenith* factors and should only be granted

an exculpation for their actions or inactions between the Petition Date and the Effective Date, not

a release from the Debtors.

## IV. The Exculpation Provision in the Plan is Overbroad and Exceeds the Limitation of Third Circuit Law

83.    The Plan is not confirmable for the separate and independent reason that it includes

an impermissible exculpation provision.  To the extent applicable law authorizes exculpation

beyond the provisions of Bankruptcy Code section 1125(e), the Plan's exculpation provision

contravenes Third Circuit precedent because it is not limited to estate fiduciaries.  *See In re PWS*

*Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000).

84.    The Plan's definition of Exculpated Parties is overbroad as it includes "any others

agreed to between the Committee and the Debtors, in any capacity, subject to approval by the

Committee based on the results of its investigation and (if required by the Committee) execution

of an agreement satisfactory to the Committee to cooperate with the Liquidating Trust and the

Direct Claims Trust in their investigation and prosecution of claims" and "any other party, subject

to approval by the Committee, which may be withheld for any reason or conditioned on execution

of any appropriate agreement to cooperate with the Liquidating Trust and the Direct Claims Trust

in their investigation and prosecution of claims, for whom the Debtors determine a release is

appropriate."  *See* Dkt. 942 at Section 2, page 19 of 85.

85.     It is unclear as to whether any others agreed to by and between the Debtors and the

Committee will be in fact estate fiduciaries entitled to an exculpation.

86.    In addition, through the Plan's exculpation provision, the "Exculpated Parties" are

granted the protection and benefits provided pursuant to section 1125(e) of the Bankruptcy Code.

*See* Dkt. 942 at Section 15.1, page 66 of 85.  However, section 1125(e) provides protection to a

"person that solicits acceptance or rejection of a plan[.]"  *See* 11 U.S.C. § 1125(e).  Here, it is

unclear as to who solicited acceptances and rejections under the Plan other than the Debtors and

their professionals.  Unless they can show that they participated in the solicitation of acceptances

and rejections under the Plan, such protection should not be provided to the Committee or any

other "Exculpated Parties" later determined to be exculpated by and between the Debtors and the

Committee.

87.     Additionally, the Exculpation Provision shields the Exculpated Parties in ways

inconsistent with Third Circuit precedent, including *PWS*, because it seeks to "deem" the

Exculpated Parties as having participated in good faith, which then swallows the exception that

limits exculpatory relief for "any action (or inaction) constituting willful misconduct, fraud, bad

faith, or gross negligence (in each case subject to determination by final order of the Bankruptcy

Court))."  *See* Dkt. 942 at Section 15.1, page 66 of 85.

88.     In light of the foregoing, the Plan cannot be confirmed unless the exculpation

provision is stricken or otherwise amended to be made consistent with applicable law.

## V.     The Injunction Provision in the Plan is Overbroad and Impermissible

89.     The Plan includes overbroad and impermissible injunction language for a

liquidating plan.  Pursuant to Section 524(a)(3) of the Bankruptcy Code, confirmation of a plan

does not operate as an injunction.  Only a discharge operates as an injunction, and as this Plan is a

liquidating plan, the Debtor is not entitled to a discharge.  Instead, pursuant to Section 362(c) of

the Bankruptcy Code, the automatic stay remains in effect until the earlier of the time the case is

closed or the case is dismissed.  Additionally, pursuant to Section 1141(a), the provisions of a

confirmed plan bind all parties, including debtors and creditors, to the terms of a plan.

90.     Because the Bankruptcy Code protects the Debtor by continuing the automatic stay

until the earlier of entry of a discharge or the case is closed (11 U.S.C. § 362(c)), and by binding

all parties to the terms of the Plan (11 U.S.C. § 1141(a)), the U.S. Trustee submits that Article 15.3 is unnecessary and should be removed or revised.

## VI.    The Court Should Not Waive the Rule 3020 Stay

91.      The Debtor's request for a waiver of the 14-day stay under Fed R. Bankr. P. 3020(e) is inappropriate and should be denied.

92.      Federal Rule of Bankruptcy Procedure 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." *See* Fed. R. Bankr. P. 3020(e).  The Committee Notes explain that subsection (e) was "added to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan under chapter 9 or chapter 11 of the Code before the plan is implemented and an appeal becomes moot." *See id.*

93.      Plan proponents frequently include stay waiver provisions to invoke the doctrine of "equitable mootness" as a sword to evade appellate review.  *See In re Chemtura Corp.*, No. 09–11233, 2010 WL 4607822, at *1 (Bankr. S.D.N.Y. Nov. 3, 2010).  Courts, however, should be "wary of wholly denying any party at least an opportunity to seek a stay to avoid the mooting of its appeal" in deciding whether to waive Rule 3020(e)'s 14-day stay.  *See id.*; *see also In re Adelphia Comm. Corp.*, 368 B.R. 140, 282 (Bankr. S.D.N.Y. 2007) (denying request to waive automatic stay because "fairness to [objecting creditors] . . . requires that I not take an affirmative step that would foreclose all opportunities for judicial review").

