**DENTONS US LLP**

Lauren Macksoud (admitted)
101 JFK Parkway
Short Hills, NJ 07078
Telephone: (973) 912-7100
Facsimile: (973) 912-7199
Email: lauren.macksoud@dentons.com

Tania M. Moyron (admitted pro hac vice)
Van C. Durrer, II (admitted pro hac vice)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: tania.moyron@dentons.com
        van.durrer@dentons.com

John D. Beck (admitted pro hac vice)
Sarah M. Schrag (admitted pro hac vice)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
Email: john.beck@dentons.com
        sarah.schrag@dentons.com

Counsel for Debtors and
Debtors in Possession

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Email: frankoswald@teamtogut.com

Albert Togut (admitted pro hac vice)
Eitan Blander (admitted pro hac vice)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Email: altogut@teamtogut.com
        eblander@teamtogut.com

Counsel for Debtors and
Debtors in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>Powin, LLC, *et al.*,<br><br>Debtors. [1] | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504], (iii) PEOS Holdings, LLC [5476], (iv) Powin China Holdings 1, LLC [1422], (v) Powin China Holdings 2, LLC [9713], (vi) Charger Holdings, LLC [15241], (vii) Powin Energy Ontario Storage, LLC [8348], (viii) Powin Energy Operating Holdings, LLC [2495], (ix) Powin Energy Operating, LLC [6487] (x) Powin Energy Storage 2, Inc. [9926]; (xi) Powin Energy Ontario Storage II LP [5787]; (xii) Powin Canada B.C. Ltd. [2239]; and (xiii) Powin EKS SellCo, LLC [9110]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

**DEBTORS' RESPONSE TO THE MOTION OF AD HOC CUSTOMER GROUP FOR ENTRY OF AN ORDER (I) COMPELLING THE DEBTORS TO ASSIGN OEM WARRANTIES AND GUARANTIES AND (II) GRANTING RELATED RELIEF AND JOINDERS THERETO**

BESS RemainCo, LLC f/k/a Powin, LLC and the affiliated debtors and debtors in possession (collectively, the "Debtors") under chapter 11 of title 11 of the United States Code §§ 101 et seq. (the "Bankruptcy Code"),[2] in the above-referenced chapter 11 cases (the "Chapter 11 Cases"), file this response to the *Motion of Ad Hoc Customer Group for Entry of an Order (I) Compelling the Debtors to Assign OEM Warranties and Guaranties and (II) Granting Related Relief* [Docket No. 956] (the "Motion") filed by the Ad Hoc Customer Group (as defined in the Motion), which motion was joined by other parties (the parties joining the Motion are the "Joining Parties,"[3] and together, the Joining Parties, with the Ad Hoc Customer Group, are the "Rejected Contract Counterparties").

## PRELIMINARY STATEMENT

1.      The Rejected Contract Counterparties admit that they seek to enforce the terms – specifically the assignment of warranties – of their rejected contracts.  The Rejected Contract Counterparties do not cite a single case or statute that supports compelling performance of a rejected contract.  This is because this relief is unprecedented and has no basis in the Bankruptcy Code.  In fact, it flies against the entire point of section 365, which allows a debtor to reject a

---

[2] All references to "§" and "section" are to sections of the Bankruptcy Code unless otherwise specified herein.  All references to "Rules" are to the Federal Rules of Bankruptcy Procedure.

[3] The Joining Parties are: AMP Solar US Services LLC n/k/a PureSky Services LLC [Docket No. 980]; EPC Services Company [Docket No. 956]; Mitsubishi Power Americas, Inc. and Prevalon Energy LLC [Docket No. 1022]; DTE Electric Company [Docket No. 1024]; Leeward Renewable Energy, LLC, on Behalf of Rabbitbrush Solar, LLC, Chaparral Springs, LLC, and Antelope Valley BESS, LLC [Docket No. 1025]; Longroad Development Company, LLC, on Behalf of Serrano Solar, LLC, Sun Streams PVS, LLC, and Sun Streams Expansion, LLC [Docket No. 1026]; EDF Power Solutions, Inc. [Docket No. 1028]; esVolta, LP [Docket No. 1029]; and Galp Parques Fotovoltaicos de Alcoutim, Lda [Docket No. 1035].

burdensome contract.  Once rejection occurs, a counterparty cannot selectively enforce a contract and compel the debtor to further burden its estate.

2.       The equities also do not favor the Rejected Counterparties, who did not pay for post-petition services the Debtors provided yet still seek to compel the Debtors' performance.  The Debtors are negotiating in good faith to reach commercial solutions with their former customers, including warranty assignments.  However, the Rejected Counterparties have chosen to litigate without any supporting precedent or law.  Simply put, the dispute here is a commercial matter, not a contested matter, and the Motion should be denied.

## **BACKGROUND**

3.       As described in the *Declaration of Gerald Uzzi in Support of Emergency First Day Motions of the Debtors* [Docket No. 13] (the "First Day Decl."), the Debtors sold and serviced battery storage systems ("BESS(es)") as a part of their pre-petition business.  In the course of their business, the Debtors became parties to certain warranties for BESSes (together, with related guaranties, the "Warranties").  First Day Decl. ¶¶ 13; 17 ("At a high level, Powin's [pre-petition] business model ha[d] two lines of business: (a) the engineering and installation of BESS, which are governed by various energy supply agreements (each, an "ESA"); and (b) the warranties, servicing and maintenance of BESS, which are governed by various long term servicing agreements (each, an 'LTSA')).

4.       On June 9, 2025 (the "Petition Date"),[4] the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

---

[4] Powin Project LLC filed for voluntary relief under Chapter 11 of the Bankruptcy Code on June 9, 2025. Powin Canada B.C. Ltd., Powin Energy Ontario Storage II LP, and Powin Energy Storage 2, Inc., filed on June 22, 2025, Powin EKS SellCo, LLC filed on October 10, 2025, and the remaining Debtors filed on June 10, 2025.

5.      On June 10, 2025, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Enter Into New Customer Program with Existing Customers and (II) Granting Related Relief* [Docket No. 15] (the "Customer Program Motion") seeking approval of an LTSA Program (as defined in the Customer Program Motion) to restructure their contractual arrangements with their customers.  On June 13, 2025 the Court entered an order granting the Customer Program Motion.  Docket No. 62.

6.      On June 17, 2025, the Debtors filed their *Omnibus Motion of the Debtors for Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief* [Docket No. 88] (the "Rejection Motion") and identified contracts, including those of the Rejected Counterparties, to be rejected (the "Rejected Contracts").  The Debtors' Chief Restructuring Officer testified that continued performance under these contracts was burdensome for the estates.  Docket No. 88 at pp. 22-25 (the "Uzzi Rejection Declaration").

7.      The Ad Hoc Customer Group, certain Joining Parties, and other customers filed objections and responses to the Rejection Motion.  *See e.g.*, Docket Nos. 287; 288; 295; 296.  In the objections, parties took the position that assignment of Warranties needed to be a condition of rejection.  *See e.g.*, Docket No. 295 (esVolta/EDF objection) at ¶ 16 (seeking transfer of Warranties).

8.      On July 8, 2025, the Ad Hoc Customer Group filed their *Emergency Motion of Ad Hoc Customer Group for Entry of an Order (I) Granting Adequate Protection Under Section 363(e) of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 297] (the "First Ad Hoc Motion").  In the First Ad Hoc Motion, the Ad Hoc Customer Group requested that the Court order the Debtors continue to perform under the Rejected Contracts until there was a "seamless transition of 24/7 operational and maintenance control of the BESS consistent with the Customers'

respective rights and interests under the Contracts …"  Docket No. 297-1 (Proposed Order) at ¶
5(iii).  The Debtors have responded to the First Ad Hoc Motion [Docket No. 605], and this motion
is set for hearing on November 25, 2025, at 11:30 a.m.  Docket No. 983. [5]

9.      On August 1, 2025, the Debtors filed a reply in support of their Rejection Motion,
and unequivocally stated that customers were not *entitled* to Warranty assignments:

> As practicable, the Debtors are willing to cooperate with th[e]
> request [for Warranty assignments], however, this is not a section
> 365(n) matter, and a Customer is not entitled to impose upon the
> Debtors the burdensome requirement of performance after rejection.

Docket No. 605 [6] at ¶ 36.

10.     The Court held a hearing on the Rejection Motion on August 6, 2025.  At this
hearing, customers raised the issues of transfer of warranties.  *See* Exhibit 1 – Transcript of August
6 Hearing.  Counsel for Spark Power Renewables US Inc. ("Spark") also appeared and objected
to the court ordering any assignment of warranties:

> MR. DUGGAN (Counsel for Spark): … EDF and EsVolta …
> [have] asked for an assignment and transfer of the --
>
> THE COURT: Warranties.
>
> MR. DUGGAN: -- unidentified warranties. There's no assumption
> and assignment here. To the extent the contract with my client
> ultimately gets assumed and warranties are part of it, we can have
> at it. But to have the rejection conditioned upon an assignment of a
> collateral agreement, we have no privity with these people. If they
> believe they're third-party beneficiaries or they have some sort of
> State Court rights, they can have at it. But it's not a party here and
> we'd like to make sure that that's not going to be included in the
> rejection order, some sort of assignment of these warranty claims.
>
> THE COURT: All right. Thank you. Fair enough.

---

[5] West Warwick Energy Storage 1 LLC, West Warwick Energy Storage 2 LLC, and West Warwick Energy Storage 3
LLC have withdrawn their participation in the First Ad Hoc Motion.  Docket No. 902.
[6] This filing was an omnibus response to the First Ad Hoc Motion and also a reply in support of the Rejection Motion.

*See* **Exhibit 1** – Transcript of August 6 Hearing at 29:16-30:2.  The Court did not issue an order regarding the Warranties at this hearing.  *Id.*

11.     At an August 18, 2025 hearing, the Court approved the sale of substantially all of the Debtors' assets (the "Sale") to FlexGen Power Systems, LLC ("FlexGen").  *See* Docket No. 751  (the "Sale Order" with the appended asset purchase agreement the "APA").  FlexGen did not assume the Rejected Contracts in the Sale Order.  *Id.*  In the Sale, FlexGen did acquire "all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, or products sold, to Sellers to the extent such equipment or products are included in the Purchased Assets and/or Assumed Liabilities …"  APA at § 2.1(k).

12.     Up and until the closing of the Sale, the Debtors provided services under the Rejected Contracts. However, since the Petition Date, the Debtors were not and have not been compensated for these services.

13.     The Court held a status conference on September 3, 2025, and counsel for the Ad Hoc Customer Group acknowledged that the assignment of Warranties was an open, disputed issue:

> MS. KANZER (Counsel for the Ad Hoc Customer Group): …
> [T]he request is to have an assignment [of Warranties] to the extent
> that it is assignable.  So, to the extent that the warranty agreement
> that the Debtors have with a supplier is assignable, we're asking
> for that to be assigned to us.
>
> THE COURT: All right.  Then we'll wait --
>
> MS. KANZER: Okay.
>
> THE COURT: -- and we'll see.  Thank you.

**Exhibit 2** – Transcript of September 3 Hearing at 12:24-25:14.

6

14.     On September 9, 2025, the Court granted the Rejection Motion, and approved rejection of the Rejected Contracts.  Docket No. 843 (the "Rejection Order").  The Rejection Order preserved arguments raised at the August 6 hearing, including arguments for transfer of the Warranties, but the Rejection Order did not order the Debtors to take any action relating to the Warranties.  *Id.*

15.     The Debtors have also sent invoices to former customers, including Rejected Contract Counterparties, for unpaid postpetition services.  The Debtors have also discussed executing a quitclaim assignment of warranty with Rejected Contract Counterparties and have sought appropriate consideration to the estates.  The Debtors will continue to engage with the Rejected Contract Counterparties to reach commercial resolutions.

16.     The Ad Hoc Customer Group has filed proofs of claim for rejection damages, including for "contingent and unliquidated claims on account of repairs the Customers may be required to pay for that would otherwise have been covered by the [applicable] Warranties." Motion at ¶ 19.

17.     The Debtors (subject to their business judgment) have and will provide customers files and/or access to their data-room to provide information related to Rejected Contracts and Warranties.  On October 20, 2025, the Debtors provided the Ad Hoc Customer Group access to such responsive documents in their possession.[7]

---

[7] The Ad Hoc Customer Group requested:

"1) [A]ll documents providing OEM warranties or other warranties or guarantees (collectively, the "Warranties") applicable to any BESS systems or equipment purchased by any of Lone Star Solar, LLC, Idaho Power Company, West Warwick Energy Storage 1, LLC, West Warwick Energy Storage 2, LLC, and West Warwick Energy Storage 3, LLC (collectively, the 'Powin Customers');
(2) all documents setting forth the term of the Warranties applicable to any BESS systems or equipment purchased by the Powin Customers; and
(3) all documents describing the assignability of the Warranties applicable to any BESS systems or equipment purchased by the Powin Customers."

18.     On November 6, 2025, Spark filed an objection to the Motion [Docket No. 1030] (the "Spark Objection") and objected to the assignment of warranties from Spark's MSA (as defined in the Spark Objection).

## ARGUMENT

### A. The Rejected Counterparties Cite no Law to Support their Effort to Enforce a Rejected Contract

19.     The Court approved the rejection of the Rejected Contracts because they were burdensome to the estates to perform.  *See* Rejection Order; 11 U.S.C. § 365(a); Uzzi Rejection Declaration.  In spite of this, the Rejected Counterparties seek enforcement of these Rejected Contracts.  *See e.g.*, Motion at ⁋ 14 (the applicable Rejected Contracts "provide that Powin is obligated to assign the OEM Warranties to the applicable Customer following either Commissioning, expiration of the Warranty Period (each as defined in the ESAs), or termination of such ESAs, as applicable.").  For authority, they cite no cases and only one statute – section 105:

> 6.     The statutory bases for the relief requested herein is section 105(a) of title 11 of the United States Code (the "***Bankruptcy Code***").

*See* Motion at ⁋ 6.

### B. The Debtors Cannot be Compelled to Perform Under Selective Provisions of the Rejected Contracts.

20.     "[Section] 105(a) alone cannot justify [a court granting relief] because it serves only to 'carry out' authorities expressly conferred elsewhere in the code."  *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 216, n. 2, 144 S. Ct. 2071, 2082, 219 L. Ed. 2d 721 (2024) (citing 11 U.S.C. § 105(a) (other citations omitted)).  Further, "[w]hen the Bankruptcy Code provides a specified means for a debtor to obtain a specific form of equitable relief, those standards and

procedures must be observed," and relief may not be granted under section 105 in contravention of another section of the Bankruptcy Code. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004), as amended (Feb. 23, 2005).

21.     Here, under section 365, upon rejection of a contract, the counterparty "bec[omes] entitled to a damage claim against the estate and [is] barred from specifically enforcing the terms of the agreement against the debtor." *In re Ducane Gas Grills, Inc.*, 320 B.R. 324, 335 (Bankr. D.S.C. 2004) (citing 11 U.S.C. § 365 (other citations omitted)). Here, the Ad Hoc Customer Group have filed proofs of claim, and recovery of damages, not specific performance, is their redress for any alleged breach relating to Warranties.[8] The Bankruptcy Code is clear, once a debtor rejects a contract, they do not have to perform under it. Any remedy for a counterparty is by filing a rejection damages claim, not seeking an affirmative injunction.

### C. Other Parties have Objected to Assignment of the Warranties.

22.     The Ad Hoc Customer Group is incorrect that there is "no cost" to the Debtors for the assignment of the Warranties, because assignment, like any commercial action, includes risk. Motion ⁋ 17. For instance, Spark Power has objected to the assignment of Warranties of EDF/esVolta. The Debtors are liquidating and seek to minimize any claims against the estates. There is no reason for the estates to absorb risk for no return consideration.

