**<u>Exhibit 1</u>**

(Declaration of Gerard Uzzi in Support of Emergency First Day Motions)

Docket #0013  Date Filed: 6/10/2025

**DENTONS US LLP**

Tania M. Moyron (*pro hac vice* forthcoming)
Van C. Durrer, II (*pro hac vice* forthcoming)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: tania.moyron@dentons.com
      van.durrer@dentons.com

John D. Beck (*pro hac vice* forthcoming)
Sarah M. Schrag (*pro hac vice* forthcoming)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
Email: john.beck@dentons.com
      sarah.schrag@dentons.com

*Proposed Counsel for Debtors and
Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Email: frankoswald@teamtogut.com

Albert Togut (*pro hac vice* forthcoming)
Amanda C. Glaubach (*pro hac vice*
forthcoming)
Eitan Blander (*pro hac vice* forthcoming)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Email: altogut@teamtogut.com
      aglaubach@teamtogut.com
      eblander@teamtogut.com

*Proposed Counsel for Debtors and
Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re:<br><br>Powin, LLC, *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Joint Administration Requested) |

### DECLARATION OF GERARD UZZI IN SUPPORT OF
### EMERGENCY FIRST DAY MOTIONS OF THE DEBTORS

    I, Gerard Uzzi, hereby state and declare as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504]; (iii) PEOS Holdings, LLC [5476]; (iv) Powin China Holdings 1, LLC [1422]; (v) Powin China Holdings 2, LLC [9713]; (vi) Charger Holdings, LLC [5241]; (vii) Powin Energy Ontario Storage, LLC [8348]; (viii) Powin Energy Operating Holdings, LLC [2495]; and (ix) Powin Energy Operating, LLC [6487]. The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.



2516137250610000000000013

1. I am the Chief Restructuring Officer (the "CRO") of Powin, LLC ("Powin"). I was appointed as CRO of Powin and the above-referenced affiliated debtors and debtors in possession (collectively, the "Debtors") effective on June 9, 2025.

2. I am also a Managing Partner and Founder of CBMN Advisors LLC d/b/a Uzzi & Lall ("Uzzi & Lall"). I have extensive experience advising companies, boards of directors, senior management, creditors, equity holders, and investors in stressed and distressed situations, including chapter 11, out-of-court work outs, and rescue financings across industries and jurisdictions. I also serve in a number of fiduciary capacities, including presently as the Chairman of the Celsius Litigation Oversight Committee.

3. Prior to co-founding Uzzi & Lall, I was a senior restructuring partner at Milbank LLP and White & Case LLP for over 18 years in the aggregate. During that time, I was personally involved in senior roles in some of the nation's largest and most complex chapter 11 cases, including Lehman Brothers, Washington Mutual, American Airlines, Rescap, Charter Communications, Mirant, Adelphia Communications, Purdue Pharma, and ZAIS. I have been recognized for my work in Chambers, Euromoney's IFLR, The Legal 500, and Expert Guides as one of the World's Leading Insolvency and Restructuring Professionals.

4. On June 9, 2025 (the "Petition Date"),[2] Powin and certain of its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"). I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases (the "Chapter 11 Cases").

5. Except as otherwise indicated herein, this declaration (the "Declaration") is based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors or the Debtors' advisors, my opinion based upon my experience,

---

[2] Lead Debtor Case No. 25-16137 (MBK) for Debtor Powin Project LLC was filed on June 9, 2025, and the remaining Debtors were filed shortly thereafter on June 10, 2025.

knowledge, and information concerning the Debtors' operations and this industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

6.    I make this Declaration for the purpose of apprising the Court and parties in interest of the circumstances that compelled the commencement of these Chapter 11 Cases, in support of the First Day Motions (as defined below), and to articulate the Debtors' goals in these Chapter 11 Cases.

7.    To enable the Debtors to minimize the adverse effects of the commencement of these Chapter 11 Cases on their business and its going concern value, the Debtors have requested various types of relief in a number of applications and motions (each a "First Day Motion," and, collectively, the "First Day Motions"). The First Day Motions seek relief intended to maintain the Debtors' business operations for their going concern value and to otherwise preserve value for the Debtors, its stakeholders, and parties in interest. Each First Day Motion is crucial to the Debtors' efforts. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.

8.    Section I is an overview of the Debtors' goals in these Chapter 11 Cases. Section II provides an overview of the Debtors' business and organizational structure. Section III describes the circumstances that compelled the commencement of the Chapter 11 Cases. Section IV describes the Debtors' capital structure. Section V provides a summary of the First Day Pleadings and factual bases for the relief requested therein.

## I.    OVERVIEW

9.    Debtor Powin, a Delaware limited liability corporation, and its affiliates are collectively an energy storage integrator based in Portland, Oregon, and with offices around the world in Vietnam, China, Canada, Australia, and Spain. As one of the leading global energy platform providers, Powin and its affiliates are at the forefront of the clean energy revolution. Powin focuses on advancing the next frontier of energy by ensuring access to clean, reliable, resilient, and affordable power through cutting-edge technology. The Debtors' business model

US_ACTIVE\130481403

targets innovations in energy storage, which are essential to the planet's transition to a sustainable, carbon-free world.

10.     Before the filing of these Chapter 11 Cases, as a result of several factors described further below, the Debtors experienced challenges leading to financial constraints that required engagement with their Prepetition Lenders (defined below) and other parties in interest on an appropriate path forward for the Debtors' business.

11.     As explained in more detail in Sections II and IV below, on March 24, 2025, the Prepetition Agent (defined below) and the Debtors' lenders party to the Prepetition Loan Documents (the "Prepetition Lenders," and together with the Prepetition Agent, the "Prepetition Secured Parties") declared payment and covenants defaults and demanded payment in full of the Debtors' Prepetition Secured Debt (defined below). After consultation with Powin's management team and advisors, the Prepetition Agent also exercised its cash dominion rights over certain blocked accounts. On April 25, 2025, the Prepetition Agent exercised remedies against a portion of the Debtors' cash on hand and exercised its rights to appoint me as independent manager for Powin.

