| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE |
|---|---|

| In re: Powin, LLC | Chapter 11 Case Number: 25-16137 | |
|---|---|---|

**NOTE:** This form should not be used for an unsecured claim arising prior to the commencement of the case. In such instances, a proof of claim should be filed.

Name of Creditor: HUB @ 202 Ownco, LLC
(The person or other entity to whom the debtor owed money or property.)

Name and Addresses Where Notices Should Be Sent:

HUB @ 202 Ownco, LLC
c/o Polsinelli PC, Attn: Shanti Katona
222 Delaware Ave. Suite 1101
Wilmington, DE 19801

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:

Check here if this request:
☐ replaces a previously filed request, dated:
☐ amends a previously filed request, dated:

**1. BASIS FOR CLAIM**

☐ Goods Sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other (Describe briefly)

☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
☐ Wages, salaries and compensations (Fill out below)

Provide last four digits of your social security number _____

**2. DATE DEBT WAS INCURRED:** See attached addendum.

**3. TOTAL AMOUNT OF REQUEST AS OF ABOVE DATE:** $102,607.46 _____

☐ Check this box if the request includes interest or other charges in addition to the principal amount of the request. Attach itemized statement of all interest or additional charges.

**4. Secured Claim**
☒ Check this box if your claim is secured by collateral (including a right of setoff). See attached addendum.
Brief Description of Collateral:

☐ Real Estate                    ☐ Motor Vehicle
☒ Other (Describe briefly)   _See attached addendum._____

Value of Collateral: $ _See attached addendum._____

☐ Check this box if there is no collateral or lien securing your claim.

**5. Credits:** The amount of all payments have been credited and deducted for the purposes of making this request for payment of administrative expenses.

THIS SPACE IS FOR COURT USE ONLY

**6. Supporting Documents**: *Attach copies of supporting documents*, such as purchase orders, invoices, itemized statements of running accounts, contracts as well as any evidence of perfection of a lien.

DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain.

If the documents are voluminous, attach a summary.

**7. Date-Stamped Copy**: To receive an acknowledgment of the filing of your request, enclose a self-addressed envelope and copy of this request.

Date:
1/16/2026

Sign and print below the name and title, if any, of the creditor or other person authorized to file this request (attach copy of power of attorney, if any).

/s/ Ken Gerold
Authorized Signatory

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**NOTE:** The filing of this request will not result in the scheduling of a hearing to consider payment of your administrative claim but will result in the registry of your administrative claim with the Bankruptcy Court. If you wish to have a hearing scheduled on your claim, you must file a motion in accordance with D.N.J. LBR 3001-1(b).                    *rev.8/1/15*

## ADDENDUM TO REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE

**Case No.:**            25-16137 (MBK)

**Debtor:**             Powin, LLC

**Claimant:**           HUB @ 202 Ownco, LLC

**Amount of Claim:**    $102,607.46

### Basis for Administrative Expense Claim

1.      This Request for Payment of Administrative Expense (the "**Request**") is filed by HUB @ 202 Ownco, LLC ("**Claimant**").

2.      On June 9, 2025 (the "**Petition Date**"), Powin, LLC ("**Powin**") and certain of its affiliates (collectively, and together with Powin, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Court**"), commencing chapter 11 cases jointly administered under Case No. 25-16137 (collectively, the "**Chapter 11 Cases**").

3.      Powin was the tenant under that certain Industrial Lease, dated as of August 2, 2023 (as amended or modified from time to time and together with all schedules, exhibits, instruments, and other documents related thereto, the "**Lease**"), with Claimant as the landlord, covering that certain leased premises comprised of an area containing approximately 71,831 rentable square feet (the "**Leased Premises**") within that certain building commonly known as Building 1A, as situated at 7524 East Warner Road, Mesa, Arizona 85212 in Maricopa County, Arizona and located on such real property comprising APN 304-17-982, all as set forth and described in more detail in the Lease.  A true and correct copy of the Lease is attached hereto as Exhibit A.

4.      Pursuant to the terms of the Lease, Powin paid to Claimant, and Claimant holds, a security deposit in the amount of $750,000 (the "**Security Deposit**") as security for Powin's performance of all of its obligations under the Lease.

108067636.1

5.      On August 18, 2025, the Court entered the *Order (I) Authorizing the Debtors to Enter Into and Perform Under the FlexGen Power Systems, LLC Asset Purchase Agreement, (II) Approving the Sale of Purchased Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (III) Authorizing the Assumption and Assignment of the Assumed Contracts to Purchaser and Establishing Cure Amounts Related Thereto in Accordance with the Assumption and Assignment Procedures, and (IV) Granting Related Relief* [Docket No. 751] (the "**Sale Order**"), approving the sale of certain of the Debtors' assets to FlexGen Power Systems, LLC ("**FlexGen**").

6.      Pursuant to the Sale Order and the Asset Purchase Agreement attached thereto, FlexGen did not receive the assignment of or otherwise acquire the Lease. However, the Leased Premises is identified in the Asset Purchase Agreement as containing certain of the Debtors' inventory purchased by FlexGen.

7.      On December 1, 2025, the Court entered the *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Joint Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Powin, LLC and Affiliates Thereof and the Official Committee of Unsecured Creditors* [Docket No. 1165] (the "**Confirmation Order**"), confirming the *Joint Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Powin, LLC and Affiliates Thereof and the Official Committee of Unsecured Creditors* [Docket No 942] (the "**Plan**").

8.      On December 5, 2025 (the "**Plan Effective Date**"), the Plan became effective and, pursuant to the terms and provisions of the Plan and the Confirmation Order, the Lease was rejected as of the Plan Effective Date. *See* Plan, § 12.1; Confirmation Order, ¶ 28.

9.      Upon information and belief, at all times following the Petition Date and prior to the rejection of the Lease, the Debtors remained in possession of and continued to operate out of

the Leased Premises. Such use and occupancy provided an actual, necessary, and continuing benefit to the Debtors' estates.

10.     The Debtors did not pay any of the rent or other amounts due under the Lease for the months of November and December 2025.

11.     The prorated amount of the Debtors' rent and other obligations due and owing to Claimant for November and December 2025 is no less than $102,607.46 (the "**Administrative Expense**"), as set forth in <u>Exhibit B</u> attached hereto.

12.     As of the filing of this Request, Claimant still has not received payment of any portion of the Administrative Expense.

<u>**Reservation of Rights**</u>

13.     Claimant expressly reserves the right to amend this Request and to file, assert, and seek payment of any additional claims and any additional amounts, including  attorneys' fees and costs, amounts which are or may be currently contingent or unliquidated, and amounts that may be entitled to administrative priority under sections 507 and 503 of the Bankruptcy Code. Claimant also expressly reserves the right to any pre- or post-petition interest and for any pre- or post-petition legal fees.

14.     Claimant expressly reserves the right to amend, modify and/or supplement any of the claims set forth herein and to file, in accordance with orders of the Court and/or the Federal Rules of Bankruptcy Procedure, any additional, amended, modified and/or supplementary claims that Claimant may have against any of the Debtors. Claimant expressly reserves the right to attach, produce and/or rely upon additional documentation which supports its claims and any additional documents that may become available after further investigation or discovery.

108067636.1

15.     The filing of this Request does not and shall not constitute a waiver or release of any of Claimant's rights or claims (i) against any other person, entity or property, including, but not limited to, any claims related to the Security Deposit; (ii) to contest the jurisdiction of the Court with respect to the subject matter of the claims set forth herein; (iii) to elect remedies or choice of law or right to contest venue or *forum non convenes* or for arbitration of any matters; (iv) and/or for any offset, setoff or recoupment against the Debtors and/or any third parties, including, but not limited to, with respect to the Security Deposit.

16.     Claimant expressly reserves all rights with respect to claims and causes of action it may hold against any of the Debtors. Claimant reserves all of its rights and defenses, whether under the Bankruptcy Code or other applicable law, as to any claims or defenses that may be asserted by any of the Debtors, including, without limitation, any rights of setoff, offset, and/or recoupment.

17.     Claimant hereby further reserves all rights accruing to it, and the filing of this Request is not and shall not be deemed or construed as: (i) a waiver, release, or limitation of Claimant's rights, claims or defenses against any person, entity, or property (including, without limitation, the Debtors or any other person or entity that is or may become a debtor in any bankruptcy case); (ii) a consent by Claimant to the jurisdiction or venue of the Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (iii) a waiver, release, or limitation of the right of Claimant to trial by jury in the Court or any other court or forum in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether or not such jury trial right is pursuant to a statute or the U.S. Constitution; (iv) a consent by Claimant to a jury trial in the Court or any other court

4

in any proceeding as to any and all matters so triable therein or in any case, controversy, or proceeding related thereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (v) a waiver, release, or limitation of the right of Claimant to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by U.S. District Court Judge; (vi) consent to the Court hearing or deciding any matter or proceeding, to the extent the Court lacks the constitutional authority to do so, under *Stern v. Marshall* or otherwise; (vii) a waiver or release of the right to move or request to withdraw the reference with respect to the subject matter of this Request, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving Claimant; (viii) an election of remedies; (ix) a consent to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c); (x) a waiver of any right to enforce arbitration; or (xi) a waiver of any past, present or future default or event of default.

108067636.1

<u>Exhibit A</u>

Lease

# INDUSTRIAL LEASE
(Single Tenant Net)

entered into by and between

HUB @ 202 OWNCO, LLC, a Delaware limited liability company, as Landlord,

and

POWIN, LLC, a Delaware limited liability company, as Tenant.

Dated as of __August 2__, 2023

---

## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| ARTICLE ONE | BASIC TERMS AND GENERAL DEFINITIONS | 1 |
| ARTICLE TWO | TERM | 4 |
| ARTICLE THREE | BASE RENT AND SECURITY DEPOSIT | 7 |
| ARTICLE FOUR | OTHER CHARGES PAYABLE BY TENANT | 9 |
| ARTICLE FIVE | USE OF PROPERTY | 15 |
| ARTICLE SIX | CONDITION OF PROPERTY; MAINTENANCE, REPAIRS AND ALTERATIONS | 22 |
| ARTICLE SEVEN | DAMAGE OR DESTRUCTION | 25 |
| ARTICLE EIGHT | CONDEMNATION | 26 |
| ARTICLE NINE | ASSIGNMENT AND SUBLETTING | 27 |
| ARTICLE TEN | DEFAULTS; REMEDIES | 30 |
| ARTICLE ELEVEN | PROTECTION OF LENDERS | 33 |
| ARTICLE TWELVE | LEGAL COSTS | 35 |
| ARTICLE THIRTEEN | BROKERS | 35 |
| ARTICLE FOURTEEN | BUILDING AND TENANT IMPROVEMENTS | 36 |
| ARTICLE FIFTEEN | COMMUNICATIONS SERVICES | 39 |
| ARTICLE SIXTEEN | MISCELLANEOUS PROVISIONS | 40 |

| | |
|---|---|
| EXHIBIT 1.04-1 | DEPICTION OR DESCRIPTION OF THE PREMISES |
| EXHIBIT 1.04-2 | DEPICTION OR DESCRIPTION OF THE LAND |
| EXHIBIT 1.04-3 | LEGAL DESCRIPTION OF LAND COMPRISING THE PROJECT |
| EXHIBIT 2.02 | COMMENCEMENT DATE CERTIFICATE |
| EXHIBIT 3.01 | FORM OF AUTHORIZATION AGREEMENT – PRE-ARRANGED PAYMENTS |
| EXHIBIT 14.01 | BUILDING IMPROVEMENTS |

INDUSTRIAL LEASE
7524 EAST WARNER ROAD
POWIN, LLC

**INDEX OF DEFINED TERMS**

<u>**TERM**</u>                                                                                                          <u>**PAGE**</u>

Additional Rent ................................................................................................................. 9
Applicable Laws .............................................................................................................. 16
Approved Changes ........................................................................................................... 36
Association ........................................................................................................................ 3
Base Rent .......................................................................................................................... 2
Broker(s) .......................................................................................................................... 36
Building ............................................................................................................................. 1
Building Improvements ................................................................................................... 36
Building Systems ............................................................................................................... 3
Business Day ...................................................................................................................... 3
Change Cost ..................................................................................................................... 36
Changes ............................................................................................................................ 36
Collateral .......................................................................................................................... 33
Commencement Date ........................................................................................................ 5
Commencement Date Certificate ...................................................................................... 5
Communications Agreements .......................................................................................... 39
Communications Equipment ........................................................................................... 39
Communications Services ................................................................................................ 39
Condemnation .................................................................................................................. 26
Conditionally Abated Rent .............................................................................................. 33
Consent ............................................................................................................................ 29
Consultant ........................................................................................................................ 19
Contractor ........................................................................................................................ 38
Contractor Certificate ...................................................................................................... 26
Control................................................................................................................................ 3
Damage Notice ................................................................................................................. 25
Day ..................................................................................................................................... 3
Declaration ........................................................................................................................ 3
Defaulting Party .............................................................................................................. 35
Effective Date .................................................................................................................... 1
Environment ..................................................................................................................... 16
Environmental Damages .................................................................................................. 16
Environmental Requirements .......................................................................................... 17
Estimated Commencement Date ........................................................................................ 2
Event of Default ............................................................................................................... 31
Expiration Date .................................................................................................................. 5
Extension(s) ....................................................................................................................... 6
Fair Market Rental Rate ..................................................................................................... 3
Final Plans ........................................................................................................................ 38
Finish Items ...................................................................................................................... 37
FMV Rental Adjustment Date(s)........................................................................................ 6
FMV Rental Rate ............................................................................................................... 6
Governmental Authority ..................................................................................................... 4
Hazardous Material .......................................................................................................... 17
HVAC Systems ................................................................................................................... 4
Imposition ........................................................................................................................ 24
Interest .............................................................................................................................. 15
Land..................................................................................................................................... 1
Landlord ................................................................................................................... 1, 41, 1
Landlord Affiliate ............................................................................................................... 4
Landlord Party ................................................................................................................... 4
Lease ................................................................................................................................... 1
Lease Month ....................................................................................................................... 7
Lease Year ........................................................................................................................... 7

Legal Requirements.................................................................................................................. 4
Non-defaulting Party............................................................................................................... 35
Notices..................................................................................................................................... 42
OFAC....................................................................................................................................... 44
Option(s).................................................................................................................................... 6
Parties......................................................................................................................................... 4
Party........................................................................................................................................... 4
Person......................................................................................................................................... 4
Plans......................................................................................................................................... 39
Premises..................................................................................................................................... 1
Prohibited Person.................................................................................................................... 44
Project........................................................................................................................................ 1
Punchlist.................................................................................................................................. 37
Real Property Tax................................................................................................................... 10
Release..................................................................................................................................... 17
Rent............................................................................................................................................ 9
Repair Period.......................................................................................................................... 26
Security Deposit........................................................................................................................ 8
Sign.......................................................................................................................................... 20
Space Plan............................................................................................................................... 38
Structural and Safety Alterations.......................................................................................... 24
Subject Space.......................................................................................................................... 27
Sublease................................................................................................................................... 29
Substantial Completion.......................................................................................................... 37
Substantially Completed......................................................................................................... 37
Subtenant................................................................................................................................. 29
Tenant......................................................................................................................................... 1
Tenant Affiliate......................................................................................................................... 4
Tenant Alterations................................................................................................................... 23
Tenant Delay........................................................................................................................... 37
Tenant Improvements............................................................................................................. 38
Tenant Party.............................................................................................................................. 4
Tenant Work............................................................................................................................ 38
Tenant's Communications Equipment.................................................................................... 40
Term........................................................................................................................................... 5
Transfer.................................................................................................................................... 29
Transfer Notice....................................................................................................................... 27
Transfer Premium.................................................................................................................... 28
Transferee................................................................................................................................ 27
UCC.......................................................................................................................................... 33
Unavoidable Delay.................................................................................................................. 37

**INDUSTRIAL LEASE**
(Single Tenant Net)

**ARTICLE ONE**
**BASIC TERMS AND GENERAL DEFINITIONS**

This Article One contains the Basic Terms of this Lease between Landlord and Tenant named below. Other Articles, Sections, and Paragraphs of this Lease referred to in this Article One explain and define the Basic Terms and are to be read in conjunction with the Basic Terms.

**Section 1.01.    Date of Lease**:      August 2    , 2023 ("**Effective Date**").

**Section 1.02.    Landlord**:    HUB @ 202 OWNCO, LLC, a Delaware limited liability company ("**Landlord**").

| | |
|---|---|
| Address of Landlord: | HUB@202 OWNCO, LLC<br>c/o Madison Ventures+<br>4950 S. Yosemite Street, F2#393<br>Greenwood Village, CO 80111<br>Attn: Andrew Federbusch<br>Email: afederbusch@madisonventuresplus.com |
| And to: | DORSEY&WHITNEY, LLP<br>2325 E. Camelback Road, Suite 300<br>Phoenix, Arizona 85016<br>Attn: Ken Downey<br>Email: Downey.Ken@Dorsey.com |

**Section 1.03.    Tenant**: POWIN, LLC, a Delaware limited liability company ("**Tenant**").

| | |
|---|---|
| Address of Tenant: | 2035 NW Front Avenue, Suite 600<br>Portland, Oregon 97209<br>Attn: Rachel Livek |
| With a copy of any notices by email to: | Stuart.Bolland@Powin.com<br>Rachel.Livek@Powin.com |

**Section 1.04.    Premises**:  The premises that are the subject of this Lease (the "**Premises**") comprise an area depicted on Exhibit 1.04 – 1 attached hereto, which contains approximately 71,831 rentable square feet within the building commonly known as Building 1A (the "**Building**"), as situated at 7524 East Warner Road, Mesa, Arizona 85212 in Maricopa County, Arizona. The Building sits upon the parcel of real property comprising APN 304-17-982 and described or depicted on Exhibit 1.04-2 attached hereto (the "**Land**"), which Land comprises approximately 5.40 acres.  The Land comprises a "Unit" pursuant to and as defined in the Declaration.  The square footage figure for the Building and the acreage of the Land, as recited in this Section 1.04, are approximate.  No adjustment will be made to the Base Rent or any other amounts payable by Tenant under this Lease (or to any other provisions of this Lease) if the actual square footage or acreage, however measured, is more or less than that recited.  The Land and the Building are part of a larger commercial development known as The Hub @ 202, which is composed of approximately 1,500,000 rentable square feet in eleven (11) buildings situated upon certain real property described in the Declaration as the "Property" and comprising approximately 101 acres, all of which is more particularly described as set forth on Exhibit 1.04 – 3 attached hereto (the "**Project**").  Notwithstanding any language to the contrary in this Section 1.04, but subject to rights that may specifically be granted to Tenant under Section 15.02 and Section 15.03, Landlord reserves to itself and to the Association (as defined below), all rights to use and occupy the rooftop of the Building, and thus shall have, except only as specifically provided under Section 15.02 and Section 15.03, the exclusive right to install, inspect, maintain, use, repair, alter, and replace

1

equipment thereupon (whether related or unrelated to the operation and use of the Building, and specifically including, without limitation, solar power collecting and generating equipment) and to enter the Premises in order to do so. Landlord reserves to itself and to the Association, portions of the Premises, the exterior walls of the Building and portions of the ground adjacent to the Building as necessary for the performance of the duties of the Association under the Declaration and the installation of other equipment related to such rooftop equipment. In connection with its exercise of the rights granted above, Landlord shall use commercially reasonable efforts to minimize any interference with Tenant's business resulting from the installation, use, maintenance, or removal of such equipment.

**Section 1.05.    Term**.

(a)    Term:  The "**Term**" shall be the period of not less than eighty-five (85) full months beginning on the Commencement Date and ending on the Expiration Date.

(b)    Commencement Date: The Commencement Date (as defined in Section 2.01 below) of the initial Term shall, as provided and subject to the terms and conditions of Section 14.01, be the date on which the Building Improvements (as defined in Article Fourteen below) shall be Substantially Complete (as defined in Article Fourteen below)—or, in the event of any Tenant Delay, the date on which the Building Improvements would have been Substantially Completed but for any Tenant Delay.  The estimated date for such Substantial Completion of the Building Improvements, subject to Unavoidable Delay and Tenant Delay, is November 1, 2023 (the "**Estimated Commencement Date**").  Upon determination of the actual Commencement Date, Landlord and Tenant shall promptly execute a Confirmation of Initial Term and Amendment to Lease, substantially in the form of that attached as Exhibit 2.02 to this Lease.

(c)    Expiration Date:  The expiration date of the initial Term shall be the earlier to occur of (i) the last Day of the eighty-fifth (85th) full calendar month following the month in which the Commencement Date falls or (ii) any other day upon which this Lease shall expire or be cancelled or terminated pursuant to any of the terms, covenants, or conditions of this Lease, or pursuant to any Legal Requirements.

**Section 1.06.    Permitted Uses**:  The Premises shall be used only for distribution, warehousing and repair of spare parts and assemblies to support domestic renewable energy sites, professional offices, and related ancillary uses (*see* Article Five), as and to the extent permitted under the Declaration, the Legal Requirements (as defined below), and by Landlord.

**Section 1.07.    Initial Security Deposit**:  US $750,000.00 (*see* Section 3.02)

**Section 1.08.    Tenant's Guarantor**: None.

**Section 1.09.    Brokers**: (*See* Article Thirteen)

Landlord's Broker::                  Lee & Associates

Tenant's Broker:                  Keyser

**Section 1.10.    Rent and Other Charges Payable by Tenant**:

(a)    Base Rent: The following sums shall be payable as "**Base Rent**":

| Term | Monthly Installment of Base Rent* |
|---|---|
| Lease Month 1 | Conditionally Abated (see Section 10.10 below) |
| Lease Months 2 through 12 | US $68,239.45 |
| Lease Months 13 through 24 | US $70,969.03 |
| Lease Months 25 through 36 | US $73,807.79 |
| Lease Months 37 through 48 | US $76,760.10 |

2

| | |
|---|---|
| Lease Months 49 through 60 | US $79,830.50 |
| Lease Months 61 through 72 | US $83,023.72 |
| Lease Months 73 through 84 | US $86,344.67 |
| Lease Month 85 | US $89,798.46 |
| | *plus applicable Rent Tax (as defined in <u>Section 4.02(b)</u> below) |

Notwithstanding any language in this Lease to the contrary, if a rental adjustment date specified in this <u>Section 1.10(a)</u> (or elsewhere in this Lease) falls on a date other than the first day of a calendar month, then such rental adjustment date shall be deemed to be the first day of the calendar month in which the rental adjustment date falls, and the amount of Base Rent payable by Tenant under this Lease shall be adjusted effective as of such earlier date; *provided, however,* that if any Rent payable by Tenant is conditionally abated at the beginning of the Term, the above language shall not shorten such period of Rent conditional abatement.

(b)    <u>Other Periodic Payments</u>:  (i) Real Property Taxes (*see* <u>Section 4.02</u>); (ii) Utilities (*see* <u>Section 4.03</u>); (iii) Insurance Premiums (*see* <u>Section 4.04</u>); (iv) maintenance fees, Association fees, and administrative charges (*see* <u>Section 4.05</u>); and (v) Maintenance, Repairs, and Alterations (*see* <u>Article Six</u>).

**Section 1.11.    General Defined Terms**.

(a)    "**Association**" means The Hub at 202 Association, an Arizona non-profit corporation, a party to the Declaration.

(b)    "**Building Systems**" means (i) all mechanical, electrical, plumbing, telephone and data, life safety (including ESFR and other sprinkler systems), sanitary sewer, storm sewer, and HVAC Systems (as defined below) forming any part of the building(s), improvements, and fixtures located, constructed, or installed upon the Land or to be installed upon the Land pursuant to this Lease, (ii) any other mechanical systems structurally incorporated into such buildings, improvements, or fixtures, and (iii) all facilities used to provide any utility service, ventilation, or municipal services to such buildings, improvements, or fixtures.

(c)    "**Business Day**" means every day Monday through Friday, inclusive, but excluding legal holidays of the United States of America and the State of Arizona.

(d)    "**Control**" means the full power and legal authority to direct and control the business, operations, decisions, and actions of the subject person or entity.

(e)    "**Day**" means every day; *provided, however*, that if the relevant action Day specified in this Lease shall fall on a Saturday, Sunday, or legal holiday of the United States of America or of the State of Arizona, then the actionable Day shall be the next occurring Business Day. By comparison, "**day**" shall mean every calendar day without exception.

(f)    "**Declaration**" means the Declaration Establishing the Hub at 202 Condominium Association and Declaration of Covenants, Conditions and Restrictions made by HUB @ 202 OWNCO, LLC, a Delaware limited liability company, and the Association and recorded in the public land records of Maricopa County Arizona on June 15, 2023 as Instrument No. 20230312883, together with all bylaws, articles of incorporation, and rules concerning the Project or the Premises, and including (without limitation) all "Condominium Documents" as defined in the Declaration, as may be amended from time to time.

(g)    "**Fair Market Rental Rate**" for the Premises shall mean the total fair market Base Rent payment, for each year of the pertinent Extension, that would be agreed upon between a landlord and a tenant entering into a new lease for space (i) comparable to the Premises in location, configuration, size, and use, (ii) in a facility comparable to the Premises in respect of building location, quality, reputation, and age, (iii) built out in a layout comparable to the Premises, (iv) for a term comparable to the relevant Extension, (v) with comparable pass-throughs of expenses and taxes, and (vi) in all instances assuming the following: (A) that such a landlord and tenant were informed, well-advised, and each acting in what it considered its own best interests; and (B) that Tenant shall continue to pay Additional Rent as provided under this Lease.

