**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

**ATTORNEY FINAL FEE APPLICATION COVER SHEET
FOR THE PERIOD FROM JUNE 9, 2025 TO AND INCLUDING DECEMBER 5, 2025**

In re:  Powin, LLC, et al.[1]                    Applicant:     Dentons US LLP ("Dentons")

Case No. 25-16137 (MBK)                 Client:        Debtors and Debtors in
Jointly Administered                                   Possession (the "Debtors")

Chapter 11                                 Case Filed:    June 9, 2025

| SECTION 1<br>FEE SUMMARY |
|---|

☐ Interim Fee Application No. ___ _              or        ☒ Final Fee Application

|  | **FEES** | **EXPENSES** |
|---|---|---|
| Total Previous Fees Requested: | $5,871,821.75 | $56,364.32 |
| Total Fees Allowed to Date: | $4,536,054.25 | $47,641.97 |
| Total Retainer (If Applicable): | $0.00 | $0.00 |
| Total Holdback (If Applicable): | N/A | N/A |
| Total Received by Applicant: | $5,613,390.60 | $56,364.32 |
| Total Unpaid Amount: | $403,482.90 | $9,727.80 |

**Summary of Monthly Fee Statements**

| ECF No.<br>of Filing | Period | Fees Sought | Expenses<br>Sought | Total Sought | Holdback<br>(20%) |
|---|---|---|---|---|---|
| 592 | 6/10/2025 –<br>6/30/2025 | $1,121,233.00 | $8,886.04 | $1,130,119.04 | $224,246.60 |
| 796 | 7/1/2025 –<br>7/31/2025 | $1,724,964.50 | $10,164.59 | $1,735,129.09 | $344,992.90 |
| 989 | 8/1/2025 –<br>8/30/2025 | $1,146,994.25 | $20,814.32 | 1,167,808.57 | $229,398.85 |
| 1148 | 9/1/2025 –<br>9/30/2025 | $542,862.50 | $7,777.02 | $550,639.52 | $108,572.50 |
| 1192 | 10/1/2025 –<br>10/31/2025 | $453,904.00 | $1,041.28 | $454,945.28 | $90,780.80 |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504]; (iii) PEOS Holdings, LLC [5476]; (iv) Powin China Holdings 1, LLC [1422]; (v) Powin China Holdings 2, LLC [9713]; (vi) Charger Holdings, LLC [5241]; (vii) Powin Energy Ontario Storage, LLC [8348]; (viii) Powin Energy Operating Holdings, LLC [2495]; (ix) Powin Energy Operating, LLC [6487]; (x) Powin Energy Storage 2, Inc. [9926]; (xi) Powin Energy Ontario Storage II LP [5787]; (xii) Powin Canada B.C. Ltd. [2239]; and (xiii) Powin EKS SellCo, LLC [9110].

| 1208 | 11/1/2025 – 11/30/2025 | $881,863.50 | $7,681.07 | $889,544.57 | $176,372.70 |
| N/A | 12/1/2025 – 12/5/2025 | $136,329.40 | $9,727.80 | $146,057.20 | N/A |

| Name of Professional and Title | Year Admitted | Hours | Rate | Fee |
|---|---|---|---|---|
| Sam J. Alberts - Partner | 1992 | 10.5 | $1,400 | $14,700.00 |
| John D. Beck – Partner | 2010 | 512.1 | $1,450 | $742,545.00 |
| | | 18.7 | $725 | $13,557.50 |
| Van C. Durrer II – Partner | 1993 | 517.2 | $1,800 | $930,960.00 |
| | | 126.6 | $900 | $113,940.00 |
| R. Matthew Garms – Partner | 1999 | 219.6 | $830 | $182,268.00 |
| John L. Harrington - Partner | 1987 | 0.9 | $1,690 | $1,521.00 |
| Justin N. Kattan – Partner | 2001 | 1 | $1,480 | $1,480.00 |
| Ken Kraft – Partner | N/A | 3.2 | $1,200 / $1345 | $4,217.00 |
| Lisa Krigsten - Partner | 1995 | 5.1 | $895 | $4,564.50 |
| Lauren Macksoud – Partner | 2003 | 21.7 | $1,250 | $27,125.00 |
| Samuel R. Maizel – Partner | 1985 | 2.5 | $1,400 | $3,500.00 |
| Patrick C. Maxcy – Partner | 1999 | 1.8 | $1,400 | $2,520.00 |
| Sandra R. McCandless – Partner | 1973 | 119.4 | $1,295 | $154,623.00 |
| Geoffrey M. Miller – Partner | 2012 | 465.4 | $1,250 | $581,750.00 |
| Tania M. Moyron - Partner | 2005 | 624 | $1,545 | $964,080.00 |
| | | 57.1 | $773 | $44,109.75 |
| Paul O'Halloran – Partner | N/A | 2.2 | $610 / $640 | $1,342.00 |
| John Stragalinos - Partner | N/A | 9.6 | $640 / $630 | $6,100.00 |
| Casey W. Doherty, Jr. – Counsel | 2011 | 377 | $1,100 | $414,700.00 |
| | | 58.1 | $550 | $31,955.00 |
| Nick Janda – Counsel | 2007 | 133.7 | $1,120 | $149,744.00 |
| Carolyn P. Richter – Counsel | 1989 | 55.8 | $1,360 | $75,888.00 |
| Javier Royo – Counsel | N/A | 13.4 | $500 | $6,679.00 |
| Luis San Emeterio – Counsel | N/A | 39.5 | $460 | $18,768.00 |
| Elena Bosque – Junior Associate | N/A | 17.7 | $240 | $4,250.40 |
| Elysa Chew – Managing Associate | 2021 | 71 | $950 | $67,450.00 |
| David F. Cook – Senior Managing Associate | 2017 | 389.8 | $1,100 | $428,780.00 |
| | | 16 | $550 | $8,800.00 |
| Jemuel Gascon – Associate | 2021 | 6.7 | $850 | $5,695.00 |
| Jacob Hernandez – Associate | 2023 | 8.2 | $795 | $6,519.00 |
| John Koutsodontis – Senior Associate | N/A | 1.5 | $345 | $517.50 |
| Antony Lam – Managing Associate | 2021 | 0.9 | $890 | $801.00 |
| Vanessa Madrigal – Managing Associate | 2021 | 89.8 | $940 | $84,412.00 |
| Ali Pantelis – Associate | N/A | 5.4 | $230 / $240 | $1,258.00 |
| Lucia Rojo – Associate | N/A | 41.3 | $340 | $14,040.00 |
| Samantha Ruben – Managing Associate | 2019 | 47.6 | $950 | $45,220.00 |
| | 2016 | 411.3 | $1,100 | $452,430.00 |

| | | | | |
|---|---|---|---|---|
| Sarah M. Schrag – Senior Managing Associate | | 3.4 | $550 | $1,870.00 |
| Henry Thomas – Associate | 2023 | 216.9 | $855 | $185,449.50 |
| Peter Watkins – Senior Associate | N/A | 7.1 | $430 | $2,738.00 |
| Eamonn Watson - Associate | N/A | .6 | $530 | $318.00 |
| Jenny Xu – Associate | 2023 | 17.4 | $815 | $14,181.00 |
| George L. Medina – Senior Paralegal | N/A | 323.3 | $525 | $169,732.50 |
| | | 6.2 | $263 | $1,627.50 |
| Dianne Thomas-Nichols – Senior Paralegal | N/A | 37 | $525 | $19,425.00 |
| **TOTALS** | **N/A** | **5,115.2** | **N/A** | **$6,008,151.15** |

<div style="border:1px solid black;text-align:center">

**SECTION II**
**SUMMARY OF SERVICES**

</div>

| Services Rendered | Hours | Fee |
|---|---|---|
| B100 – Administration | 1.1 | $874.50 |
| B110 – Case Administration | 228.2 | $226,303.00 |
| B120 - Asset Analysis and Recovery | 382.9 | $481,196.50 |
| B130 - Asset Disposition | 1031.4 | $1,262,570.50 |
| B140 - Stay Relief/Adequate Protection | 83.6 | $103,942.50 |
| B150 - UCC Issues/Meetings | 102.8 | $118,719.00 |
| B160 - Fee/Employment Applications | 190.4 | $210,228.50 |
| B185 – Assumption/Rejection of Contracts | 130.8 | $143,221.00 |
| B190 – Other Contested Matters | 5.5 | $6,763.50 |
| B195 - Non-Working Travel | 286.1 | $215,859.75 |
| B200 - Utilities | 44.4 | $42,616.00 |
| B220 - Employee Benefits/Pension | 2.5 | $3,288.00 |
| B230 - DIP Financing/Cash Collateral | 472.7 | $588,316.50 |
| B240 - Tax Issues | 19.2 | $26,226.00 |
| B250 - Real Estate Leases | 18.5 | $27,192.50 |
| B260 - Independent Manager Matters | 54.3 | $80,126.00 |
| B310 - Claims Administration and Objections | 234.5 | $272,363.50 |
| B320 – Plan and Disclosure Statement (incl. Business Plan) | 687.3 | $889,959.50 |
| CUST - Customer Issues | 409 | $523,082.50 |
| EMP - Employee Matters | 453 | $463,956.40 |
| INS – Insurance | 10.7 | $15,086.50 |
| REP - Reporting/Schedules | 208.9 | $231,754.50 |
| WARNACT – WARN Act Issues | 57.4 | $74,504.50 |
| **TOTALS** | **5,115.2** | **$6,008,151.15** |

**SECTION III**
**SUMMARY OF DISBURSEMENTS**

| Disbursements | Amount |
|---|---:|
| Meals | $3,797.12 |
| Filing Fees | $8,390.50 |
| Ground Transportation | $4,875.57 |
| Litigation Support | $14.20 |
| Research | $5,384.28 |
| Travel – Lodging and Airfare | $26,118.12 |
| Mileage | $296.80 |
| Postage & Delivery-Federal Express | $501.16 |
| Other Office Expenses | $198.00 |
| Corporate Fees | $9,379.15 |
| Foreign Experts and Procuradores | $7,137.22 |
| **TOTAL** | **$66,092.12** |

<div style="border:1px solid black; text-align:center">

**SECTION IV**
**CASE HISTORY**

</div>

(1)  Date case filed:        June 9, 2025[2]

(2)  Chapter under which case commenced:        Chapter 11

(3)  Date of retention:        August 19, 2025 as of June 9, 2025.  *See* **Exhibit B**.

  If limit on number of hours or other limitations to retention, set forth:        N/A

(4)  Summarize in brief the benefits to the estate and attach supplements as needed:    *See* narrative portion of fee application.

