**DENTONS US LLP**

Tania M. Moyron (admitted *pro hac vice*)
Van C. Durrer, II (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:  tania.moyron@dentons.com
           van.durrer@dentons.com

John D. Beck (admitted *pro hac vice*)
Sarah M. Schrag (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:  john.beck@dentons.com
           sarah.schrag@dentons.com

*Counsel for Debtors and*
*Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  altogut@teamtogut.com
           eblander@teamtogut.com

*Counsel for Debtors and*
*Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re:<br><br>Powin, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

**NOTICE OF JOINT MOTION OF DEBTORS'**
**PROFESSIONALS FOR ENHANCEMENT OF PROFESSIONAL FEES**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504]; (iii) PEOS Holdings, LLC [5476]; (iv) Powin China Holdings 1, LLC [1422]; (v) Powin China Holdings 2, LLC [9713]; (vi) Charger Holdings, LLC [5241]; (vii) Powin Energy Ontario Storage, LLC [8348]; (viii) Powin Energy Operating Holdings, LLC [2495]; (ix) Powin Energy Operating, LLC [6487]; (x) Powin Energy Storage 2, Inc. [9926]; (xi) Powin Energy Ontario Storage II LP [5787]; (xii) Powin Canada B.C. Ltd. [2239]; and (xiii) Powin EKS SellCo, LLC [9110].  The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

**PLEASE TAKE NOTICE** that on February 24, 2026 at 11:00 a.m. (EST), or as soon thereafter as counsel may be heard, Dentons US LLP, Togut, Segal & Segal LLP, and CBMN Advisors LLC d/b/a Uzzi & Lall will move (the "<u>Motion</u>") this Court for entry of an order, substantially in the form attached hereto as **<u>Exhibit D</u>**, approving a fee enhancement for these debtor professionals.

**PLEASE TAKE FURTHER NOTICE** that the Motion sets forth the relevant legal and factual bases upon which the relief requested should be granted.  A proposed order granting the relief requested in the Motion is also submitted with the Motion.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in the Motion shall: (a) be in writing; (b) state with particularity the basis of the objection; and (c) be filed with the Clerk of the United States Bankruptcy Court electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the *General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002* (the "<u>General Order</u>") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "<u>Supplemental Commentary</u>") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties in interest, on CD-ROM in Portable Document Format (PDF), and shall be served in accordance with the General Order and the Supplemental Commentary, so as to be received no later than seven (7) days prior to the hearing date set forth above.

**PLEASE TAKE FURTHER NOTICE** that if you do not want the court to grant this Motion, or if you want the court to consider your views, you or your attorney must file with the clerk at the address listed below, a written response explaining your position no later than 7 days prior to the hearing date.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Verita Global at https://www.veritaglobal.net/powin.  You may also obtain copies of any pleadings by visiting the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that unless objections are timely filed and served, the Motion will be decided on the papers in accordance with D.N.J. LBR 9013-3(d) and the relief requested may be granted without further notice or hearing.

*[Remainder of page left intentionally blank]*

Dated: January 28, 2026

**TOGUT, SEGAL & SEGAL LLP**

*/s/ Van C. Durrer, II*

Frank A. Oswald (admitted)
550 Broad Street, Suite 1508
Newark, NJ 07102
Tel:    (212) 594-5000
Fax:    (212) 967-4258
Email: frankoswald@teamtogut.com

Albert Togut (*pro hac vice*)
Eitan Blander (*pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Tel:    (212) 594-5000
Fax:    (212) 967-4258
Email: altogut@teamtogut.com
        eblander@teamtogut.com

- and –

**DENTONS US LLP**

Tania M. Moyron (*pro hac vice*)
Van C. Durrer, II (*pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Tel:    (213) 623-9300
Fax:    (213) 623-9924
Email: tania.moyron@dentons.com
        van.durrer@dentons.com

John D. Beck (*pro hac vice*)
Sarah M. Schrag (*pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Tel:    (212) 768-6700
Fax:    (212) 768-6800
Email: john.beck@dentons.com
        sarah.schrag@dentons.com

*Counsel for Debtors and Debtors in Possession*

**DENTONS US LLP**

Tania M. Moyron (admitted *pro hac vice*)
Van C. Durrer, II (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:  tania.moyron@dentons.com
            van.durrer@dentons.com

John D. Beck (admitted *pro hac vice*)
Sarah M. Schrag (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:  john.beck@dentons.com
            sarah.schrag@dentons.com

*Counsel for Debtors and*
*Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**

Frank A. Oswald (admitted)
550 Broad Street
Suite 1508
Newark, NJ 07102
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  frankoswald@teamtogut.com

Albert Togut (admitted *pro hac vice*)
Eitan Blander (admitted *pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  altogut@teamtogut.com
            eblander@teamtogut.com

