**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**EVERSHEDS SUTHERLAND (US) LLP**

Sameer M. Alifarag (NJ No. 353692021)
sameeralifarag@eversheds-sutherland.com
The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 389-5000

David A. Wender (admitted *pro hac vice*)
davidwender@eversheds-sutherland.com
999 Peachtree Street NE, Suite 2300
Atlanta, Georgia 30309
Tel: (404) 853-8175
Fax: (404) 853-8806

*Counsel to Pulse Clean Energy SPV Watt
Limited*

|  |  |
|---|---|
| In re: | Chapter 11 |
| POWIN, LLC, *et al.*,[1] | Case No. 25-16137 (MBK)<br>(Jointly Administered) |
| Debtors. | Honorable Michael B. Kaplan |

**REPLY OF PULSE CLEAN ENERGY SPV WATT LIMITED IN FURTHER SUPPORT
OF THE MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND IN RESPONSE
TO THE TRUST'S OBJECTION**

Pulse Clean Energy SPV Watt Limited ("Pulse" or "Movant"), by and through its

undersigned counsel, hereby submits this reply (the "Reply"): (a) in further support of the *Motion*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Powin Project LLC [1583]; (ii) Powin LLC [0504]; (iii) PEOS Holdings, LLC [5476]; (iv) Powin China Holdings 1, LLC [1422]; (v) Powin China Holdings 2, LLC [9713]; (vi) Charger Holdings, LLC [5241]; (vii) Powin Energy Ontario Storage, LLC [8348]; (viii) Powin Energy Operating Holdings, LLC [2495]; (ix) Powin Energy Operating, LLC [6487]; (x) Powin Energy Storage 2, Inc. [9926]; (xi) Powin Energy Ontario Storage II LP [5787]; (xii) Powin Canada B.C. Ltd. [2239]. The Debtors' mailing address is 20550 SW 115th Avenue, Tualatin, OR 97062.

*of Pulse Clean Energy SPV Watt Limited for Relief from the Automatic Stay and Authorizing*

*Actions Consistent Therewith* [Docket No. 1127] (the "Motion"); and (b) in response to the *Trust's*

*Objection to Motion of Pulse Clean Energy SPV Watt Limited for Relief from the Automatic Stay*

*and Authorizing Actions Consistent Therewith* [Docket No. 1340] (the "Objection").  In support of

this Reply, the Movant respectfully states as follows:[2]

## PRELIMINARY STATEMENT

1.     This case presents a straightforward application of fundamental escrow law

principles to a commercial dispute with an equally straightforward factual background.  Pulse

deposited approximately $6.76 million of its own funds into an escrow account to secure the

Debtor's performance under the ESA.  The Debtor failed to perform, thereby breaching the ESA,

and ultimately rejected the contract pursuant to this Court's order.  The ESA expressly grants Pulse

the right to make a unilateral demand for payment from the Escrow Account upon the occurrence

of specified events, including circumstances entitling Pulse to terminate the ESA for the Debtor's

breach, irrespective of whether Pulse has actually given notice of termination.  Those triggering

events have undisputedly occurred.  Under these circumstances, both the plain language of the

parties' agreements and well-established New York law compel the conclusion that Pulse is

entitled to the immediate return of the funds it deposited.

2.     The Trust's Objection seeks to deny Pulse access to its own money through a series

of legal arguments that cannot withstand scrutiny.  The Trust contends that English law, rather

than New York law, should govern the property rights in escrow because the ESA contains an

English choice-of-law provision.  The Trust further complains that Pulse "has not provided any

information regarding the parties' respective interests in the Escrow Property under English law"

---

[2] Capitalized term used but not otherwise defined herein shall have their respective meanings ascribed to them in the Motion, Objection, ESA, or Escrow Agreement.

yet provides no English law analysis of its own.  But this argument ignores the separate Escrow Agreement, a distinct contract with its own express New York choice-of-law provision, that actually governs the parties' rights to the escrowed funds.  Notwithstanding Pulse's belief that New York law should apply to the instant dispute without establishing a conflict between those laws, Pulse has now obtained the opinion of Justin Mort KC (the "<u>Barrister's Opinion</u>"),[3] a leading English barrister specializing in construction and commercial contract disputes, which confirms that the ESA, when analyzed under English law, likewise demonstrates that Pulse is entitled to the Escrow Property.  Accordingly, the Trust fails to establish that an application of English law to the ESA would produce a different conclusion on the entitlement of the escrow funds, and therefore its argument must fail.

3.      The Trust also attempts to recharacterize the escrow deposits as "earned" milestone payments that Powin already owned and merely agreed to "divert" into escrow at Pulse's request. But this creative revision of the parties' bargain is contradicted by the ESA's repeated references to the "Security Escrow Account" established "as security for [Powin's] proper performance" and by the Escrow Agreements' identification of Pulse as the depositing party.  The Trust demands that Pulse provide, with reasonable certainty, its actual damages before accessing any escrow funds and asks this Court to conduct an evidentiary hearing to calculate Pulse's damages with precision. This demand misunderstands both the nature of performance security and the proper scope of a stay relief motion, while ignoring Pulse's Filed Claim asserting damages (which, to date, continue to accrue and are in excess of the damages asserted in the Filed Claim) less than double the Escrow Amount.[4]

---

[3] A copy of the Barrister's Opinion is attached hereto as **Exhibit A**.
[4] The contention also fails to take into account the fact that Pulse's Filed Claim is prima facie valid.  11 U.S.C. § 502.

