## EXHIBIT A

**Barrister's Opinion**

**(1) POWIN LLC**
**(2) POWIN LIQUIDATING TRUST**

_____

_____

**A D V I C E**

_____

**The parties**

1.      In this advice I refer to the parties as follows.

     (1)      I refer to Powin LLC as *"Powin"*;

     (2)      I refer to Pulse Clean Energy SPV Watt Limited as *"Pulse"*.

2.      As set out below the parties entered into a contract.

3.      Powin is the subject of a formal liquidation procedure, subject to the supervision of the bankruptcy court in the district of New Jersey.

4.      Powin has *"rejected"* its contract with Pulse and will not satisfy its obligations thereunder.  I understand that rejection of the contract is a statutory mechanism permitted by the insolvency regime as applying in the United States of America (there is no exact equivalent under English law).

5.      As of late 2025 a liquidating trust had been established: Powin Liquidating Trust, referred to herein as *"the Trust"*.  The Trust is represented by Steptoe LLP.

6.      Pulse is seeking to enforce its rights under the contract against money held in escrow as set out below.  Pulse is represented by Eversheds Sutherland (US) LLP in New Jersey.  I am instructed on behalf of Pulse by Eversheds Sutherland (International) LLP in London.

1

**The ESA**

7.      Pulse and Powin entered into an agreement dated 22 December 2023 for the supply by Powin to Pulse of energy equipment, the energy equipment supply agreement, referred to as *"the ESA"*.

8.      In the ESA, the parties are referred to respectively as *"Employer"* and *"Contractor".* Where appropriate, and/or in any quotations from the ESA, I use those terms in this advice.  For the purposes of analysis I also refer to *"the employer"* and *"the contractor"* (without capitals) i.e. in order to refer to hypothetical parties acting in those roles.

9.      References herein to numbered clauses are references to the clauses of the ESA save where indicated otherwise.

10.     The ESA is subject to English law: clause 2.1.

11.     Clause 12 provides for *inter alia* termination.

12.     Clause 12.2 provides for termination by the Employer.

13.     Clause 12.2.1 provides *inter alia* that

> *"The Employer shall be entitled to terminate the Agreement if:*
>
> *"...*
>
> *"(a)      the Contractor commits a material breach of the Agreement and such breach is not remedied within thirty (30) Days after receipt of a notice of such breach from the Employer, provided that such timeframe shall be extended where the Contractor can demonstrate to the reasonable satisfaction of the Employer that the breach cannot be remedied within the thirty (30) Days and the Contractor has provided a remedial plan to the Contractor* [sic]*.*
>
> *"The Employer shall be entitled to immediately terminate the Agreement if the Contractor fails to comply with the remedial plan provided under this clause 12.2.1(a);"*

14.    I am instructed that Pulse has in fact been prevented from formally terminating the ESA by the fact of the bankruptcy proceedings.

15.    In any event I am instructed that the present position is:

(1)    Powin will not perform its obligations;

(2)    Powin's rejection of the contract constitutes a material breach that entitles Pulse to terminate the contract;

(3)    Pulse has incurred and/or will incur considerable costs engaging alternative suppliers.

16.    Clause 12.4 provides for the calculation and payment of any balance due from the Contractor or from the Employer following termination.

**The Escrow Agreement**

17.    The ESA provides for the payment of money earned by Powin into an Escrow Account. This is governed primarily by

(1)    clause 3.2 headed *"performance security"*;

(2)    schedule 14 of the ESA, form of escrow agreement to be entered into by the parties;

(3)    the escrow agreement in fact entered into by the parties dated 25 October 2023, adopting the form of agreement contained in schedule 14 of the ESA.

18.    It should be noted that

(1)    the escrow agreement as entered into by the parties (25 October 2023) pre-dates the ESA (22 December 2023);

(2)     the escrow agreement, unlike the ESA, is subject to New York law: section 10(b);

(3)     the form of the escrow agreement differs in certain respects from schedule 14 of the ESA.