94.      "An orderly bankruptcy process depends on a concomitantly efficient appeals process," *see In re Syncora Guarantee Inc.*, 757 F.3d 511, 517 (6th Cir. 2014) (citations omitted), and a waiver of the 14-day stay undermines this goal by forcing parties to seek an emergency stay.

95.    Debtors have presented no exigencies that would justify departing from the Rule's imposition of an automatic 14-day stay and impeding the ability to obtain appellate review. The Court should thus deny their request to waive Rule 3020(e)'s stay.

**VII.    The Overbroad Language in the Plan Concerning Compromise, Settlement, Release and Discharge Must be Removed**

96.    Pursuant to the Plan, a Holder of Allowed Priority Non-Tax Claim (Section 9.1(b)) and a Holder of Allowed Other Secured Claim (Section 9.2(b)) are exchanging their claims in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such claims. *See* Sections 9.1(b), 9.2(b), and 3.1, pages 28, 29, 48 and 49 of 85.

97.    These provisions should be revised to remove "compromise, settlement, release and discharge." The Holder of Allowed Priority Non-Tax Claim and the Holder of an Allowed Other Secured Claim have not agreed to a compromise or to settle their claims. In addition, not all creditors have agreed to release their claims. Further, the Debtors are not entitled to a discharge in this case. Instead, the language in these provisions should simply state that holders of claims are exchanging their claims in full and final satisfaction of such claims.

**VIII.    The Statutory Quarterly Fee Provisions Must be Revised in the Plan**

98.    Sections 3.1, 7.2(a) and 7.2(c) of the Plan provide for the payment of statutory quarterly fees pursuant to 11 U.S.C. § 1930(a)(6). *See* Dkt. 942 at Sections 3.1, 7.2(a) and 7.2(c), pages 28 and 46 of 85. The language in the Plan provides that statutory quarterly fees are Administrative Claims pursuant to Section 2 of the Plan, that such statutory quarterly fees will be paid 100% as and when due under applicable law pursuant to Sections 3.1 and 7.2(a) of the Plan, and that all statutory quarterly fees that have not been paid will be paid on or before the Effective Date of the Plan pursuant to Section 7.2(c). *See id.*

99.     The U.S. Trustee requests the language contained in Sections 3.1, 7.2(a) and 7.2(c) be revised as follows:  "All statutory quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) payable on or before the Effective Date shall be paid by the Debtors in full in cash on the Effective Date.  After the Effective Date, the Debtors, any entity making disbursements on behalf of any Debtors, including the Wind-Down Officer, the Liquidating Trust and Liquidating Trustee, and the Direct Claims Trust and Direct Claims Trustee (solely in their capacity as such), or any entity making disbursements on account of an obligation of any Debtors, including the Wind-Down Officer, the Liquidating Trust and Liquidating Trustee, and the Direct Claims Trust and Direct Claims Trustee (solely in their capacity as such), shall be jointly and severally liable to pay any and all statutory quarterly fees in full in cash when due and payable in these Chapter 11 Cases for each quarter (including any fraction thereof) until the earliest of that Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Debtors, the Wind-Down Officer, the Liquidating Trustee, and the Direct Claims Trustee shall cause to be filed with the Bankruptcy Court post-confirmation quarterly reports for these Chapter 11 Cases for each quarter (including any fraction thereof) that these Chapter 11 Cases are pending, using UST Form 11-PCR.  The U.S. Trustee shall not be required to file any proof of claim or any other request(s) for payment with respect to statutory quarterly fees in these Chapter 11 Cases and shall not be treated as providing any release under the Plan.  The provisions of this paragraph shall control notwithstanding any other provision(s) in the Plan to the contrary."

## IX.    Substantial Consummation Must be Revised in the Plan

100.    Section 19.15 of the Plan provides that Substantial Consummation will be deemed to occur on the Effective Date.  *See* Dkt. 942 at Section 19.15, page 83 of 85.

101.    However, "Substantial Consummation" under the Bankruptcy Code "means:  (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan."  *See* 11 U.S.C. § 1101(2).  Unless distributions commence on the Effective Date, the Plan cannot be deemed to be substantially consummated on the Effective Date.

102.    As "Substantial Consummation" can only occur if each of the three parts of the statute have been met, the U.S. Trustee requests that the provision in the Plan concerning "Substantial Consummation" be replaced with the statutory definition.

## RESERVATION OF RIGHTS

103.    The U.S. Trustee reserves all of his rights and objections regarding any and all future amendments to the Plan.  The U.S. Trustee reserves the right to comment on and object to the proposed form of confirmation order.  The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, among other things, complement, supplement, augment, alter or modify this Objection and reservation of rights, assert any objection, file any appropriate motion, or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

38

**WHEREFORE**, the U.S. Trustee respectfully requests that this Court sustain the Objection and either deny confirmation or require revisions to be made to the Plan and grant such other relief it deems just and proper.

Respectfully submitted,

ANDREW R. VARA
UNITED STATES TRUSTEE
REGIONS 3 & 9

By: */s/ Jeffrey M. Sponder*
Jeffrey M. Sponder
Trial Attorney

Dated: November 18, 2025