### D. The Debtors Will Negotiate with Counterparties to Reach Commercially Reasonable Terms

23.     The Debtors have been clear that they will negotiate with former counterparties to reach business solutions. This is a two-way street. Here, the Rejected Counterparties have refused to pay the Debtors for post-petition services by claiming that the Rejected Contracts were rejected.

---

[8] Further section 365(n)(1)(B) (which the Ad Hoc Customer Group has introduced in the First Ad Hoc Motion) specifically forbids a licensee, after rejection, to compel "specific performance of such contract." 11 U.S.C. § 365(n)(1)(B).

This is incongruous with them demanding that the Debtors perform by transferring the Warranties. At the end of the day, and as shown by the lack of precedent in the Motion and Joinders, this is a commercial opportunity to be solved in the boardroom, not a matter to be litigated in the courtroom.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court (i) deny the Motion and (ii) grant the Debtors such other and further relief is just and proper under the circumstances.

[*Signature Page Follows*]

Dated: November 18, 2025                    **DENTONS US LLP**

                                           */s/ Lauren Macksoud*
                                           Lauren Macksoud (admitted)
                                           101 JFK Parkway
                                           Short Hills, NJ 07078
                                           Telephone:  (973) 912-7100
                                           Facsimile:  (973) 912-7199
                                           Email:   lauren.macksoud@dentons.com

                                           Tania M. Moyron (admitted pro hac vice)
                                           Van C. Durrer, II (admitted pro hac vice)
                                           601 S. Figueroa Street #2500
                                           Los Angeles, CA 90017
                                           Telephone:  (213) 623-9300
                                           Facsimile:  (213) 623-9924
                                           Email:  tania.moyron@dentons.com
                                                   van.durrer@dentons.com

                                           John D. Beck (admitted pro hac vice)
                                           Sarah M. Schrag (admitted pro hac vice)
                                           1221 Avenue of the Americas
                                           New York, NY 10020-1089
                                           Telephone:  (212) 768-6700
                                           Facsimile:  (212) 768-6800
                                           Email:  john.beck@dentons.com
                                                   sarah.schrag@dentons.com

                                                   - and –

                                           **TOGUT, SEGAL & SEGAL LLP**
                                           Frank A. Oswald (admitted)
                                           550 Broad Street, Suite 1508
                                           Newark, NJ 07102
                                           Telephone: (212) 594-5000
                                           Facsimile: (212) 967-4258
                                           Email: frankoswald@teamtogut.com

                                           Albert Togut (admitted pro hac vice)
                                           Eitan Blander (admitted pro hac vice)
                                           One Penn Plaza, Suite 3335
                                           New York, New York 10119
                                           Telephone: (212) 594-5000
                                           Facsimile: (212) 967-4258
                                           Email: altogut@teamtogut.com
                                                   eblander@teamtogut.com

                                           *Counsel for Debtors and Debtors in Possession*

## **Exhibit 1**

**Hearing Transcript August 6, 2025**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE:                          .   Case No. 25-16137 (MBK)
                                .   Chapter 11
POWIN, LLC, et al,              .   (Jointly Administered)
                                .
                                .   U.S. Courthouse
            Debtors.            .   402 East State Street
                                .   Trenton, NJ 08608
                                .
                                .   August 6, 2025
. . . . . . . . . . . . .        .   11:00 a.m.

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            Dentons US LLP
                            By:  TANIA M. MOYRON, ESQ.
                                 VAN C. DURRER, II, ESQ.
                            1221 Avenue of the Americas
                            Ste. 25th Floor
                            New York, NY 10020

                            Togut, Segal & Segal LLP
                            By:  FRANK A. OSWALD, ESQ.
                            One Penn Plaza
                            Suite 3335
                            New York, NY 10119

For Ace Engineering:        Sherman Silverstein
                            By:  ARTHUR ABRAMOWITZ, ESQ.
                            East Gate Corporate Center
                            308 Harper Drive, Suite 200
                            Moorestown, NJ 08057

Audio Operator:             Wendy Quiles

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd):

```
For Lu Pacific              Archer & Greiner, P.C.
Properties, LLC:            By:  NATASHA M. SONGONUGA, ESQ.
                            300 Delaware Avenue
                            Suite 1100
                            Wilmington, DE 19801-1670


For Honeywell               Rabinowitz, Lubetkin & Tully, LLC
International Inc.:          By:  JEFFREY A. COOPER, ESQ.
                            293 Eisenhower Parkway
                            Suite 100
                            Livingston, NJ 07039

                            Adams & Reese
                            By:  SCOTT ROBERT CHEATHAM, ESQ.
                            701 Poydras Street
                            Suite 4500
                            New Orleans, LA 70139


For the U.S. Trustee:       Office of the U.S. Trustee
                            By:  LAUREN BIELSKIE, ESQ.
                            One Newark Center
                            Suite 2100
                            Newark, NJ 07102


For Mainfreight Inc.:       Benesch, Friedlander, Coplan & Aronoff
                            By:  KEVIN CAPUZZI, ESQ.
                            411 Hackensack Avenue, 3rd Floor
                            Suite 801
                            Hackensack, NJ 07601


For FlexGen Power           Latham & Watkins, LLP
Systems, LLC:               By:  JEFFREY T. MISPAGEL, ESQ.
                            355 South Grand Avenue
                            Suite 100
                            Los Angeles, CA 90071-1560


For Longroad               Mayer Brown
Development Company,        By:  JOAQUIN M. C de BACA, ESQ.
LLC, et al.:               1221 Avenue of the Americas
                            New York, NY 10020-1001


For Stem, Inc.:             Greenberg Traurig, LLP
                            By:  ALAN J. BRODY, ESQ.
                            500 Campus Drive
                            Suite 400
                            Florham Park, NJ 07932
```

APPEARANCES (Cont'd):

For EDF Power                Orrick, Herrington & Sutcliffe LLP
Solutions, Inc.             By:  LORRAINE McGOWEN, ESQ.
and esVolta:                51 West 52nd Street
                            New York, NY 10019-6142

For Ad Hoc Customer         Vinson & Elkins LLP
Group:                      By:  LAUREN R. KANZER, ESQ.
                            The Grace Building
                            1114 Avenue of the Americas
                            32nd Floor
                            New York, NY 10036

For Spark Power             Stark & Stark
Renewables and              By:  TIMOTHY P. DUGGAN, ESQ.
THI, Inc.:                  100 American Metro Boulevard
                            Hamilton Township, NJ 08619

For Solar Carver            Riker Danzig LLP
1, LLC, et al.:             By:  JOSEPH L. SCHWARTZ, ESQ.
                            7 Giralda Farms
                            Suite 250
                            Madison, NJ 07940

For Keyframe Capital        Faegre Drinker Biddle & Reath LLP
Partners, L.P.:             By:  MICHAEL P. POMPEO, ESQ.
                            1177 Avenue of the Americas
                            41st Floor
                            New York, NY 10036

TELEPHONIC APPEARANCES:

For Specified               Fox Rothschild LLP
Technologies, Inc.:         By:  AGOSTINO A. ZAMMIELLO, ESQ.
                            49 Market Street
                            Morristown, NJ 07960

For Ulinda Park             Weil, Gotshal & Manges
Projectco, et al.:          By:  KEVIN BOSTEL, ESQ.
                            767 Fifth Avenue
                            New York, NY 10153

For Ameresco, Inc. and      Troutman Pepper Locke LLP
Kupono Solar, LLC:          By:  TORI L. REMINGTON, ESQ.
                            Hercules Plaza, Suite 1000
                            1313 N. Market Street, P.O. Box 1709
                            Wilmington, DE 09899-1709

- - -

4

1          THE COURT:  All right.  This is Judge Kaplan, and

2   we'll begin our somewhat long agenda on Powin.  I'll remind

3   those who are viewing and participating remotely, if you wish

4   to be heard, make sure you use the raise hand function.  I'll

5   also remind those who are sitting in court, and counsel,

6   please, to assist the recording and the transcript, if we could

7   have you announce -- give your appearance when you rise to

8   speak and when you're speaking.

9          Otherwise, I'm ready to see what you all -- we had a

10  schedule.  Now, you'll let me know what adjustments are to be

11  made, if any.

12          MS. MOYRON:  Thank you, Your Honor.  Good morning.

13  Tania Moyron of Dentons on behalf of Powin.  And thank you for

14  the brief adjournment this morning.  And you are correct, it is

15  a long agenda, Your Honor.

16          And currently there are at least ten lawyers in one

17  of your chamber's conference rooms continuing to reach an

18  agreement.  And we are hopeful that we will reach an agreement.

19  Counsel needs to call their client in order to try to get sign-

20  off.  So, we would like, Your Honor, another 30 minutes.  We

21  apologize for the request.  But, we do think that it'll likely

22  obviate testimony and the long hearing today, so we would like

23  another 30 minutes, Your Honor.

24          THE COURT:  How could I say no to that?  That's fine.

25  It's -- I guess it's 11 o'clock now.

1          MS. MOYRON:  Yes.

2          THE COURT:  Rather than doing this again, do we think

3  it's 30 minutes?  Should we -- will that suffice?  Do we say an

4  hour?  And then we're going to bump up into when I have to give

5  everybody lunch.  Come back in 30 minutes, you think will

6  suffice?

7          MS. MOYRON:  I think that will suffice, Your Honor.

8          THE COURT:  All right.  Then let chambers know.  Mr.

9  Abramowitz, I see you standing.

10          MR. ABRAMOWITZ:  Yes.  Is Mr. Capuzzi in court? I see

11  him.  Yes.  We want to approach the court bench for one second,

12  Your Honor.

13          THE COURT:  Sure.

14                    (Attorney discussion)

15          MR. ABRAMOWITZ:  Your Honor, we'll defer to the --

16  it's tied into the overall --

17          THE COURT:  The other issues?

18          MR. ABRAMOWITZ:  Yes.  Thank you.  Okay.

19          THE COURT:  All right.  Counsel, good morning.

20          MS. SONGONUGA:  Good morning, Your Honor.  For the

21  record, Natasha Songonuga of Archer & Greiner, counsel to Lu

22  Pacific Properties, LLC, who is the landlord of the debtor's

23  property, located in Oregon.

24          Your Honor, I actually have a flight to Canada that I

25  have to catch.  So, we filed a non-waiver of rights and

6

1  reservation of rights to the notice of assume -- the

2  subcontracts.  And I just wanted to put the reservations on the

3  record today, Your Honor, before I have to run to catch a

4  flight.

5          THE COURT:  That's fine.

6          MS. SONGONUGA:  Will that be okay?  Okay.  So, again,

7  Your Honor, for the record, Natasha Songonuga of Archer and

8  Greiner for Lu Pacific Properties, LLC.  Your Honor, the client

9  is the landlord for the property located in Oregon.  This is

10 where the debtor stores lithium battery, as well as testing the

11 batteries.  There's a significant amount of batteries stored on

12 the property.

13         And so we filed a non-waiver and reservation of

14 rights.  We do not object to the cure amount.  But,

15 specifically, Your Honor, we filed the reservation of rights

16 just to put on the record that on July 7th, the landlord was

17 allowed access to the premises to conduct a health and safety

18 inspection.  There was a letter sent by counsel to the landlord

19 outlining a number of health and safety concerns, Your Honor.

20 And that was attached to the reservation of rights, and that's

21 Docket Number 523.

22         There are a number of issues listed, including lack

23 of sufficient staffing, other health inspection and code

24 violations.  As I stand here today, Your Honor, I learned

25 yesterday that the client and the proposed purchaser have been

1  in communications and are discussing the outstanding issues,

2  but have not reached any resolution on those issues.

3         And so I merely wanted to make it clear to the Court

4  that we still reserve the rights under the lease, not only to

5  inspect -- to continue to inspect, but to have the purchaser

6  and the debtors bring the property up to code should the

7  parties not be able to come to consensus on that.

8         THE COURT:  Fair enough.  All right.  Noted.  Have a

9  safe travels.

10        MS. SONGONUGA:  Thank you, Your Honor.

11        THE COURT:  Mr. Cooper?

12        MR. COOPER:  Thank you, Judge.  Jeffrey Cooper,

13  Rabinowitz, Lubetkin & Tully.  And together with Scott

14  Cheatham, Adams & Reese, counsel for Honeywell International.

15  I rise, Judge, just to let Your Honor know that we are

16  representing one of, I think many, the licensees whose

17  agreements are being -- proposed to be rejected today.

18        And my understanding is that the discussions that are

19  ongoing with the people for Mayor Brown and so forth often go

20  to our issues.  We have not been involved with those

21  negotiations.  But, very specifically, we need to deal with the

22  issues of the 365(n) relief, both temporarily and going

23  forward, and specifically with regard to a certain operating

24  system called Cobalt, which I understand is integral to the

25  operation of the licenses.

8

1          And it seems to me, a controlling argument at a later

2    time, that the code and 365(n) envisions that these, if you

3    will, ancillary contracts that go to implement the license are

4    included in the term of embodiment, not unlike in the real

5    estate context, the term apartment 2 with regard to 365(h).

6          So, I just wanted to raise the issue so the parties

7    know that we're here.  Hopefully the resolution will be able to

8    be something that's applicable to our client as well.  But, we

9    have an independent interest in making sure that it's resolved

10   today.

11          THE COURT:  All right.  Thank you, Mr. Cooper.

12          MR. COOPER:  Thank you, Judge.

13          MS. MOYRON:  Thank you, Your Honor.  With those

14   comments being made, perhaps I'm going to take you up, Your

15   Honor, on your suggestion that we do this for -- maybe adjourn

16   for an hour, and then we come back.  And we're happy to speak

17   with counsel, and Mr. Kane, the CEO, is here.  And, again,

18   these are issues that we are trying to resolve, and so --

19          THE COURT:  Why don't we adjourn 'til noon, then

20   we'll discuss -- see where you're at, see what our schedule

21   will be.

22          MS. MOYRON:  Perfect.

23          THE COURT:  And what we have to accomplish for the

24   rest of the day.

25          MS. MOYRON:  Perfect.

1              THE COURT:  All right?

2              MS. MOYRON:  Thank you, Your Honor.

3              THE COURT:  Thank you, counsel.

4              MS. MOYRON:  Thank you.

5              THE COURT:  We are adjourned.

6                        (Off the record)

7              THE COURT:  All right.  We are ready to go.  Welcome

8    back, everyone.  It's Judge Kaplan on the Powin matters.  Mr.

9    Durrer?

10             MR. DURRER:  Good afternoon, Your Honor.  Van Durrer,

11   Dentons, for the debtors, the Powin debtors.  I'm going to give

12   a brief statement and then turn over the podium to Mr. Oswald

13   to walk through the uncontested matters.  But, in fairness and,

14   thank you, I should say at the outset, for the time.  I think

15   it's been well used.

16             Powin, as you know, Your Honor, has dozens of

17   customers.  Those customers are very focused on their 365(n)

18   rights.  We've been working throughout the last many days and

19   this morning to develop a framework that everybody's

20   comfortable with.  That process remains ongoing.  We do hope to

21   conclude it soon.

22             But, we thought that while we had everybody, that we

23   would proceed with those uncontested matters, with Your Honor's

24   permission, and we'll keep working.  And then, you know, we

25   will still probably need some time.  But, the design is to have

1 those -- the framework for those 365(n) rights resolved.  The

2 framework, not the details.  And then the sale as well.  The

3 sale will be subject to those rights.  And, again, I don't want

4 to presume anything, but that's the game plan.

5          So, with that, I'll turn it over to Mr. Oswald.

6          THE COURT:  So, the Court will hear the lease issues,

7 the licensing issues, with the sale motion.  You're not going

8 to do one without the other at this juncture?