12.     Upon such appointment, and with the resources available to me at Uzzi & Lall, I took the following steps to stabilize the Debtors' situation:

  a.  I quickly engaged Dentons LLP ("Dentons") as legal counsel to support our analysis of strategic alternatives.

  b.  I undertook steps to understand the Debtors' liquidity position, and, working with Dentons, successfully negotiated an agreement with the Prepetition Secured Creditors to (i) release cash and (ii) relend $6.25 million to allow my team an opportunity to evaluate the Debtors' situation and develop a working strategy to maximize value.

  c.  I then engaged Huron Transaction Advisory LLC ("Huron") as investment banker to assist the Debtors in raising needed capital and pursuing strategic alternatives.

  d.  I participated with the Debtors' existing management in meetings with our largest stakeholders, including our largest vendor, Ace Engineering & Co., LTD ("ACE Engineering"), and our largest customers, to explore both near-term and long-term solutions to the Debtors' deepening liquidity crisis.

e. During the course of those interactions, two things became clear: (a) the new project or "ESA"[3] side of the business was not immediately sustainable, in large part because two of the Debtors' largest customers terminated their projects during these discussions; and (b) the servicing or "LTSA"[4] side of the business was vitally important to the Debtors' customer base, and a community of customers were very interested in supporting this business line.

f. While certain potential transactions remain in negotiation, we successfully negotiated an interim transaction with a key customer to bridge the Debtors for a period of weeks, and we developed a business model that contemplates sustaining the LTSA business line (the "LTSA Program") in a manner that preserves the customers projects during the Chapter 11 Cases. The feedback from customers also suggested that the LTSA Program would be best accomplished through a stand-alone entity that was removed and could be reorganized separately from Powin's legacy liabilities. Consequently, Powin formed a new subsidiary, Powin Project LLC for that purpose.

g. If we are successful in implementing that LTSA Program, the Debtors will proceed to market their remaining assets for sale under the protection chapter 11 affords.

## II.   THE DEBTORS' BUSINESS AND ORGANIZATIONAL STRUCTURE[5]

13.    As part of their commitment to clean energy and to accelerate the shift to clean energy alternatives, Powin and its affiliates engineer and install battery energy storage systems ("BESS") in clean energy power projects. They then provide data-driven software controls, proven hardware, and experienced end-to-end project execution for cell-level monitoring and reporting, as well as other support services like comprehensive maintenance, wrapped warranties, and specialized training to ensure the long term benefits of their deployed BESS. Powin's products are more than just collections of battery cells; they are active intelligent energy storage and discharge systems powered by Powin's StackOS™, which are designed to bolster energy distribution to alleviate grid congestion, reduce costs, and strengthen aging infrastructure. [6]

---

[3] The ESA side of Powin's business is further discussed in Section II and V.
[4] The LTSA side of Powin's business is further discussed in Section II and V.
[5] Capitalized terms used but not defined in this overview section shall have the meanings assigned to them below.
[6] The information provided in ¶¶ 13-16 is largely derived from the Powin Sustainability Report 2024, *available at* https://powin.com/wp-content/uploads/2025/04/Powin-Sustainability-Report.pdf. The report is a public document maintained in the ordinary course of business, but I have not had an opportunity to independently verify it. I make no assurances that such report is accurate.

14.    This comprehensive proprietary system integrates an onboard battery management system, thermal management system, and energy management system seamlessly, which Powin continuously monitors remotely in real time from the Powin Battery Lab. The Powin Battery Lab relies on the latest testing facilities, equipment, and experienced specialists to enable better performance, control processes, and strategies for each of its products. With the Powin Battery Lab, Powin is able to provide unparalleled visibility and control into each and every battery cell in the field, empowering clients to make informed decisions on the operational performance of their energy storage assets. Every day, Powin monitors over 5 million battery cells in the field. Additionally, to counter cyber attack threats that could otherwise destabilize connected grids, Powin's system must be continually updated, requiring continual efforts by Powin's experts. Relentlessly focused on innovation and lasting value, Powin optimizes energy management, mitigates risk, and ensures predictable energy throughout the lifetime of its projects.

15.    Powin's system, which is now well ingrained into the clean energy landscape, is vital to the vast array of parties in the clean energy space and to future endeavors towards a carbon-free planet writ large. Currently deployed in the field are utility scale Powin BESS worth in excess of $2 billion that depend on Powin's StackOS™ for their continued operation over, which equates to over 17,000 megawatt-hour ("MWh") of energy storage systems deployed or under construction worldwide. Without Powin's Stack OS™, these BESS cannot operate safely and the worldwide system collapses, jeopardizing billions of dollars of investments in the clean energy space.

16.    As further background, in 2016, Powin began commercial operations with the launch of its first utility-scale project, the 9MWh Millikan BESS. Since then, Powin has continued to achieve significant growth, introducing new products and entering new markets. In 2017, Powin built the largest project in Canada, with 40MWh currently operating today in Stratford, Ontario. In 2018, Powin built the largest microgrid battery in Mexico in a project that introduced Powin's first containerized systems. In 2019, Powin expanded its international footprint with projects in Italy, Greece, and Israel. Then in 2020, Powin introduced its Stack 230™ product line and grew new commitments to 4GWh. In 2021, Powin acquired its first external investors. By 2022, Powin

US_ACTIVE\130481403

had secured over 17 GWh of new committed installations.

17. At a high level, Powin's business model has two lines of business: (a) the engineering and installation of BESS, which are governed by various energy supply agreements (each, an "**ESA**"); and (b) the warranties, servicing and maintenance of BESS, which are governed by various long term servicing agreements (each, an "**LTSA**"). To implement Powin's business plan, Powin entered into these ESAs and LTSAs with its customers, and then used suppliers and vendors to support performance under the ESAs and LTSAs.

A.    **The Debtors' Organizational Structure.**

18. Powin and its affiliated Debtors are as follows:

- Powin Project LLC (New Jersey);
- Powin, LLC (Delaware);
- PEOS Holdings, LLC (Oregon);
- Powin China Holdings 1, LLC (Oregon);
- Powin China Holdings 2, LLC (Oregon);
- Charger Holdings, LLC (Oregon);
- Powin Energy Ontario Storage, LLC (Oregon);
- Powin Energy Operating Holdings, LLC (Delaware); and
- Powin Energy Operating, LLC (Delaware).