3

(h)      "**Governmental Authority**"and "**Governmental Authorities**" means all governmental and quasi-governmental agencies, departments, commissions, boards, bureaus, or instrumentalities of the United States, and of any states, counties, and/or cities, and of any political subdivisions of any of the foregoing.

(i)      "**HVAC Systems**" means all heating, ventilation, ducting, and air conditioning systems of the Premises (including, without limitation, all boilers and pressure vessels).

(j)      "**Landlord Affiliate**" means any person or entity that Controls, is Controlled by, or is under common Control with Landlord.

(k)      "**Landlord Party**" means Landlord and any Landlord Affiliate, as well as their respective successors, assignees, guarantors, officers, members, managers, directors, agents, employees, property managers, contractors, invitees, permittees, or any other Person(s) under the supervision or control of Landlord or entering the Premises during the Term with the permission or knowledge of Landlord (other than Tenant or Tenant's agents or employees). With respect to any and all obligations of Tenant under this Lease to protect, defend, indemnify, and hold Landlord or any Landlord Party harmless, the **term** Landlord Party shall also be inclusive of Landlord's lender.

(l)      "**Legal Requirements**" means all of the following, present and future: all statutes, laws (including, without limitation, cases and common law), codes, regulations, ordinances, orders, rules, bylaws, administrative guidelines, requirements, decrees, directives, and actions of any Governmental Authority that are applicable to the Premises (including, but not limited to the lawful conduct of the Permitted Uses at the Premises), including without limitation, the Americans with Disabilities Act; all recorded easements (including, without limitation, those arising under the Declaration) and licenses, the Declaration (including rules and regulations promulgated thereunder by the Association, as to all of which Tenant, as an occupant of certain real property described in the Declaration as the "Property," shall be bound), all recorded building and use restrictions, and all other recorded covenants that are applicable to the Premises or the Project; and all other legal requirements of whatever kind or nature that are applicable to the Premises.

(m)      "**Parties**" means both Landlord and Tenant.

(n)      "**Party**" means either Landlord or Tenant.

(o)      "**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority, or other entity.

(p)      "**Tenant Affiliate**" means any person or entity that Controls, is Controlled by, or is under common Control with Tenant.

(q)      "**Tenant Party**" means Tenant and any Tenant Affiliate, as well as their respective successors, assignees, guarantors, officers, members, managers, directors, agents, employees, contractors, invitees, permittees, or any other Person(s) under the supervision or control of Tenant or entering the Premises during the Term with the permission or knowledge of Tenant (other than Landlord or Landlord's agents or employees).

## ARTICLE TWO
## TERM

### Section 2.01.   Lease of Premises for Term.

(a)      In consideration of Tenant's payment of the Base Rent and Additional Rent and Tenant's performance of the covenants set forth in this Lease, Landlord hereby lets to Tenant, and Tenant hereby takes from Landlord, the Premises.  As an incident to such demise, Tenant shall also have a nonexclusive right to use, consistent with and subject to the terms, conditions, and limitations of the Declaration, all parking areas and pedestrian and vehicular paths of travel located from time to time during the Term upon the Land.

(b)      The term of this Lease (the "**Term**") shall be as set forth in Section 1.05(a) above, shall commence on the date (the "**Commencement Date**") set forth in Section 1.05(b) above, and shall terminate on the date (the "**Expiration Date**") set forth in Section 1.05(c) above, unless sooner terminated or extended as

4

expressly provided in this Lease.  The terms and provisions of this Lease shall be effective as of the Effective Date.

**Section 2.02.   Delay in Commencement**.  Landlord shall not be liable to Tenant if Landlord does not Substantially Complete the Building Improvements, and thus deliver possession of the Premises to Tenant, on the Estimated Commencement Date.  Landlord's non-delivery of the Premises to Tenant on that date shall not affect this Lease or the obligations of Tenant under this Lease, except that (i) the Commencement Date shall be delayed until Landlord has Substantially Completed the Building Improvements (unless such delay is the result of a Tenant Delay, as defined in Section 14.01 below, in which instance the Building Improvements shall be deemed completed, and possession of the Premises thus delivered, on the day that the Building Improvements would have been completed but for Tenant Delay) and (ii) the Term and the respective period of Conditional Abatement contemplated by this Lease shall be extended for a period equal to the delay in delivery of possession of the Premises to Tenant, on a day by day basis plus the number of days necessary to end the Term on the last Day of a month. Tenant shall, upon the request of Landlord, execute, acknowledge, and deliver to Landlord an instrument in the form of the "**Commencement Date Certificate**" attached hereto as Exhibit 2.02; provided, however, that Tenant's failure to execute, acknowledge, and deliver such an instrument shall not affect the validity of the Commencement Date, the Expiration Date, the Base Rent, or such other items as set forth in such Commencement Date Certificate.  The failure of Tenant to take possession of or to occupy the Premises shall not serve to relieve Tenant of any obligations arising on the Commencement Date, and shall not delay the payment of Rent by Tenant. Landlord shall be deemed to have delivered possession of the Premises to Tenant upon Substantial Completion (as defined in Article Fourteen below) of the Building Improvements and written notice to Tenant regarding the same, regardless of whether Tenant actually takes possession of the Premises on such date.

**Section 2.03.   Early Occupancy**.  Tenant shall have the right of early occupancy of the Premises, subject to (i) full execution of this Lease, (ii) Landlord's receipt of all deposits, including the Security Deposit, and the initial monthly installment of Base Rent, (iii) Landlord's and Tenant's receipt of any necessary governmental permits, approvals, or consents, including with respect to the Permitted Use, (iv) Landlord's prior written approval of Tenant's proposed schedule describing the timing and specific purpose of Tenant's early occupancy, and (v) all of the terms and conditions of this Lease (including, but not limited to, the insurance provisions of <u>Section 4.04</u> below), with the exception of the payment of Base Rent.  Such early occupancy shall be for the sole purpose of preparing the Premises for Tenant's use, including construction of the Tenant Improvements in accordance with <u>Section 14.02</u> and the installation of furnishings and equipment.  During such period, Tenant shall assume all risk of loss to Tenant's materials, furnishings, equipment, and other personal property.   Tenant's occupancy during this period shall not interfere with construction of the Building Improvements (if any) by Landlord's contractor, and in the event Tenant's occupancy does so interfere, Tenant agrees to cease all construction or other activity until Landlord's contractor has completed its work. Notwithstanding the above, if Tenant occupies the Premises and commences business operations thereon before the Commencement Date, Tenant's occupancy of the Premises shall be subject to all of the provisions of this Lease, including those governing the payment of Rent.  Tenant's early occupancy of the Premises shall not advance the Expiration Date.

**Section 2.04.   Holding Over**.  If Tenant holds over after the expiration of the Term, with or without the express or implied consent of Landlord, such tenancy shall be from month-to-month only (the "**Hold Over Tenancy**"), and shall not constitute a renewal hereof or an extension for any further term, and in such case Base Rent shall be payable at a monthly rate equal to: (i) one hundred and fifty percent (150%) of the Base Rent applicable immediately before the expiration of the Term for the first month of such Hold Over Tenancy, and (ii) two hundred percent (200%) of the Base Rent applicable immediately before the expiration of the Term for each month after the first month of such Hold Over Tenancy.  Such Hold Over Tenancy shall be subject to every other term, covenant, and agreement contained herein.  Nothing contained in this <u>Section 2.04</u> shall be construed as consent by Landlord to any holding over by Tenant, and Landlord expressly reserves the right to require Tenant to surrender possession of the Premises to Landlord as provided in this Lease upon the expiration or other termination of this Lease.  The provisions of this <u>Section 2.04</u> shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein or at law.  If Tenant fails to surrender the Premises upon the termination or expiration of this Lease, in addition to any other liabilities to Landlord accruing therefrom,

4871-2699-3514\4

Tenant shall protect, defend (with counsel acceptable to Landlord), indemnify, and hold Landlord harmless from all loss, costs (including reasonable attorneys' fees), and liability resulting from such failure, including, without limiting the generality of the foregoing, any claims made by any succeeding tenant founded upon such failure to surrender, and any lost profits to Landlord resulting therefrom.

**Section 2.05.**    Option(s) to Extend Term.

(a)    Grant of Option(s).  Landlord hereby grants to Tenant a total of two (2) option(s) (the "**Option(s)**") to extend the Term for additional term(s) of three (3) years each (the "**Extension(s)**"), on the same terms and conditions as set forth in this Lease, but at an increased Base Rent as set forth below and without any additional Option(s) other than those granted in this Section 2.05.  Each Option shall be exercised only by written notice delivered to Landlord not more than two hundred seventy (270) Days nor less than one hundred eighty (180) Days before the expiration of the initial Term or the preceding Extension of the Term, respectively.  If Tenant fails to deliver Landlord written notice of the exercise of an Option within the prescribed time period, such Option, and any succeeding Options shall lapse, and there shall be no further right to extend the Term.  Each Option shall be exercisable by Tenant on the expressed conditions that (i) at the time of the exercise, and at all times thereafter and before the commencement of such Extension, Tenant shall not be in default under any of the provisions of this Lease that remains uncured at the time of such purported exercise of Tenant's right under this Section 2.05(a), and (ii) Tenant has not been ten (10) or more Days late in the payment of any Rent more than a total of three (3) times during the initial Term and all preceding Extensions.  Following Tenant's timely and valid exercise of an Option, Landlord shall prepare, and Tenant shall execute and deliver to Landlord, an amendment to this Lease confirming the term of the Extension and the amount of Base Rent payable by Tenant during such Extension or, at Landlord's sole option, Landlord and Tenant shall execute and deliver a new lease for the Extension based on the standard form of lease agreement then in use by Landlord.

(b)    Personal Options.  The Option(s) are personal to the Tenant named in Section 1.03 of this Lease or any Tenant Affiliate described in Section 9.07 of this Lease.  If Tenant sublets any portion of the Premises or assigns or otherwise transfers any interest under this Lease to an entity other than a Tenant Affiliate before the exercise of an Option (whether with or without Landlord's consent), then such Option and any succeeding Options shall lapse and be void *ab initio*.  If Tenant sublets any portion of the Premises or assigns or otherwise transfers any interest of Tenant under this Lease to an entity other than a Tenant Affiliate after the exercise of an Option but before the commencement of the respective Extension (whether with or without Landlord's consent), then such Option and any succeeding Options shall lapse and the Term shall expire as if such Option were not exercised.  If Tenant sublets any portion of the Premises or assigns or otherwise transfers any interest of Tenant under this Lease to an entity other than a Tenant Affiliate after the exercise of an Option and after the commencement of the Extension related to such Option, then the term of this Lease shall expire upon the expiration of the Extension during which such sublease or transfer occurred.

(c)    Time of Essence.  Time is of the essence with respect to Tenant's exercise of the Option(s) granted in this Section 2.05.

(d)    Calculation of Base Rent during Extension.  The Base Rent shall be increased on the first day of the term of each pertinent Extension (the "**FMV Rental Adjustment Date(s)**") to the Fair Market Rental Rate for the Premises throughout the Extension term (the "**FMV Rental Rate**"), as reasonably determined by Landlord and published to Tenant in a written notice delivered to Tenant not more than thirty (30) Days after Tenant's timely delivery of the written notice of extension required under Section 2.05(a).  If Tenant shall object to Landlord's determination of the FMV Rental Rate, then Tenant may either: (i) withdraw Tenant's written notice of the Option's exercise by delivering to Landlord, not more than ten (10) Business Days after Landlord delivers notice of such FMV Rental Rate, a written statement of such withdrawal; or (ii) deliver to Landlord within the same period of ten (10) Business Days a written notice electing to arbitrate the FMV Rental Rate determination.

(i)    If Tenant shall not timely deliver either (i) a written notice of withdrawal or (ii) a written notice electing to arbitrate, then the FMV Rental Rate noticed by Landlord shall be the Base Rent during the term of the pertinent Extension.

(ii)    If Tenant shall timely deliver a written notice of withdrawal under <u>Section 2.05(d),</u> Tenant's exercise of the Option shall thereupon be deemed nullified, and the Term then shall end on the Expiration Date determined without reference to such Option.

(iii)    If Tenant shall timely deliver a written notice electing to arbitrate the FMV Rental Rate determination, then each of Landlord and Tenant shall have ten (10) additional Business Days after such delivery to select an arbitrator from among those listed on the American Arbitration Association's National Roster of Arbitrators, and to notify the other Party of such selection—whereupon the arbitrators so selected shall convene and, within five (5) Business Days after the deadline for such selection notices, select a third arbitrator to conduct the arbitration process provided below, which third arbitrator (i) shall likewise be selected from among persons then listed on the American Arbitration Association's National Roster of Arbitrators. (If one Party fails timely to so notify the other of its selection, then the arbitrator so selected by the Party timely noticing its selection shall conduct the arbitration process provided below; if neither Party timely notifies the other of its selection, an arbitrator shall be designated by the Joint Arbitration and Mediation Service (JAMS) from among the real property neutrals available through JAMS.)  All arbitrators so selected (whether by the Parties or by JAMS) shall have at least ten (10) years' experience with commercial real estate leasing, and shall not have been employed by either Party within the past five (5) years.

(iv)    In the pertinent arbitration, each of Landlord and Tenant shall submit to the arbitrator and to the other Party its determination of the Fair Market Rental Rate.  The arbitrator shall grant to Landlord and Tenant a hearing and the right to submit evidence as to their determinations.  The arbitrator shall determine which of the two (2) Fair Market Rental Rate determinations more closely represents the actual fair market rental rate of the Premises, and thus shall be the FMV Rental Rate.  The arbitrator may not, however, select as the FMV Rental Rate any Fair Market Rental Rate other than the one submitted by Landlord or the one submitted by Tenant.  The FMV Rental Rate determination shall be binding upon Landlord and Tenant as Base Rent as of the FMV Rental Adjustment Date.  In no event shall the delay in the determination of the FMV Rental Rate affect Tenant's obligation to pay the amount of Base Rent or any other charges under the Lease.  If the FMV Rental Rate value is not determined pursuant to <u>Section 2.05(d)</u> before the applicable FMV Rental Adjustment Date, then Tenant shall continue after the FMV Rental Adjustment Date to pay to Landlord during the Extension the Base Rent applicable to the Premises immediately before the FMV Rental Adjustment Date, and shall do so until the FMV Rental Rate is so determined.  When the FMV Rental Rate of the Premises is determined, Tenant shall thereafter pay to Landlord, without need for additional notice or demand, any sum then accrued of differences between monthly installments of Base Rent actually paid by Tenant to Landlord after the FMV Rental Adjustment Date and monthly installment of the adjusted Base Rent determined so far as payable after the FMV Rental Adjustment Date.

**ARTICLE THREE**
**BASE RENT AND SECURITY DEPOSIT**

**Section 3.01.    Time and Manner of Payment of Base Rent**.  Subject to any Conditionally Abated Rent, on the Commencement Date, Tenant shall pay Landlord monthly Base Rent in the amount stated in <u>Section 1.10(a)</u> above for the first month of the Term.  On the first day of the first full calendar month thereafter, and on the same day of each and every month thereafter during the Term, Tenant shall pay Landlord the monthly Base Rent, in advance, without offset, recoupment, deduction, or prior demand.  The Base Rent shall be payable at Landlord's address or at such other place as Landlord may designate in writing.  The term "**Lease Month**" shall mean each consecutive calendar month during the Term (including any partial calendar month at the inception of the Term), with the first Lease Month commencing on the Commencement Date.  For purposes of this Lease, the term "**Lease Year**" shall mean, with respect to the first Lease Year, the period commencing on the Commencement Date and ending on the last day of the twelfth (12th) full calendar month following the month in which the Commencement Date falls (unless the Commencement Date falls on the first day of a calendar month, in which case the first Lease Year will end on the last day of the twelfth (12th) Lease Month), and with respect to subsequent Lease Years, each consecutive twelve (12) month period during the Term following the first Lease Year.  If the Commencement Date is a day other than the first day of a calendar month, then (i) the Term shall include the number of months stated (or the number of months included within the number of years stated) in <u>Section 1.05</u> above, plus the partial Lease Month in which the Commencement Date falls, and (ii) the Rent for

7

such partial Lease Month shall be prorated based on the number of days in such calendar month. On the Effective Date, Tenant shall deposit with Landlord the initial monthly installment of Base Rent, along with all Rent Tax thereon, which amounts shall be due and payable and applied to first month's Base Rent and Rent Tax as set forth in this Lease. Upon execution of this Lease, Tenant shall deliver to Landlord a complete Authorization Agreement – Pre-Arranged Payments in the form of Exhibit 3.01 attached hereto and incorporated herein by this reference, together with a voided check for account verification, establishing arrangements whereby payments of the Base Rent, and all other Rent are transferred by Automated Clearing House Debit ("ACH") initiated by Landlord from an account established by Tenant at a United States bank or other financial institution to such account as Landlord may designate. Tenant shall continue to pay all Rent by ACH unless otherwise directed by Landlord. Tenant understands and agrees that Landlord shall impose the following additional fees: a $250.00 fee for each ACH transaction that does not clear Landlord's bank account (as determined by Landlord in its sole discretion), and a $150.00 fee for new or revised ACH instructions that are different from those then on file with Landlord at the time of each such change; provided, however, that Tenant understands and agrees that Landlord further reserves the right to update or otherwise modify the foregoing fees at any time, and from time to time, in its sole and absolute discretion. In the event Landlord elects to modify any such fees pursuant to the immediately preceding sentence, Tenant agrees to pay such additional fees without the necessity for obtaining additional consents or approvals from Tenant.

**Section 3.02.    Security Deposit**.

(a)    On the Effective Date, Tenant shall deposit with Landlord a cash Security Deposit in the amount set forth in Section 1.07 to serve as a deposit to be held and used in accordance with this Section 3.02 (the "**Security Deposit**"). The Security Deposit shall be held by Landlord as security for the faithful performance of all the terms of this Lease to be observed and performed by Tenant. The Security Deposit shall not be mortgaged, assigned, transferred, or encumbered by Tenant, and any such act on the part of Tenant shall be without force or effect and shall not be binding upon Landlord.

(b)    Upon any Event of Default, or if Landlord should make any payment on behalf of the Tenant, then Landlord, at its option and without notice or prejudice to any other remedy that Landlord may have on account thereof, may appropriate and apply the entire Security Deposit (or so much thereof as may be necessary to compensate Landlord) toward the payment of Base Rent, Additional Rent, other sums paid by Landlord on behalf of Tenant, or loss or damage sustained by Landlord, due to the Event of Default. Thereafter, Tenant shall forthwith, on demand, restore the Security Deposit to the original sum deposited, and Tenant's failure to do so shall constitute a default by Tenant in its obligation to pay Rent. Tenant hereby waives any and all rights Tenant may have with respect to the Security Deposit under applicable Legal Requirements.

(c)    Landlord may hold any Security Deposit in an interest bearing account, interest (if any) on which, net of account maintenance and administrative fees, shall be held on account of Tenant; provided that, while Landlord holds the Security Deposit, Landlord shall have no obligation to pay interest on the same and shall have the right to commingle the same with Landlord's other funds. So long as Tenant shall not be in default of its obligations under this Lease, Landlord shall return the Security Deposit (or so much thereof as shall have not theretofore been applied in accordance with the terms of this Section) to Tenant following the Expiration Date and the surrender of possession of the Premises by Tenant to Landlord in accordance with the terms of this Lease. If Landlord conveys Landlord's interest under this Lease, the Security Deposit, or any part thereof not previously applied, shall be turned over by Landlord to Landlord's grantee, and Tenant shall look solely to such grantee for proper application of the Security Deposit in accordance with the terms of this Section 7.1 and the return thereof in accordance herewith. The holder of a mortgage on the Premises shall not be responsible to Tenant for the return or application of the Security Deposit, whether or not it succeeds to the position of Landlord hereunder, unless such holder actually receives the Security Deposit. Tenant hereby waives all Legal Requirements that (i) establish the time frame by which Landlord must refund a security deposit under a lease, and/or (ii) provide that Landlord may claim from the Security Deposit only those sums reasonably necessary to remedy defaults in the payment of rent, to repair damage caused by Tenant or to clean the Premises, it being agreed that Landlord may, in addition, claim those sums specified in ARTICLE X below, and/or those sums reasonably necessary to compensate Landlord for any loss or damage caused by Tenant's breach of this Lease or the acts or omission of any Tenant Party.

8

(d)     Tenant may provide written notice to Landlord asserting that there are sufficient Quarterly Financial Statements (as defined below) to demonstrate at least four (4) consecutive calendar quarters of positive earnings before interest, taxes, depreciation and amortization ("**EBITDA**") of Tenant (each, an "**EBITDA Notice**").   After receipt by Landlord of an EBITDA Notice, along with all applicable Quarterly Financial Statements (duly audited or certified as required by Section 11.03 below), and any other reasonable documentation, Landlord shall have at least ten (10) business days to approve or reject an EBITDA Notice, in Landlord's commercially reasonable discretion.   Landlord's failure to approve an EBITDA Notice in writing within ten (10) business days after Landlord's receipt thereof shall be deemed the disapproval of such EBITDA Notice.   In the event an EBITDA Notice is rejected (or deemed rejected) by Landlord under this Section 3.02(d), Tenant may make a subsequent resubmission under this Section 3.02(d).   Notwithstanding anything to the contrary in this Lease, if (i) Tenant provides an initial EBITDA Notice that is subsequently approved in writing by Landlord, and (ii) Tenant has not defaulted under this Lease (that remains uncured beyond any applicable notice and cure period) or the Declaration, is not subleasing any portion of the Premises and has not assigned any interest in the Lease, a portion of the Security Deposit equal to $375,000 shall be applied to the monthly Rent obligations of Tenant following the date of such approved first EBITDA Notice and the remaining Security Deposit shall then be $375,000.   Subsequent to the first approved EBITDA Notice, if (i) Tenant provides a second EBITDA Notice for four (4) consecutive quarters distinct from the four (4) consecutive quarters set forth in the first EBITDA Notice, which second EBITDA Notice is subsequently approved in writing by Landlord, and (ii) Tenant has not defaulted under this Lease (that remains uncured beyond any applicable notice and cure period), or the Declaration, is not subleasing any portion of the Premises and has not assigned any interest in the Lease, a portion of the Security Deposit equal to $187,500 shall be applied to the monthly Rent obligations of Tenant following the date of such approved second EBITDA Notice and the remaining Security Deposit shall then be $187,500.

(e)     Notwithstanding the foregoing, in the event Tenant fails by December 31, 2023 to deliver to Landlord: (i) annual financial statements for 2021 and 2022 duly audited by an independent certified public accountant, and (ii) audited financial statements for 2023; *provided that* if such 2023 audited financial statements are not available, Tenant may alternatively deliver quarterly financial statements for the first, second, and third calendar quarter ending on September 30, 2023 certified by the chief financial officer of Tenant, the Security Deposit will increase by $136,478.90, which is equal to two (2) additional months of Base Rent.

**Section 3.03.   Application of Payments**.   Unless otherwise designated by Landlord in its sole discretion, all payments received by Landlord from Tenant shall be applied to the longest aged payment obligation owed by Tenant to Landlord.   No designation by Tenant, either in a separate writing or on a check or money order, shall modify this section or have any force or effect.

**Section 3.04.   Termination; Advance Payments**.   Upon termination of this Lease under Article Seven (Damage or Destruction) of this Lease, or under Article Eight (Condemnation) of this Lease, or any other termination not resulting from Tenant's default, and after Tenant has vacated the Premises in the manner required by this Lease, Landlord shall refund to Tenant (or Tenant's successor) the unused portion of the Security Deposit, any advance Rent or other advance payments made by Tenant to Landlord, and any amounts paid for Real Property Taxes (defined below) and insurance which apply to any time periods after termination of this Lease.

**ARTICLE FOUR**
**OTHER CHARGES PAYABLE BY TENANT**

**Section 4.01.   Additional Rent**.   All charges payable by Tenant other than Base Rent are called "**Additional Rent**." Commencing on the Commencement Date, Tenant shall pay any and all Additional Rent due and payable regardless of the period of Conditionally Abated Rent contemplated in this Lease.   Unless this Lease provides otherwise, Tenant shall pay all Additional Rent then due with the next monthly installment of Base Rent. The term "**rent**" or "**Rent**" shall mean the sum of all Base Rent and all Additional Rent.   Without limitation on other obligations of Tenant that shall survive the expiration or earlier termination of the Term, the obligations of Tenant to pay the Additional Rent provided for in this Article Four shall survive the expiration or earlier termination of the Term.   The failure of Landlord to timely furnish Tenant the amount of the Additional Rent shall not preclude Landlord from enforcing its rights to collect such Additional Rent.

9

**Section 4.02.    Property Taxes**.

(a)    **Real Property Taxes**.  Commencing on the Commencement Date, Tenant shall pay all Real Property Taxes on the Land (including any fees, taxes, or assessments against, or as a result of, any tenant improvements installed on or at the Premises by or for the benefit of Tenant) during the Term.  Subject to <u>Section 4.02(c)</u> and <u>Section 4.08</u> below, such payment shall be made at least ten (10) Days before the delinquency date of such taxes.  Within such ten (10)-Day period, Tenant shall furnish Landlord with satisfactory evidence that the Real Property Taxes have been paid.  Landlord shall reimburse Tenant for any Real Property Taxes paid by Tenant covering any period of time before or after the Term.  Alternatively, Landlord may elect to bill Tenant in advance for such taxes and Tenant shall pay Landlord the amount of such taxes, as Additional Rent, at least ten (10) Days before the delinquency date of such taxes.  Landlord shall pay such taxes before such delinquency date, provided Tenant has timely made payment to Landlord.  Any penalty caused by Tenant's failure to timely make such payments shall also be Additional Rent owed by Tenant immediately upon demand.