(5)  Anticipated distribution to creditors:

  (a) Administrative expenses: paid in full.

  (b) Secured creditors: paid in full.

  (c) Priority creditors: paid in full.

  (d) General unsecured creditors: unknown at this time.

(6)  Final disposition of case and percentage of dividend paid to creditors: The Debtors' Plan of Liquidation was confirmed on December 1, 2025 (*see* Docket No. 1165) and became effective on December 5, 2025 (*see* Docket No. 1187).  The percentage dividend paid to creditors remains unknown at this time while the Liquidating Trust and Direct Claims Trust continue to pursue certain recoveries for the benefit of creditors.

---

[2] Powin Project LLC filed for voluntary relief under Chapter 11 of the Bankruptcy Code on June 9, 2025.  Powin Canada B.C. Ltd., Powin Energy Ontario Storage II LP, and Powin Energy Storage 2, Inc., filed on June 22, 2025, Powin EKS SellCo, LLC filed on October 10, 2025, and the remaining Debtors filed on June 10, 2025.

**DENTONS US LLP**

Tania M. Moyron (admitted *pro hac vice*)
Van C. Durrer, II (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:  tania.moyron@dentons.com
          van.durrer@dentons.com

John D. Beck (admitted *pro hac vice*)
Sarah M. Schrag (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:  john.beck@dentons.com
          sarah.schrag@dentons.com

*Counsel for Debtors and
Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  altogut@teamtogut.com
          eblander@teamtogut.com

*Counsel for Debtors and
Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re:<br><br>Powin, LLC, *et al.*,[1]<br><br>          Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

**FINAL FEE APPLICATION OF DENTONS US LLP FOR ALLOWANCE OF
COMPENSATION FOR SERVICES RENDERED AND FOR REIMBURSEMENT OF
EXPENSES AS CO-COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION
FOR THE PERIOD FROM JUNE 9, 2025 TO AND INCLUDING DECEMBER 5, 2025**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504]; (iii) PEOS Holdings, LLC [5476]; (iv) Powin China Holdings 1, LLC [1422]; (v) Powin China Holdings 2, LLC [9713]; (vi) Charger Holdings, LLC [5241]; (vii) Powin Energy Ontario Storage, LLC [8348]; (viii) Powin Energy Operating Holdings, LLC [2495]; (ix) Powin Energy Operating, LLC [6487]; (x) Powin Energy Storage 2, Inc. [9926]; (xi) Powin Energy Ontario Storage II LP [5787]; (xii) Powin Canada B.C. Ltd. [2239]; and (xiii) Powin EKS SellCo, LLC [9110].

## **Introduction**

Pursuant to §§ 330 and 331 of title 11 of the United States Code, §§ 101-1532 (the "Bankruptcy Code") and Rule 2016 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"),[2] Rules 2016-1 and 2016-3 of the Local Rules of United States Bankruptcy Court for the District of New Jersey (the "Local Rules"), and the *Administrative Fee Order Establishing Procedures for Allowance and Payment of Interim Compensation and Reimbursement of Expenses of Professionals Retained by Order of this Court* [Docket No. 519] (the "Administrative Fee Order"), Dentons US LLP ("Dentons"), counsel to the former debtor and debtor in possession (the "Debtor") in the above-captioned cases (the "Chapter 11 Cases"), hereby submits this *Final Fee Application of Dentons US LLP for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors and Debtors in Possession for the Period from June 9, 2025, to and Including December 5, 2025* (the "Fee Application").

The Fee Application (i) provides an overview of the work which was the subject of the Dentons's first interim fee application [Docket No. 1158] (the "Interim Fee Application") during the period from June 9, 2025 (the "Petition Date") to and including September 30, 2025 (the "First Interim Period") and (ii) covers the period from October 1, 2025 to and including December 5, 2025 (the "Second Interim Period"). By this Fee Application, Dentons seeks an order affirming its prior interim award of fees totaling $4,536,054.25 and expenses of $47,641.97, for a total of $4,583,696.22 on a final basis. Further, Dentons seeks entry of an order allowing compensation in the amount of $1,472,096.90 for reasonable and necessary legal services rendered to the Debtor

---

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, and all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure.

during the Second Interim Period, and $18,450.15 for reimbursement of actual and necessary expenses incurred during the Second Interim Period, for a total of $1,490,587.05 on a final basis. Dentons also separately seeks approval of a fee enhancement in the amount of $323,636.65 (the "Fee Enhancement") by its *Joint Motion of Debtors' Professionals for Enhancement of Professional Fees* filed concurrently herewith (the "Fee Enhancement Motion").

Therefore, Dentons hereby seeks final approval for compensation in the aggregate amount of $6,008,151.15 for reasonable and necessary legal services rendered during the Fee Period, $66,092.12 for reimbursement of actual and necessary expenses incurred during the Fee Period, exclusive of the Fee Enhancement.

### I.    Overview of Services Performed During the First Interim Period

Dentons served as lead bankruptcy counsel to the Debtor from prior to the Petition Date through the date of this Fee Application.  As this Court is aware, Dentons' services led to a successful outcome in this Case, including, among other things: (i) the consummation of three value-maximizing sale transactions that led to the sale of substantially all of the Debtors' assets; (ii) a confirmed chapter 11 plan of liquidation which paid all secured claims in full and is likely to result in significant payments being made to unsecured creditors; and (iii) reaching comprehensive settlement agreements resolving the most significant claims in the Chapter 11 Cases, including agreements resolving the largest unsecured claim and priority WARN claims asserted in that certain adversary proceeding commenced on the petition date.

More specifically, upon the filing the Case, Dentons successfully obtained "first day" relief that allowed the Debtor to continue postpetition operations and preserve value.  Critically, Dentons also successfully obtained debtor in possession financing which provided the Debtors the liquidity to then able to pivot to a sale process to sell substantially all of their assets.  Dentons assisted the Debtors in obtaining the *Order (I) Designating a Stalking Horse Bidder and Approving Stalking*

*Horse Bidder Protections, (II) Approving Bidding Procedures By Which Interested Parties May*

*Bid and an Auction Sale Format in Connection With the Sale of Substantially All of the Debtors'*

*Assets; (III) Approving Form of Asset Purchase Agreement, (IV) Approving From of Noice to be*

*Provided to Interested Parties, (V) Authorizing the Assumption and Assignment of Assumed*

*Contracts and Notice Procedures Thereto, (VI) Scheduling a Court Hearing to Consider Approval*

*of the Sale to the Highest and Best Bidder, and (VII) Authorizing the Sale of the Debtors' Property*

*Fee and Clear of all Causes of Action and Claims* [Docket No. 413] (the "<u>Bidding Procedures</u>

<u>Order</u>"), which allowed the Debtors and other interested parties to work toward the consummation

of three sale transactions.  Pursuant to the Bidding Procedures Order, Dentons conducted a robust

auction, and, after the auction and in consultation amongst the Debtor, Dentons, and the Debtors'

other professional advisors, the Debtor filed the *Notice of Winning Bidders* [Docket No. 591] and

named the winning bidders for the Debtors' assets.  The Debtors' assets were sold to FlexGen (as

defined below) for a purchase price of $36 million, Hitachi (as defined below) for a fixed sum of

$15 million, and to Mainfreight (as defined below).  The Court approved the sales [Docket

Nos. 691, 692, 751].

II.      **Overview of Services Performed During the Second Interim Period**

During the Second Interim Period, Dentons and the Debtors focused on confirming a

chapter 11 plan of liquidation and negotiating such plan with various parties in interest and also

spent considerable time reconciling claims, finalizing settlements with multiple claimants,

including the largest unsecured creditor, certain significant administrative creditors and holders of

certain priority WARN claims asserted in that certain adversary proceeding commenced on the

petition date, and resolving various customer disputes.  With the support and input of the other

estate professionals, Dentons, the Debtors, and the Committee engaged in a process to confirm the

*Joint Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Powin, LLC and Affiliates Thereof and the Official Committee of Unsecured Creditors* [Docket No. 942] (the "Joint DS and Plan"). The Joint DS and Plan garnered overwhelming support from each class entitled to vote on confirmation of the Plan, which the Court confirmed [Docket No. 1165] and is now effective [Docket No. 1187]. Dentons also assisted the Debtors in investigating and safeguarding potential claims and assets for liquidation after confirmation as well as addressing labor and wind-down issues in various foreign countries including Australia, Canada, China, Spain, and the United Kingdom. Finally, Dentons supported the transition of remaining assets and records to the Liquidating Trustee.

Dentons' representation of the Debtor and the accumulated skill and background of Dentons' partners, counsel, associates, and paraprofessionals resulted in substantial benefits to the Debtor's estate and the successful resolution of the Debtor's case. Given the accomplishments and the complexities of the Debtors' businesses and restructuring, Dentons submits that the compensation and expense reimbursement sought herein for the necessary and beneficial professional services Dentons provided to the Debtors during the Fee Period are reasonable and appropriate, commensurate with the scale, nature, and complexity of the Chapter 11 Cases, and should be approved.

In support of this Fee Application, Dentons submits the declaration of Van C. Durrer, II, which is attached hereto as **Exhibit A** (the "Durrer Fee Declaration"). In further support of this Fee Application, Dentons states as follows:

### Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on

September 18, 2012 (Simandle, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).
The Debtors confirm their consent to the Court entering a final order in connection with this
Application to the extent that it is later determined that the Court, absent consent of the parties,
cannot enter final orders or judgments in connection herewith consistent with Article III of the
United States Constitution.

2.         Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

3.         On and following the Petition Date, each of the Debtors filed a voluntary petition
for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses as
debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. On June 13, 2025,
the Court entered an order authorizing the joint administration and procedural consolidation of the
Chapter 11 Cases [Docket No. 58]. On June 27, 2025, the United States Trustee for the District of
New Jersey (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant
to § 1102 of the Bankruptcy Code [Docket No. 174] (the "Committee").

4.         A description of the Debtors' business, the reasons for filing the Chapter 11 Cases,
and the relief sought from the Court related to first-day motions were set forth in the *Declaration
of Gerard Uzzi in Support of Emergency First Day Motions of the Debtors* [Docket No. 13].

5.         On July 25, 2025, the Court entered the Administrative Fee Order, which sets forth
the procedures for interim compensation and reimbursement of expenses for all professionals in
these cases.