*Counsel for Debtors and*
*Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>Powin, LLC, *et al.*,[1]<br><br>          Debtors. | Chapter 11<br><br>Case No. 25-16137 (MBK)<br><br>(Jointly Administered) |

## JOINT MOTION OF DEBTORS'
## PROFESSIONALS FOR ENHANCEMENT OF PROFESSIONAL FEES

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  (i) Powin Project LLC [1583]; (ii) Powin, LLC [0504]; (iii) PEOS Holdings, LLC [5476]; (iv) Powin China Holdings 1, LLC [1422]; (v) Powin China Holdings 2, LLC [9713]; (vi) Charger Holdings, LLC [5241]; (vii) Powin Energy Ontario Storage, LLC [8348]; (viii) Powin Energy Operating Holdings, LLC [2495]; (ix) Powin Energy Operating, LLC [6487]; (x) Powin Energy Storage 2, Inc. [9926]; (xi) Powin Energy Ontario Storage II LP [5787]; (xii) Powin Canada B.C. Ltd. [2239]; and (xiii) Powin EKS SellCo, LLC [9110].  The Debtors' mailing address is 20550 SW 115th Avenue Tualatin, OR 97062.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Each of Dentons US LLP ("Dentons") and Togut, Segal & Segal LLP ("Togut"), co-counsel to the above-captioned chapter 11 debtors and debtors in possession (the "Debtors"); and CBMN Advisors LLC d/b/a Uzzi & Lall ("U&L"), the Debtors' Chief Restructuring Officer (together with Dentons and Togut the "Debtors' Professionals"), by this *Joint Motion of Debtors' Professionals for Enhancement of Professional Fees* (this "Motion"), hereby move this Court for entry of an order, substantially in the form attached hereto as **Exhibit D**, for approval and allowance of a fee augmentation (the "Fee Enhancement") in an amount intended to compensate each Debtor Professional for the exceptional result reached in these chapter 11 cases (the "Chapter 11 Cases"). The amount sought is equal to what could not be paid for the work that was required to prepare the Debtors to be able to file their Chapter 11 cases -- and no more. All that is being sought is enough to make the Debtor's Professionals whole. Specifically, the Debtors' Professionals request $651,500.64 in the aggregate, approximately $149,000 of which can be satisfied by the surplus held in the professional fee reserve.

In further support of the Motion, the Debtors' Professionals submit the *Declaration of Van C. Durrer, II in Support of Joint Motion of Debtors' Professionals for Enhancement of Professional Fees* (the "Durrer Declaration") as **Exhibit A**, the *Declaration of Gerard Uzzi in Support of Joint Motion of Debtors' Professionals for Enhancement of Professional Fees* (the "Uzzi Declaration") as **Exhibit B**, and the *Declaration of Frank A. Oswald in Support of Joint Motion of Debtors' Professionals for Enhancement of Professional Fees* (the "Oswald Declaration") as **Exhibit C** and respectfully state as follows:

2

# I.    **PRELIMINARY STATEMENT**

1.      On June 9, 2025 (the "Petition Date"),[2] the Debtors filed voluntary petitions for relief under title 11 of the United States Code, §§ 101-1532 (the "Bankruptcy Code").  As of the Petition Date, the Debtors were in free fall and suffering from multiple inter-related issues, including a severe liquidity crisis, and yet emerged from chapter 11 a day less than six months later under a confirmed and fully funded, consensual chapter 11 plan, as described in more detail below.

2.      At the time each of the Debtors' Professionals were retained, there was a real danger that these Debtors would be forced to file chapter 7 and liquidate their assets, to the detriment of the Debtors' secured and unsecured creditors.  The Debtor's Professionals were retained on the eve of bankruptcy when the Debtors had insufficient funds to pay them.  In a very real sense, they came to the Debtors' aid.  They believed that they could help the Debtors due to their experience and skill.

3.      Through the exceptional efforts of the Debtors' Professionals, the Debtors not only were able to pursue chapter 11 rather than a liquidation, but were able to confirm a consensual plan after consummating three value-maximizing transactions for the sale of substantially all of the Debtors' assets.  Secured creditors were paid in full and unsecured creditors are likely to see a meaningful recovery.  Indeed, there was never a contested matter with the Official Committee of Unsecured Creditors (the "Committee"), nor hardly at all with any party. The Debtors' Professionals do not suggest that they alone were responsible for the successful outcome of this case.  Among others, this Court's willingness to accommodate hearings when they were needed,

---

[2] Powin Project LLC filed for voluntary relief under Chapter 11 of the Bankruptcy Code on June 9, 2025.  Powin Canada B.C. Ltd., Powin Energy Ontario Storage II LP, and Powin Energy Storage 2, Inc., filed on June 22, 2025, Powin EKS SellCo, LLC filed on October 10, 2025, and the remaining Debtors filed on June 10, 2025.

the Debtors' employees and managers, the Debtors' other professionals, the members of and advisors to the Committee, and the United States Trustee all contributed to and made the successful outcome possible. However, by any measure, these are exceptional results nonetheless, reached in large part due to the considerable efforts of, and risks undertaken by, the Debtors' Professionals. As such, the Debtors' Professionals respectfully request that the Court grant this Motion.