4.      The Trust further suggests that Pulse's demand rights constitute an impermissible penalty or an unenforceable ipso facto clause triggered by bankruptcy.  But Pulse's demand rights are triggered by Powin's actual breach and failure to perform (not by the bankruptcy filing itself), and are fundamentally different from the liquidated damages provisions subject to penalty scrutiny.

5.      The Trust's arguments, though superficially appealing in their invocation of bankruptcy policy and equity, ultimately amount to an effort to rewrite the commercial bargain that does not favor the Debtor.  The automatic stay serves vital purposes in bankruptcy proceedings, but it was never intended to prevent a creditor from recovering its own property— particularly property that was specifically set aside as security for obligations the Debtor has admittedly breached and contractually rejected.  For the reasons set forth herein, the Objection should be overruled and the Motion should be granted.

## REPLY

### I.      Cause Exists to Grant Relief from the Automatic Stay

1.      Section 362(d)(1) requires the Court to grant relief from the automatic stay "for cause." 11 U.S.C. § 362.  Courts in the Third Circuit apply a balancing test, examining "the totality of the circumstances to determine whether sufficient cause exists to lift the stay" and considering whether "the balance of hardships from not obtaining relief tips significantly in [the movant's] favor." *In re Manley Toys Ltd.*, No. 16-15374 (JNP), 2020 WL 1580244, at *5 (Bankr. D.N.J. Mar. 31, 2020).  Here, the balance of hardships overwhelmingly favors Pulse.

### A.  Pulse Faces Concrete and Substantial Hardship From Denial of Stay Relief

2.      Pulse deposited approximately $6.76 million of its own funds into escrow to secure the Debtor's performance of the ESA.  The Debtor failed to perform, breached the ESA, and rejected it pursuant to this Court's order.  Pulse now faces the task of completing a complex energy

storage project that the Debtor abandoned mid-performance. Pulse's estimated costs to remedy

the Debtor's breach are not speculative future losses; they are concrete costs Pulse is incurring to

fulfill its own obligations to third parties and complete the Project.

3.      Every day that Pulse is denied access to the Escrow Amount causes real financial

harm. Pulse must finance the completion of the project using funds that should be available from

the security deposit Pulse established for precisely this purpose. Pulse continues to incur financing

costs on funds it should have available, and faces potential penalties or damages in its relationships

with third parties if the Project is not completed timely. Pulse suffers reputational harm in the

competitive energy infrastructure industry from delays and complications in Project completion.

All of these harms are directly attributable to the Trust's retention (through its unwillingness to

consent to release of the Escrow Amount) of funds that are properly Pulse's property.

4.      Critically, Pulse is not seeking preference over other creditors or attempting to

recover the Debtor's property. Pulse seeks only to recover funds that Pulse itself deposited and to

which Pulse has both a contractual right under the ESA and Escrow Agreement and a property

right under New York law. The automatic stay exists to preserve estate assets for equitable

distribution to creditors and to prevent a chaotic race to the courthouse. Neither purpose is served

by preventing Pulse from recovering its own security deposit, based on Powin's own failure to

complete the Project and rejection of the ESA. The Escrow Property was never the Debtor's asset

available for distribution to creditors; it was Pulse's asset held in escrow pending the Debtor's

performance.

**B. The Estate Suffers No Cognizable Hardship from Granting Stay Relief**

5.      The Trust has identified no legitimate hardship to the estate from granting the

requested relief. The Debtors are in liquidation, not reorganization. There is no ongoing business

operation that requires access to the Escrow Property. The ESA has been rejected, and the Debtor no longer intends to perform any obligations under it. The estate has no use for the Escrow Property and no legitimate basis to retain funds that the Debtor never owned.

6.      The Trust's argument that "the Escrow Property may still exceed the damages Pulse incurred due to Powin's rejection of the ESA" and therefore the estate might have a claim to some residuum is entirely speculative. Pulse's Filed Claim demonstrates damages of not less than $12,152,823.70—less than double the Escrow Amount. The possibility that the Court might someday determine, after full litigation of a claim objection not presented to the Court, that Pulse's actual recoverable damages are somehow less than $6.76 million is remote in the extreme. The Trust offers no evidence, no expert analysis, and no concrete basis for believing that the Escrow Amount exceeds Pulse's damages, and, in fact, Pulse has provided information to the Trust demonstrating that Pulse's damages to date are in excess of the amounts in its proof of claim. Speculation about a hypothetical future residuum does not constitute hardship to the estate sufficient to outweigh Pulse's concrete and immediate harm.

7.      Moreover, Pulse has committed that it will credit the Escrow Amount to reduce amounts owing by the Debtor arising out of its failure to perform. This commitment fully protects any legitimate interest the estate might have. If, after full litigation of Pulse's proof of claim, it is somehow determined that Pulse's actual recoverable damages are less than the Escrow Amount (an unlikely scenario given the magnitude of claimed damages), the Escrow Amount will be credited to reduce Pulse's claim, and any excess will reduce the allowed amount of that claim, benefiting all creditors through increased percentage distributions. Pulse is not seeking to evade the claims allowance process or to recover more than its actual damages; Pulse seeks only immediate access to its security deposit (which, as repeatedly stated herein, was deposited for work

that Powin never performed and therefore never became entitled to) rather than being forced to wait years for resolution of all claims issues.

### C. The Escrow Property is Not Necessary for Any Reorganization Purpose

8.      Even if the estate could demonstrate some interest in the Escrow Property (which it cannot), that interest would not outweigh Pulse's rights where the property is not necessary for reorganization.  The Debtors confirmed a liquidating plan, the business has ceased operations, and there is no reorganization to fund or facilitate.  The only purpose served by retaining the Escrow Property is to potentially increase the pool of assets available for distribution to creditors.  But that purpose is not served by retaining property that was never part of the estate.