19.     In the escrow agreement, Pulse is referred to as *"Company A"*, and Powin as *"Company B"*.

20.     Section 4 of the escrow agreement as entered into by the parties provides that

> *"<u>Distribution of Escrow Property.</u>*
> *"The Escrow Agent shall hold the Escrow Property in its possession until instructed hereunder to deliver the Escrow Property or any specified portion thereof in accordance with the ESA either by (i) delivery of a written release notice signed jointly by an Authorized Person of Company A and Company B substantially in the form of Schedule C hereto or (ii) delivery of a written release notice signed by an Authorised Person of Company A specifying that one or more events have occurred that entitle it to receive the applicable Escrow Property, in substantially the form of Schedule D hereto. …"*

21.     Note that this wording is different to the wording of section 4 as contained in schedule 14: schedule 14 of the ESA does not refer to the second possibility (beginning *"(ii) delivery of a written release …"*) notwithstanding the fact that the schedule 14 form did incorporate the schedule D form of written instruction.  In those circumstances the form of the escrow agreement as entered into by the parties is the governing document, rather than a draft document that the parties did not enter into (albeit a part of the ESA that they did enter into).

22.     For the purposes of section 4 of the escrow agreement the *"events"* that entitle Company A (Pulse) to receive the applicable Escrow Property are those sets of circumstances listed in clause 3.2.7 of the ESA.  There are four such sets of circumstances identified as clause 3.2.7(a) to (d): see below.

23.     Schedule D of the escrow agreement is a simple statement to be made by Company A (Pulse) in the following terms:

> *"Re: Escrow Account No._____ Ladies and Gentlemen:*
>
> *"We refer to the Escrow Agreement dated _____ (the 'Agreement') among*
>
> *"_____ ('Company A') and _____ ('Company B') and HSBC Bank USA NA (the 'Escrow Agent') ....*
>
> *"Company A hereby represents, in accordance with the terms and provisions of Section 4 of the Agreement, that the following circumstance has occurred which warrants the delivery of Escrow Property:*
>
> *"[INSERT STATEMENT]*
>
> *"Based on the foregoing, Company A hereby directs the Escrow Agent to release the Escrow Property from the above captioned Escrow Account with a value in the aggregate equal to $ _____, to the fed wire instructions below: ...."*

24.   Clause 3.2.7 of the ESA entitled the Employer to make a unilateral demand for payment under the Security Escrow Agreement in the event of any of the four sets of circumstances there listed.  The events listed in clause 3.2.7 are as follows:

> *"(a)   failure by the Contractor to pay the Employer an amount due for which the Contractor is liable to pay the Employer under or in connection with the Contract;*
>
> *"(b)   any loss, damages and/or expenses (including legal fees and expenses) incurred or suffered by the Employer as a result of any default or breach of contract by the Contractor;*
>
> *"(c)   any circumstances which entitle the Employer to termination under Clause 12.2 (Termination by Employer), irrespective of whether notice of termination has been given; or*
>
> *"(d)   the Employer becoming entitled to deduct or recover Delay Liquidated Damages, and/or a Recovery Payment."*

25.   It is my understanding that in practice all of the four circumstances listed in clause 3.2.7(a) to (d) have occurred:

(1)  Circumstances have occurred which entitle the Employer to terminate: clause 3.2.7(c).

(2)  In addition I am instructed that the Contractor was late in performing its obligations, so that the Employer became entitled to deduct or recover delay liquidated damages: clause 3.2.7(d).

(3)  Presumably the Employer has suffered loss, damages and/or expenses as a result of default or breach of contract by the Employer: clause 3.2.7(b).

(4)  Presumably clause 3.2.7(a) also applies.

26.  The Employer's entitlement to make a claim under clause 3.2.7 is expressed to be

   *"Without prejudice to any other rights or remedies which the Employer may have against the Contractor under the Contract …"*

27.  I read this provision as meaning that the Employer's remedy in the event of e.g. breach of contract on the part of the Contractor is not limited to the right to make a claim for payment from the escrow agreement.

28.  That is a statement of the obvious although it is understandable why the parties should include such provision. As set out below, clause 3.2.7 is concerned with security, not compensation.

**Issues arising**

29.  Pulse has made an application in the US bankruptcy court (*"motion of Pulse Clean Energy SPV Watt Limited for relief from the automatic stay and authorizing actions consistent therewith"*) in order to allow Pulse to demand and receive the return of amounts in the escrow account.