9          MR. DURRER:  They're very closely related.  Yes, Your

10 Honor.

11          THE COURT:  Okay.  And so, we're going to -- we'll

12 address the other matters on the agenda?

13          MR. DURRER:  Yes, Your Honor.

14          THE COURT:  Sounds good.

15          MR. DURRER:  Thank you very much.

16          THE COURT:  Thank you.

17          MR. OSWALD:  Thank you, Your Honor.  Frank Oswald,

18 Togut, Segal & Segal, co-counsel for the debtors.  Again, I

19 appreciate the Court's patience today.  We do have a few

20 uncontested matters on the calendar.  I'll just go in order of

21 the agenda, if that's okay with the Court?

22          THE COURT:  All right.

23          MR. OSWALD:  These are matters that teed up.  The

24 first one, dealing with a specific lease and landlord issue.

25 We had agreed with that landlord to turn back possession at the

1  end of June, and ultimately entered into a stipulation with the

2  lessor reflecting a rejection date of June 30.

3        We had some minimal office equipment and furnishings

4  in the premises, which we've deemed abandoned to the landlord.

5  I shared that stipulation with counsel for the Committee and

6  U.S. Trustee.  They're okay with the form of order.  No

7  objections were submitted.  And we filed a certificate of no

8  objection at Docket Number 623.

9        So, if that stipulation is satisfactory to the Court,

10  we'd respectfully request that it be so ordered.

11        THE COURT:  All right.  So then, we're not getting

12  another order?  We're just going to so order the stipulation?

13        MR. OSWALD:  Yes.

14        THE COURT:  All right.  And I reviewed it on the

15  docket.  Wendy, this is Docket 214, is the motion.  The Court

16  approves the rejection on the lease pursuant to the terms of

17  the stipulation.

18        MR. OSWALD:  Thank you.  Item 2, Your Honor, was our

19  motion to -- for an interim and final order regarding the

20  payment of accrued pre-petition taxes, which had not yet come

21  due.  That was at Docket Entry 99.  Your Honor entered the

22  interim order previously.

23        We've submitted a form of final order.  Again,

24  reviewed that in advance with Committee counsel, the U.S.

25  Trustee.  They're satisfied with the form of that order.  No

1 | other objections or responses were filed.

2 | And I believe we have -- earlier today, it's not

3 | reflected on the agenda, but I think earlier we did get a

4 | certificate of no objection on file.  I just don't have that

5 | docket number handy.

6 | THE COURT:  Here.  Let me see what -- 652, I believe.

7 | All right.  The Court approves.

8 | MR. OSWALD:  Thank you.  Item 3 on the agenda, Your

9 | Honor, deals with the standard motion for the utilities,

10 | adequate assurance.  And that was at Docket Entry 112.  Your

11 | Honor entered the interim order.  We have since established an

12 | escrow account for the utility deposit funds.

13 | The form of final order, likewise, is the other

14 | motion shared with the U.S. Trustee, counsel to the Committee.

15 | They had no issue with that order.  No other responses were

16 | received.  We filed a certificate of no objection at Docket

17 | Number 387.

18 | If that form of order is satisfactory to the Court,

19 | we ask that it be entered at your convenience.

20 | THE COURT:  All right.  Just for the record, I think

21 | the certificate of no objection is 653.

22 | MR. OSWALD:  Item 4, Your Honor, was a customer

23 | settlement.  Again, the Court dealt with something similar at

24 | the last hearing.  This is known as the Idaho Power 9019

25 | Settlement.  The motion was filed at Docket 355.  Objection

13

1  deadline was July 30.  No objections or responses were filed.

2       Again, the settlement was reviewed in advance with

3  Committee counsel.  Form of order also reviewed and signed off

4  by Committee counsel, as well as the U.S. Trustee.  We have

5  filed a certificate of no objection, again, earlier today.  I

6  know the agenda doesn't reflect the number, but I think that

7  came in within the last couple of hours.

8       THE COURT:  All right.  So, will we be getting a new

9  order or --

10      MR. OSWALD:  Yes.

11      THE COURT:  All right.  And let me just check one

12 thing on this.  There was also a, I think, an application to

13 seal the company -- the settlement.

14      MR. OSWALD:  Yes, yes.  I'm sorry, Your Honor.  We

15 did have the application sealed.  Reviewed that as well with

16 Committee counsel and the U.S. Trustee.  No objections to that.

17      THE COURT:  All right.  The Court will grant the

18 motion to seal, and we'll grant -- and grant approval of the

19 settlement, and await the submission of the order.

20      MR. OSWALD:  Thank you, Your Honor.  The next item,

21 Item 5, is our motion to implement a KERP and KEIP program.  I

22 think that it's one of the leanest programs that I've seen

23 certainly in quite some time.  And we do know that oftentimes

24 these motions bring concerns of the -- of the creditors and the

25 U.S. Trustee.  Pleased to say that this one has not.

14

1          I know the U.S. Trustee counsel would like to put a

2   statement on the record.  But, in substance, no objections to

3   this motion.  The employees, from the executives down, as you

4   know, how active this case has been, has really been working

5   tirelessly both pre-petition and since we filed the case.  And

6   so we're very grateful for all of their time and services.

7          With that, maybe I will turn it over to the U.S.

8   Trustee for their statement.  But, there are no objections to

9   this motion and the form of order is satisfactory to the

10  Committee and the U.S. Trustee.

11         THE COURT:  All right.  Thank you.  Here I was

12  looking on the screen for Ms. Bielskie.  You're here.

13         MS. BIELSKIE:  You had to check, Your Honor.

14         THE COURT:  Live.

15         MS. BIELSKIE:  Good afternoon.  Lauren Bielskie with

16  the Office of the United States Trustee.  As counsel stated,

17  Your Honor, the U.S. Trustee did not object to the pending KERP

18  and KEIP motion.  Counsel did provide our office with

19  additional information, including the titles of the individuals

20  that are subject to the KERP.

21         And I just want to be on the record saying, Your

22  Honor, that our decision not to object was based on the facts

23  and circumstances of this case, including the relative dollar

24  amounts, and should not be construed by any party as a policy

25  change by the U.S. Trustee, precedent for future cases, or

15

1  anything more than a determination on this particular motion.

2  And that's all, Your Honor.

3          THE COURT:  For wanting for other cases.  Okay.

4          MS. BIELSKIE:  Thank you.

5          THE COURT:  Thank you.  Motion is granted.

6          MR. OSWALD:  Thank you, Your Honor.  I believe that

7  takes care of the uncontested matters.

8          While I'm up, Your Honor, just as a housekeeping

9  measure, I would like to let the Court know, if you haven't

10  seen it, we did file timely last month our schedules and

11  statements.  The U.S. Trustee conducted an extensive first

12  meeting of creditors.  Closed that meeting, subject to our

13  providing some additional information.

14          We're working with the Committee currently on a

15  motion to have a claims bar date set.  We'd like to move ahead

16  quickly with that.  We'll share with the U.S. Trustee.  We've

17  already got a form of customized claim form in the works.  And

18  we'll also share it with the clerk.

19          And so, you'll see that in hopefully short order

20  following the sale, and hopefully we get that sale approved and

21  closed.  We'll move quickly to get the bar date entered, and

22  then move to a plan.  So, I just wanted to let the Court know

23  that.

24          THE COURT:  All right.  Thank you for the update.

25  Just one matter.  We also had as an adjourned matter, the

16

1  Mainfreight, we'll call it, the motion.

2           MR. CAPUZZI:  Good afternoon, Your Honor.

3           THE COURT:  Good afternoon.

4           MR. CAPUZZI:  For the record, Kevin Capuzzi, Benesch,

5  Friedlander, Coplan & Aronoff, counsel for the Mainfreight

6  entities.  Your Honor, the Mainfreight motion is reflected at

7  Item 10 of the agenda.

8           THE COURT:  Correct.

9           MR. CAPUZZI:  It is adjourned with the consent of the

10 debtors, BHER and Ace, who were all of the responding parties.

11 We're hoping to use the time between now and September 3rd to

12 have some business discussions.  And if not, we'll be back to

13 you on the 3rd.  While I'm up here, Your Honor --

14          THE COURT:  Yes?

15          MR. CAPUZZI:  -- one of the three sale orders is the

16 Mainfreight sale order.  There's no objection to that one, so

17 I'm wondering, is there any reason why we can't take that up

18 now?  Okay.

19          THE COURT:  Exasperation noted.

20                      (Laughter)

21          UNIDENTIFIED ATTORNEY:  There's plenty enough to go

22 around.

23          MR. CAPUZZI:  Can we put our stipulation on the

24 record, at least, that resolves Mr. Abramowitz's limited

25 objection?  That was the only objection to the Mainfreight

 1  order.

 2          THE COURT:  I don't have a problem if you want to put

 3  something on the record so you could free up counsel to go

 4  elsewhere.

 5          MR. CAPUZZI:  Yeah, it's -- it's not going to be

 6  earth shattering.

 7          THE COURT:  Go ahead.

 8          MR. CAPUZZI:  So, Your Honor, just to set the stage.

 9  The sale in this case resulted in three different sale orders.

10  One for not to seal the debtor's funder, but to the stalking

11  horse purchaser, Mainfreight credit bidded on a certain lot --

12          THE COURT:  Right.

13          MR. CAPUZZI:  -- of assets which were subject to

14  Mainfreight's possessor in maritime liens.  Those do not

15  involve any of the goods that relate to the BHER goods that are

16  subject to the motion that we've adjourned.  These are totally

17  separate debtor owned goods that we credit bidded on and we're

18  the winning bidder.

19          So, that -- that proposed order was uploaded at

20  Docket Number 608.  It was Exhibit B to that.  And the only

21  objection or response was by Ace, who Mr. Abramowitz

22  represents.

23          THE COURT:  All right.

24          MR. ABRAMOWITZ:  Thank you, Your Honor.  Ace is not

25  objecting to Mainfreight's purchase, but does reserve its

18

1    rights.  And does not waive any rights stemming from its

2    reclamation claims for assets purchased in the sale.  So,

3    that's the extent of our stipulation.  But, I just felt -- I

4    appreciate the Court allowing us to put it on an expedited

5    basis.

6              THE COURT:  Not a problem.

7              MR. ABRAMOWITZ:  Thank you.

8              THE COURT:  Thank you.  All right.  Then we'll take

9    -- so, the game plan, how much time anticipate?  What are your

10   thoughts?

11             MR. OSWALD:  Shall we say two o'clock, Your Honor?

12             THE COURT:  You could say two o'clock.  If that's

13   enough, that's fine for me.  If it looks like more, rather than

14   reconvening, just reach out to my chambers.

15             UNIDENTIFIED ATTORNEY:  Will do, Your Honor.

16             THE COURT:  Okay?

17             UNIDENTIFIED ATTORNEY:  Thank you so much.

18             THE COURT:  All right.  Thanks.  We'll be back at two

19   o'clock.

20             MR. ABRAMOWITZ:  Thank you, Your Honor.

21             THE COURT:  You're welcome.

22                      (Recess)

23             THE COURT:  We are back.  It's 3:30.  Mr. Durrer?

24             MR. DURRER:  Good afternoon, Your Honor.  Van Durrer,

25   Dentons, on behalf of the debtors.  Let me give you the order

1  of go here.  First of all, we're going to start with Item

2  Number 6 on the agenda.  The agenda is Docket 645.  Item Number

3  6 is the debtor's omnibus rejection motion, which is Docket 88.

4  The plan, Your Honor, and then we'll -- we'll turn to the sale

5  stuff.

6          With respect to the rejection motion, there's been a

7  ton of very construction conversations.  We are very, very

8  close.  The plan is that we do have a general agreement on the

9  rejection framework.  I'll use that word again from this

10  morning, or early this afternoon.  And our design would be to

11  submit a proposed form of order on the rejection motion close

12  of business tomorrow.

13          We want to give everybody one more chance to look

14  through it.  Because there's a lot of people that are here.

15  There's a lot of people that have been on Zoom and on e-mail.

16  I just want to make sure that everybody gets a look.  But, in

17  broad strokes, it appears to be generally agreed.

18          Now, let me give you some high level components of

19  that.  And then I'm going to invite other stakeholders to come

20  forward and give their views, which hopefully will be largely

21  consistent with what I'm about to tell you.

22          So, first of all, the debtors are not seeking

23  rejection today.  We're seeking rejection effect -- you know,

24  we had originally filed this as a nunc pro tunc.

25          THE COURT:  Nunc pro tunc.  Right.

20

1          MR. DURRER:  We're seeking rejection effective as of

2   the closing, or such earlier date that parties agree to.  But,

3   it won't be earlier than the closing, which is presently

4   contemplated for Monday, August 11.

5          The parties who have filed adequate protection or

6   motions to compel 365(n) rights, those motions will be

7   continued to September 3rd, which is our next omnibus hearing.

8   But, if people have an emergency, they know how to contact

9   chambers and Your Honor.  Hopefully we won't have any

10  emergencies, but people have their rights to pursue that.

11         The rejection order will carve out -- there was a

12  provision in the rejection order that said there's no adequate

13  protection issue, because the contracts are rejected.  That

14  will carve out those continuing motions to compel/adequate

15  protection motions.

16         In addition, and this is really important, the motion

17  will reserve, as will any sale order, irrelevant to

18  intellectual property, the rejection order will reserve all

19  365(n) rights.  We've included additional language, because

20  people have different views about what is covered.  But, the

21  high level point that everybody needs to grasp is, whatever

22  365(n) rights you have, they're preserved.

23         We actually made a lot of progress in defining what

24  365(n) rights are and are not.  But, for today, that is a TBD.

25  If we work it out in the order and there's more clarity, great.

1   If not, that'll be for another day.

2          Parties have also expressed some concerns about

3   continuity in the post-closing period.  I think it's helpful

4   for Your Honor to hear that from our buyer, FlexGen, in the

5   context of this.  It's more relevant to the sale.  But, my

6   vision is, let's just do it once.

7          So, I'm going to invite FlexGen's counsel to say what

8   they're going to say about continuity issues.  And then I'll

9   let people chime in on issues that are important to them from a

10  365(n) perspective.  And then I think we're good on rejection.

11         But, with that, Jeff.  So, Mr. Mispagel from Latham &

12  Watkins is here for FlexGen.  He's going to speak to

13  continuity.  And then I think Mr. Sedebach (phonetic) --

14         THE COURT:  Good afternoon, counsel.  Just let me

15  have -- for those who are coming up to the podium, appearances.

16         MR. MISPAGEL:  Good afternoon, Your Honor.  I guess

17  Mr. Durrer already introduced me.  But, for the record, Jeff

18  Mispagel from Latham & Watkins on behalf of FlexGen, the

19  debtor's DIP lender and proposed purchaser.  Your Honor,

20  FlexGen fully intends to provide customers with continuity of

21  service, including access to Cobalt and AWS and continued

22  services from the ROC, which is remote operations center.

23         FlexGen looks forward to providing services to the

24  debtor's customers, that is why FlexGen is acquiring the assets

25  to be acquired under the APA.  And FlexGen expects to negotiate

22

1  agreements with customers, likely short-term to start, with an

2  eye towards longer term agreements, so that FlexGen can

3  continue to provide services to the debtor's customers

4  following the closing of the sale and hopefully for a long time

5  after that.

6         As Mr. Durrer noted, there have been some disputes

7  regarding what -- what counterparties are entitled to under

8  Section 365(n) of the Bankruptcy Code.  One thing to make

9  clear, Your Honor, is that FlexGen is not seeking to override

10 Section 365(n) rights, and the proposed sale order and the

11 asset purchase agreement make that clear.