19. The Debtors' prepetition organizational structure is attached hereto as **Exhibit A**.

20. **Non-Debtor Powin Entities.** The Debtors' are affiliated with the entities listed below that have not filed chapter 11 petitions at this time:

- Powin Energy Holdings, LLC (Delaware);
- Powin Energy Intermediate, LLC (Delaware);
- Powin Australia Pty Ltd. (Australia);
- Powin Netherlands B.V. (The Netherlands);
- Powin Energy Spain S.L. (Spain);
- Powin UK Ltd. (United Kingdom);
- Powin Canada B.C., Ltd. (Canada);
- Powin Energy Storage 2, Inc. (Canada);
- Powin Energy Ontario Storage II, LP (Canada);
- Yangzhou Finway Energy Tech Co., Ltd. (China);
- Qingdao CIMC-Powin New Energy Technology Co., Ltd. (China);
- Powin (Qingdao) New Energy Co., Ltd. (China);
- Powin EKS SellCo, LLC (Delaware); and
- EKS HoldCo, LLC (Delaware).

21. Powin Energy Holdings, LLC (Delaware) and Powin Energy Intermediate, LLC

US_ACTIVE\130481403

(Delaware) are holding companies who own Powin, LLC. While Powin Energy Intermediate, LLC is an obligor on the Prepetition Loan Documents, neither Powin Energy Holdings, LLC (Delaware) nor Powin Energy Intermediate, LLC (Delaware) has any operations or any material assets other than their direct and indirect ownership of the Debtors. The governance and conduct of those entities is outside of the scope of the authority of my appointment as CRO and that of the independent manager, John R. Brecker.

## B.    The Debtors' Management.

22.    As described below, pursuant to the terms of that certain Irrevocable Proxy, dated as of October 25, 2024 (the "Proxy"), Powin LLC's Parent, Powin Energy Intermediate, LLC ("Parent Pledgor"), appointed GLAS USA LLC, as collateral agent for the Prepetition Lenders under the Loan Agreement (the "Prepetition Agent"), as its proxy and attorney-in-fact entitling the Prepetition Agent to, upon an event of default, exercise Parent Pledgor's voting rights and all other rights, powers, privileges, and remedies to which a holder of such Pledged Stock (as defined in the Proxy) would be entitled (including giving or withholding written consents of shareholders, partners, or members). On April 25, 2025, the Prepetition Agent exercised the Proxy and provided notice to Powin and the Parent Pledgor that, from and after the date thereof, it was exercising its rights under the Loan Agreement and the Proxy to direct the voting of all of the Parent Pledgor's held equity interests in Powin to amend the operating agreement of Powin (the "LLC Agreement") to provide that Powin would be a manager-managed LLC and appointed me as independent manager of Powin.

23.    On June 8, 2025, the Prepetition Agent exercised its Proxy rights pursuant to Loan Agreement, amended the LLC Agreement for Powin, LLC to include up to two independent managers, and appointed John R. Brecker as an additional independent manager. John R. Brecker has over 30 years as a restructuring professional and is the founder of Drivetrain, LLC, a multi-disciplinary fiduciary services business serving the distressed investing industry with an investor's perspective. John R. Brecker has experience serving as a creditor representative on ad hoc and official creditor committees, as trustee, as examiner, and as independent and creditor-appointed

directorships.

24.     Other management remained in place to continue their focus on day-to-day operations, but certain personnel did resign since my appointment, including the Chief Executive Officer (the "CEO") and the Head of Human Resources. Following these resignations, the independent managers determined to elevate the CEO and Head of Human Resources' direct reports, Brian J. Kane and Arielle Pachecho, respectively. On June 9, 2025, I resigned as one of Powin's independent manager and the remaining independent manager, John R. Brecker (the "Independent Manager") determined to engage my firm to continue providing professional advice and to appoint me as Chief Restructuring Officer. The other management is now as follows:

| Name | Position |
|------|----------|
| Brian J. Kane | Chief Executive Officer |
| Chad Paulson | Senior Vice President & Secretary |
| Kevin Paprzycki | Chief Financial Officer |
| Arielle Pachecho | Head of Human Resources |

**C.     Recent Financial Results.**

25.     In the last audited financials for the year ending on December 31, 2023, the company reported total assets of $1.16 billion and liabilities of $1.24 billion. The assets consisted mostly of accounts receivable and inventories related to projects in process. The liabilities related mostly to accounts payable and deferred revenue. The company has not yet closed its books for 2024 or any month in 2025.

**III.     THE NEED FOR CHAPTER 11 RELIEF AND THE EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES**

**A.     Historical Challenges.**

26.     Soon after my appointment, my team and I discovered that the Debtors suffered from the following inter-related problems, among others:  (a) severe liquidity constraints; (b) an extreme overdependence on trade credit; (c) increasing assertions of liquidated damages entitlements by customers aggrieved by alleged performance delays; and (d) a real credibility problem. My team has not yet had sufficient opportunity to investigate the root cause of these problems but rather, immediately focused on identifying a thoughtful approach to stabilize the

situation in a way to maximize value and minimize potential claims. We fully expect to work cooperatively with any official committee of unsecured creditors (if one is appointed) and any other parties in interest to investigate whether potential claims exist in connection with such root causes of the Debtors' prepetition challenges.

## IV.    CAPITAL STRUCTURE

### A.    Secured Debt.

27.     Prior to the Petition Date, the Debtors entered into that certain Loan Agreement, dated as of October 1, 2024 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and among Powin, the Parent Pledgor, the Subsidiary Guarantors party thereto (as such term is defined in the Loan Agreement), the Prepetition Agent, as administrative agent and collateral agent, and the Prepetition Lenders. The primary purpose of the credit available under the Loan Agreement was to bridge the debtors' working capital from acquisition of materials from vendors until customers made progress payments in connection with those materials.