(b)    **Definition of "Real Property Tax" and "Rent Taxes."**  "**Real Property Tax**" means: (i) any fee, license fee, license tax, business license fee, commercial rental tax, levy, charge, assessment, penalty, or tax imposed by any taxing authority against the Premises; (ii) any gross receipts tax, gross excise tax, transaction privilege tax, or other tax imposed on the Landlord's right to receive, or the receipt of, rent, charge, sums, or income from the Premises or against Landlord's business of leasing the Premises (including, without limitation, any tax or excise imposed by the United States of America, the State of Arizona, Maricopa County, the City of Mesa, or other body or governmental authority pursuant as a transaction privilege tax) (collectively, "**Rent Taxes**"); (iii) any tax or charge for fire protection, streets, sidewalks, road maintenance, refuse ,or other services provided to the Premises by any Governmental Authority; (iv) any tax, including any decrease in tax, imposed upon this transaction or based upon a re-assessment of the Premises due to a change of ownership, as defined by applicable law, or other transfer of all or part of Landlord's interest in the Premises; and (v) any charge or fee replacing any tax previously included within the definition of Real Property Tax.  Neither "Real Property Tax" nor "Rent Taxes" include Landlord's federal or state income, franchise, inheritance, or estate taxes.  For clarity, payments of Rent Tax shall be made by Tenant at the same time and in the same manner as Tenant's payments of any Rent.

(c)    **Joint Assessment; Tenant's Share**.  If the Premises are not separately assessed under the Declaration or by applicable Governmental Authority, Landlord shall reasonably determine Tenant's share of the Real Property Taxes payable by Tenant under <u>Section 4.02(a)</u> above from the assessor's worksheets, based on square footage, or other reasonably available information.

(d)    **Personal Property Taxes**.

(i)    Tenant shall pay all taxes charged against trade fixtures, furnishings, equipment, or any other personal property belonging to Tenant.  Tenant shall diligently pursue the separate assessment of such personal property, so that it is taxed separately from the Real Property, and/or the Premises.

(ii)    If any of Tenant's personal property is taxed with the Real Property or the Premises, Tenant shall pay Landlord the taxes for the personal property within fifteen (15) Days after Tenant receives a written statement from Landlord for such personal property taxes.

**Section 4.03.    Utilities**.  Tenant shall pay, directly to the appropriate supplier, the cost of all natural gas, heat, light, power, sewer service, telephone, fiber optic, cable, or other Communications or data delivery services, water, refuse disposal, and other utilities and services supplied to the Premises.  However, if any services or utilities are jointly metered with other property in the Building or the Project, Landlord shall make a reasonable determination of Tenant's proportionate share of the cost of such utilities and services and Tenant shall pay such share to Landlord with Tenant's next monthly installment of Rent, consistent with <u>Section 4.01</u> above.  Tenant acknowledges and agrees that (1) this Lease is entirely separate and distinct from and independent of any and all agreements that Tenant may at any time enter into with any third party for the provision of utility services or any other services, and (2) Landlord has no obligation of any kind concerning the provision of any such services.  Landlord shall not be liable for any failure to furnish, stoppage of, or interruption in furnishing any of the services or utilities described in this <u>Section 4.03</u>, when such failure is caused by accident, breakage, repairs, strikes, lockouts, labor disputes, labor disturbances, governmental regulation, civil disturbances, terrorist acts, acts of war,

moratorium, or other governmental action, or any other cause beyond Landlord's reasonable control, and, in such event, Tenant shall not be entitled to any damages nor shall any failure or interruption abate or suspend Tenant's obligation to pay Rent as required under this Lease or constitute or be construed as a constructive or other eviction of Tenant. Further, in the event any Governmental Authority or public utility promulgates or revises any law, ordinance, rule or regulation, or issues mandatory controls or voluntary controls relating to the use or conservation of energy, water, gas, light, or electricity, the reduction of automobile or other emissions, or the provision of any other utility or service, Landlord may take any reasonably appropriate action to comply with such law, ordinance, rule, regulation, mandatory control, or voluntary guideline without affecting Tenant's obligations under this Lease. Tenant recognizes that security services, if any, provided by Landlord at the Building are for the protection of Landlord's property and under no circumstances shall Landlord be responsible for, and Tenant waives any rights with respect to, providing security or other protection for Tenant or its employees, invitees or property in or about the Premises or the Building.

**Section 4.04.  Insurance Policies**.

(a)  **Liability Insurance**.  From and after the Effective Date and during the Term, Tenant, at Tenant's sole cost and expense, shall maintain a commercial general liability insurance and umbrella liability insurance on the broadest forms available for similar risks, insuring Tenant against liability for bodily injury, property damage (including loss of use of property), personal injury, and contractual liability arising out of the operation, use, or occupancy of the Premises in an amount of not less than $10,000,000 as to any one occurrence and $10,000,000 in the annual aggregate—of which commercial general liability insurance affording primary (and not excess liability) coverage shall be maintained with coverage limits of not less than One Million Dollars ($1,000,000.00) arising out of any one occurrence and Two Million Dollars ($2,000,000.00) in the annual aggregate. Tenant shall name Landlord, as well as any Landlord Affiliate and any lender or mortgagee designated by Landlord, as additional insured(s) under such policy, and Tenant shall provide Landlord with an appropriate "additional insured" endorsement to Tenant's liability insurance policy (in a form acceptable to Landlord) not less than ten (10) Business Days before Tenant occupies the Premises.  The liability insurance obtained by Tenant under this Section 4.04(a):  shall (i) be primary and non-contributing; (ii) contain a "separation of insureds" clause (or equivalent); (iii) contain contractual liability coverage respecting Tenant's indemnity obligations under Section 5.05 below; and (iv) not have a deductible amount in excess of Twenty-Five Thousand Dollars ($25,000.00).  The amount and coverage of such insurance shall not limit Tenant's liability nor relieve Tenant of any other obligation under this Lease.  Landlord may also obtain commercial general liability insurance in an amount and with coverage determined by Landlord, insuring Landlord against liability arising out of ownership, operation, use, or occupancy of the Premises.  The policy obtained by Landlord shall not be contributory and shall not provide primary insurance.

(b)  In addition, Tenant shall during the Term, at Tenant's sole cost and expense, maintain a policy of pollution legal liability insurance insuring Tenant against liability for bodily injury, property damage (including loss of use of property), legal defense and remediation, and personal injury arising out of the operation, use, or occupancy of the Premises. The pollution legal liability insurance so required shall be in an initial amount of not less than Five Million Dollars ($5,000,000.00) arising out of any one occurrence and in the annual aggregate. Tenant shall name all Landlord Parties and their successors and assigns (as well as additional Persons, if any—including any lender of Landlord—specified in writing from time to time by Landlord) as additional insureds under such policy, and Tenant shall provide Landlord with an appropriate "additional insured" endorsement to Tenant's pollution legal liability insurance policy (in a form acceptable to Landlord and otherwise in accordance with Section 5.03(b)(i)) not less than ten (10) Business Days before Tenant occupies the Premises.

(c)  **Premises and Rental Income Insurance**.  From and after the Commencement Date and during the Term, Landlord shall maintain policies of insurance covering loss of or damage to the Premises in the full amount of its replacement value, with such policies providing protection against loss or damage due to fire or other casualties covered within the classification of fire, extended coverage, vandalism, malicious mischief, sprinkler leakage and any other perils which Landlord, Landlord's lender or ground lessor deems reasonably necessary.  Tenant acknowledges and agrees that Landlord's property and rental loss insurance required pursuant to this Section 4.04(c) insures damage to the Premises as a result of fire or other casualty and does not extend to damage to the Premises as a result of Tenant's and/or Tenant's employees, contractors or agents acts or omissions.

11

For example, fire damage to the Premises that is caused by a short in the electrical system is an insured loss, but damage to the Premises caused by forklift damage to a support column, dock door or concrete wall is not an insured loss and would be Tenant's responsibility to repair.  Landlord shall have the right to obtain terrorism, flood, and earthquake insurance, and other forms of insurance as required by any lender holding a security interest in the Premises or any ground lessor.  Landlord shall not obtain insurance for Tenant's fixtures, equipment, or building improvements installed by Tenant on the Premises.  During the Term, Landlord shall also maintain a rental income insurance policy, with loss payable to Landlord, in an amount equal to one year's Base Rent, plus estimated Real Property Taxes and insurance premiums.  During the Term, Tenant shall maintain, (at its sole cost and expense), policies of insurance covering loss of or damage to Tenant's fixtures, equipment, and building improvements installed by Tenant on the Premises, in the full amount of their replacement value, with such policies providing protection against loss or damage due to fire or other casualties covered within the classification of fire, extended coverage, vandalism, malicious mischief, sprinkler leakage and any other perils which Tenant deems necessary.  Such policies shall contain an agreed amount endorsement in lieu of a co-insurance clause, and shall be written as primary policies, not contributing with, and not supplemental to the property insurance coverage that Landlord is required to carry pursuant to this Section 4.04(c).  Tenant shall be liable for the payment of any deductible amount under Landlord's insurance policies (in an amount not to exceed $10,000.00) maintained pursuant to this Section 4.04(c); *provided, however*, that if the loss or damage is due to an act or omission of Landlord, then Tenant shall not be responsible for payment of any such deductible amount.  Tenant shall also be responsible for payment of the entirety of any deductible amount under Tenant's insurance policies.  Tenant shall not do or permit anything to be done, which invalidates any such insurance policies.

(d)    **Payment of Premiums**.  Subject to Section 4.08 below, Tenant shall pay all premiums for the insurance policies described in Sections 4.04(a), (b), and Section 4.04(c) above, (whether obtained by Landlord or Tenant), within the earlier of (i) when Tenant obtains such insurance policy, or (ii) fifteen (15) Days after Tenant's receipt of a copy of the premium statement, or other evidence of the amount due, except Landlord shall pay all premiums for non-primary commercial general liability insurance which Landlord elects to obtain as provided in Section 4.04(a) above.  If insurance policies maintained by Landlord cover improvements on real property other than the Premises, Landlord shall deliver to Tenant a statement of the premium applicable to the Premises showing in reasonable detail how Tenant's share of the premium was computed.  If the Term expires before the expiration of an insurance policy maintained by Landlord, Tenant shall be liable for Tenant's prorated share of the insurance premiums.  Subject to the provisions of Section 2.03 above, before the date required under this Section 4.04, Tenant shall deliver to Landlord a copy of any policy of insurance, which Tenant is required to maintain under this Section 4.04.  At least thirty (30) Days before the expiration of any such policy, Tenant shall deliver to Landlord a renewal of such policy.  As an alternative to providing a policy of insurance, Tenant shall have the right to provide Landlord a certificate of insurance, (in form acceptable to Landlord), executed by an authorized officer or agent of the insurance company, certifying that the insurance which Tenant is required to maintain under this Section 4.04 is in full force and effect and containing such other information which Landlord reasonably requires.

(e)    **General Insurance Provisions**.

(i)    Any insurance that Tenant is required to maintain under this Lease shall be endorsed to include a provision that requires the insurance carrier to deliver to Landlord not less than thirty (30) Days' written notice before any cancellation or modification of such coverage, including the cancellation or modification of any required endorsements.

(ii)    If Tenant fails to deliver any policy, certificate, or renewal to Landlord required under this Lease within the prescribed time period, or if any such policy is canceled or modified during the Term without Landlord's consent, Landlord may obtain such insurance for Landlord's sole benefit (but is under no obligation to do so), in which case Tenant shall reimburse Landlord as Additional Rent for the cost of such insurance within fifteen (15) Days after receipt of a statement that indicates the cost of such insurance.  If Tenant fails to carry the required insurance, such failure shall automatically be deemed to be a covenant by Tenant to self-insure such required coverage, with a full waiver of subrogation in favor of Landlord (in the case of deemed self-insurance of Tenant's required property insurance).

4871-2699-3514\4

(iii)      Tenant shall maintain all insurance required under this Lease with companies duly authorized to issue insurance policies in the State of Arizona and holding a Financial Strength Rating of "A" or better, and a Financial Size Category of "XII" or larger, based on the most recent published ratings of the A.M. Best Company.  Landlord and Tenant acknowledge the insurance markets are rapidly changing and that insurance in the form and amounts described in this Section 4.04 may not be available in the future.  Tenant acknowledges that the insurance described in this Section 4.04 is for the primary benefit of Landlord.  If at any time during the Term, Tenant is unable to maintain the insurance required under this Lease, Tenant shall nevertheless maintain insurance coverage, which is customary and commercially reasonable in the insurance industry for Tenant's type of business, as that coverage may change from time to time.  Landlord makes no representation as to the adequacy of such insurance to protect Landlord or Tenant's interests.  If Tenant believes that any such insurance coverage is inadequate, Tenant shall obtain any such additional property or liability insurance, which Tenant deems necessary to protect Landlord and Tenant.

(iv)      Unless prohibited under any applicable insurance policies maintained, and notwithstanding anything in this Lease to the contrary, Landlord and Tenant each hereby waives any and all rights of recovery against the other, or against the members, managers, officers, employees, agents, or representatives of the other (whether such right of recovery arises from a claim based on negligence or otherwise), for loss of, or damage to, its property or the property of others under its control, if such loss or damage is covered by any insurance policy in force (whether or not described in this Lease) at the time of such loss or damage.  In addition, any policy of insurance maintained by Tenant under this Lease shall, to the extent possible, contain a waiver of the rights of subrogation by the insurer as to any claim against (a) the Association and its officers, directors, agents, and employees, (b) all other owners and occupants (together with all of their employees, agents, and invitees) of any portion of the Project other than the Premises, and (c) any mortgagee of all or any portion of the Project for which the Association, or any owner or occupant of any portion of the Project except the Premises, may be liable.  Upon obtaining the required policies of insurance, Landlord and Tenant shall deliver notice to the insurance carriers of the required waivers of subrogation.

(v)      Tenant shall not do or permit to be done any act or thing upon the Premises or the Project which would (a) jeopardize or be in conflict with the property insurance policies covering the Project or fixtures or property in the Project; (b) increase the rate of property insurance applicable to the Project to an amount higher than it otherwise would be for general office and warehouse use of the Project; or (c) subject Landlord to any liability or responsibility for injury to any person or persons or to property by reason of any business or operation being conducted at the Premises.

(vi)      Tenant shall, at its sole cost and expense, keep in full force and effect during the Term the following additional coverage:  (a) workers' compensation insurance as required by state law; (b) employer's liability insurance, with a limit of One Million Dollars ($1,000,000), each accident, One Million Dollars ($1,000,000) policy limit, and One Million Dollars ($1,000,000) each employee for all persons employed by Tenant who may come onto or occupy the Premises; (c) commercial auto liability insurance with a limit of One Million Dollars ($1,000,000) aggregate limit for bodily injury and property damage, including owned, non-owned, and hired auto liability coverage for such vehicles driven on and around the Premises (if Tenant does not own company vehicles, a letter to that effect from an officer or principal of Tenant, in addition to proof of non-owned and hired auto liability coverage is required); (d) "Causes of Loss – Special Form" (or equivalent) personal property insurance, covering Tenant's personal property, whether owned, leased, or rented, including but not limited to trade fixtures, furniture, equipment, office contents, any interior improvements constructed within the Premises and any alterations to the Premises made by Tenant; and (e) to the extent that Tenant constructs or develops any improvements in or on the Premises, which according to the terms and conditions of this Lease shall become property of Landlord at the termination thereof, Tenant shall also provide "Causes of Loss – Special Form" (or equivalent) property coverage on a replacement cost basis.

(vii)      Coverage limits specified in this Section 4.04 shall be subject to periodic increase based upon inflation, increased liability awards, recommendation of Landlord's professional insurance advisors, and other relevant factors.

(viii)      If Tenant carries any of the liability insurance required hereunder in the form of a blanket policy, any certificate required hereunder shall make specific reference to the Premises; *provided,*

13

*however*, the blanket policy carried with respect to the insurance required by Tenant hereunder shall contain a "per location" endorsement assuring that any aggregate limit under such blanket policy shall apply separately to the Premises and that the insurer thereunder shall provide written notice to Landlord if the available portion of such aggregate is reduced to less than the minimum amounts required under Section 4.04(a) above by either payment of claims or the establishment of reserves for claims (in which case Tenant shall be obligated to take immediate steps to increase the amount of its insurance coverage in order to satisfy the minimum requirements set forth in Section 4.04(a) above).

Section 4.05.    **Maintenance Services and Fees, Association Fees, and Administrative Charges**.

(a)    Maintenance Services and Fees.  Landlord shall provide only the maintenance services required of Landlord under Section 6.03 and shall otherwise have absolutely no responsibility to repair, maintain, or replace any portion of the Premises at any time.  The cost of any capital repair or replacement to any Building Systems required of Landlord under Section 6.03, as well as the cost of any capital repair or replacement whatsoever required of Landlord under Section 6.03 owing to Tenant's negligent or intentionally wrongful act or omission or to its failure to observe its obligations under this Lease, shall be amortized (including Interest on the unamortized amount) over the useful life of such repair or replacement (as reasonably determined by Landlord), and Tenant thereafter shall be liable as Additional Rent for that portion of such cost as shall be allocable to the remaining Term (as it may be extended).

(b)    Association Fees.  Tenant shall pay to Landlord, as Additional Rent due and payable by Tenant as set forth below, all sums owed by Landlord with respect to the Land and the Premises pursuant to the terms of the Declaration (including, without limitation, any Association dues, assessments, special assessments, supplemental assessments, and Common Expenses due thereunder). Tenant shall make such payment together with Tenant's monthly Rent payment next due after Landlord's delivery of such demand, without the necessity of notice from Landlord.

(c)    Property Manager Fee; Administration Fees.  Landlord may retain a third-party property manager with respect to the Land and Premises. If Landlord does so, Tenant shall pay to Landlord as Additional Rent an amount equal to all property management fees and other amounts payable by Landlord to such property manager with respect to the Premises and Land, which amount shall be due and payable by Tenant within thirty (30) days after Landlord delivers to Tenant a written demand for the same.  Tenant also shall pay to Landlord as Additional Rent an administrative fee equal to two percent (2.0%) on all amounts due from Tenant for tax and insurance obligations described in Section 4.02 and Section 4.04 above, which fee shall be due and payable concurrently with the amounts otherwise due from Tenant under this Lease for such tax and insurance obligations.

(d)    Additional Rent shall not include the following:

(1)    The costs of repair to the Building or Project, including the Premises and other costs and expenses arising from a casualty (which would otherwise be included as part of Additional Rent), to the extent such costs contemplated under this Section 4.05(d)(1) are actually reimbursed by insurance proceeds;

(2)    The cost of improving or renovating space in the Project that exclusively serves a particular tenant within the Project that is not the Tenant, if any;

(3)    The cost of utilities, services, and other benefits charged exclusively to an individual tenant (excluding Tenant) for such tenant's exclusive use, if any;

(4)    Interest, fines or penalties assessed as a result of Landlord's failure to make payments in a timely manner (unless such failure is commercially reasonable under the circumstances);

(5)    The cost of any political or charitable donations or contributions.

Section 4.06.  **Late Charges**.  Tenant's failure to pay Rent promptly may cause Landlord to incur unanticipated costs.  The exact amount of such costs is impractical or extremely difficult to ascertain.  Such costs may include, but are not limited to, processing and accounting charges and late charges, which may be imposed

on Landlord by any ground lease, mortgage, or trust deed encumbering the Premises. Therefore, if Landlord does not receive any Rent payment within ten (10) Days after it becomes due, Tenant shall pay Landlord a late charge equal to ten percent (10%) of the overdue amount. The Parties agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of such late payment. If Tenant shall be served with a demand for payment of past due Rent or any other charge, any payments tendered thereafter to cure any default of Tenant shall be made only by cashier's check, wire transfer, or other immediately available funds.

**Section 4.07.   Interest on Past Due Obligations**. In addition to any late charge imposed pursuant to Section 4.06 above, any amount owed by Tenant to Landlord which is not paid when due shall bear interest from the due date of such amount at the rate of fifteen percent (15%) per annum ("**Interest**"); *provided, however*, that no interest shall be payable on any late charges imposed on Tenant under this Lease. The payment of interest on such amounts shall not excuse or cure any default by Tenant under this Lease. If the interest rate specified in this Section 4.07, or any other charge or payment due under this Lease which may be deemed or construed as interest, is higher than the rate permitted by law, such interest rate is hereby decreased to the maximum legal interest rate permitted by law.

**Section 4.08.   Impounds for Insurance Premiums and Real Property Taxes.** If requested by any ground lessor or lender to whom Landlord has granted a security interest in the Premises, or if Tenant is more than ten (10) Days late in the payment of Rent more than once in any consecutive twelve (12) month period, Tenant shall pay Landlord a sum equal to one-twelfth (1/12) of the annual real property taxes and insurance premiums payable by Tenant under this Lease, together with each payment of Base Rent. Landlord shall hold such payments in a non-interest bearing impound account. If unknown, Landlord shall reasonably estimate the amount of real property taxes and insurance premiums when due. Tenant shall pay any deficiency of funds in the impound account to Landlord upon written request. If Tenant defaults under this Lease, Landlord may apply any funds in the impound account to any obligation then due under this Lease.

## ARTICLE FIVE
## USE OF PROPERTY

**Section 5.01.   Permitted Uses**. Tenant may use the Premises only for the Permitted Uses set forth in Section 1.06 above and for no other purpose whatsoever; *provided, however*, that such Permitted Uses (i) do not create any unusual or atypical wear and tear on the Building or decrease the value of the Premises; (ii) do not create any risk of Environmental Damages or Hazardous Material contamination on the Premises; (iii) do not create obnoxious (as to a reasonable person) odors or noise; (iv) do not include storage of tires, chemicals or explosives or other products made with like materials; and (v) do not involve fabrication or manufacturing, except as expressly permitted in Section 1.06 above.

**Section 5.02.   Manner of Use**.

(a)   Compliance with Legal Requirements. Tenant shall not cause or permit the Premises to be improved, developed, or used in any way which constitutes a violation of any Legal Requirements, or which unreasonably interferes with the rights of other tenants of Landlord, or which constitutes a nuisance or waste. Tenant shall obtain and pay for all permits required for Tenant's occupancy of the Premises, and for all business licenses, and shall promptly take all actions necessary to comply with all applicable statutes, ordinances, rules, regulations, orders and requirements regulating the use by Tenant of the Premises, including without limiting to the Occupational Safety and Health Act. Notwithstanding the foregoing, Landlord shall, at Tenant's sole cost and expense, cooperate with Tenant in executing permitting applications and performing other ministerial acts reasonably necessary to enable Tenant to obtain a high pile stock permit and/or racking permit (or comparable permit) from the applicable Governmental Authority, if applicable. Tenant, at Tenant's sole cost and expense, shall be responsible for the installation of any fire hose valves, draft curtains, smoke venting, and any additional fire protection systems that may be required by the fire department or any Governmental Authority. It shall be considered a Tenant Delay under Article Fourteen below if a delay in obtaining such permit thereby delays or affects Landlord's receipt of governmental permits, approvals, or certificates of occupancy.

(b)   Compliance with Applicable Laws. Without in any way limiting Section 5.02(a), Tenant shall, at its sole cost and expense, promptly comply with any Legal Requirements which relate to (or are triggered

4871-2699-3514\4

by) (i) Tenant's use of the Premises, and (ii) any alteration or any tenant improvements made to the Premises either by Tenant or at the request of Tenant (altogether, the "**Applicable Laws**").  Should any standard or regulation now or hereafter be imposed on Tenant by any federal, state, or local governmental body charged with the establishment, regulation, and enforcement of occupational, health or safety standards, then Tenant agrees, at its sole cost and expense, to comply promptly with such standards or regulations.  The judgment of any court of competent jurisdiction or the admission of Tenant in any judicial action, regardless of whether Landlord is a party thereto, that Tenant has violated any Applicable Laws, shall be conclusive of that fact as between Landlord and Tenant.

(c)      Water Infiltration. Tenant shall immediately notify Landlord in writing of any water infiltration at the Premises.

**Section 5.03.   Hazardous Materials**.

(a)      Definitions.

(i)      "**Environment**" means all indoor and outdoor air, surface, water, groundwater, surface or subsurface land, wildlife, biota, and all other natural resources.