6.         On December 1, 2025, the Court entered the *Findings of Fact, Conclusions of Law,
and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Joint
Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Powin, LLC and Affiliates
Thereof and the Official Committee of Unsecured Creditors* [Docket No. 1165] (the "Confirmation

Order"). On December 5, 2025, the Debtors filed the *Notice of (I) Confirmation and Effective Date of the Joint Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Powin LLC and Affiliates Thereof and the Official Committee of Unsecured Creditors and (II) Deadlines Under the Plan and Confirmation Order to File Administrative Claims, Professional Fee Claims, and Rejection Claims* (the "<u>Effective Date Notice</u>") [Docket No. 1187]. As set forth in the Effective Date Notice, the Plan went effective on December 5, 2025 (the "<u>Effective Date</u>").

## **Information Required by the Trustee Guidelines**

### A. **THE SCOPE OF THE APPLICATION**

Consistent with the U.S. Trustee Guidelines, Dentons disclosures the following concerning the scope of the Application:

| | |
|---|---|
| **Name of Applicant** | Dentons US LLP |
| **Name of Client** | Powin, LLC, *et al.* (Debtors and Debtors in Possession |
| **Petition Date** | June 9, 2025[3] |
| **Retention Date** | August 19, 2025, effective as of June 9, 2025. *See* Docket No. 753, a copy of which is attached hereto as **Exhibit B**. |
| **Time Period Covered by Application** | June 9, 2025 through December 5, 2025 |
| **Terms and Conditions of Employment** | Hourly (except for the Fee Enhancement, as set forth more fully in the Fee Enhancement Motion) |
| **Interim / Final** | Final |
| **Date and Terms of Administrative Fee Order** | On July 25, 2025, the Court entered the Administrative Fee Order. Pursuant to the Administrative Fee Order, Professionals, as defined therein, may file monthly fee statements with the Court. If there are no objections to a monthly fee statement, Professionals are entitled to payment of eighty (80%) percent of the fees and one hundred (100%) percent of the expenses requested in their monthly fee statement. The Administrative Fee Order further provides that Professionals may file interim fee applications for allowance of compensation and reimbursement of expenses of the amount sought in their monthly fee statements, including the twenty percent (20%) |

---

[3] Powin Project LLC filed for voluntary relief under Chapter 11 of the Bankruptcy Code on June 9, 2025. Powin Canada B.C. Ltd., Powin Energy Ontario Storage II LP, and Powin Energy Storage 2, Inc., filed on June 22, 2025, Powin EKS SellCo, LLC filed on October 10, 2025, and the remaining Debtors filed on June 10, 2025.

| | |
|---|---|
| | holdback pursuant to § 331 of the Bankruptcy Code at four-month intervals or such other intervals directed by the Court. |
| **11 U.S.C. § 330** | Dentons seeks compensation under § 330 of the Bankruptcy Code. |
| **Total Compensation (Fees) Sought this Period** | $6,008,151.15[4] |
| **Total Expenses Sought this Period** | $66,092.12 |
| **Total Compensation Approved by Interim Order to Date** | $4,536,054.25 |
| **Total Expenses Approved by Interim Order to Date** | $47,641.97 |
| **Blended Rate in This Application for All Attorneys** | $1,225.04[5] |
| **Blended Rate in This Application for All Timekeepers** | $1,174.56[6] |
| **Compensation Sought in This Application Already Paid Pursuant to a Monthly Compensation Order But Not Yet Allowed** | $1,068,614.00 |
| **Expenses Sought in This Application Already Paid Pursuant to a Monthly Compensation Order But Not Yet Allowed** | $8,722.35 |
| **If Applicable, Number of Professionals in This Application Not Included in Staffing Plan Approved by Client** | N/A |
| **If Applicable, Difference Between Fees Budgeted and Compensation Sought for This Period** | N/A |
| **Number of Professionals Billing Fewer Than 15 Hours to the Case During This Period** | 17 |
| **Are Any Rates Higher Than Those Approved or Disclosed at Retention? If Yes, Calculate and Disclose the Total Compensation Sought in This Application Using the Rates Originally Disclosed in the Retention Application** | ☐ Yes        ☒ No |

## B.  SUMMARY OF TIMEKEEPERS AND RATE INCREASES

7.    With respect to each professional who billed on the matter during the Fee Period, Dentons discloses the following in the above Section I: (i) Name of Timekeeper and title or position, (ii) year of admission, if applicable; (iii) current hourly rate; and (vi) total fees billed in

---

[4] This amount does not include the Fee Enhancement.

[5] This blended rate excludes the Fee Enhancement.

[6] This blended rate excludes the Fee Enhancement.

the Fee Period.  No rate increases were implemented during the Fee Period.  However, Dentons'
Retention Order (as defined below) authorizes Dentons to utilize the services of Member Firms,
and Dentons hereby submits those charges at their prevailing rates.  In the ordinary course of
business, Member Firms adjust their rates according to market.  Specifically, (a) Kenneth Kraft's
rate was adjusted from $1,200 to $,1345, resulting in incremental fees of $377; (b) Ali Palentis'
rate was adjusted from $230 to $240, resulting in incremental fees of $16; (c) John Stagalinos'
rate was adjusted from $630 to $640, resulting in incremental fees of $52; and (d) Peter Watkins' rate
was adjusted from $345 to $430, resulting in incremental fees of $289.  This de minimis change
of $734 in the aggregate is disclosed for completeness and transparency.

### C.  CUSTOMARY AND COMPARABLE COMPENSATION

8.    Dentons submits its compensation is customary as evidenced by the blended hourly
rate data set forth on **Exhibit D** attached for the 2025 calendar year as compared to the Fee Period.
Dentons' blended hourly rate for all timekeepers during the Compensation Period was $1,225.04.

### D.  STATEMENTS FROM THE APPLICANT

9.    Consistent with U.S. Trustee guidelines, Dentons answers the following questions:

| Question | Answer |
|---|---|
| Did you agree to any variations from, or alternatives to, your standard or customary billing rates, fees or terms for services pertaining to this engagement that were provided during the application period? | No[7] |
| If the fees sought in this fee application as compared to the fees budgeted for the time period covered by this fee application are higher by 10% or more, did you discuss the reasons for the variation with the client? | N/A |
| Have any of the professionals included in this fee application varied their hourly rate based on the geographic location of the bankruptcy case? | No |
| Does the fee application include time or fees related to reviewing or revising time records or preparing, reviewing, or revising invoices? | Yes (minimal time/fees) |

---

[7] Dentons is, however, seeking approval of the Fee Enhancement in the Fee Enhancement Motion.

| Does this fee application include time or fees for reviewing time records to redact any privileged or other confidential information? | Yes (minimal time/fees) |
|---|---|
| Does the fee application include any rate increases? | No |

### E.  BUDGET AND STAFFING PLAN

10.     Consistent with the Guidelines, attached as **Exhibit E** is Dentons' internal case budget and staffing plan for the Compensation Period.

### Case Summary

11.     The Debtors filed the Chapter 11 Cases to pursue a value-maximizing sale process for their assets.  During the Fee Period, the Debtors, with the assistance of their advisors: (a) obtained first-day relief to stabilize operations and ensure a seamless transition into the Chapter 11 Cases; (b) participated in the meeting of creditors pursuant to § 341 of the Bankruptcy Code on July 23, 2025; (c) rejected certain unnecessary and burdensome unexpired contracts; (d) established the claims bar dates and distributed notices to their clients and other stakeholders in connection therewith; (e) obtained approval of debtor-in-possession financing; (f) negotiated and consummated three value-maximizing transactions for the Debtors' estates; (g) prepared, negotiated, filed, and successfully confirmed the Joint DS and Plan, and (h) reached comprehensive settlement agreements resolving the most significant claims in the Chapter 11 Cases, including agreements resolving the largest unsecured claim and priority WARN claim, all as more fully described herein.

12.     The compensation and expense reimbursement sought herein were actual and necessary to preserve and protect the value of the Debtors' estates and, given the circumstances of the Chapter 11 Cases, reasonable, appropriate, and commensurate with the scale, nature, and complexity of the Chapter 11 Cases and should be approved.

**The Debtors' Retention of Dentons**

13.      On August 19, 2025, the Court entered the *Order Authorizing the Employment and Retention of Dentons US LLP as Counsel for the Debtors and Debtors in Possession, Effective as of the Petition Date* [Docket No. 753] (the "Retention Order"), attached hereto as **Exhibit B**. The Retention Order authorizes the Debtors to compensate and reimburse Dentons in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Administrative Fee Order. The Retention Order also authorizes the Debtors to compensate Dentons for services provided in connection with the Chapter 11 Cases and to reimburse Dentons for Dentons' actual and necessary out-of-pocket expenses incurred in connection with providing such services, subject to application to this Court. The particular terms of Dentons' engagement are detailed in the engagement letter by and between Dentons and the Debtors, effective as of June 9, 2025,[8] and attached hereto as **Exhibit C** (the "Engagement Letter").

**Disinterestedness of Dentons**

14.      To the best of the Debtors' knowledge and as disclosed in the *Declaration of Van Durrer II in Support of the Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Dentons US LLP as Counsel for the Debtors and Debtors in Possession, Effective as of the Petition Date* [Docket No. 277] (the "Durrer Declaration"), Dentons is a "disinterested person" within the meaning of § 101(14) of the Bankruptcy Code, as required by § 327(a) of the Bankruptcy Code, and does not hold or represent an interest adverse to the Debtors' estates and has no connection to the Debtors, their creditors, or other parties in interest, except as may have been disclosed in the Durrer Declaration.

---

[8] The Engagement Letter amended and restated a prior engagement letter between Powin, LLC and Dentons dated as of May 2, 2025.

15.     Dentons performed the services for which it is seeking compensation on behalf of the Debtors and their estates, and not on behalf of any committee, creditor, or other entity.

16.     Except to the extent of the advance payments paid to Dentons that Dentons previously disclosed to this Court in the Durrer Declaration, Dentons has received no payment and no promises for payment from any source other than the Debtors for services provided or to be provided in any capacity whatsoever in connection with the Chapter 11 Cases.

17.     Pursuant to Bankruptcy Rule 2016(b), Dentons has not shared, nor has Dentons agreed to share (a) any compensation it has received or may receive with another party or person other than with the partners, counsel, and associates of Dentons or (b) any compensation another person or party has received or may receive.

### Summary of Compliance with Administrative Fee Order

18.     This Fee Application has been prepared in accordance with the Administrative Fee Order.

19.     Dentons seeks (a) final approval and allowance of the $1,472,096.90 in fees and $18,450.15 in reimbursement for actual and necessary expenses that Dentons incurred for the Second Interim Period; and (b) final approval and allowance of the $6,008,151.15 in fees and $66,092.12 in reimbursement for actual and necessary expenses that Dentons incurred for the entire Fee Period.  During the Fee Period, Dentons attorneys and paraprofessionals expended a total of 5,115.2 hours for which compensation is requested.  As noted above, Dentons has separately sought allowance of the Fee Enhancement by the Fee Enhancement Motion.