## II.    OVERVIEW OF THE BANKRUPTCY CASES

### A.  Circumstances Leading to the Filing of the Chapter 11 Cases

4.    Prior to the Petition Date, the Debtors operated as a leading energy storage integrator at the forefront of the clean energy revolution, based in Portland, Oregon, and with operations around the world in Vietnam, China, Canada, Australia, and Spain. The Debtors focused their business on advancing the next frontier of energy by ensuring access to clean, reliable, resilient, and affordable power through cutting-edge technology. The Debtors' business model targeted innovations in energy storage, which are essential to the planet's transition to a sustainable, carbon-free world.

5.    At a high level, the Debtors' business model had two lines of business: (i) the engineering and installation of battery energy storage systems ("BESS"), which were governed by various energy supply agreements (each, an "ESA"); and (ii) the warranties, servicing and maintenance of battery energy storage systems, which were governed by various long term servicing agreements (each, an "LTSA"). To implement the Debtors' business plan, the Debtors entered into these ESAs and LTSAs with their customers, and then used suppliers and vendors to support performance under the ESAs and LTSAs. Indeed, as of immediately prior to the Petition Date, the Debtors were installing a BESS in the largest solar energy plant in the world in Australia and separately managed an approximate twenty percent (20%) market share in the LTSA business line worldwide.

6.      The Debtors commenced the Chapter 11 Cases as a result of certain historical challenges to the Debtors' business, including severe liquidity constraints, an extreme overdependence on trade credit, increasing assertions of liquidated damages entitlements by customers aggrieved by alleged performance delays, and damaged credibility with customers.  The Debtors commenced the Chapter 11 Cases in order to, among other things, pursue a value-maximizing sale process for their assets.

7.      As of the Petition Date, the outstanding secured obligations under a certain loan agreement were no less than $25,612,281.51, plus other fees, expenses, and other obligations owed under the Prepetition Loan Documents.  Further, the Debtors estimated that unsecured claims against the Debtors were over $350,000,000, including: (i) accrued and unpaid amounts owed to the Debtors' trade vendors and customers and other unsecured debt incurred in the ordinary course of the Debtors' business; and (ii) certain then ongoing or threatened litigation claims.  The Debtors had also reduced their workforce precipitously in the weeks leading up to the Petition Date and so incurred substantial potential liabilities which former employees ultimately asserted (the "WARN Claims") [Adv. Proc. 25-01249-MBK].

**B.  Filing of the Chapter 11 Cases**

8.      In light of the foregoing, on the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Dentons, with Togut's and U&L's support, filed numerous 'first day motions'.[3]  Crucially, the Debtors' Professionals also assisted the Debtors with the *Motion of the Debtors for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; (IV) Scheduling*

---

[3] Docket Nos. 3, 7, 8, 9, 11, 12, 99, 112.

*a Final DIP Hearing; and (V) Granting Related Relief* [Docket No. 120] (the "<u>DIP Motion</u>") and

the *Motion of the Debtors for Entry of Order (I) Approving Key Employee Retention Plan and Key*

*Employee Incentive Plan and (II) Granting Related Relief* [Docket No. 493] (the "<u>KERP/KEIP</u>

<u>Motion</u>").   The Debtors filed the DIP Motion in order to obtain critical liquidity necessary to

continue operations and sought, among other things, authorization and approval of the DIP Facility

(as defined in the DIP Motion) with up to $27.5 million in new money borrowing capacity.   The

Debtors filed the KERP/KEIP Motion to secure the authority to retain key employees during the

Chapter 11 Cases.   The Court ultimately approved the DIP Motion [Docket No. 520] and the

KERP/KEIP Motion [Docket No. 665].

9.      In advance of the filing of the DIP Motion, the Debtors only source of liquidity for

funding their Chapter 11 Cases consisted of precious-little cash collateral.   As a consequence,

among the first day filings, the Debtors' Professionals launched and obtained final approval on the

first day of the Debtors' new customer program as an interim measure to finance these Chapter 11

Cases, as described in the Debtors' *Motion of the Debtors for Entry of an Order (I) Authorizing*

*the Debtors to Enter into New Customer Program with Existing Customers and (II) Granting*

*Related Relief* [Docket No. 15] (the "<u>Customer Program Motion</u>").   Approval of the Customer

Program Motion was necessary to avoid a liquidating transaction and avoid enormous harm to the

Debtors.   The Court approved the Customer Program Motion on June 13, 2025 [Docket No. 62].