9.      The stay relief analysis alone warrants granting the Motion.  But even if the Court looks beyond the balance of hardships, the result is the same: the Escrow Property is not property of the estate.   Under the Escrow Agreement and well-settled New York law, Pulse, as the depositing party, retains legal title to the funds, and Powin held at most a contingent interest that has now been extinguished.

## II.    Pulse Retains Legal Title to the Escrow Property as the Depositing Party

10.      As the Escrow Agreement is governed under New York law, the Court must next determine which party holds legal title to the Escrow Property under that law.  This question is answered by a well-established principle of New York escrow law: the party that deposits funds into escrow retains legal title to those funds until the conditions specified in the Escrow Agreement are satisfied.  *See DeFlora Lake Dev. Assocs. v. Hyde Park (In re DeFlora Lake Dev. Assocs.)*, 628 B.R. 189, 198 (Bankr. S.D.N.Y. 2021).  The Trust attempts to avoid this principle through creative recharacterization of the escrow deposits, but the unambiguous contractual language defeats the Trust's argument at every turn.

**A. Under New York Law, the Depositor Retains Legal Title Until Escrow Conditions Are Satisfied**

11.    New York courts have consistently held that legal title to property placed in escrow remains with the grantor (the party making the deposit) until the occurrence of the conditions specified in the underlying escrow agreement.  *Cohen v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 138 B.R. 687, 710 (Bankr. S.D.N.Y. 1992).  The logic underlying this rule is straightforward: an escrow is a conditional delivery.  The depositing party relinquishes possession to a third-party stakeholder but does not transfer ownership unless and until specified conditions are met.  Until those conditions are satisfied, the depositor retains not merely a security interest or an equitable claim, but full legal title.  *See DeFlora Lake Dev. Assocs.*, 628 B.R. at 203-04 (applying same principle).

12.    The Trust implicitly acknowledges this legal framework when it cites to *Mortgage Elec. Registration System, Inc. v. Maniscalco*, which defines the "grantor" of an escrow as "the party entitled to funds who relinquishes control of such funds to a third-party depository."  46 A.D.3d. 1279, 1281 (N.Y. App. Div. 3d Dep't 2007).  The critical question, then, is who is the "grantor" or depositing party.  The answer is found in the express terms of the Escrow Agreement, which provides that "[Pulse] shall cause to be deposited with the Escrow Agent, at the times and in the amounts set forth in the ESA, funds in the aggregate amount of the [Escrow Amount]."  Escrow Agreement § 2.  Thus, by its plain terms, Pulse is the depositor, Pulse is the grantor, and, under New York law, Pulse retains legal title.

13.    The Trust's entire argument to the contrary rests on a mischaracterization of the economic arrangement underlying the escrow deposits.  It contends that "these funds were amounts diverted from payments made by Pulse to the Debtors for completing Milestones under the ESA" and "that Powin had earned the money through services provided, held title to the funds at the time

of the transfer and therefore is the grantor of the [e]scrow [funds]." Objection ¶ 2. But this argument confuses the source of the funds with the legal question of who deposited them into escrow and who holds title.

14.    It is true that the Payment Schedule shows escrow deposits as reductions from milestone payments. However, the Trust seizes on this accounting presentation to argue that Powin had already "earned" the full milestone payments and merely agreed to let Pulse "divert" some portion into escrow. This argument inverts the actual legal and economic relationship the parties established. The Payment Schedule does not show Pulse paying the full milestone amount to Powin and then Powin transferring funds back into escrow. Rather, it shows that *instead of* paying the full milestone amount to Powin, Pulse agreed to pay a reduced amount directly to Powin and deposit the remainder into the Escrow Account *as security for future performance*.[5] The funds that remain in escrow, thus, represent amounts deposited in escrow for milestones Powin never reached and accordingly never became Powin's property nor property of its bankruptcy estate.

15.    This distinction is not mere formalism. It reflects the fundamental nature of the security arrangement the parties negotiated. If Powin had truly "earned" the full milestone payments as unrestricted property and then agreed to grant Pulse a security interest in some portion, the parties would have structured the arrangement very differently. Powin would have received the full payments, and Powin (not Pulse) would have then deposited the funds from its own

---

[5] As the Court will note, the line items in the Payment Schedule representing "Escrow from Milestone #1," "Escrow from Milestone #4," and "Escrow from Milestone #5" are amounts paid by Pulse to Powin directly for work completed by Powin through the respective milestone dates. No work was completed by Powin after Milestone 5. On the other hand, the line items representing "Escrow Release from Milestone #6" and "Escrow Release 1,095 days after Guaranteed Commissioning Date" are the Initial Escrow Amount exclusive of additional amounts escrowed and interest accrued thereon, which Powin would have been entitled to *but for* its failure to complete any work on the Project after Milestone 5. These facts alone are fatal to the Trust's position, as it reaffirms the structure of the ESA and Escrow Agreement whereby Powin would only be entitled to funds for work which it has completed. As the remaining milestones were never completed, Powin (or the Trust, as its successor) could never be entitled to such funds.

9

accounts into escrow or granted Pulse a security interest in funds Powin controlled.  That is not

what happened.  Instead, the parties agreed that as each milestone was reached, Pulse would pay a

portion of the milestone value directly to Powin and deposit another portion directly into escrow

as security for future performance (and subject to the condition that Powin completes performance

to obtain legal entitlement to the funds).  This structure continues to support the fact that Pulse is

the depositor and grantor under New York law.