30.  The Trust is resisting Pulse's application on various grounds.

31.     By a document filed in the proceedings in New Jersey entitled *"Trust's objection to motion of Pulse Clean Energy SPV Watt Limited for relief from the automatic stay and authorizing actions consistent therewith"*, the trust objects to the relief sought by Pulse. I refer to this document as the *"objection to motion"*.  References herein to numbered paragraphs are references to the numbered paragraphs of the objection to motion save where indicated otherwise.

32.     At paragraph 6, the Trust asserts that

(1)     the parties rights are governed by the ESA;

(2)     the ESA is subject to English law.

33.     Then at paragraph 7, the Trust observes that Pulse has

> *"not provided any information regarding the Parties' respective interests in the Escrow Property under English Law"*.

34.     It is in those circumstances that I have been instructed to provide advice as an independent member of the Bar of England and Wales, qualified in English law, in case the court believes that the consideration of English law is required.

35.     The Trust goes on to set out a number of points against the Employer's application for the release of funds from the escrow account.  In summary, at the risk of not doing justice to the detail of the Trust's argument, the Trust's case is as follows:

(1)     The money paid into escrow is Powin's, not Pulse's.  See paragraphs 9-14.

(2)     Pulse's claim to payment of money in escrow is contingent upon Pulse establishing its entitlement to compensatory damages; see paragraphs 17-18. Pulse has not established any such entitlement.  See paragraphs 28-30.  At paragraph 29, the Trust refers to the process for determining the termination account at clause 12.4.

(3)     Pulse must set out and establish its entitlement to compensation both in principle and as to amount before it can make a claim on the escrow; see paragraphs 3-5 and 28-30.

(4)     Pulse cannot be entitled both to compensation and payment of the money in escrow.   Were the position otherwise the escrow provisions would be unenforceable under New York law as being penal; see paragraphs 24-27.

36.     In this context I have been asked by Eversheds Sutherland (International) LLP to advise upon the following specific questions:

1.  **According to the terms of the ESA, when does Powin become entitled to receive the funds held in Escrow [para 9, 10]?**
2.  **What is the mechanism in the ESA for the release of the funds held in the Escrow Account [paras 19-25]?**
3.  **Does the ESA provide that Pulse must establish it has actual damages resulting from the Debtor's breach prior to drawing down on the Escrow [paras 3, 15]?**
4.  **Does the ESA provide that Pulse must determine its entitlement to payment at termination (section 12.4 of the ESA) and/or valuation at date of termination (section 12.3) prior to drawing down on the Escrow [paras 28-30]?**
5.  **Are the liquidated damages a penalty under English law [paras 26-27]?**

**Overview**

37.     I believe that the arrangement is relatively straightforward.

38.     Pulse required security against non-performance on the part of Powin.   The parties agreed that that security would take the form of money paid into an escrow account, to be taken from sums that would otherwise (i.e. but for the agreement for this escrow arrangement) be due to be paid by Pulse to Powin, and to be paid to Pulse in the agreed circumstances as set out in the ESA.

39.     The money paid into escrow is security against non-performance on the part of Powin. The security is not itself compensation.   Nor does it cap, limit, define or measure Pulse's entitlement to compensation.   It is a secure fund, to be paid to Pulse in the agreed circumstances, as security in respect of Pulse's entitlement to compensation from Powin.

40.     The position is analogous to other forms of security for non-performance.

8

41.   I acknowledge that the difficulty with using other forms of security as analogy is that there may be good reason why parties use one form of security in preference to another. The parties have agreed this form of security, not those other forms. Some caution must therefore be exercised.

42.   However it is potentially informative to consider how other forms of security operate.

43.   Typically security against non-performance might take one of two forms:

       (1)    a performance bond of some kind, e.g. an on-demand performance bond;

       (2)    the retention by the paying party of a part of sums otherwise due to be paid; such retention might simply be held by the paying party or paid into a separate account, held in trust and/or (as here) paid into an escrow.

44.   The simplest form of security is the case where the employer under a construction contract simply retains a percentage of sums due to the contractor, typically 5% or 2.5% of the value of completed work until practical completion or until the final account. Such an arrangement is typical for some of the forms of contract most commonly used for domestic projects in the UK, e.g. certain JCT forms and NEC option X16. (Note: the ESA also incorporates provision for a *"Punch List Holdbank Amount"*, being *"100% of the estimated cost to complete the items listed in the Punch List"*. See the relevant defined term and clause 7.5.2. But the comparison I am making here is with an ordinary retention calculated as a percentage of value executed.)