12        But, as debtor's counsel also noted, 365 disputes --

13 or 365(n) disputes are going to be continued until September

14 3rd.  And in the interim, we want it to be clear that FlexGen

15 does not think it is obligated to provide services to customers

16 between now and September 3rd, whether that's by, you know,

17 under 365(n) or otherwise.  But, FlexGen does intend to and

18 will provide services to customers through September 3rd while

19 we wait for those disputes to be heard.

20        THE COURT:  All right.  Thank you.  Thank you for

21 putting it on the record.

22        MR. MISPAGEL:  Thank you, Your Honor.

23        THE COURT:  Now, we'll hear from others who wish to

24 be heard.  Good afternoon.

25        MR. C de BACA:   Good afternoon, Your Honor.  Joaquin

23

1  C de Baca from Mayer Brown.  And Mayer Brown represents certain

2  projects owned by Longroad Development Company, LLC, certain

3  projects owned by Leeward Renewable Energy, LLC, and DTE

4  Electric Company.

5          And, Your Honor, the reason that Mr. Durrer's

6  explanation of why this -- the proposed order works for us

7  today is because it reflects, I think, what we have been saying

8  in our papers in terms of the way 365(n) is supposed to work in

9  terms of what licensees are entitled to, both prior to

10  rejection and after rejection, (n)(4) and (n)(3) of Section

11  365.

12          And what that means is that there are things we are

13  entitled to prior to rejection.  And I think that it hopefully

14  came across clearly in our papers when this was fully briefed.

15  We don't think there's any ambiguity about that, at all.  And I

16  should note also that the reason this is so important is -- is

17  a lot of what is not visible in the papers is that all this

18  goes to the operation of physical plants.

19          This IP is more than just an idea in a hard drive

20  somewhere.  This stuff goes to our customer's ability to make

21  sure that their projects stay fully operational, there's not

22  portions of them that go down.  There's real money at issue

23  here, as these things are operational -- are or not.  And that

24  is what's at stake in terms of whether this IP gets handed

25  over, and how quickly it gets handed over.

24

1        So, that means under (n)(4), in particular, that --

2   and I think that you'll see as you'll see in the order, and as

3   a result of the fact that contracts are not being rejected nunc

4   pro tunc, there are things that need to be handed over now.  I

5   think that -- that's -- that is simply the way the statute

6   operates.  I think that as a result of the discussions we've

7   had today, that's where we're landing.

8        But, what that means is, that if we don't get things

9   after today, and I understand people need to go back and

10  examine what they -- what, you know, the -- essentially sort

11  through their differences to what they think is covered here.

12  But, nonetheless, if we don't start getting those things,

13  they're, you know, those projects aren't going to be able to

14  operate.  There's going to be loss as a result of that.  And we

15  think the Court should be aware of that.

16       And also, if this continues to be a contested issue,

17  we are going to be back here very, very quickly.  This is --

18  this continues to be an emergency basis, and we cannot let it

19  linger.  This has to be -- the IP has to start flying.

20       THE COURT:  All right.  Thank you, counsel.  Mr.

21  Cooper?

22       MR. COOPER:  Thank you, Judge.  Jeffrey Cooper,

23  Rabinowitz, Lubetkin & Tully, together with Adams & Reese, for

24  Honeywell.  Your Honor, we understand the proposed language and

25  understand we're going to have a chance to be able to look at

25

1  the order and make suggestions as -- through tomorrow to get it

2  before Your Honor.

3       But, we had a couple specific thoughts.  One of the

4  things that we had talked about was that -- and I think this is

5  probably fine with the buyer, that the services and the

6  continuity will be as currently provided to each of the various

7  licensees.  So, the idea is that whatever's now in existence

8  will just continue going forward.  And I think that was

9  probably acceptable.

10       With regard to the language of saying the continuity

11  lasts until September 3rd, we've got a problem with that.  Only

12  because right now there's a hearing scheduled on Nov -- I'm

13  sorry, on September 3rd, to hear some of the underlying issues

14  that is what's included within the intellectual property,

15  what's the concept of embodiment, whether the source codes go

16  with it or not.  All those things we hope to work out in the

17  interim.

18       But, if we don't, we need to have the continuity go

19  through either in agreement of the parties or further order

20  from Your Honor.  Perhaps the hearing won't be held on the 3rd,

21  perhaps something else might happen.  But, as I understand the

22  way that these things work, the services that we provide to our

23  customers includes things like air conditioning and things like

24  that, that we really can't not have.

25       So, I had -- the language I had suggested was until

1  agreement of the parties or an order of the Court.  I don't

2  know if that's acceptable.  That's what I'm going to suggest we

3  put in the language for tomorrow in the proposed order.

4        And with regard to the underlying issues that come

5  before Your Honor, again, we are -- we may be able to agree

6  with those.  Right now, among the issues that's out there, is

7  what, I think we as bankruptcy lawyers, are calling services,

8  which may not actually be intellectual property.  And we're

9  trying to work that out as to whether the actual IT plus the

10 embodiment is -- is all that's required by 365(n) or whether

11 there's some other requirement.  And secondarily, whether the

12 payments being made now for royalties and other things include

13 these services.

14       But, I just highlight that to say that those are

15 issues that I'm very confident we can work out in the interim.

16 But, we do need to have the continuity last until either we

17 agree or Your Honor rules one way or the other.  Thank you.

18       THE COURT:  All right.  Fair enough.

19       MR. BRODY:  Good afternoon, Your Honor.  Alan Brody,

20 Greenberg Traurig, on behalf of Stem, Inc.  Stem, Inc. is also

21 a customer who uses very much the same as Mr. Cooper has said

22 with his client.  Your Honor, we echo exactly what Mr. Cooper

23 has stated.  But, I want to be specific as to one item, which

24 is the continuity of service, which include the access to the

25 software, Colbalt and HW.  The parties are going to try

27

1  to work everything out prior to September 3rd and that is the

2  hopes and I think it's good to be able to put this off through

3  another date, but yet hold everybody's feet to the fire with

4  the September 3rd date, keeping -- allowing the customers to

5  continue with the access, to the extent they already have, to

6  continue with an access.

7           But just as Mr. Cooper had mentioned, want to make it

8  clear that if for some reason the parties cannot work things

9  out and we come before Your Honor, the customers are not

10  agreeing that September 3rd is the cutoff date for access.  So

11  that's why Mr. Cooper was asking for September 3rd or any other

12  order that the Court gives.  Again, we hope to work it out, but

13  we just want Your Honor to know that September 3rd is not a

14  cutoff date from the view of the customers.  Thank you.

15           THE COURT:  Fair enough.  Thank you, Mr. Brody.

16  Counsel?

17           MS. McGOWEN:  Good afternoon, Your Honor, I'm

18  Lorraine McGowen from Orrick Herrington on behalf of EsVolta,

19  LLC and EDF Power Solutions.  And like the other gentlemen

20  before you, we represent customers who rely on this

21  intellectual properly and we hope to resolve the issues

22  regarding access, particularly to Cobalt and AWS, as has been

23  mentioned.  It is critical for the operation of the systems and

24  for public safety because if the systems don't work, then the

25  systems will be in danger of fire and other grid issues.

28

1          In addition, Your Honor, in our limited objections on

2   behalf of EsVolta and EDF, we noted a number of other requests

3   for resourcing assistance.  We understand based on discussions

4   with counsel for the debtor that a number of our issues will be

5   addressed in the order, the rejection order that's being

6   circulated.  That includes access to books and records, the

7   access to warehouses to the extent permissible so that our

8   client that purchased a number of equipment and spare parts can

9   retrieve those spare parts and equipment and also access to the

10  assignment of warranties to the extent that that's permissible.

11         And then, lastly, Your Honor, the debtors noted that

12  they provided a number of technical assistance to other

13  customers.  I believe the debtors have agreed to provide that

14  to our clients and others.

15         THE COURT:  All right.  Thank you.  Thank you,

16  counsel.

17         MS. KANZER:  Good afternoon, Your Honor.

18         THE COURT:  Good afternoon.

19         MS. KANZER:  Lauren Kanzer of Vinson & Elkins on

20  behalf of an Ad Hoc Customer Group.  My group includes Lonestar

21  Solar, Idaho Power and West Warwick.  As everyone else has

22  expressed, my clients are customers of the debtors, licensees

23  of intellectual property and they filed a number of pleadings

24  in these cases aimed at ensuring their rights under 365(n) are

25  preserved and protected, including a motion for adequate

1 protection.  That was filed at Docket Number 297.

2          As Mr. Durrer noted, we'll be adjourning that

3 consensually until September 3rd, but reserving rights to come

4 back earlier if we can't reach resolution with the debtors and

5 with FlexGen.  I think that's all I had, Your Honor.

6          THE COURT:  All right.

7          MS. KANZER:  Thank you.

8          THE COURT:  Thank you.

9          MR. DUGGAN:  Good afternoon, Your Honor.

10          THE COURT:  Good afternoon.

11          MR. DUGGAN:  Timothy Duggan of Stark & Stark on

12 behalf of Spark Power Renewables.  We have a very limited

13 objection to EDF and EsVolta.  Two minutes ago, they asked for

14 an assignment and transfer of the --

15          THE COURT:  Warranties.

16          MR. DUGGAN:  -- unidentified warranties.  There's no

17 assumption and assignment here.  To the extent the contract

18 with my client ultimately gets assumed and warranties are part

19 of it, we can have at it.  But to have the rejection

20 conditioned upon an assignment of a collateral agreement, we

21 have no privity with these people.

22          If they believe they're third-party beneficiaries or

23 they have some sort of State Court rights, they can have at it.

24 But it's not a party here and we'd like to make sure that

25 that's not going to be included in the rejection order, some

30

1  sort of assignment of these warranty claims.

2         THE COURT:  All right.  Thank you.  Fair enough.  Mr.

3  Schwartz.

4         MR. SCHWARTZ:  Thank you, Your Honor.  For the

5  record, Your Honor, Joseph Schwartz, Riker Danzig, on behalf of

6  Solar Carver 1, LLC and Solar Carver 3, LLC.  Your Honor, I

7  rise not because I am a counter party that with respect to

8  365(n) or not because I'm objecting to the rejection motion.

9  But, instead, I just wanted to point out a few things to Your

10 Honor.  My clients are parties to two different contracts with

11 the debtors.  They're both called battery supply -- battery

12 equipment supply agreements.  They were entered into back in

13 2021.

14        The schedule that's attached to the rejection motion

15 talks about energy storage agreements and it talks about that

16 those agreements relate to two separate projects, one in

17 Rochester, one in Tremont.  I don't know whether or not those

18 two agreements are my client's agreements.  It's unclear.  But

19 the debtors then filed at Docket Number 446 a notice of

20 potentially assumed contacts, as Your Honor I'm sure is well

21 aware.  And on that notice, the debtor lists two battery

22 equipment supply agreements with my client.

23        And so we have two separate notices, one of

24 potentially a rejection of these contacts, again, not clear if

25 they're the same contracts.  Then we have a potentially assumed

1  assumption of those two contracts.  And so my client was

2  confused as a result of that, reached out to the debtors, tried

3  to engage with the debtors concerning the debtors' intentions

4  and hasn't received any sort of satisfaction with respect to

5  that outreach.

6       But, more importantly, Your Honor, the two battery

7  equipment supply agreements that I'm talking about both pertain

8  to my client's purchase of substantial equipment.  My client

9  paid approximately $10 million in exchange for these large

10 pieces of equipment.  The pieces of equipment were never

11 installed and delivered and commissioned at my client's

12 buildings.  But, nonetheless, we believe and we're not sure

13 that those pieces of equipment are part of the sale.

14      And so, the sale motion is, obviously, not, you know,

15 we're not talking about that right now.  That's Agenda Item

16 Number 9.  But what I don't want to see happen here is that the

17 debtors get a rejection order entered and then later claim that

18 somehow the rejection order somehow divested my client of title

19 to these two pieces of equipment and at the same time try to

20 sell that equipment for which the debtor doesn't have a title

21 to the buyer.

22      And so, you know, again, I rise to preserve my rights

23 with respect to rejection.  You're going to hear from me again

24 with respect to the sale motion because it's our position, Your

25 Honor, and I submit that the debtors can't sell something that

32

1  they don't have title to.  Title is vested in my client.  And

2  the debtors have not, while the debtors may contest title, the

3  debtors have not procedurally brought any kind of action to

4  bring to Your Honor's attention where title properly vests and

5  lies.

6          Those two contracts are not even before the Court.

7  They've never been attached to any pleadings before the Court.

8  There's no adversary proceeding or any other proceeding that's

9  pending before the Court.  And so Your Honor doesn't have

10 enough information to make that kind of determination here

11 today.  But, again, the debtors can't sell something that they

12 don't own and that's black-letter law.

13         THE COURT:  All right.  Well, it's too late in the

14 day to hear you again on that.  I just heard you.  So --

15         MR. SCHWARTZ:  No, that's -- and that's fine, Your

16 Honor.

17         THE COURT:  Let's see how they respond.

18         MR. SCHWARTZ:  Okay.

19         THE COURT:  I appreciate it.  Thank you.

20         MR. SCHWARTZ:  Thank you, Your Honor.

21         THE COURT:  One thing's been clear, Mr. Durrer, on

22 September 3rd, I don't -- you've accomplished and gone through

23 quite a bit in this long day today.  I don't think you all

24 could have gotten where you are even at this juncture without

25 everybody being in the room, so-to-speak.

1         MR. DURRER:  Oh, 1,000 percent agree with that, Your

2    Honor.

3         THE COURT:  So, September 3rd I'm going to have

4    in-court appearances unless everything is wrapped up in a

5    bow --

6         MR. DURRER:  Oh, we agree.

7         THE COURT:  -- without any issues.

8         MR. DURRER:  Yeah, thank you, Your Honor.

9         THE COURT:  It's scheduled now for 11:30, but that

10   ship has sailed.  We'll put it back to ten o'clock.  Okay.

11        MR. DURRER:  Understood, Your Honor.  And in response

12   to the comments made on behalf of Solar Carver, and apologies

13   that this didn't happen during the course of the long day, we

14   are not, there's no design to leverage the rejection motion to

15   accomplish something in the sale.  That's clear.  We are

16   seeking to reject those contracts to the extent they remain

17   executory.

18        And then we have agreed, no pun intended, to carve

19   out the Solar Carver alleged assets from the sale today.  If we

20   can reach an agreement, great.  But for purposes of the sale

21   today, they're carved out.

22        THE COURT:  Okay.  Thank you.

23        MR. DURRER:  Thank you.

24        THE COURT:  I don't see any raised hands remotely.  I

25   see somebody -- did you want to be heard again, counsel?

34

1           MR. MISPAGEL:  I do, Your Honor.

2           THE COURT:  Okay.

3           MR. MISPAGEL:  Just one point in response.

4           THE COURT:  Sure.

5           MR. MISPAGEL:  For the record, again, Jeff Mispagel

6  from Latham & Watkins on behalf of FlexGen.  I guess two

7  points.  One is just to echo what some of the others had said

8  which is that we are hopeful that resolutions can be reached.

9  We hope there can be agreements as to what 365(n) requires.  We

10 hope there can be agreements between our client and customers

11 regarding agreements going forward.

12          The other point is just in terms of continuing to

13 provide services, when the end date for that would be, we're

14 agreeing right now to provide services through September 3rd.

15 Come September 3rd, the Court thinks it's fair and equitable to

16 order, you know, an extension, we'll comply with that.  But we

17 would hope that the Court also understands that we can't just

18 continue to provide services indefinitely.