28.     Under Section 9.1 of the Loan Agreement, each Loan Party (as defined therein) pledged and granted to the Prepetition Agent, for the benefit of the Prepetition Lenders, a security interest in and lien on all of such Loan Party's right, title, and interest in and to substantially of their assets, including the Loan Party's cash.[7] In connection therewith, Powin entered into (i) that certain Blocked Account Control Agreement dated as of November 12, 2024, by and among Powin, the Prepetition Agent, and JPMorgan Chase Bank, N.A.; and (ii) that certain Deposit Account Control Agreement, dated as of October 1, 2024, by and among Powin, Powin China Holdings 2 LLC, the Prepetition Agent, and HSBC Bank USA, National Association (together, the "Controlled Accounts").

29.     As further security for the benefit of the Prepetition Lenders, Parent Pledgor issued the Proxy appointing the Prepetition Agent as its proxy and attorney-in-fact entitling the

---

[7] On October 2, 2024, the Prepetition Agent filed UCC-1 Financing Statements with the applicable secretaries of state against each of the Loan Parties.

US_ACTIVE\130481403

Prepetition Agent to, upon an event of default, exercise Parent Pledgor's voting rights and all other rights, powers, privileges, and remedies to which a holder of such Pledged Stock (as defined in the Proxy) would be entitled (including giving or withholding written consents of shareholders, partners, or members).

30.    On March 24, 2025, the Prepetition Agent sent a default notice (the "Default Notice"):  (i) notifying Powin of the occurrence and continuation of payment and covenants defaults; and (ii) terminating all Commitments and declaring all Loans, together with all other outstanding Obligations, immediately due and payable. The Prepetition Agent also exercised control over the Controlled Accounts by issuing two separate Shifting Control Notices and notifying JPMorgan Chase Bank and HSBC Bank of such exercise.

31.    On April 25, 2025, following consultation with Powin's management team and advisors, the Prepetition Agent exercised the Proxy and provided notice to Powin and the Parent Pledgor that, from and after the date thereof, it was exercising its rights under the Loan Agreement and the Proxy to direct the voting of all of the Parent Pledgor's held equity interests in Powin to amend the operating agreement of Powin to provide that Powin would be a manager-managed LLC and appoint me as the independent manager of Powin.

32.    After my appointment, it became evident that Powin's liquidity position was untenable. I immediately engaged in discussion with the Prepetition Lenders (among others) regarding potential ways to address Powin's liquidity shortfall. As a result of these discussions, the Prepetition Lenders (i) directed the Prepetition Agent to release a substantial amount of cash from the Controlled Account to sustain Powin's operations on multiple occasions and (ii) relent $6.25 million to Powin under the Prepetition Credit Agreement.

33.    On June 9, 2025, the Prepetition Lenders and the Prepetition Agent agreed to forbear from exercising their right, pursuant to the Control Agreements, to direct the Prepetition Agent to direct disbursements from the Controlled Accounts during the period until through June 11, 2025 pursuant to that certain Forbearance, Support and Joinder Agreement.

34.    As of the Petition Date, the outstanding secured obligations under the Loan

- 11 -

Agreement were no less than $25,612,281.51, plus any other fees, expenses, and other obligations owed under the Prepetition Loan Documents.

**B.      Unsecured Debt.**

35.      The Debtors estimate that unsecured claims against the Debtors as of the Petition Date are at least $300,000,000, including: (i) accrued and unpaid amounts owed to the Debtors' trade vendors and customers and other unsecured debt incurred in the ordinary course of the Debtors' business; and (ii) certain ongoing or threatened litigation claims, which are disputed.

## V.      First Day Pleadings

36.      The Debtors request that the relief described below in the First Day Motions be granted, as each request constitutes a critical element in achieving the successful restructuring of the Debtors for the benefit of their creditors.

**A.      Administrative Motions.**

37.      In the *Motion of the Debtors for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases; and (II) Granting Related Relief* (the "Joint Administration Motion"), the Debtors request entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes pursuant to Bankruptcy Rule 1015(b) and that the Court maintain one file and one docket for all of the Chapter 11 Cases under the lead case, Powin, LLC (Case No. 25-16137 (MBK)).

38.      Joint administration of the Chapter 11 Cases will provide significant administrative efficiencies without harming the substantive rights of any party in interest. Many of the motions, hearings and orders that will be filed in the Chapter 11 Cases almost certainly will affect each of the Debtors. The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings, objections, notices, and hearings, and will allow all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency. I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their business in chapter 11 with the least disruption.

39.    In the *Motion of the Debtors Seeking Entry Of an Order Extending Time To (I) File Schedules and Statements; and (II) Granting Related Relief* (the "Schedules and SOFA Motion"), the Debtors request entry of an order granting additional time to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs. As a consequence of the size and complexity of the Debtors' business operations, the number of creditors likely to be involved in these Chapter 11 Cases, and numerous critical operational matters that the Debtors' management and employees must address, a 28-day extension (without prejudice to further extensions) is necessary and appropriate.

40.    In the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, (B) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (C) Redact Certain Personally Identifiable Information of Natural Persons, and (II) Granting Related Relief* (the "Creditor Matrix Motion"), the Debtors seek entry of interim and final orders: (i) authorizing the Debtors to (a) file a consolidated list of the Debtors' fifty (50) largest unsecured creditors in lieu of filing separate creditor lists for each Debtor, (b) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, and (c) redact certain personally identifiable information of natural persons; and (ii) granting related relief, and permitting the Debtors' claims and noticing agent Verita (as defined below) to maintain and update a consolidated creditor matrix (the "Consolidated Creditor Matrix").

41.    Permitting the Debtors to file a Consolidated Creditor Matrix, as opposed to a separate creditor matrix for each Debtor, is, in my opinion, warranted under the circumstances of these Chapter 11 Cases. Indeed, because the Debtors estimate that they have hundreds of creditors and other parties in interest, I believe that filing separate creditor matrices for each Debtor would be duplicative and burdensome. Additionally, I understand that converting the Debtors' computerized information to a format compatible with the matrix requirements would be time-consuming and, more importantly, would greatly increase the risk of error. As such, I believe that the Debtors' request to file the Consolidated Creditor Matrix as it is currently formatted and in

- 13 -

accordance with the procedures outlined in the Creditor Matrix Motion is reasonable and warranted under the circumstances

42.      Additionally, the Debtors request authority to redact certain personally identifiable information from their lists of creditors. The Debtors respectfully submit that it is appropriate to authorize the Debtors to redact from any paper filed or to be filed with the Court in these Chapter 11 Cases, including the Consolidated Creditor Matrix and their Schedules and Statements, (i) the home, e-mail addresses and any other personally identifiable information, not including names of natural persons that the Debtors identified as employees, and (ii) the names, home addresses, and email addresses of natural persons that the Debtors identified as being customers of the Debtors, as known to the Debtors, unless such names have already been made public in litigation with the Debtors because such information can be used to perpetrate identity theft and phishing scams or to locate survivors of domestic violence, harassment, or stalking under 11 U.S.C. § 107(c)(1).