(ii)      "**Environmental Damages**" means all claims, judgments, damages, losses, penalties, fines, liabilities (including strict liability), encumbrances, liens, costs, and expenses (including the expense of investigation and defense of any claim, whether or not such claim is ultimately defeated, or the amount of any good faith settlement or judgment arising from any such claim) of whatever kind or nature, contingent or otherwise, matured or unmatured, foreseeable or unforeseeable (including without limitation reasonable attorneys' fees and disbursements and consultants' fees) any of which are incurred at any time as a result of the existence of Hazardous Material upon, about, or beneath the Premises or the Land, or migrating or threatening to migrate to or from the Premises or the Land, or the existence of a violation of Environmental Requirements pertaining to the Premises or the Land and the activities thereon regardless of whether the existence of such Hazardous Material or the violation of Environmental Requirements arose before the present ownership or operation of the Premises.  . Environmental Damages include, without limitation:

A.      damages for personal injury, or injury to property or natural resources occurring upon or off of the Premises, including, without limitation, lost profits, consequential damages, the cost of demolition and rebuilding of any improvements on real property, interest, penalties and damages arising from claims brought by or on behalf of employees of Tenant (with respect to which Tenant waives any right to raise as a defense against Landlord any immunity to which it may be entitled under any industrial or worker's compensation laws);

B.      fees, costs or expenses incurred for the services of attorneys, consultants, contractors, experts, laboratories and all other costs incurred in connection with the investigation or remediation of such Hazardous Materials or violation of such Environmental Requirements, including, but not limited to, the preparation of any feasibility studies or reports or the performance of any cleanup, remediation, removal, response, abatement, containment, closure, restoration or monitoring work required by any Governmental Authority or reasonably necessary to make full economic use of the Premises or any other property in a manner consistent with its current use or otherwise expended in connection with such conditions, and including without limitation any attorneys' fees, costs and expenses incurred in enforcing the provisions of this Lease or collecting any sums due hereunder;

C.      liability to any third person or Governmental Authority to indemnify such person or Governmental Authority for costs expended in connection with the items referenced in subparagraph (ii) above; and

D.      diminution in the fair market value of the Premises including without limitation any reduction in fair market rental value or life expectancy of the Premises or the improvements located thereon or the restriction on the use of or adverse impact on the marketing of the Premises or any portion thereof.

(iii)      "**Environmental Requirements**" means all applicable present and future:

16

A.     statutes, regulations, rules, ordinances, codes, licenses, permits, orders, approvals, plans, authorizations, concessions, franchises, and similar items (including, but not limited to those pertaining to reporting, licensing, permitting, investigation and remediation), of all Governmental Agencies; and

B.     all applicable judicial, administrative, and regulatory decrees, judgments, and orders relating to the protection of human health or the environment, including, without limitation, all requirements pertaining to emissions, discharges, releases, or threatened releases of Hazardous Materials or chemical substances into the air, surface water, groundwater or land, or relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of Hazardous Materials or chemical substances.

(iv)    "**Hazardous Material**" means any substance, whether solid, liquid, or gaseous in nature:

A.     the presence of which requires investigation or remediation under any federal, state or local statute, regulation, ordinance, order, action, policy or common law;

B.     which is or becomes defined as a "hazardous waste," "hazardous substance," "pollutant," "contaminant," "hazardous material" or "toxic" under any federal, state or local statute, regulation, rule or ordinance or amendments thereto including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. section 9601 et seq.) and/or the Resource Conservation and Recovery Act (42 U.S.C. section 6901 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. section 1801 et seq.), the Federal Water Pollution Control Act (33 U.S.C. section 1251 et seq.), the Clean Air Act (42 U.S.C. section 7401 et seq.), the Toxic Substances Control Act, as amended (15 U.S.C. section 2601 et seq.), and the Occupational Safety and Health Act (29 U.S.C. section 651 et seq.), as these laws have been amended or supplemented;

C.     which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic, or otherwise hazardous or is or becomes regulated by any Governmental Authority;

D.     the presence of which on the Premises or the Land causes or threatens to cause a nuisance upon the Premises or the Land or to adjacent properties or poses or threatens to pose a hazard to the health or safety of persons on or about the Premises;

E.     the presence of which on adjacent properties could constitute a trespass by Tenant;

F.     without limitation which contains gasoline, diesel fuel or other petroleum hydrocarbons;

G.     without limitation which contains polychlorinated biphenyls (PCBs), asbestos or urea formaldehyde foam insulation; or

H.     without limitation which contains radon gas.

(v)    "**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of Hazardous Materials into the Environment.

(b)    Prohibitions.

(i)    Other than normal quantities of general office and cleaning supplies, Tenant shall not cause, permit, or suffer any Hazardous Material to be brought upon, treated, kept, stored, disposed of, discharged, released, produced, manufactured, generated, refined, or used upon, about, or beneath the Premises or the Land by any Tenant Party, or any other Person without the prior written consent of Landlord. From time to time during the Term, Tenant may request Landlord's approval of Tenant's use of other Hazardous Materials, which approval may be withheld in Landlord's sole discretion. Tenant shall, before the Commencement Date, provide to Landlord for any contemplated Hazardous Materials: (A) a description of handling, storage, use and disposal procedures; (B) all "community right to know" plans or disclosures and/or emergency response plans

17

which Tenant is required to supply to local Governmental Agencies pursuant to any Environmental Requirements; and (C) a certificate of pollution legal liability insurance naming Landlord, and any lender or mortgagee designated by Landlord, as additional insured(s) in accordance with <u>Section 4.04(b)</u>, which coverage shall insure against losses due to (i) bodily injury, sickness, disease, mental anguish or shock, or death sustained by any person, (ii) property damage, including physical injury to or destruction of tangible property (including the resulting loss of use thereof), (iii) clean-up costs and the loss of use of tangible property that has not been physically damaged or destroyed, and (iv) defense, including costs, charges, and expenses incurred in the investigation, adjustment or defense of claims for damages.

(ii)    Tenant shall not cause, permit, or suffer the existence or the commission by any Tenant Party, or by any other Person, of a violation of any Environmental Requirements upon, about, or beneath the Premises or the Land.

(iii)    Tenant shall neither create or suffer to exist, nor permit any Tenant Party to create or suffer to exist, any lien, security interest, or other charge or encumbrance of any kind with respect to the Premises, including without limitation, any lien imposed pursuant to section 107(f) of the Superfund Amendments and Reauthorization Act of 1986 (42 U.S.C. section 9607(l)) or any similar state statute.

(iv)    Tenant shall not install, operate, or maintain any above or below grade tank, sump, pit, pond, lagoon, or other storage or treatment vessel or device on the Premises without Landlord's prior written consent, which Landlord may withhold, condition, or delay in its sole discretion.

(c)    <u>Indemnity</u>.

(i)    Tenant, its successors, assigns, and guarantors, agree to indemnify, defend, reimburse, and hold harmless (A) Landlord, (B) any other person who acquires all or a portion of the Premises in any manner (including purchase at a foreclosure sale) or who becomes entitled to exercise the rights and remedies of Landlord under this Lease, and (C) the directors, officers, shareholders, employees, partners, members, managers, agents, contractors, subcontractors, experts, licensees, affiliates, lessees, mortgagees, trustees, heirs, devisees, successors, assigns, and invitees of such persons, from and against any and all Environmental Damages which exist as a result of the activities or negligence of any Tenant Party or which exist as a result of the breach of any warranty or covenant or the inaccuracy of any representation of Tenant contained in this Lease, or by Tenant's remediation of the Premises or failure to meet its obligations contained in this Lease.

(ii)    The obligations contained in this <u>Section 5.03(c)</u> shall include, but not be limited to, the burden and expense of defending all claims, suits, and administrative proceedings, even if such claims, suits, or proceedings are groundless, false, or fraudulent, and conducting all negotiations of any description, and paying and discharging, when and as the same become due, any and all judgments, penalties or other sums due against such indemnified persons.  Landlord, at its sole expense, may employ additional counsel of its choice to associate with counsel representing Tenant.

(iii)    Landlord shall have the right but not the obligation to join and participate in, and control, if it so elects, any legal proceedings or actions initiated in connection with Tenant's activities.  Landlord may also negotiate, defend, approve, and appeal any action taken or issued by any applicable Governmental Authority with regard to contamination of the Premises by a Hazardous Material.

(iv)    The obligations of Tenant in this <u>Section 5.03(c)</u> shall survive the expiration or termination of this Lease.

(v)    The obligations of Tenant under this <u>Section 5.03(c)</u> shall not be affected by any investigation, by or on behalf of Landlord, or by any information, which Landlord may have or obtain with respect thereto.

(d)    <u>Obligation to Remediate</u>.  In addition to the obligation of Tenant to indemnify Landlord pursuant to this Lease, Tenant shall, upon approval and demand of Landlord, at its sole cost and expense and using contractors approved by Landlord, promptly take all actions to remediate the Premises and the Project which are required by any Governmental Authority, consistent with the Closing Environmental Assessment (as defined below), or which are reasonably necessary to mitigate Environmental Damages or to allow full economic use of

4871-2699-3514\4

the Premises and the Project, which remediation is necessitated from the presence upon, about or beneath the Premises or the Project, at any time during or upon termination of this Lease (whether discovered during or following the Term), of a Hazardous Material or a violation of Environmental Requirements existing as a result of the activities or negligence of any Tenant Party.  Such actions shall include, but not be limited to, the investigation of the environmental condition of the Premises and the Project the preparation of any feasibility studies, reports or remedial plans, and the performance of any cleanup, remediation, containment, operation, maintenance, monitoring or restoration work, whether on or off the Premises, which shall be performed in a manner approved by Landlord.  Tenant shall take all actions necessary to restore the Premises and the Project to the condition existing before the introduction of Hazardous Material upon, about, or beneath the Premises or the Project, notwithstanding any lesser standard of remediation allowable under applicable law or governmental policies.

(e)    Right to Inspect.  Landlord shall have the right in its sole and absolute discretion, but not the duty, to enter and conduct an inspection of the Premises, including invasive tests, upon 24 hours prior notice (except in the case of emergency), which notice may come by email, to determine whether Tenant is complying with the terms of this Lease, including but not limited to the compliance of the Premises and the activities thereon with Environmental Requirements and the existence of Environmental Damages as a result of the condition of the Premises, the Land, or surrounding properties and activities thereon.  Landlord shall have the right, but not the duty, to retain any independent professional consultant (the "**Consultant**") to enter the Premises to conduct such an inspection or to review any report prepared by or for Tenant concerning such compliance.  The cost of the Consultant shall be paid by Landlord unless such investigation discloses a violation of any Environmental Requirement by any Tenant Party or the existence of a Hazardous Material on the Premises or the Project or any other property caused by the activities or negligence of any Tenant Party (other than Hazardous Materials used in compliance with all Environmental Requirements and previously approved by Landlord), in which case Tenant shall pay the cost of the Consultant.  Upon 24 hours prior notice (except in the case of emergency), which notice may come by email, Tenant hereby grants to Landlord, and the agents, employees, consultants and contractors of Landlord the right to enter the Premises and to perform such tests on the Premises or the Land as are reasonably necessary to conduct such reviews and investigations.  Landlord shall use commercially reasonable efforts to minimize interference with the business of Tenant.

(f)    Notification.  If Tenant shall become aware of or receive notice or other communication concerning any actual, alleged, suspected, or threatened violation of Environmental Requirements, or liability of Tenant for Environmental Damages in connection with the Premises or past or present activities of any person thereon, including but not limited to notice or other communication concerning any actual or threatened investigation, inquiry, lawsuit, claim, citation, directive, summons, proceeding, complaint, notice, order, writ, or injunction, relating to same, then Tenant shall deliver to Landlord within ten (10) Days of the receipt of such notice or communication by Tenant, a written description of said violation, liability, or actual or threatened event or condition, together with copies of any documents evidencing same.  Receipt of such notice shall not be deemed to create any obligation on the part of Landlord to defend or otherwise respond to any such notification.

If requested by Landlord, Tenant shall disclose to Landlord the names and amounts of all Hazardous Materials other than general office and cleaning supplies referred to in Section 5.03(b) of this Lease, which were used, generated, treated, handled, stored, or disposed of on the Premises or which Tenant intends to use, generate, treat, handle, store, or dispose of on the Premises.  The foregoing in no way shall limit the necessity for Tenant obtaining Landlord's consent pursuant to Section 5.03(b) of this Lease.

(g)    Surrender of Premises.  In the ninety (90) Days before the expiration or termination of the Term, and for up to ninety (90) Days after the later to occur of: (i) Tenant fully surrenders to Landlord exclusive possession of the Premises; and (ii) the termination of this Lease (the "**Environmental Closing Period**"), Tenant shall perform, at its sole cost and expense, any clean-up or remedial work which is necessary to remove, mitigate or remediate any Hazardous Materials and/or contamination of the Premises caused by the activities or negligence of any Tenant Party.  Prior to the expiration of the Environmental Closing Period, Tenant shall deliver to Landlord a phase-I environmental site assessment of the Premises prepared in accordance with all applicable ASTI standards by the Consultant or another competent, licensed, and experienced environmental engineer or engineering firm

19

satisfactory to Landlord that confirms all Tenant remediation obligations under this Lease are complete (the "**Closing Environmental Assessment**").

(h)     Assignment and Subletting.  In the event this Lease provides that Tenant may assign this Lease or sublet the Premises subject to Landlord's consent and/or certain other conditions, and if the proposed assignee's or sublessee's activities in or about the Premises involve the use, handling, storage, or disposal of any Hazardous Materials other than those used by Tenant and in quantities and processes similar to Tenant's uses in compliance with this Lease, (i) it shall be reasonable for Landlord to withhold its consent to such assignment or sublease in light of the risk of contamination posed by such activities and/or (ii) Landlord may impose an additional condition to such assignment or sublease which requires Tenant to reasonably establish that such assignee's or sublessee's activities pose no materially greater risk of contamination to the Premises than do Tenant's permitted activities in view of:  (A) the quantities, toxicity and other properties of the Hazardous Materials to be used by such assignee or sublessee; (B) the precautions against a release of Hazardous Materials such assignee or sublessee agrees to implement; (C) such assignee's or sublessee's financial condition as it relates to its ability to fund a major clean-up; and (D) such assignee's or sublessee's policy and historical record respecting its willingness to respond to the cleanup of a release of Hazardous Materials.

(i)     Storage Tanks.  Without limiting the generality of the above provisions of this Section 5.03, with respect to any above or underground storage tanks to be located on the Premises by Tenant with Landlord's consent, Tenant shall keep all permits and registrations  current and shall provide Landlord with copies of all test results regarding such tanks, including without limitation, tightness testing and release detection results, all submissions to and correspondence with any Governmental Authority regarding such tests and provide copies of all plans for responding to releases from such tanks, including any and all SPCC (spill prevention control and countermeasure) plans.  Tenant shall, within twenty-four (24) hours, notify Landlord of any release or suspected release from such tanks, and shall immediately commence corrective action and shall remediate any release to the condition existing before the commencement of this Lease, unless Landlord specifically consents in writing to a lesser standard for remediation.  Tenant shall comply with all requests by Landlord for modification to any spill prevention, investigation, or remediation plan and in connection with any investigation or remediation and shall allow Landlord to conduct its own testing and provide Landlord with split samples.

(j)     Survival of Hazardous Materials Obligation.  Tenant's breach of any of its covenants or obligations under this Section 5.03 shall constitute a material default under this Lease.  The obligations of Tenant under this Lease shall survive the expiration or earlier termination of this Lease without any limitation, and shall constitute obligations that are independent and severable from Tenant's covenants and obligations to pay Rent under this Lease.

**Section 5.04.  Auctions and Signs**.  Tenant shall not conduct or permit any auctions or sheriff's sales at the Premises.  Tenant may, with Landlord's written consent (which consent may be withheld, conditioned, or delayed by Landlord in its discretion), and then only at Tenant's sole cost and expense, install an identification sign ("**Sign**") at the Premises; *provided, however*, that (i) the size, color, location, materials, and design of the Sign shall be subject to Landlord's prior written approval, (ii) the Sign shall comply with all applicable Legal Requirements, (iii) the Sign shall not be painted directly on the Building or attached or placed on the roof of the Building, (iv) the sign shall not be removed from the Premises at any time (including upon the Expiration Date) without Landlord's written consent (which consent may be withheld, conditioned, or delayed by Landlord in its discretion), and (v) Tenant's continuing signage right shall be contingent upon Tenant maintaining the Sign in a first-class condition.  Tenant shall be responsible for all costs incurred in connection with the design, construction, installation, repair, and maintenance of the Sign.  Upon the expiration or earlier termination of this Lease, Tenant shall cause the Sign to be removed and shall repair any damage caused by such removal (including, but not limited to, patching and painting), all at Tenant's sole cost and expense.  Any signs, notices, logos, pictures, names or advertisements which are installed and that have not been separately approved by Landlord, may be removed by Landlord, without notice by Landlord to Tenant at Tenant's sole cost and expense.

**Section 5.05.  Indemnity**.  Tenant shall indemnify, defend (with counsel acceptable to Landlord), protect, and hold harmless all Landlord Parties for, from, and against any and all costs, claims, loss, damage, expense, and liability (including without limitation consultant fees, court costs, litigation expenses, and reasonable attorneys' fees in the defense or pursuit of any claim, action or proceeding, whether or not litigated and/or reduced

to judgment, and whether or not well-founded) incurred in connection with or arising from: (i) Tenant's use of the Premises, including, but not limited to, those arising from any accident, incident, injury, or damage, however and by whomsoever caused (except to the extent of any claim arising out of Landlord's gross negligence or willful misconduct), to any person or property occurring in or about the Premises; (ii) the conduct of Tenant's business or anything else done or permitted by Tenant to be done in or about the Premises; (iii) any breach or default in the performance of Tenant's obligations under this Lease; (iv) any misrepresentation or breach of warranty by Tenant under this Lease; or (v) other acts or omissions of Tenant.  As a material part of the consideration to Landlord, Tenant assumes all risk of damage to property or injury to persons in or about the Premises arising from any cause (including, but not limited to, those arising from a claim of negligence), and Tenant hereby waives all claims in respect thereof against Landlord, except to the extent of any claim arising out of Landlord's gross negligence or willful misconduct. As used in this Section, the "Tenant" shall include every Tenant Party. The provisions of this Section 5.05 shall survive the expiration or earlier termination of this Lease with respect to any claims or liability occurring before such expiration or earlier termination, and shall constitute obligations that are independent and severable from Tenant's covenants and obligations to pay Rent under this Lease.

**Section 5.06.  Landlord's Access**.  Landlord reserves the right at all reasonable times and upon reasonable notice to Tenant to enter the Premises to (i) inspect it, (ii) show the Premises to prospective purchasers, mortgagees or tenants, or to the ground or underlying lessors, (iii) post notices of non-responsibility, (iv) alter, improve, or repair the Premises, or (v) place "For Sale" and "For Lease" signs on the Premises.  Notwithstanding anything to the contrary contained in this Section 5.06, Landlord, the Association, and their respective agents may enter the Premises at any time to (A) perform services required of Landlord, (B) take possession due to any breach of this Lease, in the manner provided in this Lease, and consistent with applicable Legal Requirements, and (C) perform any covenants of Tenant, which Tenant fails to perform.  Any such entries shall be without the abatement of Rent and shall include the right to take such reasonable steps as required to accomplish the stated purposes. Tenant hereby waives any claims for damages or for any injuries or inconvenience to or interference with Tenant's business, lost profits, any loss of occupancy or quiet enjoyment of the Premises, and any other loss occasioned thereby.  For each of the above purposes, Landlord may request and Tenant shall provide a key with which to unlock all the doors in the Premises.  Notwithstanding the foregoing, in an emergency, Landlord shall have the right to use any means that Landlord may deem proper to open the doors in and to the Premises.  Any entry into the Premises in the manner described above shall not be deemed to be a forcible or unlawful entry into, or a detainer of, the Premises, or an actual or constructive eviction of Tenant from any portion of the Premises.  In exercising its rights under this Section 5.06, Landlord shall use commercially reasonable efforts to minimize interference with the business of Tenant.

**Section 5.07.  Parking**.  Tenant shall not allow large trucks or other large vehicles to be parked on the public streets located adjacent to the Premises.  With respect to the Premises and subject to applicable Legal Requirements and the Declaration, the storage of Powin Energy Segments and Collection Segments, in addition to the parking or storing of large trucks and other commercial vehicles is allowed in front of, adjacent, and perpendicular to Tenant's dock high loading doors at the Premises, so as to be on the concrete apron adjacent to such doors, or in other areas of the Premises specifically designated by Landlord for such purpose, but not otherwise.  Notwithstanding the foregoing, (i) Tenant shall not permit its parking and/or storage activities to unreasonably interfere with the rights of other tenants, guests, and occupants of the Project, and (ii) subject to applicable Legal Requirements, the Declaration, and Landlord's prior written approval, Tenant shall be allowed to fence in the truck wells and load docks at the Premises and use such area for storage.  Except as provided for in the prior sentence, Tenant shall not permit or cause any over-night storage of any items within the Project outside of the Premises.  Subject to and in accordance with the Declaration, Tenant shall be entitled to non-exclusive parking within the parking areas of the Project on a first come, first serve basis.

**Section 5.08.  Quiet Possession**.  If Tenant pays the Rent and complies with all other terms of this Lease, Landlord agrees to defend Tenant's right to enjoy the Premises for the full Term against any Person claiming by, through or under Landlord, subject to Legal Requirements and the provisions of this Lease.

**ARTICLE SIX**
**CONDITION OF PROPERTY; MAINTENANCE, REPAIRS AND ALTERATIONS**

**Section 6.01.    Existing Conditions**.    Subject to the performance of Landlord's obligations under Section 14.01 below, Tenant accepts the Premises in its "as-is", "where-is", "with all faults" condition as of the Commencement Date.  Except as expressly provided in this Lease, Tenant acknowledges that neither Landlord nor any agent of Landlord has made any representations or warranties, express or implied, whatsoever with respect to the condition of the Premises, the Building, the Land, all or any portion of the Project, or any buildings or other improvements on or comprising a part of either of same, nor with respect to the fitness or suitability thereof for any particular use or purpose, and Tenant hereby waives any and all such warranties, express or implied, including specifically but without limitation any warranty or representation of suitability.  Tenant represents and warrants that Tenant has made its own inspection of and inquiry regarding the condition of the Premises (or has had the opportunity to do so) and is not relying on any representations of Landlord or any Broker with respect thereto. Notwithstanding the foregoing, Landlord agrees to reasonably cooperate with Tenant to enforce all available construction warranties.

**Section 6.02.    Exemption of Landlord from Liability**.  Landlord shall not be liable for any damage or injury to the person, business (or any loss of income therefrom), goods, wares, merchandise, or other property of Tenant, Tenant's employees, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from: (i) fire, steam, electricity, water, gas, or rain; (ii) the breakage, leakage, obstruction, or other defects of pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures, or any other cause; (iii) conditions arising in or about the Premises or upon other portions of the Project, or from other sources or places; (iv) criminal acts or entry by unauthorized persons into the Premises or the Building; or (v) any act or omission of any other tenant of Landlord.  Landlord shall not be liable for any such damage or injury even though the cause of or the means of repairing such damage or injury are not accessible to Tenant.  The provisions of this Section 6.02 shall not, however, exempt Landlord from liability to the extent of Landlord's gross negligence or willful misconduct, and are subject to Section 4.04(e)(iv) above.

**Section 6.03.    Landlord's Obligations**.  Subject only to the provisions of Article Seven (Damage or Destruction) below, and Article Eight (Condemnation) below, Landlord shall perform all capital repairs and replacements to (i) the roof of the Building, (ii) the structural elements of the Building, and (iii) except for the HVAC Systems, the Building Systems.  Landlord shall otherwise, however, have absolutely no responsibility to repair, maintain, or replace any portion of the Premises at any time.  Tenant waives the benefit of any present or future law, that might give Tenant the right to repair the Premises at Landlord's expense or to terminate this Lease due to the condition of the Premises.

**Section 6.04.    Tenant's Obligations**.

(a)    Except only (A) as provided in Section 6.03 above, Article Seven (Damage or Destruction) below, and Article Eight (Condemnation), below, or (B) as must be performed by the Association pursuant to the Declaration, Tenant, at Tenant's sole cost and expense, shall undertake the following: (i) all cleaning, maintenance, repairs and replacements with respect to the HVAC Systems using product(s) and licensed contractor(s) acceptable to Landlord in Landlord's sole discretion, (ii) except as provided in the immediately preceding sentence of subsection (i) above, all non-capital repairs and replacements required to keep the roof, the structural elements of the Building, and all Building Systems (except HVAC Systems, which Tenant is solely obligated to clean, maintain, repair, and replace) in good order, condition, and repair; and (iii) all cleaning, maintenance, repair, and replacement required to keep all other portions of the Premises (including nonstructural elements, interior, exterior, and other systems and equipment), in good order, condition, and repair. If any part or element of the Premises or Land, or any system or equipment in the Premises, that Tenant is obligated to repair cannot be fully repaired or restored (in Landlord's judgment), Tenant shall promptly replace (subject to Landlord's right to undertake such responsibility) such portion of the Premises, system, or equipment in the Premises. Except with respect to the HVAC Systems, the cost of any such replacement shall be amortized (including Interest on the unamortized amount) over the useful life of such replacement, as reasonably determined by Landlord, and Tenant shall only be liable for that portion of the cost which is applicable to the remaining Term (as it may be extended) and if the full replacement cost is initially borne by Tenant, Landlord shall reimburse Tenant or provide Tenant

22

with a credit against future Additional Rent obligations in an amount equal to Landlord's share of such total cost. Tenant shall at its cost maintain one or more preventive maintenance service contracts providing for the regular inspection and maintenance of all Building Systems by licensed contractors reasonably acceptable to Landlord; *provided, however*, that Landlord shall have the right, upon written notice to Tenant, to undertake the responsibility for preventive maintenance of all or a portion of the Premises heating and air conditioning systems at Tenant's expense, the cost of which shall then be paid by Tenant as Additional Rent.  Tenant shall also at its cost maintain a preventive maintenance service contract providing for the regular inspection and maintenance of the Building's roof.  If any part of the Premises or the Project is damaged by any act or omission of Tenant, Tenant shall pay Landlord the cost of repairing or replacing such damaged property, whether or not Landlord would otherwise be obligated to pay the cost of maintaining or repairing such property.  It is the intention of Landlord and Tenant that, at all times during the Term, Tenant shall maintain the Premises in an attractive, first-class, and fully operative condition.  Without limiting the generality of the provisions contained above in this Section 6.04(a), Tenant agrees to repair any damage caused by the transportation and storage of its products in, on, or about the Premises, including, but not limited to any damage to the Premises' concrete floor slab, adjoining concrete ramps, adjoining concrete truck apron, and adjoining asphalt parking and access areas due to the use of forklifts hauling Tenant's products.  Tenant's repair obligation described above shall include the replacement of any damaged areas of the Premises or the Project, if repair is impracticable, so as to restore such areas to the condition existing before such damage.