20.     In accordance with the Administrative Fee Order, as of the date hereof, Dentons has received payments totaling $5,669,754.92 ($5,613,390.60 of which was for fees and $56,364.32 in reimbursement of expenses) for the Fee Period.  Accordingly, by this Fee Application, and to the extent such amounts have not been paid by the time of the hearing on this Fee Application,

Dentons seeks payment of the remaining $413,210.70, which amount represents the entire amount of unpaid fees and expenses incurred between June 9, 2025, and December 5, 2025, exclusive of the Fee Enhancement.

## Fees and Expenses Incurred During the Fee Period

### A.   Customary Billing Disclosures

21.   Dentons' hourly rates are set at a level designed to compensate Dentons fairly for the work of its attorneys and paraprofessionals and to cover fixed and routine expenses.  The hourly rates and corresponding rate structure utilized by Dentons in the Chapter 11 Cases are equivalent to the hourly rates and corresponding rate structure used by Dentons for other restructuring matters, as well as similar complex corporate, securities, and litigation matters whether in court or otherwise, regardless of whether a fee application is required.  The rates and rate structure reflect that such restructuring and other complex matters typically are national in scope and typically involve great complexity, high stakes, and severe time pressures.

### B.   Fees Incurred During the Fee Period

22.   In the ordinary course of Dentons' practice, Dentons maintains computerized records of the time expended to render the professional services required by the Debtors and their estates.  For the convenience of the Court and all parties in interest, above, at Section II, is a summary of fees incurred and hours expended during the fee period setting forth the following information:

   a.   the name of each attorney and paraprofessional for whose work on these Chapter 11 Cases compensation is sought;

   b.   each attorney's year of bar admission and title;

   c.   the aggregate time expended and fees billed by each attorney and each paraprofessional during the Fee Period;

   d.   each attorney's and paraprofessional's hourly rate; and

13

e.    the total fee incurred on behalf of the Debtors for work performed by each such attorney and paraprofessional.

**C.    Expenses Incurred During the Fee Period**

23.    In the ordinary course of Dentons' practice, Dentons maintains a record of expenses incurred in the rendition of the professional services required by the Debtors and their estates and for which reimbursement is sought.  For the convenience of the Court and all parties in interest, above, at Section III, is a summary of the disbursements made by Dentons on behalf of the Debtors.

**Summary of Legal Services Rendered During the Fee Period**

24.    The pleadings and papers filed below are relevant to Dentons' services rendered in the Chapter 11 Cases.

| Document(s) | Docket Number |
|---|---|
| *Motion of the Debtors for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases; and (II) Granting Related Relief* (the "Joint Administration Motion") | 3 |
| *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief* (the "Employee Benefits Motion") | 7 |
| *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Renew, Amend, Supplement, Extend, or Modify Insurance Programs and Pay Obligations Thereunder; and (II) Granting Related Relief* (the "Insurance Motion") | 8 |
| *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "Cash Collateral Motion") | 11 |
| *Motion of the Debtors for Entry of Interim and Final Orders: (I) Authorizing Use of Cash Management Procedures, Bank Accounts, and Existing Business Forms; (II) Prohibiting Setoffs and Freezing of Bank Accounts; (III) Modifying Requirements of Section 345(b) of the Bankruptcy Code; and (IV) for Related Relief* (the "Cash Management Motion") | 12 |
| *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Enter Into New Customer Program with Existing Customers and (II) Granting Related Relief* (the "Customer Programs Motion") | 15 |

| Document(s) | Docket Number |
|---|---|
| *Motion of the Debtors for Entry of an Order (I) Authorizing the Rejection of Legacy Customer Contracts and (II) Granting Related Relief* (the "Rejection Motion") | 88 |
| *Motion of the Debtors Pursuant to 11 U.S.C. §§ 105(a) and 366 and Fed. R. Bankr. P. 6003 and 6004 for Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief* (the "Utilities Motion") | 112 |
| *Motion of the Debtors for Entry of an Interim and Final Order (I) Granting Authority to Pay Certain Prepetition Taxes; and (II) Granting Related Relief* (the "Tax Motion") | 99 |
| *Motion of the Debtors for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Modifying The Automatic Stay; (IV) Scheduling a Final DIP Hearing; and (V) Granting Related Relief* (the "DIP Motion") | 120, as amended by 149 |
| *Expedited Motion of the Debtors for Entry of an Order (I) Authorizing and Approving Settlement and Release Agreement; and (II) Granting Related Relief* (the "Project Group Settlement Motion") | 191, as supplemented by 265 |
| *Motion of the Debtors for Entry of an Order (I) Designating a Stalking Horse Bidder and Approving Stalking Horse Bidder Protections (II) Approving Bidding Procedures by Which Interested Parties May Bid and an Auction Sale Format in Connection with the Sale of Substantially All of the Debtors' Assets, (III) Approving Form of Asset Purchase Agreement, (IV) Approving Form of Notice to be Provided to Interested Parties, (V) Authorizing the Assumption and Assignment of Assumed Contracts and Notice Procedures Thereto, (VI) Scheduling a Court Hearing to Consider Approval of the Sale to the Highest and Best Bidder, and (VII) Authorizing the Sale of Debtors' Property Free and Clear of All Causes of Action and Claims* (the "Bidding Procedures Motion") | 228 |
| *Debtors' Objection to Mainfreight Inc.'s Motion to Confirm that the Automatic Stay Pursuant to 11 U.S.C. § 362(a) Does Not Apply to Certain Goods in its Possession* (the "Mainfreight Objection") | 294 |
| *Motion of the Debtors for Entry of an Order (I) Authorizing and Approving Settlement Agreement; and (II) Granting Related Relief* | 355 |
| *Debtors' Omnibus (I) Objection to (A) Emergency Motion of Licensees for Entry of an Order (1) Compelling the Debtors to Comply with Section 365(n)(4) of the Bankruptcy Code, (2) Granting Adequate Protection Under Section 363(e) of the Bankruptcy Code and (B) Related Joinders and (II) Reply in Support of Omnibus Motion of the Debtors for Entry of an Order (A) Authorizing the* | 357 |

15

| Document(s) | Docket Number |
|---|---|
| *Rejection of Legacy Customer Contracts and (B) Granting Related Relief* (the "365(n) Motion") | |
| *Notice of Filing Amended Stalking Horse APA, Order Approving Bidding Procedures, and Bidding Procedures* (the "Stalking Horse APA") | 384 |
| Statements of Financial Affairs (the "SOFAs") | 414 - 425 |
| Schedules of Assets and Liabilities (the "SOALs") | 426 - 437 |
| *Motion of Debtors for Entry of Order (I) Approving Key Employee Retention Plan and Key Employee Incentive Plan and (II) Granting Related Relief* (the "KERP/KEIP Motion") | 493 |
| *Debtors' Reply in Support of Omnibus Rejection Motion and Opposition to Section 365(n) Motions* (the "Reply to Licensee Objections") | 605 |
| *Debtors' Objection to Motion of Expeditors International of Washington, Inc. for Entry of an Order, Pursuant to § 362(d)(1) of the Bankruptcy Code Modifying the Automatic Stay to Permit Abandonment and Liquidation of Collateral* | 814 |
| *Debtors' Motion for Entry of an Order, Pursuant to § 1121(d) of the Bankruptcy Code, Extending its Exclusive Periods for the Filing of a Chapter 11 Plan and to Solicit Acceptances Thereof* | 849 |
| *Debtors' Motion for Entry of an Order Authorizing (I) Abandonment or Sale of Remaining Inventory and (II) Granting Related Relief* (the "Abandonment Motion") | 909 |
| *Debtors' Motion for Entry of an Order Pursuant to Section 365(d)(4) of the Bankruptcy Code Extending the Deadline for the Debtors to Assume or Reject Unexpired Leases of Non-Residential Real Property* | 910 |
| *Joint Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Powin, LLC and Affiliates Thereof and the Official Committee of Unsecured Creditors* (the "Joint DS and Plan") | 914, as thereafter amended by 942 |
| *Joint Motion of the Plan Proponents for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement on Conditional Basis, (II) The Solicitation and Notice Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* | 915 |
| *Debtors' Application in Lieu of Motion in Support of Entry of Joint Stipulation and Agreed Order Authorizing the Termination of that Certain Real Property Lease for Property Located at 16902 Millikan Avenue* | 978 |
| *Stipulation and Agreed Order Authorizing JPMorgan Chase Bank to Apply Prepetition Collateral Against Commercial Card Obligations* | 1008 |

| **Document(s)** | **Docket Number** |
|---|---|
| *Debtors' Motion for Entry of an Order (I) Estimating the Claims of New York Marine & General Insurance Company and Avalon Risk Management Insurance Agency, LLC at $0; (II) Directing the Turnover and Use of Excess Cash Collateral to be Distributed Pursuant to the Plan; (III) Approving a Procedure for Consensually Resolving Surety Claims and (IV) Related Relief* | 1018 |
| Amended SOFAs and SOALs for Powin, LLC | 1032 - 1033 |
| *Plan Supplement* | 1036 |
| *Expedited Motion of the Debtors for Entry of an Order (I) Authorizing and Approving Settlement Agreement; and (II) Granting Related Relief* | 1065 |
| *Debtors' Response to the Motion of Ad Hoc Customer Group for Entry of an Order (I) Compelling the Debtors to Assign OEM Warranties and Guaranties and (II) Granting Related Relief and Joinders Thereto* | 1081 |
| *Plan Proponents' Joint (I) Memorandum of Law in Support of (A) Final Approval of the Disclosures Made in the Joint Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Powin, LLC and Affiliates Thereof and the Official Committee of Unsecured Creditors; (B) Confirmation of Chapter 11 Plan; and (II) Omnibus Reply to Objections Thereto* (the "Response in Support of the Joint DS and Plan") | 1097 |
| *Joint Motion of Debtors and Class Representatives, Pursuant to Section 105 of the Bankruptcy Code and Bankruptcy Rules 9019 and 7023 to: Approve the Settlement Pursuant to Bankruptcy Rule 9019, (II) Preliminarily Approve the Settlement Pursuant to Bankruptcy Rule 7023, (III) Approve the Form and Manner of Notice to Class Members of the Settlement, (IV) Schedule a Fairness Hearing to Consider Final Approval of the Settlement, (V) Finally Approve the Settlement Following the Fairness Hearing, and (VI) Grant Related Relief* (the "WARN Settlement Motion") | 1119 |
| *Stipulation and Agreed Order Regarding R.H. Shipping and Chartering, S. de R.L. de C.V. Claim No. 311 and RH Shipping and Chartering USA, L.L.C. Claim No. 312* | 1174 |

25.    As discussed above, during the Fee Period, Dentons provided extensive and important professional services to the Debtors in connection with the Chapter 11 Cases. These services were often performed under time constraints and were necessary to address a multitude of critical issues both unique to the Chapter 11 Cases and typically faced by large corporate debtors in similar cases of this magnitude and complexity.