In the week following the approval of the Customer Program Motion, the Debtors' Professionals

hosted a customer summit at Dentons' Dallas offices, attended by approximately one hundred

(100) customer representatives (both in person and virtually), and such summit yielded a written

proposal for customer financing of these Chapter 11 Cases.

10.     These first day filings, and the DIP Motion, allowed the Debtors to fund their Chapter 11 Cases and satisfy requirements related thereto while continuing to operate their businesses as debtors in possession.

**C. Sales Processes**

11.     The Debtors commenced these Chapter 11 Cases in order to, among other things, engage in a value-maximizing sale process for their assets.  To that end, on July 1, 2025, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Designating a Stalking Horse Bidder and Approving Stalking Horse Bidder Protections, (II) Approving Bidding Procedures By Which Interested Parties May Bid and an Auction Sale Format in Connection With the Sale of Substantially All of the Debtors' Assets; (III) Approving Form of Asset Purchase Agreement, (IV) Approving Form of Notice to be Provided to Interested Parties, (V) Authorizing the Assumption and Assignment of Assumed Contracts and Notice Procedures Thereto, (VI) Scheduling a Court Hearing to Consider Approval of the Sale to the Highest and Best Bidder, and (VII) Authorizing the Sale of the Debtors' Property Free and Clear of all Causes of Action and Claims* [Docket No. 228] (the "Bidding Procedures Motion"), which the Bankruptcy Court granted through entry of the Bidding Procedures Order on July 17, 2025.  In accordance therewith, on July 30, 2025, the Debtors conducted an auction of their assets after receiving three qualified bids, all as more detailed in the *Notice of Winning Bidders* [Docket No. 591] ("Notice of Winning Bidders") filed by the Debtors on July 31, 2025.  Upon the conclusion of the auction, the Debtors filed the Notice of Winning Bidders announcing the winning bidders for their assets, as more fully detailed therein. The transactions contemplated thereunder are outlined below.

    i.     Mainfreight Sale

12.     Pursuant to that certain bill of sale made in favor of Mainfreight Distribution Pty Ltd. ("Mainfreight") by the Debtors ("Mainfreight Bill of Sale"), attached as Exhibit A to the

Notice of Winning Bidders, the Debtors agreed to sell certain of its assets, described on Exhibit A to the Mainfreight Bill of Sale, constituting collateral of Mainfreight to Mainfreight via credit bid in the amount of $3,000,000.00 (the "Mainfreight Sale").  On August 8, 2025, the Bankruptcy Court entered an order approving the Mainfreight Sale [Docket No. 592].

ii.    FlexGen Sale

13.    Pursuant to that certain asset purchase agreement by and between FlexGen Power Systems, LLC ("FlexGen") and the Debtors ("FlexGen APA"), attached as Exhibit B to the Notice of Winning Bidders, the Debtors agreed to sell the Purchased Assets, as defined in the FlexGen APA, to FlexGen for a purchase price of $36,000,000, comprised in FlexGen's discretion of a credit bid and cash, assumption by FlexGen of certain liabilities described in the FlexGen APA, and the Retention Fund, as defined in the FlexGen APA (the "FlexGen Sale").  On August 18, 2025, the Bankruptcy Court entered an order approving the FlexGen Sale [Docket No. 751], and the FlexGen Sale closed thereafter on August 19, 2025.

iii.    EKS Sale

14.    Pursuant to that certain Sale and Release Agreement by and between Hitachi Energy Ltd., Hitachi Energy Power Conversion Solutions (together with Hitachi Energy Ltd., "Hitachi"), Powin, LLC, and Powin EKS Sellco, LLC (together with Powin, LLC, the "Powin Parties") ("EKS Sale Agreement"), attached as Exhibit C to the Notice of Revised Order Approving Sale of Shares in EKS Holdco LLC and Filing of Release and Sale Agreement [Docket No. 649], the Powin Parties agreed to enter into a comprehensive transaction with Hitachi, whereby Hitachi would acquire the Remaining Units, as defined in the EKS Sale Agreement, from Powin EKS Sellco, LLC and receive certain releases from the Powin Parties, as described in the EKS Sale Agreement, in exchange for providing the Powin Parties with a fixed sum of $15,000,000 (the

8

"EKS Sale"). On August 8, 2025, the Court entered an order approving the EKS Sale [Docket No. 691].

**D. The Plan**

15.     The Debtors' Professionals, in conjunction with the Official Committee of Unsecured Creditors and its retained professional advisors (the "Committee") focused their efforts on confirming a chapter 11 plan of liquidation after the aforementioned sales closed. On October 15, 2025, the Debtors' Professionals and the Committee filed the *Joint Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Powin, LLC and Affiliates Thereof and the Official Committee of Unsecured Creditors* [Docket No. 942] (the "Plan").