**B.  The ESA's Characterization of the Escrow as "Security" Confirms Pulse's Superior Interest**

16.     The Trust's attempt to characterize the escrow deposits as "earned payments" is

further undermined by the ESA's own description of the arrangement.  The ESA does not refer to

the escrow as holdbacks of earned milestone payments or deferred compensation subject to a

security interest.  Rather, it repeatedly refers to the "Security Escrow Account" and states expressly

that the parties "have agreed to a Security Escrow Account" "as security for [Powin's] proper

performance of its obligations arising out of the [ESA]."  ESA § 3.2.1.  This language is

unambiguous and dispositive.  Security exists for the benefit of the secured party—here, Pulse.

The party posting security retains ownership of the security until the secured obligations are fully

performed.

17.     The ESA further confirms this understanding through its provisions governing

release of the escrowed funds.  Particularly, the ESA provides that funds may be released to Powin

only after issuance of a Final Acceptance Certificate, and even then only amounts in excess of five

percent of the Contract Price may be released.  *Id.* at § 3.2.4.  Further, the ESA provides that the

remaining funds may be released only upon expiry of the Warranty Period and Powin's compliance

with all warranty obligations.  *Id.* at § 3.2.5.  These provisions establish that Powin's right to

receive escrow funds was contingent upon full performance of all obligations through the end of the Warranty Period—not an entitlement already earned by completion of construction milestones.

18.    If the Trust's interpretation were correct, *i.e.*, that Powin had already "earned" the milestone payments and held title subject only to Pulse's security interest, then the ESA would have been structured to reflect that relationship.  Pulse would have taken a security interest in funds that Powin owned, and Pulse's rights would have been limited to recovering proven damages from that security.  Instead, the ESA grants Pulse affirmative demand rights exercisable upon the occurrence of specified triggering events, which is characteristic of an arrangement where the demanding party holds legal title.

19.    As noted above, Pulse has obtained the Barrister's Opinion, which confirms that even under English law, Pulse is entitled to the Escrow Property.  *See* Barrister's Opinion.  Mr. Mort concludes that Clause 3.2.7 of the ESA unambiguously entitles Pulse to make a unilateral demand for payment upon the occurrence of the specified triggering events (which have occurred here), that Pulse need not establish the quantum of its damages or compete the termination account process before making such demand, and that the escrow is not considered a penalty because it constitutes a security rather than compensation and does not determine or fix the amount of compensation to be paid.  In short, whether analyzed under New York law (which governs the Escrow Agreement) or English law (which governs the ESA), the result is identical: Pulse is entitled to recover the Escrow Property.

## C. The Escrow Agreement's Terms Confirm That Powin Held Only a Contingent Beneficial Interest

20.    The Escrow Agreement itself contains numerous provisions that confirm the parties' understanding that Powin held, at most, a contingent beneficial interest in the escrow funds (the right to receive them if all conditions were satisfied, while Pulse retains legal title).  The Trust

points to Section 3 of the Escrow Agreement, which provides that income from the escrow "shall

be deemed income of Company B [Powin] for all tax purposes, whether or not the income was

disbursed by the Escrow Agent during any particular year."  Escrow Agreement § 3.  The Trust

argues that this tax treatment "strongly suggests that Powin had superior legal title to the Escrow

Account."  Objection ¶ 13.

21.     This reliance on tax characterization is misplaced.   Tax treatment for income

recognition purposes and legal title for ownership purposes are distinct concepts that frequently

diverge.  The tax provision in Section 3 of the Escrow Agreement simply allocates the obligation

to report and pay taxes on escrow income to Powin, which makes sense as the party who would

ultimately receive the funds *if all performance conditions were satisfied*.  This allocation is entirely

consistent with Powin holding a contingent beneficial interest (the economic right to the funds

upon satisfaction of conditions) while Pulse retains legal title (the current ownership and right to

demand return if conditions are not satisfied).  Indeed, escrow arrangements routinely allocate tax

obligations to one party while legal title remains with another.  The party expected to receive the

funds bears the tax burden on income, even though the party who deposited the funds retains

ownership.  The *Drexel Burnham* case cited by the Trust actually supports this understanding.  In

that case, the court found that certain escrow funds were property of the estate, but did so based

on a comprehensive analysis of multiple factors (including who deposited the funds, what

conditions governed release, and who had control over the funds), not based solely on tax

treatment.  Here, all of those factors point toward Pulse, not Powin.

22.     The Trust also argues that Clause 3.2.8 of the ESA, which permits Powin to

substitute alternative security with Pulse's approval, "suggests that legal title to the Escrow

Property lies with Powin, while Pulse only has a beneficial interest." *Id.* at ¶ 14.  This argument turns the provision on its head.  Clause 3.2.8 states:

> The Contractor may substitute the Security Escrow Account with another form of security with the prior written approval of the Employer (not to be unreasonably withheld). To the extent the Contractor provides another form of performance security (with the Employer's approval under this Clause 3.2.8), the Employer shall promptly release and return the unreleased Security Escrow Amount that is being substituted.

ESA § 3.2.8.  This substitution right demonstrates exactly the opposite of what the Trust claims. The provision confirms that the escrow is security for Pulse's benefit.  If Powin had legal title to funds it had already earned, there would be no need for a substitution right.  In such case, Powin could simply withdraw its own funds and separately post alternative security.  Instead, the provision contemplates that Powin can obtain release of escrow funds only by providing substitute security acceptable to Pulse.  This structure is characteristic of an arrangement where the secured party (Pulse) controls access to security, consistent with Pulse holding legal title.