45.   The purpose of such retention is to provide security to the employer in respect of any claims that it might have in respect of defects not manifest at the time of payment and/or snagging.

46.   In such a case, where there is no requirement to pay the money into a separate account, the employer is absolutely entitled to retain that money even though earned by the contractor.

47.    There is no requirement in such a case that the employer demonstrate that it has or that it might have claims against the contractor, or as to the amount of such claims. If the employer does have claims for defects and such claims are significantly lower in value than the sum retained in this way that does not result in any kind of adjustment to the sum retained. Similarly if there were no defects that would not have any impact upon the calculation of retention which is determined by the terms of the contract.

48.    The sums retained are not required to be any kind of pre-estimate of the cost of defects or to track or match the contractor's liability for defects. It is just a sum of money acting as security in respect of such claims. The amount of the sum is what the parties have agreed (e.g. 5% of sums otherwise due). If the sum does correspond with the contractor's liability for defects that would be nothing more than a coincidence and a bizarre one at that.

49.    However at the final account stage

(1)    the employer would no longer have any entitlement to retain the retention sums as such;

(2)    it would be necessary to carry out a reconciliation or credits and debits as between the two parties;

(3)    any money still held as retention would at that point be a credit to the contractor in the calculation of the final payment;

(4)    if there were defects that the employer had had to remedy or that the employer was left to remedy they would diminish the contractor's entitlement to final payment.

50.    That is the most straightforward form of security for the benefit of the employer against non-performance on the part of the contractor.

51.   In this case the retention money is not held by the Employer (Pulse), but instead

    (1)   the money is paid into escrow for the time being;

    (2)   the money is to be paid back to the Employer from escrow in those specific
circumstances that the parties have agreed (so that at that point, but not
otherwise, the Employer will be put into the position of an employer who has
simply retained payment).

52.   Such an arrangement is therefore far more generous to the Contractor.  But the principle
is the same.

53.   As a result of the escrow account arrangement, unless and until the circumstances occur
that entitle the Employer to claim payment, the retained sum is not merged with the
Employer's other funds.  It cannot be used by the Employer for its own general
purposes; moreover if the Employer were to become insolvent the Employer's other
creditors would not have any claim on such money.

54.   By being paid into escrow the money is held at one remove from the Employer's other
accounts or funds.  However: the Employer has an immediate and unqualified
entitlement to be paid that money in those circumstances expressly agreed by the
parties.  If the circumstances do not arise the Employer has no such claim, if they do
the Employer does.  Whether the circumstances have arisen is simply a matter of
construing the list of circumstances contained in clause 3.2.7.

55.   At paragraph 12, the Trust advances the following argument:

> *"Powin is entitled to the residuum of the Escrow Property after Pulse's
> damages claim under the ESA have been determined and paid.  See ESA
> section 3.2.7.*
>
> *"Indeed this is the only sensical interpretation of the ESA and the
> Payment Schedule – the intention was that Powin would acquire title to
> the underlying funds when earned at the applicable milestone payment,
> notwithstanding that it would be diverted to the Escrow Account and
> would serve as security for Pulse.*

> *"Otherwise, there would be no purpose in diverting the funds to the Escrow Account, Pulse could have just withheld the funds ..."*

56.    This argument is incorrect.

57.    Nothing in the wording of clause 3.2.7 supports the first sentence quoted above (*"Powin is entitled to the residuum ...etc.  See ESA section 3.2.7"*) or comes close to doing so. Clause 3.2.7 provides only for payment to Employer; so far as I am aware the reference to Powin's entitlement to *"the residuum"* is something that the Trust has added.  In this context I note that the Trust does not identify where that provision is found in clause 3.2.7 and/or what wording in clause 3.2.7 is said to support such an outcome.

58.    The parties' entitlement to be paid the money held in escrow is as set out in the ESA. In the four set of circumstances listed in clause 3.2.7(a) to (d), the Employer is entitled to demand payment.

59.    If none of those circumstances arises (or the circumstances arise but no demand is made by the Employer) then the Contractor becomes entitled to payment in accordance with clause 3.2.4 in the circumstances there described.