19          THE COURT:  Understood.

20          MR. MISPAGEL:  Thank you, Your Honor.

21          THE COURT:  All right.  Thank you.  So, with that, is

22 it fair for the Court to mark the rejection motion, Docket

23 Document 88, as an order to be submitted?

24          MR. DURRER:  Yes, Your Honor.

25          THE COURT:  Okay.  And I know there's a gulf to get

1  there, but and, obviously --

2          MR. DURRER:  It's a chasm, it's not a gulf.

3          THE COURT:  Chasm.  If there's a need and the Court

4  is available, if it comes down to some language, the Court

5  would certainly participate in any call just to get us over the

6  hump, over the line, rather, on that issue.

7          MR. DURRER:  Thank you, Your Honor.

8          THE COURT:  All right.

9          MR. DURRER:  So, as part of that presentation, Your

10 Honor, Items 7 and 8 are adjourned to September 3rd, that is

11 the group represented by Mr. C de Baca at Docket Number 117,

12 and then the group represented by Ms. Kanzer, Docket Number

13 297.

14         THE COURT:  Correct.

15         MR. DURRER:  And that brings up to the sale hearing

16 on Docket -- or I'm sorry, Agenda Item Number 9, Docket 413.

17         THE COURT:  All right.  Thank you.

18         MR. DURRER:  Okay.  So, just briefly, Your Honor, and

19 then we're going to tag team this a little bit so your

20 indulgence is there.  As Your Honor knows, at the last hearing,

21 Your Honor approved the bidding procedures, we had a stalking

22 horse bid submitted by Mr. Mispagel's client, FlexGen.  That

23 was the only bid with respect to those assets at the July 30

24 auction.

25         But as a consequence of pursuing the sale of

36

1  substantiality assets, getting the bidding procedures approved,

2  the outreach that Curon (phonetic) performed on behalf of the

3  company, the diligence efforts, all that jazz, we did end up

4  with a couple of additional proposals for assets that were not

5  part of the FlexGen stalking horse APA.  Those included the

6  Mainfreight credit bid.  Mainfreight, you'll recall, Your

7  Honor, is represented by Mr. Capuzzi and he put some items on

8  the record, so I'm going to cede the podium to him in a moment.

9       And then, in addition, there was some equity, there's

10 an equity interest that a non-debtor, Powin EKS Selco

11 (phonetic) owns.  We did receive a bid for that.  We made that

12 bid available to parties at the July 30 auction.  That was made

13 available to everyone in attendance, including FlexGen,

14 including our DIP lender, including Mainfreight and others.  No

15 one elected to advance a bid higher than the Hitachi proposal

16 to purchase the EKS equity.

17      So, that, plus the Mainfreight transaction, plus the

18 FlexGen transaction is what we're proposing that Your Honor

19 approve today now.  Again, the only transaction among those

20 that impacts the debtors' intellectual property is the FlexGen

21 proposal and the FlexGen proposed sale order does include

22 language that makes it clear that all 365(n) rights are

23 preserved.  In addition, the FlexGen stalking horse APA states

24 that that transaction is subject to Section 365(n) rights, as

25 well.

37

1          So, with that, I'll start maybe with Mr. Capuzzi if

2   he wants to say anything more about the Mainfreight transaction

3   and then we'll go to the EKS and finish up with FlexGen --

4          THE COURT:  Great.

5          MR. DURRER:  -- if that's okay, Your Honor.

6          THE COURT:  Thank you.  Mr. Capuzzi.

7          MR. CAPUZZI:  Thank you, Your Honor.  Again, for the

8   record, Kevin Capuzzi, Benesch Friedlander, counsel for the

9   Mainfreight entities.  Your Honor, as Mr. Durrer noted,

10  Mainfreight was the successful bidder through a credit bid for

11  certain goods owned by the debtors that are subject to

12  Mainfreight's maritime and possessory lien rights.

13         The goods in which Mainfreight credit bidded do not

14  include any of the goods that are in the West Virginia laydown

15  yard related to the BHER Project which is subject to a separate

16  motion pending before Your Honor, nor does it include any goods

17  located in two warehouses in Australia that were part of a

18  private sale that Your Honor approved earlier in these cases.

19  It's pretty much everything else.

20         Your Honor, there were no objections received with

21  respect to the Mainfreight sale, other than the limited

22  objection and reservation of rights that was put on the record

23  earlier this morning by Mr. Abramowitz's client, Ace

24  Engineering, who I understand is simply reserving rights,

25  vis-a-vis, the debtors.  They allege certain administrative

1  claims and other rights against the debtors, but they are not

2  opposed to the free and clear sale of the Mainfreight goods to

3  Mainfreight.

4       So, with that, Your Honor, I believe the Mainfreight

5  proposed order, which is Exhibit B to Docket Number 608, is

6  unopposed and we would ask Your Honor to enter it.

7       THE COURT:  All right.  Thank you, counsel.

8       MR. CAPUZZI:  Thank you.

9       THE COURT:  Let me turn, and I probably was remiss

10 even with respect to the rejection motion, did the Committee

11 want to take a position or make a statement, be heard?  And

12 then, obviously, on this piece, as well.

13      MR. AULET:  Good morning or good afternoon, Your

14 Honor.  It's been a long day.  Kenneth Aulet of Brown Rudnick

15 for the Committee.  We have no objection, as you would expect,

16 to the rejection compromise that was announced given that, you

17 know, I confirmed with the debtors that that's not imposing

18 additional costs on the estate that are going to diminish the

19 recoveries to my constituents.

20      I will say, look, I understand the issues the

21 customers have.  But these cases are not, are looking at a very

22 low recovery at this point to unsecured creditors.  And so

23 while we are certainly hopeful that all those issues can be

24 resolved, we will be quite vehement against any attempt to

25 further pick unsecured creditors' pockets who are out 300

1 million for the benefit of those customers.

2          As to the Mainfreight sale, the Committee is

3 supportive of the Mainfreight sale, as well.

4          THE COURT:  All right.

5          MR. AULET:  And I think you'll hear the same for the

6 subsequent sales.  But I'll be happy to address those at the

7 appropriate time.

8          THE COURT:  Great.  Thank you.  Anyone else wish to

9 be heard?

10          (No audible response)

11          THE COURT:  Hearing and seeing no one, motion will be

12 granted.  Do we have -- now is that order that's submitted the

13 final version or does the language have to be tweaked?

14          MR. MISPAGEL:  Your Honor, the version that was

15 submitted and hopefully uploaded to Your Honor at Docket Number

16 608, Exhibit B, is the final version.  There were no further

17 changes to that.

18          THE COURT:  All right.  If we have problems, we'll

19 reach out.

20          MR. MISPAGEL:  Thank you.

21          THE COURT:  Thank you.

22          MR. DURRER:  So, Your Honor, the next on the list,

23 Your Honor, Van Durrer for the debtors, is that Hitachi

24 purchase of the Powin EKS Selco.  That, just to be clear, that

25 order has also been presented.  There's no controversy or other

1  changes.  Because that's a non-debtor, the order's a little

2  different from the traditional free and clear order.  It

3  authorizes us to undertake the transaction and cause that

4  non-debtor to perform.

5       So, it's a little different than what you might be

6  used to.  But, otherwise, it approves the relief.  And, as I

7  noted moments ago, there were no other higher or better bids

8  offered at the auction or otherwise.

9       THE COURT:  Are there any -- does anybody wish to

10  raise any issues or concerns?

11               (No audible response)

12       THE COURT:  Motion will be granted as to the EKS

13  interest and in favor of Hitachi.  Thank you.  That brings us

14  to FlexGen.

15       MR. DURRER:  That brings us to, Your Honor, the

16  proposed sale to the stalking horse bidder FlexGen.  As noted,

17  Your Honor, the order will contain language explicitly

18  preserving the rights under Section 365(n).  In addition, there

19  are two objections raised, one by a customer Leeward and

20  another by the customer Solar Carver that Your Honor already

21  heard about that have expressed the view that some of the

22  assets proposed to be sold to FlexGen are, in fact, their

23  assets and not the debtors' assets.

24       As a consequence, we've agreed to include language in

25  the order that those assets are carved out unless the parties

41

1  otherwise agree.  So, if we reach an accommodation, we don't

2  need to come back to Your Honor.  If we believe that the

3  accommodation would otherwise require further disclosure and

4  approval, obviously, we'll do that.  But we don't expect that.

5  But if we need it, we'll do that.  But, otherwise, we are

6  asking for the FlexGen transaction to be approved.

7           THE COURT:  All right.  Now, the FlexGen transaction

8  includes a smaller credit bid if I'm correct and assumption of

9  liabilities?

10          MR. DURRER:  So, yes, Your Honor.  There is -- it was

11 the original amount was $38 million and change.  Because

12 FlexGen is also our DIP lender, they're entitled to credit bid

13 the portion of the DIP loan.  And then there are specifically

14 delineated assumptions of liabilities.  I won't walk you

15 through the APA in gory detail, but trust me when I say that

16 the APA is very specific about what is assumed and what's not

17 assumed and what's sold and what's not sold.  So I'll let the

18 document speak for itself, but, yes.

19          THE COURT:  All right.  Thank you, Mr. Durrer.  Does

20 anybody wish to be heard?  Mr. Duggan?

21          MR. DUGGAN:  Thank you, Your Honor.  Timothy Duggan

22 of Stark & Stark on behalf of THI Inc.  I think this objection

23 was resolved.  On the debtors' schedules, there was some

24 deposits and prepayments listed as assets on Schedule B that

25 are tied into certain contracts.  We just want to make sure

42

1  that those are not being sold and we're going to have a

2  problem, an estoppel argument of, hey, why didn't you object at

3  the time.

4        So, I don't know if the debtors consider them as cash

5  and cash is not being sold, but when you have a security, in

6  essence, a license deposit, as well as prepayments of the tune

7  about $250,000 because they're listed on Schedule B, we just

8  want to make sure they're carved out and not being sold to the

9  extent they're considered cash or something else and that we

10 wouldn't be estopped down the road if somebody tried to collect

11 them because they don't exist.

12       THE COURT:  I was going to say, I think you took the

13 position in the papers they don't exist.

14       MR. DUGGAN:  Yes.  Thank you.

15       THE COURT:  Mr. Durrer?

16       MR. DURRER:  Yeah, that's correct, Your Honor, and

17 we're not selling cash.  And I was remiss.  I should have

18 mentioned, Your Honor, that there were a hand -- there was a

19 cure notice process.  At this time, you know, FlexGen has not

20 identified any contracts to be assumed and assigned.  So, we're

21 not litigating any cure issues today because they may be

22 completely unnecessary if that changes because FlexGen does

23 retain rights to tweak that assumption of silent schedule.

24       We'll, obviously, come back to Your Honor, but we

25 don't anticipate, well, certainly not we're dealing with any

43

1  cure today.  But if we do, we'll come back and make that clear

2  to everybody.

3            THE COURT:  All right.  Thank you.  Thank you,

4  counsel.

5            MS. McGOWEN:  Your Honor, Lorraine McGowen again from

6  Orrick on behalf of EsVolta and EDF.  We filed a limited

7  objection and notice of lien and reservation of rights, Docket

8  Numbers 558 and 559, on behalf of EsVolta and EDF noting that

9  pursuant to our contracts, both of those customers had

10 purchased certain goods and equipment, including replacement

11 parts, and asserted liens associated with that.  So to the --

12 and that notice was in connection with the sale to FlexGen.

13           So, to the extent that the FlexGen order proposes to

14 sell property that our clients have already purchased, we would

15 argue again that that's not property of the estate and should

16 not be part of the sale order.

17           THE COURT:  All right.  Thank you.  Counsel?

18           MR. POMPEO:  Good afternoon, Your Honor.

19           THE COURT:  Good afternoon.

20           MR. POMPEO:  Michael Pompeo on behalf of Faegre,

21 Drinker, Biddle & Reath on behalf of Keyframe, pre-petition

22 lender.  You asked a question about the credit bid.

23           THE COURT:  Right.

24           MR. POMPEO:  Just to state the obvious, Your Honor,

25 pre-petition obligations will be paid off as a part of this

44

1  sale and it's a part of Paragraph 35 of the proposed form of

2  order.

3          THE COURT:  All right.  Thank you.

4          MR. POMPEO:  Okay.

5          THE COURT:  Mr. Schwartz.

6          MR. SCHWARTZ:  Thank you, Your Honor.  Joseph

7  Schwartz, Riker Danzig.  This time is I stand on behalf of a

8  different client.  My client is Front Range-Midway Solar

9  Project, LLC.  We have two contracts with the debtor.  We filed

10 a response and our response is found at Docket Number 446.

11         I heard Mr. Durrer and my response was generally

12 directed towards cure and I understand that cure is not an

13 issue for today.  We raised another issue which was that we

14 have two contracts, one of which was terminated pre-petition

15 and I also heard Mr. Durrer when he said that the buyer

16 reserves the right to designate which contracts they want to

17 assume or take by way of assignment.  But I just want to

18 reserve rights and make sure that nothing is affecting my

19 client here today.

20         THE COURT:  Fair enough.

21         MR. SCHWARTZ:  Thank you, Your Honor.

22         THE COURT:  Thank you.  Today's been a lesson for

23 interns and law clerks on, you know, the meaning of reservation

24 of rights in all capacities.  All right.  Anyone else wish to

25 be heard?  Oh, I see a lot of raised hands on the screen.  Mr.

45

1  Aulet, do you, on behalf of the Committee, before I turn to the

2  screen?

3          MR. AULET:  Yes, Your Honor.  The Committee is

4  supportive of the FlexGen sale.  I think the auction result as

5  a whole was better than expected, but unfortunately this

6  particular portion was not.  I would just rise again to say

7  while we support the sale at this point, you know, these cases

8  are looking very rough for unsecured creditors.

9          The debtors came in with over $300 million of unpaid

10  trade vendors and the Committee is going to be very focused in

11  the days and weeks ahead on finding out exactly how that came

12  to be and what can be done to increase the quite meager

13  recoveries that unsecured creditors are looking at as a result

14  of this sale.  But this sale is critical to getting to that

15  point.  And so the Committee supports the approval of this --

16  of all three transactions, Your Honor.

17          THE COURT:  Understood and thank you, Mr. Aulet.  Let

18  me turn to those who are appearing remotely.  In no particular

19  order, Mr. Zammiello.

20          MR. ZAMMIELLO:  Good afternoon, Your Honor, Agostino

21  Zammiello from Fox Rothschild on behalf of Specified

22  Technologies, Inc.  Can you hear me okay?

23          THE COURT:  I can.  Thank you.

24          MR. ZAMMIELLO:  Perfect.  Your Honor we filed a

25  reservation of rights to the debtors' notice of winning bidders

46

1  found at Docket Number 662.  The debtors and Specified

2  Technologies are parties to a master supply agreement or MSA.

3  The MSA was not previously listed on the notice of potentially

4  assumed executory contracts that was previously filed by the

5  debtors.  And we simply want to reserve our right to the extent

6  FlexGen or another party seeks to assume the MSA.

7          Specified Technologies reserves its right to assert

8  any objection related to the assumption and assignment of the

9  agreement, including but not limited to, receiving notice,

10  objecting to the notice, cure amount or any sort of adequate

11  assurance.

12          THE COURT:  All right.  Thank you.

13          MR. ZAMMIELLO:  Thank you, Your Honor.

14          THE COURT:  Noted.  Mr. Bostel.

15          MR. BOSTEL:  Good afternoon, Your Honor, Kevin

16  Bostel, Weil, Gotshal & Manges, on behalf of Munmorah Battery

17  ProjectCo and Ulinda Park ProjectCo.  Your Honor, as you're

18  aware, our clients reached a settlement with the debtors with

19  respect to certain claims relating to pre-petition agreements

20  between the parties.  Under the settlement, which was approved

21  at Docket Number 283, the project group was to receive transfer

22  of certain assets, inventory and the restatement of a license.