43.      In the *Debtors' Application for Entry of an Order Authorizing the Appointment of Kurtzman Carson Consultants, LLC DBA Verita Global as Claims and Noticing Agent Effective as of the Petition Date* (the "Claims Agent Application") the Debtors seek entry of an order appointing Kurtzman Carson Consultants, LLC dba Verita Global ("Verita") as the claims and noticing agent for the Debtors in connection with these Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim in these Chapter 11 Cases.

44.      I have reviewed Verita's services agreement, which is attached as an exhibit to the proposed order approving the Claims Agent Application, and the description of services that Verita has agreed to provide and the compensation and other terms of the engagement as provided in the services agreement. Based on that review, I believe that the Debtors' estates, creditors, parties in interest and the Court will benefit from Verita's experience and cost-effective methods. The Debtors believe, and I agree, that Verita's rates are competitive and reasonable given Verita's quality of service and expertise and that the appointment of Verita as claims and noticing agent is

- 14 -

the most effective and efficient manner by which to provide noticing and claims processing services in these Chapter 11 Cases.

45.    I believe that the relief requested in the Claims Agent Application is in the best interests of the Debtors' estates, creditors, and all other parties in interest. Accordingly, I respectfully submit that the Claims Agent Application should be approved.

**B.    Operational Motions Requesting Immediate Relief.**

46.    The Debtors intend to ask for immediate relief with respect to the following First Day Pleadings and, therefore, will present these motions at the First Day Hearing.

47.    The *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Cash Collateral Motion") seeks entry of interim and final orders: (i) authorizing the Debtors to use cash collateral ("Cash Collateral"); (ii) granting adequate protection, solely to the extent provided in the orders, to the Prepetition Secured Parties (as defined herein); (iii) modifying the automatic stay imposed by section 362 of the Bankruptcy Code (the "Automatic Stay") to the extent necessary to implement and effectuate the terms of the orders; (iv) scheduling a hearing to consider approval of the Cash Collateral Motion on a final basis; and (v) granting related relief.

48.    Recognizing their immediate need to access Cash Collateral, the Debtors swiftly engaged with the Prepetition Secured Parties on the consensual use of Cash Collateral in furtherance of a comprehensive restructuring transaction. As part of these negotiations, the Debtors and the Prepetition Secured Parties discussed, among other things, a form of budget for the duration of the Chapter 11 Cases, an adequate protection package, and a restructuring timeline that would allow the Debtors to continue to use Cash Collateral while they work expeditiously to seek to restructure their business during the pendency of these Chapter 11 Cases. After extended good faith and arm's length negotiations with the Prepetition Secured Parties, the Debtors reached an

- 15 -

agreement with the Prepetition Secured Parties concerning the consensual use of Cash Collateral, as more fully described below.

49.     The *Motion of the Debtors for Entry of an Order:  (I) Authorizing the Debtors to Enter into New Customer Program with Existing Customers; (II) Scheduling a Hearing; and (III) Granting Related Relief* (the "Customer Program Motion") seeks entry of an order: (i) authorizing the Debtors to enter into a new Customer Program with existing customers ("Customers"); (ii) scheduling a hearing to consider approval of the Customer Program Motion on a final basis; and (iii) granting related relief.

50.     The Debtors commenced these Chapter 11 Cases to, among other things, reorganize their businesses around the Debtors' long term servicing line of business. Through this line of business, the Debtors provide their Customers with continuing maintenance and repair services with respect to previously installed Debtor battery systems at Customer sites. The Debtors' proprietary cloud-based technology and related servicing functionality is highly valuable to their Customers, and, in recent days, the Debtors have conducted in-depth discussions with Customers who have communicated a strong willingness to support the Debtors' efforts to continue this business line on a focused basis with pricing that is designed to allow the Debtors to continue this business. Successful implementation of this Customer Program will enable the Debtors to pursue a sale process of its remaining assets and therefore represents the most viable way to maximize value in these Chapter 11 Cases.

51.     Specifically, the Debtors have been working closely with Customers to develop a cost-plus, and cash flow positive, long term servicing program. Through such program, the Debtors would provide Customers with an amended suite of battery warranty services at a modified price point.

52.     The LTSA Program is entirely consistent with the Debtors' prepetition ordinary course of business. Under the proposed LTSA Program, the Debtors will be providing a reduced scope of service at pricing that is designed to be cash flow positive during the post-petition period. As noted, Customers are very desirous of the Debtors' continuation of their cloud-based

proprietary technology and related servicing functionality. The termination of the Debtors LTSA Line of Business would have a severely detrimental impact on Customers who are largely incapable of replacing those functions without the Debtors' assistance. In light of the commencement of these Chapter 11 Cases, the Debtors are seeking the instant relief in an effort to be transparent as well as assure Customers participating in the LTSA Program that it is fully authorized and viable.

53.    The *Motion of the Debtors for Entry of Interim and Final Orders: (I) Authorizing Use of Cash Management Procedures, Bank Accounts, Credit Cards, and Existing Business Forms; (II) Prohibiting Setoffs and Freezing of Bank Accounts; (Iii) Modifying Requirements of Section 345(b) of the Bankruptcy Code; and (Iv) for Related Relief* (the "Cash Management Motion") seeks entry of interim and final orders: (i) authorizing the Debtors to continue to use (as such capitalized terms are defined below) their existing Cash Management System, Bank Accounts, Credit Cards, and existing Business Forms in the ordinary course of business; (ii) authorizing the Debtors to open or close Bank Accounts or establish new or different Credit Cards, all in the ordinary course of business; (iii) prohibiting applicable banks from offsetting against or freezing any of the Debtors' deposit accounts; (iv) modifying the requirements of § 345(b) of the Bankruptcy Code; (v) scheduling a final hearing; and (vi) granting related relief.