(b)      Tenant shall fulfill all of Tenant's obligations under this Section 6.04 at Tenant's sole expense. If Tenant fails to maintain, repair or replace the Premises as required by this Section 6.04, Landlord may (but without any obligation to do so) upon ten (10) Days' prior notice to Tenant (except that no notice shall be required in the case of an emergency), enter the Premises and perform such maintenance or repair (including replacement, as needed) on behalf of Tenant. In such case, Tenant shall reimburse Landlord, as Additional Rent due and payable by Tenant within ten (10) Days after Landlord delivers to Tenant a written demand for the same, the sum of all costs incurred in performing such maintenance or repair.

**Section 6.05.    Alterations, Additions, and Improvements**.

(a)      Except for the Tenant Improvements (which shall be subject instead to the terms and condition of Article Sixteen) and for non-structural interior alterations that (i) do not exceed One Hundred Thousand Dollars ($100,000.00) in cost, (ii) do not alter or penetrate the floor slab or the roof membrane, and (iii) do not affect any Building Systems, Tenant shall not make any alterations, additions, or improvements to the Premises ("**Tenant Alterations**") without Landlord's prior written consent, which consent Landlord may withhold, condition, or delay in its sole discretion. Furthermore, notwithstanding the foregoing, any alteration by Tenant to any structural element or safety feature of the Premises and any exterior alteration shall in every instance require the Association's prior written approval (as and if contemplated under the Declaration) and Landlord's prior written consent, which consent Landlord may withhold, condition, or delay in its sole  and absolute discretion.  Landlord may require Tenant to provide demolition and/or lien and completion bonds in form and amount satisfactory to Landlord.  Tenant shall promptly remove any Tenant Alterations constructed in violation of this Section 6.05(a) upon Landlord's written request. All Tenant Alterations shall be performed in a good and workmanlike manner, in conformity with all Legal Requirements (including, specifically, the requirements of the Declaration), and all contractors and subcontractors shall be approved by Landlord.  Upon completion of any such work, Tenant shall provide Landlord with "as built" plans, copies of all construction contracts, and proof of payment for all labor and materials.

(b)      Tenant shall pay when due all claims for labor and material furnished to the Premises. Tenant shall deliver to Landlord at least twenty (20) Days' prior written notice of the commencement of any work on the Premises, regardless of whether Landlord's consent to such work is required.

(c)      To the extent Landlord's prior consent is required by this Section 6.05, Landlord may condition its consent to any proposed Tenant Alterations on such requirements as Landlord, in its sole discretion, deems necessary or desirable, including without limitation: (i) Tenant's submission to Landlord, for Landlord's prior written approval, of all plans and specifications relating to Tenant Alterations; (ii) Landlord's prior written approval of the time or times when Tenant Alterations are to be made; (iii) Landlord's prior written approval of the contractors and subcontractors performing Tenant Alterations; (iv) Tenant's written notice of whether Tenant

23

Alterations include the use or handling of any Hazardous Materials; (v) Tenant's obtaining, for Landlord's benefit and protection, of such insurance as Landlord may reasonably require (in addition to that required under Section 4.04 of this Lease); and (vi) Tenant's payment to Landlord of all costs and expenses incurred by Landlord because of Tenant Alterations, including, but not limited to, costs incurred in reviewing the plans and specifications for, and the progress of, Tenant Alterations, and costs of engaging outside consultants (whether for structural engineering review or otherwise).

(d)     Within ten (10) Days following the imposition of any lien or stop notice resulting from any Tenant Alterations (an "**Imposition**"), Tenant shall either (i) cause such Imposition to be released of record by payment, or (ii) in case of a disputed Imposition, cause the posting of a proper bond in favor of Landlord or provide other security satisfactory to Landlord.  In case of a disputed Imposition, Tenant shall diligently contest such Imposition and indemnify, defend (with counsel acceptable to Landlord), and hold Landlord harmless from any and all loss, cost, damage, liability, and expense (including attorneys' fees) arising from or related to it.  If Tenant fails to take either action within such ten (10)-Day period, Landlord, at its election, may pay and satisfy the Imposition, in which case the sum so paid by Landlord, with interest from the date of payment at the rate set forth in Section 4.07 of this Lease, shall be deemed Additional Rent due and payable by Tenant within ten (10) Days after Landlord delivers to Tenant a written demand for the same.

(e)     Notwithstanding any language to the contrary in this Section 6.05, if the proposed Tenant Alterations involve or affect in any way one or more of the structural components of the Building, or relate in any way to life safety matters, including, but not limited to, the Building's or Project's fire suppression system of safety-related Building Systems (collectively, the "**Structural and Safety Alterations**"), Landlord's prior written consent will be required, regardless of the cost of the proposed Alterations.  Moreover, Tenant agrees to use contractors and subcontractors selected by Landlord for the construction of any and all permitted Structural and Safety Alterations, and for any work involving possible roof penetrations (so as to ensure that any such work is performed properly does not render any applicable roof warranty void or voidable).

(f)     Tenant acknowledges and agrees that any Tenant Alterations are wholly optional with Tenant and are not being required by Landlord, either as a condition to the effectiveness of this Lease or otherwise.

(g)     All door access system hardware shall be installed such that the door and frame can be restored back to their original condition if door access control hardware components are removed.

**Section 6.06.  Condition upon Termination**.  Upon the termination of this Lease, Tenant shall surrender the Premises to Landlord, broom clean and in the same condition as received (including, without limitation, the removal of all floor striping and the resealing of the floor), ordinary wear and tear alone excepted; *provided, however*, Tenant shall not be obligated to repair any damage which Landlord is required to repair under Article Seven (Damage or Destruction) below.  In addition, Landlord may require Tenant to remove any Tenant Alterations (whether or not made with Landlord's consent) before the expiration of this Lease and to restore the Premises to their prior condition, all at Tenant's expense.  All alterations (including Tenant Alterations), additions, and improvements which Landlord has elected to keep or otherwise remain at the Premises despite Tenant's breach of this Section 6.06 shall become Landlord's property and shall be surrendered to Landlord upon the expiration or earlier termination of this Lease.  Notwithstanding the foregoing, Tenant may remove any of Tenant's machinery, equipment, or other personal property that can be removed without material damage to the Premises on the expressed condition that Tenant shall repair, at Tenant's expense, any damage to the Premises caused by the removal of any such machinery, equipment or other personal property (including, without limitation, the complete removal of all studs and bolts that penetrate the floor or walls and filling and patching the holes; *provided, however*, that with respect to floor bolt anchors, the provisions of Section 6.09 below shall control).  In no event, however, shall Tenant remove any of the following materials or equipment (which shall be deemed Landlord's property): any power wiring and power panels; lighting and lighting fixtures; wall coverings; drapes, blinds and other window coverings; carpets and other floor coverings; heaters, air conditioners and any other heating and air conditioning equipment; fencing and security gates; load levelers, dock lights, dock locks and dock seals; and other similar building operating equipment and decorations.  Tenant's obligations under this Section 6.06 shall also include its obligations under Section 5.04 with respect to any Sign.  If Tenant fails, by the expiration or earlier termination of the Term, to restore the Premises to the condition required under this Section 6.06, then Tenant shall pay Landlord, as Additional Rent due and payable by Tenant within ten (10) Days after Landlord

delivers to Tenant a written demand for the same, an amount equal to the cost of such restoration work, plus an administration fee equal to ten percent (10%) of such amount.

**Section 6.07.   Roof Access**. Except as contemplated in <u>Section 15.02</u> and <u>Section 15.03</u> below, anything in this Lease to the contrary notwithstanding, Tenant shall not, and shall not permit any Tenant Party, to enter on or in any way move about on the roof of the Building, for any purposes whatsoever, without the prior written consent of, coordination with, and supervision of Landlord or its selected agents or contractors.

**Section 6.08.   Floor Load Limits**. Tenant shall not place a load upon any floor of the Premises exceeding the floor load per square foot area, which it was designed to carry and which is allowed by law. Landlord reserves the right to prescribe the weight and position of all safes, machinery, and mechanical equipment in the Building. Such installations shall be placed and maintained by Tenant, at Tenant's expense, in settings sufficient, in Landlord's judgment, to absorb and prevent vibration, noise, and annoyance to other occupants of the Project.

**Section 6.09.   Floor Bolt Anchors**. Prior to anchoring any racking or equipment to the floor of the Premises, Tenant shall drill the holes for any anchor bolts to a depth that is one inch (1") deeper than normally required for such anchoring mechanism. Upon the expiration or earlier termination of this Lease, Tenant shall cut the top off the anchor bolts, pound the remaining bolt into the one inch (1") space described above, and pour epoxy filler into the existing hole so that the epoxy filler is flush with the floor, all at Tenant's sole cost and expense.

**ARTICLE SEVEN**
**DAMAGE OR DESTRUCTION**

**Section 7.01.   Damage or Destruction to Premises**.

(a)      Tenant shall deliver to Landlord written notice of any damage to the Premises ("**Damage Notice**") immediately upon the occurrence of any such damage. Subject to the provisions of <u>Section 7.01(c)</u> and <u>Section 7.01(d)</u> below, if the insurance proceeds received by Landlord from the insurance policies described in <u>Section 4.04(c)</u> above are sufficient to pay for the necessary repairs, this Lease shall remain in effect and Landlord shall repair the damage as soon as reasonably possible. Landlord may elect (but shall not be required) to repair any damage to Tenant's fixtures, equipment, or improvements. In the absence of such an election, Tenant shall be solely responsible for the repair, replacement, and restoration of Tenant's fixtures, equipment, or improvements and shall promptly commence such repair and diligently pursue the same to completion, unless this Lease is terminated as provided in this <u>Article Seven</u>.

(b)      If the insurance proceeds received by Landlord are not sufficient to pay the entire cost of repair, or if the cause of the damage is not covered by the insurance policies which Landlord maintains under <u>Section 4.04(c)</u> above, Landlord may elect either to:  (i) repair the damage as soon as reasonably possible, in which case this Lease shall remain in full force and effect; or (ii) terminate this Lease as of the date the damage occurred. Landlord shall notify Tenant within thirty (30) Days after receipt of the Damage Notice whether Landlord elects to repair the damage or terminate this Lease. If Landlord elects to repair the damage, Tenant shall pay to Landlord (i) the deductible amount under Landlord's insurance policies (in an amount not to exceed $10,000.00), and (ii) if the damage is due to an act or omission of Tenant or Tenant's employees, agents, contractors or invitees, the difference between the actual cost of repair and any insurance proceeds received by Landlord (including, but not limited to, the entirety of any such deductible amount). If Landlord elects to terminate this Lease, Tenant may elect to continue this Lease in full force and effect, in which case Tenant shall repair any damage to the Premises and the Building. Tenant shall pay the cost of such repairs, except that upon satisfactory completion of such repairs, Landlord shall deliver to Tenant any insurance proceeds received by Landlord for the damage repaired by Tenant. Tenant shall deliver to Landlord written notice of such election within ten (10) Days after Landlord delivers its notice of termination under this <u>Section 7.01(b)</u>.

(c)      If repairs to the Premises are reasonably estimated by Landlord to require more than three hundred sixty-five (365) Days from Landlord's receipt of insurance proceeds and building permits (the "**Repair Period**"), then either Landlord or Tenant shall have the right to terminate this Lease as of the later to occur of:  (i) the date Landlord receives the Damage Notice; and (ii) the date Tenant ceases to do business on the Premises and

25

delivers exclusive possession thereof to Landlord.  Tenant shall have the right, at any time and from time to time to request in writing that Landlord deliver to Tenant a written notice (the "**Contractor Certificate**") certifying to both Parties, in the reasonable opinion of Landlord's contractor, the amount of time required to repair or complete the repair of the Premises.  If, in the Contractor Certificate, the contractor certifies that the repair of the Premises will require a period in excess of the Repair Period, then either Party may terminate this Lease by delivering written notice of such termination to the other Party within five (5) Days after Landlord delivers the pertinent Contractor Certificate, and this Lease shall be terminated as of the date of such written notice is delivered. Notwithstanding the foregoing, Tenant shall not have any right to terminate this Lease under this Section 7.01 if the damage to the Premises was caused by the acts or omissions of Tenant or its agents, employees, contractors, or invitees.

(d)    If the damage to the Premises occurs during the last one hundred eighty (180) Days of the Term and repairs to the Premises are reasonably estimated by Landlord to require a Repair Period of more than thirty (30) Days, then either Party may elect to terminate this Lease as of the date the damage occurred, regardless of the sufficiency of any insurance proceeds, by delivering written notification to the other Party of such election within thirty (30) Days after Tenant delivers a Damage Notice.

(e)    In addition, if the Project shall be sold pursuant to provisions of the Declaration requiring notice and execution of the Declaration's termination and sale of the Project as a consequence of Substantial Destruction or Substantial Obsolescence (as defined in the Declaration), then this Lease shall terminate upon closing of the required sale.  Landlord shall deliver to Tenant written notice of any notice of intent to sell the Project pursuant to relevant provisions of the Declaration, and shall do so within ten (10) Days after receiving any such notice.

Section 7.02.   **Temporary Reduction of Rent**.  If the Premises are destroyed or damaged and Landlord or Tenant repairs or restores the Premises pursuant to the provisions of this Article Seven, any Rent payable during the period of such damage, repair, and/or restoration shall be reduced according to the degree, if any, to which Tenant's use of the Premises is impaired.  However, the reduction shall not exceed the sum of one year's payment of Base Rent, insurance premiums, and Real Property Taxes.  Except for such possible reduction in Base Rent, insurance premiums, and Real Property Taxes, Tenant shall not be entitled to any compensation, reduction, or reimbursement from Landlord as a result of any damage, destruction, repair, or restoration of or to the Premises. If such destruction or damage was caused by the acts or omissions of Tenant or its agents, employees, contractors, or invitees, no Rent shall be abated.

Section 7.03.    **Waiver**. Tenant waives the protection of any statute, code, or judicial decision that may grant to Tenant the right to terminate a lease in the event of the destruction of the leased property. Tenant agrees that the provisions of Article Seven above shall govern the rights and obligations of the Parties in the event of any destruction of the Premises.

## ARTICLE EIGHT
## CONDEMNATION

If all or any portion of the Premises are taken under the power of eminent domain or sold under the threat of that power (all of which are called "**Condemnation**"), this Lease shall terminate as to the part taken or sold on the date the condemning authority takes title or possession, whichever occurs first. If more than twenty percent (20%) of the floor area of the Building is taken, either Landlord or Tenant may terminate this Lease as of the date the condemning authority takes title or possession, by delivering written notice to the other within ten (10) Days after receipt of written notice of such taking (or in the absence of such notice, within ten (10) Days after the condemning authority takes title or possession). If neither Party terminates this Lease, this Lease shall remain in effect as to the portion of the Premises not taken, except that the Base Rent shall be reduced in proportion to the reduction in the floor area of the Premises.  Landlord shall be entitled to receive the entire award or payment in connection therewith, except that Tenant shall have the right to file any separate claim available to Tenant for any taking of Tenant's personal property and fixtures belonging to Tenant and removable by Tenant upon expiration of the Term pursuant to the terms of this Lease, and for moving expenses, so long as such claim does not diminish the award available to Landlord, its ground lessor with respect to the real property or its lender, and such claim is payable separately to Tenant.  If this Lease is not terminated, Landlord shall repair any damage to the Premises

4871-2699-3514\4

caused by the Condemnation, except that Landlord shall not be obligated to repair any damage for which Tenant has been reimbursed by the condemning authority. If the severance damages received by Landlord are not sufficient to pay for such repair, Landlord shall have the right to either terminate this Lease or make such repair at Landlord's expense.

In addition to, and not in lieu of, the foregoing, if the Project shall be sold pursuant to provisions of the Declaration requiring notice and execution of the Declaration's termination and sale of the Project as a consequence of Substantial Condemnation (as defined in the Declaration), then this Lease shall terminate upon closing of the required sale. Landlord shall deliver to Tenant written notice of any notice of intent to sell the Project pursuant to relevant provisions of the Declaration, and shall do so within ten (10) Days after receiving any such notice.

## ARTICLE NINE
## ASSIGNMENT AND SUBLETTING

**Section 9.01.   Transfers**.  Subject to Section 9.07 below, Tenant shall not, without the prior written consent of Landlord, assign, mortgage, pledge, encumber or otherwise transfer, this Lease or any interest hereunder, permit any assignment or other such foregoing transfer of this Lease or any interest hereunder by operation of law, or sublet the Premises or any part thereof (all of the foregoing are hereinafter sometimes referred to collectively as "**Transfers** "and any person to whom any Transfer is made or sought to be made is hereinafter sometimes referred to as a "**Transferee**").  To request Landlord's consent to any Transfer requiring such consent under the provisions of this Article Nine, Tenant shall deliver to Landlord written notice of such request, which notice (the "**Transfer Notice**") shall include (i) the proposed effective date of the Transfer, which shall not be less than forty-five (45) Days after the date of delivery of the Transfer Notice, (ii) a description of the portion of the Premises to be transferred (the "**Subject Space**"), (iii) all of the terms of the proposed Transfer and the consideration therefor, including (A) a calculation of the "Transfer Premium," as that term is defined in Section 9.03 below, in connection with such Transfer, (B) the name and address of the proposed Transferee, and (C) a copy of all existing and/or proposed documentation pertaining to the proposed Transfer, including all existing operative documents to be executed to evidence such Transfer or the agreements incidental or related to such Transfer, and (iv) current financial statements of the proposed Transferee certified by an officer, partner, or owner thereof, and any other information required by Landlord, which will enable Landlord to determine the financial responsibility, character, and reputation of the proposed Transferee, the nature of such Transferee's business and proposed use of the Subject Space, and such other information as Landlord may reasonably require.  Any Transfer requiring but made without Landlord's prior written consent shall, at Landlord's option, be null, void and of no effect, and shall, at Landlord's option, constitute a material default by Tenant under this Lease.  Whether or not Landlord shall grant consent, Tenant shall pay (as Additional Rent) Landlord's review and processing fees, as well as any reasonable legal fees incurred by Landlord in connection with such review, within thirty (30) Days after written request by Landlord.

**Section 9.02.   Landlord's Consent**.  Landlord shall not unreasonably withhold its consent to any proposed Transfer of the Subject Space to a Transferee on the terms specified in the Transfer Notice.  The Parties hereby agree, however, that it shall be reasonable under this Lease and under any applicable Legal Requirements for Landlord to withhold consent to any proposed Transfer where one or more of the following apply, without limitation as to other reasonable grounds for withholding consent:

(a)     The Transferee's character or reputation is significantly less prestigious than that of the Tenant;

(b)     The Transferee's business or use of the Subject Space is not permitted under this Lease;

(c)     The Transferee is not a party of reasonable financial worth and/or financial stability in light of the responsibilities involved under this Lease on the date consent is requested;

(d)     The proposed Transfer would cause Landlord to be in violation of another lease or agreement to which Landlord is a party; or

27

(e)    The terms of the proposed Transfer will allow the Transferee to exercise a right of renewal, right of expansion, right of first offer, or other similar right held by Tenant (or will allow the Transferee to occupy space leased by Tenant pursuant to any such right).

If Landlord consents to any Transfer pursuant to the terms of this Section 9.02 (and does not exercise any recapture rights Landlord may have under Section 9.04 of this Lease), Tenant may within one hundred eighty (180) Days after Landlord's consent, but not later than the expiration of such 180-Day period, enter into such Transfer of the Premises or portion thereof, upon substantially the same terms and conditions as are set forth in the Transfer Notice furnished by Tenant to Landlord pursuant to Section 9.01 of this Lease.

Section 9.03.    Transfer Premium.  In the event of a Transfer requiring Landlord's consent, if Landlord consents to such a Transfer, as a condition thereto which the Parties hereby agree is reasonable, Tenant shall pay to Landlord fifty percent (50%) of any "Transfer Premium," as that term is defined in this Section 9.03, received by Tenant from such Transferee.  "Transfer Premium" shall mean all Rent or other consideration payable by such Transferee in excess of the Rent payable by Tenant under this Lease, determined on a per rentable square foot basis if less than all of the Premises are transferred.  "Transfer Premium" shall also include, but not be limited to, key money and bonus money paid by Transferee to Tenant in connection with such Transfer, and any payment in excess of fair market value for services rendered by Tenant to Transferee or for assets, fixtures, inventory, equipment, or furniture transferred by Tenant to Transferee in connection with such Transfer.

Section 9.04.    Landlord's Option as to Subject Space.  Notwithstanding anything to the contrary contained in this Article Nine, Landlord shall have the option, by delivering written notice to Tenant within thirty (30) Days after receipt of any Transfer Notice, to recapture the Subject Space.  Such recapture notice shall cancel and terminate this Lease with respect to the Subject Space as of the effective date of the proposed Transfer until the last day of the term of the Transfer as set forth in the Transfer Notice.  In the event of a recapture by Landlord, if this Lease shall be canceled with respect to less than the entire Premises, the Rent reserved herein shall be prorated on the basis of the number of rentable square feet of the Building retained by Tenant in proportion to the number of rentable square feet contained in the Building, and this Lease as so amended shall continue thereafter in full force and effect, and upon request of either Party, the Parties shall execute written confirmation of the same. In the event of a recapture, Landlord may, if it elects, enter into a new lease covering the Subject Space with the intended Transferee on such terms as Landlord and such person or entity may agree or enter into a new lease covering the Subject Space with any other person or entity; in such event, Tenant shall not be entitled to any portion of the Transfer Premium, if any, which Landlord may realize on account of such termination and reletting.

Section 9.05.    Effect of Transfer.  If Landlord consents to a Transfer, (i) the terms and conditions of this Lease shall in no way be deemed to have been waived or modified, (ii) such consent shall not be deemed consent to any further Transfer by either Tenant or a Transferee, (iii) Tenant shall deliver to Landlord, promptly after execution, an original executed copy of all documentation pertaining to the Transfer in form reasonably acceptable to Landlord, (iv) Tenant shall furnish upon Landlord's request a complete statement, certified by an independent certified public accountant, or Tenant's chief financial officer, setting forth in detail the computation of any Transfer Premium Tenant has derived and shall derive from such Transfer, and (v) no Transfer relating to this Lease or agreement entered into with respect thereto, whether with or without Landlord's consent, shall relieve Tenant or any guarantor of Tenant's obligations under this Lease from liability under this Lease.  Landlord or its authorized representatives shall have the right at all reasonable times to audit the books, records and papers of Tenant relating to any Transfer, and shall have the right to make copies thereof.  If the Transfer Premium respecting any Transfer shall be found understated, Tenant shall, within thirty (30) Days after demand, pay (as Additional Rent) the deficiency and Landlord's costs of such audit, and if understated by more than ten percent (10%), Landlord shall have the right to cancel this Lease upon thirty (30) Days' notice to Tenant.

Section 9.06.    Additional Transfers.  For purposes of this Lease, the term "Transfer" shall also include:  (i) if Tenant is a partnership, the cumulative withdrawal or change, voluntary, involuntary, or by operation of law, of twenty-five percent (25%) or more of the partners, or the cumulative transfer of twenty-five percent (25%) or more of partnership interests, within a twelve (12)-month period, or the dissolution of the partnership without immediate reconstitution thereof; (ii) if Tenant is a closely held corporation (i.e., the stock of which is not publicly held and not traded through an exchange or over the counter), (A) the dissolution, merger,

28

consolidation, or other reorganization of Tenant, (B) the sale or other transfer of more than an aggregate of twenty-five percent (25%) of the voting shares of Tenant (other than to immediate family members by reason of gift or death) within a twelve (12)-month period, or (C) the sale, mortgage, hypothecation or pledge of more than an aggregate of twenty-five percent (25%) of the value of the unencumbered assets of Tenant within a twelve (12) month period, or (D) any other change of Control; and (iii) if Tenant is a limited liability company, any cumulative transfer of more than twenty-five percent (25%) of the membership interests within a twelve (12) month period. In addition to those types of Transfers specified above in this Article Nine, any change to the form of tenant entity or any use of the Premises by an individual or entity other than Tenant, whether pursuant to a license or concession, or otherwise, shall be deemed a Transfer requiring Landlord's consent. Notwithstanding any language to the contrary in this Article Nine, Landlord may, in its sole discretion, withhold its consent to any proposed assignment of Tenant's leasehold interest in the Premises to a lender as security, whether such proposed assignment is in the form of a leasehold deed of trust, leasehold mortgage, or otherwise.