26.     To provide a meaningful summary of Dentons' services provided on behalf of the Debtors and their estates, Dentons has utilized, in accordance with its internal billing procedures, certain task codes (each, a "Task Code") in connection with the Chapter 11 Cases. A summary chart of the fees and hours billed by each Task Code is attached above as Section II.

27.     The following is a summary, by Task Code, of the most significant professional services provided by Dentons during the Fee Period. This summary is organized in accordance with Dentons' internal system of task codes. The detailed descriptions demonstrate that Dentons was heavily involved in performing services for the Debtors on a daily basis to meet the needs of the Debtors' estates in the Chapter 11 Cases. A schedule setting forth a description of the Task Codes utilized in this case, the number of hours expended by Dentons' partners, associates and paraprofessionals by matter, and the aggregate fees associated with each matter is attached above as Section II.

28.     In addition, Dentons' previously filed monthly fee statements are attached hereto as **Exhibit F-1** and its unfiled December invoice is attached hereto as **Exhibit F-2**.

    a.  B100 – Administration

Total Fees:          $874.50
Total Hours:         1.1

29.     During the Fee Period, Dentons expended time corresponding with other Debtor professionals, tracking case deadlines, and compiling documents for filing.

    b.  B110 – Case Administration

Total Fees:          $226,303.00
Total Hours:         228.2

30.     During the Fee Period, Dentons expended time managing day-to-day case administration. Dentons prepared materials for the first- and second-day hearings, including, but not limited to, motions and proposed orders, hearing agendas, and other documents. Additionally,

Dentons professionals worked closely with the Debtors employees, Gerard Uzzi, the Debtors'

Chief Restructuring Officer ("CRO"), and his staff at CBMN Advisors LLC dba Uzzi & Lall

("Uzzi & Lall"), and Huron Transaction Advisory LLC ("Huron") to (i) collect the required

information for chapter 11 petitions, first- and second-day motions, lists, matrices, and other

documents, and (ii) analyze, prepare and produce documents to the U.S. Trustee in connection

with the Initial Debtor Interview.  Dentons contributed to the creation and filing of the Debtors'

monthly operating reports.  Dentons also managed data rooms containing crucial documents

relating to the Debtors prepetition businesses.  Throughout the Fee Period, Dentons also engaged

with the various parties in interest to negotiate and draft the terms of final orders.  Dentons

routinely conferred with the Debtors, other professional advisors, the U.S. Trustee, and other third

parties on legal, procedural, and scheduling issues.

     c.   B120 – Asset Analysis and Recovery

Total Fees:     $481,196.50
Total Hours:   382.9

31.    During the Fee Period, Dentons devoted substantial time to analyzing the Debtors'

complex commercial relationships with subsidiaries of Akaysha Energy (the "Project Group"),

including reviewing the Energy Supply Agreements, Long-Term Supply Agreements, escrow

arrangements, Key Supplier Agreements, and related project documents.  Dentons evaluated

asserted defaults, termination notices, demands for intellectual-property escrow releases, and the

Project Group's claims for liquidated damages.  This work included detailed consultations with

the Debtors' management, financial advisors, and subject-matter experts to assess potential

exposure, identify viable defenses, and determine the range of litigation outcomes.  Dentons also

coordinated closely with the Debtors' prepetition lender, KKR, and reviewed the interplay between

the proposed settlement structure and the Debtors' DIP financing, budget constraints, and overall

reorganization strategy

32.     Dentons engaged in extensive, good-faith, arm's-length negotiations with

representatives of the Project Group and KKR to develop a comprehensive resolution that would

eliminate significant asserted liabilities, monetize project-specific assets, and deliver essential

liquidity to the estates. These efforts included drafting, revising, and negotiating and preparing

multiple iterations of the proposed settlement documents—principally the Settlement and Release

Agreement, related schedules, the Letter Agreement, the Designation Procedures. Counsel

analyzed complex cross-border issues, including Australian project-delivery schedules, supplier

relationships, possessory liens over equipment, and escrowed intellectual-property rights. Dentons

also worked to structure a commercially reasonable framework for the transfer of equipment,

contracts, designation rights, cure-cost responsibilities, and mutual releases, with the goal of

maximizing value and minimizing administrative costs.

33.     Once the parties reached an agreement in principle, Dentons prepared the Project

Group Settlement Motion [Docket No. 191] and ancillary documentation to synthesize the

extensive factual and legal issues into a clear presentation for the Court, including addressing the

standards under Bankruptcy Rule 9019, sections 105, 363, and 365 of the Bankruptcy Code, and

the Martin factors. The settlement with the Project Group was ultimately approved by the Court

[Docket No. 283]. Dentons corresponded with the Debtors, Uzzi & Lall, the Committee, and other

third parties also coordinated analysis of the proposed transactions with Uzzi & Lall and Huron.

34.     Dentons also negotiated and finalized the settlements with various parties in the

Project Group, Idaho Power, and Energy Re, including analysis of the impact of the settlements on

pending asset sales; negotiated, prepared and filed motions to obtain Court approval of these settlements; and obtained Court approval of the settlements.

35.    Dentons also analyzed the Debtors' joint venture with Hitachi (as defined below) and possible sale transactions related to the joint venture entity.  As described below, the Debtors, during the Fee Period, were ultimately successful in selling their interest in the joint venture entity to Hitachi which provided a substantial recovery to the Debtors' estates.

36.    Dentons also spent time analyzing issues related to certain of the Debtors' leases, disputes with creditors over accounts receivable, customs bond and Section 505 issues, drafting a motion on questions regarding surety bonds, and proposals relating to certain of the Debtors' assets in foreign countries and the ability to monetize those assets.  Among other positive results, Dentons' work on the customs bond matters allowed the Debtors to recover $8,000,000 in cash proceeds to fund the Plan.

   d.  B130 – Asset Disposition

   Total Fees:        $1,262,570.50
   Total Hours:       1031.4

37.    During the Fee Period, Dentons expended time leading an intensive sales process for a sale of substantially all of the Debtors assets to FlexGen Power Systems, LLC ("FlexGen"). At the outset of the sale process, Dentons assisted the Debtors in setting up data rooms and provided necessary documentation to interest parties, conducting due diligence with the Debtors' other professionals and responding to diligence requests from FlexGen, drafting non-disclosure agreements, negotiating with potential sale counterparties, and ultimately drafting and revising numerous documents, including the term sheet, Sale Motion, asset purchase agreement, schedules to the asset purchase agreement, Bid Procedures Motion, and proposed orders approving the Sale Motion and Bid Procedures Motion.  Dentons spent substantial amounts of time negotiating the

terms of the sale with FlexGen and its advisors and worked closely with the Debtors' own management and financial advisors to examine the assets being conveyed, identify encumbrances or contractual restrictions, confirm the liabilities FlexGen proposed to assume, and ensure the proposed sale maximized value for the estates and creditors.  After the Debtors were successful in having FlexGen named the stalking horse bidder for substantially all of the Debtors' assets, Dentons conducted an auction at their New York office, which resulted in the Debtors determining that FlexGen had submitted the highest or best bid for the Debtors' assets.

38.      During the Fee Period, Dentons further assisted the Debtors in completing two other sales, one to a group consisting of Hitachi Energy Ltd. and Hitachi Energy Power Conversion Solutions (collectively, "Hitachi") and another to Mainfreight Distribution Pty Ltd. ("Mainfreight").  In connection with the sale to Hitachi, Dentons devoted significant time to reviewing, analyzing and negotiating the sale agreement and conducted extensive diligence on the value of the property to be transferred, the validity of and enforceability of a put right under the Debtors' governing documents, and assessing the interaction between the proposed transaction and the Debtors' broader restructuring strategy and sale transaction with FlexGen.

39.      Each of these transactions required conducting extensive negotiations, making numerous revisions to the transaction documents, preparation of motions and proposed orders related thereto, and presenting these transactions to the Court and other parties in interest to demonstrate the value added to the Debtors' estates through the sales.  Ultimately, the Debtors, with Dentons' assistance successfully consummated sales to FlexGen, Hitachi, and Mainfreight during the Fee Period.

40.      During the Fee Period, Dentons also prepared the Abandonment Motion by which the Debtors sought to abandon certain property which had become burdensome to the Debtors'

estates, reviewed certain claims and proposals made and submitted by the Debtors' creditors and analyzed law related thereto. Additionally, even after the sales to FlexGen, Mainfreight, and Hitachi were completed, Dentons continued to deal with issues which arose surrounding the sales and prepared documentation in support of the enforcement of the Court's sale orders and corresponded with parties in interest on topics related to the sales. Dentons also expended considerable time during the Fee Period, both before and after the sales, working with the Debtors, other professional advisors, and parties in interest in order to analyze and handle issues relating to the Debtors' assets which were not subject to the sales.

e.   B140 – Stay Relief/Adequate Protection

Total Fees:        $103,942.50
Total Hours:      83.6

41.     During the Fee Period, Dentons prepared numerous stay violation and cease-and-desist letters warning of the ramifications of actions taken in violation of the automatic stay to creditors, both within and outside the United States, which, upon the filing of the Chapter 11 Cases, threatened legal action against the Debtors. Dentons also analyzed, responded to, and negotiated a settlement of the automatic stay-related motion filed by Mainfreight. Dentons also conducted research into the extraterritoriality of the automatic stay and informally communicated with creditors in response to creditor inquiries.

f.   B150 – UCC Issues/Meetings

Total Fees:        $118,719.00
Total Hours:      102.8

42.     During the Fee Period, Dentons expended time on communications with counsel for the Committee through teleconferences and email correspondence regarding, among other items, Committee bylaws and provisions therein, the Debtors' postpetition financing, potential asset sales, investigation updates, and other matters. Dentons also reviewed documents in

connection with document requests, prepared for production, and produced documents to the