16.     On December 1, 2025, the Court entered the *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Joint Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Powin, LLC and Affiliates Thereof and the Official Committee of Unsecured Creditors* [Docket No. 1165] (the "Confirmation Order"). On December 5, 2025, the Debtors filed the *Notice of (I) Confirmation and Effective Date of the Joint Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Powin LLC and Affiliates Thereof and the Official Committee of Unsecured Creditors and (II) Deadlines Under the Plan and Confirmation Order to File Administrative Claims, Professional Fee Claims, and Rejection Claims* (the "Effective Date Notice") [Docket No. 1187]. As set forth in the Effective Date Notice, the Plan went effective on December 5, 2025 (the "Effective Date").

17.     At the inception of these Chapter 11 Cases, and as authorized by the Court, the Debtors established a professional fee reserve (the "Professional Fee Reserve"). The Professional Fee Reserve was funded from time to time based on estimates provided in good faith by the Debtors' Professionals and the advisors to the Committee. As provided in the Plan, the CRO has

9

retained control of the Professional Fee Reserve.  As of the date of this Motion, the Professional

Fee Reserve has an estimated surplus of approximately $149,000.

18.     Prior to confirmation and the Effective Date, the Debtors' Professionals worked to

reconcile numerous claims filed against the Debtors and were successful in reaching consensual

resolutions of certain substantial claims, including, among others, the largest unsecured claim and

priority WARN Claims asserted in that certain adversary proceeding commenced on the petition

date.  Moreover, given the continued liquidity constraints the Debtors faced, the Debtors'

Professionals also successfully negotiated deferrals of certain administrative and priority claims

which deferral was essential for confirmation of the Plan.  For the avoidance of doubt, in the event

that the Motion is granted, the proposed form of order provides that the Debtors' Professionals

will not receive payment from the Liquidating Trust for any amounts in excess of the remaining

funds in the Professional Fee Reserve until such deferred creditors also receive payment of their

administrative and priority claims from the Liquidating Trust.

19.     Additionally, the Debtors' Professionals developed a novel approach to retrieve

eight million dollars ($8,000,000) of excess collateral from certain surety providers in order to

strengthen the liquidity of the liquidating trust to be established under the Plan.  Absent the

Debtors' Professionals filing the *Debtors' Motion for Entry of an Order (I) Estimating the Claims*

*of New York Marine & General Insurance Company and Avalon Risk Management Insurance*

*Agency, LLC at $0; (II) Directing the Turnover and Use of Excess Cash Collateral to be*

*Distributed Pursuant to the Plan; (III) Approving a Procedure for Consensually Resolving Surety*

*Claims and (IV) Related Relief* [Docket No. 1018] (the "Surety Bond Motion"), it could potentially

have taken years for such funds to be returned to the liquidating trust under the Plan.  Such relief

was granted by the Court [Docket No. 1155] without opposition, coincident with confirmation of the Plan.

20.    Finally, the Debtors negotiated a settlement of the WARN Claims alleged in the Adversary Proceeding which obviated the need for lengthy, complicated litigation which would have been costly to the Debtors' estates.

## III.    RETENTION AND ROLES OF THE FIRMS

21.    On July 5, 2025, the Debtors filed the *Debtors' Application for Entry of an Order (I) Authorizing the Debtors to Employ and Retain Uzzi & Lall to Provide the Debtors and Chief Restructuring Officer and Certain Additional Personnel, (II) Designating Gerard Uzzi as Chief Restructuring Officer for the Debtors Effective as of the Petition Date, and (III) Granting Related Relief* [Docket No. 268] (the "U&L Retention Application"), seeking authorization for the Debtors to employ U&L to provide the Debtor with a Chief Restructuring Officer and other personnel pursuant to sections 105(a) and 363(b) of the Bankruptcy Code. The Debtors' engagement letter with U&L which was attached to the U&L Retention Application as Exhibit C [Docket No. 268-3] (the "U&L Engagement Letter") provided, in pertinent part: "[I]f we achieve an extraordinary result for you, we reserve the right to seek additional fees, subject to the approval of the Independent Manager and the Bankruptcy Court." U&L Engagement Letter, p. 3. The Court granted the U&L Retention Application on August 8, 2025 [Docket No. 690].