23.     Most significantly, the Escrow Agreement provides that funds shall be released either by joint written instruction from both parties or "by a written release notice signed by an Authorized Person of Company A [Pulse] specifying that one or more events have occurred that entitle it to receive the applicable Escrow Property."  Escrow Agreement § 4.  This unilateral demand right is the hallmark of a depositor with legal title.  If Powin held legal title and Pulse merely had a security interest, the Escrow Agreement would require Pulse to prove its damages and obtain either Powin's consent or a court order based solely on Pulse's representation that triggering events have occurred.  This allocation of control is inconsistent with the Trust's assertion that Powin holds superior title.

### D. Powin's Contingent Interest Has Been Extinguished by Rejection

24.     Even if one were to accept the Trust's argument that Powin had some interest in

the Escrow Property as of the Petition Date, that interest was at most a contingent future right to

receive funds upon satisfying performance conditions that will now never be met.  Section

541(a)(1) of the Bankruptcy Code provides that the property of the estate includes "all legal or

equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. §

541(a)(1).  Courts, including the Supreme Court, Third Circuit and others, have consistently held

that the trustee or debtor-in-possession can assert no greater rights than the debtor himself had on

the date the bankruptcy case was commenced.  *See, e.g.*, *Mission Prods. Holdings, Inc. v.*

*Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019) ("Section 365 reflects a general bankruptcy rule:

[t]he estate cannot possess anything more than the debtor itself did outside bankruptcy.") (citing

*Board of Trade of Chicago v. Johnson*, 264 U.S. 1, 15 (1924)); *Majestic Star Casino, LLC v.*

*Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 748 (3d Cir. 2013) ("It is a

given that '[t]he trustee [or debtor-in-possession] can assert no greater rights than the debtor

himself had on the date the [bankruptcy] case was commenced.'"); *In re Atl. Gulf Cmtys. Corp.*,

369 B.R. 156, 163 (Bankr. D. Del. 2007) (concluding that the dispositive consideration for whether

escrow property ought to be property of the estate under New York law is whether the debtor has

any present right to the property, and finding that if a debtor is only entitled to the escrow property

when it fulfilled some condition, then the property would not be part of the estate); *Dynasty*

*Express Corp. v. Kurtzman (In re AGSY, Inc.)*, 120 B.R. 313, 319 (Bankr.S.D.N.Y.1990) (holding

that escrow was not property of the estate of debtor/grantee); *In re Palm Beach Heights Dev. &*

*Sales Corp.*, 52 B.R. 181, 183 (Bankr.S.D.Fla.1985).

25.     As of the Petition Date, Powin's interest in the Escrow Property was conditioned upon future performance that Powin has now rendered impossible.  The ESA required issuance of a Final Acceptance Certificate before any certain escrow funds could be released, and full compliance with warranty obligations through the end of the Warranty Period before all remaining funds could be released.  *Supra* ¶ 17.  These milestones will never be reached because the ESA has been rejected.  *See* Docket Nos. 88, 843.  The rejection of an executory contract "constitutes a breach of such contract" as of the date immediately before the petition date.  11 U.S.C.§ 365(g)(1).  While rejection does not rescind the contract or eliminate rights previously granted to the non-debtor party—as the Supreme Court clarified in *Mission Prods. Holdings, Inc.*, 139 S. Ct. at 1658, 1666—it does eliminate any contingent rights the Debtor might have had that were dependent on future performance by the Debtor.

26.     Here, rejection triggered Pulse's contractual right to make a unilateral demand while simultaneously extinguishing Powin's contingent right to receive funds upon performance.  The ESA expressly provides that Pulse may demand payment upon "any circumstances which entitle [Pulse] to termination under Clause 12.2 . . . *irrespective of whether notice of termination has been given*."  ESA § 3.2.7.  The Debtor's breach and rejection plainly constitute circumstances entitling Pulse to terminate.  Thus, the triggering event for Pulse's demand rights has occurred, while the conditions precedent to Powin's receipt of the funds will never be satisfied.  While the Trust is correct that the question of who has a present interest in the Escrow Property is the dispositive question, it is profoundly wrong about the answer.  As of the Petition Date, Pulse had a present right to demand escrow funds upon the occurrence of specified events.  Powin had only a contingent future right that would vest only upon full performance through the Warranty Period.

15

That contingent right will never vest because Powin will never perform. Accordingly, Pulse has the only present interest in the Escrow Property.

27. Having failed to establish any present property interest in the Escrow Property, the Trust pivots to public policy arguments that fare no better.

### III. Pulse's Demand Rights Are Not An Impermissible Penalty or Ipso Facto Clause

28. The Trust's third principal argument attempts to invoke public policy concerns by characterizing Pulse's demand rights as an "impermissible penalty" and suggesting that enforcement would violate bankruptcy law's prohibition on ipso facto clauses. Neither characterization withstands analysis. Pulse does not seek to penalize Powin or to enforce a provision triggered by bankruptcy. Pulse seeks to recover its own funds deposited as security for obligations that Powin admittedly breached and contractually rejected.

#### A. The Escrow Amount and Assertion of Damages Are Not A Penalty

29. The Trust argues that if Pulse is permitted to retain the entire Escrow Amount "essentially as liquidated damages" while also asserting rejection damages against the estate, the result would be "a penalty intended to 'secure performance by the compulsion of the very disproportion'" in violation of New York public policy. Objection ¶ 27. This argument fails for multiple independent reasons.