60.    There is no need to add some sort of gloss or interpretation: the meaning of the ESA is clear from its express wording.

61.    As for the last sentence of paragraph 12 quoted above (underlined text: *"Otherwise, there would be no purpose etc"*): as indicated above of course there is a difference between:

(1)     an employer withholding funds; and

(2)     an employer paying the same retained money into an escrow account.

62.    As set out above, the differences are *inter alia* as follows:

(1)     Where the money is paid into escrow the retention money is not merged with the employer's other funds as would be the case where the employer simply keeps it.  The retained sum is therefore protected from the claims of other creditors against the employer.  That is obviously significant in the event that the employer itself becomes insolvent and/or is subject to any kind of formal insolvency process.

(2)     The contractor can be confident that the employer has the sum available even if the contractor is not yet entitled to receive it: because the money has already been paid into a separate account.  Conversely the employer cannot use that money for investment in other projects, or rely upon raising the money at some future date from other projects about which the contractor knows nothing.

(3)     If and when the contractor becomes entitled to payment of the retained amount it can be reasonably confident that there will be no delay in payment, because the money has been set aside specifically in order to be deployed in this way.

63.    The second analogy to consider is an on demand performance bond.

64.    Such a bond acts as security for the employer's claims arising in the event of the contractor's default.  However the circumstances in which the bondsman must pay the security are as defined (1) in the bond and/or (2) the underlying contract requiring providing for the performance bond.  Subject to express terms providing for something different, in the case of an on demand bond there is no additional requirement that the employer either demonstrate or indeed formulate the amount of any claim.  Indeed in many situations, e.g. where the contractor abandons the site, the party making the call on the bond may well have no way of calculating or estimating its losses as at the time of the call.

65.    One would need to consider the form of demand and exactly what information the employer was required to provide.  However in principle an on demand bond does not involve, permit or require any kind of inquiry into quantum.  In the event that sums paid out in response to such a demand exceed any losses then of course the employer would

13

in such a case be obliged to give credit for such amount.  The position is to be contrasted with a default bond where the employer must establish breach and amount.  It is not difficult to tell the two types of instrument apart because the different types of bond will specify in express terms precisely what information is required and/or in what circumstances a call may be made.

66.    I would also add that the agreed form for making a call on an on demand bond will typically be in equivalent terms to the wording of schedule D of the escrow agreement.

67.    As indicated caution must be exercised when considering analogies with other forms of security.  Nonetheless the key points are these:

(1)    Security for performance is not the same as compensation for non-performance. They are related because the ultimate purpose of the security is to fund (that is to say: to provide security for) compensation in the event of non-performance. But the amount of security and/or the circumstances in which it is to be provided or paid to the employer are governed by the terms of the parties' agreement, not by the employer's entitlement to compensation.

(2)    It makes perfect commercial sense for security to be provided and/or paid to the employer in an amount that differs from (and, in theory, it may be exceeds) the employer's entitlement to compensation at any one time.  Indeed in practice that will invariably be the case because the parties' ultimate obligations, indebtedness and/or entitlements owed to one another can only be determined over a relatively drawn out period, whereas the employer's requirement for and/or entitlement to security is likely to be immediate.

68.    In my mind, no doubt influenced by my extensive experience of construction contracts entered into in England and Wales, payment by the employer of retention money into escrow is simply a superior version of the employer keeping such funds and one considerably more beneficial to the contractor.  The two arrangements are the same, save that by the use of an escrow account the contractor has considerable protection against *inter alia* employer insolvency.  However upon the occurrence of those

circumstances agreed by the parties the money in escrow is paid to the employer (in this case Pulse) i.e. the contractor loses the benefit of the additional protection provided by the use of an escrow account.

69.    In addition it goes without saying that in determining the parties' rights and obligations owed to one another under English law the actual wording of their agreement is likely to be of paramount importance.  The wording in this case is clear.  Of course that wording must be construed in context.  However:

(1)    So far as I am aware the context here is apparent from the wording of the ESA: Pulse as the paying party required security for performance (i.e. security against the possibility of non-performance on the part of Powin).  The parties agreed that the form that that security would take was an amount of money (the amount determined in accordance with the terms of the ESA) to be paid into escrow, and to be paid out of escrow in those circumstances agreed by the parties.  But that is not really context so much as simply what the parties have agreed.