23          We had intended on closing that deal well in advance

24  of the sale.  But, unfortunately, some of the conditions

25  remained outstanding until late last night.  The original APA

1  filed didn't carve out those assets and we were concerned that,

2  you know, some of those assets may inadvertently be transferred

3  or there could be confusion as to those going with the sale.

4        Fortunately, we were able to resolve and get language

5  in the order that resolved our concerns which is found at

6  Paragraph 36.  And we did, in fact, close on the settlement

7  deal late last night.  So, we're all resolved with the

8  inclusion of the language in Paragraph 36 and we'd just like to

9  thank the debtors and FlexGen for working with us through that

10 up until late last night.

11        THE COURT:  All right.  Thank you, counsel.  Ms.

12 Remington.

13        MS. REMINGTON:  Good afternoon, Your Honor, Tori

14 Remington, Troutman, Pepper, Locke, on behalf of Ameresco, Inc.

15 and Kupono Solar, LLC.  Your Honor, we were a party that filed

16 a cure objection a NDI 555.  We understand today that the cure

17 objections to the extent agreements are assumed and assigned

18 will be heard at a later date.  However, prior to the hearing

19 today, we reached agreed to language with counsel to the

20 debtors with respect to language we wanted to be included on a

21 record.

22        That language is to the extent that any contract with

23 Ameresco, Inc. or Kupono Solar, LLC for which there is a

24 disputed cure amount is designated as an assumed contract.

25 Such disputed cure amounts shall be resolved unless otherwise

48

1   resolved by agreement of the debtors and the Ameresco entities

2   at a further hearing before the Court scheduled on at least 14

3   days notice to the debtors and the Ameresco entities.

4          We just wanted to put that on the record, Your Honor.

5   Thank you.

6          THE COURT:  All right.  Thank you.  Is there anyone

7   else who wishes to be heard?

8                    (No audible response)

9          THE COURT:  All right.  Then, at this juncture, the

10  Court appreciates the work that has been undertaken by debtors'

11  counsel and the cooperation of those who have filed limited

12  objections.  The Court notes various carveouts that are going

13  to be included in the order language protecting 365(n) rights,

14  the deferral of consideration of cure amounts to another date.

15         There's no question for the Court, as the Committee

16  has noted, that the sale satisfies the <u>Abbotts Dairies</u>

17  requirements, is certainly beneficial to the estate for fair

18  value given the process that to which there has been no

19  objection raised as far as soliciting interest and the sale

20  process, the auction process itself.  I assume, and I have no

21  reason not to, grant 363(m) protections to the bidder and I

22  also assume, although I don't have the language in front of me,

23  that there are various 6006 waivers --

24         UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

25         THE COURT:  -- 14-day waivers.  The Court will grant

49

1  those and the Court will -- I'm not going to got through the

2  litany of 363(b) and (f) requirements.  They've been satisfied,

3  they've been -- there's recitations of those in the supporting

4  briefs and the Court adopts.

5       Again, I appreciate the long day and the long nights

6  that preceded it and days.  And we're making progress.  So with

7  that, are there any other issues parties want to address?  So

8  this, the sale order is going to be approved and that's an

9  order to be submitted.  You'll reach out for chambers, again,

10  likewise if there are any issues, reach out for chambers and

11  we'll see what we can do.

12       Our next gathering together is on September 3rd, as

13  discussed, at ten o'clock.  Other than that, thank you, all.

14       UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

15       THE COURT:  Take care.

16                        *  *  *  *  *

17

18

19

20

21

22

23

24

25

## C E R T I F I C A T I O N

We, KIM WEBER and KELLI R. PHILBURN, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Kim Weber

KIM WEBER


/s/ Kelli Philburn

KELLI R. PHILBURN

J&J COURT TRANSCRIBERS, INC.          DATE:   August 8, 2025

**Exhibit 2**

**Hearing Transcript September 3, 2025**

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                      FOR THE DISTRICT OF NEW JERSEY

IN RE:                      .      Case No. 25-16137 (MBK)
                            .      Chapter 11
   POWIN, LLC, ET AL.,      .      (Jointly Administered)
                            .
                            .      U.S. Courthouse
             Debtors.       .      402 East State Street
                            .      Trenton, NJ 08608
                            .
                            .      September 3, 2025
 . . . . . . . . . . . . .  .      11:31 a.m.


                  TRANSCRIPT OF STATUS CONFERENCE
             BEFORE THE HONORABLE MICHAEL B. KAPLAN
              UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:            Togut, Segal & Segal LLP
                            By:  FRANK A. OSWALD, ESQ.
                            One Penn Plaza
                            Suite 3335
                            New York, NY 10119

                            Dentons US LLP
                            By:  VAN C. DURRER, II, ESQ.
                            1221 Avenue of the Americas
                            Ste. 25th Floor
                            New York, NY 10020

For Leeward Renewable       Mayer Brown
Energy, LLC, Longroad       By:  RICHARD A. STIEGLITZ, ESQ.
Energy Partners, DTE        1221 Avenue of the Americas
Electric Company:           New York, NY 10020-1001