54.    The *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Renew, Amend, Supplement, Extend, or Modify Insurance Programs and Pay Obligations Thereunder; and (II) Granting Related Relief* (the "Insurance Motion") seeks entry of interim and final orders: (i) authorizing the Debtors to maintain and renew, amend, supplement, extend, or modify insurance programs and pay obligations thereunder; and (ii) granting related relief.

55.    The Debtors maintain various insurance policies providing coverage for, among other things, the Debtors' general liability, workers' compensation, property, automobile liability, professional liability, cyber liability, stock throughput, and directors and officers coverage and excess liability (collectively the "Insurance Policies"), which the Debtors have obtained through

- 17 -

third-party insurance carriers (each an "<u>Insurance Carrier</u>").[8]

56.     The premium amounts for the Insurance Policies (the "<u>Insurance Premiums</u>") are determined annually and are due in their entirety at policy inception or renewal. The Debtors' aggregate annual Insurance Premiums under the Insurance Policies total approximately $2.21 million. As of the Petition Date, the Debtors believe they have paid all Insurance Premiums, but out of an abundance of caution, seek authority to satisfy any outstanding Insurance Premiums.

57.     Most of the Debtors' Insurance Policies will expire between June 11, 2025 and May 12, 2026. Specifically, the Debtors' cyber liability insurance policy and the director and officer liability insurance policies expire on June 11, 2025. It is critical that the Debtors continue to carry the necessary insurance coverage to operate their business. The Debtors have begun negotiating renewals, extensions and/or entries into new insurance policies with respect to the expiring Insurance Policies. The Debtors have obtained extensions of cyber liability and director and officer liability coverage through September 9, 2025.

58.     The Debtors employ USI Insurance Services (the "<u>Broker</u>") to assist them with the procurement and management of the Insurance Policies. The Broker receives compensation from the Debtors in the form of a commission fee in addition to the Insurance Premiums paid by the Debtors (the "<u>Broker's Fees</u>"). The employment of the Broker allows the Debtors to obtain and manage the Insurance Policies in an efficient manner and to realize considerable savings in the procurement of such policies.

59.     Certain Insurance Premiums and all Brokers Fees are financed through AFCO Credit Corporation (the "<u>Premium Financier</u>") over a twelve (12) month period through June, 2025. The monthly financing payment amount to the Premium Financier is approximately $190,000 per month, starting on June 12, 2025. Among the potential remedies available to the Premium Financier for non-payment is the ability to cancel the Insurance Policies and seek a refund of the Insurance Premiums it financed. As of the Petition Date, the Debtors have made all monthly financing payments and believe that they have satisfied all of their obligations to the

---

[8] A true and accurate schedule of the Debtors' Insurance Policies is attached as Exhibit C to the Insurance Motion.

Premium Financier (the "Premium Financing Obligations").

60.    Under the Insurance Policies, the Debtors may be required to pay various deductibles, retention amounts, and administrative fees (together with the Insurance Premiums, the "Insurance Obligations"), depending upon the type of policy and claim involved. As of the Petition Date, the Debtors to not believe that are any prepetition Insurance Obligations owed.

61.    The *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief* (the "Wage Motion") seeks entry of interim and final orders: (i) authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and costs related to these items, and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto (together, the "Employee Compensation & Benefits"); (ii) scheduling a final hearing; and (iii) granting related relief.

62.    As of the Petition Date, the Debtors employ approximately 85 non-insider individuals (of which a majority work in Oregon, with the others working in other states) in addition to their executive team (the "Employees").

63.    The Debtors have significantly reduced their workforce this year, including in a reduction-in-force that took place on June 6, 2025. The remaining Employees represent approximately 17% of the Debtors' workforce compared to January 1, 2025. These Employees remain, because they are critical for the Debtors' operations – particularly, with respect to the Debtors' Project and Technology branches of their services business – and to maintaining going concern value for the Debtors' business. The Employees are difficult to replace, and without the Employees' services, the Debtors will no longer be able to provide products and services to their customers. A number of the Debtors' employees have also resigned because of the uncertain situation. The Debtors cannot provide assurances that the Employee Benefit & Compensations will be provided in the ordinary course, the Debtors believe that more resignations will follow.

64.    The Debtors are not parties to any collective bargaining agreements.

65.     The Debtors' Employees are paid either a salary or on an hourly basis as their primary form of compensation. Employees receive wages and salaries (the "Wages") on a bi-weekly basis every other Friday. The Debtors generally fund their payroll approximately two days before the applicable payday (on the applicable Wednesday).

66.     Payroll is generally paid one week in arrears. In the last regular payroll, on June 6, 2025,[9] the current Employees received payment for services provided through Friday, May 30, 2025. The next payroll, on June 20, 2025, will cover the pay-period of May 31 through June 13, 2025.[10] The Employees are therefore owed prepetition Wages.

67.     The Debtors estimate that they owe their Employees an aggregate of approximately $527,262.17 on account of accrued prepetition Wages (collectively, the "Unpaid Employee Wages"). However, this amount may fluctuate depending on contingencies.

68.     Postpetition, the Debtors estimate that their average gross payroll for their Employees will be (before Adjustments/deductions) approximately $1,150,000 per month.

69.     As of the Petition Date, the Debtors believe that they do not owe any Unpaid Employee Wages in excess of the statutory cap of $17,150 set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code (the "Statutory Cap") to any Employees(s).

70.     The Debtors utilize software and services from UKG (the "Payroll Provider") to support payroll processing, payroll tax calculations and filings, and other payroll-related services (all such associated costs, collectively, the "Payroll Costs"). The Debtors pay the Payroll Provider a quarterly fee, and the next payment will be due in July, 2025. The Debtors owe the Payroll Provider $90,616.61, which last payment was due in April, 2025. The Debtors seek authority to honor prepetition and postpetition amounts of Payroll Costs, including amounts owed to the Payroll Provider, to ensure continued payroll services during the Chapter 11 Cases.