**Section 9.07.    Tenant Affiliate**.  Notwithstanding anything to the contrary contained in Section 9.01 of this Lease, a Transfer of all or a portion of the Premises to a Tenant Affiliate shall not be deemed a Transfer under Article Nine for which (i) consent is required or (ii) any Transfer Premium is payable.  The terms of this Section 9.07 shall apply, however, only on the conditions that:  (i) Tenant shall deliver written notice of such proposed Transfer to Landlord; (ii) Tenant shall simultaneously deliver to Landlord copies of the full audited financial statements most recently prepared for both Tenant and the Tenant Affiliate to which Tenant proposes to assign this Lease; (iii) Tenant shall promptly provide Landlord any other documents or information reasonably requested by Landlord regarding such Transfer; (iv) if requested by Landlord, the Lease as so transferred shall be guaranteed (on Landlord's standard guaranty form) by an affiliate of the Tenant Affiliate reasonably acceptable to Landlord; (v) if the proposed Transfer is an assignment, Tenant Affiliate shall assume in writing all of Tenant's obligations under this Lease; (vi) Landlord shall reasonably determine, based on Landlord's review of the audited financial statements required to be provided by Tenant under this Section 9.07, that the net worth of the identified Tenant Affiliate is not less than the net worth of Tenant at (or substantially at) the time of such Transfer; and (vii) such Transfer shall not be a subterfuge by Tenant to avoid its obligations under this Lease.

**Section 9.08.    Transfer Involving Sublease**.  Every approved sublease transaction shall be evidenced by a written sublease (in each instance, a "**Sublease**") between Tenant and the subtenant (in each instance, a "**Subtenant**").  The Sublease or, where applicable, Landlord's written consent required under Section 9.01 above, to which Tenant and Subtenant shall be parties (the "**Consent**"), shall comply with the following requirements:

(i)    The form of the Sublease, and the terms and conditions thereof, shall be subject to Landlord's approval, which shall be granted or withheld in Landlord's reasonable discretion.

(ii)    The Sublease shall be subject to, and shall incorporate by reference, all of the terms and conditions of this Lease, except those terms and conditions relating to Base Rent, Additional Rent, and any other amount due under this Lease.  Subtenant shall acknowledge in the Sublease or Consent that it has reviewed and agreed to all of the terms and conditions of this Lease.  Subtenant shall agree in the Sublease or Consent not to do, or fail to do, anything that would cause Tenant to violate any of its obligations under this Lease.

(iii)    The Sublease or Consent shall require that:  (A) Subtenant shall have no right to exercise any option to extend the Term or any right of first refusal (or similar right) granted to Tenant in this Lease; and (B) the Sublease shall require Tenant to agree that it shall neither exercise on behalf of, nor assign to, Subtenant any such option or right.

(iv)    The Sublease or Consent shall contain, in full, any use restrictions or other provisions of this Lease that affect the use of the Premises, and any other provisions that Landlord otherwise requires be contained in the Sublease.

(v)    The Sublease or Consent shall contain a waiver of subrogation against Landlord and shall require Subtenant's insurance policies to acknowledge such a waiver of subrogation.

(vi)    The Sublease or Consent shall prohibit a sub-subletting of the Premises or the assignment of the Sublease by Subtenant, without first obtaining Landlord's consent, which consent may be granted or withheld in Landlord's sole and absolute discretion.

4871-2699-3514\4

(vii)    The Sublease or Consent shall require Subtenant, acting through Tenant, to obtain Landlord's prior written consent to any alterations to the Premises, to the extent Tenant is required by this Lease to obtain such consent.

(viii)    The Sublease or Consent shall require:  (A) Subtenant to send Landlord copies of any and all notices concerning the Premises that Subtenant is obligated to provide to Tenant; and (B) Tenant to send Landlord copies of any and all notices concerning the Premises that Tenant is obligated to provide to Subtenant.

(ix)    The Sublease or Consent shall provide (A) that, at Landlord's option, the Sublease shall not terminate in the event that this Lease terminates and (B) that, if Landlord in its sole and absolute discretion shall elect to have the Sublease continue beyond the date of termination of this Lease, the Sublease or Consent shall require that Subtenant execute an attornment agreement, which attornment agreement shall be in form and content acceptable to Landlord pursuant to which Subtenant confirms it is in direct privity of contract with Landlord and that all obligations owed to Tenant under the Sublease shall become obligations owed to Landlord for the balance of the term of the Sublease.

(x)    The Sublease or Consent shall provide that unless and until such time as an attornment agreement is executed by Subtenant pursuant to the terms and conditions of the preceding subsection (ix), nothing contained in the Sublease shall create or shall be construed or deemed to create privity of contract or privity of estate between Landlord and Subtenant.

(xi)    The Sublease or Consent shall provide that Subtenant shall have no right (and shall waive any rights it may have) to hold Landlord responsible for any liability in connection with the Premises, including, without limitation, any liability arising from the noncompliance with any Legal Requirements.

(xii)    The Sublease or Consent shall provide that:  (A) Nothing in the Sublease shall amend or shall be construed or deemed to amend this Lease; and (B) Tenant and Subtenant shall not amend the Sublease, without Landlord's prior written consent.

(xiii)    The Sublease or Consent shall contain such other terms as Landlord may reasonably require.

**Section 9.09.    No Merger**.  No merger shall result from Tenant's sublease of the Premises under this Article Nine, Tenant's surrender of this Lease or the termination of this Lease in any other manner.  In any such event, Landlord may terminate any or all subtenancies or succeed to the interest of Tenant as sublessor under any or all subtenancies.

**Section 9.10.    Tenant's Indemnity**.  If Landlord shall withhold its consent to any proposed assignment or subletting, or if Landlord shall exercise its recapture right in Section 9.04 above, Tenant shall indemnify, defend, and hold harmless Landlord and all Landlord Parties from and against any and all loss, liability, damages, costs and expenses (including attorneys' fees) resulting from any claims that may be made against Landlord by the proposed assignee or subtenant or by any brokers or other persons claiming a commission or similar compensation in connection with the proposed assignment or subletting.

**ARTICLE TEN**
**DEFAULTS; REMEDIES**

**Section 10.01. Covenants and Conditions**.  Tenant's performance of each of Tenant's obligations under this Lease is a condition as well as a covenant.  Tenant's right to continue in possession of the Premises is conditioned upon such performance.  Time is of the essence in the performance of all covenants and conditions.

**Section 10.02.  Defaults**.  Tenant shall be in material default under this Lease (an "**Event of Default**"):

(i)    If Tenant ceases actively to occupy and operate upon the Premises for a continuous period of at least thirty (30) Days, or otherwise is deemed to have abandoned the Premises, or if Tenant's vacating the Premises results in the cancellation of any insurance described in Section 4.04 above;

30

(ii)       If Tenant fails to pay Rent or any other charge within five (5) Days after receipt of written notice from Landlord of Tenant's failure to pay the same when due; *provided however*, written notice shall not be required after delivering one (1) written notice of Tenant's failure to pay Rent or other charge;

(iii)      If Tenant fails to perform any of Tenant's non-monetary obligations under this Lease (including, without limitation, any provision of the Declaration) for a period of fifteen (15) Days after written notice from Landlord; provided that if more than fifteen (15) Days are required to complete such performance, Tenant shall not be in default if Tenant commences such performance within the fifteen (15) Day period and thereafter diligently pursues its completion; *provided, however*, Landlord shall not be required to deliver such notice if Tenant's failure to perform constitutes a non-curable breach of this Lease.  The notice required by this paragraph is (A) intended to satisfy any and all notice requirements imposed by Legal Requirements on Landlord and is not in addition to any such requirement, and (B) not intended to extend the time for Tenant's performance if a shorter period of time for performance is expressly provided in this Lease.

(iv)      If Tenant makes a general assignment or general arrangement for the benefit of creditors; (A) if a bankruptcy petition is filed by or against Tenant and is not dismissed within thirty (30) Days; (B) if a trustee or receiver is appointed to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease and possession is not restored to Tenant within thirty (30) Days; or (C) if substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease is subjected to attachment, execution or other judicial seizure which is not discharged within thirty (30) Days.  If a court of competent jurisdiction determines that any of the acts described in this subparagraph (iv) is not a default under this Lease, and a trustee is appointed to take possession (or if Tenant remains a debtor in possession) and such trustee or Tenant transfers Tenant's interest hereunder, then Landlord shall receive, as Additional Rent, the excess, if any, of the Rent (or any other consideration) paid in connection with such assignment or sublease over the Rent payable by Tenant under this Lease.

(v)       If Tenant purports or attempts to make or cause a Transfer in violation of Article Nine.

(vi)      If Tenant fails to obtain, or violates the conditions and stipulations of, any permits required for Tenant's intended or actual activities contemplated under this Lease or Tenant otherwise breaches any of the Tenant covenants required under Section 5.03.

(vii)     If Tenant fails to provide and maintain the insurance coverages required by Section 4.04 and otherwise in this Lease.

**Section 10.03. Remedies**.  On the occurrence of any Event of Default, and at any time thereafter, with or without notice or demand and without limiting Landlord in the exercise of any right or remedy that Landlord may have:

(a)       Landlord may terminate Tenant's right to possess the Premises by any lawful means, in which case this Lease shall terminate and Tenant shall immediately surrender possession of the Premises to Landlord.  In such event, Landlord shall be entitled to recover from Tenant, upon Landlord's demand, all damages incurred by Landlord by reason of Tenant's default, including (without limitation) all of the following:  (i) all Rent (including Base Rent and Additional Rent) and other charges which Landlord had earned at the time of termination, plus Interest; (ii) an amount equal to the present value (determined using as a discount rate the rate of interest paid on advances to member banks under Section 13 and 13a of the Federal Reserve Act, as in effect at the Federal Reserve Bank of San Francisco at the time of such determination) of all Rent (including all Base Rent and Additional Rent) that would have been owing by Tenant under this Lease for the balance of the Term if this Lease had not been terminated, which amount shall be due and payable by Tenant within five (5) Days after Landlord shall deliver written demand for the same to Tenant; (iii) all Additional Rent that Landlord may elect not to include, in whole or in part, in determining such accelerated rent, which Additional Rent (if any) shall thereafter be due and payable by Tenant during the remainder of the Term, in the amounts and at the times otherwise provided for in this Lease; and (iv) any other amount necessary to compensate Landlord to the extent of any detriment resulting from (or, in the ordinary course, likely to result from) Tenant's failure to perform its

obligations under this Lease, including, but not limited to, any costs or expenses Landlord may incur in maintaining or preserving the Premises after such default, the cost of recovering possession of the Premises, expenses of reletting (including necessary renovation or alteration of the Premises), Landlord's reasonable attorneys' fees incurred in connection therewith, and any real estate commission paid or payable with respect to the Lease and any reletting, all of which amounts shall be due and payable by Tenant within five (5) Days after Landlord shall deliver written demand for the same to Tenant.  If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Landlord shall further have the right to recover in such proceeding the unpaid rent and damages as are recoverable therein, or Landlord may reserve therein the right to recover all or any part thereof in a separate suit for such rent and/or damages. If Tenant has abandoned the Premises, Landlord shall have the option of (i) retaking possession of the Premises and recovering from Tenant the amount specified in this Section 10.03(a), and/or (ii) proceeding under Section 10.03(b) below;

(b)    Landlord may maintain Tenant's right to possession, in which case this Lease shall continue in effect whether or not Tenant has abandoned the Premises.  In such event, Landlord shall be entitled to enforce all of Landlord's rights and remedies under this Lease, including the right to recover the Rentals it becomes due; or

(c)    Landlord may pursue any other remedy now or hereafter available to Landlord under the Legal Requirements of the State of Arizona.

In addition, Landlord may, at its sole option, perform on Tenant's behalf any duty or obligation neglected by Tenant, including but not limited to, obtaining by obtaining any required bond, insurance policy, or governmental licenses, permit, or approvals. The reasonable costs and expenses of any such performance by Landlord shall be due and payable by Tenant to Landlord, as Additional Rent, upon invoice for any cost or expense so incurred by Landlord.

If Tenant shall at any time be served with a demand for the payment of past due Rent or any other charge, any payments rendered thereafter to cure any default by Tenant shall be made only by cashier's check.

**Section 10.04. Termination**.  If Landlord elects to terminate this Lease as a result of a Tenant default, Tenant shall be liable to Landlord for all damages resulting therefrom, which shall include, without limitation, all costs, expenses and fees, including reasonable attorneys' fees that Landlord incurs in connection with the filing, commencing, pursuing, and/or defending any action in any bankruptcy court or other court with respect to this Lease; the obtaining of relief from any stay in bankruptcy restraining any action to evict Tenant; or pursuing any action with respect to Landlord's right to possession of the Premises.  All such damages suffered (apart from Base Rent and other Rent payable hereunder) shall constitute pecuniary damages that shall be reimbursed to Landlord before assumption of this Lease by Tenant or any successor to Tenant in any bankruptcy or other proceeding.

**Section 10.05. Cumulative Remedies**.  Landlord's exercise of any right or remedy shall not prevent it from exercising any other right or remedy.

**Section 10.06. Surrender**.  No act or thing done by Landlord or its agents during the Term shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless made in writing and signed by Landlord.

**Section 10.07. Removal of Tenant's Property**.  All furniture, equipment, and other personal property of Tenant not removed from the Premises upon Tenant's vacating or abandoning the Premises following an uncured default by Tenant or upon the termination of this Lease, for any cause whatsoever, shall conclusively be deemed to have been abandoned by Tenant, and may be appropriated, sold, stored, destroyed, or otherwise disposed of by Landlord without notice to Tenant and without obligation to account therefor.  Tenant shall reimburse Landlord for all reasonable expenses incurred in connection with the disposition of such personal property.  Landlord, upon presentation of evidence of a third party's claim of ownership or security interest in any such abandoned property, may turn over such property to the third party claimant without any liability to Tenant.

**Section 10.08. Consequential Damages**.  Notwithstanding anything to the contrary contained in this Lease, nothing in this Lease shall impose any obligations on Tenant or Landlord to be responsible or liable for, and each hereby releases the other from all liability for, consequential damages other than those consequential damages incurred by Landlord in connection with (i) the holdover of the Premises by Tenant after the expiration

32

or earlier termination of this Lease, (ii) the contamination of the Premises or any property resulting from the presence or use of Hazardous Materials caused or permitted by any Tenant Party, or (iii) any repair, physical construction or improvement work performed by or on behalf of Tenant in the Premises.

**Section 10.09. Landlord's Lien**.  In addition to any statutory or common law lien protecting Landlord's interests, in consideration of the mutual benefits arising under this Lease, Tenant hereby grants to Landlord a lien and security interest in all of Tenant's property now or hereafter placed in or on the Premises to secure payment of all Rent that becomes due under this Lease.  The provisions of this section constitute a security agreement under the Uniform Commercial Code of Arizona (the "**UCC**") so that Landlord has and may enforce a security interest on all of Tenant's inventory, fixtures, machinery, equipment, accessions, furnishings, and other such property now or hereafter placed in or on the Premises and all proceeds therefrom (the "**Collateral**"), and such property shall not be removed from the Premises without the prior written consent of Landlord until all arrearages in Rent have been paid and Tenant has complied with all other provisions of this Lease.  Consistent with the terms of the UCC, Tenant authorizes Landlord to file a financing statement describing the Collateral.  Upon the occurrence of an Event of Default identified in Section 10.02 of this Lease, Landlord may, in addition to all other remedies provided by law or under this Lease, without notice or demand except as provided below, exercise the rights afforded to a secured party under the UCC.  To the extent the UCC requires Landlord to deliver to Tenant notice of any act or event and such notice cannot be validly waived before a default occurs, then five (5) Days prior written notice thereof shall be reasonable notice of the act or event.

**Section 10.10. Conditionally Abated Rent**.  If this Lease provides for a conditional abatement or postponement of any monthly rental payments, such conditionally abated or postponed rent is called the "**Conditionally Abated Rent**."  Tenant shall be credited with having paid all of the Conditionally Abated Rent on the expiration of this Term only if Tenant has fully, faithfully, and punctually performed all of Tenant's obligations hereunder, including the payment of all Rent (other than the Conditionally Abated Rent) and all other monetary obligations and the surrender of the Premises in the physical condition required by this Lease.  Notwithstanding anything in this Lease to the contrary, Tenant acknowledges that its right to receive credit for the Conditionally Abated Rent is absolutely conditioned upon Tenant's full, faithful, and punctual performance of its obligations under this Lease.  If Tenant defaults and does not cure within any applicable grace period, the Conditionally Abated Rent shall immediately become due and payable in full and this Lease shall be enforced as if there were no such Rent abatement or other rent concession.  In such case, Conditionally Abated Rent shall be calculated based on the full initial Rent payable under this Lease.  For purposes of this Lease, the Conditionally Abated Rent is equal to $68,239.45.

**Section 10.11. Repayment of Cost of Building Improvements**.  If Landlord agrees, pursuant to the terms and provisions of Article Fourteen of this Lease, to provide Tenant with certain Building Improvements, then Tenant agrees to immediately pay Landlord the unamortized amount of the cost of such Building Improvements (based on straight-line amortization over the initial Term) in the event this Lease is terminated or there is an Event of Default under Section 10.02 of this Lease.  The provisions of this Section 10.11 shall not in any way limit or abrogate the remedies available to Landlord elsewhere in this Lease on account of a default by Tenant.

**ARTICLE ELEVEN**
**PROTECTION OF LENDERS**

**Section 11.01. Subordination**.  This Lease is subject and subordinate to all present and future ground or underlying leases of the Project or Premises, and to the lien of any mortgages or trust deeds, now or hereafter in force against the Project or Premises, and to all renewals, extensions, modifications, consolidations, and replacements thereof, and to all advances made or hereafter to be made upon the security of such mortgages or trust deeds, unless the holders of such mortgages or trust deeds, or the lessors under such ground lease or underlying leases, require in writing that this Lease be superior thereto by delivering notice thereof to Tenant at least five (5) Days before the election becomes effective.  Tenant covenants and agrees in the event any proceedings are brought for the foreclosure of any such mortgage or trust deed, or if any ground or underlying lease is terminated, to attorn, without any deductions or set-offs whatsoever, to the purchaser upon any such foreclosure sale, or to the lessor of such ground or underlying lease, as the case may be, if so requested to do so

by such purchaser or lessor, and to recognize such purchaser or lessor as the landlord under this Lease. Landlord's interest herein may be assigned as security at any time to any lienholder. Tenant shall, within ten (10) Days of request by Landlord, execute such further instruments or assurances in the form acceptable to Landlord (or in such other form as is then required by Landlord's lender) to evidence or confirm the subordination or superiority of this Lease to any such mortgages, trust deeds, ground leases, or underlying leases. Tenant hereby irrevocably authorizes Landlord to execute and deliver in the name of Tenant, any such instrument or instruments, if Tenant fails to do so, provided that such authorization shall in no way relieve Tenant from the obligation of executing such instruments of subordination or superiority. Tenant waives the provisions of any current or future Legal Requirements that may give or purport to give Tenant any right or election to terminate or otherwise adversely affect this Lease and the obligations of the Tenant hereunder in the event of any foreclosure proceeding or sale.

Notwithstanding the foregoing, if Landlord's lender forecloses, then such lender and any purchaser at any foreclosure or grantee of a deed in lieu of foreclosure (each a "**Successor Landlord**") shall not be:

(a)      subject to any claims, causes of action, offsets or defenses which Tenant might have against any prior landlord (including Landlord), or liable for any claims, causes of action, offsets or defenses first arising under this Lease after such Successor Landlord no longer owns the Premises;

(b)      liable for any act or omission, breach, or default of any prior landlord (including Landlord);

(c)      bound by any rent or additional rent which Tenant might have paid for more than the current month or any unapplied Tenant security deposit, except to the extent Successor Landlord has actually received for its own account, as landlord, all or any portion of the amount of such rent, additional rent, or Tenant security deposit;

(d)      bound by any amendment or modification of this Lease made without Successor Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed; or

(e)      liable or responsible for any construction or alteration of any improvements, provided that the foregoing shall not be deemed to apply to Landlord's repair, maintenance, and replacement obligations expressly set forth in this Lease (but without limiting the exculpation of liability provisions in favor of Successor Landlord set forth in this Section 11.01(a) and (b) above).

(f)      Landlord shall use commercially reasonable efforts to provide Tenant a Subordination, Non-Disturbance and Attornment agreement from current and future lenders on form acceptable to Tenant, any such lender(s), and Landlord.

**Section 11.02. Estoppel Certificates**.

(a)      Upon Landlord's written request, Tenant shall execute, acknowledge and deliver to Landlord a written statement, in the form acceptable to Landlord (or such other form as is then required by Landlord's lender), certifying: (i) that none of the terms or provisions of this Lease has been changed (or if changed, stating how so changed); (ii) that this Lease has not been cancelled or terminated; (iii) the last date of payment of Base Rent and other charges, and the time period covered by such payment; (iv) that Landlord is not in default under this Lease (or, if Landlord is claimed to be in default, stating why); and (v) such other representations or information with respect to Tenant or this Lease as Landlord may reasonably request or which any prospective purchaser or encumbrancer of the Premises, the Land, or the Project may require. Tenant shall deliver such statement to Landlord within ten (10) Days after Landlord's request. Landlord may deliver any such statement by Tenant to any prospective purchaser or encumbrancer of the Premises, the Land, or the Project. Such purchaser or encumbrancer may rely conclusively upon such statement as true and correct.

(b)      If Tenant does not deliver such statement to Landlord within such ten (10) Day period, Landlord, and any prospective purchaser or encumbrancer, may conclusively presume and rely upon the following facts: (i) that the terms and provisions of this Lease have not been changed except as otherwise represented by Landlord; (ii) that this Lease has not been canceled or terminated except as otherwise represented by Landlord; (iii) that not more than one month's Base Rent or other charges have been paid in advance; and (iv) that Landlord is not in default under this Lease. In such event, Tenant shall be estopped from denying the truth of such facts.

34

**Section 11.03.     Tenant's Financial Condition**.  Within ten (10) Days after the close of each calendar quarter, Tenant shall deliver to Landlord a balance sheet and profit and loss statement to verify the net worth of Tenant or any assignee, subtenant, or guarantor of Tenant (each, a "**Quarterly Financial Statement**" and collectively, the "**Quarterly Financial Statements**").  In addition, Tenant shall deliver to any lender designated by Landlord any financial statements required by such lender to facilitate the financing or refinancing of the Premises, the Land, or the Project.  The Quarterly Financial Statements and any lender required financial statements are each referred to as a "**Financial Statement**" and collectively, the "**Financial Statements**."  Tenant represents and warrants to Landlord that each such Financial Statement is a true and accurate statement as of the date of such Financial Statement.  Notwithstanding the foregoing, in the event that a Second EBITDA Notice has been approved by Landlord and provided that Tenant is not then uncured default under this Lease, the Financial Statements shall then be due annually (instead of quarterly) within forty-five (45) calendar days after the end of the prior calendar year.  In addition, unless the Financial Statements are audited by an independent certified public accountant of recognized standing and acceptable to Landlord, each of the Financial Statements shall be certified by the chief financial officer of Tenant as being true and correct.  All Financial Statements shall be confidential and shall be used only for the purposes set forth in this Lease.

In addition to the requirement to provide financial statements to Landlord, as provided above, Tenant also agrees to provide Landlord, as and when requested by Tenant's lender (but not more frequently than quarterly), a certificate attesting to Tenant's compliance with any and all financial covenants required of Tenant by Tenant's lender.  In the event that any such certificate indicates that Tenant is in breach of any of such financial covenants, Tenant agrees to immediately increase the amount of the Security Deposit required under the terms of this Lease to an amount equal to six (6) months Base Rent then payable by Tenant to Landlord.

**ARTICLE TWELVE**
**LEGAL COSTS**

**Section 12.01.  Legal Proceedings**.  If Tenant or Landlord shall be in breach or default under this Lease, such Party (the "**Defaulting Party**" shall reimburse the other Party (the "**Non-defaulting Party**") upon demand for any costs or expenses that the Non-defaulting Party incurs in connection with any breach or default of the Defaulting Party under this Lease, whether or not suit is commenced or judgment entered.  Such costs shall include legal fees and costs incurred for negotiating a settlement, enforcing rights, or otherwise.  Furthermore, if any action for breach of, or to enforce the provisions of, this Lease is commenced, the court in such action shall award to the Party in whose favor a judgment is entered a reasonable sum as attorneys' fees and costs.  The losing Party in such action shall pay such attorneys' fees and costs.  Tenant shall also indemnify Landlord against and hold harmless Landlord and all Landlord Parties from all costs, expenses, demands, and liability Landlord may incur if Landlord becomes or is made a party to any claim or action that is: (i) instituted by Tenant against any third party, or by any third party against Tenant, or by or against any person holding any interest under or using the Premises by license of or agreement with Tenant; (ii) for foreclosure of any lien for labor or material furnished to or for Tenant or such other person; (iii) otherwise arises out of or results from any act or transaction of Tenant or such other person; or (iv) necessary to protect Landlord's interest under this Lease in a bankruptcy case, or other proceeding under Title 11 of the United States Code, as amended.  Tenant shall defend Landlord against any such claim or action at Tenant's expense with counsel reasonably acceptable to Landlord or (at Landlord's election) Tenant shall reimburse Landlord for any legal fees or costs Landlord incurs in any such claim or action.