Committee, pursuant to Committee document requests. There were also various entries in this task

code related to negotiating and drafting the Joint Disclosure Statement and Plan.  Dentons also

participated in the § 341(a) meeting of creditors and regularly corresponded with individual

creditors via email and teleconference to address their concerns.

g.  B160 – Fee/Employment Applications

Total Fees:       $210,228.50
Total Hours:      190.4

43.      During the Fee Period, Dentons prepared the employment applications for Uzzi &

Lall, Huron, and Dentons to ensure that all of the Debtors' chosen advisors would continue to

represent the Debtors after the Petition Date.   Dentons also corresponded with the CRO and his

staff at Uzzi & Lall, Huron, and Togut, Segal & Segal LLP ("Togut") to coordinate and finalize

each Debtor professional's employment application.    In drafting such retention applications,

Dentons professionals also prepared the parties in interest list and created charts of timekeepers'

fee information and bar admission status.   Upon receiving comments on its proposed retention

order from the U.S. Trustee, Dentons prepared and submitted supplemental declarations.   Dentons

also prepared its fee statements for the months of June through November during the Fee Period

and certificates of no objection thereto, as applicable.   Dentons also spent time drafting its Interim

Fee Application for the First Interim Period which summarized Dentons' contributions to the

Chapter 11 Cases.   No time sought in this Fee Application or any other previously-filed fee

application relates to the Fee Enhancement or preparation of the Fee Enhancement Motion.

h.  B185 – Assumption/Rejection of Contracts

Total Fees:       $143,221.00
Total Hours:      130.8

44.     During the Fee Period, Dentons expended time on analyzing leases and executory contracts and advised the Debtors in connection with deciding which contracts would be assumed or rejected.  Dentons also prepared rejection motions and dealt with creditor responses thereto, including numerous customer objections.  Dentons also responded numerous objections and related filings by licensees, including but not limited to demands for adequate protection, including preparation for and attendance at the omnibus hearing on related contested matters.

i.   B190 – Other Contested Matters

Total Fees:      $6,736.50
Total Hours:     5.5

45.     During the Fee Period, Dentons expended time addressing other contested matters which arose during the Fee Period, including but not limited to matters raised by Contemporary Amperex Technology Ltd., Sonic Systems and others, and corresponding with the Debtors' CRO and his staff at Uzzi & Lall coordinating and responding to disputes with foreign creditors.

j.   B195 – Non-Working Travel

Total Fees:      $215,859.75
Total Hours:     286.1

46.     During the Fee Period, Dentons professionals expended time traveling to and from the New York/New Jersey area to represent the Debtors in-person in multiple hearings before the Court, at the auction for the sale of substantially all of the Debtors' assets, and at hearings related to confirming the Joint DS and Plan.  At the inception of Dentons' engagement, the Debtors' fiduciaries explicitly requested that Van C. Durrer, II (based in California) head the team for the engagement due to his expertise and the fact that much of the Debtors' physical assets and headquarters were located on the West Coast.  Indeed, given the Debtors' significant operations in Australia and China and its relationships in Korea (where the Debtors' largest prepetition creditor is based), a West Coast presence was efficient.  As the engagement developed, the complexity

required that Dentons also staff the matter with its restructuring practice leader, Tania Moyron (also based in California).  This approach was ideal for the Debtors under the circumstances, but also occasioned travel between the Debtors' primary locations and the Court's location on the East Coast.  The Debtors' auction was conducted in New York to maximize the presence of bidders and key stakeholders which also occasioned travel.  Per the United States Trustee Guidelines, non-working travel was billed at 50% of regular hourly rates.

k.   B200 – Utilities

Total Fees:        $42,616.00
Total Hours:       44.4

47.    During the Fee Period, Dentons expended time preparing the Utility Motion to ensure utility providers continued to provide the Debtors' businesses necessary utilities and dealt with issues stemming from those efforts.  Notwithstanding the scope of the automatic stay and section 366 of the Bankruptcy Code, certain Canadian utilities threatened to shut off utility service to an office of a Canadian subsidiary of the Debtors.  Canadian attorneys of Dentons provided support in analyzing and securing effective relief to safeguard assets of the Debtors located in Canada.  Dentons professionals analyzed Canadian and U.S. law, communicated with the provider threatening to withhold services, and came to a resolution with that utility provider during the Fee Period.

l.   B220 – Employee Benefits/Pension

Total Fees:        $3,288.00
Total Hours:       2.5

48.    During the Fee Period, Dentons expended time addressing the termination of certain employee benefits and analyzing law related thereto.

26

m.  B230 – DIP Financing/Cash Collateral

Total Fees:        $588,316.50
Total Hours:       472.7

49.    During the Fee Period, Dentons devoted significant time to issues arising from the

Debtors' need for postpetition liquidity, including initial use of the prepetition lender's cash

collateral and then a new debtor-in-possession ("DIP") financing.  Dentons' services included

reviewing the Debtors' liquidity needs, analyzing cash-flow projections and budgets, evaluating

proposed lending terms, and assessing the legal and economic implications of cash collateral use

and the DIP facility and the terms of the related orders.  Dentons also examined proposed collateral

packages and adequate-protection terms to ensure compliance with the Bankruptcy Code and

preservation of estate value, as well as the interplay of the cash collateral and DIP financing orders.

50.    Dentons actively negotiated the terms of the cash collateral and DIP facility orders

with the prepetition lender and the proposed DIP lender, the Debtors, the Committee and other key

stakeholders.  In connection with these negotiations, Dentons reviewed and drafted multiple

iterations of the cash collateral order, interim and final DIP financing orders, DIP loan agreement,

supporting declarations, and related documents, such as the DIP Motion [Docket No. 120].  Unlike

most cases, the prepetition lender and DIP lender were not the same, so the financing matters were

more complex than typical.  It is also noteworthy that the Debtors had multiple, active bidders to

provide the DIP facility, and the prepetition lender debt was also purchased by a potential bidder

during the process, creating additional complexities.  Dentons also prepared for and participated

in hearings on cash collateral and DIP financing approval, including drafting objections or briefing

where necessary to address lien-priority issues, challenge rights, protections for creditors, and

other matters affecting the estates.

51.     Following entry of the DIP orders, Dentons continued to advise on the
implementation and administration of the cash collateral order and DIP facility.  This included
coordinating with financial advisors on budget compliance, reviewing draw requests and reporting
obligations, and interpreting DIP covenants as issues arose.  There was also significant work in
connection with documentation of the payment in full of the prepetition loan facility and DIP
facility with the proceeds of the sale to FlexGen.  Dentons' efforts were essential to securing and
maintaining postpetition liquidity and allowed the Debtors to operate their businesses and move
toward a value-maximizing sale transaction.

n.  B240 – Tax Issues

Total Fees:      $26,226.00
Total Hours:    19.2

52.     During the Fee Period, Dentons expended time analyzing tax-related issues and
preparing and filing the Tax Motion [Docket No. 99] which sought authority to pay certain
expenses, which the Court ultimately approved upon Dentons making certain revisions to the
proposed order on the Tax Motion.  Dentons also corresponded with the Texas Comptroller of
Public Accounts regarding an audit of the Debtors and analyzed law on that and other tax issues.

o.  B250 – Real Estate Leases

Total Fees:      $27,192.50
Total Hours:    18.5

53.     During the Fee Period, Dentons expended time corresponding with multiple
landlords, including the Debtors' landlord of their leased Tualatin, Oregon property, and
negotiating with their counsel.  Dentons also prepared motions to reject certain real estate leases
and corresponded with the Debtors' other professional advisors and parties in interest with regard
to the rejection motions.  Additionally, in the course of winding down operations in Canada, the
Debtors explored the potential of selling certain assets in Canada for value but also to mitigate

28

potential exposure due to decommissioning of battery systems located in Canada.  Canadian attorneys of Dentons provided support in this area.

p.  B260 – Independent Manager Matters

Total Fees:        $80,126.00
Total Hours:       54.3

54.    During the Fee Period, Dentons expended time advising the Debtors on corporate governance issues and the day-to-day management of their estates by preparing for and attending meetings held by the Debtors' CRO and his staff at Uzzi & Lall along with the Debtors' independent managers.   At such meetings, Dentons provided updates into the status of key pleadings and objections thereto, negotiations with the Project Group regarding that settlement, negotiations with FlexGen, Hitachi, and Mainfreight regarding each of the sales consummated during the Fee Period, and the Debtors' efforts to secure debtor in possession financing.  Dentons also regularly updated the independent manager and sought approval of major governance decisions, including the various sales and prosecution of the Plan.  Dentons also advised the CRO and independent manager on important decisions of corporate governance.

q.  B310 – Claims Administration and Objections

Total Fees:        $272,363.50
Total Hours:       234.5

55.    During the Fee Period, Dentons expended time responding to creditor inquiries regarding the likelihood of recovery on claims and analyzed law on defenses to reclamation notices sent to the Debtors by PureSky and others.   Furthermore, Dentons analyzed every claim for priority, secured, and administrative expenses and, to the extent those claims were mischaracterized, incorrectly filed, or invalid, spent considerable efforts negotiating with the holders of such claims to recharacterize or disallow those claims.  The Debtors, with Dentons' assistance, were successful in negotiating settlements of some of the most substantial claims filed

against their estates, such as the WARN claims and the claim of the Debtors' largest unsecured creditor.

56.    Dentons also, in conjunction with the CRO and his team, successfully negotiated with certain holders of incorrectly filed administrative expense claims for such creditors to amend incorrectly classified claims to general unsecured claims, obviating the need for the Debtors to prepare formal objections or incur further cost to the Debtors' estates. These considerable efforts involved numerous conferences with the CRO and various creditors as the Debtors and those creditors worked towards mutually beneficial resolutions relating to the claims. Dentons also drafted and reviewed multiple iterations of the settlement agreements with the Debtors' largest unsecured creditor and corresponded at length with counsel to those parties during the drafting process. To the extent efforts towards amicable resolutions of claims disputes failed during the Fee Period, Dentons also drafted numerous objections to claims and analyzed law regarding the reclassification of such claims to protect the Debtors' estates for the benefit of the Debtors and their creditors. To the extent such matters were not concluded before the Effective Date, Dentons transferred its analysis to the Liquidating Trustee.

r.   B320 – Plan and Disclosure Statement (incl. Business Plan)

Total Fees:       $889,959.50
Total Hours:      687.3

57.    During the Fee Period, Dentons expended time formulating and drafting the Joint DS and Plan and related motion, solicitation materials, order, and ancillary documents. The Debtors' Joint DS and Plan and the Plan Supplement resolved the Chapter 11 Cases on a consensual basis among the Debtors and the Committee and to memorialize the parties' substantial efforts at reaching such a resolution. To that end, the Joint DS and Plan included a comprehensive analysis of the Debtors' corporate structure, the Debtors' prepetition history, significant events in the

Chapter 11 Cases, and described much of the progress that had been made by the Debtors to that point.