22.    On July 7, 2025, the Debtors filed the *Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Dentons US LLP as Counsel for the Debtors and Debtors in Possession, Effective as of the Petition Date* [Docket No. 277] (the "Dentons Retention Application"), seeking to retain and employ Dentons as its bankruptcy co-counsel pursuant to section 327 of the Bankruptcy Code. The Debtors' engagement letter with Dentons, which was

11

attached to the Dentons Retention Application as Exhibit D (the "Dentons Engagement Letter"),

provided, in pertinent part:

> If this engagement results in one or more transactions or a direct economic benefit to the Client, with your concurrence as provided below, our fee would reflect a variety of factors. These factors include our hourly time charges, as noted above, the overall benefit to the Client of such transactions, the Client's subjective appraisal of our contribution to such transactions, the cost-control and efficiency exercised in our execution of the engagement, the personal contribution of our partners coordinating and managing the engagement, our success in collaboration with the Client's management and integration with the Client's legal staff and co-counsel and the view of the Client.

Dentons Engagement Letter, p. 1.  The Court granted the Dentons Retention Application on August

19, 2025 [Docket No. 753].

23.      Also on July 7, 2025, the Debtors filed the *Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Togut, Segal & Segal LLP as Co-Counsel to the Debtors Nunc Pro Tunc to the Petition Date* [Docket No. 276] (the "Togut Retention Application"), seeking to retain and employ Togut as its bankruptcy co-counsel pursuant to section 327 of the Bankruptcy Code.  The Debtors' engagement letter with Togut, which was attached to the Togut Retention Application as Exhibit 1 (the "Togut Engagement Letter"), provided, in pertinent part: "As with any Chapter 11 case, there is a risk to us and if we achieve an extraordinary result for you, we reserve the right to seek additional fees, subject to the Independent Manager's and Bankruptcy Court approval."  Togut Engagement Letter, p. 2.  The Court granted the Togut Retention Application on August 1, 2025 [Docket No. 596].

24.      More detailed descriptions of the services provided by Dentons, Togut, and U&L are set forth in each such Debtor Professionals' final fee applications and declarations in support thereof (the "Final Fee Applications") or monthly fee statements, as applicable.  Given the extreme condition of the Debtors immediately before the Petition Date, as well as the substantial risk undertaken by the Debtors' Professionals in connection with their engagement with the Debtors,

this opportunity for a fee enhancement was an express term of the Debtors' Professionals engagement with the Debtors.

## IV.     REQUESTED FEE ENHANCEMENT

25.     As set forth in the Final Fee Applications, the Debtors' Professionals are seeking final approval and allowance of fees and expenses pursuant to Section 330 of the Bankruptcy Code.

26.     By this Motion, the Debtors' Professionals respectfully request that the Court enhance the fees awarded to each Debtor Professional pursuant to the separately filed Final Fee Applications by awarding the Fee Enhancement request by each Debtor Professional herein. Specifically, and as detailed in the accompanying Declarations, the Debtors' Professionals seek the following Fee Enhancement: Dentons in the amount of $323,636.65; U&L in the amount of $280,000.00; and Togut in the amount of $47,864.00.   The amount of the proposed fee enhancement, in the case of each professional, is equivalent to the amount that each professional waived due to the need to accelerate the filing of these Chapter 11 Cases and the severe liquidity constraints the Debtors suffered at the time.   John Brecker, the independent manager of the Debtors, has approved the proposed fee enhancement.

## V.     THE FEE ENHANCEMENT IS APPROPRIATE UNDER APPLICABLE LAW

### A. The Lodestar Method

27.     Section 330 of the Bankruptcy Code governs the compensation that may be awarded to professional persons employed under Section 327.   11 U.S.C. § 330.   Section 330(a) provides in pertinent part:

(a) (1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a ... professional person employed under section 327 or 1103—

(A) reasonable compensation for actual, necessary services rendered by the ... professional person, or attorney and by any paraprofessional person employed by any such person; and

(B) reimbursement for actual, necessary expenses.

...

(3) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a).

28.     To determine whether such compensation is "reasonable," consideration of the first two factors listed under section 330(a)(3), the time spent and the rate charged, or "lodestar," is ordinarily presumed to be a reasonable fee. *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 856 (3d Cir. 1994). To calculate the lodestar, "a court first establishes a reasonable hourly rate (corresponding to the value of the services and the cost of comparable services in § 330(a)(1)) for each set of compensable services (corresponding to the nature of the services in § 330(a)(1)), and then multiplies each rate by the reasonable number of hours of compensable work included in each respective set (corresponding to the time and extent of the services in § 330(a)(1))." *In re Busy Beaver*, 19 F.3d at 849 n. 21. The hourly billing rate must be reasonable for the geographical area, the work accomplished and the attorney's experience. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005). In considering the nature, extent and value of the services rendered, and in addition

to the lodestar calculation, the bankruptcy court is directed to consider, among other factors, the

benefit of the services to the estate, the complexity of the task, and a comparison with rates charged

in the nonbankruptcy market.  *In re Busy Beaver*, 19 F.3d at 853–54.

29.    The compensation requested by the Debtors' Professionals by their Final Fee

Applications and monthly fee statements reflect fair and reasonable compensation for the work

accomplished by them during these Chapter 11 Cases.