30. First, neither the Escrow Amount nor the Filed Claim are "liquidated damages" subject to a penalty analysis. Liquidated damages are a contractual pre-estimate of damages payable as compensation for breach. The Restatement (Second) of Contracts distinguishes liquidated damages provisions from a penalty, noting that the latter is not subject to the same scrutiny. *See* Restatement (Second) of Contracts § 356 cmts. a, b. The Escrow Amount is security (neither serving as liquidated damages *or* a penalty), funds deposited by the non-breaching party

to protect against the breaching party's non-performance.  And the damages asserted in the Filed

Claim were Pulse's estimate of damages incurred at the time the ESA was rejected, which, as

noted, have continued to accrue.  These distinctions are fundamental.  When a party deposits its

own funds as security and then seeks to recover those funds following the other party's breach, the

depositing party is not extracting a payment from the breaching party; it is simply recovering its

own property.

31.     The cases the Trust cites regarding New York's prohibition on penalties all involve

provisions requiring a breaching party to *pay* a specified sum *to* the non-breaching party as

damages.  *See In re Trans World Airlines, Inc.*, 145 F.3d 124, 134 (3d Cir. 1998); *Rattigan v.

Commodore International Ltd.*, 739 F. Supp. 167, 169-70 (S.D.N.Y. 1990).  Those cases address

contractual mechanisms that transfer wealth from the breaching party to the non-breaching party

in amounts potentially disproportionate to actual harm.  *See In re Trans World Airlines, Inc.*, 145

F.3d at 135; *Rattigan*, 739 F. Supp. At 170.  Here, by contrast, Pulse deposited its own funds into

escrow.  If Pulse recovers those funds following Powin's breach, no wealth has been transferred

from Powin to Pulse.  Pulse has simply recovered money that was always Pulse's property.  There

can be no "disproportion" when a party recovers its own funds.

32.     Second, even if the penalty doctrine somehow applied to security deposits (which

it does not), the Escrow Amount would easily satisfy the test for enforceable liquidated damages.

Under New York law, a liquidated damages provision is enforceable if the amount is reasonable

in light of the anticipated or actual harm caused by breach.  *JMD Holding Corp. v. Congress Fin.

Corp.*, 4 N.Y.3d 373, 380 (2005).  Pulse's Filed Claim asserts damages of not less than

$12,152,823.70 (£9,036,522.17), including estimated costs for replacement contractor and project

completion (£2,500,000), replacement warranties (£1,300,000), replacement technical contractor

(£450,000), reinsurance (£1,412,056.90), spare parts (£100,000), and other damages (£3,301,465.26). The Escrow Amount of approximately $6.76 million represents only about 56% of Pulse's total claimed damages.[6]  This ratio demonstrates that the Escrow Amount is eminently reasonable and proportionate to actual harm, not a penalty.

33.     Third, the Trust mischaracterizes Pulse's position regarding credit against damages. In footnote 10 of the Motion, Pulse stated: "Though not required under the express terms of the ESA, the Movant will credit the Escrow Amount to reduce amounts owing by the Debtor arising out of its failure to perform."  Motion at 13 n. 10.  The Trust seizes on this statement as an "acknowledg[ment] of the limitation of its logic" and evidence that "Pulse's request for payment of the Escrow would still fail as a clear penalty."  Objection ¶ 25.  The Trust has it exactly backwards.  This statement demonstrates Pulse's good faith and reasonableness.  Pulse is not seeking a windfall or double recovery.  Pulse is entitled under the express terms of the ESA to demand the Escrow Amount upon the occurrence of triggering events.  Pulse is separately entitled under Section 502(g) of the Bankruptcy Code to file a claim for rejection damages.  These are distinct contractual and statutory rights.  Nevertheless, Pulse has voluntarily committed to credit the Escrow Amount against its damages claim to ensure there is no possibility of double recovery.[7]  Pulse's commitment here refutes any suggestion that Pulse seeks a penalty.

**B.  The ESA Grants Pulse an Unambiguous Contractual Right to Make a Unilateral Demand**

34.     The Trust's penalty argument also fails because it ignores the actual mechanism by which Pulse is entitled to recover the Escrow Property.  Clause 3.2.7 of the ESA provides that

---

[6] To date, Pulse has continued to accrue damages in connection with Powin's failure to complete the Project, which are larger than the amounts in Pulse's Filed Claim.
[7] Tellingly, the Trust has yet to object to Pulse's Filed Claim nor commence an adversary proceeding for a determination on the entitlement of the escrow funds.

Pulse "shall be entitled to make a unilateral demand for payment under the Security Escrow Agreement in the event of" four specified categories of occurrences: "(a) failure by the Contractor to pay the Employer an amount due for which the Contractor is liable to pay the Employer under or in connection with the Contract; (b) any loss, damages and/or expenses (including legal fees and expenses) incurred or suffered by the Employer as a result of any default or breach of contract by the Contractor; (c) any circumstances which entitle the Employer to termination under Clause 12.2 (Termination by Employer), irrespective of whether notice of termination has been given; and (d) the Employer becoming entitled to deduct or recover Delay Liquidated Damages, and/or a Recovery Payment." ESA § 3.2.7. These provisions are clear and unambiguous. Pulse's demand rights are triggered by the occurrence of specified events, not by proof of a liquidated sum of damages. The triggering events set forth in subsections (b) and (c) have indisputably occurred. Powin breached the ESA by failing to perform and by rejecting the contract, and circumstances entitling Pulse to terminate exist (material breach, failure to complete the work, and rejection). Pulse has incurred substantial losses and damages as a result of Powin's breach, including the costs of finding a replacement contractor, completing the Project, obtaining replacement warranties, and other damages. The contractual conditions for Pulse's unilateral demand have been satisfied.