(2)    So far as I am aware there is no other factual context that would have some material impact upon the natural and obvious meaning of the words.  In any event none is identified by the Trust.

70.    Clause 3.2.7 provides that the in the circumstances listed in paragraphs (a), (b), (c) and (d) the Employer

*"shall be entitled to make a unilateral demand for payment"*.

If those circumstances arise then the money held in escrow becomes the Employer's.

71.    I do not believe that any other construction of clause 3.2.7 is possible.  If the intention were that the Employer's entitlement to make a claim was subject to proof as to the amount then the provision would have needed to have said so.

72.    Moreover that is consistent with the clear objective of the escrow account:

   (1)  The purpose of the escrow account is to provide immediate and enforceable security for the Employer's entitlement.

   (2)  The escrow account is in place of performance security such as an on demand performance bond.

73.  I would also add that my reading of clause 3.2.7 is entirely consistent with the wording of the parties' escrow agreement (1) as executed and/or (2) as contemplated in schedule 14 of the ESA.  I refer in particular to the form of schedule D *"Form Company A Written Instruction"*.  As indicated above this is the equivalent to the form of demand that parties typically agree where the security takes the form of an on demand bond.  The only requirement is a statement by Company A (Pulse) that one of the circumstances (the be identified in the form) has occurred *"which warrants the delivery of Escrow Property"*.

74.  So far as I can see the Trust makes no reference to schedule D in its objection to motion.  However I am not sure how one can have any sensible debate about

   (1)  what Pulse must do or what it must establish in order to make a demand;

   (2)  the circumstances in which money is to be paid from escrow to Pulse;

without considering this document since it is the form of document agreed by the parties setting out what Pulse is required to say or represent in order to obtain money.

75.  By way of example: at paragraph 3 the Trust asserts that

      *"Prior to drawing down on the Escrow, Pulse must establish that it has actual damages resulting from the Debtors' breach"*

76.  It is impossible to reconcile that statement with the emphatic wording of clause 3.2.7 or the form of schedule D.

77. My reading of the ESA is further supported by the wording of the individual paragraphs of clause 3.2.7. The key thrust of the Trust's argument is that prior to making a claim against the money in escrow, Pulse must establish the amount of its entitlement. In paragraph 29 it refers to the process set out in the ESA for determining the termination account.

78. However:

(1) There is no reference to any of those provisions within clause 3.2.7(c).

(2) Instead the triggering event is *"any circumstances which entitle the Employer to terminate ... <u>irrespective of whether notice of termination has been given</u>"*.

79. In those circumstances it is surely clear beyond argument that the entitlement to claim payment from escrow will arise long before the termination account process has concluded or even started. Pulse is entitled to claim payment (i.e. to submit a claim in the form at schedule D) not once the termination account has been resolved, or even upon termination: but upon the occurrence of those circumstances that entitle the Employer to terminate.

80. I turn now to the specific questions asked of me.

> 1. **According to the terms of the ESA, when does Powin become entitled to receive the funds held in Escrow [para 9, 10]?**
> 2. **What is the mechanism in the ESA for the release of the funds held in the Escrow Account [paras 19-25]?**

81. See my overview above. Powin becomes entitled to receive the funds in the circumstances set out in clause 3.2.7 and the escrow agreement.

82. Once Powin makes a demand in accordance with clause 3.2.7 it becomes entitled to payment.

> 3. **Does the ESA provide that Pulse must establish it has actual damages resulting from the Debtor's breach prior to drawing down on the Escrow [para 3, 15]?**

    **4.   Does the ESA provide that Pulse must determine its entitlement to payment at termination (section 12.4 of the ESA) and/or valuation at date of termination (section 12.3) prior to drawing down on the Escrow [paras 28-30]?**

83.    See my analysis above.

84.    There is no requirement for Pulse to establish the amount of its claim.  Such a reading is not supported by the wording of clause 3.2.7.  Indeed such a reading is inconsistent with the wording of that clause.  It is also directly inconsistent with the form of demand agreed in schedule D of the escrow agreement.

    **5.   Are the liquidated damages a penalty under English law [paras 26-27]?**

85.    In the objection to motion the Trust has argued that the provision would constitute a penalty clause under New York law if the Employer were entitled to be paid the entirety of the funds in escrow and also compensation.  See in particular paragraph 24.