Audio Operator:             Linda Brakel


 Proceedings recorded by electronic sound recording, transcript
                  produced by transcription service.
```

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

For EDF Power Solutions      Orrick, Herrington & Sutcliffe LLP
and EsVolta, LLC:            By:  LORRAINE McGOWEN, ESQ.
                            51 West 52nd Street
                            New York, NY 10019-6142

For Stem, Inc.:              Greenberg Traurig, LLP
                            By:  ALAN J. BRODY, ESQ.
                            500 Campus Drive, Suite 400
                            Florham Park, NJ 07932

For Lone Star                Vinson & Elkins
Solar, LLC, et al.:          By:  LAUREN R. KANZER, ESQ.
                            1114 Avenue of the Americas, 32nd Fl.
                            New York, NY  10036

For Honeywell                Rabinowitz, Lubetkin & Tully, LLC
International, Inc.:          By:  JEFFREY A. COOPER, ESQ.
                            293 Eisenhower Parkway, Suite 100
                            Livingston, NJ 07039

                            Adams & Reese
                            By:  SCOTT CHEATHAM, ESQ.
                            Hancock Whitney Center
                            701 Poydras Street, Suite 4500
                            New Orleans, LA 70139-4596

For FlexGen Power            Latham & Watkins LLP
Systems LLC:                 By:  JEFFREY T. MISPAGEL, ESQ.
                            355 South Grand Avenue, Suite 100
                            Los Angeles, CA 90071

For Mainfreight Inc.:        Benesch, Friedlander, Coplan & Aronoff
                            By:  KEVIN CAPUZZI, ESQ.
                            411 Hackensack Avenue, 3rd Floor
                            Suite 801
                            Hackensack, NJ 07601

For Ace Engineering:         Sherman Silverstein
                            By:  ARTHUR ABRAMOWITZ, ESQ.
                            East Gate Corporate Center
                            308 Harper Drive, Suite 200
                            Moorestown, NJ 08057

For BHER Ravenswood          Gibson, Dunn & Crutcher LLP
Solar 1, LLC:                By:  JEFFREY C. KRAUSE, ESQ.
                            333 South Grand Avenue
                            Los Angeles, CA 90071-3197

3

APPEARANCES (Cont'd):

For the Committee:          Brown Rudnick, LLP
                            By:  KENNETH AULET, ESQ.
                            7 Times Square
                            New York, NY 10036

For Expeditors              Bressler, Amery & Ross, P.C.
International of            By:  DAVID H. PIKUS, ESQ.
Washington:                 325 Columbia Turnpike
                            Florham Park, NJ 07932

                            Brennan Scungio & Kresge LLP
                            By:  LISA M. KRESGE, ESQ.
                            362 Broadway
                            Providence, RI 02909


                         - - -

1          THE COURT:  All right.  Good morning.

2          MR. OSWALD:  Good morning, Your Honor.  I think we

3 have a light courtroom today, but, good to see you as always.

4 Frank Oswald, Togut, Segal & Segal, co-counsel for the Powin

5 debtors, here today with my colleagues from Dentons.  We've got

6 one uncontested matter, adjourned matter, which I'll handle

7 before turning over to Mr. Durrer.

8          And that first matter was for an extension of the

9 time to remove pre-petition actions.  A hundred and twenty day

10 extension was requested.  We filed the motion at Docket Number

11 725.  We've viewed that motion with the Committee and the U.S.

12 Trustee.  There were no comments to it.  And yesterday, filed a

13 certificate of no objection at Docket Number 764.

14          Unless Your Honor has any questions, we would ask

15 that that order be entered when the Court gets an opportunity.

16          THE COURT:  All right.  I think I -- the certificate

17 of no objection was Document 823, or was that a different

18 certificate?

19          MR. OSWALD:  The extension?

20          THE COURT:  No objection --

21          MR. OSWALD:  No objection, yeah.

22          THE COURT:  -- with respect to extending debtors'

23 motion -- motion for an entry of an order extending the time

24 when the debtors may remove civil actions.

25          MR. OSWALD:  Yeah.

1            THE COURT:  All right.  I have it.  Granted.

2            MR. OSWALD:  Thank you, Your Honor.

3            THE COURT:  Thank you.  And let me just note.  Since

4  we do have a number of participants who are appearing remotely

5  or auditing remotely, as usual, if you wish to be heard, please

6  use the raise hand function so we can identify you and call

7  upon you.

8            MR. OSWALD:  With that, Your Honor, we'll turn it

9  over to Mr. Durrer.  I know you had originally on the agenda

10  the ordinary course professionals motion.  We're working

11  through some issues with the U.S. Trustee's Office, so --

12            THE COURT:  Right.

13            MR. OSWALD:  -- we'll want to deal with that at a

14  later time.

15            THE COURT:  And I think that -- yes, that was

16  carried?

17            MR. OSWALD:  Yeah.

18            THE COURT:  Let's make sure I have it.  Carried to

19  September 25.

20            MR. OSWALD:  Thank you, Your Honor.

21            UNIDENTIFIED SPEAKER:  Something to think about.

22            THE COURT:  Oh.  That will help.  They want to see

23  me.  There I am.  All right.  Good morning.

24            MR. DURRER:  Good morning, Your Honor.  Van Durrer,

25  Dentons, on behalf of the debtors.  I'm just here to introduce

1  the next set of motions, which are a couple of the motions to

2  compel and adequate protection motions regarding Section 365(n)

3  rights.  I believe that there's a bunch of piece that's broken

4  out, but I'll defer to Mr. Stieglitz to start with their

5  motion, which is Number 2 on the agenda, Your Honor.

6          THE COURT:  All right.  Thank you.  Good morning, Mr.

7  Stieglitz.

8          MR. STIEGLITZ:  Good morning, Your Honor.  Richard

9  Stieglitz from Mayer Brown on behalf of the various licensees

10 and customers set forth in our motion to compel.  As we have

11 mentioned over several past status conferences, and I'll take a

12 quick break and again thank Your Honor for those status

13 conferences, both before the past hearing and over the last

14 couple weeks.  They were incredibly helpful in resolving our

15 issues.

16         And I think you may actually be undefeated, because I

17 think some other people are going to come up here and also say

18 they've resolved issues since our last status conference.  But,

19 I, am in no way speaking for them.  As I mentioned before, I

20 only speak for my clients.

21         THE COURT:  Okay.

22         MR. STIEGLITZ:  I will mention that we are prepared

23 to adjourn our motion as we previewed over the status

24 conferences.  I believe there's an omnibus hearing on the 25th.

25 We think it makes sense to move it to that date, both to give

1  us some time to finalize documentation and also hopefully keep

2  people's feet to the fire to, you know, dot the I's and cross

3  the T's.  I will mention --

4          THE COURT:  Could I just stop you just for a second?

5          MR. STIEGLITZ:  Sure.

6          THE COURT:  Becca, I mean, I'm looking on our 9/25

7  calendar.

8          MR. STIEGLITZ:  I could have messed up the date, Your

9  Honor.

10          THE COURT:  No, no.  That's -- because that's the

11  date I just adjourned a matter to.  I'm just -- I don't -- I

12  want to make sure --

13          LAW CLERK:  I have 11:30.

14          THE COURT:  You have 11:30?

15          LAW CLERK:  For Powin.  And then (indiscernible).

16          THE COURT:  I don't see it on CHAP.  But, all right.

17  We'll work out those details.

18          LAW CLERK:  I don't think we have anything filed that

19  we can link a hearing to yet.

20          THE COURT:  Oh, okay.  All right.

21          LAW CLERK:  I think it's just been reserved.

22          THE COURT:  That's fine.

23          UNIDENTIFIED SPEAKER:  We had thought it was reserved

24  as an omnibus.

25          LAW CLERK:  Yes.  Yeah, but there's --

1          THE COURT:  For the afternoon?  Oh, at 11:30.

2          LAW CLERK:  11:30 is what we have.

3          THE COURT:  11:30?

4          LAW CLERK:  Is that what we have?

5          THE COURT:  I'll defer to her.

6          MR. STIEGLITZ:  I will defer to both of you.  I'm

7    just glad the date was actually right and I wasn't making up

8    dates.  I've already spoken more than I meant to.  The only

9    thing I'm going to say is, and I sort of previewed this at the

10   status conference, folks who joined our motion are going to

11   come up and make representations.

12         If they start arguing facts or substance, I may come

13   back up, because we have, you know, extensively briefed and

14   prepared for those hearings.  And our arguments aren't

15   necessarily the same.  So, I just reserve my right to come back

16   up if anything potentially contradictory or prejudicial may be

17   said with respect to our client's motion.

18         THE COURT:  Fair enough.  But, as far as your

19   client's motion, we're carrying it to the 25th?

20         MR. STIEGLITZ:  Yes, Your Honor.

21         THE COURT:  All right.

22         MR. STIEGLITZ:  Thank you.

23         THE COURT:  You're welcome.  Thank you.

24         MS. McGOWEN:  Good morning, Your Honor.

25         THE COURT:  Good morning.

1        MS. McGOWEN:  Lorraine McGowen from Orrick,

2   Herrington & Sutcliffe on behalf of EsVolta, LLC and EDF Power

3   Solutions.  Your Honor, we're one of those customers that Mr.

4   Stieglitz mentioned may have reached agreement.  And so we had

5   joined the motion that was filed by Mr. Stieglitz, and we're

6   happy to report that we have reached an agreement that resolves

7   the issues.  We're working on documentation.

8        THE COURT:  I've heard that before.

9        MS. McGOWEN:  And so we do ask that our joinder, as

10  well as the 365(n) rights that was also going to be addressed

11  today be put off to the next omnibus.

12       THE COURT:  All right.  Fair enough.  So, we'll carry

13  that as well.

14       MR. BRODY:  Good morning, Your Honor.

15       THE COURT:  Good morning, Mr. Brody.

16       MR. BRODY:  Alan Brody, Greenberg Traurig, on behalf

17  of Stem, Inc., one of the other customers.  Your Honor, the

18  simple answer is ditto.  But, for purposes of the record, Stem

19  and FlexGen have worked out an agreement principle.  We are

20  memorializing that agreement.

21       Stem had also filed a joinder.  Therefore, for

22  purposes of today, we would simply ask that the joinder be

23  carried along with the other motion, all of the motions with

24  respect to 365(n), so that the parties could finalize and

25  memorialize the agreement.

10

1          THE COURT:  Fair enough.

2          MR. BRODY:  Thank you.

3          THE COURT:  You also are added to the party on the

4    25th.

5          MR. BRODY:  Thank you.

6          MS. KANZER:  Good morning, Your Honor.

7          THE COURT:  Good morning, counsel.

8          MS. KANZER:  Lauren Kanzer of Vinson & Elkins, LLP,

9    on behalf of an Ad Hoc Customer Group that includes Lone Star

10   Solar, Idaho Power, and West Warwick entities.  My clients are

11   licensees of intellectual property, filed a number of pleadings

12   in these cases aimed at insuring that their rights under

13   Section 365(n) are preserved and protected, including the

14   motion for adequate protection that is Agenda Item Number 3.

15         Similar to others, while we -- you heard from

16   customers at the status conferences last week that we lacked

17   clarity on Section 365(n) rights and access to Cloud services,

18   which could leave clients in an untenable position.  My clients

19   share these concerns, but we have made progress with FlexGen

20   regarding the provision of intellectual property.  And we

21   appreciate their efforts over the last few days to get there.

22         We're still subject to documentation, and so

23   similarly, our -- adjourning our motion, I have a slightly

24   different request, which is to adjourn ours to September 15th

25   if the Court has availability.  Similarly, we'd like to keep

1 people's feet to the fire, but on a maybe shorter timeline than

2 others.

3         THE COURT:  Let's see.  Well, timing is going to be

4 difficult on the 15th.

5         MS. KANZER:  Okay.

6         THE COURT:  And then, I guess my question becomes, if

7 there are -- if you're the only licensee that I'm hearing from,

8 or presenting the argument to make sense.  But, if I'm -- if

9 I'm adjourning others to the 25th, why would I -- it doesn't

10 make sense to hear it in pieces, which is my concern.

11        MS. KANZER:  Yeah, no.  I understand, Your Honor.

12        THE COURT:  And I understand the goal, you know.

13 Nobody's -- nobody's satisfied we keep pushing it down the

14 road.

15        MS. KANZER:  Right.  And I think the other concern

16 from my clients' perspective is just ensuring that Cloud

17 services are kept on during the time period while our motion is

18 outstanding.  And so, you know, to the extent that we need to

19 come back sooner, I'm happy to reach out to chambers.  That's

20 really the main concern.

21        THE COURT:  Why don't we do this?  Why don't we carry

22 it to the 25th?  If there's a concern during --

23        MS. KANZER:  Yep.

24        THE COURT:  -- the interim, a disagreement on the

25 continuation of services --

1          MS. KANZER:  Yep.

2          THE COURT:  -- reach out for my chambers, and I can

3    schedule an initial call and then see about scheduling to get

4    on.

5          MS. KANZER:  Yep.

6          THE COURT:  Rather than just putting off on a

7    separate date.

8          MS. KANZER:  That makes sense.

9          THE COURT:  All right.

10         MS. KANZER:  That works, Your Honor.  Thank you.

11         THE COURT:  You're welcome.

12         MS. KANZER:  And then the other thing I just wanted

13   to flag.  At the status conferences last week, Mr. Durrer had

14   noted that customers have raised other issues related to

15   contracts, including the assignment of warranties and

16   guarantees that are related to the agreements that are subject

17   to rejection.

18         These assignments of warranties are important to

19   customers, so that if a component part of one of the batteries

20   isn't working, that the warranty work can be done on behalf of

21   that customer.  Maintaining these warranties, we don't think

22   has any value to the debtors and should be assigned to the

23   customers.

24         We have not been able to get to a final agreement on

25   that assignment, and so we may come back before Your Honor on

13

1  that.  But, I'm hoping that we'll be able to work that out with

2  the debtors.

3            THE COURT:  All right.  I guess my question on that

4  is, does that implicate third parties, those providing

5  services?

6            MS. KANZER:  I think the request is to have an

7  assignment to the extent that it is assignable.  So, to the

8  extent that the warranty agreement that the debtors have with a

9  supplier is assignable, we're asking for that to be assigned to

10 us.

11           THE COURT:  All right.  Then we'll wait --

12           MS. KANZER:  Okay.

13           THE COURT:  -- and we'll see.  Thank you.

14           MS. KANZER:  Thank you, Your Honor.

15           THE COURT:  Thank you, counsel.  Mr. Cooper?  Mr.

16 Durrer --

17           MR. COOPER:  Thank you, Judge.

18           THE COURT:  Good morning, Mr. Cooper.

19           MR. COOPER:  Good morning, Judge.  Jeffrey Cooper,

20 Rabinowitz, Lubetkin & Tully, together with Scott Cheatham at

21 Adams & Reese, representing Honeywell International.  I'm glad

22 I came in the latter part of the group, because I like to join

23 in virtually the different issues that were raised by the other

24 customers, that is, my understanding is that the business

25 people from our client and FlexGen are literally talking as of

14

1  now, or at least earlier this morning, and that we would

2  believe that we have an agreement hopefully in principle, but

3  we'd like to use that September 25th date in the event that

4  things don't work out.  Therefore, I think, technically

5  speaking, we have to continue our joinder to the various

6  motions that are outstanding.

7         And although this may open a hornet's nest, given

8  your comments in the last presentation, my understanding is

9  that the services now being provided by FlexGen will continue

10 until the new date.  But, from what Your Honor had just said,

11 apparently if there's a problem with those services, we can

12 contact the Court and deal with that issue.

13        THE COURT:  Whenever I make comments like that, it

14 comes back to bite me.  So, we'll see.

15        MR. COOPER:  And also, the one issue that I do want

16 to raise and I'm glad prior counsel did, has to do with this

17 concept of the assignment of certain warranties and guarantees.

18 Just so Your Honor knows, we were talking with representatives

19 of FlexGen, including the, you know, the technology people,

20 with regard to concepts that I understand to be called

21 performance guarantees or capacity guarantees.

22        And I'm sort of advised by my client that those are

23 separate things.  I'm not quite sure they are.  But, I do think

24 that those are the types of things that prior counsel had

25 mentioned and that we also are interested in having an

1  assignment of the debtors' rights in those warranties and

2  guarantees.

3         It's my understanding that -- and I could be

4  incorrect, that the debtor has actually paid for these things

5  already.  And if the debtor doesn't need them and they can be

6  assigned as part of the transaction, we're looking to do that.

7  When I spoke briefly with the FlexGen people, they suggested

8  that the guarantee issue was really a Powin issue.  I mentioned

9  it to Mr. Durrer, and we can talk more about that as well.

10 But, I just wanted to put that on the record.

11        THE COURT:  Fair enough.  All right.  Thank you.

12        MR. COOPER:  Thank you, Judge.

13        MR. MISPAGEL:  Good morning, Your Honor.  Jeff

14 Mispagel from Latham & Watkins on behalf of FlexGen, the

15 purchaser of certain of the debtors' assets, including the

16 debtors' intellectual property.  I am formerly the debtors' DIP

17 lender.  Your Honor, I don't have a lot to say fortunately.  I

18 think that's good news for everyone.  I will say first that,

19 with us in the court, is Flex Gen's chief technology officer,

20 Hugh Scott.

21        We heard Your Honor last week.  You wanted decision

22 makers here.  You wanted people to reach agreements.

23 Fortunately, we've made enough progress over the past few days

24 that, you know, I don't think we need to spend a lot of time in

25 your courtroom or in the hallway working things out.  Because I

16

1  think, as you've heard from a lot of the customers, we think we

2  have agreements in principle.

3        The only other thing I'll add is, I guess, thinking

4  Your Honor, I would propose the same solution in terms of

5  services between now and when the hearing is adjourned to the

6  25th, that we don't expect any issues with any of these

7  customers.  If there are any issues, they're welcome to come

8  back to the Court.  And we think that's all that needs to be

9  said on that point.  And that's all -- that's all I have, Your

10 Honor.

11        THE COURT:  All right.

12        MR. MISPAGEL:  Thank you.

13        THE COURT:  Well, thank you.  I appreciate it.  All

14 right.  Any others?  Let me just check remotely.  Any --

15 anybody wish to be heard who's appearing remotely?

16                (No audible response)

17        THE COURT:  Mr. Durrer?

18        MR. DURRER:  Thank you, Your Honor.  So, that

19 actually addresses Items 2 and 3 on the agenda.  Three was Ms.

20 Kanzer's motion.  And then the next couple of items are stay

21 relief motions and related matters, the first being 4 and 5,

22 which are Mainfreight, so I'll defer to Mr. Capuzzi.

23        MR. CAPUZZI:  Good morning, Your Honor.

24        THE COURT:  Good morning.

25        MR. CAPUZZI:  For the record, Kevin Capuzzi, Benesch,

1  Friedlander, Coplan & Aronoff, counsel for the Mainfreight

2  entities.  Your Honor, we are at Items 4 and 5 on the agenda.

3  With respect to Item Number 4, that's Docket 180, this is

4  Mainfreight's motion to confirm that the automatic stay is not

5  in effect with respect to certain goods that were transferred

6  from the debtors to an entity that we refer to as BHER,

7  B-H-E-R, prior to the petition date.

8          Your Honor, I'm happy to report that that motion is

9  uncontested, subject to a couple of reservation of rights that

10  I'll put on the record, and then invite the debtors or BHER to

11  make any confirmations or clarifications.

12          So, Your Honor, just briefly as background, I think

13  you recall, but Mainfreight was a transportation provider and

14  warehouse meant for the debtors.  It was holding certain goods

15  as of the petition date.  Those are classified into two sets.

16  One set of goods were owned by the debtors.  They were subject

17  to our credit bid a couple weeks ago, and are now owned by

18  Mainfreight.  The other set of goods are what we refer to as

19  the BHER goods.  Those are the goods that are subject to the

20  motion.  Those are still being held by Mainfreight at a lay-

21  down facility in West Virginia, and remain subject to

22  Mainfreight's lien.

23          The motion sought primarily two things.  One, a

24  declaration that the stay doesn't apply to those goods, because

25  title was transferred pre-petition to BHER.  And, two, that

18

1  because the stay doesn't apply, Mainfreight can enforce its

2  contractual and statutory lien rights.

3          So, as I noted, the motion is uncontested.  However,

4  the debtors and BHER reserve all rights as to the commercial

5  reasonableness of any sale or disposition of those assets that

6  Mainfreight undertakes.  For example, the amount and scope of

7  the notice that we're going to send out before we undertake a

8  sale of those goods.

9          So, with that reservation that all party's rights as

10  to commercial reasonableness, including Mainfreight's, to argue

11  that it is commercially reasonable, I would ask Your Honor to

12  enter the order in the form that we submitted at Docket Number

13  180, subject to any comments anyone else wants to make.

14          THE COURT:  So, nothing else is going in the order?

15          MR. CAPUZZI:  Nothing else is going in the order.

16          THE COURT:  I don't recall the language of the order.

17  Was it -- was it a blanket, the automatic stay doesn't apply?

18  Or is it more refined, automatic stay under 363(a)(3)?