---

[9] As referenced above, on June 6, 2025, the Debtors conducted a reduction-in-force, and prior to the bankruptcy filing, processed and fulfilled their remaining payment obligations to the terminated employees by depositing funds into the payroll account for the applicable amounts due.

[10] In these payrolls Debtors would ordinarily pay Employees amounts that had been reconciled or adjusted as owed from any previous underpayment, including recently submitted expenses, uncalculated overtime, etc. (with these amounts as the "Adjustments" and which, as applicable are included within the definition of Unpaid Employee Wages).

71.     The Debtors may need to utilize independent contractors for services during the Chapter 11 Cases. These independent contractors (the "Supplemental Workforce") would be paid by the Debtors as needed. As of the Petition Date, the Debtors estimate that approximately $0 is owed to the Supplemental Workforce.

72.     In the ordinary course of business, the Debtors incur obligations on account of Payroll Deductions and Employee Payroll Taxes (each as defined below and collectively, the "Withholding Obligations").

73.     The Debtors routinely deduct amounts from Employees' wages, including garnishments and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of healthcare benefits and insurance premiums (the "Payroll Deductions").

74.     The Debtors are required by law to withhold from the Employees' wages amounts related to, among other things, national, regional, and local income tax (the "Employee Payroll Taxes") for remittance to the appropriate taxing authorities. The Employee Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority when the Employees' payroll checks are disbursed.

75.     In addition to their wages, the Debtors' Employees also generally are entitled to receive other forms of compensation, including health benefits, paid time off, and reimbursement of certain business expenses (collectively, the "Employee Benefit Programs"). The Employee Benefit Programs include, but are not limited to: (i) reimbursement of expenses; (ii) paid time off; (iii) a healthcare program, including dental and vision coverage; (iv) health savings accounts or flexible spending accounts; (v) life and disability coverage; (vi) workers' compensation; (vii) a 401(k) retirement savings plan; and (viii) an ethics and harassment platform.

76.     The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtor. Such expenses typically include, but are not limited to, business-related travel expenses (including mileage) and other items (the "Reimbursement Obligations"). Expense reports detailing the Reimbursement Obligations are

submitted for reimbursement by the Employees and generally must be supported by copies of receipts. Expenses are paid with payroll, and the Debtors utilize a vendor, Concur (the "Expense Vendor"). Employees expect that their business expenses will be paid promptly, and Employees may suffer hardship in delay of payment of these expenses.

77.     There is commonly delay between when an Employee incurs an expense and submits the corresponding expense report for processing. Therefore, it is difficult for the Debtors to determine the exact amount of Reimbursement Obligations that are due and owing for any particular time period. However, the Debtors believe that few, if any, Employees will be owed expenses earned within 180 days of the Petition Date that would require payment above the Statutory Cap. Upon information and belief, certain of the Debtors' executives are owed amounts that may exceed the Statutory Cap for recent business travel to Oregon.

78.     The Debtors provide eligible (non-insider) Employees with paid time off ("PTO"). Employees are eligible for varying amount of PTO, depending on their length of service and may exercise PTO according to company policy. Recently, the Debtors capped PTO at a maximum of 40 hours, but grandfathered in amounts exceeding 40 hours for Employees that had already accrued more than 40 hours. Upon an Employee's termination, the Debtors will cash out the Employee's PTO benefits to the extent required by applicable law.

79.     As of the Petition Date, the Debtors estimate they owe $691,170.14 (before adjustments/deductions) for accrued PTO for current Employees. The Debtors believe that the continuation of PTO policy in accordance with prior practice for their current Employees is essential to maintaining Employee wellness and morale during the Chapter 11 Cases. Further, the policies are broad-based programs upon which all Employees have come to depend, and the continuation of those programs will not create any material cash flow obligations beyond the Debtors' normal payroll obligations. Moreover, disruptions or changes to these policies could have a direct impact on Employee commitment, morale, and retention, to the detriment of the Debtors.

80.     The Debtors also offer parental, bereavement and other leave through their vendor, Voya.

- 22 -

81.     The Debtors offer eligible Employees and their eligible dependents (collectively, the "Dependents") the option of medical, dental and vision insurance. For medical insurance, including prescription drug coverage, the Debtors offer coverage (the "Medical Plan") through Regence ("Health Provider"). The Debtors bear a percentage of the costs of the Medical Plan for eligible Employees (which amount varies depending on their coverage and Dependents), and the Employees bear the remainder of the costs, based on dependent elections. In the ordinary course of their business, on the first of the month, the Debtors pay the Health Provider premiums for the following month, and, as of the Petition Date, the Debtors are current in payments to the Health Provider.

82.     For dental insurance, the Debtors also offer coverage through Delta Dental (the "Dental Plan"). The Debtors bear a percentage of the costs of the Dental Plan for eligible Employees (which amount varies depending on their coverage and Dependents). The Debtors pay for the Dental Plan on the first of the month.

83.     For vision insurance, the Debtors offer coverage through VSP (the "Vision Plan," and, together with the Medical Plan and Dental Plan, the "Health Plans"). The Debtors bear 100% of the costs of the Vision Plan for eligible Employees. The Debtors pay for the Vision Plan mid-month.

84.     Prepetition, the Debtors' monthly cost for the premiums of the Health Plans was approximately $420,000 per month, which amount should reduce during the Chapter 11 Cases due to the pre-petition reduction in force.[11]  The Debtors' Health Plans are fully insured, and there is no estate liability outside of payment of premiums and a monthly fee of $15,833.33 to the Debtors' broker, Alliant.

85.     The Debtors seek authority, but not direction, to pay any amounts due and to continue to pay, in their discretion, the premiums for the Health Plans incurred postpetition and to maintain their Health Plans.

---

[11] Given the reduction of the size of the Debtors' workforce, the providers for the Health Plans will likely have a right to re-negotiate terms of the Health Plans, which could result in a higher per-capita, but lower gross, amount owed by the Debtors.

US_ACTIVE\130481403

86.    The Debtors also offer their Employees the benefit of maintaining a respective health-savings account (the "HSA(s)") and a flexible savings account (the "FSA(s)") through Rocky Mountain Reserve (the "HSA & FSA Benefits"). Employees contribute to the FSAs at their election, and the Debtors do not contribute to the FSAs.