**Section 12.02.  Landlord's Consent**.  Tenant shall pay Landlord's reasonable attorneys' fees incurred in connection with Tenant's request for (i) Landlord's consent under Article Nine (Assignment and Subletting) of this Lease, or in connection with any other act which Tenant proposes to do and which requires Landlord's consent, or (ii) other Landlord action done at the request of Tenant.

**ARTICLE THIRTEEN**
**BROKERS**

Landlord and Tenant hereby warrant to each other that they have had no dealings with any real estate broker or agent in connection with the negotiation of this Lease, and that they know of no other real estate broker or agent who is entitled to a commission in connection with this Lease, excepting only the real estate broker(s) or

35

agent(s) named in <u>Section 1.09</u> above (the "**Broker(s)**").  Each Party agrees to indemnify and defend the other Party against, and to hold the other Party harmless from, any and all claims, demands, losses, liabilities, lawsuits, judgments, and costs and expenses (including without limitation reasonable attorneys' fees) with respect to any leasing commission or equivalent compensation alleged to be owing on account of the indemnifying Party's dealings with any real estate broker or agent, *other than* the Broker(s).  Landlord hereby discloses to Tenant that Landlord's Broker is acting in this transaction as the agent of Landlord exclusively, and Tenant hereby consents to Landlord's Broker acting in such capacity.  Upon the successful execution of this Lease, subject to the terms of a separate agreement between Landlord and the Brokers, Landlord will pay any commission owed directly to the Brokers pursuant to such separate agreement.

## ARTICLE FOURTEEN
## BUILDING AND TENANT IMPROVEMENTS

**Section 14.01. Building Improvements**.  The Parties agree that Landlord shall use commercially reasonable efforts to improve the Premises with such building improvements  as shall be itemized and described on the Exhibit 14.01 attached hereto (the "**Building Improvements**"). Furthermore, subject to its obtaining all necessary governmental approvals (and subject to any changes mandated by any Governmental Authority as a condition to obtaining such approvals), Landlord shall, after the Effective Date, use commercially reasonable efforts to undertake to complete the Building Improvements upon the Premises, in a good and workmanlike manner and in compliance with applicable Legal Requirements, on or before the Estimated Commencement Date, subject to Unavoidable Delay and Tenant Delay.

(a)    **Changes**.  Tenant may request changes, additions, or alterations (altogether, the "**Changes**") in the Building Improvements described on the Exhibit 14.01 attached hereto by delivering to Landlord a written request detailing such Changes.  Upon Landlord's receiving any such request, Landlord shall review the requested Changes and either approve or deny, in full or in part, such requested Changes, whereupon Landlord shall deliver to Tenant, within ten (10) Business Days after receiving such request, written notice of such approval and/or denial.  If Landlord fails timely to deliver such written notice of approval and/or denial, the requested Changes shall be deemed denied in full.  As to such Changes as shall be approved by Landlord, (the "**Approved Changes**"), Landlord shall thereafter timely deliver to Tenant estimates of (x) any additional costs associated with the Approved Changes and (y) any resulting delay anticipated in Substantial Completion of the Building Improvements due to the Approved Changes (all of which delay, including the period of three (3) Business Days permitted hereunder for Tenant's review and approval of Approved Changes, shall be considered a Tenant Delay).  Within three (3) Business Days after Landlord delivers such estimates, Tenant shall deliver to Landlord written notice stating that Tenant elects to proceed with the Approved Changes.  If Tenant timely notifies Landlord in writing that Tenant elects to proceed with the Approved Changes, Landlord shall promptly make the Approved Changes, whereupon Tenant shall pay any increased costs associated with the Approved Changes (the "**Change Cost**"), as Additional Rent, before the commencement of any work related to or affected by such Approved Changes,  and whereupon the Approved Changes shall be deemed to comprise a part of the Building Improvements.  If Tenant fails timely to deliver to Landlord notice stating its election to make the Approved Changes within the pertinent three (3) Business Day period, or fails timely to pay the estimated amount of the Change Cost (as provided above), Tenant's request for Changes shall be deemed withdrawn in full and Landlord shall complete the Building Improvements without making any Changes.

(b)    Landlord shall use commercially reasonable efforts to Substantially Complete the Building Improvements on or before the Estimated Commencement Date, subject only to Unavoidable Delay and Tenant Delay.  The Commencement Date shall be the date on which the Building Improvements shall be Substantially Complete (or, in the event of any Tenant Delay, the date on which the Building Improvements would have been Substantially Completed but for any Tenant Delay). If Landlord does not Substantially Complete the Building Improvements by the Estimated Commencement Date, Landlord shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or the obligations of Tenant hereunder or extend the Term.

(i)    For purposes of this Lease, the Building Improvements shall be conclusively deemed Substantially Completed when (i) all governmental inspections required for the Building

36

Improvements have been successfully completed and temporary or permanent certificates of occupancy (or the equivalent) and other municipal permits or approvals for Premises have been obtained, and (ii) the Building Improvements are completed in all material respects in accordance with this Lease except only for any Finish Items ("**Substantially Completed**" or "**Substantial Completion**" or similar phrase). The term "**Finish Items**" shall mean (i) minor details of construction, mechanical adjustment, or any other similar matter, the non-completion of which will not interfere with Tenant's use and occupancy of the Premises for the Permitted Uses, and (ii) items that, in accordance with good construction practice, must be performed after Substantial Completion of the Building Improvements.

(ii)     During the period beginning on the date of such walkthrough and ending five (5) Business Days after the Commencement Date, the Parties shall conduct a walkthrough of the Premises and jointly prepare a written list (the "**Punchlist**") of Finish Items. Landlord shall exercise commercially reasonable efforts to complete the Finish Items specified on the Punchlist as soon as conditions reasonably permit, and Tenant shall afford Landlord access to the Premises for such purposes. No later than sixty (60) Days after the Commencement Date, Tenant shall deliver to Landlord written notice of all respects (if any) in which Landlord has not completed the Finish Items specified on the Punchlist in accordance with the terms of this Lease, and Landlord shall then have sixty (60) additional Days after Tenant's delivery of such notice to complete all Finish Items so specified. Except as identified in any such notice from Tenant to Landlord, Tenant shall have no right to make any claim that Landlord has failed to complete the Finish Items in accordance with the terms of this Lease or to require Landlord to perform any further work.

(iii)    "**Tenant Delay**" shall mean any delay Landlord encounters in the performance of Landlord's obligations as to the Building Improvements under this Lease arising from or related to any act or omission of Tenant or its agents, employees, or contractors, including, without limitation, any delays due to (A) any Changes, (B Tenant's request for long-lead items, (C) any delays by Tenant in providing Landlord with information requested by Landlord, or in completing submittals or obtaining permits within the time periods agreed to by Landlord and Tenant or as reasonably required by Landlord, or in providing consents or approvals required to be delivered by Tenant, or in paying the amount of any Excess Cost or Change Cost, or (D) any delays caused by interference by Tenant or its agents, employees, or contractors with Landlord's construction of the Building Improvements (including, without limitation, any delay associated with Tenant's early access to the Premises pursuant to Section 2.03 or otherwise, as well as any delay to accommodate the installation of furniture and equipment by Tenant), expressly notwithstanding Landlord's actual or deemed consent to such access, installation, or other delaying factor

(iv)    "**Unavoidable Delay**" means any delay or prevention suffered by either Party (or, with respect to work, if any, required to be performed by Landlord under this Lease as to Building Improvements, suffered by Landlord's contractor's, subcontractors, suppliers, or other third party vendors), in each case without its fault or negligence, in performing any of its respective obligations because of strikes, lockouts, labor troubles, labor shortages, inability to procure materials, failure of power, government shutdowns, government-declared restrictions, epidemic disease (including quarantine and other governmental measures, and employment policies imposed in light of the same, intended to limit the spread of disease), war, armed hostility, terroristic acts, natural disaster, unusually severe weather, acts of God, litigation that results in an injunction prohibiting or otherwise delaying the continuity of construction or other acts under this Lease, as well as other reasons (whether or not foreseeable) not within the reasonable control of the Party or other Person delayed in performing or prevented from performing any such obligation(s).

(c)     Except for Landlord's obligations under this Section 14.01 with respect to the Building Improvements (including any Finish Items), the Premises shall be delivered to and accepted by Tenant in their "as is" condition, and Landlord shall have no liability or obligation for making any further alterations or improvements of any kind in or about the Premises. The Building Improvements shall, however, remain the property of Landlord and shall be part of, shall remain upon, and shall be surrendered with the Premises upon the Expiration Date.

**Section 14.02. Tenant Improvements**. In addition to the above Building Improvements, and subject to obtaining all necessary governmental approvals (and subject to any changes mandated by the applicable

Governmental Authorities as a condition to obtaining such approvals), Tenant may space plan, design, engineer, and construct such improvements contemplated in this Section 14.02 in excess of the limitations set forth in Section 6.05 (the "**Tenant Improvements**").  Tenant's space planning, design, and engineering shall be in accordance with a preliminary space plan (the "**Space Plan**") to be mutually agreed upon by Landlord and Tenant as provided in this Section 14.02.  The Tenant Improvements shall be the property of Landlord and shall be part of, shall remain upon, and shall be surrendered with the Premises upon the Expiration Date, subject to the terms of Section 6.06 of this Lease.

(a)     If Tenant elects to make any Tenant Improvements, Tenant shall prepare and deliver to Landlord a proposed Space Plan for Landlord's review and approval.  Landlord shall have fifteen (15) Business Days following receipt of the proposed Space Plan to approve the proposed Space Plan or disapprove it and provide Tenant with specific reasons for such disapproval, in the form of written comments.

(b)     If Landlord disapproves the proposed Space Plan, Tenant shall have ten (10) Business Days (or such additional time as may be reasonably necessary in Landlord's judgment) following receipt of Landlord's written comments to revise and resubmit the proposed Space Plan to Landlord.  Landlord shall have five (5)) Business Days following receipt of the revised proposed Space Plan to either approve the revised Space Plan or disapprove it and again provide Tenant with specific written comments, as provided above.  If Landlord does not approve or disapprove the proposed Space Plan within the times specified above, the proposed Space Plan shall be deemed approved by Landlord.

(c)     Upon approval by Landlord, Tenant shall engage an architect or other design professional reasonably acceptable to or selected by Landlord to prepare final plans and specifications (the "**Final Plans**") consistent with the approved Space Plans and submit the Final Plans to Landlord within twenty (20) Business Days following the Space Plan's approval.  Landlord shall have five (5) Business Days following receipt of the proposed Final Plans to either approve the Final Plans or disapprove them and provide Tenant with specific reasons for such disapproval, in the form of written comments.  Landlord shall have the right to disapprove the Final Plans only if they materially differ from the approved Space Plan.  If Landlord disapproves the proposed Final Plans because they materially differ from the approved Space Plan and provides Tenant with specific written comments describing such material difference, Tenant shall have five (5) Business Days (or such additional time as may be reasonably necessary in Landlord's judgment) after receiving Landlord's written comments to revise and resubmit the proposed Final Plans to Landlord.  Landlord shall again have five (5) Business Days following receipt of the revised proposed Final Plans to approve them.  If Landlord does not approve or disapprove (if applicable) the Final Plans within the times specified above for Landlord's approval, the Final Plans shall be deemed approved by Landlord.

**Section 14.03. Tenant's Work.**  Tenant shall engage a contractor reasonably acceptable to Landlord and licensed in the State of Arizona (the "**Contractor**") to construct the Tenant Improvements.  If Tenant engages in constructing the Tenant Improvements (the "**Tenant Work**"), Tenant shall proceed only in accordance with all of the following terms and conditions:

(a)     Prior to commencing the Tenant Work, and according to the requirements of Section 14.02, Landlord shall have approved the Space Plans and Final Plans (together, the "**Plans**").

(b)     The Tenant Work shall have been (i) completed in good and workmanlike manner by, and (ii) approved by Landlord as being in substantial compliance with the Plans.

(c)     Final inspection by the building department having jurisdiction over the Premises shall have been completed and a certificate of occupancy (if required) shall have been obtained, and upon the satisfaction of these conditions, the Tenant Work shall be deemed Substantially Completed.

(d)     Tenant shall have furnished to Landlord copies of permits required by governmental agencies and an itemized statement of the total cost of the Tenant Work.  The total cost of accomplishing the Tenant Work shall include amounts paid to contractors, subcontractors, materialmen, suppliers, architects, and engineers, for permit fees and other direct expenses of constructing the Tenant Work.  Such statement of total

4871-2699-3514\4

costs shall be certified by Tenant to be true and correct, and Tenant shall furnish such reasonable verification of the total costs as Landlord reasonably requests.

(e)    Tenant shall have recorded and served a Notice of Completion concerning the Tenant Work in accordance with Arizona law, and no liens shall have been recorded against the Premises during the sixty (60) Day period following the recording of such Notice of Completion.  A title company of Landlord's choosing shall have furnished a preliminary title report or commitment for title insurance to Landlord as of the expiration of such sixty (60) Day period, showing that no mechanic's liens have been recorded against the Premises in respect to the Tenant Work.  If any mechanic's liens have been recorded, Tenant shall either (i) remove such lien within ten (10) days at Tenant's sole cost and expense, or (ii) obtain a surety bond, for the sole benefit of Landlord, in form and amount reasonably satisfactory to Landlord, with respect to any such mechanic's liens.

(f)    Tenant shall have received and provided to Landlord unconditional final lien releases (in the statutory form and otherwise reasonably acceptable to Landlord) from the Contractor and each subcontractor, materialman, supplier, architect, and engineer, together with a complete reproducible set of final as-built drawings.

(g)    Tenant shall have reimbursed Landlord for any cost or expense reasonably incurred by Landlord as a result of any damage to Landlord's property caused by the Contractor or any subcontractor.

(h)    Tenant shall have reimbursed Landlord for any cost or expense incurred by Landlord in defending against any recorded mechanic's liens affecting the Premises, including attorneys' fees, court costs, and litigation expenses.

(i)    Tenant shall have executed an Estoppel Certificate in the form required by this Lease.

**ARTICLE FIFTEEN**
**COMMUNICATIONS SERVICES**

**Section 15.01.Landlord's Communications Equipment**.  Without limiting the generality of the reservation contained in <u>Section 1.04</u> above, and subject to applicable Legal Requirements, Landlord reserves to itself and its affiliates the exclusive right to (i) place antennae and related facilities and other equipment for providing of communications services (the "**Communications Equipment**" on the rooftop (or other exterior portions) of the Building, the Project, and on other property owned or controlled by Landlord or an affiliate of Landlord designated for such use, and (ii) enter into license agreements or leases for the use of such areas by commercial and other providers of communications services (the "**Communications Agreements**").  As used in this Article, "**Communications Services**" shall mean the implementation, provision, facilitation and maintenance of voice, data, video or other communication services (or any combination of the foregoing) including, without limitation: (i) the provision and resale of point-to-point telephone communications (including dedicated long distance service), (ii) video communications service, (iii) 800-number service, (iv) telephone credit or debit card service, (v) audio or video conferencing, paging, voice mail and message centers, (vi) data transmission service, (vii) access to computer "internet" or other networked computer-based communications, (viii) satellite or cable television, (ix) wideband digital networks, (x) security services, and (xi) provision of telephone, video communication or other telecommunication equipment to consumers of such services; whether now existing or subsequently developed and however provided, including, without limitation, wireless transmission and reception of communication signals.  Landlord shall be entitled to any and all fees or other charges payable by any such provider of communications services on account of any Communications Agreements.

**Section 15.02.Tenant's Communications Equipment**.  Notwithstanding the foregoing, Tenant may, with Landlord's prior written consent and subject to all applicable provisions of this Lease, the Declaration, and applicable Legal Requirements, install at Tenant's sole cost and expense Communications Equipment on the rooftop or in other portions of the Premises, but only if such Communications Equipment is solely limited to Tenant's own use in the conduct of its business from the Premises ("**Tenant's Communications Equipment**").  Tenant shall be solely responsible for all costs and expenses related to the use and maintenance of Tenant's

39

Communications Equipment, the removal of which upon the expiration or earlier termination of this Lease shall be governed by Section 6.06 of this Lease.  Tenant agrees that the use of Tenant's Communications Equipment shall in no way interfere with the operation and maintenance of any Communications Equipment owned, installed, or maintained by Landlord (including any offsite Communications Equipment which may be the subject of a Communications Agreement), the Project, the Building, or any of the Building's systems.  Tenant shall indemnify and hold harmless Landlord and all Landlord Parties from all expenses, costs, damages, losses, claims or other expenses and liabilities arising from any such interference, specifically including the disruption or voiding of any existing roof warranty at the time such Tenant Communications Equipment is installed.  If such interference occurs, Tenant agrees to suspend use of Tenant's Communications Equipment until the interference has been corrected to the sole satisfaction of Landlord.  Tenant shall be responsible for all costs associated with any tests deemed necessary to resolve any and all interference caused by Tenant's Communications Equipment, or any use that is not permitted by this Article.  If such interference has not been corrected within twenty (20) Days, Landlord may require Tenant to remove those components of Tenant's Communications Equipment causing such interference, or Landlord will enjoin such interference at Tenant's sole cost and expense.  All operations by Tenant pursuant to this Article shall be lawful and in compliance with rules and regulations of the Federal Communications Commission, the Federal Aviation Administration, and all applicable Legal Requirements (including, without limitation, all requirements of the City of Mesa Airport Overlay District and any avigation easement required thereby.  Consistent with the terms of Section 6.05 above, Landlord shall have the right, in its sole discretion, to determine the location of any visible Tenant's Communications Equipment and require its screening at Tenant's sole cost and expense.  Also, any rooftop installation of Tenant's Communications Equipment shall be commenced and completed in full and strict compliance with the requirement to use a contractor or subcontractor selected by Landlord for any work involving possible roof penetrations, as set forth in Section 6.05 above.  Regardless of any roof warranty or any repair obligations of Landlord in this Lease, Tenant shall be solely responsible for the repair of any leaks or other damage to the roof membrane resulting from the installation of any Tenant's Communications Equipment.

**Section 15.03. Installation of Tenant's Communications Equipment**.  Consistent with and subject to the provisions of Section 15.02 above, Tenant's Communications Equipment for use with Tenant's operations from the Premises, subject to Landlord's prior approval of the final installation plans, provided that such installation plans do not include any roof penetrations.  Tenant's Communications Equipment shall remain the property of Tenant or its contractor, and shall be removed by Tenant, at Tenant's sole cost and expense, at the expiration or earlier termination of this Lease.  Any damage caused by such installation or removal shall be repaired as required in Section 6.06 of this Lease.  Tenant shall bear all expenses of the installation, use, maintenance, and removal of Tenant's Communications Equipment.  Tenant shall indemnify and hold harmless Landlord and all Landlord Parties from all expenses, costs, damages, loss, claims or other expenses (including reasonable attorneys' fees) arising out of Tenant's installation, use, maintenance, and removal of Tenant's Communications Equipment.  Tenant shall maintain in force during the term of this Lease commercial general liability insurance protecting Landlord and Landlord's agents, employees, and contractors (and their affiliates) against any liability, damages, costs or expenses in connection with the installation, use, maintenance, and removal of Tenant's Communications Equipment, and shall supply  evidence satisfactory to Landlord of such insurance coverage.  Landlord agrees to permit Tenant and its contractor's reasonable access to the rooftop of the building and other areas of the Project required to facilitate the installation, use, maintenance, and removal of Tenant's Communications Equipment, so long as other users and occupants of the Building and the Project are not disturbed thereby.

## ARTICLE SIXTEEN
## MISCELLANEOUS PROVISIONS

**Section 16.01. Non-Discrimination**.  Tenant promises, and it is a condition to the continuance of this Lease, that there will be no discrimination against, or segregation of, any person or group of persons on the basis of race, color, sex, creed, national origin or ancestry in the leasing, subleasing, transferring, occupancy, tenure or use of the Premises or any portion thereof.

**Section 16.02. Landlord's Liability; Certain Duties**.

40

(a)     As used in this Lease, the term "**Landlord**" means only the current owner or owners of the fee title to the Premises or the leasehold estate under a ground lease of the Premises at the time in question. Each Landlord is obligated to perform the obligations of Landlord under this Lease only during the time such Landlord owns such interest or title.  Any Landlord that transfers its title or interest is relieved of all liability with respect to the obligations of Landlord under this Lease to be performed on or after the date of transfer.  However, each Landlord shall deliver to its transferee all funds that Tenant previously paid if such funds have not yet been applied under the terms of this Lease.

(b)     Tenant shall deliver written notice of any failure by Landlord to perform any of its obligations under this Lease (i) to Landlord and (ii) to any ground lessor, mortgagee, or beneficiary under any deed of trust encumbering the Premises so far as names and addresses of the same have been furnished to Tenant in writing.  Landlord shall not be in default under this Lease unless Landlord (or such ground lessor, mortgagee or beneficiary) fails to cure such non-performance within thirty (30) Days after receipt of Tenant's notice.  However, if such non-performance reasonably requires more than thirty (30) Days to cure, Landlord shall not be in default if such cure is commenced within such thirty (30)-Day period and thereafter diligently pursued to completion.

(c)     Notwithstanding any term or provision herein to the contrary, the liability of Landlord for the performance of its duties and obligations under this Lease is limited to Landlord's interest in the Premises, no Landlord Party shall have any personal liability under this Lease.

(d)     Tenant shall have no right to terminate this Lease based on an uncured default by Landlord in the performance of Landlord's obligations under this Lease.  Consistent with Section 10.08 above, in no event shall Tenant be permitted to recover consequential, punitive, or exemplary damages from Landlord based on any such uncured default of Landlord, or otherwise.

(e)     With respect to any term of this Lease that provides (or is held to provide) that Landlord shall not unreasonably withhold, condition, or delay any consent or approval, Tenant shall not be entitled to make any claim for, and Tenant hereby expressly waives, any claim for damages, it being acknowledged and agreed that Tenant's sole right and exclusive remedy therefor shall be an action for specific performance.

**Section 16.03. Severability**.  If any provisions of this Lease or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Lease and the application of that provision to other persons or circumstances shall not be affected but rather shall be enforced to the extent permitted by Legal Requirements.

**Section 16.04. Interpretation**.  The captions of the Articles or Sections of this Lease are to assist the Parties in reading this Lease and are not a part of the terms or provisions of this Lease.  Unless the context clearly requires otherwise: (i) the plural and singular numbers will each be deemed to include the other; (ii) the masculine, feminine, and neuter genders will each be deemed to include the others; (iii) "shall," "will," "must," "agrees," and "covenants" are all mandatory and not permissive; (iv) "may" is permissive; (v) "or" is not exclusive; and (vi) "includes" and "including" are not limiting.  In the event of a dispute between Landlord and Tenant over the interpretation of this Lease, both Parties shall be deemed to have been the drafter of this Lease, and any applicable Legal Requirements stating that contracts are to be construed against the drafter shall not apply.  In any provision relating to the conduct, acts, or omissions of Tenant, the term "Tenant" shall include Tenant's agents, employees, contractors, invitees, successors, or others using the Premises with Tenant's express or implied permission.

**Section 16.05. Incorporation of Prior Agreements; Modifications**.  This Lease is the only agreement between the Parties pertaining to the lease of the Premises and no other agreements are effective.  All amendments to this Lease shall be in writing and signed by all Parties.  Any other attempted amendment shall be void.  All attached exhibits are hereby expressly incorporated into this Lease by this reference.

**Section 16.06. Notices**.  Any notices, demands, statements, or communications (collectively and in every instance, "**Notices**") under this Lease must be in writing and must be sent (i) by personal delivery, (ii) by electronic mail, or (iii) by an independent overnight courier service, addressed to the addresses specified in Section 1.03 (or at such other place as a Party may designate) to the other Parties by written notice delivered in accordance with this Section 16.06.  Notices delivered by personal delivery are, if so deposited before 5:00 p.m. local time on

41

a Business Day, effective when deposited into the possession of an employee or agent of the addressee at the indicated address—or, if deposited into the possession of an employee or agent of the addressee at the indicated address (i) on a Business Day but after 5:00 p.m. local time, or (ii) on a day that is not a Business Day, then on the next occurring Business Day.  Notices delivered by electronic mail are deemed effective on the Business Day transmitted if so transmitted before 5:00 p.m. local time at the principal office of the addressee—or, if transmitted (i) on a Business Day but after 5:00 p.m. local time at the principal office of the addressee, or (ii) on a day that is not a Business Day, then on the next occurring Business Day.  Notices delivered by overnight courier are deemed effective on the next Business Day after the day the Party delivering the notice timely deposits the notice with the courier for overnight (next day) delivery.

Any notice by either Party, whether required or permissible hereunder, may be delivered by such Party's then current attorney, which notice, when delivered by such attorney, shall be deemed equally as effective as if delivered by such Party directly.

Furthermore, consistent with the provisions of <u>Section 16.02(b)</u> above, if Tenant is notified of the identity and address of Landlord's secured lender or ground or underlying lessor, Tenant shall deliver to such lender or ground or underlying lessor written notice of any default by Landlord under the terms of this Lease by the means required under this <u>Section 16.06</u>, and such lender or ground or underlying lessor shall be given the same opportunity to cure such default as is provided Landlord under this Lease (unless such cure period is extended pursuant to the terms of any agreement to which Tenant is a party or to which Tenant consents) before Tenant's exercising any remedy available to Tenant.