58. Dentons prepared briefing in support of the Joint DS and Plan including a motion [Docket No. 915] and also analyzed and provided comment on the proposed forms of ballots, solicitation materials, related notices, and other documents. During the drafting process, Dentons analyzed various legal issues in connection with the Joint DS and Plan. As part of the Joint DS and Plan negotiation process, Dentons and the Committee spent considerable time in teleconferences and corresponding to negotiate the material terms of such documents in order to craft a chapter 11 plan that was acceptable to a wide variety of trade creditors, customers, and other parties in interest. Dentons also prepared a motion to extend the Debtors' exclusivity period to file a plan to avoid potential disruption from potential competing plans during the negotiation process.

59. Upon the filing of the Joint DS and Plan, Dentons then drafted and ultimately filed the Plan Supplement [Docket No. 1038] in order to provide adequate information on which creditors could base their vote on the Joint DS and Plan. Dentons also assisted in the preparation of the attendant documents to the Plan Supplement, including, among others, the Liquidating Trust Agreement, the Direct Claims Trust Agreement, the Liquidation Analysis, Schedules of Assumed Executory Contracts and Unexpired Leases and Retained Causes of Action, and documents which provided notice of certain settled claims. Dentons also drafted the Confirmation Order and coordinated with various parties in interest, including, among others, the United States Trustee, FlexGen, on the final language of such order.

60. Overall, the Joint DS and Plan was voted on by 203 parties, and 188 (92.6%) of those parties voted to accept the plan. Certain parties in interest, including the United States Trustee, however, submitted objections the Joint DS and Plan. Dentons and the Committee

expended considerable efforts collaborating on and filing the Response in Support of the Joint DS and Plan [Docket No. 1097] to address the various objections to the Joint DS and Plan. Dentons prepared for and attended the hearing on the Joint DS and Plan and objections thereto. The Court entered the Confirmation Order on December 1, 2025, and the Effective Date occurred on December 5, 2025.

      s.  CUST – Customer Issues

Total Fees:      $523,082.50
Total Hours:     409

    61.    During the Fee Period, Dentons prepared and filed, among other things, filed the Customer Programs Motion [Docket No. 15] and Rejection Motion [Docket No. 88] to address customer issues. The Customer Program Motion, which was approved by the Court, sought approval of the Long Term Service Agreements Program ("LTSA Program") in which the Debtors' proposed to reduce the scope of the services they provided to their customers at new price points designed to maximize cash flow. The Rejection Motion sought authority to reject all of the Debtors' Energy Supply Agreements, Long Term Service Agreements ("LTSAs"), and related contractual arrangements with customers because those contracts had become burdensome to the estates and no longer provided a net economic benefit. During the Fee Period, Dentons hosted a customer summit in Dallas, Texas, a centralized location among the customer base, to negotiate terms under the LTSA Program. The meeting allowed parties to present issues and lay the groundwork for negotiation throughout the Chapter 11 Cases and concluded with a written proposal to provide financing to the Debtors. Dentons also negotiated with and attempted to resolve disputes with numerous parties in interest that filed responses to the Rejection Motion. Two separate groups of the Debtors' customers filed motions [Docket Nos. 117 and 297] seeking to compel the Debtors to take certain actions related to intellectual property and for adequate

protection, one of which was submitted on an emergency basis which Dentons defended, and

Dentons negotiated with and prepared responses to those customer motions. Dentons also

prepared for and attended hearings before the Court in connection with the Customer Program

Motion, Rejection Motion, and motions filed by creditors in response thereto. In response to such

creditor motions, Dentons filed a response [Docket No. 1081] and engineered resolutions with

creditors that continued to object post-rejection regarding assignment of warranties, which the

Court approved at the Confirmation Hearing. In addition to the Confirmation Hearing which

involved customer issues, Dentons also prepared for and attended hearings before the Court in

connection with the Customer Program Motion and Rejection Motion. Both motions were

ultimately resolved on a consensual basis.

       t.   EMP – Employee Matters

Total Fees:       $463,956.40
Total Hours:     453

      62.    During the Fee Period, Dentons expended time addressing and resolving issues

related to employees of the Debtors' foreign affiliates and communicating with foreign experts to

resolve such issues. Prior to the Petition Date, the Debtors operated international affiliates in

Australia, Canada, China, Spain, and the United Kingdom, among others. Numerous and varied

questions of employment law arose in light of the many jurisdictions in which the Debtors operated

prepetition. Consistent with its Engagement Letter, Dentons involved certain of its member firms

and the Debtors' foreign employees, as needed or appropriate, to assess and respond to inquiries

submitted by foreign employees of the Debtors and assist the Debtors in determining how to

address such issues, including issues related to the outstanding amounts owed to such employees

under local employment laws (wages, severance, etc.), tax laws, and insolvency laws. Dentons'

efforts in this regard mitigated the potential for the wind-down of foreign operations and workforce to increase claims against the Debtors' estates.

63.     As is customary, an officer of the Debtors also served as a fiduciary for the Debtors overseas operations in Spain and Australia.  Labor laws in Spain and Australia impose potential liability on fiduciaries.  The Debtors therefore undertook to address employee and wind-down issues proactively in order to mitigate potential indemnification claims against the Debtors' estates. Dentons obtained the advice of its member firms in Spain and Australia to advise and assist in these areas to benefit the Debtors' estates.  Specifically, in Spain, Dentons assisted the Debtors in entering into a statutory negotiation process with employees, followed by a liquidation process. Such process included the necessity to hire local experts to consummate the process.  For example, the EUR 605 disbursement on invoice 426/24 was the fee for a technical expert report required for the collective dismissal undertaken by Powin Energy Spain, S.L. ("Powin Spain").  Additionally, the EUR 3,031.88 was the charge for the "Procuradores" (professionals) required for the representation of Powin Spain during the bankruptcy proceedings in Spain and is set by Spanish statute Royal Decree 434/2024. In Australia, Dentons' professionals advised the Debtors in connection with the settlement with the Project Group and an ensuing liquidation process.

64.     Dentons also prepared and filed the KERP/KEIP Motion [Docket No. 493], which was approved by the Court, and worked with the Committee and U.S. Trustee to resolve all issues related thereto before the hearing.  The relief obtained was critical for retaining and incentivizing employees to remain with the Debtors through the Chapter 11 Cases.

u.   INS – Insurance

Total Fees:       $15,086.50
Total Hours:      10.7

65.     During the Fee Period, Dentons expended time analyzing matters related to directors and officers insurance policy issues and questions of law related thereto.

v.   REP – Reporting/Schedules

Total Fees:      $231,754.50
Total Hours:     208.9

66.     During the Fee Period, Dentons expended time working closely with the Debtors and Uzzi & Lall in preparing and finalizing 12 sets of SOFAs and SOALs [Docket Nos. 414-437]—one set for each Debtor entity which filed in June 2025—and analyzing related documents and issues, including the Debtors' books and records, accounts receivable, inventory, contracts and leases, and interest in subsidiaries and affiliates.  Additionally, Dentons assisted in the preparation of monthly operating reports for each of the Debtors and assisted in the preparation of SOFAs and SOALs for Powin EKS SellCo, LLC and amended documents for other Debtors, as appropriate.

w.   WARN ACT – WARN Act Issues

Total Fees:      $74,504.5
Total Hours:     57.4

67.     During the Fee Period, Dentons advised the Debtors on the implications of the WARN Act and other termination-related matters.  Dentons prepared WARN notices for groups of the Debtors employees and identified relevant state and local officials based on the work location of each affected employee and prepared notices to those officials and communicated with the Debtors regarding those notices.  After the termination of employees pre-petition, Luis Santiago and Brian Palomino each filed a complaint against the Debtors on behalf of a class of WARN Act claimants, which Dentons assisted the Debtors to assess and then began negotiations on a mutually beneficial resolution to the claims asserted against the Debtors which resulted in the Debtors and WARN Act claimants filing the WARN Settlement Motion [Docket No. 1119] which was approved by the Court.

**Actual and Necessary Expenses Incurred by Dentons**

68.     As set forth in Section III above, Dentons has incurred a total of $66,092.12in expenses on behalf of the Debtors during the Fee Period.  These charges are intended to reimburse Dentons' direct operating costs, which are not incorporated into the Dentons hourly billing rates. Only clients who actually use services of the types set forth in the above Section III are charged for such services.  The effect of including such expenses as part of the hourly billing rates would impose that cost upon clients who may not require such services.  Dentons exercised billing judgment and did not submit every expense, particularly travel-related, in an effort to preserve estate resources.  In the exercise of billing judgment, Dentons also wrote off more than $223,000 in postpetition fees and expenses.

**Reasonable and Necessary Services Provided by Dentons**

**A.     Reasonable and Necessary Fees Incurred in Provided Services to the Debtors**

69.     The foregoing professional services provided by Dentons on behalf of the Debtors during the Fee Period were reasonable, necessary, and appropriate to the administration of these Chapter 11 Cases and related matters.

70.     Many of the services performed by partners and associates of Dentons were provided by Dentons' Restructuring Group.  Dentons has a prominent practice in this area and enjoys a national and international reputation for its expertise in financial reorganizations and restructurings of troubled companies.  The attorneys at Dentons have represented, among others, debtors, creditors' committees, and other stakeholders and have acted as special counsel in other large chapter 11 cases.

71.     In addition, due to the facts and circumstances of the Chapter 11 Cases, attorneys from Dentons' labor and employment, corporate, and tax groups were involved with Dentons

representation of the Debtors.  Overall, Dentons brings to the Chapter 11 Cases a particularly high level of skill and knowledge, which inured to the benefit of the Debtors and all stakeholders.

**B.**      **Reasonable and Necessary Expenses Incurred in Provided Services to the Debtors**

72.      The time constraints imposed by the circumstances of the Chapter 11 Cases required Dentons attorneys and other employees to devote substantial time including during evenings and on weekends and holidays to perform services on behalf of the Debtors.  These services were essential to meet deadlines, respond to inquiries from various creditors and other parties in interest on a timely basis, and satisfy the demands of the Debtors' businesses and ensure the orderly administration of their estates.  Furthermore, certain travel expenses were incurred by Dentons professionals when attending hearings before the Court.  Dentons' regular practice is not to include components for those charges in overhead when establishing billing rates, but rather to charge its clients for these and all other out-of-pocket disbursements incurred during the regular course of the rendition of legal services.