### B.  Fee Enhancements Beyond the Lodestar Figure are Allowable

30.    Section 330 does not contain an express authorization to award a fee enhancement

and that the lodestar method is the typical method for a bankruptcy court to assess whether a fee

award is proper; however, courts have nonetheless found authority for the use of enhancements

and/or bonuses to award a reasonable fee under Section 330.  *In re THCR/LP Corp.*, No. 04-

46898/JHW, 2008 WL 3194056 at *7 (Bankr. D. N.J. Aug. 1, 2008).  In finding such authority,

courts have looked to decisions rendered in non-bankruptcy fee-shifting, where the losing side

pays the attorney's fees for the winning side, and common fund cases, where one party creates a

fund that will be used to pay claimants.  *Id.*; *see also In re Blue Coal Corp.*, 206 B.R. 721, 727

(Bankr. M.D. Pa. 1997) ("enhancements for bankruptcy representation is likely to require

considerations of factors utilized in both common fund and fee-shifting cases"); *In re UNR Indus.,*

*Inc.*, 986 F.2d 207, 209 (7th Cir. 1993) ("Although bankruptcy situations certainly share many

attributes of common fund cases ... courts have viewed fee-shifting statutes as providing a more

suitable analogy.").  "Bankruptcy courts have often cited [] Supreme Court fee-shifting cases to

award counsel fee enhancements under section 330 in those rare cases where exceptional success

has been achieved."  *In re THCR/LP Corp.*, 2008 WL 3194056 at *8.

31.     Courts in this circuit have awarded fee enhancements when the facts supported such an enhancement.  *See In re Covad Comms. Group, Inc.*, 292 B.R. 31, 32 (D. Del. 2003) (awarding $1 million fee enhancement where the Bankruptcy Court had commented on the "remarkable" result reached in the Debtors' cases); *In re THCR/LP Corp.*, 2008 WL 3194056 at *9-11 (awarding fee enhancement because of the "enormous success" achieved with the assistance of Debtors' counsel); *LTL Mgmt., LLC v. Houlihan Lokey Capital, Inc.*, 2024 WL 5264295 (D. N.J. Dec. 31, 2024) (affirming bankruptcy court award of a 'discretionary fee' to the debtors' investment banker which was allowable under the applicable engagement letter where the bankruptcy court determined such an award would be appropriate).  Indeed, even in cases where courts have denied enhancement requests, they acknowledge that fee enhancements are allowable but simply improper under the circumstances at issue.  *See, e.g., In re Brous*, 370 B.R. 563 (Bankr. S.D.N.Y. 2007) (denying enhancement because the chapter 7 trustee did not demonstrate that the case called for an enhancement of the lodestar); *In re Meronk*, 24 Fed. Appx. 737 (9th Cir. 2001) (denying enhancement where firm failed to provide specific evidence why lodestar alone was not reasonable); *In re Chewning & Frey Security, Inc.*, 328 B.R. 899, 916 (Bankr. N.D. Ga. 2005) (the court found "nothing remarkable nor any unique issues or unforeseen obstacles" and no other factors sufficient to justify an adjustment).

32.     The Court therefore has the ability to award a fee enhancement to the Debtors' Professionals and should do so in these Chapter 11 Cases, as set forth in greater detail below.

16

**C.  A Fee Enhancement is Appropriate in these Chapter 11 Cases**

i.    <u>The Chapter 11 Cases Achieved an Exceptional Result with the Assistance of the Debtors' Professionals</u>

33.     The Debtors were in a precarious position both prior to and just after the Petition Date and the assistance of the Debtors' Professionals made it possible for the Debtors to reach chapter 11 and avoid a liquidation and successfully confirm the Plan.

34.     As set forth more fully in the *Declaration of Gerard Uzzi in Support of Emergency First Day Motions of the Debtors* [Docket No. 13] (the "<u>First Day Declaration</u>"), in the months leading up to the Petition Date, the Debtors suffered from numerous issues which limited their ability to continue operating as a going concern and, ultimately, the Debtors' prepetition agent terminated all commitments with the Debtors and declared all loans immediately due and payable and exercised its right to appoint an independent manager over the lead debtor.  Gerard Uzzi, in conjunction with U&L, then negotiated with the prepetition agent to relend $6.25 million and release substantial cash in order to allow Dentons and U&L to assess the options available to the Debtors.  On the Petition Date, the Debtors' Professionals successfully negotiated with certain prepetition lenders and the prepetition agent to forbear from exercising their rights to direct the prepetition agent from directing certain disbursements.  In addition to these efforts, the Debtors' Professionals, in order to help the Debtors reach chapter 11 and avoid liquidation, each waived certain of their fees and expenses.  As noted above, these waived professional fees are equivalent to the amount of the requested Fee Enhancement.