35.    The Trust acknowledges the existence of Section 3.2.7 and even recites the four categories of triggering events. Yet the Trust argues that Pulse must nonetheless prove the precise quantum of its damages before accessing the escrow. But that is not what Section 3.2.7 (nor any provision of the ESA or Escrow Agreement) requires. The triggering mechanism is the occurrence of events, not the proof of damages.

36.    This distinction is critical and reflects the commercial purpose of performance security. When parties agree to a security arrangement, they do so precisely to avoid the need for

protracted litigation over damages before the secured party can access protection.  If Pulse were required to complete the Project, obtain final invoices from all replacement contractors, undergo a comprehensive accounting, and litigate the amount of its damages before accessing the escrow, the security would provide no meaningful protection.  Pulse would be forced to finance the entire remedy out of pocket and wait years to recover even partial reimbursement from the escrow.  This would defeat the entire purpose of requiring security in the first place.

### C.  The Escrow Arrangement is Not an Ipso Facto Clause

37.      The Trust's invocation of ipso facto principles is equally unavailing.  Section 365(e)(1) of the Bankruptcy Code provides that a contract term is unenforceable to the extent it would "terminate or modify" the debtor's rights "solely because" of the debtor's insolvency or bankruptcy filing.  11 U.S.C. § 365(e)(1).  This provision prevents enforcement of contractual provisions triggered merely by bankruptcy status or a debtor's financial condition.  However, Section 365(e)(1) does not prohibit enforcement of provisions triggered by the debtor's breach or failure to perform that are independent of the bankruptcy or financial condition.

38.      Here, Pulse's demand rights are not triggered by Powin's bankruptcy filing.  They are triggered by Powin's "material breach of the [ESA]," by "circumstances which entitle [Pulse] to termination," and by "losses, damages and/or expenses incurred or suffered by [Pulse]" as a result of Powin's default.  These are performance-based triggers.  Powin failed to complete the Project, rejected the ESA, and will never perform its obligations.  These are breaches and failures to perform, not merely the filing of bankruptcy.  The fact that breach and rejection occurred in the context of bankruptcy does not transform a performance-based provision into an ipso facto clause.

39.      The Trust's ipso facto argument, if accepted, would effectively prohibit enforcement of any security arrangement in bankruptcy.  A letter of credit, performance bond, or

security deposit would all be unenforceable if the beneficiary's right to draw on the security could

be characterized as "punishing" the debtor for bankruptcy. This is manifestly not the law. Security

arrangements are routinely enforced in bankruptcy when the conditions for drawing on the security

have been satisfied. The automatic stay prevents secured creditors from taking enforcement action

without court permission, but it does not transform valid security arrangements into unenforceable

penalties.

## IV. New York Law Governs the Determination of Property Rights in the Escrow Funds

40.    As a final effort to defeat stay relief, the Trust argues that English law, rather than

New York law, governs the parties' rights in the Escrow Property. This argument misconstrues

both the parties' contracts and settled choice-of-law principles. "Generally speaking, before

a choice of law question arises there must be an actual conflict between the two applicable

bodies of law. *Cf. Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 (3d Cir. 1991). In other words,

if law A is applied, the outcome will differ from the outcome if law B is applied." *Oil Shipping

(Bunkering) B.V. v. Sonmez Denizcilik Ve Ticaret A.S.*, 10 F.3d 1015, 1018 (3d Cir. 1993). The

Trust raises no such conflict here, and, in fact, an analysis of the documents in accordance with

English law (as set forth in the Barrister's Opinion) likewise demonstrates no dispute. *See Berg

Chilling Sys. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006) ("According to conflicts of laws

principles, where the laws of the two jurisdictions would produce the same result on the particular

issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-

law question.").

41.    Here, the question before the Court is whether Movant is entitled to stay relief to

access funds per the terms of the Escrow Agreement. The Trust contends that English law applies

because Clause 16.1 of the ESA provides that the contract "shall be governed by and construed in

accordance with the law of England and Wales." ESA § 16.1.   Pulse maintains that New York

law governs because the Escrow Agreement, a separate contract incorporated into the ESA as

Schedule 14, contains its own choice-of-law provision stating that the escrow arrangement "shall

be governed by and construed in accordance with the laws of the State of New York." Escrow

Agreement § 10.   Though Movant does not believe it is necessary to resolve this legal conundrum,

because the Trustee has failed to demonstrate how applying English law would cause a different

result than the applicable New York law, its premise is incorrect as, even if there is a distinction

two different laws may apply. *See Berg Chilling Sys.*, 435 F.3d at 462 ("Because choice of

law analysis is issue-specific, different states' laws may apply to different issues in a single case,

a principle known as 'depecage.'").   Ultimately, however, the Trust's position fails both as a matter

of contract interpretation and conflict of laws principles.

## A. The Escrow Agreement is a Separate Contract With its Own Governing Law Provision

42.     The Trust's choice-of-law argument rests on a fundamental misconception: that the

ESA's English choice-of-law provision somehow controls all aspects of the parties' legal

relationship, including their rights to funds held by the Escrow Agent under the Escrow

Agreement.  This conflation of distinct legal instruments cannot be sustained.  While the ESA and

Escrow Agreement are certainly related, they serve different functions, create different obligations,

and speak to different subject matter.  Most importantly for present purposes, they contain different

choice-of-law provisions.