86.    As such, the Trust argues, the arrangement would be unenforceable.  The Trust's contention in contrast is that the Employer's entitlement to payment from the escrow account is limited to such compensation as it first establishes.

87.    I have no qualifications in New York law and therefore do not attempt to advise upon it.  Similarly I have no experience of the New York courts or their approach to such issues.  In the circumstances I do not attempt to advise whether the court in New York would be obliged to consider the issue:

    (1)    exclusively by reference to English law, as being the law of the contract; or

    (2)    by reference to both English law and also the law of New York as the jurisdiction where the contract is being enforced.

In the circumstances I confine myself to the proper construction and application of the contract under English law.

88. So far as English law is concerned, penalty clauses were considered in *Cavendish Square Holding BV v Makdessi* [2015] UKSC 67. The test set out in that seminal decision of the Supreme Court of England and Wales (at [32]) is whether the clause is

> *"out of all proportion to any legitimate interest of the innocent party".*

89. However for the reasons set out above this test has no application here:

   (1) Security such as retention money paid into escrow is not intended to be and does not act as compensation.

   (2) The payment of funds from escrow to the Employer is not to compensate the Employer for its losses but to put the Employer in funds.

   (3) As is clear from the wording of clause 3.2.7 (and in paragraph 3.2.7(c)) the sequence will be:

      (a) default event of the kind listed in clause 3.2.7;

      (b) claim by Pulse in the form set out in schedule D of the escrow agreement;

      (c) payment out to Pulse from escrow.

   (4) There will then subsequently be:

      (a) final determination of the parties' respective rights and obligations: in the case of termination this would mean the resolution of the termination account in accordance with clause 12.4, either by agreement and/or if necessary by formal proceedings;

      (b) payment of any sum found to be outstanding pursuant to the concluded termination account; such payment might in theory be payment by Pulse to Powin or from Powin to Pulse.

19

90.     In crude terms a penalty clause is a provision that requires the party in default to pay an agreed amount of compensation that in some way does not correspond with the innocent party's loss. The *Cavendish* decision was concerned with where the line should be drawn and/or how the court should determine which side of the line a clause providing for compensation should fall.

91.     In this context it will be appreciated that the escrow account and clause 3.2.7 are not arrangements governing:

(1)     the payment of compensation to the Employer; and/or

(2)     the evaluation of the Employer's losses.

92.     The purpose of the escrow account is to ensure that the Employer has security i.e. protection against the possibility of default on the part of the Contractor. The form that the security takes is a fund independent of and separate from the assets of the Contractor, to be paid to the Employer in the event that any of the circumstances listed in clause 3.2.7 occurs.

93.     Clause 3.2.7 does not determine or fix the amount of compensation to be paid: that is irrelevant to its purpose. Nor does it purport to override or modify the underlying rights and obligations of the parties which are set out elsewhere in the contract and/or at common law. The amount of money owed by one party to the other under the ESA is unaffected by the provisions and operation of clause 3.2.7.

94.     In those circumstances it is immediately apparent that the analysis of penalty clauses has no application.

95.     The mechanism by which it does that is to provide that a sum of money is held in a separate account.

96.    It goes without saying that once the termination account has been concluded the Employer has to pay any outstanding sums.

97.    So far as I am aware there is no possibility of the Employer ending up with a windfall or receiving compensation that exceeds its actual loss.

98.    By way of example: there is no suggestion or even hint in clause 3.2.7 that the compensation that the Employer is to receive in delay liquidated damages in the event of delay should be greater than provided for elsewhere.

99.    As set out above the position under clause 3.2.7 can be compared with other situations where some security or other protection is provided against non-performance such as ordinary retention or an on demand performance bond.

100.    No one would suggest that the agreed retention of funds under such a contract was in any sense a penalty merely because the amount of the fund at any one time exceeded the likely costs of remedial work or because the employer was (on a temporary basis) holding more money than in the final account it would be entitled to keep.

101.    The position is the same here save that the money is held in escrow and paid to the Employer if any of the circumstances in clause 3.2.7 arise.

**17 February 2026**

**JUSTIN MORT KC**

**Keating Chambers,**
**15 Essex Street,**
**London WC2R 3AA**