19          MR. CAPUZZI:  I can grab the order and we can check.

20          THE COURT:  And do you have a preference?  I don't

21  want somebody coming down the road on another case to make an

22  argument there was an issue whether 362(a)(6) would apply.

23          MR. CAPUZZI:  Right.

24          THE COURT:  I'm trying to leave it so it doesn't get

25  shoved back in front of me.

19

1          MR. CAPUZZI:  I believe --

2          THE COURT:  You can --

3          MR. CAPUZZI:  -- the order as drafted, just referred

4   to the automatic stay without a particular subset.  So, I would

5   like it to remain that way, if the Court's okay with that.

6          THE COURT:  All right.  Let me take a look at it.

7          MR. CAPUZZI:  Okay.

8          THE COURT:  If I have an issue, I'll reach out.

9          MR. CAPUZZI:  All right.  And I could also take a

10  look at it while we wrap up the other things.

11         THE COURT:  Thank you.

12         MR. CAPUZZI:  So, I'll cede the podium to BHER and to

13  the debtors, and then I'll come back up with respect to Item

14  Number 5.

15         THE COURT:  All right.  For BHER, come up.  Mr.

16  Abramowitz, good morning.

17         MR. ABRAMOWITZ:  Good morning, Your Honor.  Arthur

18  Abramowitz of Sherman Silverstein representing Ace Engineering.

19  Your Honor, Ace Engineering is withdrawing its limited

20  objection without prejudice with regard to reclamation rights

21  and its right to pursue an administrative claim.

22         Counsel for Ace and the debtor have agreed to engage

23  in limited discovery, after which time Ace will make a

24  determination as to what it believes would be appropriate for a

25  course of action.  Thank you.

20

1          THE COURT:  Fair enough.  Thank you, Mr. Abramowitz.

2    Mr. Krause, good morning.

3          MR. KRAUSE:  Good morning, Your Honor.  Jeffrey

4    Krause of Gibson, Dunn & Crutcher on behalf of BHER Ravenswood,

5    the entity that Mr. Capuzzi refers to as BHER.  Your Honor, my

6    understanding is that the agreement that was reached addresses

7    both motions, so I'm not really sure why we're dealing with

8    Item 4 and not Item 5.  Our agreement was that we would not

9    contest them proceeding with a sale, so long as we reserve our

10   rights on commercial reasonableness.

11         We have filed pleadings at 286 and 621 that we think

12   demonstrate the stay does apply, but we're not objecting to

13   them having relief from the stay or that they should have to

14   file a separate motion for relief.  The parties tried to use

15   the time we've had over the last couple of months to reach an

16   agreement.  Unfortunately, that has not yet happened.  We hope

17   that during the marketing period it may still be possible to

18   have constructive discussions and to reach an agreement, but

19   we're not there yet.

20         And we recognize that the fact that Mainfreight has

21   bought the other goods in their possession, so there's no

22   longer cross collateralization of the debtors' other assets

23   obviates the need for this Court to deal with the dispute,

24   which is now essentially a dispute between Mainfreight and

25   BHER.

21

1        Item 5 is a request that BHER be compelled to pay

2   storage costs with respect to the goods that Mainfreight is now

3   going to conduct a foreclosure sale for.  And our understanding

4   of the discussions among counsel was that our consent to the

5   right to foreclose, whether that's because the stay is being

6   lifted or the Court is determining the stay did not apply, was

7   a global resolution.

8        And that the storage charges that we do not think we

9   are obligated to pay, they may be part of the lien and that

10  Mainfreight can credit bid them in at the foreclosure, are what

11  the next motion deals with.  And our understanding was it was a

12  package agreement that we are not obligated to pay those.  They

13  can add them to their debt.  They can conduct a foreclosure

14  sale.  So, I'm not a hundred percent sure why they've been

15  broken out separately today.

16       THE COURT:  All right.  Well, before I turn to Mr.

17  Aulet, Mr. Capuzzi, you want to address that?

18       MR. CAPUZZI:  Yes, Your Honor.  With respect to Item

19  Number 5, there was no agreement that that was wrapped in to

20  Item Number 4.  With that said, I understand Your Honor has not

21  yet entered the order shortening notice.  I am more than happy

22  to carry that to the September 25th hearing and see if we can

23  come to ground on that between now and September 25th.  But,

24  it's apples and oranges.

25       In June, we were before you.  BHER and the debtors

22

1  requested an adjournment.  And one of the terms of that

2  adjournment was that BHER would pay storage.  Their argument

3  now that that's only conditioned upon them becoming the

4  eventual owner of the goods is found nowhere in the record.

5  So, I'm not willing to merge those two issues.  But, I am

6  willing to put off Item Number 5 to September 25th so that we

7  can, you know, brief that on regular notice rather than on the

8  shortened notice.

9        THE COURT:  All right.  Clearly, I'm not hearing that

10  motion today.  Mr. Krause, your thoughts?

11        MR. KRAUSE:  Your Honor, I would just state that the

12  comments made about what the record shows are entirely

13  inaccurate and there is no commitment by BHER in the record to

14  pay storage charges for batteries it does not receive.  But, we

15  can address that on September 25th.  So, I don't object to that

16  being put over to normal notice.  But, it is not what the

17  record shows.

18        THE COURT:  Fair enough.  Everybody's made their

19  statements.  Why don't we carry it to the 25th?  But, that does

20  not impact -- well, you tell me, I guess, Motion Number 4, as

21  far as entry of the order --

22        MR. CAPUZZI:  It doesn't impact it --

23        THE COURT:  -- and the process.

24        MR. CAPUZZI:  -- from my perspective.  But, if Mr.

25  Krause disagrees.

1          THE COURT:  Mr. Krause?

2          MR. KRAUSE:  It does not.

3          THE COURT:  All right.  Then -- then I can still go

4  ahead and enter that order.

5          MR. CAPUZZI:  And, Your Honor, I grabbed a copy of

6  the proposed order while others were speaking.  I'm happy to

7  hand it up.  But, it simply states that the automatic stay does

8  not apply.  So, it doesn't get into any reference as to the

9  stay being lifted and under what section.

10          THE COURT:  All right.  We'll let it go.

11          MR. CAPUZZI:  Thank you.

12          THE COURT:  Thank you.  Mr. Aulet, do you wish to be

13  heard?

14          MR. AULET:  Yes, Your Honor.  For the record, Kenneth

15  Aulet, Brown Rudnick, for the Committee.  I just wanted to

16  confirm that the Committee is in agreement and withdraws its

17  joinder that it filed back on the 14th, given the resolution of

18  this matter.

19          THE COURT:  Great.  I appreciate that.  Thank you,

20  Mr. Aulet.  All right.  So, we have taken care of then 4 and 5

21  on today's agenda.

22          MR. DURRER:  Yeah, just for the record, Your Honor,

23  Van Durrer for the debtors.  On Item 4, our main issue is that

24  Your Honor's not making a determination of property rights

25  today, just that the stay doesn't apply.  Mainfreight's going

24

1   to do what it believes is appropriate.  There's been a

2   reservation of rights.  And we think Section 108(b) is

3   implicated, but ideally we'll still have a deal, and that's

4   definitely, I know, what is in Mr. Krause's mind and Mr.

5   Capuzzi's mind, so, it's in my mind, too.

6           THE COURT:  All right.  Thank you.

7           MR. DURRER:  So, that takes us to Item 6, which is

8   the Expeditors' motion for stay relief, Your Honor.

9           THE COURT:  Thank you.  Let me hear from counsel.

10          MR. PIKUS:  Good morning or -- yes, still good

11  morning, Your Honor.  David Pikus, P-i-k-u-s of Bressler, Amery

12  & Ross, P.C., representing the creditor, Expeditors

13  International of Washington.

14          THE COURT:  All right.  Thank you.  Good morning.

15  Other appearances?

16          MS. KRESGE:  Lisa Kresge.  I'm co-counsel with Dave

17  Pikus on this matter as well.

18          THE COURT:  All right.  Thank you.  And I guess in

19  opposition will be debtor arguing?

20          MR. DURRER:  Yes, Your Honor.

21          THE COURT:  Okay.  Thank you.  Then, Mr. Pikus, you

22  want to proceed, or counsel proceed?  I have read the motion.

23  Anything you wish to supplement or add?

24          MR. PIKUS:  May it please the Court, Your Honor.

25  Thank you for hearing us on short notice.  The one thing that I

25

1  do want to emphasize is that every constituency in this case

2  benefits by getting these goods away from the port, liquidated,

3  whatever has to be done.  Because the storage charges are

4  increasing at the rate of $4,290 a day.  That's a couple of

5  hundred less than what's in the papers, because of currency

6  fluctuations.

7          There are duties due.  It will be an administrative

8  nightmare for everybody if we have to reconcile everything

9  before the goods are moved out of the port.  And these goods

10  have not cleared Customs yet, and they can't clear Customs

11  until either they're properly abandoned or the duties are paid.

12  And the duties now are $184,000.

13          So, I want to stress that everybody benefits and

14  we've been trying to work this out since June.  So, we submit

15  that the debtor has had more than ample time, along with its

16  customers, to try to get this stuff worked out.  And as we

17  understand it, most of these goods are dedicated to ongoing

18  projects.  So, it shouldn't be all that difficult to get the

19  customers to cooperate with it.  And if not, we'll liquidate

20  them to stop the bleeding here, which is running $32,000 a

21  week.

22          I'll just quickly note the two points that have been

23  made in objection by the debtor.  One, apparently, is a claim

24  that Expeditors is over secured.  If this goes on for another

25  several days, Expeditors is going to go from over to under

1  secured and we're going to have problems with the duties and

2  other things getting paid.  So, that's the quick answer to

3  that.  We've got to staunch the bleeding.

4        And then the second point, I think I've already

5  addressed to some degree.  And that's that the debtor wants

6  some additional time to try to work this out.  As I mentioned

7  earlier, you know, we've been after them for two to three

8  months now to try to work something out.  And, Expeditors, this

9  is not our first rodeo in terms of goods that are stuck on the

10 dock.  We're pretty good at disposing of these goods if

11 necessary.  And we're prepared to do so.

12        And the cost of delaying this to the next hearing

13 date is almost $100,000.  And at that point, what's owed for

14 storage charges and duties will probably exceed the value of

15 the goods.

16        THE COURT:  So, when you indicated that the cargo is

17 valued at six eighty-six, what was that bottomed on?

18        MR. PIKUS:  Those are the commercial invoice numbers,

19 Your Honor, that we get from the manufacturer of the goods and

20 from the consignee of the goods, which in this case is the

21 debtor.  That's the agreed value of the goods.  That's what's

22 submitted to Customs.  That number also may change a little bit

23 due to currency fluctuations.

24        I've seen a more current number of $659,000.  But,

25 there's no question about it.  We're talking about goods that

27

1  are valued right now in excess of $600,000, and representations

2  have been made to the United States Customs and Border Patrol

3  to that effect.  So, these are numbers submitted under penalty

4  of perjury.

5          THE COURT:  And from that number, a hundred and

6  eighty-four thousand or so in duties would have to come off the

7  top?

8          MR. PIKUS:  Yeah.  There -- I can break down what's

9  owed right now, which is over half a million dollars without

10  even including what's owed to Expeditors.  We've got $54,235

11  that are due on collect freight charges.  We've got the duties,

12  which as of a couple of days ago, were at $184,867.50.  There

13  were entry fees of $250 that are due.

14          And finally, the big number is the demurrage, that's

15  basically logistics talk for storage charges and delay charges.

16  Those are $266,260.  That made the total as of August 30th,

17  $505,612.50.  And as I indicated, that's gone up by $4,290 a

18  day for the past three or four days.  So, we're probably

19  approaching $520,000 right now.

20          THE COURT:  All right.  Thank you.  Let me hear from

21  debtor's counsel.

22          MR. PIKUS:  Thank you, Your Honor.

23          MR. DURRER:  Thank you, Your Honor.  Van Durrer for

24  the debtors.  Our view, given the fact that Your Honor

25  shortened the time, which, you know, was fine.  We're all here.

1  We viewed this sort of as a status conference with respect to

2  stay relief, you know, pending a final evidentiary hearing.  We

3  noted that the Expeditors' filing was a bit lax in terms of the

4  documentation.  For example, what Your Honor's referred to,

5  like, having those bills of lading with the actual numbers on

6  them would be super helpful, having the invoices.

7        Our view is that notwithstanding Mr. Pikus' remarks,

8  that Expeditors remains over secured, because most of what it's

9  owed would constitute most likely administrative claims.  The

10 debtors' estates are administratively solvent.  And we have

11 actually been making payments to Expeditors in connection with

12 the FlexGen sale.  We did pay some of their invoices.  Modest,

13 I'll admit.  But, there is a flow of payment.

14       The issue -- the primary issue that the debtors are

15 concerned about, Your Honor, is, and this is very similar to

16 Mainfreight in that, if this was just one customer's goods,

17 that will be one thing.  But, we have multiple customer's

18 goods.  Those customers, we believe will be responsible for the

19 storage, tariffs, some of the Customs charges.  We need to find

20 out if they want them.

21       The one factual correction I would make to something

22 that Mr. Pikus said is, you know, the debtors are not in the

23 business of completing these projects anymore.  And nor is

24 FlexGen.  I think that FlexGen is cooperating with customers to

25 the greatest extent possible, as are the debtors.  But,

29

1  effectively, that business was shut down as we entered Chapter

2  11.

3          So, there are customers that still want their stuff.

4  There are customers that are figuring out if they do.  And

5  there's a process that we're engaged in.  We've been a little

6  busy up to now.  We're somewhat sympathetic to the time that

7  has passed.  But as Your Honor is very aware, there's been a

8  lot of activity filling that space.  We haven't had idle hands.

9          So, our suggestion in the papers was just to grant a

10 60-day stay of execution while we continue to work the problem.

11 As I said, I believe there's ample, adequate protection around

12 the system for Expeditors, notwithstanding that delay.  We have

13 hearings already set up, late September, late October, and I

14 think the first couple weeks in November.  So, we should be

15 able to agree on a date when we can come back, if we're not

16 able to work this out, that Expeditors would then have stay

17 relief.

18         THE COURT:  All right.  When I look at these numbers,

19 and I appreciate the effort of the debtor, and probably the

20 Committee, to get a global resolution with all of its

21 customers.  When I look at these numbers, there's not a lot of

22 room at $4,000 a day.  Sixty days out is just -- turns it

23 upside down.  If I carry this to the 25th, that adds another

24 hundred thousand, ninety-two -- my numbers, roughly ninety-two

25 thousand or so.

1        At that point, I mean, it would seem logical, if the

2   estate is trying to secure any benefit from these assets, that

3   somebody just comes up with a small number in between and

4   satisfy the estate to release its interest in this.  I don't

5   need to tell you how to do this.  We all in this room know how

6   to do this.  It can't go that far.

7        I'll carry this to the 25th date.  Mr. Pikus, I'll

8   come back in a second to you.  I see your hand.  That's the

9   outside limit where this makes any sense.  And hopefully not

10  even -- and hopefully there could be a resolution before that.

11  Because it just -- the dollars, it's too small a gap to afford

12  any more time in this.  Mr. Pikus?

13       MR. PIKUS:  Thank you, Your Honor.  Two points.  One,

14  I'd like to make a suggestion that if the estate is

15  administratively solvent, as we just heard it is, what they

16  should really do in the meantime is pay the duty and pay the

17  demurrage so that we can move these things off the dock.

18  That's really what's costing the money, is that they're sitting

19  there on the dock.

20       You know, I get the sense from the Mainfreight cases

21  that Your Honor knows something about the freight business at

22  this point.  But, the most expensive place to leave these goods

23  is sitting there on the dock.  If they can be moved off and

24  placed in a warehouse somewhere, that will staunch the

25  demurrage charges and we'll get the duties paid so that

1  Expeditors or some other substitute can clear the Customs, so

2  that the goods can be dealt with right away.  These goods can't

3  clear Customs until the duties are paid.  So, that's one

4  reaction I had.

5          Second reaction I had is, you know, given the fact

6  that it's almost another $100,000 to wait until the 25th, I

7  might fall back on a suggestion that Your Honor grant the

8  relief today, but to stay it for a period of time, maybe three,

9  five days, so that we could move up the ladder of the debtors'

10 priorities and get this worked out and get the goods off the

11 dock.

12         THE COURT:  Let me go back to Mr. Durrer, and I don't

13 know if you can answer this.  And I'd want to hear from Mr.

14 Aulet.  I have a hearing on the 25th.  This doesn't require a

15 hearing.  This requires action, a business decision.  I don't

16 need a further legal argument.  What would be -- so I think

17 everybody's interest, what's a reasonable amount of time to try

18 to address this issue from a business perspective?

19         And then, if otherwise, just -- I would take up Mr.

20 Pikus' and say stay relief granted effective a certain date.

21 It doesn't -- I mean, the 25th is three weeks.  That is a

22 hundred grand.  Is there a date in between where the debtor and

23 the Committee and others could commit to somehow reaching a

24 resolution one way or the other or giving up the ship, so to

25 speak?

32

1        MR. DURRER:  Yeah.  Your Honor, if this just involved

2   the debtor, the Committee, and Expeditors, I would be a

3   thousand percent in agreement with that.  It doesn't.  It

4   involves, you know, a half a dozen customers.  And the problem

5   is, we don't -- we don't have a warehouse.  We sold our

6   warehouse.  So, we're a little constrained.

7        I can tell Your Honor and Your Honor won't be

8   surprised to learn that since the filing of the motion, there's

9   been quite a bit of activity at the business level.  So, people

10  are engaged, like Your Honor's suggestion of adjourning this to

11  the 25th.  And if we work it out in advance of that, terrific.

12  But, I think that's the best that we could do at this stage,

13  Your Honor.

14       And I suspect that Mr. Aulet has a similar comment to

15  make, because he wants to get his arms around this, too.

16  Because what we're really nervous about, frankly, Your Honor,

17  is exposing the estate unnecessarily to tariffs for stuff that

18  nobody wants.

19       THE COURT:  Right.

20       MR. DURRER:  So, that's -- I'm sympathetic to Mr.

21  Pikus' comments in that regard.  But, there is a universe where

22  some of this stuff gets abandoned because nobody wants to pay

23  the tariffs.  So, I just -- we haven't sorted that out with

24  every single customer that we have to talk to.

25       THE COURT:  All right.  Thank you, Mr. Durrer.  Mr.

1  Aulet?

2         MR. AULET:  Yes, Your Honor.  For the record, Kenneth

3  Aulet, again, for the Committee.  I agree with Mr. Van Durrer

4  that -- I appreciate where Mr. Pikus' client is at.  But, this

5  has been a very busy case with a lot of moving parts.  And

6  unfortunately the amount of money at issue here just wasn't as

7  much as the amount of money at issue in everything that we've

8  been dealing with up to now.

9         If it's, you know, all of the figures that he's cited

10  suggest that it would be, you know, useful for the debtors and

11  the Committee to get this done quickly.  And so I agree with

12  the suggestion of setting this for the 25th.  I don't agree

13  with the sort of blanket grant of a stay relief predicated on a

14  particular date without the chance for the debtors and the

15  Committee to really get their arms around this issue.

16         THE COURT:  All right.  Thank you, Mr. Aulet.  I

17  can't see any scenario where I would let it go past the 25th.

18  So, Mr. Pikus, it's not what you're looking for, but it's

19  somewhere in between.  I'll grant stay relief effective on the

20  25th, absent further order of the Court.  Which doesn't mean

21  that if you don't reach an accord before that, I'll enter an

22  order earlier and we can get it going.  But, at least we know

23  there's an ending in sight.  All right?

24         MR. PIKUS:  Thank you very much, Your Honor.

25         THE COURT:  Mr. Pikus, why don't you submit a form a

34

1  order?

2          MR. PIKUS:  We will do that.  Thank you again.

3          THE COURT:  All right.  Thank you.

4          MR. PIKUS:  Bye now.

5          THE COURT:  Take care.  I think that concludes?

6          MR. DURRER:  Other than, thanks again, Your Honor,

7  and especially chambers was super helpful since August 6th.  We

8  actually got a lot done through those host of chambers

9  conferences.  So, thank you, Your Honor.

10         THE COURT:  You're welcome.  All right.  No raised

11 hands online.  Then we will mark the -- we'll adjourn.  Thanks,

12 folks.

13         MR. DURRER:  Thank you, Your Honor.

14         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

15         THE COURT:  Take care.

16                    * * * * *

17              **C E R T I F I C A T I O N**

18         I, KIM WEBER, court approved transcriber, certify

19 that the foregoing is a correct transcript from the official

20 electronic sound recording of the proceedings in the above-

21 entitled matter, and to the best of my ability.

22

23 /s/ Kim Weber                    

24 KIM WEBER

25 J&J COURT TRANSCRIBERS, INC.      DATE:  September 8, 2025