87.    The Debtors contribute to HSAs based on the type of coverage for the Employee. The Debtors contribute semi-annually to Employee HSAs, with the next payment due in July, 2025. Additionally, the Debtors pay a monthly administration fee to Rocky Mountain Reserve of approximately $3.75 per employee HSA enrollee and $2.75 per Employee FSA enrollee.

88.    The Debtors are required to offer certain of their former Employees certain health benefits following termination of employment under § 4980B of the Internal Revenue Code to administer Continuation Health Coverage ("COBRA") (*see* 26 U.S.C. § 4980B)  Pursuant to COBRA, former Employees of the Debtors (the "COBRA Eligible Employees") may continue using certain health benefits (the "COBRA Benefits"), and are entitled to continue to receive COBRA Benefits for up to eighteen, and occasionally thirty-six, months following termination of employment. The Debtors' COBRA Eligible Employees are typically responsible for paying all costs associated with the COBRA Benefits.

89.    The Debtors have also provided COBRA benefits to employees that have been previously terminated, for which the Debtors are responsible for payment, which responsibility extends, to the Debtors belief, through September, 2025. Certain current Employees also have similar COBRA benefits in their contract upon severance.

90.    The Debtors pay a 2% administrative fee for enrolled COBRA participants. The Debtors request authority, but not direction, to (a) pay any prepetition amounts outstanding on account of the COBRA Benefits; (b) to continue to offer the COBRA Benefits, including to Employees who may be terminated after the Petition Date, if any, and to honor all postpetition obligations related thereto in the ordinary course of business consistent with past practices; and (c) to continue to pay fees related to the COBRA Benefits in the ordinary course of business on a postpetition basis.

91.     The Debtors offer eligible Employees premium based group life insurance ("Life Insurance") and accidental death and dismemberment insurance, disability and other similar insurance ("AD&D Insurance") through Voya. The Debtors also offer background check insurance ("Background Check Insurance") through Accurate Ace. The Debtors pay premiums monthly, and the prepetition amount of monthly premiums for Life Insurance, AD&D Insurance and Background-Check Insurance total approximately $30,000 per month, less voluntary employee deductions, which amount should be reduced during the Chapter 11 Cases due to the prepetition reduction in force.

92.     The Debtors' Employees and their families depend on insurance provided by the Debtors as a fundamental aspect of compensation. Any disruption or perceived-disruption regarding insurance benefits or coverage would damage morale and may cause Employees to seek employment elsewhere. The Debtors are not current on their insurance obligations and owe Voya estimated amounts of $85,897.89 for AD&D Insurance and $111,591.37 for Life Insurance. The Debtors seek authority, in their discretion, to pay these amounts and any accrued and unpaid prepetition premiums and related charges, to continue the above benefits post-petition and to deliver the Employees' portion of any accrued and unpaid prepetition premiums for the AD&D Insurance and Life Insurance to the corresponding administrators in connection with the payment of the Wages and withholding obligations.

93.     The Debtors maintain workers' compensation insurance for their Employees at the statutorily required level for each state in which they have Employees (collectively, and as described herein, the "Workers' Compensation Program"). As part of the Workers' Compensation Program, the Debtors maintain a workers' compensation insurance policy with Zurich American Insurance Company (the "Workers' Compensation Insurance Policy"). The Debtors must continue claim assessment, determination, adjudication, and payment pursuant to the Workers' Compensation Program, without regard to whether such liabilities are outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements.

- 25 -

94.     The Debtors are not aware of any active, open claims under the Workers'
Compensation Program. To the extent any Employees assert claims arising under the Workers'
Compensation Program, the Debtors request that the Court modify the automatic stay under section
362 to permit the Employees to proceed with such claims. This requested modification of the
automatic stay pertains solely to claims under the Workers' Compensation Program.

95.     Because the Debtors are statutorily and/or contractually obligated to maintain the
Workers' Compensation Program, their inability to do so may result in adverse legal consequences
that potentially could disrupt the reorganization process. As of the Petition Date, the Debtors do
not believe that there are any prepetition amounts outstanding on account of accrued but unpaid
Workers' Compensation Program obligations.

96.     The Debtors offer eligible Employees the opportunity to participate in a defined
401(k) contribution plan through Empower, which allows for voluntary employee pre-tax deferrals
(the "Retirement Plan"). Employees participating in this program may contribute up to 90% of
their salary up to the federal statutory cap per year, and the Debtors deduct the employee pre-tax
deferrals from Employee paychecks for each pay-cycle. The Debtors' Retirement Plan includes a
match (each pay-period) by the Debtors of up to 100% up to the first 3%, and 50% on the next 2%
of Employee contributions. Failure to timely forward the Employees' Retirement Plan deductions
may be a violation of the Employee Retirement Income Security Act of 1974, as amended
("ERISA"), resulting in potential personal liability for the Debtors' officers for such deducted
amounts. Maintaining the Retirement Plan as a part of the Employee Benefit Programs is critical
to maintaining employee morale.

97.     Administration fees for the Retirement Plan are paid through plan assets.

98.     The Debtors maintain an ethics and harassment platform (the "Platform") with
NAVEX Global to assist their Human Resources department and to provide mandatory and
discretionary training to employees. The Debtors pay a $30,000 annual fee. The Debtors are not
current, and, if the Debtors do not make payment by June 18, 2025, service will be suspended. The

Debtors seek authority, in their discretion, to pay this amount and amounts due relating to the Platform.

US_ACTIVE\130481403

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 10th day of June 2025, at Sea Bright, New Jersey in Monmouth County.



Signed by:

C933082321E44B5...

Gerard Uzzi

US_ACTIVE\130481403

**Exhibit A**

**(Powin's Organizational Structure)**

Case 25-16137-MBK    Doc 1104-1    Filed 11/21/25    Entered 11/21/25 22:12:50    Desc
Exhibit 1 Declaration of Gerard Uzzi in Support of Emergency First Day Motions    Page 31 of 31

Case 25-16137-MBK    Doc 13    Filed 06/10/25    Entered 06/10/25 13:21:18    Desc Main
Document    Page 30 of 30