**Section 16.07. Waivers**.  The failure of Landlord to insist on the strict performance, in any of one or more instances, of any term, covenant, or condition of this Lease shall not be deemed to be a waiver by Landlord of such term, covenant, or condition.  No waiver by Landlord of any breach by Tenant of any term, provision, and covenant contained herein shall be deemed or construed to constitute a waiver of any other or subsequent breach by Tenant of any term, provision, or covenant contained herein.  Landlord's acceptance of the payment of Rent (or portions thereof) or any other payments hereunder after the occurrence of and during the continuance of a default (or with knowledge of a breach of any term or provision of this Lease which with the delivering of notice and the passage of time, or both, would constitute a default) shall not be construed as a waiver of such default or any other rights or remedies of Landlord, including any right of Landlord to recover the Premises.  Moreover, Tenant acknowledges and agrees that Landlord's acceptance of a partial Rent payment shall not, under any circumstances (whether or not such partial payment is accompanied by a special endorsement or other statement), constitute an accord and satisfaction.  Landlord will accept the check (or other payment means) for payment without prejudice to Landlord's right to recover the balance of such Rent or to pursue any other remedy available to Landlord.  Forbearance by Landlord to enforce one or more of the remedies herein provided upon the occurrence of a default shall not be deemed or construed to constitute a waiver of such default.

**Section 16.08. No Recordation**.  Tenant shall not record this Lease or any assignment or security document pertaining to this Lease.  Either Landlord or Tenant may require that a recordable memorandum of this Lease, prepared by Landlord and executed by both Parties, be recorded.  The Party requiring such recording shall pay all legal, transfer, and recording fees and taxes incurred with respect to the same.

**Section 16.09. Binding Effect; Choice of Law**.  This Lease binds any Party who legally acquires any rights or interest in this Lease from Landlord or Tenant.  However, Landlord shall have no obligation to Tenant's successor unless the rights or interests of Tenant's successor are acquired in accordance with the terms of this Lease.  The Legal Requirements of the State of Arizona shall govern this Lease, without regard to such State's conflicts of law principles.  Tenant hereby knowingly, intentionally, and irrevocably agrees that Landlord may bring any action or claim to enforce or interpret the provisions of this Lease in Maricopa County, Arizona, and that Tenant irrevocably consents to personal jurisdiction in the State of Arizona for the purposes of any such action or claim.  Nothing in this <u>Section 16.09</u> shall be deemed to preclude or prevent Landlord from bringing any action or claim to enforce or interpret the provisions of this Lease in any other appropriate place or forum.  Tenant further agrees that any action or claim brought by Tenant to enforce or interpret the provisions of this Lease, or otherwise arising out of or related to this Lease or to Tenant's use and occupancy of the Premises, regardless of the theory of relief or recovery and regardless of whether third Persons are involved in the action, may only be brought in

4871-2699-3514\4

Maricopa County, Arizona, unless otherwise agreed in writing by Landlord before the commencement of any such action.

**Section 16.10.  WAIVER OF JURY TRIAL.  IN THE INTEREST OF OBTAINING A SPEEDIER AND LESS COSTLY ADJUDICATION OF ANY DISPUTE, THE PARTIES HEREBY KNOWINGLY, INTENTIONALLY, AND IRREVOCABLY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CLAIM, OR COUNTERCLAIM BROUGHT BY EITHER OF THEM AGAINST THE OTHER ON ALL MATTERS ARISING OUT OF OR RELATED TO THIS LEASE OR THE USE AND OCCUPANCY OF THE PROPERTY.**

**Section 16.11.  Corporate Authority; Partnership Authority; LLC Authority**.  If Tenant is a corporation, each person signing this Lease on behalf of Tenant represents and warrants that he or she has full authority to do so and that this Lease binds the corporation.  Within thirty (30) Days after this Lease is signed, Tenant shall deliver to Landlord a certified copy of a resolution of Tenant's Board of Directors authorizing the execution of this Lease or other evidence of such authority reasonably acceptable to Landlord.  If Tenant is a partnership, each person or entity signing this Lease for Tenant represents and warrants that he, she, or it is a general partner of the partnership, that he, she, or it has full authority to sign for the partnership and that this Lease binds the partnership and all general partners of the partnership.  Tenant shall deliver written notice to Landlord of any general partner's withdrawal or addition.  Within thirty (30) Days after this Lease is signed, Tenant shall deliver to Landlord a copy of Tenant's recorded statement of partnership or certificate of limited partnership.  If Tenant is a limited liability company (LLC), each person or entity signing this Lease for Tenant represents and warrants that he, she, or it is a manager or member of the LLC, that he, she, or it has full authority to sign for the LLC and that this Lease binds the LLC.  Within thirty (30) Days after this Lease is signed, Tenant shall deliver to Landlord a certified copy of a resolution of Tenant's managers or members authorizing the execution of this Lease, or other evidence of such authority reasonably acceptable to Landlord.

**Section 16.12.  Joint and Several Liability**.  Every Person signing this Lease as Tenant shall be jointly and severally liable for all obligations of Tenant.

**Section 16.13.  Consent.**  Except as this Lease specifically provides that Landlord may withhold, condition, or delay consent at its sole discretion, any consent required under this Lease shall not unreasonably be withheld, conditioned, or delayed.  If Tenant shall request Landlord's consent hereunder and Landlord shall fail or refuse to give such consent, however, Tenant shall not be entitled to any damages for any withholding by Landlord of its consent, it being intended that Tenant's sole remedy shall be an action for specific performance or injunction, and such remedy shall be available only in those cases where Landlord has expressly agreed in writing not to unreasonably withhold its consent or where as a matter of law Landlord may not unreasonably withhold its consent.  Furthermore, whenever Tenant requests Landlord's consent or approval (whether or not provided for herein), Tenant shall pay to Landlord, on demand, as Additional Rent, any reasonable expenses incurred by Landlord (including without limitation reasonable attorneys' fees and costs, if any) in connection therewith.

**Section 16.14.  Counterparts**.  This Lease may be executed in counterparts and, when all counterpart documents are executed, the counterparts shall constitute a single binding instrument.

**Section 16.15.  Survival**.  All representations and warranties of Landlord and Tenant shall survive the termination of this Lease.

**Section 16.16.  Relationship of Parties**.  Nothing contained in this Lease shall be deemed or construed by the Parties or by any third party to create the relationship of principal and agent, partnership, joint venturer or any association between Landlord and Tenant, it being expressly understood and agreed that neither the method of computation of Rent nor any act of the Parties shall be deemed to create any relationship between Landlord and Tenant other than the relationship of landlord and tenant.

**Section 16.17.  No Warranty**.  In executing and delivering this Lease, Tenant has not relied on any representation, including, but not limited to, any representation whatsoever as to the amount of any item comprising Additional Rent or the amount of the Additional Rent in the aggregate or that Landlord is furnishing the same services to other tenants, at all, on the same level or on the same basis, or any warranty or any statement of Landlord which is not set forth herein or in one or more of the exhibits attached hereto.

**Section 16.18. Waiver of Redemption by Tenant**. Tenant hereby waives, for all Tenant Parties, all rights now or hereafter existing to redeem by order or judgment of any court or by any legal process or writ, Tenant's right of occupancy of the Premises after any termination of this Lease.

**Section 16.19. Independent Covenants**. This Lease shall be construed as though the covenants herein between Landlord and Tenant are independent and not dependent and Tenant hereby expressly waives the benefit of any statute or other law to the contrary and agrees that if Landlord fails to perform its obligations set forth herein, Tenant shall not be entitled to make any repairs or perform any acts hereunder at Landlord's expense or to any setoff of the Rent or other amounts owing hereunder against Landlord.

**Section 16.20. Confidentiality**. Tenant acknowledges that the content of this Lease and any related documents are confidential information. Tenant shall keep such information strictly confidential and shall not, except as otherwise required by law, disclose such confidential information to any person or entity other than Tenant's financial, legal, and space planning consultants, provided that such recipients agree to maintain the confidentiality of the information.

**Section 16.21. Tenant's Representations and Warranties**. As an inducement to Landlord to enter into this Lease, Tenant warrants and represents to Landlord as follows, each of which is material and being relied upon by Landlord:

(a)     Tenant and all Persons that (i) own or control (directly or indirectly) an ownership interest in Tenant, (ii) are an assignee of Tenant's interest in this Lease, or (iii) are a guarantor of Tenant's obligations under this Lease: (A) are not owned or controlled directly or indirectly by, any person, group, entity or nation named on any list issued by the Office of Foreign Assets Control of the United States Department of the Treasury ("**OFAC**") pursuant to Executive Order 13224 or any similar list or any law, order, rule or regulation, or any Executive Order of the President of the United States as a terrorist, "Specially Designated National and Blocked Person" or other banned or blocked person (any such person, group, entity, or nation being hereinafter referred to as a "**Prohibited Person**"); (B) are not acting directly or indirectly for or on behalf of any Prohibited Person; (C) are not owned or controlled, directly or indirectly, by any person, group, entity, or nation that is acting directly or indirectly for or on behalf of any Prohibited Person; and (D) from and after the effective date of the above-referenced Executive Order, have not knowingly conducted and may not knowingly conduct business, nor knowingly engaged in any transaction or dealing with, nor will knowingly engage in any transaction or dealing with, during the Term, any Prohibited Person in violation of the USA PATRIOT Act (including, for purposes of this Section 16.21, any expired provisions of the Act reauthorized or reenacted, including as amended, by the USA FREEDOM Act) or any OFAC rule or regulation, including without limitation any assignment of this Lease or any subletting of all or any portion of the Premises or the making or receiving of any contribution of funds, goods, or services to or for the benefit of a Prohibited Person in violation of the USA PATRIOT Act or any OFAC rule or regulation.

(b)     Tenant and all Persons that (i) own or control (directly or indirectly) an ownership interest in Tenant, (ii) are an assignee of Tenant's interest in this Lease, or (iii) are a guarantor of Tenant's obligations under this Lease are not, and shall not become, a person or entity with whom Landlord is restricted from doing business under the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders thereunder; and (z) are not knowingly engaged in, and shall not knowingly engage in, any dealings or transaction or be otherwise associated with such persons or entities described in Section 16.21(a), above.

(c)     Tenant is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of its organization, and is qualified to do business in the State of Arizona, Tenant shall furnish to Landlord any and all documents to evidence such authority as Landlord shall reasonably request. The execution, delivery, and performance of this Lease by Tenant, and of all the documents and instruments contemplated hereby, and the consummation of the transactions contemplated by this Lease, are within the power of Tenant, and have been duly authorized by all necessary action on the part of Tenant. This Lease is, and the other documents and instruments contemplated hereby will be, when executed and delivered by Tenant, the valid and binding obligations of Tenant, enforceable in accordance with their respective terms. The execution, delivery, and performance of this Lease (and the transactions and other documents contemplated

44

herein) by Tenant will not conflict with or, with or without notice or the passage of time or both, constitute a default under, any contract, lease, or other agreement to which Tenant is a party or by which Tenant may be bound or any Legal Requirements governing or affecting Tenant or the Premises. No consent from any third party or Person is required for the execution, delivery, and performance of this Lease by Tenant, and of all the documents and instruments contemplated hereby, or for the consummation of the transactions contemplated by this Lease.

(d)     Tenant has not (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing of an involuntary petition by any creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of its assets, (iv) suffered the attachment or other judicial seizure of all or substantially all of its assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally.

In connection with the foregoing, it is expressly understood and agreed that (x) any breach by Tenant of the foregoing representations and warranties shall be deemed an immediate Event of Default by Tenant under Section 10.02 of this Lease (without the benefit of notice or grace) and shall be covered by the indemnity provisions of Section 10.02, and (y) the representations and warranties contained in this subsection shall be continuing in nature and shall survive the Expiration Date.

Section 16.22. **Further Assurances**.  Except as otherwise expressly provided in this Lease, Landlord and Tenant each will, at its own cost and expense, execute and deliver such further documents and instruments and will take such other actions as may be reasonably required or appropriate to carry out the intent and purposes of this Lease.

Section 16.23. **No Option or Offer**.  THE SUBMISSION OF THIS LEASE BY LANDLORD, ITS AGENT OR REPRESENTATIVE FOR EXAMINATION OR EXECUTION BY TENANT DOES NOT CONSTITUTE AN OPTION OR OFFER TO LEASE THE PROPERTY UPON THE TERMS AND CONDITIONS CONTAINED HEREIN OR A RESERVATION OF THE PROPERTY IN FAVOR OF TENANT, IT BEING INTENDED HEREBY THAT THIS LEASE SHALL ONLY BECOME EFFECTIVE UPON THE EXECUTION HEREOF BY LANDLORD AND DELIVERY OF A FULLY EXECUTED LEASE TO TENANT.  NEITHER PARTY SHALL HAVE ANY OBLIGATION TO CONTINUE DISCUSSIONS OR NEGOTIATIONS OF THIS LEASE.

Section 16.24. **Heirs and Successors**.  The covenants and agreements of this Lease shall be binding upon the heirs, legal representatives, successors and permitted assigns of the Parties.

Section 16.25. **Rent Deferral Right Waiver**.  In consideration of Landlord entering into this Lease and to the maximum extent allowed by Legal Requirements, Tenant hereby expressly and irrevocably waives any and all current or future rights pursuant to any Legal Requirement(s) which may allow Tenant to withhold or defer Rent payments with or without late fees or interest due to any epidemic or pandemic declared to exist by any Governmental Authority.

*(Signatures begin on next page)*

Landlord and Tenant have signed this Lease at the place and on the dates specified adjacent to their signatures below.

**LANDLORD**:

**HUB @ 202 OWNCO, LLC**,
a Delaware limited liability company

By: _____

Print Name: Peter C. Lewis

Its: Authorized Signatory

**TENANT**:

**POWIN, LLC**,
a Delaware limited liability company

By: _____

Print Name: Stuart Bolland

Its: Chief Operating Officer

**SIGNATURE PAGE TO INDUSTRIAL LEASE FOR 7524 EAST WARNER ROAD, MESA, ARIZONA 85212**

## **EXHIBIT 1.04-1**

Depiction below.



## **EXHIBIT 1.04-2**

DEPICTION OR DESCRIPTION OF THE LAND

LOT 1 OF HUB AT 202, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF MARICOPA COUNTY, ARIZONA, RECORDED ON JANUARY 4, 2023 AT DOCUMENT NUMBER 20230003590.

## EXHIBIT 1.04-3

LEGAL DESCRIPTION OF THE LAND COMPRISING THE PROJECT

PARCEL 1:
THE SOUTH 1,471 FEET OF THE SOUTHEAST QUARTER Of SECTION 18, TOWNSHIP 1 SOUTH, RANGE 7 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;
EXCEPT THE SOUTH 33 FEET.

PARCEL 2:
THE SOUTH 1,471 FEET OF THE WEST HALF OF SECTION 18, TOWNSHIP 1 SOUTH, RANGE 7 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, LYING EAST OF THE MARICOPA COUNTY FLOOD CONTROL DISTRICT CANAL RIGHT OF WAY;

EXCEPT THAT PORTION OF THE EAST HALF OF WEST HALF OF SAID SECTION 18, DEEDED TO THE MARICOPA COUNTY FLOOD CONTROL DISTRICT IN DOCKET 16131, PAGE 761, RECORDS OF MARICOPA COUNTY, ARIZONA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTH QUARTER CORNER OF SAID SECTION 18;
THENCE NORTH 89°43'19" WEST, 561.13 FEET ALONG THE NORTH LINE OF SAID SECTION 18 TO THE TRUE POINT OF BEGINNING;

THENCE CONTINUING NORTH 89°43'19" WEST ALONG SAID SECTION LINE, 375.00 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY LINE OF THE RWCD MAIN CANAL, SAID POINT BEING 50 FEET EASTERLY AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID CANAL RIGHT OF WAY;

THENCE ALONG SAID RIGHT OF WAY LINE, PARALLEL TO SAID CENTERLINE AND 50.00 FEET EASTERLY THEREFROM, SOUTH 00°10'41" WEST 954.30 FEET;

THENCE SOUTHERLY 215.18 FEET ALONG A CURVE WHICH IS TANGENT TO THE LAST COURSE AND CONCAVE EASTERLY HAVING A RADIUS OF 1730.18 FEET;

THENCE ALONG A TANGENT TO SAID CURVE SOUTH 06°56'51" EAST 2522.95 FEET;

THENCE SOUTHERLY 325.30 FEET ALONG A CURVE WHICH IS TANGENT TO THE LAST COURSE AND CONCAVE WESTERLY HAVING A RADIUS OF 925.88 FEET;

THENCE ALONG A TANGENT TO SAID CURVE SOUTH 13°10'59" WEST 270.21 FEET TO THE SOUTH LINE OF SAID SECTION 18;

THENCE ALONG SAID SECTION LINE SOUTH 89°49'46" EAST 384.88 FEET TO A POINT BEING 425 FEET EASTERLY AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID CANAL RIGHT OF WAY;

THENCE PARALLEL TO SAID CENTERLINE AND 425.00 FEET EASTERLY THEREFROM RUNNING NORTH 13°10'59" EAST 183.54 FEET;

THENCE NORTHERLY 457.06 FEET ALONG A CURVE WHICH IS TANGENT TO THE LAST COURSE AND CONCAVE WESTERLY HAVING A RADIUS OF 1300.88 FEET;

THENCE ALONG A TANGENT TO SAID CURVE NORTH 06°56'5" WEST 2,522.95 FEET;

Exhibit 1.04-3 – Page 1

4871-2699-3514\4

THENCE NORTHERLY 168.54 FEET ALONG A CURVE WHICH IS TANGENT TO THE LAST COURSE AND CONCAVE EASTERLY HAVING A RADIUS OF 1355.18 FEET;

THENCE ALONG A TANGENT TO SAID CURVE NORTH 00°19'41" EAST, 1953.65 FEET TO THE TRUE POINT OF BEGINNING.

4871-2699-3514\4

**EXHIBIT 2.02**

**COMMENCEMENT DATE CERTIFICATE**

THIS AGREEMENT, dated _____, 20___, is made by and between HUB @ 202 OWNCO, LLC, a Delaware limited liability company ("Landlord"), and POWIN, LLC, a Delaware limited liability company ("Tenant").  Landlord and Tenant agree as follows:

 1. Landlord and Tenant entered into an Industrial Lease _____, 2023 (the "Lease"), pursuant to which Lease Landlord let to Tenant, and Tenant leased from Landlord, certain described premises located at 7524 East Warner Road, Mesa, Arizona 85212 in Maricopa County, Arizona (the "Premises").

 2. Consistent with Sections 2.01 and 2.02 of the Lease, Landlord and Tenant hereby confirm the Commencement Date and the Expiration Date of the initial Term (as defined in the Lease), and amend Section 1.05 of the Lease to conform to such dates. The pertinent dates are as follows:

  a. _____, 20___ is the Commencement Date; and

  b. _____, 20___ is the anticipated Expiration Date, if the full Term specified in Section 1.05 of the Lease is completed.

 3. Tenant confirms that:

  a. It has accepted possession of the Premises as provided in the Lease;

  b. The Lease has not been modified, altered, or amended, except as provided in this Confirmation and as follows: _____; and

  c. The Lease is in full force and effect.

 4. The provisions of this Confirmation shall inure to the benefit, or bind, as the case may require, Landlord, Tenant, and their respective permitted successors and assigns.

 DATED as of the date first written above.

LANDLORD:          **TENANT:**

HUB @ 202 OWNCO, LLC,      POWIN, LLC,
a Delaware limited liability company   a Delaware limited liability company


By:              By:
Print Name:         Print Name:
Its:              Its:

Exhibit 2.02 – Page 1

4871-2699-3514\4

**EXHIBIT 3.01**

**FORM OF AUTHORIZATION AGREEMENT – PRE-ARRANGED PAYMENTS**

| AUTHORIZATION AGREEMENT PRE-ARRANGED PAYMENTS |
|---|

Reference Number _____

I (We) (Tenant) authorize _____ to initiate entries identified below as required.  Tenant further authorizes the bank below to post such entries to the identified checking account beginning with the payment draft date of _____ / ____ / ____.  A minimum of thirty (30) days advance notice is required to process first payment by ACH.

Bank Name_____Branch_____

City_____State_____Zip_____

__ __ __ __ __ __ __ __ __     __ __ __ __ __ __ __ __ __ __ __ __
    ***Transit - ABA                Account Number Information
ACCOUNT TYPE*** Please specify checking or savings account (C/S) _____

PLEASE FILL IN BANK INFORMATION CAREFULLY
ATTACH VOIDED CHECK FOR ACCOUNT VERIFICATION

Automatic debits will be made on the payment due date established by the relevant lease documents, or the next subsequent business day if such date is not a business day.  This authority may be terminated upon thirty days prior written notification from the tenant to the servicer.  Tenant has the right to stop payment of any entry by notification to the bank prior to the scheduled debit date.  If an erroneous entry is initiated by the servicer to the tenant's account, tenant shall have the right to have the amount of such entry reversed by the bank.  To initiate a reversal, the tenant must notify the bank in writing that an error has occurred and request a reversal.  Such notice must be within 15 calendar days after the tenant receives the statement of account or other written notice from the bank identifying the error.  Tenant hereby authorizes the servicer to impose a $250.00 returned item processing fee, subject to change, via ACH debit against the above-referenced account of the tenant if a non-sufficient funds or stop payment item is charged against the servicer's account.

Tenant                                     Tax Identification
Name(s) _____Number _____

Date_____

Print Authorized Name _____

Authorized Signature _____

Print Authorized Name _____

Authorized Signature _____

Contact Phone Number _____Fax Number _____

Email Address: _____

Return Original to:
_____
_____

Exhibit 3.01- Page 1

<u>**EXHIBIT 14.01**</u>
BUILDING IMPROVEMENTS

- Prior to the Estimated Commencement Date, subject to an Unavoidable Delay and Tenant Delay, Landlord shall use commercially reasonable efforts to cause Substantial Completion of the following work:

  o Approximately 2,058 SF of speculative office improvements according that certain Space Plan – Powin, HUB 202 Building 1A, prepared by Ware Malcomb (the "**Space Plan**");

  o Install certain LED lights solely with respect to the intended warehouse portion of the Premises;

  o Install evaporative cooled warehouse systems within the Premises; and

  o Install electrical infrastructure for five (5) forklift charging stations, at mutually agreed upon locations to be initially proposed by Tenant for Landlord's approval no later than August 10, 2023, and to be further designated on the Space Plan.

  o Except for the Building Improvements set forth in this <u>Exhibit 14.01</u> (collectively, "**Landlord's Work**"), Landlord will perform no work, alterations or installations in or with respect to the Premises.  Tenant acknowledges that neither Landlord nor any of Landlord's agents, employees, representatives, legal representatives or brokers has made any representations or warranties whatsoever, express or implied, as to the Premises (including, without limitation, as to the condition thereof or the location, use, description, design, merchantability, fitness or suitability for use for Tenant's business or any other particular purpose, condition or durability thereof), it being agreed that all risks incident thereto are to be borne by Tenant, and that neither Landlord nor any of Landlord's agents, employees, representatives, legal representatives or brokers has agreed to undertake or cause to be undertaken any alterations or to construct any improvements to the Premises or the Project except Landlord's Work.  Tenant agrees that Tenant will accept the Premises in its condition AS-IS, WHERE IS and WITH ALL FAULTS upon completion of the Landlord's Work, and that Landlord shall not be required to perform any tenant improvements with respect thereto beyond Landlord's Work.  Landlord has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes. TENANT ACKNOWLEDGES THAT (1) NEITHER LANDLORD NOR ANY LANDLORD PARTY HAS MADE ANY WARRANTY, REPRESENTATION, COVENANT OR AGREEMENT WITH RESPECT TO THE MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE PREMISES, (2) EXCEPT FOR LANDLORD'S WORK, NO REPRESENTATIONS AS TO THE REPAIR OF THE PREMISES, NOR PROMISES TO ALTER, REMODEL OR IMPROVE THE PREMISES HAVE BEEN MADE BY LANDLORD OR ANY LANDLORD PARTY, AND (3) THERE ARE NO REPRESENTATIONS OR WARRANTIES, EXPRESSED, IMPLIED OR STATUTORY, THAT EXTEND BEYOND THE DESCRIPTION OF THE PREMISES.

Exhibit 14.01- Page 1

4871-2699-3514\4

Exhibit B

Administrative Expense Calculation

| Post Month | From | To | Description | Amount |
|---|---|---|---|---|
| 11/2025 | 11/1/2025 | 11/30/2025 | cam Common Area Maintenance | 12,393.60 |
| 11/2025 | 11/1/2025 | 11/30/2025 | salestax Sales Tax for Common Area Maintenance | 309.84 |
| 11/2025 | 11/1/2025 | 11/30/2025 | rent Base Rent | 73,807.79 |
| 11/2025 | 11/1/2025 | 11/30/2025 | salestax Sales Tax for Base Rent | 1,845.19 |
| 12/2025 | 12/1/2025 | 12/5/2025 | cam Common Area Maintenance | 1,998.97 |
| 12/2025 | 12/1/2025 | 12/5/2025 | salestax Sales Tax for Common Area Maintenance | 49.97 |
| 12/2025 | 12/1/2025 | 12/5/2025 | rent Base Rent | 11,904.48 |
| 12/2025 | 12/1/2025 | 12/5/2025 | salestax Sales Tax for Base Rent | 297.61 |
| | | | | **102,607.46** |

2