73.      In addition, due to the location of the Debtors' businesses, co-counsel, creditors, and other parties in interest in relation to Dentons' offices, frequent multi-party telephone conferences involving numerous parties were required. On some occasions, the circumstances of these Chapter 11 Cases required overnight delivery of documents and other materials.  The disbursements for such services are not included in Dentons' overhead for the purpose of setting billing rates and Dentons has made every effort to minimize its disbursements in these Chapter 11 Cases.  The actual expenses incurred in providing professional services were necessary, reasonable, and justified under the circumstances to serve the needs of the Debtors in these Chapter 11 Cases.

74.     Among other things, Dentons makes sure that all overtime meals, travel meals, hotel rates, and airfares are reasonable and appropriate expenses for which to seek reimbursement. Specifically, Dentons regularly reviews its bills to ensure that the Debtors are only billed for services that were actual and necessary and, where appropriate, prorates expenses.  In that regard, Dentons will waive certain fees and reduce its expenses if necessary.

**Dentons' Requested Compensation and Reimbursement Should be Allowed**

75.     Section 331 of the Bankruptcy Code provides for interim compensation of professionals and incorporates the substantive standards of § 330 of the Bankruptcy Code to govern the Court's award of such compensation.  Section 330 of the Bankruptcy Code provides that a court may award a professional employed under § 327 of the Bankruptcy Code "reasonable compensation for actual necessary services rendered . . . and reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1).  Section 330 also sets forth the criteria for the award of such compensation and reimbursement:

> In determining the amount of reasonable compensation to be awarded . . . the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
>
> (a) the time spent on such services;
>
> (b) the rates charged for such services;
>
> (c) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (d) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (e) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and expertise in the bankruptcy field; and

>    (f) whether the compensation is reasonable based on the customary compensation
>        charged by comparably skilled practitioners in cases other than cases under this
>        title.

11 U.S.C. § 330(a)(3).

76.    In determining the reasonableness of fees, courts routinely "employ the twelve

factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)."

*Staiano v. Cain (In re Lan Assocs. XI, L.P.)*, 192 F.3d 109, 123 (3d Cir. 1999); *see In re Redington*,

No. 16-18407, 2018 WL 6444387, at *8 (Bankr. D. N.J. Dec. 6, 2018) (applying the *Johnson*

factors).  These factors include: (1) the time and labor required; (2) the novelty and difficulty of

the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of

employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the

fee is fixed or contingent; (7) time limitations imposed by client or the circumstances; (8) the

amount involved and the results obtained; (9) the experience, reputation and ability of the

attorneys; (10) the undesirability of the case; (11) the nature and length of the professional

relationship with the client; and (12) awards in similar cases.  *Lan Assocs.*, 192 F.3d at 123 n.8.

77.    In addition, § 331 of the Bankruptcy Code provides that a debtor's attorney

employed under § 327 of the Bankruptcy Code may apply to the Court for interim compensation

not more than once every 120 days after an order for relief in a case under chapter 11.  *See* 11

U.S.C. § 331.

78.    In the instant case, Dentons devoted a substantial amount of time and effort to

addressing the numerous issues involved in the Chapter 11 Cases.  Dentons respectfully submits

that the services for which it seeks compensation in this Fee Application were, at the time rendered,

believed to be necessary to effectively represent the Debtors, and were performed economically,

effectively, and efficiently.  Because Dentons' services benefitted the Debtors' estates, Dentons

respectfully submits that it performed "actual and necessary" services compensable under § 330 of the Bankruptcy Code.

79.    Further, Dentons submits that consideration of the relevant factors enumerated in *Lan Assocs.*, 192 F.3d at 123 n.8, establishes that the compensation requested is reasonable in light of the nature, extent, and value of such services to the Debtor:

a.    *The Time and Labor Required*. The professional services rendered by Dentons on behalf of the Debtors have required the expenditure of substantial time and effort, as well as a high degree of professional competence and expertise, in order to address the many complex issues encountered by the Debtors in these cases with skill and dispatch. Dentons respectfully represents that the services rendered by it were performed efficiently, effectively and economically.

b.    *The Novelty and Difficulty of Questions*. These cases have presented numerous difficult questions of law arising from novel factual circumstances.    Among other novel and difficult questions, Dentons expended significant amounts of time addressing (i) numerous customer motions relating to expanding the scope of Section 365(n) of the Bankruptcy Code; (ii) the widespread foreign operations of the Debtors; and (iii) surety bond issues.

c.    *The Skill Required to Perform the Legal Services Properly*. Dentons believes that its recognized expertise in complex restructuring matters across industries, including large chapter 11 cases, contributes to the efficient and effective representation of the Debtors in these Chapter 11 Cases.

d.    *The Preclusion of Other Employment by Applicant Due to Acceptance of the Case*. Dentons' representation of the Debtors did not preclude its acceptance of new clients.    However, the complex issues that arose in these cases required attention on a continuing basis, requiring Dentons' professionals to commit significant portions of their time to the Chapter 11 Cases.

e.    *The Customary Fee*. The fees sought, other than the Fee Enhancement requested by separate motion, are based on Dentons' normal hourly rates for services of this kind.    Dentons respectfully submits that the hourly rates of its professionals are not unusual given the time expended in attending to the representation of the Debtors.    Dentons' hourly rates and the fees requested herein are commensurate with fees Dentons has been awarded in other chapter 11 cases, as well as with fees charged by other attorneys of comparable experience.

    f.    *Whether the Fee is Fixed or Contingent*. Not applicable.

    g.    *Time Limitations Imposed by Client or other Circumstances*. Not applicable.

    h.    *The Amount Involved and Results Obtained*. Dentons respectfully submits that the amount of fees for which compensation is sought is reasonable under the circumstances given the numerous, complex issues that had to be addressed during the Fee Period.

    i.    *The Experience, Reputation and Ability of the Attorneys*. Dentons is a professional association that practices extensively in the fields of, among many others, bankruptcy and corporate restructuring, litigation, real estate, tax, corporate, finance, and employment. Dentons has represented debtors, creditors, and numerous other parties in cases in various Bankruptcy Courts throughout the country.

    j.    *The Undesirability of the Case*. Not applicable.

    k.    *The Nature and Length of Professional Relationship*. Not applicable.

    l.    *Awards in Similar Cases*. As previously indicated, the fees sought herein are commensurate with fees Dentons and other firms have been awarded in other chapter 11 cases.

80.    Dentons respectfully submits that the services for which it seeks compensation in this Fee Application were, at the time rendered, necessary for and beneficial to the Debtors and their estates and were rendered to protect and preserve the Debtors' estates. Dentons further believes that it performed the services for the Debtors economically, effectively, and efficiently, and the results obtained benefited not only the Debtors, but also the Debtors' estates and the Debtors' constituents. Dentons further submits that the compensation requested herein is reasonable in light of the nature, extent, and value of such services to the Debtors, their estates, and all parties in interest.

81.    During the Fee Period, Dentons' hourly billing rates for attorneys ranged from $240 to $1,800. The hourly rates and corresponding rate structure utilized by Dentons in the Chapter 11 Cases are equivalent to the hourly rates and corresponding rate structure used by Dentons for restructuring, workout, bankruptcy, insolvency, and comparable matters, and similar complex

corporate, securities, and litigation matters, whether in court or otherwise, regardless of whether a

fee application is required. Dentons strives to be efficient in the staffing of matters.  These rates

and the rate structure reflect that such matters are typically national in scope and involve great

complexity, high stakes, and severe time pressures—all of which were present in these Chapter 11

Cases.

82.     Moreover, Dentons' hourly rates are set at a level designed to compensate Dentons

fairly for the work of its attorneys and paraprofessionals and to cover certain fixed and routine

overhead expenses.  Hourly rates vary with the experience and seniority of the individuals

assigned. These hourly rates are subject to periodic adjustments to reflect economic and other

conditions and are consistent with the rates charged elsewhere.

83.     In sum, Dentons respectfully submits that the professional services provided by

Dentons on behalf of the Debtors and their estates during these Chapter 11 Cases were necessary

and appropriate given the complexity of the Chapter 11 Cases, the time expended by Dentons, the

nature and extent of Dentons' services provided, the value of Dentons' services, and the cost of

comparable services outside of bankruptcy, all of which are relevant factors set forth in § 330 of

the Bankruptcy Code.   Accordingly, Dentons respectfully submits that approval of the

compensation sought herein is warranted and should be approved.

**Reservation of Rights and Notice**

84.     The Debtors have provided notice of this Fee Application to: (a) the U.S. Trustee;

(b) the Committee; (c) the office of the attorney general for each of the states in which the Debtors

operate; (d) the United States Attorney's Office for the District of New Jersey; (e) the Securities

and Exchange Commission; (f) the Internal Revenue Service; and (g) any party that has requested

notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  Pursuant to the

Administrative Fee Order, any party, other than the Notice Parties, that wishes to object to the Fee

42

Application, must file its objection with the Court, with a copy to Chambers and serve it on the affected professional and the Notice Parties so that it is actually received on or before February 9, 2026 at 4:00 p.m. (Prevailing Eastern Time).  In the event the Fee Application is opposed on any ground, Dentons reserves the right to seek approval of time charges and expenses written off in the exercise of billing judgment.

### No Prior Request

85.    No prior application for the relief requested herein has been made to this or any other court.

WHEREFORE, Dentons respectfully requests that the Court enter an order (a) approving and allowing the $1,472,096.90 in fees and $18,450.15 in reimbursement for actual and necessary expenses that Dentons incurred during the Second Interim Period; (b) finally approving and allowing the $6,008,151.15 in fees and $66,092.12 in reimbursement for actual and necessary expenses that Dentons incurred during the Fee Period; (c) authorizing and directing the Debtors to remit payment to Dentons for such fees and expenses; and (d) granting such other relief as is appropriate under the circumstances.

Dated: January 28, 2026

**DENTONS US LLP**

*/s/ Van C. Durrer, II*
Tania M. Moyron (admitted *pro hac vice*)
Van C. Durrer, II (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email: tania.moyron@dentons.com
        van.durrer@dentons.com

John D. Beck (admitted *pro hac vice*)
Sarah M. Schrag (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800

Email: john.beck@dentons.com
        sarah.schrag@dentons.com

- and -

**TOGUT, SEGAL & SEGAL LLP**
Frank A. Oswald (admitted)
550 Broad Street, Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email: frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email: altogut@teamtogut.com
        eblander@teamtogut.com

*Counsel to Debtors and Debtors in Possession*