35.     After the Petition Date, the Debtors' Professionals continued obtaining significant results for the Debtors.  Among other things, the Debtors were able to: (i) negotiate the use of cash collateral, without which the Debtors would not have been able to stabilize and rehabilitate their businesses while negotiating sale transactions; (ii) negotiate a rare junior DIP facility which the

17

Court approved pursuant to the DIP Motion; (iii) consummate three sales for substantially all of the Debtors' assets, as discussed above; (iv) repay the Debtors' secured creditors in full; and (v) successfully prosecute to confirmation a joint plan of liquidation with the Committee, which has since gone effective and will likely result in a meaningful return to unsecured creditors who otherwise were unlikely to see any recovery whatsoever if these Debtors had been forced to file for chapter 7 relief instead of chapter 11.

36.     Additionally, each of the Debtors' Professionals' engagement letters also explicitly acknowledged that the Debtors' Professional may be entitled to a fee enhancement in the event that the Debtors achieve an extraordinary result in the Chapter 11 Cases.  As such, the engagement letters, which were approved by the Court, demonstrate that the Debtors agreed to a departure from the lodestar method in the event of an outstanding result.  The Debtors' Professionals respectfully submit that the results obtained in these Chapter 11 Cases were indeed exceptional and a departure from lodestar is proper.  Indeed, at the hearing on confirmation of the Plan, this Court noted that this case was a "model" for other similarly situated chapter 11 cases.  Before the involvement of the Debtors' Professionals, the Debtors were headed towards liquidation, to the detriment of all parties in interest.  The outstanding work of the Debtors' Professionals allowed the Debtors the liquidity and time, needed to proceed through chapter 11 and the Debtors' Professionals' services were essential to the Debtors' success.

ii.     Efficient Resolution of Complex Legal Issues

37.     The Chapter 11 Cases posed many complex legal questions, each of which was efficiently resolved by the Debtors' Professionals in conjunction with other parties in interest. Among other complicated issues, the Debtors' Professionals addressed numerous customer motions relating to Section 365(n) of the Bankruptcy Code which the Debtors' Professionals worked diligently to resolve without the need for extensive litigation, a class action filed by the

WARN class which was ultimately amicably resolved after considerable negotiations between the parties, the complicated winding-down of the Debtors' foreign operations and related issues of foreign employment law in numerous foreign jurisdictions, and surety bond disputes. Despite these complicated legal issues, the Debtors were able to confirm the Plan within six months of the Debtors' "freefall" filing.

       iii.    <u>Skill and Experience of the Debtors' Professionals</u>

38.    Each of the Debtors' Professionals are well-regarded professional firms that have considerable experience representing major constituencies in complex chapter 11 proceedings. The Debtors' Professionals submit that they have exhibited unique skills and achieved extraordinary results in guiding the Debtors through the Chapter 11 Cases, as set forth above in detail. Finally, the Debtors' independent manager does not object to the relief sought herein. The Debtors advised the Liquidating Trustee of this request for relief in advance of filing the Motion. Based on the foregoing, the Debtors' Professionals each request a fee enhancement in the amounts proposed.

## VI.    <u>CONCLUSION</u>

39.    For all of the foregoing reasons, the Debtors' Professionals respectfully request that this Court award them a lodestar adjustment to their fees as requested in each Debtors' Professional's Final Fee Applications, such that each of the Debtors' Professionals would receive the following additional amounts: (i) Dentons in the amount of $323,636.65; (ii) Togut in the amount of $47,864.00; and (iii) U&L in the amount of $280,000.00.

Dated: January 28, 2026                  **TOGUT, SEGAL & SEGAL LLP**

                                      */s/ Van C. Durrer, II*
                                        Frank A. Oswald (admitted)
                                        550 Broad Street, Suite 1508
                                        Newark, NJ 07102
                                        Tel:    (212) 594-5000

Fax:    (212) 967-4258
Email: frankoswald@teamtogut.com

Albert Togut (*pro hac vice*)
Eitan Blander (*pro hac vice*)
One Penn Plaza, Suite 3335
New York, New York 10119
Tel:    (212) 594-5000
Fax:    (212) 967-4258
Email: altogut@teamtogut.com
        eblander@teamtogut.com

- and –

**DENTONS US LLP**

Tania M. Moyron (*pro hac vice*)
Van C. Durrer, II (*pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Tel:    (213) 623-9300
Fax:    (213) 623-9924
Email: tania.moyron@dentons.com
        van.durrer@dentons.com

John D. Beck (*pro hac vice*)
Sarah M. Schrag (*pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Tel:    (212) 768-6700
Fax:    (212) 768-6800
Email: john.beck@dentons.com
        sarah.schrag@dentons.com

*Counsel for Debtors and Debtors in Possession*