43.     The ESA is a comprehensive construction contract governing the design,

manufacture, delivery, installation, testing, and commissioning of battery energy storage systems.

The agreement runs to hundreds of pages and addresses in exhaustive detail matters such as

technical specifications, delivery schedules, testing protocols, acceptance procedures, warranty

22

obligations, payment terms tied to milestone achievements (i.e., the escrow arrangement), intellectual property rights, liability limitations, insurance requirements, force majeure events, and procedures for handling variations and disputes. The ESA's choice of English law makes perfect sense in this context, as it ensures that a single, coherent body of law will govern the myriad disputes that might arise from the performance (or non-performance) of complex construction obligations under an international contract.

44.     The Escrow Agreement, by contrast, serves a much narrower and more specific function. It establishes the terms under which HSBC Bank USA, National Association, acting as Escrow Agent, will receive, hold, and disburse funds deposited by Pulse to secure Powin's performance. For example, the Escrow Agreement provides without ambiguity that it "shall be governed by and construed in accordance with the law of the State of New York without reference to the principles of conflict of laws." Escrow Agreement § 10(b). This choice of New York law is equally sensible—the Escrow Agent is a New York bank, the funds are held in New York, and New York has a highly developed body of escrow law that provides clarity and predictability for all parties to such arrangements.

45.     The question before the Court is not whether Powin breached the ESA (it undisputably did), what remedies English law might provide for such breach, or how English law would interpret the ESA's technical specifications or warranty provisions. Rather, the pertinent question is who owns the funds currently held in the Escrow Account. This is quintessentially a question about the escrow arrangement itself, precisely the subject matter that the parties agreed would be governed by and construed in accordance with the law of the State of New York. Courts have recognized that escrow agreements are separate contracts with their own choice-of-law provisions, and the determination of parties' interests in such escrow shall be determined in

accordance therewith.  *See In re TTS, Inc.*, 158 B.R. 583, 586 (D. Del. 1993) (applying New York law to escrow dispute where escrow agreement was governed by New York law).

46.    Though the Trust contends that Pulse does not provide legal support for its position under English law, its failure to put forth any analysis of such law is remarkably telling.  The Trust insists that English law governs the parties' rights in the Escrow Account, yet the Trust itself cannot cite a single provision of English law or offer any analysis whatsoever under English law to support its position.  Moreover, the Trust's position would lead to the anomalous result that an Escrow Agent—here, HSBC Bank USA, National Association, a New York-based financial institution—would be required to interpret and apply English law to determine its obligations under an escrow agreement that expressly states it is governed by New York law.  This makes no practical sense and would introduce unnecessary complexity and uncertainty into escrow arrangements.  The parties chose New York law for good reason, and this Court should give effect to that choice.

## B.  Even if English Law Were Relevant, the Contractual Language Would be Enforceable

47.    Even assuming *arguendo* that English law had some application to the determination of property rights in the escrow (and to be clear, it does not for the reasons stated above), the outcome would be the same.  *See* Barrister's Opinion.  The contractual provisions establishing Pulse's rights are clear and unambiguous.  Clause 3.2.1 of the ESA states, "[a]s security for the Contractor's proper performance of its obligations arising out of the Contract, the Parties have agreed to a Security Escrow Account in accordance with this Clause 3.2."  ESA § 3.2.1.  The parties thus expressly characterized the escrow as "security" for performance.  Clause 3.2.7, in turn, provides that Pulse "shall be entitled to make a unilateral demand for payment under the Security Escrow Agreement in the event of" four specified categories of occurrences, including

"(b) any loss, damages and/or expenses (including legal fees and expenses) incurred or suffered by the [Pulse] as a result of any default or breach of contract by [Powin]" and "(c) any circumstances which entitle [Pulse] to termination under Clause 12.2 (Termination by Employer), *irrespective of whether notice of termination has been given*." *Id.* at § 3.2.7 (emphasis added).

48.     These provisions would be enforceable under both New York and English law.  The Trust does not and cannot argue that English law prohibits parties from agreeing to security arrangements or from including contractual provisions allowing unilateral demand upon the occurrence of specified triggering events. Security arrangements are a fundamental feature of commercial contracting in every developed legal system, and courts across jurisdictions routinely enforce them according to their terms. The Trust's invocation of English law is thus a red herring— an attempt to create confusion and delay by raising a choice-of-law dispute that, even if resolved in the Trust's favor, would not change the result.  Accordingly, this Court should apply New York law as the Escrow Agreement expressly provides and as both parties contemplated when they entered into the escrow arrangement.

## **CONCLUSION**

**WHEREFORE**, for the reasons set forth herein and in the Motion, the Movant requests that the Court (i) enter the Proposed Order granting relief from the automatic stay and authorizing actions consistent therewith; (ii) overruled the Objection; and (iii) grant such other and further relief that the Court deems just and proper.

*[Signature Page Follows]*

Dated: February 17, 2026

/s/ Sameer M. Alifarag

**EVERSHEDS SUTHERLAND (US) LLP**

Sameer M. Alifarag (NJ No. 353692021)
The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 389-5000
sameeralifarag@eversheds-sutherland.com

David A. Wender (admitted *pro hac vice*)
999 Peachtree Street NE, Suite 2300
Atlanta, Georgia 30309
Tel: (404) 853-8175
Fax: (404) 853-8806
davidwender@eversheds-sutherland.com

*Counsel to Pulse Clean Energy SPV Watt Limited*